No. 24-2109

# United States Court of Appeals

*for the*

# Fourth Circuit

MICHAEL N. HERLIHY; ANN HERLIHY;
THE ESTATE OF PETER L. BERGRUD,

*Claimants-Appellants,*

– v. –

DBMP, LLC,

*Debtor-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NORTH CAROLINA, CHARLOTTE DIVISION

## JOINT APPENDIX
## Volume 1 of 3 (Pages JA1 to JA606)


JONATHAN RUCKDESCHEL
THE RUCKDESCHEL LAW FIRM, LLC
8357 Main Street
Ellicott City, Maryland 21043
(410) 750-7825
rucklawfirm@rucklawfirm.com

THOMAS W. WALDREP, JR.
CHRIS W. HAAF
DIANA S. JOHNSON
WALDREP WALL BABCOCK & BAILEY PLLC
370 Knollwood Street, Suite 600
Winston-Salem, North Carolina 27103
(336) 722-6300
twaldrep@waldrepwall.com
chaaf@waldrepwall.com
dsantosjohnson@waldrepwall.com

*Counsel for Claimants-Appellants*


*(For Continuation of Appearances See Inside Cover)*


COUNSEL PRESS (800) 4-APPEAL • (JOB 811477)

JOHN L. STEFFAN
MAUNE RAICHLE HARTLEY FRENCH
& MUDD, LLC
1015 Locust Street, Suite 1200
St. Louis, Missouri 63101
(314) 320-9643
jsteffan@mrhfmlaw.com

CLAYTON L. THOMPSON
MAUNE RAICHLE HARTLEY FRENCH
& MUDD, LLC
150 West 30th Street, Suite 201
New York, New York 10001
(314) 241-2003
cthompson@mrhfmlaw.com

*Counsel for Claimants-Appellants*

GARLAND S. CASSADA
RICHARD C. WORF
ROBINSON BRADSHAW
& HINSON, P.A.
101 North Tryon Street, Suite 1900
Charlotte, North Carolina 28246
(704) 377-2536
gcassada@robinsonbradshaw.com
rworf@robinsonbradshaw.com

JEFFREY B. ELLMAN
JONES DAY
1221 Peachtree Street, N.E.,
Suite 400
Atlanta, Georgia 30361
(404) 521-3939
jbellman@jonesday.com

GREGORY M. GORDON
JONES DAY
2727 North Harwood Street,
Suite 500
Dallas, Texas 75201
(214) 220-3939
gmgordon@jonesday.com

C. KEVIN MARSHALL
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
(202) 879-3939
ckmarshall@jonesday.com

SARAH E. WELCH
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
(216) 586-3939
swelch@jonesday.com

*Counsel for Debtor-Appellee*

**TABLE OF CONTENTS**

**District Court Case No. 3:24-cv-00558**

**VOLUME ONE**

District Court Docket Sheet ........ JA1

Motion to Consolidate Related Appeals
Filed July 16, 2024 ........ JA6

Brief of Appellants
Filed August 19, 2024 ........ JA12

Appendix to Appellants' Brief
Filed August 19, 2024 ........ JA52

Document 1 - Voluntary Petition Under Chapter 11
Filed January 23, 2020 ........ JA58

Document 22 - Informational Brief of DBMP LLC
Filed January 23, 2020 ........ JA76

Document 24 - Declaration of Robert J. Panaro
Filed January 23, 2020 ........ JA110

Document 614 - Motion of the Official Committee to Asbestos Personal Injury Claimants to Lift Stay
Filed January 31, 2021 ........ JA161

Document 656 - Debtor's Objection to Motion of the Official Committee of Asbestos Personal Injury Claimant's to Lift Stay
Filed January 13, 2021 ........ JA192

Document 972 - Findings of Fact and Conclusions of Law
Filed August 11, 2021 ........ JA218

Document 2753 - The Estate of Peter L. Bergrud's Motion for Relief from the Automatic Stay
Filed April 18, 2024 ........ JA297

Document 2757 - Exhibits to the Estate of Peter L. Bergrud's Motion for Relief from the Automatic Stay
Filed April 18, 2024

Exhibit 1 - Transcript of Proceedings Before Hon. J. Craig Whitley
Heard March 30, 2024 .................................................... JA335

Exhibit 2 - Transcript of Proceedings Before Hon. Laura Turner Beyer
Heard October 19, 2023 .................................................... JA344

Exhibit 3 - Transcript pf Proceedings Before Hon. Laura Turner Beyer
Heard January 18, 2024 .................................................... JA350

Exhibit 4 - Bergrud Medical Records
Filed August 19, 2024 .................................................... JA357

Exhibit 5 - Deposition of Leon David Horowitz
Filed April 18, 2024 .................................................... JA361

Exhibit 6 - Video Deposition of Lloyd C. Ambler
Filed August 19, 2024 .................................................... JA373

Exhibit 7 - Videotaped Discovery Deposition of Lloyd Ambler
Taken August 20, 2014.................................................... JA378

Exhibit 8 - Videotaped Deposition of Lloyd Ambler, Vol. 2
Filed April 18, 2024 .................................................... JA382

Exhibit 9 - Video Deposition of Juan Bergrud
Taken October 15, 2019 .................................................... JA387

Exhibit 10 - Discovery Deposition of Juan Bergrud, Vol. 2
Taken October 16, 2019 .................................................... JA398

Exhibit 11 - Discovery Deposition of Richard Trumbull
Taken November 18, 2019 .................................................... JA407

Exhibit 12 - Dr. Brodkin Medical Evaluation Report of Peter Bergrud
Filed April 18, 2024 .................................................... JA416

Exhibit 13 - Report of Dr. Christopher DePasquale, Re. Peter Bergrud Dated February 19, 2020
Filed April 18, 2024 .......................................................... JA424

Exhibit 14 - Complaint For Personal Injury
Filed April 9, 2019 .......................................................... JA428

Exhibit 15 - Consolidated Financial Statements, Dec. 31, 2023
Filed April 18, 2024 .......................................................... JA435

Document 2755 - Michael and Ann Herlihy's Motion for Relief From the Automatic Stay
File April 18, 2024 .......................................................... JA439

Document 2755-1 - Exhibits to Michael and Ann Herlihy's Motion for Relief From the Automatic Stay

Exhibit 1 - Transcript of Proceedings Before Hon. J. Craig Whitley
Heard March 30, 2023 .......................................................... JA477

Exhibit 2 - Transcript of Proceedings Before Hon. Laura Turner Beyer
Heard October 19, 2023 .......................................................... JA486

Exhibit 3 - Transcript of Proceedings Before Hon. Laura Turner Beyer
Heard January 18, 2024 .......................................................... JA492

**VOLUME TWO**

Exhibit 4 - Surgical Pathology Report of Michael Herlihy
Filed April 18, 2024 .......................................................... JA499

Exhibit 5 - Complaint for Personal Injury and Loss of Consortium
Filed August 4, 2023 .......................................................... JA501

Exhibit 6 - Order to Show Cause
Executed January 26, 2024 .......................................................... JA531

Exhibit 7 - Videotaped Discovery Deposition of Lloyd Ambler
Taken August 20, 2014 .......................................................... JA536

Exhibit 8 - Deposition of Leon David Horowitz
Taken June 30, 1980 ........ JA540

Exhibit 9 - Videotaped Deposition of Lloyd C. Ambler, Vol. 1
Filed April 18, 2024 ........ JA552

Exhibit 10 - Videotaped Deposition of Lloyd C. Ambler, Vol. 2
Filed April 18, 2024 ........ JA557

Exhibit 11 - Videotaped Deposition of Michael Herlihy
Taken October 20, 2023 ........ JA562

Exhibit 12 - Deposition of Michael Herlihy, Vol. 3
Taken November 3, 2023 ........ JA573

Exhibit 13 - Consolidated Financial Statements, December 31, 2023
Filed April 18, 2024 ........ JA580

Document 2777 - Debtor's Omnibus Objection to the Estate of Bergrud and Herlihy Motions from Relief of Automatic Stay
Filed May 2, 2024 ........ JA584

Exhibit 1 - Excerpt of Bestwall LLC, Chapter 11 Transcript
Heard September 22, 2023 ........ JA606

Document 2779 - Statement of the Official Committee of Asbestos Personal Injury Claimants in Support of Claimants' Motions for Relief from Automatic Stay
Filed May 2, 2024 ........ JA612

Document 2782 - The Estate of Peter Bergrud's and Michael and Ann Herlihy's Omnibus Reply in Support of Motions for Relief from the Automatic Stay
Filed May 6, 2024 ........ JA616

Document 2808 - Order Denying Motion of the Estate of Michael and Ann Herlihy for Relief of the Automatic Stay
Filed May 28, 2024 ........ JA625

Document 2809 - Order Denying Motion of the Estate Peter Bergrud for Relief of the Automatic Stay
Filed May 28, 2024 .......... JA627

Document 2820 - Notice of Appeal of Order Denying Michael and Ann Herlihy Motion for Relief of the Automatic Stay
Filed June 11, 2024.......... JA629

Exhibit A - Order Denying Herlihy Motion to Lift Stay
Filed May 28, 2024 .......... JA633

Document 2821 - Notice of Appeal of Order Denying Motion of the Estate of Peter Bergrud for the Relief from the Automatic Stay
Filed June 11, 2024.......... JA634

Exhibit A - Order Denying Motion of the Estate of Peter Berdrud for Relief from the Automatic Stay
Filed May 28, 2024 .......... JA638

Transcript of Proceedings Before Hon. Laura Turner Beyer
Heard January 18, 2024.......... JA641

Transcript of Proceedings Before Hon. Laura Turner Beyer
Heard March 28, 2024.......... JA733

Transcript of Proceedings Before Hon. J. Craig Whitley
Heard May 9, 2024.......... JA825

Transcript of Proceedings Before Hon. J. Craig Whitley
Heard May 23, 2024.......... JA904

**VOLUME THREE**

Brief for Appellee
Filed September 18, 2024.......... JA1048

Reply Brief of Appellants
Filed October 2, 2024 .......... JA1114

Transcript of Proceedings Before the Hon. Kenneth D. Bell
Heard October 24, 2024 .......... JA1133

Order on Appellant's Motion for Relief
Filed October 28, 2024 .......... JA1186

Notice of Appeal
Filed October 29, 2024 .......... JA1197

Exhibit A - Order Denying Appellants Motion for Relief from the Automatic Stay
Filed October 28, 2024 .......... JA1201

**United States Bankruptcy Court**
**Western District of North Carolina**
**Charlotte Division, Case No. 20-30080**

Stipulation and Agreed Order Modifying the Automatic Stay
Filed October 26, 2020 .......... JA1213

Transcript of Proceedings Before the Hon. J. Craig Whitley
Filed October 18, 2021
Heard October 14, 2021 .......... JA1218

Order Authorizing Estimation of Current and Future Mesothelioma Claims
Filed October 21, 2021 .......... JA1312

Stipulation Between Debtor and Certainteed LLC Regarding Second Amended Funding Agreement
Filed January 5, 2022 .......... JA1315

Transcript of Proceedings Before the Hon. J. Craig Whitley
Filed January 10, 2022
Heard January 6, 2022 .......... JA1359

Query Reports Utilities Help Log Out

APPEAL,BKAPPEAL,CLOSED,CONSOLIDATED

# U.S. District Court
# Western District of North Carolina (Charlotte)
# CIVIL DOCKET FOR CASE #: 3:24-cv-00558-KDB

Herlihy v. DBMP LLC
Assigned to: District Judge Kenneth D. Bell
Case in other court: US Bankruptcy - NC - Western, 20-30080
4th Circuit, 24-02109
Cause: 28:0158 Bankruptcy Appeal from Judgment/Order

Date Filed: 06/11/2024
Date Terminated: 10/28/2024
Jury Demand: None
Nature of Suit: 422 Bankruptcy Appeal (801)
Jurisdiction: Federal Question

**Appellant**

**Michael N. Herlihy** represented by

**Chris W Haaf**
Waldrep Wall Babcock & Bailey PLLC
370 Knollwood Street
Suite 600
Winston-Salem, NC 27103
336-717-1309
Email: chaaf@waldrepwall.com
*ATTORNEY TO BE NOTICED*

**Clayton L. Thompson**
Clay Thompson
Mrhfm
150 W 30th Street
Suite 201
NY
New York, NY 10001
314-241-2003
Email: cthompson@mrhfmlaw.com
*ATTORNEY TO BE NOTICED*

**John Louis Steffan , IV**
Maune Raichle Hartley French & Mudd LLC
1015 Locust Street
Suite 1200
St. Louis, MO 63101
314-320-9643
Email: jsteffan@mrhfmlaw.com
*ATTORNEY TO BE NOTICED*

**Jonathan Ruckdeschel**
Jonathan Ruckdeschel
8357 Main Street
Ellicott City, MD 21043
410-750-7825

Email: ruck@rucklawfirm.com
*ATTORNEY TO BE NOTICED*

**Thomas William Waldrep , Jr.**
Waldrep Wall Babcock & Bailey PLLC
1076 West Fourth Street
Winston-Salem, NC 27101
336-722-6300
Fax: 336-717-1340
Email: notice@waldrepwall.com
*ATTORNEY TO BE NOTICED*

**Appellant**

**Ann Herlihy** represented by **Chris W Haaf**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Clayton L. Thompson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Louis Steffan , IV**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jonathan Ruckdeschel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas William Waldrep , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Appellant**

**The Estate of Peter L. Bergrud**
*Consolidated Appellant* represented by **Thomas William Waldrep , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Appellee**

**DBMP LLC** represented by **C. Kevin Marshall**
Jones Day - Washington
51 Louisiana Ave., NW
Washington, DC 20001
202-879-3939
Email: ckmarshall@jonesday.com

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Garland Stuart Cassada**
Robinson, Bradshaw & Hinson, P. A.
101 North Tryon Street
Suite 1900
Charlotte, No 28246
704-377-8317
Fax: 704-373-3917
Email: gcassada@robinsonbradshaw.com
*ATTORNEY TO BE NOTICED*

**Gregory M. Gordon**
Jones Day
2727 N. Harwood
Dallas, TX 75201
214-220-3939
Fax: 214-969-5100
Email: gmgordon@jonesday.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeffrey B. Ellman**
Jones Day
1420 Peachtree Street NE
Suite 800
Atlanta, GA 30309
404-822-0918
Fax: 404-581-8330
Email: jbellman@jonesday.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/11/2024 | 1 | Notice of Appeal from Bankruptcy Court case number 20-30080, filed by Michael N. Herlihy and Ann Herlihy. (Attachments: # 1 Order re: Appeal)(CAS) Modified date filed on 6/12/2024 (ef). Modified docket text correcting names on 6/12/2024 (mdp). (Entered: 06/12/2024) |
| 06/12/2024 | | Case assigned to District Judge Kenneth D. Bell. *This is your only notice - you will not receive a separate document.*(mdp) (Entered: 06/12/2024) |
| 07/10/2024 | 2 | Bankruptcy Appeal Record Certificate of Readiness -designations of parties submitted herewith - documents to be accessed through BK ECF system (Attachments: # 1 Appellee designation)(Tran, Michael) (Entered: 07/10/2024) |
| 07/16/2024 | 3 | MOTION to Consolidate This Case with 3:24-cv-00559-KDB *The Estate of Peter L. Bergrud* by Ann Herlihy, Michael N. Herlihy. Responses due by 7/30/2024 (Attachments: # 1 Proposed Order) (Waldrep, Thomas) (Entered: 07/16/2024) |
| 07/18/2024 | | **TEXT ONLY Bankruptcy Scheduling Order. The appellant must serve and file a brief within 30 days. The appellee must serve and file a brief within 30 days after** |

| | | |
|---|---|---|
| | | **service of the appellant's brief. The appellant may serve and file a reply brief within 14 days after service of the appellee's brief. This is pursuant to Rule 8018(a) of the Federal Rules of Bankruptcy Procedure. Any extensions of time will be granted only upon a showing of good cause.** Appellant Brief due by 8/19/2024. (nvc) (Entered: 07/18/2024) |
| 07/18/2024 | | **TEXT-ONLY ORDER granting (3) Motion to Consolidate Related Appeals filed by Appellant with the consent of the Appellee in 3:24-cv-00558. All further pleadings to be electronically filed to: 3:24-cv-00558 only. Member Case: 3:24-cv-00559 to be administratively closed. So Ordered. Entered by District Judge Kenneth D. Bell on 7/18/2024. (mek)** (Entered: 07/18/2024) |
| 08/19/2024 | 4 | Appellant's BRIEF by Ann Herlihy, Michael N. Herlihy, The Estate of Peter L. Bergrud. Appellee Brief due by 9/18/2024. (Waldrep, Thomas) (Entered: 08/19/2024) |
| 08/19/2024 | 5 | Appendix by Ann Herlihy, Michael N. Herlihy, The Estate of Peter L. Bergrud. Appendix re: 4 Appellant's Brief (Waldrep, Thomas) (Entered: 08/19/2024) |
| 08/26/2024 | 6 | MOTION for Leave to Appear Pro Hac Vice as to Gregory M. Gordon Filing fee $ 300, receipt number ANCWDC-6642807. by DBMP LLC. (Cassada, Garland) (Entered: 08/26/2024) |
| 08/26/2024 | 7 | MOTION for Leave to Appear Pro Hac Vice as to Jeffrey B. Ellman Filing fee $ 300, receipt number ANCWDC-6642817. by DBMP LLC. (Cassada, Garland) (Entered: 08/26/2024) |
| 08/26/2024 | 8 | MOTION for Leave to Appear Pro Hac Vice as to C. Kevin Marshall Filing fee $ 300, receipt number ANCWDC-6642824. by DBMP LLC. (Cassada, Garland) (Entered: 08/26/2024) |
| 09/03/2024 | | **TEXT-ONLY ORDER granting 6 , 7 and 8 Motions for Leave to Appear Pro Hac Vice; Gregory M. Gordon, Jeffrey B. Ellman and C. Kevin Marshall added for DBMP LLC. Entered by District Judge Kenneth D. Bell on 9/3/2024. (mek)** (Entered: 09/03/2024) |
| 09/18/2024 | 9 | Appellee's BRIEF by DBMP LLC. Appellant Reply Brief due by 10/2/2024. (Cassada, Garland) (Entered: 09/18/2024) |
| 09/26/2024 | 10 | MOTION for Leave to Appear Pro Hac Vice as to John Louis Steffan IV Filing fee $ 300, receipt number ANCWDC-6681485. by Ann Herlihy, Michael N. Herlihy, The Estate of Peter L. Bergrud. (Waldrep, Thomas) (Entered: 09/26/2024) |
| 09/26/2024 | 11 | MOTION for Leave to Appear Pro Hac Vice as to Jonathan Ruckdeschel Filing fee $ 300, receipt number ANCWDC-6681525. by Ann Herlihy, Michael N. Herlihy, The Estate of Peter L. Bergrud. (Waldrep, Thomas) (Entered: 09/26/2024) |
| 09/27/2024 | 12 | MOTION for Leave to Appear Pro Hac Vice as to Clayton L. Thompson Filing fee $ 300, receipt number ANCWDC-6681773. by Ann Herlihy, Michael N. Herlihy, The Estate of Peter L. Bergrud. (Waldrep, Thomas) (Entered: 09/27/2024) |
| 10/02/2024 | 13 | Appellant's REPLY BRIEF by Ann Herlihy, Michael N. Herlihy, The Estate of Peter L. Bergrud. (Waldrep, Thomas) (Entered: 10/02/2024) |
| 10/03/2024 | | **TEXT-ONLY ORDER granting Appellants' 10 , 11 and 12 Motions for Leave to Appear Pro Hac Vice; Attorneys John Louis Steffan IV, Jonathan Ruckdeschel and Clayton L. Thompson added for Michael N. Herlihy, Ann Herlihy and the Estate of Peter L. Bergrud. So Ordered. Entered by District Judge Kenneth D. Bell on 10/3/2024. (mek)** (Entered: 10/03/2024) |

| | | |
|---|---|---|
| 10/15/2024 | | NOTICE of Hearing: Oral Argument on Bankruptcy Appeal set for 10/24/2024 01:30 PM in Courtroom #4B, 401 W Trade St, Charlotte, NC 28202 before District Judge Kenneth D. Bell. *This is your only notice - you will not receive a separate document.*(mek) (Entered: 10/15/2024) |
| 10/24/2024 | | Minute Entry: ARGUMENT ON BANKRUPTCY APPEAL held before District Judge Kenneth D. Bell. Order to issue. Plaintiffs attorney: Jonathan Ruckdeschel, Chris W Haaf, Clayton L. Thompson, Thomas William Waldrep, Jr.. Defendants attorney: C. Kevin Marshall, Garland Stuart Cassada. Court reporter: Cheryl Nuccio. (mek) (Entered: 10/24/2024) |
| 10/28/2024 | 14 | **ORDER: Appellants' appeal of the denial of their Motions for Relief from the Automatic Stay (DBMP Bankr. Doc. Nos. 2753, 2755) are DENIED and the Bankruptcy Court's rulings (DBMP Bankr. Doc. Nos. 2808, 2809) are AFFIRMED. The Clerk is directed to close this matter in accordance with this Order. Signed by District Judge Kenneth D. Bell on 10/28/2024. (mek)** (Entered: 10/28/2024) |
| 10/28/2024 | 15 | TRANSCRIPT of Motion Hearing held on 10/24/24 before Judge Bell. **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a *Notice of Intent to Request Redaction* and 21 calendar days to file a *Redaction Request*. If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before the 90 day deadline. After that date it may be obtained through PACER. Policy at www.ncwd.uscourts.gov** Release of Transcript Restriction set for 1/23/2025. (Reporter: Cheryl Nuccio, cheryl_nuccio@ncwd.uscourts.gov) (Entered: 10/28/2024) |
| 10/29/2024 | 16 | NOTICE OF APPEAL by Ann Herlihy, Michael N. Herlihy, The Estate of Peter L. Bergrud. Filing fee $ 605, receipt number ANCWDC-6716557. *Use this link www.ca4.uscourts.gov to retrieve 4th Circuit case opening documents, i.e. Appearance of Counsel, Docketing Statement, Disclosure Statement, and Transcript Order Form.* Note: Your Transcript Order Form must be served on the District Court as well as the Circuit Court. (Waldrep, Thomas) (Entered: 10/29/2024) |
| 10/30/2024 | 17 | Transmission of Notice of Appeal to US Court of Appeals re 16 Notice of Appeal (mek) (Entered: 10/30/2024) |
| 11/05/2024 | 18 | USCA Case Number as to Michael N. Herlihy, Ann Herlihy, The Estate of Peter L. Bergrud 24-2109 for 16 Notice of Appeal USCA Case Manager: Karen Stump. (llp) (Entered: 11/05/2024) |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 12/05/2024 15:04:46 | | | |
| **PACER Login:** | DiSaJo2005 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:24-cv-00558-KDB |
| **Billable Pages:** | 5 | **Cost:** | 0.50 |

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**3:24-CV-558-KDB**
**3:24-CV-559-KDB**

| | | |
|---|---|---|
| IN RE:<br><br>DBMP LLC,[1]<br><br>Debtor. | ) | APPEAL FROM<br>USBC WDNC<br>Case No. 3:20-30080 |
| THE ESTATE OF PETER L. BERGRUD; AND MICHAEL N. AND ANN HERLIHY<br><br>Plaintiffs-Appellants,<br><br>v.<br><br>DBMP LLC,<br><br>Defendant-Appellee. | ) | |

**MOTION TO CONSOLIDATE RELATED APPEALS**

The Estate of Peter L. Bergrud and Michael N. and Ann Herlihy (collectively, the "Appellants"), hereby move, by and through the undersigned counsel, to consolidate the above-captioned appeals (the "Appeals"), and in support of this request, respectfully state as follows:

1. The Appeals arise out of two related final orders of the Bankruptcy Court for the Western District of North Carolina (the "Bankruptcy Court"), including the *Order Denying Motion of the Estate of Peter L. Bergrud for Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362(d)* (the "Bergrud Relief from Stay Order") [Bankr. Dkt. No. 2809], which was entered on May 28, 2024, and *Order Denying Motion of Michael N. and Ann Herlihy for Relief from the Automatic*

[1] The last four digits of the Debtor's taxpayer identification number are 8817. The Debtor's address is 20 Moores Road, Malvern, Pennsylvania 19355.

*Stay Pursuant to 11 U.S.C. § 362(d)* (the "Herlihy Relief from Stay Order") (together, the "Relief from Stay Orders") [Bankr. Dkt. No. 2808], entered on May 28, 2024, in the Chapter 11 bankruptcy case of DBMP LLC (the "Debtor" or "Appellee"), case number 3:20-30080-JCW (the "Bankruptcy Case").

2. Following a hearing held on May 9, 2024, the Bergrud Relief from Stay Order denied *The Estate of Peter L. Bergrud's Motion for Relief From the Automatic Stay Pursuant to 11 U.S.C. § 362(d)* (the "Bergrud Motion") [Bankr. Dkt. Nos. 2753, 2757], consistent with the Court's oral ruling on May 23, 2024.

3. Similarly, at the hearing held on May 9, 2024, the Herlihy Relief from Stay Order denied *Michael N. and Ann Herlihy's Motion for Relief From the Automatic Stay Pursuant to 11 U.S.C. § 362(d)* (the "Herlihy Motion"; collectively the "Relief from Stay Motions") [Bankr. Dkt. No. 2755], consistent with the Court's oral ruling on May 23, 2024.

4. Appellants each timely filed a notice of appeal on June 11, 2024 [Bankr. Dkt. Nos. 2820, 2821].

5. The Relief from Stay Orders not only arise out of the same proceeding but also involve closely related, if not identical, issues. More specifically, the Relief from Stay Orders memorialize the Court's oral findings that Appellants should not be granted relief from the automatic stay as it would open the floodgates to other claimants seeking relief from stay and ultimately result in the destruction of the Debtor's bankruptcy case. The Appellants, having provided specific, individual facts, respectfully disagree.

6. Rule 8003 of the Federal Rules of Bankruptcy Procedure provides: "When parties have separately filed timely notices of appeal, the district court or BAP may join or consolidate the appeals." Fed. R. Bankr. P. 8003(b)(2).

7. Pursuant to Rule 8003, and for the sake of judicial economy, the Appellants request that a single briefing schedule and argument schedule govern the Appeals as consolidated. A single briefing schedule will also curb the unnecessary expenditure of time and expenses borne by the parties—and the Court—to litigate the Appeals separately.

8. Accordingly, the Appellants request that the Court consolidate the above-captioned Appeals.

9. Counsel for the Appellants has conferred with counsel for the Debtor regarding this request, and counsel for the Debtor consents to the relief requested herein.

WHEREFORE, the Appellants respectfully request that the Court consolidate the above-captioned Appeals by entering an order substantially in the form attached hereto as Exhibit A, granting the relief requested herein, and that the Court grant any such further relief that the Court deems just and necessary.

Dated: July 16, 2024
Charlotte, North Carolina

Respectfully submitted,

**WALDREP WALL BABCOCK & BAILEY PLLC**

/s/ *Thomas W. Waldrep Jr.*
Thomas W. Waldrep Jr. (NC State Bar No. 11135)
Chris Haaf (NC State Bar No. 46077)
Diana Santos Johnson (NC State Bar No. 40050)
370 Knollwood Street, Suite 600
Winston-Salem, NC 27103
Telephone: 336-717-1280
E-mail: notice@waldrepwall.com

-and-

**THE RUCKDESCHEL LAW FIRM, LLC**

/s/ *Jonathan Ruckdeschel*
Jonathan Ruckdeschel (Maryland, CPF: 9712180133)
8357 Main Street
Ellicott City, Maryland 21043
Telephone: (410) 750-7825
Facsimile: (443) 583-0430
Email: ruck@rucklawfirm.com

-and-

**MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC**

/s/ *Clayton L. Thompson*
Clayton L. Thompson (NY Bar No. 5628490)
John Louis Steffan IV (Missouri Bar No. 64180)
150 W. 30th Street, Suite 201
New York, NY 10001
Telephone: (800) 358-5922
Email: CThompson@mrhfmlaw.com

*Counsel for Appellants*

**CERTIFICATE OF COMPLIANCE REGARDING USE OF ARTIFICIAL INTELLIGENCE**

Pursuant to the Court's June 18, 2024 Order, 3:24-mc-104, the undersigned hereby certifies that no artificial intelligence was employed in performing legal research for the preparation of the foregoing document with the exception of such artificial intelligence embedded in standard online legal research sources such as Westlaw, Lexis, FastCase, and Bloomberg. The undersigned further certifies that every statement and every citation to an authority contained in the foregoing document has been checked by me or another attorney in this case, and/or a paralegal working at my direction or at the direction of another attorney in this case, as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Respectfully submitted this the 16th day of July 2024.

**WALDREP WALL BABCOCK & BAILEY PLLC**

/s/ *Thomas W. Waldrep Jr.*
Thomas W. Waldrep Jr. (NC State Bar No. 11135)
370 Knollwood Street, Suite 600
Winston-Salem, NC 27103
Telephone: 336-717-1280
E-mail: notice@waldrepwall.com

*Counsel for Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on July 16, 2024, copies of the **MOTION TO CONSOLIDATE RELATED APPEALS** were served upon the parties in this action by CM/ECF electronic service or by First-Class United States Mail, postage prepaid, as indicated below:

Garland Stuart Cassada
Robinson, Bradshaw & Hinson, P. A.
101 North Tryon Street
Suite 1900
Charlotte, No 28246
704-377-8317
Fax: 704-373-3917
Email: gcassada@robinsonbradshaw.com

Gregory M. Gordon
Jones Day
2727 N. Harwood
Dallas, TX 75201
214-220-3939
Fax: 214-969-5100
Email: gmgordon@jonesday.com

Jeffrey B. Ellman
Jones Day
1420 Peachtree Street NE
Suite 800
Atlanta, GA 30309
404-822-0918
Fax: 404-581-8330
Email: jbellman@jonesday.com

Respectfully submitted,

**WALDREP WALL BABCOCK & BAILEY PLLC**

/s/ *Thomas W. Waldrep Jr.*
Thomas W. Waldrep Jr. (NC State Bar No. 11135)
370 Knollwood Street, Suite 600
Winston-Salem, NC 27103
Telephone: 336-717-1280
E-mail: notice@waldrepwall.com

*Counsel for Appellants*

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:24-CV-558-KDB; 3:24-CV-559-KDB

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | APPEAL FROM |
| DBMP LLC,[1] | ) | USBC WDNC |
| | ) | Case No. 20-30080 |
| Debtor. | ) | |
| | ) | |
| PETER L. BERGRUD and MICHAEL N. AND ANN HERLIHY | ) | |
| Plaintiffs-Appellants, | ) | |
| v. | ) | |
| DBMP LLC, | ) | |
| Defendant-Appellee. | ) | |

# BRIEF OF APPELLANTS


**WALDREP WALL BABCOCK & BAILEY PLLC**
370 Knollwood Street, Suite 600
Winston-Salem, NC 27103
Telephone: 336-717-1280

**THE RUCKDESCHEL LAW FIRM, LLC**
8357 Main Street


[1] The last four digits of the Debtor's taxpayer identification number are 8817. The Debtor's address is 20 Moores Road, Malvern, Pennsylvania 19355.

Ellicott City, Maryland 21043
Telephone: 410-750-7825

**MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC**
**150 W. 30th Street Suite 201**
**New York, NY 10001**
**Telephone: 314-241-2003**

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** .......... **iv**

**I. JURISDICTIONAL STATEMENT** .......... **1**

**II. STATEMENT OF ISSUES PRESENTED** .......... **2**

**III. STANDARD OF REVIEW** .......... **5**

**IV. STATEMENT OF THE CASE** .......... **5**

**V. PROCEDURAL AND (UNDISPUTED) FACTUAL BACKGROUND** .......... **8**

A. Old CertainTeed (DBMP) Caused Mr. Herlihy's and Mr. Bergrud's Mesothelioma. .......... 8

B. DBMP's Two-Step and Its Bad Faith Petition. .......... 9

C. The Bankruptcy Court's Ruling on Appellants' Motions to Lift the Stay. .......... 11

**VI. ARGUMENT** .......... **15**

A. The Bankruptcy Court Erred as Matter of Law When It Denied Appellants' Motions Despite Refusing to Address DBMP's Bad Faith. .......... 17

1. Debtors must file their petitions in good faith. .......... 17
2. DBMP filed its petition in bad faith. .......... 20
3. DBMP's bad faith is grounds to lift the stay. .......... 24

B. The Bankruptcy Court Erred in Imposing Upon Appellants Burdens Not Found in Precedent or the Code, and Conflating the *Robbins* Factors With *Carolin*'s Bad Faith Stay Relief Standard .......... 27

**VII. CONCLUSION** .......... **30**

**TABLE OF AUTHORITIES**

**Cases** **Pages**

*A.H. Robins Co. Inc. v. Piccinin*,
788 F.2d 994 (4th Cir. 1986)…………………………………..……………….22
*In re A.H. Robins Company, Inc.*,
*89 B.R. 555, 558 (E.D. Va. 1988)* ……………………………………………...22
*In re Albany Partners, Ltd.*,
749 F.2d 670 (11th Cir.1984)………………………………………………….20
*In re Aldrich Pump LLC*,
2021 WL 3729335 (Bkrtcy.W.D.N.C. 2021)…………………………………………5
*Amicus Brief of North Carolina, Arizona, California, Colorado, Connecticut, Delaware, Illinois, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nevada, New Jersey, New Mexico, New York, North Dakota, Oregon, Pennsylvania, Rhode Island, South Dakota, Vermont, Washington, Wisconsin, and the District of Columbia in Support of Petitioner, Off. Comm. Of Asbestos Claimants, v. Bestwall LLC, et al.*
(No. 23-675), 2024 WL 305618………………………………………………..6
*In re Bestwall LLC*,
605 B.R. 43 (Bankr. W.D.N.C. 2019) …………………………………………………5
*In re Bestwall LLC*,
71 F.4th 168 (4th Cir. 2023)…………………………………………………Passim
*Brief of Members of Congress as Amici Curiae in Support of Petitioner, Off. Comm. Of Asbestos Claimants, v. Bestwall LLC, et al.*
(No. 23-675), 2024 WL 304851……………………………………………………6
*In re Capitol Food Corp. of Fields Corner*,
490 F.3d 21 (1st Cir. 2007)……………………………………………………..15
*Carolin Corp. v. Miller*,
886 F.2d 698 (4th Cir. 1989)…………………………………………………Passim
*In re Cedar Shore Resort, Inc.*,
235 F.3d 375, 380 (8th Cir. 2000)……………………………………………..16, 21
*In re Cohoes Indus. Terminal, Inc.*,
931 F.2d 222 (2d Cir. 1991)……………………………………………………15
*In re Cook*,
104 F.2d 981 (7th Cir. 1939)……………………………………………………15
*Copley v. United States*,
959 F.3d 118 (4th Cir. 2020)……………………………………………………5
*In re Corp. Deja Vu*,
34 B.R. 845 (Bankr. D. Md. 1983)………………………………………………20

*Foust v. Munson Steamship Lines*,
299 U.S. 77 (1936) …………………………………………………………..24
*Furness v. Lilienfield*,
35 B.R. 1006 (D.Md.1983)………………………………………………………..20
*Grogan v. Garner*,
498 U.S. 279 (1991)……………………………………………………..………16
*Harrington v. Purdue Pharma L.P.*,
144 S. Ct. 2071, 603 U.S. ___ (2024)……..……………………..…...…….…..7, 19
*In re Johns-Manville Corp.*,
36 B.R. 727 (Bankr. S.D. N.Y. 1984)………………………………………………22
*In re Jones*,
591 F.3d 308 (4th Cir. 2010)…………………………………………………..….5
*Kane v. Johns-Manville Corp.*,
843 F.2d 636, 640 (2d Cir. 1988)…………………………………..……...18, 22
*In re Kestell*,
99 F.3d 146 (C.A.4 (Md.),1996)……………………………………………………21
*In re Kinney*,
51 B.R. 840 (Bankr. C.D. Cal. 1985)………………………………………………20
*Matter of Little Creek Dev. Co.*,
779 F.2d 1068 (5th Cir. 1986)…………………………………………………Passim
*Local Loan Co. v. Hunt*,
292 U.S. 234 (1934)…………………………………………………………………15
*In re Lotus Inv., Inc.*,
16 B.R. 592 (Bankr.S.D.Fla.1981)…………………………………………………20
*In re LTL Mgmt., LLC*,
64 F.4th 84 (3d Cir. 2023)…………………………………………………..7, 17
*In re LTL Mgmt., LLC*,
2024 WL 3540467 (July 25, 2024)…………………………………………………7
*In re Marsch*,
36 F.3d 825, 829 (9th Cir. 1994)……………………………………………………16
*The Official Committee Of Asbestos Claimants of Bestwall LLC v. Bestwall LLC, f/k/a Georgia-Pacific LLC*,
No. 24-170, May 31, 2024, Dkt. No. 15 (May 31, 2024)…………………………23
*Ortiz v. Fibreboard*,
527 U.S. 815 (1999)……………………………………………………….......26
*In re Patel*,
2022 WL 1420045 (Bankr. W.D.N.C., 2022)……………………………………21
*In re Phoenix Piccadilly, Ltd.*,
849 F.2d 1393 (11th Cir. 1988)……………………………………………………21
*In re Premier Auto Services*,

492 F.3d 274 (4th Cir. 2007)……………………………………………..Passim
*In re Robbins*,
964 F.2d 342 (4th Cir. 1992)……………………………………………..Passim
*In re Setzer*,
47 B.R. 340 (Bankr.E.D.N.Y.1985)……………………………………………20
*In re Scott*,
42 B.R. 35 (Bankr.D.Ore.1984)………………………………………………20
*Stern v. Marshall*,
564 U.S. 462 (2011)…………………………………………………………23
*In re Stewart*,
175 F.3d 796 (10th Cir. 1999)………………………………………………16
*In re SGL Carbon Corp.*,
200 F.3d 154 (3d Cir. 1999)………………………………………………..Passim
*In re Talladega Steaks, Inc.*,
50 B.R. 42 (Bankr.N.D.Ala.1985)…………………………………………..20
*In re Thirtieth Place, Inc.*,
30 B.R. 503 (Bankr.App. 9th Cir.1983)……………………………………20
*Truck Ins. Exch. v. Kaiser Gypsum Co., Inc.*,
144 S.Ct. 1414 (2024)…………………..…………………………..…..2, 7, 18
*In re Victory Const. Co., Inc.*,
9 B.R. 549 (C.D. Cal. 1981)…………………………………………………20
*In re Waldron*,
785 F.2d 936 (11th Cir. 1986)………………………………………………16
*In re Yukon Enterprises, Inc.*,
39 B.R. 919 (Bankr. C.D. Cal. 1984)………………………………………19

## Statutes

28 U.S.C. § 158……………………………………………….…………………..1
11 U.S.C. § 362………………………………………………………………..Passim
11 U.S.C. § 524……………………………………………………………… .Passim
11 U.S.C. § 1112…………………………….…………………………...Passim

## Rules

Fed. R. Bankr. P. 8003…………………………………………………………………1

## I. JURISDICTIONAL STATEMENT

This is an appeal[2] from final orders of the Bankruptcy Court for the Western District of North Carolina (the "Bankruptcy Court") denying (1) the *Motion of The Estate of Peter L. Bergrud For Relief From The Automatic Stay* (Hon. J. Craig Whitley), entered May 28, 2024 (Dkt. No. 2809, App. 570-571), and (2) the *Motion of Michael N. and Ann Herlihy for Relief from The Automatic Stay* (Hon. J. Craig Whitley), both entered May 28, 2024 (Dkt. No. 2808, App. 568–69) (together the "Denial Orders") in the Chapter 11 bankruptcy case of DBMP LLC (hereinafter, "DBMP" or "Debtor"), Case No. 20-30080 (Bankr. W.D.N.C.) (the "Bankruptcy Case").

Appellants are: (1) Peter L. Bergrud, a mesothelioma victim who died as a result of his asbestos cancer in 2019 (and whose estate is represented by his widow, Cheryl) (collectively, "the Bergruds") (Dkt. No. 2821, App. 577–83); and (2) living mesothelioma victim Michael N. Herlihy and his wife, Ann ("the Herlihys") (Dkt. No. 2820, App. 572–76). Both filed timely notices of appeal. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. §158(a)(1) and Rule 8003 of the Federal Rules of Bankruptcy Procedure.

[2] This Court entered an Order consolidating the appeals of the Denial Orders. *See Herlihy v. DBMP LLC*, 24-CV-00558, TEXT-ONLY ORDER docket entry dated July 18, 2024.

## II. STATEMENT OF ISSUES PRESENTED

The purpose of Chapter 11 is "to allow the resuscitation of a financially troubled debtor." *Carolin Corp. v. Miller*, 886 F.2d 698, 701 (4th Cir. 1989). Bankruptcy is not for "financially healthy companies with no need to reorganize under the protection of Chapter 11." *In re Premier Auto Services*, 492 F.3d 274, 280 (4th Cir. 2007) (quoting *In re SGL Carbon Corp.*, 200 F.3d 154, 166 (3d. Cir. 1999) (collecting authority)). The Supreme Court reaffirmed this principle earlier this year: "Bankruptcy offers individuals and businesses ***in financial distress*** a fresh start to reorganize, discharge their debts, and maximize the property available to creditors." *Truck Ins. Exchange v. Kaiser Gypsum Company, Inc.*, 602 U.S.__, 144 S. Ct. 1414, 1420–21 (2024) (emphasis added).

DBMP is not bankrupt and it filed in bad faith. It is bad faith for a massively profitable, non-distressed company to file for bankruptcy to force renegotiation of a single class of debts that it admits it can pay in ***full*** outside of Chapter 11. It is bad faith for a profitable company to restructure on the eve of bankruptcy to isolate that single class of debts from the remainder of the profitable business and all other creditors so that the affected creditors are stranded in bankruptcy while the owners of the business continue to gorge on its profits and all other creditors are paid in full, on time.

Bad faith is "cause" for relief from the automatic stay under Section 362(d) of the Code even if dismissal cannot be granted. *Carolin*, 886 F.2d at 698–99 ("Just as § 1112(b) .

. . permits inquiry into a debtor's good faith in the context of [a] . . . motion to dismiss, § 362(d)(1) . . . authorizes the court to determine whether . . . a debtor has sought the protection of the automatic stay in good faith."). The Code places the burden of proof in resisting a motion for relief from stay on the Debtor. 11 U.S.C. § 362(g)(2).[3]

The fact that bad faith is "cause" for lifting the automatic stay under 11 U.S.C. § 362 was a building block of the Fourth Circuit's two-pronged standard for dismissal of bad faith petitions. In enacting the two-pronged dismissal standard in *Carolin Corp. v. Miller*, the Fourth Circuit expressly recognized that creditors whose rights became ensnared by bad faith petitions (that may not qualify for dismissal) had other remedies: "creditors who become entangled in hopeless Chapter 11 cases...have [the] remed[y] of relief from stay." *Id.* at 700 (quoting *In re Mill Place Ltd. Partnership*, 94 B.R. 139, 141 (Bankr.D.Minn.1988)). The availability of lift stay relief balanced the harm to creditors of the delay caused by not dismissing a petition immediately upon a finding of subjective bad faith at the "very portals" of a case. *Carolin*, 886 F.2d at 699–700.

Here, Appellants moved for relief from the automatic stay because DBMP's petition was filed in bad faith. DBMP (1) is not financially troubled, (2) admits it can pay all its debts in full, and (3) engaged in an eve-of-bankruptcy corporate shell game to isolate asbestos creditors and strand them ***in*** bankruptcy, while keeping its profitable

[3] The only statutory exception to the Debtor's burden of proof under 11 U.S.C. § 362(g)(1)—proof of equity in a piece of property—does not apply here.

business ***out*** of bankruptcy, for the benefit of its owners and all other creditors. That is bad faith. That bad faith is "cause" for lifting the automatic stay. And, when cause exists, lifting the stay is mandatory under 11 U.S.C. § 362.

The issues before this Court are:

*First*, the Bankruptcy Court erred when it refused to rule on the question of whether DBMP filed its petition in bad faith as defined by the Fourth Circuit. Bad faith is independent "cause" to modify the stay under 11 U.S.C. § 362(d)(1), was the basis of Appellants' motions to lift the stay, and the facts related to the issue are either undisputed or have already been determined by the Bankruptcy Court in Appellants' favor.

*Second*, the Bankruptcy Court erred in finding that granting limited relief from stay to Appellants to liquidate their claims and to return to the Bankruptcy Court to await the conclusion of the case would constitute a "de facto" dismissal. The Bankruptcy Court speculated that, if Appellants were given relief, "thousands" of other claimants would do the same and it would "wreck" the bankruptcy case. The Bankruptcy Court's rule, effectively, is that if the grounds for relief from stay—a debtor's bad faith in filing for Chapter 11—prejudice ***all*** claimants, then ***no*** claimants are entitled to relief. Such a rule is contrary to the Code, logic, and equity. And requiring Appellants to prove something will ***not*** happen—that thousands of other claimants will not move for relief—improperly shifts the burden of proof onto Appellants. All of this was plain error.

## III. STANDARD OF REVIEW

In a bankruptcy appeal, a district court reviews legal conclusions *de novo* and factual findings for clear error. *Copley v. United States*, 959 F.3d 118, 121 (4th Cir. 2020). Here, the relevant facts are not in dispute or have already been determined by the Bankruptcy Court, so this Court should review the Bankruptcy Court's decision *de novo*. *In re Jones*, 591 F.3d 308, 310 (4th Cir. 2010).

## IV. STATEMENT OF THE CASE

The Bankruptcy Courts in this District have repeatedly and persistently refused to address the bad faith of financially robust businesses who use bankruptcy to (1) isolate their asbestos liabilities from their assets and other creditors and (2) strand their tort victim creditors in bankruptcy for years on end, while (3) the debtors' corporate parents and siblings operate free and clear of any Chapter 11 obligations.[4] This refusal has put Charlotte on the map as the only place in America where "debtors" who admit the ability to pay all creditors in full can be indefinitely shielded by a nationwide litigation stay while they attempt to force renegotiation of their entirely payable debt.

---

[4] *See e.g.*, *Bestwall* (*In re Bestwall LLC*, 605 B.R. 43 (Bankr. W.D.N.C. 2019)) and *Aldrich* (*In re Aldrich Pump LLC*, No. 20-30608, 2021 WL 3729335 (Bankr. W.D.N.C. 2021)). This refusal to address subjective bad faith on motions to dismiss is contrary to the Fourth Circuit's express direction: "to insure disciplined application of the test and maintain its stringency, bankruptcy courts should make and report findings as to both futility ***and*** bad faith notwithstanding the same evidence is thought to establish both." *Carolin*, 886 F.2d at 701 n.3 (emphasis added). Here, because bad faith is grounds in and of itself for lifting § 362(a)'s automatic stay, this Court need not address the dismissal standard. But the Bankruptcy Courts' longstanding refusal to address the fundamental issue head-on must be addressed now.

The Debtor's strategy, known as the Texas Two-Step (the "Two-Step"), has resulted in billions of dollars in windfall to equity holders (who are supposed to be paid last in Chapter 11) and over $500,000,000.00 in fees to bankruptcy professionals.[5] The Debtor's corporate parents and siblings—the entities that fabricated the stooge Debtor here and bankrupted it—continue to thrive and pay all other creditors. Meanwhile, asbestos cancer victims receive nothing but indefinitely postponed state trials and withered Seventh Amendment rights, unless, facing years of delay, they give up their rights and those of future victims.

The Two-Step has drawn bipartisan condemnation in Congress and rebuke from two dozen state attorneys general (including North Carolina's). *See* Brief of Members of Congress as Amici Curiae in Support of Petitioner, *Off. Comm. of Asbestos Claimants v. Bestwall LLC*, 2024 WL 2116276 (U.S. May 13, 2024) (No. 23-675);[6] Amicus Brief of [24 States and D.C.] in Support of Petitioner, *Off. Comm. of Asbestos Claimants v. Bestwall LLC*, 2024 WL 2116276 (U.S. May 13, 2024) (No. 23-675).[7]

---

[5] Ames Alexander, *Profitable companies are dodging asbestos lawsuits. A Charlotte court has helped them*, THE CHARLOTTE OBSERVER, July 24, 2024, https://www.charlotteobserver.com/news/local/crime/article289390884.html (last accessed 8/6/24); Jeff Tiberri, *Legal maneuvers used in Charlotte bankruptcy court hold up lawsuits by victims of asbestos exposure*, NORTH CAROLINA PUBLIC RADIO (July 30, 2024), https://www.wunc.org/show/due-south/2024-07-30/legal-maneuvers-used-in-charlotte-bankruptcy-court-hold-up-lawsuits-by-victims-of-asbestos-exposure (last accessed 8/16/24).

[6] *Available at* https://www.judiciary.senate.gov/imo/media/doc/23-675%20Bestwall%20amicus%20FINAL.pdf.

[7] *Available at* https://www.supremecourt.gov/DocketPDF/23/23-675/298347/20240122164305807_Bestwall%20-%20NC%20et%20al.%20amicus.pdf; *see also* Dietrich Knauth, *US Senate bill aims to curb Texas Two-Step bankruptcies*, REUTERS, July 23, 2024 ("The new legislation aims to end the 'dirty back-room deals' that companies use to shield themselves from answering for corporate misconduct, [Senator] Hawley said.").

The only appellate court to address a Two-Step non-distressed billionaire bankruptcy rejected it. ***Twice***. *See In re LTL Management, LLC*, 64 F.4th 84 (3d Cir. 2023); *see also In re LTL Management* LLC, No. 23-2971, 2024 WL 3540467 (3d Cir. July 25, 2024) (affirming bankruptcy court).[8] In its most recent term, the Supreme Court restated a common theme: Chapter 11 relief is for honest companies in financial distress (*Kaiser*, 144 S. Ct. at 1420–21) who subject all (or virtually all) of their assets to bankruptcy court jurisdiction. *See Harrington v. Purdue Pharma L.P.*, 603 U.S. ___, 144 S. Ct. 2071, 2077–78 (2024). That's ***not*** DBMP and CertainTeed.

On the heels of the Third Circuit's ruling in *LTL*, in response to express guidance from the Fourth Circuit (*see In re Bestwall LLC*, 71 F.4th 168, 183 (4th Cir. 2023), "[C]laimants can bring individual actions for relief based on the specific facts of a particular claim"), Appellants moved for relief under § 362, asking the Court to decide: whether DBMP filed its petition in bad faith and, if so, to lift the stay as required by 11 U.S.C. § 362 and *Carolin*.

The Bankruptcy Court refused to consider or rule upon the question before it. Its failure to apply straightforward law to undisputed facts was plain error. And because the

---

Available at: https://www.reuters.com/legal/government/us-senate-bill-aims-curb-texas-two-step-bankruptcies-2024-07-23/#:~:text=The%20proposed%20legislation%20would%20stop,a%20Texas%20two%2Dstep%20debtor.

[8] LTL is the debtor created to send Johnson & Johnson's asbestos liabilities (but not Johnson & Johnson) into bankruptcy. The Two-Step playbook is the same as here, run by the same lawyers. The Johnson & Johnson entities have not appealed to the Supreme Court regarding the strategy they so stridently claim—in the press—to be magnanimous, well-intentioned, lawful, and in good faith.

relevant facts are undisputed or have already been determined by the Bankruptcy Court, this Court now can and should rule on that issue.

## V. PROCEDURAL AND (UNDISPUTED) FACTUAL BACKGROUND

In 2021, the Bankruptcy Court made detailed factual findings when ordering injunctive relief against all asbestos claimants.[9] These Findings, by themselves, substantiate DBMP's bad faith. But, because the question was not raised in the motion before it at that time, the Bankruptcy Court did not consider or rule upon DBMP's bad faith. Findings at ¶ 149-150, App. 203; ¶ 248, App. 229. Bad faith, however, ***was*** the basis for Appellants' motions to lift the stay.

### A. Old CertainTeed (DBMP) Caused Mr. Herlihy's and Mr. Bergrud's Mesothelioma.

DBMP did not dispute the facts at the root of Appellants' legal arguments below. Mr. Herlihy was exposed to Old CertainTeed's asbestos-cement pipe for years; this caused his mesothelioma in March 2023. App. 391-393. The Herlihys filed a civil complaint in Los Angeles, California, against several defendants on August 4, 2023. App. 445-473. They asked the Bankruptcy Court for leave to add DBMP as a defendant in this pending action, which is set for trial on March 3, 2025. App. 475-478.

[9] The Bankruptcy Court issued thorough Findings of Fact and Conclusions of Law in ruling on an earlier motion for injunctive relief on August 11, 2021. *See* Case No. 20-30080, Dkt. No. 972. These are referred to in this Appeal as "Findings" and by the Appendix page location.

Mr. Bergrud was exposed to asbestos from Old CertainTeed products for decades and he died of malignant pleural mesothelioma in April 2019. App. 250-251. His Estate sought to lift the stay to pursue DBMP in Washington state court. App. 270-71.

**B. DBMP's Two-Step and Its Bad Faith Petition.**

DBMP has repeatedly admitted—and affirmatively argued—that it is fully capable of paying all its debts in full. App. 117, n. 13; Findings at ¶ 61, App. 180. The facts, found by the Bankruptcy Court, show that DBMP's "real motivation" is to "abuse the reorganization process," "cause hardship [and] delay [its] creditors," and hide behind the automatic stay. *See Carolin*, 886 F.2d at 702. The Fourth Circuit defines these facts as ***bad faith***. *Id*. And, under *Carolin*, bad faith is—by itself—cause for lifting the automatic stay pursuant to 11 U.S.C. § 362(d)(1). *Carolin*, 886 F.2d at 699.

DBMP's predecessor, "Old CertainTeed," started plotting its Texas Two-Step over half a decade ago. As early as 2018, Old CertainTeed began discussing "a plan to isolate [its] asbestos liabilities in a new company, with minimal assets, that would file for bankruptcy." Findings at ¶¶ 40-42, App. 173. The shell entity would shield "the CertainTeed Enterprise from Old CertainTeed's asbestos liabilities." *Id*. at ¶ 46, App. 175. This plan, codenamed "Project Horizon[,]" was a closely guarded corporate secret "driven not by businesspeople, but by lawyers." Findings at ¶¶ 41, 43, App. 173-174.

Old CertainTeed "was a profitable going concern whose assets significantly outweighed its combined operating and asbestos liabilities." Findings at ¶ 44, App. 174.

Indeed, "on Old CertainTeed's publicly disclosed financial statements, [it] had almost **$3 billion in assets** and less than half of that in all liabilities." Findings at ¶ 57, App. 178 (emphasis added). The company was never in distress: it was settling cases in the tort system without financial strain. Findings at ¶ 188, App. 214. Old CertainTeed "never entertained a bankruptcy filing for itself." Findings at ¶ 44, App. 174.

After the divisive merger, "New CertainTeed" was "essentially a mirror image of Old CertainTeed: a fully operating company with all of Old CertainTeed's employees, the bulk of its assets and operations, and all of its non-asbestos creditors." Findings at ¶ 1, App. 162. DBMP, however, was "quite different," being "allocated 100% of Old CertainTeed's considerable asbestos liabilities."[10] Findings at ¶ 1, App. 162.

DBMP and New CertainTeed executed a "Funding Agreement." New CertainTeed committed to provide DBMP with the funds to, among other things, "satisfy the Debtor's 'Asbestos Related Liabilities' in connection with funding a § 524(g) trust." Findings at ¶¶ 65-66, App. 181. The Funding Agreement "is not a loan," it does not impose "repayment obligations" on DBMP, and it is not capped. Findings at ¶¶ 66-67, App. 181.

DBMP and New CertainTeed affirmatively contend that DBMP has "the same ability" to defend and resolve "present and future asbestos claims" as Old CertainTeed.

---

[10] New CertainTeed received approximately 97% of Old CertainTeed's assets, most of its operations, and all its employees in the divisional merger. Only 3% of Old CertainTeed's assets were given to DBMP. Among these assets was approximately $25 million in cash, Old CertainTeed's asbestos liabilities, and the ability to draw from a "Funding Agreement." *See* Findings at ¶¶ 53, 65, App. 177, 181.

Findings at ¶ 61, App. 180. And the Bankruptcy Court found that Old CertainTeed was never financially distressed as a result of its asbestos liabilities. There is no dispute that DBMP's petition was filed not out of financial need, but out of a desire to force renegotiation of Old CertainTeed's asbestos liabilities under the protection of the automatic stay, while CertainTeed's profitable business (and all other creditors) remained blissfully free of the obligations of bankruptcy.

On January 23, 2020, DBMP filed a voluntary petition for relief under Chapter 11 (the "Petition"). DBMP's Petition triggered the automatic stay under 11 U.S.C. § 362.

### C. The Bankruptcy Court's Ruling on Appellants' Motions to Lift the Stay.

In April 2024, Appellants asked the Bankruptcy Court to lift the automatic stay and grant them leave to liquidate their personal injury claims against DBMP, as is their right under the Code.[11] Appellants expressly did not seek to collect on their claims, only to quantify them and return to the bankruptcy proceeding. App. 240-526 (the "Motions"). These were the first and only motions for relief from stay in *DBMP* during the four-year existence of this case. The Debtor vigorously objected . App. 527-554 ("Objection").

After a hearing on May 9, 2024, the Bankruptcy Court issued its ruling on May 23, denying both Motions. *See* App. 848-990 (hearing), App. 856-868 (Announcing Ruling); App. 568-571 (Orders Denying Appellants' Motions for Relief). Rather than addressing

[11] Under 11 U.S.C. § 1129(a) and 28 U.S.C. § 157(b), the Bankruptcy Court is prohibited from liquidating or estimating personal injury claims.

the question before it—DBMP's bad faith—the Bankruptcy Court relied upon its reasoning from its 2021 ruling on a different issue (whether, as of 2021, injunctive relief should bar all claimants from suing non-debtor New CertainTeed).

In 2021, the Bankruptcy Court granted the Debtor's requested relief (preventing continued litigation against New CertainTeed) because, it held, allowing such unfettered litigation and collection against New CertainTeed would be "tantamount to dismissal." App. 858. But the test for lifting the automatic stay under § 362 is ***not*** the same as the test for entering an injunction. And the Bankruptcy Court itself in 2021 expressly recognized it was not ruling on the issue the Appellants raise here: the Debtor's bad faith. Findings ¶ 149-150, App. 203; App. 857-858.

In denying Appellants' Motions, the Bankruptcy Court below declined to follow the Fourth Circuit's directions from another Two-Step case, in which the Court of Appeals told claimants they "can bring individual actions for relief based on the specific facts of a particular claim. That is done in bankruptcy proceedings on a routine basis where appropriate." *Bestwall*, 71 F.4th at 183. Instead, the Bankruptcy Court referred to those instructions as "dicta" and adopted the ruling of its sister court in *Bestwall*, that granting relief from stay even to simply liquidate claims and return to the bankruptcy proceeding would result in a *de facto* dismissal of the entire proceeding.

The Bankruptcy Court provided no coherent explanation for how merely quantifying these two individual claims and returning to the bankruptcy to await its

conclusion would equate to dismissal. Rather, the Bankruptcy Court speculated—based on no evidence from the Debtor and again referencing the sister court in *Bestwall*—that lifting the stay for Appellants would invite other motions for relief and that this would "defeat the purpose of the bankruptcy case, and effectively, be akin to dismissal." App. 861.[12] How claimants exercising their statutory rights under the Code would "defeat the purpose of the bankruptcy case" was both unexplained and irrelevant to the question of whether "cause" exists under 11 U.S.C. § 362.

The Bankruptcy Court's decision contravenes precedent and logic. *Carolin* expressly distinguishes lift stay relief and dismissal and acknowledges that a debtor's bad faith is "cause" for relief from the automatic stay (even if dismissal is not warranted). Section 362(g) places the burden of resisting a lift-stay motion on the Debtor.

Acknowledging the issue Appellants put before it—DBMP's bad faith, the Bankruptcy Court "[didn't] feel comfortable making that conclusion today, not on this record or at this stage in the case." App. 864. But the Bankruptcy Court's "comfort" is not a valid justification for refusing to rule on the material legal issue squarely before it. The record demonstrating bad faith was primarily the Bankruptcy Court's own detailed

---

[12] The Bankruptcy Court held that it had previously denied what it termed "the same type of motion" in *Aldrich* because if one creditor was allowed to "liquidate [a] claim, then all creditors would seek that, or most of them, at least enough to wreck the bankruptcy case and that would, effectively precipitate a *de facto* dismissal." App. 860. But the motion in *Aldrich* was ***not*** premised on the debtor's bad faith as the Appellants did here. App. 241; 383. Nor was the similar motion before Judge Beyer in *Bestwall* (Richard Dale), which the Bankruptcy Court also referenced. App. 860.

factual findings from 2021, and these facts were not disputed by DBMP in opposing Appellants' requests. *See* Motions at App. 240-526; 769-996.

Despite this, the Bankruptcy Court steadfastly refused to rule, ignoring *Carolin*, *Premier Auto*, the procedural posture before it (i.e., stay relief rather than dismissal), and the plain language of 11 U.S.C. § 362:

> I've mentioned the differences of opinion about whether a non-distressed solvent company can use bankruptcy tools. . . .***Can I find today that this filing is subjective bad faith because it's sought by a solvent non-distressed entity and does that dismiss, justify dismissal***? I'd say the answer in this Circuit at the moment appears to be no. And moreover, we are currently litigating the propriety of the, of the divisional merger and the bankruptcy filing in the adversary proceedings and whether those events were detrimental to creditors. And that also cautions against trying to determine the same matters, like subjective bad faith in this current motion. ***But even if subjective bad faith lies, I don't think it's the standard.***
>
> At most, it's a factor. The standard for relief from stay is cause and the controlling case in our Circuit is *Robbins*.[13] *Robbins* involves a balancing test and as I, both I and [the Bankruptcy Court in *Bestwall*] have held, here relief from stay would lead to case dismissal, which under *Carolin* is not attainable for simply subjective bad faith. So I'm not going to try to do indirectly something that I'm not permitted to do or not inclined to do under existing law. I am bound by the *Carolin* decision. App. 864-66 (emphasis added).

The Appellants are victims of the Debtor's asbestos-containing products. Mr. Bergrud succumbed to mesothelioma, and Mr. Herlihy is slowly suffocating to death,

[13] 964 F.2d 342 (4th Cir. 1992). As discussed below, the discretionary *Robbins* analysis presupposes a good faith bankruptcy. In the Fourth Circuit, *Carolin* says that a debtor's bad faith can be grounds to lift the stay. Nowhere in *Robbins* did the Court hold or even suggest that when a debtor files in bad faith, the Court should perform a balancing analysis regarding whether cause exists to lift the stay. To the contrary, *Carolin* is clear that bad faith is "cause" under 11 U.S.C. § 362.

with no end of the bankruptcy in sight. The Appellants isolated ***one*** issue for the Bankruptcy Court: whether the undisputed facts that DBMP (1) is not financially troubled, (2) can pay all creditors ***in full***, and (3) that it engaged in a pre-filing Texas Two-Step to isolate a single class of creditors in bankruptcy and force renegotiation of its state-law tort liabilities means that it filed its petition in bad faith. The Bankruptcy Court, instead, refused to rule on this central question and rejected it as "a waste of everyone's time." App. 867. This was plain error.

## VI. ARGUMENT

Blackletter law, uniformly applied by the federal appellate courts, forbids the wielding of bankruptcy courts' "powerful equitable weapons"—like the automatic stay—by "financially healthy companies with no need to reorganize." *See Premier Auto*, 492 F.3d at 279–82 (quoting *SGL Carbon*, 200 F.3d at 166 (collecting cases)).[14] To the contrary, the

[14] *See also Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S. Ct. 695, 699 (1934) ("One of the primary purposes of the Bankruptcy Act is to relieve the honest debtor from *the weight of oppressive indebtedness*, and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes.") (emphasis added); *Wetmore v. Markoe*, 196 U.S. 68, 77, 25 S. Ct. 172, 176 (1904) ("Systems of bankruptcy are designed to relieve the honest debtor from the weight of indebtedness which has become oppressive…"); *In re Capitol Food Corp. of Fields Corner*, 490 F.3d 21, 25 (1st Cir. 2007) (reasoning that a debtor need not be insolvent before filing bankruptcy petition, but that it must be experiencing "some type of financial distress"); *In re Cohoes Indus. Terminal, Inc.*, 931 F.2d 222, 228 (2d Cir. 1991) (debtor must "at least,face such financial difficulty that, if it did not file at that time, it could anticipate the need to file in the future"); *In re SGL Carbon Corp.*, 200 F.3d at 164–66 (reversing the district court and dismissing the debtor's bankruptcy because, *inter alia*, "[t]he mere possibility of a future need to file, without more, does not establish that a petition was filed in 'good faith,'" and "Chapter 11 was designed to give those teetering on the verge of a fatal financial plummet an opportunity to reorganize on solid ground and try again, not to give profitable enterprises an opportunity to evade contractual or other liabilities"); *Matter of Little Creek Dev. Co.*, 779 F.2d 1068, 1073 (5th Cir. 1986) ("The 'new debtor' syndrome, in which a one-asset entity has been created . . . to isolate the insolvent property and its creditors, exemplifies . . . bad faith cases . . . . Neither the bankruptcy courts nor the creditors should be subjected to the costs and delays of a bankruptcy proceeding under such conditions."); *In re Cook*, 104 F.2d 981, 985 (7th Cir. 1939) (no valid bankruptcy purpose where "proceeding

purpose of the bankruptcy code is to allow for "resuscitating a financially troubled debtor." *Carolin*, 886 F.2d at 701 (quoting *In re Coastal Cable TV, Inc.*, 709 F.2d 762, 765 (1st Cir. 1983)). Because neither the Debtor nor its corporate predecessor is (or was) in financial distress, and because they admit that they can pay all their liabilities in full, this petition was filed in bad faith.[15]

Appellants sought the exact remedy contemplated by *Carolin* (and a slew of other cases), statutorily outlined in the Bankruptcy Code, and recently countenanced by the Fourth Circuit: "rather than waiting for plan confirmation, claimants can bring individual actions for relief based on the specific facts of a particular claim. That is done in

---

was instituted not for the purpose of obtaining benefits afforded by the Act to a corporation in financial distress, but to enable appellees to escape the jurisdiction of another court where the day of reckoning . . . was at hand"; "A Federal Court should not extend its jurisdiction under such circumstances."); *In re Cedar Shore Resort, Inc.*, 235 F.3d 375, 380 (8th Cir. 2000) (affirming dismissal because, *inter alia*, the bankruptcy court found the primary motivation of the debtor—a healthy company "not in dire financial straits"—was to dispose of a state court lawsuit); *In re Marsch*, 36 F.3d 825, 829 (9th Cir. 1994) (no good faith where debtor "had the financial means to pay" its obligations, which posed no "danger of disrupting business interests"); *In re Stewart*, 175 F.3d 796, 811 (10th Cir. 1999) (affirming dismissal and recognizing that relieving "oppressive indebtedness" is "[o]ne of the main purposes of bankruptcy law"); *In re Waldron*, 785 F.2d 936, 940 (11th Cir. 1986) (rejecting a debtor's bankruptcy because "[t]he bankruptcy laws are intended as a shield, not as a sword," and recognizing that the purpose of Chapter 11 is to give a fresh start to a "financially troubled debtor" rather than the "financially secure"); *see also Grogan v. Garner*, 498 U.S. 279, 286–87, 111 S. Ct. 654, 659 (1991) ("This Court has certainly acknowledged that a central purpose of the Code is to provide a procedure by which *certain insolvent* debtors can reorder their affairs . . . . But in the same breath that we have invoked this 'fresh start' policy, we have been careful to explain that the Act limits the opportunity for a completely unencumbered new beginning to the 'honest *but unfortunate* debtor.'") (emphasis added).

[15] The Debtor's bad faith is evident even without considering the intricacies of the Texas Two-Step, which provides further indicia of bad faith as discussed below.

bankruptcy proceedings on a routine basis where appropriate." *Bestwall*, 71 F.4th at 183.[16] Failing to apply the facts to the law was error.

### A. **The Bankruptcy Court Erred as Matter of Law When It Denied Appellants' Motions Despite Refusing to Address DBMP's Bad Faith.**

Knowing that it could not meet its burden of proving good faith, *see* 11 U.S.C. § 362(g)(2), DBMP conflated Appellants' § 362 request for lift stay with a § 1112(b) request for dismissal. But the Fourth Circuit has never held that *Carolin*'s dismissal standard (subjective bad faith + objective futility) must be shown for an individual creditor to receive stay relief. Bad faith alone is sufficient. To hold otherwise would eliminate bad faith as a basis for lift stay relief because dismissal would be required: the exact ***opposite*** of the structure set up by *Carolin*. The Bankruptcy Court erred when it credited the Debtor's reasoning.

#### 1. *Debtors must file their petitions in good faith.*

The Bankruptcy Code's "statutory objective" is "'resuscitating a financially troubled debtor.'" *Carolin*, 886 F.2d at 701 (quoting *Coastal Cable*, 709 F.2d at 765) (cleaned up). Eighteen years after *Carolin*, the Fourth Circuit confirmed this common-sense principle and held that it is bad faith, and an abuse of Chapter 11's "powerful equitable weapons," when "financially healthy companies with no need to reorganize" file

[16] The Debtor's lack of financial distress was not at issue before the Fourth Circuit in *Bestwall*: "In this appeal, by contrast, [appellants] do not make the arguments raised by the claimants in *LTL Management*." *Bestwall*, 71 F.4th at 182.

petitions to alter state law obligations they are fully able to pay. *See Premier Auto*, 492 F.3d at 279–82.

In recognizing bad faith, the Fourth Circuit honed in on Premier's lack of financial distress, using the Third Circuit's *SGL Carbon* case as a touchstone. *Premier Auto*, 492 F.3d at 280. In turn, cases cited by *SGL Carbon* recognize that "if a petitioner has no need to rehabilitate or reorganize, its petition cannot serve the rehabilitative purposes" of Chapter 11. *SGL* Carbon, 200 F.3d at 166. *SGL Carbon*'s supporting reasoning (*e.g.*, *Matter of Little Creek Dev. Co.*, 779 F.2d 1068 (5th Cir. 1986)) provided the foundation for both *Premier Auto* and the more recent *LTL* decision, *see* 64 F.4th 103 n.14, both of which recognize that Chapter 11 imposes a general good faith requirement. And whether a company seeking bankruptcy protection is facing "financial distress" (*LTL* at 103)—*i.e.*, whether it is a "financially healthy compan[y] with no need to reorganize (*Premier Auto* at 280)—is "central" to courts' inquiries. *LTL*, 64 F.4th at 103. The Supreme Court recently reiterated this common-sense principle that bankruptcy is for companies in financial distress. *Kaiser*, 144 S. Ct. at 1420–21.[17]

---

[17] The existence of 11 U.S.C. § 524(g), with which the Debtor will undoubtedly attempt to conflate the existence of asbestos bankruptcies with the legitimacy of non-distressed bankruptcies, does nothing to help the Debtor. Section 524(g) was enacted in the wake of the Johns-Manville bankruptcy, "for use by any asbestos company facing a similarly overwhelming [to Johns-Manville] liability." H.R. Rep. No. 103-835, at 40–41 (1994); *see also Kane v. Johns-Manville Corp.*, 843 F.2d 636, 640 (2d Cir. 1988) (confirming Manville was faced with "crippling" lawsuits); S. Rep. No. 95-989, at 9 (1978) (cited by *SGL Carbon*, 200 F.3d at 166) (legislative history suggesting Chapter 11 was meant to deal "with the reorganization of a financially distressed enterprise"). DBMP and Old CertainTeed were never faced with "crippling" or "overwhelming" asbestos liabilities.

It is bad faith, a perversion of the Bankruptcy Code, and an unconstitutional attack on state tort systems for financially robust companies like CertainTeed to perform a Two-Step and then file for bankruptcy to gain the automatic stay's protections while a federal injunction protects them from paying their fully payable state-law liabilities. *See e.g. Harrington*, 144 S. Ct. at 2077–78 ("[B]eneath [the Code's] complexity lies a simple bargain: A debtor can win a discharge of its debts if it ***proceeds with honesty*** and places virtually ***all its assets*** on the table for its creditors.") (emphasis added).

What is required when bad faith is present? According to the Bankruptcy Court, if dismissal cannot be granted, neither can lift stay relief because the Court irrationally equated the limited lift stay relief sought (liquidation only) with dismissal based upon some unexplained conclusion that liquidating individual claims would "defeat the purpose" of the bankruptcy. But dismissal under § 1112 is a red herring: Appellants moved only for limited relief from stay under § 362. And *Carolin* recognizes that, even if dismissal may not be proper, "***[c]reditors who become entangled in hopeless Chapter 11 cases … have remedies of relief from stay,***" among others. *Carolin*, 886 F.2d at 700 (emphasis added).[18] Creditor relief against a debtor who filed in bad faith is widely recognized in other jurisdictions.[19]

---

[18] Appellants dispute the Bankruptcy Court's interpretation of the standard for dismissal under *Carolin* and its application to the facts of this case for the same reasons as the movants did in the *Aldrich* bankruptcy. *Aldrich*, 2021 WL 3729335, at *2. That issue, however, is beyond the scope of this appeal and irrelevant to it, as *Carolin* distinguishes bad-faith lift stay and bad-faith dismissal.

[19] *See In re Yukon Enterprises, Inc.*, 39 B.R. 919, 920–21 (Bankr. C.D. Cal. 1984) ("The issue of what is a 'bad faith filing' usually arises in the context of a motion to dismiss the petition, a request to lift the automatic

### 2. *DBMP filed its petition in bad faith.*

A crucial and undeniable fact—that DBMP can pay every single claimant that it owes him/her in the tort system or in bankruptcy (i.e., "in full")—is relevant to every issue in this case. Because of this undisputed fact, DBMP filed in bad faith as a matter of law. Having done so, Appellants have "cause" under § 362 and lift stay relief must be granted because DBMP cannot meet its statutory burden of proof to demonstrate the lack of cause.

DBMP's asbestos liabilities never caused it or Old CertainTeed financial strain, let alone distress for which it was in need of "resuscitation." According to Old CertainTeed's "publicly disclosed financial statements, its assets greatly exceeded its combined

stay for 'cause' . . . or a combination of the two . . . . [T]he lifting of the stay is often a more prudent course for creditors rather than seeking a dismissal of the case."); *In re Thirtieth Place, Inc.*, 30 B.R. 503, 505–06 (B.A.P. 9th Cir. 1983) (reversing a finding of good faith on a creditor's motion to lift stay and/or dismiss); *In re Talladega Steaks, Inc.*, 50 B.R. 42, 44 (Bankr. N.D. Ala.1985) ("Courts have found that, if a Chapter 11 petition is not filed in good faith, grounds exist either to vacate the automatic stay or dismiss the petition); *In re Kinney*, 51 B.R. 840, 846 (Bankr. C.D. Cal.1985) ("Among the remedies available to combat bad faith filings are dismissal of the action, and relief from the automatic stay"); *In re Victory Const. Co., Inc.*, 9 B.R. 549, 560 (Bankr. C.D. Cal. 1981), vacated, 37 B.R. 222 (B.A.P. 9th 1984) (vacated on other grounds as moot) ("the debtor's lack of 'good faith' in filing a case under Chapter 11 is 'cause,' independent of the existence or lack of adequate protection, to vacate the automatic stay . . . ."); *In re Setzer*, 47 B.R. 340, 344 (Bankr. E.D.N.Y.1985) ("Bad faith has frequently been held to provide sufficient cause to warrant [dismissal or lifting the stay].") ; *In re Scott*, 42 B.R. 35, 38–39 (Bankr. D. Or. 1984) ("filing of the bankruptcy petition in bad faith" can permit relief from the automatic stay); *See Furness v. Lilienfield*, 35 B.R. 1006, 1010–13 (D. Md. 1983) ("Courts have found that if a Chapter 11 petition is not filed in good faith, grounds exist either to vacate the automatic stay or dismiss the petition."); *See In re Corp. Deja Vu*, 34 B.R. 845, 846–47, 850 (Bankr. D. Md. 1983) (finding "the petition was filed in bad faith. This bad faith constitutes cause to allow the secured creditor relief from the stay."); *In re Lotus Inv., Inc.*, 16 B.R. 592, 595–96 (Bankr. S.D. Fla. 1981) ("This Court agrees that lack of 'good faith' in filing a petition under Chapter 11 entitles a secured creditor to relief from the stay."); *In re Albany Partners, Ltd.*, 749 F.2d 670, 675 (11th Cir. 1984) ("[W]e cannot say that the bankruptcy court abused its discretion by granting [retroactive relief from automatic stay, plus dismissal], particularly in light of the finding that the petition was not filed in good faith.").

operating and asbestos liabilities." Findings at ¶57, App. 178. With almost $3 billion in assets (and liabilities totaling less than half of that), New CertainTeed possesses the capacity to enhance DBMP's ability to address its liabilities. Findings at ¶57, App. 178.

DBMP filed its petition to manipulate the Bankruptcy Code and use the automatic stay to exert pressure on tort claimants to accept a "settlement" which globally resolves all present and future individual state-law tort claims and channels any recovery to a limited fund artificially created by this proceeding. Such a mandatory global settlement is beyond what the Debtor and its affiliates are entitled to under controlling state and federal law. This is bad faith. *See Carolin*, 886 F.2d at 699, 702; *Premier Auto*, 492 F.3d at 279 (good faith requirement "prevents abuse . . . by debtors whose overriding motive is to delay creditors without benefitting them in any way . . . .") (quoting *Little Creek Dev. Co.*, 779 F.2d at 1072).

DBMP's petition bears all the indicia of bad faith:

- Was this bankruptcy filed by entities with "new debtor syndrome?" *Little Creek Dev. Co.*, 779 F.2d at 1072–73. Of course.

- Did DBMP file for relief under Chapter 11 to force creditors into "judicially compelled negotiations?" *Premier*, 492 F.3d at 280-81; *In re Patel*, 2022 WL 1420045, at *7 (Bankr. W.D.N.C. 2022). DBMP actively seeks this.

- Did DBMP forum shop? *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1395 (11th Cir. 1988). Absolutely.

- Did DBMP isolate one class of manageable liability before attempting to shield their financially robust battleship behind the walls of bankruptcy's safe harbor? *In re Kestell*, 99 F.3d 146, 149–50 (4th Cir. 1996); *Cedar Shore Resort, Inc.*, 235 F.3d at 380–81. Undeniably yes.

In *Premier Auto*, the Fourth Circuit found it was bad faith for the debtor to attempt to force renegotiation of its lease, to which it had no state law right to force, by leveraging the automatic stay despite lack of financial need. Here, DBMP does exactly the same. DBMP has no right to use the automatic stay to force renegotiation of its state-law liabilities absent financial distress. This is wholly improper and bad faith.

In contrast, in the 1980s, the Fourth Circuit noted a "striking similarity" between *A.H. Robins* and *Johns-Manville*, two mass tort driven bankruptcies (*A.H. Robins Co. Inc. v. Piccinin*, 788 F.2d 994, 1007 (4th Cir. 1986)). Manville was a "financially besieged enterprise in desperate need of reorganization of its crushing debt, both present and future." *Kane*, 843 F.2d at 649 (citing *In re Johns-Manville Corp.*, 36 B.R. 727, 741 (Bankr. S.D.N.Y. 1984)). A.H. Robins was "confronted, if not overwhelmed, with an avalanche" of actions related to its Dalkon Shield contraceptive device and the company had a "limited fund" to satisfy them. *A.H. Robins*, 788 F.2d at 996, 1008. [20] *See also In re A.H. Robins Company, Inc.*, 89 B.R. 555, 558 (E.D. Va. 1988) (recognizing the Dalkon Shield liability "caused a crucial depletion of the company's funds").

Moreover, New CertainTeed's massive wealth—available to DBMP via the unlimited Funding Agreement—establishes there is no legally cognizable burden on any

[20] This stands in stark contrast to stooge Two-Step debtors like DBMP, who can use their Funding Agreements with their non-bankrupt corporate overlords like "an ATM disguised as a contract." *LTL*, 64 F.4th at 109.

party for Appellants to liquidate their claims now. Instead, DBMP wields the stay as a bargaining tool to force claimants into the Hobson's choice of either risking years of delay and potential destruction of some or all their rights, or accepting a bankruptcy-based resolution of their claims that limits and impairs their state-law rights. *Contra*, *Premier Auto*, 492 F.3d at 279 (good faith is "'indispensable to proper accomplishment of the basic purposes of the Chapter 11'") (quoting *Carolin*, 886 F.2d at 698).

Asbestos claims are ***not*** different, nor are massively profitable companies who happen to have asbestos liability exempt from the strictures of Chapter 11. Nothing in the text or history of the Bankruptcy Code supports the conclusion that Congress intended to throw open the doors of bankruptcy jurisdiction to the ultra-wealthy when it enacted Section 524(g).[21] Indeed, had Congress attempted to do so, it would have exceeded the Constitutional limitations on the bankruptcy courts discussed in *Stern v. Marshall*, 564 U.S. 462, 131 S. Ct. 2594 (2011).[22]

---

[21] As discussed above (*supra* n. 17), the existence of 11 U.S.C. § 524(g) does not expand the statutory reach of Chapter 11 to financially robust companies who simply dislike the entirely payable state-law tort liabilities they incurred by selling deadly asbestos-laden products that poisoned Americans. Section 524(g) was enacted to provide companies facing overwhelming asbestos liabilities with a remedy that both maximized recovery for the asbestos creditors and preserved a portion of the limited fund for future claimants. DBMP/Old CertainTeed were never overwhelmed by their asbestos liabilities and, rather than seeking to preserve a portion of an inadequate limited fund for future victims, seek to create an artificially limited fund against which all present and future claimants must seek justice.

[22] The Fourth Circuit recently accepted the Committee's direct appeal of the Bankruptcy Court's denial of the Committee's Third Motion to Dismiss, which raised this Constitutional argument. Order Granting Pet. for Permission to Appeal, *The Off. Comm. Of Asbestos Claimants of Bestwall LLC v. Bestwall LLC, f/k/a Georgia-Pacific LLC*, No. 24-170, May 31, 2024, Dkt. No. 15.

### 3. *DBMP's bad faith is grounds to lift the stay.*

Bankruptcy courts have the power to lift the stay based on "the particular circumstances of the case [as] guided by considerations that under the law make for the ascertainment of what is just to the claimants, the debtor, and the estate." *Foust v. Munson Steamship Lines*, 299 U.S. 77, 83, 57 S. Ct. 90, 94 (1936). For decades, the Fourth Circuit has recognized that bad faith constitutes "cause" for relief under 11 U.S.C. § 362(d)(1):

> Just as § 1112(b) inferentially permits inquiry into a debtor's good faith in the context of an interested party's motion to dismiss, § 362(d)(1)'s "for cause" language authorizes the court to determine whether, with respect to the interests of a creditor seeking relief, a debtor has sought the protection of the automatic stay in good faith.

*Carolin*, 886 F.2d at 699.

Indeed, this premise was a building block of *Carolin*'s two-pronged ((1) subjective bad faith and (2) objective futility) test for dismissal of a bankruptcy petition. *See id.* at 701. Moreover, Congress placed the burden of proof on the ***debtor*** in resisting lift stay requests except regarding the value of property. 11 U.S.C. § 362(g). DBMP did not dispute that it bore the burden of proof when the Bankruptcy Court invited it to respond to that issue. App. 842.

The error below is clear: the Bankruptcy Court was required to "determine whether, with respect to the interests of ***a*** creditor [Appellants] seeking relief, a debtor [DBMP] sought the protection of the automatic stay in good faith." *Carolin*, 886 F.2d at

699 (emphasis added). The rule makes sense. A debtor cannot invoke the automatic stay in bad faith and then be shielded from a creditor seeking relief.

But the Bankruptcy Court flatly refused to rule on the central question of bad faith, and instead applied a legal framework unmoored from the Code, from logic, and from controlling case law. Speculating that "there'd be tens of thousands" of claimants seeking relief from stay if relief were granted to the two Appellants here (App. 863-64), the Bankruptcy Court didn't "feel comfortable" ruling on whether DBMP filed in subjective bad faith. App. 864. But, ***even if*** DBMP had filed in ***subjective bad faith***, the Bankruptcy Court didn't think this was sufficient to grant relief. App. 866.

The Bankruptcy Court's reasoning goes against a plain reading of *Carolin*. When the Fourth Circuit considered whether to require a futility prong before bad faith dismissal was proper, it recognized that creditors could seek relief from stay for bad faith. Only ***after*** this analysis did the Fourth Circuit[23] decide that both objective futility and subjective bad faith were required "in order to warrant ***dismissals for want of good faith*** in filing." *Carolin*, 886 F.2d at 700-01 (emphasis added). This two-pronged test applies only to dismissal and neither the Debtor nor the Bankruptcy Court cited any Fourth

[23] *Carolin* involved a debtor with no assets and the question of whether that debtor should be afforded the protection of the bankruptcy's "powerful equitable weapons." *See Carolin*, 886 F.2d at 698. But that distinction, which has been hotly argued elsewhere, has no import here, where the Bankruptcy Court was asked to apply 11 U.S.C. § 362.

Circuit decision even remotely suggesting the two-pronged test also applied to lift-stay motions under § 362.

The Bankruptcy Court's rationale is contrary to *Carolin*'s plain language and leads to absurd results. It means that—in ***this*** District, anyway—a debtor whose "real motivation" is to "abuse the reorganization process," "cause hardship [and] delay [its] creditors," and merely to invoke the automatic stay, may nevertheless file for bankruptcy and benefit from a nationwide litigation stay against ***all*** tort victims. *Id.* at 702 (defining subjective bad faith).

The Bankruptcy Court's distortion of *Carolin*'s plain language creates ***unlimited*** bankruptcy court jurisdiction. Any company, no matter how wealthy, un-distressed, and able to manage its liabilities, can file for Chapter 11 in ***this*** District for admittedly bad-faith reasons, and benefit from an indefinite, exception-free and universal litigation stay. That is not how the Code or how the controlling precedent are structured.

To the Bankruptcy Court, there is no remedy for Appellants, other than to waive their Constitutional rights to jury trials and state law damages, and somehow convince every single one of the thousands of other claimants to do the same, helping a non-distressed multi-billionaire cap its liability and fabricate a limited fund. All of which is unconstitutional. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 119 S. Ct. 2295 (1999).

B. **<u>The Bankruptcy Court Erred in Imposing Upon Appellants Burdens Not Found in Precedent or the Code, and Conflating the *Robbins* Factors With *Carolin*'s Bad Faith Stay Relief Standard.</u>**

DBMP's bad faith is grounds—independent and by itself—for relief from stay, without engaging in the balancing factors set forth in *Robbins (In re Robbins*, 964 F.2d 342 (4th Cir. 1992)), as the Bankruptcy Court did. App. 866. To the Bankruptcy Court, however, bad faith was "at most," a factor to consider under *Robbins*. App. 866. This was error. In *Robbins*, the lift stay analysis did not consider questions of whether the petition was filed in good faith and presupposed a debtor properly in bankruptcy court. In *Carolin*, which predated *Robbins*, the Fourth Circuit made clear that bad faith, by itself, is grounds for relief from stay.

These facts are ***undisputed:*** Appellants have mesothelioma caused by exposure to asbestos from Old CertainTeed's products, DBMP filed its petition in bad faith, and Appellants wished to liquidate their claims against DBMP in state courts with jurisdiction to decide them. In response, DBMP offered ***no*** evidence—as § 362(g) requires it to—that its petition was filed in good faith, that judicial economy would be better served if the request was denied, or that "*de facto* dismissal" would occur if relief were granted. In spite of this, the Bankruptcy Court speculated—without evidence—that "tens of thousands" of other claimants would seek relief within months of these two Appellants being allowed to quantify the value of their claims and the bankruptcy case. App. 863-64.

The Bankruptcy Court did ***not*** discuss in any detail why a balancing of the *Robbins* factors favored denying relief from stay, though seemingly it was because of *Robbins'* second factor, judicial economy. App. 861 (referring to a sister court's reasoning in *Bestwall*). Outside of the speculated "thousands" of claims, the Bankruptcy Court offered no analysis about how judicial economy would be impacted. And DBMP offered no evidence in support of this.

The Bankruptcy Court reasoned that "under *Carolin* if we're going to start granting relief from stay *en masse*, then you're back under *Carolin* and we can't on the basis of subjective bad faith, if that exists, warrant, effectively, [ending] the whole case." App. 862. "*Robbins* involves a balancing test…here relief from stay would lead to case dismissal, which under *Carolin* is not attainable for simply subjective bad faith. So I'm not going to do indirectly something that I'm not permitted to do or inclined to do under existing law." App. 866.

The Bankruptcy Court's rationale is that if a case cannot be dismissed—presumably because the Court believes objective futility cannot be shown—then no individual request for relief can ***ever*** be granted. The Court's invention of impossible-to-prove, slippery slope obstacles (and new burdens of proof) only compounds its fundamental, plain error: completely refusing to engage in the issue of whether DBMP's bankruptcy is proceeding in good faith.

Congress specifically and directly placed the burden of proof in resisting a motion to lift stay upon the debtor for all issues other than demonstrating equity in property at issue. *See* 11 U.S.C. 362(g). But the Bankruptcy Court placed burdens on Appellants not found in precedent or the Code and held Appellants accountable for future speculative actions of other civil plaintiffs while ignoring direct language from the Fourth Circuit.

***Nowhere*** in *Carolin*, *Robbins*, *Premier*, or § 362 does it say that a bankruptcy court should permit a debtor—who filed in subjective bad faith—to remain shielded by the automatic stay if the bankruptcy court believes, without evidence and based purely on speculation, that granting relief would invite other requests and lead indirectly to dismissal.

The Fourth Circuit's decision in *Bestwall* last year is informative. After expressly stating that dismissal (i.e., bad faith) was ***not*** before it as it had been before the Third Circuit in *LTL*, the Fourth Circuit recognized as "routine" the remedy available to people like Appellants: "rather than waiting for plan confirmation, claimants can bring individual actions for relief based on the specific facts of a particular claim." *Bestwall*, 71 F.4th at 183.

All creditors in *Bestwall*, as here, are asbestos claimants, so in reinforcing the remedy available to individuals seeking stay relief, the Fourth Circuit clearly contemplated that the bankruptcy courts ***would*** grant relief to at least some asbestos claimants who requested it in pending Two-Step cases in this District. But the Bankruptcy

Court erroneously believed it could not grant relief to ***any*** claimant, because to grant relief to a ***single*** claimant would require it to grant it for ***all*** claimants (and thus result in dismissal). Thus, regardless of the "specific facts" of their "particular claim", as *Bestwall* instructed, the Bankruptcy Court would ***never*** grant relief to any claimant. Rather than take the *Bestwall* decision seriously, the Bankruptcy Court told the parties seeking relief to "not continu[e] to try to beat your head against a rock." App. 867.

There is no evidence that any other claimants, let alone hundreds or thousands, would seek such relief. In the seven-year history of *Bestwall*, only two claimants have sought relief from stay; in the four year history of *Aldrich*, only one claimant has; and in the 54-month history of *DBMP*, these are the first two requests. App. 247; 389. Nor is there any intuitive reason to believe that a flood of other claimants would file such limited motions. Had the Bankruptcy Court lifted the stay, Appellants would have incurred the time and expense of litigating their claims in state court, potentially through verdict and appeal, and potentially losing. And even if they were successful, they still had to return to the Bankruptcy Court and await the final resolution before receiving a penny.

## VII. CONCLUSION

The Bankruptcy Court refused to apply the facts to the law. Because those facts are undisputed, this Court should exercise *de novo* review and reverse, ordering that Appellants' respective motions for relief from the automatic stay be granted.

Respectfully submitted, this the 19th day of August 2024.

**WALDREP WALL BABCOCK & BAILEY PLLC**
*/s/ Thomas W. Waldrep, Jr.*
Thomas W. Waldrep Jr. (NC State Bar No. 11135)
Jennifer B. Lyday (NC State Bar No. 39871)
Chris W. Haaf (NC State Bar No. 46077)
Ciara L. Rogers (NC State Bar No. 42571)
370 Knollwood Street, Suite 600
Winston-Salem, NC 27103
Telephone: 336-717-1280
Facsimile: 336-717-1340
Email: notice@waldrepwall.com

– and –

**THE RUCKDESCHEL LAW FIRM, LLC**
*/s/ Jonathan Ruckdeschel*
Jonathan Ruckdeschel
(Maryland, CPF: 9712180133)
8357 Main Street
Ellicott City, Maryland 21043
Telephone: 410-750-7825
Facsimile: 443-583-0430
Email: ruck@rucklawfirm.com
Admitted Pro Hac Vice

– and –

**MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC**
*/s/ Clayton L. Thompson*
Clayton L. Thompson (NY Bar No. 5628490)
John Louis Steffan IV (Missouri Bar No. 64180)
150 W. 30th Street, Suite 201
New York, NY 10001
Telephone: (800) 358-5922
Email: CThompson@mrhfmlaw.com
Admitted Pro Hac Vice

*Counsel for the Appellants*

## CERTIFICATE OF COMPLIANCE

I hereby certify that (1) this brief complies with the type-volume limitation of Fed. R. Bankr. P. 8015(a)(7)(B) because this brief contains 8,922 words; and (2) this brief complies with the typeface requirements of Fed. R. Bankr. P. 8015(a)(5)(A) as well as the type style requirements of Fed. R. Bankr. P. 8015(a)(6) because this brief has been prepared in a proportionally spaced typeface in a 12-point Palatino Linotype font in the text and quotations, and 10-point Palatino Linotype font in the footnotes.

Respectfully submitted this the 19th day of August 2024.


**WALDREP WALL BABCOCK**
**& BAILEY PLLC**

*/s/ Thomas W. Waldrep, Jr.*
Thomas W. Waldrep Jr. (NC Bar No. 11135)
370 Knollwood Street, Suite 600
Winston-Salem, NC 27103
Telephone: (336) 717-1280
Facsimile: (336) 717-1340
Email: notice@waldrepwall.com

*Counsel for the Appellants*

## CERTIFICATE OF COMPLIANCE REGARDING USE OF ARTIFICIAL INTELLIGENCE

Pursuant to the Court's June 18, 2024 Order, 3:24-mc-104, the undersigned hereby certifies that no artificial intelligence was employed in performing legal research for the preparation of the foregoing brief with the exception of such artificial intelligence embedded in standard online legal research sources such as Westlaw, Lexis, FastCase, and Bloomberg. The undersigned further certifies that every statement and every citation to an authority contained in the foregoing brief has been checked by me or another attorney in this case, and/or a paralegal working at my direction or at the direction of another attorney in this case, as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Respectfully submitted this the 19th day of August 2024.

**WALDREP WALL BABCOCK & BAILEY PLLC**

*/s/ Thomas W. Waldrep, Jr.*
Thomas W. Waldrep Jr. (NC Bar No. 11135)
370 Knollwood Street, Suite 600
Winston-Salem, NC 27103
Telephone: (336) 717-1280
Facsimile: (336) 717-1340
Email: notice@waldrepwall.com

*Counsel for the Appellants*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing **Appellant Brief** was filed in accordance with the local rules and served upon all parties registered for electronic service and entitled to receive notice thereof through the CM/ECF system.

Respectfully submitted this the 19th day of August 2024.

**WALDREP WALL BABCOCK & BAILEY PLLC**

*/s/ Thomas W. Waldrep, Jr.*
Thomas W. Waldrep Jr. (NC Bar No. 11135)
370 Knollwood Street, Suite 600
Winston-Salem, NC 27103
Telephone: (336) 717-1280
Facsimile: (336) 717-1340
Email: notice@waldrepwall.com

*Counsel for the Appellants*

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:24-CV-558-KDB; 3:24-CV-559-KDB

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | APPEAL FROM |
| DBMP LLC,[1] | ) | USBC WDNC |
| | ) | Case No. 20-30080 |
| Debtor. | ) | |
| | ) | |
| THE ESTATE OF PETER L. BERGRUD AND MICHAEL N. AND ANN HERLIHY | ) | |
| Plaintiffs-Appellants, | ) | |
| v. | ) | |
| DBMP LLC, | ) | |
| Defendant-Appellee. | ) | |

**APPENDIX TO APPELLANTS' BRIEF**

The Estate of Peter L. Bergrud and Michael N. and Ann Herlihy[2] (collectively, the "Appellants"), hereby submit their appendix to the Appellants' Brief [ECF No. 4], pursuant to Rule 8018(b) of the Federal Rules of Bankruptcy Procedure, and file the following:

[1] The last four digits of the Debtor's taxpayer identification number are 8817. The Debtor's address is 20 Moores Road, Malvern, Pennsylvania 19355.

[2] This Court entered an Order consolidating the appeals of the Denial Orders. *See* Herily v. DBMP LLC, 24-CV-00558, TEXT-ONLY ORDER docket entry dated July 18, 2024.

# TABLE OF CONTENTS

*In Re DBMP, 20-30080*


| Docket Name | Bankr. Doc. No. | Page |
|---|---|---|
| Voluntary Petition Under Chapter 11 | 1 | 0001 |
| Informational Brief of DBMP LLC | 22 | 0019 |
| Declaration of Robert J. Panaro | 24 | 0053 |
| Motion of the Official Committee of Asbestos Personal Injury Claimants to Lift the Stay Pursuant to 11 U.S.C. § 362 as to Certain Asbestos Personal Injury Claims | 614 | 0104 |
| Debtor's Objection to Motion of the Official Committee of Asbestos Personal Injury Claimants to Lift the Stay Pursuant to 11 U.S.C. § 362 as to Certain Asbestos Personal Injury Claims | 656 | 0135 |
| Findings of Fact and Conclusions of Law | 972 | 0161 |
| The Estate of Peter L. Bergrud's Motion for Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362(d) | 2753 | 0240 |
| Exhibits to The Estate of Peter L. Bergrud's Motion for Relief from the Automatic Stay | 2757 | 0278 |
| Michael N. and Ann Herlihy's Motion for Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362(d) | 2755 | 0382 |

| | | |
|---|---|---|
| Exhibits to Michael N. and Ann Herlihy's Motion for Relief from the Automatic Stay | 2755-1 | 0420 |
| Debtor's Omnibus Objection to the Estate of Peter L. Bergrud's and Michael N. and Ann Herlihy's Motions for Relief from the Automatic Stay | 2777 | 0527 |
| Statement of the Official Committee of Asbestos Personal Injury Claimants in Support of Claimant Motions for Relief from Automatic Stay | 2779 | 0555 |
| The Estate of Peter L. Bergrud's and Michale N. and Ann Herlihy's Omnibus Reply in Support of Motions for Relief from the Automatic Stay | 2782 | 0559 |
| Order Denying Motion of Michael N. and Ann Herlihy for Relief from Automatic Stay | 2808 | 0568 |
| Order Denying Motion of The Estate of Peter L. Bergrud for Relief from the Automatic Stay | 2809 | 0570 |
| Notice of Appeal of Order Denying Motion of Michael N. and Ann Herlihy for Relief from the Automatic Stay | 2820 | 0572 |
| Notice of Appeal of Order Denying Motion of The Estate of Peter L. Bergrud for Relief from the Automatic Stay | 2821 | 0577 |

| | | |
|---|---|---|
| | | |
| Transcript for Hearing/Trial held on 1/18/2024 | | 0584 |
| Transcript for Hearing/Trial held on 3/28/2024 | | 0676 |
| Transcript for Hearing/Trial held on 5/9/2024 | | 0769 |
| Transcript for Hearing/Trial held on 5/23/2024 | | 0848 |

Respectfully submitted this the 19th day of August, 2024.

**WALDREP WALL BABCOCK & BAILEY PLLC**

*/s/ Thomas W. Waldrep, Jr.*
Thomas W. Waldrep Jr. (NC State Bar No. 11135)
Jennifer B. Lyday (NC State Bar No. 39871)
Ciara Rogers (NC State Bar No. 42571)
Chris W. Haaf (NC State Bar No. 46077)
370 Knollwood Street, Suite 600
Winston-Salem, NC 27103
Telephone: 336-717-1280
E-mail: notice@waldrepwall.com

- and -

**THE RUCKDESCHEL LAW FIRM, LLC**


*/s/ Jonathan Ruckdeschel*
Jonathan Ruckdeschel
(Maryland, CPF: 9712180133)
8357 Main Street
Ellicott City, Maryland 21043
Telephone: 410-750-7825
Facsimile: 443-583-0430
Email: ruck@rucklawfirm.com
Admitted Pro Hac Vice


\- and -

**MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC**


*/s/ Clayton L. Thompson*
Clayton L. Thompson (NY Bar No. 5628490)
John Louis Steffan IV (Missouri Bar No. 64180)
150 W. 30th Street, Suite 201
New York, NY 10001
Telephone: (800) 358-5922
Email: CThompson@mrhfmlaw.com
Admitted Pro Hac Vice


*Counsel for Appellants*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that copies of the foregoing **APPENDIX TO APPELLANTS' BRIEF** was filed in accordance with the local rules and served upon all parties registered for electronic service and entitled to receive notice thereof through the CM/ECF system.

Respectfully submitted this the 19th day of August, 2024.

**WALDREP WALL BABCOCK & BAILEY PLLC**

*/s/ Thomas W. Waldrep, Jr.*
Thomas W. Waldrep Jr. (NC State Bar No. 11135)
370 Knollwood Street, Suite 600
Winston-Salem, NC 27103
Telephone: 336-717-1280
E-mail: notice@waldrepwall.com

*Counsel for Appellants*

**Fill in this information to identify the case.**

United States Bankruptcy Court for the
Western District of North Carolina
(State)

Case number (*If known*): ____________ Chapter 11

☐ Check if this is an amended filing

Official Form 201

# Voluntary Petition for Non-Individuals Filing for Bankruptcy

04/19

**If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals,* is available.**

1. **Debtor's name** — DBMP LLC

2. **All other names debtor used in the last 8 years** — DBMP LLC, a Texas limited liability company

   Include any assumed names, trade names, and *doing business as* names

3. **Debtor's federal Employer Identification Number** (EIN) — 84 – 3 4 5 8 8 1 7

4. **Debtor's address**

   **Principal place of business**

   20 Moores Road
   Number Street

   Malvern PA 19355
   City State ZIP Code

   Chester
   County

   **Mailing address, if different from principal place of business**

   Number Street

   P.O. Box

   City State ZIP Code

   **Location of principal assets, if different from principal place of business**

   Number Street

   North Carolina
   City State ZIP Code

5. **Debtor's website** (URL) — https://dm.epiq11.com/DBMP

6. **Type of debtor**

   ■ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))
   ☐ Partnership (excluding LLP)
   ☐ Other. Specify: ____________

Debtor DBMP LLC Case number (if known)
Name

**7. Describe debtor's business**

A. *Check one:*

- ☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))
- ☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))
- ☐ Railroad (as defined in 11 U.S.C. § 101(44))
- ☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))
- ☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))
- ☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))
- ■ None of the above

B. *Check all that apply:*

- ☐ Tax-exempt entity (as described in 26 U.S.C. § 501)
- ☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. § 80a-3)
- ☐ Investment advisor (as defined in 15 U.S.C. § 80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See http://www.uscourts.gov/four-digit-national-association-naics-codes .

5 5 1 1

**8. Under which chapter of the Bankruptcy Code is the debtor filing?**

*Check one:*

- ☐ Chapter 7
- ☐ Chapter 9
- ■ Chapter 11. *Check all that apply*:
  - ☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $2,725,625 (amount subject to adjustment on 4/01/22 and every 3 years after that).
  - ☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D). If the debtor is a small business debtor, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if all of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).
  - ☐ A plan is being filed with this petition.
  - ☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).
  - ☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.
  - ☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.
- ☐ Chapter 12

**9. Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

■ No

☐ Yes. District ______ When ______ (MM / DD / YYYY) Case number ______

District ______ When ______ (MM / DD / YYYY) Case number ______

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

List all cases. If more than 1, attach a separate list.

☐ No

■ Yes. Debtor Sepco Corporation Relationship Affiliate

District Northern District of Ohio When 01/14/2016 (MM / DD / YYYY)

Case number, if known 16-50058

Debtor DBMP LLC
Name

Case number (*if known*) ____________________

**11. Why is the case filed in *this district*?**

*Check all that apply:*

- ■ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.
- ☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

- ■ No
- ☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** (*Check all that apply.*)

- ☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.
  What is the hazard? ____________________
- ☐ It needs to be physically secured or protected from the weather.
- ☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).
- ☐ Other ____________________

**Where is the property?** ____________________
Number Street

____________________
City State ZIP Code

**Is the property insured?**

- ☐ No
- ☐ Yes. Insurance agency ____________________
  Contact name ____________________
  Phone ____________________

## Statistical and administrative information

**13. Debtor's estimation of available funds**

*Check one:*

- ■ Funds will be available for distribution to unsecured creditors.
- ☐ After any administrative expenses are paid, no funds will be available for distribution to unsecured creditors.

**14. Estimated number of creditors**

| | | |
|---|---|---|
| ☐ 1-49 | ☐ 1,000-5,000 | ☐ 25,001-50,000 |
| ☐ 50-99 | ☐ 5,001-10,000 | ■ 50,001-100,000 |
| ☐ 100-199 | ☐ 10,001-25,000 | ☐ More than 100,000 |
| ☐ 200-999 | | |

**15. Estimated assets**

| | | |
|---|---|---|
| ☐ $0-$50,000 | ☐ $1,000,001-$10 million | ■ $500,000,001-$1 billion |
| ☐ $50,001-$100,000 | ☐ $10,000,001-$50 million | ☐ $1,000,000,001-$10 billion |
| ☐ $100,001-$500,000 | ☐ $50,000,001-$100 million | ☐ $10,000,000,001-$50 billion |
| ☐ $500,001-$1 million | ☐ $100,000,001-$500 million | ☐ More than $50 billion |

**16. Estimated liabilities**

- ❑ $0-$50,000
- ❑ $50,001-$100,000
- ❑ $100,001-$500,000
- ❑ $500,001-$1 million
- ❑ $1,000,001-$10 million
- ❑ $10,000,001-$50 million
- ❑ $50,000,001-$100 million
- ❑ $100,000,001-$500 million
- ■ $500,000,001-$1 billion
- ❑ $1,000,000,001-$10 billion
- ❑ $10,000,000,001-$50 billion
- ❑ More than $50 billion

## Request for Relief, Declaration, and Signatures

**WARNING --** Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

- The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.
- I have been authorized to file this petition on behalf of the debtor.
- I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 01/23/2020
MM / DD / YYYY

✗ [signature]
Signature of authorized representative of debtor

Michael T. Starczewski
Printed name

Title Chief Legal Officer

**18. Signature of attorney**

✗ */s/ Gregory M. Gordon*
Signature of attorney for debtor

Date 01/23/2020
MM / DD / YYYY

Gregory M. Gordon
Printed name

Jones Dy
Firm name

2727 North Harwood Street, Suite 500
Number Street

Dallas TX 75201
City State ZIP Code

(214) 220-3939
Contact phone

gmgordon@jonesday.com
Email address

08435300 Texas
Bar number State

# SECRETARY'S CERTIFICATE

January 23, 2020

Michael T. Starczewski, in his capacity as Secretary of DBMP LLC, a North Carolina limited liability company (the "Company"), hereby certifies that (1) the resolutions attached hereto as Exhibit A (the "Resolutions") are a complete and accurate copy of the resolutions adopted on January 22, 2020 by the board of managers of the Company related to the authorization of the Company to file a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Western District of North Carolina (the "Chapter 11 Case") and (2) all the Resolutions are in full force and effect and are all the resolutions adopted in connection with the filing of the Chapter 11 Case as of the date hereof.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, the undersigned has executed and delivered this certificate as of the date first written above.

DBMP LLC,
a North Carolina limited liability company

By: /s/ Michael T. Starczewski
Name: Michael T. Starczewski
Title: Secretary

*[Signature Page to Secretary's Certificate of Company]*

**EXHIBIT A**

Resolutions

**MEETING OF BOARD OF MANAGERS**

**OF**

**DBMP LLC**

**January 22, 2020**

**Resolutions**

**WHEREAS**, the Board of Managers (the "Board") of DBMP LLC, a North Carolina limited liability company (the "Company"), has: (1) regularly and carefully reviewed the materials and other information presented by the management and the advisors of the Company regarding the Company's asbestos-related liabilities, current and projected financial position and other relevant information; (2) thoroughly evaluated the Company's strategic alternatives, including a possible bankruptcy filing; (3) conferred with the Company's management and advisors regarding these matters; and (4) determined that the filing of a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") is in the best interests of the Company and its stakeholders; and

**WHEREAS**, in connection therewith, the Board has selected Robert J. Panaro, currently Vice President of the Company, to serve as the chief restructuring officer for the Company.

**Chapter 11 Filing**

**NOW, THEREFORE, BE IT RESOLVED**, that in the judgment of the Board, it is desirable and in the best interests of the Company, its creditors and other interested parties that the Company seek relief under the Bankruptcy Code;

**FURTHER RESOLVED**, that the Company be, and it hereby is, authorized to file a voluntary petition (the "Petition") for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case") in the United States Bankruptcy Court for the Western District of North Carolina or such other court as any of the managers of the Company, the officers of the Company and their designees (collectively, the "Authorized Persons") may determine to be necessary, desirable or appropriate (the "Bankruptcy Court") and perform any and all such other acts as any Authorized Person may determine to be necessary, desirable or appropriate to effect any of the foregoing, with the filing of such Petition or performance of such other act to be conclusive evidence of such determination;

**FURTHER RESOLVED**, that the Authorized Persons be, and each of them hereby is, authorized, directed and empowered, in the name and on behalf of the Company, to: (1) execute, acknowledge, deliver and verify, and cause to be filed with the Bankruptcy Court, the Petition and all other ancillary documents, with each in such form, as any Authorized Person may determine to be necessary, desirable or appropriate to carry out the intent and accomplish the purposes of these resolutions; (2) execute, acknowledge, deliver, verify and file, or cause to be filed, all petitions, schedules, statements, lists, motions, complaints, declarations, applications, notices and other papers or documents, with each in such form, as any Authorized Person may determine to be necessary, desirable or appropriate in connection with the foregoing; and

(3) execute, acknowledge, deliver and verify any and all other documents, with each in such form, as any Authorized Person may determine to be necessary, desirable or appropriate in connection therewith and to administer the Chapter 11 Case; all with the taking of any such action, including any such execution, acknowledgment, delivery, verification or filing, to be conclusive evidence of such determination;

**FURTHER RESOLVED**, that, pursuant to Section 57D-3-22 of the North Carolina Limited Liability Company Act and Section 3.04 of the Operating Agreement of the Company, dated as of October 23, 2019 (the "Operating Agreement"), Robert J. Panaro be, and he hereby is, appointed to serve as an officer of the Company denominated as the Chief Restructuring Officer (the "CRO"), until his successor as CRO has been duly qualified and appointed or until his earlier death, resignation or removal, with such service to be in addition to his current service as Vice President of the Company; and

**FURTHER RESOLVED**, that the CRO shall: (1) perform such duties as may be prescribed by the Board, under whose supervision he shall be; (2) perform the usual and customary duties that pertain to such office and generally exercise such other powers and duties as the Board may further prescribe from time to time; and (3) generally assist in the administration of the Chapter 11 Case by executing, acknowledging, delivering, verifying and filing, or causing to be filed, such petitions, schedules, statements, lists, motions, complaints, declarations, applications, notices and other papers or documents as he may determine to be necessary, desirable or appropriate in connection with the Chapter 11 Case (with the taking of any such action, including any such execution, acknowledgement, delivery, verification or filing, by the CRO to be conclusive evidence of such determination), except in cases where such action shall be expressly and exclusively delegated by the Board or the Operating Agreement to some other officer or agent of the Company or shall be required by Legal Requirement (as defined in the Operating Agreement) to be otherwise effected.

**Retention of Professionals**

**RESOLVED**, that the Authorized Persons be, and each of them hereby is, authorized, directed and empowered, in the name and on behalf of the Company, to retain (1) Jones Day, (2) Robinson, Bradshaw & Hinson, P.A., (3) Bates White, LLC, (4) Schiff Hardin LLP, and (5) such additional professionals, including attorneys, accountants, financial advisors, actuaries, consultants or agents (together with the foregoing identified firms, the "Professionals"), as any Authorized Person may determine to be necessary, desirable or appropriate in connection with the Chapter 11 Case and other related matters, and to execute, deliver and perform retention agreements with the Professionals in such form and reflecting such terms as any Authorized Person may approve, all with the retention of any Professional to be conclusive evidence of such determination and approval; and

**FURTHER RESOLVED**, that the law firms of Jones Day and Robinson, Bradshaw & Hinson, P.A. and any additional special or local counsel selected by any Authorized Persons be, and each of them hereby is, authorized, directed and empowered to represent the Company, as debtor and debtor in possession, in connection with any chapter 11 case commenced by or against the Company under the Bankruptcy Code, including the Chapter 11 Case.

**General Authority**

**RESOLVED**, that the Authorized Persons be, and each of them hereby is, authorized and empowered to execute and deliver such additional agreements, instruments and documents, and to take such other actions (including the payment of costs and expenses), in the name and on behalf of the Company, in each case, as any Authorized Person may determine to be necessary, desirable or appropriate to implement the purposes and intent of the foregoing resolutions, with the execution and delivery of any such agreement, instrument or document or taking of any such action by any Authorized Person to be conclusive evidence of such determination;

**FURTHER RESOLVED**, that the Authorized Persons be, and each of them hereby is, authorized and empowered to certify and furnish to any person or entity such copies of the resolutions set forth herein, and to certify to any person or entity that the resolutions set forth herein have been duly adopted by the Board, are in full force and effect and are in conformity with the Articles of Organization and Conversion of the Company and the Operating Agreement, as any Authorized Person may determine to be necessary, desirable or appropriate to implement the purposes and intent of the foregoing resolutions, with the certification and furnishing of such copies or the certification of such matters to be conclusive evidence of such determination; and

**FURTHER RESOLVED**, that, in the event that any Authorized Person determines a specific form of resolutions is necessary or advisable in connection with the implementation of the purposes and intent of the foregoing resolutions, resolutions in such form be, and they hereby are, adopted by the Board as if such resolutions were expressly set forth herein and that any Authorized Person be, and each of them hereby is, authorized and empowered to certify and furnish to any person or entity copies of such resolutions, and to certify to any person or entity that such resolutions have been duly adopted by the Board, are in full force and effect and are in conformity with the Articles of Organization and Conversion of the Company and the Operating Agreement, with the certification and furnishing of such copies or the certification of such matters to be conclusive evidence of such determination.

**Ratification**

**RESOLVED**, that all actions taken in the name and on behalf of the Company prior to the adoption of these resolutions that would have been authorized by the foregoing resolutions had they been taken after the adoption of these resolutions be, and each of them hereby is, approved, adopted, ratified and confirmed in all respects.

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| In re<br><br>DBMP LLC,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 20-_______ |

**CORPORATE OWNERSHIP STATEMENT**

**DBMP LLC**

Check one: _X_ DEBTOR ___ PLAINTIFF ___ DEFENDANT ___ OTHER (specify):

*Instructions: Fed. R. Bankr. P. 7007.1 requires corporate parties to an adversary proceeding, other than the debtor or a governmental unit, to file a statement of corporate ownership with the first pleading filed. Fed. R. Bankr. P. 1007(a)(1) requires corporate debtors to file with the petition a Corporate Ownership Statement containing the information described in Fed. R. Bankr. P. 7007.1. Check one of the statements set forth below and provide any information as directed.*

☒ **1. The following corporations directly or indirectly own 10% or more of any class of the above named corporate debtor's/party's equity interests:**[2]

CertainTeed Holding Corporation
20 Moores Road
Malvern, Pennsylvania 19355

Compagnie de Saint-Gobain (France)
Les Miroirs
18, avenue d'Alsace
92400 Courbevoie
France

Saint-Gobain Corporation
20 Moores Road
Malvern, Pennsylvania 19355

---

[1] The last four digits of the Debtor's taxpayer identification number are 8817. The Debtor's address is 20 Moores Road, Malvern, Pennsylvania 19355.

[2] The corporations are listed in alphabetical order.

Saint-Gobain Delaware Corporation
20 Moores Road
Malvern, Pennsylvania 19355

Societe de Participations Financieres et Industrielles
Les Miroirs
18, avenue d'Alsace
92400 Courbevoie
France

☐ 2. There are no entities that directly or indirectly own 10% or more of any class of the above named corporate debtor's/party's equity interests.

Date: January 23, 2020

*/s/ Michael T. Starczewski*
Signature of Authorized Individual for Corporate Debtor/Party

Michael T. Starczewski
Printed Name of Authorized Individual for Corporate Debtor/Party

Chief Legal Officer
Title of Authorized Individual for Corporate Debtor/Party

| Fill in this information to identify the case: |
|---|
| Debtor name: DBMP LLC |
| United States Bankruptcy Court for the Western District of North Carolina |
| Case Number (if known): ______________________________ |

☐ Check if this is an amended filing

# Chapter 11 Case: List of 25 Law Firms With the Most Significant Representations of Asbestos Claimants

**The following is an alphabetical list of the law firms with the most significant representations of parties with asbestos claims against DBMP LLC, as debtor and debtor in possession (the "Debtor"), based on the volume of filings, scope of payments or related factors, across the major types of claims faced by the Debtor (the "Top Asbestos Counsel List"). Concurrently with this petition, the Debtor has filed a motion seeking authority to file this Top Asbestos Counsel List in lieu of a list of the 20 largest unsecured creditors.[1] This list does not include any person or entity who is an "insider" under section 101(31) of title 11 of the United States Code. The Top Asbestos Counsel List was prepared with information existing as of January 22, 2020. The Debtor reserves the right to amend the Top Asbestos Counsel List based on additional information it may identify. The information contained in the Top Asbestos Counsel List shall not constitute an admission by, nor shall it be binding on, the Debtor.**

| | Name of law firm and complete mailing address, including zip code | Name, telephone number, and email address of law firm contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim<br>If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 | Baron & Budd, PC | 3102 Oak Lawn Ave., #1100<br>Dallas, TX 75219<br>(214) 521-3605<br>Attn: Steve Baron | Asbestos Personal Injury | Disputed/ Contingent/ Unliquidated | N/A | N/A | Unliquidated |
| 2 | Belluck & Fox, L.L.P. | 546 Fifth Avenue, 5th Floor<br>New York, NY 10036<br>(212) 681-1575<br>Attn: Joeseph Belluck | Asbestos Personal Injury | Disputed/ Contingent/ Unliquidated | N/A | N/A | Unliquidated |
| 3 | Brookman, Rosenberg, Brown & Sandler | 30 South 15th Street<br>Philadelphia, PA 19102<br>(215) 569-4000<br>Attn: Laurence H. Brown | Asbestos Personal Injury | Disputed/ Contingent/ Unliquidated | N/A | N/A | Unliquidated |
| 4 | Cooney & Conway | 120 N. LaSalle Street<br>Suite 3000<br>Chicago, IL 60602<br>(312) 236-6166<br>Attn: John D. Cooney | Asbestos Personal Injury | Disputed/ Contingent/ Unliquidated | N/A | N/A | Unliquidated |
| 5 | Early, Lucarelli, Sweeney & Meisenkothen | 360 Lexington Avenue<br>20th Floor<br>New York, NY 10017<br>(212) 986-2233<br>Attn: Brian Early | Asbestos Personal Injury | Disputed/ Contingent/ Unliquidated | N/A | N/A | Unliquidated |
| 6 | Flint Law Firm LLC | 222 E. Park Street, Suite 500<br>Edwardsville, IL 62025<br>(618) 288-4777<br>Attn: Ethan A. Flint | Asbestos Personal Injury | Disputed/ Contingent/ Unliquidated | N/A | N/A | Unliquidated |

1 This list is in substantially the same form as Official Bankruptcy Form 204 for chapter 11 cases setting forth the list of creditors, other than insiders, who have the 20 largest unsecured claims against a debtor.

Debtor Name: DBMP LLC Case Number (if known): ___________________

| | Name of law firm and complete mailing address, including zip code | Name, telephone number, and email address of law firm contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim<br>If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 7 | George & Farinas, LLP | 151 N. Delaware Street<br>Suite 1700<br>Indianapolis, IN 46204<br>(855) 641-7406<br>Attn: Kathy Farinas | Asbestos Personal Injury | Disputed/ Contingent/ Unliquidated | N/A | N/A | Unliquidated |
| 8 | Goldberg Persky White, P.C. | 11 Stanwix Street, Suite 1800<br>Pittsburgh, PA 15222<br>(412) 471-3980<br>Attn: Bruce E. Mattock | Asbestos Personal Injury | Disputed/ Contingent/ Unliquidated | N/A | N/A | Unliquidated |
| 9 | Goldenberg Heller & Antognoli, P.C. | 2227 South State Route 157<br>Edwardsville, IL 62025<br>(618) 656-5150<br>Attn: Mark Goldenberg | Asbestos Personal Injury | Disputed/ Contingent/ Unliquidated | N/A | N/A | Unliquidated |
| 10 | The Gori Law Firm | 156 North Main Street<br>Edwardsville, IL 62025<br>(618) 307-4085<br>Attn: Sara Salger | Asbestos Personal Injury | Disputed/ Contingent/ Unliquidated | N/A | N/A | Unliquidated |
| 11 | James F. Humphreys & Associates, L.C. | 112 Capitol Street, 2nd Floor<br>Charleston, WV 25301<br>(877) 341-2595<br>Attn: Jim Humphreys | Asbestos Personal Injury | Disputed/ Contingent/ Unliquidated | N/A | N/A | Unliquidated |
| 12 | Kazan, McClain, Satterly & Greenwood PLC | 55 Harrison Street, Suite 400<br>Oakland, CA 94607<br>(510) 302-1000<br>Attn: Steven Kazan | Asbestos Personal Injury | Disputed/ Contingent/ Unliquidated | N/A | N/A | Unliquidated |
| 13 | Kelley & Ferraro, LLP | 950 Main Avenue, Suite 1300<br>Cleveland, OH 44113<br>(216) 202-3450<br>Attn: James L. Ferraro | Asbestos Personal Injury | Disputed/ Contingent/ Unliquidated | N/A | N/A | Unliquidated |
| 14 | Law Offices of Peter G. Angelos, P.C. | 100 N. Charles Street<br>22nd Floor<br>Baltimore, MD 21201<br>(410) 649-2000<br>Attn: Armand J. Volta, Jr. | Asbestos Personal Injury | Disputed/ Contingent/ Unliquidated | N/A | N/A | Unliquidated |
| 15 | Maune Raichle Hartley French & Mudd, LLC | 1015 Locust St., Ste. 1200<br>St. Louis, MO 63101<br>(800) 259-9249<br>Attn: Marcus E. Raichle, Jr. | Asbestos Personal Injury | Disputed/ Contingent/ Unliquidated | N/A | N/A | Unliquidated |
| 16 | Motley Rice LLC | 28 Bridgeside Boulevard<br>Mount Pleasant, SC 29464<br>(800) 768-4026<br>Attn: John A. Baden, IV | Asbestos Personal Injury | Disputed/ Contingent/ Unliquidated | N/A | N/A | Unliquidated |
| 17 | O'Brien Law Firm, P.C. | 815 Geyer Avenue<br>St. Louis, MO 63104<br>(314) 588-0558<br>Attn: Andrew O'Brien | Asbestos Personal Injury | Disputed/ Contingent/ Unliquidated | N/A | N/A | Unliquidated |

Debtor Name: DBMP LLC Case Number (if known): ___________________

| | Name of law firm and complete mailing address, including zip code | Name, telephone number, and email address of law firm contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim<br>If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 18 | Richardson, Patrick, Westbrook & Brickman LLC | 623 Richland Ave. W.<br>P.O. Box 3088<br>Aiken, SC 29802<br>(803) 541-7850<br>Attn: Kenneth J. Wilson | Asbestos Personal Injury | Disputed/ Contingent/ Unliquidated | N/A | N/A | Unliquidated |
| 19 | Shrader & Associates, L.L.P. | 9 Greenway Plaza, Suite 390<br>Houston, TX 77046<br>(713) 782-0000<br>Attn: Ross D. Stomel | Asbestos Personal Injury | Disputed/ Contingent/ Unliquidated | N/A | N/A | Unliquidated |
| 20 | Simmons Hanley Conroy LLC | One Court Street<br>Alton, IL 62002<br>(866) 467-6245<br>Attn: Perry J. Browder | Asbestos Personal Injury | Disputed/ Contingent/ Unliquidated | N/A | N/A | Unliquidated |
| 21 | SWMW Law, LLC | 701 Market Street, Suite 1000<br>St. Louis, MO 63101<br>(314) 480-5180<br>Attn: Ben Schmickle | Asbestos Personal Injury | Disputed/ Contingent/ Unliquidated | N/A | N/A | Unliquidated |
| 22 | The Ferraro Law Firm | 600 Brickell Ave., Suite 3800<br>Miami, FL 33131<br>(305) 547-9800<br>Attn: James L. Ferraro | Asbestos Personal Injury | Disputed/ Contingent/ Unliquidated | N/A | N/A | Unliquidated |
| 23 | The Law Offices of Peter T. Nicholl | 36 South Charles Street<br>Suite 1700<br>Baltimore, MD 21201<br>(410) 244-7005<br>Attn: Peter T. Nicholl | Asbestos Personal Injury | Disputed/ Contingent/ Unliquidated | N/A | N/A | Unliquidated |
| 24 | Weitz & Luxenberg, P.C. | 700 Broadway<br>New York, NY 10003<br>(212) 558-5500<br>Attn: Perry Weitz | Asbestos Personal Injury | Disputed/ Contingent/ Unliquidated | N/A | N/A | Unliquidated |
| 25 | Wilentz, Goldman & Spitzer, P.A. | 14 Wall Street, Suite 6B<br>New York, NY 10005<br>(646) 746-8914<br>Attn: Kevin M. Berry | Asbestos Personal Injury | Disputed/ Contingent/ Unliquidated | N/A | N/A | Unliquidated |

NAI-1509532355

**Fill in this information to identify the case and this filing:**

Debtor Name DBMP LLC

United States Bankruptcy Court for the: Western District of North Carolina (State)

Case number (*If known*): ____________

Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors

12/15

**An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.**

**WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.**

## Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

- ☐ *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)
- ☐ *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)
- ☐ *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)
- ☐ *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)
- ☐ *Schedule H: Codebtors* (Official Form 206H)
- ☐ *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)
- ☐ Amended *Schedule* ____
- ☐ *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)
- ■ Other document that requires a declaration List of 25 law firms with the most significant representations of asbestos claimants.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 01/23/2020
MM / DD / YYYY

✘ */s/ Michael T. Starczewski*
Signature of individual signing on behalf of debtor

Michael T. Starczewski
Printed name

Chief Restructuring Officer
Position or relationship to debtor

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| In re<br><br>DBMP LLC,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 20-_______ |

**MASTER CREDITORS LIST**

DBMP LLC, as debtor and debtor in possession in the above-captioned chapter 11 case (the "Debtor"), filed a petition in this Court on the date hereof for relief under chapter 11 of title 11 of the United States Code (the "Voluntary Petition"). In accordance with Rule 1007(a) of the Federal Rules of Bankruptcy Procedure and Rule 1007-1 of the Rules of Practice and Procedure of the United States Bankruptcy Court for the Western District of North Carolina, the Debtor filed concurrently herewith a matrix of the names and addresses of creditors, potential creditors and other parties in interest (the "Master Creditors List"). The Master Creditors List has been prepared from the books and records of the Debtor, and contains only those parties whose names and addresses were maintained in the databases of the Debtor or were otherwise readily ascertainable by the Debtor prior to the commencement of this chapter 11 case. The Debtor will update the Master Creditors List as more information becomes available.

Contemporaneously with the filing of the Voluntary Petition, the Debtor filed a motion (the "Motion") requesting, among other things, authority to serve all notices, mailings or other documents required to be provided to creditors who are claimants in asbestos-related lawsuits or other proceedings involving the Debtor, or who have similar claims asserted through counsel (collectively, the "Asbestos Claimants"), on the Asbestos Claimants in care of their counsel at such counsel's address in lieu of service on the individual Asbestos Claimants at their personal addresses. Accordingly, the Master Creditors List includes the addresses of counsel for each of the Asbestos Claimants rather than the addresses of each individual Asbestos Claimant.

Certain of the creditors listed on the Master Creditors List may not hold outstanding claims against the Debtor and therefore may not be creditors in the Debtor's bankruptcy case. By filing the Master Creditors List, the Debtor is not acknowledging that any listed party is a creditor, nor is it waiving or otherwise affecting its right to object to the extent, validity or enforceability of the claims, if any, held or asserted by the parties listed on the Master Creditors List.

---

1 The last four digits of the Debtor's taxpayer identification number are 8817. The Debtor's address is 20 Moores Road, Malvern, Pennsylvania 19355.

**Fill in this information to identify the case and this filing:**

Debtor Name DBMP LLC

United States Bankruptcy Court for the: Western District of North Carolina (State)

Case number (*If known*):

Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors

12/15

**An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.**

**WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571**.

## Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

- ☐ *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)
- ☐ *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)
- ☐ *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)
- ☐ *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)
- ☐ *Schedule H: Codebtors* (Official Form 206H)
- ☐ *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)
- ☐ Amended *Schedule* ____
- ☐ *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)
- ■ Other document that requires a declaration Master Creditors List

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 01/23/2020
MM / DD / YYYY

✘ */s/ Michael T. Starczewski*
Signature of individual signing on behalf of debtor

Michael T. Starczewski
Printed name

Chief Restructuring Officer
Position or relationship to debtor

**UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| DBMP LLC,[1] | : | Case No. 20-30080 (JCW) |
| Debtor. | : | |

**INFORMATIONAL BRIEF OF DBMP LLC**

Gregory M. Gordon
JONES DAY
2727 N. Harwood Street, Suite 500
Dallas, Texas 75201

Jeffrey B. Ellman
JONES DAY
1420 Peachtree Street, N.E., Suite 800
Atlanta, Georgia 30309

Garland S. Cassada
Richard C. Worf, Jr.
Kevin R. Crandall
ROBINSON, BRADSHAW & HINSON, P.A.
101 North Tryon Street, Suite 1900
Charlotte, North Carolina 28246

Elizabeth Runyan Geise
Valerie E. Ross
Jeffrey D. Skinner
SCHIFF HARDIN LLP
901 K Street NW, Suite 700
Washington, DC 20001

Dated: January 23, 2020

[1] The last four digits of the Debtor's taxpayer identification number are 8817. The Debtor's address is 20 Moores Road, Malvern, Pennsylvania 19355.

## TABLE OF CONTENTS

**Page**

I. The Products That Are the Subject of Asbestos Litigation Against DBMP ..... 4
- A. AC Pipe ..... 4
- B. Asphalt Roofing Products ..... 11
- C. Other Asbestos Products ..... 14

II. The History of Asbestos Litigation Against Old CT and DBMP ..... 15
- A. Pre-Bankruptcy Wave (Asbestos Claims Facility / Center for Claims Resolution) ..... 15
- B. Post-Bankruptcy Wave ..... 16
- C. Plaintiffs' Naming and Product Identification Practices and Failure to Disclose Alternative Exposure Evidence Undermined Old CT's Defense ..... 18
- D. Summary ..... 24

III. The Debtor's Goals in this Proceeding ..... 25
- A. Preliminary Injunction ..... 26
- B. Asbestos Claimants' Committee and Future Claimants' Representative ..... 27
- C. Diligence and Discovery ..... 28
- D. Plan Negotiations ..... 28
- E. Estimation ..... 28
- F. Plan of Reorganization ..... 29

Conclusion ..... 29

# GETTABLE OF AUTHORITIES


**Page**

**CASES**

*Amchem Products, Inc. v. Windsor*,
521 U.S. 591 (1997).....16

*Asbestos Information Ass'n/North America v. Reich*,
117 F.3d 891 (5th Cir. 1997).....14

*In re Garlock Sealing Technologies LLC*,
504 B.R. 71 (Bankr. W.D.N.C. 2014).....18, 20, 21

*Kane vs. Johns-Manville Corp.*,
843 F.2d 636, 639 (2d Cir. 1988).....5

*Ortiz v. Fibreboard Corp.*,
527 U.S. 815 (1999).....16

**STATUTES**

11 U.S.C § 524(g)..... passim

Judiciary Committee Report on the Fairness In Asbestos Injury Resolution Act of 2003, Senate Rpt. 108-118, at 109.....19

Occupational Safety and Health Administration, 29 C.F.R. Parts 1910 and 1926, Occupational Exposure to Asbestos, Tremolite, Anthophyllite, and Actinolite, Final Rule, 51 Fed. Reg. 22612 (June 20, 1986) at 22758 (29 C.F.R. § 1926.58(g)(2)(i)).....11

Occupational Safety and Health Administration, 29 C.F.R. Parts 1910, and 1926, Occupational Exposure to Asbestos; Corrections, 60 Fed. Reg. 33974, 33976 (June 29, 1995).....14

**OTHER AUTHORITIES**

A/C Pipe Producers Ass'n, *A/C Pipe and Health* (1977).....10

A/C Pipe Producers Ass'n, *Recommended Work Practices for A/C Pipe* (1977).....9

Anderson, P.H. *et al.,* SRI International, *Analysis of Fiber Release from Certain Asbestos Products* (1982) ........................................................................13

AWWA, *Work Practices for Asbestos-Cement Pipe* (1978) ........................................................10

Biederman, Christine *et al.*, *Toxic Justice*, Dallas Observer (Aug. 13, 1998) ..............................19

Carroll, Stephen J. *et al.*, RAND Institute for Civil Justice, *Asbestos Litigation* (2005) ........................................................................1, 8

CertainTeed, *How To Install A/C Utilizing Closure Couplings & Closure Lengths* (1986) ........................................................................8

CONSAD Research Corp., *Economic and Technological Profile Related to OSHA's Revised Permanent Asbestos Standard for the Construction Industry and Asbestos Removal and Routine Maintenance Projects in General Industry* (Dec. 1985) ........................................................................7, 8

Dupre, J. Stephan *et al., Report of the Royal Commission on Matters of Health and Safety Arising from Use of Asbestos in Ontario* (1984) ..................................................13

EEH, *Asbestos Exposures During the Cutting and Machining of Asbestos Cement Pipe* (Mar. 1977) ........................................................................7, 9

EEH, *Dust Exposures During the Cutting and Machining of Asbestos/Cement Pipe Additional Studies* (Dec. 1977) ........................................................................7, 9

Engineering News-Record, *Loose Asbestos Fiber Seen As Cancer Threat To Men In Building Trades* (Apr. 2, 1970) ........................................................................6

Good, Carl, *Exposure to Asbestos During Roofing Removal* (Sept. 1990) ..................................13

Good, William A., *Objective Data Demonstration for Certain Roofing Materials and Operations under OSHA's 1994 Asbestos Standard* (Dec. 14, 1994) .............................14

Lowery, James, *The Scourge Of Over-Naming In Asbestos Litigation: The Costs to Litigants and the Impact on Justice,* Mealey's (Jan. 18, 2018) ..........................................18

Selikoff, Irving J., *Partnership for Prevention – The Insulation Industry Hygiene Research Program,* Indus. Med., Vol. 39, No. 4 (Apr. 1970) ..................................................6

U.S. Dep't of Labor, Bureau of Labor Statistics, *Directory of National Unions and Employee Associations, 1979* (Sept. 1980) ........................................................................8

Debtor DBMP LLC ("DBMP" or the "Debtor") filed this reorganization case under chapter 11 the United States Code (the "Bankruptcy Code") to achieve a full, fair, and final resolution of current and future asbestos claims against it. DBMP's asbestos litigation stems from products manufactured and/or sold by the former CertainTeed Corporation ("Old CT"). The vast majority of these claims involve asbestos cement pipe ("AC Pipe") or asphalt roofing products. Asbestos litigation involving these products has lasted for nearly 40 years and is expected to continue for decades more. As numerous studies have found, asbestos litigation is inefficient, extremely costly, and has failed to resolve claims fairly or timely. In 2005, the RAND Institute for Civil Justice estimated that for every dollar spent on asbestos litigation, claimants received 42 cents, 31 cents went to defense costs and 27 cents went to plaintiffs' attorney fees and costs.[2]

The volume and expense of managing and litigating the claims imposed an extraordinary financial, administrative, and operating burden on DBMP and Old CT, forcing Old CT (and now, DBMP) to settle claims simply to avoid litigation costs, often without regard to any actual liability. That pressure only intensified in the 2000s, by which time the most prominent asbestos defendants—as well as Old CT's primary competitors—filed for bankruptcy protection. In recent years, plaintiffs have sued Old CT in the majority of all mesothelioma lawsuits filed annually in the United States. Only a small fraction of those plaintiffs possibly could have been exposed to any asbestos fibers released from Old CT's products.

More than half of mesothelioma claims filed against Old CT after 2001 were dismissed—usually because the plaintiff could provide no evidence of exposure to an Old CT

---

2 Carroll, Stephen J. *et al.*, RAND Institute for Civil Justice, *Asbestos Litigation* (2005) (the "RAND Report") at xxvi.

asbestos-containing product. This dismissal rate demonstrates the lack of any good-faith basis for much of the litigation filed against the company. With respect to claims that were not dismissed, although Old CT often could disprove the plaintiff's alleged exposure evidence, and sometimes also persuasively show that his or her disease was caused by other products or sources, the costs of mounting these defenses were enormous.

Because of substantial defense costs, Old CT settled the vast majority of the remaining claims, not because they posed a material liability risk but because it was far cheaper than trying cases to verdict. That effort often can exceed $1 million. Many of these were low-dollar settlements that were accomplished through inventory or group settlement arrangements, with little to no assessment of the merits of individual claims. Even with this strategy, Old CT spent in the range of approximately $80 million to over $160 million every year since 2002 to defend and resolve asbestos claims. Since 2002 alone, DBMP and Old CT have incurred approximately $2 billion in defense and indemnity payments in asbestos litigation. Having long ago exhausted insurance coverage for asbestos claims, Old CT and the Debtor have borne the brunt of these costs. Together, Old CT and the Debtor have paid approximately $1.5 billion of that amount out of pocket —i.e., net of insurance recoveries over that same period of time.

As of the filing of this chapter 11 case, more than 60,000 asbestos claims and associated lawsuits were pending against DBMP, of which approximately 32,700 were on active dockets. Like dozens of companies before it, DBMP has filed this case seeking a global, final, and equitable resolution of its current claims, as well as the thousands of additional claims expected to be filed in the future. Section 524(g) of the Bankruptcy Code provides the means to establish a trust that will contain a dedicated fund for claimants' recoveries, protected against the risks of the business cycle to which all companies are subject, while also affording permanent

going-forward relief to DBMP, its qualifying affiliates and other parties from having to defend or pay these claims. All asbestos claims against DBMP, current and future, will be channeled to the trust. This section 524(g) trust then will pay qualifying claimants through an efficient administrative process, and payments will come quicker than in the tort system, with lower fees and expenses.[3]

Before such a trust can be established, however, section 524(g) requires the vote of at least 75% of current asbestos claimants, the input of a representative appointed to represent the interests of future claimants, and the approval of at least two federal courts. DBMP will work to negotiate a consensual section 524(g) plan with claimant representatives and intends to begin those negotiations as soon as the official representatives of current and future claimants have been appointed. To that end, DBMP has already started working with plaintiff firms representing current claimants to organize an *ad hoc* committee of asbestos personal injury claimants. DBMP intends to file a motion seeking to have this *ad hoc* committee appointed as the official asbestos claimants' committee in this case.

To assist in understanding DBMP's need for bankruptcy protection, this brief describes:

- the history of Old CT's manufacture and sale of asbestos-containing products;
- the history of the asbestos litigation against Old CT;
- the corporate restructuring that created DBMP, which assured that DBMP has the same financial resources to pay claims as Old CT had before the restructuring; and
- DBMP's objectives in this proceeding.[4]

---

3 Claimants typically retain their right to a jury trial, but resolution through the administrative procedures (generally developed and drafted by claimants' lawyers) is almost invariably preferred.

4 Additional information about DBMP, the prepetition corporate restructuring by which it was formed, and the decision to commence this chapter 11 case is found in the *Declaration of Robert J. Panaro in Support of First Day Pleadings* (the "First Day Declaration"), which was filed concurrently with this Informational Brief.

## I. The Products That Are the Subject of Asbestos Litigation Against DBMP

### A. AC Pipe

**The market for AC Pipe.** Old CT began manufacturing and selling AC Pipe in 1962, when it acquired four AC Pipe plants (in Pennsylvania, Missouri, Texas, and California) owned by Keasbey & Mattison Company. Old CT opened a fifth AC Pipe plant in California in late 1965. It last manufactured AC Pipe in 1992, and last sold the product in 1993. Old CT's AC Pipe, examples of which are depicted in Figure 1, was primarily used in water, sewer, and storm water applications. Pressure pipe, as its name indicates, was used to carry drinking or irrigation water that was pumped under pressure through the lines; sewage and storm water was carried through sewer and storm water pipe by gravity. Until the late 1960s, Old CT also made AC air duct pipe that was installed under buildings to carry hot air for heating purposes.

**Figure 1: Old CT AC Pipe**






During the time that Old CT made and sold AC Pipe, there were four other manufacturers of AC Pipe in the United States. With seven plants (in New Jersey, Illinois, Florida, Louisiana, Texas, and California) and an estimated market share of 50-70%, Johns-Manville Corporation

("JM") was by far the largest manufacturer in the 1960s and 1970s.[5] JM filed for chapter 11 reorganization in 1982 due to its asbestos-related costs and, in 1983, sold its AC Pipe assets to J-M A/C Pipe Corporation, which manufactured AC Pipe until 1987.[6] Flintkote Company ("Flintkote") produced AC Pipe at one plant (in Ohio) from 1962 to 1977. Flintkote filed for chapter 11 reorganization in 2004. Capco Pipe Company, Inc. ("Capco") produced AC Pipe from two plants (in Alabama and Arkansas); it exited the business in 1993. Capco and its parent company, ASARCO, filed for chapter 11 reorganization in 2005. Some AC Pipe also was imported into the United States over the years from Australia, Japan, Mexico, and Europe.[7]

**Use of asbestos fiber.** Old CT's AC Pipe contained between 10% and 20% asbestos by weight, with higher percentages of asbestos present in pressure pipe (which, to withstand pressure, had to be stronger than AC sewer pipe). The majority of asbestos fiber used was chrysotile. Typically about 10% to 15% of the asbestos fiber was crocidolite, which was necessary to give the pipe proper strength.[8] The remainder of the AC Pipe was composed of sand, cement, and silica.

---

5 In addition to selling water and sewer pipe, JM also sold AC Pipe for use as air ducts, gas vents, underdrains, and electrical and telephone conduits.

6 Prior to filing for reorganization in 1982, JM was the world's largest miner of asbestos and a major manufacturer of insulating materials and many other asbestos products. *See Kane vs. Johns-Manville Corp.*, 843 F.2d 636, 639 (2d Cir. 1988). Despite its large share of the AC Pipe market, AC Pipe was a small part of JM's overall portfolio of asbestos-containing products and a small part of its asbestos liability.

7 The main alternative to AC Pipe in the 1960s and early 1970s – cast iron pipe – tended to corrode, which raised health issues. Other alternatives – ductile iron and polyvinyl chloride (PVC) pipe – were not perfected until the later 1970s and did not gain market acceptance in some parts of the U.S. until some point in the 1980s.

8 Old CT manufactured AC sewer pipe at a plant in Buffalo between 1966 and 1972 that contained only chrysotile asbestos fiber. The Buffalo plant closed because the chrysotile-only pipe suffered quality issues. Because crocidolite fiber was expensive and difficult to obtain from mines located only overseas, Old CT tried to reduce or eliminate the use of this fiber in its pipe. Although Old CT did manage to reduce the amount of crocidolite fiber over time, it was never able to eliminate it completely. During the years Old CT manufactured AC Pipe, it simply could not make a quality pipe that was strong enough without crocidolite fiber.

In AC Pipe, the asbestos fibers were bound in a cement matrix and the pipe, therefore, was a hard cement product similar to a piece of sidewalk. Throughout the 1960s and into the early 1970s, there was little health concern over AC Pipe because the asbestos fibers were encapsulated, or "locked in," and exposures from the normal use of the products were much less than in mines, in manufacturing facilities, and among insulation workers. In April 1970, Dr. Irving Selikoff, a pioneer on the health effects of asbestos exposure, wrote that it was "fortunate that the greatest part of [the asbestos in construction materials] has been in products in which the asbestos is locked in—that is, it is bound with cement or plastics or other binder so that there is no release, certainly no significant release, of asbestos fiber in either working areas or general air."[9] That same month, Dr. Selikoff was quoted in another article as stating that "products in which asbestos has been bonded into the material, such as floor and ceiling tiles, roofing, siding and pipe, are not considered a cause of cancer."[10]

**Installation of AC Pipe.** Because the standard method of joining Old CT's AC Pipe was by sliding the end of one length of pipe into the coupling on the next piece of pipe in the pipeline, little if any asbestos fibers were released when AC Pipe was handled or installed. Asbestos fibers in AC Pipe are potentially released into the air when the pipe is cut or machined. But those operations were infrequent, took only a few minutes, were performed outdoors by a limited set of specialized occupations, and, if traditional cutting methods were used, released only very low levels of asbestos fiber.

---

9 Selikoff, Irving J., *Partnership for Prevention – The Insulation Industry Hygiene Research Program*, Indus. Med., Vol. 39, No. 4 at 164 (Apr. 1970).

10 Engineering News-Record, *Loose Asbestos Fiber Seen As Cancer Threat To Men In Building Trades*, at 11 (Apr. 2, 1970).

Work practice studies conducted in March and December 1977 by an industrial hygiene consulting group, Equitable Environmental Health ("EEH"), established that asbestos dust levels generated during virtually all AC Pipe installation methods were below the permissible exposure limits ("PELs") under applicable regulations of the U.S. Occupational Safety and Health Administration ("OSHA"), and even below the much lower PELs that OSHA would enact several years later.[11] Moreover, the cutting and machining operations that did result in the release of asbestos fiber from AC Pipe occurred only during, at most, a very small portion of a typical work day. In 1985, an OSHA contractor, CONSAD, estimated that only 1.1% of the total job time installing AC Pipe was spent cutting, machining, or tapping the pipe.[12] For a typical installation job involving an average of 675 person hours, the time spent cutting, tapping, or machining AC Pipe was 7.5 person hours, or about 5.3 person minutes per work day.[13] Contractors generally tried to avoid cutting or fabricating AC Pipe because of the time involved; setting up, measuring, and then cutting delayed the job. And a poor cut could cause the pipe to leak or otherwise fail, voiding the manufacturer's warranty.

Old CT sold short pieces (one-half lengths that were 6 foot 6 inches and quarter lengths that were 3 foot 3 inches) that helped avoid cutting in the field, as well as pre-tapped couplings that would allow copper or PVC water service pipes to join to AC pressure pipe main lines without any field cutting or fabrication. Beginning in 1986, Old CT developed a system called a

---

11 *See* EEH, *Asbestos Exposures During the Cutting and Machining of Asbestos Cement Pipe*, at 15 (Mar. 1977) ("March 1977 EEH Study"); EEH, *Dust Exposures During the Cutting and Machining of Asbestos/Cement Pipe Additional Studies*, at 14-15 (Dec. 1977) ("December 1977 EEH Study").

12 *See* CONSAD Research Corp., *Economic and Technological Profile Related to OSHA's Revised Permanent Asbestos Standard for the Construction Industry and Asbestos Removal and Routine Maintenance Projects in General Industry*, at 4.8 (Dec. 1985) ("CONSAD 1985"). *See also* March 1977 EEH Study at 4 ("Each cutting operation, when performed in the field, is of short duration.... For the operations of major interest, the average time per operation was from 3 to 6 minutes.").

13 CONSAD 1985 at 4.8.

"coupling closure system" that involved multiple sizes of AC Pipe and of AC Pipe couplings. Using this system allowed a contractor to install AC Pipe with no cutting or field fabrication at all.[14]

Because it was not a consumer product, only a limited number of workers actually installed or repaired AC Pipe. In its 1985 report for OSHA, CONSAD estimated the number of workers involved in the installation of AC Pipe in the U.S. at that time ranged from 1,295 to 17,650.[15] By contrast, as of 1979, the number of members of the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada (AFL-CIO) was approximately 337,000.[16] Moreover, from the 1960s to the 1980s, tens of millions of American workers were exposed to asbestos-containing products of all kinds in the workplace.[17]

**Old CT's warnings.** During the 1960s and continuing through the early- to mid-1970s, the predominant ways to cut or fabricate AC Pipe in the field were hand methods using the carbide tip cutter and the snap cutter, and the predominant way to machine pipe was to use a hand or power lathe. These were the cutting methods recommended in Old CT's installation guides. Although Old CT's installation guides through the mid-1970s also stated that AC Pipe could be cut with an electric saw, that tool was rarely used because it was unusual to have a source of electricity in locations where AC Pipe was cut. All of these methods were evaluated in

---

14 CertainTeed, *How To Install A/C Utilizing Closure Couplings & Closure Lengths* (1986).

15 CONSAD 1985 at 5.6-5.7 & Table 5.1.

16 *See* U.S. Dep't of Labor, Bureau of Labor Statistics, *Directory of National Unions and Employee Associations, 1979* (Sept. 1980) at 40.

17 RAND Report at 2.

the EEH's 1977 work practice testing, and all generated levels of asbestos far below the then-applicable OSHA PELs (or the lower OSHA PELs proposed at that time).[18]

But in the early- to mid-1970s, contractors began installing ductile iron pipe on some job sites and that product could only be cut during installation with gas-powered abrasive disc saws. Some contractors then began to use those same saws to cut AC Pipe in the field. This was a new practice that caused Old CT and other manufacturers of AC Pipe concern because of the potential release of asbestos fibers. The EEH's 1977 work practice studies found that cutting AC Pipe with a gas-powered abrasive disc saw could release concentrations of airborne asbestos exceeding the OSHA PELs.[19]

Old CT immediately began warning against the use of gas-powered abrasive disc saws to cut AC Pipe. Old CT notified its distributors and salesmen of the EEH study results and asked them to notify customers that AC Pipe should not be cut with an abrasive disc saw. During the summer of 1977, Old CT assisted the Asbestos Cement Pipe Producers Association ("ACPPA") in preparing a booklet titled "Recommended Work Practices for A/C Pipe" that specifically warned pipe installers not to cut A/C pipe with a power saw.[20] Old CT distributed copies of this booklet to its distributors, salesmen, installers, and, through the ACPPA, to state and federal agencies concerned with occupational health. For a time, Old CT included a copy of the Recommended Work Practices with each shipment of pipe. Old CT requested that its salesmen assure that every user of AC Pipe receive a copy. It also pasted a copy of the booklet into its installation guides for AC Pipe and, when its installation guides later were reprinted,

---

18 March 1977 EEH Study at 15; December 1977 EEH Study at 14-15. The March 1977 Study did test an electric lathe, which cut AC Pipe by electric power, and the levels were far below the existing or proposed OSHA standard. *See* March 1977 EEH Study at 8, 15, Tables 1-3.

19 March 1977 EEH Study at 15; December 1977 EEH Study at 14-15.

20 A/C Pipe Producers Ass'n, *Recommended Work Practices for A/C Pipe* (1977).

incorporated the text of the guide into its installation guides.[21] Approximately 85,000 copies of the booklet ultimately were distributed by Old CT (along with JM and Capco). Old CT also began distributing another ACPPA booklet entitled "A/C Pipe and Health" in 1977 and an audiovisual program, both of which detailed health risks associated with exposure to asbestos, including cancer, and stressed the need to follow recommended work practices.[22]

In 1979, Old CT became the first company in the United States to place a warning label on every piece of AC Pipe it manufactured. The label, in both English and Spanish, read:

> CAUTION: Always use recommended work practices. Do *not* use abrasive disc saws. When cutting, machining and tapping, refer to Recommended Work Practice Guide furnished by manufacturer to your employer.

The warning was placed on the unmachined portion of pipe (quarter lengths and larger) at or near the end of the pipe, where an installer would be most likely to see it.

In March 1983, Old CT began distributing two Material Safety Data Sheets ("Safety Sheets")—one for asbestos and one for silica—to all entities that purchased AC Pipe directly from Old CT. The asbestos Safety Sheets discussed asbestosis, lung cancer, and mesothelioma, and stressed that the recommended work practices should always be followed: "[d]o not cut or bevel Asbestos/Cement Pipe [or] fittings with abrasive disc saws or abrasive disc sanders." The Safety Sheets were attached to the papers sent with every load of AC Pipe shipped from Old CT's plants, as well as to the invoices separately sent to purchasers.

---

21 The Recommended Work Practices booklet was discussed at conferences sponsored by the American Water Works Association ("AWWA"), the chief standard setting organization in the water works industry. In 1978, the AWWA came out with its own recommended work practices guide for installation of AC Pipe, which endorsed the 1977 ACPPA booklet and also warned against use of an abrasive disc saw to cut AC Pipe. *See* AWWA, *Work Practices for Asbestos-Cement Pipe* (1978).

22 A/C Pipe Producers Ass'n, *A/C Pipe and Health* (1977).

In June 1986, OSHA prohibited the use of abrasive disc saws to cut any product containing asbestos, including AC Pipe.[23] As noted above, Old CT developed the coupling closure system in 1986 that eliminated the need to cut or fabricate AC Pipe during installation. Old CT shared this system with other AC Pipe manufacturers.

**B. Asphalt Roofing Products**

Since Old CT's founding as General Roofing Manufacturing Company in 1904, roofing products had always been a major part of Old CT's product line. Few of those products, however, ever contained asbestos. Numerous government reports and industrial hygiene studies have found little, if any, exposure to asbestos fiber associated with Old CT's few roofing products that contained chrysotile asbestos—i.e., some roofing felts, asphalt roofing shingles, and cements and coatings. The risk of exposure was small because the fibers were bound in an asphalt matrix.

**Asphalt felts.** Old CT manufactured roofing felts/ply sheets for use as an underlayment (below the shingles and on top of the roof deck) or as part of built-up roofing systems (which are flat roofs, mostly in commercial construction, composed of layers of felt and hot tar or asphalt). Old CT's roofing underlayment never contained any asbestos. The overwhelming majority of asphalt built-up roofing felts/ply sheets for use on flat roofs in commercial construction did not contain any asbestos. For a period from the 1950s to the mid-1970s, Old CT sold felts/ply sheets that contained some asbestos for use on flat, built-up roofs. Old CT never had a significant share of the market for commercial roofing in this time period (its primary market was

23 Occupational Safety and Health Administration, 29 C.F.R. Parts 1910 and 1926, Occupational Exposure to Asbestos, Tremolite, Anthophyllite, and Actinolite, Final Rule, 51 Fed. Reg. 22612 (June 20, 1986) at 22758 (29 C.F.R. § 1926.58(g)(2)(i)).

non-asbestos-containing asphalt shingles for residential roofing). To the best of DBMP's knowledge, only chrysotile fiber was used in the felts.

**Asphalt roofing shingles.** Old CT manufactured millions of roofing shingles since the company was founded in 1904. These shingles were essentially an asphalt felt product with granules on top. The vast majority of asphalt roofing shingles made and sold by Old CT contained no asbestos whatsoever. There were two exceptions. First, from 1966 until 1972, Old CT sold one type of heavy-weight asphalt roofing shingle that was manufactured by Philip Carey and contained chrysotile asbestos in the asphalt shingle coating. Second, for several months during 1973 and 1974, two types of three-tab fiberglass-based asphalt roofing shingles were manufactured at two of Old CT's roofing plants (Dallas and Chicago Heights) with a small amount of chrysotile asbestos (less than ½ of 1% of the total weight of the finished shingle) in the asphalt coating. These shingles were manufactured on a developmental basis only.[24] The percentage of asbestos in these shingles was so small that they would not be classified as asbestos products under current OSHA regulations.[25]

**Roofing cements and coatings.** Old CT manufactured and sold various kinds of roof coatings and cements over the years (along with foundation coating). Old CT ceased manufacturing these coatings and cements in the 1970s but sold some of these products manufactured by others until 1983. Many of these products came in both an asbestos and a non-asbestos version. If asbestos was used, the fiber used was chrysotile. The products were

---

24 Old CT added the asbestos to get a Class A fire resistance rating for these shingles from Underwriters' Laboratory. It ceased production of these shingles after only a few months when it was able to achieve the same Class A rating without using asbestos.

25 29 C.F.R. § 1926.1101(b) ("Asbestos-containing material (ACM), means any material containing more than one percent asbestos.").

sold pre-mixed in cans or barrels and ready for application; none of these products were sold in a dry or powder form.

**Limited exposure to asbestos from roofing products.** Because any asbestos fibers contained in Old CT's roofing products were encapsulated in asphalt, there was little if any potential for exposure to asbestos fiber during installation or removal of these products. This was recognized in a study undertaken in 1982 by GCA Corporation for the U.S. Environmental Protection Agency:

> [T]he potential for fiber release during application and in-service use is low. Fibers contained within [coatings and sealants] are thoroughly wetted and remain bound by the tacky asphalt or tar matrix. The petroleum compounds of the product mix effectively cover and bind the fibers together, minimizing the potential for free-form release during application.[26]

The Royal Commission on Matters of Health & Safety Arising from the Use of Asbestos in Ontario reached the same conclusion in 1984:

> Other construction products currently in use that contain asbestos include roof coatings, roofing, caulking, and flooring. The asbestos in the first three product categories is generally saturated with asphalt or tar so that there is virtually no possibility of fibres being released during normal installation and use. The fibres are sufficiently tightly bound that we presume that work with these products would not create a hazardous work area.[27]

In 1994, the National Roofing Contractors Association submitted several thousand asbestos exposure monitoring reports to OSHA from samples taken by its members. The data showed that "not a single one of the several thousand air samples" exceeded the current (2020)

---

[26] Anderson, P.H. *et al.*, SRI International, *Analysis of Fiber Release from Certain Asbestos Products* at 39 (1982) (referring to roofing cements and coatings). *See also id.* at 88-95 & Tables 19-20; and discussion of the GCA data in Good, Carl, *Exposure to Asbestos During Roofing Removal* at 9-11 (Sept. 1990).

[27] Dupre, J. Stephan *et al.*, *Report of the Royal Commission on Matters of Health and Safety Arising from Use of Asbestos in Ontario*, Vol. II, at 633 (1984).

OSHA PEL of 0.1 f/cc[28] as an eight-hour time weighted average or the current 1.0 f/cc OSHA 30-minute short term limit; typically, the results were below the limits by one or two orders of magnitude.[29] In its 1995 rulemaking, OSHA found that, "when cement, mastics, coatings and flashings are manufactured and installed, the asbestos fibers are tightly encapsulated by adhesive bituminous and resinous compounds that effectively prevent the fibers from being released."[30] In reviewing this OSHA rulemaking in 1997, the Fifth Circuit commented: "[T]here is no evidence in the record that asbestos fibers ever escape from roofing sealants and become airborne; in fact, the evidence indicates that they cannot." *Asbestos Information Ass'n/North America v. Reich*, 117 F.3d 891, 893 (5th Cir. 1997) (emphasis in original).

### C. Other Asbestos Products

Old CT sold a few other asbestos-containing products over the years, but those products figured far less prominently in the litigation against Old CT than AC Pipe and asphalt roofing products. Old CT manufactured and sold some asbestos-containing gypsum products—primarily joint compound—until July 1, 1956. It also sold some asbestos cement building products that were primarily manufactured by National Gypsum Company, namely, asbestos cement roofing shingles until 1967, asbestos cement flat sheets until 1973, and asbestos cement siding shingles until 1975. And Old CT (or a company called Gustin-Bacon that Old CT acquired in 1966) sold some specialized fiberglass insulation products with asbestos paper facings in the 1940s and

---

28 The abbreviation "f/cc" refers to fibers per cubic centimeter, which is the measurement of airborne asbestos fiber concentration used in the OSHA PELs.

29 Good, William A., *Objective Data Demonstration for Certain Roofing Materials and Operations under OSHA's 1994 Asbestos Standard* at 2-3 (Dec. 14, 1994).

30 Occupational Safety and Health Administration, 29 C.F.R. Parts 1910, and 1926, Occupational Exposure to Asbestos; Corrections, 60 Fed. Reg. 33974, 33976 (June 29, 1995).

asbestos cloth facings until 1970; these insulation products were used only for specific applications on railcars.

## II. The History of Asbestos Litigation Against Old CT and DBMP

### A. Pre-Bankruptcy Wave (Asbestos Claims Facility / Center for Claims Resolution)

In the 1990s, Old CT spent less than $10 million per year—and usually substantially less—in indemnity to resolve mesothelioma claims. From the mid-1980s through 2001, its primary cost-avoidance strategy was to band together with other defendants to resolve claims as a group. Old CT was a member of the short-lived Asbestos Claims Facility (the "ACF") in the mid-1980s. After the ACF disbanded, Old CT was a member from 1988 to 2001 of the Center for Claims Resolution (the "CCR"), a consortium of 20 asbestos defendants.

CCR members agreed not to attempt to determine the individual liability of the members sued by plaintiffs in any given lawsuit. Instead, once a claimant provided adequate evidence of exposure to one of the CCR members' products, the CCR agreed to pay a total settlement in exchange for releases for all CCR members. The total cost of the settlement was then shared among all CCR members sued by the plaintiff pursuant to separate, internal member sharing-agreements regardless of whether the plaintiff submitted any evidence of exposure to those companies' products. In this way, Old CT and the other CCR members were able to minimize the substantial defense costs required to investigate potential member cross-claims or to litigate the members' relative responsibility for each claim. Given the limited population of people potentially exposed to Old CT's products, Old CT was a minor defendant in the CCR. From 1990 to 2001, Old CT's overall share of mesothelioma cases settled by the CCR was less than 3%.

In the 1990s, the CCR, including Old CT, also reached an agreement with plaintiff attorneys to resolve all pending and future claims against them through a class action settlement. The United States Supreme Court held in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), however, that the settlement class could not be certified. In view of this U.S. Supreme Court decision and another rejecting an attempted global class action settlement involving a single company (*Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999)), it became clear that class actions were not a viable option for achieving global resolutions of current and future asbestos claims.

**B. Post-Bankruptcy Wave**

After the Supreme Court's decisions in *Amchem* and *Ortiz*, the CCR dissolved and the most prominent defendants in asbestos litigation sought bankruptcy protection and exited the tort system. This "Bankruptcy Wave" included Babcock & Wilcox Company, Pittsburgh Corning Corporation, Owens Corning Fiberglas Corporation, Fibreboard Corporation, Armstrong World Industries, W.R. Grace & Co., USG, Federal-Mogul Corporation, and GAF Corporation, all of which filed bankruptcy in a two year-span from 2000 to 2001. These top-tier defendants were the largest sources of plaintiffs' compensation; four were the largest CCR members that collectively paid the lion's share of CCR settlements. Over 30 companies followed those top-tier defendants into bankruptcy. Old CT's primary AC Pipe competitors—JM, Capco, and Flintkote—all filed bankruptcy years ago.

After the CCR dissolved, Old CT became solely responsible for its own defense. And given that many of the significant defendants had exited the tort system, claims against Old CT exploded out of all proportion. Prior to 2001 as a CCR member, Old CT participated in the settlement of approximately 200 mesothelioma cases per year. From and after 2001, new mesothelioma claims against the company spiked to nearly 1,700 claims in 2002 and over

1,700 claims in 2003, with the number and size of settlements also skyrocketing. Since 2002, DBMP has been sued in an average of more than 1,400 new mesothelioma claims annually. As discussed above, only a small fraction of those plaintiffs possibly could have been exposed to asbestos fibers released from Old CT's products.

In the face of this deluge, Old CT continued to employ a strategy designed to minimize its costs to resolve claims. The vast majority of mesothelioma claims after 2001 were either dismissed (approximately 60% of resolved claims) or settled for $50,000 or less (approximately 20% of resolved claims), far less than the cost of discovery in an ordinary case. Old CT paid more than $250,000 to settle a mesothelioma claim in fewer than 1,000 mesothelioma cases after 2001—on average only about 50 claims per year. Where unreasonable plaintiff demands forced it to go to trial, Old CT was very successful. From 2004 to 2019, Old CT won defense verdicts in 20 of the 25 cases that resulted in a verdict on liability.[31] But the cost of defending cases through trial was extremely high.

At the same time, Old CT sought to settle large numbers of claims through a number of inventory or group settlement arrangements, with little if any consideration to the merit of the claims. Indeed, a single inventory settlement arrangement with a prominent plaintiffs' firm accounts for more than a third of Old CT's historical indemnity payments for mesothelioma claims since exiting the CCR. The driving rationale of this deal and others like it was to minimize the costs of defense.

Notwithstanding various efforts to reduce costs, Old CT remained financially burdened by substantial annual costs to resolve asbestos claims. Large numbers of small settlements, plus

---

[31] Most of these trials involved mesothelioma claims—from 2004 to 2019, CertainTeed won 18 and lost 3 of those. These figures exclude cases where the verdict (plaintiff or defense) was reversed during post-trial proceedings or on appeal.

a few dozen higher value cases per year, resulted in annual defense and indemnity costs ranging from approximately $80 million to over $160 million from 2002 through 2019.

### C. Plaintiffs' Naming and Product Identification Practices and Failure to Disclose Alternative Exposure Evidence Undermined Old CT's Defense.

Plaintiffs' litigation practices exacerbated Old CT's defense and settlement costs. Old CT incurred considerable costs settling and defending claims for which there was no basis to sue the company in the first place. The typical complaint included Old CT as just one of dozens of defendants, with no specific allegations of exposure to an Old CT product. Although Old CT successfully obtained the dismissal of a majority of claims against it for no payment, or only nominal amounts - primarily because there was no testimony concerning the plaintiff's work with or around an Old CT product - it nonetheless incurred tens of millions of dollars in defense costs associated with just these claims. As noted in a recent article, the "over-naming problem has become an epidemic, driving up costs for those entities that simply do not belong as defendants."[32]

Old CT incurred additional costs defending cases where the identification of an Old CT product was based on plaintiffs' faulty or potentially fabricated recollections. The court in *In re Garlock Sealing Technologies LLC*, 504 B.R. 71 (Bankr. W.D.N.C. 2014), noted that "[o]ne of the leading plaintiffs law firms with a national practice published a 23-page set of directions for instructing their clients on how to testify in discovery." *Id.* at 84. The memo gave plaintiffs a script for depositions, including ten pages of detailed product descriptions for plaintiffs to

---

[32] Lowery, James, *The Scourge Of Over-Naming In Asbestos Litigation: The Costs to Litigants and the Impact on Justice*, Mealey's (Jan. 18, 2018). The article discusses a case where the complaint listed 118 separate defendants. After being deposed for the better part of a day, the plaintiff could identify only five premises where he may have encountered some asbestos-containing materials and just three manufacturers that he believed incorporated any asbestos into their products that he worked with or around during his career. Old CT had its share of experiences like this.

memorize. It explained to clients that "[h]ow well you know the name of each product and how you were exposed to it will determine whether that defendant will want to offer you a settlement."[33]

In some cases, Old CT was able conclusively to rebut plaintiffs' faulty recollections by showing that the AC Pipe at issue could not possibly have been made or sold by Old CT, either because it did not make or sell the particular type of pipe at issue or by showing that plaintiff's claims were belied by contemporaneous records (invoices, blueprints, contracts, specifications, and other materials) or through a physical inspection of the pipe at issue.[34] But even when Old CT ultimately uncovered this information, the cost to conduct the investigation and otherwise defend the case through summary judgment or later was substantial.

One example—of many—involved a case in Florida. The claimant testified that he developed peritoneal (abdominal) mesothelioma from two weeks of exposure to Old CT's AC Pipe in the summer of 1968 or 1969 when he helped remove some 1,000 feet of AC irrigation pipe from an orange grove. Old CT obtained property records showing that the pipe was installed before June 1962, when Old CT first started making and selling AC Pipe. Old CT also obtained a court order permitting it to dig up the pipe; that excavation revealed that the pipe was made by JM. Discovery also showed that exposure to AC Pipe was not the likely source of plaintiff's mesothelioma. The plaintiff had undergone massive radiation therapy as a child to

---

33 Copy of Baron & Budd Memo, attached to Judiciary Committee Report on the Fairness In Asbestos Injury Resolution Act of 2003, Senate Rpt. 108-118, at 109 ("Baron & Budd Memo"). Reportedly, members of the firm separately encouraged clients to avoid identifying the products of bankrupt defendants. Biederman, Christine *et al.*, *Toxic Justice*, Dallas Observer (Aug. 13, 1998) (former Baron & Budd paralegal describing discouragement of identification of Johns-Manville exposure).

34 The contemporaneous records include Old CT's invoices for the sale and shipment of AC Pipe from 1967 through 1993 (which generally include job site information); sales records from other domestic manufacturers of AC Pipe; and historical documents like contracts, specifications, and as-built plans that show the type and sometimes brand of AC Pipe installed on a job where the plaintiff alleges exposure to AC Pipe.

treat abdominal cancer, which led to the development of numerous abdominal ailments over the course of his life. Therapeutic radiation is a recognized cause of mesothelioma. Because the plaintiff's settlement demand remained well into the seven figures, Old CT tried the case and obtained a defense verdict. The total cost to Old CT to investigate and defend the case, however, was over $2 million.

In the Florida case, Old CT was able to overcome the plaintiff's unfounded assertions of exposure to an Old CT product. But there were many cases where, due to the passage of time and the incompleteness of records, Old CT was unable to disprove claims with suspect product identification entirely, or the claimant's testimony was so vague that any investigation was next to impossible. In other cases, the cost of the investigation could not be justified. Nonetheless, DBMP believes that in a large percentage of these cases the claimed exposure to Old CT AC pipe was simply false.

Aside from having to defend claims in which it should not have been named in the first place, Old CT's defense was further complicated by the recognized practice of claimants withholding evidence of alternative asbestos exposures. This includes, in particular, exposures to products manufactured by companies that filed bankruptcy. Many plaintiffs failed to disclose (and sometimes affirmatively denied) their exposures to bankrupt entities' products during their tort suits against Old CT. These same plaintiffs would then later submit claims to the section 524(g) trusts established by those bankrupt entities, expressly claiming exposure to those bankrupt entities' products.

The court in *Garlock* found an unmistakable pattern of such misrepresentations by plaintiffs and their lawyers, finding it was "sufficiently widespread to have a significant impact on Garlock's settlement practices and results." 504 B.R. at 85. This finding was based on

evidence involving hundreds of cases producing high-value settlements (where the plaintiff's discovery responses conflicted with trust claims or bankruptcy ballots); 15 cases where the court granted full discovery and found "demonstrable misrepresentation;" and even testimony of plaintiff lawyers who attested to practices of delaying trust claims to deprive tort-system defendants of relevant exposure evidence. *Id.* at 85–86. Old CT could not have escaped this same litigation misconduct. Based on a preliminary analysis, over 85% of the mesothelioma plaintiffs who sued and ultimately received payment from Old CT between 2001 and 2009 (the year before Garlock's petition) also sued Garlock or filed a ballot in its bankruptcy case.

In some cases, Old CT learned of this or similar behavior before the case was resolved, but not before incurring substantial defense costs. One such case was resolved just last year, showing that the pattern of misrepresenting alternative exposures observed in *Garlock* continues today. The plaintiff alleged that his "bystander" exposure to Old CT's AC Pipe caused his pleural mesothelioma. He claimed that, as a surveyor in the Sacramento area from the 1950s until the 1980s, he was around other trades installing Old CT's AC Pipe on numerous jobs. He also served in the U.S. Navy from 1948 to 1952. Plaintiff testified at trial over the course of four days. Although he admitted that there was asbestos insulation on the ships on which he served in the Navy, he denied that he had much contact with any insulation materials.

Just after plaintiff's trial testimony concluded, the Veterans Administration (VA) produced records of a disability claim filed by the plaintiff in 2018 related to his Navy service. The production included a declaration signed by the plaintiff attesting to his asbestos exposures during his time in the Navy.[35] The declaration told a diametrically different story about the Navy

---

35 That declaration had been prepared with the assistance of Plaintiffs' counsel's law firm (although plaintiffs' counsel initially "unequivocally represented" to the trial court that their firm had nothing to do with the declaration). The declaration had not been produced in discovery even though it was responsive to multiple discovery requests.

exposures than what plaintiff had just told the jury. It provided numerous specific examples of his exposure to asbestos-containing insulation in the Navy, including:

- During a combat mission in 1950, "[t]he constant gunfire shook the ship and caused asbestos dust to be released from the asbestos lagging throughout the ship. I remember dust coming out of the insulation and falling on me from overhead throughout our combat operations;"

- When his ship was being repaired in drydock, "I had extensive exposure to asbestos while making repairs in the engine room from the asbestos during this period. I had to remove asbestos insulation to gain access to areas to make my electrical repairs. This process released asbestos fibers in to [*sic*] the air which I breathed;" and

- Throughout the 1948-1952 time period, "I was exposed to and breathed air contaminated with asbestos … that came from all of the insulation that covered and was contained in all of the pipes and equipment …."

When the existence of the declaration was brought to the trial court's attention, plaintiff's counsel was ordered to submit declarations to the court explaining how the declaration came about. The evening before that submission was due, the plaintiff accepted the settlement offer that Old CT had on the table since prior to the start of the trial. The total cost to defend the case, however, was almost $1.7 million.

Another example comes from a case that Old CT tried to verdict in Baltimore in 2009. The plaintiff alleged that he had developed pleural mesothelioma as a result of "bystander" exposure to others installing Old CT's AC Pipe between 1975 and 1979. Before that trial, the plaintiff produced no bankruptcy claim forms and denied most other exposure other than bystander exposure to AC Pipe (with the exception of a small amount of work involving joint compound). On appeal, the court ordered a new trial after concluding that the trial judge had improperly increased the number of defense peremptory strikes during jury selection.
The plaintiff passed away before the second trial. In discovery taken before the second trial, Old CT learned that shortly after the first verdict, the plaintiff submitted 23 bankruptcy claims

forms asserting exposure to products that he either had not identified or affirmatively denied working with or around during the first trial. Old CT filed a motion to dismiss the case and for sanctions for discovery abuses. The case settled on the morning that Old CT's motion to dismiss and for sanctions was to be argued. By then, however, Old CT had spent in excess of $1.4 million defending the case.

A further example is a wrongful death case that was scheduled to start trial in Oklahoma in early 2012. A co-worker of the decedent (the "Co-Worker Witness") testified that, in the late 1960s or early 1970s, he and the decedent replaced Old CT's AC Pipe used on a glass making machine at a Corning glass plant. This description was not consistent with how Old CT's AC Pipe was used, a fact confirmed by Old CT's investigation. A few months before the trial was scheduled to start, plaintiff was ordered to produce all bankruptcy trust claims. The materials subsequently produced included five affidavits signed by the Co-Worker Witness, five more from two other co-worker witnesses that had been deposed but had not mentioned AC Pipe, and one affidavit from a co-worker who had never before been identified by plaintiff. These affidavits asserted that decedent had worked with and around numerous asbestos-containing products that the co-workers never mentioned during their depositions and that had not otherwise been identified by plaintiff in response to discovery requests. Indeed, the five affidavits signed by the Co-Worker Witness described decedent's exposure to almost 35 asbestos-containing products (but not AC pipe). Even though these affidavits were signed in May 2005, March 2008, November 2009 (two affidavits), and May 2010, the Co-Worker Witness apparently "forgot" about these other exposures during his October 2009 deposition. This Co-Worker Witness passed away in 2010 and, as a result, Old CT was unable to question him about the inconsistencies between his deposition testimony and his five affidavits. Old CT accordingly

filed a motion to strike the Co-Worker Witness's testimony and for other sanctions due to plaintiff's discovery abuses. Plaintiff ultimately agreed to settle the case for a small fraction of her original demand just prior to the court hearing on Old CT's discovery-related motions.

In these cases, a combination of happenstance and timing led to Old CT's discovery of the plaintiffs' non-disclosure of alternative exposure evidence. Discovery into the claims plaintiffs have submitted confidentially to the Trusts would be necessary to determine the full extent to which Old CT was subjected to these practices.

### D. Summary

As a result of what is at least troubling and potentially intentional product misidentification and failures to disclose all material exposure evidence, Old CT could not be assured that even if it spent significant sums to fully investigate every claim, it would learn all facts relevant to its defense. As a result, it made more economic sense for Old CT to agree to (usually) small settlements rather than fully litigate the claims filed against it. Plaintiffs' practices also may have increased Old CT's trial risk in the small number of cases it settled for significant amounts, and potentially in the even smaller number of cases where plaintiffs obtained verdicts against Old CT. Determining the full extent of the impact would require discovery.

Despite its longstanding and partially successful efforts to cut costs and improve efficiencies, Old CT's asbestos litigation remained a significant and growing financial burden, with substantial inefficiencies for Old CT and plaintiffs alike. After 40 years of litigation, with no clear end in sight, the Debtor now seeks a permanent and global resolution of all current and future asbestos claims under section 524(g) of the Bankruptcy Code—a resolution that will be fair and equitable to both the company and to asbestos claimants.

## III. The Debtor's Goals in this Proceeding

DBMP commenced this chapter 11 case to address and resolve permanently its current and future asbestos-related claims in a manner beneficial to both the Debtor and claimants. Section 524(g) of the Bankruptcy Code provides a debtor with the opportunity to fund a trust for the payment of current and future asbestos claims, in return for a permanent injunction that enjoins such claimants from filing or continuing to prosecute lawsuits against the debtor or its affiliates. Asbestos claimants then are able to resolve their claims through an administrative process that spares claimants from the delay, uncertainty, and stress of litigation while at the same time preserving their right to a trial if they prefer. Section 524(g) was modeled on the plan of reorganization ultimately approved in the *Johns-Manville* bankruptcy case.

To facilitate its ability to pursue a section 524(g) resolution, Old CT underwent a corporate restructuring on October 23, 2019 (the "2019 Corporate Restructuring" or the "Restructuring"). As a result of the Restructuring, Old CT no longer exists and two new companies were formed: (a) the Debtor, DBMP, which was allocated certain assets and liabilities of Old CT, including Old CT's asbestos liability (other than claims for which the exclusive remedy is provided under a workers' compensation statute or similar laws); and (b) CertainTeed LLC, a Delaware limited liability company ("New CT"), which was allocated the other assets and liabilities of Old CT. The 2019 Corporate Restructuring is described in greater detail in the First Day Declaration.

As further described in the First Day Declaration, the combination of assets owned by DBMP and a funding agreement that is in place with New CT ensures that DBMP has the same ability to satisfy asbestos claims that Old CT had prior to the restructuring. As a result, asbestos claimants' ability to recover on their claims has not been adversely impacted by the 2019 Corporate Restructuring. Old CT implemented the 2019 Corporate Restructuring to provide

additional flexibility to address asbestos-related claims, including through the commencement of a chapter 11 reorganization proceeding to globally resolve these claims without subjecting the entire Old CT enterprise to chapter 11. After considering the circumstances, DBMP, through its board of managers, ultimately chose to seek such resolution by filing this case.

Claimants' interests will continue to be protected within this case by the statutory conditions necessary to establish a section 524(g) asbestos trust, including:

- The appointment of a legal representative to represent the interests of future claimants.
- Any plan must be approved by a vote of 75 percent or more of current asbestos claimants.
- The plan must have been approved by a bankruptcy court and a federal district court.

Further, chapter 11 requires the company seeking to utilize section 524(g) to bear the costs of all the professionals employed by estate representatives – in this case the asbestos claimants' committee and the future claimants' representative - to ensure that the interests of the claimants are vigorously represented.

The Debtor expects to pursue the following steps to achieve its goal of establishing a section 524(g) trust:

**A. Preliminary Injunction**

The Debtor will immediately request the entry of an order preliminarily enjoining actions against certain of the Debtor's non-debtor affiliates and certain other parties that seek recoveries on DBMP's asbestos claims. Courts have consistently granted such injunctions to ensure that the

entirety of the debtor's asbestos liability is addressed in the chapter 11 case and the potential for a global resolution under section 524(g) of the Bankruptcy Code is preserved.[36]

**B. Asbestos Claimants' Committee and Future Claimants' Representative**

One of the initial steps in this chapter 11 case is the appointment of an official asbestos claimants' committee (the "ACC"). In an effort to expedite this aspect of the proceeding, before the commencement of the Chapter 11 Case, the Debtor began working cooperatively with certain law firms representing asbestos personal injury claimants to form an *ad hoc* committee of asbestos personal injury claimants. Members were asked to execute non-disclosure agreements, and the Debtor began sharing information about the prepetition restructuring that formed the Debtor and other information relevant to the Debtor's asbestos liabilities. Although the Debtor and the Committee did not have sufficient time prior to the commencement of the Chapter 11 Case to engage in substantive discussions, they laid the foundation to begin to do so promptly. To build on these efforts, the Debtor intends to file a motion seeking to have the prepetition *ad hoc* committee appointed as the ACC in the Chapter 11 Case.

The Debtor is also prepared to quickly engage in discussions with the ACC regarding the selection of a future claimants' representative (the "FCR") to represent future asbestos claimants, a conversation that has already begun with the *ad hoc* committee. Once the ACC and the FCR have been appointed and retained their respective professionals, the Debtor will work

---

36 *See In re Bestwall LLC*, Case No. 17-31795, Adv. No. 17-03105 (Bankr. W.D.N.C. Dec. 7, 2017); *In re Kaiser Gypsum Co., Inc.*, Case No. 16-31602, Adv. No. 16-03313 (Bankr. W.D.N.C. Oct. 7, 2016); *In re Garlock Sealing Techs. LLC*, Case No. 10-31607, Adv. No. 10-3145 (Bankr. W.D.N.C. June 7, 2010); *In re Leslie Controls, Inc.*, Case No. 10-12199 (CSS), Adv. No. 10-51394 (Bankr. D. Del. July 14, 2010); *In re Specialty Prods. Holding Corp.*, Case No. 10-11780 (PJW), Adv. Proc. No. 10 51085 (Bankr. D. Del. June 4, 2010); *In re Quigley Co., Inc.*, Case No. 04-15739 (Bankr. S.D.N.Y. Dec. 17, 2004); *In re Combustion Eng'g, Inc.*, Case No. 03-10495 (Bankr. D. Del. Mar. 7, 2003); *In re Harbison-Walker Refractories Co.*, Case No. 02-2080 (Bankr. W.D. Pa. Feb. 14, 2002); *In re W.R. Grace & Co.*, Case No. 01-01139 (Bankr. D. Del. May 3, 2001); *In re Pittsburgh Corning Corp.*, Case No. 00-22876 (Bankr. W.D. Pa. Apr. 16, 2000 and Apr. 22, 2003).

cooperatively with these representatives to obtain information necessary to facilitate negotiations of a plan of reorganization.

### C. Diligence and Discovery

Both the Debtor and the claimants' representatives will need information to prepare for negotiations and move forward with the case. Therefore, the Debtor expects the parties will engage in early discussions regarding information or discovery each side will need. The Debtor will make every effort to expedite this information gathering process by, among other things, making information available to the ACC and the FCR without the need for formal discovery but subject to an agreed-upon protective order. The Debtor is prepared to commence plan negotiations with the ACC and the FCR as soon as reasonably practical, including potentially without waiting for the completion of this information gathering process.

### D. Plan Negotiations

After the diligence and discovery phase of the case is completed, the Debtor will work with the ACC and the FCR to establish a process for negotiating a plan. The Debtor is also willing to consider mediation if the parties are otherwise unable to reach an agreement. The Debtor is committed to negotiating a consensual plan of reorganization with the ACC and the FCR as soon as reasonably practicable. To that end, the Debtor is prepared to devote the time and resources necessary to plan negotiations to maximize the prospects for reaching a settlement.

### E. Estimation

If the settlement efforts described above fail to achieve a resolution, the Debtor intends to ask this Court to estimate the aggregate amount of DBMP's current and future asbestos liability for plan purposes. The Debtor anticipates that the estimation proceeding would provide for additional discovery, exchanges of expert reports and expert depositions, and pretrial motions, including *Daubert* motions and dispositive motions. The Debtor is committed to working with

the other parties to manage the estimation proceeding as efficiently and cost-effectively as possible. Notwithstanding any asbestos estimation litigation, at all appropriate times the Debtor will be willing to explore settlement opportunities with the ACC and the FCR.

**F. Plan of Reorganization**

Ultimately, the Debtor's objective is to negotiate and develop a confirmable plan of reorganization that resolves current and future asbestos claims by establishing a section 524(g) asbestos trust. The Debtor would benefit by a full and final resolution of its current and future asbestos liabilities and the related savings in substantial defense costs. Claimants would likewise benefit because the cost, uncertainty and delay of litigation would be eliminated. Instead, claimants would follow streamlined trust distribution procedures that enable fair compensation payments faster and more efficiently.

**Conclusion**

Chapter 11 provides the only mechanism for a debtor to permanently, fairly, and efficiently address its asbestos liabilities. In marked contrast to how these claims are currently adjudicated (if at all) in the tort system, an ability to reach a consensual resolution through section 524(g) of the Bankruptcy Code is beneficial to all interested parties, including asbestos claimants. With this Court's assistance, and through negotiations with the ACC and the FCR, the Debtor will attempt to achieve as soon as possible a fair resolution that finally, fairly and equitably resolves its current and future asbestos claims through a confirmed chapter 11 plan of reorganization.

Dated: January 23, 2020
Charlotte, North Carolina

Respectfully submitted,

*/s/ Garland S. Cassada*

Garland S. Cassada (NC Bar No. 12352)
Richard C. Worf, Jr. (NC Bar No. 37143)
Kevin R. Crandall (NC Bar No. 50643)
ROBINSON, BRADSHAW & HINSON, P.A.
101 North Tryon Street, Suite 1900
Charlotte, North Carolina 28246
Telephone: (704) 377-2536
Facsimile: (704) 378-4000
E-mail: gcassada@robinsonbradshaw.com
rworf@robinsonbradshaw.com
kcrandall@robinsonbradshaw.com

Gregory M. Gordon (TX Bar No. 08435300)
JONES DAY
2727 N. Harwood Street, Suite 500
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
E-mail: gmgordon@jonesday.com

Jeffrey B. Ellman (GA Bar No. 141828)
JONES DAY
1420 Peachtree Street, N.E., Suite 800
Atlanta, Georgia 30309
Telephone: (404) 521-3939
Facsimile: (404) 581-8330
E-mail: jbellman@jonesday.com
bberens@jonesday.com

Elizabeth Runyan Geise (DC Bar No. 358266)
Valerie E. Ross (DC Bar No. 445783)
Jeffrey D. Skinner (DC Bar No. 494808)
SCHIFF HARDIN LLP
901 K Street NW, Suite 700
Washington, DC 20001
Telephone: (202) 778-6451
Facsimile: (202) 778-6460
E-mail: egeise@schiffhardin.com
vross@schiffhardin.com
jskinner@schiffhardin.com

PROPOSED ATTORNEYS FOR THE DEBTOR
AND DEBTOR IN POSSESSION

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| In re<br><br>DBMP LLC,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 20-30080 (JCW) |

**DECLARATION OF ROBERT J. PANARO**
**<u>IN SUPPORT OF FIRST DAY PLEADINGS</u>**

Robert J. Panaro, being first duly sworn, deposes and states as follows:

1. I am the Vice President and Chief Restructuring Officer of DBMP LLC, a North Carolina limited liability company (the "Debtor"), which is the debtor and debtor in possession in the above-captioned chapter 11 case. I have been the Vice President of the Debtor since its formation on October 23, 2019. As Vice President of the Debtor, I have reviewed and become familiar with the financial results of both the Debtor and its subsidiary, Millwork & Panel LLC ("Millwork & Panel"), a North Carolina limited liability company.

2. I am employed by Saint-Gobain Corporation, a Pennsylvania corporation and the Debtor's ultimate non-debtor parent company in the United States ("SGC"), and I serve as Senior Vice President and Chief Operations Officer of SGC. I have held this position with SGC since March 2019. Prior to that date I was the Senior Vice President and Chief Financial Officer of SGC from January 2018 to February 2019. Prior to that position, I served as Vice President and Chief Financial Officer of the former CertainTeed Corporation from July 2008 to December 2017. Prior to my role at CertainTeed Corporation, I served as Vice President of Finance and Management Information Systems for North America Abrasives n/k/a Saint-Gobain

[1] The last four digits of the Debtor's taxpayer identification number are 8817. The Debtor's address is 20 Moores Road, Malvern, Pennsylvania 19355.

Abrasives, Inc. from November 1996 to June 2008. My first role with SGC and its affiliated entities was as Vice President Controller for SGC from April 1993 to October 1996.

3. Prior to my employment with SGC and its affiliates, I worked for PricewaterhouseCoopers from 1981 to 1993.

4. I earned a Bachelor of Science degree, *magna cum laude*, in Management with a concentration in Accounting and Finance from Boston College in 1981.

5. On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition with this Court for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), as well as certain motions and other pleadings (collectively, the "First Day Pleadings").

6. I submit this Declaration to support the First Day Pleadings and to provide certain information about the Debtor, its decision to commence this chapter 11 case and its objectives for this case. I have reviewed each of the First Day Pleadings, and it is my belief that the relief sought therein is necessary to (a) avoid immediate and irreparable harm to the Debtor, (b) maximize and preserve the value of the Debtor's chapter 11 estate, (c) assist in the smooth transition of the Debtor into chapter 11 and/or (d) promote the efficient administration of this case.

7. As the Debtor's Chief Restructuring Officer, I am familiar with the Debtor's day-to-day operations, assets, financial condition, business affairs and books and records. Except as otherwise indicated, all facts and statements set forth in this Declaration are based upon: (a) my personal knowledge; (b) information supplied to me by other members of management, professionals or employees; (c) my review of relevant documents; and/or (d) my opinion based upon my experience and knowledge of the Debtor's assets, liabilities and financial

condition. If called upon to testify, I could and would testify to the facts and opinions set forth herein.

8. Section I of this Declaration provides an overview of the Debtor's history and corporate structure. Section II describes the corporate restructuring that was completed on October 23, 2019. Section III describes the circumstances surrounding the commencement of this chapter 11 case and the Debtor's objectives for this case. Section IV sets forth relevant facts in support of the First Day Pleadings.

## I. THE DEBTOR'S HISTORY AND CORPORATE STRUCTURE

9. The Debtor traces its history back to the General Roofing Manufacturing Company, an Illinois corporation formed in 1904, which in 1917 transferred all of its assets and liabilities to Certain-teed Products Corporation, a newly-formed Maryland corporation. Certain-teed Products Corporation changed its name to CertainTeed Corporation in 1976. Compagnie de Saint-Gobain, a French company ("Saint-Gobain"), became an indirect minority shareholder of CertainTeed Corporation in 1972, and an indirect majority shareholder in 1976. CertainTeed Corporation became an indirect wholly-owned subsidiary of Saint-Gobain in 1988 when Saint-Gobain's subsidiary, Saint-Gobain Investments, Inc. ("SGII"), merged with CertainTeed Corporation. SGII was the surviving entity and, in connection with the merger, SGII changed its name to CertainTeed Corporation. CertainTeed Corporation later converted to CertainTeed LLC (with all of its historical forms, collectively, "Old CT"). Thus, Old CT's ultimate parent, through various intermediate entities (including SGC), was Saint-Gobain.

10. Old CT implemented a corporate restructuring (the "2019 Corporate Restructuring"), which was completed on October 23, 2019, as described below. As a result of that restructuring, Old CT ceased to exist and two new entities were created: (a) the Debtor in this case; and (b) the debtor's non-debtor affiliate, CertainTeed LLC ("New CT"). The Debtor

received certain of Old CT's assets and became solely responsible for the asbestos-related liabilities of Old CT (other than asbestos liabilities for which the exclusive remedy is provided under a workers' compensation statue or similar laws). New CT received all other assets of Old CT and became solely responsible for all other liabilities of Old CT. The Debtor and New CT initially were formed as Texas limited liability companies. The Debtor then converted to a North Carolina limited liability company, and New CT converted to a Delaware limited liability company.

11. As part of the 2019 Corporate Restructuring, Old CT's direct parent, CertainTeed Holding Corporation ("CT Holding"), became the direct parent company of both the Debtor and New CT. In addition, the Debtor became the direct parent of Millwork & Panel. A chart depicting the Debtor's corporate structure is attached to this Declaration as Annex 1.

12. The Debtor manages and defends thousands of asbestos-related personal injury claims and oversees the operations of its subsidiary, Millwork & Panel. Millwork & Panel, in turn, manufactures and sells vinyl siding and polyvinyl chloride (PVC) trim products for the construction market. These products are manufactured at two facilities: one located in Claremont, North Carolina; and the other in Social Circle, Georgia (together, the "M&P Facilities").

13. New CT manufactures and sells commercial and residential building products.

## II. THE 2019 CORPORATE RESTRUCTURING

14. Old CT has engaged in multiple restructurings through the years to achieve business and operational objectives. Since it began operations in 1904, Old CT has merged with other companies, been repositioned in its corporate family and acquired and sold a number of assets and businesses.

15. Most recently, Old CT implemented the 2019 Corporate Restructuring to provide additional flexibility to address its asbestos-related claims, including through the commencement of a chapter 11 reorganization proceeding to globally resolve these claims without subjecting the entire Old CT enterprise to chapter 11. A key objective of this restructuring was to make certain that the Debtor has the same ability to fund the costs of defending and resolving present and future asbestos claims, both in the state and federal courts and in connection with any chapter 11 filing, as Old CT did prior to the restructuring. This was achieved by establishing an uncapped funding agreement between the Debtor and New CT, in addition to including the siding and trim business, Millwork & Panel, as an operating subsidiary of the Debtor.

16. The 2019 Corporate Restructuring was effectuated through a series of steps. On October 22, 2019, the following transactions were effected, in sequence:

- Old CT's then-direct parent, Saint-Gobain Delaware Corporation, formed CT Holding and contributed to it all of the issued and outstanding stock of Old CT in exchange for a full ownership interest in CT Holding;
- Old CT converted from a Delaware corporation to a Delaware limited liability company;
- Old CT formed Millwork & Panel and, in exchange for full ownership of Millwork & Panel's equity, contributed to it: (a) the M&P Facilities; (b) certain other assets relating to those facilities; and (c) a North Carolina bank account containing approximately $30 million in cash; and

- Old CT entered into a funding agreement with CT Holding (as amended from time to time, the "Funding Agreement"), with Old CT as payee and CT Holding as payor.

17. On October 23, 2019, the remaining transactions in the 2019 Corporate Restructuring occurred in the following sequence:

- Old CT converted from a Delaware limited liability company to a Texas limited liability company;
- Old CT then effected a divisional merger under Chapter 10, Subchapter A of the Texas Business Organizations Code;
- Upon the effectiveness of the divisional merger, (a) Old CT ceased to exist; (b) two new Texas limited liability companies — the Debtor and New CT — were created; and (c) all of the assets and liabilities of Old CT were allocated between the Debtor and New CT, as described below;
- Immediately following the effectiveness of the divisional merger, (a) New CT assumed from CT Holding the obligations as payor under the Funding Agreement and CT Holding was released from its obligations thereunder in accordance with the express terms of the agreement, such that the Funding Agreement became an agreement between the Debtor, as payee, and New CT, as payor; and (b) the Debtor entered into certain other agreements with non-debtor affiliates, including the secondment agreement and services agreements discussed further below;
- Among its agreements with non-debtor affiliates, the Debtor entered into a divisional merger support agreement with New CT that, among other

things, provides that the Debtor will indemnify and hold harmless New CT for any losses, liabilities or other damages relating to claims against New CT in respect of the Debtor's assets or liabilities, including the Debtor's asbestos-related liabilities;

- Thereafter, the Debtor converted from a Texas limited liability company to a North Carolina limited liability company, and New CT converted from a Texas limited liability company to a Delaware limited liability company; and
- Finally, the Funding Agreement and the other intercompany agreements of the Debtor, including the secondment and services agreements discussed further below, were amended and restated to reflect the names of the parties to those agreements at the conclusion of the 2019 Corporate Restructuring.[2]

18. Pursuant to the divisional merger, the Debtor became solely responsible for Old CT's liability arising from asbestos-related claims against it (other than claims for which the exclusive remedy is provided under a workers' compensation statute or similar laws), and the defense of those claims. In addition, the Debtor received the following assets:

(a) Three bank accounts and approximately $25 million in cash;

(b) Old CT's rights and interests as payee under the Funding Agreement;

(c) All contracts of Old CT related to its asbestos-related litigation, including settlement agreements, service contracts and engagement and retention contracts;

---

2 A copy of the Funding Agreement in effect as of the Petition Date (without its Schedule 2 that includes confidential bank account information) is attached hereto as Annex 2. The summary of the terms of the Funding Agreement in this Declaration is provided for the convenience of the Court and parties in interest and is qualified in all respects by the more detailed terms contained in the Funding Agreement.

(d) A surety bond with respect to the appeal of a certain asbestos-related judgment;

(e) All equity interests in Millwork & Panel;

(f) Causes of action that relate to the assets and liabilities allocated to the Debtor;

(g) Records exclusively relating to the assets and liabilities allocated to the Debtor; and

(h) Privileges relating to these matters.

In total, the Debtor's value is approximately $175 million, in addition to the value of the Funding Agreement with New CT.

19. Pursuant to the divisional merger, New CT received all other assets and liabilities of Old CT, and New CT is solely responsible for those other liabilities.

20. As I mentioned above, the design of the 2019 Corporate Restructuring ensures that the Debtor has the same ability to fund asbestos claims and other liabilities as Old CT had before the restructuring. The Debtor received the equity of Millwork & Panel, which the Debtor has projected will generate approximately $16.0 million in EBITDA in 2020 and approximately $15 million in EBITDA per year over the next five years thereafter. The Debtor estimates the fair market value of its interest in Millwork & Panel to be approximately $150 million, including cash on hand, as of the Petition Date. In addition, as noted, as part of the 2019 Corporate Restructuring, the Debtor received $25 million in cash and became party to the Funding Agreement with New CT.

21. Significantly, the Funding Agreement imposes no repayment obligation on the Debtor; it is not a loan. It obligates New CT to provide funding to pay for all costs and expenses of the Debtor incurred in the normal course of its business (a) at any time when there is no bankruptcy case and (b) during the pendency of any chapter 11 case, including the costs of

administering the chapter 11 case, in both situations to the extent that any cash distributions received by the Debtor from Millwork & Panel are insufficient to pay such costs and expenses. In addition, the Funding Agreement requires New CT to fund any amounts necessary or appropriate (a) to satisfy the Debtor's asbestos-related liabilities at any time when there is no bankruptcy case and (b) in the event of a chapter 11 filing, to provide the funding for a section 524(g) asbestos trust, in both situations to the extent that any cash distributions received by the Debtor from Millwork & Panel are insufficient to pay such costs and expenses and further, in the case of the trust funding, the Debtor's other assets are insufficient to provide that funding.

22. To make sure the Debtor has access to services it needs to effectively operate its business, in connection with the 2019 Corporate Restructuring, the Debtor entered into two services agreements (together, the "Services Agreements") with its non-debtor affiliates, SGC and Saint-Gobain Shared Services Corporation ("Services Corp.").[3] Pursuant to the Services Agreements, SGC and Services Corp. each provide the Debtor with certain centralized services, including accounting, human resources, information technology, legal, risk management, tax and other support services. In addition, the Debtor and SGC entered into a secondment agreement, pursuant to which SGC seconded to the Debtor certain of its employees, including the Debtor's Chief Legal Officer on a full-time basis, to manage the Debtor's defense of asbestos-related claims. Following the 2019 Corporate Restructuring, the Debtor also established a cash pooling agreement with Millwork & Panel (the "Cash Pooling Agreement") that provides for a coordinated cash management system between the Debtor and its subsidiary.

---

[3] Services Corp. is wholly-owned, through another affiliate, by SGC.

23. Millwork & Panel entered into several agreements with the Debtor's non-debtor affiliates, as well, including (a) services agreements with SGC, Services Corp. and New CT pursuant to which Millwork & Panel receives certain corporate and administrative services; (b) a secondment agreement with New CT pursuant to which Millwork & Panel receives the services of certain New CT employees; and (c) a sales and marketing agreement with New CT pursuant to which Millwork & Panel sells certain products to New CT, and New CT provides certain sales and marketing services to Millwork & Panel.[4] Further, although Millwork & Panel is profitable and generates positive cash flow, Millwork & Panel entered into a revolving credit agreement with a non-debtor affiliate, Saint-Gobain Finance Corporation, which permits Millwork & Panel to access capital to address any liquidity needs that may arise as a result of working capital requirements or timing issues. The Debtor is not party to any of those agreements between non-debtor Millwork & Panel and its non-debtor affiliates.

## III. EVENTS LEADING TO THE COMMENCEMENT OF THIS CASE AND THE DEBTOR'S OBJECTIVES FOR ITS CHAPTER 11 REORGANIZATION

### A. Asbestos Litigation Against the Debtor

24. As described more fully in the *Informational Brief of DBMP LLC* (the "Informational Brief"), filed concurrently with the Court, this chapter 11 case was caused by the unceasing and unwarranted filing of thousands upon thousands of asbestos-related claims against the Debtor and Old CT. The burden of managing, defending and resolving these claims is substantial, and this litigation and its associated burdens are expected to continue for decades more.

25. Old CT manufactured and/or sold certain products that contained asbestos, including asbestos cement pipe ("AC Pipe"), asphalt roofing products, other asbestos cement

4 Under this arrangement, Millwork & Panel sells all of its products to New CT for resale to third party customers.

products such as siding shingles, joint compound products and specialty railroad insulation materials. Old CT also purchased and resold certain asbestos-containing products manufactured by other companies. Certain AC Pipe products continued to be produced and sold until 1992 and 1993, at which time Old CT ceased all production and sales of asbestos-containing products. Old CT ceased manufacturing and selling most other asbestos-containing products, however, by the 1970s or early 1980s.

26. Old CT's litigation burden has far exceeded its reasonable liabilities. Most of Old CT's asbestos-containing products, including the products that give rise to the overwhelming majority of the asbestos claims, contained asbestos that was not friable and not likely to be released into the air in sufficient concentrations to be hazardous. Nonetheless, Old CT was relentlessly sued with respect to these products, as well as several other products that did not contain any asbestos at all. In many other cases, as described in the Informational Brief, the plaintiff's identification of Old CT's product was proven false after investigation by Old CT, but often only after substantial defense costs were incurred. I expect Old CT's products were falsely identified in many other cases, although Old CT did not search for or did not uncover evidence in those cases to confirm the misidentification. Further, as described in the Informational Brief, Old CT was sued in certain cases where the plaintiffs did not disclose, or did not fully disclose, their potential exposure to asbestos-containing products of bankrupt manufacturers. These omissions drove Old CT's settlement costs higher than they otherwise would have been if all potential exposures had been disclosed.

27. The Debtor and Old CT have faced hundreds of thousands of asbestos-related claims since the 1970s — over 40 years ago. The vast majority of these claims relate to Old CT's production and sale of AC Pipe products or asbestos-containing asphalt roofing

products.[5] Since 2002 alone, the Debtor and Old CT have incurred approximately $2 billion in costs defending and resolving over 300,000 personal injury lawsuits relating to alleged asbestos exposure. Having long ago exhausted insurance coverage for asbestos claims, Old CT and the Debtor have borne the brunt of these costs. Together, Old CT and the Debtor have paid approximately $1.5 billion of that amount out of pocket — i.e., net of insurance recoveries over that same period of time.

28. Despite having resolved hundreds of thousands of claims, more than 60,000 asbestos-related claims and associated lawsuits against the Debtor were pending on court dockets as of the Petition Date. These claims are pending in jurisdictions throughout the United States, with approximately 32,700 of them on active dockets and the remainder pending on "inactive" dockets. The Debtor expects that, absent its bankruptcy filing, thousands of additional claims would have been filed against it for decades to come.

**B. The Costs and Burdens of the Asbestos Litigation**

29. For more than 20 years, Old CT was named in a relatively small number of asbestos lawsuits, and its defense and indemnity costs were likewise relatively low. As certain defendants that were the primary targets of asbestos plaintiffs began to file for bankruptcy protection, particularly in the early 2000s, the number of claims against Old CT, including mesothelioma claims, escalated sharply. Prior to 2001 as a member of a consortium of asbestos defendants called the Center for Claims Resolution (CCR), Old CT participated in the settlement of approximately 200 mesothelioma cases per year. From and after 2001, new mesothelioma claims against the company spiked to nearly 1,700 claims in 2002 and over 1,700 claims in 2003, with the number and size of settlements also skyrocketing. Since 2002,

[5] The asbestos material in these products was encapsulated, or "locked in" place by either asphalt or a cement matrix, which significantly reduced potential exposure to the asbestos fibers.

the Debtor or Old CT was named in an average of more than 1,400 new mesothelioma claims annually. Indeed, in recent years, plaintiffs have sued Old CT in the majority of all mesothelioma claims filed annually in the United States. As described herein and in the Informational Brief, only a small fraction of those plaintiffs possibly could have been exposed to asbestos fibers released from Old CT's products.

30. This sharp rise in asbestos claims, particularly mesothelioma claims, filed against Old CT since 2001 significantly increased the financial strain and administrative burden imposed by these claims. During the 1990s, Old CT paid less (and usually substantially less) than $10 million per year in indemnity costs to resolve mesothelioma claims. After the rash of bankruptcy filings in the early 2000s caused mesothelioma claims against Old CT to spike, however, Old CT has spent in the range of approximately $80 million to over $160 million every year since 2002 to defend and resolve asbestos claims.

31. In the face of this deluge, Old CT continued to employ a strategy designed to minimize its costs to resolve claims. The vast majority of mesothelioma claims after 2001 were either dismissed (approximately 60% of resolved claims) or settled for $50,000 or less (approximately 20% of resolved claims), far less than the cost of discovery in most cases. Old CT paid more than $250,000 to settle a mesothelioma claim in fewer than 1,000 mesothelioma cases after 2001 — on average only about 50 claims per year. When unreasonable plaintiff demands forced it to go to trial, however, Old CT was very successful. From 2004 to 2019, Old CT won defense verdicts in 20 of the 25 cases that resulted in a verdict on liability.[6] But the cost of defending cases through trial was extremely high and, in some cases, exceeded $1 million per case.

---

6 Most of these trials involved mesothelioma claims—from 2004 to 2019, CertainTeed won 18 and lost 3 of those. These figures exclude cases where the verdict (plaintiff or defense) was reversed during post-trial proceedings or on appeal.

32. As the number of claims against Old CT increased dramatically, particularly mesothelioma claims, so too did its defense costs. To defend and manage this nonstop litigation filed in numerous jurisdictions across the country, the Debtor and Old CT engaged a substantial number of outside professionals, including more than 40 defense firms and often multiple experts in numerous disciplines for a single claim. The Debtor estimates that in any given month, more than 250 attorneys and paralegals at roughly 25 outside defense counsel firms would expend in excess of 6,000 hours, or more, preparing and responding to pleadings and motions, conducting discovery, investigating claims and attending hearings. Further, they would bill significantly more hours when preparing for, or participating in, a trial. This time is in addition to (a) the charges of various investigators and outside experts that worked on the asbestos cases every month and (b) other costs associated with the asbestos litigation, like court reporter costs, filing fees, travel expenses and other expenses that defense professionals regularly incur. Despite ongoing efforts to manage and reduce defense fees and expenses, however, Old CT and the Debtor have spent between approximately $20 million and $30 million per year to defend these lawsuits since 2001.

33. Given the nature and limited use of Old CT's asbestos-containing products, this sudden and substantial rise in claims against Old CT, and the costs to defend and resolve those claims, cannot reasonably be attributed to anything other than the bankruptcy filings by key asbestos defendants and the naming practices employed by plaintiffs' counsel. Many, if not all, of those defendants that filed for bankruptcy established trusts funded with billions of dollars. Since those trusts were established, however, there has been no associated reduction in the number of mesothelioma claims filed against Old CT and the Debtor, or

the costs of resolving those claims. Further, there is no sign that the substantial and ongoing flow of new mesothelioma claims will diminish any time soon.

34. The Debtor's asbestos litigation, and its associated burdens and costs, are anticipated to continue for the foreseeable future. The Debtor's primary competitors have all filed for bankruptcy to resolve their asbestos liabilities, including all but one U.S.-based company with a limited history of manufacturing AC Pipe. As other co-defendants continue to file for bankruptcy, trend lines indicate that the asbestos tort claimants will attempt to seek even higher recoveries from fewer remaining defendants in the tort system. Under these circumstances, there is no predictable end in sight to the extraordinary and unflagging costs of litigating, defending and resolving asbestos claims.

35. All of these factors prompted the Debtor's consideration of a chapter 11 filing.[7]

### C. The Decision to File This Case

36. After careful consideration of the status of its asbestos litigation and potential options to resolve asbestos-related claims, the Debtor determined that the filing of a chapter 11 case in this Court was appropriate and necessary. The Debtor further concluded that this chapter 11 case offered the best alternative under the circumstances — in fact, the only alternative — to permanently, globally and fairly resolve the asbestos claims against it. As I described at length above, the burden of the litigation was considerable and anticipated to continue unabated for decades.

37. The Debtor's goal in this case is to negotiate and ultimately confirm a plan of reorganization that would, among other things, (a) establish and fund a trust to resolve and pay

[7] Additional burdens and risks of asbestos litigation on the Debtor are described in the Informational Brief.

valid current and future asbestos-related claims and (b) provide for the issuance of an injunction that will permanently protect the Debtor and its affiliates (and any other relevant parties) from any further asbestos-related claims arising from products manufactured and/or sold by Old CT, or for which Old CT may otherwise have had legal responsibility, pursuant to section 524(g) of the Bankruptcy Code. The Debtor believes it has sufficient assets, including cash available under the Funding Agreement, to fund a section 524(g) trust that will (a) efficiently and fairly review and compensate current and future asbestos claimants and (b) otherwise qualify for section 524(g) relief.

38. I understand that, in a bankruptcy case that seeks to utilize the provisions of section 524(g) of the Bankruptcy Code, the Debtor is expected to, among other things, (a) negotiate an agreement to fund a trust with representatives of current and future asbestos claimants, (b) seek approval of any plan of reorganization implementing that agreement by a vote of 75% or more of the current asbestos claimants and (c) obtain review and confirmation of the plan of reorganization by this Court and the federal district court. The Debtor is prepared to immediately commit the necessary resources to satisfy the various requirements of section 524(g), including the negotiation of an agreement with the claimants' representatives on an acceptable and confirmable plan of reorganization as soon as possible.

39. The Debtor seeks to engage in good faith negotiations to reach a consensual resolution of the Chapter 11 Case with representatives for current and future claimants as soon as they are in a position and willing to begin discussions. To that end, the Debtor is prepared to promptly provide relevant information to the asbestos claimants'

committee and future claimants' representative appointed in this case, subject to an agreed upon protective order.[8]

## IV. FIRST DAY PLEADINGS

40. Concurrently with the filing of this chapter 11 case, the Debtor filed First Day Pleadings requesting various forms of relief.

41. The Debtor will move for entry of an order scheduling an expedited hearing on certain of the First Day Pleadings.[9] The Debtor anticipates that the Court will conduct a hearing (the "First Day Hearing") as soon after the commencement of its chapter 11 case as the Court's schedule will permit, at which the Court will hear and consider certain of the First Day Pleadings. The Debtor also anticipates that the Court will consider the remainder of the First Day Pleadings at a later time. The First Day Pleadings that the Debtor anticipates will be heard at the First Day Hearing are described in Section IV.A and IV.B, below. The remaining First Day Pleadings are described in Section IV.C, below.

42. Generally, the purpose of the First Day Pleadings is to: (a) obtain authorization for the continued use of the Debtor's bank accounts and operation under key agreements with its affiliates; (b) extend and apply the automatic stay to certain non-debtors;[10] and (c) establish procedures for the smooth and efficient administration of this chapter 11 case.

---

[8] Prior to the Petition Date, the Debtor worked cooperatively with certain asbestos plaintiffs' counsel to organize an *ad hoc* committee of asbestos personal injury claimants (the "*Ad Hoc* Committee"). The *Ad Hoc* Committee consists of 11 individuals represented by law firms from a variety of geographic locations. These firms have diverse caseloads of asbestos personal injury claims against the Debtor. Although there was insufficient time for the Debtor to engage in substantive discussions with the *Ad Hoc* Committee before the commencement of the Chapter 11 Case, the Debtor believed that forming this committee in cooperation with the asbestos plaintiffs' counsel could help facilitate and expedite discussions to advance this case. The Debtor has filed concurrently herewith a motion asking the Court to appoint the *Ad Hoc* Committee as the official asbestos claimants' committee in this case.

[9] Capitalized terms used below in the descriptions of the First Day Pleadings and not otherwise defined herein have the meanings given to them in the applicable First Day Pleadings.

[10] Relief relating to the extension or application of the automatic stay to certain non-debtor affiliates and other non-debtor parties is supported by a separate declaration of Michael T. Starczewski filed concurrently herewith.

I have reviewed each of the First Day Pleadings, including the exhibits thereto, and I believe that the relief sought in each of the First Day Pleadings is tailored to meet the goals described above and, ultimately, will be critical to the Debtor's ability to achieve a successful reorganization.

### A. The Case Administration Motions

***Appointment of Claims, Noticing and Voting Agent***

43. The Debtor will seek the entry of an order appointing Epiq Corporate Restructuring LLC ("Epiq") as claims, noticing and voting agent in this chapter 11 case. I understand that Epiq may, among other things: (a) prepare and serve all notices required in the Debtor's chapter 11 case, including the notice of the commencement of this case and the meeting of creditors pursuant to section 341 of the Bankruptcy Code; (b) maintain the official claims register; and (c) assist with the mailing and tabulation of ballots in connection with any vote to accept or reject any plan or plans proposed in this chapter 11 case. The Debtor obtained and reviewed engagement proposals from two other claims, noticing and voting agents to ensure selection through a competitive process. The Debtor submits, based on all engagement proposals obtained and reviewed, that Epiq's rates are competitive and reasonable given Epiq's quality of services and expertise.

***Entry of an Order Establishing Certain Notice, Case Management and Administrative Procedures***

44. The Debtor will request that the Court enter an order establishing certain notice, case management and administrative procedures (collectively, the "Case Management Procedures") to facilitate the orderly administration of the Debtor's chapter 11 case while ensuring that appropriate notice is provided to parties who express an interest in the chapter 11 case and those directly affected by a request for relief.

45. The Debtor believes that implementation of the Case Management Procedures, among other things, will facilitate service of Court Filings and Orders in a manner that will maximize the efficiency and orderly administration of the chapter 11 case, ensure that appropriate notice is provided to parties in interest and alleviate the significant administrative burden and cost that otherwise could be imposed on the Debtor's estate, parties in interest, the Court and the Clerk of Court due to (a) the substantial number of parties in interest expected to be involved and (b) the number of Court Filings anticipated in the Debtor's chapter 11 case.

***List of the Top Law Firms With Asbestos Cases Against the Debtor in Lieu of the List of the 20 Largest Unsecured Creditors and Notice Procedures for Asbestos Claimants***

46. I understand that the Top 20 List primarily would be used by the Bankruptcy Administrator to understand the types and amounts of unsecured claims against the debtor and thus evaluate prospective candidates to serve on an official committee in the debtor's case. I further understand that, in an asbestos case, an official committee of asbestos claimants is expected to be appointed. Because an asbestos claimants' committee typically consists of asbestos plaintiff law firms acting on behalf of individual asbestos-related claimants, the Debtor seeks authority to file and provide the Bankruptcy Administrator with a list of the law firms with the most significant representations of claimants, based on the volume of filings, scope of payments or related factors, across the major types of claims faced by the Debtor (a "<u>Top Asbestos Counsel List</u>"), in lieu of listing the individual asbestos claimants with the largest unsecured claims against the Debtor on a "Top 20" list of unsecured creditors. The Debtor believes that providing the Bankruptcy Administrator with a Top Asbestos Counsel List would better facilitate the Bankruptcy Administrator's evaluation of members of an official committee of asbestos claimants or the Debtor's request for an order appointing the *Ad Hoc* Committee members to serve on the official committee.

47. The Debtor also will seek Court approval for certain notice procedures relating to individuals (collectively, the "Asbestos Claimants") who are claimants in asbestos-related personal injury lawsuits or other proceedings involving the Debtor, including to (a) serve all notices, mailings, filed documents and other communications relating to its chapter 11 case on Asbestos Claimants in care of their counsel (collectively, the "Asbestos Firms") at such counsel's address, as further described in the Motion; and (b) list the names, addresses and other contact information, as applicable, of the Asbestos Firms in any creditor or service lists, including the creditor matrix provided to the Court or filed in this case, in lieu of listing the contact information of individual Asbestos Claimants. To date, the Debtor has communicated solely with the Asbestos Firms regarding the Debtor's asbestos claims.
The Debtor in many cases cannot be sure that it has the current addresses (or any addresses) for the Asbestos Claimants. Further, consistent with the rules of professional conduct, communicating with an adversary in litigation generally is conducted through counsel.
The Debtor therefore believes that providing notice to Asbestos Claimants through the Asbestos Firms, in accordance with past practice, is much more reliable and consistent with the rules of professional conduct.

48. The notice procedures proposed in the Motion provide for an effective and appropriate noticing process for the Asbestos Claimants. Further, implementing the proposed notice procedures would alleviate the administrative burden and expense of gathering current contact information for each of the Asbestos Claimants, which, in many cases, is not readily available or is difficult to verify. The Debtor has access to the names and addresses of the counsel for the Asbestos Claimants (including counsel of record in pending lawsuits), but the names and addresses of a significant number of individual Asbestos Claimants themselves

are not readily available. It would be extremely burdensome, costly and time-consuming for the Debtor to attempt to obtain this information. In addition, any contact information for the individual Asbestos Claimants the Debtor has or is able to obtain may be outdated and unreliable. Consequently, providing notice in this chapter 11 case in accordance with the Asbestos Notice Procedures will be more efficient and reliable than providing notice to the individual Asbestos Claimants directly.

***Extension of Time to File Schedules***

49. The Debtor believes it will need additional time beyond the time period allotted under the Bankruptcy Code to assemble all of the information necessary to complete and file the required schedules of assets and liabilities and statement of financial affairs (collectively, the "Schedules"). The Debtor will need the additional time because of (a) the size and complexity of this chapter 11 case and (b) the volume of material that must be compiled and reviewed by the Debtor's limited staff to complete the Schedules during the hectic early days of this restructuring. Because the Debtor's chapter 11 case will involve tens of thousands of creditors and other parties in interest, it is my understanding that the Debtor would need to collect, review and assemble a substantial amount of information to complete the Schedules.

50. Given (a) the large number of creditors and (b) the critical matters that the Debtor and its professionals were required to address prior to the commencement of this chapter 11 case, the Debtor was not in a position to complete the Schedules by the Petition Date, even with the assistance of professionals. The Debtor further estimates that, with the many critical matters to be addressed in the early days of this case, the Debtor will require more than 14 days after the Petition Date to complete the Schedules.

51. The additional time requested is important to help ensure that the Schedules are as accurate as possible. Given the volume of information that is provided in

the Schedules, and the fact that the information must be accurate as of the Petition Date, additional time to complete the Schedules will help ensure that the relevant information is fully collected and evaluated and can be incorporated into the relevant filings. Rushing to complete the Schedules soon after the Petition Date, on the other hand, could compromise their completeness. Accordingly, the Debtor will seek to extend the deadline by which it must file its Schedules to 46 days after the Petition Date, which is March 9, 2020, without prejudice to the Debtor's right to seek a further extension for cause.

**B. Request to Continue Using Bank Accounts, Cash Management System and Related Relief**

52. The Debtor will seek approval of the continued use of its prepetition bank accounts, as well as authority to open and close bank accounts during the chapter 11 case, as necessary or appropriate. In the ordinary course of business, the Debtor maintains one bank account at Bank of America, N.A. in Charlotte, North Carolina and two bank accounts at J.P. Morgan Chase, N.A. in New York, New York (collectively, the "Bank Accounts"). One of the Debtor's Bank Accounts at Bank of America serves as a concentration account (the "Concentration Account") where all incoming cash is maintained. All payments and other funds that are received by the Debtor are deposited into that account, including cash from New CT under the Funding Agreement and cash swept from the account of the Debtor's subsidiary, Millwork & Panel, in accordance with the Cash Pooling Agreement. The other two accounts at J.P. Morgan Chase serve as general disbursement accounts (the "Disbursement Accounts") and are used to pay all of the Debtor's costs and expenses, including professional fees. The Disbursement Accounts are maintained as zero balance accounts, and are funded by transfers of the Debtor's cash from the Concentration Account on an as-needed basis.

53. The Debtor maintains, in the ordinary course, a process for collecting, holding and disbursing cash using these Bank Accounts through its "Cash Management System." The Debtor's Cash Management System is consistent with the Cash Pooling Agreement and the Funding Agreement and is accurately described in the Motion. The Cash Management System promotes the central management of cash assets of the Debtor and its subsidiary. Among other things, it ensures adequate liquidity among the Debtor's Bank Accounts and Millwork & Panel's bank accounts, and maximizes the efficiency of their financial management and accounting. Continued use of the Cash Management System and continued performance under the Cash Pooling Agreement, as they are accurately described in the First Day Papers, are in the best interest of the Debtor's estate and parties in interest. The Debtor therefore will request authority to maintain its prepetition Cash Management System and continue to perform under the Cash Pooling Agreement.

54. In addition, the Debtor will request authority for Bank of America and J.P. Morgan Chase, and any other bank that may hold a bank account of the Debtor during the chapter 11 case (each, a "Bank"), to charge, and the Debtor to pay or honor, both prepetition and postpetition service and other fees, costs, charges and expenses to which the Bank may be entitled in accordance with its contractual arrangements with the Debtor. Further, the Debtor will request that the Court authorize the Bank to charge back returned items to the Bank Accounts in the normal course of business. The Debtor requires this relief to minimize disruption to the Bank Accounts and to assist in accomplishing a smooth transition to operating in chapter 11.

55. The Bank Accounts are insured by the United States through the Federal Deposit Insurance Corporation (the "FDIC") and are maintained at large, well known and well

capitalized institutions. Therefore, the Debtor will seek a waiver of section 345(b) of the Bankruptcy Code in this case to the extent that the funds maintained in the Bank Accounts or any other domestic accounts during this chapter 11 case exceed the amount insured by the FDIC or the Federal Savings & Loan Insurance Corporation.

56. To protect against the possible inadvertent payment of prepetition claims, the Debtor will advise Bank of America and J.P. Morgan Chase not to honor checks issued prior to the Petition Date, except as otherwise expressly permitted by an order of the Court and directed by the Debtor. The Debtor has the capacity to draw the necessary distinctions between prepetition and postpetition obligations and payments without closing the Bank Accounts and opening new ones.

57. In the ordinary course of its business, the Debtor uses checks and other business forms (collectively, the "Business Forms"). The Debtor will request that it not be required to include the legend "D.I.P.," or any other debtor in possession designation, and the corresponding bankruptcy case number, on its Business Forms because such alteration is not necessary in this case. The Debtor has relatively few business relationships, and the parties it conducts business with (such as law firms) are expected to be well aware of the Debtor's status as a debtor in possession.

## C. Anticipated First Day Pleadings to Be Heard at a Later Hearing

***Performance Under Certain Intercompany Agreements***

58. The Debtor is a party to certain agreements with non-debtor affiliates (collectively, the "Intercompany Agreements") that are essential to its day-to-day operations. The transactions contemplated by the Intercompany Agreements are ordinary course transactions. Nevertheless, out of an abundance of caution and because each of the counterparties to the Intercompany Agreements is a non-debtor affiliate of the Debtor,

the Debtor will seek confirmation of its authority to perform under the Intercompany Agreements.

59. The Intercompany Agreements consist of: (a) the Services Agreements, whereby the debtor's non-debtor affiliates, SGC and Services Corp., provide the Debtor with a wide array of corporate and administrative services that are critical for the day-to-day operation of its business; and (b) a secondment agreement whereby employees of SGC are seconded to work for the Debtor on a full time or part time basis. I have reviewed the descriptions of the Intercompany Agreements set forth in the Motion and have determined that they are fair and accurate to the best of my knowledge, information and belief.

60. The Intercompany Agreements are critical to provide the Debtor with the day-to-day services that are essential to the support and management of its business. Further, they provide the Debtor with uninterrupted access to the services of experienced employees with significant historical knowledge and expertise relating to the Debtor's (a) administrative and business operations and (b) asbestos-related claims. It would be unduly burdensome and costly for the Debtor to establish its own duplicative systems, programs and capabilities, and to hire employees. As such, even before the 2019 Corporate Restructuring, Old CT and its affiliates used similar intercompany arrangements for years. If the Debtor were unable to receive employee and other services under the Intercompany Agreements, the Debtor likely would need to contract with a different provider to receive such integral services, and any such contract with a different provider would not be expected to be on such favorable terms. Further, to ensure the integrity of the services and personnel provided to the Debtor, the Debtor and SGC have agreed that the Seconded Employees (a) will not work on any matters for the Debtor's non-debtor affiliates that relate to the Debtor or its chapter 11 case and (b) at all times will act in the best

interest of the Debtor, including in the event of an actual or potential conflict between the Debtor and any of its non-debtor affiliates.

61. The costs associated with the Intercompany Agreements, in each case, are fair and reasonable. For instance, the Debtor pays only the portion of the Seconded Employees' annual base salaries that corresponds to the amount of time such employees spend working for the Debtor. The Debtor does not bear the many other costs associated with their employment, including employee benefits, employee taxes, employee withholding, trust funds, surcharges, allowances or deductions arising out of or relating to their employment or payment of their compensation. Moreover, the fees relating to the services agreements are consistent with the rates that SGC and Services Corp. charge their other affiliates for such services, which are market or below-market rates. Therefore, because the Intercompany Agreements are (a) fair and reasonable, (b) essential to the Debtor's continued operations and (c) ordinary course, the Debtor will request authority to continue to perform under them.

***Professional Retention Applications***

62. The retention of certain chapter 11 professionals is essential to the Debtor's reorganization efforts. Accordingly, the Debtor will seek to retain various professionals to represent and assist it in connection with this chapter 11 case. These professionals include: (a) Jones Day as bankruptcy counsel; (b) Robinson, Bradshaw & Hinson, P.A. as special counsel for asbestos claim estimation matters and local bankruptcy counsel; (c) Schiff Hardin as special counsel for asbestos matters; and (d) Bates White, LLC as asbestos consultants.

***Interim Compensation Procedures for Retained Professionals***

63. The Debtor's chapter 11 case is a large and complex case that requires significant investment of time and resources by the professionals retained by the Debtor.

Establishing an orderly, regular process for the allowance and payment of compensation and reimbursement of expenses for retained professionals will prevent such professionals from bearing the unjust burden of funding this chapter 11 case, and will enable the Debtor to closely monitor the costs of administration and establish consistent procedures to pay such costs.

64. Therefore, the Debtor has proposed that, except as otherwise provided in an order of the Court authorizing the retention of a particular retained professional, all retained professionals be permitted to seek interim payment of compensation and reimbursement of expenses in accordance with the procedures proposed in the Motion.

***Procedures for Engaging Ordinary Course Professionals***

65. The Debtor's members and management, in the performance of their duties, call upon certain professionals that provide ordinary course services that are not directly related to this chapter 11 case (the "Ordinary Course Professionals") to provide professional services to assist them in carrying out their assigned duties and responsibilities in the ordinary course of the Debtor's business. These Ordinary Course Professionals provide valuable assistance in addressing issues of importance to the Debtor and its business, particularly in connection with the management of the Debtor's asbestos-related litigation.

66. The Debtor desires to employ the Ordinary Course Professionals, as and when requested by the Debtor, to render professional and other services to its estate in the same manner and for the same general purposes as such services were provided prior to the Petition Date. To avoid potential disruptions, it is important that the Debtor continues to have the ability to employ the Ordinary Course Professionals (e.g., for defense counsel, to provide services related to the cases they have been defending), many of whom are familiar with the Debtor's business and affairs, including the thousands of pending litigation matters.

67. Although the Ordinary Course Professionals identified to date are counsel in asbestos-related litigation that I understand is expected to remain stayed under section 362 of the Bankruptcy Code, services from these professionals may be needed from time to time. For example, the Debtor may require services in asbestos litigation relating to filing stay notices, addressing potential stay violations, monitoring dockets and providing information about these cases that is not available from any other source. However, without assurance that the Debtor is authorized to use and pay these parties, I believe that many Ordinary Course Professionals may be reluctant to assist the Debtor when needed. Therefore, the Debtor will request approval of certain procedures for the engagement and compensation of Ordinary Course Professionals.

***Appointment of Official Committee of Asbestos Personal Injury Claimants***

68. In the fall of 2019, after completing the 2019 Corporate Restructuring, the Debtor began working with certain law firms representing asbestos personal injury claimants to form the *Ad Hoc* Committee with the hope of engaging in discussions prior to any potential chapter 11 filing and advancing progress toward a resolution of its asbestos liabilities. These law firms were identified as key firms in asbestos litigation based on a review of claims data, which was shared with certain of the firms to assist in identifying and organizing the group. To be able to share this and other information, the Debtor has provided non-disclosure agreements to the firms.

69. The *Ad Hoc* Committee consists of 11 individuals represented by law firms from a variety of geographic locations. These firms have diverse caseloads of asbestos personal injury claims against the Debtor, including with respect to asbestos-related diseases and number of claims against the Debtor. Certain of the law firms have the most substantial numbers of claims pending against the Debtor.

70. Once the *Ad Hoc* Committee was formed, the Debtor began to share certain information about the 2019 Corporate Restructuring, as well as other information relevant to the Debtor's asbestos liabilities. Because the *Ad Hoc* Committee was formed only shortly before the commencement of the Chapter 11 Case, however, the Debtor and the *Ad Hoc* Committee did not have sufficient time to engage in substantive discussions. Nonetheless, they have laid the foundation to begin to do so promptly.

71. The Debtor commenced this Chapter 11 Case to obtain a comprehensive and permanent resolution of its asbestos liability. Accordingly, the Debtor intends to focus its efforts on negotiating with representatives of current and future asbestos claimants, and ultimately obtaining approval of, a plan of reorganization that will, among other things (a) establish and fund a trust under section 524(g) of the Bankruptcy Code to pay qualifying asbestos-related claims and (b) provide for the issuance of an injunction that will permanently protect the Debtor, its affiliates and others from any further asbestos-related claims.

72. I believe the appointment of an official committee of asbestos personal injury claimants (the "ACC"), which is routine in asbestos chapter 11 cases, is necessary to ensure that the interests of current asbestos claimants are adequately and appropriately represented in the Chapter 11 Case. Accordingly, the Debtor will request an order appointing the *Ad Hoc* Committee as the ACC.

73. I believe such an order is appropriate in this case. The proposed members of the ACC were fairly chosen, are representative of the Debtor's overall pool of asbestos personal injury claimants and include individuals represented by law firms with some of the most substantial numbers of lawsuits against the Debtor. In addition, the proposed members' law firms have asserted various types of asbestos claims (e.g., mesothelioma, malignancy and

non-malignancy claims) against the Debtor and have claims pending in many different jurisdictions. The law firms also are geographically diverse (with offices in California, Illinois, Indiana, Maryland, Missouri, New York, Ohio, Pennsylvania, South Carolina and other states around the country) and have substantial experience representing claimants on asbestos claimants' committees in asbestos-related bankruptcies and participating in trust advisory committees for section 524(g) trusts. Indeed, certain of the law firms have chaired asbestos claimants' committees and most, if not all, have been involved in negotiating and confirming plans of reorganization in other asbestos bankruptcy cases. As a result, I believe the proposed ACC members and their law firms are well-suited to represent the interests of asbestos personal injury claimants in this Chapter 11 Case.

## CONCLUSION

74. For all the reasons described herein and in the First Day Pleadings, I respectfully request that the Court grant the relief requested in each of the First Day Pleadings.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge and belief.

EXECUTED on this 23rd day of January, 2020.

*/s/ Robert J. Panaro*
Robert J. Panaro

**Annex 1**

Debtor's Corporate Structure Chart

**Organizational Structure of DBMP LLC**



**Annex 2**

Funding Agreement

# AMENDED AND RESTATED FUNDING AGREEMENT

This AMENDED AND RESTATED FUNDING AGREEMENT, dated as of October 23, 2019 (as it may be amended, restated, modified or supplemented from time to time, this "Agreement") is between CERTAINTEED LLC, a Delaware limited liability company ("Payor"), and DBMP LLC, a North Carolina limited liability company ("Payee").

## RECITALS

A. Prior to and in contemplation of the conversion of CertainTeed LLC, a Delaware limited liability company ("Old CT (DE)"), to a Texas limited liability company (as such, "Old CT (TX)") and the subsequent divisional merger of Old CT (TX) pursuant to Chapter 10 of the TBOC (the "Divisional Merger"), CertainTeed Holding Corporation, a Delaware corporation ("CT Holding"), as payor, and Old CT (DE), as payee, executed and delivered a Funding Agreement, dated as of October 22, 2019 (the "Original Funding Agreement").

B. Immediately after the execution of the Original Funding Agreement and prior to the Divisional Merger, Old CT (DE) converted from a Delaware limited liability company into a Texas limited liability company, Old CT (TX), pursuant to Section 18.216 of the Delaware Limited Liability Company Act and Section 10.102 of the TBOC (the "TX Conversion").

C. Immediately following the effectiveness of the TX Conversion, CT Holding, in its capacity as the sole member of CT (TX), approved a Plan of Divisional Merger contemplating the Divisional Merger (the "Plan of Divisional Merger").

D. At the effective time of the Divisional Merger, (1) certain property of CT (TX), as set forth on Schedule 5(b)(i) to the Plan of Divisional Merger and certain liabilities and obligations of CT (TX), as set forth on Schedule 5(c)(i) to the Plan of Divisional Merger (collectively, the "Allocated Assets and Liabilities") were allocated to a new Texas limited liability company created upon the effectiveness of the Divisional Merger ("DBMP (TX)"), (2) the remaining property, liabilities and obligations of CT (TX) were allocated to another new Texas limited liability company created upon effectiveness of the Divisional Merger ("New CT (TX)"), and (3) CT (TX) ceased to exist.

E. Immediately following the effectiveness of the Divisional Merger, CT Holding assigned to New CT (TX), and New CT (TX) assumed from CT Holding, all rights and obligations of CT Holding under the Original Funding Agreement (such assignment and assumption, the "Post-Merger Assignment"), whereupon CT Holding was released from its obligations, and ceased to have any further obligations, under the Original Funding Agreement.

F. Following the Divisional Merger and the Post-Merger Assignment, (1) New CT (TX) effected a conversion (the "DE Conversion") into Payor, a Delaware limited liability company, and (2) DBMP (TX) effected a conversion (the "NC Conversion") into Payee, a North Carolina limited liability company.

G. In connection with the allocation to DBMP (TX) of the Allocated Assets and Liabilities, CT Holding and its successors and assigns agreed, pursuant to the Original Funding Agreement, to provide funding to Old CT (DE) and, after the TX Conversion, CT (TX), and,

after the Divisional Merger, DBMP (TX) and, after the NC Conversion, DBMP, sufficient to pay the costs of operations of DBMP's business and other liabilities and obligations included in the Allocated Assets and Liabilities as and when they become due.

H. The Allocated Assets and Liabilities included the rights and obligations of CT (TX) (as successor to Old CT (DE) in the TX Conversion) under the Original Funding Agreement, and, at the effective time of the Divisional Merger, pursuant to the terms and conditions of the Plan of Divisional Merger, the rights and obligations of CT (TX) under the Original Funding Agreement were allocated to DBMP (TX) such that, following the effectiveness of the Divisional Merger, DBMP (TX), and, following the NC Conversion, DBMP, had assets having a value at least equal to its liabilities and had financial capacity sufficient to satisfy its obligations as they become due in the ordinary course of business, including any Asbestos Related Liabilities.

I. Payor and Payee desire to amend and restate the Original Funding Agreement to reflect that the Merger, the Post-Merger Assignment, the DE Conversion and the NC Conversion have occurred and Payor, now a Delaware limited liability company having the name "CertainTeed LLC," and Payee, now a North Carolina limited liability company having the name "DBMP LLC," are the parties to such agreement.

**AGREEMENT**

NOW, THEREFORE, in consideration of the foregoing, the parties hereto agree as follows:

1. Definitions. As used in this Agreement, the following terms have the meanings herein specified unless the context otherwise requires:

"Affiliate" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control," as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise. For purposes of this definition, the terms "controlling," "controlled by" and "under common control with" have correlative meanings.

"Allocated Assets and Liabilities" has the meaning specified in the recitals to this Agreement.

"Asbestos Related Liabilities" has the meaning specified in Schedule 1 to this Agreement.

"Bankruptcy Case" means any voluntary case under chapter 11 of the Bankruptcy Code commenced by the Payee in the Bankruptcy Court.

"Bankruptcy Code" means title 11 of the United States Code, as amended from time to time and any successor statute and all rules and regulations promulgated thereunder.

"Bankruptcy Court" means the United States Bankruptcy Court where the Bankruptcy Case is commenced.

"Base Rate" means, for any day, a fluctuating interest rate per annum as shall be in effect from time to time, which rate per annum shall at all times be equal to the greater of (a) the rate of interest established by Bank of America, N.A from time to time, as its "prime rate," whether or not publicly announced, which interest rate may or may not be the lowest rate charged by it for commercial loans or other extensions of credit, and (b) the Federal Funds Effective Rate in effect from time to time, determined one Business Day in arrears, plus 1/2 of 1% per annum.

"Board" means (a) with respect to a corporation, the board of directors of the corporation or any committee thereof, (b) with respect to a partnership, the board of directors, the managing member or members or the board of managers, as applicable, of the general partner of the partnership, (c) with respect to a limited liability company, the managing member or members or the board of managers, as applicable, of the limited liability company, and (d) with respect to any other Person, the board or committee of such Person serving a similar function.

"Business Day" means each day other than a Saturday, a Sunday or a day on which banking institutions in Charlotte, North Carolina or at a place of payment are authorized by law, regulation or executive order to remain closed.

"Capital Stock" means (a) in the case of a corporation, corporate stock, (b) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock, (c) in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited), and (d) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding (in each case of (a) through (d) above) any debt securities convertible into such equity securities.

"Contractual Obligation" means, as to any Person, any obligation or similar provision of any security issued by such Person or any agreement, instrument or other undertaking (excluding this Agreement) to which such Person is a party or by which it or any of its property is bound.

"CT (DE)" has the meaning specified in the recitals to this Agreement.

"CT Holding" has the meaning specified in the recitals to this Agreement.

"CT (TX)" has the meaning specified in the recitals to this Agreement.

"DBMP" has the meaning specified in the recitals to this Agreement.

"DBMP (TX)" has the meaning specified in the recitals to this Agreement.

"Default" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"DE Conversion" has the meaning specified in the recitals to this Agreement.

"District Court" means the United States District Court in the district of the Bankruptcy Court.

"Divisional Merger" has the meaning specified in the recitals to this Agreement.

"Event of Default" has the meaning specified in Section 6.

"Federal Funds Effective Rate" means, for any period, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight Federal Funds transactions with members of the Federal Reserve System arranged by Federal Funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York.

"Funding Account" means the account of the Payee listed on Schedule 2 to this Agreement, into which the proceeds of all Payments made under this Agreement shall be deposited, or such other account designated in writing by the Payee to the Payor from time to time.

"Funding Date" has the meaning specified in Section 2(b).

"Funding Request" has the meaning specified in Section 2(b).

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, in effect from time to time, consistently applied. If at any time any change in GAAP (including any adoption of International Financial Reporting Standards) would materially affect the computation of any amount required to be computed under this Agreement, the Payor may give written notice to the Payee of its intent to preserve the original intent of this Agreement and upon delivery of such notice, such amounts shall be calculated in accordance with GAAP as in effect at the end of the fiscal period ended immediately prior to such change in GAAP.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"NC Conversion" has the meaning specified in the recitals to this Agreement.

"New CT" has the meaning specified in the recitals to this Agreement.

"New CT (TX)" has the meaning specified in the recitals to this Agreement.

"Organizational Documents" means (a) with respect to any corporation, its certificate or articles of incorporation and bylaws, (b) with respect to any limited liability company, its

certificate or articles of formation or organization and operating agreement, and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation of such entity.

"Original Funding Agreement" has the meaning specified in the recitals to this Agreement.

"Payee" has the meaning specified in the first paragraph of this Agreement.

"Payee Affiliate" means any wholly owned Affiliate of the Payee (and in no case includes the Payor or any Payor Affiliate).

"Payee Material Adverse Effect" means (a) a material impairment of the rights and remedies of the Payor under this Agreement, or of the ability of the Payee to perform its material obligations under this Agreement, or (b) a material adverse effect upon the legality, validity or enforceability of this Agreement against the Payee.

"Payment" has the meaning specified in Section 2(a).

"Payor" has the meaning specified in the first paragraph of this Agreement.

"Payor Affiliate" means any wholly owned Affiliate of the Payor (and in no case includes the Payee or any Payee Affiliate).

"Payor Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect upon, the business, assets, liabilities (actual or contingent) or financial condition of the Payor and its Subsidiaries, taken as a whole, (b) a material impairment of the rights and remedies of the Payee under this Agreement, or of the ability of the Payor to perform its material obligations under this Agreement, or (c) a material adverse effect upon the legality, validity or enforceability of this Agreement against the Payor.

"Permitted Funding Use" means each of the following:

(a) the payment of any and all costs and expenses of the Payee incurred in the normal course of its business (including the payment of any indemnification or other obligations of the Payee owing to any managers or officers of the Payee) at any time when there is no proceeding under the Bankruptcy Code pending with respect to the Payee;

(b) the payment of any and all costs and expenses of the Payee incurred during the pendency of any Bankruptcy Case that are necessary or appropriate in connection therewith, including the costs of administering the Bankruptcy Case and any and all other costs and expenses of the Payee incurred in the normal course of its business (including the payment of any indemnification or other obligations of the Payee owing to any managers or officers of the Payee);

(c) the funding of any amounts necessary or appropriate to satisfy (i) the Payee's Asbestos Related Liabilities established by a judgment of a court of competent jurisdiction or final settlement thereof at any time when there is no proceeding under the Bankruptcy Code pending with respect to the Payee, (ii) following the commencement of any Bankruptcy Case, the Payee's Asbestos Related Liabilities in connection with the funding of a trust under section 524(g) of the Bankruptcy Code for the benefit of existing and future claimants that is included in a plan of reorganization for the Payee confirmed by a final, nonappealable order of the Bankruptcy Court and the District Court, and (iii) in the case of either (i) or (ii), any ancillary costs and expenses of the Payee associated with such Asbestos Related Liabilities and any litigation thereof, including the costs of any appeals;

(d) the funding of any amounts necessary to cause the Funding Account to contain at least $5,000,000 at such time; and

(e) the funding of any obligations of the Payee owed to the Payor or any Payor Affiliate, including any indemnification or other obligations of the Payee under any agreement provided for in the Plan of Divisional Merger;

in the case of clauses (a) through (e) above, solely to the extent that any cash distributions theretofore received by the Payee from its Subsidiaries are insufficient to pay such costs and expenses and fund such amounts and obligations in full and further, in the case of clause (c)(ii) above, solely to the extent the Payee's other assets are insufficient to fund amounts necessary or appropriate to satisfy the Payee's Asbestos Related Liabilities in connection with the funding of such trust.

"Person" means any individual, corporation, partnership, limited liability company, joint venture, trust, unincorporated organization, or government or any agency or political subdivision thereof.

"Plan of Divisional Merger" has the meaning specified in the recitals to this Agreement.

"SEC" means the Securities and Exchange Commission.

"Subsidiary" means any Person a majority of the outstanding Voting Stock of which is owned or controlled by the Payor or by one or more other Subsidiaries and that is consolidated in the Payor's accounts.

"TX Conversion" has the meaning specified in the recitals to this Agreement.

"Voting Stock" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of such Person.

2. Funding Obligations and Procedures.

(a) Funding Obligations. The Payor hereby agrees, on the terms and conditions set forth in this Agreement, upon the request of the Payee from time to time in accordance with the requirements of Section 2(b), to make payments to the Payee (each, a

"Payment"), the proceeds of which shall be used by the Payee for any Permitted Funding Use. Nothing in this Agreement shall obligate the Payor to make Payments under this Agreement that in the aggregate exceed the aggregate amount necessary for the Payee to fund all Permitted Funding Uses, and nothing in this Agreement shall obligate the Payor to make any individual payment under this Agreement that exceeds the amount requested by the Payee in the applicable Funding Request.

(b) Funding Requests. To request a Payment, the Payee shall deliver to the Payor a written request (which written request may be a .pdf delivered via email) for such Payment in a form reasonably acceptable to the Payor and signed by the Payee (each, a "Funding Request"). Each Funding Request shall specify (i) the amount of the requested Payment, which shall be no less than $500,000, and (ii) the date of the requested Payment, which shall be the date that is five Business Days following the delivery of such Funding Request (each such date, a "Funding Date"). Each Funding Request by the Payee shall constitute a representation and warranty by the Payee that the conditions set forth in Section 2(d) have been satisfied. Except as required to comply with the minimum requirements in Section 2(b)(i), Payee shall not deliver a Funding Request for an amount in excess of the aggregate amount necessary for the Payee to fund all current Permitted Funding Uses and all projected Permitted Funding Uses over the 30 days following the date of such Funding Request.

(c) Payments. Subject only to the satisfaction of the conditions set forth in Section 2(d), on any Funding Date, the Payor shall pay or cause to be paid to the Payee an amount equal to the amount of the requested Payment specified in the applicable Funding Request. All Payments shall be made by wire or other transfer of immediately available funds, in United States dollars, to the Funding Account. In the event that the Payor does not make any Payment within the time period required by this Section 2(c), the amount of the requested Payment shall bear interest at a rate per annum equal to the Base Rate *plus* 2% until such Payment is made and the Payor shall include any interest accruing pursuant to this Section 2(c) in the next Payment made to the Payee.

(d) Conditions to Payments. The Payor's obligation to make any Payment is subject to the satisfaction of the following conditions as of the date of the Funding Request relating to such Payment (i) the representations and warranties of the Payee set forth in Section 3(b) shall be true and correct without regard to the impact of any Bankruptcy Case, including any notices or other actions that may be required therein, and (ii) there shall have been no violation by the Payee of the covenant set forth in Section 5.

3. Representations and Warranties.

(a) Representations and Warranties of the Payor. The Payor represents and warrants to the Payee that:

(i) Existence, Qualification and Power. The Payor (A) is duly organized or formed, validly existing and, as applicable, in good standing under the laws of its jurisdiction of incorporation or organization, (B) has all requisite power and authority and all requisite governmental licenses, authorizations,

consents and approvals to (I) own or lease its material assets and carry on its business and (II) execute, deliver and perform its obligations under this Agreement, and (C) is duly qualified and is licensed and, as applicable, in good standing under the laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (B)(I) or (C), to the extent that failure to do so could not reasonably be expected to have a Payor Material Adverse Effect.

(ii) Authorization; No Contravention. The execution, delivery and performance by the Payor of this Agreement has been duly authorized by all necessary corporate or other organizational action, and does not and will not (A) contravene the terms of its Organizational Documents, (B) conflict with or result in any breach or contravention of, or the creation of any lien under, or require any payment to be made under (I) any Contractual Obligation to which it is a party or affecting it or its properties or (II) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which it or its property is subject, or (C) violate any applicable law; except in each case referred to in clause (B) or (C), to the extent the failure to do so could not reasonably be expected to have a Payor Material Adverse Effect.

(iii) Governmental Authorization; Other Consents. No approval, consent, exemption, authorization or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution delivery or performance of this Agreement by, or enforcement against, the Payor.

(iv) Binding Effect. This Agreement has been duly executed and delivered by the Payor. This Agreement constitutes a legal, valid and binding obligation of the Payor, enforceable against the Payor in accordance with its terms, except to the extent such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally and by equitable principles.

(b) Representations and Warranties of the Payee. The Payee represents and warrants to the Payor that:

(i) Existence, Qualification and Power. The Payee (A) is duly organized or formed, validly existing and, as applicable, in good standing under the laws of its jurisdiction of incorporation or organization, (B) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (I) own or lease its material assets and carry on its business and (II) execute, deliver and perform its obligations under this Agreement and (C) is duly qualified and is licensed and, as applicable, in good standing under the laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (B)(I) or (C), to the extent that

failure to do so could not reasonably be expected to have a Payee Material Adverse Effect.

(ii) Authorization; No Contravention. The execution, delivery and performance by the Payee of this Agreement has been duly authorized by all necessary corporate or other organizational action, and does not and will not (A) contravene the terms of its Organizational Documents, (B) conflict with or result in any breach or contravention of, or the creation of any lien under, or require any payment to be made under (I) any Contractual Obligation to which it is a party or affecting it or its properties or (II) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which it or its property is subject, or (C) violate any applicable law; except in each case referred to in clause (B) or (C), to the extent the failure to do so could not reasonably be expected to have a Payee Material Adverse Effect.

(iii) Governmental Authorization; Other Consents. No approval, consent, exemption, authorization or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution delivery or performance of this Agreement by, or enforcement against, the Payee.

(iv) Binding Effect. This Agreement has been duly executed and delivered by the Payee. This Agreement constitutes a legal, valid and binding obligation of the Payee, enforceable against the Payee in accordance with its terms, except to the extent such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally and by equitable principles.

4. Covenants of the Payor.

(a) Provision of Financial Information.

(i) The Payor will furnish to the Payee, no later than 90 days after the end of each fiscal year (in the case of annual financial statements) and 60 days after the end of each fiscal quarter other than the last fiscal quarter (in the case of quarterly financial statements), unaudited annual and quarterly consolidated financial statements prepared in accordance with GAAP (subject to the absence of notes to the financial statements and related disclosures, and, with respect to quarterly financial statements, normal year-end audit adjustments).

(ii) By accepting such financial information, the Payee will be deemed to have represented to and agreed with the Payor that: (A) it will not use the information in violation of applicable securities laws or regulations; and (B) it will not communicate the information to any Person, including in any aggregated or converted form, and will keep the information confidential, other than where disclosure of such information is required by law, regulation or legal process (in

which case the Payee shall, to the extent permitted by law, notify the Payor promptly thereof).

(iii) Notwithstanding the foregoing, the financial statements, information and other documents required to be provided as described in Section 4(a)(i), may be, rather than those of the Payor, those of any direct or indirect parent of the Payor. Notwithstanding the foregoing, the Payor may fulfill the requirement to distribute such financial information by filing the information with the SEC within the applicable time periods required by the SEC. The Payor will be deemed to have satisfied the reporting requirements of Section 4(a)(i) if any direct or indirect parent of the Payor has filed such reports containing such information with the SEC within the applicable time periods required by the SEC and such reports are publicly available. To the extent a direct or indirect parent of the Payor provides financial statements, information and other documents pursuant to the first sentence of this Section 4(a)(iii) or such parent files such report with the SEC pursuant to the third sentence of this Section 4(a)(iii), and if the financial information so furnished relates to such direct or indirect parent of the Payor, the same shall be accompanied by consolidating information that explains in reasonable detail the difference between the information relating to such parent on the one hand, and the information relating to the Payor and its Subsidiaries on a standalone basis, on the other hand.

(b) Successor to the Payor upon Consolidation or Merger.

(i) Subject to the provisions of Sections 4(b)(ii) and 4(b)(iii), nothing contained in this Agreement shall prevent any consolidation or merger of the Payor with or into any Person, or successive consolidations or mergers in which the Payor or its successor or successors shall be a party or parties, or shall prevent any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all the property of the Payor (for the avoidance of doubt, calculated by including any equity interests held by the Payor), to any Person; *provided*, *however*, and the Payor hereby covenants and agrees, that, if the surviving Person, acquiring Person or lessee is a Person other than the Payor, upon any such consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition, all of the Payor's funding obligations under this Agreement and the observance of all other covenants and conditions of this Agreement to be performed by the Payor, shall be expressly assumed by an amendment to this Agreement or such other documentation in form reasonably satisfactory to the Payee, executed and delivered to the Payee by the Person formed by such consolidation, or into which the Payor shall have been merged, or by the Person which shall have acquired or leased such property. This covenant will not apply to (A) a merger of the Payor with an Affiliate solely for the purpose of reincorporating the Payor in another jurisdiction within the United States, (B) any conversion of the Payor from an entity formed under the laws of one state to the same type of entity formed under the laws of another state, or (C) any conversion of the Payor from a limited liability company to a corporation, from a corporation to a limited liability company, from a limited liability company to a limited

partnership or a similar conversion, whether the converting entity and the converted entity are formed under the laws of the same state or the converting entity is formed under the laws of one state and the converted entity is formed of the laws of a different state. Notwithstanding the foregoing, this Section 4(b)(i) will not apply to any consolidation or merger, or any sale, assignment, transfer, conveyance, lease or other disposition of assets, between or among Payor and its Subsidiaries.

(ii) Upon any consolidation or merger, or any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all of the assets, of the Payor (for the avoidance of doubt, calculated by including any equity interests held by the Payor) in a transaction that is subject to, and that complies with, the provisions of the preceding clause (i), the successor Person formed by such consolidation with the Payor or into which the Payor is merged, or to which such sale, assignment, transfer, lease, conveyance or other disposition is made, shall succeed to, and be substituted for (so that from and after the date of such consolidation, merger, sale, lease, conveyance or other disposition, the provisions of this Agreement referring to the "Payor" shall refer instead to the successor Person and not to the Payor), and may exercise every right and power of, the Payor under this Agreement with the same effect as if such successor Person had been named as the Payor herein. In the event of a succession in compliance with this Section 4(b)(ii), the predecessor Person shall be relieved from every obligation and covenant under this Agreement upon the consummation of such succession.

(iii) Any consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition referred to in the preceding clause (i) shall not be permitted under this Agreement unless immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing.

5. Covenants of the Payee. The Payee shall not use the proceeds of any Payment made under this Agreement for any purpose other than a Permitted Funding Use. The Payee will perform its indemnification obligations owing to the Payor under the agreements provided for in the Plan of Divisional Merger in all material respects.

6. Events of Default. Each of the following events constitutes an "Event of Default":

(a) the Payor defaults in its funding obligations pursuant to Section 2 and such default continues for a period of 10 Business Days;

(b) the Payor defaults in the performance of, or breaches, any covenant or representation or warranty of the Payor in this Agreement (other than a covenant or representation or warranty which is specifically dealt with elsewhere in this Section 6) and such default or breach continues for a period of 90 days, or, in the case of any failure to comply with Section 4(a) of this Agreement, 180 days, in each case after there has been given, by registered or certified mail, to the Payor by the Payee a written notice

specifying such default or breach and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder;

(c) the Payor, pursuant to or within the meaning of the Bankruptcy Code or any similar federal or state law for the relief of debtors, (i) commences a voluntary case, (ii) consents to the entry of an order for relief against it in an involuntary case, (iii) consents to the appointment of a custodian of it or for all or substantially all of its property, (iv) makes a general assignment for the benefit of its creditors, or (v) generally is not paying its debts as they become due; and

(d) a court of competent jurisdiction enters an order or decree under the Bankruptcy Code or any similar federal or state law for the relief of debtors that (i) is for relief against the Payor, (ii) appoints a custodian of the Payor for all or substantially all of the property of the Payor, or (iii) orders the liquidation of the Payor, and, in each case of (i) through (iii) above, such order or decree remains unstayed and in effect for 60 consecutive days.

Upon becoming aware of any Default or Event of Default, the Payor shall promptly deliver to the Payee a statement specifying such Default or Event of Default.

7. Remedies. Upon the occurrence of any Event of Default, and at any time thereafter during the continuance of any such Event of Default, the Payee may pursue any available remedy to collect any unfunded Payments due and owing to the Payee or to enforce the performance of any provision of this Agreement.

8. Notices. All notices required under this Agreement, including each Funding Request and any approval of or objection to a Funding Request, shall be delivered to the applicable party to this Agreement at the address set forth below. Unless otherwise specified herein, delivery of any such notice by email, facsimile or other electronic transmission (including .pdf) shall be effective as delivery of a manually executed counterpart thereof.

Payor:

CERTAINTEED LLC
20 Moores Road
Malvern, Pennsylvania 19355
Attention: Mark A. Rayfield, President and Chief Executive Officer
Email: Mark.A.Rayfield@saint-gobain.com

with a copy to:

CERTAINTEED LLC
20 Moores Road
Malvern, Pennsylvania 19355
Attention: R. Craig Smith, Divisional Counsel
E-mail: Craig.Smith@saint-gobain.com

Payee:

DBMP LLC
20 Moores Road
Malvern, Pennsylvania 19355
Attention: Joseph N. Bondi, President
Email: Joseph.N.Bondi@saint-gobain.com

with a copy to:

DBMP LLC
20 Moores Road
Malvern, Pennsylvania 19355
Attn: Michael T. Starczewski, Chief Legal Officer
E-mail: Michael.T.Starczewski@saint-gobain.com

9. Governing Law. This Agreement shall be governed and construed in accordance with the laws of the State of North Carolina.

10. No Implied Waiver; Amendments. No failure or delay on the part of the Payee to exercise any right, power or privilege under this Agreement, and no course of dealing between the Payor, on the one hand, and the Payee, on the other hand, shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under this Agreement preclude any other or further exercise thereof or the exercise of any other right, power or privilege. No notice to or demand on the Payor in any case shall entitle the Payor to any other or further notice or demand in similar or other circumstances, or constitute a waiver of the right of the holder of this Agreement to any other or further action in any circumstances without notice or demand. The remedies provided in this Agreement are cumulative and not exclusive of any remedies provided by law. No amendment or waiver of any provision of this Agreement, nor consent to any departure by the Payee therefrom, shall in any event be effective unless the same shall be in writing, specifically refer to this Agreement, and be signed by the Payor and the Payee, and then such amendment or waiver shall be effective only in the specific instance and for the specific purpose for which given. A waiver on any such occasion shall not be construed as a bar to, or waiver of, any such right or remedy on any future occasion.

11. Counterparts; Entire Agreement; Electronic Execution. This Agreement may be executed in separate counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement constitutes the entire contract among the parties relating to the subject matter hereof and supersedes, in its entirety, the Original Funding Agreement. This Agreement shall become effective when it shall have been executed by each party hereto and each party hereto shall have received counterparts hereof which, when taken together, bear the signatures of each of party hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Delivery of an executed counterpart of a signature page of this Agreement by telecopy, .pdf or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement.

12. Severability. If any one or more of the provisions contained in this Agreement are invalid, illegal or unenforceable in any respect, the validity, legality or enforceability of all the remaining provisions will not in any way be affected or impaired. If any one or more provisions contained in this Agreement are deemed invalid, illegal or unenforceable because of their scope or breadth, such provisions shall be reformed and replaced with provisions whose scope and breadth are valid under applicable law.

13. Transfer; Assignment. This Agreement shall be binding upon the Payor and its successors and assigns, and the terms and provisions of this Agreement shall inure to the benefit of the Payee and its successors and assigns. The Payor's rights and obligations under this Agreement may not be assigned without the prior written consent of the Payee; *provided, however*, that no such consent of the Payee shall be required in connection with the Post-Merger Assignment or any transfer effected in compliance with Section 4(b). Upon giving effect to the Post-Merger Assignment, CT Holding will be released from its obligations as the Payor and will have no further obligations under this Agreement. The DE Conversion shall not constitute an assignment of the Payor's rights and obligations under this Agreement. The Payee's rights and obligations under this Agreement may not be assigned without the prior written consent of the Payor. None of the TX Conversion, the Divisional Merger or the NC Conversion shall constitute an assignment of the Payee's rights and obligations hereunder.

14. Construction. The descriptive headings herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement. The word "including" means without limitation by reason of enumeration. The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless specifically stated otherwise, all references to Sections and Schedules are to the Sections and Schedules of or to this Agreement.

15. Rights of Parties. This Agreement shall not confer any rights or remedies upon any Person other than the parties hereto and their respective successors and permitted assigns.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**CERTAINTEED LLC**, a Delaware limited liability company, as the Payor

By: ______________________________

Mark A. Rayfield
President and Chief Executive Officer

**DBMP LLC**, a North Carolina limited liability company, as the Payee

By: ______________________________

Joseph N. Bondi
President

*[Item 7.A(x) – Signature Page to Amended and Restated Funding Agreement]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**CERTAINTEED LLC**, a Delaware limited liability company, as the Payor

By: ______________________________
Mark A. Rayfield
President and Chief Executive Officer

**DBMP LLC**, a North Carolina limited liability company, as the Payee

By: ______________________________
Joseph N. Bondi
President

*[Item 7.A(x) – Signature Page to Amended and Restated Funding Agreement]*

## SCHEDULE 1

### Definition of Asbestos Related Liabilities

For purposes of this Agreement, "Asbestos Related Liabilities" means all Liabilities (as defined below) of the Payee related in any way to asbestos or asbestos containing materials.

Capitalized terms that are used in this Schedule 1 have the following meanings:

(a) "Cause of Action" means any claim, judgment, cause of action, counterclaim, crossclaim, third party claim, defense, indemnity claim, reimbursement claim, contribution claim, subrogation claim, right of set off, right of recovery, recoupment, right under any settlement Contract and similar right, whether choate or inchoate, known or unknown, contingent or noncontingent.

(b) "Contract" means any contract, agreement, arrangement, lease, indenture, mortgage, deed of trust, evidence of indebtedness, License, Plan, guarantee, understanding, course of dealing or performance, instrument, bid, order, proposal, demand, offer or acceptance, whether written or oral.

(c) "Governmental Authority" means any national, central, federal, state, provincial, municipal, local or other domestic, foreign or supranational governmental, legislative, administrative or regulatory authority, agency, court, arbitration tribunal, board, department or commission, or other governmental or regulatory entity, including any competent governmental authority responsible for the determination, assessment or collection of taxes.

(d) "Law" means any national, central, federal, state, provincial, municipal, local or other domestic, foreign or supranational statute, law, ordinance, decree, order, injunction, rule, regulation, directive, constitution, code, edict, writ, judgment, opinion, decree, injunction, stipulation, award or other document or pronouncement having the effect of law (including common law) of any Governmental Authority, including rules and regulations of any regulatory or self-regulatory authority with which compliance is required by any of the foregoing.

(e) "Liability" shall mean any claim, demand, offer, acceptance, action, suit, liability or obligation of any kind, whether accrued or fixed, absolute or contingent, matured or unmatured, determined or determinable, choate or inchoate, asserted or unasserted, known or unknown, including (i) those arising or that may arise under any past, present or future Law or Contract or pursuant to any Cause of Action or Proceeding and (ii) all claims for economic or noneconomic damages or injuries of any type or nature whatsoever (including claims for physical, mental and emotional pain and suffering, loss of enjoyment of life, loss of society or consortium and wrongful death, as well as claims for damage to property and punitive damages).

(f) "License" means any license, sublicense, agreement, covenant not to sue or permission.

(g) "Person" means any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, benefit plan, unincorporated organization, business, syndicate, sole proprietorship, association, organization, labor union or other entity or Governmental Authority.

(h) "Plan" means, with respect to any Person, (i) any "employee benefit plan" (as defined in Section 3(3) of ERISA), (ii) all specified fringe benefit plans as defined in Section 6039(D) of the Internal Revenue Code, and (iii) any other plan, program, policy, agreement or arrangement, whether or not in writing, relating to compensation, employee benefits, severance, change in control, retention, deferred compensation, equity, employment, consulting, vacation, sick leave, paid time off, salary continuation, disability, hospitalization, medical insurance, life insurance, scholarship programs, incentive compensation or bonus compensation, in each case that is sponsored, maintained or contributed to or required to be sponsored, maintained or contributed to by, or otherwise covering, such Person.

(i) "Proceeding" means any action, appeal, arbitration, assessment, cancellation, charge, citation, claim, complaint, concurrent use, controversy, contested matter, demand, grievance, hearing, inquiry, interference, investigation, litigation (including class actions and multidistrict litigation), mediation, opposition, re-examination, summons, subpoena or suit, or other case or proceeding, whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private, commenced, brought, conducted or heard by or before, under the supervision or direction of, or otherwise involving, any Governmental Authority or arbitrator or other agreed-upon tribunal or dispute resolution mechanism.

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| DBMP LLC,[1] | : | No. 20-30080 (JCW) |
| Debtor. | : | |
| DBMP LLC, | : | Adversary Proceeding |
| Plaintiff | : | |
| | : | No. 20-03004 (JCW) |
| v. | : | |
| THOSE PARTIES LISTED ON APPENDIX A TO COMPLAINT, *et al.*, | : | |
| Defendants. | : | |

**MOTION OF THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS TO LIFT THE STAY PURSUANT TO 11 U.S.C. § 362 AS TO CERTAIN ASBESTOS PERSONAL INJURY CLAIMS**

[1] The last four digits of the Debtor's taxpayer identification number are 8817. The Debtor's address is 20 Moores Road, Malvern, Pennsylvania 19355.

# TABLE OF CONTENTS

Preliminary Statement .......... 1

Background .......... 2

Jurisdiction .......... 8

Argument .......... 8

I. The Debtor Has Acknowledged Having Effectively Unlimited Resources to Litigate and Pay Asbestos Cases .......... 8

II. The Totality of the Circumstances Supports Lifting the Stay .......... 13

A. The asbestos personal injury claims arise under and turn upon state law .......... 17

B. Judicial economy will be served by lifting the stay .......... 17

C. The Debtor's estate will not be harmed because the Debtor has unlimited funding akin to unlimited insurance .......... 18

III. Lifting the Stay Is Consistent With the Bankruptcy Code and the Purpose of the Automatic Stay .......... 22

Notice .......... 25

No Prior Request .......... 25

Conclusion .......... 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Admiral Ins. Co. v. Grace Indus., Inc.* (*In re Grace Indus., Inc.*),
341 B.R. 399 (Bankr. E.D.N.Y. 2006), *aff'd as modified sub nom. Admiral Ins. Co. v. Grace Indus., Inc.*, 409 B.R. 275 (E.D.N.Y. 2009) ....20

*Ambruster v. Monument 3: Realty Fund VIII Ltd.*,
963 F. Supp. 862 (N.D. Cal. 1997) ....16

*In re Beach First Nat'l Bancshares, Inc.*,
451 B.R. 406 (Bankr. D.S.C. 2011) ....15

*In re Bock Laundry Mach. Co.*,
37 B.R. 564 (Bankr. N.D. Ohio 1984) ....16

*In re Budd Co.*,
No. 14 B 11873, 2016 WL 556287 (Bankr. N.D. Ill. Feb. 10, 2016) ....20, 21

*Claughton v. Mixson*,
33 F.3d 4 (4th Cir. 1994) ....14

*In re Coronet Foods, Inc.*,
No. 5:04-3822, 2005 WL 1552633 (Bankr. N.D. W. Va. June 3, 2005) ....19

*Distaff, Inc. v. Springfield Contracting Corp.*,
984 F.2d 108 (4th Cir. 1993) ....19

*El-Meswari v. Wash. Gas Light Co.*,
785 F.2d 483 (4th Cir. 1986) ....16

*Elegant Concepts, Ltd. v. Kristiansen* (*In re Elegant Concepts, Ltd.*),
61 B.R. 723 (Bankr. E.D.N.Y. 1986) ....16

*In re Fernstrom Storage & Van Co.*,
100 B.R. 1017 (Bankr. N.D. Ill. 1989), *aff'd sub nom. In re Fernstrom Storage & Van Co.*, 938 F.2d 731 (7th Cir. 1991) ....20, 21, 22

*Gullett v. Cont'l Cas. Co.* (*In re Gullett*),
230 B.R. 321 (Bankr. S.D. Tex. 1999), *rev'd on other grounds sub nom.*, *Cont'l Cas. Co. v. Gullett*, 253 B.R. 796 (S.D. Tex. 1999), *aff'd sub nom. In re Gullett*, 220 F.3d 585 (5th Cir. 2000) ....23

*Holtkamp v. Littlefield* (*In re Holtkamp*),
669 F.2d 505 (7th Cir. 1982) ....20

*In re Horn*,
No. 12-50207, 2012 WL 1978287 (Bankr. M.D.N.C. June 1, 2012) ....................................18

*In re Jeff Benfield Nursery, Inc.*,
565 B.R. 603 (Bankr. W.D.N.C. 2017)......................................................................24

*In re Joyner*,
416 B.R. 190 (Bankr. M.D.N.C. 2009)..........................................................14, 15, 17

*Kadlecek v. Schwank USA, Inc.*,
486 B.R. 336 (Bankr. M.D.N.C. 2013)......................................................................17

*Lee v. Anasti* (*In re Lee*),
461 F. App'x 227 (4th Cir. 2012) ............................................................................15

*Lopez v. Trujillo*,
475 B.R. 550 (N.D. Tex. 2012)...............................................................................23

*Martin-Trigona v. Champion Fed. Sav. & Loan Ass'n*,
892 F.2d 575 (7th Cir. 1989) ..................................................................................23

*Winters ex. rel. McMahon v. George Mason Bank*,
94 F.3d 130 (4th Cir. 1996) ....................................................................................23

*In re Mitchell*,
546 B.R. 339 (Bankr. D.S.C. 2016)..........................................................................19

*Myles v. Xinergy Ltd.* (*In re Xinergy Ltd.*),
Case No. 15-70444, 2015 WL 3643418 (Bankr. W.D. Va. June 11, 2015) ............................16

*In re Nifong*,
No. 08-80034C-7D, 2008 WL 2203149 (Bankr. M.D.N.C. May 27, 2008) ...........................18

*In re Nkongho*,
59 B.R. 85 (Bankr. D.N.J. 1986) ............................................................................16

*Peterson v. Cundy* (*In re Peterson*),
116 B.R. 247 (D. Colo. 1990).................................................................................15

*Raleigh v. Ill. Dep't of Revenue*,
530 U.S. 15 (2000)................................................................................................17

*In re Robbins*,
964 F.2d 342 (4th Cir. 1992), *as amended* (May 27, 1992) ........................................... *passim*

*Santa Fe Minerals, Inc. v. BEPCO, L.P.* (*In re 15375 Mem'l Corp.*),
382 B.R. 652 (Bankr. D. Del. 2008), *order clarified on reconsideration*, 386 B.R. 548 (Bankr. D. Del. 2008), *rev'd*, 400 B.R. 420 (D. Del. 2009), *aff'd sub nom. In re 15375 Mem'l Corp. v. Bepco, L.P.*, 589 F.3d 605 (3d Cir. 2009)..........................21

*In re Sky Grp. Int'l, Inc.*,
108 B.R. 86 (Bankr. W.D. Pa. 1989) ....................24

*In re Todd Shipyards Corp.*,
92 B.R. 600 (Bankr. D.N.J. 1988) ....................20

*In re Trust*,
526 B.R. 668 (Bankr. N.D. Tex. 2015)....................25

*Walker v. Bd. of Trustees*,
69 F. App'x 953 (10th Cir. 2003) ....................16

*Walsh v. Advanced Cardiac Specialists Chartered*,
273 P.3d 645 (Ariz. 2012)....................16

**Statutes**

11 U.S.C. § 362....................1, 5, 13

11 U.S.C. § 362(d)(1) ....................14, 17

11 U.S.C. § 362(g) ....................14

28 U.S.C. § 157(b)(2)(B) ....................17

Cal. Civ. Proc. Code § 377.34 (West 2018)....................16

Tex. Bus. Orgs. Code Ann. § 10.001 (West 2019) ....................3

Tex. Bus. Orgs. Code Ann. § 10.008(a)(3) (West 2019)....................3

Tex. Bus. Orgs. Code Ann. § 10.901 (West 2019) ....................3

**Other Authorities**

3 COLLIER ON BANKRUPTCY ¶ 362.07 (Richard Levin & Henry J. Sommer eds.,
16th ed. 2018) ....................17, 19, 20

H.R. Rep. No. 95-595 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963 ....................17, 23

The Official Committee of Asbestos Personal Injury Claimants ("**Committee**" or "**ACC**") of DBMP LLC ("**Debtor**"), by and through its undersigned counsel, hereby moves for an order lifting the automatic stay pursuant to 11 U.S.C. § 362 and modifying the Court's preliminary injunction order entered in a related adversary proceeding (the **"Motion"**).[2] Specifically, the Committee requests that the Court lift the automatic stay to permit any claimant holding an asbestos personal injury claim against the Debtor (an "**Asbestos Personal Injury Claimant**" and collectively, the "**Asbestos Personal Injury Claimants**"), to pursue such claim in the tort system against the Debtor, provided that the claimant first agrees in writing that any settlement or judgment in respect of his or her asbestos personal injury claim may not be enforced against the assets of the Debtor, other than the assets available through the Funding Agreement between the Debtor and CertainTeed LLC ("**New CT**"). The stay shall otherwise remain in full force and effect, including with respect to any Asbestos Personal Injury Claimant who does not provide the requisite written acknowledgment.

In support of this Motion, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1. Through its novel "Texas two-step" transaction, subsequent bankruptcy filing and preliminary injunction motion, pre-restructuring CertainTeed ("**Old CT**") isolated asbestos creditors in a shell corporation and subjected them to a bankruptcy stay while moving its assets, operations, and its preferred creditors to a newly created company, New CT, that stayed clear of

[2] The Committee is simultaneously filing this Motion in adversary proceeding number 20-03004 (JCW) to modify the preliminary injunction order extending the automatic stay to nondebtor entities to make clear that Asbestos Personal Injury Claimants may pursue recoveries of their claims through the assets available under the Funding Agreement between the CertainTeed LLC and the Debtor. *See* Second Agreed Order Regarding Debtor's Request for Extension or Application of the Automatic Stay, 3:20-ap-03004, ECF No. 68 ("**Second Agreed Order**").

bankruptcy and went on as if nothing had happened. All creditors other than asbestos creditors continue to be paid in full.

2. But as a result of the foregoing maneuver, the asbestos personal injury cases of CertainTeed's asbestos victims have been stayed since January 23, 2020 (almost a year). This is true even though the Debtor has what it claims to be inexhaustible resources, in the form of the Funding Agreement, to pay all settlements or judgments reached in the tort system.

3. Indeed, various of the Debtor's and its affiliates' officers and directors testified in their respective depositions that the Funding Agreement between New CT and the Debtor is "uncapped" and "unlimited." Mark Rayfield, the CEO of Saint-Gobain North American and New CT, confirmed that there is a "zero" percent chance of New CT defaulting on its obligations under the Funding Agreement, and that the assets are sufficient to pay all current and future liabilities. It will thus never exhaust.

4. The Committee submits that under the circumstances presented here, the automatic stay should be lifted.

**BACKGROUND**

5. CertainTeed's legacy asbestos liabilities arise from its manufacture and sale of numerous asbestos containing products including cement pipe, asphalt roofing products, siding shingles, joint compound products and specialty railroad insulation materials. *See* Decl. of Robert J. Panaro in Support of First Day Pleadings ¶ 25, 3:20-bk-30080, ECF No. 24 ("**Panaro Decl.**"). CertainTeed also purchased and resold asbestos-containing products manufactured by other companies. Panaro Decl. ¶ 25.

6. The company resolved asbestos claims in the tort system for more than 40 years. It was first sued in the 1970s, and has since faced "hundreds of thousands" of asbestos-related claims. *Id.* ¶ 27. It ran out of insurance coverage many years ago. *Id.* It estimates that it has spent in the

range of approximately $80 million to over $160 million every year since 2002 to defend and resolve asbestos claims. *Id.* ¶ 30. The Debtor asserts that during that timeframe it "incurred approximately $2 billion in costs defending and resolving over 300,000 personal injury lawsuits relating to alleged asbestos exposure." *Id.* ¶ 27. And the Debtor is expecting "thousands of additional [asbestos] claims . . . [to be] filed against it for decades to come." *Id.* ¶ 28.

7. In 2019, CertainTeed engaged in certain corporate maneuvers in an attempt to shed its asbestos liabilities. Following in the footsteps of Georgia-Pacific (*Bestwall*), CertainTeed underwent a divisive merger under Texas law.[3] Among other things:

- In July 2019, CertainTeed reserved the corporate name DBMP in North Carolina.
- On or about October 22 and 23, 2019, the Debtor's affiliates created Holdings, CertainTeed LLC and DBMP. Holdings was incorporated in Delaware by Defendants' parent entity, Saint-Gobain Delaware Corporation, and CertainTeed LLC and DBMP were formed as Texas limited liability companies. The Debtor's affiliates positioned Holdings as the sole member of DBMP.
- CertainTeed transferred (i) its assets, operations, and non-asbestos liabilities to CertainTeed LLC, and (ii) its asbestos liabilities and an interest in certain North Carolina operations to DBMP.
- On the same day that CertainTeed LLC and DBMP were formed in Texas—on or about October 23, 2019—CertainTeed converted from a Texas limited liability company to a Delaware limited liability company. That afternoon,

[3] The Texas Business Organizations Code ("**TBOC**") permits any domestic Texas corporate entity to divide itself into more than one entity. *See* Tex. Bus. Orgs. Code Ann. § 10.001 *et seq* (West 2019). Pursuant to the TBOC, as part of a divisive merger, liabilities may be allocated among the new corporate entities. Specifically, upon the effectiveness of a merger,

> each surviving or new domestic organization to which a liability or obligation is allocated under the plan of merger is the primary obligor for the liability or obligation, and, except as otherwise provided by the plan of merger or by law or contract, no other party to the merger, other than a surviving domestic entity or non-code organization liable or otherwise obligated at the time of the merger, and no other new domestic entity or non-code organization created under the plan of merger is liable for the debt or other obligation . . . .

*Id.* § 10.008(a)(3) (West 2019). However, the TBOC also provides that a divisive merger may not be used to hinder, delay, and defraud creditors or otherwise effect a fraudulent transfer. *See id.* § 10.901 (West 2019) ("This code does not affect, nullify, or repeal the antitrust laws *or abridge any right or rights of any creditor under existing laws*." (emphasis added)).

> DBMP also converted from a Texas limited liability company to a North Carolina limited liability company.

8. CertainTeed thus created New CT, a "good" company with favored creditors and virtually all of the assets and operations of Old CT and assigned all of its asbestos liabilities to the Debtor, a "bad" company designed to contain those asbestos liabilities.

9. The Debtor admits the asbestos creditors are stuck with the Debtor, while other creditors currently enjoy full and prompt payment as creditors of the non-debtor New CT:

> The Debtor received certain of Old CT's assets and became solely responsible for the asbestos-related liabilities of Old CT (other than asbestos liabilities for which the exclusive remedy is provided under a workers' compensation statue or similar laws). New CT received all other assets of Old CT and became solely responsible for all other liabilities of Old CT.

Panaro Decl. ¶ 10.

10. In connection with the divisional merger, the Debtor entered into a series of agreements with its affiliates. Critically, an uncapped "Funding Agreement" was put in place between the Debtor and New CT, which holds the majority of the assets of CertainTeed.[4] Under the Funding Agreement, after the Debtor has exhausted all funds available to it, New CT is required to supply the Debtor with any additional funds necessary for it to satisfy its asbestos claims. *Id.* ¶ 21.

11. The Debtor has repeatedly asserted that the Funding Agreement "ensures that the Debtor has the same ability to pay the DBMP Asbestos Claims as Old CT did before the 2019 Corporate Restructuring." Complaint at 6, 3:20-ap-03004, ECF No. 1. According to the Debtor, the "asbestos claimants' ability to recover on their claims has not been adversely impacted by the 2019 Corporate Restructuring." Informational Brief at 25, 3:20-bk-30080, ECF No. 22. Indeed,

---

[4] Both the Debtor and New CT are subsidiaries of the massive French industrial conglomerate (over $40 billion in annual revenue), Compagnie de Saint-Gobain ("**Saint-Gobain**").

"the same assets, the same paying power that stood behind or that was behind or available to asbestos claims pre-restructuring is still available because [DBMP has] . . . that funding agreement in place." Hr'g Tr. 13:7-11, Jan. 27, 2020 (Debtor's counsel).

12. And according to Robert Panaro, the Debtor's Chief Restructuring Officer, the Funding Agreement provides the Debtor with the same ability to fund the costs of litigation in the tort system and in connection with a chapter 11 filing as before the restructuring:

> A key objective of this restructuring was to make certain that the Debtor has the same ability to fund the costs of defending and resolving present and future asbestos claims, both in the state and federal courts and in connection with any chapter 11 filing, as Old CT did prior to the restructuring. This was achieved by establishing an uncapped funding agreement between the Debtor and New CT, in addition to including the siding and trim business, Millwork & Panel, as an operating subsidiary of the Debtor.

Panaro Decl. ¶ 15 (emphasis added).

13. Just months after engaging in this divisional merger, on January 23, 2020, DBMP filed for bankruptcy (the "**Petition Date**") in North Carolina. As of that date, more than 60,000 asbestos-related claims and associated lawsuits were pending against the Debtor in jurisdictions throughout the United States. *Id.* ¶ 28. The Debtor acknowledges that thousands of additional claims will continue to arise in the future. *Id.*

14. Pursuant to § 362, all of the pending lawsuits were stayed against the Debtor on the Petition Date. In addition, on January 29, 2020, asbestos lawsuits against certain "Protected Parties," which included the Debtor's non-debtor affiliates and third-party distributors of CertainTeed's products,[5] were stayed by a temporary restraining order ("**TRO**")[6] that was issued in the related adversary proceeding ("**Adversary Proceeding**") to preserve the status quo pending

[5] *See* Complaint, 3:20-ap-03004, ECF No. 1; PI Motion, 3:20-ap-03004, ECF No. 2.

[6] *See* Temporary Restraining Order, 3:20-ap-03004, ECF No. 21; Order Extending Temporary Restraining Order, 3:20-ap-03004, ECF No. 44.

discovery and an evidentiary hearing on the merits of the Debtor's motion for a preliminary injunction (**"PI Motion"**). The duration of the TRO was extended twice eventually up through February 26, 2020. The Committee and the Debtor then entered into an agreed order that temporarily enjoined asbestos lawsuits against the Protected Parties through the conclusion of the evidentiary hearing on the PI Motion. The Court signed that agreed order on February 26, 2020. On June 2, 2020, this Court entered the second agreed order between the Debtor and the Committee that extended the injunctive effect of the first agreed order through the conclusion of the rescheduled hearing on the PI Motion,[7] now set to begin on March 1, 2021. Pursuant to 11 U.S.C. §§ 1107(a) and 1108, the Debtor has continued to operate its business and manage its property as debtor-in-possession.

15. On February 14, 2020, the Court entered the order appointing the Committee. No. 3:20-bk-30080, ECF No. 155.

16. On June 25, 2020, the parties to the Adversary Proceeding filed the consensual Case Management Order (the **"CMO"**), which contemplated a hearing on the PI Motion beginning on September 9, 2020. 3:20-ap-03004, ECF No. 79.

17. On July 25, 2020, one week before the CMO-imposed deadline for substantial completion of all of its document productions, the Debtor asserted to the Committee and the Future Claimants' Representative (the **"FCR"**) during a scheduled meet and confer teleconference that the Debtor would not be able to meet the July 31 deadline, but that another month was necessary for compliance. Debtor's counsel confirmed this with the Court at the July 28, 2020 hearing. *See, e.g.*, Hr'g Tr. 10:7-14, 17-20, July 28, 2020.

[7] *See* Agreed Order Regarding Debtor's Request for Extension or Application of the Automatic Stay to Certain Actions Against Non-Debtors, 3:20-ap-03004, ECF No. 52; Second Agreed Order, 3:20-ap-03004, ECF No. 68.

18. On August 17, 2020, the Committee filed its Motion of the Official Committee of Asbestos Claimants for Case Management Order (3:20-ap-03004, ECF No. 100), seeking to implement a schedule for the preliminary injunction proceeding and contemplating a mid-November hearing. The hearing on the Committee's motion was set for September 1, 2020.

19. On September 3, 2020, the Court entered the Amended Case Management Order ("**Amended CMO**"), setting a hearing on the PI Motion commencing on December 7. 3:20-ap-03004, ECF No. 115.

20. Since the entry of the Amended CMO, the parties have engaged in fact depositions as well as documentary discovery and expert depositions and discovery in connection with the PI Motion.

21. At a status conference on November 6, 2020, the parties informed the Court that they had mutually agreed to move the hearing on the PI Motion from December to a date after February 15, 2021. The Court informed the parties at the conference that the week of March 1 was available. The parties thereafter submitted a mutually -agreed upon amended case management order ("**Second Amended CMO**").

22. On November 17, 2020, the Court entered the Second Amended CMO, 3:20-ap-03004, ECF No. 160, which set the commencement of the hearing on the PI Motion for March 1, 2021, and the Committee's objection deadline with respect to the PI Motion for January 13, 2021. Concurrent with the filing of this motion to lift the stay, the Committee is filing its opposition brief with respect to the PI Motion.

## JURISDICTION[8]

23. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

## ARGUMENT

### I. THE DEBTOR HAS ACKNOWLEDGED HAVING EFFECTIVELY UNLIMITED RESOURCES TO LITIGATE AND PAY ASBESTOS CASES

24. The unusual circumstances of this case make lifting the stay and sending the asbestos claims back to the courts in which they are pending for trial and payment not only possible, but sensible.

25. Prior to the divisional merger, described above, CertainTeed resolved asbestos claims in the tort system for more than 40 years. Now New CT, which obtained all of Old CT's assets but did not file for bankruptcy itself, has agreed to fund the Debtor to litigate and pay asbestos claims. That funding is *unlimited*. It covers both defense and indemnity payments, and there are no deductibles or exclusions. According to the Debtor and New CT, there are also no restrictions or limitations on New CT's obligations to fund DBMP's liabilities.[9]

26. Both the Debtor and its affiliates agree that New CT and Saint-Gobain, the ultimate parent, have adequate means to provide the funding agreed to in the Funding Agreement. [redacted] Moreover,

[8] The Committee reserves all rights to object to the Court's jurisdiction with respect to granting a preliminary injunction protecting non-debtors, and nothing in this request for relief is intended to waive such an argument or act as the Committee's consent to the appropriateness of jurisdiction with respect to the preliminary injunction.

[9] *See* Rayfield Dep. 282:11-15. (Q: "No. This agreement, does this agreement place any restrictions or limitations on New CT's obligation to fund DBMP's liabilities?" A: "Not to my knowledge."); *see also id* at 282:16-23 (Q: "Are there any other legal obligations that New CT has, to third parties or otherwise, that might interfere with its ability to fund DBMP's obligations, liabilities, and operations?" (objection) A: "No.").

Saint-Gobain, has, as of December 29, 2020, a current market capitalization of €22.790 billion,[10] and cash on hand of over €7 billion as of June 30, 2020.[11] As the Debtor's own expert witness in the preliminary injunction proceeding testified, "Saint-Gobain, being a large global company that's public with the market cap of, you know, over 20 billion Euros. So I think -- you know, as -- as I considered this and read -- read the declarations of Mr. Knapp and Mr. Panaro, I -- I didn't have any reason to believe that the funding agreement or the conditions of the funding agreement were going to present a problem."[12] There are thus many billions of dollars readily accessible to the Debtor and CertainTeed LLC to litigate and resolve all asbestos claims without exhaustion.[13]

27. The Debtor has affirmed that a key objective in the prepetition restructuring was to make certain that "*the Debtor has the same ability to fund the costs of defending and resolving present and future asbestos claims, both in the state and federal courts* and in connection with any chapter 11 filing, as Old CT did prior to the restructuring." Panaro Decl. ¶ 15 (emphasis added).[14] This was purportedly achieved through, *inter alia*, the "uncapped" Funding Agreement. *Id.*

---

[10] *See* Compagnie de Saint-Gobain S.A. (SGO.PA), YAHOO! FINANCE (Jan. 12, 2021, 6:36 PM), https://finance.yahoo.com/quote/sgo.pa/.

[11] *See* Saint-Gobain Half-Year Financial Report 2020, at 15.

[12] Coulombe Dep. 104:24-105:7.

[13] *See* Panaro Decl. ¶ 28 (stating there are approximately 60,000 pending claims as of the Petition Date). *Compare with* Panaro Decl. ¶ 27 (noting that since 2002, the Debtor and Old CT paid approximately $1.5 billion in out-of-pocket costs defending and resolving 300,000 asbestos personal injury lawsuits), *and* ¶ 30 (stating that "Old CT has spent in the range of approximately $80 million to over $160 million every year since 2002 to defend and resolve asbestos claims").

[14] *See also* Starczewski 30(b)(6) Dep. 188:4-13 ("The purpose, as I testified to before, of the funding agreement was to ensure that DBMP had the same assets available to it in the bankruptcy situation, or even post restructuring, as were available to pay the asbestos liability claims prior to the restructuring, so that the same assets that were available prior to the restructuring are available post restructuring."); Starczewski Dep. 225:21-226:3 ("The purpose of the amended and restated funding agreement was to ensure that DBMP would have the same paying power, if you will, to pay for and resolve asbestos liability claims after the restructuring as the former CertainTeed Corporation had prior to the restructuring."); Placidet Dep. 226:14-25, Oct. 14, 2020 (Q: "So you mentioned that the funding arrangement is set up to ensure that access to funding does not change among the CertainTeed entities; is that correct?" (objections) A: "It means that for DBMP and -- and I would say the coverage of the liability doesn't -- doesn't change, because you still have the backup of CertainTeed."); Rayfield Dep. 97:5-8 ("[T]he [F]unding [A]greement . . . gives access to DBMP of all the same paying power that existed in Old CT, uncapped.").

According to the CEO of CertainTeed, the Funding Agreement will exist in perpetuity.[15]

28. The uncapped and unlimited nature of the Funding Agreement has been corroborated by the Debtor's designated 30(b)(6) witness,[16] as well as by numerous DBMP and affiliates' officers and directors in their respective fact depositions.[17] For example, when asked how much the Funding Agreement was worth as an asset, the Debtor's chief legal officer stated "It's uncapped. It's unlimited, so I can't answer that." Starczewski Dep. 219: 21-24.

29. Significantly, New CT's CEO, Mr. Rayfield, has confirmed that the assets available under the Funding Agreement are sufficient to pay *all present and future asbestos liabilities*:

> Q: "Do you know if those assets are sufficient to pay off all of the asbestos liabilities, both present and future?"
>
> [objection]
>
> A: "My understanding is yes."

Rayfield Dep. 92:25-93:5. Mr. Rayfield also testified that there is a *zero percent chance of default.*

> Q: "When you say 'no likelihood of that happening,' you're saying that there is zero percent chance of New CT ever defaulting on its obligations under this funding agreement?"
>
> A: "In my opinion, yes."

*Id.* at 285:8-12.

---

15 Rayfield Dep. 97:9-11. (Q: "Do you expect that funding agreement to exist in perpetuity?" A: "I do.").

16 Starczewski 30(b)(6) Dep. 171:4-9 (Q: "You testified earlier today that there was no maximum amount that new CertainTeed has informed you would exist with respect to the funding agreement; isn't that correct?" A: "That's correct.").

17 *See, e.g.*, Bondi Dep. 214:2-5 (Q: "The backstop you mentioned, do you understand that backstop to have any kind of maximum limit or cap?" A: "There is no cap that I am aware of."); Placidet Dep. 234:23-25, Oct. 14, 2020 (Q: "Are you aware of any limitations on new CT funding DBMP?" A: "No."); Rayfield Dep. 282:11-15 (Q: "No. This agreement, does this agreement place any restrictions or limitations on New CT's obligation to fund DBMP's liabilities?" A: "Not to my knowledge."); DiNenna Dep. 146:6-9 (Q: "Are you aware of any limits as to the amount of funding that would be available under this funding agreement?" A: "No, I'm not aware of any limits."); Knapp Dep. 266:4-9 (Q: "And are you aware of any limit, monetary limit on the amount of funds that DBMP could obtain under the funding agreement?" A: "There is no limits that I am aware of outlined in the agreement."); Rayburn Dep. 240:17-241:2 (Q: "I'm not asking for a legal interpretation. I'm asking you as a board member of DBMP whether it's your understanding that there is a limit to the amount of funding that can be provided to DBMP under the funding agreement." (objection) A: "I don't recall that there is a limit.").

30. Under the terms of the Funding Agreement, the Debtor may request payments from New CT for specified categories of " Permitted Funding Uses" set forth therein, including payments necessary to satisfy the defined-term "Asbestos Related Liabilities" assigned to the Debtor. *See* Panaro Decl., Annex 2 ("**Funding Agreement**"), 3:20-bk-30080, ECF No. 24.[18]

> 'Permitted Funding Use' means . . . (c) the funding of any amounts necessary or appropriate to satisfy (i) . . . [DBMP]'s Asbestos Related Liabilities established by a judgment of a court of competent jurisdiction or final settlement thereof at any time when there is no proceeding under the Bankruptcy Code pending with respect to . . . [DBMP], (ii) following the commencement of any Bankruptcy Case, . . . [DBMP]'s Asbestos Related Liabilities in connection with the funding of a trust under section 524(g) of the Bankruptcy Code for the benefit of existing and future claimants that is included in a plan of reorganization for . . . [DBMP] confirmed by a final, nonappealable order of the Bankruptcy Court and the District Court, and (iii) in the case of either (i) or (ii), any ancillary costs and expenses of . . . [DBMP] associated with such Asbestos Related Liabilities and any litigation thereof, including the costs of any appeals;

Funding Agreement at 38-39, 3:20-bk-30080, ECF No. 24. The Funding Agreement also provides that the Debtor may request payments from New CT for ordinary course expenses, including any indemnification obligations, in addition to all expenses incurred in connection with the bankruptcy case before this Court:

> 'Permitted Funding Use' means . . . (a) the payment of any and all costs and expenses of . . . [DBMP] incurred in the normal course of its business (including the payment of any indemnification or other obligations of . . . [DBMP] owing to any managers or officers of . . . [DBMP] at any time when there is no proceeding under the Bankruptcy Code pending with respect to . . . [DBMP] (b) the payment of any and all costs and expenses of . . . [DBMP] incurred during the pendency of any Bankruptcy Case that are necessary or appropriate in connection therewith, including the costs of administering the Bankruptcy Case and any and all other

---

[18] "Asbestos Related Liabilities" are defined as "all Liabilities . . . of the Payee related in any way to asbestos or asbestos containing materials." *Id.* at 50 (Schedule 1), 3:20-bk-30080, ECF No. 24. The term "Liabilities" is separately defined as follows in Schedule 1 of the Funding Agreement:

> [A]ny claim, demand, offer, acceptance, action, suit, liability or obligation of any kind, whether accrued or fixed, absolute or contingent, matured or unmatured, determined or determinable, choate or inchoate, asserted or unasserted, known or unknown, including (i) those arising or that may arise under any past, present or future Law or Contract or pursuant to any Cause of Action or Proceeding and (ii) all claims for economic or noneconomic damages or injuries of any type or nature whatsoever . . . .

*Id.*

> costs and expenses of . . . [DBMP] incurred in the normal course of its business (including the payment of any indemnification or other obligations of [DBMP] . . . ;

*Id.*

31. Finally, and potentially most relevant to the Debtor's ability to pay claims in the tort system during this bankruptcy, a "Permitted Funding Use" is:

> (d) the funding of any amounts necessary to cause the Funding Account to contain at least $5,000,000 at such time.

*Id.* The Funding Agreement thus allows the Debtor to request New CT to recapitalize the Funding Account to at least $5,000,000 in perpetuity to the extent it becomes depleted from, for example, paying settlements and judgments in the tort system.

32. When the Funding Agreement is considered as a whole, it should completely fund the Debtor's asbestos-related costs to litigate and satisfy any asbestos liabilities as they become due. Funding Agreement at 35-36, 3:20-bk-30080, ECF No. 24 (CertainTeed agrees to provide the Debtor with funding sufficient to pay the "liabilities and obligations included in the Allocated Assets and Liabilities as and when they become due"); *id.* at 35 (providing that under the Funding Agreement the Debtor "ha[s] financial capacity sufficient to satisfy its obligations as they become due in the ordinary course of business, including any Asbestos Related Liabilities").

33. Importantly, the Debtor's designated 30(b)(6) witness, Mr. Starczewski, confirmed that the Funding Agreement would require New CT to fund the Debtor's asbestos liabilities in the event the automatic stay is lifted:

> Q. "If the stay were lifted to permit asbestos claimants to bring claims in the tort system against DBMP during the course of the bankruptcy, would New CT pay the costs of defense and indemnity related to those claims?"
>
> [objection]
>
> A. "I would have to refer back to the funding agreement. I believe that would be part of the asbestos liabilities that new CertainTeed is obligated to fund, yes, in the event that were to happen."

> Q. "Okay. Does the amended and restated funding agreement address funding tort system costs if DBMP returns to the tort system?"
>
> A. "Does it refer to -- again, if -- if DBMP is in the tort system, then the funding agreement obligations are in existence."
>
> Q. "Is that -- is that a permitted funding use on page five or six?"
>
> A. "Yes. Top of page six."

Starczewski 30(b)(6) Dep. 194:16-195:14. Mr. Starczewski confirmed that funding the Debtors' tort system costs in the event the stay is lifted would qualify as a Permitted Funding Use pursuant to the terms of the Funding Agreement. *Id.* The record is thus clear that the Funding Agreement is unlimited, uncapped, backstopped by billions of dollars of assets of New CT and Saint-Gobain, and stands ready to provide immediate funding for DBMP's asbestos-related obligations if the stay is lifted.

## II. THE TOTALITY OF THE CIRCUMSTANCES SUPPORTS LIFTING THE STAY

34. This Court recently ruled in an analogous context—where the Debtor in an asbestos bankruptcy had unlimited insurance—that the totality of the circumstances supported lifting the stay to allow asbestos claimants to litigate their claims in the tort system. *See* Order Lifting the Automatic Stay Pursuant to 11 U.S.C. § 362 as to Certain Asbestos Personal Injury Claims, *In re Kaiser Gypsum Co.*, No. 3:16-bk-31602 (Bankr. W.D.N.C. Aug. 9, 2018), ECF No. 1108 ("**Kaiser Gypsum Lift Stay Order**"); *see also* Transcript of Hearing at 115:12-23, *In re Kaiser Gypsum Co.*, No. 3:16-bk-31602 (Bankr. W.D.N.C. July 31, 2018), ECF No. 1101. In that case, the debtors' primary insurer confirmed, similar to New CT's officers and directors here , that the insurance was inexhaustible:

> [T]he Truck primary policies and the excess above them for all of the years selected by the debtors to respond to these claims have no aggregate limits. They will never exhaust.

Transcript of Hearing at 18:11-16, *In re Kaiser Gypsum Co.*, No. 3:16-bk-31602 (Bankr. W.D.N.C. May 2, 2017), ECF No. 499 (Scott Hoyt, counsel for Truck Insurance Exchange). For the same reasons, this Court should also lift the stay here.

35. Section 362(d) of the Bankruptcy Code sets forth the grounds for relief from the automatic stay. It provides that a court "*shall*" grant relief from the section 362(a) stay for "cause." 11 U.S.C. § 362(d)(1) (emphasis added). "Congress . . . has granted broad discretion to bankruptcy courts to lift the automatic stay to permit enforcement of rights against property of the estate." *Claughton v. Mixson*, 33 F.3d 4, 5 (4th Cir. 1994). The Bankruptcy Code does not define "cause," and so courts must "determine when discretionary relief is appropriate on a case-by-case basis." *Id.* at 5.

36. Although the moving party has the burden to make a *prima facie* case that "cause" exists to lift the stay, after cause is established, the burden shifts to the party opposing the motion to demonstrate that the stay should be left in place. *See In re Joyner*, 416 B.R. 190, 192 n.1 (Bankr. M.D.N.C. 2009) ("[T]he party seeking relief from the stay has the initial burden of production . . . to establish a prima facie case for relief, [however] the burden of proof, i.e., the burden of persuasion, rests on the party opposing relief on all issues except the existence of equity."); *see* 11 U.S.C. § 362(g).

37. In the Fourth Circuit, to determine whether there is cause to lift the stay, the courts balance any prejudice to the debtor's estate against the hardship that would result to the person seeking relief from the automatic stay if relief is denied. *See In re Robbins*, 964 F.2d 342, 345 (4th Cir. 1992) ("The court must balance potential prejudice to the bankruptcy debtor's estate against the hardships that will be incurred by the person seeking relief from the automatic stay if

relief is denied."), *as amended* (May 27, 1992). *See also Joyner*, 416 B.R. at 192 (citing *Robbins*, 964 F.2d at 345).

38. Courts also look to the specific facts and the totality of the circumstances in order to determine whether sufficient cause exists to grant relief from the automatic stay. *In re Beach First Nat'l Bancshares, Inc.*, 451 B.R. 406, 410 (Bankr. D.S.C. 2011) (A court should examine "the case-specific facts and the totality of the circumstances in order to determine whether sufficient cause exists to grant relief from the automatic stay." (citing *Robbins*, 964 F.2d at 345)). This Court has commented that "[t]here are a variety of reasons to find cause . . . it is not subject to a very simple limited set of standards." Transcript of Hearing at 16:7-9, *In re Kaiser Gypsum Co.*, No. 3:16-bk-31602 (Bankr. W.D.N.C. Mar. 27, 2017), ECF No. 436.

39. The Fourth Circuit has developed a three factor test to guide the courts in finding cause to lift the stay:

> (1) whether the issues in the pending litigation involve only state law, so the expertise of the bankruptcy court is unnecessary; (2) whether modifying the stay will promote judicial economy and whether there would be greater interference with the bankruptcy case if the stay were not lifted because matters would have to be litigated in bankruptcy court; and (3) whether the estate can be protected properly by a requirement that creditors seek enforcement of any judgment through the bankruptcy court.

*Robbins*, 964 F.2d at 345. *See also Lee v. Anasti* (*In re Lee*), 461 F. App'x 227, 231 (4th Cir. 2012) (citing the *Robbins* factors). Each factor supports lifting the stay here, as demonstrated below.

40. In addition, "[n]umerous courts have permitted the stay to be lifted when the movant is simply seeking to establish the fact and amount of the debtor's liability and, as in this case, the movant has stipulated that any recovery will be sought from the debtor's insurer or a codefendant." *Peterson v. Cundy* (*In re Peterson*), 116 B.R. 247, 250-51 (D. Colo. 1990) (citing *May v. Wheeler Grp., Inc.* (*In re Wheeler Grp., Inc.*), 75 B.R. 200, 200 (S.D. Ohio 1987)) (most

expeditious way to liquidate claim was to permit foreign action to proceed to conclusion); *Elegant Concepts, Ltd. v. Kristiansen* (*In re Elegant Concepts, Ltd.*), 61 B.R. 723, 729 (Bankr. E.D.N.Y. 1986); *In re Nkongho*, 59 B.R. 85, 86 (Bankr. D.N.J. 1986) (risk that state judgment may exceed insurance coverage insufficient to justify stay).

41. Moreover, to date the Asbestos Personal Injury Claimants have had their respective cases in the tort system stayed for a year, which also weighs in favor of lifting the stay. *See, e.g., In re Bock Laundry Mach. Co.*, 37 B.R. 564, 566-67 (Bankr. N.D. Ohio 1984) ("A number of Courts have attributed a considerable weight to the fact that a plaintiff, by having to wait, may effectively be denied an opportunity to litigate. The aging of evidence, loss of witnesses, and crowded court dockets are factors which contribute to these hardships. The opinions reflect that the Courts have regarded the opportunity to litigate the issue of liability as a significant right which cannot be easily set aside, despite the existence of a bankruptcy proceeding."); *Myles v. Xinergy Ltd.* (*In re Xinergy Ltd.*), Case No. 15-70444, 2015 WL 3643418, at *4 (Bankr. W.D. Va. June 11, 2015) (quoting *Bock*, 37 B.R. at 566). For some claimants, a continuation of the stay could result in the loss of damages for pain and suffering of the exposed claimant because, in some jurisdictions, those damages do not survive the death of the injured claimant.[19]

42. And where, as here, "the court is reasonably confident that the policy proceeds [here, Funding Agreement assets] will be sufficient to satisfy all creditors with claims that may be

[19] *See*, *e.g.*, Cal. Civ. Proc. Code § 377.34 (West 2018) ("In an action or proceeding by a decedent's personal representative or successor in interest on the decedent's cause of action, the damages recoverable are limited to the loss or damage that the decedent sustained or incurred before death . . . and do not include damages for pain, suffering, or disfigurement."); *Walker v. Bd. of Trustees*, 69 F. App'x 953, 961 (10th Cir. 2003) (finding that Colo. Rev. Stat. § 13-20-101 precludes recovery for pain and suffering after a decedent's death in tort actions); *El-Meswari v. Wash. Gas Light Co.*, 785 F.2d 483, 490 (4th Cir. 1986) (interpreting Va. Code § 8.01-25 to bar pain and suffering in wrongful death actions); *Ambruster v. Monument 3: Realty Fund VIII Ltd.*, 963 F. Supp. 862, 864-65 (N.D. Cal. 1997) (concluding that "pain and suffering damages . . . do not survive the death of a decedent under the California survival statute" (quoting Cal. Civ. Proc. Code § 377.34)); *Walsh v. Advanced Cardiac Specialists Chartered*, 273 P.3d 645, 648 (Ariz. 2012) (interpreting Ariz. Rev. Stat. § 12-613 to bar damages for a decedent's own pain and suffering after death).

paid under the policy, the court should grant relief from the stay to permit an action either against the debtor, if necessary, or directly against the insurer." 3 COLLIER ON BANKRUPTCY ¶ 362.07 (Richard Levin & Henry J. Sommer eds., 16th ed. 2018). The stay should likewise be lifted here.

**A. The asbestos personal injury claims arise under and turn upon state law**

43. The first *Robbins* factor clearly weighs in favor of allowing the asbestos personal injury claimants to proceed in state court. The asbestos personal injury claims are indisputably tort claims based on state law. The "'basic federal rule' in bankruptcy is that state law governs the substance of claims." *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 20 (2000) (quoting *Butner v. United States*, 440 U.S. 48, 57 (1979)). The legislative history to § 362(d)(1) emphasizes that "it will often be more appropriate to permit proceedings to continue in their place of origin, when no great prejudice to the bankruptcy estate would result, in order to leave the parties to their chosen forum and to relieve the bankruptcy court from many duties that may be handled elsewhere." H.R. Rep. No. 95-595, at 341 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6297. *See also Kadlecek v. Schwank USA, Inc.*, 486 B.R. 336, 341-42 (Bankr. M.D.N.C. 2013) (the fact that the issues involved were exclusively governed by state law weighed "in favor of annulling the automatic stay"); *Joyner*, 416 B.R. at 192 (lifting stay was appropriate when the "claims alleged . . . all involve solely state law issues"). This factor plainly supports lifting the stay here.

**B. Judicial economy will be served by lifting the stay**

44. The second factor identified by *Robbins*, "whether modifying the stay will promote judicial economy and whether there would be greater interference with the bankruptcy case if the stay were not lifted because matters would have to be litigated in bankruptcy court," likewise supports lifting the stay. Under 28 U.S.C. § 157(b)(2)(B), "liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11" are not core proceedings that may be decided by a bankruptcy

court. As a consequence, courts within the Fourth Circuit have found that the bankruptcy court's inability to adjudicate personal injury claims weighs in favor of lifting the stay when such claims are involved. *See, e.g.*, *In re Nifong*, No. 08-80034C-7D, 2008 WL 2203149, at *3 (Bankr. M.D.N.C. May 27, 2008) (lifting the stay after concluding that the "claims asserted against the Debtor that are claims under section 1983 are personal injury torts for purposes of section 157(b)(5) and that this court therefore lacks jurisdiction to adjudicate and liquidate those claims"); *In re Horn*, No. 12-50207, 2012 WL 1978287, at *2 (Bankr. M.D.N.C. June 1, 2012) (finding that this factor weighed in favor of lifting the stay because "[n]ot only is the expertise of the bankruptcy court unnecessary, but all parties agree that this action cannot be litigated in the bankruptcy court absent consent, and likely not even then").

45. Here, for the reasons noted above, the asbestos personal injury claims cannot be tried in the context of this bankruptcy, and this factor therefore supports lifting the stay. *See also* Transcript of Hearing at 115:15-17, *In re Kaiser Gypsum Co.*, No. 3:16-bk-31602 (Bankr. W.D.N.C. July 31, 2018), ECF No. 1101 (granting motion to lift the stay and noting that "only one of . . . [the *Robbins*] factors really is in contest here, whether or not this is a good exercise in judicial economy").[20]

### C. The Debtor's estate will not be harmed because the Debtor has unlimited funding akin to unlimited insurance

46. The final *Robbins* factor considers whether the estate can be protected properly by a requirement that creditors seek enforcement of any judgment through the bankruptcy court.

[20] *See also* Transcript of Hearing at 29:12-15, *In re Kaiser Gypsum Co.*, No. 3:16-bk-31602 (Bankr. W.D.N.C. Aug. 13, 2020), ECF No. 2439 ("As we've noted before, routinely bankruptcy courts in all cases, not just asbestos cases, grant relief from stay to allow claimants and creditors to pursue insurance in the, in state court. There's nothing bad faith about that.").

47. It is important to consider first the very unusual nature of this Debtor. While the Debtor was created as a holding pen for one specific type of creditor, it allegedly has access to unlimited funds from non-debtors to pay whatever those creditors are owed. Effectively, therefore, the bankruptcy estate cannot be diminished. If asbestos creditors are paid from the estate, the estate is topped up again. Indeed, the Debtor and New CT themselves admit that the estate is invulnerable to harm in every important sense.

48. While this is a novel situation, courts have found the third *Robbins* factor satisfied in analogous circumstances–where a claimant agrees to limit recovery to insurance proceeds. *See In re Mitchell*, 546 B.R. 339, 347 (Bankr. D.S.C. 2016) ("Lifting the stay to pursue litigation in another forum has been found appropriate when the party requesting relief seeks to continue a personal injury action against the debtor as a nominal defendant and asks that the stay be lifted to the extent insurance proceeds are available under an applicable liability policy."); *see also Distaff, Inc. v. Springfield Contracting Corp.*, 984 F.2d 108, 113 (4th Cir. 1993) (citing 3 COLLIER ON BANKRUPTCY ¶ 362.07 and noting that "partial lifting of the stay to the extent of insurance coverage was appropriate").

49. For example, in *In re Coronet Foods, Inc.*, the Bankruptcy Court for the Northern District of West Virginia granted a group of personal injury claimants' motion to modify the automatic stay "subject to the condition that any related future compensation paid on behalf of the Debtor shall be recovered solely from Debtor's liability insurance policies, without recourse to any other assets of the Debtor." No. 5:04-3822, 2005 WL 1552633, at *1 (Bankr. N.D. W. Va. June 3, 2005). The court found that this modification would "not hinder, burden, delay or otherwise impact this bankruptcy case, and would instead prevent an injustice to all such outstanding . . . [personal injury] claimants." *Id.*

50. Similarly, in *In re Fernstrom Storage & Van Co.*, the court held that "[a]ny concerns regarding the potential liability of the estate may be obviated . . . by an order which prohibits any action to collect from the estate. . . . The order modifying the stay may also be limited to allow proceeding only to the extent of the debtor's insurance coverage." 100 B.R. 1017, 1024 (Bankr. N.D. Ill. 1989), *aff'd sub nom. In re Fernstrom Storage & Van Co.*, 938 F.2d 731 (7th Cir. 1991). *See also Admiral Ins. Co. v. Grace Indus., Inc.* (*In re Grace Indus., Inc.*), 341 B.R. 399, 405 (Bankr. E.D.N.Y. 2006) (where the plaintiffs have agreed to pursue only the insurance proceeds, there is no basis for continuing the automatic stay), *aff'd as modified sub nom. Admiral Ins. Co. v. Grace Indus., Inc.*, 409 B.R. 275 (E.D.N.Y. 2009); *In re Todd Shipyards Corp.*, 92 B.R. 600 (Bankr. D.N.J. 1988) (same). This is especially true when there is evidence of sufficient insurance coverage. *See* 3 COLLIER ON BANKRUPTCY ¶ 362.07; *Holtkamp v. Littlefield* (*In re Holtkamp*), 669 F.2d 505, 508-09 (7th Cir. 1982).

51. There is not, and could not be, any serious dispute that the Debtor here is protected by what amounts to adequate insurance to cover all of its asbestos-related liabilities. The Debtor has admitted that it has an unlimited and uncapped funding source for asbestos claims in the Funding Agreement. *See supra* Part I. New CT's CEO has testified that the assets are sufficient to pay off all current and future asbestos liabilities. *Id.* According to the Debtor's 30(b)(6) witness, that funding source is also available to fund the Debtor's asbestos liabilities in the event the stay is lifted. Starczewski 30(b)(6) Dep. 194:16-195:14. Where, as here, the funding is sufficient to satisfy the relevant claims, that is an additional factor in support of lifting the stay.

52. For example, in *In re Budd Co.*, the court granted a motion brought by the official committee of asbestos claimants for relief from the automatic stay to pursue debtors in state court on asbestos personal injury claims. No. 14 B 11873, 2016 WL 556287, at *2 (Bankr. N.D. Ill.

Feb. 10, 2016). There, debtors had proposed a plan that would "pass-through" asbestos claims for later adjudication in non-bankruptcy forums. The court concluded that there was no reason to further delay claimants' ability to make progress in their tort actions. The court found that "[a]mple insurance coverage will pay most or all of any liabilities, though some need for supplemental cash infusion by Debtor to share certain costs is likely, and has been provided for by Debtor in its proposed Plan." *Id.* The court further found that "aside from the need to share in certain defense costs, there will be no great prejudice to the Debtor or its estate if the stay is lifted to allow asbestos claimants to which Debtor's only objection is as to liability to proceed in state or federal court without further delay." *Id.*

53. In another relevant case, *Santa Fe Minerals, Inc. v. BEPCO, L.P.* (*In re 15375 Mem'l Corp.*), the court granted relief from the stay in order to allow a claimant to liquidate its claims against the debtors and their insurers and to recover from available insurance proceeds. 382 B.R. 652 (Bankr. D. Del. 2008), *order clarified on reconsideration*, 386 B.R. 548 (Bankr. D. Del. 2008), *rev'd*, 400 B.R. 420 (D. Del. 2009), *aff'd sub nom. In re 15375 Mem'l Corp. v. Bepco, L.P.*, 589 F.3d 605 (3d Cir. 2009). The court found that relief from the stay would not prejudice the debtors or other creditors where the only real assets at issue were insurance proceeds, and noted that the insurance policies that were the "primary source of coverage" for movant's claim "contain no aggregate coverage limits for a given policy period" and that in any case "limits per occurrence are more than sufficient to satisfy . . . [movant's] claims." *Id.* at 690.

54. Similarly, in *Fernstrom*, the court lifted the stay over the debtors' objections, explaining that "[w]here it is undisputed that insurance coverage is substantial, an action to recover insurance proceeds may not cause great prejudice to the estate." 100 B.R. at 1023-24. The court noted that "[t] he fact that the debtor may be required to participate in the defense is not

determinative of prejudice . . . especially when the debtor's insurance is obligated to provide counsel." *Id.* at 1023. Moreover it concluded that "[a]ny concerns regarding the potential liability of the estate may be obviated . . . by an order which prohibits any action to collect from the estate. . . . The order modifying the stay may also be limited to allow proceeding only to the extent of the debtor's insurance coverage." *Id.* at 1024.

55. Finally, as referenced above, in the pending *Kaiser Gypsum* bankruptcy and in the face of unlimited insurance, this Court lifted the stay as to certain asbestos claimants who executed an acknowledgment and release agreeing that any settlement or judgment could not be enforced against the assets of the Debtors or Protected Parties, *other than the Debtors' insurance policies*:

> The automatic stay is hereby lifted, effective as of October 29, 2018 (the "Effective Date"), pursuant to section 362(d) of the Bankruptcy Code, to permit only those Asbestos Personal Injury Claimants who first satisfy the requirements set forth in paragraph 3 below [requiring signed acknowledgment and release] to file or continue their Asbestos Personal Injury Claims in the tort system against one or both of the Debtors, solely for the purpose of pursuing claims that are covered by, or enforcing settlements or judgments solely against, the Debtors' available insurance.

*See* Kaiser Gypsum Lift Stay Order ¶ 2. This factor further supports lifting the stay as described herein.

## III. LIFTING THE STAY IS CONSISTENT WITH THE BANKRUPTCY CODE AND THE PURPOSE OF THE AUTOMATIC STAY

56. In the present case, the Debtor has, through the divisive merger and bankruptcy, engineered a result specifically designed to foil the purposes of the automatic stay provided by the Bankruptcy Code.

57. First, as noted above, the Debtor itself and the bankruptcy estate is in no actual peril from the lifting of the stay. The Funding Agreement protects the Debtor from harm. As the Debtor expends funds, they are simply replaced by New CT. In this unusual situation, therefore, the usual

Debtor-protective purpose of the automatic stay is effectively unnecessary. The Debtor will always have whatever money it needs to pay whatever it has to pay its creditors.

58. But the purpose of the automatic stay in the Bankruptcy Code is not just to protect a debtor from creditors. The automatic stay is also designed to insure that creditors are treated fairly and have equal access to a debtor's assets. *Winters ex. rel. McMahon v. George Mason Bank*, 94 F.3d 130, 133 (4th Cir. 1996) (recognizing "protecting the relative position of creditors" as a purpose of the automatic stay along with shielding the debtor). As Judge Posner of the Seventh Circuit observed:

> The fundamental purpose of bankruptcy, from the creditors' standpoint, is to prevent creditors from trying to steal a march on each other . . . , and the automatic stay is essential to accomplishing this purpose.

*Martin-Trigona v. Champion Fed. Sav. & Loan Ass'n*, 892 F.2d 575, 577 (7th Cir. 1989). Indeed, this creditor-protective purpose of the stay is recognized in the legislative history of the Code itself.

> The stay gives the debtor the opportunity to bring all of its creditors together for discussion, explanation of the debtor's financial problems, and negotiation. Creditors are prevented from acting unilaterally to gain an advantage over other creditors or to pressure the debtor into action.

H.R. Rep. No. 95-595, at 220.

59. This principle is applied in situations closely analogous to the present one. For example, a debtor cannot by its own action free selected creditors from the automatic stay by granting them a prepetition waiver. *See*, *e.g.*, *Lopez v. Trujillo*, 475 B.R. 550, 561 (N.D. Tex. 2012) ("[D]ebtor cannot waive the automatic stay." (quoting *In re Cobb*, 88 B.R. 119, 120-21 (Bankr. W.D. Tex. 1988))); *Gullett v. Cont'l Cas. Co.* (*In re Gullett*), 230 B.R. 321, 330 (Bankr. S.D. Tex. 1999) ("[T]he automatic stay serves the interests of both debtors and creditors. Consequently, the debtor may not waive the automatic stay or limit its scope."), *rev'd on other grounds sub nom.*, *Cont'l Cas. Co. v. Gullett*, 253 B.R. 796 (S.D. Tex. 1999), *aff'd sub nom. In re*

*Gullett*, 220 F.3d 585 (5th Cir. 2000); *In re Sky Grp. Int'l, Inc.*, 108 B.R. 86, 89 (Bankr. W.D. Pa. 1989) ("To grant a creditor relief from stay simply because the debtor elected to waive the protection afforded the debtor by the automatic stay ignores the fact that it also is designed to protect all creditors and to treat them equally."). Indeed this Court, in finding prepetition waivers of the automatic stay *per se* unenforceable, has observed that,

> such provisions, which effectively render the automatic stay meaningless, are unenforceable as a matter of public policy. Upholding pre-petition waivers of this sort deprives debtors of the 'breathing spell' contemplated by the Bankruptcy Code and thwarts the congressional intent underlying imposition of the automatic stay.

*In re Jeff Benfield Nursery, Inc.*, 565 B.R. 603, 609 (Bankr. W.D.N.C. 2017).

60. Here, having moved only one type of creditor—the asbestos claimants—to the Debtor, but having attached all other creditors to the non-debtor New CT, CertainTeed decided that some creditors should be subjected to the automatic stay while others should not. The arrangement is, effectively, a structu ral waiver of the stay for certain creditors. As such, it undermines the creditor-protective purposes of the automatic stay itself.

61. Lifting the stay to which the asbestos creditors have been subjected, putting them back on equal footing with the other creditors of the pre-transaction CertainTeed by allowing them to access the same asset pool, is therefore entirely consistent with the creditor-protective purpose of the automatic stay provided by the Bankruptcy Code.

62. Given the considerable resources behind the Funding Agreement, there is no reason to believe that the resources of New CT would be inadequate to the task of funding all asbestos claims as they arise. Indeed, as noted above, the CEO of New CT unequivocally confirmed the adequacy of New CT's resources to cover both present and future asbestos claims. Thus, both present and future claims can and should be able to recover what they are entitled to in the tort system, now, and into the future. Moreover, ultimately, the Debtor's and its affiliates' purpose in

restructuring CertainTeed and filing the bankruptcy was an illegitimate one. That lack of good faith in filing itself qualifies as cause to lift the automatic stay. *See, e.g.*, *In re Trust*, 526 B.R. 668, 680-81 (Bankr. N.D. Tex. 2015) (stating that "it is well established that a debtor's lack of good faith may constitute 'cause' for relief from the automatic stay" and citing extensive precedent.).

## NOTICE

63. Notice of this Motion has been provided to: (a) the Debtor; (b) the Office of the United States Bankruptcy Administrator for the Western District of North Carolina; (c) CertainTeed LLC; (d) counsel to the FCR; (e) the attorneys for the defendants identified in Appendix A of the Debtor's Complaint; and (f) all parties entitled to notice pursuant to Bankruptcy Rule 2002. The Committee submits that, in light of the nature of the relief requested, no other or further notice need be provided.

## NO PRIOR REQUEST

64. No prior request for the relief sought herein has been made to this Court or any other court.

## CONCLUSION

For the foregoing reasons, the Committee respectfully request that this Court (i) enter an order granting its motion to lift the automatic stay and modify the Preliminary Injunction Order to allow Asbestos Personal Injury Claimants to proceed in the tort system with their asbestos personal injury claims if each first agree in writing that any settlement or judgment in respect of his or her asbestos personal injury claim may not be enforced against the assets of the Debtor, other than the assets available through the Funding Agreement between the Debtor and New CT, and (ii) grant the Committee such other and further relief to which it may be entitled.

Respectfully submitted,

HAMILTON STEPHENS STEELE
+ MARTIN, PLLC

*/s/ Glenn C. Thompson*
Glenn C. Thompson (Bar No. 37221)
525 North Tryon Street, Suite 1400
Charlotte, North Carolina 28202
Telephone: (704) 344-1117
Facsimile: (704) 344-1483
Email: gthompson@lawhssm.com

*Local Counsel for the Official Committee of Asbestos Personal Injury Claimants*

CAPLIN & DRYSDALE, CHARTERED
Kevin C. Maclay (admitted *pro hac vice*)
Todd E. Phillips (admitted *pro hac vice*)
James P. Wehner (admitted *pro hac vice*)
One Thomas Circle NW, Suite 1100
Washington, DC 20005
Telephone: (202) 862-5000
Facsimile: (202) 429-3301
Email: kmaclay@capdale.com
tphillips@capdale.com
jwehner@capdale.com

*Counsel to the Official Committee of Asbestos Personal Injury Claimants*

ROBINSON & COLE LLP
Natalie D. Ramsey (admitted *pro hac vice*)
Davis Lee Wright (admitted *pro hac vice*)
1201 North Market Street, Suite 1406
Wilmington, Delaware 19801
Telephone: (302) 516-1700
Facsimile: (302) 516-1699
Email: nramsey@rc.com
dwright@rc.com

*Counsel to the Official Committee of Asbestos Personal Injury Claimants*

David Neier (admitted *pro hac vice*)
Carrie V. Hardman (admitted *pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 294-6700
Fax: (212) 294-4700
Email: dneier@winston.com
chardman@winston.com

*Special Litigation and International Counsel to the Official Committee of Asbestos Personal Injury Claimants*

Dated: January 13, 2021

**UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| DBMP LLC,[1] | : | Case No. 20-30080 (JCW) |
| Debtor. | : | |
| DBMP LLC, | : | |
| Plaintiff, | : | |
| v. | : | Adv. Pro. No. 20-03004 (JCW) |
| THOSE PARTIES LISTED ON APPENDIX A TO COMPLAINT and JOHN AND JANE DOES 1-1000, | : | |
| Defendants. | : | |

**DEBTOR'S OBJECTION TO MOTION OF THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS TO LIFT THE STAY PURSUANT TO 11 U.S.C. § 362 AS TO CERTAIN ASBESTOS PERSONAL INJURY CLAIMS**

DBMP LLC, the debtor and debtor in possession in the above captioned chapter 11 case (the "Debtor"), hereby objects to the *Motion of the Official Committee of Asbestos Personal Injury Claimants to Lift the Stay Pursuant to 11 U.S.C. § 362 as to Certain Asbestos Personal Injury Claims* [Dkt. 614; Adv. Pro. Dkt. 195] (the "Motion"), filed by the official committee of asbestos personal injury claimants in this chapter 11 case (the "Committee"). In support of this Objection, the Debtor respectfully represents as follows:

[1] The last four digits of the Debtor's taxpayer identification number are 8817. The Debtor's address is 20 Moores Road, Malvern, Pennsylvania 19355.

## Preliminary Statement

The Debtor filed this bankruptcy case to fully, fairly, and permanently resolve its liability for current and future asbestos-related claims. The Debtor's goal is to establish and fund a section 524(g) trust to efficiently and equitably process and pay asbestos claims and to reorganize and emerge from bankruptcy free from the litigation that has burdened it and its predecessor for over 40 years. The Debtor and that predecessor, the former CertainTeed Corporation ("Old CT"), have incurred approximately $2 billion defending and resolving more than 300,000 asbestos-related personal injury claims in the tort system since 2002 alone, paying approximately $1.5 billion of that amount net of insurance.[2] As of the filing of this bankruptcy case, more than 60,000 asbestos claims were pending against the Debtor.[3] The Debtor projects that, absent bankruptcy relief, the extraordinary burden of these lawsuits will continue for decades to come.[4]

Notwithstanding that the purpose of this bankruptcy case is to resolve the asbestos litigation here and now, permanently, globally, and fairly — for the benefit of the Debtor and claimants alike — the Committee asks the Court to lift the stay to permit the crush of that litigation to resume and then continue apace. The Committee seeks relief that would allow that litigation to restart in hundreds of courthouses throughout the United States as if no bankruptcy were ever filed, let alone pending.

The Committee asserts that this extraordinary relief is appropriate because claimants would pursue recoveries only against the purportedly "unlimited" assets available to

---

2 *See Declaration of Robert J. Panaro in Support of First Day Pleadings* [Dkt. 24] (the "Panaro Decl.") ¶ 27.

3 *Id.* ¶ 28

4 *Id.*

the Debtor under the Amended and Restated Funding Agreement (the "Funding Agreement")[5] between the Debtor and CertainTeed LLC ("New CT"). But those assets would not be available. The relief the Committee seeks is based entirely on a misreading of the Funding Agreement.

The Funding Agreement provides that the Debtor is entitled to funding from New CT to satisfy asbestos-related liabilities: (a) established by settlement or judgment at any time when no bankruptcy case is pending and (b) following the commencement of a bankruptcy case, in connection with the funding of a section 524(g) trust. The Funding Agreement does *not* provide funding for the anomalous circumstance where the Debtor would remain in bankruptcy for the purpose of globally resolving claims while, at the same time, it would be required to defend those claims in the tort system. Thus, were the stay to be lifted, no funding under the Funding Agreement would be available to pay asbestos claims; the only source of funding would be other assets of the Debtor.

In addition, even if the Funding Agreement provided funding for payment of tort system settlements and judgments while the Debtor is in bankruptcy, the Funding Agreement is not the equivalent of insurance as the Committee incorrectly asserts. With respect to the Debtor's asbestos liability, it provides only backstop funding to the Debtor to fund a section 524(g) trust in the event the Debtor's assets are insufficient. The value of the Debtor's assets must be used first to fund liabilities, and claimants cannot collect directly from New CT. The Committee's proposal that claimants limit their right to collect from the Debtor to only those assets available under the Funding Agreement simply does not work under the terms of that agreement.

---

[5] A copy of the Funding Agreement, without its Schedule 2, which includes confidential bank account information, is attached to the Panaro Declaration as Annex. 2. *See* Panaro Decl. ¶¶15-18, 20-21 for a discussion of the Funding Agreement.

The Committee contends that the *Kaiser Gypsum* case supports a modification of the stay. It does not. In *Kaiser Gypsum*, third-party insurance was available to pay claims. In addition, as part of a consensual plan, the debtors agreed to a global resolution that permitted lawsuits to return to the tort system to collect this insurance (subject to an agreement by the claimants to waive any claims against the debtors and their affiliates), and the debtors joined in the request to lift the stay. Here, there is no third-party insurance (and there has not been any for years), the Funding Agreement is nothing like third-party insurance, there is no global resolution of this bankruptcy case, and the Debtor opposes the lift-stay.

Lifting the stay here is wholly inconsistent with the goal of section 524(g) to consolidate and collectively resolve all asbestos claims — current and future — against the Debtor fairly and equitably through a trust established by a plan confirmed in this chapter 11 case. By asking this Court to lift the stay, the Committee seeks to undermine the purpose of the bankruptcy filing, impede the Debtor's ability to establish a trust notwithstanding its benefits for claimants, and effectively dismiss this bankruptcy case without satisfying the stringent Fourth Circuit standard for dismissal. The Court should reject the Committee's attempt to pursue a *de facto* (and back-door) dismissal when no ground could support it. This is especially true where, as here, lifting the stay would only diminish estate property and cause the Debtor irreparable harm.

## <u>Argument</u>

### I. The Committee Premises its Motion on a Misreading of the Funding Agreement.

1. The Committee repeatedly asserts that if the stay is modified, the Debtor would have access to funds under the Funding Agreement to satisfy any asbestos settlements and judgments in the tort system.[6] But the Committee overlooks the plain language of the Funding

6 *E.g.*, Mot. ¶¶ 12, 25, 31-32.

Agreement, which permits funding of those settlements and judgments only if there is no pending bankruptcy proceeding.[7]

2. A fundamental rule of contract interpretation is to ascertain and "give effect to the expressed intentions of the parties." *In re Motors Liquidation Co.*, 460 B.R. 603, 619 (Bankr. S.D.N.Y. 2011); *see also Onewest Bank FSB v. Peoples Bank (In re Finding)*, No. 10-40125, 2012 WL 5993700, *4 (Bankr. W.D.N.C. Nov. 30, 2012) (Whitley, J.) ("The overriding goal in interpreting a contract is to determine the intention of the parties."). Under North Carolina law, which governs the Funding Agreement,[8] "'[w]hen the language of a contract is clear and unambiguous, effect must be given to its terms, and the court, under the guise of construction, cannot reject what the parties inserted or insert what the parties elected to omit.'" *Id.* (quoting *Taylor v. Gibbs*, 268 N.C. 363, 365, 150 S.E.2d 506, 507 (1966)).[9] Rather, the court should look only to the text of the contract to determine the parties' intent.[10] *Lynn, 689 S.E.2d at 206.*

3. The language of the Funding Agreement is clear and unambiguous. The Debtor may use any funding provided by New CT only for a "Permitted Funding Use."[11] The circumstances under which the funding may be used by the Debtor to satisfy asbestos-related liabilities are specifically identified in the Funding Agreement:

---

7 The Committee incorrectly suggests that the ability of Compagnie de Saint-Gobain ("Saint-Gobain") to pay is somehow relevant to funding available through the Funding Agreement. (Mot. ¶ 26.) Saint-Gobain is not a party to and has no obligations under the Funding Agreement.

8 Funding Agreement § 9.

9 *See also Lynn v. Lynn*, 689 S.E.2d 198, 206 (N.C. Ct. App. 2010) (the court need not "look beyond the terms of the contract to determine the intentions of the parties.").

10 A contract or provision is ambiguous if it is reasonably susceptible to more than one interpretation. *Lagies v. Myers,* 542 S.E.2d 336, 342 (N.C. Ct. App. 2001). Ambiguity "is not established by the mere fact that [one party] makes a claim based upon a construction of its language which the [other party] asserts is not its meaning." *RME Mgmt., LLC v. Chapel H.O.M. Assocs., LLC*, 795 S.E.2d 641, 645 (N.C. Ct. App. 2017).

11 Funding Agreement § 5 ("The [Debtor] shall not use the proceeds of any Payment under this Agreement for any purpose other than a Permitted Funding Use.").

> 'Permitted Funding Use' means . . . (c) the funding of any amounts necessary or appropriate to satisfy (i) the [Debtor's] Asbestos Related Liabilities established by a judgment of a court of competent jurisdiction or final settlement thereof **at any time when there is no proceeding under the Bankruptcy Code pending with respect to the [Debtor]**, (ii) **following the commencement of any Bankruptcy Case, the [Debtor's] Asbestos Related Liabilities in connection with the funding of a trust under section 524(g)** of the Bankruptcy Code for the benefit of existing and future asbestos claimants that is included in a plan of reorganization for the [Debtor] confirmed by a final, nonappealable order of the Bankruptcy Court and the District Court, and (iii) in the case of either (i) and (ii), any ancillary costs and expenses of the [Debtor] associated with such Asbestos Related Liabilities and any litigation thereof, including the costs of any appeals. . . .[12]

Payment of asbestos-related judgments and settlements is a Permitted Funding Use *only when no chapter 11 case is pending*. Payment of asbestos-related liabilities in a bankruptcy case is a Permitted Funding Use *only in connection with the funding of a trust under section 524(g)*. Funding, therefore, is unavailable to pay settlements and judgments were the stay to be lifted while the bankruptcy case remains pending. The Committee's arguments to the contrary cannot be squared with the text of the Funding Agreement, and the Committee never even attempts the exercise.

4. During the pendency of the Debtor's chapter 11 case, the Funding Agreement is available to help fund a section 524(g) trust to satisfy asbestos liabilities under a confirmed plan.[13] This is logical because (a) the Debtor cannot pay prepetition asbestos claims during its chapter 11 case except pursuant to a confirmed chapter 11 plan, (b) it would be unprecedented (at least in the absence of unlimited third party insurance and the agreement of estate representatives to a global resolution of this bankruptcy case) to lift the automatic stay to

---

[12] Funding Agreement § 1 (definition of Permitted Funding Use) (emphasis added).

[13] *Id.* (also requiring that the plan be "confirmed by a final, nonappealable order of the Bankruptcy Court and the District Court").

permit all prepetition claims to be litigated and paid outside the bankruptcy case, and (c) it would instead be expected that all claims would only be litigated and paid in the tort system if the bankruptcy filing had been dismissed (and the Funding Agreement would be available in that circumstance).

5. Moreover, although the Funding Agreement provides the Debtor with funding for a section 524(g) trust, it is only a backstop available to the extent the Debtor's other assets are insufficient to fund such a trust. Thus, contrary to the premise of the Motion, the Funding Agreement cannot be accessed as a primary source of funding.

6. The Committee's proposed limitation on enforcement of settlements and judgments against the Debtor is a nullity because it is premised on a misreading of the Funding Agreement. The Committee purports to require claimants to "agree in writing that any settlement or judgment in respect of his or her asbestos personal injury claim may not be enforced against the assets of the Debtor, other than those available through the Funding Agreement."[14] But, as detailed above, no funding and none of those assets would be available to pay any settlements or judgments while this bankruptcy remains pending. Nor do the claimants have the right to pursue New CT directly.[15] And, even in funding a trust established under a plan, the Funding Agreement expressly requires the Debtor's assets to be used first. No claimant can recover as the Committee contends.[16]

7. The Committee also misreads another sub-clause of the Funding Agreement's definition of "Permitted Funding Use." This one focuses on the right of the Debtor

---

14 Mot. at 25 (Conclusion).

15 Funding Agreement § 15 (explaining that the Funding Agreement confers no rights or remedies on non-parties to the agreement, such as the asbestos claimants).

16 Funding Agreement § 1 (definition of "Permitted Funding Use," providing trust funding "solely to the extent the [Debtor's] other assets are insufficient"). Even outside of a chapter 11 case, funding to pay asbestos claims is only available to the extent any cash distributions from the Debtor's subsidiary are used first. *Id.*

to request funding of its bank account to maintain a reserve of up to $5 million (the "Reserve Fund"): "(d) the funding of any amounts necessary to cause the Funding Account to contain at least $5,000,000 at such time."[17] The Committee contends that this provision allows the Debtor to require New CT to fund its bank account in perpetuity no matter how the Debtor uses those funds.[18] The Committee further argues that those funds could be used to pay prepetition asbestos-related settlements and judgments notwithstanding that the Funding Agreement specifically precludes use of funds for that purpose, as does bankruptcy law.[19] The specific terms of the Funding Agreement detailing discrete permitted uses for the funds belie these contentions.

8. It is well established that a court should construe contract terms, where possible, to give rational meaning to all provisions in the contract. *Int'l Eng'g & Trading Corp. v. Ingersoll-Rand Co.,* Civil No. 3:12CV294-DSC, 2012 WL 5354998, *5 (W.D.N.C. Oct. 30, 2012) ("This Court has long acknowledged that an interpretation which gives a reasonable meaning to all provisions of a contract will be preferred to one which leaves a portion of the writing useless or superfluous." (quotes removed)). Specific language in a contract controls over general language. *See, e.g., In re Roberson*, Case No. 18-05432-5-JNC, 2020 WL 6265062, *5 (Bankr. E.D.N.C. Oct. 23, 2020) ("It is an elementary provision of contract interpretation that specific terms control over general terms.").

9. The $5 million reserve provision simply permits the Debtor to have an immediate source of cash on hand in the event that a proper and authorized use of cash is needed before a funding request could be issued by the Debtor and satisfied by a transfer of funds from

---

17 Funding Agreement § 1.

18 Mot. ¶ 31.

19 *Id.*

New CT. It does not grant the Debtor discretion to use those funds for any purpose.[20] The Committee's reading of the clause is incorrect because it would render meaningless all other Permitted Funding Uses.

10. And it conflicts with the express language of the rest of the definition of Permitted Funding Use, which, as discussed above, specifically provides that as long as this bankruptcy case is pending, payment of asbestos-related settlements and judgments is not a Permitted Funding Use. *See Clement Bros. Co., Inc. v. N.C. Dep't of Admin. and Appalachian State Univ.*, 57 N.C. App. 497, 503 (N.C. Ct. App. 1982) (affirming ruling that contract for construction of dam and reservoir "must be construed in its entirety with specific provisions related to excavation from the quarry and spillway area controlling over the more general provisions relating to common excavation").

11. The Committee asserts that one of the Debtor's witnesses, Mr. Starczewski, agrees with its interpretation of the Funding Agreement.[21] He did not. When asked how the Funding Agreement might operate in connection with a hypothetical lift-stay scenario, Mr. Starczewski testified that he would need to "refer back to the funding agreement"[22] and only after so qualifying his answer, offered a "belief" about how it might work. He then expressly clarified that the "best source for understanding the terms and obligations" of the various restructuring agreements, of course, were the agreements themselves to which he "deferred" on

20 *See* Funding Agreement § 5.

21 Mot. ¶33.

22 Starczewski Dep. 194:24-25, Dec. 15, 2020.

the question of "interpretation."[23] He expressed no definitive view of the meaning of the Funding Agreement's Permitted Funding Use definition, and it would not be admissible if he had.[24]

12. Use of the Reserve Funds to pay asbestos-related judgments or settlements during the bankruptcy case would also violate the covenant against unpermitted uses of funds in Section 5 of the Funding Agreement.[25] This, in turn, would constitute a breach of the Funding Agreement that would relieve New CT of its obligation to satisfy any further requests for funding.[26]

13. There is no funding available to the Debtor under the Funding Agreement to pay prepetition asbestos-related judgments or settlements during the pendency of the bankruptcy case. What the Committee seeks to accomplish through its proposed modification of the stay simply cannot be done.

**II. There Is No Cause to Lift the Automatic Stay.**

14. The automatic stay — "one of the fundamental debtor protections provided by the bankruptcy laws" — can be lifted for cause. *Midlantic Nat. Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 503, 106 S. Ct. 755, 760, 88 L. Ed. 2d 859 (1986) (citation omitted); 11 U.S.C. § 362(d)(1) (stay may be lifted for "cause"). "Cause" is a flexible concept requiring courts to conduct a case-by-case balancing test. *See In re Beach First Nat'l Bancshares, Inc.*, 451 B.R. 406,

23 *Id.* at 240:6-241:14.

24 Under North Carolina law, when the language of a contract is clear and unambiguous, "construction of the agreement is a matter of law for the court . . . and the court cannot look beyond the terms of the contract to determine the intentions of the parties." *Lynn*, 689 S.E.2d at 206. In those cases, the plain language of the contract "may not be contradicted by parol or extrinsic evidence." *Cordaro v. Singleton*, 229 S.E.2d 707, 709 (N.C. Ct. App. 1976).

25 Section 5 of the Funding Agreement provides, among other things, that the Debtors "shall not use the proceeds of any Payment made under this Agreement for any purpose other than a Permitted Funding Use." Funding Agreement § 5.

26 Funding Agreement § 2(d) (providing that New CT's obligation to fund is subject to, among other things, no violation of covenant set forth in Section 5).

410 (Bankr. D.S.C. 2011). The Fourth Circuit has focused on three, non-exhaustive factors in conducting this balancing analysis:

> (1) whether the issues in the pending litigation involve only state law, so that the expertise of the bankruptcy court is unnecessary; (2) whether modifying the stay will promote judicial economy and whether there would be greater interference with the bankruptcy case if the stay were not lifted because matters would have to be litigated in bankruptcy court; and (3) whether the estate can be protected properly by a requirement that creditors seek enforcement of any judgment through the bankruptcy court.

*In re Robbins*, 964 F.2d 342, 345 (4th Cir. 1992).

15. But in applying the factors, the Court must balance any prejudice to the debtor's estate against the hardship that would result if stay relief is denied. *See Id.* at 345 ("The court must balance potential prejudice to the bankruptcy debtor's estate against the hardships that will be incurred by the person seeking relief from the automatic stay if relief is denied.").

16. Applying those factors and striking that balance only confirm that the Motion should be denied because: (a) the prejudice to the estate that would result if the stay is lifted significantly outweighs any hardship to the Debtor's asbestos claimants; (b) flooding the tort system with asbestos cases at the same time this bankruptcy case remains pending would not serve judicial economy; and (c) the fact that asbestos claims arise under state law does not support a modification of the stay because this bankruptcy case provides the only opportunity to globally and permanently resolve asbestos claims in a single forum.

### A. The Debtor and Its Estate Will Suffer Substantial Prejudice if the Court Grants the Motion.

17. A fundamental tenet of the automatic stay is to enable the bankruptcy court "to avoid interference with the orderly liquidation or rehabilitation of the debtor." *Matter of Rexene Prods. Co.*, 141 B.R. 574, 576 (Bankr. D. Del. 1992) (citing *Borman v. Raymark Ind., Inc.*, 946 F.2d 1031, 1036 (3d Cir. 1991)) (quoting *St. Croix Condo. Owners v. St. Croix Hotel*,

682 F.2d 446, 448 (3d Cir. 1982)). That precept should be preserved, and the Motion should be denied.

18. Granting the Motion would deplete estate resources, irreparably harm the Debtor's prospects for reorganization, and amount to an effective dismissal of this bankruptcy case. The Debtor filed this bankruptcy case to obtain a permanent, global, and fair resolution of all current and future asbestos claims against it — an option that is not available in the tort system or elsewhere.[27] Permitting all asbestos claimants to recommence tort litigation against the Debtor would defeat that purpose. If the Motion is granted, claims would not be resolved globally in a single forum; instead, they would be litigated individually in hundreds of state and federal courts across the country. The Debtor's ability to treat all claimants equitably through a section 524(g) consensual plan of reorganization would be utterly undermined.

19. Further, if the Court were to grant the Motion, the Debtor would be forced to immediately return to defending the same nationwide litigation (suffering all associated burdens and costs) that caused the Debtor to commence this bankruptcy case. Prepetition, the defense of this litigation required the assistance of a substantial number of outside professionals, including more than 40 defense firms, with, in any given month, more than 250 attorneys and paralegals expending in excess of 6,000 hours, or more, preparing and responding to pleadings and motions, conducting discovery, investigating claims, and attending hearings.[28] In addition, despite efforts to manage and reduce defense fees and expenses, since 2001, between approximately $20 million and $30 million a year was spent to defend these lawsuits, and in the range of approximately

27 *See* Panaro Decl. ¶¶ 36, 37.

28 *Id.* ¶ 32.

$80 million to over $160 million every year since 2002 was spent to defend and resolve those claims.[29]

20. Although the Debtor could seek funding for litigation "costs" as an expense of administration under the Funding Agreement,[30] it would have to use any cash distributions from its subsidiary first.[31] And, because of the pendency of this bankruptcy case, the Funding Agreement could only be used to pay asbestos-related liabilities in connection with the funding of a section 524(g) trust. Even then, the Funding Agreement would be available only after the Debtor's other assets are used to make the payments.[32] Paying claims liquidated in the tort system while the chapter 11 case is pending is not a Permitted Use of Funds under the Funding Agreement.

21. Indeed, when viewed in the proper context, the Motion is no more than an attempt by the Committee to achieve dismissal of this bankruptcy case without satisfying the Fourth Circuit's stringent dismissal standard (which the Committee could not do). *See In re Bestwall LLC,* 605 B.R. 43, 48-51 (Bankr. W.D.N.C. 2019) (applying the Fourth Circuit's stringent dismissal standard and denying motion to dismiss in a similar asbestos case (citing *Carolin Corp. v. Miller*, 886 F.2d 693, 700-01 (4th Cir. 1989)). The Committee seeks to allow all asbestos claimants to liquidate and collect their claims as if no bankruptcy existed. That result would only be available to claimants if this bankruptcy case were dismissed.

---

29 *Id.* ¶¶ 30, 32.

30 Funding Agreement § 1 (definition of "Permitted Funding Use," providing funding for "any and all costs and expenses of the [Debtor] incurred during the pendency of any Bankruptcy Case that are necessary and appropriate in connection therewith, including the costs of administering the Bankruptcy Case").

31 Funding Agreement § 1 (definition of "Permitted Funding Use," providing that in the case of clauses (a) through (e) of the defined term, "solely to the extent that any cash distributions theretofore received by the [Debtor] from its Subsidiaries are insufficient to pay such costs and expenses and fund such amounts and obligations in full").

32 *Id.* § 1 (definition of "Permitted Funding Use," providing that in the case of "clause (c)(ii) above, solely to the extent the Payee's other assets are insufficient to fund amounts necessary or appropriate to satisfy the Payee's Asbestos Related Liabilities in connection with the funding of such trust").

**i. The Committee Relies on Inapposite Case Law.**

22. The Committee relies on case law in which courts have agreed to lift the stay to permit certain parties, including asbestos claimants, to pursue available insurance.[33] Those cases are all inapposite, however, because the Debtor has no insurance coverage for asbestos-related claims.[34] The Funding Agreement is not insurance. The Debtor neither paid nor pays premiums with respect to the Funding Agreement, and there is no element of risk distribution, a key feature of insurance contracts.[35] Instead, the Funding Agreement is a backstop by New CT that was intended to ensure that, upon its formation, the Debtor had the same ability to pay its asbestos liabilities as Old CT had prior to the corporate restructuring that created the Debtor.

23. This distinction is critical. In each of the cases cited by the Committee, the availability of insurance permitted the court to conclude that the stay could be lifted without harming the debtor or its estate. *In re Budd Co., Inc.*, Case No. 14 B 11873, 2016 WL 556287, at *2 (Bankr. N.D. Ill. Feb. 10, 2016) (in light of available insurance "there will be no great prejudice to the Debtor or its estate if the stay is lifted to allow [certain] asbestos claim[s] to which Debtor's only objection is as to liability to proceed in state or federal court" where *debtor had proposed* plan of reorganization providing for asbestos liabilities to "pass-through" for adjudication in non-bankruptcy forums) (emphasis added); *In re Coronet Foods, Inc.*, No: 5:04-3822, 2005 WL 1552633, at *1 (Bankr. N.D. W. Va. June 3, 2005) (lifting stay solely to extent that any recovery would be "from Debtor's liability insurance policies, without recourse to any other assets of the

33 Mot. ¶¶ 49-54.

34 Panaro Decl. ¶ 27.

35 Courts have noted that the distribution of risk among a larger group of people is a "primary characteristic" of insurance. *La. Safety Ass'n of Timbermen-Self Insurers Fund v. La. Ins. Guar. Ass'n*, 17 So.3d 350 (La. 2009); *Myers v. State Bd. of Equalization*, 192 Cal. Rptr. 3d 864 (Cal. Ct. App. 2015), *rev. denied*, (Dec. 9, 2015).

Debtor" and finding that doing so would "not hinder, burden, delay or otherwise impact this bankruptcy case"); *In re Fernstrom Storage & Van Co.*, 100 B.R. 1017, 1024 (Bankr. N.D. Ill. 1989) ("[a]ny concerns regarding the potential liability of the estate may be obviated . . . by an order which prohibits any action to collect from the estate"; enjoining party from collecting from debtors or their property or bankruptcy estates); *Santa Fe Minerals, Inc. v. BEPCO, L.P. (In re 15375 Mem'l Corp.)*, 382 B.R. 652 (Bankr. D. Del. 2008), *rev'd on other grounds In re 15375 Mem'l Corp. v. Bepco, L.P.*, 589 F.3d 605 (3d Cir. 2009) (lifting stay after finding such relief would not prejudice debtors or other creditors because, among other things, claimant solely would recover from available insurance proceeds).[36]

24. As noted, there is no insurance here. And the lifting of the stay would cause irreparable harm to the Debtor by consuming the Debtor's assets and undermining the Debtor's prospects of reorganizing through a section 524(g) plan that treats all claimants equitably.

**ii. Any Harm to Asbestos Claimants Is Outweighed by the Hardship to the Debtor.**

25. The Committee asserts that the passage of time occasioned by the automatic stay could cause harm.[37] Significantly, however, the Committee has offered *no* evidence to support this contention. Plaintiffs in asbestos-related tort suits typically name multiple defendants.[38] Denial of the Motion will have no impact on a claimant's ability to pursue those

---

36 *See also Admiral Ins. Co. v. Grace Indus., Inc. (In re Grace Indus., Inc.)*, 341 B.R. 399, 405 (Bankr. E.D.N.Y. 2006) (holding that insured debtor did not breach duty to cooperate under insurance policy by consenting to termination of automatic stay as to personal injury plaintiffs who agreed to limit recovery to available insurance).

37 *See* Mot. ¶ 41.

38 *Declaration of Michael T. Starczewski in Support of Debtor's Complaint for Injunctive and Declaratory Relief and Related Motions* [Adv. Pro. Dkt. 3] (the "Starczewski Declaration") ¶ 21; *see also Expert Report of Charles E. Bates, PhD* (the "Bates Report") ¶ 9 (available data show that typically "[a]sbestos claimants sue dozens of parties and can submit claims to many previously established asbestos trusts"); *see also* Bates Dep. 13:11-16, 16:17-17:4, Oct. 29, 2020 (Dr. Bates' identification of the Bates Report as his own and inclusive of his opinions).

alternative defendants in the tort system or the numerous asbestos trusts created from bankruptcies filed by the former primary defendants in the tort system. *See Bestwall*, 606 B.R. at 257 ("Nothing about maintaining the injunction in this case prohibits the plaintiffs from continuing to proceed against any remaining defendants in state court."). In fact, the "typical claimant alleges exposure to products of 36 parties,"[39] and data show that the Debtor only provides 3% of the total recoveries received by typical asbestos claimants whose claims they resolve.[40]

26. In addition, litigation, particularly mass tort asbestos litigation, generally requires extensive discovery, involves numerous parties and presents complicated questions of causation. *Bestwall,* 606 B.R. at 257. Such litigation is rarely efficient and often goes on for many years. *Id.*[41] By contrast, a section 524(g) trust established by the Debtor in this bankruptcy case would provide all claimants — including future claimants who have yet to initiate litigation — an efficient means through which to expeditiously and equitably resolve their claims. *Id.*; Bates Report ¶ 10 ("A bankruptcy reorganization of DBMP that leads to a properly structured trust is an economically more efficient, more equitable way to compensate asbestos claimants."); ¶ 44 ("Trusts can be and typically are structured to provide for faster and more efficient claim resolutions.").

27. In addition, the continuation of the automatic stay will not permanently deprive asbestos claimants of an opportunity to pursue their claims. Instead, it merely will interrupt pursuit of those claims on a temporary basis, giving the Debtor time to reach consensus on a section 524(g) plan of reorganization that establishes a trust that equitably treats, and fairly

---

39 *In re Garlock Sealing Techs., LLC*, 504 B.R. 71, 96 (Bankr. W.D.N.C. 2014).

40 Bates Report ¶ 9.

41 For example, as of the Petition Date, nearly half of the Debtor's pending asbestos-related claims on active dockets had been filed more than 10 years ago. Starczewski Decl. ¶ 21.

pays, all current and future asbestos personal injury claims of the Debtor. *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 234 (3d Cir. 2004, as amended Feb. 23, 2005) (The "unique funding mechanism [available under section 524(g)] makes it possible for future asbestos claimants to obtain substantially similar recoveries as current claimants in a manner consistent with due process.").

28. The Committee's allegation that "a continuation of the stay could result in the loss of damages for pain and suffering of the exposed claimant" in certain jurisdictions who may die while the stay is in force,[42] is both premature and ignores precedent. Those circumstances can be, and in other cases have been, addressed by a section 524(g) trust's distribution procedures.[43]

29. The automatic stay protects the Debtor and its ability to achieve a global resolution of the asbestos claims under a plan. The stay is a fundamental feature of all chapter 11 cases, including asbestos cases, and any delay to creditors allegedly caused by the imposition of the stay cannot, alone, justify its termination. *See, e.g.*, *In re Madison Hotel Assocs.*, 18 B.R. 218, 219 (Bankr. W.D. Wis. 1982) ("[R]elief from the automatic stay for 'cause' is not, nor was it intended by the drafters of the Bankruptcy Code, to encompass mere delay in the assertion of rights where that delay is not accompanied by demonstrable economic loss" particularly when "the

---

42 Mot. ¶ 41.

43 *See, e.g., In re Kaiser Gypsum Co., Inc.*, Case No. 16-31602 (JCW) (Bankr. W.D.N.C. Sept. 24, 2020) [Dkt. 2481], Kaiser Gypsum Asbestos Personal Injury Trust Dist. Procedures § 7.3 ("If the claimant was alive at the time the initial Pre-Petition complaint was filed or on the date the claim form was filed with the Asbestos Trust, the case shall be treated as a personal injury case with all personal injury damages to be considered even if the claimant has died during the pendency of the claim."); *In re Specialty Prods. Holding Corp.*, Case No. 10-11780 (JKF) (Bankr. D. Del. Oct. 23, 2014) [Dkt. 5117–3], Form of Specialty Products Holding Corp. Asbestos Trust Distib. Procedures § 7.6, available at https://www.cpf-inc.com/assets/1/6/BondexTDP.pdf (same).

occurrence of delay is speculative upon the failure of the debtor's efforts to reorganize under chapter 11.").

30. Indeed, if delay were enough, the stay would be terminated in every case. *See In re Lewis*, 339 B.R. 814, 817 (Bankr. S.D. Ga. 2006) ("Obviously, with the . . . reimposition of the § 362 stay, all the debtors' creditors are delayed in pursuing their obligations under applicable non-bankruptcy law, but because a creditor might be required to wait . . . standing alone does not establish an unreasonable delay."). Here, even if the automatic stay were lifted to permit the asbestos claimants to litigate claims, they could not collect any judgment or settlement except under a plan in this bankruptcy case. The relief requested will not lead to payments of claims, and thus maintaining the stay will not cause claimants any harm.

**iii. The Ruling in *Kaiser Gypsum* Does Not Support Lifting the Stay.**

31. The Committee argues that the lift-stay ruling in *In re Kaiser Gypsum Co.*, Case No. 16-31602 (JCW) (Bankr. W.D.N.C.), a case pending before this Court, supports lifting the stay here. The Committee claims that the relevant circumstances in *Kaiser Gypsum* are "analogous"[44] to the situation here and, in particular, that the uncapped insurance in that case is like the Funding Agreement here. But the Funding Agreement is not insurance, as detailed above. Nor are the circumstances in *Kaiser Gypsum* that led to the lift-stay there analogous to the facts here.

32. In *Kaiser Gypsum*, the debtors have third-party insurance coverage for asbestos personal injury claims that is "effectively unlimited."[45] Although the per-occurrence limit

---

44 Mot. ¶ 34.

45 *Proposed Findings of Fact and Conclusions of Law Regarding Confirmation of the Joint Plan of Reorganization of Kaiser Gypsum Company, Inc. and Hanson Permanente Cement, Inc., as Modified*, *Kaiser Gypsum* [Dkt. 2486, Ex. A] (the "Kaiser Findings") at 25. In particular, as the result of nearly two decades of prepetition coverage litigation, it is settled that (a) the *Kaiser Gypsum* debtors' primary insurer must defend

and deductibles under the primary policies vary, virtually all asbestos personal injury claims triggered policies with a $5,000 deductible and a $500,000 per claim primary product liability insurance limit.[46] Multiple excess policies provide coverage above the primary insurance limit.[47] In 2018, the debtors and their parent company entered into a term sheet with the asbestos personal injury committee and the future claimants' representative setting forth the parties' agreement in principle on a consensual plan of reorganization that would resolve all present and future asbestos personal injury claims pursuant to section 524(g) of the Bankruptcy Code.[48] The resolution includes a contribution of $50 million to a section 524(g) trust in addition to certain other assets, plus an assignment of the debtors' rights under insurance policies that cover asbestos claims.[49] The $50 million contribution will be used to pay uninsured asbestos claims, including deductibles and the operating expenses of the section 524(g) trust; the assignment of the insurance rights is intended to preserve the claimants' ability to recover from available insurance.

33. As required by the Kaiser Term Sheet, the debtors, the asbestos personal injury committee and the future claimants' representative filed a joint lift stay motion seeking to modify the stay to permit any asbestos claimant to pursue his or her claim in the tort system, but only if the claimant first agreed to limit his or her recovery to insured amounts and waived and released his or her uninsured claim against the debtors and certain other parties, including the

---

each covered asbestos personal injury claim (without eroding coverage) and indemnify the debtors for such claims up to the $500,000 per claim limit of the policy year selected by the debtors and (b) the debtors' excess insurers are obligated under their policies to respond to asbestos personal injury claims and indemnify the debtors for amounts in excess of the $500,000 primary policy limits. Kaiser Findings, at 8.

46 *Id.*

47 Kaiser Findings at 8-9.

48 *See Notice of Filing of Plan Term Sheet*, *Kaiser Gypsum* [Dkt. 854] (the "Kaiser Term Sheet").

49 *See* Kaiser Term Sheet § C.

debtors' affiliates.[50] In August 2018, the Court entered an order granting the joint lift stay motion.[51] Pursuant to the Court's order, among other things, the automatic stay was lifted, pursuant to section 362(d) of the Bankruptcy Code, to permit only those holders of asbestos personal injury claims who first agreed to limit their recoveries and waive and release claims as described above to file or continue litigating their asbestos personal injury claims in the tort system against one or both of the debtors, solely for the purpose of pursuing recoveries from the debtors' insurance.

34. The Court in *Kaiser Gypsum* later entered an order recommending confirmation of the debtors' plan of reorganization, which, among other things, would implement the Kaiser Term Sheet and permanently resolve the debtors' legacy asbestos liabilities.[52] The plan provides, like the Kaiser Lift Stay Order, that, with respect to asbestos personal injury claims, claimants will be permitted to commence or continue to assert tort actions against the reorganized debtors in name only to collect available insurance.[53] The trust will satisfy uninsured asbestos personal injury claims in accordance with trust distribution procedures.[54]

35. *First*, unlike the debtors in *Kaiser Gypsum*, the Debtor has no insurance coverage available to satisfy asbestos-related claims. As this Court noted, "the thing that differentiates [*Kaiser Gypsum*] from [a more typical asbestos bankruptcy case] is [the debtors] have unlimited insurance and that being the case, it changes all of the dynamics in the case and the

---

50 *See Motion of the Debtors, the Official Committee of Asbestos Personal Injury Claimants and the Future Claims Representative to Lift the Stay Pursuant to 11 U.S.C. § 362 as to Certain Asbestos Personal Injury Claims*, *Kaiser Gypsum* [Dkt. 881] (the "Kaiser Stay Motion") at 2.

51 Order granting the Kaiser Stay Motion, *Kaiser Gypsum* [Dkt. 1108] (the "Kaiser Lift Stay Order") ¶ 3.

52 *See generally* Kaiser Findings.

53 *Id.* at 13.

54 *Id.* The Kaiser Findings are currently subject to objection by the debtors' primary insurer in the district court.

parties' motivations."[55] In contrast, the Debtor here long ago exhausted its insurance coverage and, as described above, the Funding Agreement is not insurance and cannot be used like the insurance in *Kaiser Gypsum* to satisfy the Debtor's obligations in the event the stay is lifted.

36. *Second*, the debtors in *Kaiser Gypsum* supported the requested modification of the stay because, as reflected in the Kaiser Term Sheet, it was consistent with a global agreement to resolve their bankruptcy cases.[56] Requests to lift the stay to which the debtor stipulates, consents, or does not object are routinely granted. *See, e.g., In re Legacy at Jordan Lake, LLC*, 2011 WL 6008388 (Bankr. E.D.N.C. 2011). Here, the Debtor objects to the Motion, which, if approved, would directly interfere with its reorganization efforts.

37. *Third*, in *Kaiser Gypsum* the stay was lifted only after the debtors had reached an agreement to permanently resolve their liability for asbestos personal injury claims pursuant to the terms of the Kaiser Term Sheet. As a result, the debtors in *Kaiser Gypsum* already had an opportunity to resolve and, in fact, had resolved (subject to bankruptcy and district court approval) their asbestos liability. Moreover, the stay relief was completely consistent with the treatment of claimants under the agreed plan as claimants were permitted to pursue their insured claims in the tort system both under the lift stay motion and the proposed joint plan and, in both cases, uninsured claims could only be recovered from the trust to be established under the plan. Thus, the agreed lifting of the stay in *Kaiser Gypsum* was a key part of a global, consensual resolution of the debtors' asbestos liability.

38. In contrast, in this bankruptcy case there is no agreement to resolve the Debtor's asbestos liability. Despite the Debtor's invitation, the Committee has not even engaged

---

55 *Kaiser Gypsum*, Aug. 13, 2020 Hr'g Tr. at 29:5-8 [Dkt. 2439].

56 Kaiser Stay Motion, at 1, 3.

in settlement negotiations in this bankruptcy case, focusing all its efforts to date on litigation. The Debtor has had no opportunity to pursue a consensual resolution of its asbestos liability, and lifting the stay would only undermine, if not eliminate altogether, the Debtor's ability to achieve such a resolution. In addition, unlike in *Kaiser Gypsum*, there is significant risk that the relief requested by the Motion will result in inconsistent treatment of claimants, as claims would be litigated piecemeal in other forums before the framework of a global resolution under a chapter 11 plan has even been considered in this forum.

39. *Finally*, the stay relief in *Kaiser Gypsum* was conditioned to ensure that the debtors would not suffer any prejudice. In particular, in *Kaiser Gypsum*, a claimant is required to execute an acknowledgement and release waiving all claims for uninsured amounts against the debtors and various other protected parties, including the debtors' affiliates, before proceeding with litigation in the tort system. No similar waiver is possible here.

40. Claimant recoveries cannot be limited to assets available under the Funding Agreement because no assets are available to fund claims in the manner the Committee proposes and, even if they were, they only serve as a backstop in the event the Debtor's assets have been exhausted. There is simply no ability to lift the stay in a way that would not irreparably harm the Debtor's estate.

**B. Judicial Economy Would Not Be Served by Returning Thousands of Asbestos Cases to the Tort System.**

41. Lifting the stay and sending more than 60,000 asbestos cases back into the tort system would not promote judicial economy. To the contrary, it would undermine it. Rather than facilitating a global resolution of all current and future asbestos cases in a single forum, granting the relief would result in piecemeal litigation of asbestos cases in multiple state and federal courts across the country. Even worse, it would do so at a time that this bankruptcy case,

whose purpose is to globally resolve the same claims, remains pending. This would defeat the purpose of section 524(g) of the Bankruptcy Code and only foster inefficiency. As the court in *Bestwall* recognized: "Section 524(g) allows a debtor to address *in one forum* all potential asbestos claims against it, both current and future, as well as current and potential future claims against third parties alleged to be liable on account of asbestos claims against the debtor." *In re Bestwall*, 606 B.R. at 249 (emphasis added).

### C. The Fact That Asbestos Claims Arise Under State Law Does Not Support Lifting the Stay.

42. The asbestos claims against DBMP arise under state law, but that does not support a modification of the stay that would permit these claims to be litigated in state and federal courts across the nation.

43. Section 524(g) of the Bankruptcy Code provides a debtor with a unique mechanism to resolve its asbestos liabilities in a single forum through a consensual plan process. *See Bestwall*, 606 B.R at 249. Indeed, Congress enacted section 524(g) to address precisely the type of crippling, state law-based asbestos claims faced by the Debtor. To lift the stay as to all asbestos personal injury claims where (a) the Debtor opposes the relief, (b) the Debtor's estate would be substantially harmed; and (c) the Debtor's opportunity to achieve a global, consensual resolution of its asbestos personal injury claims would be all but eliminated even before a single negotiation has taken place would contravene the clear purpose of section 524(g) of the Bankruptcy Code.

## III. Lifting the Stay Would Not Promote Equal Treatment of the Debtor's Creditors.

44. The Committee argues that the Debtor's prepetition restructuring effected "a structural waiver of the stay for certain creditors" that "undermines the creditor-protective

purposes of the automatic stay itself."[57] But no stay waiver occurred — the Debtor has not excepted any of its creditors from the automatic stay. The Committee simply seeks to ignore the transactions that created the Debtor, which were valid under applicable law.

45. The Debtor was formed as part of a corporate restructuring (the "2019 Corporate Restructuring"), pursuant to which the Debtor was allocated certain assets (including rights and benefits under the Funding Agreement) and liabilities.[58] Other assets and liabilities were allocated to New CT, another newly formed entity.[59] The Debtor commenced this bankruptcy case to address its liabilities. There is no inequality, threatened or otherwise, as among the Debtor's creditors, all of which are subject to the automatic stay.

46. The Committee's concern, however, is not related to the Debtor's creditors (the only creditors as to which the Debtor conceivably could effect a stay waiver). Instead, its focus is on creditors of New CT, a separate legal entity that did not file a chapter 11 case. In effect, the Committee argues that because New CT did not commence a bankruptcy case, the automatic stay applicable in the Debtor's bankruptcy case should be lifted (and the Debtor's bankruptcy case effectively dismissed) to provide asbestos claimants with the same ability to pursue their claims as creditors against a non-debtor. What the Committee casts as a stay-waiver argument, then, really is an unsupported argument that the Court should disregard the 2019 Corporate Restructuring.

47. As is set forth in detail in the Debtor's reply in support of its request for a preliminary injunction, there is no support for such an argument.[60] The 2019 Corporate

---

57 Mot. ¶ 60.

58 *See* Panaro Decl. ¶¶ 16, 17, 18.

59 *Id.* ¶¶ 18, 19.

60 *See Omnibus Reply in Support of Motion of the Debtor for an Order (I) Preliminarily Enjoining Certain Actions Against Non-Debtors or, (II) In the Alternative, Declaring that the Automatic Stay Applies to Such*

Restructuring complied with all legal requirements for a Texas divisional merger.[61] And, tellingly, even after months of extensive discovery regarding the transaction, the Committee has been unable to muster any facts to the contrary.

48. The 2019 Corporate Restructuring occurred, and the transactions thereunder are effective and enforceable under applicable law. Its effects cannot be disregarded, by virtue of a stay waiver argument or otherwise. There is no risk, nor does the Committee claim as much, of unequal treatment of asbestos claimants if the stay is maintained. In contrast, a risk of unequal treatment would exist, and be realized, if the stay is lifted and claims against the estate are permitted to be liquidated outside of this Court at the same time they are before the Court for global resolution.

49. If the Committee believes the 2019 Corporate Restructuring harmed asbestos claimants (although it did not), its remedy is to request derivative standing to pursue a fraudulent conveyance claim. If the Committee believes this bankruptcy filing was improper (although it is not), its remedy is to file a motion to dismiss the case. The Committee has done neither, and it has no basis to seek relief from the stay for the purpose of impeding if not undermining altogether the Debtor's prospects for reorganization.

**Conclusion**

50. For the reasons set forth above, the Debtor respectfully requests that the Court deny the Motion.

---

*Actions and (III) Granting a Temporary Restraining Order Pending a Final Hearing on the Merits* (the "Debtor's PI Reply") § I.

61 *Id*.

Dated: February 5, 2021
Charlotte, North Carolina

Respectfully submitted,

*<u>/s/ Garland S. Cassada</u>*
Garland S. Cassada (NC Bar No. 12352)
David M. Schilli (NC Bar No. 17989)
Andrew W.J. Tarr (NC Bar No. 31827)
ROBINSON, BRADSHAW & HINSON, P.A.
101 North Tryon Street, Suite 1900
Charlotte, North Carolina 28246
Telephone: (704) 377-2536
Facsimile: (704) 378-4000
E-mail: gcassada@robinsonbradshaw.com
dschilli@robinsonbradshaw.com
atarr@robinsonbradshaw.com

Gregory M. Gordon (TX Bar No. 08435300)
Amanda Rush (TX Bar No. 24079422)
JONES DAY
2727 North Harwood Street, Suite 500
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
E-mail: gmgordon@jonesday.com
asrush@ jonesday.com
(Admitted *pro hac vice*)

Jeffrey B. Ellman (GA Bar No. 141828)
Danielle Barav-Johnson (GA Bar No. 751721)
JONES DAY
1420 Peachtree Street, N.E., Suite 800
Atlanta, Georgia 30309
Telephone: (404) 581-3939
Facsimile: (404) 581-8330
E-mail: jbellman@jonesday.com
dbarav@jonesday.com
(Admitted *pro hac vice*)

ATTORNEYS FOR DEBTOR
AND DEBTOR IN POSSESSION

FILED & JUDGMENT ENTERED
Steven T. Salata

August 11 2021

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

J. Craig Whitley
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NORTH
CAROLINA CHARLOTTE DIVISION**

| | |
|---|---|
| In re:<br><br>DBMP LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 20-30080 |
| DBMP LLC,<br><br>Plaintiff,<br><br>v.<br><br>THOSE PARTIES LISTED ON APPENDIX A TO COMPLAINT and JOHN AND JANE DOES 1-1000,<br><br>Defendants. | Adv. Pro. No. 20-03004 |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING ORDER: (I) DECLARING THAT THE AUTOMATIC STAY APPLIES TO CERTAIN ACTIONS AGAINST NON-DEBTORS, (II) DENYING MOTION OF THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS TO LIFT THE STAY, AND ALTERNATIVELY (III) PRELIMINARILY ENJOINING SUCH ACTIONS**

# I. PROCEDURAL BACKGROUND

1. On October 23, 2019, CertainTeed Corporation ("Old CertainTeed"), a building products manufacturer with significant asbestos liabilities, underwent a corporate restructuring, including a Texas state law divisional merger, where it divided itself into two new entities. One, CertainTeed LLC ("New CertainTeed"), was essentially a mirror image of Old CertainTeed: a fully operating company which retained all of Old CertainTeed's employees, the bulk of its assets and operations, and all of its non-asbestos creditors. The other entity, DBMP LLC ("DBMP" or the "Debtor") was quite different. The merger allocated to DBMP no employees, no operations, and few assets. However, in one respect the merger was generous with DBMP: it was allocated 100% of Old CertainTeed's considerable asbestos liabilities.

2. Three months later, on January 23, 2020 (the "Petition Date"), DBMP filed a voluntary chapter 11 petition (the "Chapter 11 Case") in this bankruptcy court as well as a complaint initiating this Adversary Proceeding [Adv. Pro. Dkt. 1].

## A. The Preliminary Injunction Motion

3. The complaint in turn was accompanied by a motion for a temporary restraining order, a preliminary injunction and, in the alternative, declaratory relief (the "Injunction Motion") [Adv. Pro. Dkt. 2]. Through this Injunction Motion, DBMP sought to protect New CertainTeed, some 80 affiliated entities ("Other Affiliates") and certain nonbankrupt distributors of asbestos-containing products for which Old CertainTeed had liability ("Distributors") (collectively, the "Protected Parties") from the filing or continued prosecution of actions that sought recovery on the asbestos-related claims, including claims for exposure to asbestos-containing products manufactured or sold by the Debtor's predecessor, Old CertainTeed. These, of course, were the asbestos liabilities exclusively allocated to DBMP in the divisional merger. In

the alternative, the Debtor sought a declaration that the automatic stay in 11 U.S.C. § 362 applied to actions asserting or pursuing DBMP Asbestos Claims.

4. On January 27, 2020, an emergency hearing was held on the Injunction Motion, and on January 29, 2020, this Court entered a Temporary Restraining Order ("TRO") [Adv. Pro. Dkt. 21].

5. On February 6, 2020, certain asbestos personal injury claimants filed objections to the TRO [Adv. Pro. Dkt. 29-31]. Through orders entered on February 18, 2020, and after, the TRO was extended. Later with the consent of the parties, the TRO was twice extended through an evidentiary hearing and a ruling on the Injunction Motion. This extension was intended to maintain the status quo so that the estate fiduciaries and their professionals could be appointed and to permit the parties to conduct discovery.

6. Upon appointment of the Official Committee of Asbestos Personal Injury Claimants (the "ACC") on February 14, 2020 [Dkt. 155] and later the Future Claimants' Representative on June 1, 2020 [Dkt. 310] (the "FCR" and, together with the ACC, the "Representatives"), the parties engaged in extensive discovery.[1]

7. On January 13, 2021, the ACC filed its objection to the Injunction Motion [Adv. Pro. Dkt. 216] (the "ACC Objection"). That same day, the FCR filed his objection to the Injunction Motion [Adv. Pro. Dkt. 192] (the "FCR Objection").

8. On February 5, 2021, the Debtor filed its *Omnibus Reply in Support of the Motion* [Adv. Pro. Dkt. 223] in response to both the ACC Objection and the FCR Objection (the

[1] Before formally moving to intervene in this Adversary Proceeding, the FCR participated in discovery by agreement of the parties. Later, the FCR was permitted to intervene in this action on March 15, 2021 [Adv. Pro. Dkt. 292].

"Reply"); and on February 19, 2021, the Debtor filed the *Notice of Filing of Appendix in Connection with Omnibus Reply in Support of the Motion* [Adv. Pro. Dkt. 236].

**B. Base Case Relief From Stay Motion**

9. Meanwhile, on January 13, 2021, the ACC filed a Motion to Lift the Stay Pursuant to 11 U.S.C. § 362 as to Certain Asbestos Personal Injury Claims (the "Stay Motion") in both the base bankruptcy case and this Adversary Proceeding [Dkt. 614, Adv. Pro. Dkt. 195]. In the Stay Motion, the ACC seeks to permit all asbestos claims against the Debtor to be filed, prosecuted, liquidated, and paid in the tort system with funding provided under a Funding Agreement between DBMP and New CertainTeed, as described herein.

10. On February 5, 2021, the FCR joined the Stay Motion [Dkt. 654, Adv. Pro. Dkt. 220], whereas the Debtor and New CertainTeed objected to it [Dkt. 655-656, Adv. Pro. Dkt. 221].

11. On February 11, 2021, a Stipulation and Agreed Order Regarding the Automatic Stay [Dkt. 664, Adv. Pro. Dkt. 230] was entered, providing that, "[n]otwithstanding section 362(e) of the Bankruptcy Code, the automatic stay shall not terminate as requested in the [Stay] Motion and shall remain in place pending the entry of an order by the Court adjudicating the [Stay] Motion" [Dkt. 664, Adv. Pro. Dkt. 230 at ¶ 1]. As with the extended TRO, this Stipulation was entered to maintain the status quo while the parties engaged in discovery and prepared for a hearing.

**C. The Hearing and the Evidentiary Record**

12. By consent, the Injunction Motion in the adversary proceeding and the ACC's base case Stay Motion were heard together on March 1 through 3, 2021, upon a consolidated evidentiary record. Follow up hearings were conducted on March 11 and 25, 2021.

13. We would not ordinarily detail the evidence presented at hearing. But, due to the COVID-19 pandemic, it was necessary to conduct these hearings by video conferencing technology, and the extensive evidentiary record was presented electronically. For the benefit of a reviewing court, we will briefly summarize that evidence.

14. By agreement, and to streamline the evidentiary presentation, the Parties proffered, and this Court later admitted certain testimony related to the two Motions via declaration and deposition.[2]

15. On February 23, 2021, the Debtor filed its *Notice of Filing of Declarations in Support of the Motion* [Adv. Pro. Dkt. 238] and, with that notice, the declarations of Charles E. Bates, Ph.D. [Adv. Pro. Dkt. 238 at 4–57] ("Bates Decl."), Joseph N. Bondi [Adv. Pro. Dkt. 238 at 59–65] ("Bondi Decl."), Robert J. Panaro [Adv. Pro. Dkt. 238 at 67–77] ("Panaro Decl."), Mark Rayfield [Adv. Pro. Dkt. 238 at 79–83] ("Rayfield Decl."), and Michael T. Starczewski [Adv. Pro. Dkt. 238 at 85–107] ("Starczewski Decl." and, together with the Bates Decl., the Bondi Decl., the Panaro Decl., and the Rayfield Decl., the "Debtor's Hearing Declarations").

16. On February 25, 2021, the Debtor filed its *Notice of Filing Debtor's Exhibits for March 1, 2021, Hearing* [Adv. Pro. Dkt. 243] and provided the Court with electronic and paper copies of its exhibits.

17. On February 26, 2021, the Representatives filed their *Notice of Filing of Select Cross-Examination of Certain of the Debtor's Witnesses by Deposition Testimony Designation* [Adv. Pro. Dkt. 245]; and on February 28, 2021, the Debtor filed its *Notice of Filing of Re-Direct Examination of Witnesses by Deposition Testimony and Supplemental Designation to Previously Designated Deposition Testimony* [Adv. Pro. Dkt. 248].

[2] *See, e.g., Stipulation Regarding Evidentiary Matters* [Adv. Pro. Dkt. 302] (the "Evidentiary Stipulation").

18. The hearing conducted March 1 through March 3, 2021 included: (a) opening statements and arguments from the Debtor, the ACC, and the FCR; (b) live testimony from two expert witnesses on certain financial and restructuring matters: Stephen Coulombe of Berkeley Research Group, LLC ("BRG"), for the Debtor, and Matthew Diaz of FTI Consulting, Inc. ("FTI"), for the Representatives; (c) subject to certain evidentiary motions *in limine* and reservations of evidentiary objections, proffers of the Parties' evidence described above; *i.e.*, the Debtor's Hearing Declarations, the deposition designations and the Parties' exhibits.[3]

**D. Post-Hearing**

19. After the Hearing, on March 24, 2021, the Parties filed the Evidentiary Stipulation in which the Parties agreed that several evidentiary motions *in limine* would be withdrawn, all previously asserted evidentiary objections would be withdrawn, and the Parties would not oppose admission into evidence of (a) the testimony proffered at the Hearing, whether elicited live during the Hearing or submitted through declarations or deposition designations or (b) the proffered exhibits [Adv. Pro. Dkt. 302].

20. On March 31, 2021, the Parties filed post-petition briefs to address questions by the Court concerning the Texas Divisional Merger Statutes, [Adv. Pro. Dkts. 310, 311, 312]. Also, each side was invited to, and did, proffer proposed findings and conclusions (collectively, the "Post-Hearing Briefs").

21. Since the Hearing, the Debtor offered its stipulation that the personal injury claim of any claimant who (a) had a pending DBMP Asbestos Claim as of the Petition Date and (b) was alive at that time, shall be preserved (with no impairment of the claimant's personal injury

[3] Hr'g Tr., 109:13-18, 139:18-142:19, 144:1-11, 144:20-145:18, 195:1-6; 220:2-21, Mar. 1, 2021; *see also* Adv. Pro. Dkts. 243, 249, 293, 294, 205; and (d) closing arguments from the Debtor, the ACC, and the FCR.

damages) even if the claimant subsequently dies (the "PI Damages Agreement").[4] Although the Representatives are adamantly opposed to the preliminary injunction, no party has objected to this concession should the injunction be granted.

Holding: By virtue of the Texas merger statutes, the asbestos claims of Old CertainTeed which the Representatives seek to return to the tort system are presently claims owed by DBMP and no other party. Thus, they are subject to the automatic stay under Bankruptcy Code Sections 362(a)(1) and/or Section 105.

Due to the apparent negative effects of the Divisional Merger (and this ensuing bankruptcy filing) on the legal rights of Asbestos Claimants, that Merger and its allocations may constitute an avoidable fraudulent transfer or otherwise be subject to attack under remedial doctrines like alter ego and successor liability. If so, New CertainTeed, et.al., could eventually be held responsible for Old CertainTeed's, now DBMP's, asbestos liabilities.

However, as the aforementioned apparent injuries are not specific to individual creditors but are instead "general" injuries (both to DBMP and the asbestos claimants) and with DBMP in chapter 11, if such remedial actions lie, they are either: (a) bankruptcy estate property under Section 541, and/or (b) avoidance actions which under the Fourth Circuit's "first crack" doctrine must be asserted by a bankruptcy trustee, and not individual creditors.[5] Thus, the causes of action by which the Divisional Merger might be contested—and through which claims might be asserted against the Protected Parties—are also subject to the automatic stay, particularly Section 362(a)(3).

---

[4] *See Debtor's Notice of Filing* its proposed findings of fact and conclusions of law related to the Motions (further describing the PI Damages Agreement).
[5] *See* Section III(D) below.

Essentially, what the Representatives seek by their opposition to the Preliminary Injunction and their Stay Motion is an end to this Chapter 11 Case. This is problematic because (1) there is no pending motion to dismiss, and (2) as Judge Beyer's recent *Bestwall* decision reflects, even if these actions reflect "bad faith" on the part of DBMP, under the Fourth Circuit's exacting *Carolin s*tandard, dismissal would be difficult to obtain at such an early stage of the bankruptcy case.[6]

Because the relief which the Representatives seek, dismissal, appears not directly obtainable, nor may it be had through indirect means—such as a grant of relief from stay to all asbestos claimants or through denial of the preliminary injunction.

For the present, we have a pending chapter 11 reorganization case. Given the potentially prejudicial effects of the Corporate Restructuring on asbestos claimants, the necessity of the Debtor reaching agreement on a Section 524(g) Plan and trust with a supermajority of the asbestos claimants, and the need to establish "good faith" at confirmation, this reorganization attempt may or may not bear fruit. However, under controlling Circuit precedent, DBMP is entitled to try to reorganize and to persuade the asbestos claimants to join it in a Section 524(g) plan. Clearly, reorganization will be impossible without the benefit of the automatic stay and the preliminary injunction.

Accordingly, and without endorsing Old CertainTeed and DBMP's prepetition actions, this Court concludes (1) the Section 362(a) automatic stay applies to these actions, (2) the Stay Motion must be Denied, and (3) the Preliminary Injunction Motion must be Granted.

[6] *Carolin Corp. v. Miller*, 886 F.2d 693, 700-01 (4th Cir. 1989).

To that end, and pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable to these proceedings by Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure, enters the following Findings of Fact and Conclusions of Law in connection with that determination:

## II. FINDINGS OF FACT[7]

### A. The Parties and their Requests for Relief

22. The Plaintiff in this Adversary Proceeding is DBMP, a North Carolina limited liability company and the debtor in possession in the Chapter 11 Case.

23. The Defendants are those parties listed on Appendix A to the Injunction Motion and John and Jane Does 1-1000 (collectively, the "Defendants"). The Defendants listed on Appendix A are all plaintiffs in lawsuits, pending as of the Petition Date, who sought to hold, or may seek to hold, the Protected Parties liable for the DBMP Asbestos Claims. John and Jane Does 1-1000 are prospective plaintiffs who may, at any time while the Chapter 11 Case is pending, seek to hold the Protected Parties liable for the DBMP Asbestos Claims.

24. The Protected Parties are identified in Appendix B to the Injunction Motion. They are essentially New CertainTeed, the Other Affiliates and the Distributors, entities which distributed asbestos-containing products manufactured or sold by Old CertainTeed (the "Distributors").

25. "DBMP Asbestos Claims" are, collectively, any asbestos-related claims against DBMP, including all claims that formerly were asserted against (or that could have been asserted against) Old CertainTeed, relating in any way to asbestos or asbestos-containing

[7] To the extent any of the following findings of fact constitute conclusions of law, they are adopted and treated as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted and treated as such.

materials, but not including asbestos-related claims for which the exclusive remedy is provided under workers' compensation statutes and similar laws.

26. During this Chapter 11 Case, DBMP has stated its intention to "permanently, globally, and fairly resolve" resolve all current and future DBMP Asbestos Claims "through the consummation of a consensual plan of reorganization that includes the establishment of a trust under section 524(g) of title 11 of the United States Code (the "Bankruptcy Code").[8]

27. The Representatives are dismissive of the Debtor's avowed good intentions. They view this bankruptcy case as a gross abuse of chapter 11. They accuse New CertainTeed of seeking the benefits of bankruptcy without bearing any of the burdens. And the Representatives view the Injunction Motion as simply the last link in a chain of several intentional actions (Corporate Restructuring, Divisional Merger, and the bankruptcy filing) intentionally undertaken by the CertainTeed entities for the purpose of isolating asbestos claimants and impairing their rights.

**B. Old CertainTeed's and DBMP's Defense of DBMP's Asbestos Claims**

28. New CertainTeed, the Other Affiliates, and DBMP are part of a multinational building products conglomerate whose ultimate parent is a French corporation known as Compagnie de Saint-Gobain, headquartered in Paris.

29. From the 1930s to 1993, Old CertainTeed manufactured and/or sold certain products that contained asbestos, including asbestos cement pipe, asphalt roofing products, other asbestos cement products, certain gypsum products, and specialty railroad insulation products.[9]

---

[8] Panaro 1st day Decl. ¶ 36; Starczewski Decl. ¶ 33.
[9] Starczewski Decl. ¶ 8.

30. Since the 1970s, Old CertainTeed has faced hundreds of thousands of claims in the tort system for asbestos-induced personal injury and wrongful death.[10]

31. Initially, Old CertainTeed was an insignificant defendant in these tort actions.[11] During the 1990s, Old CertainTeed paid less than $10 million per year in indemnity costs to resolve mesothelioma claims. However, as the primary asbestos manufacturers, commonly known as the "Big Dusties," began to file for bankruptcy protection in the early 2000s, the number of claims filed against Old CertainTeed increased dramatically.[12]

32. Old CertainTeed's defense and indemnity spending increased, accordingly. Since 2002, Old CertainTeed spent on average more than $80 million per year in indemnity payments to resolve asbestos claims.[13] Old CertainTeed spent between approximately $20 million and $30 million per year to defend these lawsuits since 2001.[14]

33. In total, since 2002, Old CertainTeed has incurred approximately $2 billion of expenses defending and resolving over 300,000 personal injury lawsuits relating to alleged asbestos exposure. Of this, Old CertainTeed paid approximately $1.5 billion "out of pocket" as its asbestos-related insurance coverage became exhausted.[15] Thus, there is no existent, much less shared, insurance between the Debtor and any other entity. From 2002 to 2019, CertainTeed's annual indemnity costs (payments of settlements and judgments) and defense costs ranged from approximately $80 million to over $160 million.[16]

---

[10] Panaro Decl. ¶ 27.
[11] The typical asbestos complaint names many different producers of asbestos containing products as defendants.
[12] *See* Pl.'s Ex. 1 (historical DBMP Asbestos Claim counts from the DBMP's claims database); Starczewski Decl. ¶ 11.
[13] *See* Pl.'s Ex. 2 (summary of defense and indemnity payments made by Old CertainTeed annually from 2002 to 2019); Starczewski Decl. ¶ 12.
[14] Starczewski Decl. ¶ 17; *see also* Bates Decl. ¶ 17.
[15] Starczewski Decl. ¶ 10; *see* Pl.'s Ex. 2 (summarizing defense and indemnity payments made by Old CertainTeed annually from 2002 to 2019).
[16] Informational Brief of DBMP LLC, at 18, 3:20-bk-30080, ECF No. 22; Panaro Decl. ¶ 30.

34. For cases filed since 2012 and tried to verdict, defense costs, on average, exceeded $1 million per case.[17]

35. As of the Petition Date, almost 60,000 asbestos-related claims were pending against Old CertainTeed and/or the Debtor across the United States. Approximately 32,200 of these are on active dockets, with the remainder on "inactive" dockets.[18]

36. Absent this bankruptcy filing, it is likely that thousands of additional claims would be filed against DBMP, New CertainTeed, and the Other Affiliates for decades to come.[19]

**C. Project Horizon and the 2019 Corporate Restructuring**

37. Seeking a less expensive way of dealing with these tort liabilities, in 2019, Old CertainTeed engaged in a series of transactions (described herein and collectively referred to as the "Corporate Restructuring") which led to the Debtor's creation and its chapter 11 filing.[20]

38. Planning for the Corporate Restructuring began sometime prior to February 2018 and was conducted under the codename "Project Horizon."[21] Project Horizon was an attorney-created and implemented strategy "[t]o facilitate [Old CertainTeed's] ability to pursue a section 524(g) resolution" in bankruptcy "without subjecting the entire. . . enterprise to chapter 11."[22] The Corporate Restructuring in turn, contemplated, and directly led to the Debtor's chapter 11 filing.[23]

---

[17] Starczewski Decl. ¶ 15; *see also* Bates Decl. ¶ 13.
[18] *See* Pl.'s Ex. 3 (summarizing the unresolved DBMP Asbestos Claim counts); Starczewski Decl. ¶ 13.
[19] Starczewski Decl. ¶¶ 14, 18.
[20] *Id.* at ¶¶ 11, 19.
[21] DBMP 30(b)(6) Dep. 62:21-63:8, 156:18-157:3 (Starczewski), Dec. 15, 2020.
[22] Project Horizon has been attributed to the general counsel of SGC. The law firm of Goodwin Proctor, CertainTeed's current counsel, was brought in early to assist with the project. Rayfield Dep. 103:7-12, Oct. 7, 2020; Starczewski Dep. 72:16-74:22, Oct. 1, 2020.
[23] *See* CertainTeed 30(b)(6) Dep. 62:2-7 (Campbell), Dec. 18, 2020 (describing Project Horizon as a "legal-driven process"); Placidet Dep. 49:22-50:3, Oct. 14, 2020 ("Project Horizon is a confidential project which basically was led by the lawyers to try to find a fair and global solution to the asbestos liability that we have with CertainTeed.").

39. Project Horizon involved not only CertainTeed's upper management but also CertainTeed's ultimate parent company in North America, Saint-Gobain Corporation ("SGC").[24] As the Debtor's Rule 30(b)(6) witness put it, "Project Horizon was an analysis by the former CertainTeed Corporation, as well as its ultimate corporate parent, Saint-Gobain Corporation."[25]

40. By at least February 2018, Old CertainTeed and SGC had begun discussions regarding Project Horizon.[26] By early 2019, Project Horizon had developed into a plan to isolate Old CertainTeed's asbestos liabilities in a new company, with minimal assets, that would file for bankruptcy.[27]

41. Project Horizon was a closely guarded corporate secret. Before they could work on Project Horizon, CertainTeed employees were required to sign nondisclosure agreements.[28] The number of employees privy to Project Horizon was initially small but grew as Project Horizon took shape and required the involvement of additional personnel.[29] Even then, lower-echelon employees working on certain discrete parts of Project Horizon—such as "Project Sky"—were not informed of all facets of Project Horizon, such as the involvement of outside counsel, or that the Corporate Restructuring was being undertaken to address Old CertainTeed's asbestos liabilities.[30]

42. During 2019, Project Horizon team meetings began and increased in frequency as the year went on. As when these meetings began, several CertainTeed business

[24] DBMP 30(b)(6) Dep. 62:21-63:2 (Starczewski).
[25] *Id.*
[26] *See* DBMP 30(b)(6) Dep. 156:18-157:3 (Starczewski).
[27] *See* ACC-FCR Ex. 250.
[28] *See, e.g.,* ACC-FCR Ex. 66; ACC-FCR Ex. 139; see also Bondi Dep. 112:5-14, Oct. 9, 2020; CertainTeed 30(b)(6) Dep. 88:4-9 (Campbell).
[29] *See, e.g.,* ACC-FCR Ex. 66, at DBMP-BR_0150411; ACC-FCR Ex. 139; see also Bondi Dep. 112:15-22.
[30] CertainTeed 30(b)(6) Dep. 111:15-112:14 (Campbell).

managers learned for the first time about CertainTeed's experience in the tort system. The *Garlock* and *Bestwall* asbestos bankruptcies from this judicial district were among the topics of discussion.[31] There were discussions about how CertainTeed could end up paying less under a § 524(g) plan than it would if it continued paying asbestos claims as they arose in the tort system.[32]

43. At each of these meetings, at least one attorney was present, either in-house counsel or someone from Goodwin Proctor or Jones Day.[33] The close involvement of attorneys in Project Horizon prompted CertainTeed's own corporate representative to acknowledge that Project Horizon was driven not by businesspeople, but by lawyers.[34]

44. Old CertainTeed never entertained a bankruptcy filing for itself and all of its subsidiaries and affiliates (the "CertainTeed Enterprise"). This was a profitable going concern whose assets significantly outweighed its combined operating and asbestos liabilities. For such an enterprise, a bankruptcy filing would have serious negative consequences.

45. Stephen Coulombe, a managing director with BRG, prepared two expert reports on the corporate restructuring and testified at the Hearing as to these negative consequences. Coulombe opined that a hypothetical CertainTeed bankruptcy filing in October 2019, would have had five primary detrimental business effects: (a) adverse financial impact on Old CertainTeed's trade creditors/vendors; (b) potential significant loss of sales and Old CertainTeed's customer base; (c) likely key personnel losses; (d) events of default under various financing agreements; and (e) incremental costs that would result from a significantly more

[31] Kinisky Dep. 112:13-24, 113:19-25, 114:6-10, Oct. 5, 2020; Bondi Dep. 92:7-17, 93:7-18.
[32] CertainTeed 30(b)(6) Dep. 217:16-24 (Campbell).
[33] *See, e.g.*, DBMP 30(b)(6) Dep. 79:8-25 (Starczewski); Kinisky Dep. 130:7-23, 134:5-9; Bondi Dep. 64:20-25, 77:25-78:6, 116:19-117:9(The presence of attorneys at these meetings has become a basis for numerous privilege assertions and instructions not to answer at the depositions of CertainTeed personnel in this proceeding when the Representatives sought to inquire about Project Horizon); *See, e.g.*, Rayfield Dep. 54:4-56:2 (at least 57 instructions not to answer during a less-than-seven-hour deposition); DiNenna Dep. 65:11-19, 96:9-97:8, Sept. 24, 2020.
[34] CertainTeed 30(b)(6) Dep. 62:2-7 (Campbell) (describing Project Horizon as a "legal-driven process"); Placidet Dep. 49:22-50:3.

complex bankruptcy filing. Coulombe was assessing the situation retrospectively, after this case was filed. However, the landscape would have appeared the same to Old CertainTeed's management and directors.

46. Rather, than file Old CertainTeed or the CertainTeed Enterprise in bankruptcy, the Project Horizon plan was to isolate the asbestos liabilities in a single affiliated corporation and file it in chapter 11. That entity could then seek Section 524(g) injunctive relief shielding the CertainTeed Enterprise from Old CertainTeed's asbestos liabilities. This strategy had been previously employed in *Bestwall*, and it would thereafter be repeated in the *Aldridge* and *Murray* bankruptcy cases filed in this judicial district. In each of the four cases, the Debtor corporation was represented by the Jones Day law firm.

47. DBMP says the proposed corporate restructuring was simply an option, one intended to provide Old CertainTeed additional "flexibility" to address its asbestos-related claims, potentially by a chapter 11 filed by some part of the enterprise.[35] In fact, the Debtor says that it made the decision to file bankruptcy independently of its parent and affiliates, and that decision was not made until January 23, 2020, the night before the case was filed. This contention is discussed below in Section II(E) and is rejected.

48. Ultimately, Mark Rayfield, as Old CertainTeed's sole director, ultimately authorized the corporate restructuring, based on the information and advice he had received from the Project Horizon team.[36]

**D. Implementing the Corporate Restructuring**

49. Old CertainTeed took advantage of a corporate restructuring procedure under Texas law to put all of its asbestos liabilities into one company, DBMP, and virtually all of

---

[35] Panaro 1st day Decl. ¶ 15
[36] Rayfield Decl. ¶ 9.

its assets and all of its non-asbestos liabilities, into another, New CertainTeed.[37] The Debtor's own documents describe the procedure as the "[s]plitting of CertainTeed legal entity . . . (Carving out two locations to isolate Asbestos liability)."[38]

50. To this end, in July 2019, Old CertainTeed reserved the corporate name DBMP in North Carolina. On October 22, 2019, Old CertainTeed's direct parent, Saint-Gobain Delaware Corporation, formed CertainTeed Holding Corporation ("CT Holding") and contributed all the issued and outstanding stock of Old CertainTeed to CT Holding in exchange for full ownership of CT Holding.[39] That same day, Old CertainTeed converted from a Delaware corporation to a Delaware limited liability company.[40]

51. Millwork & Panel LLC ("Millwork & Panel") was also formed as a direct subsidiary of Old CertainTeed. Old CertainTeed contributed a North Carolina bank account containing approximately $30 million and two manufacturing plants from its exterior siding and trim business—one based in Georgia and the other in Claremont, North Carolina—to Millwork & Panel.[41] The siding and trim business had several plants located throughout the country, but it was the North Carolina plant that had been earmarked in the Project Horizon deliberations as early as April 2019.[42] This would establish venue for a chapter 11 filing in the Western District of North Carolina.[43]

[37] ACC-FCR Ex. 369 (Project Horizon: Splitting of CertainTeed legal entity CRT (Carving out two locations to isolate Asbestos liability)).
[38] *Id.*
[39] Panaro Decl. ¶ 16.
[40] *Id.*
[41] *Id.*
[42] ACC-FCR Ex. 138, at DBMP-BR_0150417; Bondi Dep. 40:2-21; 85:15-23; 91:10-92:6.
[43] DBMP 30(b)(6) Dep. 31:17-23 (Bondi), Dec. 22, 2020 ("Q. The selection of the Claremont [NC] plant to be contributed to Millwork & Panel, that was done in order to give DBMP the option of filing in North Carolina, filing chapter 11 in North Carolina, if it chose to do so. A. That's correct."). Claremont is in Catawba County, one of the 32 counties comprising the Western District. Presumably, the attraction to this judicial district stems from Judge Hodges' groundbreaking claims estimation decision in *Garlock* and the injunctive relief provided in *Bestwall*.

52. On October 23, 2019, at 9:00 a.m. Central Time, Old CertainTeed converted to a Texas limited liability company.[44] A half-hour later, Old CertainTeed effected a divisional merger under Chapter 10, Subchapter A of the Texas Business Organizations Code (the "TBOC"). Old CertainTeed split itself into two Texas limited liability companies: New CertainTeed and DBMP.[45] Old CertainTeed ceased to exist.

53. Under the Plan of Divisional Merger, New CertainTeed received approximately 97% of former CertainTeed's assets, most of Old CertainTeed's operations, and all of its employees. Only 3% of the Old CertainTeed assets were allocated to the Debtor.[46] Among these, the Debtor received approximately $25 million in cash, the equity interests in Millwork & Panel, Old CertainTeed's contracts related to asbestos litigation, and rights under a Funding Agreement, described below.[47] Apart from its Millwork & Panel subsidiary, the Debtor received no operating business or employees. DBMP was but a holding company.

54. Meanwhile, the Plan of Divisional Merger allocated all of Old CertainTeed's asbestos liabilities to the Debtor and, as described below, also purported to obligate DBMP to indemnify New CertainTeed and hold it harmless from and against "all losses" relating to those liabilities.[48]

---

[44] ACC-FCR Ex. 213, at DBMP-BR_0001808.
[45] ACC-FCR Ex. 214.
[46] *See* ACC-FCR Ex. 27, § 5(b)(ii) ("Plan of Divisional Merger"); Hr'g Tr. 155:16-156:5, Mar. 1, 2021 ("PI Hr'g Tr.").
[47] Panaro CT Holding ¶ 18. Apart from his "First Day" declaration, the Debtor's Chief Restructuring Officer—Robert Panaro also submitted a declaration in this Adversary Proceeding, which claims that estimates, as of December 31, 2020, reflect that the Debtor's value rose to an estimated $274 million. Declaration of Robert J. Panaro ¶ 21, ECF No. 238, p. 74. This value was calculated by adding "the Debtor's cash [to] the value of its ownership of Millwork & Panel," which was calculated by "multiplying Millwork & Panel's EBITDA (or projected EBITDA) for the year by eight." *Id.* Thus, this valuation is simply an aggregation of the Debtor's estimated assets. It does not take into account the Debtor's liabilities. So, absent the Funding Agreement the Debtor remains more than $300 million underwater even under its own estimate of asbestos liabilities.
[48] Plan of Divisional Merger §§ 5(c)(i), 9(b).

55. At 10:00 a.m. Central on October 23, 2019, New CertainTeed converted to a Delaware limited liability company.[49] At 12:49 p.m. Central that same day, DBMP converted to a North Carolina limited liability company.[50] In total, New CertainTeed and the Debtor were Texas entities for less than four hours.[51]

56. Thus, in a matter of hours and without notice to any of its asbestos creditors, Old CertainTeed separated virtually all of its business, assets, and employees from its asbestos liabilities, transferring those liabilities to DBMP. This enabled Old CertainTeed to reach its goal of placing its asbestos liabilities into bankruptcy without the entire enterprise filing for chapter 11.

57. While we do not here estimate Old CertainTeed's asbestos liability, it should be noted that on Old CertainTeed's publicly disclosed financial statements, its assets greatly exceeded its combined operating and asbestos liabilities.[52] Old CertainTeed had almost $3 billion in assets and less than half of that in all liabilities.[53] By contrast, and disregarding the Funding Agreement (described below), DBMP's assets were not then, and are not now, sufficient to satisfy its liabilities.[54]

[49] *See* PI Hr'g Tr. 155:3-156:14.
[50] ACC-FCR Ex. 218, at DBMP-BR_0003527; ACC-FCR Ex. 216, at DBMP-BR_0003330. There were other associated corporate restructuring steps. To avoid needless confusion, we mention only the most salient of these.
[51] *Compare* ACC-FCR Ex. 213, at DBMP-BR_0001808, *with* ACC-FCR Ex. 216, at DBMP-BR_0003330, *and* ACC-FCR Ex. 218, at DBMP-BR_0003527.
[52] ACC *See* PI Hr'g Tr. 155:3-156:14.
[53] *See* PI Hr'g Tr. 155:3-156:14; Diaz Expert Report at ¶ 17.
[54] *See id.* at 155:15-24.

58. Table 1 below depicts, in condensed form, the organizational structure before and after the Corporate Restructuring:




59. Undertaking such a Corporate Restructuring followed almost immediately by one of the two newly created entities filing bankruptcy is an unorthodox strategy.[55] Other than a few recently filed asbestos bankruptcies (of which four are presently pending in this District), we are unaware of any precedent or business reason for such a transaction.[56]

60. Since the completion of the Corporate Restructuring, New CertainTeed has continued to manufacture and sell the building products historically sold by Old CertainTeed.[57] New CertainTeed also continues to pay non-asbestos creditors in the ordinary course.[58]

---

[55] PI Hr'g Tr. 164:21-167:2, 182:12-183:3.
[56] *Id.* at 180:3-8.
[57] *See* Panaro Decl. ¶ 13.
[58] CertainTeed 30(b)(6) Dep. 126:2-9 (Placidet); Placidet Dep. 181:17-21; PI Hr'g Tr. 160:15-20.

61. DBMP and New CertainTeed have been frank about what transpired in the Corporate Restructuring and, to a certain extent, as to why these actions were undertaken.[59] Despite the apparent inequities, each steadfastly maintains that the 2019 Corporate Restructuring was designed to ensure that DBMP "has the same ability to fund the costs of defending and resolving present and future asbestos claims, both in the state and federal courts and in connection with any chapter 11 filing as [former CertainTeed]."[60] This assertion is premised upon several intercompany agreements which were inked in conjunction with the Corporate Restructuring.

**E. Intercompany Agreements**

62. In contemplation of the Divisional Merger, Old CertainTeed drafted and purported to make several agreements as between the yet to be formed DBMP and New CertainTeed, as well as other agreements between its prospective successors and certain of the Other Affiliates.[61] These agreements were dated "as of" October 23, 2019, the day of the Texas divisional merger. These agreements purport to establish the contractual relationships and obligations as between Old CertainTeed's two prospective successors and between them and the other members of the CertainTeed Enterprise.

63. These Agreements are not "arm's length" contracts. They were "negotiated" by Old CertainTeed and CertainTeed Holding Corp., for application to two companies that did not, at that moment, exist. The agreements were then revised and ratified by New CertainTeed, through signatories who held positions with both entities and/or their parent.

[59] As noted, the same officers and directors of Old CT, are the officers and directors of New CertainTeed. The Debtor has no employees of its own, but certain officers of SGC, New CertainTeed's US parent, work for the Debtor under the Secondment Agreements discussed below. Thus, the Debtors and New CertainTeed speak with one voice.
[60] Panaro Decl. ¶12, 15; Starczewski Decl. ¶ 20; Rayfield Decl. ¶¶ 10–11.
[61] To avoid confusion, we will use the names of the intended signatory companies when referencing these agreements.

For example, DBMP executed the Funding Agreement by signature of Joseph Bondi, an officer of both DBMP and New CertainTeed.[62] Given the insider relationships and conflicts of interest, the legal enforceability of these agreements vis a vis third parties is doubtful.[63]

64. The most pertinent of these agreements are as follows:

i. The Funding Agreement

65. The Funding Agreement is central to DBMP's assertion that it has the same ability as Old CertainTeed to pay the DBMP Asbestos Claims.[64] This is so because New CertainTeed has committed to give DBMP the necessary money, at the appropriate time.

66. More particularly, the Funding Agreement provides, *inter alia*, that current CertainTeed will transfer funds to the Debtor to pay any "Permitted Funding Use."[65] The term "Permitted Funding Use" includes (a) the costs of administering the Debtor's Chapter 11 Case, (b) amounts necessary to satisfy the Debtor's "Asbestos Related Liabilities" in connection with funding a § 524(g) trust, and (c) the Debtor's indemnification obligations to CertainTeed under any agreement provided for in the Plan of Divisional Merger.[66]

67. The Funding Agreement is not a loan. It imposes no repayment obligations on the Debtor.[67] Nor is it capped.

---

[62] Bondi Decl.; *See generally* Amended and Restated Funding Agreement; *See* Section II(E), below.
[63] *Schmoll v. AC and S, Inc.*, 703 F. Supp. 868, 874 (D. Or. 1988), aff'd, 977 F.2d 499 (9th Cir. 1992) (Court will disregard corporate transactions which, while meeting technical legal requirements, were designed with the improper purpose of escaping asbestos-related liabilities and would not have been undertaken in an arm's length transaction)
[64] *See, e.g.*, DBMP 30(b)(6) Dep. 165:12-17, 196:13-19, 199:15-18, 202:11-19 (Starczewski); Starczewski Dep. 226:17-227:5, 246:18-247:6, 264:13-265:5.
[65] Funding Agreement § 2.
[66] *Id.* at 5-6.
[67] Panaro Decl. ¶ 16; Rayfield Decl. ¶ 12.

68. However, the Funding Agreement is not an unconditional promise by New CertainTeed to pay the DBMP Asbestos Claims, either. First of all, CertainTeed is obligated to bankroll the chapter 11 administrative expenses and pay the Debtor's indemnification obligations only if the cash distributions from Millwork & Panel are insufficient to pay those expenses and obligations in full.[68] CertainTeed is obligated to fund a § 524(g) trust only if the Debtor's "other assets are insufficient to fund amounts necessary or appropriate to satisfy . . . Asbestos Related Liabilities in connection with the funding of such trust."[69] The Funding Agreement is a backstop. Arguably, DBMP would have to spend all of its distributions before it can pay administrative expenses and would have to liquidate before it could secure funding for a plan.

69. Second, the funding commitment is made by New CertainTeed to DBMP, and not to the asbestos claimants. Only DBMP can enforce the agreement. One wonders how DBMP could ever do so unless New CertainTeed wanted the Funding Agreement enforced. Apart from being sister corporations, DBMP has no employees of its own. As discussed below, its employees are borrowed from SGC, the parent company of both DBMP and New CertainTeed. Thus, the people who would have to enforce the agreement on behalf of DBMP against New CertainTeed are officers and employees of SGC, the corporate parent of both companies.

70. Moreover, the Funding Agreement limits CertainTeed's funding obligations to costs and expenses that are "necessary or appropriate"[70] but fails to specify the types of items that qualify. This creates uncertainty as to whether a particular funding request would be granted or denied. There is no dispute resolution mechanism if a funding request by the Debtor is denied.[71]

---

[68] *Id.* at 6.
[69] *Id.*
[70] Funding Agreement at 5 (definition of "Permitted Funding Use").
[71] *See generally* Funding Agreement.

71. Further, the Funding Agreement may only be assigned with consent of the counterparty.[72] Therefore, in this case arguably the Funding Agreement could not be assigned to a trust under a creditor Plan and that Plan could not be funded—unless New CertainTeed favors that Plan.

72. And as a condition of funding any Plan by which asbestos claimants might be paid, New CertainTeed must receive relief under Section 524(g). Whether New CertainTeed is entitled to such relief is an open question.[73]

73. In short, in order for DBMP to be able to fund a plan in this case, both asbestos claimants (by a 75% vote) and this Court must agree to New CertainTeed receiving the benefits of a Section 524(g) injunction. Otherwise, DBMP has no ability to pay the asbestos claimants.

74. In sum, while the Funding Agreement may provide funding for a plan, it will do so only if New CertainTeed favors that Plan. And that favor is dependent on New CertainTeed receiving permanent injunctive relief from the DBMP Asbestos Claims—whether it is entitled to it or not.

75. DBMP's ability to obtain funding under the Funding Agreement is also dependent on New CertainTeed's continued viability. While New CertainTeed is a prosperous corporation, these obligations are not secured by New CertainTeed's assets. They are not guaranteed by any of the Saint-Gobain parent companies or other Protected Parties.[74] And nothing

[72] PI Hr'g Tr. at 157:21-162:4.
[73] The Representatives argue that New CertainTeed does not fall within the enumerated categories of Section 524(g)(4)(a)(ii) and is therefore ineligible for injunctive relief.
[74] *See, e.g.*, CertainTeed 30(b)(6) Dep. 213:24-214:16 (Campbell); Starczewski Dep. 236:24-237:15; PI Hr'g Tr. 3/1/21 158:13-159:1.

in the Funding Agreement prevents New CertainTeed from adding debt that would be senior in priority to its obligations in the Funding Agreement.[75]

76. Similarly, there is no limit on New CertainTeed's ability to forgive material obligations owed to it by SGC, Saint-Gobain Finance Corporation ("SG Finance"), and other affiliates.[76] The Funding Agreement also allows New CertainTeed to engage in consolidations and mergers, and to transfer "all or substantially all" of its assets.[77] Nothing in the Funding Agreement purports to limit or bar New CertainTeed's ability to pay dividends to its parent company, CT Holding.[78]

77. In sum, the Funding Agreement is not an unconditional promise to pay the DBMP Asbestos Liabilities. It is instead a conditional agreement which is dependent on New CertainTeed's approval of any reorganization plan and upon New CertainTeed's continued good financial health.

ii. <u>The Support Agreement</u>

78. The Support Agreement is between the Debtor and New CertainTeed.[79] It, too, was drawn and executed by the two companies' predecessor(s) and then assigned and ratified by DBMP and New CertainTeed.[80] Among other things, the Support Agreement requires the Debtor to indemnify New CertainTeed and hold it harmless from and against all asbestos-related "Losses" and "Proceedings" to which New CertainTeed "may become subject."[81] Incongruously,

---

[75] *See generally* Funding Agreement; *see* PI Hr'g Tr. 159:12-14.
[76] *See generally* Funding Agreement; PI Hr'g Tr. 159:9-10.
[77] If "all or substantially all" of CertainTeed's assets are transferred, the Funding Agreement contemplates that the transferee will assume CertainTeed's obligations thereunder. *Id*. When questioned on this clause in deposition, at least one witness could not quantify the proportion of CertainTeed assets—whether it be 50% of the assets, 80%, or 99%—that would constitute "substantially all" of its property. *See* Bondi Dep. 222:13-20, 224:4-230:18.
[78] *See generally* Funding Agreement; PI Hr'g Tr. 159:8-9; DBMP 30(b)(6) Dep. 189:15-21 (Starczewski).
[79] *See* ACC-FCR Ex. 33, Am. and Restated Divisional Merger Support Agreement ("Support Agreement").
[80] *Id.*
[81] *Id.* ¶ 3.

DBMP the entity which received few of Old CertainTeed's assets but all of its asbestos liabilities is charged with protecting the sister company which inherited almost all of Old CertainTeed's assets, its operations[82] and its employees, from Old CertainTeed's asbestos liabilities.

79. Adding to the irony, if the cash distributions from Millwork & Panel are insufficient to allow the Debtor to pay its indemnification obligations to New CertainTeed under the Support Agreement, the Funding Agreement provides that New CertainTeed will provide the funds to the Debtor so that the Debtor, in turn, may indemnify New CertainTeed.[83]

80. The Support Agreement's indemnity provision, when coupled with the Funding Agreement, creates a potential circular transfer of funds between the Debtor and New CertainTeed. If the Debtor's cash flow is insufficient, New CertainTeed is required to provide DBMP with the funds that DBMP would then use to pay any indemnity it allegedly owes to New CertainTeed, on the effective date of a confirmed chapter 11 plan.

81. Thus, the Support Agreement is an unorthodox transaction with no apparent business purpose apart from aiding this bankruptcy case and securing injunctive relief for the Protected Parties.

iii. The Secondment Agreement

82. Intending that DBMP would have no employees of its own, Old CertainTeed drew a Secondment Agreement for DBMP with SGC, whereby five individuals would be loaned to the Debtor to work as employees.[84]

---

[82] The Support Agreement also specifies that the Debtor and New CertainTeed are each a "disregarded entity for U.S. federal income tax purposes" and that "the Divisional Merger will be disregarded" for federal tax purposes. Under the agreement, New CertainTeed retained the federal employer identification number (EIN) of Old CertainTeed. The Debtor, however, is required to obtain "a new EIN, if and when it is required by Law."
[83] Funding Agreement at 6 (clause (e) in definition of "Permitted Funding Use"); DBMP 30(b)(6) Dep. 202:5-10 (Starczewski).
[84] ACC-FCR Ex. 31 ("Secondment Agreement").

83. That DBMP was created with no employees and no operations reflects its single purpose: the Debtor was a vessel designed to ferry Old CertainTeed's asbestos liabilities into bankruptcy. This lack of employees appears intended to set up the argument in a then contemplated, now existing, bankruptcy case that a preliminary injunction is necessary to avoid overwhelming the Debtor's employees.

iv. <u>The Millwork & Panel Agreements</u>

84. Through Old CertainTeed, DBMP also entered into a Contribution Agreement, a Sales and Marketing Agreement, an IP License Agreement, and a Secondment Agreement with Millwork & Panel.

85. Under the Secondment Agreement, all of Old (now New) CertainTeed's employees working at the North Carolina and Georgia plants that were transferred to Millwork & Panel have been seconded to Millwork & Panel.[85] Post-merger, New CertainTeed is Millwork & Panel's only customer.[86] The prices by which Millwork & Panel provides its goods to New CertainTeed (for subsequent resale to CertainTeed customers) are fixed under the Sales and Marketing Agreement. Effectively, Millwork & Panel is another entity established by Old CertainTeed for the purposes of this bankruptcy case. While theoretically the Debtor's subsidiary, Millwork & Panel, is dependent on New CertainTeed.

**E. Post Corporate Restructuring, Pre-Bankruptcy.**

86. With no employees or operations, DBMP's activities have been limited to managing its asbestos liabilities and overseeing its equity interest in Millwork & Panel.

[85] DBMP 30(b)(6) Dep. 33:19-23 (Bondi).
[86] *Id*. at 34:8-10; Bondi Dep. 38:2-8.

87. As to corporate governance, DBMP's Board of Managers (the "DBMP Board" or the "Board") is comprised of Joseph Bondi, Sean Knapp, and Lawrence Rayburn. Bondi and Knapp are employees of SGC, the parent company of both New CertainTeed and the Debtor. Rayburn is not employed by SGC or any other affiliate of the Debtor.[87]

88. Bondi serves as DBMP's and Millwork & Panel's president, as well as a Vice President of New CertainTeed.[88] Knapp is Chief Financial Officer and Vice President of the Debtor, as well as Millwork & Panel.[89] Vincent DiNenna III is DBMP's Treasurer as well as Assistant Treasurer of SGC and New CertainTeed.[90] Donald J. Melroy is Assistant Treasurer of DBMP, of SGC and of New CertainTeed.[91] Robert J. Panaro is DBMP's Chief Restructuring Officer and Vice President as well as Senior Vice President and Chief Operating Officer of SGC.[92] Michael Starczewski is DBMP's Vice President, Secretary, and Chief Legal Officer.[93]

89. DBMP was initially staffed by five seconded SGC employees. These individuals were Starczewski, the Debtor's Chief Legal Officer, and four others.[94] These five individuals essentially comprised an in-house legal team for the Debtor.

90. Since the Petition Date, two of these individuals have left SGC and no longer work for the Debtor.[95] Only one, Starczewski, is a full-time employee. The other two individuals are an attorney and an administrative assistant who devote one-third of their time or less to the Debtor.[96]

---

[87] Starczewski Decl. ¶ 25; *see also* Bondi Decl. ¶¶ 7, 8.
[88] Bondi Dep. 32:10-14.
[89] Knapp Dep. 20:18-21:5.
[90] DiNenna Dep. 22:19-25.
[91] Melroy Dep. 12:23-25, 20:2-10, Oct. 8, 2020.
[92] Panaro Dep. 40:9-21, 43:7-22, Oct. 6, 2020.
[93] Starczewski Decl. ¶ 25; Bondi Decl. ¶¶ 8, 9.
[94] Bondi Decl. ¶ 10.
[95] DBMP 30(b)(6) Dep. 108:2-5, 113:11-16 (Starczewski); ACC-FCR Ex. 188 (Letter from Jeffrey B. Ellman to Kevin C. Maclay, at 3 (June 9, 2020)) ("Ellman Letter").
[96] ACC-FCR Ex. 188, Ellman Letter, at 2-3.

i. DBMP's Board of Managers Meets and Considers Options to Address Asbestos Liabilities

91. On January 23, 2020 (or 91 days after its creation), the Debtor filed chapter 11 in this bankruptcy court.

92. In that short period, the DBMP Board met six times.[97] DBMP insists that the decision to file bankruptcy was made only at the last of these meetings, the one on January 22, 2020.[98] Thus, according to the Debtor, its decision to file was reached the night before the bankruptcy petition was in fact filed.[99]

93. DBMP suggests that during this three month period, DBMP's Board members "… familiarized themselves with their duties and responsibilities, received information concerning the financial performance and condition of DBMP and its operating subsidiary, Millwork & Panel, and assessed the historical and current efforts and challenges involved in, and the financial and other burdens associated with, the defense of the DBMP Asbestos Claims."[100] DBMP suggests that with input from legal counsel who attended these meetings, its Board thoroughly considered its options, and over a period of time came to the conclusion that a bankruptcy filing was its (and the asbestos claimants) best course of action.[101]

94. DBMP's statements tie in to two other Debtor contentions: first, that the Corporate Restructuring was intended only to provide the Debtor with "flexibility" in dealing with its asbestos liabilities and that a bankruptcy filing by DBMP was simply one of those options. Second, that the DBMP Board made the decision to enter bankruptcy independently of Old CertainTeed or New CertainTeed. Both suggestions are contrary to the evidence and are rejected.

[97] Starczewski Decl. ¶¶ 26-32.
[98] Starczewski Decl. ¶ 32.
[99] *See* Pl.'s Ex. 36; Starczewski Decl. ¶¶ 26-33.
[100] Bondi Decl. ¶ 12.
[101] *See, e.g.,* Starczewski Decl. ¶¶ 26-32; Pl.'s Exs. 29-30, 32-35 (Board minutes).

95. The first problem with these assertions is that they are largely untested. Even as the DBMP and New CertainTeed officer and director witnesses offered selective testimony in their depositions about the Corporate Restructuring and the decision to file bankruptcy, the Debtor and New CertainTeed interposed attorney client and work product privilege assertions to block a fulsome inquiry by the Representatives about these matters.

96. Shortly before the Hearing, the Representatives filed motions to compel and sought emergency hearings seeking to obtain this information. Due to the limited time period between the depositions in which these privilege assertions were made and the Hearing, a full-blown motion to compel hearing was untenable. Literally thousands of documents were at issue and hundreds of privilege objections had been asserted. Given this, the Representatives found it necessary to abandon their motion to compel in favor of seeking to exclude the proffered witness testimony at hearing, on the assertion that the privileges were being improperly employed by the Debtor and New CertainTeed as both 'shield and sword.'

97. Many of these matters appear in fact privileged and the assertions were proper, but for the fact that DBMP and New CertainTeed's corporate representatives proceeded to testify about the same topics—to the extent that they found it advantageous.

98. Obviously, DBMP and new CertainTeed cannot have it both ways. The attorney client and work product privileges may not be used as both shield and sword.[102] Thus, a waiver might have been found. However, here we have the unusual circumstance where this testimony was submitted, not in open court through live testimony where objections could be made and ruled upon as presented, but instead in a virtual proceeding through a hodgepodge of declarations, deposition transcripts, and written discovery responses. And there is a timing aspect

[102] *See generally Tackett v. State Farm Fire & Cas. Ins. Co.*, 653 A.2d 254, 259 (Del. 1995); *Alaska Elec. Pension Fund v. Brown*, 988 A.2d 412, 419 (Del. 2010).

to this: these two Motions are time sensitive matters whose resolution had already been greatly delayed.

99. Instead of further delaying matters to reopen discovery, potentially compel testimony, and reopen the evidentiary record to introduce the same, we will instead disregard the self-serving witness testimony proffered by the DBMP and New CertainTeed witnesses as to these matters, to the extent it is inconsistent with other available evidence as to what these corporations did, and the inferences that flow from their actions.

100. As to that evidence, by early 2018 Old CertainTeed had learned of the *Bestwall* case and was investigating whether it too could place its asbestos liabilities in a new company that would file for bankruptcy. By June 5, 2019, Old CertainTeed began preparations for such a bankruptcy filing when the Jones Day bankruptcy team was brought in.[103]

101. What DBMP did in the Corporate Restructuring, the Divisional Merger, and then the follow-on bankruptcy filing of DBMP closely paralleled the three other asbestos bankruptcy cases filed by the Jones Day law firm in this judicial district—*Bestwall*, *Aldrich* and *Murray*. In each case, a successful corporate enterprise with substantial asbestos liabilities briefly reincorporated in Texas and then divided itself in two under the Texas Divisional Merger statutes. This led to two companies, one with limited assets and all of the old company's asbestos liabilities, the other with most of the enterprise assets, employees, and operations. The stated purpose of these actions for each corporation was to permit the asbestos bearing successor company the "option" to file bankruptcy. In short order each of these companies did in fact file bankruptcy, and immediately sought to provide injunctive relief and the benefits of Section 524(g) to its non-filing sibling. In each case, under a Funding Agreement, the healthy twin agrees to fund a plan,

[103] *See* ACC-FCR Ex. 226.

conditioned on it receiving Section 524(g) relief.

102. While both Old CertainTeed and DBMP have said that bankruptcy was but one of several options, that strains credibility. In the first place, it is most unlikely that a large corporate concern such as Old CertainTeed would undertake the considerable expense and disruptions of the Corporate Restructuring unless it intended that DBMP file the bankruptcy that the Corporate Restructuring was intended to facilitate.

103. As to entertaining other options, during the Debtor's Board meeting held on December 20, 2019, Starczewski as Chief Legal Officer presented the company's three alternatives. The first, continuing to defend DBMP Asbestos Claims in the tort system, was not really an option. That was the status quo. The only options were whether to (a) seek a transfer of the DBMP Asbestos Claims liability to a third party; or (b) file a chapter 11 case in anticipation of treating the asbestos liabilities under a Section 524(g) trust.[104]

104. On the evidence available to us, it does not appear that anyone seriously considered a transfer of liabilities to a third party. If this was an option, Old CertainTeed could have employed it in lieu of the Corporate Restructuring. This would have been much less disruptive than the Corporate Restructuring. Further, by virtue of the Texas Divisional Merger, Old CertainTeed had already isolated its asbestos liabilities in a separate corporation, DBMP. There would be no reason to further separate those asbestos liabilities from the CertainTeed Enterprise by transferring them to a third company.

105. This leaves bankruptcy as the only viable option. At his deposition, Lawrence Rayburn, a member of the Debtor's board of managers, testified that apart from CertainTeed remaining in the tort system, he could not recall any option on the table other than a

[104] *See, e.g.,* Starczewski Decl. ¶¶ 26-32; Pl.'s Exs. 29-30, 32-35 (Board minutes).

bankruptcy filing.[105] Doubtless, this is the truth of the matter.

106. So, while technically, the DBMP Board approved the formal resolution authorizing a bankruptcy filing by this company only on January 22, 2020, the decision that this newly formed corporation would file chapter 11 was made before the Corporate Restructuring and before the Debtor existed.[106]

ii. Post-Merger New CertainTeed.

107. After the Merger and through the present time, New CertainTeed, has continued almost all of Old CertainTeed's business producing the same products, using the same executive management team, and operating out of the same facilities as Old CertainTeed. Project Horizon has had no net effect on New CertainTeed's business.[107]

108. To this point, New CertainTeed has performed under the Funding Agreement. As of February 18, 2021, DBMP has made requests for funding—mostly the administrative costs of DBMP's bankruptcy case—in the aggregate amount of $64.5 million; all such requests have been funded by New CertainTeed.[108]

109. New CertainTeed has also stated its commitment to comply with its future contractual obligations under the Funding Agreement, including meeting DBMP's contractually authorized funding requests to provide funding for a section 524(g) trust as established under a confirmed plan of reorganization in the Chapter 11 Case.[109] To the extent that this happens, New CertainTeed has the financial ability to satisfy these obligations as evidenced by New CertainTeed's considerable owners' equity and profitable operations.

[105] Rayburn Dep. 135:11-136:5, Sept. 28, 2020.
[106] Old CertainTeed had begun preparations for this bankruptcy by at least June 5, 2019, when the Jones Day bankruptcy team was brought in. *See* ACC-FCR Ex. 226.
[107] Rayfield Dep. 81:8-25; ACC-FCR Ex. 250.
[108] Rayfield Decl. ¶ 13.
[109] *Id.* at 13, 14.

iii. Post-Merger Suits Against New CertainTeed and Others

110. Following the 2019 Corporate Restructuring, individual asbestos claimants began (a) naming New CertainTeed and/or other non-debtor Other Affiliates of the Debtor as defendants in newly filed DBMP Asbestos Claims or (b) adding or seeking to add New CertainTeed as a defendant in previously filed DBMP Asbestos Claims.[110] More than 170 complaints or amended complaints asserting DBMP Asbestos Claims against New CertainTeed and/or other non-debtor affiliates of the Debtor during the roughly three-month period between the 2019 Corporate Restructuring and the January 23, 2020 bankruptcy filing.[111]

111. Another 40 complaints or amended complaints were filed against New CertainTeed and Other Affiliates of the Debtor after the Petition Date.[112]

112. At least one such complaint pleads an alter ego theory of recovery against New CertainTeed. Others seek to recover DBMP Asbestos Claims against New CertainTeed by alleging that the 2019 Corporate Restructuring is a fraudulent conveyance.[113]

113. The number of DBMP Asbestos Claims already initiated against New CertainTeed and other Protected Parties after the 2019 Corporate Restructuring confirms that absent injunctive relief, the asbestos-related litigation in the tort system would recommence and continue as before the chapter 11 filing.[114]

114. Indeed, the stated reason for the Representatives' opposition to the injunctive relief sought here is to enable asbestos claimants to recommence suing New CertainTeed and potentially the Other Affiliates and Distributors for DBMP Asbestos Claims.[115]

---

[110] Starczewski Decl. ¶ 38.
[111] *Id.* at 39.
[112] *See* Pl.'s Ex. 4 (compilation of exhibits); Pl.'s Ex. 5 (copies of complaints filed by members of the ACC against Old CertainTeed or DBMP and other defendants); *see also* Starczewski Decl. ¶ 39.
[113] Starczewski Decl. ¶ 40.
[114] *Id.* at ¶ 46.
[115] *See generally* ACC Objection; FCR Objection.

## III. CONCLUSIONS OF LAW

### A. Jurisdiction and Venue

115. Although the Representatives argue otherwise, this Court has subject matter jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §1334.

116. More specifically, a bankruptcy court has "jurisdiction of all civil proceedings arising under title 11 or arising in or related to cases under title 11," 28 U.S.C. § 1334(b). All three statutory bases pertain and provide subject matter jurisdiction to enjoin third-party litigation under the circumstances presented.

117. First, "arising under" jurisdiction exists. A proceeding "aris[es] under" the Bankruptcy Code if it "invokes a substantive right created by the Bankruptcy Code."[116] The Debtor's request for declaratory relief aims to confirm the scope of the automatic stay, "a substantive right created by [section 362 of] the Bankruptcy Code."[117]

118. "Arising under" jurisdiction also exists in that the Debtor is seeking a section 105(a) injunction in aid of the automatic stay (to the extent it does not apply by its own force). Under the Texas Divisional Merger Statutes and the merger documents, all of the Old CertainTeed asbestos claims were exclusively allocated to the Debtor. As discussed below, that merger and the liability allocations themselves are subject to potential legal challenge. However, at the moment, these asbestos claims are exclusively "claims against the debtor and therefore impair the automatic stay."[118]

---

[116] *FPSDA II, LLC v. Larin (In re FPSDA I, LLC)*, No. 10-75439, Adv. No. 12-08032, 2012 WL 6681794, at *4 (Bankr. E.D.N.Y. Dec. 21, 2012), *as corrected* (Dec. 26, 2012).
[117] *See A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 999-1000 (4th Cir. 1986); *In re Brier Creek Corporate Ctr. Assocs. Ltd.*, 486 B.R. 681, 685 (Bankr. E.D.N.C. 2013).
[118] *Chase Manhattan Bank (N.A.) v. Third Eighty-Ninth Assocs. (In re Thirty Eighty-Ninth Assocs.)*, 138 B.R. 144, 147 (S.D.N.Y. 1992).

119. Second, as we discuss below in Section III(D), while the merger and the allocations between DBMP and New CertainTeed may be challenged as fraudulent transfers[119] or under remedial doctrines like alter ego and successor liability, with DBMP in bankruptcy, the challenge may not be made by individual creditors. The applicable remedial causes of action are estate property under Code Section 541 or else fraudulent transfer claims under Sections 544 and 548 that must be asserted by the bankruptcy trustee for the benefit of all creditors, under the Fourth Circuit's "first crack" theory. Under 28 U.S.C. 1334(e)(1), this Court has exclusive jurisdiction over all property of the debtor as of the commencement of the case, and over all estate property.

120. Finally, there is a close nexus between the injunction sought by DBMP and the substantive rights created by the automatic stay. "[C]ommon sense indicates that, if the Court has subject matter jurisdiction over a proceeding to determine the applicability of the automatic stay" as it does here, "then it has jurisdiction over a related motion for preliminary injunctive relief" in the same proceeding.[120]

121. "Arising in" jurisdiction also exists. The Debtor's request for injunctive relief under section 105(a) is unique to bankruptcy. A proceeding "arises in" a bankruptcy case when it "would have no existence outside of the bankruptcy."[121] A claim for such an injunction, tied to and lasting only during a bankruptcy case, meets this standard. "The debtor[] would not be entitled to a § 105 injunction but for the existence of [its] bankruptcy case[]."[122]

---

[119] The Corporate Restructuring occurred through a series of transactions that occurred within hours and, in some cases, within days of one another. However, "[c]ourts have 'collapsed' a series of transactions into one transaction when it appears that despite the formal structure erected and the labels attached, the segments, in reality, comprise a single integrated scheme when evaluated focusing on the knowledge and intent of the parties involved in the transaction." *In re Abell*, 549 B.R. 631, 660 (Bankr. D. Md. 2016) (alteration in original) (quoting *In re Sunbeam*, 284 B.R. 355, 370 (Bankr. S.D.N.Y. 2002)).
[120] *FPSDA I, LLC*, 2012 WL 6681794, at *5 (quoted in *Brier Creek*, 486 B.R. at 685).
[121] *Bergstrom v. Dalkon Shield Claimants Tr. (In re A.H. Robins Co., Inc.)*, 86 F.3d 364, 372 (4th Cir. 1996); accord *Grausz v. Englander*, 321 F.3d 467, 471 (4th Cir. 2003).
[122] *Brier Creek*, 486 B.R. at 685.

122. Third, and "at a minimum, [this court has] 'related to' jurisdiction" over these disputes.[123] "Related to" jurisdiction over third-party claims lies when "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy."[124]

123. As we discuss below in Section III(C), litigation of the DBMP Asbestos Claims against the Protected Parties outside of this case could "conceivably have [an] effect" on the Debtor's estate and reorganization.

124. The FCR also argues that this Court lacks jurisdiction over this action because the underlying DBMP Asbestos Claims against New CertainTeed are "direct" claims—meaning they assert asbestos claims against non-debtors that exist outside of bankruptcy. However, by virtue of the Texas Merger statutes and merger documents, those asbestos claims are, at least for now, exclusively the Debtor's obligations.[125] Liquidating those claims elsewhere even as the Debtor seeks to resolve them in this bankruptcy case, undoubtedly "affects" this estate, to say nothing of potentially creating claims of indemnity as against DBMP and possibly binding it under preclusion doctrines.

125. Further, and as we discuss below in Section III(C) and (D), the apparent deleterious effects of the Corporate Restructuring and Divisional Merger would affect all asbestos claimants. Post-merger, the only way that these tort claims themselves might be asserted against third parties like New CertainTeed would be through remedial equitable doctrines like alter ego and successor liability, or by attacking them as fraudulent transfers.

---

[123] *Id.* at 686.
[124] *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984); *see Robins*, 788 F.2d at 1002, 1002 n.11.
[125] Again, nominally, but subject to challenge of the merger itself.

126. Again, the aforementioned equitable remedy claims by which the asbestos claimants would hold the Protected Parties liable are themselves estate property. And due to the pendency of this bankruptcy case, any fraudulent transfer claims must in the first instance be pursued by the bankruptcy trustee. Permitting an individual creditor to assert such general claims for its individual benefit would clearly, and adversely, affect the bankruptcy estate.

127. Even if those claims were personal to individual asbestos claimants, "[i]n the asbestos context,…this standard [for "related to" jurisdiction] applies whether any claims against a third party are alleged to be 'direct' or 'derivative.'"[126] "An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankruptcy estate."[127] A proceeding "need not necessarily be against the debtor or against the debtor's property" to confer jurisdiction.[128] Third-party litigation involving these claims could at least "conceivably" and adversely affect the Debtor's estate, so even if individual, the litigation is still "related to."[129]

128. The Representatives argue that but for the Corporate Restructuring, there would be no Debtor, no allocation of asbestos liabilities, no indemnification obligations, no Secondment Agreement or even a need to centralize asbestos claims in one forum. Reciting the well-known legal maxim that "no action by the parties can confer subject-matter jurisdiction on a federal court," the Representatives suggest subject matter jurisdiction does not lie in this case.[130]

---

[126] *Bestwall*, 606 B.R. at 249.
[127] *Robins*, 788 F.2d at 994.
[128] *Pacor*, 743 F.2d at 994.
[129] *See, e.g.*, Bestwall, 606 B.R. at 249-51.
[130] ACC Obj., 19; *see also* FCR Obj., 21-22.

129. Of course, parties cannot, *on their own*, *create (or waive)* subject matter jurisdiction *by consent* — a federal court either has it, or it does not.[131] Here, however, it was the Debtor's bankruptcy filing, not the prepetition merger or agreements between DBMP and New CertainTeed that create federal jurisdiction over the Chapter 11 Case and estate property.[132]

130. The Representatives' related arguments based upon 28 U.S.C. § 1359 also fail. Section 1359 bars jurisdiction "of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court." It generally prohibits parties from manufacturing jurisdiction to channel ordinary business litigation into the federal courts.[133]

131. Section 1359 has been used almost exclusively to prevent gaming of federal courts' diversity jurisdiction.[134] This bankruptcy proceeding of course, is not a diversity action.

132. In fact, Section 1359 may not even apply in bankruptcy.[135] If it does, Section 1359 would not apply here as no one has been "made or joined" as a "party" "to invoke" this Court's jurisdiction. The Debtor, as plaintiff, is a party because it filed this adversary proceeding in its bankruptcy case. The Defendants are parties because according to the Debtor, they could potentially assert the DBMP Asbestos Claims in derogation of the estate.

133. Similarly, jurisdiction over this adversary proceeding is not based upon an assignment to, or a joinder of, the Defendants (or even the Debtor) as parties to the action— the

---

[131] *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).
[132] *See* 28 U.S.C. § 1334(b).
[133] *See* Kramer v. Caribbean Mills, Inc., 394 U.S. 823, 828-29 (1969).
[134] *See, e.g.*, *Bishop v. Hendricks*, 495 F.2d 289, 292-93 (4th Cir. 1974); *Long & Foster Real Estate, Inc. v. NRT Mid-Atl., Inc.*, 357 F. Supp. 2d 911, 921 (E.D. Va. 2005).
[135] No case has been identified from or within the Fourth Circuit that has ever applied section 1359 to bankruptcy proceedings. *See Longview Power, LLC v. First Am. Title Ins. Co. (In re Longview Power, LLC)*, 516 B.R. 282, 293 (Bankr. D. Del. 2014) (application of section 1359 to bankruptcy proceedings is not clear).

focus of section 1359. Again, "arising in" and "arising under" jurisdiction exist simply because DBMP is a Debtor in bankruptcy. At a minimum, "related to" jurisdiction exists because any DBMP Asbestos Claim that a Defendant might bring against the Protected Parties could conceivably have an effect on the Bankruptcy Estate.

134. Finally, several Courts have found that they have subject matter jurisdiction to consider and determine the merits of a preliminary injunction against third-party claims in an asbestos bankruptcy.[136] This Court declines to deviate from this precedent.

135. Venue is proper under 28 U.S.C. § 1409. These matters present "core proceedings," or at a minimum, "related to" proceedings under 28 U.S.C. § 157(b).

**B. The 2019 Corporate Restructuring Was Not Preempted by Section 524(g).**

136. The undersigned agrees with Judge Beyer in *Bestwall* that a divisional merger under the Texas law is not preempted by Section 524(g).[137] The Texas statutes and Section 524(g) serve different purposes.

137. There is a "strong presumption against inferring Congressional preemption" of state law.[138] And "[t]his presumption is strongest when Congress legislates in a field which the States have traditionally occupied"—such as the field of corporate organization relevant to the Texas provisions.[139]

138. Here, the ACC argues only for implied preemption, which can occur either through conflict or field preemption. "Conflict preemption" occurs "when compliance with both federal and state regulations is a physical impossibility, or when state law stands as an

[136] *See, e.g., Bestwall*, 606 B.R. at 249; *In re Specialty Prods. Holding Corp.*, No. 10-11780, Adv. Pro. No. 10-51085, at 2 [Adv. Pro. Dkt. 72] (Bankr. D. Del. Oct. 13, 2010); *In re W.R. Grace & Co.*, 386 B.R. at 28-30; *see also In re Garlock Sealing Techs. LLC*, No. 10-31607, Adv. Pro. No. 10-03145, at 2 [Adv. Pro. Dkt. 14] (Bankr. W.D.N.C. June 21, 2010).
[137] *See Bestwall*, 606 B.R. at 251.
[138] *Integrated Sols., Inc. v. Serv. Support Specialties, Inc.,* 124 F.3d 487, 493 (3d Cir. 1997).
[139] *S. Blasting Servs., Inc. v. Wilkes Cty., N.C.,* 288 F.3d 584, 590 (4th Cir. 2002).

obstacle to the accomplishment and execution of the full purposes and objectives of Congress."[140] There is no conflict preemption here, because, as *Bestwall* noted, the Texas divisional merger provisions and section 524(g) "concern completely different subjects and work readily in tandem."[141] There also is no conflict apparent in the "[s]tatutory text and structure" of the provisions, which are "the most reliable guideposts in th[e] [preemption] inquiry."[142]

139. The ACC argues that the Texas divisional merger provisions, "as applied" to the 2019 Corporate Restructuring, create an obstacle to the purpose of section 524(g) because the Texas provisions (a) allow asbestos liabilities to vest in one entity created through a divisional merger, and not the other, (b) without the "procedural and due process protections" of section 524(g) of the Bankruptcy Code, and (c) without requiring the dividing company to file for bankruptcy.[143] This argument confuses both the nature and effects of the divisional merger as well as the purposes of section 524(g).

140. The section 524(g) procedural measures upon which the ACC relies are required under that section for the discharge of claims and demands and the channeling of all current and future claims to a trust. All of the procedural and substantive protections afforded under section 524(g) remain in place.

141. Meanwhile, the 2019 Corporate Restructuring did not finally resolve any of Old CertainTeed's asbestos liabilities; it only allocated, as between DBMP and New CertainTeed, which entity was to bear those liabilities. As we discuss below, the Divisional Merger statutes implicitly presume that the new corporation to which those liabilities are allocated

[140] *Id.*
[141] *Bestwall*, 606 B.R. at 251.
[142] *PPL EnergyPlus, LLC v. Nazarian*, 753 F.3d 467, 474 (4th Cir. 2014), aff'd sub nom., *Hughes v. Talen Energy Mktg., LLC,* 136 S.Ct. 1288 (2016).
[143] ACC Obj. 72-73.

will have the ability to pay those liabilities. If not, creditors of the old entity may contest the merger, including the asset and liability allocations. They may seek to hold the other company responsible for those liabilities.[144]

142. All of those safeguards generally available to protect creditors' rights, including fraudulent-transfer laws, remain in effect.[145] To date, New CertainTeed has not escaped, discharged, or eliminated any liability for DBMP Asbestos Claims through the divisional merger.

143. There is also no basis to find field preemption "of asbestos-related corporate reorganizations."[146] "Field preemption" occurs when "federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it."[147] Field preemption is rare and requires a showing that Congress has "regulat[ed] so pervasively that there is no room left for the states to supplement federal law," or that "there is a 'federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'"[148]

144. Section 524(g) itself confirms the absence of field preemption because it expressly contemplates prepetition corporate restructurings without establishing any requirements for them.[149] This reflects the long-standing principle that corporate governance is traditionally left to the States: "No principle of corporation law and practice is more firmly established than a state's authority to regulate domestic corporations."[150]

---

[144] *See* Section III(C)(i) below.
[145] *Id.*
[146] ACC Obj., 75.
[147] *S. Blasting Servs.*, 288 F.3d at 590.
[148] *U.S. v. South Carolina*, 720 F.3d 518, 528-29 (4th Cir. 2013); *Accord Hillsborough Cty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985). The Court is not persuaded that *MSR Exploration, Ltd. v. Meridian Oil, Inc.*, 74 F.3d 910, 913-14 (9th Cir. 1996) supports the ACC's field preemption argument. The facts of that case are distinguishable from the facts here; the Debtor is not collaterally attacking or seeking to address asbestos claims outside the chapter 11 process.
[149] *See* 11 U.S.C. § 524(g)(4)(A)(ii)(IV).
[150] *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 89 (1987); see also Cort v. Ash, 422 U.S. 66, 84 (1975).

145. Section 524(g) also is not sufficiently comprehensive to occupy the field of resolution or discharge of asbestos liabilities. Even after section 524(g) became law, the Supreme Court called on Congress to do more regarding asbestos liabilities, recognizing that Congress had not comprehensively addressed the area.[151]

**C. The 2019 Corporate Restructuring Appears Materially Prejudicial to the Rights of Asbestos Claimants, and in Accordance with the Texas Statutory Scheme, is Subject to Legal Challenge.**

146. At the center of the disputes in this case is the propriety of what the ACC terms the "Texas Two Step," a Divisional Merger followed by a bankruptcy by the new company bearing the old company's asbestos liabilities and in which the debtor seeks Section 524(g) relief for the entire enterprise.

147. DBMP and New CertainTeed maintain that these are practical, prudent and fair actions that enable the CertainTeed Enterprise to globally resolve its asbestos claims under Section 524(g) without subjecting the entire enterprise and its other stakeholders to the deleterious effects of chapter 11. Due to the Funding Agreement, these parties argue DBMP has the same ability to pay asbestos claims as did Old CertainTeed, and New CertainTeed is more than willing to do so. Asbestos claimants are not hurt.

148. By contrast, the Representatives view these actions as a craven effort by Old, and now New, CertainTeed to separate asbestos claimants from the enterprise assets. The Divisional Merger allocations, they contend, have all of the attributes of a fraudulent transfer. Worse, by virtue of Section 362 and the proposed preliminary injunction, the CertainTeed entities seek not just a stay of recovery actions against the Debtor, but also as against New CertainTeed, the Other Affiliates, and the Distributors. This, the Representatives say, gives these non-debtors

[151] *See, e.g., Ortiz Fibreboard Corp.*, 527 U.S. 815, 821 (1999); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 598 (1997).

protections afforded a bankruptcy debtor (e.g., the automatic stay, access to Section 524(g)) but without the corresponding creditor protections imposed by the bankruptcy Code on debtors (e.g., the absolute priority rule, debtor transparency, and court supervision)).

149. We should note here what is not before this Court for decision. First, there is no pending motion to dismiss the case as a "bad faith" filing. Even if there were, it would likely fail—as it did in *Bestwall*—due to the exacting *Carolin* dual requirements of "subjective bad faith" and "objective futility."[152]

150. Although no motion to dismiss has been filed here, the Representatives seek the functional equivalent. They openly express their desire for an end to this bankruptcy case. Thus, they argue for a denial of the Preliminary Injunction request and a grant of relief from stay to prosecute the DBMP asbestos claims in the tort system. Either would effectively end DBMP's reorganization effort.

151. Second, and while there have been many arguments made suggesting that the Divisional Merger was a fraudulent transfer, etc., at present, there is no pending action in this case that challenges the transaction. While a few individual creditors have filed such actions in state court, DBMP, the debtor in possession (which holds the powers and duties of a bankruptcy trustee in chapter 11), has not. Nor can it be expected to do so given its close relationship to New CertainTeed. Although the Representatives believe the merger to be a fraudulent conveyance, to date they have not sought authority to pursue such an action on behalf of the bankruptcy estate.[153] Instead, they seek dismissal of the case, but indirectly.

---

[152] In *Bestwall*, the motion to dismiss failed without regard to the Debtor's alleged 'bad faith.' With Georgia Pacific promising to fund any Section 524(g) plan, the movants could not demonstrate the "objective futility" of the chapter 11 attempt. *See In re Bestwall LLC*, 605 B.R. at 48-51 (citing *Carolin Corp.*, 886 F.2d at 700-01).

[153] *In re Commodore Int'l, Ltd.*, 262 F.3d 96, 100 (2d Cir.2001) (A creditors' committee may acquire standing to pursue the debtor's claims if (1) the committee has the consent of the debtor in possession or trustee, and (2) the court finds that suit by the committee is (a) in the best interest of the bankruptcy estate, and (b) is necessary and beneficial to the fair and efficient resolution of the bankruptcy proceedings.); accord *Off. Comm. of Unsecured*

152. Given this, we are not in a position today to rule on the core dispute between the parties: whether New CertainTeed should be held liable for the DBMP asbestos liabilities. Even so, this topic informs the two Motions which are before us, and some preliminary observations are in order about the Texas Divisional Merger and how it was employed by Old CertainTeed.

i. The Texas Divisional Merger Laws

153. For over 30 years, Texas law has permitted divisional mergers that permit an existing corporation to divide itself into two or more new entities.[154]

154. Under the current version of the TBOC, upon a divisional merger in which the dividing entity does not survive, "all liabilities and obligations" of the dividing entity automatically "are allocated to one or more of the . . . new organizations in the manner provided by the plan of merger."[155] Except as otherwise provided, "no other . . . entity . . . created under the plan of merger is liable for the debt or other obligation."[156]

155. Technically, the 2019 Corporate Restructuring met all applicable state-law requirements to effect a divisional merger. At the moment of the merger, Old CertainTeed was domiciled in Texas.[157] It made the necessary filings, including filing a plan of merger (specifying, among other things, an allocation of assets and liabilities) with the Secretary of State.[158]

*Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 566 (3d Cir. 2003) (Sections 1109(b) and 1103(c)(5) confer upon creditors' committees the right to sue derivatively.).

[154] *Compare* Tex. Bus. Corp. Act Ann. art. 5.06A(2), (3) (Vernon Supp. 1990) *with* Tex. Bus. Orgs. Code Ann. § 10.008(a)(2), (3).

[155] Tex. Bus. Orgs. Code Ann. § 10.008(a)(2), (3).

[156] *Id.* § 10.008(a)(4).

[157] There is no minimum period for which an entity must be domiciled under Texas law. *Phillips v. United Heritage Corp.*, 319 S.W.3d 156, 163 n.5 (Tex.App. 2010); *see also* Tex. Bus. Orgs. Code Ann. § 1.101.

[158] *See* Tex. Bus. Orgs. Code Ann. §§ 10.001(b), 10.002, 10.003, 10.151.

156. Upon the divisional merger, Old CertainTeed ceased to exist.[159] Its assets and liabilities were allocated to the two newly created entities, DBMP and New CertainTeed. All of Old CertainTeed's asbestos liabilities were exclusively allocated to DBMP.

157. But, while the TBOC permits a company to engage in a divisional merger, it does not permit that company to thereby prejudice its creditors. The TBOC explicitly states that the merger provisions do not "abridge any right or rights of any creditor under existing laws."[160]

158. This has been the unwavering, stated policy behind the Texas divisional merger statute since it was first adopted. The original version of the statute, Texas Business Corporations Act § 5.15. provided: "Antitrust Laws; Creditors." "Nothing contained in Part 5 of this Act shall ever be construed as affecting, nullifying or repealing the Anti-trust laws or as abridging any right or rights of any creditor under existing laws."

159. So too the legislative history: "[c]reditors' rights would not be adversely affected by the proposed amendment, and creditors would continue to have the protections provided by the Uniform Fraudulent Transfer Act and other existing statutes that protect the rights of creditors."[161]

160. In 2006, when the Texas Business Corporations Act ("TBCA") was transformed into the TBOC, no change to this policy was made. The divisional merger statute moved from section 5 of the TBCA to section 10 of the TBOC, but only non-substantive changes were made to the creditor protection provisions.[162]

---

[159] The FCR has argued that "Old CT, the non-surviving entity under the divisional merger, 'continues in existence until the third anniversary of the effective date of [its] termination,' pursuant to section 11.356 of the TBOC." FCR's Post-Hearing Br. [Adv. Pro. Dkt. 312] at 6 . However, Section § 11.356(a) addresses the statutory dissolution and winding up of an entity and is not applicable to a divisional merger under Chapter 10 of the TBOC. *See* Tex. Bus. Orgs. Code Ann. § 11.356(a)

[160] Tex. Bus. Orgs. Code Ann. § 10.901.

[161] H. COMM. ON BUS. & COM., BILL ANALYSIS, H.B. 472, 1989 Leg., 71st Reg. Sess., at 23 (Tex. 1989).

[162] *Id.* at 1.

161. Curtis Huff, a primary author of the Texas divisional merger statute,[163] has confirmed that the rights of creditors under federal and state fraudulent transfer laws are not abrogated or abridged by such a merger:

> "While the provisions permitting multiple surviving entities in a merger were intended to provide corporations with greater flexibility in structuring acquisition and restructuring transactions, **they were not intended to have any material effect on the existing rights of creditors** of the parties to a merger."[164]

162. Huff further explains that "all laws protecting the rights of creditors with respect to fraudulent conveyances, preferences and insolvency will remain in force and apply."[165] "Principal among the laws available to protect creditors in mergers with multiple survivors are the Uniform Fraudulent Transfer Act (the "UFTA"), the Uniform Fraudulent Conveyance Act (the "UFCA") and the United States Bankruptcy Code of 1978, as amended (the "Bankruptcy Code")."[166]

163. And although "a merger will not involve a 'transfer' of assets in the traditional sense," the "allocation of assets in a merger should constitute both a 'transfer' and 'conveyance' of assets under both the letter and spirit of the UFTA, the UFCA and the Bankruptcy Code."[167] "The allocation of liabilities of the parties to a merger among the surviving entities in the merger should also constitute the incurrence of obligations under the UFTA and the Bankruptcy Code by the surviving entities."[168]

---

[163] Curtis Huff was a member of the subcommittee of the Corporation Law Committee of the Business Law Section of the State Bar of Texas that drafted the amendments to the merger provisions of the TBCA
[164] *See* Curtis Huff, *The New Texas Business Corporation Act Merger Provisions*, 21 ST. MARY'S L.J. 109, 110 n.2 (1989) (emphasis added).
[165] *Id.* at 109.
[166] *Id.* at 126.
[167] *Id.* at 129.
[168] *Id.* at 129-30.

164. In particular, the allocation of a creditor's claim to another corporation in a merger with multiple survivors will allow the creditor to challenge the merger and the transfer of assets if any of the requirements of fraudulent transfer law are met, including (1) the original corporation was insolvent and the transfer of assets to the other resulting corporation or entity was not for reasonably equivalent value or for fair consideration, (2) the transfer of assets to the resulting entity was not for reasonably equivalent value or fair consideration, and the resulting entity has an unreasonably small amount of assets in relationship to the business or transactions conducted or contemplated to be conducted by it or the resulting entity intended to incur, or believed that it would incur, debts beyond its ability to pay as they become due and absolute, or (3) the merger was effected with an actual intent to hinder, delay or defraud any creditor of the original corporation or the resulting entity.[169]

165. Huff's analysis anticipates the current dispute and how it should be addressed: "**if in a merger with multiple survivors, the parties allocate a creditor's claim to an inadequately capitalized or insolvent corporation, that creditor will have the right to challenge the merger as a fraudulent transfer**."[170]

166. As for a remedy, and "[a]lthough various remedies are possible where the allocation of a liability in a merger constitutes a fraudulent transfer, the most appropriate remedy in such a case would generally be to **reallocate all or a portion of the allocated liability to one or more of the surviving entities in the merger or to make some or all of the resulting entities liable for all or a portion of the liabilities** of the predecessor debtor corporation."[171]

[169] *Id.* at 131-32.
[170] *Id.* at 133. (emphasis added).
[171] *Id.* at 132 n.73. (emphasis added).

167. Thus, if a corporation uses a divisional merger to dump its liabilities into a newly created "bad" company which lacks the ability to pay creditors while its "good" twin corporation walks away with the enterprise's assets, a fraudulent transfer avoidance action lies.[172]

168. DBMP maintains that nothing like this has happened. Between the Funding Agreement and the other allocated assets, the Debtor claims to have the same funding capacity after the 2019 Corporate Restructuring as did Old CertainTeed immediately before the restructuring.

169. Possibly, but that is not the relevant question. Under the TBOC, the proper question is—were the rights of creditors, here asbestos claimants, and future demands, materially affected by the Merger and its asset and liability allocations? The preliminary answer to that question is, yes.

170. Before the Corporate Restructuring, Old CertainTeed's asbestos creditors had the same ability and rights to access Old CertainTeed's considerable assets as did its other unsecured (non-asbestos) creditors. As a result of the Corporate Restructuring, asbestos creditors were placed one step beyond those assets and made dependent on the DBMP's willingness to press its rights under the Funding Agreement. As discussed above, the Funding Agreement is conditional, unsecured, and can be enforced only by DBMP acting through seconded SGC employees, not by the asbestos claimants. The willingness to seek funding and New CertainTeed's willingness to pay asbestos claimants cannot simply be assumed. Apart from the Funding Agreement, DBMP lacks the ability to pay asbestos claims.

---

[172] *See* Cliff Ernst, *Steps to Accomplish a Divisional Merger, in Divisive [Sic] Mergers: How To Divide An Entity Into Two Or More Entities Under A Merger Authorized By The Texas Business Organization Code,* 2016 Wl 10610449 (Tex. 2016) ("[O]ne could certainly imagine an egregious situation where all assets were allocated to one party to the merger and all liabilities were allocated to another party without assets and creditors might attempt to void the transaction as a fraudulent conveyance.")

171. Perhaps DBMP and New CertainTeed mean exactly what they say. Perhaps DBMP will negotiate a plan acceptable to the asbestos claimants. Perhaps New CertainTeed will fund that plan, and all of these liabilities will be satisfied. It is too early to say.

172. However, at the moment, it appears that the Divisive Merger had a material, negative effect on the asbestos creditors' ability to recover on their claims. Thus, an action to contest the merger and its exclusive allocation of all of Old CertainTeed's asbestos claims to DBMP, appears to be a viable cause. But with DBMP in bankruptcy the next question is, "Who has standing to assert such claims, individual asbestos claimants or a bankruptcy trustee?" To answer that question, we must consider the nature of the claims at issue, and the procedural posture of this case.

### D. The Prosecution of DBMP Asbestos Claims is Stayed Pursuant to Sections 362(a)(1) and 362(a)(3) of the Bankruptcy Code.

i. Section 362(a)(1)

173. By virtue of the TBOC, DBMP is liable for Old CertainTeed's asbestos liabilities, the so called DBMP Asbestos Claims. With the bankruptcy filing, the Claimants are stayed from prosecuting DBMP Asbestos Claims against the Debtor pursuant to section 362(a)(1) of the Bankruptcy Code. Section 362(a)(1) of the Bankruptcy Code prohibits the "commencement or continuation . . . of a judicial . . . proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title."[173]

174. As the Representatives point out, Section 362(a)(1) ". . . provides only for the automatic stay of judicial proceedings and enforcement of judgments 'against the debtor or the

[173] 11 U.S.C. § 362(a)(1).

property of the estate.'"[174] It does not typically shield non-debtor codefendants from asbestos lawsuits.[175]

175. At the moment, however, there are no such codefendants for whom injunctive relief is sought. The claims that the asbestos claimants wish to prosecute against New CertainTeed et. al. were once claims against Old CertainTeed. Old CertainTeed is no more, and, at present, the Debtor is exclusively responsible for the DBMP Asbestos Claims.[176] Thus, pressing the DBMP Asbestos Claims against the Protected Parties in the tort system would necessarily result in the liquidation and recovery of claims against the Debtor outside of the bankruptcy case. This is barred by the automatic stay.

176. The automatic stay imposed by section 362(a)(1) also either presently extends to or can be extended through this action to enjoin actions against the Protected Parties, who share such an identity of interests with the Debtor that the Debtor is, in effect, the real party defendant.[177]

177. The Fourth Circuit in *Robins* described the type of situation that would cause such an identity of interests: "An illustration of such a situation would be a suit against a third-party who is entitled to absolute indemnity by the debtor on account of any judgment that might result against them in the case."[178] "To refuse application of the statutory stay in that case would defeat the very purpose and intent of the statute."[179] This logic applies equally to situations where third-party litigation raises collateral estoppel and *res judicata* issues for the debtor.[180]

---

[174] *Credit Alliance Corp. v. Williams*, 851 F.2d 119, 121 (4th Cir. 1988).
[175] *Williford v. Armstrong World Industries, Inc.*, 715 F.2d 124 (4th Cir. 1983).
[176] Tex. Bus. Orgs. Code Ann. 10.008(a)(4).
[177] *See Robins*, 788 F.2d at 999.
[178] *Id.*
[179] *Id.*
[180] *See id.*

178. Both situations described by the *Robins* court are present here. Litigating the DBMP Asbestos Claims against the Protected Parties would effectively liquidate claims against the Debtor. And it could potentially trigger indemnification rights.[181] There is an even an outside risk that such litigation could bind the Debtor through *res judicata* and collateral estoppel, or by creating an evidentiary record that prejudices the Debtor.[182] The Debtor thus is the real party defendant in any suit seeking to liquidate and recover on account of a DBMP Asbestos Claim, even if directed at a Protected Party, and section 362(a)(1) applies to stay such actions.

ii. Section 362(a)(3)

179. Additionally, any such effort to pursue New CertainTeed and the Other Affiliates would necessarily involve third parties asserting claims which are now held by the DBMP bankruptcy estate. As the preceding analysis of the Texas Merger statutes reflects, to hold New CertainTeed and the Other Affiliates liable for debts allocated under the merger to DBMP, asbestos claimants will be required to assert (as some already have) claims for fraudulent transfer, successor liability, and/or alter ego arising from the Divisional Merger.

180. The law in the Fourth Circuit is that certain theories of recovery through which claimants seek to liquidate the debtor's liability on a claim against a non-debtor are property of the debtor's estate. These include alter ego and successor liability theories of recovery.[183]

---

[181] We need not decide today whether the indemnification provisions of the Support Agreement would give rise to absolute indemnification rights in this case. As noted, this was not an arm's length agreement, and it was made in contemplation of a bankruptcy filing by one of Old CertainTeed's successor entities. Under similar circumstances, at least one Court has brushed aside such an agreement. *Schmoll v. ACandS, Inc.,* 703 F. Supp. 868, 869 (D. Or. 1988), aff'd, 977 F.2d 499 (9th Cir. 1992). It is sufficient for now to say that if enforceable, under the authorities cited by DBMP, the Support Agreement would give rise to indemnification claims against the DBMP estate.

[182] Admittedly, this is a lesser concern as historically, DBMP has not experienced such legal handicaps.

[183] *See, e.g., Steyr-Daimler-Puch of Am. Corp. v. Pappas*, 852 F.2d 132, 136 (4th Cir. 1988); *In re Anderson & Strudwick, Inc.*, No. 14-32679, Adv. Pro. 14-03175, 2015 WL 1651146, at 5 (Bankr. E.D. Va. Apr. 8, 2015); *Mitchell v. Greenberg (In re Creative Entm't, Inc.),* Adv. Pro. No. 00-3114, 2003 Bankr. LEXIS 2468, 28-29 (Bankr. W.D.N.C. May 28, 2003). *Acme Boot Co. v. Tony Lama Interstate Retails Stores, Inc.*, 1991 WL 39457, 929 F.2d 691 (4th

181. One can split hairs as to whether fraudulent transfer claims are property of the estate or whether they simply permit avoidance of certain transfers with the estate standing in the shoes of creditors.[184] For present purposes, the net result is the same. With DBMP in bankruptcy, under the Fourth Circuit's "first crack" rule, it is the bankruptcy trustee, not individual asbestos claimants, that has standing to assert fraudulent conveyance claims and claims that share the same underlying focus as fraudulent conveyance claims.[185] "Reserving the [fraudulent conveyance] action for the [Debtor] maintains the integrity of the bankruptcy proceedings and ensures that individual creditors cannot hijack the bankruptcy process."[186]

182. Or as our U.S. District Court has put it: "In the Fourth Circuit the rule is settled that [section] 362(a)(3) [of the Bankruptcy Code] stays automatically—without a restraining order—a creditor's claim against a third-party that the debtor can assert for the benefit of the estate."[187]

183. Thus, the claims which the Representatives propose to return to the tort system to be asserted by individual asbestos claimants for their individual benefits are (1) claims against DBMP by virtue of the TBOC, <u>and</u> (2) remedy claims which seek to make New CertainTeed and the Other Affiliates liable for those same asbestos liability claims under theories of fraudulent conveyance, alter ego, etc. The former are claims against the debtor whose liquidation is stayed by Section 362(a)(1). The later remedial claims are either bankruptcy estate

---

Cir. 1991), cited by the ACC, is distinguishable, in part because it addresses a successor claim applicable only to a single creditor, rather than a claim generally available to the debtor's other creditors.

[184] Contrast *In re Midstate Mills, Inc.*, No. 13-50033, 2015 WL 5475295, at *7 (Bankr. W.D.N.C. Sept. 15, 2015) with *In re Fabian,* 458 B.R. 235, 258 (Bankr. D. Md. 2011).

[185] *See* 11 U.S.C. § 544(b); 11 U.S.C. § 548; *Nat'l Am. Ins. Co. v. Ruppert Landscaping Co., Inc.*, 187 F.3d 439, 441 (4th Cir. 1999).

[186] *Ruppert*, 187 F.3d at 442.

[187] *In re Litchfield Co. of S.C. Ltd. P'Ship*, 135 B.R. 797, 803 n.4 (W.D.N.C. 1992).

property under Section 541 and/or avoidance claims. Both are subject to the automatic stay under Section 362(a)(3).

**E. The ACC's Motion for Relief from Stay**

184. Anticipating this might be the case, the ACC has moved for relief from stay to permit the asbestos claimants to individually liquidate their tort claims against DBMP and New CertainTeed in the tort system.

185. The Representatives argue that under the unusual circumstances presented in this case, it would be appropriate to send all 60,000+ asbestos claims back to the tort system, even as the bankruptcy case proceeds. This, they say, is justified by the gross inequities of the Corporate Restructuring and the Debtor's lack of good faith in pursuing this bankruptcy case.[188] They argue that the Corporate Restructuring has structurally subordinated asbestos creditors even as the non-asbestos creditors of Old CertainTeed are being paid in the ordinary course of business.

186. The Representatives believe this inequity would be compounded by preliminarily enjoining actions against the Protected Parties. The Representatives further suggest that, by stranding the asbestos claimants in bankruptcy, the Debtor is seeking a "bankruptcy discount" of its tort-system liability in this Chapter 11 Case. With the asbestos liabilities "ring-fenced" within the Debtor, New CertainTeed is free to upstream its net income to parent companies. Thus, the Debtor is incentivized to prolong this reorganization case until the asbestos claimants knuckle under and accept a Plan that pays them less than that to which they are entitled.

[188] ACC Opposition [Adv. Pro. Dkt. 216 at p. 29-30, 63-67].

187. The ACC's Stay Motion is also premised on the idea that no harm will come to the Debtor by allowing all of its creditors relief from stay to pursue their claims in other courts. This most unusual suggestion is based upon the ACC's reading of the Funding Agreement.[189]

188. The ACC posits the following: New CertainTeed has agreed to fund the Debtor to both litigate and pay the asbestos claims. That funding is unlimited, covers both defense and indemnity payments, and has no deductibles or exclusions. New CertainTeed and Saint-Gobain (the ultimate Parent of both companies) have adequate means to provide the funding agreed to in the Funding Agreement. Given this, the ACC concludes that the Debtor has the wherewithal to litigate and satisfy any asbestos liabilities as they become due. There is no need for a bankruptcy stay.

189. The ACC analogizes its stay relief request to the circumstance where a debtor possesses unlimited insurance coverage. In such cases, bankruptcy courts routinely grant relief from stay to creditors to seek recovery against the insurance in state court. In particular, the ACC refers to this Court's recent decision in *Kaiser*[190] where such relief was granted.

i. <u>The ACC's Requested Relief Is Not Possible Because the Funding Agreement Would Not Provide Funding to Pay Asbestos Claims Outside of a Plan.</u>

190. However, the relief sought by the ACC—notably the payment of all prepetition asbestos claims outside of a confirmed plan of reorganization but while this Chapter 11 Case is pending—is neither proper, nor possible under the terms of the present Funding Agreement.

191. The Representatives misread the Funding Agreement. Assuming for the

---

[189] This in contrast to the Representatives responses to the Preliminary Injunction request where they argue that because the Funding Agreement is conditional and must be enforced by the Debtor as against New CertainTeed, it is unlikely to provide full payment to asbestos claimants.
[190] No. 3:16-bk-31602 (Bankr. W.D.N.C. Aug. 9, 2018), ECF No. 1108

moment that the Funding Agreement is a legally enforceable contract, it is limited by its terms. Under North Carolina law, "'[w]hen the language of a contract is clear and unambiguous, effect must be given to its terms, and the court, under the guise of construction, cannot reject what the parties inserted or insert what the parties elected to omit.'"[191]

192. The language of the Funding Agreement is clear and unambiguous. The Debtor may use any funding provided by New CT only for a "Permitted Funding Use." New CertainTeed is obligated to provide funding only for "Permitted Funding Uses."[192] Payment of asbestos-related judgments and settlements is a Permitted Funding Use only when no chapter 11 case is pending.[193]

193. The ACC misreads sub-clause (d) of the definition of "Permitted Funding Use," which affords the Debtor the right to request funding of its bank account to maintain a reserve of up to $5 million (the "Reserve Fund").[194]

194. The Reserve Fund provision does not allow the Debtor to require New CertainTeed to fund the Debtor's bank account in perpetuity no matter how the Debtor uses those funds.[195] Such a reading of the Reserve Fund clause would render meaningless all the Funding Agreement's other terms defining Permitted Funding Uses and limiting DBMP's payments, and New CertainTeed's obligations, to Permitted Funding Uses (*i.e.*, by providing an evergreen fund for uses not otherwise permitted). It is well established that a court should construe contract terms, where possible, to give rational meaning to all provisions in the contract.[196]

[191] *Onewest Bank FSB v. Peoples Bank (In re Finding)*, Nos. 10-40125, 10-4033, 2012 WL 5993700, *4 (Bankr.W.D.N.C. Nov. 30, 2012) (quoting *Taylor v. Gibbs*, 268 N.C. 363, 365, 150 S.E.2d 506, 507 (1966)).
[192] Pl.'s Ex. 13, Funding Agreement §§ 5, 2(a).
[193] *Id.* § 1.
[194] *See* Pl.'s Ex. 13, Funding Agreement § 1.
[195] *Id.* §§ 5, 2(a).
[196] *Int'l Eng'g & Trading Corp. v. Ingersoll-Rand Co.*, Civil No. 3:12CV294-DSC, 2012 WL 5354998, *5 (W.D.N.C. Oct. 30, 2012).

195. Specific language in a contract controls over general language.[197] Here, sub-clause (c) of the definition of "Permitted Funding Use" specifically addresses what asbestos-related liabilities are covered by the Funding Agreement during each period of time, and hence controls over the general provision in sub-clause (d).

196. Nor does the testimony of Starczewski support the ACC's reading of the Funding Agreement as the ACC suggests.[198] When asked how the Funding Agreement might operate in connection with a hypothetical lift-stay scenario, Starczewski testified that he would need to "refer back to the funding agreement" and only after so qualifying his answer, offered a "belief" about how it might work.[199] He then expressly clarified that the "best source for understanding the terms and obligations" of the various restructuring agreements, of course, were the agreements themselves to which he "deferred" on the question of "interpretation."[200]

197. Regardless, the Funding Agreement is unambiguous and not subject to interpretation through parole evidence.[201]

198. Finally, the use of the Reserve Funds to pay asbestos-related judgments or settlements during the bankruptcy case would violate the covenant against unpermitted uses of funds in Section 5 of the Funding Agreement.[202]

199. The ACC purports to limit the relief it seeks by requiring claimants to "agree in writing that any settlement or judgment in respect of his or her asbestos personal injury claim may not be enforced against the assets of the Debtor, other than those available through the Funding Agreement."[203] This "waiver" by claimants, however, is ineffective to protect the Debtor

[197] *See, e.g., In re Roberson*, Case No. 18-05432-5-JNC, 2020 WL 6265062, *5 (Bankr. E.D.N.C. Oct. 23, 2020).
[198] *See* Stay Mot. ¶ 33.
[199] Starczewski Dep. 194:24-25, Dec. 15, 2020.
[200] *Id.* at 240:6-241:14.
[201] *See Lynn,* 689 S.E.2d at 206; *Cordaro v. Singleton,* 229 S.E.2d 707, 709 (N.C. Ct. App. 1976).
[202] Pl.'s Ex. 13, Funding Agreement § 5.
[203] Stay Mot. at 25 (Conclusion).

or its estate or assist the claimants in receiving payments.

200. First, as concluded above, no funding through the Funding Agreement would be available to pay any settlements or judgments while the Chapter 11 Case remains pending; funding is only available for a confirmed section 524(g) plan of reorganization. Nor do the claimants have the right under the Funding Agreement's terms to pursue funding from New CertainTeed directly.[204]

201. Second, with respect to the funding of a trust established under a plan of reorganization, the Funding Agreement expressly requires that the Debtor's assets be used first.[205] The Funding Agreement is only a backstop available to the extent the Debtor's other assets are insufficient to fund such a trust.[206]

202. Third, in order to recover, the individual asbestos claimants would necessarily have to usurp the estate's ability to assert claims against New CertainTeed or interfere with the funding that might be obtained therefrom in a negotiated Section 524(g) Plan and Trust.

ii. <u>There Is No Cause to Lift the Automatic Stay.</u>

203. The automatic stay—"one of the fundamental debtor protections provided by the bankruptcy laws"—can be lifted for cause.[207] "Cause" is a flexible concept requiring courts to conduct a case-by-case balancing test.[208]

204. The Fourth Circuit has focused on three, non-exhaustive factors in conducting this balancing analysis:

> (1) whether the issues in the pending litigation involve only state law, so that the expertise of the bankruptcy court is unnecessary; (2) whether modifying the stay will promote judicial economy and whether there would be greater

---

[204] Pl.'s Ex. 13, Funding Agreement § 15.
[205] *Id.* § 1.
[206] *Id.*
[207] *Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 503 (1986); 11 U.S.C. § 362(d)(1).
[208] *See In re Beach First Nat'l Bancshares, Inc.*, 451 B.R. 406, 410 (Bankr. D.S.C. 2011).

> interference with the bankruptcy case if the stay were not lifted because matters would have to be litigated in bankruptcy court; and (3) whether the estate can be protected properly by a requirement that creditors seek enforcement of any judgment through the bankruptcy court.[209]

205. In applying the factors, the Court must balance any prejudice to the debtor's estate against the hardship that would result if stay relief is denied.[210]

206. Applying those factors and striking that balance, we conclude the Stay Motion should be denied because: (a) prejudice to the estate would result if the stay is lifted and this prejudice significantly outweighs any hardship to the Debtor's asbestos claimants; (b) allowing the tort system to be re-flooded with asbestos cases at the same time the Chapter 11 Case remains pending would not serve judicial economy; and (c) and the fact that asbestos claims arise under state law does not support a modification of the stay because it necessarily involves individual creditors liquidating their claims against the Debtor outside of the bankruptcy proceeding, asserting estate causes of action for their individual benefit, and thwarting any attempt to globally and permanently resolve asbestos claims in a single forum.

iii. <u>The Debtor and its Estate will Suffer Substantial Prejudice if the Court Grants the Stay Motion, and Any Harm to Asbestos Claimants Would be Limited.</u>

207. The Debtor and the Estate will suffer substantial prejudice if the Court grants the Stay Motion. A fundamental tenet of the automatic stay is to enable the bankruptcy court "to avoid interference with the orderly liquidation or rehabilitation of the debtor."[211] The relief sought in the Stay Motion is antithetical to that fundamental tenet.

208. Granting the Stay Motion would deplete estate resources and irreparably

[209] *In re Robbins*, 964 F.2d 342, 345 (4th Cir. 1992).
[210] *See id.*
[211] *Matter of Rexene Prods. Co.*, 141 B.R. 574, 576 (Bankr. D. Del. 1992).

harm the prospects for reorganization. Permitting all asbestos claimants to recommence tort litigation against the Debtor would preclude the stated purpose of this Chapter 11 Case—to obtain a permanent, global, and fair resolution of all current and future asbestos claims against it.

209. If the Stay Motion were granted, asbestos claims would not be resolved globally in a single forum; they would be litigated piecemeal in hundreds of state and federal courts across the country. The ability to treat equitably and consistently all similarly situated claimants through a section 524(g) consensual plan of reorganization would be foreclosed; and the Debtor's ability to achieve any type of a successful reorganization would be substantially impaired, if not eliminated.

210. The Funding Agreement would not likely eliminate the burdens and costs such litigation would impose upon the Debtor. Although the Debtor could seek funding for litigation "costs" as an expense of administration under the Funding Agreement, the terms of that agreement stipulate[212] that DBMP would have to use any cash distributions from its subsidiary Millwork & Panel first.[213] And, because of the pendency of the Chapter 11 Case, the Funding Agreement could only be used to pay asbestos-related liabilities in connection with the funding of a section 524(g) trust.[214]

211. The Stay Motion seeks to have all asbestos claims liquidated in the tort system and for claimants to seek payment of those claims as they are liquidated. Under these circumstances, if the Court were to grant the Stay Motion, it would amount to an effective dismissal of the Chapter 11 Case without satisfying the Fourth Circuit's stringent *Carolin* dismissal standard, or even such a motion being filed.[215]

---

[212] Here we again temporarily assume the Funding Agreement to be enforceable by its terms.
[213] Pl.'s Ex. 13, Funding Agreement § 1.
[214] *Id.*
[215] *See In re Bestwall LLC*, 605 B.R. at 48-51 (citing *Carolin Corp.*, 886 F.2d at 700-01).

212. The cases on which the ACC relies are inapposite.[216] In each, the availability of insurance permitted the court to lift the stay without harming the debtor or its estate. Here, the Debtor has no insurance coverage for asbestos-related claims.[217]

213. The Funding Agreement is not insurance. The Debtor neither paid nor pays premiums with respect to the Funding Agreement, and there is no element of risk distribution, a key feature of insurance contracts.[218] Instead, according to its terms, the Funding Agreement is a funding backstop by New CertainTeed. Here, lifting the stay would cause irreparable harm to the Debtor by consuming the estate assets and undermining the Debtor's prospects of reorganizing.

214. Although the ACC suggests otherwise, this Court's ruling in *In re Kaiser Gypsum Co.* does not support lifting the stay here.[219]

215. First, unlike the debtors in *Kaiser Gypsum*, DBMP has no insurance coverage available to satisfy asbestos-related claims. As this Court noted in *Kaiser Gypsum*, "the thing that differentiates [*Kaiser Gypsum*] from [a more typical asbestos bankruptcy case] is [the debtors] have unlimited insurance[,] and that being the case, it changes all of the dynamics in the case and the parties' motivations."[220] As set forth above, the Funding Agreement is not insurance and cannot be used like the insurance in *Kaiser Gypsum*.

216. Second, the debtors in *Kaiser Gypsum* supported the requested

---

[216] *In re Budd Co., Inc.*, Case No. 14 B 11873, 2016 WL 556287, at *2 (Bankr. N.D. Ill. Feb. 10, 2016); *In re Coronet Foods, Inc.*, No: 5:04-3822, 2005 WL 1552633, at *1 (Bankr. N.D. W. Va. June 3, 2005); *In re Fernstrom Storage & Van Co.*, 100 B.R. 1017, 1024 (Bankr. N.D. Ill. 1989); *Santa Fe Minerals, Inc. v. BEPCO, L.P. (In re 15375 Mem'l Corp.)*, 382 B.R. 652 (Bankr. D. Del. 2008), rev'd on other grounds *In re 15375 Mem'l Corp. v. Bepco, L.P.*, 589 F.3d 605, 690 (3d Cir. 2009); *see also Admiral Ins. Co. v. Grace Indus., Inc. (In re Grace Indus., Inc.),* 341 B.R. 399, 405 (Bankr. E.D.N.Y. 2006).
[217] Starczewski Decl. ¶ 10.
[218] Courts have noted that the distribution of risk among a larger group of people is a "primary characteristic" of insurance. *La. Safety Ass'n of Timbermen-Self Insurers Fund v. La. Ins. Guar. Ass'n,* 17 So.3d 350, 358 n.7 (La. 2009); *Myers v. State Bd. of Equalization,* 192 Cal. Rptr. 3d 864 (Cal. Ct. App. 2015), rev. denied, (Dec. 9, 2015).
[219] Case No. 16-31602 (JCW) (Bankr. W.D.N.C.) [Dkt. 1108],
[220] *Kaiser Gypsum*, Hr'g Tr., 29:5-8, Aug. 13, 2020 [Dkt. 2439].

modification of the stay because it was consistent with a global agreement to resolve their bankruptcy cases.[221] Requests to lift the stay to which the debtor stipulates, consents, or does not object are routinely granted.[222] But here, the Debtor has objected to the Stay Motion, and the proposed relief would interfere with the Debtor's reorganization efforts.

217. Third, in *Kaiser Gypsum* the stay was lifted only after the debtors had reached an agreement to permanently resolve their liability for asbestos personal injury claims pursuant to a plan of reorganization term sheet.[223] Thus, the agreed lifting of the stay in *Kaiser Gypsum* was part of, and not detrimental to, a global, consensual resolution of the debtors' asbestos liability. In contrast, here, there currently is no agreement to resolve the Debtor's asbestos liability. The Debtor is entitled to an opportunity to pursue a consensual resolution of its asbestos liability, and lifting the stay would undermine, if not eliminate, the Debtor's ability to achieve such a resolution.

218. Finally, the stay relief in *Kaiser Gypsum* was conditioned to ensure that the debtors would not suffer any prejudice. As above, no similar conditions are possible here.

219. The record in this case demonstrates that any harm to asbestos claimants caused by the continuation of the automatic stay is outweighed by the hardship to the Debtor and its estate that would occur if the stay were lifted.

220. The ACC asserts that the passage of time occasioned by the automatic stay causes harm to asbestos claimants. Mesothelioma is fatal. To the extent there are any asbestos claimants who contracted the disease due to exposure to products for which DBMP (or the

[221] Motion of the Debtors, the Official Committee of Asbestos Personal Injury Claimants, and the Future Claims Representative to Lift the Stay Pursuant to 11 U.S.C. § 362 as to Certain Asbestos Personal Injury Claims, Kaiser Gypsum [Dkt. 881] at 1.
[222] *See, e.g., In re Legacy at Jordan Lake, LLC*, 2011 WL 6008388 (Bankr. E.D.N.C. 2011).
[223] *See* Notice of Filing of Plan Term Sheet, Kaiser Gypsum [Dkt. 854].

Protected Parties) may be liable, as time passes and the stay remains in effect, those victims remain uncompensated, and they die. Thus, they suffer harm.

221. Despite those incontrovertible facts, the Debtor denies any such harm will occur here as a result of this bankruptcy. DBMP notes that plaintiffs in asbestos-related tort suits typically name multiple defendants. Denial of the Stay Motion will not prevent a claimant from pursuing other defendants in the tort system or seeking payment from their asbestos trusts. Historically, Old CertainTeed paid less than 4% of the total recoveries received by the typical asbestos claimants whose claims they resolved.[224] As the asbestos claimants are currently able to seek recovery for the largest part of their injuries, DBMP concludes that they are not harmed by the stay.

222. Both sides are partially correct, but neither is completely so. Obviously, even if a claimant can seek recovery of 96% of his damages from other tortfeasors, if he is stayed from seeking the 4% which the debtor owes him, he is still harmed—it is simply to a lesser degree than if he were completely stayed from seeking recovery.

223. But what is the harm visited on these claimants? Here, the Representatives seem to assume that DBMB's share of these liabilities will never be paid. That appears unlikely. Hopefully, these claims will receive payment under a consensual Section 524(g). Otherwise, the case will be dismissed, and the claims will be returned to the tort system. The perceived "harm" occasioned by the stay is delay in receiving payment.

224. Within reason, delay in payment due to bankruptcy is not a reason to grant relief from stay.[225] In theory, the bankruptcy stay causes payment delay to every unsecured creditor in every bankruptcy case. After all, it takes time to achieve confirmed plans, to liquidate

[224] Bates Decl. ¶ 5; Bates Report ¶ 17.
[225] *See, e.g.*, *In re Madison Hotel Assocs.*, 18 B.R. 218, 219 (Bankr. W.D. Wis. 1982).

bankruptcy estates, to object to claims, and to make case distributions. While courts seek to minimize the time consumed by these case events, there is no avoiding such "harm," if there is to be a bankruptcy case, at all. If delay alone were enough to provide "cause," the stay would be terminated in every case.[226]

225. But as Judge Beyer noted in *Bestwall,* "prejudice" by delay is not confined to bankruptcy. Litigation, particularly mass tort asbestos litigation, generally requires extensive discovery, involves numerous parties, and presents complicated questions of causation.[227] Such litigation often goes on for years, if not decades. In fact, as of the Petition Date, nearly half of DBMP's pending asbestos-related claims on active dockets had been filed more than 10 years ago.[228]

226. By contrast, a section 524(g) trust established by an asbestos debtor in chapter 11 in cooperation with the Representatives, and with each fiduciary acting in good faith and with an earnest desire to achieve a full and fair resolution of asbestos claims, could well provide all asbestos claimants—including future claimants who have yet to initiate litigation—a more efficient means to resolve their claims.[229]

227. And even if such a trust is not forthcoming, the automatic stay will not permanently deprive asbestos claimants of their opportunity to pursue their claims. Section 362 temporarily stays pursuit while the parties attempt to reach a consensus on a section 524(g) plan.[230] If a consensus on a Section 524(g) plan is not reached in due time, the Representatives may seek dismissal or conversion for "cause" under Section 1112.

---

[226] *See In re Lewis*, 339 B.R. 814, 817 (Bankr. S.D. Ga. 2006).
[227] *Bestwall,* 606 B.R. at 257.
[228] Starczewski Decl. ¶ 44
[229] *Bestwall*, 606 B.R. at 257; Bates Decl. ¶¶ 21, 26.
[230] *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 234 (3d Cir. 2004) (as amended Feb. 23, 2005).

228. In the meantime, and if they deem it provident, the Representatives may seek authority to pursue the causes of action challenging the merger and allocations on behalf of the Estate, meaning all asbestos claimants.[231] For if the current proceedings have proven anything, it is this: to the extent that such claims lie, the Debtor is in no position to file or prosecute them against New CertainTeed and the Other Affiliates.[232]

229. The ACC also argues that a continuation of the stay could, in certain jurisdictions, result in a loss of damages for pain and suffering for claimants who die while the stay is in force.[233] The Committee offered no evidence on this issue at hearing.[234]

230. However, such concerns can be, and in other cases have been, addressed through preservation of these damages in section 524(g) trusts' trust distribution ("TDPs").[235] Further, and seeking to blunt this argument, the Debtor has offered the Damages Agreement described above, which similarly preserves the right to pain and suffering recoveries even in the absence of TDPs.

[231] *Off. Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 566 (3d Cir. 2003); We express no opinion whether such an action would be successful. Nor do we opine whether such an action would benefit the reorganization effort. In *Garlock*, such a proceeding was filed, and thereafter, the parties reached accord on a Section 524(g) plan and trust. However, if DBMP and New CertainTeed mean what they say—that they desire, and New CertainTeed is willing to fund, a full and fair resolution of these asbestos liabilities—it may not be necessary or productive to bring such a lawsuit.

[232] The Debtor posits that it was unharmed as a result of the Corporate Restructuring. It maintains that no aspect of the Corporate Restructuring is subject to challenge or avoidance.

[233] Stay Mot. ¶ 41.

[234] *Id.* (The ACC acknowledged that this issue only arises in "some" jurisdictions). In fact, the survival statutes in only a few jurisdictions "do not allow any recovery for the decedent's pain and suffering prior to death." 25 Am. Jur. Proof of Facts 3d 251, § 6 (citing only the Arizona and California statutes as examples and explaining that "under most wrongful death or survival acts, the victim's estate may recover for the decedent's conscious pain and suffering sustained between injury and death.").

[235] *See, e.g., In re Kaiser Gypsum Co., Inc.*, Case No. 16-31602 (JCW) (Bankr. W.D.N.C. Sept. 24, 2020) [Dkt. 2481], Kaiser Gypsum Asbestos Personal Injury Trust Dist. Procedures § 7.3; *In re Specialty Prods. Holding Corp.*, Case No. 10-11780 (JKF) (Bankr. D. Del. Oct. 23, 2014) [Dkt. 5117—3], Form of Specialty Products Holding Corp. Asbestos Trust Dist. Procedures § 7.6, available at https://www.cpf- inc.com/assets/1/6/BondexTDP.pdf (same).

iv. Judicial Economy Would Not Be Served by Returning Thousands of Asbestos Cases to the Tort System.

231. Lifting the stay would mean dumping more than 60,000 asbestos cases back into the tort system. It would result in piecemeal litigation of asbestos cases in multiple state and federal courts across the country even as the Debtor is attempting to resolve those same claims in this Court. This would undermine, if not eliminate, the Debtor's reorganization efforts and defeat its effort to employ section 524(g) to treat its asbestos liabilities. As the Court in *Bestwall* recognized: "Section 524(g) allows a debtor to address in one forum all potential asbestos claims against it, both current and future, as well as current and potential future claims against third parties alleged to be liable on account of asbestos claims against the debtor."[236] A case dump of this magnitude would not promote judicial economy. It would be the furthest thing from judicial economy.

v. The Fact That Asbestos Claims Arise Under State Law Does Not Support Lifting the Stay.

232. The asbestos claims against the Debtor arise under state law. However, this fact alone does not support liquidating those claims in the state and federal courts across the nation. Almost all claims against a bankruptcy debtor arise under state law. Nevertheless, they are typically liquidated treated and treated in the bankruptcy courts.[237]

233. Section 524(g) of the Bankruptcy Code provides a debtor with a unique mechanism to resolve its asbestos liabilities in a single forum through a consensual plan of reorganization process.[238] Indeed, Congress enacted section 524(g) to address precisely the type of state law-based asbestos claims faced by the Debtor. To lift the stay as to all asbestos personal

[236] *Bestwall*, 606 B.R. at 249.
[237] Asbestos tort claims, of course, cannot be determined in bankruptcy court. This is the function of the Section 524(g) asbestos trust.
[238] *See Bestwall*, 606 B.R at 249.

injury claims as requested would contravene the clear purpose of section 524(g) of the Bankruptcy Code.

vi. There Has Been No Stay Waiver and Lifting the Stay Would Not Promote Equal Treatment of the Debtor's Creditors.

234. The ACC argues that as the Debtor's prepetition restructuring isolated Old CertainTeed's asbestos creditors in this Debtor, whereas other creditors are being paid by New CertainTeed unabated, the Corporate Restructuring effected "a structural waiver of the stay for certain creditors" that "undermines the creditor-protective purposes of the automatic stay itself."[239]

235. DBMP counters that the 2019 Corporate Restructuring did not result in any inequality among the Debtor's creditors, all of which are subject to the automatic stay. It accuses the ACC of improperly focusing on the creditors of non-debtor New CertainTeed who are not subject to an automatic stay.

236. DBMP further argues that the 2019 Corporate Restructuring and the transactions where were made thereunder are effective and legally enforceable. Thus, there is no risk of unequal treatment of asbestos claimants (as opposed to the other creditors of Old CertainTeed) if the stay is maintained. Rather, unequal treatment would result if the stay were to be lifted and these asbestos claims were liquidated in other courts.

237. Here again, we partially agree with each side but with neither, in full. The Divisional Merger and the liability allocations are facially valid under Texas law, and presently, at least, the asbestos claims of Old CertainTeed are exclusively the debts of New CertainTeed.[240]

[239] Stay Mot. ¶ 60.
[240] Tex. Bus. Orgs. Code Ann. § 10.008(a)(4).

238. However, as explained, the Divisional Merger and its allocations are potentially subject to challenge as fraudulent transfers, and under alter ego, successor liability and potentially other creditor remedy legal doctrines. It is too early to draw any conclusions that these liabilities are or are not debts for which New CertainTeed and the Other Affiliates will be held accountable.

239. As noted, Old CertainTeed apparently believed, as DBMP and New CertainTeed now believe, the Corporate Restructuring and this follow up bankruptcy case to be an appropriate way for a corporate conglomerate to use Section 524(g) to treat asbestos liabilities without subjecting the entire enterprise to the uncertainties of bankruptcy. And the two surviving companies DBMP and New CertainTeed have declared their earnest intention to fairly compensate victims under a Section 524(g) plan. Perhaps, they will.

240. However, from the perspective of asbestos claimants, these prepetition transactions "bear all of the hallmarks" of an intentional fraudulent transfer of gigantic proportions.[241] Given the prepetition machinations which created DBMP and New CertainTeed, with one obtaining most of the enterprise value and the other all of the asbestos liabilities, the Representatives' question the Debtor's good intentions.

241. From the Representatives' perspective, these transactions were designed to insure that the only way asbestos claims would be paid, is if the claimants vote for a Debtor-created plan[242] that limits recoveries to an amount which New CertainTeed find acceptable and which affords the Protected Parties Section 524(g) injunctive relief to which they are not entitled.

[241] ACC Opposition [Adv. Pro. Dkt. 216 at p. 30].
[242] Again, since the Funding Agreement purports to be nontransferable, arguably it would not be available to support any Creditor plan. Thus, only a Debtor's plan which confers Section 524(g) relief to New CertainTeed and the Affiliates would provide the ability to "fully" compensate asbestos claims.

Otherwise, the asbestos claimants will remain marooned on 'Bankruptcy Island,' even as the CertainTeed Enterprise sails on.

242. Given that an action to challenge the Divisional Merger has yet to be filed in this case, it remains to be seen whether New CertainTeed and the Other Affiliates are themselves liable for Old CertainTeed's asbestos claims.

243. Reflecting how far out of the norm this case lies, in response to these actions, the Representatives want to give creditors relief from stay to bring or continue tens of thousands of individual actions against DBMP and the Protected Parties in state court. Such an en masse grant of relief from stay to all creditors to liquidate their claims against a Debtor[243] in the various state courts is, in our experience, unprecedented. So too, the proposal to allow claimants to pursue for their individual benefit, generalized injury claims which are either estate property or "first crack" avoidance claims. Either would destroy any chance of a bankruptcy resolution of these asbestos claims and future demands.

244. The Representatives' goal is to force an outright dismissal of this bankruptcy case. This Court appreciates why these parties feel aggrieved, but we are not in a position to grant a lift stay motion that effectuates their dismissal hopes.

245. Again, there is no pending motion to dismiss this case as a "bad faith" filing. Such an effort was made in the *Bestwall* case and it failed, due to the demanding *Carolin* standard.[244] The Representatives have not renewed their attempt in this case.[245]

---

[243] As DBMP argues, these are not insured claims, so the ACC's suggestion that this is a similar circumstance to the pending Kaiser Gypsum Plan is misplaced. *See* Section III(E).
[244] *Carolin Corp.*, 886 F.2d at 700-01.
[245] No doubt, the fact that the effort failed in *Bestwall* is the reason that no such motion was filed in this case. *Bestwall, DBMP* and *Aldrich* feature the same general cast of professionals representing, with only one notable exception, the same constituencies. As such, rulings in one of these asbestos cases lead to the parties adjusting tactics in the other cases with regard to similar disputes.

246. And while there is reason for the asbestos claimants and their fiduciaries to question the good faith and enforceability, of the Corporate Restructuring and the merger allocations, the way to challenge those actions is not through piecemeal individual claimant actions in the tort system. It is through plan negotiation and/or an adversary proceeding filed in this case for the benefit of all asbestos claimants.

247. And here, even if the automatic stay were lifted to permit the asbestos claimants to individually litigate claims against the Debtor, consistent with the above conclusions above, they would be unlikely to collect any judgment or settlement except under a plan of reorganization in this bankruptcy case.

248. The automatic stay protects the Debtor and its estate. It avoids a race to the courthouse and enables a Debtor to seek a global resolution of the asbestos claims under a plan of reorganization. It remains to be seen whether the actions of Old CertainTeed, New CertainTeed and the Debtor were undertaken in good faith or, apart from DBMP who among them should be answerable to asbestos claimants. That will be sorted out in this bankruptcy case. However, it is most abundantly clear that granting relief from stay as proposed would create bedlam, produce inconsistent results for creditors, and effectively end the bankruptcy case. The Stay Motion must be denied.

**F. The Preliminary Injunction Request**

249. Having determined (1) that the Asbestos Claims which the Defendants seek to assert against New CertainTeed and the Protected Parties are in the first instance claims against the Debtor, (2) the legal mechanisms to challenge the Corporate Restructuring so as to make New CertainTeed and the Other Affiliates liable for the asbestos claims are either estate property and/or claims for which the Estate is given the "first crack" to assert under controlling Circuit authority, and (3) that cause does not exist to grant relief from stay, we might end there.

250. However, out of an abundance of caution, we will consider the propriety of continued injunctive relief pending a resolution of this Chapter 11 Case.

i. Preliminary Injunction Standards

251. Preliminary injunctions are "extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances."[246] In each case, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."[247]

252. To obtain the requested preliminary injunction, the Debtor is required to make "a clear showing" "[1] that [it] is likely to succeed on the merits, [2] that [it] is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in [the Debtor's] favor, and [4] that an injunction is in the public interest."[248]

253. Congress intended that standard to apply to § 105(a) preliminary injunctions."[249] Indeed, the Fourth Circuit has employed the traditional standard when reviewing an injunction staying actions against non-debtors under § 105(a).[250]

254. "[T]he Fourth Circuit has made very clear that the critical, if not decisive, issue over whether injunctive relief should be granted is whether and to what extent the non-debtor litigation interferes with the debtors' reorganization efforts."[251]

[246] *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).
[247] *Id.* at 24.
[248] *Id.* at 20.
[249] *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1094-95 (9th Cir. 2007) (citing S. REP. NO. 95-989, at 51 (1978), as reprinted in 1978.
[250] U.S.C.C.A.N. 5787, 5836-37 and H.R. REP. NO. 95-595, at 342, as reprinted in 1978 U.S.C.C.A.N.; *Piccinin*, 788 F.2d at 1003-09.
[251] *Brier Creek*, 486 B.R. at 694.

**a. Likelihood of a Successful Reorganization**

255. In bankruptcy proceedings, "success on the merits is to be evaluated in terms of the likelihood of a successful reorganization."[252] Courts also consistently recognize that satisfying this factor does not present a high bar.[253] In the typical chapter 11 case, it can be met where the debtor has demonstrated the financial ability to carry out a reorganization and efforts to negotiate with parties in interest.[254]

256. DBMP has repeatedly stated that it seeks to resolve the DBMP Asbestos Claims permanently, globally, and equitably through the establishment of a Section 524(g) trust. And as this Debtor seeks to treat both present asbestos claims and future demands, and to afford permanent injunctive relief to the Protected Parties, nothing less than a Section 524(g) plan and injunction will do. This being so, we believe the evaluation must necessarily focus on the likelihood of a successful reorganization which includes Section 524(g) relief.[255]

257. The Representatives argue that DBMP has failed to demonstrate such a likelihood. First, there has been no progress toward achieving a 524(g) plan—no filed plan, draft, or even a term sheet. Second, DBMP has not obtained funding commitments to the potential Section 524(g) trust from the "Protected Parties"—i.e., those that would benefit from a preliminary injunction. Third, a successful reorganization under § 524(g) is dependent on overwhelming creditor support. Confirmation of a § 524(g) plan requires a supermajority of assenting current asbestos claimants.[256] Given all that has transpired, the Representatives confidently predict that the Debtor will be unable to gain that creditor support. Finally, the Representatives suggest that

---

[252] *Bestwall*, 606 B.R. at 254.
[253] *Id.*
[254] *See Chicora Life Ctr.*, 553 B.R. at 66; *Litchfield Co. of S.C. Ltd. P'ship v. Anchor Bank (In re Litchfield Co. of S.C. Ltd. P'ship)*, 135 B.R. 797, 807 (W.D.N.C. 1992).
[255] On this narrow point, we respectfully disagree with our colleague's conclusion in *Bestwall* that an ordinary Section 1129 confirmation would suffice. *Bestwall*, 606 B.R. at 255.
[256] *See* 11 U.S.C. § 524(g)(2)(ii)(IV)(bb) (requiring 75% acceptance of voting asbestos creditors).

the Distributors of former CertainTeed's products do not fall within Section 524(g)'s four enumerated categories of derivative liability.[257] As these parties are not entitled to permanent injunctive protection, the Representatives say they should not receive preliminary relief either.[258]

258. The ability of this Debtor to successfully reorganize under chapter 11 with a Section 524 trust and injunction is far from certain. Nevertheless, it within the scope of "likelihood." Assuming that agreement can be reached on the terms of a Section 524(g) plan and trust, by virtue of its present assets and with contribution from New CertainTeed (a corporation with significant financial resources) and perhaps other protected parties, the Debtor has the financial ability to appropriately fund a section 524(g) trust and to pay the administrative costs of the Chapter 11 Case.

259. Admittedly, there have yet to be meaningful settlement negotiations or plan formulation actions in the case. However, here that does not demonstrate inability to reorganize, for two reasons. First, injunctions of this kind are often entered at the outset of the chapter 11 case necessarily when no plan or negotiations have occurred. Rather, the requested preliminary injunction is necessary to provide the Debtor with an opportunity to negotiate and formulate a plan that can then be confirmed. Thus, bankruptcy courts routinely grant preliminary injunctions before plans of reorganization have been filed.[259]

260. Here, we are admittedly a year and a half into the case. Still, the fact that plan negotiations and plan formulation has not begun is not due to lassitude. From the first day

[257] *See* 11 U.S.C. § 524(g)(4)(A)(ii)(I)-(IV)).
[258] *See DeBeers Consol. Mines, Ltd. v. United States*, 325 U.S. 212, 220 (1945) (courts should not grant a preliminary injunction when such injunction is not "of the same character as that which may be granted finally").
[259] *See, e.g., In re Kaiser Gypsum Co., Inc.,* No. 16-31602, Adv. Pro. No. 16-03313, at 5 [Adv. Pro. Dkt. 18] (Bankr. W.D.N.C. Nov. 4, 2016); *In re Garlock Sealing Techs. LLC*, No. 10-31607, Adv. Pro. No. 10-03145, at 6 [Adv. Pro. Dkt. 14] (Bankr. W.D.N.C. June 21, 2010); *In re Specialty Prods. Holding Corp.*, No. 10-11780, Adv. Pro. No. 10-51085, at 3 [Adv. Pro. Dkt. 47] (Bankr. D. Del. July 23, 2010); *In re W.R. Grace,* No. 01-01139, Adv. Pro. No. 01-00771 [Adv. Pro. Dkt. 32] (Bankr. D. Del. May 3, 2001); *In re Quigley Co., Inc.,* No. 04-15739, Adv. Pro. No. 04-04262, at 5 [Adv. Pro. Dkt. 122] (Bankr. S.D.N.Y. Dec. 17, 2004).

hearings, the asbestos claimants have decried this case filing as a massive fraud and have passionately urged this Court to deny injunctive relief to the Protected Parties.

261. Given this, upon securing the appointment of the estate fiduciaries and professionals to represent them, resolution of the preliminary injunction motion was made the first order of business. No one then envisioned that it would take a year and tens of millions of dollars of professional fees to reach a hearing. But the fact remains: this injunction was given top priority. Other case activities, like plan negotiations, have been deferred.

262. The Debtor has on several occasions, voiced its willingness to engage with the Representatives toward a consensual resolution of this case. Obviously, the prepetition transactions which Old CertainTeed and DBMP have undertaken have poisoned the well, at least for the moment. Nevertheless, the offer has been made.

263. DBMP has also attempted to move forward into other case matters, such as personal injury questionnaire motions and trust discovery, only to have the Representatives argue—and this Court to direct—that the preliminary injunction hearing should come first. Thus, DBMP cannot be faulted for a lack of diligence; nor is the lack of a plan or plan negotiations indicative of an inability to reorganize.

264. As to the ACC's prediction that the asbestos claimants will never agree to a Plan, it is simply too early to tell. Having sat on two other hotly contested and apparently irreconcilable asbestos bankruptcy cases that wound up with consensual plans as between these constituencies (*Garlock Sealing* and *Kaiser Gypsum*[260]), this Court is unable to conclude that our parties cannot reach agreement, as well. To find otherwise would effectively be to prejudge the

[260] The *Garlock* plan was approved by a supermajority of the asbestos claimants and confirmed without objection. The *Kaiser Gypsum* plan received a 100% favorable vote of the asbestos claimants, was recently confirmed, and is on appeal due to the opposition of the company's insurer.

outcome of a Chapter 11 Case at its outset. Almost forty years of bankruptcy experience has impressed upon this Court that such prognostications cannot be accurately made in the early stages of a case.

265. Similarly, it is simply too early in the case to determine whether any Protected Party is or is not eligible for section 524(g) relief. That determination will be made at confirmation. If the Protected Parties are not so entitled, such relief will not be afforded them. The current dispute after all concerns a preliminary, not a permanent, injunction. And the primary function of a preliminary injunction in a chapter 11 case is to afford the parties the time to sort out the finer points of the case and if necessary for the Court rule on their disputes.

**b. Irreparable Harm to the Debtor**

266. The DBMP Asbestos Claims asserted to this point in the tort system, and those that are likely to follow, seek to recover on account of the same liabilities that the Debtor seeks to resolve through reorganization in bankruptcy. As previously described, prosecution of those same claims outside of this case would gravely harm, and almost certainly end, the Debtor's reorganization efforts.

267. Moreover, the only way to make third parties liable for these claims would be for such plaintiffs to assert remedial causes of action like alter ego and successor liability claims as well as fraudulent conveyance claims which are either estate property or for which first crack is afforded to the bankruptcy estate. And the litigation of DBMP Asbestos Claims in the tort system while the Chapter 11 Case remains pending would undermine the purposes of chapter 11 and

section 524(g) to resolve all such current and future claims in a fair and equitable manner though a chapter 11 plan.[261]

268. This is not assumption. In the few prepetition months of the Corporate Restructuring and DBMP's creation, dozens of new asbestos cases or amended complaints were filed seeking to pursue DBMP Asbestos Claims against one or more Protected Parties. The Representatives expressly oppose the entry of a preliminary injunction precisely to permit claimants to pursue such claims outside of this case.[262] Pursuit of even a small fraction of the more than 32,000 active cases (of more than 60,000 total claims) that the Debtor faced as of the Petition Date, would impose unsustainable burdens upon the Debtor's reorganization effort and, as we have said, would cause bedlam as these claims would be pursued in multiple courts. even as the parties are trying to negotiate their resolutions in this court.

269. The parties have argued at length as to whether permitting DBMP Asbestos Claims to proceed against the Protected Parties would fix and liquidate contingent indemnification claims against the Debtor and whether under preclusion principles, the Debtor might be bound by such determinations. Because we have concluded that permitting such actions in the tort system would necessarily involve (1) determining claims against the debtor and (2) exercising control over estate property, we need not address these additional arguments. Irreparable harm has already been established.

[261] The Debtor also argues that this would divert the Debtor's officers from their duties, but this is not a compelling argument. This Debtor was designed not to have any employees but to borrow them from SGC, a conglomerate which boasts more than 171,000 employees. If the Debtor's employees are too few, SGC has but to second others to the cause.

[262] *See*, *e.g.*, Hr'g Tr., 31:5-9, Nov. 18, 2020.

**c. Balance of the Harms**

270. As we discussed above with respect to stay relief, the demonstrated irreparable harm to the Debtor that would occur were the preliminary injunction lifted substantially outweighs any prejudice to the Defendants. We need not repeat all those points. Suffice it to say the harm to asbestos claimants appears to be delay in recovering what for most asbestos claimants will be but a small portion of their overall damages.

271. The Representatives again argue that the Corporate Restructuring undermined the legal recourse available to asbestos claimants and has the characteristics of a fraudulent transfer. They suggest that these potentially fraudulent actions of old CertainTeed tip the equitable balance against granting the preliminary injunction.

272. As noted above in Section III(C), there is reason to question the propriety of the Corporate Restructuring and the Divisional Merger. However, it is because of this prospect—that there may have been a colossal general injury worked upon the asbestos claimants—that redress must be sought in the bankruptcy case on behalf of all claimants, and not piecemeal by a thousand individual plaintiffs, for their personal benefit, in a hundred different courts.

273. As noted, if the Corporate Restructuring was in fact a fraudulent transfer, controlling Fourth Circuit precedent demands that the bankruptcy trustee be afforded the "first crack" at asserting the avoidance action.[263] And to the extent that the remedial claims are state law alter ego or successor liability theories, these are claims held under applicable state law by DBMP's bankruptcy estate under Section 541.[264]

[263] *Ruppert*, 187 F.3d at 441.
[264] *See* Section III(D)(ii).

274. While the Representatives suggest that New CertainTeed is being improperly rewarded with a preliminary injunction for its predecessor's conduct, should a trustee (or the Representatives) assert those claims for the benefit of all asbestos claimants, then this injunction may not be a reward, at all. It would be a marshalling of those claims and those potentially responsible into a single forum, were the injuries might be addressed for the benefit of all asbestos claimants. This would seem to be a superior result for such creditors as opposed to forcing each to bring, and finance, the same litigation separately. From a judicial economy perspective, it is a far superior procedure.

275. In sum, the potential delays occasioned by the stay and injunction are outweighed by the greater harms that would arise otherwise—the almost certain termination of the Debtor's reorganization effort and a pell mell race to the courthouses.

**d. Public Interest**

276. Courts have consistently affirmed the public's interest in a successful reorganization, which interest may be at its greatest in mass-tort bankruptcies.[265] This Court agrees.

277. DBMP's successful reorganization also would promote Congress's particular goal in section 524(g) by establishing an asbestos trust that would efficiently and equitably resolve tens of thousands of asbestos claims.[266] A section 524(g) trust "will provide all claimants—including future claimants who have yet to institute litigation—with an efficient means through which to equitably resolve their claims."[267]

[265] *See U.S. v. Whiting Pools, Inc.*, 462 U.S. 198, 204 (1983)*; Robins*, 788 F.2d at 1008; *W.R. Grace & Co.*, 386 B.R.at 52.
[266] *See In re Congoleum Corp*., 362 B.R. 198, 201 (Bankr. D.N.J. 2007); *see also* Bates Report ¶ 51.
[267] *Bestwall*, 606 B.R. at 257; *see also* Bates Report ¶ 10.

278. There is, of course, no public policy interest in aiding a fraud on creditors if that is what the Corporate Restructuring and Divisional Merger turn out to be. But again, this is a preliminary injunction, implemented so that the proper inquiry can be made. Or as Judge Beyer put it in *Bestwall*, this Preliminary Injunction is necessary to protect the Debtor during its efforts to reorganize, but it will not "allow any party to escape any asbestos related liabilities," and a permanent channeling injunction will only be granted in connection with a confirmed plan of reorganization that meets the requirements of section 524(g).[268]

279. It is far from certain that granting the preliminary injunction will result in the parade of horribles that the Representatives suggest. If DBMP and New CertainTeed are true to their word, if they are committed to providing "full and fair" resolution of these asbestos liabilities, then the parties may reach accord. If not, safeguards and creditor protections remain available to the asbestos claimants in this bankruptcy case, including—state and federal fraudulent transfer law (which applies to Texas divisional mergers), the ability to dismiss a bankruptcy case if circumstances warrant, and the plan confirmation requirements under the Bankruptcy Code (especially including the legal requirements for obtaining a channeling injunction under section 524(g)). None of those protections is affected by the grant of the preliminary injunction.

280. Again, continued litigation of DBMP Asbestos Claims against Protected Parties in the tort system while the Debtor attempts to address and resolve those same claims in this Chapter 11 Case would undoubtedly interfere with, and almost surely end, the Debtor's reorganization. With thousands of claims and proceedings spread out across the country, it would be all but impossible to negotiate or confirm a Section 524(g), or any other, plan.

[268] *Bestwall*, Adv. Pro. No. 17-03105, slip op. at 5 [Adv. Pro. Dkt. 190] (Jan. 31, 2020).

281. Thus, while this Court has concerns about the propriety of what Old CertainTeed wrought in the Corporate Restructuring and Divisional Merger, controlling law and present realities require that the Preliminary Injunction be maintained while this reorganization case proceeds. The Preliminary Injunction will be Granted.

Signed: August 10, 2021
/s/ J. Craig Whitley
J. Craig Whitley
United States Bankruptcy Judge for the Western District of North Carolina

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | | |
|---|---|---|
| In re: | : | |
| | : | Chapter 11 |
| DBMP LLC,[1] | : | |
| | : | Case No. 20-30080 |
| Debtor. | : | |

**THE ESTATE OF PETER L. BERGRUD'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(d)**

Pursuant to 11 U.S.C. § 362(a)(1), Cheryl L. Bergrud, individually and as Personal Representative for the Estate of Peter L. Bergrud ("Mrs. Bergrud" or "Movant") requests relief from the automatic stay to quantify her state law claims against DBMP.[2]

## I. INTRODUCTION

***If you choose not to decide, you still have made a choice.***

[1] The last four digits of the Debtor's taxpayer identification number are 8817. The Debtor's address is 20 Moores Road, Malvern, Pennsylvania 19335.

[2] This Court issued thorough Findings of Fact and Conclusions of Law in ruling on the preliminary injunction on August 11, 2021. *See* Case No. 20-30080, Adv. Pro. Case No. 20-03004, Adv. Pro. Dkt. 972 ("Findings"). CertainTeed Corporation ("Old CertainTeed" or "Old CT") manufactured building products containing asbestos for decades. *See* Findings at ¶ 1. On October 23, 2019, Old CertainTeed divided itself into two new entities: CertainTeed LLC ("New CertainTeed" or "New CT") and DBMP LLC ("DBMP" or the "Debtor").

Forty-four years ago, the iconic Canadian band, Rush, immortalized in song the concept first articulated by the American philosopher and psychologist William James that "not to act on one belief, is often equivalent to acting as if the other belief were true."[3]

This Motion implores the Court to decide whether DBMP filed its petition in bad faith and whether this is grounds to lift the stay, as well-established precedent in the Fourth Circuit demonstrates. If so, then even if dismissal cannot be granted at this time, due to this Court's evaluation of "objective futility" under *Carolin Corp. v. Miller*, 886 F.2d 693 (4th Cir. 1989), individual claimants who seek relief must ***not*** continue to be subjected to the devastating effects of the automatic stay.

Over six years and several cases into the Texas Two-Step debacle in this District, no court has addressed whether these wealthy and fabricated debtors, all of whom boast the ability to pay all claims in full, have filed for Chapter 11 in subjective bad faith. In *Aldrich*, this Court denied the motions to dismiss without reaching this issue, finding those two debtors "were designed to meet [*Carolin*'s] objective futility standard, and they do." *Aldrich* Dismissal Order at 63.[4] Nor has Judge Beyer ruled on Bestwall's subjective bad faith, despite being urged to do so recently by plaintiff Wilson Buckingham.[5]

[3] James, *Some Problems of Philosophy: Beginning of an Introduction to Philosophy*, p. 223, Longmans, Green, and Co. (1911). Rush, *Freewill*, from the album Permanent Waves, Anthem Records, January 14, 1980.
[4] *Order Denying Motions To Dismiss* (Hon. J. Craig Whitley), entered December 28, 2023, Case No. 20-30608-JCW (Dkt. No. 2047) ("*Aldrich* Dismissal Order").
[5] *See In re Bestwall LLC*, 605 B.R. 43, 50-51 (Bankr. W.D.N.C. 2019) ("Because the Court concludes that this case is not objectively futile, it need not (and does not) reach the issue of whether this case was filed in subjective bad faith."); *In re Bestwall LLC*, 71 F.4th 168, 182 (4th Cir. 2023)("In this appeal, by contrast, [claimants] do not make the arguments raised by the claimants in *LTL Management LLC*" where motions to

Only yesterday, despite this Court's thoughtful and thorough dismissal opinion and certification ruling in Aldrich, the Fourth Circuit declined to take interlocutory review. *See* U.S.C.A4 Appeal No. 24-128, Dkt. 50. The subjective bad faith of Two-Step debtors must be addressed, and Mrs. Bergrud urges this Court not to put off for another day what can and should be decided ***now***:

> Is it a proper use of the Bankruptcy Code for a massively profitable and non-financially troubled company to manipulate its corporate structure on the eve of bankruptcy to isolate a single class of creditor, remove all the productive assets of its business from the reach of the bankruptcy court, and file for Chapter 11 in an admitted attempt to leverage the automatic stay into judicially compelled re-negotiations of state law liabilities, and for relief which that debtor is not entitled to under controlling law outside of bankruptcy?

If the answer is "no," then this proceeding is in bad faith and the stay must be lifted for those who ask. *See In re Premier Automotive Servs., Inc.*, 492 F.3d 274, 281–82 (4th Cir. 2007) (bankruptcy courts' "powerful equitable weapons" should not be wielded by "financially healthy companies with no need to reorganize"); *Carolin Corp. v. Miller*, 886 F.2d 693, 702 (4th Cir. 1989) (it is bad faith for a debtor to file for Chapter 11 "merely for the purpose of invoking the automatic stay…").

Saint-Gobain, New CertainTeed, and DBMP insist they can pay asbestos plaintiffs in full in the tort system. So ***why*** are we here? Because they prefer to pay less. Being ***cheap***

dismiss were filed based on a lack of financial distress); *In re Bestwall LLC*, 2024 WL 721596, *21 (Bankr. W.D.N.C. 2024) (declining to dismiss due to law of case doctrine and divestment rule based on prior ruling, and rejecting Official Committee's argument of the court's lack of constitutional subject matter jurisdiction).

is not a valid reason to file for bankruptcy. Nor is dissatisfaction with the refusal of Congress and state legislatures to statutorily restrict the rights of asbestos victims. This is bankruptcy court, not tort-reform court.

Prior rulings on lift stay motions have turned on an understandable but erroneous premise that conflates dismissal with frustrating the debtor's (improper) bankruptcy purpose. While it is certainly true that if the Court were to lift the stay for many (or all) claimants, DBMP's primary goal in this proceeding—to homogenize victims and collectively estimate the value of their claims without a jury—would fail. But frustrating a bad-faith multi-billionaire's goal is ***not*** the same as dismissal.

Permitting Mrs. Bergrud to liquidate her claims against DBMP before a jury and a trial judge will certainly displease DBMP and frustrate the agenda of its tail-wagging parents in France and Pennsylvania, but that's not a proper factor in deciding this motion and is simply not the same as dismissing the case. The bankruptcy case will continue—but with the value of Mrs. Bergrud's claims conclusively established by a jury—to which she is statutorily and constitutionally entitled.

Nor can ruling on the question of good faith in the context of this lift stay motion be properly avoided by determining that *Carolin*'s objective futility prong has not been satisfied. Objective futility is plainly ***not*** a factor in lifting the stay. Stay relief is to be given "for cause" (11 U.S.C. § 362(d)(1)), and this Court is authorized "to determine

whether, with respect to the interests of a creditor seeking relief, a debtor has sought the protection of the automatic stay in good faith." *Carolin*, 886 F.2d at 699.

While Mrs. Bergrud recognizes that Judge Beyer, in *Bestwall*, recently applied *Carolin* in the denial of Mr. Buckingham's lift stay motion, that decision was contrary to well-established law that bad faith lift stay motions are judged on a different and more relaxed standard than bad faith dismissal motions; otherwise, there would be no need for bad faith lift stay motions as all such cases would be dismissed outright. *See In re Dixie Broadcasting, Inc.*, 871 F. 2d 1023, 1024, 1027 (11th Cir. 1989) (affirming the bankruptcy court's lifting the stay for specific creditors who moved for relief after the bad faith debtor filed its petition "despite [its]apparent good financial health..." and with an "intent to abuse the judicial process and reorganization provisions.").

If the Court disagrees with Mrs. Bergrud, and rules that DBMP filed in subjective good faith, that is better than not ruling at all, as at least an appeal can be taken. *See Official Committee of Asbestos Claimants v. Bestwall LLC*, 3:19-cv-00396-RJC, 2023 WL 7361075, *2 n.2 (W.D.N.C. Nov. 7, 2023) (referencing the denied petition for direct appeal in 2019 and an "unknown error" that resulted in the District Court not ruling on the interlocutory appeal until years later).

DBMP will oppose this motion. DBMP will argue that if a single plaintiff is permitted to pursue the Debtor in the tort system, the 'floodgates' will be open to more and more requests and granting those will be 'akin to a dismissal.' DBMP will say Mrs.

Bergrud and her lawyers are 'relitigating' issues that have already been decided (they have not).

DBMP will do this because ***its*** purpose is to globally resolve every single current and future asbestos claim against it in bankruptcy court from a capped limited fund, despite being non-distressed, massively wealthy, and fully capable of paying all claims in full, and despite having performed a Texas Two-Step manipulation on the eve of its petition to isolate and discriminate against its asbestos victims. Saint-Gobain, New CertainTeed, and DBMP's purpose in launching this ongoing abuse of Chapter 11 is contrary to purposes of the Bankruptcy Code as defined by the Fourth Circuit and as applied by it in *Carolin* and *Premier Auto*.[6]

The Code's purpose, its "statutory objective," is "'resuscitating a financially troubled [debtor],'" which DBMP is ***not.*** *Carolin*, 886 F.2d at 701 (citing *In re Coastal Cable TV, Inc.*, 709 F.2d 762, 765 (1st Cir. 1983)). The Fourth Circuit has specifically and directly rejected the premise that companies that are not in financial distress can file for bankruptcy for the purpose of forcing judicial negotiations and seeking a result not permitted by controlling state law, all while protected by the automatic stay. *See Premier Auto*, 492 F.3d at 281–82. Imposing a stay on ***all*** claimants—even those who seek relief based on the specific facts of their claims, as the Fourth Circuit recently recommended in

[6] *See* Dkt. 22, Informational Brief at 16.

*Bestwall*—when DBMP filed its petition in subjective bad faith does not further the purposes of the Code.

In addition to DBMP's subjective bad faith being sufficient to grant Mrs. Bergrud this relief, the *Robbins* factors are satisfied: (1) all issues pending in their litigation against DBMP involve state law; (2) liquidating their claims in state court will not interfere with this proceeding and will promote judicial economy; and (3) the DBMP's bankruptcy estate is protected because this Court will decide when the Movant's liquidated claims will be paid. *In re Robbins*, 964 F.2d 342, 345 (4th Cir. 1992). *See In re Claughton*, 140 B.R. 861, 867-68 (Bankr. W.D.N.C. 1992).

## II. FACTUAL AND PROCEDURAL BACKGROUND

Nearly three years ago, this Court wrote that it "remains to be seen" whether DBMP, New CertainTeed, and Old CertainTeed had acted in "good faith," and extended to them the protections of the automatic stay and preliminary injunction. Findings at ¶ 248. What has not been before this Court—until now—is whether DBMP filed its petition in subjective bad faith. *See* Findings ¶¶ 149-50 (noting the exacting *Carolin* dual prong requirements and that a motion to dismiss was not before the Court).

While recognizing at the time that the ACC predicted asbestos claimants would never agree to a plan, this Court found it was "simply too early to tell." Findings at ¶ 264. Several legal and factual developments since 2021 are relevant to deciding Mrs. Bergrud's motion now.

### A. Prior Motions to Lift the Stay in Two-Step Cases in This District.

This is the first individual action seeking relief from stay in *DBMP*, the first presented to this Court since the Fourth Circuit ruled in *Bestwall*, the first asking this Court to rule on whether DBMP filed in subjective bad faith, and the first to ask whether this is grounds, by itself, to lift the stay for an individual plaintiff. Three prior lift stay motions were denied in Two-Step cases, two in *Bestwall* and one in *Aldrich*.

#### 1. *In re Aldrich Pump LLC/Murray Boiler LLC.*

In denying Robert Semian's motion for relief in March 2023, this Court reasoned: "I have no doubt . . . that if I grant relief from stay to one creditor to liquidate the claim, all of the claimants will—not all—but a substantial number of the claimants, enough to wreck the bankruptcy case, will seek like measure and that effectively precipitates a *de facto* dismissal of the case." Ex. 1, *Aldrich* Tr. 3/30/23 at 67. This Court denied Mr. Semian's subsequent motion to dismiss *Aldrich* and certified its ruling for direct appeal. *See Aldrich*, Certification Order, Dkt. 2111.

#### 2. *In re Bestwall LLC.*

Richard and Joan Dale's motion before Judge Laura T. Beyer (Case No. 17-31795-LTB) was denied in October 2023. Ex. 2, *In re Bestwall*, Tr. 10/19/23 at 69-70. The Dales did not raise bad faith directly as grounds to lift the stay. Despite finding that—"strictly speaking"—the Dales satisfied the *Robbins* factors and recognizing that "bankruptcy courts . . . often [grant such motions] so that a state court can liquidate claims that are

based on state court causes of action," Judge Beyer denied the motion. *Bestwall* Tr. 10/19/23 at 69-70. Judge Beyer made what she admitted was the "speculative . . . assum[ption] that granting the Dales' motion . . . would result in a wave of similar motions." *Id*.

Second, Wilson Buckingham and his wife, Angelika Weiss, moved for relief (*Bestwall*, Dkt. 3242), in December 2023, arguing Bestwall's bad faith was grounds, by itself, to lift the stay. Judge Beyer denied this motion "in large part [based upon] the same reasons [she] denied the Dales' motion for relief from stay." *See* Ex. 3, *Bestwall*, Tr. 1/18/24 at 77. Judge Beyer reasoned it would be improper to apply a standard for bad faith lift stay motions that was less stringent than the standard for bad faith dismissal under *Carolin*, notwithstanding precedent directly to the contrary. Judge Beyer later denied Mr. Buckingham's motion to certify her denial of his motion for relief from stay for direct appeal.

**B. Old CertainTeed Negligently Caused Mr. Bergrud's Mesothelioma.**

Old CertainTeed negligently and unnecessarily exposed Peter Bergrud to deadly asbestos dust on a sustained, regular basis for decades. Mr. Bergrud died of malignant pleural mesothelioma in April 2019. He was also diagnosed with asbestosis and an asbestos body was found in his lung tissue, both indications of heavy exposure to asbestos dust. *See* Ex. 4, Tarin Report at 3.

### 1. *CertainTeed knew its asbestos-cement pipe was hazardous for decades before exposing Mr. Bergrud.*

By the mid-1960s, at the latest, Old CertainTeed knew that asbestos exposure caused mesothelioma and that crocidolite asbestos—the type of asbestos used in its cement pipe—had a higher potency in causing cancer than other forms of asbestos. Ex. 7, Lloyd Ambler Dep. 8/20/2014 at 208:17-209:15.[7] Fellow Two-Step debtors Aldrich, Murray and Bestwall agree; all contend amphibole asbestos fibers (i.e. crocidolite and amosite) are many times more "potent" at causing mesothelioma than the chrysotile fibers found in their products.[8]

Old CertainTeed knew that cutting its asbestos-cement pipe with an abrasive saw—like the one Mr. Bergrud regularly used—generated levels of asbestos dust up to six times higher than OSHA's exposure limit, but Old CT did nothing to warn workers of these hazards. Knowing these hazards, Old CertainTeed internally took steps to protect its own employees, but did ***nothing*** to warn or protect end users like Mr. Bergrud.

---

[7] Old CertainTeed took over the asbestos-cement pipe manufacturing business of Keasbey & Mattison in 1962. Leon Horowitz was an industrial hygienist with K&M who remained in this capacity at Old CertainTeed. *See* Ex. 5, Leon Horowitz Dep. 6/30/1980 at 5-30. By 1960, he and Old CertainTeed were well aware of the connection between asbestos exposure and cancer. Ex. 5, at 39:20-21; Ex. 6, Lloyd Ambler Dep. 8/27/2009 at 126:8-20.

[8] *See In re Aldrich*, Informational Brief at 14 (Case No. 20-30608-JCW, Dkt. 5). Aldrich contends amphibole forms of asbestos (i.e., crocidolite and amosite) are much more likely to cause mesothelioma. *Id.* at 2. There is a "broad consensus" that crocidolite and amosite are far more toxic than chrysolite. *Id.* at 3,15. Aldrich argues "amphiboles" are "500 times more potent" in causing mesothelioma than the chrysotile asbestos in gaskets found in Aldrich pumps. *Id.* at 16. *See In re Bestwall*, Informational Brief at 4 (Case No. 17-31795-LTB, Dkt. 12). Bestwall claims chrysotile asbestos in its products has potency "substantially lower" than amphibole asbestos. Amphibole containing products have "proven toxicity." *Id.* at 4. Bestwall argues amphiboles are "100 to 1,000" more potent than chrysotile asbestos refers to them as "dangerous amphibole-containing products." *Id.* at 26.

Ex. 5, Leon Horowitz Dep. 6/30/1980 at 49.[9] Only in 1985 did Old CT—allegedly—first include a warning about its asbestos-cement pipe. Ex. 6, at 137:9-317:2.[10] And Old CertainTeed continued to manufacture, market, and sell this product, made of a known human carcinogen, well into the ***1990s.***

**2. *Mr. Bergrud was exposed to asbestos from Old CertainTeed's pipe on a sustained, regular basis for over forty years.***

Mr. Bergrud worked for various construction companies in the state of Washington throughout his career.[11] Over the course of his career, Mr. Bergrud primarily worked with Old CertainTeed and Johns-Manville asbestos-cement pipe. *See* Ex. 10, Juan Bergrud Dep. 10/16/19 at 36:23-37:5. During these years, Mr. Bergrud regularly cut, beveled, and tapped (drilled) asbestos-cement pipe, all of which created heavy amounts of respirable dust. *See* Ex. 11, at 112:14-19. None of the witnesses who worked with Mr.

[9] In March 1977, the Asbestos Cement Pipe Producers Association, of which CertainTeed was a member, found that cutting asbestos-cement pipe with an abrasive disc saw generated asbestos dust concentrations which "greatly exceeded the current OSHA standard for short term or peak exposures." Ex. 8, Deposition of Lloyd Ambler 8/28/2009 at 41-43. In fact, CertainTeed was producing peak exposure levels of up to six times OSHA's permissible exposure limit, and up to ten times the limit when wet-down procedures were implemented. The study also revealed that all methods of cutting asbestos-cement pipe released respirable asbestos fiber. *Id.*

[10] This is not a comprehensive recitation of facts supporting Old CertainTeed's negligence and liability for punitive damages. However, it shows the unique recklessness with which the Company behaved in manufacturing and selling its asbestos-cement pipe well into the 1990s, over twenty years after OSHA was enacted.

[11] For example, Mr. Bergrud and his younger brother, Juan Bergrud ("Juan"), worked together for Universal Construction from 1965 to 1968 installing underground water lines. Ex. 9, Juan Bergrud Dep. 10/15/19 at 52:10-18. Mr. Bergrud's other employers included (but were no limited to) Almon Lawler in 1968 and 1969, and Shoreline Construction from 1969 to 1972. Ex. 9, at 48-50. Mr. Bergrud's stepson, Richard Trumbull, worked his entire career in underground utility construction, and started working with Mr. Bergrud as a teenager. Mr. Trumbull installed underground water, sewer, and storm lines with Mr. Bergrud, and the only brands of asbestos pipe they used were Old CertainTeed and Johns-Manville.[11] Ex. 11, Richard Trumbull Dep. 11/18/19 at 111:12-22.

Bergrud recalled seeing an asbestos warning on any CertainTeed materials. As a result, Mr. Bergrud was unknowingly exposed to ultra-hazardous levels of asbestos from Old CT's pipe for decades.

#### 3. *Mr. Bergrud's exposure to Old CertainTeed's asbestos-cement pipe caused his mesothelioma.*

Dr. Carl Andrew Brodkin reviewed Mr. Bergrud's exposure and medical history and opined that his malignant pleural mesothelioma was caused by occupational exposure to asbestos-cement pipe. Ex. 12, Brodkin Report at 1, 7-11. Christopher DePasquale, MPH, CIH, found Mr. Bergrud suffered high occupational levels of asbestos exposure from working with Old CT's pipe. Ex. 13, DePasquale Report at 5.[12]

### C. CertainTeed's and DBMP's Subjective Bad Faith.

Saint-Gobain and Old CertainTeed were never overwhelmed by asbestos liabilities. They both could and can pay asbestos plaintiffs what they owe in the tort system. Profitable and non-distressed companies attempting to transform this Court into tort-reform policy court—after Congress and state legislatures have repeatedly refused to enact comprehensive legislation to address asbestos-litigation—is ***not*** a proper purpose under the Code. Trying to 'overcome the tort system' by wasting the bankruptcy courts' time and attention, sidestepping the absolute priority rule, and avoiding the many other safeguards built into the Code to prevent abuse ***is*** bad faith.

[12] Old CT's pipe generally contained between ten (10%) and twenty-five (25%) percent asbestos by weight. Ex. 13, at 5, 14.

1. ***Saint-Gobain and Old CertainTeed's secret bankruptcy scheme.***

As early as 2018, having studied the *Garlock* and *Bestwall* bankruptcies, Old CertainTeed began discussing "a plan to isolate [its] asbestos liabilities in a new company, with minimal assets, that would file for bankruptcy." Findings at ¶¶ 40-42. The shell entity would shield "the CertainTeed Enterprise from Old CertainTeed's asbestos liabilities." *Id*. at ¶ 46. This plan, codenamed "Project Horizon[,]" was a closely guarded corporate secret "driven not by businesspeople, but by lawyers." Findings at ¶¶ 41, 43.

2. ***Old CertainTeed was massively profitable and able to pay all liabilities without financial strain.***

Old CertainTeed "was a profitable going concern whose assets significantly outweighed its combined operating and asbestos liabilities." Findings at ¶ 44. Indeed, "on Old CertainTeed's publicly disclosed financial statements, [it] had almost $3 billion in assets and less than half of that in all liabilities." Findings at ¶ 57. The company was never in distress and was settling cases in the tort system without financial strain (Findings at ¶ 188), as such Old CT "never entertained a bankruptcy filing for itself." Findings at ¶ 44.

3. ***With the Funding Agreement DBMP is a non-distressed, multi-billionaire, and able to pay all asbestos claims in full.***

After the divisive merger, New CertainTeed was "essentially a mirror image of Old CertainTeed: a fully operating company which retained all of Old CertainTeed's employees, the bulk of its assets and operations, and all of its non-asbestos creditors."

Findings at ¶ 1. DBMP, however, was "quite different," being "allocated 100% of Old CertainTeed's considerable asbestos liabilities."[13] Findings at ¶ 1.

DBMP and New CertainTeed executed a "Funding Agreement" wherein New CertainTeed committed to providing DBMP with the funds to, among other things, "satisfy the Debtor's 'Asbestos Related Liabilities' in connection with funding a § 524(g) trust." Findings at ¶¶ 65-66. The Funding Agreement is central to DBMP's and New CertainTeed's assertion that the Debtor has "the same ability" to defend and resolve "present and future asbestos claims" in the tort system as Old CertainTeed. Findings at ¶ 61.

The Funding Agreement "is not a loan," it does not impose "repayment obligations" on DBMP, and it is ***not*** capped. Findings at ¶¶ 66-67. While this Court correctly expressed concern about the enforceability of the Funding Agreement (i.e., New CertainTeed must approve any 524(g) plan),[14] DBMP can pay Mrs. Bergrud and all

[13] New CertainTeed received approximately 97% of Old CertainTeed's assets, most of its operations, and all its employees in the divisional merger. Meanwhile, only 3% of Old CertainTeed's assets were left to give to DBMP. Among these assets was approximately $25 million in cash, Old CertainTeed's asbestos liabilities, and the ability to draw from "a Funding Agreement" paid for by New CertainTeed. *See* Findings at ¶¶ 53, 65.

[14] While only DBMP can enforce this agreement, as this Court recognized, that will only happen if New CertainTeed approves. *See* Findings at ¶ 69. Ultimately, "the Funding Agreement is not an unconditional promise to pay the DBMP Asbestos liabilities. It is instead a conditional agreement which is dependent on New CertainTeed's approval." Findings at ¶ 77. Mrs. Bergrud asks this Court to take New CertainTeed at its word for purposes of this motion.

claimants what it owes them ***in full***.[15] Given its massive wealth and ability to pay, DBMP simply filed its petition to leverage the automatic stay and benefit its corporate parents.

## III. ARGUMENT

DBMP cannot file its petition in subject bad faith and be shielded from all individual claims brought by all individual claimants for years on end, simply because its reorganization is not ***yet*** objectively futile. Taken to its logical conclusion, DBMP's position is that the ***more*** money a debtor has, the ***more*** entitled to bankruptcy protection it is.

Even if that is how the Fourth Circuit intends "objective futility" to be interpreted, this has no relevance to a lift stay motion, nor does the straw man the Debtor will raise about permitting one plaintiff to liquidate her claims eventually leading to a 'de-facto dismissal.' These are ***not*** factors, under *Carolin* or *Robbins*, to be considered in ruling on individual lift stay requests.

### A. Individual Actions for Relief from Stay Are Proper.

This Court knows well the lack of progress in Two-Step cases. *See Aldrich* Dismissal Order at 21. The Court also recognizes that in the case of a "solvent asbestos defendant"—like Aldrich or Bestwall or DBMP—"due process requires that a 'plaintiff [must] be provided an opportunity to remove himself'"—i.e., opt-out—"from the aggregate

[15] Further, funding a trust is expressly conditioned upon New CertainTeed receiving a channeling injunction. Findings at ¶ 72. Thus, "while the Funding Agreement may provide funding for a plan, it will do so only if New CertainTeed favors that Plan. And that favor is dependent on New CertainTeed receiving permanent injunctive relief from the DBMP Asbestos Claims – whether it is entitled to it or not." *Id* at ¶ 74.

resolution." *Aldrich* Dismissal Order at 37-38 (citing *Ortiz*, 527 U.S. at 848 (quoting *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985))).[16]

Given the way in which *Carolin* has been interpreted in *Aldrich* and *Bestwall*, DBMP's inevitable bankruptcy failure—due to *Ortiz* or multiple other issues at confirmation—is, at best, years away. [17] What remedy, then, is available to Mrs. Bergrud in the meantime? The Fourth Circuit answered this question last June: "rather than waiting for plan confirmation, claimants can bring individual actions for relief based on the specific facts of a particular claim. That is done in bankruptcy proceedings on a **routine basis** where appropriate." *In re Bestwall LLC* , 71 F.4th 168, 183 (4th Cir. 2023)(emphasis added).[18]

**1. *Granting individual actions relief is not akin to dismissal.***

Recognizing that granting individual actions relief from stay is "routine," the Fourth Circuit did ***not*** say that lifting the stay for one claimant based on the "specific facts of a particular claim" might open the floodgates or be 'akin to a dismissal,' or that these factors have any relevance in lifting the stay for an individual action.

[16] While leaving these issues for "another day," this Court noted the Supreme Court found that a "mandatory 'no-opt-outs' settlement of a defendant's aggregate mass-torty liability is unconstitutional if the defendant's resources are sufficient to fully pay all claims." *Aldrich* Dismissal Order at 37 (discussing *Ortiz v. Fibreboard*, 527 U.S. 815, 817-18 (1999)). Depriving individual asbestos claimants of their due process rights to exclude themselves from the class action in *Ortiz* "can only be justified if the defendant's resources were insufficient to fully pay all claims." *Id.* (citing *Ortiz*, 527 U.S. at 837).

[17] *North Carolina Judges Are Shaping 'Two-Step' Bankruptcy Future*, Bloomberg, Evan Ochsner, April 10, 2024, available at https://news.bloomberglaw.com/bankruptcy-law/north-carolina-judges-are-shaping-two-step-bankruptcy-future

[18] On June 20, 2023, the Fourth Circuit upheld Judge Beyer's extension of the preliminary injunction to Georgia-Pacific.

While it is true that allowing liquidation of individual claims will defeat DBMP's primary goal—depriving claimants of the right to uncapped state-law remedies before juries, which will make any plan more difficult—frustrating DBMP's ***illegitimate*** bankruptcy purpose is not akin to frustrating a ***legitimate*** purpose of the Code. The Code specifically provides for liquidation of individual personal injury claims before a jury and the Constitution provides that individual jury trial rights cannot be impaired in the absence of a legitimate limited fund. *See* 11 U.S.C. § 1129(a); 28 U.S.C. § 157(b); U.S. Const. Amend. VII; *Amchem Products Inc. v. Windsor*, 521 U.S. 591 (1997); *Ortiz v. Fibreboard*, 527 U.S. 815 (1999).

What is ***not*** routine is a non-distressed billionaire, contentedly wallowing in bankruptcy with no incentive to reorganize and weaponizing the automatic stay to please its multi-billionaire parents. In instances such as these, multiple motions to lift stay should be expected and should be granted. If doing so frustrates the objectives of DBMP's corporate overlords because Saint-Gobain's bad faith scheme depends on overriding individual rights, so much the better. Frustrating a ***bad*** faith bankruptcy scheme is a ***good*** thing. The most important facts are indisputable: DBMP can pay all claimants what it owes them, and the only burden if the stay is not lifted is on the sick people and their families.

Lifting the stay for claimants who seek relief and frustrating Saint-Gobain's bad faith scheme is not akin to dismissal. The Debtor will remain in bankruptcy and this

proceeding will continue. The substantive consolidation and fraudulent conveyance litigation will continue, as well as any other alternative relief sought by claimants or the ACC. Similarly, DBMP and its corporate puppet-masters could propose a plan that protected the rights of claimants rather than impairing or trampling on them. While it seems clear DBMP will not do this—since overriding individual rights is its express goal—a clear finding from this Court on the issue of subjective bad faith is likely the only way these cases will ever move forward. Lifting the stay—for one, ten, or all claimants—is not dismissal.

This Court retains jurisdiction to rule on individual stay requests, first on whether the debtor filed in bad faith, and second whether the specific facts of each request justify lifting the stay. And most importantly, DBMP can pay everyone in ***full***, so whatever it costs to defend and pay any judgment or settlement to Mrs. Bergrud will not reduce what it is able to pay everyone else, including the armies of bankruptcy professionals.

This Court has the equitable powers to decide whether to lift the stay and for whom, given that DBMP filed in bad faith. *See In re Dixie Broadcasting, Inc.*, 871 F. 2d 1023, 1024, 1027 (1Ith Cir. 1989) (affirming the bankruptcy court's lifting the stay for specific creditors who moved for relief after the debtor filed its petition "despite [its]apparent good financial health..." and with an "intent to abuse the judicial process and reorganization provisions."). *See also* 11 U.S.C. § 105.

Alternatively, the Court could end the stay for all claimants and appoint a trustee to enforce the Funding Agreement, or find that the Agreement is enforceable and must be enforced (thus removing the threat of an improper collusion between DBMP, New CertainTeed and Saint-Gobain, as occurred between Johnson & Johnson and LTL Management), or order that the Debtor's remaining assets be liquidated for payment of claims and permit a pass through the tort system against New CertainTeed.

**2. *Objective futility is not a factor in deciding individual actions for relief.***

When Judge Beyer ruled against Mr. Buckingham in *Bestwall*, she recognized that nowhere in *Carolin* did the Fourth Circuit say that "objective futility" should be considered in ruling on whether to lift the stay. *Bestwall*, Tr. 1/18/24 at 79-80. While it "defied logic" to Judge Beyer that a less stringent test should apply to motions to lift stay (*id.*) than to motions to dismiss, nowhere in *Robbins*, which post-dated *Carolin*, did the Fourth Circuit set forth that the two-pronged *Carolin* dismissal standard, principally objective futility, had any bearing in ruling on individual motions for relief from stay. The opposite is true; in *Carolin*, the Fourth Circuit recognized that in deciding these motions, Section 362(a)(1) empowers bankruptcy courts to determine whether a debtor has sought the protections of the automatic stay in "good faith." *Carolin*, 886 F.2d at 699.

That the bankruptcy court in *Dixie* compared lifting the stay to deciding the propriety of a preliminary injunction, simply because it was "fit to grant relief from the stay is **<u>not</u>** equivalent to a decision by that court that Dixie may not maintain its petition…

[t]he fact that preliminary relief is obtained does not mean that permanent relief also must be forthcoming." *Dixie*, 871 F.2d at 1029 (citing *University of Texas v. Camenisch*, 451 U.S. 390, 394–95 (1981) (decisions on preliminary injunctions are not "tantamount to decisions on the underlying merits"); *McArthur v. Firestone*, 817 F.2d 1548 (11th Cir.1987) (district court's denial of temporary restraining order did not constitute decision on merits of First Amendment claim).[19]

By not ruling on whether DBMP filed in bad faith, in either motions to dismiss or motions for relief from stay, Two-Step debtors and their corporate parents receive all the benefits of the stay while taking on none of the burdens. All because they say they want to fund a trust that is "equitable," but only ***after*** all victims waive their Constitutional rights and state law remedies and accept a pennies-on-the-dollar resolution. Saint-Gobain, New CertainTeed, and DBMP continue to get ***everything*** they want—indefinite delay, negotiating leverage, millions and millions saved, the continued death of mesothelioma claimants—and asbestos victims get ***nothing***.

The role that good faith has in seeking reliefhas been widely recognized. *See In re Sparklet Devices, Inc.*, 154 B.R. 544, 547 (Bankr. E.D. Mo. 1993) ("Generally, the factors used to demonstrate bad faith are the same whether the court is considering a motion for relief

[19] A panel of this Court stated in dicta in *In re Phoenix Piccadilly, Ltd.* that "what amounts to bad faith is the same for both proceedings." 849 F.2d, 1393, 1394 (11th Cir. 1988). We interpret that statement to mean that the factors used to demonstrate bad faith are the same in both contexts, but that a bankruptcy judge may nonetheless take into consideration the number of factors and their certainty in determining whether they constitute bad faith for dismissal purposes." *Dixie*, 871 F.2d at 1029.

or a motion to dismiss for lack of good faith"); *In re Anthony*, 481 B.R. 602, 620 (D. Neb. 2012) ("The bankruptcy court did not err in concluding that whether Anthony's petition was filed in good faith was pertinent to Cattle National's motion for relief from the bankruptcy stay"); *In re Bestwall LLC*, No. 17-31795, 2024 WL 721596 at *20 (Bankr. W.D.N.C. Feb. 21, 2024) ("The LTL Opinion is not the only example of a court using good faith to police against financially healthy debtors abusing the bankruptcy system").[20]

The United States District Court for the Southern District of South Carolina cited *Dixie* to support denying relief to Dunes Hotel Associates, reasoning that a "solvent debtor-in-possession should not be permitted to remain in bankruptcy for the sole purpose of being able to use the strong-arm clause of the Bankruptcy Code to strike down a bilateral contract to the detriment of its only remaining non-insider creditor." *Dunes Hotel Associates v. Hyatt Corp.*, 245 B.R. 492, 507 (D.S.C. 2000) (citing *Dixie*, 871 F.2d at 1028)

[20] In her dismissal opinion of February 21, 2024, Judge Beyer cited: *In re Cedar Shore Resort, Inc.*, 235 F.3d 375, 381 (8th Cir. 2000) ("Nor did the bankruptcy court abuse its discretion in dismissing Cedar Shore's petition. Congress designed Chapter 11 to give those businesses 'teetering on the verge of a fatal financial plummet an opportunity to reorganize on solid ground and try again, not to give profitable enterprises an opportunity to evade contractual or other liability.'" (quoting *Furness v. Lilienfield*, 35 B.R. 1006, 1009 (D. Md. 1983))); *In re SGL Carbon Corp.*, 200 F.3d 154, 164 (3d Cir. 1999) ("SGL Carbon cites no case holding that petitions filed by financially healthy companies cannot be subject to dismissal for cause."). *Bestwall*, 2024 WL 721596 at *20. Judge Beyer continued: "Some courts even find 'cause' under section 362 to grant relief from the automatic stay when a debtor files a case in bad faith." *Id.* (citing *In re Corp. Deja Vu*, 34 B.R. 845, 850 (Bankr. D. Md. 1983) ("The petition was filed in bad faith. This bad faith constitutes cause to allow the secured creditor relief from the stay."); *Constitutional Limits*, *supra*, at 551 (citing *In re Dixie Broad., Inc.*, 871 F.2d 1023 (11th Cir.), *cert. denied*, 493 U.S. 853, 110 S.Ct. 154, 107 L.Ed.2d 112 (1989)).

("The Bankruptcy Code is not intended to insulate financially secure sellers or buyers from the bargains they strike.").

Nearly three years ago, when ruling on the ACC's[21] objection to the stay and preliminary injunction, staying all claims by all plaintiffs, this Court viewed the ACC's opposition as seeking an effective dismissal, noting *Carolin's* "exacting" two-pronged standard would be difficult to satisfy. Findings at ¶ 8. At that time, this Court reasoned the "perceived harm" on asbestos claimants was primarily delay, but such delay, "**within reason**" was not sufficient harm to end the Chapter 11 case near its inception. Findings at ¶ 223-24 (emphasis).

Having a desire to access a remedy found in Chapter 11, here, a Section 524(g) trust, which DBMP wants, and which may be sufficient to overcome dismissal in this District, must ***not*** be grounds for bad-faith debtors to benefit from an overt abuse of the automatic stay for years on end. Mrs. Bergrud's claims have now been delayed for over four years. This is no longer within reason.

**B. DBMP Filed Its Petition in Subjective Bad Faith.**

The admitted purpose of this case is not to further Chapter 11's "statutory objective of resuscitating a financially troubled debtor," *Carolin*, 886 F.2d at 701–02, but to avoid state law tort liabilities while shielding the profitable assets of the business from the rigors of bankruptcy, isolating a single class of creditors and allowing continuing and

[21] Official Committee of Asbestos Claimants ("ACC").

unfettered distributions of profits to equity while that one class of creditors is frozen by the stay. These facts are not just undisputed. They are freely admitted and indisputable.

DBMP filed its petition to manipulate the Bankruptcy Code and use the automatic stay to exert pressure on tort claimants to accept a "settlement" the globally resolved all present and future individual state-law tort claims and channels any recovery to a limited fund artificially created by this proceeding. There is no dispute that such a mandatory global settlement is beyond what the Debtor and its affiliates are entitled to under controlling state and federal law. This is bad faith. *See Carolin*, 886 F.2d at 699, 702; *Premier Auto*, 492 F.3d at 279 (good faith requirement "prevents abuse…by debtors whose overriding motive is to delay creditors without benefitting them in any way…") (citing *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986)).

Just like *Premier Auto*, where that debtor had no right to force renegotiation of its lease on more favorable terms and its petition was dismissed for bad faith given its lack of financial distress, here, DBMP has no right to the force renegotiation of its state-law liabilities, especially absent financial distress. This is a wholly improper use of the automatic stay.

**1. *Saint-Gobain, New CertainTeed, and DBMP can pay all asbestos claimants in full and are not financially troubled or in need of resuscitation.***

This crucial and undeniable fact—that DBMP can pay every single claimant what it owes him/her in the tort system or in bankruptcy (i.e., "in full")—is relevant to every

issue in this case, including to whether DBMP filed in subjective bad faith, and, having done so, whether it can be shielded by a universal litigation stay even when "individual actions" for relief are made by plaintiffs like Mrs. Bergrud.

Blackletter law, uniformly applied by the federal appellate courts, including the Fourth Circuit, forbids the wielding of bankruptcy courts' "powerful equitable weapons" by "financially healthy companies with no need to reorganize." *Premier Auto*, 492 F.3d at 281–82.[22]

---

[22] *See Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934) ("One of the primary purposes of the Bankruptcy Act is to relieve the honest debtor from *the weight of oppressive indebtedness*, and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes.") (emphasis added); *Wetmore v. Markoe*, 196 U.S. 68, 77 (1904) ("Systems of bankruptcy are designed to relieve the honest debtor from the weight of indebtedness which has become oppressive…"); *In re Capitol Food Corp. of Fields Corner*, 490 F.3d 21, 25 (1st Cir. 2007) (reasoning that a debtor need not be insolvent before filing bankruptcy petition, but that it must be experiencing "some sort of financial distress"); *In re Cohoes Indus. Terminal, Inc.*, 931 F.2d 222, 228 (2d Cir. 1991) (debtor must "at least…face such financial difficulty that, if it did not file at that time, it could anticipate the need to file in the future"); *In re SGL Carbon Corp.*, 200 F.3d 154, 164–66 (3d Cir. 1999) (reversing the district court and dismissing the debtor's bankruptcy because, *inter alia*, "[t]he mere possibility of a future need to file, without more, does not establish that a petition was filed in 'good faith," and "Chapter 11 was designed to give those teetering on the verge of a fatal financial plummet an opportunity to reorganize on solid ground and try again, not to give profitable enterprises an opportunity to evade contractual or other liabilities"); *In re Premier Auto. Servs., Inc.*, 492 F.3d 274, 280–81 (4th Cir. 2007) (dismissal upheld because debtor was not "experiencing financial difficulties;" the debtor's filings "reveal a solvent business entity," a fact that "alone may justify dismissal of [the debtor's] Chapter 11 petition"); *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072–73 (5th Cir. 1986) ("The 'new debtor' syndrome, in which a one-asset entity has been created … to isolate the insolvent property and its creditors, exemplifies … bad faith cases…Neither the bankruptcy courts nor the creditors should be subjected to the costs and delays of a bankruptcy proceeding under such conditions."); *In re Cook*, 104 F.2d 981, 985 (7th Cir. 1939) (no valid bankruptcy purpose where "proceeding was instituted not for the purpose of obtaining benefits afforded by the Act to a corporation in financial distress, but to enable appellees to escape the jurisdiction of another court where the day of reckoning … was at hand"; "A Federal Court should not extend its jurisdiction under such circumstances."); *In re Cedar Shore Resort, Inc.*, 235 F.3d 375, 380 (8th Cir. 2000) (affirming dismissal because, *inter alia*, the bankruptcy court found the primary motivation of the debtor—a healthy company "not in dire financial straits"—was to dispose of a state court lawsuit); *In re Marsch*, 36 F.3d 825, 829 (9th Cir. 1994) (no good faith where debtor "had the financial means to pay" its obligations, which posed no "danger of disrupting business interests"); *In re Stewart*, 175 F.3d 796, 811 (10th Cir. 1999) (affirming dismissal and recognizing that relieving "oppressive indebtedness" is "[o]ne of the main purposes of bankruptcy law"); *In re Waldron*, 785 F.2d 936, 940 (11th Cir. 1986) (rejecting a debtor's

DBMP's asbestos liabilities never caused it or Old CertainTeed financial strain, let alone distress. According to Old CertainTeed's "publicly disclosed financial statements, its assets greatly exceeded its combined operating and asbestos liabilities." Findings at ¶57. With almost $3 billion in assets (and liabilities totaling less than half of that), New CertainTeed possesses the capacity to enhance DBMP's ability to address its liabilities. Findings at ¶57.

By contrast, in the 1980s, the Fourth Circuit noted a "striking similarity" between *A.H. Robins* and *Johns-Manville*, two mass tort driven bankruptcies (*A.H. Robins Co. Inc. v. Piccinin*, 788 F.2d 994, 1007 (4th Cir. 1986)). Manville was a "financially besieged enterprise in desperate need of reorganization of its crushing debt, both present and future." *Kane*, 843 F.2d at 649 (citing *In re Johns-Manville Corp.*, 36 B.R. 727, 741 (Bankr. S.D. N.Y. 1984)).

A.H. Robins was "confronted, if not overwhelmed, with an avalanche" of actions related to its Dalkon Shield contraceptive device and the company had a "**<u>limited fund</u>**" to satisfy them. *A.H. Robins*, 788 F.2d at 996, 1008 (emphasis). *See also In re A.H. Robins*

bankruptcy because "[t]he bankruptcy laws are intended as a shield, not as a sword," and recognizing that the purpose of Chapter 11 is to give a fresh start to a "financially troubled debtor" rather than the "financially secure"). *See also Grogan v. Garner*, 498 U.S. 279, 286–87 (1991) ("This Court has certainly acknowledged that a central purpose of the Code is to provide a procedure by which *certain insolvent* debtors can reorder their affairs … But in the same breath that we have invoked this 'fresh start' policy, we have been careful to explain that the Act limits the opportunity for a completely unencumbered new beginning to the 'honest *but unfortunate* debtor.'").

*Company, Inc.*, 89 B.R. 555, 558 (E.D. Va. 1988) (recognizing the Dalkon Shield liability "caused a crucial depletion of the company's funds").

This is not the situation with DBMP. New CertainTeed's massive wealth—available to DBMP via the unlimited Funding Agreement—establishes there is no legally cognizable burden on any party for Mrs. Bergrud to liquidate her claims now and is grounds for this relief.

**2. *Saint-Gobain, New CertainTeed, and DBMP only filed for Chapter 11 to leverage the automatic stay and harm their creditors.***

Saint-Gobain and its puppets are acting in bad faith; their "real motivation" is to "abuse the reorganization process," "cause hardship," and "delay [to] creditors," "without intent or ability to reorganize," and Saint-Gobain—after being socialized to the idea—made DBMP file for Chapter 11 merely to invoke the automatic stay. *See Carolin*, 886 F. 2d at 702 (citing *In re Thirtieth Place, Inc.*, 30 B.R. 503, 505 (9th Cir. Bankr. App. 1983)).

Now, DBMP purports to wield the stay as a bargaining tool to force claimants into the Hobson's choice of either risking years of delay and potential destruction of some or all their rights, or accepting a bankruptcy-based resolution of their claims that limits and impairs victims' state-law rights. *See Premier Auto*, 492 F.3d at 279 (a petitioner's good faith is "'indispensable to proper accomplishment of the basic purposes of the Chapter 11 protection.'") (citing *Carolin*, 886 F.2d at 698).

Saint-Gobain's post-petition behavior is both revealing and offensive to the people its subsidiaries poisoned to death with asbestos. During 2022, the Compagnie gave away over $1,000,000,000 in voluntary dividends, 22% ***more*** than in 2021.[23] In 2023, Saint-Gobain had € 47.9 billion in sales, over € 3 billion in net income and free cash flow, and more than € 5 billion in operating income.[24]

Referencing the "Situation in the United States"—i.e., its embarrassing bad-faith billionaire bankruptcy scam—Saint-Gobain boasted that this proceeding was "expected to take up to approximately five to eight years" during which "all asbestos litigations [sic] have been stayed and all related costs suspended…" Ex. 15, 2023 Ann. Report at 44.

Apparently, Saint-Gobain believes DBMP's ***total*** current and future asbestos liabilities are $407 million.[25] A large number in the abstract (and disputed by Mrs. Bergrud), but a fraction of what the Compagnie de Saint-Gobain gives away in dividends in a single year.[26] Saint-Gobain had ***a $1 billion,*** didn't need it, and gave it away, all while opposing Mrs. Bergrud's request to merely ***quantify*** her claim against DBMP. And the Compagnie intends to abuse the automatic stay for another 5 to 8 years.

---

[23] *See* Ex. 15, Compagnie de Saint-Gobain, *Statutory auditors' report on the consolidated financial statements*, "2023 Ann. Report" at 56. Saint-Gobain has over 506 million shares and paid out dividends of € 2.00 per share. The company paid out dividends in 2021 of € 1.63 per share. One Euro is approximately equal to $1.07.

[24] *See*, https://www.saint-gobain.com/en

[25] Saint-Gobain recorded a "provision corresponding to the amount of the estimated debt against DBMP amounting to € 407 million as of December 31, 2023," recognizing New CertainTeed's obligation to pay "debts" to DBMP. *See* Ex. 15, Ann. Report at 44. At present, on €1.00 is equal to $1.07.

[26] DBMP/Old CertainTeed's annual spend on asbestos litigation (defense and indemnity) from 2002 to 2019 was only $80 million to $160 million. Findings at ¶ 33.

Companies with billions in excess cash that intentionally identify, isolate, and then strand one class of creditor in bankruptcy —and aim to waste 5 to 8 more years, time their asbestos victims don't have—are not acting in good faith and should not benefit from the automatic stay, especially when individual plaintiffs set forth specific facts and seek relief, as here.

## C. DBMP's Subjective Bad Faith Is Grounds to Lift the Stay.

Bankruptcy courts have the power to modify, annul, or vacate the stay based on "the particular circumstances of the case [as] guided by considerations that under the law make for the ascertainment of what is just to the claimants, the debtor, and the estate." *Foust v. Munson Steamship Lines*, 299 U.S. 77, 83 (1936). Section 362(d)(1) authorizes modifying the automatic stay "for cause."

"Just as § 1112(b) inferentially permits inquiry into a debtor's good faith in the context of an interested party's motion to dismiss, § 362(d)(1)'s 'for cause' language authorizes the court to determine whether, with respect to the interests of a creditor seeking relief, a debtor has sought the protection of the automatic stay in good faith." *Carolin*, 886 F.2d at 699 (citing *Little Creek*, 779 F.2d 1068).

"Every bankruptcy statute since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith for the commencement, prosecution, and confirmation of bankruptcy proceedings." *Little Creek*, 779 F.2d at 1072. "Like its predecessor statutes . . . the Bankruptcy Code of 1978 has been endowed with

requirements of good faith in the construction of many of its provisions….[n]umerous cases have found a lack of good faith to constitute 'cause' for lifting the stay" *Id*. This principle, that the debtor's bad faith is a factor which supports lifting the stay, is widely accepted.[27] DBMP's bad faith abuse of the Bankruptcy Code and perversion of the automatic stay is grounds to grant this motion. *See Carolin*, 886 F.2d at 699.

This Court has recognized that lifting the stay "for cause" is a "flexible concept" and should be evaluated on a case-by-case basis. Findings at ¶ 208. In 2021, the Court denied the ACC's opposition to the preliminary injunction and automatic stay, but that pertained to ***all*** asbestos claimants and that was over 30 months ago. *See* Findings at ¶ 208, 211.

This is different. Mrs. Bergrud asks this Court to rule first on whether DBMP filed in subjective bad faith (based all on the evidence *supra*), and second, whether this is grounds to lift the stay for her individual action to proceed, especially considering the specific facts of her case, as set forth *supra*. *See Bestwall*, 71 F.4th at 183.

**D. Mrs. Bergrud Satisfies The *Robbins* Factors.**

[27] *See In re Thirtieth Place, Inc.*, 30 B.R. 503, 505–06 (Bankr.App. 9th Cir.1983); *In re Talladega Steaks, Inc.*, 50 B.R. 42, 43–44 (Bankr.N.D.Ala.1985); *In re Kinney*, 51 B.R. 840, 845–46 (Bankr.C.D.Cal.1985); *In re Silver*, 46 B.R. 772, 773–74 (D.Colo.1985); *In re Volpe*, 53 B.R. 46, 47–48 (Bankr.M.D.Fla.1985); *In re Martin*, 51 B.R. 490, 493–95 (Bankr.M.D.Fla.1985); *In re Setzer*, 47 B.R. 340, 344–45 (Bankr.E.D.N.Y.1985); *In re Port Richey Service Co.*, 44 B.R. 634, 635 (Bankr.M.D.Fla.1984); In re Winn, 43 B.R. 25, 28 (Bankr.M.D.Fla.1984); *Basin Elec. Power Co-op v. Midwest Processing Co.*, 47 B.R. 903, 908–10 (D.N.D.1984), aff'd, 769 F.2d 483 (8th Cir.1985); *In re Scott*, 42 B.R. 35, 38–39 (Bankr.D.Ore.1984); *Furness v. Lilienfield*, 35 B.R. 1006, 1010–13 (D.Md.1983); *In re Corp. Deja Vu*, 34 B.R. 845, 846–47, 850 (Bankr.D.Md.1983); *In re 299 Jack-Hemp Assoc.*, 20 B.R. 412, 413–14 (Bankr.S.D.N.Y.1982); *In re Lotus Inv., Inc.*, 16 B.R. 592, 595–96 (Bankr.S.D.Fla.1981); *Winshall Settlor's Trust*, 758 F.2d 1136, 1137 (6th Cir. 1985); *In re Albany Partners, Ltd.*, 749 F.2d 670, 673–74 (11th Cir.1984).

DBMP's subjective bad faith and the specific facts of Mrs. Bergrud's action are sufficient to lift the stay. In addition, she satisfies the *Robbins* factors: (1) all issues pending in Movant's litigation against the Debtor involve state law; (2) liquidating Movant's claims in state court will interfere with this proceeding and will promote judicial economy; and (3) the Debtor's bankruptcy estate is protected because this Court will decide when Movant's liquidated claims will be paid. *In re Robbins*, 964 F.2d 342, 345 (4th Cir. 1992); *see In re Claughton*, 140 B.R. 861, 867-68 (Bankr. W.D.N.C. 1992).

Under *Robbins*, this Court should "harmonize the interests of both debtor and creditors while preserving the debtor's assets for repayment and reorganization of his or her obligations." 964 F.2d at 345. However, maintaining the automatic stay to protect the Debtor's ability to reorganize is not the same thing as upholding the preliminary injunction as to non-debtor affiliates. Nor does it address whether this Court can decide Movant's claims against DBMP, or whether issues pending in litigation involve only state law, such that the expertise of the bankruptcy court is unnecessary.

DBMP's anticipated objection to this request on grounds that this Court should estimate all claims or that a trust claim with an artificially capped Section 524(g) trust is the remedy available to the Bergruds, would render 28 U.S.C. § 157 meaningless and subordinate individual statutory rights and state law remedies to the whims of wealthy tortfeasors who prefer to avoid the civil jury system by manipulating the Bankruptcy Courts. The number of individual claimants that decide to liquidate their personal injury

claims in front of juries and trial courts with power to hear these cases will have no impact on this case, because, ***unlike*** in *Manville*, *A.H. Robins*, and many other mass tort bankruptcies, DBMP is fully funded, non-distressed, and can pay all claimants 100% of their claims' tort system value.

This Court's expertise related to the Bankruptcy Code and the payment of liquidated claims is not needed to allow Mrs. Bergrud to try her state law claims to verdict. Further, she admits that once her claims are liquidated only this Court can decide when it will be paid.

**1. *Whether modifying the stay will promote judicial economy and whether there would be greater interference with the bankruptcy case if the stay were not lifted because matters would have to be litigated in bankruptcy court.***

Mr. Bergrud and his wife, Cheryl Bergrud, filed suit against all entities they believed contributed to his contracting mesothelioma, including Old CertainTeed. Ex. 14, Complaint, filed on April 9, 2019. Under Washington law, the Bergruds have two primary claims against DBMP, one for manufacturing an unsafe product and one for negligence. DBMP's bankruptcy petition stayed their action against Old CT, New CT, and the Debtor. Between May 7, 2020, and November 29, 2021, Mrs. Bergrud resolved with all defendants and trusts who had ***not*** filed a bad-faith Texas Two-Step multi-billionaire bankruptcy.

If relief is granted, Mrs. Bergrud will file a second suit in Washington state against only DBMP. This second suit should have been unnecessary and is entirely the fault of

Saint-Gobain and New CertainTeed. This is an example of the adverse impact on judicial economy that Two-Step bankruptcies inflict on state courts throughout the country. But for its Two-Step, Old CertainTeed would have resolved Mrs. Bergrud's claims years ago in her first case in Washington state.

Mrs. Bergrud will ***never*** vote on a plan of reorganization until she knows the liquidated value of her claims against DBMP. *See* 11 U.S.C. § 1129(a)(7)(A) and 28 U.S.C. § 157(b). To know the liquidated value, she must quantify these claims before a jury or negotiate them at arm's length before trial. There is no burden on any party for her to do so now, as opposed to later.

There is no legitimate reason to delay determining the value of Mrs. Bergrud's claims now while Saint-Gobain, New CertainTeed, and DBMP continue to demand this Court's attention and waste their victims' time in navigating through estimation related proceedings. An estimation which will result in an advisory opinion the claimants will ignore.

DBMP can provide no legitimate reason—the fact that it does not want to, is not a legitimate reason—why liquidating claims in state court and then coming back to this Court to allow those liquidated claims later would interfere with the bankruptcy case.

**2. *Whether the estate can be protected properly by a requirement that creditors seek enforcement of any judgment through the bankruptcy court.***

Mrs. Bergrud is not asking the Court to enforce her claims against the Debtor. She seeks only to liquidate them through arm's length settlement or jury trial in a Washington state court. Whatever the specific value owing to her from the Debtor, she agrees that amount will not be paid until this Court allows it.[28] There is no harm to the Debtor's bankruptcy estate by granting this request.

**3. *Whether the issues pending in Movant's litigation against the Debtor involve state law***

All the Movant's claims are based on Washington law. The Debtor will likely attempt to sidestep this explicit limitation on this Court's jurisdiction, effectively arguing that while this Court cannot estimate ***any*** of these claims, it should estimate ***all*** of them. However, even if the Court estimates claims against the Debtor in aggregate, Mrs. Bergrud's right to pursue uncapped state law remedies against DBMP before a jury is indisputable under the United States Constitution, the United States Bankruptcy Code, and Washington law.[29]

[28] It is no defense for the Debtor to argue that in a jury trial some claimants may lose and get nothing. In that instance, those claimants will have been determined to not have a valid claim and, accordingly, suffer no legal harm.

[29] "The right of trial by jury [in Washington state] shall remain inviolate." Wash. Const. art. 1, § 21. It does "not diminish over time and must be protected from all assaults to its essential guarantees." *Thorley v. Nowlin*, 542 P.3d 137, 154 (2024).

This Court lacks jurisdiction to estimate or quantify these claims. *See* 28 U.S.C. §§ 157(b) and 1411(a). "If the bankruptcy court lacks jurisdiction to adjudicate a claim, relief from the automatic stay is **required** so that the claim can be adjudicated in a court that does have jurisdiction." *In re Nifong*, 2008 WL 2203149, *4 (Bankr. M.D.N.C. 2008) (citing *In re Erickson*, 330 B.R. 346 (Bankr. D. Conn. 2005) (emphasis added).[30]

Mrs. Bergrud will ***never*** vote in favor of a plan to reorganize a bad-faith debtor in a manufactured bankruptcy until after she knows the full liquidated value of all her state law claims. There is no prejudice to anyone in proceeding now, and only ongoing undue prejudice to Mrs. Bergrud in proceeding later. The bankruptcy case will not be interfered with by DBMP having to—for the first time over 48 months—retain counsel to defend it in the tort system for a limited number of cases. Nor will allowing a few cases to proceed in the tort system be a distraction to this bankruptcy case or the adversary proceedings.

Disregarding state law and the Constitutional rights of claimants, DBMP will no doubt argue that resolution with all claimants requires the tools contemplated by Section 524(g). But Section 524(g) demands that an operating, good faith debtor, overwhelmed by asbestos liabilities, subject itself to bankruptcy court jurisdiction. DBMP and New CertainTeed are none of these, and no part of the Bankruptcy Code, including Section

[30] Absent consent, a United States District Court "should retain control over all aspects of personal injury tort claims under section 157." *Moore v. Idealease of Wilmington*, 358 B.R. 248, 252 (E.D.N.C. 2006). *See Stokes v. Southeast Hotel Properties, LTD.*, 877 F. Supp. 986 (W.D.N.C. 1994) ("The decision where a personal injury claim will be adjudicated is clearly reserved for attention of the district court.").

524(g), can override Mrs. Bergrud's individual state law remedies and Constitutional rights. This Court's expertise is not needed to allow Mrs. Bergrud to try their claims to verdict in state court.[31]

Mrs. Bergrud also satisfies the more comprehensive *Curtis* factors. These narrower but more numerous factors subsume the broader factors of *Robbins* and provide a more nuanced examination of "cause" under Section 362.[32] *See In re Curtis*, 40 B.R. 795, 799-800 (Bankr. D. Utah 1984); *Sonnax Industries, Inc. v. Tri Component Products Corp. (In re Sonnax Industries, Inc.)*, 907 F.2d 1280 (2nd Cir. 1990); *Jim's Maintenance & Sons, Inc. v. Target*

---

[31] "[A] determination of the validity and amount of [the Movants'] claim must be made either in the state court or this court. The court is satisfied that the proper forum for such a determination is the state court. The claims alleged in the State Court Action all involve solely state law issues. There are no issues in any of the claims that require bankruptcy expertise. It also is clear that if the stay is lifted, the Debtor and the bankruptcy estate can be protected adequately by a requirement that the Movants seek enforcement of any judgment obtained through the bankruptcy court. The modification of the stay will permit the Movants only to reduce their claims against the Debtor to judgment and will specifically provide that any judgment against the Debtor obtained in the State Court Action may not be enforced against the Debtor or property of the bankruptcy estate unless and until further relief from the automatic stay has been granted by the bankruptcy court. Allowing the claims to be pursued in this fashion will not change the status or priority of the claims but will result in a determination of the nature and amount of the Debtor's liability. Also, allowing all of the claims to be determined in one proceeding in state court promotes judicial economy and avoids the hardship on the Movants that would result if they were required to litigate some of the claims in state court and some of them in this court. It is true that some of the claims in the State Court Action do not involve the Debtor. However, any additional burden on the Debtor resulting from this circumstance is far outweighed by the factors that weigh in favor of lifting the stay and allowing the State Court Action to proceed. *In re Joyner*, 416 B.R. 190, 192–93 (Bankr. M.D.N.C. 2009).

[32] "The court must balance potential prejudice to the bankruptcy debtor's estate against the hardships that will be incurred by the person seeking relief from the automatic stay if relief is denied." *See In re Peterson*, 116 B.R. 247, 249 (D.Colo.1990) (discussing balancing test). The factors that courts consider in deciding whether to lift the automatic stay include (1) whether the issues in the pending litigation involve only state law, so the expertise of the bankruptcy court is unnecessary; (2) whether modifying the stay will promote judicial economy and whether there would be greater interference with the bankruptcy case if the stay were not lifted because matters would have to be litigated in bankruptcy court; and (3) whether the estate can be protected properly by a requirement that creditors seek enforcement of any judgment through the bankruptcy court." *In re Robbins*, 964 F.2d 342, 345 (4th Cir. 1992), as amended (May 27, 1992).

*Corporation (In re Jim's Maintenance & Sons, Inc.)* 418 Fed. App'x 726 (10th Cir. 2011). Whether applying the twelve *Curtis* factors or the three *Robbins* factors, the stay should be modified to allow Movants to liquidate their claims.

Broadly, the greater balance of hurt is unquestionably born by Mrs. Bergrud if the requested relief is denied. DBMP will not be impacted if she liquidates her claims outside of bankruptcy now, and Mrs. Bergrud agrees to have her claims paid from the Debtor's bankruptcy estate only when allowed by this Court.

## IV. CONCLUSION

Mrs. Bergrud urges this Court to rule on whether DBMP filed its petition in bad faith. Avoiding this issue is akin to finding good faith. If DBMP is found to have filed in bad faith, that constitutes grounds to lift the stay, which she asks this Court to do.

Respectfully submitted, this the 18th day of April, 2024.

**WALDREP WALL BABCOCK
& BAILEY PLLC**
*/s/ Thomas W. Waldrep, Jr.*
Thomas W. Waldrep Jr. (NC State Bar No. 11135)
James C. Lanik (NC State Bar No. 30454)
Ciara L. Rogers (NC State Bar No. 42571)
370 Knollwood Street, Suite 600
Winston-Salem, NC 27103
Telephone: 336-717-1280
Facsimile: 336-717-1340
Email: notice@waldrepwall.com

-and-

**MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC**
*/s/ Clayton L. Thompson*
Clayton L. Thompson (NY Bar No. 5628490)
John Louis Steffan IV (Missouri Bar No. 64180)
150 W. 30th Street, Suite 201
New York, NY 10001
Telephone: (800) 358-5922
Email: CThompson@mrhfmlaw.com
Pro Hac Vice Admission Pending

*Counsel for Movants*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing THE ESTATE OF PETER L. BERGRUD'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(d) was filed in accordance with the local rules and served upon all parties registered for electronic service and entitled to receive notice thereof through the CM/ECF system.

Respectfully submitted, this the 18th day of April, 2024.

**WALDREP WALL BABCOCK & BAILEY PLLC**

*/s/ Thomas W. Waldrep, Jr.*

Thomas W. Waldrep Jr. (NC State Bar No. 11135)
370 Knollwood Street, Suite 600
Winston-Salem, NC 27103
Telephone: (336) 717-1280
Facsimile: (336) 717-1340
Email: notice@waldrepwall.com

*Counsel for Movants*

# Exhibit 1

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| IN RE: | : | Case No. 20-30608 (JCW) (Jointly Administered) |
| ALDRICH PUMP LLC, ET AL., | : | Chapter 11 |
| Debtors, | : | Charlotte, North Carolina |
| | : | Thursday, March 30, 2023 9:30 a.m. |
| | : | |

: : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

| | | |
|---|---|---|
| OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS, on behalf of the estates of Aldrich Pump LLC and Murray Boiler LLC, | : | AP 22-03028 (JCW) |
| Plaintiff, | : | |
| v. | : | |
| INGERSOLL-RAND GLOBAL HOLDING COMPANY LIMITED, et al., | : | |
| Defendants, | : | |

: : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

| | | |
|---|---|---|
| OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS, on behalf of the estates of Aldrich Pump LLC and Murray Boiler LLC, | : | AP 22-03029 (JCW) |
| Plaintiff, | : | |
| v. | : | |
| TRANE TECHNOLOGIES PLC, et al., | : | |
| Defendants, | : | |

: : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

ARMSTRONG WORLD INDUSTRIES, INC. ASBESTOS PERSONAL INJURY SETTLEMENT TRUST, et al., : Miscellaneous Pleading No. 22-00303 (JCW) (Transferred from District of Delaware)

Plaintiffs, :

v. :

ALDRICH PUMP LLC, et al., :

Defendants, :

: : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

AC&S ASBESTOS SETTLEMENT TRUST, et al., : Miscellaneous Pleading No. 23-00300 (JCW) (Transferred from District New Jersey)

Petitioners, :

v. :

ALDRICH PUMP LLC, et al., :

Respondents, :

VERUS CLAIM SERVICES, LLC, :

Interested Party, :

NON-PARTY CERTAIN MATCHING CLAIMANTS, :

Interested Party.

: : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE J. CRAIG WHITLEY,
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For Debtors/Defendants, Aldrich Pump LLC and Murray Boiler LLC:

Rayburn Cooper & Durham, P.A.
BY: JOHN R. MILLER, JR., ESQ.
MATTHEW TOMSIC, ESQ.
C. RICHARD RAYBURN, JR., ESQ.
227 West Trade St., Suite 1200
Charlotte, NC 28202

APPEARANCES (continued):

| | |
|---|---|
| For Debtors/Defendants, Aldrich Pump LLC and Murray Boiler LLC: | Jones Day<br>BY: BRAD B. ERENS, ESQ.<br>MORGAN R. HIRST, ESQ.<br>110 North Wacker Dr., Suite 4800<br>Chicago, IL 60606 |
| | Jones Day<br>BY: DAVID S. TORBERG, ESQ.<br>51 Louisiana Avenue, N.W.<br>Washington, D.C. 20001 |
| | Evert Weathersby Houff<br>BY: C. MICHAEL EVERT, JR., ESQ.<br>3455 Peachtree Road NE, Ste. 1550<br>Atlanta, GA 30326 |
| | Evert Weathersby Houff<br>BY: CLARE M. MAISANO, ESQ.<br>111 South Calvert St., Suite 1910<br>Baltimore, MD 21202 |
| | ROBERT H. SANDS, ESQ.<br>ALLAN TANANBAUM, ESQ. |
| Audio Operator: | COURT PERSONNEL |
| Transcript prepared by: | JANICE RUSSELL TRANSCRIPTS<br>1418 Red Fox Circle<br>Severance, CO 80550<br>(757) 422-9089<br>trussell31@tdsmail.com |

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

APPEARANCES (continued):

| | |
|---|---|
| For the ACC: | Caplin & Drysdale<br>BY: SERAFINA CONCANNON, ESQ.<br>One Thomas Circle, NW, Suite 1100<br>Washington, DC 20005 |
| | Robinson & Cole LLP<br>BY: NATALIE RAMSEY, ESQ.<br>DAVIS LEE WRIGHT, ESQ.<br>1201 N. Market Street, Suite 1406<br>Wilmington, DE 19801 |
| | Robinson & Cole LLP<br>BY: ANDREW A. DePEAU, ESQ.<br>280 Trumbull Street<br>Hartford, CT 06103 |
| | Winston & Strawn LLP<br>BY: DAVID NEIER, ESQ.<br>CRISTINA I. CALVAR, ESQ.<br>200 Park Avenue<br>New York, NY 10166-4193 |
| | Hamilton Stephens<br>BY: ROBERT A. COX, JR., ESQ.<br>525 North Tryon St., Suite 1400<br>Charlotte, NC 28202 |
| For the FCR: | Orrick Herrington<br>BY: JONATHAN P. GUY, ESQ.<br>DANNY BAREFOOT, ESQ.<br>1152 15th Street, NW<br>Washington, D.C. 20005-1706 |
| For Certain Insurers: | Duane Morris LLP<br>BY: RUSSELL W. ROTEN, ESQ.<br>865 S. Figueroa St., Suite 3100<br>Los Angeles, CA 90017-5440 |
| For Individual Fiduciary Duty Defendants: | Brooks Pierce<br>BY: JIM W. PHILLIPS, JR., ESQ.<br>JEFFREY E. OLEYNIK, ESQ.<br>P. O. Box 26000<br>Greensboro, NC 27420 |

APPEARANCES (continued):

| | |
|---|---|
| For Trane Technologies Company LLC and Trane U.S. Inc.: | McCarter & English, LLP<br>BY: GREGORY J. MASCITTI, ESQ.<br>825 Eighth Avenue, 31st Floor<br>New York, NY 10019 |
| | McGuireWoods, LLP<br>BY: BRADLEY R. KUTROW, ESQ.<br>201 North Tryon St., Suite 3000<br>Charlotte, NC 28202 |
| | Cordes Law, PLLC<br>BY: STACY C. CORDES, ESQ.<br>1800 East Boulevard<br>Charlotte, NC 28203 |
| For Asbestos Trusts: | Ward and Smith, P.A.<br>BY: LANCE P. MARTIN, ESQ.<br>P. O. Box 2020<br>Asheville, NC 28802-2020 |
| | Ballard Spahr LLP<br>BY: BETH MOSKOW-SCHNOLL, ESQ.<br>919 North Market St., 11th Floor<br>Wilmington, DE 19801-3034 |
| For the Verus Trusts: | Moon Wright & Houston, PLLC<br>BY: ANDREW T. HOUSTON, ESQ.<br>212 N. McDowell Street, Suite 200<br>Charlotte, NC 28204 |
| | Lowenstein Sandler LLP<br>BY: LYNDA A. BENNETT, ESQ.<br>One Lowenstein Drive<br>Roseland, NJ 07068 |
| For Verus Claims Services, LLC: | Bradley Arant Boult Cummings LLP<br>BY: ANNA-BRYCE HOBSON, ESQ.<br>214 North Tyron St., Suite 3700<br>Charlotte, NC 28202 |
| | Anselmi & Carvelli LLP<br>BY: ZACHARY D. WELLBROCK, ESQ.<br>West Tower, Fifth Floor<br>56 Headquarters Plaza<br>Morristown, NJ 07960 |

APPEARANCES (continued):

| | |
|---|---|
| For Robert and Marcella Semian: | Maune Raichle<br>BY: CLAYTON L. THOMPSON, ESQ.<br>150 West 30th Street, Suite 201<br>New York, NY 10001 |
| | Waldrep Wall<br>BY: JAMES C. LANIK, ESQ.<br>370 Knollwood Street, Suite 600<br>Winston-Salem, NC 27103 |
| For Non-Party Certain Matching Claimants: | Hogan McDaniel<br>BY: DANIEL K. HOGAN, ESQ.<br>1311 Delaware Avenue<br>Wilmington, DE 19806 |
| | Waldrep Wall<br>BY: DIANA SANTOS JOHNSON, ESQ.<br>370 Knollwood Street, Suite 600<br>Winston-Salem, NC 27103 |
| For DCPF: | Alexander Ricks PLLC<br>BY: FELTON PARRISH, ESQ.<br>1420 E. 7th Street, Suite 100<br>Charlotte, NC 28204 |
| | Young Conaway<br>BY: KEVIN A. GUERKE, ESQ.<br>1000 North King Street<br>Wilmington, Delaware 19801 |
| ALSO PRESENT: | JOSEPH GRIER, FCR<br>Grier, Wright & Martinez, PA<br>521 E. Morehead St, Suite 440<br>Charlotte, NC 28202 |

APPEARANCES (via telephone):

| | |
|---|---|
| For Non-Party Certain Matching Claimants: | Stark & Stark, PC<br>BY: JOSEPH H. LEMKIN, ESQ.<br>P. O. Box 5315<br>Lawrenceville, NJ 08648 |

APPEARANCES (via telephone continued):

| | |
|---|---|
| For Travelers Insurance Companies, et al.: | Steptoe & Johnson LLP<br>BY: JOSHUA R. TAYLOR, ESQ.<br>1330 Connecticut Avenue, N.W.<br>Washington, D.C. 20036 |
| For Verus Claims Services, LLC: | Anselmi & Carvelli LLP<br>BY: ANDREW ANSELMI, ESQ.<br>West Tower, Fifth Floor<br>56 Headquarters Plaza<br>Morristown, NJ 07960 |

THE COURT: All right.

That got it?

It will not, probably, surprise anyone that I feel compelled to deny the motion basically for the reasons stated by the debtor and, and the FCR, if not going back to the preliminary injunction and the reasons I stated then. I have no doubt, I don't think anyone could have any reasonable doubt that if I grant relief from stay to one creditor to liquidate the claim, all of the claimants will -- not all -- but a substantial number of the claimants, enough to wreck the bankruptcy case, will seek like measure and that effectively precipitates a *de facto* dismissal of the case. It will be unable to go forward and even more so than at the time of the preliminary injunction, now we've got some of these claims that are estate claims under the first-crack doctrine that would be asserted by individual claimants elsewhere as against New Trane and the new entities, the "good" companies, if you will, and it's even stronger in this case because now I have the ACC bringing those causes of action. And so we would be undermining our own lawsuits if we did that.

I don't think anything's really changed. I'm appreciative of the fact that, that the underlying claim here may be somewhat different than the norm, but the circumstance of the case and the relationship of the claimants to the reorganization has not changed in any material way.

# Exhibit 2

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| IN RE: | : | Case No. 17-31795-LTB |
| BESTWALL LLC, | : | Chapter 11 |
| Debtor. | : | Charlotte, North Carolina<br>Thursday, October 19, 2023 |
| | : | 9:35 a.m. |

: : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE LAURA TURNER BEYER,
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

| | |
|---|---|
| For the Debtor: | Robinson, Bradshaw & Hinson, P.A.<br>BY: RICHARD C. WORF, ESQ.<br>GARLAND CASSADA, ESQ.<br>101 N. Tryon Street, Suite 1900<br>Charlotte, NC 28246 |
| | Jones Day<br>BY: GREGORY M. GORDON, ESQ.<br>2727 North Harwood St., Suite 500<br>Dallas, TX 75201-1515 |
| Audio Operator: | COURT PERSONNEL |

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

---

**JANICE RUSSELL TRANSCRIPTS**
**1418 Red Fox Circle**
**Severance, CO 80550**
**(757) 422-9089**
**trussell31@tdsmail.com**

APPEARANCES (continued):

| | |
|---|---|
| For the Debtor: | Jones Day<br>BY: JEFFREY B. ELLMAN, ESQ.<br>1221 Peachtree Street, N.E., #400<br>Atlanta, GA 30361 |
| | Schachter Harris, LLP<br>BY: ERIN A. THERRIAN, ESQ.<br>909 Lake Carolyn Pkwy., #1775<br>Irving, TX 75039 |
| For Richard and Joann Dale: | Maune Raichle<br>BY: CLAY THOMPSON, ESQ.<br>150 W. 30th Street, Suite 201<br>New York, NY 10001 |
| For Richard and Joann Dale, Wilson Buckingham and Angelika Weiss: | Waldrep Wall<br>BY: THOMAS W. WALDREP, JR., ESQ.<br>370 Knollwood Street, Suite 600<br>Winston-Salem, NC 27103 |
| For Future Claimants' Representative, Sander L. Esserman: | Young Conaway<br>BY: SHARON ZIEG, ESQ.<br>EDWIN J. HARRON, ESQ.<br>1000 North King Street<br>Wilmington, DE 19801 |
| | Alexander Ricks PLLC<br>BY: FELTON E. PARRISH, ESQ.<br>1420 E. 7th Street, Suite 100<br>Charlotte, NC 28204 |
| For Official Committee of Asbestos Claimants: | Robinson & Cole LLP<br>BY: NATALIE RAMSEY, ESQ.<br>KATHERINE S. DUTE, ESQ.<br>1201 N. Market Street, Suite 1406<br>Wilmington, DE 19801 |
| | JD Thompson Law<br>BY: LINDA W. SIMPSON, ESQ.<br>Post Office Box 33127<br>Charlotte, NC 28233 |

APPEARANCES (continued):

| | |
|---|---|
| For Georgia-Pacific LLC: | Rayburn Cooper & Durham, P.A.<br>BY: JOHN R. MILLER, JR., ESQ.<br>227 West Trade Street, Suite 1200<br>Charlotte, NC 28202 |
| | Debevoise & Plimpton<br>BY: MARK P. GOODMAN, ESQ.<br>NATASHA LABOVITZ, ESQ.<br>66 Hudson Boulevard<br>New York, NY 10001 |
| APPEARANCES (via telephone): | SANDER L. ESSERMAN<br>Future Claimants' Representative<br>2323 Bryan Street, Suite 2200<br>Dallas, TX 75201-2689 |

I'll let you all get your seats. Sorry.

MR. HARRON: Pardon us, your Honor. Sorry.

THE COURT: That's okay. I guess you never know when we're gonna come back in, huh?

Having considered the motion for relief from stay and the arguments of the parties and the responses and replies thereto, let me start by saying, Mr. Thompson. Of course, I'm sympathetic to Mr. Dale and his situation and I understand why he would request to liquidate his claim, but I can't find that there is cause to grant his motion for relief from stay.

You know, strictly speaking and considering the Robbins factors, which are the applicable factors in this Circuit, and considering Mr. Dale's case in isolation the Court could, I suppose, conclude it's appropriate to grant the motion for relief from stay. As bankruptcy courts, we often do that so that a state court can liquidate claims that are based on state court causes of action, as you all cited the Joyner case, which is a Judge Stocks case from the Middle District of North Carolina, but which is a very different case from, from this case. I think that case involved two plaintiffs who were seeking relief from stay to continue with a civil action in state court that involved less than a handful of defendants, one of whom was the debtor. But that case stands in stark contrast to this case, which is a mass tort asbestos case with an excess of 60,000 claimants and the Court is obliged to

consider the motion in that context and while it may be specula to, speculative to assume that granting the Dales' motion for relief from stay would result in a wave of similar motions, I believe that that's a fair and reasonable assumption, as apparently did Judge Whitley when he denied a similar motion in the Aldrich case, and if I grant this motion I think I would be hard pressed to deny future motions for relief from stay in this case and that's especially true since the Dales have not pled any unique facts or circumstances that would justify lifting the stay as to them or otherwise distinguish their case from the thousands of cases that are pending in state court.

In addition, I conclude I should deny the motion because when considering the motion and the overall context of this case, I think I should deny the motion for the same reasons I determined I should grant the motion for a preliminary injunction, which decision the Fourth Circuit recently affirmed. And I agree with the, the debtor's statement that the Fourth Circuit's opinion confirms the importance of centralizing all of the pending claims in the bankruptcy court and while the Fourth Circuit did say that rather than waiting for plan confirmation, and I quote, "Claimants can bring individual actions for relief based on the specific facts of a particular claim," the Dales have not pled any facts specific or unique to them to cause this Court to find that there's cause to grant their motion for relief from

# Exhibit 3

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| IN RE: | : | Case No. 17-31795-LTB |
| BESTWALL LLC, | : | Chapter 11 |
| Debtor. | : | Charlotte, North Carolina<br>Thursday, January 18, 2024 |
| | : | 9:34 a.m. |

: : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE LAURA TURNER BEYER,
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

| | |
|---|---|
| For the Debtor: | Robinson, Bradshaw & Hinson, P.A.<br>BY: RICHARD C. WORF, ESQ.<br>GARLAND CASSADA, ESQ.<br>KEVIN CRANDALL, ESQ.<br>101 N. Tryon Street, Suite 1900<br>Charlotte, NC 28246 |
| | Jones Day<br>BY: GREGORY M. GORDON, ESQ.<br>2727 North Harwood St., Suite 500<br>Dallas, TX 75201-1515 |
| Audio Operator: | COURT PERSONNEL |
| Transcript prepared by: | JANICE RUSSELL TRANSCRIPTS<br>1418 Red Fox Circle<br>Severance, CO 80550<br>(757) 422-9089<br>trussell31@tdsmail.com |

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

APPEARANCES (continued):

| | |
|---|---|
| For the Debtor: | Jones Day<br>BY: JEFFREY B. ELLMAN, ESQ.<br>1221 Peachtree Street, N.E., #400<br>Atlanta, GA 30361 |
| For Richard and Joann Dale: | Maune Raichle<br>BY: CLAY THOMPSON, ESQ.<br>150 W. 30th Street, Suite 201<br>New York, NY 10001 |
| For Richard and Joann Dale, Wilson Buckingham and Angelika Weiss: | Waldrep Wall<br>BY: THOMAS W. WALDREP, JR., ESQ.<br>370 Knollwood Street, Suite 600<br>Winston-Salem, NC 27103 |
| For Wilson Buckingham and Angelika Weiss: | Ruckdeschel Law Firm, LLC<br>BY: JONATHAN RUCKDESCHEL, ESQ.<br>8357 Main Street<br>Ellicott City, MD 21043 |
| For Future Claimants' Representative, Sander L. Esserman: | Young Conaway<br>BY: SHARON ZIEG, ESQ.<br>ERIN EDWARDS, ESQ.<br>1000 North King Street<br>Wilmington, DE 19801 |
| | Young Conaway<br>BY: FELTON E. PARRISH, ESQ.<br>Charlotte, NC 28204 |
| For Official Committee of Asbestos Claimants: | Robinson & Cole LLP<br>BY: NATALIE RAMSEY, ESQ.<br>DAVIS LEE WRIGHT, ESQ.<br>1201 N. Market Street, Suite 1406<br>Wilmington, DE 19801 |
| | Robinson & Cole LLP<br>BY: KATHERINE M. FIX, ESQ.<br>1650 Market Street, Suite 3600<br>Philadelphia, PA 19103 |
| | Hamilton Stephens<br>BY: LINDA W. SIMPSON, ESQ.<br>525 N. Tryon St., 14th Floor<br>Charlotte, NC 28202 |

APPEARANCES (continued):

For Georgia-Pacific LLC:

Rayburn Cooper & Durham, P.A.
BY: JOHN R. MILLER, JR., ESQ.
227 West Trade Street, Suite 1200
Charlotte, NC 28202

Debevoise & Plimpton
BY: MARK P. GOODMAN, ESQ.
66 Hudson Boulevard
New York, NY 10001

APPEARANCES (via telephone):

SANDER L. ESSERMAN
Future Claimants' Representative
2323 Bryan Street, Suite 2200
Dallas, TX 75201-2689

opposition to the motion for relief from stay and the arguments at today's hearing, I conclude I should deny the motion for relief from stay and in large part, I do so for the same reasons I denied the Dales' motion for relief from stay, the order for which was entered about one month ago, and for the same reasons I granted the preliminary injunction motion early on in this case, but I will add a few things to the remarks that I made when I ruled on the Dales' motion for relief from stay.

Consideration of the Robbins factors, particularly the second factor, that being whether modifying the stay will promote judicial economy and whether there would be greater interference with the bankruptcy case if the stay were not lifted because matters would have to be litigated in bankruptcy court, I believe and find weighs against modifying the automatic stay.

As I said in the Dales' case, I can't look at modifying the stay in Mr. Buckingham's case in isolation, at least particularly not with respect to the second prong. That issue must be considered in the context of this case being a mass tort case and because that is the reality in which we find ourselves, I still conclude that if I granted Mr. Buckingham's motion for relief from stay I would be obliged to grant the motion for relief from stay of most, if not all, claimants who sought similar relief. That is true for Mr. Buckingham as it

pending motion for relief from stay in Carolin. That issue was not on the table and they cited to 362 because it includes the word "cause" as does 1112(b). And the Fourth Circuit was defining what that broad language means and of course, ultimately concluded that it supports the construction that a debtor's lack of good faith may constitute cause for dismissal of a petition.

Similarly, the Fourth Circuit points out that 362 "inferentially permits inquiry into the debtor's good faith in commencing this case as a whole," and it cites Collier's for that proposition.

In his reply, Mr. Buckingham accurately points out that, "Nowhere in Carolin does the Fourth Circuit indicate that its two-pronged approach to dismissal is applicable to motions for relief from stay." I guess I would add, though, but nowhere does it say that it doesn't and to me, it defies logic to conclude that the two-prong standard doesn't apply in the context of this case and I underscore that statement if considering whether to grant relief from stay on the basis that the case was filed in bad faith. In other words, it can't be that a less stringent standard applies to a relief from stay motion which, if granted, would result in the dismissal of the case. To conclude otherwise would mean that I could deny the motions to dismiss the case as a bad faith filing for failure to meet the objective futility prong of the two-prong standard,

but grant relief from stay upon the finding of subjective bad faith. If I granted such relief from stay to one claimant, I would be obliged to grant it to all claimants, again resulting in the dismissal of this case and standing in stark contrast to the proposition for which I have held Carolin stands.

And as a practical matter, you know, this issue isn't gonna come up in other cases because in chapter 11 cases the Court wouldn't grant a motion for relief from stay if the case was filed in bad faith. The Court would dismiss the case. And that was true in a couple of the cases that were cited by Mr. Buckingham in his Footnote 6. There were both motions to dismiss and motions for relief from stay that were pending. The Court granted the motion to dismiss, but denied the motion for relief from stay as moot or didn't otherwise consider it.

Otherwise, with respect to the cases Mr. Buckingham cites in support of his argument that a lack of good faith constitutes cause for lifting the stay, I agree with the debtor that those cases are distinguishable. None of them were mass tort cases with tens of thousands of claims pending against the debtor.

I would also note that several of the cases include no reference to 362 or the automatic stay and the Basin Electric Cooperative case was an involuntary petition in which the district court concluded the petition should have been dismissed based on the petitioning creditors' bad faith. My

# Exhibit 4

***David Tarin M.D., PhD, FRCPath***
*856 San Antonio Place*
*San Diego*
*CA 92106-3057*
E-mail: dtarin1@gmail.com
*Phone: 619-225-1106*
*Mobile; 858-361-3658*

---

*NAME: Peter BERGRUD* *AGE:77*

*DATE OF BIRTH:*[redacted] *DATE OF DEATH: 04/21/2019*

*DATE FILE RECEIVED:10/14/2019* *DATE REPORT ISSUED: 11/25/2019*

*REQUESTED BY:**Ms Sarah Jett*** *FOR**: MRHFM, Portland, OR***

*RECORDS REVIEWED:*

***Medical Records (195 pages plus 68 photographs)***

*Kaiser Permanente – Medical records*
*Death Certificate*
*National Autopsy Services – Autopsy report-19-4-23 PLB*
- *and photographs (68)*

***Pathology Slides (65): all stained***
*Series S19-32390: 4 slides and 3 controls for immunohistochemical(IHC) stains*
*Series19-2-06952-5: 58 slides including IHC controls*

---

SUMMARY OF CLINICAL HISTORY

The history of this illness began with a routine chest Xray (November 2018) for persistent cough. A moderate sized left pleural effusion was seen and computer tomographic (CT) was ordered, which confirmed the observation, but the cause was not evident. Cytology of fluid should only a mild inflammatory cell exudate. At follow-up CT on 01/08/2019 pleural nodules were noted in addition to the persisting effusion which was now loculated. Mild to moderate bilateral emphysema was also documented. By 02/25/2019 the continuing presence of the pleural effusion and pleural nodules with pleural calcification was causing concern for possible malignancy and he now reported pleuritic chest pain. These features prompted video-assisted thoracoscopy (VATS) with pleural biopsy on 02/26/2019. The biopsy was reported as confirming a malignant biphasic mesothelioma. Immunohistochemical (IHC) studies demonstrated that the tumor cells stained with

reagents for CK7, calretinin, CK5/6, pankeratin, GATA3 and WT-1. They did not stain with stains for TTF-1, CK20, MOC-31, BerEP4, and EMA. Post-operative positron emission tomography showed hypermetabolic left pleural nodules and hypermetabolic enlarged mediastinal lymph nodes. Surgery was considered, but treatment with chemotherapy was chosen as more suitable treatment for this patient. During the next month the patient's condition declined, he became weaker and CT in early April 2019 showed enlargement of the intrathoracic masses, with recurrence of the left pleural effusion. Soon after he became severely hypotensive and was diagnosed to be in septic shock. Chemotherapy was therefore discontinued on 04/15/2019 and treatment was redirected towards providing terminal comfort care. Mr Bergrud died on 04/21/2019.

*Social history*
Former smoker - 16 pack years. Ceased 1974*:*
The patient has an occupational history of working construction working with cutting asbestos cement pipes without respiratory protection for 4 years with frequent exposure to this in the late 70s and 80s. He was employed in the Air Force working in Missile Sites.

*Family history:*
Father died of lung cancer
Brother had a stroke

*Past Medical History*:
Old cerebrovascular accident – June 2016 – residual weakness of right leg

*Occupational History:*
Heavy equipment operator. Further details and discussion to follow.
More detail and discussion will follow in a separate report.

DEATH CERTIFICATE – *Signed* 04/25/2019
Cause of death stated to be Mesothelioma

AUTOPSY REPORT
A partial autopsy on the thoracic contents of the deceased was conducted on 04/23/2019. The report is skimpy on details but provided several (68) photographs. It is evident that the left pleural cavity was obliterated by tumor which was adherent to the inside of the chest wall and to the sternum. Multiple tumor nodules were visible in the parietal pleura. The left lung was described as extensively necrotic. Serial slicing of the left lung revealed that it was extensively replaced by tumor. The weight of the left lung was given as 1704gm and that of the right lung was 591 gms. Both were therefore markedly overweight. The right pleural cavity contained 2 liters of effusion.

***MY REPORT ON HISTOLOGY SLIDES (DR DAVID TARIN)***

*Series S19-32380 – Pleural biopsy*
*Single slide stained with hematoxylin and eosin (H&E):* This slides carries multiple small fragments of tissue ranging from 0.3 cm to 0.7 cm. The fragments are derived from tumor tissue composed of tubulo-papillary epithelioid and whorled spindle cell sarcomatous regions interdigitating with each other. The tumor cells display moderate cellular and nuclear pleomorphism and substantial embedded anthracotic pigment. Immunohistochemical (IHC) stains demonstrate the tumor cells in the biopsy to stain positively for calretinin, D2-40 and WT-1. These features establish the biopsy as being derived from a biphasic malignant pleural mesothelioma.

*Series19-2-06952-5: 58 slides including IHC controls*
Histopathological and IHC observations on the autopsy derived tissue blocks confirm extensive necrosis in the tumor in the left pleural cavity. This is mainly due to post mortem autolysis and deterioration, but enough morphological detail remains to confirm the biopsy diagnosis of mesothelioma and demonstrate it to be invading lung parenchyma and adipose tissue of the chest wall. The IHC stains show that the remaining identifiable tumor cells are positive for CK8/18, pancytokeratin, calretinin, WT-1 (weak nuclear and cytoplasmic staining). Iron stains revealed 1 asbestos body in 3 sections. The tumor cells were negative for TTF-1, CEA, HBME-1, and PSA markers. Hematoxylin and van Gieson staining confirmed extensive bilateral interstitial fibrosis grade 3 with peripheral honeycombing, typical of asbestosis in the lung tissue not involved with tumor.

***Diagnosis:***

1. **Malignant biphasic mesothelioma of left lung**
2. **Bilateral Grade 3 asbestosis CAP-NIOSH**

*Interpretation:*
The clinical history, radiological observations, biopsy pathology diagnosis, IHC staining profile and autopsy findings all combine to establish irrevocably that the deceased died of a malignant biphasic mesothelioma. The accompanying widespread bilateral peripheral fibrosis and honeycombing in the lungs had the characteristic features of pulmonary asbestosis and this is supported by the presence of an asbestos body in the lung tissue sections.

---

SIGNED:

David Tarin

David Tarin MD PhD FRCPath

# Exhibit 5

2660407

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CLARENCE JOHNSON, et ux, et al., | ) | C.A. No. 78-464 |
| | ) | 78-1027 |
| Plaintiffs, | ) | 78-1117 |
| | ) | 78-1041 |
| v. | ) | 78-2023 |
| | ) | 78-1987 |
| TURNER & NEWALL, LTD., et al., | ) | 78-3046 |
| | ) | 79-1523 |
| Defendants. | ) | 79-4337 |
| | | 79-4338 |
| | | 79-4341 |
| | | 79-4339 |
| | | 79-4340 |
| | | 79-4342 |
| | | 79-2715 |
| | | 78-4172 |
| | | 79-3690 |
| | | 79-3770 |

Monday,
June 30, 1980
Washington, D. C.

Deposition of:

LEON DAVID HOROWITZ

called for examination by counsel for Defendant Cassiar Asbestos Corporation, Limited, pursuant to notice, at the offices of Shea & Gardner, 1800 Massachusetts Avenue, N. W., Washington, D. C., before Gerald Nevitt, Notary Public in and for the District of Columbia, commencing at 10:55 a.m.

OFFICIAL REPORTER COMPANY
12401 Palermo Drive
SILVER SPRING, MD. 20904
Tel. 572-4324

Appearances:

For the Plaintiffs:

HAMBURG RUBIN MULLIN & MAXWELL
BY: EDWARD RUBIN, ESQ.

For the Defendant Turner & Newall, Ltd:

JOHN P. MASON, ESQ.

For the Defendant CertainTeed Corporation:

SWARTZ CAMPBELL & DETWEILER
BY: G. DANIEL BRUCH, JR., ESQ.

CURTIS M. PONTZ, ESQ.

LaBRUM & DOAK
BY: JAMES D. HILLY, ESQ.

For the Defendant Cassiar Asbestos Corp., Ltd:

SHEA & GARDNER
BY: DAVID BOOTH BEERS, ESQ.,
ELIZABETH S. GIBSON, ESQ.

For the Defendant Lake Asbestos of Quebec, Ltd:

PORZIO & BROMBERG
BY: MYRON J. BROMBERG, ESQ.

For the Defendant Johns-Manville:

MARSHALL DENNEHEY & WARNER
BY: THOMAS C. DELORENZO, ESQ.,
ANNE M. KENNEY, ESQ.

For the Defendant Asbestos Corporation, Ltd:

OMINSKY JOSEPH & WELSH
BY: EDWARD B. JOSEPH, ESQ.

Appearances: (Cont'd)

For the Defendant GAF:

MESIROV GELMAN JAFFE & CRAMER
BY: EDWARD GREER, ESQ.

For the Defendant Southern Asbestos:

WHITE & WILLIAMS
BY: ANDREA L. BOWMAN, ESQ.

For the Defendant Bell Asbestos Mines, Ltd:

POST & SCHELL
BY: F. JAMES GALLO, ESQ.

For the Defendant Turner & Newall, Ltd:

SULLIVAN & CROMWELL
BY: RICHARD J. RAWSON, ESQ.

For the Defendant Carey Canadian Mines, Ltd:

HARVEY PENNINGTON
BY: JOEL D. GUSKY, ESQ.

For the Defendant United States of America:

WILLIAM R. HERMAN, ESQ.
Civil Division, U. S. Department of Justice

\- - -

# I N D E X


| DEPONENT | EXAMINATION BY | PAGE |
|---|---|---|
| Leon David Horowitz | Mr. Beers | 5 |
| | Mr. Herman | 119 |
| | Mr. Gallo | 125 |
| | Mr. Bromberg | 138 |
| | Mr. Beers | 172 |
| | Mr. Rubin | 176 |
| | Mr. Hilly | 226 |
| | Mr. Bruch | 235 |
| | Mr. Hilly | 241 |
| | Mr. Pontz | 242 |
| | Ms. Gibson | 242 |
| | Mr. Bromberg | 243 |
| | Mr. Bruch | 244 |
| | Mr. Gallo | 245 |

| HOROWITZ DEPOSITION EXHIBITS | PAGE |
|---|---|
| 1 through 25 - | 5 |
| 26- | 172 |


(Exhibits attached to court original)

OFFICIAL REPORTER COMPANY
12401 Palermo Drive
SILVER SPRING, MD. 20904
Tel. 577-4324

(Horowitz Deposition Exhibits Nos. 1 through 25 were marked.)

LEON DAVID HOROWITZ

having been duly sworn by the Notary-Reporter, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR DEFENDANT CASSIAR

BY MR. BEERS:

Q What is your full name, Mr. Horowitz?

MR. MASON: The usual stipulations?

MR. BEERS: Yes. They are in the Federal Rules, Mr. Mason.

A Leon David Horowitz.

Q Where do you live?

A I live in Burlington, Massachusetts, 78 Macon Road, Burlington, Massachusetts 01803.

Q Where do you work?

A I work with American Mutual Liability Insurance Company, in Wakefield, Massachusetts.

Q How old are you?

A I am 62 years old.

Q What is your position at the insurance company?

A I am Chief of the Industrial Hygiene Section of the company.

A Yes, I did.

Q Can you give me some examples of your clients during that four-year period?

A Well, I did a beryllium survey for RCA in New Jersey.

I did another RCA survey in another plant in New Jersey with respect to employee complaints during their work hours, which was the third shift, and there were a mixture of chemicals so I can't specify which chemicals.

Most other clients were small clients, small businesses in New York City.

Q What did you do after you left that consulting position?

A I was hired by Keasbey & Mattison, of Ambler, Pennsylvania, as a dust control engineer.

Q How did you first make contact with Keasbey & Mattison?

A They had an advertisement for a dust control engineer in the New York Times and I responded to that.

Q To whom did you respond?

A To the address that was in the paper.

Q Who at --

A A personnel man was my first contact.

Q When did you go to work?
A I believe it was May of that year, 1960.
Q What was your title?
A I believe my first title was Dust Control Engineer.
Q How long did you remain Dust Control Engineer?
A I was Dust Control Engineer until a few years later, after CertainTeed took over and when I took over duties as corporate Safety Director. I don't know the exact year, but it may have been '65.
Q How long did you remain corporate Safety Directo
A From '65 to '68, when I left the company.
Q What did you do when you left the company?
A I joined American Mutual Liability Insurance Company.
Q When you first started with Keasbey & Mattison were your duties company-wide or did they relate to a particular plant?
A They were company-wide with respect to dust control engineering and I added, with their agreement, to do industrial hygiene work.
Q Did the industrial hygiene work pertain to all plants or just to a particular plant?

Q Keasbey & Mattison did not have a plant in Texas or California at that time, did it?

A Not at that time. No, they didn't have a plant.

Q After you started work with CertainTeed did you visit all the plants that CertainTeed owned, at one time or another?

A In all the years, yes, I visited all their plants, in all the years. While I was still a Dust Control Engineer I don't remember visiting all the new plants that came with CertainTeed, but I continued visiting the plants that dealt with asbestos and cement.

Q Mr. Horowitz, I think you described your job as falling into two parts, dust control engineering on the one hand and industrial hygiene on the other?

A I considered them as one. They both functioned together. That is why I brought them in. But, yes, they considered it both parts; right.

Q Did you work for the same people while doing both functions?

A Yes.

Q Who was your immediate supervisor at Keasbey & Mattison when you first went there?

A Al Spedding.

A The same as the asbestos cement pipe plant only.

Q After 1962, when you worked for CertainTeed, did you also work with the dust levels at some of the other plants

A The same as the asbestos cement plants prior to that time.

Q Could you just tell us that in a complete sentence, what your understanding was as to the component parts of the dust levels in the plants, say, at Hillsboro and at Santa Clara?

A The answer would be the same at Hillsboro and Santa Clara, which would be 100 percent asbestos as one of the raw materials to make asbestos cement pipe, 100 percent silica to make the cement, and 100 percent cement, as raw materials; and then the final product as 14 percent asbestos, with the rest as a finished cement, combined cement.

MR. BEERS: For the next little while or long while we are going to be dealing with a series of 20-some documents.

This is off the record.

(Discussion off the record.)

Q I have asked the Reporter at the beginning of the deposition to mark each of these documents as Horowitz Exhibits 1 through 25. I would like to turn to the document

made. All I know is that he was going to come and I was invited to the meeting.

Q Do you remember what interest Turner & Newall had in the affairs of Keasbey& Mattison at that time?

MR. MASON: I object to the form of that questio

A I can still answer that?

Q Yes, sir.

A I believe Dr. Knox felt that in England they were much more aware of the hazard of asbestos and that in America, the United States; we were not that much aware.

Q Do you remember whether or not T & N, Turner & Newall, had any relationship with Keasbey& Mattison at the time?

A I only know of the relationship that I understoo that they owned Keasbey& Mattison.

Q What did Dr. Knox tell you at that meeting?

A His concern as well as the general knowledge that seemed to prevail in the British Empire, that cancer was associated with asbestos.

Q Did he discuss any particular form of cancer?

A Yes. He mentioned mesothelioma.

Q What did he say about mesothelioma?

A That it was a unique cancer, that a person could

maintaining a dust-free industrial atmosphere?
A For health reasons.
Q Did you design the cut-off saw that is referred to in this document, the dust collection system for the cut-off saw?
A May I read it just to recall?
Q Certainly.
(Pause.)
A Apparently, it was my design that they were trying to correct, from their existing design to my design, and he was urging him to do it.
Q I would like you to now turn to a document that has been marked Horowitz Exhibit 5. Could you read the heading of that document.
A It is written to Mr. A. W. Spedding on September 14, 1960. Asbestos Textile Institute Meeting, September 8th and 9th, 1960.
Q Have you ever seen this document before?
A Yes. I wrote it.
Q This is a true copy of the document that you wrote?
A Yes.
Q Can you tell us what this document is all about?

# Exhibit 6

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION - MIDDLESEX COUNTY
DOCKET NO. L-3458-09

| | |
|---|---|
| JOYCE BRADLEY, Plaintiff, vs. 3M COMPANY, et als., Defendants. | VIDEOTAPE DEPOSITION UPON ORAL EXAMINATION OF LLOYD C. AMBLER VOLUME 1 |

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION - MIDDLESEX COUNTY
DOCKET NO. L-1628-09

GARY R. CHAVAN and JULIE H. CHAVAN, Husband and wife,
Plaintiffs,

vs.

3M COMPANY, et als.,
Defendants.

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION - MIDDLESEX COUNTY
DOCKET NO. L-3465-09

PATRICIA DUGGAN and JOHN J. DUGGAN, Husband and wife,
Plaintiffs,

vs.

3M COMPANY, et als.,
Defendants.

BRODY DEPOSITION SERVICES, INC.
Certified Shorthand Reporters & Videographers
7 Elm Street
Westfield, New Jersey 07090
Phone: (908) 789-2000
Fax: (908) 789-2007

different question. Why don't you switch the tape.
THE VIDEOGRAPHER: Off the record at 12:10.
(Discussion is held off the record.)
THE VIDEOGRAPHER: Back on the record at 12:11.
BY MR. PLACITELLA:
Q. When CertainTeed was advised that asbestos was associated with mesothelioma, they didn't hold that information back from their employees; they told them, true?
MR. EDELL: Objection to the form of the question. I don't know what you mean by "associated with."
BY MR. PLACITELLA:
Q. You can answer it.
A. When CertainTeed was -- when CertainTeed became aware that there was a possible connection with asbestos and mesothelioma or any disease, they shared that information.
Q. And they had safety meetings about that?
A. They -- well, they had safety meetings about what asbestos could do and how it could be harmful and safe ways of using asbestos --

Q. With the workers?
A. With the workers.
Q. Tell the ladies and gentlemen of the jury, when is the first time CertainTeed mentioned the word "mesothelioma" in relation to the sale of asbestos-containing cement pipe.
A. Well, it's an entirely -- a different situation.
Q. Isn't it true, sir, that, although you told the employees in the plant about mesothelioma, you never mentioned the word "mesothelioma" to a customer or a consumer ever?
A. That's not true.
Q. When is the first time you mentioned the word "mesothelioma" --
A. Oh.
Q. -- to a customer or a consumer?
A. I may be wrong on that. We mentioned the word "cancer." We may not have mentioned the meso. I'd have to look at what we said on the label and also what was in the work practices, but "cancer" was used.
Q. Cancer was not used until 1985? True, sir?
A. Cancer itself was not used until

labels on our pipe, one in '79 and one in '85, and you know what the wording is.

BY MR. PLACITELLA:

Q. My question is, did you at any time tell -- put a label on your pipe that said "Small amounts of exposure can cause cancer"?

A. We put on our pipe what we've already said we put on our pipe, and those words weren't used.

Q. Did you ever use -- did you ever put on your pipe that family members were at risk from exposure to asbestos?

A. That was never put on our pipe.

MR. PLACITELLA: The defense lawyers are getting allergic to me, so I'll conclude the questions for today. I think we are out of tape anyway.

Thank you.

THE VIDEOGRAPHER: This concludes Day 1 at 5:19 p.m.

(5:20 p.m.)

# Exhibit 7

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

---o0o---

HOLLY ORTWEIN and RICHARD ORTWEIN,

Plaintiffs,

vs.

CERTAINTEED CORPORATION Et al.,

Defendants.

No. RG13701633

-----------------------/

VIDEOTAPED DISCOVERY DEPOSITION OF LLOYD AMBLER

Taken before JOSEPHINE CARDILLO,

Professional Court Reporter and Notary Public.

August 20, 2014

Aiken Welch Court Reporting
One Kaiser Plaza, Suite 250
Oakland, California 94612
510.451.1580/877.451.1580
Fax: 510.451.3797
www.aikenwelch.com

BY MR. SATTERLEY:

Q. Okay.

A. We were always trying to improve our systems, whether -- it could be laze, it could be a boring mill, it could be the -- the mixing -- the mixing containers up where the cement silica and asbestos are all mixed together with water; it could be any of those things.

We were always evaluating -- we were evaluating doing a better job of adding our asbestos to the mix. And, eventually, we even invented a -- developed an automatic asbestos bag opener.

EXAMINATION BY MR. SATTERLEY: Mo ve to strike portions as nonresponsive.

BY MR. SATTERLEY:

Q. Mr. Ambler, when you were first hired in and was told about asbestos hazards, were you told about Crocidolite asbestosis?

A. What about it?

Q. That that was one of the ingredients of the CertainTeed pipe.

A. Oh, yes.

Q. And were you told about Chrysotile asbestosis?

A. Yes, sir.
Q. And when you were -- and in the 1967 time frame, did individuals educate you that the Crocidolite was considered to be more toxic than the Chrysotile?
A. I was told that there was a lot of talk about that, that the Crocidolite fiber was more toxic than the Chrysotile, right.
Q. Anywhere in the plants in the late 1960s or '70s, did you see any notifications about Crocidolite being more dangerous or more toxic than Chrysotile?
A. Yeah, I don't remember seeing any notification of that. But everybody knew it, 'cause it was talked about.
EXAMINATION BY MR. SATTERLEY: Mo ve to strike portion that is nonresponsive.
BY MR. SATTERLEY:
Q. You don't read the mind of everybody, do you?
MS. GEISE: I'm going to object to the form; that's argumentative.
THE WITNESS: What do you mean, I don't read the -- I don't read the mind of

# Exhibit 8

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION:MIDDLESEX COUNTY
DOCKET NO. L-3458-09

- - - - - - - - - - - - - - - - -:
JOYCE BRADLEY : VIDEOTAPE
: DEPOSITION UPON
Plaintiff, : ORAL EXAMINATION
: OF
-vs- : LLOYD C. AMBLER
: VOLUME 2
3M COMPANY, et als, :
:
Defendants. :
- - - - - - - - - - - - - - - - -:

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION:MIDDLESEX COUNTY
DOCKET NO. L-1628-09

- - - - - - - - - - - - - - - - -:
GARY R. CHAVAN and JULIE H. :
CHAVAN, Husband and Wife, :
:
Plaintiffs, :
:
-vs- :
:
3M COMPANY, et als, :
:
Defendants. :
- - - - - - - - - - - - - - - - -:

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION:MIDDLESEX COUNTY
DOCKET NO. L-3465-09

- - - - - - - - - - - - - - - - -:
PATRICIA DUGGAN and JOHN J. :
DUGGAN, Husband and Wife, :
:
Plaintiffs, :
:
-vs- :
:
3M COMPANY, et als, :
:
Defendants. :
- - - - - - - - - - - - - - - - -:

BRODY DEPOSITION SERVICES, INC.
Certified Court Reporters & Videographers
7 Elm Street
Westfield, New Jersey 07090
Phone: (908) 789-2000 Fax: (908) 789-2007

heat down, correct?
**A The dust down, correct.**
Q Right.
And even when it was wet, there were readings of a hundred and nine fibers per cc for the person that was actually cutting the pipe, correct?
**A It was one -- one count of a hundred and nine, yes.**
Q Well, there was another one for 95, and there was another one for 60, correct?
**A Right.**
Q Okay.
**A And there was one for 11, and one for 30.**
Q All right.
So the average for the people who -- for instance, cut the pressure pipe was 65 fibers per cc, correct --
MR. EDELL: Objection to the form of the question.
Q -- isn't that what it said?
**A For those four tests conducted, the mean was 65 fibers per cc, yes.**
Q All right.
And that was -- the average was more than six times the then OSHA limit, correct?

**A The peak level, yes.**
Q Okay. And then they also tested helpers, correct?
**A Yes.**
Q They were people who were not cutting the pipe --
**A That's correct, yes.**
Q -- correct?
And the helpers' average exposure was for pressure pipe 49 fibers per cc, correct?
**A On the mean.**
Q Right.
That was almost five times OSHA's limit at the time, correct?
**A That's correct, yes.**
Q The helper was a bystander, correct?
**A Ah, well, what -- I don't know what your definition of a bystander is. A bystander could be many different things.**
**The helper was standing there prob -- most likely holding the pipe while it was being cut.**
Q And did you not do readings in your test that showed that people 15 feet away were still exposed to asbestos fibers in excess of the OSHA limits?

A I don't -- I don't know if we did or didn't. I didn't see it.

Q Do you recall ever testifying to that in prior depositions?

A I may have. I don't remember.

Q Okay. And, for example, another test was run on sewer pipe, and that showed people cutting the pipe were exposed to almost ten times the OSHA limit, true?

A Ten times?

Q Yes, sir.

A On the average mean?

Q No --

A There was one --

Q -- one test -- correct --

A -- one test was nine and a half times, yes, sir.

Q Right. And the average -- and that average was 42, so that was about four times the OSHA levels.

A The mean was 42, yes, sir.

Q Okay. Now, ten years earlier when -- remember yesterday we were talking about the flurry of activity that went on in 1967 and '68 with the Asbestos Cement Products Association over whether a

# Exhibit 9

PohlmanUSA®
Court Reporting and Litigation Services

# Juan Bergrud - Volume I

October 15, 2019

Peter L. Bergrud, deceased, et al.

vs.

Bartells Asbestos Settlement Trust, et al.

SUPERIOR COURT OF WASHINGTON

FOR PIERCE COUNTY

```
----------------------------------x
CHERYL L. BERGRUD, Individually   )
and as Personal Representative    )
for the Estate of Peter L.        )  Case No.
Bergrud,                          )  19-2-06952-5
                 Plaintiff,       )
                                  )
       vs.                        )
                                  )
BARTELLS ASBESTOS SETTLEMENT      )
TRUST, et al.,                    )
                                  )
                 Defendants.      )
----------------------------------x
```

VOLUME I

DISCOVERY DEPOSITION OF

JUAN BERGRUD

October 15, 2019

9:58 a.m.

31611 Pete von Reichbauer Way South

Federal Way, Washington 98003

Reported Stenographically By:
Mayleen Ahmed, RMR, CRR, CRC
WA CCR No. 3402

# I N D E X


| | PAGE |
|---|---|
| Appearances of Counsel ..................... | 3 |
| Telephonic Appearances ..................... | 5 |

WITNESS: JUAN BERGRUD

| EXAMINATION | PAGE |
|---|---|
| By Ms. Kruger ............................. | 6 |
| By Mr. Madderra ........................... | 86 |
| By Ms. Pearson ............................ | 95 |

-------------------- EXHIBITS ----------------------
(Attached to original transcript)

| BERGRUD EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Arthur Bergrud Social Security records | 16 |
| Exhibit 2 | Juan Bergrud employment listing | 34 |
| Exhibit 3 | Peter Bergrud Social Security records | 34 |
| Exhibit 4 | Juan Bergrud Social Security | 115 |

INSTRUCTIONS NOT TO ANSWER:

| PAGE | LINE |
|---|---|
| 11 | 25 |

INFORMATION REQUESTED:
(None)

MOTIONS TO STRIKE:
(None)


o0o

APPEARANCES OF COUNSEL

On behalf of the Plaintiffs and the witness Juan Bergrud:
D'ARCY L.R. RAPP, ESQ.
MAUNE RAICHLE HARTLEY FRENCH & MUDD LLC
1015 Locust Street - Suite 1200
St. Louis, Missouri 63101
drapp@mrhfmlaw.com
-and-
MEREDITH GOOD, ESQ.
MAUNE RAICHLE HARTLEY FRENCH & MUDD LLC
80 SE Madison Street - Suite 310
Portland, Oregon 97214
mgood@mrhfmlaw.com

On behalf of Honeywell International, Inc.:
KRISTINE E. KRUGER, ESQ.
PERKINS COIE LLP
1201 Third Avenue - Suite 4900
Seattle, Washington 98101
kkruger@perkinscoie.com

On behalf of BorgWarner Morse TEC LLC:
MICHAEL MADDERRA, ESQ.
BENNETT BIGELOW & LEEDOM, P.S.
601 Union Street - Suite 1500
Seattle, Washington 98101-1363
mmadderra@bbllaw.com

On behalf of CertainTeed Corporation and H.D. Fowler Co., Inc.:
PATRICIA T.O. PEARSON, ESQ.
GORDON THOMAS HONEYWELL LLP
600 University Street - Suite 2100
Seattle, Washington 98101-4185
ppearson@gth-law.com

On behalf of Consolidated Supply Co. and McWane, Inc.:
KARLEEN J. SCHARER, ESQ.
BULLIVANT HOUSER BAILEY PC
1700 Seventh Avenue - Suite 1810
Seattle, Washington 98101-1397
karleen.scharer@bullivant.com

APPEARANCES OF COUNSEL (Cont'd)

On behalf of Genuine Parts Co.:
LORIANNE G. HANSON, ESQ.
BULLIVANT HOUSER BAILEY PC
1700 Seventh Avenue - Suite 1810
Seattle, Washington 98101-1397
lorianne.hanson@bullivant.com

On behalf of Mueller Co. LLC:
ANDREW J. CHRISTMAN, ESQ.
von BRIESEN & ROPER, S.C.
411 East Wisconsin Avenue - Suite 1000
Milwaukee, Wisconsin 53202
achristman@vonbriesen.com

On behalf of Crown Cork & Seal and General Electric Company:
ALICE C. SERKO, ESQ.
TANENBAUM KEALE LLP
701 Pike Street - Suite 1575
Seattle, Washington 98101
aserko@tktrial.com

On behalf of the Water Applications Distribution Group, Inc:
WILLIAM R. SQUIRES III, ESQ.
CORR CRONIN LLP
1001 Fourth Avenue - Suite 3900
Seattle, Washington 98154-1051
rsquires@corrcronin.com

On behalf of J-M Manufacturing Co., Inc.:
TYLER J. HERMSEN, ESQ.
WILLIAMS KASTNER, PLLC
601 Union Street - Suite 4100
Seattle, Washington 98101
thermsen@williamskastner.com

TELEPHONIC APPEARANCES OF COUNSEL:

On behalf of ITT LLC
RONALD C. GARDNER, ESQ.
GARDNER TRABOLSI & ASSOCIATES PLLC
2200 Sixth Avenue - Suite 600
Seattle, Washington 98121
rgardner@gandtlawfirm.com

On behalf of the Hajoca Corporation:
KEVIN J. CRAIG, ESQ.
GORDON REESE SCULLY MANSUKHANI LLP
701 Fifth Avenue - Suite 2100
Seattle, Washington 98104
kcraig@grsm.com

o0o

Q. So Lany's only biological children were Rebella and Amy?

**A. Correct.**

Q. Sorry for that detour. I would like to go back to the Social Security records now.

**A. Oh, okay.**

Q. So it looks like we have Almon Lawler in Bothell in 1968 and 1969?

**A. Yes.**

Q. Did you work there with Lany?

**A. Yes.**

Q. And was Mr. Almon Lawler your boss?

**A. Yeah. He owned the company. It was a small company. He tried to start up.**

Q. And what did you guys do there?

**A. Same thing; I was the operator and Lany installed the pipe.**

Q. And Pinkertons, Inc., in 1969, do you recall that?

**A. A neighbor of ours worked for the -- he was -- he was up in the Pinkertons guard. And he couldn't get people, so he'd call us every once in a while to see if we could fill in here or there and help him out; so...**

Q. Got it.

**A. We worked for him.**
Q. And what did you guys do there?
**A. If there was a building that they were working on or something, when the crew went home, they had to have somebody there to watch it overnight for theft and stuff like that.**
Q. Okay.
**A. But it wasn't a permanent job. It was just helping him out.**
Q. And then Pacific Service Co., Inc. in 1969, Sno-King Drive-in Theater. It looks like he was only there in the first quarter.
**A. Yeah.**
Q. Does that ring a bell?
**A. Snow-King? Where is that?**
**(Witness reviewing document.)**
**A. No.**
Q. Okay. Then we have Leo Cowdrick and John Cowdrick, Cowdrick & Son?
**A. Correct. Yeah.**
Q. And did you work with Lany at this job?
**A. I believe so. They were good friends of ours. They started their own business and they got -- they wanted us to help, help them out for a while. You see we didn't make that much money there.**

**We didn't stay. Just helping them out.**
Q. So both you and Lany worked there?
**A. Yeah. yeah. I can remember that job even.**
Q. Are Leo and John still with us?
**A. Leo is not. But his son John is.**
Q. Were they close friends?
**A. Correct. Yeah.**
MS. RAPP: Wait. Who? Were who close friends?
MS. KRUGER: Leo and John.
THE WITNESS: Leo and John.
MS. RAPP: Okay.
THE WITNESS: Cowdrick.
**A. And his grandson, Larry, worked with us for a long time. He's over at the -- he's over in Eastern Washington too now.**
Q. So Cowdrick & Son is no longer in the Seattle area?
**A. No.**
Q. And then it looks like we have a long stint at Shoreline Construction.
**A. Correct.**
Q. And you worked with Lany here?
**A. Correct.**
Q. And what did you guys do at Shoreline?

Q. I know some of the other counsel in the room will be interested in the detail of that work, but I'm just going to get a thumbnail sketch.

**A. Okay.**

Q. It looks like Puget Pipeline was next.

**A. Puget Pipeline?**

**(Witness reviewing document.)**

**A. I couldn't tell you.**

Q. You don't recall that?

**A. No. Or Noble. Some of these jobs, you know, I mean, there is so short and everything on it, because of his expertise, he'd go and help them out for just a little bit, get a certain thing done, and come back.**

Q. Okay.

**A. Yeah.**

Q. What was his expertise?

**A. Pipe layer and he worked, yeah, in manholes.**

MS. PEARSON: I'm sorry. I'm having a hard time hearing that. Can you read that answer back?

(Record read.)

**A. The work in the manholes is -- you know, once they're buried, they got leaks in them, you got to stop the leaks, and you use special hot, hot concrete to plug the leaks and channel the manholes.**

# Exhibit 10

PohlmanUSA®
Court Reporting and
Litigation Services

# Juan Bergrud - Volume II

October 16, 2019

Peter L. Bergrud, deceased, et al.

vs.

Bartells Asbestos Settlement Trust, et al.

SUPERIOR COURT OF WASHINGTON

FOR PIERCE COUNTY

| | |
|---|---|
| CHERYL L. BERGRUD, Individually and as Personal Representative for the Estate of Peter L. Bergrud, Plaintiff, | Case No. 19-2-06952-5 |
| vs. | VOLUME II |
| BARTELLS ASBESTOS SETTLEMENT TRUST, et al., Defendants. | |

DISCOVERY DEPOSITION OF

JUAN BERGRUD

October 16, 2019

9:06 a.m.

31611 Pete von Reichbauer Way South

Federal Way, Washington 98003

Reported Stenographically By:
Mayleen Ahmed, RMR, CRR, CRC
WA CCR No. 3402

# I N D E X


| | PAGE |
|---|---|
| Appearances of Counsel .................... | 3 |
| Telephonic Appearances .................... | 4 |

WITNESS: JUAN BERGRUD

| EXAMINATION | PAGE |
|---|---|
| By Ms. Serko ............................ | 6 |
| By Ms. Pearson .......................... | 12 |


EXHIBITS
(None marked)

MOTIONS TO STRIKE

| PAGE | LINE |
|---|---|
| 37 | 8 |

INFORMATION REQUESTED
(None)

INSTRUCTIONS NOT TO ANSWER
(None)

o0o

APPEARANCES OF COUNSEL

On behalf of the Plaintiffs and the witness Juan Bergrud:
D'ARCY L.R. RAPP, ESQ.
MAUNE RAICHLE HARTLEY FRENCH & MUDD LLC
1015 Locust Street - Suite 1200
St. Louis, Missouri 63101
drapp@mrhfmlaw.com
-and-
MEREDITH GOOD, ESQ.
MAUNE RAICHLE HARTLEY FRENCH & MUDD LLC
80 SE Madison Street - Suite 310
Portland, Oregon 97214
mgood@mrhfmlaw.com

On behalf of CertainTeed Corporation and H.D. Fowler Co., Inc.:
PATRICIA T.O. PEARSON, ESQ.
GORDON THOMAS HONEYWELL LLP
600 University Street - Suite 2100
Seattle, Washington 98101-4185
ppearson@gth-law.com

On behalf of Consolidated Supply Co. and McWane, Inc.:
KARLEEN J. SCHARER, ESQ.
BULLIVANT HOUSER BAILEY PC
1700 Seventh Avenue - Suite 1810
Seattle, Washington 98101-1397
karleen.scharer@bullivant.com

On behalf of Mueller Co. LLC:
ANDREW J. CHRISTMAN, ESQ.
von BRIESEN & ROPER, S.C.
411 East Wisconsin Avenue - Suite 1000
Milwaukee, Wisconsin 53202
achristman@vonbriesen.com

On behalf of Crown Cork & Seal and GE:
ALICE C. SERKO, ESQ.
TANENBAUM KEALE LLP
701 Pike Street - Suite 1575
Seattle, Washington 98101
aserko@tktrial.com

APPEARANCES OF COUNSEL (Cont'd)

On behalf of the Water Applications Distribution Group, Inc.:
WILLIAM R. SQUIRES III, ESQ.
CORR CRONIN LLP
1001 Fourth Avenue - Suite 3900
Seattle, Washington 98154-1051
rsquires@corrcronin.com

On behalf of J-M Manufacturing Co., Inc.:
DAVID SHAW, ESQ.
WILLIAMS KASTNER, PLLC
601 Union Street - Suite 4100
Seattle, Washington 98101
dshaw@williamskastner.com

o0o

TELEPHONIC APPEARANCES OF COUNSEL

On behalf of Honeywell International, Inc.:
KRISTINE E. KRUGER, ESQ.
PERKINS COIE LLP
1201 Third Avenue - Suite 4900
Seattle, Washington 98101
kkruger@perkinscoie.com

On behalf of BorgWarner Morse TEC LLC:
MICHAEL MADDERRA, ESQ.
BENNETT BIGELOW & LEEDOM, P.S.
601 Union Street - Suite 1500
Seattle, Washington 98101-1363
mmadderra@bbllaw.com

On behalf of Genuine Parts Co.:
LORIANNE G. HANSON, ESQ.
BULLIVANT HOUSER BAILEY PC
1700 Seventh Avenue - Suite 1810
Seattle, Washington 98101-1397
lorianne.hanson@bullivant.com

TELEPHONIC APPEARANCES OF COUNSEL (Cont'd)

On behalf of ITT LLC
RONALD C. GARDNER, ESQ.
DAVID D. MORDEKHOV, ESQ.
GARDNER TRABOLSI & ASSOCIATES PLLC
2200 Sixth Avenue - Suite 600
Seattle, Washington 98121
rgardner@gandtlawfirm.com
dmordekhov@gandtlawfirm.com

On behalf of the Hajoca Corporation:
KEVIN J. CRAIG, ESQ.
GORDON REESE SCULLY MANSUKHANI LLP
701 Fifth Avenue - Suite 2100
Seattle, Washington 98104
kcraig@grsm.com

o0o

Q. That's fine. That's fine.
**A. I don't think I can --**
Q. It was a long time ago. I'm just trying to --
**A. I mean -- yeah.**
Q. -- find out what you remember.
MS. RAPP: Go ahead.
**A. Well, these questions, I mean, when your mom and dad were born, and when were you here, and exactly when did Lany start there. I don't remember. That's 40-50 years ago.**
Q. Yes.
**A. And you keep asking the same questions.**
Q. Yes.
**A. Okay.**
Q. I'm sorry. This is what I have to do. So I'm just trying to --
**A. Okay.**
Q. -- find out what you remember. If you don't remember or if you have an estimate, that's fine. Tell me that. You're my opportunity to get information about your brother.
**A. Well, you know, we did many, many projects together. And I would say 80 percent of the projects in that era was with either Certain-Teed or John**

**Mansfield, and we did a lot of -- and Greystone, and Associated Concrete came in also. And it's hard to pick the projects apart back that long. But I can -- like that one project I remember explicitly. But I'll just tell you I don't know if I don't know.**

Q. That sounds good.

**A. Okay.**

MS. PEARSON: And I'll respectfully move to strike the nonresponsive portions.

Q. Okay. Yesterday, you said something about sometime around '70 and '72, you became a supervisor with Shoreline. Did I hear that correctly?

**A. Yes. That was on the Lake Stevens project.**

Q. Okay. During that project?

**A. At the start of the project.**

Q. So before that time, you were an operator?

**A. Correct.**

Q. Okay. And then what did it mean for you to become a supervisor? How did your job change?

**A. You run a crew instead of operating. I was out at the machine and run the crew, and lining up things.**

Q. Okay.

**A. Getting ready for tomorrow every day.**

Q. Okay. Once you became -- or when you were

# Exhibit 11

PohlmanUSA®
Court Reporting and
Litigation Services

Richard Trumbull

November 18, 2019

Peter L. Bergrud, et al.

vs.

Bartells Asbestos Settlement Trust, et al.

THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR PIERCE COUNTY

| | |
|---|---|
| CHERYL L. BERGRUD, Individually and as Personal Representative for the Estate of PETER L. BERGRUD,<br><br>Plaintiff,<br><br>vs.<br><br>BARTELLS ASBESTOS SETTLEMENT TRUST, et al.,<br><br>Defendants. | No. 19-2-06952-5 |

DISCOVERY DEPOSITION UPON ORAL EXAMINATION

OF

RICHARD TRUMBULL

Taken at: 415 Ellingson Road

Pacific, Washington

DATE TAKEN: November 18, 2019

REPORTED BY: ELIZABETH PATTERSON HARVEY, RPR, CCR 2731

A P P E A R A N C E S:

FOR THE PLAINTIFF:

D'Arcy L.R. Rapp
dreinhard@MRHFMLaw.com
Maune Raichle Hartley French & Mudd, LLC
1015 Locust Street, Suite 1200
St. Louis, Missouri 63101
314.241.2003

FOR BORGWARNER MORSE TEC LLC (via telephone):

Michael J. Madderra
mmadderra@bbllaw.com
Bennett Bigelow & Leedom, PS
601 Union Street, Suite 1500
Seattle, Washington 98101
206.622.4511

FOR CONSOLIDATED SUPPLY CO., GENUINE PARTS CO., and MCWANE, INC.:

Karleen J. Scharer
karleen.scharer@bullivant.com
Bullivant Houser Bailey
1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101
206.292.8930

FOR WATER APPLICATIONS DISTRIBUTION GROUP, INC.:

Jeff Bone
asbestos@corrcronin.com
Corr Cronin Michelson Baumgardner Fogg & Moore
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
206.625.8600

A P P E A R A N C E S

FOR MUELLER CO.:

Ronald C. Gardner
asbestos@gantlawfirm.com
Gardner Trabolsi & Associates
2200 Sixth Avenue Suite 600
Seattle, Washington 98121
(206) 256-6309

FOR HAJOCA CORPORATION (via telephone):

Kevin J. Craig
seaasbestos@grsm.com
Gordon & Rees Scully Mansukhani
701 Fifth Avenue
Suite 2100
Seattle, Washington 98104
206.695.5100

FOR CERTAIN-TEED CORP and H.D. FOWLER INC.:

Patricia O. Pearson
ppearson@gth-law.com
Gordon Thomas Honeywell
600 University, Suite 2100
Seattle, Washington 98101
206.676.7599

FOR ITT, LLC (via telephone):

Cory M. Martin
cory.martin@morganlewis.com
Morgan, Lewis & Bockius, LLP
One Market, Spear Street Tower
San Francisco, California 94105
(415) 442-1000

A P P E A R A N C E S

FOR HONEYWELL INTERNATIONAL, INC.:

Andrew Chen
HW Asbestos SEA@perkinscoie.com
achen@perkinscoie.com
Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101
(206) 359-8000

FOR CROWN, CORK & SEAL, INC. (via telephone):

Alice Serko
aserko@tktrial.com
Tanenbaum Keale LLP
One Convention Place
701 Pike Street
Suite 1575
Seattle, Washington 98101
(206) 889-5082

FOR J-M MANUFACTURING CO., INC.:

David A. Shaw
dshaw@williamskastner.com
Williams Kastner & Gibbs, PLLC
601 Union Street, Suite 4100
Seattle, Washington 98101
206.628.6600

* * * * * * *

DEPOSITION OF RICHARD TRUMBULL

EXAMINATION INDEX


| EXAMINATION BY: | PAGE |
|---|---|
| MS. PEARSON | 6, 177 |
| MR. GARDNER | 135 |
| MR. SHAW | 145 |
| MR. BONE | 183 |
| MS. SCHARER | 189, 217 |
| MR. MARTIN | 199 |
| MR. CHEN | 206 |
| MR. MADDERRA | 215 |


EXHIBIT INDEX


| EXHIBITS FOR IDENTIFICATION | | PAGE |
|---|---|---|
| Exhibit 1 | Photographs | 16 |
| Exhibit 2 | Drawing | 117 |
| Exhibit 3 | Publication - Asbestos Cement Pipe Producers Association | 158 |

**A That I recall, yes.**
Q Okay. Any other work with A/C pipe that you observed Lanny do that we haven't talked about?
**A Other than moving around and unloading and installing.**
Q We talked about that, right?
**A Yeah.**
Q We talked about that stuff.
**A That's -- I think that covers a lot of it.**
Q Well, does that cover all of it?
**A As best I can recall right now, yes.**
Q Okay. Do you know the brands of A/C pipe that Lanny worked with during his career?
**A Certain-Teed and JM.**
Q How do you know that he worked with those brands?
**A They were stamped. There was a stamp on the pipe that would say Certain-Teed. They were usually in a green or a blue. That's what I recall, is the green and the blue for sewer and for water.**
Q Do you remember any other brands other than those two?
**A I don't.**
Q Do you recall ever seeing him work with Flint-Coat A/C pipe?
**A No.**

Q How about CAPPCO?
**A I do not.**
Q Do you recall Kubota?
**A No. I chuckle because there's a Kubota machine.**
Q Sure.
**A So no, I do not recall that.**
Q Okay. Are you able to say that any particular brand of A/C pipe was used on any particular project that Lanny worked on?
**A No, I would say it's pretty -- depending on what kind of -- the project required and got the best deal on. So whatever is the most efficient. So I couldn't pick one over the other.**
Q You couldn't remember which brand of A/C pipe was used on any project that Lanny worked on; is that right?
**A No. It was either Certain-Teed or JM. What I'm saying is each job may have been a different, JM or Certain-Teed, depending on what kind of deal they got with those contractors.**
Q Okay. Focusing in on the Certain-Teed A/C pipe, based on what you remember, do you remember the color of it?
**A Green or blue.**
Q The pipe?
**A Oh, the pipe. No, I'm sorry. Concrete color, cement color, gray-ish.**

# Exhibit 12

**CARL ANDREW BRODKIN, MD MPH FACOEM**
**Occupational & Environmental Medicine**
**3607 47th Avenue N.E.; Seattle, WA 98105**
**Phone: 206-523-4180 Fax: 206-523-0815**

February 10, 2020

**To:** D'Arcy L.R. Rapp, Esq.
Maune Raichle Hartley French & Mudd

**From:** Carl Andrew Brodkin, MD MPH FACOEM

**Re:** Peter Bergrud (Dr. Brodkin Medical Evaluation Report)
(Bergrud v. Bartells Asbestos Settlement Trust, et al.)

Please find attached, per your request, Dr. Brodkin's report in the above-referenced case addressing Mr. Bergrud's Occupational & Environmental Medical history, asbestos-related health effects, scientific/medical evidence of causation, clinical course and whether treatment was reasonable and necessary, as well as state of the art medical knowledge regarding asbestos health effects.

My medical report includes the following sub-sections:

Section 1: Clinical Summary & Material Reviewed (Pages 1-7)
Section 2: Occupational & Environmental History (Pages 1-27)
Section 3: Chronologic Review of Medical Records (Pages 1-13)
Section 4: Diagnosis & Assessment (Pages 1-11)
Section 5: Reference Reliance List (20 Pages)

Should additional exposure or medical information become available, I would be pleased to review these materials. Should this contribute substantively to the exposure and/or health-related information or opinions described in this report, conclusions and opinions will be provided as separate addenda.

Carl A. Brodkin, M.D.

**PAGE 1 OF 79 WITH COVER**

1

BERGRUD, PETER [redacted]

DIAGNOSIS & ASSESSMENT

DX: Malignant Pleural Mesothelioma (L), causally-related to direct occupational exposure as a career pipelayer (1965 -> 1989; ≥ 25 yrs.) to asbestos cement pipe during water and sewer line installation cutting / sawing (power saw), beveling / machining (power saw, rasp-file, hand-machining tool) and drill / tapping (hand-drilling); and 2) fire hydrants c̄ ACM gaskets during removal (scraping, wire-brush & power-grinding [barrel-bonnet & lower barrel flanges; 1965 - early 1980's)); with additional occasional / intermittent environmental exposure to ACM 3) friction products (1960-1980's personal vehicle maintenance) during brake removal - blowout (~3-4 brakes / yr.) & clutch bell-housing blow-out (# 15-20x [lifetime]) and 4) indirect foundry-refractory dust (~1950-1960 [stepmother's laundering of father's contaminated work clothing - Bethlehem Steel furnace / casting operations]), leading to progressive clinical deterioration with respiratory failure and death over ~ 6 mos. (11/18 - 4/19) on April 21, 2019, to a high degree of medical certainty:



0361

JA418

7

Diagnosis: Assessment (cont'd)

- Strong Epidemiologic Evidence for Asbestos-Related Mesothelioma

Epidemiologic studies of asbestos cement workers, gasket-exposed workers (including pipe fitters), other chrysotile-exposed workers (including friction products), crocidolite-exposed workers, as well as domestic/indirect exposure to asbestos, indicate high risk for development of mesothelioma.
(see REFERENCE-RELIANCE LIST).

3) LATENCY

- Asbestos Exposure: ≤ 1960's - ≥ 1980's

- Clinical Presentation: 11/18 (Dx: 2/26/19)

- Decades latency c/w asbestos-related mesothelioma

- Mean ($\bar{x}$) latency 48 yrs. (14-75 yrs.)
(Monfalcone Registry)
(Bianchi, Ind Med 2001)

Diagnosis: Assessment (cont'd)

4) DIFFERENTIAL DIAGNOSIS: ABSENCE OF ALTERNATIVE CAUSES FOR MESOTHELIOMA: CLINICAL DETERIORATION)

- Asbestos exposure pre-eminent risk (Tosavainen; SJWEH '97)
  - Meets all HELSINKI Criteria - Exposure Hx, latency, path
    - "a hx of significant occup., domestic or environ exposure will suffice for attribution" (Helsinki)
    - "a hx of brief or low-level exposure should be considered sufficient for meso to be designated as occup.-related" (Helsinki)
    - Meso demonstrated in assoc. c̄ low cumulative exposures from few days (Skammeritz; JOEM 2011), to several weeks (Greenberg: Davies; BJIM 1974) (↑ risk c̄ increasing dose)

- Identified asbestos exposure in OEM Hx (Cullen: Rosenstock; Text Clin OEM, 2nd Ed 2005)

...he '09
...HA '94

- Meets all BRADFORD-HILL Criteria for causation (Hill. Proc Royal Acad Sci 1965)

Diagnosis & Assessment (cont'd)

- No alternative cause of mesothelioma
  - ϕ hx of therapeutic radiation
  - ϕ hx of recurrent pneumothorax
  - ϕ hx of chronic empyema (infection)
  - ϕ hx of erionite exposure

- No evidence of alternative primary malignancy
  - PET-CT (8/12/19) localized to Ⓛ pleura
  - IHC markers specific for mesothelioma

- No association between cigarette smoking & meso (Muscatt; CA Res 1991)
  - mild-moderate distant former smoker (D/c ≤ 1974) (16 pack-yrs [1ppd; ~1957-1973; ≤31 y.o])
  - mild COPD (emphysematous changes/scattered bullae reported on CT imaging— At times symptomatic c̄ mild dyspnea on moderate- strenuous exertion [5/2/11], not requiring treatment).
  - No significant impact on life expectancy c̄ ϕ evidence of clinically-significant (severe) obstruction (ϕ wheezing on any PE findings), and cigarette smoking cessation decades previously-
    - Devereaux. BMJ 2006; 332: 1142
    - Cooper. Chest 1994; 105: 335

Diagnosis: Assessment (cont'd)

- Stable health c̄ well-controlled medical conditions:
  - Atrial Fibrillation c̄ single CVA (stroke [6/16])
    - Rx anti-coagulant (warfarin) therapy without recurrence
    - Overall 4% annual risk for recurrent stroke following initial event, without statistically significant increased risk associated c̄ A-fib etiology (Burn et al. Long-Term Risk of Recurrent Stroke After a First-Ever Stroke Stroke 1994; 25(2): 333-337).
  - Mild Aortic Stenosis (AS [≥ 9/16/16]) - Aortic valve area mildly reduced (> 1.5cm² [9/16/16 - 1/10/19 ECHO]), c̄ normal cardiac function (LVEF Nl 55%-71%), without symptoms (e.g. CHF, syncope) — low mortality risk - < 1% / year (and effectively treatable should symptoms develop). (Vahanian et al. Risk stratification of Patient c̄ Aortic Stenosis". European Heart J 2010; 31: 416 - 423.
  - HTN, hypercholesterolemia, OA, lumbar disc dz monitored / stable / well-controlled.

• No prior medical conditions significantly impacting life expectancy.

Diagnosis & Assessment (cont'd)

- Life Expectancy Prior to Mesothelioma at 77 y.o.

  ~ 9.85 yrs. (~87 y.o.)
  (SSA 2013 Life Tables)

- Medical Care Reasonable & Necessary

Carl A. Brodkin, M.D.

# Exhibit 13

# REPORT OF CHRISTOPHER DEPASQUALE, MPH, CIH

**RE: Peter 'Lanny' Bergrud**

**February 19, 2020**

At the request of Maune, Raichle, Hartley, French & Mudd, LLC, I have reviewed case specific information regarding Mr. Peter 'Lanny' Bergrud, and prepared this report concerning his exposure to asbestos-containing materials (ACM). I am a Senior Industrial Hygienist with Compass Environmental, Inc. located at 1751 McCollum Parkway, Kennesaw, GA 30144. I am certified in the comprehensive practice of industrial hygiene by the American Board of Industrial Hygiene (Certificate No. 8361 CP). Industrial hygiene is the field of identification, evaluation and control of occupational and environmental health hazards. I have practiced industrial hygiene for over twenty-two years. In the field of asbestos management and control, I have conducted asbestos sampling in over one hundred buildings, including commercial office buildings, hospitals, industrial plants, and government facilities. I have performed monitoring on individuals and at facilities to evaluate potential exposures to asbestos and analyzed such samples over the course of my career. Furthermore, I have participated in sampling to evaluate historical exposures to asbestos. I have researched the published literature, and unpublished reports and studies, to understand the historical exposures workers experienced. I have read over one thousand depositions given by workers that have worked with or around asbestos-containing products to learn the work practices they followed. These have included workers in asbestos product manufacturing, construction trades, building maintenance, and others in various settings. I am also familiar with the standards, guidelines and regulations applicable to workers' exposure to asbestos. My curriculum vita is attached providing specific details of my qualifications, experience and publications. Compass Environmental, Inc. invoices $325 per hour for my time plus any necessary expenses.

The case specific materials provided and relied upon in developing my opinions were the following:

1. Deposition of Juan Bergrud, Volumes 1 through 3, and exhibit 2 to deposition; October 15, 2019, through November 7, 2019;
2. Deposition of Richard Trumbull, November 18, 2019;
3. Deposition of John Cowdrick, November 21, 2019;
4. Deposition of James Bidon, December 10, 2019;

**Asbestos Exposures**

Exposures to asbestos are expressed as a concentration of asbestos (either as fibers or structures) in air. The units are either fibers per cubic centimeter of air (f/cc) or structures per cubic centimeter of air (s/cc).

The work of Mr. Bergrud's father, Arthur Bergrud, at Bethlehem Steel likely resulted in exposure to asbestos. Reportedly, Arthur Bergrud showered and changed at work, but would bring home coveralls he worked in to be laundered at home. This would have likely resulted in some exposure to asbestos for Mr. Peter 'Lanny' Bergrud.

Mr. Peter 'Lanny' Bergrud would have had significant exposures to asbestos when he cut asbestos cement (AC) pipe or when he was a helper during the cutting of the AC pipe. He would have also at times had significant exposures to asbestos during tapping operations. Asbestos cement pipes typically contain between ten and twenty-five percent asbestos by weight. The major U.S. manufacturers combined chrysotile and crocidolite asbestos in their formulations.[1] In 1977, the Asbestos Cement Pipe Producers Association conducted a study to measure exposures during the installation of asbestos cement pipe.[2,3] The results are summarized in Table 1.

[1] Millette, J.R., Compton, S., and DePasquale, C.; "Microscopical Analyses of Asbestos Cement Pipe and Board", *The Microscope*, Vol. 66:1, pp. 3-20, 2018.

[2] Noble, W.M., et al., of Equitable Environmental Health, Inc. "Asbestos Exposures During the Cutting and Machining of Asbestos Cement Pipe," Report to The Asbestos Cement Pipe Producers Association, Arlington, VA, March 16, 1977.

[3] Equitable Environmental Health, Inc. "Dust Exposures During the Cutting and Machining of Asbestos Cement Pipe, Additional Studies" Report to The Asbestos Cement Pipe Producers Association, Arlington, VA, December 15, 1977.

from clutch removal.[27] The authors reported a range of exposures of 0.015 – 0.13 f/cc during this work. This study examined only the removal of clutches from vehicles and not the installation of new clutch assemblies. Furthermore, no effort was made to clean the bell housing surrounding the clutches. A practice Mr. Juan Bergrud described they would perform using compressed air. Any effort to remove debris from the housing containing the clutch friction plate would result in greater exposures.

The range of airborne fiber concentrations for those times when asbestos-containing gaskets were cleaned from automotive equipment would vary. Some gaskets were likely cork or rubber and resulted in no excess exposure. Other gaskets may have been completely covered with a layer of soft metal (e.g., copper) effectively encasing the asbestos fibers within. Asbestos-containing gaskets that were scraped off would have likely resulted in some exposure. If additional cleaning procedures were used on the surface, such as a wire brush, a powered wire brush, or the use of compressed air then additional airborne fibers would be generated.

In conclusion, it is my opinion that Mr. Peter 'Lanny' Bergrud suffered exposures to asbestos occupationally through his own work and as a bystander to the work performed by others with asbesros containing cement pipe and asbestos-containing gaskets associated with fire hydrants, as well as personally through automotive repair work.

I hold the opinions expressed herein to a reasonable degree of scientific certainty.

Chris DePasquale

Christopher DePasquale, MPH, CIH

THE AMERICAN BOARD OF INDUSTRIAL HYGIENE INCORPORATED CERTIFICATION NUMBER 8361 CP EXPIRES 6-1-2023 PENNSYLVANIA 1960 CHRISTOPHER DePASQUALE, CIH

February 19, 2020

Date

[27] Cohen, H.J. and D. R. Van Orden, "Asbestos Exposures of Mechanics Performing Clutch Service on Motor Vehicles", *J. Occup. And Environ. Hyg.*, Vol. 5, No. 3, 2008, pp. 148-156.

# Exhibit 14

E-FILED
IN COUNTY CLERK'S OFFICE
PIERCE COUNTY, WASHINGTON

April 09 2019 2:51 PM

KEVIN STOCK
COUNTY CLERK
NO: 19-2-06952-5

SUPERIOR COURT OF WASHINGTON FOR PIERCE COUNTY

| | |
|---|---|
| PETER L. BERGRUD and CHERYL L. BERGRUD, husband and wife,<br><br>Plaintiffs,<br><br>vs.<br><br>BARTELLS ASBESTOS SETTLEMENT TRUST;<br><br>BORGWARNER MORSE TEC LLC, as successor-by-merger to Borg-Warner Corporation;<br><br>CERTAIN-TEED CORPORATION, Individually and as successor-in-interest to WATER WORKS SUPPLY CORP.;<br><br>CONSOLIDATED SUPPLY COMPANY;<br><br>CLOW VALVE CO., Individually and as successor-in-interest to Iowa Valve Co.<br><br>CROWN, CORK & SEAL COMPANY, INC.;<br><br>GENERAL ELECTRIC COMPANY;<br><br>GENUINE PARTS COMPANY;<br><br>H.D. FOWLER CO., INC.;<br><br>HAJOCA CORORATION as successor-in-interest to HUGHES SUPPLY CO., | NO.<br><br>COMPLAINT FOR PERSONAL INJURIES |


MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC
80 SE MADISON ST, SUITE 310
PORTLAND, OREGON 97214
(314) 241-2003 – FACSIMILE (314) 241-4838

Individually and as successor-in-interest to Western Utilities Supply Co.;

HOME DEPOT USA, INC., as successor-in-interest to HUGHES SUPPLY CO., Individually and as successor-in-interest to Western Utilities Supply Co.;

HONEYWELL INTERNATIONAL, INC., Individually and as successor to Allied Signal, Inc. and The Bendix Corporation;

ITT CORPORATION, Individually and as successor-in-interest to Kennedy Valve Manufacturing Company;

J-M MANUFACTURING COMPANY, INC.;

KELLER SUPPLY CO.;

MCWANE, INC., Individually and as successor-in-interest to Iowa Valve Co.

METROPOLITAN LIFE INSURANCE COMPANY;

MUELLER CO.;

MUELLER WATER PRODUCTS, INC.;

WATER APPLICATIONS DISTRIBUTION GROUP, INC., f/k/a U.S. Filter Distribution Group, Inc., Individually and as successor-in-interest to Pacific Supply Co., Inc.;

UNION CARBIDE CORPORATION;

WCM INDUSTRIES, INC. f/k/a Woodford Manufacturing Company; and

WOODFORD MANUFACTURING COMPANY,

Defendants.



**MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC**
80 SE MADISON ST, SUITE 310
PORTLAND, OREGON 97214
(314) 241-2003 – FACSIMILE (314) 241-4838

## I. PARTIES

Plaintiffs PETER L. BERGRUD and CHERYL L. BERGRUD are married individuals who reside in Grapeview, Washington.

Defendants and/or their predecessors-in-interest are corporations who, at all times relevant herein, either owned/controlled premises where Plaintiff PETER L. BERGRUD was exposed to asbestos, or who manufactured, sold, and/or distributed asbestos-containing products or products that were used in conjunction with asbestos and/or asbestos-containing products and/or equipment, and/or equipment solely designed to be used with asbestos-containing products mined, manufactured, supplied, distributed, produced, processed, imported, converted, compounded and/or sold by the Defendants.

## II. JURISDICTION & VENUE

Plaintiff PETER L. BERGRUD was exposed to asbestos for which Defendants have liability in the state of Washington. At all times relevant herein, all Defendants owned/controlled premises in the state of Washington where Plaintiff PETER L. BERGRUD was exposed to asbestos and/or Defendants transacted business in this state by mining, manufacturing, supplying, distributing, producing, processing, importing, converting, compounding, selling, or otherwise purposefully placing into the stream of commerce asbestos-containing products or products used in conjunction with asbestos, products they purposefully directed into the state of Washington, and into Pierce County and the counties of Plaintiff PETER L. BERGRUD'S exposure. Therefore, Defendants may be served with process in Washington, pursuant to RCW 4.28.180 and 4.28.185.

This Court has jurisdiction over each and every named Defendant pursuant to RCW 4.12 *et seq.* and Washington case law: By mining, manufacturing, supplying, distributing, producing, processing, importing, converting, compounding, selling, and/or causing to be used asbestos or asbestos-containing products to which Plaintiff PETER L. BERGRUD was exposed in Washington, Defendants purposefully availed themselves of the privilege of doing business in Washington, thus invoking the benefits and protections of Washington's laws. Venue is


MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC
80 SE MADISON ST, SUITE 310
PORTLAND, OREGON 97214
(314) 241-2003 – FACSIMILE (314) 241-4838

appropriate pursuant to RCW 4.12.025 because Defendants reside in Pierce County, Washington by: currently transacting business in Pierce County and/or by transacting business at the time the cause of action arose in Pierce County.

Defendants H.D. FOWLER CO., INC.; KELLER SUPPLY CO.; and PACIFIC WATER WORKS SUPPLY CO., INC. are Washington corporations.

## III. FACTS

Plaintiff PETER L. BERGRUD (DOB: [redacted] was exposed to asbestos and asbestos-containing products, which had been mined, manufactured, supplied, distributed, produced, processed, imported, converted, compounded sold, and/or placed into the stream of commerce by Defendants and/or was exposed to asbestos through the use of products manufactured by Defendants, and/or was exposed to asbestos on premises owned and/or controlled by Defendants. As a direct and proximate result of this exposure, Plaintiff PETER L. BERGRUD developed mesothelioma. Plaintiffs provide the following information:

| | | |
|---|---|---|
| A. | Specific Disease: | Mesothelioma |
| B. | Date of Diagnosis: | February 2019 |
| C. | Military Service: | U.S. Air Force |
| D. | Occupation(s): | Laborer |
| E. | Places of Exposure: | Commercial, industrial and residential jobsites in the Seattle, WA area; Household exposure through father's employment at Bethlehem Steel in Seattle, WA; non-occupational automotive repairs in Seattle, WA |
| F. | Dates of Exposure: | Approximately 1952 to 2010 |
| G. | Current Address: | [redacted] |



MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC
80 SE MADISON ST, SUITE 310
PORTLAND, OREGON 97214
(314 ) 241-2003 – FACSIMILE (314) 241-4838

## IV. LIABILITY

Plaintiffs claim liability based upon the theories of common law negligence; product liability (or if applicable to certain product sellers, RCW 7.72 et seq.); conspiracy; strict product liability under Section 402A and 402B of the Restatement of Torts; premises liability; and any other applicable theory of liability. The liability-creating conduct of Defendants consisted, *inter alia*, of negligent and unsafe design; failure to inspect, test, warn, instruct, monitor, and/or recall; failure to substitute safe products; marketing or installing unreasonably dangerous or extra-hazardous and/or defective products; marketing or installing products not reasonably safe as designed; marketing or installing products not reasonably safe for lack of adequate warning and marketing or installing products with misrepresentations of product safety; failure to warn and/or protect plaintiff regarding the deleterious effects of asbestos utilized on Defendants' premises.

## V. DAMAGES

As a proximate result of Defendants' negligence and/or product liability and/or other basis of liability, Plaintiff PETER L. BERGRUD sustained pain, suffering, and disability in an amount not now known, but which will be proven at trial. Plaintiff PETER L. BERGRUD also sustained medical expenses and economic losses in an amount to be proven at trial. As a proximate result of Defendants' negligence and/or product liability and/or other basis of liability, Plaintiff CHERYL L. BERGRUD has suffered loss of spousal relationship as a result of Plaintiff PETER L. BERGRUD's illness, including a loss of emotional support, love, affection, care, services, companionship, and assistance in an amount to be proven at trial. Plaintiff PETER L. BERGRUD's children have sustained a loss of parental-child relationship as a result of Plaintiff PETER L. BERGRUD's illness.

WHEREFORE, Plaintiffs pray for judgment against Defendants and each of them as follows:

1. For general and special damages specified above, including pain, suffering, loss of consortium and parental-child relationship, and disability;


MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC
80 SE MADISON ST, SUITE 310
PORTLAND, OREGON 97214
(314 ) 241-2003 – FACSIMILE (314) 241-4838

2. For medical and related expenses and economic loss, all of which will be proven at the time of trial;
3. Past and future loss of care, maintenance, services, support, advice, counsel, and consortium which Plaintiff CHERYL L. BERGRUD would have received from Plaintiff PETER L. BERGRUD before his illness and disability caused by his exposure to asbestos;
4. For Plaintiffs' costs and disbursements herein;
5. For prejudgment interest in the amount to be proven at trial; and
6. For such other relief as the Court deems just.

DATED this 9th day of April, 2019.

/s/ Meredith Good
MAUNE RAICHLE HARTLEY FRENCH & MUDD LLC
Kelly L. Battley, WSBA No. 53071
Meredith Good, WSBA No. 39890
80 SE Madison Street, Suite 310
Portland, OR 97214
Phone: (800) 358-5922
Fax: (314) 241-4838
Counsel for Plaintiffs

# Exhibit 15



# CONSOLIDATED FINANCIAL STATEMENTS DECEMBER 31, 2023

SAINT-GOBAIN

**Anxiety claims**

Eight of the Group's subsidiaries that operate or have operated facilities in France classified as containing asbestos, were the subject of anxiety claims brought by current or former employees not suffering from an occupational disease due to asbestos – claiming compensation for prejudice of anxiety suffered as a result of their alleged exposure to asbestos.

As of December 31, 2023, a total of 861 lawsuits had been brought against these companies.

At the same date, the lawsuits have been all definitely completed.

The total amount of compensation paid since the outset of the litigations was €8.8 million as of December 31, 2023 (against approximately €8.5 million as of December 31, 2022).

It should be clarified that the above figures do not take into account suits filed against companies that are no longer part of the Group.

Last, the total amount registered as provision for asbestos-related litigations in France – inexcusable faults lawsuits and anxiety claims – amounted to around €7 million as of December 31, 2023 (compared to around €8 million as of December 31, 2022).

## Situation in the United States

**Measures taken to achieve an equitable and permanent resolution of the former CertainTeed Corporation's legacy asbestos liabilities in the United States**

DBMP LLC, an affiliate of CertainTeed LLC based in North Carolina, that holds the legacy asbestos liabilities of the former CertainTeed Corporation, filed, on January 23, 2020, a voluntary petition for relief under Chapter 11 of the US Bankruptcy Code in the US Bankruptcy Court for the Western District of North Carolina in Charlotte. The matter remains pending. The purpose of the filing is to achieve a certain, final and equitable resolution of all current and future claims arising from asbestos-containing products manufactured and sold by the former CertainTeed Corporation.

DBMP LLC intends to seek court authority to establish a trust under Section 524(g) of the US Bankruptcy Code – a specific provision that is applicable to companies that face substantial numbers of asbestos-related claims – to achieve a fair and equitable resolution of its asbestos-related liabilities. Upon establishment of the trust, current and future plaintiffs with qualifying claims will be able to receive faster payment of their claims without the delay, stress and uncertainty of litigation in the tort system; at the same time, the creation and funding of such a trust will permanently and finally resolve DBMP LLC's asbestos liability.

During the course of this bankruptcy process, which is expected to take up to approximately five to eight years, all asbestos litigations have been stayed and all related costs suspended, providing DBMP LLC with the time and protection to negotiate an agreement to be approved on behalf of all claimants and by the court.

This action was taken as a result of the increasing risks presented in the US tort system. Despite the passage of time, the aging of the population and lessening opportunity for claimants to assert legitimate claims of exposure to the asbestos-containing products of the former CertainTeed Corporation, naming practices in the tort system continued to result in a steady volume of claims against DBMP LLC, with no foreseeable end in sight. In addition, there has been, in general, an escalation of settlement demands and verdicts in the tort system.

Certain adversary proceedings have been filed by representatives of current and future asbestos plaintiffs against DBMP LLC, CertainTeed LLC, Saint-Gobain Corporation, Compagnie de Saint-Gobain and various other parties. No decisions on the merits of the claims have been made and such claims do not affect the Company's financial assessment of the Chapter 11 case.

**Impact on the financial statements**

Following the commencement of the proceeding under Chapter 11 of the US Bankruptcy Code on January 23, 2020, the assets and liabilities of DBMP LLC and its wholly-owned subsidiary Millwork & Panel LLC, and in particular the provision for asbestos-related litigation in the United States, are no longer consolidated in the Group's financial statements.

Nonetheless, because of a funding agreement between CertainTeed LLC and DBMP LLC by which CertainTeed LLC has agreed to fund the costs of the Chapter 11 case and, ultimately, the 524(g) trust, in both cases solely to the extent DBMP LLC is unable to do so in full, the Group recorded in its consolidated financial statements a provision corresponding to the amount of the estimated debt against DBMP LLC amounting to $407 million as of December 31, 2023 ($410 million as of December 31, 2022).

The Group's consolidated income for 2023 is not impacted by the ongoing Chapter 11 proceeding described above.

As a result of this bankruptcy proceeding, all legal costs and indemnity payments related to DBMP LLC's asbestos tort claims have been suspended, and no further charges in relation to such claims have been taken in 2023 (as in 2022).

## Situation in Brazil

In Brazil, former employees of Brasilit, that once manufactured fiber cement containing asbestos, suffering from asbestos-related occupational illnesses are offered, depending on the case, either financial compensation alone or lifetime medical assistance combined with financial compensation. Around 1,200 contractual instruments have accordingly been signed to date.

Two class actions were initiated against Brasilit in 2017 by two associations defending former employees exposed to asbestos at the São Caetano (São Paulo state) and Recife (Pernambuco state) plants, asking for their medical assistance and compensation to be revised. First and second instance decisions were rendered in connection with the suit related to the São Caetano plant respectively in July 2020 and July 2021, rejecting the claims of the plaintiffs. The latter have nevertheless appealed the second instance decision. First and second instance decisions were rendered in relation to Recife case, respectively in February and October 2022 rejecting the claiming party arguments. The plaintiff has appealed such second instance decision.

A third class action was initiated against Brasilit in 2019 in Capivari (State of São Paulo) by the Labor prosecutor asking for health insurance, as well as collective moral damages, in favor of employees, former employees and their respective families, as well as subcontractors who were exposed to asbestos. First and second instance decisions were rendered respectively in September 2020 and May 2023 partly in favor of the plaintiffs. In particular, collective moral damages were granted to the plaintiffs, for an amount reduced to BRL 5 million (€0.8 million). Brasilit has appealed the second instance decision.

Brasilit is subject to controls by the Ministry of Labor and continues to comply with all of its legal obligations with regard to medical assistance for its current and former employees.

# NOTE 11 SHAREHOLDERS' EQUITY AND EARNINGS PER SHARE

## 11.1 Equity

### 11.1.1 Equity

At December 31, 2023, Saint-Gobain's capital stock was composed of 506,438,012 shares with a par value of €4 each (515,769,082 shares at December 31, 2022).

### 11.1.2 Additional paid-in capital and legal reserve

This item includes capital contributions in excess of the par value of capital stock as well as the legal reserve, which corresponds to a cumulative portion of the yearly net income of Compagnie de Saint-Gobain.

### 11.1.3 Retained earnings and consolidated net income

Retained earnings and consolidated net income correspond to the Group's share in the undistributed earnings of all consolidated companies.

### 11.1.4 Treasury stock

Treasury stock is measured at cost and recorded as a deduction from equity. Gains and losses on disposals of treasury stock are recognized directly in equity and have no impact on net income for the period.

Forward purchases of treasury stock are treated in the same way. When a fixed number of shares is purchased forward at a fixed price, this amount is recorded in "Other liabilities" against a deduction from equity under "Retained earnings and net income for the year".

Saint-Gobain shares held or controlled by Compagnie de Saint-Gobain and Saint-Gobain Corporation are shown as a deduction from equity under "Treasury stock" at acquisition cost.

The liquidity agreement signed with Exane BNP Paribas on November 16, 2007 and implemented on December 3, 2007 for a period up to December 31, 2007 has been automatically renewed since that date.

At December 31, 2023, 4,376,475 shares were held in treasury (December 31, 2022: 4,406,990 shares). In 2023, the Group acquired 17,111,277 shares (2022: 18,011,705 shares) directly on the market The number of shares sold in 2023 was 2,935,434 versus 3,174,316 in 2022. 14,206,358 shares were canceled in 2023, compared with 13,177,086 shares in 2022.

For the purposes of a compensation plan set up in January 2008 for certain employees in the United States, Compagnie de Saint-Gobain shares are held by the trustee, Wachovia Bank, National Association. In the consolidated financial statements, these shares are treated as being controlled by Saint-Gobain Corporation.

### 11.1.5 Number of shares

| | Number of shares | |
|---|---|---|
| | Issued | Outstanding |
| **NUMBER OF SHARES AT DECEMBER 31, 2021** | **524,017,595** | **521,270,908** |
| Group Savings Plan | 4,916,097 | 4,916,097 |
| Stock subscription option plans | 12,476 | 12,476 |
| Shares purchased | | (18,011,705) |
| Shares sold | | 3,174,316 |
| Shares canceled | (13,177,086) | |
| **NUMBER OF SHARES AT DECEMBER 31, 2022** | **515,769,082** | **511,362,092** |
| Group Savings Plan | 4,778,291 | 4,778,291 |
| Stock subscription option plans | 96,997 | 96,997 |
| Shares purchased | | (17,111,277) |
| Shares sold | | 2,935,434 |
| Shares canceled | (14,206,358) | |
| **NUMBER OF SHARES AT DECEMBER 31, 2023** | **506,438,012** | **502,061,537** |

### 11.1.6 Dividends

The Annual Shareholders' Meeting of June 8, 2023 approved the recommended dividend payout for 2022 representing €2 per share (€1.63 per share for 2021). The ex-dividend date was June 12 and the dividend was paid on June 14, 2023.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | | |
|---|---|---|
| In re: | : | |
| | : | Chapter 11 |
| DBMP LLC,[1] | : | |
| | : | Case No. 20-30080 |
| Debtor. | : | |

**MICHAEL N. AND ANN HERLIHY'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(d)**

Pursuant to 11 U.S.C. § 362(a)(1), Michael N. and Ann Herlihy (the "Herlihys" or "Movants") request relief from the automatic stay to quantify their state law claims against DBMP.[2]

## I. INTRODUCTION

***If you choose not to decide, you still have made a choice.***

[1] The last four digits of the Debtor's taxpayer identification number are 8817. The Debtor's address is 20 Moores Road, Malvern, Pennsylvania 19335.

[2] This Court issued thorough Findings of Fact and Conclusions of Law in ruling on the preliminary injunction on August 11, 2021. *See* Case No. 20-30080, Adv. Pro. Case No. 20-03004, Adv. Pro. Dkt. 972 ("Findings"). CertainTeed Corporation ("Old CertainTeed" or "Old CT") manufactured building products containing asbestos for decades. *See* Findings at ¶ 1. On October 23, 2019, Old CertainTeed divided itself into two new entities: CertainTeed LLC ("New CertainTeed" or "New CT") and DBMP LLC ("DBMP" or the "Debtor").

Forty-four years ago, the iconic Canadian band, Rush, immortalized in song the concept first articulated by the American philosopher and psychologist William James that "not to act on one belief, is often equivalent to acting as if the other belief were true."[3]

This Motion implores the Court to decide whether DBMP filed its petition in bad faith and whether this is grounds to lift the stay, as well-established precedent in the Fourth Circuit demonstrates. If so, then even if dismissal cannot be granted at this time, due to this Court's evaluation of "objective futility" under *Carolin Corp. v. Miller*, 886 F.2d 693 (4th Cir. 1989), individual claimants who seek relief must ***not*** continue to be subjected to the devastating effects of the automatic stay.

Over six years and several cases into the Texas Two-Step debacle in this District, no court has addressed whether these wealthy and fabricated debtors, all of whom boast the ability to pay all claims in full, have filed for Chapter 11 in subjective bad faith. In *Aldrich*, this Court denied the motions to dismiss without reaching this issue, finding those two debtors "were designed to meet [*Carolin*'s] objective futility standard, and they do." *Aldrich* Dismissal Order at 63.[4] Nor has Judge Beyer ruled on Bestwall's subjective bad faith, despite being urged to do so recently by plaintiff Wilson Buckingham.[5]

---

[3] James, *Some Problems of Philosophy: Beginning of an Introduction to Philosophy*, p. 223, Longmans, Green, and Co. (1911). Rush, *Freewill*, from the album Permanent Waves, Anthem Records, January 14, 1980.

[4] *Order Denying Motions To Dismiss* (Hon. J. Craig Whitley), entered December 28, 2023, Case No. 20-30608-JCW (Dkt. No. 2047) ("*Aldrich* Dismissal Order").

[5] *See In re Bestwall LLC*, 605 B.R. 43, 50-51 (Bankr. W.D.N.C. 2019) ("Because the Court concludes that this case is not objectively futile, it need not (and does not) reach the issue of whether this case was filed in subjective bad faith."); *In re Bestwall LLC*, 71 F.4th 168, 182 (4th Cir. 2023)("In this appeal, by contrast, [claimants] do not make the arguments raised by the claimants in *LTL Management LLC*" where motions to

Only yesterday, despite this Court's thoughtful and thorough dismissal opinion and certification ruling in *Aldrich*, the Fourth Circuit declined to take interlocutory review. *See* U.S.C.A4 Appeal No. 24-128, Dkt. 50. The subjective bad faith of Two-Step debtors must be addressed, and the Herlihys urge this Court not to put off for another day what can and should be decided ***now***:

> Is it a proper use of the Bankruptcy Code for a massively profitable and non-financially troubled company to manipulate its corporate structure on the eve of bankruptcy to isolate a single class of creditor, remove all the productive assets of its business from the reach of the bankruptcy court, and file for Chapter 11 in an admitted attempt to leverage the automatic stay into judicially compelled re-negotiations of state law liabilities, and for relief which that debtor is not entitled to under controlling law outside of bankruptcy?

If the answer is "no," then this proceeding is in bad faith and the stay must be lifted for those who ask. *See In re Premier Automotive Servs., Inc.*, 492 F.3d 274, 281–82 (4th Cir. 2007) (bankruptcy courts' "powerful equitable weapons" should not be wielded by "financially healthy companies with no need to reorganize"); *Carolin Corp. v. Miller*, 886 F.2d 693, 702 (4th Cir. 1989) (it is bad faith for a debtor to file for Chapter 11 "merely for the purpose of invoking the automatic stay…").

Saint-Gobain, New CertainTeed, and DBMP insist they can pay asbestos plaintiffs in full in the tort system. So ***why*** are we here? Because they prefer to pay less. Being ***cheap***

dismiss were filed based on a lack of financial distress); *In re Bestwall LLC*, 2024 WL 721596, *21 (Bankr. W.D.N.C. 2024) (declining to dismiss due to law of case doctrine and divestment rule based on prior ruling, and rejecting Official Committee's argument of the court's lack of constitutional subject matter jurisdiction).

is not a valid reason to file for bankruptcy. Nor is dissatisfaction with the refusal of Congress and state legislatures to statutorily restrict the rights of asbestos victims. This is bankruptcy court, not tort-reform court.

Prior rulings on lift stay motions have turned on an understandable but erroneous premise that conflates dismissal with frustrating the debtor's (improper) bankruptcy purpose. While it is certainly true that if the Court were to lift the stay for many (or all) claimants, DBMP's primary goal in this proceeding—to homogenize victims and collectively estimate the value of their claims without a jury—would fail. But frustrating a bad-faith multi-billionaire's goal is ***not*** the same as dismissal.

Permitting the Herlihys to liquidate their claims against DBMP before a jury and a trial judge will certainly displease DBMP and frustrate the agenda of its tail-wagging parents in France and Pennsylvania, but that's not a proper factor in deciding this motion and is simply not the same as dismissing the case. The bankruptcy case will continue—but with the value of the Herlihys' claims conclusively established by a jury—to which they are statutorily and constitutionally entitled.

Nor can ruling on the question of good faith in the context of this lift stay motion be properly avoided by determining that *Carolin*'s objective futility prong has not been satisfied. Objective futility is plainly ***not*** a factor in lifting the stay. Stay relief is to be given "for cause" (11 U.S.C. § 362(d)(1)), and this Court is authorized "to determine

whether, with respect to the interests of a creditor seeking relief, a debtor has sought the protection of the automatic stay in good faith." *Carolin*, 886 F.2d at 699.

While the Herlihys recognize that Judge Beyer, in *Bestwall*, recently applied *Carolin* in the denial of Mr. Buckingham's lift stay motion, that decision was contrary to well-established law that bad faith lift stay motions are judged on a different and more relaxed standard than bad faith dismissal motions; otherwise, there would be no need for bad faith lift stay motions as all such cases would be dismissed outright. *See In re Dixie Broadcasting, Inc.*, 871 F. 2d 1023, 1024, 1027 (11th Cir. 1989) (affirming the bankruptcy court's lifting the stay for specific creditors who moved for relief after the bad faith debtor filed its petition "despite [its]apparent good financial health..." and with an "intent to abuse the judicial process and reorganization provisions.").

If the Court disagrees with the Herlihys, and rules that DBMP filed in subjective good faith, that is better than not ruling at all, as at least an appeal can be taken. *See Official Committee of Asbestos Claimants v. Bestwall LLC*, 3:19-cv-00396-RJC, 2023 WL 7361075, *2 n.2 (W.D.N.C. Nov. 7, 2023) (referencing the denied petition for direct appeal in 2019 and an "unknown error" that resulted in the District Court not ruling on the interlocutory appeal until years later).

DBMP will oppose this motion . DBMP will argue that if a single plaintiff is permitted to pursue the Debtor in the tort system, the 'floodgates' will be open to more and more requests and granting those will be 'akin to a dismissal.' DBMP will say the

Herlihys and their lawyers are 'relitigating' issues that have already been decided (they have not).

DBMP will do this because ***its*** purpose is to globally resolve every single current and future asbestos claim against it in bankruptcy court from a capped limited fund, despite being non-distressed, massively wealthy, and fully capable of paying all claims in full, and despite having performed a Texas Two-Step manipulation on the eve of its petition to isolate and discriminate against its asbestos victims. Saint-Gobain, New CertainTeed and DBMP's purpose in launching this ongoing abuse of Chapter 11 is contrary to purposes of the Bankruptcy Code as defined by the Fourth Circuit and as applied by it in *Carolin* and *Premier Auto*[6].

The Code's purpose, its "statutory objective," is "'resuscitating a financially troubled [debtor],'" which DBMP is ***not.*** *Carolin*, 886 F.2d at 701 (citing *In re Coastal Cable TV, Inc.*, 709 F.2d 762, 765 (1st Cir. 1983)). The Fourth Circuit has specifically and directly rejected the premise that companies that are not in financial distress can file for bankruptcy for the purpose of forcing judicial negotiations and seeking a result not permitted by controlling state law, all while protected by the automatic stay. *See Premier Auto*, 492 F.3d at 281–82. Imposing a stay on ***all*** claimants—even those who seek relief based on the specific facts of their claims, as the Fourth Circuit recently recommended in

[6] *See* Dkt. 22, Informational Brief at 16.

*Bestwall*—when DBMP filed its petition in subjective bad faith does not further the purposes of the Code.

In addition to DBMP's subjective bad faith being sufficient to grant the Herlihys this relief, the *Robbins* factors are satisfied: (1) all issues pending in their litigation against DBMP involve state law; (2) liquidating their claims in state court will not interfere with this proceeding and will promote judicial economy; and (3) the DBMP's bankruptcy estate is protected because this Court will decide when the Movants' liquidated claims will be paid. *In re Robbins*, 964 F.2d 342, 345 (4th Cir. 1992). *See In re Claughton*, 140 B.R. 861, 867-68 (Bankr. W.D.N.C. 1992).

## II. FACTUAL AND PROCEDURAL BACKGROUND

Nearly three years ago, this Court wrote that it "remains to be seen" whether DBMP, New CertainTeed, and Old CertainTeed had acted in "good faith," and extended to them the protections of the automatic stay and preliminary injunction. Findings at ¶ 248. What has not been before this Court—until now—is whether DBMP filed its petition in subjective bad faith. *See* Findings ¶¶ 149-50 (noting the exacting *Carolin* dual prong requirements and that a motion to dismiss was not before the Court).

While recognizing at the time that the ACC[7] predicted asbestos claimants would never agree to a plan, this Court found it was "simply too early to tell." Findings at ¶ 264.

[7] Official Committee of Asbestos Claimants ("ACC").

Several legal and factual developments since 2021 are relevant to deciding the Herlihys motion now.

## A. Prior Motions to Lift the Stay in Two-Step Cases in This District.

This is the first individual action seeking relief from stay in *DBMP*,[8] the first presented to this Court since the Fourth Circuit ruled in *Bestwall*, the first asking this Court to rule on whether DBMP filed in subjective bad faith, and the first to ask whether filing a petition in subjective bad faith is grounds, by itself, to lift the stay for an individual plaintiff. Three prior lift stay motions were denied in Two-Step cases, two in *Bestwall* and one in *Aldrich*.

### 1. *In re Aldrich Pump LLC/Murray Boiler LLC.*

In denying Robert Semian's motion for relief in March 2023, this Court reasoned: "I have no doubt . . . that if I grant relief from stay to one creditor to liquidate the claim, all of the claimants will—not all—but a substantial number of the claimants, enough to wreck the bankruptcy case, will seek like measure and that effectively precipitates a *de facto* dismissal of the case." Ex. 1, *Aldrich* Tr. 3/30/23 at 67. This Court denied Mr. Semian's subsequent motion to dismiss *Aldrich* and certified its ruling for direct appeal. *See Aldrich*, Certification Order, Dkt. 2111.

[8] The Herlihys note the filing by the Estate of Peter Bergrud also seeking relief. Collectively, these are the first individual motions in DBMP.

**2. *In re Bestwall LLC.***

Richard and Joan Dale's motion before Judge Laura T. Beyer (Case No. 17-31795-LTB) was denied in October 2023. Ex. 2, *In re Bestwall*, Tr. 10/19/23 at 69-70. The Dales did not raise bad faith directly as grounds to lift the stay. Despite finding that—"strictly speaking"—the Dales satisfied the *Robbins* factors and recognizing that "bankruptcy courts . . . often [grant such motions] so that a state court can liquidate claims that are based on state court causes of action," Judge Beyer denied the motion. *Bestwall* Tr. 10/19/23 at 69- 70. Judge Beyer made what she admitted was the "speculative . . . assum[ption] that granting the Dales' motion . . . would result in a wave of similar motions." *Id*.

Second, Wilson Buckingham and his wife, Angelika Weiss , moved for relief (*Bestwall*, Dkt. 3242), in December 2023, arguing Bestwall's bad faith was grounds, by itself, to lift the stay. Judge Beyer denied this motion "in large part [based upon] the same reasons [she] denied the Dales' motion for relief from stay." *See* Ex. 3, *Bestwall*, Tr. 1/18/24 at 77. Judge Beyer reasoned it would be improper to apply a standard for bad faith lift stay motions that was less stringent than the standard for bad faith dismissal under *Carolin*, notwithstanding precedent directly to the contrary. Judge Beyer later denied Mr. Buckingham's motion to certify her denial of his motion for relief from stay for direct appeal.

## B. Old CertainTeed Negligently Caused Mr. Herlihy's Mesothelioma.

Mr. Herlihy, age 73, was diagnosed with malignant mesothelioma of the peritoneum on March 23, 2023. Ex. 4, Kaiser Path Report at 1. The Herlihys filed their complaint in the County of Los Angeles, California, against several defendants on August 4, 2023. Ex. 5, Complaint. Their trial is set for March 3, 2025. Ex. 6, Trial Setting Order.[9] If DBMP is added to their case in California, the Herlihys will be able to litigate against all tortfeasors in *one* proceeding and DBMP will not be prejudiced being added as defendant now, ten months before trial.

### 1. *CertainTeed knew its asbestos-cement pipe was hazardous for decades before exposing Mr. Herlihy.*

By the mid-1960s, at the latest, Old CertainTeed knew that asbestos exposure caused mesothelioma and that crocidolite asbestos—the type of asbestos used in its cement pipe—had a higher potency in causing cancer than other forms of asbestos. Ex. 7, Lloyd Ambler Dep. 8/20/2014 at 208:17-209:15.[10] Fellow Two-Step debtors Aldrich, Murray and Bestwall agree; all contend amphibole asbestos fibers (i.e. crocidolite and

[9] CertainTeed Corporation was initially named in the Herlihys' California Complaint. This was in error. CertainTeed Corporation was dismissed to comply with this Court's preliminary injunction.

[10] Old CertainTeed took over the asbestos-cement pipe manufacturing business of Keasbey & Mattison in 1962. Leon Horowitz was an industrial hygienist with K&M who remained in this capacity at Old CertainTeed. *See* Ex. 8, Leon Horowitz Dep. 6/30/1980 at 5-30. By 1960, he and Old CertainTeed were well aware of the connection between asbestos exposure and cancer. Ex. 8, at 39:20-21; Ex. 9, Lloyd Ambler Dep. 8/27/2009 at 126:8-20.

amosite) are many times more "potent" at causing mesothelioma than the chrysotile fibers found in their products.[11]

Old CertainTeed knew that cutting its asbestos-cement pipe with an abrasive saw generated levels of asbestos dust up to six times higher than OSHA's exposure limit, but Old CT did nothing to warn workers of these hazards. Knowing these hazards, Old CertainTeed internally took steps to protect its own employees but did ***nothing*** to warn or protect end users like Mr. Herlihy. Ex. 8, Leon Horowitz Dep. 6/30/1980 at 49.[12] Only in 1985 did Old CT—allegedly—first include a warning about its asbestos-cement pipe. Ex. 9, at 137:9-317:2.[13] Old CertainTeed continued to manufacture, market, and sell this product, made of a known human carcinogen, well into the ***1990s.***

[11] *See In re Aldrich*, Informational Brief at 14 (Case No. 20-30608-JCW, Dkt. 5). Aldrich contends amphibole forms of asbestos (i.e., crocidolite and amosite) are much more likely to cause mesothelioma. *Id.* at 2. There is a "broad consensus" that crocidolite and amosite are far more toxic than chrysolite. *Id.* at 3,15. Aldrich argues "amphiboles" are "500 times more potent" in causing mesothelioma than the chrysotile asbestos in gaskets found in Aldrich pumps. *Id.* at 16. *See In re Bestwall*, Informational Brief at 4 (Case No. 17-31795-LTB, Dkt. 12). Bestwall claims chrysotile asbestos in its products has potency "substantially lower" than amphibole asbestos. Amphibole containing products have "proven toxicity." *Id.* at 4. Bestwall argues amphiboles are " 100 to 1,000" more potent than chrysotile asbestos refers to them as "dangerous amphibole-containing products." *Id.* at 26.

[12] In March 1977, the Asbestos Cement Pipe Producers Association, of which CertainTeed was a member, found that cutting asbestos-cement pipe with an abrasive disc saw generated asbestos dust concentrations which "greatly exceeded the current OSHA standard for short term or peak exposures." Ex. 10, Deposition of Lloyd Ambler 8/28/2009 at 41-43. In fact, CertainTeed was producing peak exposure levels of up to six times OSHA's permissible exposure limit, and up to ten times the limit when wet-down procedures were implemented. The study also revealed that all methods of cutting asbestos-cement pipe released respirable asbestos fiber. *Id.*

[13] This is not a comprehensive recitation of facts supporting Old CertainTeed's negligence and liability for punitive damages. However, it shows the unique recklessness with which the Company behaved in manufacturing and selling its asbestos-cement pipe well into the 1990s, over twenty years after OSHA was enacted.

### 2. *Mr. Herlihy was exposed to asbestos from Old CertainTeed's pipe on a regular basis for over six years.*

Mr. Herlihy worked at Precision Saw Sharpening in Riverside, CA, from 1984 until the mid-1990s. During these years, one of his employers' primary clients was Old CertainTeed's Riverside plant, where Old CT manufactured asbestos-cement pipe from 1965 through the early 1990s. *See* Ex. 11, Herlihy Dep Vol. 1 10/20/2023 at 23:1-20. At Precision Saw, Mr. Herlihy regularly used a nylon brush to remove caked on grey dust—from CertainTeed's asbestos-cement pipe—from saw blades that were used at the Riverside plant. *Id.* at 32:3-25. These activities exposed him to outrageously dangerous levels of both crocidolite and chrysotile asbestos.

Mr. Herlihy was never told that there was or might be asbestos in the dust on the saw blades he cleaned hundreds of times even during his many visits to the Riverside plan. *See* Ex. 11, at 41:12-21. If he had known he would have protected himself. *Id.* at 41:22–42:1-2. CertainTeed claims it first included warnings about the hazards of asbestos in its pipe in 1985, but Mr. Herlihy never received such warning, despite having conversed multiple times with workers and managers at the CertainTeed plant. *See* Ex. 12, Herlihy Dep Vol. 3 11/3/2023 at 314:8-24. Without this critical information, Mr. Herlihy was unable to protect himself when exposed to dust from CertainTeed's asbestos-cement pipe.

## C. CertainTeed's and DBMP's Subjective Bad Faith.

Saint-Gobain and Old CertainTeed were never overwhelmed by asbestos liabilities. They both could and can pay asbestos plaintiffs what they owe in the tort system. Profitable and non-distressed companies attempting to transform this Court into tort-reform policy court—after Congress and state legislatures have repeatedly refused to enact comprehensive legislation to address asbestos-litigation—is ***not*** a proper purpose under the Code. Trying to 'overcome the tort system' by wasting the bankruptcy courts' time and attention, sidestepping the absolute priority rule, and avoiding the many other safeguards built into the Code to prevent abuse ***is*** bad faith.

### 1. *Saint-Gobain and Old CertainTeed's secret bankruptcy scheme.*

As early as 2018, having studied the *Garlock* and *Bestwall* bankruptcies, Old CertainTeed began discussing "a plan to isolate [its] asbestos liabilities in a new company, with minimal assets, that would file for bankruptcy." Findings at ¶¶ 40-42. The shell entity would shield "the CertainTeed Enterprise from Old CertainTeed's asbestos liabilities." *Id*. at ¶ 46. This plan, codenamed "Project Horizon[,]" was a closely guarded corporate secret "driven not by businesspeople, but by lawyers." Findings at ¶¶ 41, 43.

### 2. *Old CertainTeed was massively profitable and able to pay all liabilities without financial strain.*

Old CertainTeed "was a profitable going concern whose assets significantly outweighed its combined operating and asbestos liabilities." Findings at ¶ 44. Indeed, "on Old CertainTeed's publicly disclosed financial statements, [it] had almost $3 billion

in assets and less than half of that in all liabilities." Findings at ¶ 57. The company was never in distress and was settling cases in the tort system without financial strain (Findings at ¶ 188), as such Old CT "never entertained a bankruptcy filing for itself." Findings at ¶ 44.

### 3. *With the Funding Agreement DBMP is a non-distressed, multi-billionaire, and able to pay all asbestos claims in full.*

After the divisive merger, New CertainTeed was "essentially a mirror image of Old CertainTeed: a fully operating company which retained all of Old CertainTeed's employees, the bulk of its assets and operations, and all of its non-asbestos creditors." Findings at ¶ 1. DBMP, however, was "quite different," being "allocated 100% of Old CertainTeed's considerable asbestos liabilities."[14] Findings at ¶ 1.

DBMP and New CertainTeed executed a "Funding Agreement" wherein New CertainTeed committed to providing DBMP with the funds to, among other things, "satisfy the Debtor's 'Asbestos Related Liabilities' in connection with funding a § 524(g) trust." Findings at ¶¶ 65-66. The Funding Agreement is central to DBMP's and New CertainTeed's assertion that the Debtor has "the same ability" to defend and resolve "present and future asbestos claims" in the tort system as Old CertainTeed. Findings at ¶ 61.

[14] New CertainTeed received approximately 97% of Old CertainTeed's assets, most of its operations, and all its employees in the divisional merger. Meanwhile, only 3% of Old CertainTeed's assets were left to give to DBMP. Among these assets was approximately $25 million in cash, Old CertainTeed's asbestos liabilities, and the ability to draw from "a Funding Agreement" paid for by New CertainTeed. *See* Findings at ¶¶ 53, 65.

The Funding Agreement "is not a loan," it does not impose "repayment obligations" on DBMP, and it is ***not*** capped. Findings at ¶¶ 66-67. While this Court correctly expressed concern about the enforceability of the Funding Agreement (i.e., New CertainTeed must approve any 524(g) plan),[15] DBMP can pay the Herlihys and all claimants what it owes them ***in full***.[16] Given its massive wealth and ability to pay, DBMP simply filed its petition to leverage the automatic stay and benefit its corporate parents.

## III. ARGUMENT

DBMP cannot file its petition in subject bad faith and be shielded from all individual claims brought by all individual claimants for years on end, simply because its reorganization is not ***yet*** objectively futile. Taken to its logical conclusion, DBMP's position is that the ***more*** money a debtor has, the ***more*** entitled to bankruptcy protection it is.

Even if that is how the Fourth Circuit intends "objective futility" to be interpreted, this has no relevance to a lift stay motion, nor does the straw man the Debtor will raise about permitting one plaintiff to liquidate her claims eventually leading to a 'de-facto

[15] While only DBMP can enforce this agreement, as this Court recognized, that will only happen if New CertainTeed approves. *See* Findings at ¶ 69. Ultimately, "the Funding Agreement is not an unconditional promise to pay the DBMP Asbestos liabilities. It is instead a conditional agreement which is dependent on New CertainTeed's approval." Findings at ¶ 77. The Herlihys ask this Court to take New CertainTeed at its word for purposes of this motion.

[16] Further, funding a trust is expressly conditioned upon New CertainTeed receiving a channeling injunction. Findings at ¶ 72. Thus, "while the Funding Agreement may provide funding for a plan, it will do so only if New CertainTeed favors that Plan. And that favor is dependent on New CertainTeed receiving permanent injunctive relief from the DBMP Asbestos Claims – whether it is entitled to it or not." *Id* at ¶ 74.

dismissal.' These are ***not*** factors, under *Carolin* or *Robbins*, to be considered in ruling on individual lift stay requests.

A. **Individual Actions for Relief from Stay Are Proper.**

This Court knows well the lack of progress in Two-Step cases. *See Aldrich* Dismissal Order at 21. The Court also recognizes that in the case of a "solvent asbestos defendant"—like Aldrich or Bestwall or DBMP—"due process requires that a 'plaintiff [must] be provided an opportunity to remove himself'"—i.e., opt-out—"from the aggregate resolution." *Aldrich* Dismissal Order at 37-38 (citing *Ortiz*, 527 U.S. at 848 (quoting *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985))).[17]

Given the way in which *Carolin* has been interpreted in *Aldrich* and *Bestwall*, DBMP's inevitable bankruptcy failure—due to *Ortiz* or multiple other issues at confirmation—is, at best, years away. [18] What remedy, then, is available to the Herlihys in the meantime? The Fourth Circuit answered this question last June: "rather than waiting for plan confirmation, claimants can bring individual actions for relief based on the specific facts of a particular claim. That is done in bankruptcy proceedings on a

[17] While leaving these issues for "another day," this Court noted the Supreme Court found that a "mandatory 'no-opt-outs' settlement of a defendant's aggregate mass-torty liability is unconstitutional if the defendant's resources are sufficient to fully pay all claims." *Aldrich* Dismissal Order at 37 (discussing *Ortiz v. Fibreboard*, 527 U.S. 815, 817-18 (1999)). Depriving individual asbestos claimants of their due process rights to exclude themselves from the class action in *Ortiz* "can only be justified if the defendant's resources were insufficient to fully pay all claims." *Id.* (citing *Ortiz*, 527 U.S. at 837).

[18] *North Carolina Judges Are Shaping 'Two-Step' Bankruptcy Future,* Bloomberg, Evan Ochsner, April 10, 2024, available at https://news.bloomberglaw.com/bankruptcy-law/north-carolina-judges-are-shaping-two-step-bankruptcy-future

**routine basis** where appropriate." *In re Bestwall LLC* , 71 F.4th 168, 183 (4th Cir. 2023)(emphasis added).[19]

1. ***Granting individual actions relief is not akin to dismissal.***

Recognizing that granting individual actions relief from stay is "routine," the Fourth Circuit did ***not*** say that lifting the stay for one claimant based on the "specific facts of a particular claim" might open the floodgates or be 'akin to a dismissal,' or that these factors have any relevance in lifting the stay for an individual action.

While it is true that allowing liquidation of individual claims will defeat DBMP's primary goal—depriving claimants of the right to uncapped state-law remedies before juries, which will make any plan more difficult—frustrating DBMP's ***illegitimate*** bankruptcy purpose is not akin to frustrating a ***legitimate*** purpose of the Code. The Code specifically provides for liquidation of individual personal injury claims before a jury and the Constitution provides that individual jury trial rights cannot be impaired in the absence of a legitimate limited fund. *See* 11 U.S.C. § 1129(a); 28 U.S.C. § 157(b); U.S. Const. Amend. VII; *Amchem Products Inc. v. Windsor*, 521 U.S. 591 (1997); *Ortiz v. Fibreboard*, 527 U.S. 815 (1999).

What is ***not*** routine is a non-distressed billionaire, contentedly wallowing in bankruptcy with no incentive to reorganize and weaponizing the automatic stay to please

[19] On June 20, 2023, the Fourth Circuit upheld Judge Beyer's extension of the preliminary injunction to Georgia-Pacific.

its multi-billionaire parents. In instances such as these, multiple motions to lift stay should be expected and should be granted. If doing so frustrates the objectives of DBMP's corporate overlords because Saint-Gobain's bad faith scheme depends on overriding individual rights, so much the better. Frustrating a ***bad*** faith bankruptcy scheme is a ***good*** thing. The most important facts are indisputable: DBMP can pay all claimants what it owes them and the only burden if the stay is not lifted is on the sick people and their families.

Lifting the stay for claimants who seek relief and frustrating Saint-Gobain's bad faith scheme is not akin to dismissal. The Debtor will remain in bankruptcy and this proceeding will continue. The substantive consolidation and fraudulent conveyance litigation will continue, as well as any other alternative relief sought by claimants or the ACC. Similarly, DBMP and its corporate puppet- masters could propose a plan that protected the rights of claimants rather than impairing or trampling on them. While it seems clear DBMP will not do this—since overriding individual rights is its express goal—a clear finding from this Court on the issue of subjective bad faith is likely the only way these cases will ever move forward. Lifting the stay—for one, ten or all claimants—is not dismissal.

This Court retains jurisdiction to rule on individual stay requests, first on whether the debtor filed in bad faith, and second whether the specific facts of each request justify lifting the stay. And most importantly, DBMP can pay everyone in ***full***, so whatever it

costs to defend and pay any judgment or settlement to the Herlihys will not reduce what it is able to pay everyone else, including the armies of bankruptcy professionals.

This Court has the equitable powers to decide whether to lift the stay and for whom, given that DBMP filed in bad faith. *See In re Dixie Broadcasting, Inc.*, 871 F. 2d 1023, 1024, 1027, 1029 (1Ith Cir. 1989) (affirming the bankruptcy court's lifting the stay for specific creditors who moved for relief after the debtor filed its petition "despite [its]apparent good financial health..." and with an "intent to abuse the judicial process and reorganization provisions."). *See also* 11 U.S.C. § 105.

Alternatively, the Court could end the stay for all claimants and appoint a trustee to enforce the Funding Agreement, or find that the Agreement is enforceable and must be enforced (thus removing the threat of an improper collusion between DBMP, New CertainTeed and Saint-Gobain, as occurred between Johnson & Johnson and LTL Management), or order that the Debtor's remaining assets be liquidated for payment of claims and permit a pass through the tort system against New CertainTeed.

**2. *Objective futility is not a factor in deciding individual actions for relief.***

When Judge Beyer ruled against Mr. Buckingham in *Bestwall*, she recognized that nowhere in *Carolin* did the Fourth Circuit say that "objective futility" should be considered in ruling on whether to lift the stay. *Bestwall*, Tr. 1/18/24 at 79-80. While it "defied logic" to Judge Beyer that a less stringent test should apply to motions to lift stay (*id.*) than to motions to dismiss, nowhere in *Robbins*, which post-dated *Carolin*, did the

Fourth Circuit set forth that the two-pronged *Carolin* dismissal standard, principally objective futility, had any bearing in ruling on individual motions for relief from stay. The opposite is true; in *Carolin*, the Fourth Circuit recognized that in deciding these motions, Section 362(a)(1) empowers bankruptcy courts to determine whether a debtor has sought the protections of the automatic stay in "good faith." *Carolin*, 886 F.2d at 699.

That the bankruptcy court in Dixie compared lifting the stay to deciding the propriety of a preliminary injunction, simply because it was "fit to grant relief from the stay is not equivalent to a decision by that court that Dixie may not maintain its petition… [t]he fact that preliminary relief is obtained does not mean that permanent relief also must be forthcoming." Dixie, 871 F.2d at 1029 (citing University of Texas v. Camenisch, 451 U.S. 390, 394–95 (1981) (decisions on preliminary injunctions are not "tantamount to decisions on the underlying merits"); McArthur v. Firestone, 817 F.2d 1548 (11th Cir.1987) (district court's denial of temporary restraining order did not constitute decision on merits of First Amendment claim).[20]

By not ruling on whether DBMP filed in bad faith, in either motions to dismiss or motions for relief from stay, Two-Step debtors and their corporate parents receive all the benefits of the stay while taking on none of the burdens. All because they say they want

[20] A panel of this Court stated in dicta in *In re Phoenix Piccadilly, Ltd.* that "what amounts to bad faith is the same for both proceedings." 849 F.2d, 1393, 1394 (11th Cir. 1988). We interpret that statement to mean that the factors used to demonstrate bad faith are the same in both contexts, but that a bankruptcy judge may nonetheless take into consideration the number of factors and their certainty in determining whether they constitute bad faith for dismissal purposes." *Dixie*, 871 F.2d at 1029.

to fund a trust that is "equitable," but only ***after*** all victims waive their Constitutional rights and state law remedies and accept a pennies-on-the-dollar resolution. Saint - Gobain, New CertainTeed, and DBMP continue to get ***everything*** they want—indefinite delay, negotiating leverage, millions and millions saved, the continued death of mesothelioma claimants—and asbestos victims get ***nothing***.

The role that good faith has in seeking relief has been widely recognized. *See In re Sparklet Devices, Inc.*, 154 B.R. 544, 547 (Bankr. E.D. Mo. 1993) ("Generally, the factors used to demonstrate bad faith are the same whether the court is considering a motion for relief or a motion to dismiss for lack of good faith"); *In re Anthony*, 481 B.R. 602, 620 (D. Neb. 2012) ("The bankruptcy court did not err in concluding that whether Anthony's petition was filed in good faith was pertinent to Cattle National's motion for relief from the bankruptcy stay"); *In re Bestwall LLC*, No. 17-31795, 2024 WL 721596 at *20 (Bankr. W.D.N.C. Feb. 21, 2024) ("The LTL Opinion is not the only example of a court using good faith to police against financially healthy debtors abusing the bankruptcy system).[21]

[21] In her dismissal opinion of February 21, 2024, Judge Beyer cited: In re Cedar Shore Resort, Inc., 235 F.3d 375, 381 (8th Cir. 2000) ("Nor did the bankruptcy court abuse its discretion in dismissing Cedar Shore's petition. Congress designed Chapter 11 to give those businesses 'teetering on the verge of a fatal financial plummet an opportunity to reorganize on solid ground and try again, not to give profitable enterprises an opportunity to evade contractual or other liability.'" (quoting Furness v. Lilienfield, 35 B.R. 1006, 1009 (D. Md. 1983))); In re SGL Carbon Corp., 200 F.3d 154, 164 (3d Cir. 1999) ("SGL Carbon cites no case holding that petitions filed by financially healthy companies cannot be subject to dismissal for cause."). Bestwall, 2024 WL 721596 at *20. Judge Beyer continued: "Some courts even find 'cause' under section 362 to grant relief from the automatic stay when a debtor files a case in bad faith." Id. (citing In re Corp. Deja Vu, 34 B.R. 845, 850 (Bankr. D. Md. 1983) ("The petition was filed in bad faith. This bad faith constitutes cause to allow the secured creditor relief from the stay."); Constitutional Limits, supra, at 551 (citing In re Dixie Broad., Inc., 871 F.2d 1023 (11th Cir.), cert. denied, 493 U.S. 853, 110 S.Ct. 154, 107 L.Ed.2d 112 (1989)).

The United States District Court for the Southern District of South Carolina cited *Dixie* to support denying relief to Dunes Hotel Associates, reasoning that a "solvent debtor-in-possession should not be permitted to remain in bankruptcy for the sole purpose of being able to use the strong-arm clause of the Bankruptcy Code to strike down a bilateral contract to the detriment of its only remaining non-insider creditor." *Dunes Hotel Associates v. Hyatt Corp.*, 245 B.R. 492, 507 (D.S.C. 2000) (citing *Dixie*, 871 F.2d at 1028) ("The Bankruptcy Code is not intended to insulate financially secure sellers or buyers from the bargains they strike.").

Nearly three years ago, when ruling on the ACC's[22] objection to the stay and preliminary injunction, staying all claims by all plaintiffs, this Court viewed the ACC's opposition as seeking an effective dismissal, noting *Carolin's* "exacting" two-pronged standard would be difficult to satisfy. Findings at ¶ 8. At that time, this Court reasoned the "perceived harm" on asbestos claimants was primarily delay, but such delay, "**<u>within reason</u>**" was not sufficient harm to end the Chapter 11 case near its inception. Findings at ¶ 223-24 (emphasis).

Having a desire to access a remedy found in Chapter 11, here, a Section 524(g) trust, which DBMP wants, and which may be sufficient to overcome dismissal in this District, must ***not*** be grounds for bad-faith debtors to benefit from an overt abuse of the automatic stay for years on end. This is ***not*** within reason.

[22] Official Committee of Asbestos Claimants ("ACC").

B. **DBMP Filed Its Petition in Subjective Bad Faith.**

The admitted purpose of this case is not to further Chapter 11's "statutory objective of resuscitating a financially troubled debtor," *Carolin*, 886 F.2d at 701–02, but to avoid state law tort liabilities while shielding the profitable assets of the business from the rigors of bankruptcy, isolating a single class of creditors and allowing continuing and unfettered distributions of profits to equity while that one class of creditors is frozen by the stay. These facts are not just undisputed. They are freely admitted and indisputable.

DBMP filed its petition to manipulate the Bankruptcy Code and use the automatic stay to exert pressure on tort claimants to accept a "settlement" the globally resolved all present and future individual state-law tort claims and channels any recovery to a limited fund artificially created by this proceeding. There is no dispute that such a mandatory global settlement is beyond what the Debtor and its affiliates are entitled to under controlling state and federal law. This is bad faith. *See Carolin*, 886 F.2d at 699, 702; *Premier Auto*, 492 F.3d at 279 (good faith requirement "prevents abuse…by debtors whose overriding motive is to delay creditors without benefitting them in any way…") (citing *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986)).

Just like *Premier Auto*, where that debtor had no right to force renegotiation of its lease on more favorable terms and its petition was dismissed for bad faith given its lack of financial distress, here, DBMP has no right to the force renegotiation of its state-law

liabilities, especially absent financial distress. This is a wholly improper use of the automatic stay.

### 1. *Saint-Gobain, New CertainTeed, and DBMP can pay all asbestos claimants in full and are not financially troubled or in need of resuscitation.*

This crucial and undeniable fact—that DBMP can pay every single claimant what it owes him/her in the tort system or in bankruptcy (i.e., "in full")—is relevant to every issue in this case, including to whether DBMP filed in subjective bad faith, and, having done so, whether it can be shielded by a universal litigation stay even when "individual actions" for relief are made by plaintiffs like the Herlihys.

Blackletter law, uniformly applied by the federal appellate courts, including the Fourth Circuit, forbids the wielding of bankruptcy courts' "powerful equitable weapons" by "financially healthy companies with no need to reorganize." *Premier Auto*, 492 F.3d at 281–82.[23]

[23] *See Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934) ("One of the primary purposes of the Bankruptcy Act is to relieve the honest debtor from *the weight of oppressive indebtedness*, and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes.") (emphasis added); *Wetmore v. Markoe*, 196 U.S. 68, 77 (1904) ("Systems of bankruptcy are designed to relieve the honest debtor from the weight of indebtedness which has become oppressive…"); *In re Capitol Food Corp. of Fields Corner*, 490 F.3d 21, 25 (1st Cir. 2007) (reasoning that a debtor need not be insolvent before filing bankruptcy petition, but that it must be experiencing "some sort of financial distress"); *In re Cohoes Indus. Terminal, Inc.*, 931 F.2d 222, 228 (2d Cir. 1991) (debtor must "at least…face such financial difficulty that, if it did not file at that time, it could anticipate the need to file in the future"); *In re SGL Carbon Corp.*, 200 F.3d 154, 164–66 (3d Cir. 1999) (reversing the district court and dismissing the debtor's bankruptcy because, *inter alia*, "[t]he mere possibility of a future need to file, without more, does not establish that a petition was filed in 'good faith," and "Chapter 11 was designed to give those teetering on the verge of a fatal financial plummet an opportunity to reorganize on solid ground and try again, not to give profitable enterprises an opportunity to evade contractual or other liabilities"); *In re Premier Auto. Servs., Inc.*, 492 F.3d 274, 280–81 (4th Cir. 2007) (dismissal upheld because debtor was not "experiencing financial difficulties;" the debtor's filings "reveal

DBMP's asbestos liabilities never caused it or Old CertainTeed financial strain, let alone distress. According to Old CertainTeed's "publicly disclosed financial statements, its assets greatly exceeded its combined operating and asbestos liabilities." Findings at ¶57. With almost $3 billion in assets (and liabilities totaling less than half of that), New CertainTeed possesses the capacity to enhance DBMP's ability to address its liabilities. Findings at ¶57.

By contrast, in the 1980s, the Fourth Circuit noted a "striking similarity" between *A.H. Robins* and *Johns-Manville*, two mass tort driven bankruptcies (*A.H. Robins Co. Inc. v. Piccinin*, 788 F.2d 994, 1007 (4th Cir. 1986)). Manville was a "financially besieged enterprise in desperate need of reorganization of its crushing debt, both present and

a solvent business entity," a fact that "alone may justify dismissal of [the debtor's] Chapter 11 petition"); *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072–73 (5th Cir. 1986) ("The 'new debtor' syndrome, in which a one-asset entity has been created … to isolate the insolvent property and its creditors, exemplifies … bad faith cases…Neither the bankruptcy courts nor the creditors should be subjected to the costs and delays of a bankruptcy proceeding under such conditions."); *In re Cook*, 104 F.2d 981, 985 (7th Cir. 1939) (no valid bankruptcy purpose where "proceeding was instituted not for the purpose of obtaining benefits afforded by the Act to a corporation in financial distress, but to enable appellees to escape the jurisdiction of another court where the day of reckoning … was at hand"; "A Federal Court should not extend its jurisdiction under such circumstances."); *In re Cedar Shore Resort, Inc.*, 235 F.3d 375, 380 (8th Cir. 2000) (affirming dismissal because, *inter alia*, the bankruptcy court found the primary motivation of the debtor—a healthy company "not in dire financial straits"—was to dispose of a state court lawsuit); *In re Marsch*, 36 F.3d 825, 829 (9th Cir. 1994) (no good faith where debtor "had the financial means to pay" its obligations, which posed no "danger of disrupting business interests"); *In re Stewart*, 175 F.3d 796, 811 (10th Cir. 1999) (affirming dismissal and recognizing that relieving "oppressive indebtedness" is "[o]ne of the main purposes of bankruptcy law"); *In re Waldron*, 785 F.2d 936, 940 (11th Cir. 1986) (rejecting a debtor's bankruptcy because "[t]he bankruptcy laws are intended as a shield, not as a sword," and recognizing that the purpose of Chapter 11 is to give a fresh start to a "financially troubled debtor" rather than the "financially secure"). *See also Grogan v. Garner*, 498 U.S. 279, 286–87 (1991) ("This Court has certainly acknowledged that a central purpose of the Code is to provide a procedure by which *certain insolvent* debtors can reorder their affairs … But in the same breath that we have invoked this 'fresh start' policy, we have been careful to explain that the Act limits the opportunity for a completely unencumbered new beginning to the 'honest *but unfortunate* debtor.'").

future." *Kane*, 843 F.2d at 649 (citing *In re Johns-Manville Corp.*, 36 B.R. 727, 741 (Bankr. S.D. N.Y. 1984)).

A.H. Robins was "confronted, if not overwhelmed, with an avalanche" of actions related to its Dalkon Shield contraceptive device and the company had a "**limited fund**" to satisfy them. *A.H. Robins,* 788 F.2d at 996, 1008 (emphasis). *See also In re A.H. Robins Company, Inc.*, 89 B.R. 555, 558 (E.D. Va. 1988) (recognizing the Dalkon Shield liability "caused a crucial depletion of the company's funds").

This is not the situation with DBMP. New CertainTeed's massive wealth—available to DBMP via the unlimited Funding Agreement—establishes there is no legally cognizable burden on any party for the Herlihys to liquidate their claims now and is grounds for this relief.

**2. *Saint-Gobain, New CertainTeed, and DBMP only filed for Chapter 11 to leverage the automatic stay and harm their creditors.***

Saint-Gobain and its puppets are acting in bad faith; their "real motivation" is to "abuse the reorganization process," "cause hardship" and "delay [to] creditors," "without intent or ability to reorganize," and Saint-Gobain—after being socialized to the idea—made DBMP file for Chapter 11 merely to invoke the automatic stay. *See Carolin*, 886 F. 2d at 702 (citing *In re Thirtieth Place, Inc.*, 30 B.R. 503, 505 (9th Cir. Bankr. App. 1983)).

Now, DBMP purports to wield the stay as a bargaining tool to force claimants into the Hobson's choice of either risking years of delay and potential destruction of some or

all their rights, or accepting a bankruptcy-based resolution of their claims that limits and impairs victims' state-law rights. *See Premier Auto*, 492 F.3d at 279 (a petitioner's good faith is "'indispensable to proper accomplishment of the basic purposes of the Chapter 11 protection.'") (citing *Carolin*, 886 F.2d at 698).

Saint-Gobain's post-petition behavior is both revealing and offensive to the people its subsidiaries poisoned to death with asbestos. During 2022, the Compagnie gave away over $1,000,000,000 in voluntary dividends, 22% ***more*** than in 2021.[24] In 2023, Saint-Gobain had € 47.9 billion in sales, over € 3 billion in net income and free cash flow, and more than € 5 billion in operating income.[25]

Referencing the "Situation in the United States"—i.e., its embarrassing bad-faith billionaire bankruptcy scam—Saint-Gobain boasted that this proceeding was "expected to take up to approximately five to eight years" during which "all asbestos litigations [sic] have been stayed and all related costs suspended…" 2023 Ann. Report at 44.

Apparently, Saint-Gobain believes DBMP's ***total*** current and future asbestos liabilities are $407 million.[26] A large number in the abstract, but a fraction of what the

[24] *See* Ex. 13, Compagnie de Saint-Gobain, *Statutory auditors' report on the consolidated financial statements*, "2023 Ann. Report" at 56. Saint-Gobain has over 506 million shares and paid out dividends of € 2.00 per share. The company paid out dividends in 2021 of € 1.63 per share. One Euro is approximately equal to $1.07.

[25] *See*, https://www.saint-gobain.com/en

[26] Saint-Gobain recorded a "provision corresponding to the amount of the estimated debt against DBMP amounting to € 407 million as of December 31, 2023," recognizing New CertainTeed's obligation to pay "debts" to DBMP. Ann. Report at 44. At present, on €1.00 is equal to $1.07.

Compagnie de Saint-Gobain gives away in dividends in a single year.[27] Saint-Gobain had ***a $1 billion,*** didn't need it, and gave it away. And the Compagnie intends to abuse the automatic stay for another 5 to 8 years.

Companies with billions in excess cash that intentionally identify, isolate and then strand one class of creditor in bankruptcy —and aim to waste 5 to 8 more years, time their asbestos victims don't have—are not acting in good faith and should not benefit from the automatic stay, especially when individual plaintiffs set forth specific facts and seek relief, as here.

## C. DBMP's Subjective Bad Faith Is Grounds to Lift the Stay.

Bankruptcy courts have the power to modify, annul, or vacate the stay based on "the particular circumstances of the case [as] guided by considerations that under the law make for the ascertainment of what is just to the claimants, the debtor, and the estate." *Foust v. Munson Steamship Lines*, 299 U.S. 77, 83 (1936). Section 362(d)(1) authorizes modifying the automatic stay "for cause."

"Just as § 1112(b) inferentially permits inquiry into a debtor's good faith in the context of an interested party's motion to dismiss, § 362(d)(1)'s 'for cause' language authorizes the court to determine whether, with respect to the interests of a creditor

[27] DBMP/Old CertainTeed's annual spend on asbestos litigation (defense and indemnity) from 2002 to 2019 was only $80 million to $160 million. Findings at ¶ 33.

seeking relief, a debtor has sought the protection of the automatic stay in good faith." *Carolin*, 886 F.2d at 699 (citing *Little Creek*, 779 F.2d 1068).

"Every bankruptcy statute since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith for the commencement, prosecution, and confirmation of bankruptcy proceedings." *Little Creek*, 779 F.2d at 1072. "Like its predecessor statutes . . . the Bankruptcy Code of 1978 has been endowed with requirements of good faith in the construction of many of its provisions….[n]umerous cases have found a lack of good faith to constitute 'cause' for lifting the stay" *Id* . This principle, that the debtor's bad faith is a factor which supports lifting the stay, is widely accepted.[28] DBMP's bad faith abuse of the Bankruptcy Code and perversion of the automatic stay is grounds to grant this motion. *See Carolin*, 886 F.2d at 699.

This Court has recognized that lifting the stay "for cause" is a "flexible concept" and should be evaluated on a case-by-case basis. Findings at ¶ 208. In 2021, the Court denied the ACC's opposition to the preliminary injunction and automatic stay, but that

[28] *See In re Thirtieth Place, Inc.*, 30 B.R. 503, 505–06 (Bankr.App. 9th Cir.1983); *In re Talladega Steaks, Inc.*, 50 B.R. 42, 43–44 (Bankr.N.D.Ala.1985); *In re Kinney*, 51 B.R. 840, 845–46 (Bankr.C.D.Cal.1985); *In re Silver*, 46 B.R. 772, 773–74 (D.Colo.1985); *In re Volpe*, 53 B.R. 46, 47–48 (Bankr.M.D.Fla.1985); *In re Martin*, 51 B.R. 490, 493–95 (Bankr.M.D.Fla.1985); *In re Setzer*, 47 B.R. 340, 344–45 (Bankr.E.D.N.Y.1985); *In re Port Richey Service Co.*, 44 B.R. 634, 635 (Bankr.M.D.Fla.1984); In re Winn, 43 B.R. 25, 28 (Bankr.M.D.Fla.1984); *Basin Elec. Power Co-op v. Midwest Processing Co.*, 47 B.R. 903, 908–10 (D.N.D.1984), aff'd, 769 F.2d 483 (8th Cir.1985); *In re Scott*, 42 B.R. 35, 38–39 (Bankr.D.Ore.1984); *Furness v. Lilienfield*, 35 B.R. 1006, 1010–13 (D.Md.1983); *In re Corp. Deja Vu*, 34 B.R. 845, 846–47, 850 (Bankr.D.Md.1983); *In re 299 Jack-Hemp Assoc.*, 20 B.R. 412, 413–14 (Bankr.S.D.N.Y.1982); *In re Lotus Inv., Inc.*, 16 B.R. 592, 595–96 (Bankr.S.D.Fla.1981); *Winshall Settlor's Trust*, 758 F.2d 1136, 1137 (6th Cir. 1985); *In re Albany Partners, Ltd.*, 749 F.2d 670, 673–74 (11th Cir.1984).

pertained to ***all*** asbestos claimants and that was over 30 months ago. *See* Findings at ¶ 208, 211.

This is different. The Herlihys ask this Court to rule first on whether DBMP filed in subjective bad faith (based all on the evidence *supra*), and second, whether this is grounds to lift the stay for her individual action to proceed, especially considering the specific facts of their case, as set forth *supra*. *See Bestwall*, 71 F.4th at 183.

**D. <u>The Herlihys Satisfy The *Robbins* Factors.</u>**

DBMP's subjective bad faith and the specific facts of the Herlihys' actions are sufficient to lift the stay. In addition, they satisfy the *Robbins* factors: (1) all issues pending in Movants' litigation against the Debtor involve state law; (2) liquidating Movants' claims in state court will interfere with this proceeding and will promote judicial economy; and (3) the Debtor's bankruptcy estate is protected because this Court will decide when Movants' liquidated claims will be paid. *In re Robbins*, 964 F.2d 342, 345 (4th Cir. 1992); *see In re Claughton*, 140 B.R. 861, 867-68 (Bankr. W.D.N.C. 1992).

Under *Robbins*, this Court should "harmonize the interests of both debtor and creditors while preserving the debtor's assets for repayment and reorganization of his or her obligations." 964 F.2d at 345. However, maintaining the automatic stay to protect the Debtor's ability to reorganize is not the same thing as upholding the preliminary injunction as to non-debtor affiliates. Nor does it address whether this Court can decide

Movants' claims against DBMP, or whether issues pending in litigation involve only state law, such that the expertise of the bankruptcy court is unnecessary.

DBMP's anticipated objection to this request on grounds that this Court should estimate all claims or that a trust claim with an artificially capped Section 524(g) trust is the remedy available to the Herlihys, would render 28 U.S.C. § 157 meaningless and subordinate individual statutory rights and state law remedies to the whims of wealthy tortfeasors who prefer to avoid the civil jury system by manipulating the Bankruptcy Courts. The number of individual claimants that decide to liquidate their personal injury claims in front of juries and trial courts with power to hear these cases will have no impact on this case, because, ***unlike*** in *Manville, A.H. Robins*, and many other mass tort bankruptcies, DBMP is fully funded, non-distressed, and can pay all claimants 100% of their claims' tort system value.

This Court's expertise related to the Bankruptcy Code and the payment of liquidated claims is not needed to allow the Herlihys to try their state law claims to verdict. Further, they admit that once their claims are liquidated only this Court can decide when it will be paid.

1. ***Whether modifying the stay will promote judicial economy and whether there would be greater interference with the bankruptcy case if the stay were not lifted because matters would have to be litigated in bankruptcy court.***

California law entitles parties aged 70 or older who have health issues which may prejudice the prosecution of their cases to a mandatory trial date within 120 days of the

granting of a motion for preference. It also provides for a discretionary but encouraged preference for those with terminal illnesses and limited remaining time to the same trial preference, upon sufficient evidentiary showing. Mr. Herlihy is over 70 years old and battles every day with the progressive decline associated with his invariably terminal mesothelioma. Plaintiffs intend to file for trial preference, under one or both grounds outlined above, in weeks if not months. At present, the Herlihys' trial is set for March 2025.

If this motion is granted, the Herlihys will add DBMP as a defendant to their pending California case. If this motion is denied, the Los Angeles state court will have two cases instead of one. The Movants will file a second suit against only DBMP after this bankruptcy case is inevitably dismissed. The Herlihys will ***never*** vote on a plan of reorganization until they know the liquidated value of their claims against DBMP. *See* 11 U.S.C. § 1129(a)(7)(A) and 28 U.S.C. § 157(b). To know the liquidated value, they must quantify these claims before a jury or negotiate them at arm's length before trial. There is no burden on any party for them to do so now, as opposed to later.

There is no legitimate reason to delay determining the value of the Herlihys' claims now while Saint-Gobain, New CertainTeed, and DBMP continue to demand this Court's attention and waste their victims' time in navigating through estimation related proceedings. An estimation which will result in an advisory opinion the claimants will ignore.

DBMP can provide no legitimate reason—the fact that it does not want to, is not a legitimate reason—why liquidating claims in state court and then coming back to this Court to allow those liquidated claims later would interfere with the bankruptcy case.

**2. *Whether the estate can be protected properly by a requirement that creditors seek enforcement of any judgment through the bankruptcy court.***

The Herlihys are not asking the Court to enforce their claims against the Debtor. They seek only to liquidate them through arm's length settlement or jury trial in California state court. Whatever the specific value owing to them from the Debtor, they agree that amount will not be paid until this Court allows it.[29] There is no harm to the Debtor's bankruptcy estate by granting this request.

**3. *Whether the issues pending in Movants' litigation against the Debtor involve state law***

All the Movants' claims—negligence, strict liability, negligent misrepresentation, fraud by non-disclosure—against DBMP are all based on California law. *See* Ex. 5. The Debtor will likely attempt to sidestep this explicit limitation on this Court's jurisdiction, effectively arguing that while this Court cannot estimate ***any*** of these claims, it should estimate ***all*** of them. However, even if the Court estimates claims against the Debtor in aggregate, the Herlihys' right to pursue uncapped state law remedies against DBMP

[29] It is no defense for the Debtor to argue that in a jury trial some claimants may lose and get nothing. In that instance, those claimants will have been determined to not have a valid claim and, accordingly, suffer no legal harm.

before a jury is indisputable under the United States Constitution, the United States Bankruptcy Code, and California law.[30]

This Court lacks jurisdiction to estimate or quantify these claims. *See* 28 U.S.C. §§ 157(b) and 1411(a). "If the bankruptcy court lacks jurisdiction to adjudicate a claim, relief from the automatic stay is **required** so that the claim can be adjudicated in a court that does have jurisdiction." *In re Nifong*, 2008 WL 2203149, *4 (Bankr. M.D.N.C. 2008) (citing *In re Erickson*, 330 B.R. 346 (Bankr. D. Conn. 2005) (emphasis added).[31]

The Herlihys will ***never*** vote in favor of a plan to reorganize a bad-faith debtor in a manufactured bankruptcy until after they know the full liquidated value of all their state law claims. There is no prejudice to anyone in proceeding now, and only ongoing undue prejudice to the Herlihys in proceeding later. The bankruptcy case will not be interfered with by DBMP having to—for the first time over 48 months—retain counsel to defend it in the tort system for a limited number of cases. Nor will allowing a few cases to proceed in the tort system be a distraction to this bankruptcy case or the adversary proceedings.

---

[30] "Trial by jury is an inviolate right and shall be secured to all . . ." (Cal. Const. art. 1 § 16.) "The California Constitution, as originally adopted in 1849, set out the right to a jury trial in the strongest possible terms . . ." (Grafton Partners v. Superior Court (2005) 36 Cal.4th 944, 952-953.)

[31] Absent consent, a United States District Court "should retain control over all aspects of personal injury tort claims under section 157." *Moore v. Idealease of Wilmington*, 358 B.R. 248, 252 (E.D.N.C. 2006). *See Stokes v. Southeast Hotel Properties, LTD.*, 877 F. Supp. 986 (W.D.N.C. 1994) ("The decision where a personal injury claim will be adjudicated is clearly reserved for attention of the district court.").

Disregarding state law and the Constitutional rights of claimants, DBMP will no doubt argue that resolution with all claimants requires the tools contemplated by Section 524(g). But Section 524(g) demands that an operating, good faith debtor, overwhelmed by asbestos liabilities, subject itself to bankruptcy court jurisdiction. DBMP and New CertainTeed are none of these, and no part of the Bankruptcy Code, including Section 524(g), can override the Herlihys' individual state law remedies and Constitutional rights. This Court's expertise is not needed to allow the Herlihys to try their claims to verdict in state court.[32]

The Herlihys also satisfy the more comprehensive *Curtis* factors. These narrower but more numerous factors subsume the broader factors of *Robbins* and provide a more nuanced examination of "cause" under Section 362.[33] *See In re Curtis*, 40 B.R. 795, 799-800

[32] "[A] determination of the validity and amount of [the Movants'] claim must be made either in the state court or this court. The court is satisfied that the proper forum for such a determination is the state court. The claims alleged in the State Court Action all involve solely state law issues. There are no issues in any of the claims that require bankruptcy expertise. It also is clear that if the stay is lifted, the Debtor and the bankruptcy estate can be protected adequately by a requirement that the Movants seek enforcement of any judgment obtained through the bankruptcy court. The modification of the stay will permit the Movants only to reduce their claims against the Debtor to judgment and will specifically provide that any judgment against the Debtor obtained in the State Court Action may not be enforced against the Debtor or property of the bankruptcy estate unless and until further relief from the automatic stay has been granted by the bankruptcy court. Allowing the claims to be pursued in this fashion will not change the status or priority of the claims but will result in a determination of the nature and amount of the Debtor's liability. Also, allowing all of the claims to be determined in one proceeding in state court promotes judicial economy and avoids the hardship on the Movants that would result if they were required to litigate some of the claims in state court and some of them in this court. It is true that some of the claims in the State Court Action do not involve the Debtor. However, any additional burden on the Debtor resulting from this circumstance is far outweighed by the factors that weigh in favor of lifting the stay and allowing the State Court Action to proceed. *In re Joyner*, 416 B.R. 190, 192–93 (Bankr. M.D.N.C. 2009).

[33] "The court must balance potential prejudice to the bankruptcy debtor's estate against the hardships that will be incurred by the person seeking relief from the automatic stay if relief is denied." *See In re Peterson*, 116 B.R. 247, 249 (D.Colo.1990) (discussing balancing test). The factors that courts consider in deciding

(Bankr. D. Utah 1984); *Sonnax Industries, Inc. v. Tri Component Products Corp. (In re Sonnax Industries, Inc.)*, 907 F.2d 1280 (2nd Cir. 1990); *Jim's Maintenance & Sons, Inc. v. Target Corporation (In re Jim's Maintenance & Sons, Inc.)* 418 Fed. App'x 726 (10th Cir. 2011). Whether applying the twelve *Curtis* factors or the three *Robbins* factors, the stay should be modified to allow Movants to liquidate their claims.

Broadly, the greater balance of hurt is unquestionably born by the Herlihys if the requested relief is denied. DBMP will not be impacted if they liquidate their claims outside of bankruptcy now, and the Herlihys agree to have her claims paid from the Debtor's bankruptcy estate only when allowed by this Court.

## IV. CONCLUSION

The Herlihys urge this Court to rule on whether DBMP filed its petition in bad faith. Avoiding this issue is akin to finding good faith. If DBMP is found to have filed in bad faith, that is grounds to lift the stay, which she asks this Court to do.

Date: April 18, 2024

---

whether to lift the automatic stay include (1) whether the issues in the pending litigation involve only state law, so the expertise of the bankruptcy court is unnecessary; (2) whether modifying the stay will promote judicial economy and whether there would be greater interference with the bankruptcy case if the stay were not lifted because matters would have to be litigated in bankruptcy court; and (3) whether the estate can be protected properly by a requirement that creditors seek enforcement of any judgment through the bankruptcy court." *In re Robbins*, 964 F.2d 342, 345 (4th Cir. 1992), as amended (May 27, 1992).

Respectfully submitted,

WALDREP WALL BABCOCK
& BAILEY PLLC
*/s/ Thomas W. Waldrep, Jr.*
Thomas W. Waldrep Jr. (NC State Bar No. 11135)
James C. Lanik (NC State Bar No. 30454)
Ciara L. Rogers (NC State Bar No. 42571)
370 Knollwood Street, Suite 600
Winston-Salem, NC 27103
Telephone: 336-717-1280
Facsimile: 336-717-1340
Email: notice@waldrepwall.com

-and-

MAUNE RAICHLE HARTLEY FRENCH &
MUDD, LLC
*/s/ Clayton L. Thompson*
Clayton L. Thompson (NY Bar No. 5628490)
John Louis Steffan IV (Missouri Bar No. 64180)
150 W. 30th Street, Suite 201
New York, NY 10001
Telephone: (800) 358-5922
Email: CThompson@mrhfmlaw.com
Pro Hac Vice Admission Pending

*Counsel for Movants*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing MICHAEL N. AND ANN HERLIHY'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(d) was filed in accordance with the local rules and served upon all parties registered for electronic service and entitled to receive notice thereof through the CM/ECF system.

Respectfully submitted this the 18th day of April, 2024.

WALDREP WALL BABCOCK
& BAILEY PLLC

*/s/ Thomas W. Waldrep, Jr.*

Thomas W. Waldrep Jr. (NC State Bar No. 11135)
370 Knollwood Street, Suite 600
Winston-Salem, NC 27103
Telephone: (336) 717-1280
Facsimile: (336) 717-1340
Email: notice@waldrepwall.com

*Counsel for Movants*

# Exhibit 1

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| IN RE: | : | Case No. 20-30608 (JCW) (Jointly Administered) |
| ALDRICH PUMP LLC, ET AL., | : | Chapter 11 |
| Debtors, | : | Charlotte, North Carolina |
| | : | Thursday, March 30, 2023 9:30 a.m. |
| | : | |

: : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

| | | |
|---|---|---|
| OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS, on behalf of the estates of Aldrich Pump LLC and Murray Boiler LLC, | : | AP 22-03028 (JCW) |
| Plaintiff, | : | |
| v. | : | |
| INGERSOLL-RAND GLOBAL HOLDING COMPANY LIMITED, et al., | : | |
| Defendants, | : | |

: : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

| | | |
|---|---|---|
| OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS, on behalf of the estates of Aldrich Pump LLC and Murray Boiler LLC, | : | AP 22-03029 (JCW) |
| Plaintiff, | : | |
| v. | : | |
| TRANE TECHNOLOGIES PLC, et al., | : | |
| Defendants, | : | |

: : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

| | | |
|---|---|---|
| ARMSTRONG WORLD INDUSTRIES, INC. ASBESTOS PERSONAL INJURY SETTLEMENT TRUST, et al., Plaintiffs, v. ALDRICH PUMP LLC, et al., Defendants, | : | Miscellaneous Pleading No. 22-00303 (JCW) (Transferred from District of Delaware) |

: : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

| | | |
|---|---|---|
| AC&S ASBESTOS SETTLEMENT TRUST, et al., Petitioners, v. ALDRICH PUMP LLC, et al., Respondents, VERUS CLAIM SERVICES, LLC, Interested Party, NON-PARTY CERTAIN MATCHING CLAIMANTS, Interested Party. | : | Miscellaneous Pleading No. 23-00300 (JCW) (Transferred from District New Jersey) |

: : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE J. CRAIG WHITLEY,
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

| | |
|---|---|
| For Debtors/Defendants, Aldrich Pump LLC and Murray Boiler LLC: | Rayburn Cooper & Durham, P.A.<br>BY: JOHN R. MILLER, JR., ESQ.<br>MATTHEW TOMSIC, ESQ.<br>C. RICHARD RAYBURN, JR., ESQ.<br>227 West Trade St., Suite 1200<br>Charlotte, NC 28202 |

APPEARANCES (continued):

| | |
|---|---|
| For Debtors/Defendants, Aldrich Pump LLC and Murray Boiler LLC: | Jones Day<br>BY: BRAD B. ERENS, ESQ.<br>MORGAN R. HIRST, ESQ.<br>110 North Wacker Dr., Suite 4800<br>Chicago, IL 60606 |
| | Jones Day<br>BY: DAVID S. TORBERG, ESQ.<br>51 Louisiana Avenue, N.W.<br>Washington, D.C. 20001 |
| | Evert Weathersby Houff<br>BY: C. MICHAEL EVERT, JR., ESQ.<br>3455 Peachtree Road NE, Ste. 1550<br>Atlanta, GA 30326 |
| | Evert Weathersby Houff<br>BY: CLARE M. MAISANO, ESQ.<br>111 South Calvert St., Suite 1910<br>Baltimore, MD 21202 |
| | ROBERT H. SANDS, ESQ.<br>ALLAN TANANBAUM, ESQ. |
| Audio Operator: | COURT PERSONNEL |
| Transcript prepared by: | JANICE RUSSELL TRANSCRIPTS<br>1418 Red Fox Circle<br>Severance, CO 80550<br>(757) 422-9089<br>trussell31@tdsmail.com |

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

APPEARANCES (continued):

| | |
|---|---|
| For the ACC: | Caplin & Drysdale<br>BY: SERAFINA CONCANNON, ESQ.<br>One Thomas Circle, NW, Suite 1100<br>Washington, DC 20005 |
| | Robinson & Cole LLP<br>BY: NATALIE RAMSEY, ESQ.<br>DAVIS LEE WRIGHT, ESQ.<br>1201 N. Market Street, Suite 1406<br>Wilmington, DE 19801 |
| | Robinson & Cole LLP<br>BY: ANDREW A. DePEAU, ESQ.<br>280 Trumbull Street<br>Hartford, CT 06103 |
| | Winston & Strawn LLP<br>BY: DAVID NEIER, ESQ.<br>CRISTINA I. CALVAR, ESQ.<br>200 Park Avenue<br>New York, NY 10166-4193 |
| | Hamilton Stephens<br>BY: ROBERT A. COX, JR., ESQ.<br>525 North Tryon St., Suite 1400<br>Charlotte, NC 28202 |
| For the FCR: | Orrick Herrington<br>BY: JONATHAN P. GUY, ESQ.<br>DANNY BAREFOOT, ESQ.<br>1152 15th Street, NW<br>Washington, D.C. 20005-1706 |
| For Certain Insurers: | Duane Morris LLP<br>BY: RUSSELL W. ROTEN, ESQ.<br>865 S. Figueroa St., Suite 3100<br>Los Angeles, CA 90017-5440 |
| For Individual Fiduciary Duty Defendants: | Brooks Pierce<br>BY: JIM W. PHILLIPS, JR., ESQ.<br>JEFFREY E. OLEYNIK, ESQ.<br>P. O. Box 26000<br>Greensboro, NC 27420 |

APPEARANCES (continued):

| | |
|---|---|
| For Trane Technologies Company LLC and Trane U.S. Inc.: | McCarter & English, LLP<br>BY: GREGORY J. MASCITTI, ESQ.<br>825 Eighth Avenue, 31st Floor<br>New York, NY 10019 |
| | McGuireWoods, LLP<br>BY: BRADLEY R. KUTROW, ESQ.<br>201 North Tryon St., Suite 3000<br>Charlotte, NC 28202 |
| | Cordes Law, PLLC<br>BY: STACY C. CORDES, ESQ.<br>1800 East Boulevard<br>Charlotte, NC 28203 |
| For Asbestos Trusts: | Ward and Smith, P.A.<br>BY: LANCE P. MARTIN, ESQ.<br>P. O. Box 2020<br>Asheville, NC 28802-2020 |
| | Ballard Spahr LLP<br>BY: BETH MOSKOW-SCHNOLL, ESQ.<br>919 North Market St., 11th Floor<br>Wilmington, DE 19801-3034 |
| For the Verus Trusts: | Moon Wright & Houston, PLLC<br>BY: ANDREW T. HOUSTON, ESQ.<br>212 N. McDowell Street, Suite 200<br>Charlotte, NC 28204 |
| | Lowenstein Sandler LLP<br>BY: LYNDA A. BENNETT, ESQ.<br>One Lowenstein Drive<br>Roseland, NJ 07068 |
| For Verus Claims Services, LLC: | Bradley Arant Boult Cummings LLP<br>BY: ANNA-BRYCE HOBSON, ESQ.<br>214 North Tyron St., Suite 3700<br>Charlotte, NC 28202 |
| | Anselmi & Carvelli LLP<br>BY: ZACHARY D. WELLBROCK, ESQ.<br>West Tower, Fifth Floor<br>56 Headquarters Plaza<br>Morristown, NJ 07960 |

APPEARANCES (continued):

| | |
|---|---|
| For Robert and Marcella Semian: | Maune Raichle<br>BY: CLAYTON L. THOMPSON, ESQ.<br>150 West 30th Street, Suite 201<br>New York, NY 10001 |
| | Waldrep Wall<br>BY: JAMES C. LANIK, ESQ.<br>370 Knollwood Street, Suite 600<br>Winston-Salem, NC 27103 |
| For Non-Party Certain Matching Claimants: | Hogan McDaniel<br>BY: DANIEL K. HOGAN, ESQ.<br>1311 Delaware Avenue<br>Wilmington, DE 19806 |
| | Waldrep Wall<br>BY: DIANA SANTOS JOHNSON, ESQ.<br>370 Knollwood Street, Suite 600<br>Winston-Salem, NC 27103 |
| For DCPF: | Alexander Ricks PLLC<br>BY: FELTON PARRISH, ESQ.<br>1420 E. 7th Street, Suite 100<br>Charlotte, NC 28204 |
| | Young Conaway<br>BY: KEVIN A. GUERKE, ESQ.<br>1000 North King Street<br>Wilmington, Delaware 19801 |
| ALSO PRESENT: | JOSEPH GRIER, FCR<br>Grier, Wright & Martinez, PA<br>521 E. Morehead St, Suite 440<br>Charlotte, NC 28202 |

APPEARANCES (via telephone):

| | |
|---|---|
| For Non-Party Certain Matching Claimants: | Stark & Stark, PC<br>BY: JOSEPH H. LEMKIN, ESQ.<br>P. O. Box 5315<br>Lawrenceville, NJ 08648 |

APPEARANCES (via telephone continued):

| | |
|---|---|
| For Travelers Insurance Companies, et al.: | Steptoe & Johnson LLP<br>BY: JOSHUA R. TAYLOR, ESQ.<br>1330 Connecticut Avenue, N.W.<br>Washington, D.C. 20036 |
| For Verus Claims Services, LLC: | Anselmi & Carvelli LLP<br>BY: ANDREW ANSELMI, ESQ.<br>West Tower, Fifth Floor<br>56 Headquarters Plaza<br>Morristown, NJ 07960 |

THE COURT: All right.

That got it?

It will not, probably, surprise anyone that I feel compelled to deny the motion basically for the reasons stated by the debtor and, and the FCR, if not going back to the preliminary injunction and the reasons I stated then. I have no doubt, I don't think anyone could have any reasonable doubt that if I grant relief from stay to one creditor to liquidate the claim, all of the claimants will -- not all -- but a substantial number of the claimants, enough to wreck the bankruptcy case, will seek like measure and that effectively precipitates a *de facto* dismissal of the case. It will be unable to go forward and even more so than at the time of the preliminary injunction, now we've got some of these claims that are estate claims under the first-crack doctrine that would be asserted by individual claimants elsewhere as against New Trane and the new entities, the "good" companies, if you will, and it's even stronger in this case because now I have the ACC bringing those causes of action. And so we would be undermining our own lawsuits if we did that.

I don't think anything's really changed. I'm appreciative of the fact that, that the underlying claim here may be somewhat different than the norm, but the circumstance of the case and the relationship of the claimants to the reorganization has not changed in any material way.

# Exhibit 2

Case 17-31795 Doc 3243-1 Filed 04/18/24 Entered 04/18/24 18:20:31 Desc
Exhibit 1 Page 1 of 107



UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| IN RE: | : | Case No. 17-31795-LTB |
| BESTWALL LLC, | : | Chapter 11 |
| Debtor. | : | Charlotte, North Carolina<br>Thursday, October 19, 2023 |
| | : | 9:35 a.m. |

: : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE LAURA TURNER BEYER,
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor: Robinson, Bradshaw & Hinson, P.A.
BY: RICHARD C. WORF, ESQ.
GARLAND CASSADA, ESQ.
101 N. Tryon Street, Suite 1900
Charlotte, NC 28246

Jones Day
BY: GREGORY M. GORDON, ESQ.
2727 North Harwood St., Suite 500
Dallas, TX 75201-1515

Audio Operator: COURT PERSONNEL

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

---

**JANICE RUSSELL TRANSCRIPTS**
**1418 Red Fox Circle**
**Severance, CO 80550**
**(757) 422-9089**
**trussell31@tdsmail.com**

APPEARANCES (continued):

| | |
|---|---|
| For the Debtor: | Jones Day<br>BY: JEFFREY B. ELLMAN, ESQ.<br>1221 Peachtree Street, N.E., #400<br>Atlanta, GA 30361 |
| | Schachter Harris, LLP<br>BY: ERIN A. THERRIAN, ESQ.<br>909 Lake Carolyn Pkwy., #1775<br>Irving, TX 75039 |
| For Richard and Joann Dale: | Maune Raichle<br>BY: CLAY THOMPSON, ESQ.<br>150 W. 30th Street, Suite 201<br>New York, NY 10001 |
| For Richard and Joann Dale, Wilson Buckingham and Angelika Weiss: | Waldrep Wall<br>BY: THOMAS W. WALDREP, JR., ESQ.<br>370 Knollwood Street, Suite 600<br>Winston-Salem, NC 27103 |
| For Future Claimants' Representative, Sander L. Esserman: | Young Conaway<br>BY: SHARON ZIEG, ESQ.<br>EDWIN J. HARRON, ESQ.<br>1000 North King Street<br>Wilmington, DE 19801 |
| | Alexander Ricks PLLC<br>BY: FELTON E. PARRISH, ESQ.<br>1420 E. 7th Street, Suite 100<br>Charlotte, NC 28204 |
| For Official Committee of Asbestos Claimants: | Robinson & Cole LLP<br>BY: NATALIE RAMSEY, ESQ.<br>KATHERINE S. DUTE, ESQ.<br>1201 N. Market Street, Suite 1406<br>Wilmington, DE 19801 |
| | JD Thompson Law<br>BY: LINDA W. SIMPSON, ESQ.<br>Post Office Box 33127<br>Charlotte, NC 28233 |

Case 23-30795 Doc 3265-1 Filed 02/28/24 Entered 02/28/24 18:29:31 Desc
Exhibit 10 Page 13 of 107



APPEARANCES (continued):

For Georgia-Pacific LLC:
Rayburn Cooper & Durham, P.A.
BY: JOHN R. MILLER, JR., ESQ.
227 West Trade Street, Suite 1200
Charlotte, NC 28202

Debevoise & Plimpton
BY: MARK P. GOODMAN, ESQ.
NATASHA LABOVITZ, ESQ.
66 Hudson Boulevard
New York, NY 10001

APPEARANCES (via telephone):
SANDER L. ESSERMAN
Future Claimants' Representative
2323 Bryan Street, Suite 2200
Dallas, TX 75201-2689

I'll let you all get your seats. Sorry.

MR. HARRON: Pardon us, your Honor. Sorry.

THE COURT: That's okay. I guess you never know when we're gonna come back in, huh?

Having considered the motion for relief from stay and the arguments of the parties and the responses and replies thereto, let me start by saying, Mr. Thompson. Of course, I'm sympathetic to Mr. Dale and his situation and I understand why he would request to liquidate his claim, but I can't find that there is cause to grant his motion for relief from stay.

You know, strictly speaking and considering the Robbins factors, which are the applicable factors in this Circuit, and considering Mr. Dale's case in isolation the Court could, I suppose, conclude it's appropriate to grant the motion for relief from stay. As bankruptcy courts, we often do that so that a state court can liquidate claims that are based on state court causes of action, as you all cited the Joyner case, which is a Judge Stocks case from the Middle District of North Carolina, but which is a very different case from, from this case. I think that case involved two plaintiffs who were seeking relief from stay to continue with a civil action in state court that involved less than a handful of defendants, one of whom was the debtor. But that case stands in stark contrast to this case, which is a mass tort asbestos case with an excess of 60,000 claimants and the Court is obliged to

consider the motion in that context and while it may be specula to, speculative to assume that granting the Dales' motion for relief from stay would result in a wave of similar motions, I believe that that's a fair and reasonable assumption, as apparently did Judge Whitley when he denied a similar motion in the Aldrich case, and if I grant this motion I think I would be hard pressed to deny future motions for relief from stay in this case and that's especially true since the Dales have not pled any unique facts or circumstances that would justify lifting the stay as to them or otherwise distinguish their case from the thousands of cases that are pending in state court.

In addition, I conclude I should deny the motion because when considering the motion and the overall context of this case, I think I should deny the motion for the same reasons I determined I should grant the motion for a preliminary injunction, which decision the Fourth Circuit recently affirmed. And I agree with the, the debtor's statement that the Fourth Circuit's opinion confirms the importance of centralizing all of the pending claims in the bankruptcy court and while the Fourth Circuit did say that rather than waiting for plan confirmation, and I quote, "Claimants can bring individual actions for relief based on the specific facts of a particular claim," the Dales have not pled any facts specific or unique to them to cause this Court to find that there's cause to grant their motion for relief from

# Exhibit 3

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| IN RE: | : | Case No. 17-31795-LTB |
| BESTWALL LLC, | : | Chapter 11 |
| Debtor. | : | Charlotte, North Carolina<br>Thursday, January 18, 2024 |
| | : | 9:34 a.m. |

: : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE LAURA TURNER BEYER,
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor: Robinson, Bradshaw & Hinson, P.A.
BY: RICHARD C. WORF, ESQ.
GARLAND CASSADA, ESQ.
KEVIN CRANDALL, ESQ.
101 N. Tryon Street, Suite 1900
Charlotte, NC 28246

Jones Day
BY: GREGORY M. GORDON, ESQ.
2727 North Harwood St., Suite 500
Dallas, TX 75201-1515

Audio Operator: COURT PERSONNEL

Transcript prepared by: JANICE RUSSELL TRANSCRIPTS
1418 Red Fox Circle
Severance, CO 80550
(757) 422-9089
trussell31@tdsmail.com

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

APPEARANCES (continued):

| | |
|---|---|
| For the Debtor: | Jones Day<br>BY: JEFFREY B. ELLMAN, ESQ.<br>1221 Peachtree Street, N.E., #400<br>Atlanta, GA 30361 |
| For Richard and Joann Dale: | Maune Raichle<br>BY: CLAY THOMPSON, ESQ.<br>150 W. 30th Street, Suite 201<br>New York, NY 10001 |
| For Richard and Joann Dale, Wilson Buckingham and Angelika Weiss: | Waldrep Wall<br>BY: THOMAS W. WALDREP, JR., ESQ.<br>370 Knollwood Street, Suite 600<br>Winston-Salem, NC 27103 |
| For Wilson Buckingham and Angelika Weiss: | Ruckdeschel Law Firm, LLC<br>BY: JONATHAN RUCKDESCHEL, ESQ.<br>8357 Main Street<br>Ellicott City, MD 21043 |
| For Future Claimants' Representative, Sander L. Esserman: | Young Conaway<br>BY: SHARON ZIEG, ESQ.<br>ERIN EDWARDS, ESQ.<br>1000 North King Street<br>Wilmington, DE 19801 |
| | Young Conaway<br>BY: FELTON E. PARRISH, ESQ.<br>Charlotte, NC 28204 |
| For Official Committee of Asbestos Claimants: | Robinson & Cole LLP<br>BY: NATALIE RAMSEY, ESQ.<br>DAVIS LEE WRIGHT, ESQ.<br>1201 N. Market Street, Suite 1406<br>Wilmington, DE 19801 |
| | Robinson & Cole LLP<br>BY: KATHERINE M. FIX, ESQ.<br>1650 Market Street, Suite 3600<br>Philadelphia, PA 19103 |
| | Hamilton Stephens<br>BY: LINDA W. SIMPSON, ESQ.<br>525 N. Tryon St., 14th Floor<br>Charlotte, NC 28202 |

APPEARANCES (continued):

| | |
|---|---|
| For Georgia-Pacific LLC: | Rayburn Cooper & Durham, P.A.<br>BY: JOHN R. MILLER, JR., ESQ.<br>227 West Trade Street, Suite 1200<br>Charlotte, NC 28202 |
| | Debevoise & Plimpton<br>BY: MARK P. GOODMAN, ESQ.<br>66 Hudson Boulevard<br>New York, NY 10001 |
| APPEARANCES (via telephone): | SANDER L. ESSERMAN<br>Future Claimants' Representative<br>2323 Bryan Street, Suite 2200<br>Dallas, TX 75201-2689 |

opposition to the motion for relief from stay and the arguments at today's hearing, I conclude I should deny the motion for relief from stay and in large part, I do so for the same reasons I denied the Dales' motion for relief from stay, the order for which was entered about one month ago, and for the same reasons I granted the preliminary injunction motion early on in this case, but I will add a few things to the remarks that I made when I ruled on the Dales' motion for relief from stay.

Consideration of the Robbins factors, particularly the second factor, that being whether modifying the stay will promote judicial economy and whether there would be greater interference with the bankruptcy case if the stay were not lifted because matters would have to be litigated in bankruptcy court, I believe and find weighs against modifying the automatic stay.

As I said in the Dales' case, I can't look at modifying the stay in Mr. Buckingham's case in isolation, at least particularly not with respect to the second prong. That issue must be considered in the context of this case being a mass tort case and because that is the reality in which we find ourselves, I still conclude that if I granted Mr. Buckingham's motion for relief from stay I would be obliged to grant the motion for relief from stay of most, if not all, claimants who sought similar relief. That is true for Mr. Buckingham as it

pending motion for relief from stay in Carolin. That issue was not on the table and they cited to 362 because it includes the word "cause" as does 1112(b). And the Fourth Circuit was defining what that broad language means and of course, ultimately concluded that it supports the construction that a debtor's lack of good faith may constitute cause for dismissal of a petition.

Similarly, the Fourth Circuit points out that 362 "inferentially permits inquiry into the debtor's good faith in commencing this case as a whole," and it cites Collier's for that proposition.

In his reply, Mr. Buckingham accurately points out that, "Nowhere in Carolin does the Fourth Circuit indicate that its two-pronged approach to dismissal is applicable to motions for relief from stay." I guess I would add, though, but nowhere does it say that it doesn't and to me, it defies logic to conclude that the two-prong standard doesn't apply in the context of this case and I underscore that statement if considering whether to grant relief from stay on the basis that the case was filed in bad faith. In other words, it can't be that a less stringent standard applies to a relief from stay motion which, if granted, would result in the dismissal of the case. To conclude otherwise would mean that I could deny the motions to dismiss the case as a bad faith filing for failure to meet the objective futility prong of the two-prong standard,

but grant relief from stay upon the finding of subjective bad faith. If I granted such relief from stay to one claimant, I would be obliged to grant it to all claimants, again resulting in the dismissal of this case and standing in stark contrast to the proposition for which I have held Carolin stands.

And as a practical matter, you know, this issue isn't gonna come up in other cases because in chapter 11 cases the Court wouldn't grant a motion for relief from stay if the case was filed in bad faith. The Court would dismiss the case. And that was true in a couple of the cases that were cited by Mr. Buckingham in his Footnote 6. There were both motions to dismiss and motions for relief from stay that were pending. The Court granted the motion to dismiss, but denied the motion for relief from stay as moot or didn't otherwise consider it.

Otherwise, with respect to the cases Mr. Buckingham cites in support of his argument that a lack of good faith constitutes cause for lifting the stay, I agree with the debtor that those cases are distinguishable. None of them were mass tort cases with tens of thousands of claims pending against the debtor.

I would also note that several of the cases include no reference to 362 or the automatic stay and the Basin Electric Cooperative case was an involuntary petition in which the district court concluded the petition should have been dismissed based on the petitioning creditors' bad faith. My

# Exhibit 4

KAISER PERMANENTE

**San Diego Medical Center**
9455 Clairemont Mesa Blvd
San Diego CA, 92123
Tel: 858-266-2640 Fax: 858-266-2630
Majid Ghassemi, M.D., Chief of Pathology/Laboratory Director

# SURGICAL PATHOLOGY REPORT

| | | | |
|---|---|---|---|
| Patient Name: | **HERLIHY, MICHAEL N** | Med. Rec. #: | **000009376460** |
| Accession #: | **CLMS23-6451** | Patient Type: | Outpatient |
| DOB/Age: | [redacted] (Age: 72) Sex: M | Obtained: | 3/23/2023 |
| Facility: | CLM - San Diego Medical Center. | Received: | 3/23/2023 |
| Location: | PREO-12 | Reported: | 3/27/2023 15:35 |
| Provider(s): | ANURAG GOYAL M.D. | | |
| CC: | MITRA BLAIR BAHAEE M.D. | | |

## FINAL PATHOLOGIC DIAGNOSIS

Peritoneal mass, core biopsy
- MALIGNANT NEOPLASM, CONSISTENT WITH MALIGNANT MESOTHELIOMA, SEE COMMENT

## Comment

The malignant cells are positive for Pancytokeratin, WT-1, Calretinin, CK5/6 and Ck7. The TTF-1 and PAX-8 stains are negative.
This case was reviewed at QC conference with agreement on the above diagnosis. QCR
FFPE: Block 2

nr/3/27/2023

Report Electronically Signed by
NILOUFAR REISIAN M.D.
Date Signed Out: 3/27/2023
Interpretation Performed at:
Kaiser Foundation Hospital San Diego Laboratory

## Microscopic Description

Microscopic examination is performed.

## Studies

Immunohistochemical analysis, with appropriate control stains, is performed.

## Clinical Information

Reason: 8.9 mm omental nodule with surrounding ascites
Michael N Herlihy is a 72 year old who comes to interventional radiology for biopsy of a 9 mm omental nodule, possible paracentesis for mild ascites sent for cytology. Suspect peritoneal carcinomatosis unknown primary.

## Gross Description

Case verification is performed. All specimens are received in formalin.

Received are 6 tan tissue cores, 0.7-0.9 cm. TE x2. EB

eb/3/23/2023

If immunohistochemistry and/or in situ hybridization and/or image analysis tests were used in this case, these tests were developed and their performance characteristics determined by SCPMG Regional Reference Laboratories, Anatomic Pathology - Chino Hills. It has not been cleared or approved by the US Food and Drug Administration. FDA does not require this test to go through premarket FDA review. This test is used for clinical purposes. It should not be regarded as investigational or for research. This laboratory is certified under the Clinical Laboratory Improvement Amendments (CLIA) as qualified to perform high complexity clinical laboratory testing.

## Specimen(s) Submitted As:

PERITONEAL MASS, CORE BIOPSY - a

# Exhibit 5

**MAUNE.RAICHLE.HARTLEY.FRENCH & MUDD, LLC**
David L. Amell, Esq. (State Bar No. 227207)
Tyler S. Summers, Esq. (State Bar No. 331515)
6101 W. Centinela Avenue, Suite 340
Culver City, CA 90230
Telephone: (800) 358-5922
Facsimile: (314) 241-4838
damell@mrhfmlaw.com
tsummers@mrhfmlaw.com

Attorneys for Plaintiffs

**Electronically FILED by Superior Court of California, County of Los Angeles 8/04/2023 12:59 PM David W. Slayton, Executive Officer/Clerk of Court, By J. Nunez, Deputy Clerk**

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES - COURT OF UNLIMITED JURISDICTION

MICHAEL N. HERLIHY and ANN HERLIHY,

Plaintiffs,

vs.

AUTO PARTS WAREHOUSE, INC.; CALAVERAS ASBESTOS, LTD.; CERTAINTEED CORPORATION; GENUINE PARTS COMPANY; HONEYWELL INTERNATIONAL, INC., f/k/a ALLIED SIGNAL, INC., individually and as successor-in-interest to the BENDIX CORPORATION, BENDIX AVIATION CORP., and THE SIGNAL COMPANIES, INC., f/k/a SIGNAL OIL & GAS COMPANY; PARKER HANNIFIN CORPORATION as Successor-In-Interest to EIS BRAKES; PNEUMO ABEX LLC, Individually and as Successor-By-Merger to PNEUMO ABEX CORPORATION, Successor-In-Interest to ABEX CORPORATION f/k/a AMERICAN BRAKE SHOE COMPANY, f/k/a AMERICAN BRAKE SHOE AND FOUNDRY COMPANY including the AMERICAN BRAKEBLOK DIVISION, Successor-By-Merger to the AMERICAN BRAKE SHOE AND FOUNDRY COMPANY and THE AMERICAN BRAKEBLOK CORPORATION, f/k/a THE

Case No.: 23STCV18584

**COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM – ASBESTOS**

AMERICAN BRAKE MATERIALS CORPORATION;
STANDARD MOTOR PRODUCTS, INC.;
WORLDWIDE AUTO PARTS, Individually and as Successor-in-Interest to UNITED SYATT AMERICA CORPORATION as Successor and dba BROADWAY AUTO PARTS;
and DOES 1-100,

Defendants.

## GENERAL ALLEGATIONS

COME NOW, Plaintiffs MICHAEL N. HERLIHY and ANN HERLIHY (hereinafter "Plaintiffs"), and complain and allege as follows:

1. Plaintiff MICHAEL N. HERLIHY (hereinafter "Plaintiff") has been diagnosed with mesothelioma.

2. Plaintiffs were married on February 15, 1984.

3. As used herein, the term "asbestos" collectively refers to the mineral asbestos in any type or form, including but not limited to chrysotile, amosite, tremolite, actinolite, anthophyllite and/or crocidolite, as well as the asbestiform varieties thereof.

4. As used herein, the term "asbestos-containing products" collectively means asbestos and products incorporating any amount of asbestos, whether added as a component and/or present as a contaminant in any manner.

5. Prior to his diagnosis, Plaintiff was exposed to asbestos fibers by using and handling asbestos fibers and products incorporating asbestos as a component, and being in the presence of others using and handling asbestos fibers and products incorporating asbestos as a component, as alleged herein.

6. Plaintiff's cumulative exposure to asbestos, as a result of acts and omissions of defendants, their "alternate entities", and each of them, and the defective products of defendants, their "alternate entities", and each of them as hereinafter alleged, individually and together, were a substantial factor in increasing Plaintiff's risk of mesothelioma and other related injuries, and therefore a legal cause of Plaintiff's injuries and damages as set forth herein.

7. Plaintiff was not aware at the time of exposure that asbestos presented any risk of injury and/or disease in human beings, and particularly was not aware that exposure to asbestos presented a risk of incurable, fatal cancer in human beings.

8. Plaintiff's claims are timely filed and are not barred by any applicable statute of limitations or statute of repose.

9. Each of the herein named defendants is liable for its own tortious conduct and/or the tortious conduct of each and every "alternate entity", whether or not said entity is specifically named herein. Defendants, and each of them, including but not limited to the following defendants, are liable for the acts of their "alternate entity," and each of them, including that there has been a corporate name change, defendant is the successor by merger or successor by other acquisition resulting in a virtual destruction of Plaintiff's remedy against each such "alternate entity"; defendants, and each of them, have acquired the liabilities, assets, product line, and/or a portion thereof, of each such "alternate entity"; such "alternate entity"; defendants, and each of them, caused the destruction of Plaintiff's remedies against each such "alternate entity"; each such defendant has the ability to assume the risk-spreading role of each such "alternate entity"; and that each such defendant enjoys the goodwill originally attached to each such "alternate entity." Plaintiffs are aware of the following specific named "alternate entities" as to certain defendants, but do not contend this is a fully inclusive or exhaustive list of all "alternate entities" of defendants herein:

| DEFENDANT | ALTERNATE ENTITIES |
|---|---|
| HONEYWELL INTERNATIONAL, INC. | ALLIED SIGNAL, INC.<br>BENDIX CORPORATION<br>BENDIX AVIATION CORP.<br>THE SIGNAL COMPANIES, INC.<br>SIGNAL OIL & GAS COMPANY |
| PARKER HANNIFIN CORPORATION | EIS BRAKES |

| | |
|---|---|
| PNEUMO ABEX LLC | PNEUMO ABEX CORPORATION<br><br>ABEX CORPORATION<br><br>AMERICAN BRAKE SHOE COMPANY<br><br>AMERICAN BRAKE SHOE AND FOUNDRY COMPANY<br><br>AMERICAN BRAKEBLOK DIVISION<br><br>AMERICAN BRAKE SHOE AND FOUNDRY COMPANY<br><br>THE AMERICAN BRAKEBLOK CORPORATION<br><br>THE AMERICAN BRAKE MATERIALS CORPORATION |
| WORLDWIDE AUTO PARTS | UNITED SYATT AMERICA CORPORATION<br><br>BROADWAY AUTO PARTS |

10. Each defendant, whether explicitly named herein or a DOE defendant, and each defendant's alternate entities, are referred to collectively henceforth as "Defendants".

11. Plaintiffs are informed and believe, and therefore allege, that at all times herein mentioned, Defendants were and are corporations, partnerships, unincorporated associations, sole proprietorships and/or other business entities organized and existing under and by virtue of the laws of the State of California, or the laws of some other state or foreign jurisdiction; that at all relevant times, Defendants were and are authorized to do business in the State of California; that Defendants have minimum contacts with the State of California, including through placing their products in the stream of commerce in the State of California, and regularly conducting business in the State of California, such that Defendants are subject to the jurisdiction of the State of California.

12. Plaintiffs are informed and believe, and therefore allege, that one or more Defendants reside in Los Angeles County in the State of California, and that some of the

exposure giving rise to Plaintiffs claims occurred in Los Angeles County, such that venue is proper in Los Angeles County.

13. Plaintiffs are informed and believe, and thereon allege, that progressive lung disease, asbestosis, pleural plaques, lung cancer, mesothelioma and other serious diseases are caused by inhalation of asbestos fibers, without perceptible trauma on exposure, and that said diseases result from exposure to asbestos over a period of time.

14. Plaintiffs are informed and believe, and therefore allege, that Defendants exposed Plaintiff to the same hazardous product, namely asbestos.

15. As a direct and proximate result of Defendants' conduct, Plaintiff was exposed to respirable asbestos, which he inhaled and which thereby entered his body, and which caused him to suffer the severe and permanent harm set forth herein.

16. As a direct and proximate result of the conduct as hereinafter alleged, Plaintiff suffered permanent injuries, including, but not limited to mesothelioma, and the mental, physical and emotional distress attendant thereto, all to Plaintiffs' incurred general damages in a sum in excess of $75,000.00.

17. As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiffs have paid and/or incurred liability for medical costs, including, but not limited to, the costs of physicians, surgeons, nurses, hospital care, medicine, hospices, medical imaging, palliative care and other medical treatment, the true and exact amount thereof being unknown to Plaintiffs at this time.

18. As a further direct and proximate result of Defendants' conduct as hereinafter alleged, Plaintiff has incurred, and will incur, loss of the ability to perform household services, loss of income, a diminishment of earning potential, and other pecuniary losses, the full nature and extent of which are not yet known to Plaintiffs.

///

///

///

**FIRST CAUSE OF ACTION**
**(Negligence)**

**PLAINTIFFS COMPLAIN OF DEFENDANTS ON EXHIBIT "B", AND DOES 1-50, AND EACH OF THEM, FOR A CAUSE OF ACTION FOR NEGLIGENCE, AND ALLEGE AS FOLLOWS:**

19. Plaintiffs incorporate by reference each and every allegation of the General Allegations and of each cause of action set forth previously herein.

20. At all relevant times, Defendants were engaged in the business of placing asbestos-containing products into the stream of commerce, including by mining, milling, refining, manufacturing, fabricating, designing, modifying, labeling, assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting, servicing, installing, contracting for installation, repairing, marketing, warranting, re-branding, manufacturing for others, packaging, and/or advertising said products.

21. At all relevant times, Defendants negligently and carelessly placed asbestos-containing products into the stream of commerce as set forth above, which caused personal injuries and damages to users and consumers of said products, and persons in proximity to users and consumers of said asbestos-containing products, including Plaintiff (collectively, "exposed persons") when said asbestos-containing products were used and/or misused in a manner that was reasonably foreseeable, thereby rendering said products unsafe and dangerous for use.

22. At all relevant times, Defendants negligently and carelessly researched, designed, modified, tested and/or failed to test asbestos-containing products, which caused personal injuries and damages to exposed persons when used and/or misused in a manner that was reasonably foreseeable, such that said products were unsafe and dangerous for use by exposed persons.

23. At all relevant times, Defendants and their employees, contractors, subcontractors and/or agents, in the performance of their work, negligently and carelessly used asbestos-containing products in proximity to exposed persons, including Plaintiff, such that these persons were exposed to respirable asbestos.

24. At all relevant times, Defendants negligently and carelessly failed to warn and/or inadequately warned of the health hazards of these asbestos-containing products, and failed to provide adequate use instructions or other information for eliminating the health risks inherent in their use, in that asbestos-containing products caused personal injuries to exposed persons while being used and/or misused in a manner that was reasonably foreseeable and/or actually foreseen by Defendants, such that said products were unsafe and dangerous for use by exposed persons.

25. At all relevant times, Defendants owed a duty to Plaintiff and other foreseeably affected persons to exercise due care in the pursuance of the activities mentioned above, and Defendants breached this duty of due care.

26. Defendants knew, or should have known, and intended, that asbestos-containing products would be transported by truck, rail, ship and other common carriers, and knew, or should have known, that in the shipping process the products would break, crumble, crack, shed or be otherwise damaged, resulting in the release of airborne asbestos fibers in the proximity of Plaintiff and other exposed persons, who would then be exposed to, and inhale, said respirable fibers.

27. Defendants knew, or should have known, and intended, that asbestos shipped in bags made of permeable materials such as jute or burlap, or breakable materials such as paper or plastic, would be transported by truck, rail, ship and other common carriers, and that as a result of such transportation, the bags would leak, tear, rip, split open, break, and otherwise cause asbestos to be released from the bags into the compartment in which they were transported and the surrounding air, thereby exposing exposed persons to these respirable fibers.

28. Defendants knew, or should have known, and intended that the process of normal, intended, and/or foreseeable use and/or misuse of these asbestos-containing products would result in the release of airborne asbestos fibers in the proximity of exposed persons, who would then be exposed to and inhale said asbestos fibers.

///

///

29. At all times herein relevant, Defendants were aware that asbestos-containing products were defective and dangerous, but nonetheless failed to take reasonable precautions, such as providing adequate warnings and/or other information regarding the hazards of said products to known or foreseeable exposed persons, including Plaintiff.

30. At all times herein, Defendants failed to recall asbestos-containing products that had been placed in the stream of commerce, and/or to retrofit asbestos-containing products so as to eliminate the risk of exposure to asbestos from said products. A reasonable manufacturer, distributor, marketer, supplier and/or seller of asbestos-containing products would, under the same or similar circumstances, have warned and/or adequately warned of the hazards associated with their use, so that persons in possession of, or exposed to, said asbestos fibers could cease their use, abate any asbestos-containing materials present, and otherwise act to protect themselves from harm. A reasonable manufacturer, distributor, supplier, marketer and/or seller of asbestos fibers would also, under the same or similar circumstances, have recalled these products from the market, and/or retrofitted said products in order to make them safe.

31. Plaintiff suffers from injury and disease, including malignant mesothelioma, as a result of said exposure to asbestos-containing products as set forth herein. Plaintiff was not aware at the time of this exposure that Defendants' asbestos-containing products presented any risk of injury and/or disease to Plaintiff from work with and around these products.

32. Defendants' conduct and Defendants' placing of defective products into the stream of commerce, as set forth herein, were a direct and proximate cause of Plaintiff's injuries and damages.

33. Furthermore, the conduct of Defendants in continuing to market and sell products which they knew were dangerous to human health, without adequate warnings or proper use instructions, was done with reckless and conscious disregard for, and indifference to, the safety and health of Plaintiff and other exposed persons.

///

///

34. Defendants acted with reckless disregard for the safety of Plaintiff and other exposed persons who came in contact with Defendants' asbestos-containing products, in that Defendants knew or should have known that there was a substantial risk of injury and death resulting from exposure to asbestos, as set forth above, and that these risks included asbestosis, pleural plaques, lung cancer and mesothelioma.

35. On or before 1930, and thereafter, Defendants, who as a matter of law are held to the knowledge of an expert, knew or should have known of the hazards of exposure to asbestos, by way of medical, scientific and industrial literature, including but not limited to literature available to organizations of which Defendants and their agents, officers, directors, managing agents and/or employees were members.

36. Defendants were aware that members of the general public and other exposed persons, including Plaintiff, would assume, and in fact did assume, that exposure to asbestos-containing products was safe, when in fact said exposure was and is extremely hazardous.

37. Defendants' conduct was motivated by Defendants' financial interests and was conducted for Defendants' own benefit and profit. In continuing to place asbestos-containing products in the stream of commerce in furtherance of their financial interest and for their own benefit, Defendants consciously disregarded the safety of exposed persons, including Plaintiff, and in fact were consciously willing and intended to permit asbestos to cause injury to exposed persons, including Plaintiff.

38. In furtherance of their financial interests and for their own benefit, Defendants induced exposed persons to purchase, select and work with, and in proximity to, their asbestos-containing products, causing these persons to become exposed to asbestos.

39. Defendants are liable for the fraudulent, oppressive, and malicious acts of their alternate entities, and each of them, and each Defendant's officers, directors and managing agents participated in, authorized, expressly and impliedly ratified, and had full knowledge of, and/or should have known of, the acts and omissions of Defendants, as set forth herein.

40. Defendants' herein-described conduct was and is willful, malicious, fraudulent, outrageous and done in reckless and conscious disregard and indifference to the safety and health of exposed persons, including Plaintiff. Plaintiffs, for the sake of example and by way of punishing said Defendants, seek punitive damages according to proof.

WHEREFORE, Plaintiffs pray judgment against Defendants.

## SECOND CAUSE OF ACTION
**(Strict Liability)**

**PLAINTIFFS COMPLAIN OF DEFENDANTS ON EXHIBIT "B", AND DOES 1-50, AND EACH OF THEM, FOR A SECOND CAUSE OF ACTION FOR STRICT LIABILITY, AND ALLEGE AS FOLLOWS:**

41. Plaintiffs incorporate by reference each and every allegation of the General Allegations and of each cause of action set forth previously herein.

42. Defendants marketed, manufactured, sold, supplied, distributed, rebranded, relabeled, and otherwise placed asbestos-containing products into the stream of commerce.

43. Certain Defendants' asbestos-containing products contained a manufacturing defect when they left Defendants' possession. Specifically, Defendants' asbestos-containing talc products were defective in that they, as manufactured, did not conform to Defendants' design or specifications by virtue of their asbestos content; such products were unsafe for their intended purpose as asbestos was a dangerous substance, capable of causing and in fact did cause serious bodily injury and harm to exposed persons, including Plaintiff.

44. Defendants' asbestos-containing products were also defective and unsafe for their intended purpose, in that they did not perform as safely as expected by an ordinary consumer when used or misused in a reasonably foreseeable or intended manner, as asbestos-containing products were capable of causing and in fact did cause serious bodily injury and harm to exposed persons, including Plaintiff.

45. These defects in Defendants' asbestos-containing products existed and were present at the time the products left Defendants' possession. These asbestos-containing products were intended to reach the ultimate consumer in the same condition as they left Defendants'

possession, custody and/or control. These asbestos-containing products did, in fact, cause severe injury and bodily harm to exposed persons, including Plaintiff, while being used and/or misused in a reasonably foreseeable manner, thereby rendering them defective, unsafe and dangerous for use.

46. The defects in the asbestos-containing products placed in the stream of commerce by Defendants were a substantial factor in increasing Plaintiff's risk of developing an asbestos-related disease, including mesothelioma, which he did in fact develop, and thus in causing the injuries and damages sustained by Plaintiffs.

47. Plaintiff's use and/or misuse, and the use and/or misuse by others in his proximity, of said asbestos-containing products occurred in a manner that was reasonably foreseeable to Defendants.

48. Asbestos-containing products posed risks to human health that were known and/or knowable in light of the scientific and medical knowledge that was generally accepted in the scientific and medical communities at the time Defendants placed said products into the stream of commerce.

49. The potential risks of asbestos-containing products presented a substantial danger to human health when used and/or misused in a way intended by, and/or reasonably foreseeable to, Defendants.

50. Defendants knew and intended that asbestos-containing products would be used by the purchaser or user without inspection for defects therein or in any of their component parts, and without knowledge of the hazards involved in such use.

51. Defendants whose asbestos-containing products reached exposed persons by way of an intermediary, such as a supplier or manufacturer of a finished product, did not reasonably rely on such intermediaries to convey adequate warnings to others regarding the hazards of asbestos generally or of Defendants' asbestos-containing products specifically.

///

///

52. Exposed persons, including Plaintiff, did not know of the substantial danger of using asbestos-containing products, and did not have the same or similar access to medical, industrial and scientific sources of such knowledge as were actually and/or constructively available to Defendants.

53. Said dangers were not readily recognizable by Plaintiff or other exposed persons. Defendants failed to warn, adequately warn, or instruct of the potential hazards of said asbestos-containing products, and these acts and/or omissions were a substantial factor in causing harm to Plaintiff as set forth herein.

54. Plaintiff was not negligent in any manner, including in Plaintiff's use or alleged modification or misuse of asbestos-containing products, and negligence by Plaintiff was not a substantial factor in causing or contributing to Plaintiffs' injuries or damages.

55. Defendants' herein-described conduct was and is willful, malicious, fraudulent, outrageous and done in reckless and conscious disregard and indifference to the safety and health of exposed persons, including Plaintiff. Plaintiffs, for the sake of example and by way of punishing said Defendants, seek punitive damages according to proof.

WHEREFORE, Plaintiffs pray judgment against Defendants.

## THIRD CAUSE OF ACTION
## (Negligent Misrepresentation)

**PLAINTIFFS COMPLAIN OF DEFENDANTS ON EXHIBIT "B", AND DOES 1-50 AND EACH OF THEM, FOR A THIRD CAUSE OF ACTION FOR NEGLIGENT MISREPRESENTATION, AND ALLEGE AS FOLLOWS:**

56. Plaintiffs incorporate by reference each and every allegation of the General Allegations and of each cause of action set forth previously herein.

57. Defendants, through words and conduct, represented that asbestos generally and asbestos-containing products marketed, sold, supplied, distributed, disturbed, installed removed, and/or placed in the stream of commerce by Defendants were of merchantable quality and safe for their intended and foreseeable use.

///

58. Defendants' representations were made to members of the general public, the purchasers and users of said products, and other exposed persons including Plaintiff, intending or reasonably expecting that it would heard by Plaintiff and others similarly situated.

59. Defendants' representations were not true, because asbestos-containing products were not safe for their intended use, nor were they of merchantable quality as represented by Defendants, in that asbestos has very dangerous properties and defects because it causes harm and disease in human beings, including but not limited to asbestosis, lung cancer, pleural plaques, and mesothelioma.

60. Defendants had no reasonable grounds for believing these representations were true when Defendants made them.

61. Defendants intended that members of the general public, the purchasers and users of said products, and other exposed persons including Plaintiff would rely on these representations.

62. As intended by Defendants, Plaintiff and other similarly situated exposed persons reasonably relied on Defendants' representations of Defendants, as such representations substantially influenced Plaintiff and others to purchase, use, recommend, supply, specify and/or work in the presence of said products, such that Plaintiff and others similarly situated were injured and damaged as a proximate result.

63. As a direct and proximate result of his reliance on Defendants' representations, which were a substantial factor in causing harm, Plaintiff sustained injuries and damages as set forth herein.

64. Defendants' herein-described conduct was and is willful, malicious, fraudulent, outrageous and in reckless and conscious disregard and indifference to the safety and health of exposed persons, including Plaintiff. Plaintiffs, for the sake of example and by way of punishing said Defendants, seek punitive damages according to proof.

WHEREFORE, Plaintiffs pray judgment against Defendants.

///

## FOURTH CAUSE OF ACTION
**(Fraud by Nondisclosure)**

**PLAINTIFFS COMPLAIN OF DEFENDANTS ON EXHIBIT "B", AND DOES 1-50 AND EACH OF THEM, FOR A FOURTH CAUSE OF ACTION FOR FRAUD BY NONDISCLOSURE, AND ALLEGE AS FOLLOWS:**

65. Plaintiffs incorporate by reference each and every allegation of the General Allegations and of each cause of action set forth previously herein.

66. Defendants sold their products directly to Plaintiff thereby creating a direct transactional relationship between Defendants and Plaintiff giving rise to a duty to disclose. Defendants directly profited from the sale of their products to Plaintiff.

67. Furthermore, Defendants directly advertised their products to Plaintiff and others similarly situated. Plaintiff therefore belonged to a class of persons to whom Defendants owed a duty to disclose.

68. Defendants intentionally failed to disclose to Plaintiff and others similarly situated the fact that asbestos generally and asbestos-containing products marketed, sold, supplied, distributed, disturbed, installed removed, and/or placed in the stream of commerce by Defendants were not safe for their intended use, nor were they of merchantable quality, in that asbestos, and thus any product containing asbestos, has very dangerous properties and defects because asbestos fibers cause serious harm and disease in human beings, including but not limited to asbestosis, lung cancer, pleural plaques, and mesothelioma.

69. Defendants intentionally failed to disclose certain facts which were known exclusively to them, and which Plaintiff could not have discovered, as Defendants had knowledge of the composition and hazardous nature of their asbestos-containing products, including the existence of and amount of asbestos present in said products and the propensity of those products to release asbestos fibers into the air during their ordinary and intended use.

70. Plaintiff and others similarly situated did not know that that asbestos, and thus any product containing asbestos, has very dangerous properties and defects because it causes serious

harm and disease in human beings, including but not limited to asbestosis, lung cancer, pleural plaques, and mesothelioma.

71. Defendants intended to deceive Plaintiff and others similarly situated by concealing these facts as set forth herein.

72. Plaintiff relied upon Defendants' intentional nondisclosure to Plaintiff's detriment. Had Defendants not concealed information about the hazards associated with asbestos and Defendants' asbestos-containing products, Plaintiff reasonably would have behaved differently, which may have included behavior such as using different safety and industrial hygiene measures or purchasing products with less or no asbestos content.

73. Defendants' fraudulent nondisclosure was a substantial factor in causing harm to Plaintiff, and as a result of Defendants' concealment of facts known to them, Plaintiff sustained injuries and damages as set forth herein.

74. Defendants' herein-described conduct was and is willful, malicious, fraudulent, outrageous and in reckless and conscious disregard and indifference to the safety and health of exposed persons, including Plaintiff. Plaintiffs, for the sake of example and by way of punishing said Defendants, seek punitive damages according to proof.

WHEREFORE, Plaintiffs pray judgment against Defendants.

**FIFTH CAUSE OF ACTION**
**(Vicarious Liability Based on Respondeat Superior)**

**PLAINTIFFS COMPLAIN OF AGAINST DEFENDANTS ON EXHIBIT "C" AND DOES 51-100, AND EACH OF THEM, FOR A FIFTH CAUSE OF ACTION FOR VICARIOUS LIABILITY BASED ON RESPONDEAT SUPERIOR, AND ALLEGE AS FOLLOWS:**

75. Plaintiffs incorporate by reference each and every allegation of the General Allegations and of each cause of action set forth previously herein.

76. At all relevant times, Defendants retained, employed and/or hired workers, contractors and/or other personnel (hereinafter collectively "employees") in areas where Defendants owned, maintained, controlled, managed and/or conducted business activities where Plaintiff worked and/or was otherwise present.

77. At all relevant times, Defendants' employees encountered asbestos-containing products during the course and scope of their employment, and during their regular work activities negligently disturbed said products, causing the release of respirable asbestos fibers, to which Plaintiff was exposed.

78. These employees handling and disturbing asbestos-containing products in Plaintiff's vicinity were Defendants' agents, and at all times herein relevant, were subject to Defendants' control with respect to their acts, labor, and work involving (a) the removal, transport, installation, cleaning, handling, and maintenance of asbestos-containing products, including debris and dust generated from work with asbestos-containing products, and (b) the implementation of safety policies and procedures regarding their work with and asbestos-containing products.

79. Defendants controlled both the means and manner of performance of the work of their employees as described herein.

80. Defendants' employees received monetary compensation from Defendants in exchange for the work performed as described herein, and these employees performed the work as described herein in the transaction and furtherance of Defendants' business.

81. Respirable asbestos fibers were released during Defendants' employees' use, handling, breaking, and/or otherwise disturbing asbestos-containing products.

82. Defendants' employees' use, handling, manipulation and/or disturbing of asbestos-containing products, as required by their employment and occurring during the course and scope of their employment, did, in fact, cause personal injuries, including mesothelioma and other lung damage to exposed persons, including Plaintiff.

83. Defendants' employees were negligent in that they failed to isolate their work with asbestos-containing products and/or to suppress asbestos fibers from being released into the air and surrounding areas; failed to take appropriate steps to learn how to prevent exposure to asbestos-containing products; failed to warn and/or adequately warn Plaintiff that he was being exposed to asbestos-containing products; and failed to adequately warn Plaintiff of the harm

associated with his exposure to asbestos-containing products and/or provide him with protection to prevent his contamination with or inhalation of asbestos.

84. At all relevant times, Defendants had extensive knowledge and experience in the field of work to be performed, and therefore knew or should have known of the risks created by the work of its employees as set forth herein.

85. Defendants' employees knew or should have known that failure to take such steps would result in exposure to bystanders, including Plaintiff and others similarly situated.

86. Defendants' employees owed Plaintiff, and other similarly situated persons, a duty to exercise due care and diligence in their activities, so as to avoid causing harm to Plaintiff and others similarly situated.

87. Defendants' employees breached this duty of care as herein described.

88. At all times herein mentioned, Plaintiff was unaware of the dangerous conditions and unreasonable risk of personal injury created by Defendants' employees' use of and work with and around asbestos-containing products.

89. As a direct result of Defendants' conduct, Plaintiff was exposed to asbestos-containing products, causing severe and permanent injury and the damages and injuries to Plaintiff as complained of herein.

90. Based on the foregoing, Defendants, as the employers of said employees, are vicariously liable under the doctrine of respondeat superior for all negligent acts and omissions committed by their employees in the course and scope of their work that caused harm to Plaintiff.

91. Defendants' herein-described conduct was and is willful, malicious, fraudulent, outrageous and in reckless and conscious disregard and indifference to the safety and health of exposed persons, including Plaintiff. Plaintiffs, for the sake of example and by way of punishing said Defendants, seek punitive damages according to proof.

WHEREFORE, Plaintiffs pray judgment against Defendants.

///

**SIXTH CAUSE OF ACTION**
**(Premise Owner/Contractor Liability)**

**PLAINTIFFS COMPLAIN OF DEFENDANTS ON EXHIBIT "C", AND DOES 51-100, AND EACH OF THEM, FOR A SIXTH CAUSE OF ACTION FOR PREMISES OWNER/CONTRACTOR LIABILITY, AND ALLEGE AS FOLLOWS:**

92. Plaintiffs incorporate by reference each and every allegation of the General Allegations and of each cause of action set forth previously herein.

93. Plaintiff was exposed to asbestos-containing products in a manner that was reasonably foreseeable to Defendants.

94. At all times herein mentioned, Defendants caused asbestos-containing products to be constructed, installed, maintained, used, replaced, repaired and/or removed on the respective premises owned, leased, maintained, managed and/or controlled by Defendants.

95. At all times mentioned herein, Defendants owned, leased, maintained, managed, and/or otherwise controlled the premises where Plaintiff was present.

96. At all relevant times and places, Defendants caused asbestos-containing products, to be constructed, installed, maintained, used, supplied, replaced, repaired, disturbed and/or removed on each of the aforesaid respective premises, by their own workers and/or by various contractors and/or subcontractors, causing the release of dangerous quantities of respirable asbestos fibers, thereby creating hazardous and unsafe conditions such that Plaintiff and similarly situated persons were exposed to respirable asbestos fibers while present at said premises.

97. At all times mentioned herein, Defendants knew or, in the exercise of ordinary and reasonable care, should have known, that the foregoing conditions and activities created hazardous and unsafe conditions which posed an unreasonable risk of harm to Plaintiff and persons present on each of the aforesaid respective premises.

98. At all times relevant herein, Plaintiff entered and/or occupied these premises as intended and for the benefit and advantage of Defendants and at their request and invitation. In so doing, Plaintiff was exposed to dangerous quantities of respirable asbestos fibers released through activities managed, maintained, initiated, created, controlled and/or caused by Defendants.

99. Plaintiff at all relevant times was unaware of the hazardous conditions or the risk of personal injury created by the aforesaid presence and use of asbestos-containing products on said premises.

100. At all relevant times, Defendants remained in control of the premises where Plaintiff worked or was otherwise present.

101. At all relevant times, Defendants owed to Plaintiff and others similarly situated a duty to exercise ordinary care in the management of such premises in order to avoid creating an unreasonable risk of harm, and to avoid causing injury, to Plaintiff and others similarly situated.

102. At all relevant times, Defendants knew, or in the exercise of ordinary and reasonable care should have known, that the premises in their control would be used without knowledge of, or inspection for, defects or dangerous conditions, and that the persons present and using said premises such as Plaintiff would not be aware of the aforesaid hazardous conditions to which they were exposed on the premises.

103. At all relevant times, Defendants negligently failed to abate, correct or warn Plaintiff of the existence of these dangerous conditions and hazards on the premises.

104. Defendants caused asbestos-containing products to be constructed, installed, maintained, used, replaced, repaired, disturbed and/or removed on these premises, by their own workers and/or by employing various contractors, and caused the release of dangerous quantities of respirable asbestos fibers on the premises, which Plaintiff inhaled, thereby causing him injury.

105. At all relevant times, Defendants should have recognized that the work of said contractors with asbestos-containing products would result in the release of asbestos fibers into the air, creating dangerous conditions which posed a substantial risk of harm to Plaintiff and others similarly situated unless appropriate precautions were taken.

106. Defendants knew or should have known that the work performed on their premises required appropriate industrial hygiene controls to be implemented to avoid creating a risk of harm from asbestos-containing products, and were aware or should have been aware that such procedures were not taken.

107. The negligent conduct of the contractors employed by Defendants includes, but is not limited to:

a) Failure to warn of the presence and hazardous nature of asbestos-containing products;

b) Failure to use appropriate industrial hygiene controls to remove, reduce and/or eliminate the release of asbestos-containing products;

c) Failure to provide adequate personal protection from exposure and inhalation of respirable asbestos fibers, including but not limited to the use of breathing protection, work clothing, disposable coveralls, change rooms, and/or showers;

d) Failure to inspect, monitor and/or test the air on the premises for the presence of asbestos and to determine the quantity of asbestos present;

e) Failure to provide appropriate medical monitoring for contractors, employees and others present on the premises, including Plaintiff and others similarly situated, to detect the presence of asbestos-related disease and injury.

108. At all relevant times, Defendants were subject to certain rules, ordinances, statutes, and other government regulations promulgated by the United States Government, the State of California, and others, including but not limited to the General Industry Safety Orders promulgated pursuant to California Labor Code §6400 and the California Administrative Code under the Division of Industrial Safety, Department of Industrial Relations, including but not limited to Title VIII, Group 9 (Control of Hazardous Substances), Article 81, §§4150, 4106, 4107, and 4108, and Threshold Limit Values as documented for asbestos and other toxic substances under Appendix A, Table 1 of said Safety Orders.

109. At all relevant times, Defendants were required to provide specific safeguards or precautions to prevent or reduce the inhalation of asbestos dust and other toxic fumes or substances as prescribed by Title 40 Code of Federal Regulations, Chapter 1, Part 61, et seq. -- The National Emission Standards for Hazardous Air Pollutants and under the regulations

promulgated by California regional Air Quality Management Districts as empowered by California Health and Safety Code §40.200, *et seq*.

110. Defendants violated these rules, ordinances, statutes, and other government regulations by:

a) Failing to comply with statutes, and allowing ambient levels of airborne asbestos fiber to exceed the permissible/allowable levels with regard to the aforementioned statutes;

b) Failing to segregate work involving the release of asbestos;

c) Failing to suppress asbestos using prescribed ventilation techniques;

d) Failing to suppress asbestos using prescribed "wet down" techniques;

e) Failing to warn or educate Plaintiff and others similarly situated regarding the presence and risks of asbestos-containing products on the premises;

f) Failing to provide appropriate respiratory protection devices;

g) Failing to ensure appropriate respiratory protection devices were used properly, including administering 'fit tests';

h) Failing to provide for an ongoing health screening program for those exposed to asbestos-containing products on the premises;

i) Failing to provide adequate housekeeping and clean-up of the work place;

j) Failing to properly warn of the hazards associated with asbestos-containing products as required by these statutes;

k) Failing to properly report renovation and disturbance of asbestos-containing products, as required by statutes and regulations, including but not limited to BAAQMD Regulation 11-2-401 and/or SCQAMD Rule 1403 D(1);

l) Failing to have an asbestos removal supervisor present, as required by regulation;

m) Failing to obtain approval for renovation as required by statutes; and

n) Failing to maintain records as required by statute.

111. Plaintiff was at all times unaware of the hazardous condition or the risk of personal injury created by the violation of said regulations, ordinances or statutes by Defendants.

112. At all times relevant times, Plaintiff was a member of the class of persons whose safety was intended to be protected by the regulations, statutes or ordinances described in the foregoing paragraphs.

113. At all relevant times, Defendants knew, or in the exercise of ordinary and reasonable care should have known, that Plaintiff and similarly situated persons would be lawfully present on premises under Defendants' control, without knowledge of dangerous conditions on said premises; that the persons present on said premises would not be aware of the aforesaid hazardous conditions to which they were exposed on the premises; and that such persons were unaware of the aforesaid violations of codes, regulations and statutes by Defendants.

114. As a direct and proximate result of the foregoing, Plaintiff developed an asbestos-related illness and injury, including mesothelioma, and Plaintiff has suffered damages as herein alleged.

115. At all relevant times relevant herein, Defendants negligently selected, supplied, distributed, and provided asbestos-containing products to Plaintiff for use during his regular work activities, causing him to be exposed to respirable asbestos fibers.

116. At all relevant times, Defendants selected, supplied, and distributed asbestos-containing products to their employees for use during their regular work activities, such that said employees caused the release of respirable asbestos fibers to which Plaintiff and others similarly situated were then exposed as set forth herein.

117. At all relevant times, Defendants knew or should have known that their employees, contractors, and other persons lawfully on said premises, including Plaintiff, encountered asbestos-containing products during the course and scope of their work activities.

///

///

118. At all relevant times, Defendants, knew or should have known that the asbestos-containing products encountered on its premises by persons including Plaintiff were unsafe, in that respirable asbestos fibers were released during the use, handling, breaking, or other manipulation of those asbestos-containing products, and that once released, asbestos fibers can be inhaled, causing severe risk of disease and death in human beings.

119. At all relevant times, Defendants knew, or in the exercise of reasonable diligence, should have known, that employees and other persons lawfully present, including Plaintiff, who were exposed to asbestos-containing products as set forth herein would have asbestos fibers released from these products accumulating on their clothing, shoes, hair and persons, such that absent appropriate industrial hygiene controls to prevent such contamination, Plaintiff and other similarly situated persons would unknowingly carry these asbestos fibers home from the workplace, and contaminate their homes and vehicles, such that family members and others exposed to these asbestos fibers were at risk of severe and permanent harm.

120. At all relevant times, Defendants had a duty to use due care in the selection, supply, distribution and disturbance of asbestos-containing products; to adequately instruct, train, and supervise their employees; and to implement adequate industrial hygiene controls, safety policies and procedures to protect workers, and persons encountering those workers, including Plaintiff, from suffering injury or death as a result of exposure to respirable asbestos.

121. The duties of Defendants as alleged herein exist and existed independently of their duties to maintain their premises in reasonably safe condition, free from concealed hazards.

122. Defendants negligently selected, supplied, and distributed asbestos-containing products; failed to adequately train or supervise their employees to identify asbestos-containing products; to ensure the safe handling of asbestos-containing products encountered during the course of their work activities; and to guard against inhalation of asbestos fibers by those who would come into close contact with them after they had used, disturbed, or handled, said asbestos-containing products during the course and scope of their employment.

///

123. As a direct and proximate result of Defendants' conduct, and each of them as set forth herein, Plaintiff became exposed to and inhaled respirable asbestos fibers, which were a substantial factor contributing to his risk of developing an asbestos-related disease, which he in fact developed, leading to Plaintiff's injuries and damages.

124. Defendants' herein-described conduct was and is willful, malicious, fraudulent, outrageous and in reckless and conscious disregard and indifference to the safety and health of exposed persons, including Plaintiff. Plaintiffs, for the sake of example and by way of punishing said Defendants, seek punitive damages according to proof.

WHEREFORE, Plaintiffs pray judgment against Defendants.

**SEVENTH CAUSE OF ACTION**
**(Loss of Consortium)**

**PLAINTIFF ANN HERLIHY COMPLAINS OF DEFENDANTS, AND DOES 1-100, AND EACH OF THEM, FOR A CAUSE OF ACTION FOR LOSS OF CONSORTIUM, AND ALLEGES AS FOLLOWS:**

125. Plaintiffs incorporate by reference each and every allegation of the General Allegations and of each cause of action set forth previously herein.

126. Plaintiffs were married on February 15, 1984 and at all relevant times were husband and wife.

127. Prior to his injuries as alleged, Plaintiff MICHAEL N. HERLIHY was able to, and did, fully perform the duties of a spouse. As a result of his injuries, Plaintiff MICHAEL N. HERLIHY has been and is unable to fully perform the necessary duties of a spouse and the work and service usually performed in the care, maintenance and management of the family home. As a proximate result thereof, Plaintiff ANN HERLIHY was and is deprived of the full consortium of her spouse, including the performance of duties, all to Plaintiffs' damages, in an amount presently unknown to Plaintiffs but which will be proved at time of trial.

128. As a direct and proximate result of the Defendants' acts and omissions as set forth herein, and the severe injuries caused thereby to Plaintiff MICHAEL N. HERLIHY as set forth in the complaint, Plaintiff ANN HERLIHY has suffered, and continues to suffer, loss of

consortium, including but not by way of limitation, loss of love, comfort, care, assistance, protection, society, moral support services, marital relations, companionship and affection of her said spouse, and has suffered severe mental and emotional distress and other damages as a result thereof. Plaintiff ANN HERLIHY seeks compensation only for such harm that has occurred and will occur during the period between Plaintiff MICHAEL N. HERLIHY's mesothelioma diagnosis and untimely death.

129. Defendants' herein-described conduct was and is willful, malicious, fraudulent, outrageous and done in reckless and conscious disregard and indifference to the safety and health of exposed persons, including Plaintiff MICHAEL N. HERLIHY, and resulted in Plaintiff ANN HERLIHY's loss of consortium. Plaintiffs, for the sake of example and by way of punishing said Defendants, seek punitive damages according to proof.

WHEREFORE, Plaintiffs pray judgment against Defendants.

## PRAYER FOR JUDGMENT

WHEREFORE, Plaintiff prays judgment against defendants, their "alternate entities," and each of them, in an amount to be proved at trial, as follows:

1. For Plaintiff's general damages according to proof;
2. For medical and related expenses according to proof;
3. For loss of earnings according to proof;
4. For exemplary or punitive damages according to proof;
5. For Plaintiff's cost of suit herein;
6. For damages for fraud according to proof; and

///

///

///

///

///

7. For such other and further relief as the Court may deem just and proper, including costs and prejudgment interest as provided in California Code of Civil Procedure section 998, California Code of Civil Procedure section 1032 and related provisions of law.

DATED: August 4, 2023

Maune Raichle Hartley French & Mudd LLC

By: [signature]
David L. Amell
Attorneys for Plaintiffs

# EXHIBIT A

From a young age, Plaintiff Michael N. Herlihy ("Plaintiff" or "Mr. Herlihy") performed automotive repair work, including brake work, on his personal vehicles and the vehicles of friends and family all within the state of California. Plaintiffs allege that the friction products that Mr. Herlihy worked with and around in the course of this work contained asbestos and that he was exposed to asbestos as a result.

From approximately 1984 through the 1990s, Mr. Herlihy worked for two saw sharpening shops: Ruff Saw Service and Precision Saw Sharpening. CertainTeed's Riverside asbestos-cement pipe plant was one of the saw sharpening shops' biggest customers. Mr. Herlihy routinely entered the CertainTeed plant to pick up industrial sawblades which he then cleaned and sharpened before returning them to CertainTeed. Plaintiffs allege that he was exposed to asbestos as a result of this work.

**EXHIBIT "B"**

AUTO PARTS WAREHOUSE, INC.;
CALAVERAS ASBESTOS, LTD.;
CERTAINTEED CORPORATION;
GENUINE PARTS COMPANY;
HONEYWELL INTERNATIONAL, INC., f/k/a ALLIED SIGNAL, INC., individually and as successor-in-interest to the BENDIX CORPORATION, BENDIX AVIATION CORP., and THE SIGNAL COMPANIES, INC., f/k/a SIGNAL OIL & GAS COMPANY;
PARKER HANNIFIN CORPORATION as Successor-In-Interest to EIS BRAKES;
PNEUMO ABEX LLC, Individually and as Successor-By-Merger to PNEUMO ABEX CORPORATION, Successor-In-Interest to ABEX CORPORATION f/k/a AMERICAN BRAKE SHOE COMPANY, f/k/a AMERICAN BRAKE SHOE AND FOUNDRY COMPANY including the AMERICAN BRAKEBLOK DIVISION, Successor-By-Merger to the AMERICAN BRAKE SHOE AND FOUNDRY COMPANY and THE AMERICAN BRAKEBLOK CORPORATION, f/k/a THE AMERICAN BRAKE MATERIALS CORPORATION;
STANDARD MOTOR PRODUCTS, INC.;
WORLDWIDE AUTO PARTS, Individually and as Successor-in-Interest to UNITED SYATT AMERICA CORPORATION as Successor and dba BROADWAY AUTO PARTS;
and DOES 1-50.

**EXHIBIT "C"**

CERTAINTEED CORPORATION;
and DOES 51-100.

# Exhibit 6

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**Civil Division**

Central District, Spring Street Courthouse, Department 15

**23STCV18584**
**MICHAEL N. HERLIHY, et al. vs AUTO PARTS WAREHOUSE, INC., et al.**

January 26, 2024
9:00 AM

Judge: Honorable Laura A. Seigle
Judicial Assistant: K. Sandoval
Courtroom Assistant: M. Torres

CSR: None
ERM: None
Deputy Sheriff: None

APPEARANCES:

For Plaintiff(s): No Appearances

For Defendant(s): No Appearances

Other Appearance Notes: Plaintiff's counsel: David Rancilio (X); Defense counsel: Seana Azad and Owais Bari (X);

**NATURE OF PROCEEDINGS:** Order to Show Cause Re: re dismissal of Defendant Certainteed and a Trial Setting Conference (Herlihy 23STCV18584)

Matters are called for hearing.

The Order to Show Cause Re: re dismissal of Defendant Certainteed and a Trial Setting Conference (Herlihy 23STCV18584) scheduled for 01/26/2024 is 'Held' for case 23STCV18584.

The Order to show cause is held and discharged.

The Court sets the following:

Initially, in open court, the Court set the Final Status Conference for 2-13-25 and the Jury Trial date for 2-27-25 but LATER amends the dates as follows:

Final Status Conference (Herlihy 23STCV18584) is scheduled for 02/18/2025 at 09:00 AM in Department 15 at Spring Street Courthouse on case 23STCV18584.

Jury Trial (Herlihy 23STCV18584) is scheduled for 03/03/2025 at 09:00 AM in Department 15 at Spring Street Courthouse on case 23STCV18584.

Plaintiff is electronically advised to give notice to all forthwith via File & Serve.

A copy of this minute order will append to the following coordinated case under JCCP4674: 23STCV18584.

# PROOF OF SERVICE

## STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the City of Emeryville, State of California. I am over the age of 18 and not a party to the within action; my business address is: 1900 Powell Street, Suite 200, Emeryville, California 94608.

On **January 26, 2024,** I served the foregoing:

- **LAOSD MINUTE ORDER SETTING TRIAL**

and a copy of this declaration to the interested parties herein as follows:

**[ X ] BY ELECTRONIC SERVICE VIA FILE & SERVEXPRESS:**
Based on a court order or an agreement of the parties to accept electronic service, I caused the documents to be sent from e-mail address chosni@mrhfmlaw.com to the recipients designated on the Transaction Receipt located on the File & ServeXpress website.

PLEASE SEE ATTACHED SERVICE LIST

Executed on **January 26, 2024,** in Emeryville, California.

Christina Hosni

Christina Hosni

***Michael N. Herlihy, et al. v. Auto Parts Warehouse, Inc., et al.***
Los Angeles County Superior Court Case No.: 23STCV18584

**Herlihy v. Auto Parts Warehaouse, Inc., et al.**
**Los Angeles County Superior Court Case No.:**

**SERVICE LIST (via FSX)**

AUTO PARTS WAREHOUSE, INC.
Larry R. Schmadeka, Esq.
FISHERBROYLES, LLP
260 Newport Center Drive, Suite 100
Newport Beach, CA 92660
T: 949-694-5388
F: 949-694-5389
larry.schmadeka@fisherbroyles.com

David D. Messa, Esq.
FISHERBROYLES, LLP
530 Lytton Avenue, Second Floor
Palo Alto, CA 94301
T: 415-915-4415
F: 415-890-4845
david.mesa@fisherbroyles.com

CALAVERAS ASBESTOS, LTD.
Melanie L. Ameele, Esq.
Timothy C. Pieper, Esq.
FOLEY MANSFIELD
181 W. Huntington Drive , Suite 210
Monrovia, CA 91016
T: 213-283-2100
mameele@foleymansfield.com
tpieper@foleymansfield.com

GENUINE PARTS COMPANY
Frank D. Pond, Esq.
Mark K. Gittler
POND NORTH LLP
800 S. Figueroa St., Suite 970
Los Angeles, CA 90017
T: 213-617-6170
F: 213-623-3594
mgittler@pondnorth.com

HONEYWELL INTERNATIONAL, INC., f/k/a ALLIED SIGNAL, INC., individually and as successor-in-interest to the BENDIX CORPORATION, BENDIX AVIATION CORP., and THE SIGNAL COMPANIES, INC., f/k/a SIGNAL OIL & GAS COMPANY
Michael E. Sandgren, Esq.
Natalie Garcia Lashinsky
Aaron D. Costa
HUSCH BLACKWELL, LLP
355 S. Grand Ave., Suite 2850
Los Angeles, CA 90071
T: 213.337.6550
F: 213.337.6551
michael.sandgren@huschblackwell.com
natalie.lashinsky@huschblackwell.com
aaron.costa@huschblackwell.com

PARKER HANNIFIN CORPORATION as Successor-In-Interest to EIS BRAKES
Leonard M. Tavera, Esq.
SEMPER LAW GROUP, LLP
330 N. Brand Boulevard, Suite 670
Glendale, CA 91203
T:213-437-9700
F:213-596-1466
ltavera@semperlawgroup.com

**Herlihy v. Auto Parts Warehaouse, Inc., et al.**
**Los Angeles County Superior Court Case No.:**

**SERVICE LIST (via FSX)**

---

PNEUMO ABEX LLC, Individually and as Successor-By-Merger to PNEUMO ABEX CORPORATION, Successor-In-Interest to ABEX CORPORATION f/k/a AMERICAN BRAKE SHOE COMPANY, f/k/a AMERICAN BRAKE SHOE AND FOUNDRY COMPANY including the AMERICAN BRAKEBLOK DIVISION, Successor-By-Merger to the AMERICAN BRAKE SHOE AND FOUNDRY COMPANY and THE AMERICAN BRAKEBLOK CORPORATION, f/k/a THE AMERICAN BRAKE MATERIALS CORPORATION
Stephanie L. Bowlby, Esq.
Zachary H. Lodmer, Esq.
DEHAY & ELLISTON, LLP
515 South Flower Street, Suite 180
Los Angeles, CA 90071
T: 213-271-2727
F: 213-271-2730
sbowlby@dehay.com
zlodmer@dehay.com

STANDARD MOTOR PRODUCTS, INC.
Leonard M. Tavera, Esq.
SEMPER LAW GROUP, LLP
330 N. Brand Boulevard, Suite 670
Glendale, CA 91203
T:213-437-9700
F:213-596-1466
ltavera@semperlawgroup.com

WORLDWIDE AUTO PARTS, Individually and as Successor-in-Interest to UNITED SYATT AMERICA CORPORATION as Successor and dba BROADWAY AUTO PARTS
Frank D. Pond, Esq.
Michael A. Graham, Esq.
Seana Azad, Esq.
POND NORTH
800 S. Figueroa St., Suite 970
Los Angeles, CA 90017
T: 213-617-6170
F: 213-623-3594

# Exhibit 7

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

---o0o---

HOLLY ORTWEIN and RICHARD ORTWEIN,

Plaintiffs,

vs.

CERTAINTEED CORPORATION Et al.,

Defendants.

No. RG13701633

-----------------------/

VIDEOTAPED DISCOVERY DEPOSITION OF LLOYD AMBLER

Taken before JOSEPHINE CARDILLO,

Professional Court Reporter and Notary Public.

August 20, 2014

Aiken Welch Court Reporting
One Kaiser Plaza, Suite 250
Oakland, California 94612
510.451.1580/877.451.1580
Fax: 510.451.3797
www.aikenwelch.com

BY MR. SATTERLEY:
Q. Okay.
A. We were always trying to improve our systems, whether -- it could be laze, it could be a boring mill, it could be the -- the mixing -- the mixing containers up where the cement silica and asbestos are all mixed together with water; it could be any of those things.
We were always evaluating -- we were evaluating doing a better job of adding our asbestos to the mix. And, eventually, we even invented a -- developed an automatic asbestos bag opener.
EXAMINATION BY MR. SATTERLEY: Mo
ve to strike portions as nonresponsive.
BY MR. SATTERLEY:
Q. Mr. Ambler, when you were first hired in and was told about asbestos hazards, were you told about Crocidolite asbestosis?
A. What about it?
Q. That that was one of the ingredients of the CertainTeed pipe.
A. Oh, yes.
Q. And were you told about Chrysotile asbestosis?

A. Yes, sir.
Q. And when you were -- and in the 1967 time frame, did individuals educate you that the Crocidolite was considered to be more toxic than the Chrysotile?
A. I was told that there was a lot of talk about that, that the Crocidolite fiber was more toxic than the Chrysotile, right.
Q. Anywhere in the plants in the late 1960s or '70s, did you see any notifications about Crocidolite being more dangerous or more toxic than Chrysotile?
A. Yeah, I don't remember seeing any notification of that. But everybody knew it, 'cause it was talked about.
EXAMINATION BY MR. SATTERLEY: Mo ve to strike portion that is nonresponsive.
BY MR. SATTERLEY:
Q. You don't read the mind of everybody, do you?
MS. GEISE: I'm going to object to the form; that's argumentative.
THE WITNESS: What do you mean, I don't read the -- I don't read the mind of

# Exhibit 8

2660401

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CLARENCE JOHNSON, et ux, et al., | ) | C.A. No. 78-464 |
| | ) | 78-1027 |
| Plaintiffs, | ) | 78-1117 |
| | ) | 78-1041 |
| v. | ) | 78-2023 |
| | ) | 78-1987 |
| TURNER & NEWALL, LTD., et al., | ) | 78-3046 |
| | ) | 79-1523 |
| Defendants. | ) | 79-4337 |
| | | 79-4338 |
| | | 79-4341 |
| | | 79-4339 |
| | | 79-4340 |
| | | 79-4342 |
| | | 79-2715 |
| | | 78-4172 |
| | | 79-3690 |
| | | 79-3770 |

Monday,
June 30, 1980
Washington, D. C.

Deposition of:

LEON DAVID HOROWITZ

called for examination by counsel for Defendant Cassiar Asbestos Corporation, Limited, pursuant to notice, at the offices of Shea & Gardner, 1800 Massachusetts Avenue, N. W., Washington, D. C., before Gerald Nevitt, Notary Public in and for the District of Columbia, commencing at 10:55 a.m.

OFFICIAL REPORTER COMPANY
12401 Palermo Drive
SILVER SPRING, MD. 20904
Tel. 572-4324

Appearances:

For the Plaintiffs:

HAMBURG RUBIN MULLIN & MAXWELL
BY: EDWARD RUBIN, ESQ.

For the Defendant Turner & Newall, Ltd:

JOHN P. MASON, ESQ.

For the Defendant CertainTeed Corporation:

SWARTZ CAMPBELL & DETWEILER
BY: G. DANIEL BRUCH, JR., ESQ.

CURTIS M. PONTZ, ESQ.

LaBRUM & DOAK
BY: JAMES D. HILLY, ESQ.

For the Defendant Cassiar Asbestos Corp., Ltd:

SHEA & GARDNER
BY: DAVID BOOTH BEERS, ESQ.,
ELIZABETH S. GIBSON, ESQ.

For the Defendant Lake Asbestos of Quebec, Ltd:

PORZIO & BROMBERG
BY: MYRON J. BROMBERG, ESQ.

For the Defendant Johns-Manville:

MARSHALL DENNEHEY & WARNER
BY: THOMAS C. DELORENZO, ESQ.,
ANNE M. KENNEY, ESQ.

For the Defendant Asbestos Corporation, Ltd:

OMINSKY JOSEPH & WELSH
BY: EDWARD B. JOSEPH, ESQ.

Appearances: (Cont'd)

For the Defendant GAF:

MESIROV GELMAN JAFFE & CRAMER
BY: EDWARD GREER, ESQ.

For the Defendant Southern Asbestos:

WHITE & WILLIAMS
BY: ANDREA L. BOWMAN, ESQ.

For the Defendant Bell Asbestos Mines, Ltd:

POST & SCHELL
BY: F. JAMES GALLO, ESQ.

For the Defendant Turner & Newall, Ltd:

SULLIVAN & CROMWELL
BY: RICHARD J. RAWSON, ESQ.

For the Defendant Carey Canadian Mines, Ltd:

HARVEY PENNINGTON
BY: JOEL D. GUSKY, ESQ.

For the Defendant United States of America:

WILLIAM R. HERMAN, ESQ.
Civil Division, U. S. Department of Justice

\- - -

# I N D E X


| DEPONENT | EXAMINATION BY | PAGE |
|---|---|---|
| Leon David Horowitz | Mr. Beers | 5 |
| | Mr. Herman | 119 |
| | Mr. Gallo | 125 |
| | Mr. Bromberg | 138 |
| | Mr. Beers | 172 |
| | Mr. Rubin | 176 |
| | Mr. Hilly | 226 |
| | Mr. Bruch | 235 |
| | Mr. Hilly | 241 |
| | Mr. Pontz | 242 |
| | Ms. Gibson | 242 |
| | Mr. Bromberg | 243 |
| | Mr. Bruch | 244 |
| | Mr. Gallo | 245 |

| HOROWITZ DEPOSITION EXHIBITS | PAGE |
|---|---|
| 1 through 25 - | 5 |
| 26- | 172 |


(Exhibits attached to court original)

(Horowitz Deposition Exhibits Nos.
1 through 25 were marked.)

LEON DAVID HOROWITZ

having been duly sworn by the Notary-Reporter, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR DEFENDANT CASSIAR

BY MR. BEERS:

Q What is your full name, Mr. Horowitz?

MR. MASON: The usual stipulations?

MR. BEERS: Yes. They are in the Federal Rules, Mr. Mason.

A Leon David Horowitz.

Q Where do you live?

A I live in Burlington, Massachusetts, 78 Macon Road, Burlington, Massachusetts 01803.

Q Where do you work?

A I work with American Mutual Liability Insurance Company, in Wakefield, Massachusetts.

Q How old are you?

A I am 62 years old.

Q What is your position at the insurance company?

A I am Chief of the Industrial Hygiene Section of the company.

A Yes, I did.
Q Can you give me some examples of your clients during that four-year period?
A Well, I did a beryllium survey for RCA in New Jersey.
I did another RCA survey in another plant in New Jersey with respect to employee complaints during their work hours, which was the third shift, and there were a mixture of chemicals so I can't specify which chemicals.
Most other clients were small clients, small businesses in New York City.
Q What did you do after you left that consulting position?
A I was hired by Keasbey & Mattison, of Ambler, Pennsylvania, as a dust control engineer.
Q How did you first make contact with Keasbey & Mattison?
A They had an advertisement for a dust control engineer in the New York Times and I responded to that.
Q To whom did you respond?
A To the address that was in the paper.
Q Who at --
A A personnel man was my first contact.

Q When did you go to work?
A I believe it was May of that year, 1960.
Q What was your title?
A I believe my first title was Dust Control Engineer.
Q How long did you remain Dust Control Engineer?
A I was Dust Control Engineer until a few years later, after CertainTeed took over and when I took over duties as corporate Safety Director. I don't know the exact year, but it may have been '65.
Q How long did you remain corporate Safety Directo
A From '65 to '68, when I left the company.
Q What did you do when you left the company?
A I joined American Mutual Liability Insurance Company.
Q When you first started with Keasbey & Mattison were your duties company-wide or did they relate to a particular plant?
A They were company-wide with respect to dust control engineering and I added, with their agreement, to do industrial hygiene work.
Q Did the industrial hygiene work pertain to all plants or just to a particular plant?

Q Keasbey & Mattison did not have a plant in Texas or California at that time, did it?
A Not at that time. No, they didn't have a plant.
Q After you started work with CertainTeed did you visit all the plants that CertainTeed owned, at one time or another?
A In all the years, yes, I visited all their plants, in all the years. While I was still a Dust Control Engineer I don't remember visiting all the new plants that came with CertainTeed, but I continued visiting the plants that dealt with asbestos and cement.
Q Mr. Horowitz, I think you described your job as falling into two parts, dust control engineering on the one hand and industrial hygiene on the other?
A I considered them as one. They both functioned together. That is why I brought them in. But, yes, they considered it both parts; right.
Q Did you work for the same people while doing both functions?
A Yes.
Q Who was your immediate supervisor at Keasbey & Mattison when you first went there?
A Al Spedding.

A The same as the asbestos cement pipe plant only.

Q After 1962, when you worked for CertainTeed, did you also work with the dust levels at some of the other plants

A The same as the asbestos cement plants prior to that time.

Q Could you just tell us that in a complete sentence, what your understanding was as to the component parts of the dust levels in the plants, say, at Hillsboro and at Santa Clara?

A The answer would be the same at Hillsboro and Santa Clara, which would be 100 percent asbestos as one of the raw materials to make asbestos cement pipe, 100 percent silica to make the cement, and 100 percent cement, as raw materials; and then the final product as 14 percent asbestos, with the rest as a finished cement, combined cement.

MR. BEERS: For the next little while or long while we are going to be dealing with a series of 20-some documents.

This is off the record.

(Discussion off the record.)

Q I have asked the Reporter at the beginning of the deposition to mark each of these documents as Horowitz Exhibits 1 through 25. I would like to turn to the document

made. All I know is that he was going to come and I was invited to the meeting.

Q Do you remember what interest Turner & Newall had in the affairs of Keasbey& Mattison at that time?

MR. MASON: I object to the form of that questio

A I can still answer that?

Q Yes, sir.

A I believe Dr. Knox felt that in England they were much more aware of the hazard of asbestos and that in America, the United States; we were not that much aware.

Q Do you remember whether or not T & N, Turner & Newall, had any relationship with Keasbey& Mattison at the time?

A I only know of the relationship that I understoo that they owned Keasbey& Mattison.

Q What did Dr. Knox tell you at that meeting?

A His concern as well as the general knowledge that seemed to prevail in the British Empire, that cancer was associated with asbestos.

Q Did he discuss any particular form of cancer?

A Yes. He mentioned mesothelioma.

Q What did he say about mesothelioma?

A That it was a unique cancer, that a person could

maintaining a dust-free industrial atmosphere?
A For health reasons.
Q Did you design the cut-off saw that is referred to in this document, the dust collection system for the cut-off saw?
A May I read it just to recall?
Q Certainly.
(Pause.)
A Apparently, it was my design that they were trying to correct, from their existing design to my design, and he was urging him to do it.
Q I would like you to now turn to a document that has been marked Horowitz Exhibit 5. Could you read the heading of that document.
A It is written to Mr. A. W. Spedding on September 14, 1960. Asbestos Textile Institute Meeting, September 8th and 9th, 1960.
Q Have you ever seen this document before?
A Yes. I wrote it.
Q This is a true copy of the document that you wrote?
A Yes.
Q Can you tell us what this document is all about?

# Exhibit 9

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION - MIDDLESEX COUNTY
DOCKET NO. L-3458-09

| | |
|---|---|
| JOYCE BRADLEY, Plaintiff, vs. 3M COMPANY, et als., Defendants. | VIDEOTAPE DEPOSITION UPON ORAL EXAMINATION OF LLOYD C. AMBLER VOLUME 1 |

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION - MIDDLESEX COUNTY
DOCKET NO. L-1628-09

GARY R. CHAVAN and JULIE H. CHAVAN, Husband and wife,
Plaintiffs,

vs.

3M COMPANY, et als.,
Defendants.

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION - MIDDLESEX COUNTY
DOCKET NO. L-3465-09

PATRICIA DUGGAN and JOHN J. DUGGAN, Husband and wife,
Plaintiffs,

vs.

3M COMPANY, et als.,
Defendants.

BRODY DEPOSITION SERVICES, INC.
Certified Shorthand Reporters & Videographers
7 Elm Street
Westfield, New Jersey 07090
Phone: (908) 789-2000
Fax: (908) 789-2007

different question. Why don't you switch the tape.
THE VIDEOGRAPHER: Off the record at 12:10.
(Discussion is held off the record.)
THE VIDEOGRAPHER: Back on the record at 12:11.
BY MR. PLACITELLA:
Q. When CertainTeed was advised that asbestos was associated with mesothelioma, they didn't hold that information back from their employees; they told them, true?
MR. EDELL: Objection to the form of the question. I don't know what you mean by "associated with."
BY MR. PLACITELLA:
Q. You can answer it.
A. When CertainTeed was -- when CertainTeed became aware that there was a possible connection with asbestos and mesothelioma or any disease, they shared that information.
Q. And they had safety meetings about that?
A. They -- well, they had safety meetings about what asbestos could do and how it could be harmful and safe ways of using asbestos --

Q. With the workers?
A. With the workers.
Q. Tell the ladies and gentlemen of the jury, when is the first time CertainTeed mentioned the word "mesothelioma" in relation to the sale of asbestos-containing cement pipe.
A. Well, it's an entirely -- a different situation.
Q. Isn't it true, sir, that, although you told the employees in the plant about mesothelioma, you never mentioned the word "mesothelioma" to a customer or a consumer ever?
A. That's not true.
Q. When is the first time you mentioned the word "mesothelioma" --
A. Oh.
Q. -- to a customer or a consumer?
A. I may be wrong on that. We mentioned the word "cancer." We may not have mentioned the meso. I'd have to look at what we said on the label and also what was in the work practices, but "cancer" was used.
Q. Cancer was not used until 1985? True, sir?
A. Cancer itself was not used until

labels on our pipe, one in '79 and one in '85, and you know what the wording is.

BY MR. PLACITELLA:

Q. My question is, did you at any time tell -- put a label on your pipe that said "Small amounts of exposure can cause cancer"?

A. We put on our pipe what we've already said we put on our pipe, and those words weren't used.

Q. Did you ever use -- did you ever put on your pipe that family members were at risk from exposure to asbestos?

A. That was never put on our pipe.

MR. PLACITELLA: The defense lawyers are getting allergic to me, so I'll conclude the questions for today. I think we are out of tape anyway.

Thank you.

THE VIDEOGRAPHER: This concludes Day 1 at 5:19 p.m.

(5:20 p.m.)

# Exhibit 10

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION:MIDDLESEX COUNTY
DOCKET NO. L-3458-09

JOYCE BRADLEY, Plaintiff, -vs- 3M COMPANY, et als, Defendants.

VIDEOTAPE DEPOSITION UPON ORAL EXAMINATION OF LLOYD C. AMBLER
VOLUME 2

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION:MIDDLESEX COUNTY
DOCKET NO. L-1628-09

GARY R. CHAVAN and JULIE H. CHAVAN, Husband and Wife, Plaintiffs, -vs- 3M COMPANY, et als, Defendants.

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION:MIDDLESEX COUNTY
DOCKET NO. L-3465-09

PATRICIA DUGGAN and JOHN J. DUGGAN, Husband and Wife, Plaintiffs, -vs- 3M COMPANY, et als, Defendants.

BRODY DEPOSITION SERVICES, INC.
Certified Court Reporters & Videographers
7 Elm Street
Westfield, New Jersey 07090
Phone: (908) 789-2000 Fax: (908) 789-2007

heat down, correct?
**A The dust down, correct.**
Q Right.
And even when it was wet, there were readings of a hundred and nine fibers per cc for the person that was actually cutting the pipe, correct?
**A It was one -- one count of a hundred and nine, yes.**
Q Well, there was another one for 95, and there was another one for 60, correct?
**A Right.**
Q Okay.
**A And there was one for 11, and one for 30.**
Q All right.
So the average for the people who -- for instance, cut the pressure pipe was 65 fibers per cc, correct --
MR. EDELL: Objection to the form of the question.
Q -- isn't that what it said?
**A For those four tests conducted, the mean was 65 fibers per cc, yes.**
Q All right.
And that was -- the average was more than six times the then OSHA limit, correct?

**A The peak level, yes.**

Q Okay. And then they also tested helpers, correct?

**A Yes.**

Q They were people who were not cutting the pipe --

**A That's correct, yes.**

Q -- correct?

And the helpers' average exposure was for pressure pipe 49 fibers per cc, correct?

**A On the mean.**

Q Right.

That was almost five times OSHA's limit at the time, correct?

**A That's correct, yes.**

Q The helper was a bystander, correct?

**A Ah, well, what -- I don't know what your definition of a bystander is. A bystander could be many different things.**

**The helper was standing there prob -- most likely holding the pipe while it was being cut.**

Q And did you not do readings in your test that showed that people 15 feet away were still exposed to asbestos fibers in excess of the OSHA limits?

**A I don't -- I don't know if we did or didn't. I didn't see it.**

Q Do you recall ever testifying to that in prior depositions?

**A I may have. I don't remember.**

Q Okay. And, for example, another test was run on sewer pipe, and that showed people cutting the pipe were exposed to almost ten times the OSHA limit, true?

**A Ten times?**

Q Yes, sir.

**A On the average mean?**

Q No --

**A There was one --**

Q -- one test -- correct --

**A -- one test was nine and a half times, yes, sir.**

Q Right. And the average -- and that average was 42, so that was about four times the OSHA levels.

**A The mean was 42, yes, sir.**

Q Okay. Now, ten years earlier when -- remember yesterday we were talking about the flurry of activity that went on in 1967 and '68 with the Asbestos Cement Products Association over whether a

# Exhibit 11

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

COURT OF UNLIMITED JURISDICTION

| | |
|---|---|
| Coordinated Proceedings Special Title (Rule 3.550)<br><br>LAOSD ASBESTOS CASES | JCCP 4674 |
| MICHAEL N. HERLIHY and ANN HERLIHY,<br><br>Plaintiffs,<br><br>vs.<br><br>AUTO PARTS WAREHOUSE, INC., et al.,<br><br>Defendants. | CASE NO. 23STCV18584 |

VOLUME I

VIDEOTAPED DEPOSITION OF

MICHAEL N. HERLIHY

SAN DIEGO, CALIFORNIA

FRIDAY, OCTOBER 20, 2023

Ruth Valdivia
CSR License No. 11752, RPR
Expiration Date: December 31, 2023

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

COURT OF UNLIMITED JURISDICTION

| | | |
|---|---|---|
| Coordinated Proceedings Special Title (Rule 3.550)<br><br>LAOSD ASBESTOS CASES | ) | JCCP 4674 |
| MICHAEL N. HERLIHY and ANN HERLIHY<br><br>Plaintiffs,<br><br>vs.<br><br>AUTO PARTS WAREHOUSE, INC., et al.,<br><br>Defendants. | ) | CASE NO. 23STCV18584 |

VOLUME I

Videotaped deposition of MICHAEL N. HERLIHY, taken on behalf of the plaintiffs, at the Double Tree by Hilton Hotel San Diego - Hotel Circle, 1515 Hotel Circle South, conference room, San Diego, California, commencing at 10:10 a.m.; Friday, October 20, 2023, before Ruth N. Valdivia, CSR No. 11752, RPR.

A P P E A R A N C E S

FOR THE PLAINTIFFS:

MAUNE, RAICHLE, HARTLEY, FRENCH & MUDD, LLC
BY: TYLER S. SUMMERS, ESQ.
1900 Powell Street, Suite 200
Emeryville, California 94608
800.358.5922
tsummers@mrhfmlaw.com

(All counsel below appearing remotely)

FOR THE DEFENDANT AUTO PARTS WAREHOUSE, INC.:

FISHER BROYLES, LLP
BY: DAVID MESA, ESQ.
530 Lytton Avenue, Second Floor
Palo Alto, California 94301
415.915.4415
david.mesa@fisherbroyles.com

FOR THE DEFENDANT CALAVERAS ASBESTOS, LTD.:

FOLEY MANSFIELD, LLP
BY: TIM PIEPER, ESQ.
181 West Huntington Drive, Suite 210
Monrovia, California 91016
213-283-2100
tpieper@foleymansfield.com

FOR THE HONEYWELL INTERNATIONAL, INC., f/k/a ALLIED SIGNAL, INC., individually and as successor-in-interest to the BENDIX CORPORATION, BENDIX AVIATION CORP., and THE SIGNAL COMPANIES, INC., f/k/a SIGNAL OIL & GAS COMPANY:

HUSCH BLACKWELL, LLP
BY: JON KASIMOV, ESQ.
355 South Grand Avenue, Suite 2850
Los Angeles, California 90071
213.337.6550
jon.kasimov@huschblackwell.com

(continued)

A P P E A R A N C E S

(continued)

FOR THE DEFENDANTS PARKER HANNIFIN CORPORATION as successor-in-interest to EIS BRAKES - and - STANDARD MOTOR PRODUCTS, INC.:

SEMPER LAW GROUP, LLP
BY: SUKO GOTOH, ESQ.
330 North Brand Boulevard, Suite 670
Glendale, California 91203
213.437.9700
sgotoh@semperlawgroup.com

FOR THE DEFENDANT PNEUMO ABEX LLC, individually and as successor-by-merger to PNEUMO ABEX CORPORATION, successor-in-interest to ABEX CORPORATION f/k/a AMERICAN BRAKE SHOE COMPANY, f/k/a AMERICAN BRAKE SHOE AND FOUNDRY COMPANY including the AMERICAN BRAKEBLOK DIVISION, successor-by-merger to the AMERICAN BRAKE SHOE AND FOUNDRY COMPANY and THE AMERICAN BRAKEBLOK CORPORATION, f/k/a THE AMERICAN BRAKE MATERIALS CORPORATION:

DEHAY & ELLISTON, LLP
BY: ZACHARY H. LODMER, ESQ.
515 South Flower Street, Suite 180
Los Angeles, California 90071
213.271.2727
zlodmer@dehay.com

FOR THE DEFENDANT WORLDWIDE AUTO PARTS, individually and as successor-in-interest to UNITED SYATT AMERICA CORPORATION as Successor and dba BROADWAY AUTO PARTS:

POND NORTH LLP
BY: SEANA AZAD, ESQ.
505 Montgomery Street, 11th Floor
San Francisco, California 94111
415-217-1240
sazad@pondnorth.com

(continued)

I N D E X

(continued)

THE VIDEOGRAPHER:

GREG BUHLERT
Dean Jones Legal Video, Inc.
Los Angeles and Santa Ana, California

# I N D E X

| | PAGE |
|---|---|
| EXAMINATION BY MR. SUMMERS | 9 |

EXHIBITS

(None)

QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER

(None)

INFORMATION REQUESTED

(None)

Q. From 1984 until about when? 10:37
A. Ten years. 10:37
Q. Okay. 10:37
A. About nine years, something like that. I really can't remember. 10:37
Q. But about ten years? 10:37
A. Yeah. 10:37
Q. And can you tell -- describe for me or name for me any, let's say, major clients or customers that Precision Saw had? 10:37
A. Sure. I had the City of Riverside account, the County of Riverside account, all the school districts in Riverside, a lot of -- four or five major framing companies, glass doors, a lot of restaurants came in. I had the Sheplers knives done. 10:38
Certainteed, I think that was -- some -- they cut some far -- they cut some type of piping and big piping and other -- welding shop. They had cold saws and stuff like that. 10:38
Q. So, sir, just to be clear, I think you mentioned -- 10:38
MR. PIEPER: Move to strike nonresponsive portions. 10:38
MR. SUMMERS: I'm sorry? 10:38

cardboard or something so they don't get too damaged and go to my shop. And I'd take them out, came to this tank I used to clean them. First, I would kind of dust the dust off. As I dust them off -- about 12 inches from me, and then I would put them in the tank. And then I'd do the second one or third one or whatever. And I'm sitting there for, you know, depending what time I'd meet them, overnight or three, four hours. 10:59 10:59 10:59 10:59 11:00 11:00 11:00 11:00 11:00

Q. Okay. So I believe you predicted some of my questioning. But I just want to make sure that I -- that I -- I get another answer. Well, not another answer. I'm sorry. I just want to make sure that I don't get an objection based on the length of your answer. Okay? 11:00 11:00 11:00 11:00 11:00 11:00

A. Okay. 11:00

Q. Can you describe, once you got the blades back to the shop -- and I believe you did, but if you could state it so, the process of cleaning the blades once you got back to the shop. 11:00 11:00 11:00 11:00

A. Yeah. I'd get down and brush them off with the -- I don't know -- handheld nylon brush and get all the dust off. And that was a little dusty, cloudy, light dust or whatever. You know, takes a few -- a minute or two on both sides. 11:00 11:01 11:01 11:01 11:01

Q. Okay. 11:29
A. But, you know, probably about the time I worked for Pechanga. 11:29 11:29
Q. Okay. 11:29
A. I heard it somewhere. I don't know where. I can't remember exactly where I heard it, but... 11:29 11:29
Q. That's okay, sir. 11:29
Sir, in general, if you purchase a product and there's a label that has a warning on it, do you follow that warning? 11:29 11:29 11:29
A. The best that I can, yes. 11:29
Q. Sir, when did you first learn that there was or might be asbestos in the dust on the blades that you cleaned for Certainteed? 11:29 11:30 11:30
MR. PIEPER: Objection. Vague. Ambiguous. Overbroad. Calls for speculation. Lacks foundation. Assumes facts. 11:30 11:30 11:30
BY MR. SUMMERS: 11:30
Q. Go ahead. 11:30
A. I really never heard of it. Nobody told me about it. 11:30 11:30
Q. If Certainteed had warned you that the dust on the saw blades you were cleaning and sharpening did or might contain asbestos, would you have worked with those blades? 11:30 11:30 11:30 11:30

A. I would say yes, but I would take extra or special care to be around it. 11:30 11:30

Q. And has Certainteed ever reached out to you or otherwise communicated with you to let you know that the products that you worked with or the equipment that you worked with may have been contaminated with asbestos? 11:30 11:31 11:31 11:31 11:31

A. No. 11:31

Q. Sir, if you saw a warning on -- either on brake parts or their packaging that said that the use of those brakes could cause cancer, would you have used those brakes? 11:31 11:31 11:31 11:31

A. Unless I had another alternative to use a better brake system, yes. 11:31 11:31

Q. Sir, do you ever recall seeing a warning on a package of Bendix brakes? 11:31 11:31

A. No, I can't recall that. 11:31

Q. Do you ever recall seeing a warning on a package of Napa Rayloc brakes? 11:32 11:32

A. No. 11:32

Q. Sir, you testified previously to working at Precision Saw cleaning saw blades with dust on them and that those saw blades came from Certainteed. 11:32 11:32 11:32 11:32

After you worked with those saw blades, 11:32

# Exhibit 12

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES - COURT OF UNLIMITED JURISDICTION

| | | |
|---|---|---|
| Coordinated Proceedings Special Title (Rule 3.550) | ) | JCCP 4674 |
| LAOSD ASBESTOS CASES, | ) | |
| MICHAEL N. HERLIHY and ANN HERLIHY, | ) | Case No.: 23STCV18584 |
| Plaintiffs, | ) | |
| vs. | ) | |
| AUTO PARTS WAREHOUSE, INC., et al., | ) | |
| Defendants. | ) | |

DEPOSITION OF MICHAEL N. HERLIHY

VOLUME III

SAN DIEGO, CALIFORNIA

NOVEMBER 3, 2023

REPORTED BY KAYLEE LACHMANN, RPR, CRR, CSR NO. 14348

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES - COURT OF UNLIMITED JURISDICTION

| | | |
|---|---|---|
| Coordinated Proceedings Special Title (Rule 3.550) | ) | JCCP 4674 |
| LAOSD ASBESTOS CASES, | ) | |
| MICHAEL N. HERLIHY and ANN HERLIHY, | ) | Case No.: 23STCV18584 |
| Plaintiffs, | ) | |
| vs. | ) | |
| AUTO PARTS WAREHOUSE, INC., et al., | ) | |
| Defendants. | ) | |

VIDEO RECORDED DEPOSITION OF MICHAEL N. HERLIHY, VOLUME III, commencing at the hour of 10:05 a.m., Friday, November 3, 2023, at 1515 Hotel Circle South, San Diego, California 92108, before Kaylee Lachmann, Certified Shorthand Reporter, Registered Professional Reporter, and Certified Realtime Reporter in and for the State of California.

APPEARANCES

FOR THE PLAINTIFFS:

MAUNE RAICHLE HARTLEY FRENCH & MUDD
BY: TYLER SUMMERS, ESQ.
1900 POWELL STREET, SUITE 200
EMERYVILLE, CA 94608
(800) 358-5922
TSUMMERS@MRHFMLAW.COM

FOR THE DEFENDANT, AUTO PARTS WAREHOUSE, INC.:

FISHERBROYLES, LLP
BY: DAVID MESA, ESQ.
530 LYTTON AVENUE, SECOND FLOOR
PALO ALTO, CA 94301
(415) 915-4415
DAVID.MESA@FISHERBROYLES.COM
(PRESENT REMOTELY)

FOR THE DEFENDANT, HONEYWELL INTERNATIONAL, INC.:

HUSCH BLACKWELL LLP
BY: JON KASIMOV, ESQ.
355 SOUTH GRAND AVENUE, SUITE 2850
LOS ANGELES, CA 90071
(213) 337-6548
JON.KASIMOV@HUSCHBLACKWELL.COM
(PRESENT REMOTELY)

FOR THE DEFENDANT, CALAVERAS ASBESTOS, LTD.:

FOLEY & MANSFIELD, PLLP
BY: NA HYUN SEO, ESQUIRE
181 WEST HUNTINGTON DRIVE, SUITE 210
MONROVIA, CA 91016
(213) 283-2100
NSEO@FOLEYMANSFIELD.COM
(PRESENT REMOTELY)

APPEARANCES CONTINUED

FOR THE DEFENDANT, PNUEMO ABEX LLC:

DEHAY & ELLISTON L.L.P.
BY: STEPHANIE L. BOWLBY, ESQ.
ZACHARY H. LODMER, ESQ.
515 SOUTH FLOWER STREET, SUITE 1800
LOS ANGELES, CA 90071
(213) 271-2722
SBOWLBY@DEHAY.COM
ZLODMER@DEHAY.COM
(PRESENT REMOTELY)

FOR THE DEFENDANTS, STANDARD MOTOR PRODUCTS, INC. AND PARKER-HANNIFIN CORPORATION, SUCCESSOR-IN-INTEREST TO THE EIS AUTOMOTIVE CORPORATION:

SEMPER LAW GROUP, LLP
BY: LENOR RAMIREZ, ESQ.
330 NORTH BRAND BOULEVARD, SUITE 670
GLENDALE, CA 91203
(213) 437-9700
LRAMIREZ@SEMPERLAWGROUP.COM
(PRESENT REMOTELY)

FOR THE DEFENDANT, WORLDWIDE AUTO PARTS:

POND NORTH LLP
BY: SEANA AZAD, ESQ.
505 MONTGOMERY STREET, 11TH FLOOR
SAN FRANCISCO, CA 94111
(415) 217-1244
SAZAD@PONDNORTH.COM
(PRESENT REMOTELY)

ALSO PRESENT:

DAVID KIM, VIDEOGRAPHER

I N D E X

WITNESS: MICHAEL N. HERLIHY


| EXAMINATION | PAGE |
| --- | --- |
| BY MR. MESA | 266 |
| BY MS. RAMIREZ | 270 |
| BY MR. AZAD | 273 |
| BY MR. KASIMOV | 275 |
| BY MS. SEO | 281 |
| BY MR. KASIMOV | 329 |
| BY MR. SUMMERS | 350 |


E X H I B I T S

(NONE)

Q. Do you recall the name of the person who called and came in?
A. No.
Q. Then who was your primary contact at CertainTeed? 11:37
MR. SUMMERS: Objection. Vague.
A. I really didn't have one to speak of.
Q. Do you recall speaking to anybody in CertainTeed.
MR. SUMMERS: Objection. Vague and ambiguous. Asked and answered. 11:37
A. If I drop -- when I dropped off I would talk to a couple people, the workers or the employees.
Q. When you were talking about maybe just business transactions, did you speak to somebody in CertainTeed? 11:37
MR. SUMMERS: Objection. Vague. Overbroad.
A. I would give them the price, but I wouldn't know who. They would say they were the manager or something. I don't know. 11:38
Q. So the person that you spoke with in CertainTeed, they told you that they were the manager?
A. Yeah, I guess so, or the shop foreman. I don't have a name to give you.
Q. Do you have any documents related to your 11:38

# Exhibit 13



# CONSOLIDATED FINANCIAL STATEMENTS DECEMBER 31, 2023

SAINT-GOBAIN

**Anxiety claims**

Eight of the Group's subsidiaries that operate or have operated facilities in France classified as containing asbestos, were the subject of anxiety claims brought by current or former employees not suffering from an occupational disease due to asbestos – claiming compensation for prejudice of anxiety suffered as a result of their alleged exposure to asbestos.

As of December 31, 2023, a total of 861 lawsuits had been brought against these companies.

At the same date, the lawsuits have been all definitely completed.

The total amount of compensation paid since the outset of the litigations was €8.8 million as of December 31, 2023 (against approximately €8.5 million as of December 31, 2022).

It should be clarified that the above figures do not take into account suits filed against companies that are no longer part of the Group.

Last, the total amount registered as provision for asbestos-related litigations in France – inexcusable faults lawsuits and anxiety claims – amounted to around €7 million as of December 31, 2023 (compared to around €8 million as of December 31, 2022).

## Situation in the United States

**Measures taken to achieve an equitable and permanent resolution of the former CertainTeed Corporation's legacy asbestos liabilities in the United States**

DBMP LLC, an affiliate of CertainTeed LLC based in North Carolina, that holds the legacy asbestos liabilities of the former CertainTeed Corporation, filed, on January 23, 2020, a voluntary petition for relief under Chapter 11 of the US Bankruptcy Code in the US Bankruptcy Court for the Western District of North Carolina in Charlotte. The matter remains pending. The purpose of the filing is to achieve a certain, final and equitable resolution of all current and future claims arising from asbestos-containing products manufactured and sold by the former CertainTeed Corporation.

DBMP LLC intends to seek court authority to establish a trust under Section 524(g) of the US Bankruptcy Code – a specific provision that is applicable to companies that face substantial numbers of asbestos-related claims – to achieve a fair and equitable resolution of its asbestos-related liabilities. Upon establishment of the trust, current and future plaintiffs with qualifying claims will be able to receive faster payment of their claims without the delay, stress and uncertainty of litigation in the tort system; at the same time, the creation and funding of such a trust will permanently and finally resolve DBMP LLC's asbestos liability.

During the course of this bankruptcy process, which is expected to take up to approximately five to eight years, all asbestos litigations have been stayed and all related costs suspended, providing DBMP LLC with the time and protection to negotiate an agreement to be approved on behalf of all claimants and by the court.

This action was taken as a result of the increasing risks presented in the US tort system. Despite the passage of time, the aging of the population and lessening opportunity for claimants to assert legitimate claims of exposure to the asbestos-containing products of the former CertainTeed Corporation, naming practices in the tort system continued to result in a steady volume of claims against DBMP LLC, with no foreseeable end in sight. In addition, there has been, in general, an escalation of settlement demands and verdicts in the tort system.

Certain adversary proceedings have been filed by representatives of current and future asbestos plaintiffs against DBMP LLC, CertainTeed LLC, Saint-Gobain Corporation, Compagnie de Saint-Gobain and various other parties. No decisions on the merits of the claims have been made and such claims do not affect the Company's financial assessment of the Chapter 11 case.

**Impact on the financial statements**

Following the commencement of the proceeding under Chapter 11 of the US Bankruptcy Code on January 23, 2020, the assets and liabilities of DBMP LLC and its wholly-owned subsidiary Millwork & Panel LLC, and in particular the provision for asbestos-related litigation in the United States, are no longer consolidated in the Group's financial statements.

Nonetheless, because of a funding agreement between CertainTeed LLC and DBMP LLC by which CertainTeed LLC has agreed to fund the costs of the Chapter 11 case and, ultimately, the 524(g) trust, in both cases solely to the extent DBMP LLC is unable to do so in full, the Group recorded in its consolidated financial statements a provision corresponding to the amount of the estimated debt against DBMP LLC amounting to $407 million as of December 31, 2023 ($410 million as of December 31, 2022).

The Group's consolidated income for 2023 is not impacted by the ongoing Chapter 11 proceeding described above.

As a result of this bankruptcy proceeding, all legal costs and indemnity payments related to DBMP LLC's asbestos tort claims have been suspended, and no further charges in relation to such claims have been taken in 2023 (as in 2022).

## Situation in Brazil

In Brazil, former employees of Brasilit, that once manufactured fiber cement containing asbestos, suffering from asbestos-related occupational illnesses are offered, depending on the case, either financial compensation alone or lifetime medical assistance combined with financial compensation. Around 1,200 contractual instruments have accordingly been signed to date.

Two class actions were initiated against Brasilit in 2017 by two associations defending former employees exposed to asbestos at the São Caetano (São Paulo state) and Recife (Pernambuco state) plants, asking for their medical assistance and compensation to be revised. First and second instance decisions were rendered in connection with the suit related to the São Caetano plant respectively in July 2020 and July 2021, rejecting the claims of the plaintiffs. The latter have nevertheless appealed the second instance decision. First and second instance decisions were rendered in relation to Recife case, respectively in February and October 2022 rejecting the claiming party arguments. The plaintiff has appealed such second instance decision.

A third class action was initiated against Brasilit in 2019 in Capivari (State of São Paulo) by the Labor prosecutor asking for health insurance, as well as collective moral damages, in favor of employees, former employees and their respective families, as well as subcontractors who were exposed to asbestos. First and second instance decisions were rendered respectively in September 2020 and May 2023 partly in favor of the plaintiffs. In particular, collective moral damages were granted to the plaintiffs, for an amount reduced to BRL 5 million (€0.8 million). Brasilit has appealed the second instance decision.

Brasilit is subject to controls by the Ministry of Labor and continues to comply with all of its legal obligations with regard to medical assistance for its current and former employees.

## NOTE 11 SHAREHOLDERS' EQUITY AND EARNINGS PER SHARE

### 11.1 Equity

#### 11.1.1 Equity

At December 31, 2023, Saint-Gobain's capital stock was composed of 506,438,012 shares with a par value of €4 each (515,769,082 shares at December 31, 2022).

#### 11.1.2 Additional paid-in capital and legal reserve

This item includes capital contributions in excess of the par value of capital stock as well as the legal reserve, which corresponds to a cumulative portion of the yearly net income of Compagnie de Saint-Gobain.

#### 11.1.3 Retained earnings and consolidated net income

Retained earnings and consolidated net income correspond to the Group's share in the undistributed earnings of all consolidated companies.

#### 11.1.4 Treasury stock

Treasury stock is measured at cost and recorded as a deduction from equity. Gains and losses on disposals of treasury stock are recognized directly in equity and have no impact on net income for the period.

Forward purchases of treasury stock are treated in the same way. When a fixed number of shares is purchased forward at a fixed price, this amount is recorded in "Other liabilities" against a deduction from equity under "Retained earnings and net income for the year".

Saint-Gobain shares held or controlled by Compagnie de Saint-Gobain and Saint-Gobain Corporation are shown as a deduction from equity under "Treasury stock" at acquisition cost.

The liquidity agreement signed with Exane BNP Paribas on November 16, 2007 and implemented on December 3, 2007 for a period up to December 31, 2007 has been automatically renewed since that date.

At December 31, 2023, 4,376,475 shares were held in treasury (December 31, 2022: 4,406,990 shares). In 2023, the Group acquired 17,111,277 shares (2022: 18,011,705 shares) directly on the market The number of shares sold in 2023 was 2,935,434 versus 3,174,316 in 2022. 14,206,358 shares were canceled in 2023, compared with 13,177,086 shares in 2022.

For the purposes of a compensation plan set up in January 2008 for certain employees in the United States, Compagnie de Saint-Gobain shares are held by the trustee, Wachovia Bank, National Association. In the consolidated financial statements, these shares are treated as being controlled by Saint-Gobain Corporation.

#### 11.1.5 Number of shares

| | Number of shares | |
|---|---|---|
| | Issued | Outstanding |
| **NUMBER OF SHARES AT DECEMBER 31, 2021** | **524,017,595** | **521,270,908** |
| Group Savings Plan | 4,916,097 | 4,916,097 |
| Stock subscription option plans | 12,476 | 12,476 |
| Shares purchased | | (18,011,705) |
| Shares sold | | 3,174,316 |
| Shares canceled | (13,177,086) | |
| **NUMBER OF SHARES AT DECEMBER 31, 2022** | **515,769,082** | **511,362,092** |
| Group Savings Plan | 4,778,291 | 4,778,291 |
| Stock subscription option plans | 96,997 | 96,997 |
| Shares purchased | | (17,111,277) |
| Shares sold | | 2,935,434 |
| Shares canceled | (14,206,358) | |
| **NUMBER OF SHARES AT DECEMBER 31, 2023** | **506 438 012** | **502,061,537** |

#### 11.1.6 Dividends

The Annual Shareholders' Meeting of June 8, 2023 approved the recommended dividend payout for 2022 representing €2 per share (€1.63 per share for 2021). The ex-dividend date was June 12 and the dividend was paid on June 14, 2023.

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| In re:<br><br>DBMP LLC,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 20-30080 (JCW) |

**DEBTOR'S OMNIBUS OBJECTION TO THE ESTATE OF PETER L. BERGRUD'S AND MICHAEL N. AND ANN HERLIHY'S MOTIONS FOR RELIEF FROM THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(d)**

DBMP LLC, the debtor and debtor in possession in the above-captioned chapter 11 case (the "Debtor"), objects to both (a) the *Motion for Relief From the Automatic Stay Pursuant to 11 U.S.C. § 362(d)* [Dkt. 2753] (the "Bergrud Motion") filed by Cheryl L. Bergrud ("Mrs. Bergrud"), individually and as Personal Representative for the Estate of Peter L. Bergrud; and (b) the *Motion for Relief From the Automatic Stay Pursuant to 11 U.S.C. § 362(d)* [Dkt. 2755] (the "Herlihy Motion" and, together with the Bergrud Motion, the "Motions") filed by Michael N. and Ann Herlihy (together with Mrs. Bergrud, the "Movants").[2]

**PRELIMINARY STATEMENT**

The Movants request that the Court lift the automatic stay to allow them to pursue their state law claims against the Debtor even though they have not demonstrated any cause to do so—either through the assertion of new developments or unique circumstances in the Movants' cases. Instead, the virtually identical Motions spend the bulk of their pages attacking both the prepetition restructuring that created the Debtor and the Debtor's chapter 11 case. These attacks—

[1] The last four digits of the Debtor's taxpayer identification number are 8817. The Debtor's address is 20 Moores Road, Malvern, Pennsylvania 19335.

[2] Local Bankruptcy Rule 9013-2(a) limits briefs to 25 pages. Although each Motion is 36 pages long, the Movants, in violation of the rule, have not sought authority to exceed the page limit.

constructed only on rhetoric—are based on arguments that have been rejected by courts in this District or that otherwise are irrelevant to the lift stay analysis under controlling law. The applicable standard for lifting the automatic stay (from the *Robbins* case) is not even addressed until after page 30 of each Motion.

Contrary to the Movants' assertions that the relief sought will not interfere with the Debtor's chapter 11 case, granting the Motions would establish a precedent for potentially thousands of other similarly situated claimants to seek the same relief in a piecemeal fashion without demonstrating unique facts or circumstances, sabotaging the Debtor's prospects for reorganization. The Motions admit as much[3] and the unsupported rhetoric of the Movants' counsel regarding the Debtor's alleged bad faith is insufficient to overcome this harm. As this Court previously stated, "the way to challenge" the prepetition restructuring and the Debtor's chapter 11 case "is not through piecemeal individual claimant actions in the tort system. It is through plan negotiation and/or an adversary proceeding filed in this case for the benefit of all asbestos claimants." *DBMP LLC v. Those Parties Listed on Appendix A to Complaint and John and Jane Does 1-1000 (In re DBMP LLC)*, 2021 WL 3552350, at *38 (Bankr. W.D.N.C. Aug. 11, 2021).

Although framed as lift stay motions, it is clear from the page-after-page attacks that the Movants wish for dismissal of this case. But the Movants should not be allowed to achieve an effective dismissal of this case through stay relief, especially where (a) no party has to date sought dismissal, (b) dismissal has been denied in cases raising very similar issues (including two dismissal motions in the *Aldrich/Murray* cases and four in the *Bestwall* case), (c) the Fourth

3 *See, e.g.*, Bergrud Mot., 4 ("While it is certainly true that if the Court were to lift the stay for many (or all) claimants, [the Debtor's] primary goal in this proceeding . . . would fail."); Herlihy Mot., 4 (same); Bergrud Mot., 17 ("In instances such as these, multiple motions to lift stay should be expected and should be granted."); Herlihy Mot., 18 (same).

Circuit, in affirming the preliminary injunction order in *Bestwall*,[4] already has recognized that "the time and place to raise" concerns about the chapter 11 case is at "plan confirmation" and not through "challenge[s] that really [go] to the merits of the reorganization," and (d) the official committee of asbestos personal injury claimants (the "Committee") and the legal representative for future asbestos claimants appointed in this case (the "Future Claimants' Representative") already are challenging the prepetition restructuring and the filing of the chapter 11 case in three pending adversary proceedings, including two in which they are acting as estate representatives. *See id.* at *37 (stating the Court is "not in a position to grant a lift stay motion that effectuates their dismissal hopes").

As recognized by the Court, the Debtor needs the protection of the automatic stay to preserve its ability "to obtain a permanent, global, and fair resolution of all current and future asbestos claims against it." *See id.* at *32. Neither the *Robbins* factors used by courts in the Fourth Circuit to assess whether cause exists to lift the automatic stay, nor the *Curtis* factors used in other jurisdictions, weigh in favor of granting the Motions, especially where the Movants have failed to demonstrate any unique facts or circumstances that would distinguish their cases from the tens of thousands of other cases that are pending or might be asserted against the Debtor. Despite the Movants' baseless assertions to the contrary, (a) bankruptcy court expertise is necessary to address estimation and global resolution of the current and future asbestos claims against the Debtor; (b) lifting the automatic stay would undermine, not promote, judicial economy; and (c) the Debtor's estate would be inadequately protected if the automatic stay were lifted. The Motions should be denied.

---

4 *Bestwall LLC v. Official Comm. of Asbestos Claimants (In re Bestwall LLC)*, 71 F.4th 168, 183 (4th Cir. 2023).

## ARGUMENT

### I. NO UNIQUE FACTS OR CIRCUMSTANCES JUSTIFY LIFTING THE AUTOMATIC STAY AS TO THE MOVANTS.

1. Like the recently denied lift stay motions in the *Bestwall* case filed or joined by the same counsel,[5] the Movants do not even attempt to assert any new or unique facts or circumstances that justify treating them differently from the thousands of other similarly situated asbestos-related claimants whose claims also are stayed.[6] The Fourth Circuit's statement in *Bestwall* that, "where appropriate," claimants routinely bring motions "for relief based on the specific facts of a particular claim" is of no benefit to the Movants where they fail to distinguish their claims from the thousands of other asbestos claims currently pending against the Debtor. *See Bestwall*, 71 F.4th at 183.[7] The Fourth Circuit recognized that, while seeking to lift the automatic stay is "routine," it should only occur where it is demonstrated to be "appropriate." *Id.* It is not appropriate to lift the automatic stay here.[8]

---

5 *Order Denying Richard and Joann Dale's Mot. for Relief From the Automatic Stay Pursuant to 11 U.S.C. 362(d)*, *In re Bestwall, LLC*, No. 17-31795 (LTB) (Bankr. W.D.N.C. Dec. 13, 2023), Dkt. 3218; *Order Denying Wilson Buckingham and Angelika Weiss's Mot. for Relief From the Automatic Stay Pursuant to 11 U.S.C. 362(d)*, *In re Bestwall, LLC*, No. 17-31795 (LTB) (Bankr. W.D.N.C Feb. 26, 2024), Dkt. 3290.

6 The Debtor denies the Movants' allegations that "Old CertainTeed Negligently Caused" Mr. Bergrud's (Bergrud Mot., 9-12) and Mr. Herlihy's (Herlihy Mot., 10-12) mesothelioma. *See Informational Br. of DBMP LLC* [Dkt. 22] and *Debtor's Reply to Informational Br. of the Official Committee of Asbestos Personal Injury Claimants* [Dkt. 1208]. Regardless, these allegations are irrelevant to the issues presented by the Motions.

7 *See also Bestwall*, Dkt. 3154, Oct. 19, 2023 Hr'g Tr., 70:20-71:1 ("while the Fourth Circuit did say that rather than waiting for plan confirmation, and I quote, 'Claimants can bring individual actions for relief based on the specific facts of a particular claim,' the Dales have not pled any facts specific or unique to them to cause this Court to find that there's cause to grant their motion for relief from stay"); *In re W.R. Grace & Co.*, 2007 WL 1129170, at *3 (Bankr. D. Del. Apr. 13, 2007) ("There is no indication that the state court claims are in any way unique, or that, if proven, Debtors' liability to the State of Montana, if any, will be distinguishable from liability for any of the other hundreds of thousands of asbestos claims asserted against Debtors. The State of Montana is in no different position than any other creditor claiming an injury by the Debtor entities based on asbestos.").

8 By contrast to the circumstances here, the Debtor previously agreed to modify the automatic stay to allow an appeal to proceed because the unique circumstances of that matter justified such relief. *See Stipulation and Agreed Order Modifying the Automatic Stay*, Dkt. 542 (modifying automatic stay to allow the Supreme Court of California to dispose of appeal and to allow court, on remand, to dispose of the matter given that the judgment was supported by an appellate bond).

2. The Movants also contend that granting individual actions for stay relief here would not be akin to dismissal because doing so would simply frustrate "a bad faith bankruptcy" and an "***illegitimate*** bankruptcy purpose." *See* Bergrud Mot., 15-19 (emphasis in original); Herlihy Mot., 16-19 (emphasis in original). But such assertions are based solely on the views of the Movants' counsel as expressed in heated rhetoric—not on evidence or law. Similarly, the Movants' suggestions for alternatives the Court may implement—notably, terminating the stay for all claimants, appointing a trustee, liquidating the Debtor's assets, etc. (Bergrud Mot., 19; Herlihy Mot., 19)—lack any legal basis, are not before the Court, and simply reveal the Movants' real objective: the effective dismissal of this case. In that regard, it is worth recalling that the Court already denied a request by the Committee to lift the automatic stay as to ***all claimants***,[9] finding that such request "would create bedlam, produce inconsistent results for creditors, and effectively end the bankruptcy case." *DBMP*, 2021 WL 3552350, at *38.

3. Contrary to the Movants' assertions (Bergrud Mot., 29; Herlihy Mot., 29-30), the requests in the Motions are not materially different from the Committee's request that the stay be lifted as to all asbestos claimants—the effect of granting the Motions would be much the same. Granting the Motions would establish a precedent for potentially thousands of other similarly situated claimants to seek the same relief in a piecemeal fashion without demonstrating cause due to unique facts. *See Bestwall*, Dkt. 3268, Jan. 18, 2024 Hr'g Tr., 77:19-78:12 (stating the "issue must be considered in the context of this case being a mass tort case," that if the court "granted Mr. Buckingham's motion for relief from stay," the court "would be obliged to grant the motion for relief from stay of most, if not all, claimants who sought similar relief," that it would

---

9 *Mot. of the Official Committee of Asbestos Personal Injury Claimants to Lift the Stay Pursuant to 11 U.S.C. § 362 as to Certain Asbestos Personal Injury Claims*, Dkt. 614; Adv. Pro. No. 20-03004, Dkt. 195 (the "Committee Lift Stay Motion").

"not promote judicial economy" to grant the motion for relief from the stay, and that doing so "would ultimately equate to dismissal"); *Bestwall*, Oct. 19, 2023 Hr'g Tr., 70:1-8 ("if I grant this motion I think I would be hard pressed to deny future motions for relief from stay in this case"); *Aldrich*, Mar. 30, 2023 Hr'g Tr., 67:8-12 (stating that if Court were to "grant relief from stay to one creditor to liquidate the claim, all of the claimants will – not all – but a substantial number of the claimants, enough to wreck the bankruptcy case, will seek like measure and that effectively precipitates a *de facto* dismissal of the case").

4. Other courts likewise have rejected motions to lift the automatic stay when they risk opening the floodgates for other similar claimants. *See*, *e.g.*, *In re Motors Liquidation Co.*, 2010 WL 4630327, at *5 (S.D.N.Y. Nov. 8, 2010) (noting that potential for opening floodgates to claimants with similar allegations is "the very state of affairs the automatic stay was enacted to prevent"); *In re SunEdison, Inc.*, 557 B.R. 303, 308 (Bankr. S.D.N.Y. 2016) ("Granting stay relief to Vivint may encourage other claimants to file their own stay relief motions."). In fact, the Movants' serial requests for this relief on the same day demonstrate that copycat motions are a risk, and one that can be expected to grow exponentially if the Motions are granted. Indeed, as noted above, the Movants concede this. The Motions should be denied.

## II. THE *ROBBINS* FACTORS ALL WEIGH AGAINST GRANTING THE MOTIONS.

5. The automatic stay embodied in section 362 of the Bankruptcy Code has been described as "one of the fundamental debtor protections provided by the bankruptcy laws." *Midlantic Nat'l. Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 503 (1986) (citation omitted). The bankruptcy court however, in certain appropriate circumstances, may lift the stay "for cause." Section 362(d)(1) provides that:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under

> subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—(1) ***for cause*** . . . .

11 U.S.C. § 362(d)(1) (emphasis added). "Cause" is a flexible concept, and a bankruptcy court is granted discretion to determine when relief is appropriate on a case-by-case basis. *See In re Robbins*, 964 F.2d 342, 345 (4th Cir. 1992).

6. In the Fourth Circuit, courts use the factors laid out in *Robbins* to determine whether there is cause to lift the stay. *DBMP*, 2021 WL 3552350, at *31 (identifying the *Robbins* factors as the appropriate factors for a lift stay analysis); *see also In re Lee*, 461 Fed. App'x. 227, 231 (4th Cir. 2012) (same). Consideration of each of the *Robbins* factors in the context of this case supports denial of the Motions, notwithstanding the Movants' unsupported allegations of bad faith.

### A. Whether the Issues in the Pending Litigation Involve Only State Law and, Thus, the Expertise of the Bankruptcy Court Is Unnecessary.

7. The Movants argue that the "Court's expertise related to the Bankruptcy Code . . . is not needed" for the Movants to try their "state law claims to verdict," and take issue with the estimation proceeding that was approved by the Court over two years ago.[10] Bergrud Mot., 30-31, 33-35; Herlihy Mot., 30-31, 33-35. Not only have the Movants' arguments regarding estimation already been addressed by this Court, but, by virtue of the Debtor's chapter 11 case and the Estimation Order, the expertise of this Court is necessary. The Court is in the midst of overseeing an estimation proceeding for the asbestos-related claims against the Debtor and is uniquely equipped to address the myriad of issues involved in estimating the thousands of claims for purposes of negotiating, formulating, and confirming a chapter 11 plan—not for establishing a non-consensual cap on the Debtor's asbestos liability as the Movants claim. *See* Estimation Order

---

[10] *See Order Authorizing Estimation of Current and Future Mesothelioma Claims*, Dkt. 1239 (the "Estimation Order").

¶ 3. Such estimation is not a proceeding that can occur in state court or any forum other than a bankruptcy court, and "should precede any trials of the claims." *A.H. Robins Co., Inc. v. Piccinin (In re A.H. Robins Co., Inc.)*, 788 F.2d 994, 1012 (4th Cir. 1986); *see also Blair v. Bestwall, LLC*, Nos. 22-1981, 22-1984 (4th Cir. Sept. 22, 2023) Unofficial Hr'g Tr., 12 (Judge Wilkinson: "But here, the proceeding and the purpose of the bankruptcy litigation is to find out what the obligations of Bestwall are, to contribute to this trust fund.") (excerpt attached as Exhibit A hereto).

8. In addition, Congress enacted section 524(g) of the Bankruptcy Code because it contemplated having the bankruptcy court, not individual state courts, address and facilitate the comprehensive resolution of asbestos claims. *See* H. Rep. 103-835, 2d Sess., 40-41 (1994), reprinted in 1994 U.S.C.C.A.N. 3340, 3348-49. The Movants' conclusory statements that the Court can disregard section 524(g) because the Debtor does not qualify for relief under that section are unsupported, and ignore prior rulings of this Court. *See* Bergrud Mot., 34-35; Herlihy Mot., 35. Notably, the Court previously found that "Congress enacted section 524(g) to address precisely the type of state law-based asbestos claims faced by the Debtor." *DBMP*, 2021 WL 3552350, at *36.

9. The Debtor's chapter 11 case is the only proceeding in which the Debtor can achieve a global and equitable resolution of its current and future asbestos-related claims. Lifting the stay undermines the bankruptcy court's ability pursuant to section 524(g) to effectuate such a result. *See id.* at *31 ("the fact that asbestos claims arise under state law does not support a modification of the stay because it necessarily involves individual creditors liquidating their claims against the Debtor outside of the bankruptcy proceeding, . . ., and thwarting any attempt to globally and permanently resolve asbestos claims in a single forum"); *id.* at *32 ("The ability to treat equitably and consistently all similarly situated claimants through a section 524(g) consensual

plan of reorganization would be foreclosed" if stay relief were to be granted); *see also Bestwall*, Oct. 19, 2023 Hr'g Tr., 71:1-4 ("allowing the ongoing litigation of asbestos claims against the debtor in state court could cause irreparable harm to the debtor, which could defeat the purpose of this bankruptcy case and could be akin to the dismissal of the case").

**B. Whether Modifying the Stay Will Promote Judicial Economy and Whether There Would Be Greater Interference with the Bankruptcy Case if the Stay Were Not Lifted Because Matters Would Have to Be Litigated in Bankruptcy Court.**

10. The Movants assert that relief would be in the interest of judicial economy because the liquidation of the Movants' claims would assist them in analyzing any proposed plan, and there is no legitimate reason to delay determining the value of the Movants' claims. *See* Bergrud Mot., 31-32; Herlihy Mot., 31-33. The Movants also contend that the Debtor and its affiliates are weaponizing and abusing the automatic stay. *See* Bergrud Mot., 17, 22-23, 26; Herlihy Mot., 17-18, 23, 26.

11. The automatic stay is not a weapon of the Debtor or its affiliates. It is a statutory protection critical to achieving the Debtor's objective in this case—a global resolution and payment of all valid current and future claimants on a fair and equitable basis through a chapter 11 plan providing for the establishment of a section 524(g) trust. "[T]he automatic stay allows the bankruptcy court to centralize all disputes concerning property of the debtor's estate in the bankruptcy court so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas." *In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 989 (2d Cir. 1990). This Court and the Fourth Circuit in *Bestwall* recognized the importance of centralizing claims against the Debtor and its affiliates. *See DBMP*, 2021 WL 3552350, at *41 ("And the litigation of DBMP Asbestos Claims in the tort system while the Chapter 11 Case remains pending would undermine the purposes of chapter 11 and section 524(g) to resolve all such current and future claims in a fair

and equitable manner though a chapter 11 plan."); *Bestwall*, 71 F.4th at 179 ("And the possible effect on the Bestwall bankruptcy estate of litigating thousands of identical claims in state court is sufficient to confer 'related to' jurisdiction" over the preliminary injunction request, which the Fourth Circuit affirmed).

12. Further, allowing the Movants' claims to be liquidated in state court will not change the estimation task before this Court or 'aid' the thousands of other claimants in plan evaluation. The Court still will need to estimate on an aggregate basis the thousands of claims pending against the Debtor and those that are expected to be filed in the future. *See Decl. of Robert J. Panaro in Supp. of First Day Pleadings*, Dkt. 24 ¶ 28 (as of January 23, 2020, "more than 60,000 asbestos-related claims and associated lawsuits against the Debtor were pending," with "approximately 32,700" on active dockets and "thousands of additional claims" expected "for decades to come"). There is simply no basis to distinguish the Movants' claims from the thousands of other pending asbestos claims against the Debtor that would justify lifting the automatic stay for these particular claimants.

13. Permitting the Movants to initiate state court litigation against the Debtor under these circumstances undoubtedly would lead to a spate of similar requests in this case, all of which would need to be litigated and addressed by the parties and this Court—a fact conceded by the Movants, demonstrated by the serial nature of the Motions themselves, and recognized as a problem multiple times by this Court. *See LTL Mgmt. LLC*, No. 21-30589 (JCW) (Bankr. W.D.N.C.) Nov. 10, 2021 Hr'g Tr., 155:8-22 ("The problem we have here is 38,000 plus claims, plus all those that are going to come to, to light. If I start with one, I'm going to have to go to dozens, if not hundreds, if not thousands . . . . I don't think I can start making exceptions or this will all unravel and we'll be back at where we were before."); *Bestwall*, Oct. 19, 2023 Hr'g Tr.,

70:6-11 ("if I grant this motion I think I would be hard pressed to deny future motions for relief from stay in this case and that's especially true since the Dales have not pled any unique facts or circumstances that would justify lifting the stay as to them or otherwise distinguish their case from the thousands of cases that are pending in state court."); *Bestwall*, Jan. 18, 2024 Hr'g Tr., 77:10-25 ("Consideration of the *Robbins* factors, particularly . . . whether modifying the stay will promote judicial economy and whether there would be greater interference with the bankruptcy case if the stay were not lifted because matters would have to be litigated in bankruptcy court, I believe and find weighs against modifying the automatic stay. . . . I still conclude that if I granted Mr. Buckingham's motion for relief from stay I would be obliged to grant the motion for relief from stay of most, if not all, claimants who sought similar relief.").

14. The most efficient and economic resolution of not just the Movants' claims, but the thousands of similarly situated current and future asbestos claims against the Debtor, is through the bankruptcy process and the creation of a trust pursuant to a chapter 11 plan that efficiently, timely, and equitably resolves claims.[11] This Court and the Fourth Circuit previously have recognized the benefits to all claimants from bankruptcy and the creation of a section 524(g) trust.[12]

---

11 The purpose of the estimation proceeding is to permit formulation and confirmation of a plan of reorganization with trust procedures that obviate the need to litigate all of the tens of thousands of claims against the Debtor. Under such a plan, the Movants and all other claimants will have the opportunity to accept payment from the eventual trust in lieu of litigating and to pursue the alternative dispute resolution mechanisms common in trust procedures. It is far from certain that any personal injury claims will have to be litigated if a plan of reorganization is confirmed—indeed, it is extremely rare for litigation to be initiated against an asbestos trust, despite claimants' preserved rights to pursue such litigation against a trust under typical trust procedures.

12 *See DBMP*, 2021 WL 3552350, at *34 ("a section 524(g) trust established by an asbestos debtor in chapter 11 in cooperation with the Representatives, and with each fiduciary acting in good faith and with an earnest desire to achieve a full and fair resolution of asbestos claims, could well provide all asbestos claimants—including future claimants who have yet to initiate litigation—a more efficient means to resolve their claims"); *Bestwall*, 71 F.4th at 183 ("These bankruptcy procedures promote the equitable, streamlined, and timely resolution of claims in one central place compared to the state tort system, which can and has caused delays in getting payment for legitimate claimants."); *Piccinin*, 788 F.2d at 1013 ("If the bankruptcy court could arrive at a fair estimation of the value of all the claims and submit a fair plan of reorganization based

15. If the Motions, which demonstrate no unique circumstances or any cause for relief, are granted, similar motions are certain to follow, judicial economy would not be promoted, and claims would not be resolved globally in a single forum. The Debtor's ability to treat all claimants equitably through a section 524(g) trust would become impossible. *See DBMP*, 2021 WL 3552350, at *32 (concluding that if stay relief was granted, "[t]he ability to treat equitably and consistently all similarly situated claimants through a section 524(g) consensual plan of reorganization would be foreclosed"); *Bestwall*, Jan. 18, 2024 Hr'g Tr., 77:22-25 (concluding that if the court granted motion for relief from the automatic stay, it would be "obliged to grant the motion for relief from stay of most, if not all, claimants who sought similar relief"); *Bestwall*, Oct. 19, 2023 Hr'g Tr., 70:1-8 (stating that it is a fair and reasonable assumption that granting a claimant relief from stay likely would lead to a wave of similar motions and that Court would be hard pressed to deny future motions on similar grounds); *Aldrich*, Mar. 30, 2023 Hr'g Tr., 67:8-12 (finding that granting claimant's motion to lift the stay likely would lead to similar motions from other claimants and "effectively precipitate[] a *de facto* dismissal of the case.").

16. As effectively conceded by the Movants, granting the Motions would result in the "effective dismissal" of the chapter 11 case—a result this Court already rejected in denying the Committee Lift Stay Motion. *See DBMP*, 2021 WL 3552350, at *32 ("if the Court were to grant the Stay Motion, it would amount to an effective dismissal of the Chapter 11 Case without satisfying the Fourth Circuit's stringent *Carolin* dismissal standard, or even such a motion being filed.").

on such estimation, with some mechanism for dispute resolution and acceptable to all interested parties, great benefit to all the claimants could be achieved and the excessive expense of innumerable trials, stretching over an interminable time, could be avoided.").

### C. Whether the Estate Can Be Protected Properly by a Requirement That Creditors Seek Enforcement of Any Judgment Through the Bankruptcy Court.

17. The Movants argue that there will be no harm to the bankruptcy estate as they "seek only to liquidate" their claims and agree "that that amount will not be paid" until this Court allows it. *See* Bergrud Mot., 33; Herlihy Mot., 33. Nevertheless, even without payment, allowing the Movants' claims to proceed to liquidation would still harm the estate. The financial burden of defending against the Movants' claims in the tort system, in addition to the cost of litigation related to follow-on lift stay requests, would be immense. Prior to the chapter 11 case, trying a single case to conclusion cost the Debtor on average $1.2 million.[13] *See Decl. of Charles E. Bates, PHD*, Adv. Pro. No. 20-03004, Dkt. 238 ¶¶ 13, 17. And this additional litigation, in the form of lift stay motions and tort litigation, would divert the parties' attention from the estimation process and negotiation and formulation of a plan, leading to considerable delay.[14] *See DBMP*, 2021 WL 3552350, at *32 (the Debtor and the estate would "suffer substantial prejudice" if the Court granted motion for relief from stay because such relief "would deplete estate resources and irreparably harm the prospects for reorganization"); *see also* Ex. A, 26-27 (Judge Wilkinson: "[W]e are not advancing the ball in terms of the ultimate object of the whole bankruptcy proceeding, which is to allow the bankruptcy judge to make a reliable estimate of what exactly Bestwall's asbestos-related liabilities are to fund the trust."). The circumstances under which the

---

13 This burden also would entail time, effort, and costs to the Debtor in retaining defense counsel in the applicable local jurisdictions—who would have to evaluate the status of the cases—and working with that counsel on the defense of each claim, including discovery, retention of experts, and trial preparation that must occur in each case.

14 *See Piccinin*, 788 F.2d at 1012 (holding that purpose of chapter 11 "to ascertain whether a fair reorganization of the debtor can be achieved" "may well be completely thwarted if the energies of the debtor's executives and officers are initially diverted by, and the resources of the debtor are dissipated in the expenses of litigating, the trial of thousands of personal injury suits in courts throughout the land spread over an interminable period of time.").

Court reached the conclusion that relief from stay would harm the Debtor and its estate have not changed, and this conclusion is just as applicable to the Motions as it was to the Committee Lift Stay Motion. The Movants' proposals thus do not adequately protect the Debtor.

### D. The *Curtis* Factors Are Not Binding and Do Not Support Lifting the Stay.

18. Claiming a "more nuanced examination of 'cause'" under the factors set forth in *In re Curtis*, 40 B.R. 795 (Bankr. D. Utah 1984), but without actually analyzing any of those factors, the Movants assert that "the greater balance of hurt is unquestionably born by Movants" because the Debtor "will not be impacted" if the stay is lifted. Bergrud Mot., 35-36; Herlihy Mot., 35-36.

19. This bare assertion, however, ignores that (a) the Movants' claims are indistinguishable from the myriad other asbestos claims against the Debtor; (b) lifting the stay would result in the Movants receiving preferential treatment as compared to other claimants, lead to disparate recoveries on similar claims, and impede the Debtor's ability to make progress toward the establishment of a trust for the benefit of all claimants; (c) the Movants already have achieved recoveries on their claims against other defendants or will be proceeding against those defendants in short order (Bergrud Mot., 31; Herlihy Mot., 32); (d) the establishment of an asbestos trust would result in a far more timely and efficient process that ultimately would reduce delay and eliminate uncertainty and unjustified disparate results, thereby ensuring prompt, consistent, and equitable treatment for current and future asbestos claimants; and (e) delay on its own is insufficient to justify relief from the automatic stay. *See DBMP*, 2021 WL 3552350, at *34 ("While courts seek to minimize the time consumed by these case events, there is no avoiding such 'harm,' if there is to be a bankruptcy case, at all. If delay alone were enough to provide 'cause,' the stay would be terminated in every case.").

## III. THE MOVANTS' OTHER ARGUMENTS PREVIOUSLY HAVE BEEN REJECTED OR ARE IRRELEVANT TO THE LIFT STAY ANALYSIS.

20. Unable to demonstrate any unique circumstances or that relief is warranted under the *Robbins* (or *Curtis*) factors, each Motion instead spends most of its 36 pages advancing a narrative about the alleged illegitimacy and bad faith of this chapter 11 case and raising premature and irrelevant arguments about jury trial rights and claim recoveries under a future plan of reorganization. *See* Bergrud Mot., 2-7, 12-29; Herlihy Mot., 2-7, 13-30. These unsupported arguments are misguided.

21. To start, the Movants confuse the standard for evaluating motions for relief from the automatic stay, insisting that bad faith be determined first. But allegations of bad faith should not be considered separate and apart from the governing *Robbins* factors. *See* Bergrud Mot., 29; Herlihy Mot., 30. Bad faith, if relevant, should be considered as part of the Court's balancing under *Robbins*. *See Fairville Co. v. Ramkaran (In re Ramkaran)*, 315 B.R. 361, 365-66 (D. Md. 2004) (in affirming ruling denying motion to lift the automatic stay, finding that *Carolin*'s "strict standard for the use of bad faith as a basis for dismissal applies equally" to section 362 and that "bad faith is one component of, but not necessarily dispositive of, the balance test" under *Robbins*).

22. Moreover, the application of *Carolin Corp. v. Miller*, 886 F.2d 693 (4th Cir. 1989), to lift stay motions in this Circuit is not contrary to well-established precedent in the Fourth Circuit. *See* Bergrud Mot., 5; Herlihy Mot., 5; *compare Ramkaran*, 315 B.R. at 365-66. In *Bestwall*, Judge Beyer properly considered *Carolin* and acknowledged that *Carolin* established the bad faith test for dismissals in this Circuit with specific reference to section 362(d)(1). *See Bestwall*, Jan. 18, 2024 Hr'g Tr., 78:21-79:11; *see also Carolin*, 886 F.2d at 699 ("Just as § 1112(b) inferentially permits inquiry into a debtor's good faith in the context of an interested party's motion

to dismiss, § 362(d)(1)'s 'for cause' language authorizes the court to determine whether, with respect to the interests of a creditor seeking relief, a debtor has sought the protection of the automatic stay in good faith.").

23. Similar to the lift stay motion in *Bestwall*, it would defy "logic to conclude that [*Carolin*'s] two-prong standard doesn't apply" to the Motions' allegations of bad faith, particularly where (a) lifting the stay would essentially constitute a dismissal of the case, (b) the arguments raised in support of lifting the stay are those that have been raised in support of dismissing similar cases, and (c) both this Court (in *Aldrich/Murray*) and Judge Beyer (in *Bestwall*) already have denied motions to dismiss those cases under similar facts. *See Bestwall*, Jan. 18, 2024 Hr'g Tr., 79:12-80:5 ("it can't be that a less stringent standard applies to a relief from stay motion which, if granted, would result in the dismissal of the case.").

24. The Movants' citation to an out-of-circuit, non-mass tort case does not change this analysis. *See* Bergrud Mot., 5, 18-21; Herlihy Mot., 5, 19-20, 22 (citing to *In re Dixie Broad., Inc.*, 871 F.2d 1023 (11th Cir. 1989)). In *Dixie*, the bankruptcy court was considering whether to lift the stay to allow a contract counter-party to pursue state court litigation in a case that was filed during court-ordered settlement negotiations as a result of a two-party contractual dispute. 871 F.2d at 1026-1027. Importantly, the courts in *Dixie* were not contending with a mass-tort case with tens of thousands of claimants alleging the same claims—merely a contract dispute between two parties, which often is the hallmark of a bad faith filing.[15] The Movants also ignore that their long string cite of cases allegedly supporting their argument—*i.e.*, that lack of good faith can constitute cause to lift the automatic stay—are distinguishable and irrelevant here. *See*

[15] The Movants' emphasis on *Dunes Hotel Assocs. v. Hyatt Corp.*, 245 B.R. 492, 507 (D.S.C. 2000) as supporting the reasoning in *Dixie* (Bergrud Mot., 21-22; Herlihy Mot., 22) disregards that, in *Dunes*, the court was not considering a motion for relief from the automatic stay, but rather a motion to dismiss the case.

Bergrud Mot., 29 n.27; Herlihy Mot., 29 n.28. Only a few of these cases addressed bad faith in the context of the automatic stay, and none of the cases involved a mass tort debtor with tens of thousands of actions pending against it as of the filing of the bankruptcy case. In fact, most of the cases focused on dismissal or fee award issues and involved single-asset debtors seeking to avoid foreclosures or other two-party disputes.[16] Indeed, Judge Beyer, in addressing these very same cases (as cited by the lift stay movants in *Bestwall*), stated that the case citations were "somewhat misleading" and the cases did not "stand for the proposition for which [the Court] believe[s] they were cited." *See Bestwall*, Jan. 18, 2024 Hr'g Tr., 80:9-81:3.

25. Further, the Movants' arguments regarding the Debtor's alleged subjective bad faith are incorrect,[17] totally unsupported, and more appropriate in the context of dismissal than

---

16 *See, e.g.*, *In re Little Creek Dev. Co.*, 779 F.2d 1068 (5th Cir. 1986) (reversing and remanding bankruptcy court order lifting the automatic stay to allow secured creditor to foreclose on real-estate property); *In re Thirtieth Place, Inc.*, 30 B.R. 503 (Bankr. App. 9th Cir. 1983) (dismissing bankruptcy case filed by debtor to delay foreclosure); *In re Talladega Steaks, Inc.*, 50 B.R. 42 (Bankr. N.D. Ala. 1985) (dismissing bankruptcy case involving dispute between shareholders and management of the debtor); *In re Kinney*, 51 B.R. 840 (Bankr. C.D. Cal. 1985) (imposing sanctions on attorney due to multiple repeat filings in cases that were dismissed for bad faith); *In re Silver*, 46 B.R. 772 (D. Colo. 1985) (reviewing award of attorney's fees as a result of a bad faith filing); *In re Volpe*, 53 B.R. 46 (Bankr. M.D. Fla. 1985) (dismissing bankruptcy case filed primarily to stop pending foreclosure sale); *In re Martin*, 51 B.R. 490 (Bankr. M.D. Fla. 1985) (dismissing bankruptcy case involving two-party dispute); *In re Setzer*, 47 B.R. 340 (Bankr. E.D.N.Y. 1985) (dismissing bankruptcy case filed as a litigation tactic to circumvent a district court order and where debtor faced only a handful of lawsuits); *In re Port Richey Serv. Co.*, 44 B.R. 634 (Bankr. M.D. Fla. 1984) (dismissing bankruptcy case involving two-party dispute); *In re Winn*, 43 B.R. 25 (Bankr. M.D. Fla. 1984) (dismissing bankruptcy case essentially involving two-party dispute); *Basin Elec. Power Co-op v. Midwest Processing Co.*, 47 B.R. 903, (D.N.D. 1984), *aff'd*, 769 F.2d 483 (8th Cir. 1985) (dismissing involuntary bankruptcy case involving two-party dispute); *In re Scott*, 42 B.R. 35 (Bankr. D. Ore. 1984) (granting motion to lift stay to allow foreclosure of real estate property); *Furness v. Lilienfield*, 35 B.R. 1006 (D. Md. 1983) (dismissing bankruptcy case filed to delay a single trial in the district court); *In re Corp. Deja Vu*, 34 B.R. 845 (Bankr. D. Md. 1983) (granting motion to lift stay to allow foreclosure of real-estate project); *In re 299 Jack-Hemp Assocs.*, 20 B.R. 412 (Bankr. S.D.N.Y. 1982) (dismissing bankruptcy case filed to stop foreclosure); *In re Lotus Invs., Inc.*, 16 B.R. 592 (Bankr. S.D. Fla. 1981) (granting motion to lift stay to allow foreclosure of real-estate project); *Matter of Winshall Settlor's Tr.*, 758 F.2d 1136 (6th Cir. 1985) (dismissing bankruptcy case); *In re Albany Partners, Ltd.*, 749 F.2d 670 (11th Cir. 1984) (dismissing bankruptcy case and annulling automatic stay in case filed on the eve of foreclosure).

17 For example, the Movants' contentions regarding the funding agreement (Bergrud Mot., 13-14; Herlihy Mot., 14-15) misleadingly ignore that the funding agreement here ***does not require***, as a condition to funding, that CertainTeed LLC ("New CT") obtain relief pursuant to section 524(g) or agree to the terms of a confirmed plan. Although already true, the Debtor and New CT entered into a stipulation regarding the Second Amended Funding Agreement, *see* Dkt. 1279, dated as of September 15, 2021, to avoid any argument and make it explicitly clear that funding under the Second Amended Funding Agreement would be available for

a motion for relief from the automatic stay.[18] The Movants repeat arguments regarding lack of financial distress and lack of a proper purpose that already have been rejected by courts in this District. *See In re Bestwall LLC*, 605 B.R. 43, 49 (Bankr. W.D.N.C. 2019) ("Attempting to resolve asbestos claims through 11 U.S.C. § 524(g) is a valid reorganizational purpose, and filing for Chapter 11, especially in the context of an asbestos or mass tort case, need not be due to insolvency. . . . The volume of current asbestos claims that Bestwall faced as of the Petition Date, coupled with the projected number of claims to be filed through 2050 and beyond, is sufficient financial distress for Bestwall to seek resolution under section 524(g) of the Bankruptcy Code."); *In re Aldrich Pump LLC*, 2023 WL 9016506, at *28 (Bankr. W.D.N.C. Dec. 28, 2023) (Court stating in response to the same arguments raised by the same law firm that "since these motions [to dismiss] were filed, both higher courts have stated that the *Carolin* Two-Prong Test applies to Chapter 11 bad faith dismissal motions, even those involving solvent, and arguably financially non-distressed corporate debtors. Those decisions bind this bankruptcy court.").[19] And, as acknowledged by the Movants, the Fourth Circuit recently denied a direct appeal regarding these same arguments.

a section 524(g) plan of reorganization, "regardless of whether such plan of reorganization provides that [New CT] will receive the protection of section 524(g) of the Bankruptcy Code and regardless of whether [New CT] supports such plan of reorganization." *See* Ex. B, Dkt. 1279. Further, the stipulation made clear the enforceability of the Second Amended Funding Agreement and provided that, upon an Event of Default (as defined in the Second Amended Funding Agreement), the Debtor and New CT agreed not to oppose a request of the Committee and the Future Claimants' Representative to take actions that are necessary or appropriate to pursue remedies in this Court. *See* Dkt. 1279 ¶¶ 2, 6. The Debtor has no intention of foregoing any of its rights under the Second Amended Funding Agreement and does not believe that New CT has any intention of avoiding its obligations under that agreement. Since the funding agreement became effective, the parties have fully complied with their obligations thereunder—further exemplifying the Debtor's (and New CT's) good faith.

18 *See Bestwall*, Jan. 18, 2024 Hr'g Tr., 81:16-19 ("In my view, this motion for relief from stay is, in many respects, a repeat of the arguments made by Mr. Buckingham in his motion to dismiss and many of the arguments strike me as misplaced in the context of a motion for relief from stay.").

19 The Movants also ignore the multiple cases involving solvent debtors, each of which had been defending and paying claims in the tort system, that resulted in claimant-supported and court-approved asbestos trusts established under a section 524(g) plan of reorganization. *See In re Mid-Valley, Inc.*, 305 B.R. 425, 429-31 (Bankr. W.D. Pa. 2004) (bankruptcy court stating that the "fact of solvency does not require a finding that the bankruptcy filing was in bad faith"); *In re N. Am. Refractories Co.*, No. 02-20198 (Bankr. W.D. Pa.); *In re Garlock Sealing Techs. LLC*, No. 10-31607 (Bankr. W.D.N.C.); *In re W.R. Grace & Co.*, Nos. 01-1139,

26. The Motions repeat these arguments in a case where no party has moved for dismissal and where the Committee and the Future Claimants' Representative are actively prosecuting three adversary proceedings regarding the prepetition restructuring and the Debtor's filing of the chapter 11 case—an avenue suggested by this Court in the order granting the Debtor's request for a preliminary injunction and extending the automatic stay to non-debtor affiliates, which order was not appealed.[20] *See DBMP*, 2021 WL 3552350, at *38; Adv. Pro. Nos. 21-03023 (JCW) (seeking substantive consolidation of the Debtor with New CT); 22-03000 (JCW) (asserting counts for both intentional and constructive fraudulent conveyance related to the prepetition restructuring); and 22-03001 (JCW) (seeking relief based on theories of breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, and civil conspiracy in connection with the approval and implementation of the prepetition restructuring).[21]

27. In addition, the Movants' assertions regarding "the lack of progress in Two-Step cases" (Bergrud Mot., 15; Herlihy Mot., 16) ignore the many matters concluded in this case (such as the preliminary injunction adversary proceeding), the parties' work towards estimation

1140 (Bankr. D. Del.); *In re USG Corp.*, No. 01-2094 (Bankr. D. Del.); *In re United Gilsonite Labs.*, No. 11-02032 (Bankr. M.D. Pa.)); *see also In re Kaiser Gypsum Co., Inc.*, 60 F.4th 73, 77-78 (4th Cir. 2023) (Congress passed section 524(g) of the Bankruptcy Code with the stated intention that a debtor with "substantial" asbestos liabilities could access it.); *In re Honx, Inc.*, 2022 WL 17984313, at *2 (Bankr. S.D. Tex. Dec. 28, 2022) ("Congress recognized that while an asbestos bankruptcy differs from a 'classic' bankruptcy with an insolvent or near-insolvent debtor, it is still a forward-looking solution meant to treat fairly all parties in interest. That is the hallmark purpose of chapter 11. That is not a 'bad faith' motive.").

20 The Motions similarly repeat the argument previously raised by the Committee and the Future Claimants' Representative that the Debtor's non-debtor affiliates are seeking "all the benefits of the stay while taking on none of the burdens" of bankruptcy. *See* Bergrud Mot., 20; Herlihy Mot., 20. But this argument ignores that "Old CertainTeed is no more, and, at present, the Debtor is exclusively responsible for the DBMP Asbestos Claims, " *see DBMP*, 2021 WL 3552350, at *27, and the Debtor retains the same ability to fund the costs of defending and resolving present and future asbestos claims as the former CertainTeed LLC did prior to the prepetition restructuring through the Second Amended Funding Agreement.

21 Notably, the Movants' arguments are contrary to the assertions of the Committee and the Future Claimants' Representative in the fraudulent transfer and breach of fiduciary duty proceedings that the Debtor was insolvent as a result of the prepetition restructuring. *See, e.g.*, *Amended Complaint*, Adv. Pro. No. 22-03000 (JCW), Dkt. 14 ¶¶ 6, 54, 73, 107, 114, 125, 144, 151; *Amended Complaint*, Adv. Pro. No. 22-03001 (JCW), Dkt. 12, ¶¶ 2, 7, 78, 101, 105, 125, 126, 139, 141, 145, 146, 148, 153, 155, 162, 180, 182.

(including ongoing estimation-related discovery), the parties' participation in a Court-ordered mediation process, and the lack of any evidence that the Debtor is the cause of delay here. *See Bestwall*, 71 F.4th at 183-84 ("the main interference with the timely resolution of the claims in Bestwall's bankruptcy proceeding appears to be Claimant Representatives' challenge to the preliminary injunction, thereby prolonging the bankruptcy process and preventing the claimants from obtaining prompt relief."); *see also Aldrich*, 2023 WL 9016506, at *32 (finding no unreasonable delay in the debtors' prosecution of their cases, including because "at every opportunity [the official committee of asbestos claimants and claimant law firms] have sought to force dismissal of these cases").

28. Lifting the stay and allowing the Movants' claims to proceed to liquidation, outside of the chapter 11 case, would (a) be wholly inconsistent with the ultimate goal of estimation—establishing an aggregate value for the asbestos-related claims asserted against the Debtor and avoiding the liquidation of individual asbestos claims—and (b) potentially trigger a wave of similar requests that would, at a minimum, distract the parties from mediation and the estimation proceeding. This is especially so since the Debtor is not seeking to "avoid state law tort liabilities" through the chapter 11 case and the estimation proceeding, but rather to quantify the Debtor's aggregate liability in order to negotiate and confirm a consensual section 524(g) plan. The Movants' conclusory assertions to the contrary are simply wrong.

29. Finally, the Movants' arguments regarding (a) an alleged absolute right to liquidate their individual claims before a jury and (b) the manner in which claims may be treated under a proposed plan of reorganization (Bergrud Mot., 17-18, 32-34; Herlihy Mot., 17-18, 32-34) are not reasons to lift the automatic stay and are raised prematurely. *See Aldrich*, 2023 WL 9016506, at *21 (recognizing that these issues were "a question for another day" in denying the

motions to dismiss the *Aldrich/Murray* cases). Section 524(g) plans do not deprive asbestos claimants of access to the tort system nor do they eliminate claimants' rights to a jury trial.[22] And *Ortiz*—cited by the Movants to support this argument—at its core involved an interpretation of a rule of civil procedure that has no application here. The issue before the Supreme Court was not whether no-opt-out settlements are ever constitutional, but rather whether Rule 23(b)(1)(B), a class action rule that the Court interpreted to require a limited fund, was satisfied where "the only limited fund . . . was a creature of the settlement itself." *Ortiz v. Fibreboard*, 527 U.S. 815, 830 (1999). *Ortiz* did not address any limited fund issues in the context of bankruptcy generally or section 524(g) specifically. *See id.* at 821 ("This case turns on the conditions for certifying a mandatory settlement class on a limited fund theory under Federal Rule of Civil Procedure 23(b)(1)(B)."); *see also id.* at 861 ("The nub of our position is that we are bound to follow Rule 23 as we understood it upon its adoption, and that we are not free to alter it except through the process prescribed by Congress in the Rules Enabling Act."). Indeed, the Supreme Court in *Ortiz*, in discussing due process concerns, explicitly recognized the existence of exceptions to general rules for "special remedial scheme[s] . . . for example in bankruptcy or probate." *Id.* at 846 (internal citation omitted).

30. The Movants' unsupported objections to this chapter 11 case and what they perceive to be the Debtor's approach to a plan are irrelevant at this juncture, especially since the Movants will have the opportunity to assess and object to any proposed plan at the appropriate time. The Motions repackage the same arguments these and other claimant firms have advanced

---

22 *See In re Duro Dyne Nat'l Corp.*, No. 19-1543 (Bankr. D.N.J.) [Dkt. 1-2], Trust Distribution Procedures 43, Exhibit F to Third Amended Plan (claimants, after non-binding arbitration and other prerequisites "may file a lawsuit against" the trust); *see also In re Specialty Prods. Holding Corp.*, No. 10-11780, Exhibit I.A.13 at 3-4 [Dkt. 2669-1] (Bankr. D. Del. July 12, 2012) (same); Amended Plan of Reorganization of DBMP LLC, Exhibit I.A.12 at 46 [Dkt. 944] ("Claimants who elect non-binding arbitration and then reject their arbitral awards retain the right to institute a lawsuit in the tort system against the PI Trust.").

in motions for relief from stay and motions to dismiss filed in the *Bestwall* and *Aldrich/Murray* cases and advanced in the Committee Lift Stay Motion in this case. They should be denied for the same reasons those motions were denied.

**CONCLUSION**

The Debtor respectfully requests that the Court deny the Motions and grant the Debtor such other and further relief as the Court may deem proper.

Dated: May 2, 2024
Charlotte, North Carolina

Respectfully submitted,

*/s/ Garland S. Cassada*

Garland S. Cassada (NC Bar No. 12352)
ROBINSON, BRADSHAW & HINSON, P.A.
101 North Tryon Street, Suite 1900
Charlotte, North Carolina 28246
Telephone: (704) 377-2536
Facsimile: (704) 378-4000
E-mail: gcassada@robinsonbradshaw.com

Gregory M. Gordon (TX Bar No. 08435300)
JONES DAY
2727 North Harwood Street, Suite 500
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
E-mail: gmgordon@jonesday.com
(Admitted *pro hac vice*)

Jeffrey B. Ellman (GA Bar No. 141828)
JONES DAY
1221 Peachtree Street, N.E., Suite 400
Atlanta, Georgia 30361
Telephone: (404) 581-3939
Facsimile: (404) 581-8330
E-mail: jbellman@jonesday.com
(Admitted *pro hac vice*)

ATTORNEYS FOR DEBTOR
AND DEBTOR IN POSSESSION

**EXHIBIT A**