**No. 24-2109**

# United States Court of Appeals

*for the*

# Fourth Circuit

MICHAEL N. HERLIHY; ANN HERLIHY;
THE ESTATE OF PETER L. BERGRUD,

*Claimants-Appellants,*

– v. –

DBMP, LLC,

*Debtor-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NORTH CAROLINA, CHARLOTTE DIVISION

## JOINT APPENDIX
## Volume 2 of 3 (Pages JA607 to JA1212)

JONATHAN RUCKDESCHEL
THE RUCKDESCHEL LAW FIRM, LLC
8357 Main Street
Ellicott City, Maryland 21043
(410) 750-7825
rucklawfirm@rucklawfirm.com

THOMAS W. WALDREP, JR.
CHRIS W. HAAF
DIANA S. JOHNSON
WALDREP WALL BABCOCK & BAILEY PLLC
370 Knollwood Street, Suite 600
Winston-Salem, North Carolina 27103
(336) 722-6300
twaldrep@waldrepwall.com
chaaf@waldrepwall.com
dsantosjohnson@waldrepwall.com

*Counsel for Claimants-Appellants*

*(For Continuation of Appearances See Inside Cover)*

COUNSEL PRESS (800) 4-APPEAL • (JOB 811477)

JOHN L. STEFFAN
MAUNE RAICHLE HARTLEY FRENCH
& MUDD, LLC
1015 Locust Street, Suite 1200
St. Louis, Missouri 63101
(314) 320-9643
jsteffan@mrhfmlaw.com

CLAYTON L. THOMPSON
MAUNE RAICHLE HARTLEY FRENCH
& MUDD, LLC
150 West 30th Street, Suite 201
New York, New York 10001
(314) 241-2003
cthompson@mrhfmlaw.com

*Counsel for Claimants-Appellants*

GARLAND S. CASSADA
RICHARD C. WORF
ROBINSON BRADSHAW
& HINSON, P.A.
101 North Tryon Street, Suite 1900
Charlotte, North Carolina 28246
(704) 377-2536
gcassada@robinsonbradshaw.com
rworf@robinsonbradshaw.com

JEFFREY B. ELLMAN
JONES DAY
1221 Peachtree Street, N.E.,
Suite 400
Atlanta, Georgia 30361
(404) 521-3939
jbellman@jonesday.com

GREGORY M. GORDON
JONES DAY
2727 North Harwood Street,
Suite 500
Dallas, Texas 75201
(214) 220-3939
gmgordon@jonesday.com

C. KEVIN MARSHALL
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
(202) 879-3939
ckmarshall@jonesday.com

SARAH E. WELCH
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
(216) 586-3939
swelch@jonesday.com

*Counsel for Debtor-Appellee*

**TABLE OF CONTENTS**

**District Court Case No. 3:24-cv-00558**

**VOLUME ONE**


District Court Docket Sheet ........ JA1

Motion to Consolidate Related Appeals
Filed July 16, 2024 ........ JA6

Brief of Appellants
Filed August 19, 2024 ........ JA12

Appendix to Appellants' Brief
Filed August 19, 2024 ........ JA52

Document 1 - Voluntary Petition Under Chapter 11
Filed January 23, 2020 ........ JA58

Document 22 - Informational Brief of DBMP LLC
Filed January 23, 2020 ........ JA76

Document 24 - Declaration of Robert J. Panaro
Filed January 23, 2020 ........ JA110

Document 614 - Motion of the Official Committee to Asbestos Personal Injury Claimants to Lift Stay
Filed January 31, 2021 ........ JA161

Document 656 - Debtor's Objection to Motion of the Official Committee of Asbestos Personal Injury Claimant's to Lift Stay
Filed January 13, 2021 ........ JA192

Document 972 - Findings of Fact and Conclusions of Law
Filed August 11, 2021 ........ JA218

Document 2753 - The Estate of Peter L. Bergrud's Motion for Relief from the Automatic Stay
Filed April 18, 2024 ........ JA297

Document 2757 - Exhibits to the Estate of Peter L. Bergrud's Motion for Relief from the Automatic Stay
Filed April 18, 2024

Exhibit 1 - Transcript of Proceedings Before Hon. J. Craig Whitley
Heard March 30, 2024 .................................................... JA335

Exhibit 2 - Transcript of Proceedings Before Hon. Laura Turner Beyer
Heard October 19, 2023 .................................................... JA344

Exhibit 3 - Transcript pf Proceedings Before Hon. Laura Turner Beyer
Heard January 18, 2024 .................................................... JA350

Exhibit 4 - Bergrud Medical Records
Filed August 19, 2024 .................................................... JA357

Exhibit 5 - Deposition of Leon David Horowitz
Filed April 18, 2024 .................................................... JA361

Exhibit 6 - Video Deposition of Lloyd C. Ambler
Filed August 19, 2024 .................................................... JA373

Exhibit 7 - Videotaped Discovery Deposition of Lloyd Ambler
Taken August 20, 2014.................................................... JA378

Exhibit 8 - Videotaped Deposition of Lloyd Ambler, Vol. 2
Filed April 18, 2024 .................................................... JA382

Exhibit 9 - Video Deposition of Juan Bergrud
Taken October 15, 2019 .................................................... JA387

Exhibit 10 - Discovery Deposition of Juan Bergrud, Vol. 2
Taken October 16, 2019 .................................................... JA398

Exhibit 11 - Discovery Deposition of Richard Trumbull
Taken November 18, 2019 .................................................... JA407

Exhibit 12 - Dr. Brodkin Medical Evaluation Report of Peter Bergrud
Filed April 18, 2024 .................................................... JA416

Exhibit 13 - Report of Dr. Christopher DePasquale, Re. Peter Bergrud Dated February 19, 2020
Filed April 18, 2024 .......................................................... JA424

Exhibit 14 - Complaint For Personal Injury
Filed April 9, 2019 .......................................................... JA428

Exhibit 15 - Consolidated Financial Statements, Dec. 31, 2023
Filed April 18, 2024 .......................................................... JA435

Document 2755 - Michael and Ann Herlihy's Motion for Relief From the Automatic Stay
File April 18, 2024 .......................................................... JA439

Document 2755-1 - Exhibits to Michael and Ann Herlihy's Motion for Relief From the Automatic Stay

Exhibit 1 - Transcript of Proceedings Before Hon. J. Craig Whitley
Heard March 30, 2023 .......................................................... JA477

Exhibit 2 - Transcript of Proceedings Before Hon. Laura Turner Beyer
Heard October 19, 2023 .......................................................... JA486

Exhibit 3 - Transcript of Proceedings Before Hon. Laura Turner Beyer
Heard January 18, 2024 .......................................................... JA492

**VOLUME TWO**

Exhibit 4 - Surgical Pathology Report of Michael Herlihy
Filed April 18, 2024 .......................................................... JA499

Exhibit 5 - Complaint for Personal Injury and Loss of Consortium
Filed August 4, 2023 .......................................................... JA501

Exhibit 6 - Order to Show Cause
Executed January 26, 2024 .......................................................... JA531

Exhibit 7 - Videotaped Discovery Deposition of Lloyd Ambler
Taken August 20, 2014 .......................................................... JA536

Exhibit 8 - Deposition of Leon David Horowitz
Taken June 30, 1980 .......... JA540

Exhibit 9 - Videotaped Deposition of Lloyd C. Ambler, Vol. 1
Filed April 18, 2024 .......... JA552

Exhibit 10 - Videotaped Deposition of Lloyd C. Ambler, Vol. 2
Filed April 18, 2024 .......... JA557

Exhibit 11 - Videotaped Deposition of Michael Herlihy
Taken October 20, 2023 .......... JA562

Exhibit 12 - Deposition of Michael Herlihy, Vol. 3
Taken November 3, 2023 .......... JA573

Exhibit 13 - Consolidated Financial Statements, December 31, 2023
Filed April 18, 2024 .......... JA580

Document 2777 - Debtor's Omnibus Objection to the Estate of Bergrud and Herlihy Motions from Relief of Automatic Stay
Filed May 2, 2024 .......... JA584

Exhibit 1 - Excerpt of Bestwall LLC, Chapter 11 Transcript
Heard September 22, 2023 .......... JA606

Document 2779 - Statement of the Official Committee of Asbestos Personal Injury Claimants in Support of Claimants' Motions for Relief from Automatic Stay
Filed May 2, 2024 .......... JA612

Document 2782 - The Estate of Peter Bergrud's and Michael and Ann Herlihy's Omnibus Reply in Support of Motions for Relief from the Automatic Stay
Filed May 6, 2024 .......... JA616

Document 2808 - Order Denying Motion of the Estate of Michael and Ann Herlihy for Relief of the Automatic Stay
Filed May 28, 2024 .......... JA625

Document 2809 - Order Denying Motion of the Estate Peter Bergrud for Relief of the Automatic Stay
Filed May 28, 2024 .......... JA627

Document 2820 - Notice of Appeal of Order Denying Michael and Ann Herlihy Motion for Relief of the Automatic Stay
Filed June 11, 2024 .......... JA629

Exhibit A - Order Denying Herlihy Motion to Lift Stay
Filed May 28, 2024 .......... JA633

Document 2821 - Notice of Appeal of Order Denying Motion of the Estate of Peter Bergrud for the Relief from the Automatic Stay
Filed June 11, 2024 .......... JA634

Exhibit A - Order Denying Motion of the Estate of Peter Berdrud for Relief from the Automatic Stay
Filed May 28, 2024 .......... JA638

Transcript of Proceedings Before Hon. Laura Turner Beyer
Heard January 18, 2024 .......... JA641

Transcript of Proceedings Before Hon. Laura Turner Beyer
Heard March 28, 2024 .......... JA733

Transcript of Proceedings Before Hon. J. Craig Whitley
Heard May 9, 2024 .......... JA825

Transcript of Proceedings Before Hon. J. Craig Whitley
Heard May 23, 2024 .......... JA904

**VOLUME THREE**

Brief for Appellee
Filed September 18, 2024 .......... JA1048

Reply Brief of Appellants
Filed October 2, 2024 .......... JA1114

Transcript of Proceedings Before the Hon. Kenneth D. Bell
Heard October 24, 2024 .................................................................. JA1133

Order on Appellant's Motion for Relief
Filed October 28, 2024 .................................................................. JA1186

Notice of Appeal
Filed October 29, 2024 .................................................................. JA1197

Exhibit A - Order Denying Appellants Motion for Relief from the Automatic Stay
Filed October 28, 2024 .......................................................... JA1201

**United States Bankruptcy Court**
**Western District of North Carolina**
**Charlotte Division, Case No. 20-30080**

Stipulation and Agreed Order Modifying the Automatic Stay
Filed October 26, 2020 .................................................................. JA1213

Transcript of Proceedings Before the Hon. J. Craig Whitley
Filed October 18, 2021
Heard October 14, 2021 .................................................................. JA1218

Order Authorizing Estimation of Current and Future Mesothelioma Claims
Filed October 21, 2021 .................................................................. JA1312

Stipulation Between Debtor and Certainteed LLC Regarding Second Amended Funding Agreement
Filed January 5, 2022 .................................................................... JA1315

Transcript of Proceedings Before the Hon. J. Craig Whitley
Filed January 10, 2022
Heard January 6, 2022 .................................................................... JA1359

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

DATE: SEPTEMBER 22, 2023

IN RE: BESTWALL, LLC, DEBTOR

CHAPTER 11

CASE NOS. 22-1981(L), 22-1984

question whether this thing is a proceeding independent enough that it ought to be reviewed on the contempt citation against these lawyers.

MS. TALBOT: Yes, Your Honor. And -- I'm sorry.

JUDGE KING: I practiced law a bit myself. And it's a tough situation.

JUDGE WILKINSON: A lot of times, it's the bankruptcy case itself is the proceeding. But of course, every bankruptcy case spawns potentially hundreds of little subsidiary proceedings.

MS. TALBOT: Yes.

JUDGE WILKINSON: And they may be proceedings. But here, the proceeding and the purpose of the bankruptcy litigation is to find out what the obligations of Bestwall are, to contribute to this trust fund. And taking the appeal of the district court or the court of appeals still does nothing to resolve the basic question, which is what is the best estimate of Bestwall's asbestos-related liabilities? What does Bestwall -- what do they owe to the trust fund? And this sanctions appeal doesn't have anything to say about that.

MS. TALBOT: I agree, Your Honor. It does not. And that is why it is a separable procedural

discovery order reversed. I'll particularly point you to page four of their reply. They freely concede the close link here, and that's why, particularly when civil contempt is entered to enforce a discovery order, it's important to enforce the rule against interlocutory appeals.

JUDGE WILKINSON: We can't resolve the sanctions order without looking at the discovery dispute. And that takes -- it's going to take us right back into the merits of a discovery order. And to me, there might be a more sympathetic case. But I don't like the route that this case has taken from the earlier non-final judgement. And then suddenly, it goes over to Illinois court. And as I say, that's a collateral attack upon the North Carolina order. And if I were the people who were defending that or whatever, or the district court of North -- Western District of North Carolina or what have you, or the bankruptcy judge whose now got to probably put things on hold until these non-final orders are litigated, and we're doing all of this and we are not advancing the ball in terms of the ultimate object of the whole bankruptcy proceeding, which is to allow the bankruptcy judge to make a reliable estimate of what exactly Bestwall's asbestos-related liabilities are to

fund the trust. And that's where we need to get to. And I must say that my friends talk about ten years and 20 years and everything. That is speculation. That is speculation. And the -- to me, I can speculate about how long it's going to take to get to the bottom line in this case, which is finding out what Bestwall's liability is. But I'm not going to speculate about how long that is, because I don't know.

JUDGE KING: I'll agree that that's speculation on my part, and a guess. And the guess of my -- our good lawyer here is 2025, and it's two years. But we're talking about lawyers being held in contempt of court, and then being sanctioned. And the sanctions order is, in my view, firm enough. In 1291, it calls for final decisions for appealing in the federal courts. It does not apply to bankruptcy. It does not. It's separate. Bankruptcy's separate, right? And we're not talking about reviewing it in the court of appeals or the sanctions order or the contempt order, or the discovery order. We're talking about whether the district court had jurisdiction to hear an appeal from the bankruptcy court. And Judge Conrad said he didn't. And that's what the appeal is here, whether that proceeding, these sanctions in

CERTIFICATE OF TRANSCRIBER

I, ASHLEY MATTHEWS, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

Dated: October 6, 2023

Ashley Matthews

ASHLEY MATTHEWS

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| In re:<br><br>DBMP LLC,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 20-30080 (JCW) |

**STATEMENT OF THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS IN SUPPORT OF CLAIMANT MOTIONS FOR RELIEF FROM AUTOMATIC STAY**

The Official Committee of Asbestos Personal Injury Claimants of DBMP LLC (the "**Committee**"), by and through undersigned counsel, hereby submits this statement in support of (a) *The Estate of Peter L. Bergrud's Motion for Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362(d)* [Dkt. No. 2753] (the "**Bergrud Motion**"); and (b) *Michael N. and Ann Herlihy's Motion for Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362(d)* [Dkt. No. 2755] (the "**Herlihy Motion**," and with the Bergrud Motion, the "**Lift Stay Motions**") and represents as follows:

1. The Bergrud Motion, filed by Cheryl Bergrud in both her individual capacity and as Personal Representative for the Estate of Peter L. Bergrud, seeks relief from the automatic stay to pursue state law causes of action against DBMP LLC ("**DBMP**" or the "**Debtor**") in the Superior Court of Washington (Pierce County). Mr. Bergrud passed away in April 2019, just months after his February 2019 mesothelioma diagnosis. As noted in the Bergrud Motion, Mrs. Bergrud has resolved the suit against all defendants not subject to a bankruptcy stay,[2] and all of

[1] The last four digits of the Debtor's taxpayer identification number are 8817. The Debtor's address is 20 Moores Road, Malvern, Pennsylvania 19355.

[2] Bergrud Motion at 31.

her claims are based on Washington law.[3] Further, Mrs. Bergrud agrees that the liquidated value of the claim "will not be paid until this Court allows it."[4]

2. Similarly, Michael and Ann Herlihy (**"the Herlihys"**) seek relief from the automatic stay to pursue state law causes of action against DBMP in California. Mr. Herlihy was diagnosed with malignant mesothelioma on March 23, 2023, but has been prevented from joining DBMP in his state court lawsuit due to the automatic stay. In support of the Herlihy Motion, the Herlihys note the trial is set for March 2025, which would permit litigation "against all tortfeasors in ***one*** proceeding" and avoid any risk of prejudice against DBMP, as well as promote judicial economy in the California court.[5] Like the Bergrud Motion, the Herlihy Motion relates to claims based entirely on state law, and any payment would occur only after this Court's allowance.[6]

3. The Debtor contends[7] that, assuming the funding agreement were enforced, DBMP could fully fund a section 524(g) trust.[8]

4. Moreover, New CT has unquestionably benefited from DBMP's bankruptcy filing. Before filing for bankruptcy protection, Old CT spent about $160 million in **one year** defending or resolving cases in the tort system.[9] Using the Debtor's own numbers, between the Petition Date

---

[3] *Id.* at 33.

[4] *Id.*

[5] Herlihy Motion at 10 (emphasis in original), 32. The Herlihy Motion also notes they may seek trial preference under California law, which would accelerate the trial date. *Id.* at 31-32.

[6] *Id.* at 33.

[7] *See, e.g., Informational Brief of DBMP LLC* at 25 [Dkt. No. 22] ("the combination of assets owned by DBMP and a funding agreement that is in place with New CT ensures that DBMP has the same ability to satisfy asbestos claims that Old CT had prior to the restructuring.") (**"Info. Br."**).

[8] *See, e.g., Findings of Fact and Conclusions of Law Regarding Order: (I) Declaring that the Automatic Stay Applies to Certain Actions Against Non-Debtors, (II) Denying Motion of the Official Committee of Asbestos Personal Injury Claimants to Lift the Stay, and Alternatively (III) Preliminarily Enjoining Such Actions* at ¶ 109 [Adv. Pro. No. 20-03004, Dkt. No. 343].

[9] Info. Br. at 17-18.

and the end of 2023,[10] the Committee estimates that New CT has saved **approximately $530.4 million** in defense and indemnity payments. Separate and apart from these savings, analysis by the Committee's Financial Advisor also suggests that New CT has financially benefited from DBMP's bankruptcy.

5. Granting the Lift Stay Motions will not prejudice other claimants—present or future—because the Debtor contends it has the ability to pay all claims in full. Moreover, there is no question that the balance of the harms favors Mrs. Bergrud and the Herlihys.

6. For these reasons, the Committee supports Mrs. Bergrud's and the Herlihys' requests for stay relief and does not oppose the Lift Stay Motions.

7. The Committee reserves the right to appear and be heard at any hearing on the Lift Stay Motions.

[*Signature Page Follows*]

[10] Calculations are based on submitted professional fees through December 2023.

May 2, 2024

HAMILTON STEPHENS STEELE
+ MARTIN, PLLC

*/s/ Robert A. Cox, Jr.*
Glenn C. Thompson (Bar No. 37221)
Robert A. Cox, Jr. (Bar No. 21998)
525 North Tyron Street, Suite 1400
Charlotte, North Carolina 28202
Telephone: (704) 344-1117
Facsimile: (704) 344-1483
Email: gthompson@lawhssm.com
rcox@lawhssm.com

ROBINSON & COLE LLP
Natalie D. Ramsey (admitted *pro hac vice*)
Davis Lee Wright (admitted *pro hac vice*)
1201 N. Market Street, Suite 1406
Wilmington, Delaware 19801
Telephone: (302) 516-1700
Email: nramsey@rc.com
dwright@rc.com

CAPLIN & DRYSDALE, CHARTERED
Kevin C. Maclay (admitted *pro hac vice*)
Todd E. Phillips (admitted *pro hac vice*)
Jeffrey A. Liesemer (admitted *pro hac vice*)
One Thomas Circle NW, Suite 1100
Washington, DC 20005
Telephone: (202) 862-5000
Facsimile: (202) 429-3301
Email: kmaclay@capdale.com
tphillips@capdale.com
jliesemer@capdale.com

*Co-Counsel to the Official Committee of Asbestos Personal Injury Claimants of DBMP LLC*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | | |
|---|---|---|
| In re: | : | |
| | : | Chapter 11 |
| DBMP LLC,[1] | : | |
| | : | Case No. 20-30080 |
| Debtor. | : | |

**THE ESTATE OF PETER L. BERGRUD'S AND MICHAEL N. AND ANN HERLIHY'S OMNIBUS REPLY IN SUPPORT OF MOTIONS FOR RELIEF FROM THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(d)**

The Herlihys and Mrs. Bergrud contend DBMP[2] filed its petition in bad faith based on ***this*** Court's detailed factual findings, which they cited at length in both motions for relief from stay. *See, e.g.*, Herlihy Motion at 7, 13-15, 22-30; Bergrud Motion at 7, 13-15, 25-29. DBMP doesn't con trovert these facts with evidence. Instead, it repeatedly calls Movants' assertions (and, thus, the Court's findings) "unsupported."[3]

[1] The last four digits of the Debtor's taxpayer identification number are 8817. The Debtor's address is 20 Moores Road, Malvern, Pennsylvania 19335.

[2] This Court issued thorough Findings of Fact and Conclusions of Law in ruling on the preliminary injunction on August 11, 2021. *See* Case No. 20-30080, Adv. Pro. Case No. 20-03004, Adv. Pro. Dkt. 972 ("Findings"). CertainTeed Corporation ("Old CertainTeed" or "Old CT") manufactured building products containing asbestos for decades. *See* Findings at ¶ 1. On October 23, 2019, Old CertainTeed divided itself into two new entities: CertainTeed LLC ("New CertainTeed" or "New CT") and DBMP LLC ("DBMP" or the "Debtor").

[3] The Debtor's Objection (Dkt. 2777) characterizes these motions as: "attacks—constructed only on rhetoric" (pp. 1-2), "unsupported rhetoric" (p. 2), "baseless assertions" (p. 3), based on "heated rhetoric not on evidence or law" (p. 5), "unsupported allegations of bad faith" (p. 7), "totally unsupported" (p. 17), and "unsupported objections" (p. 21).

Therefore, given that the underlying facts are uncontested or have been found by the Court, the question of subjective bad faith—whether DBMP's petition seeks an objective consistent with the Code—is squarely before this Court:

> Is it a proper use of the Bankruptcy Code for a massively profitable and non-financially troubled company to manipulate its corporate structure on the eve of bankruptcy to isolate a single class of creditor, remove all the productive assets of its business from the reach of the bankruptcy court, and file for Chapter 11 in an admitted attempt to leverage the automatic stay into judicially compelled re-negotiations of state law liabilities, and for relief which that debtor is not entitled to under controlling law outside of bankruptcy?

Whether Texas Two-Step (Non-Distressed Tort-Reform) bankruptcies are proper must be addressed. This Court has repeatedly noted the need for appellate guidance on this issue (as has Judge Beyer in *Bestwall*), but neither this Court nor Judge Beyer has ruled on the issue of subjective bad faith in a form that mandates appellate review.

Movants urge this Court to answer this question ***now***, and to grant them relief from stay.[4] Only by this Court directly addressing the subjective bad faith elephant in the room, can the parties receive the appellate guidance the two bankruptcy courts in this District have so frequently noted is desperately needed. This Court must rule: did DBMP file in bad faith, or not? Is DBMP's Two-Step a proper use of the Code, or not? No court is better able to make that ruling than ***this*** Court, which has overseen this case and other Two-Steps since their inception.

[4] *See* Dkts. 2753 ("Bergrud Motion") and 2755 ("Herlihy Motion").

As predicted, DBMP opposes these motions. DBMP whines incessantly about the alleged horrors of having to defend two cases in the tort system for the first time in over four years. DBMP claims there are no "unique facts or circumstances" (Debtor Obj. at 2, 3, 4, and 11) shown here, granting these requests would open the "floodgates" (*Id.* at 6) to "potentially thousands" (*Id.* at 5) of similar requests, which this Court would "be obliged to grant" (*Id.* at 5), and this would result in an "effective dismissal" of the bankruptcy. *Id.* at 2.

None of these oft-repeated Two-Step debtor objections are found in Fourth Circuit precedent. A party seeking to lift the stay must show cause, and bad faith is unquestionably cause. *Carolin Corp. v. Miller*, 886 F.2d 693, 699 (4th Cir. 1989).[5]

[5] DBMP's attempt to rely on Judge Beyer's ruling on Wilson Buckingham's motion for relief from stay (Debtor Obj. at 16-17) is misplaced and that ruling is under appeal. A debtor's bad faith supports lifting the stay for cause. In addition to *Carolin* , many courts across the country have so held. *See In re Yukon Enterprises, Inc.*, 39 B.R. 919, 920–21 (Bankr. C.D. Cal. 1984) ("The issue of what is a 'bad faith filing' usually arises in the context of a motion to dismiss the petition, a request to lift the automatic stay for 'cause"…or a combination of the two…[T]he lifting of the stay is often a more prudent course for creditors rather than seeking a dismissal of the case."); *In re Thirtieth Place, Inc.*, 30 B.R. 503, 505–06 (Bankr.App. 9th Cir.1983) (reversing a finding of good faith on a creditor's motion to lift stay and/or dismiss); *In re Talladega Steaks, Inc.*, 50 B.R. 42, 43–44 (Bankr.N.D.Ala.1985) ) ("Courts have found that, if a chapter 11 petition is not filed in good faith, grounds exist either to *vacate the automatic stay* or dismiss the petition) (emphasis added); *In re Kinney*, 51 B.R. 840, 845–46 (Bankr.C.D.Cal.1985) ("Among the remedies available to combat bad faith filings are dismissal of the action, and relief from the automatic stay"); *In re Victory Const. Co., Inc.*, 9 B.R. 549, 560 (C.D. Cal. 1981) (vacated on other grounds as moot by 37 B.R. 222 (Bankr. App. 9th 1984)) ("the debtor's lack of 'good faith' in filing a case under Chapter 11 is 'cause,' independent of the existence or lack of adequate protection, to vacate the automatic stay…"); *In re Setzer*, 47 B.R. 340, 344– 45 (Bankr.E.D.N.Y.1985) ("Bad faith has frequently been held to provide sufficient cause to warrant [dismissal or lifting the stay]; *In re Scott*, 42 B.R. 35, 38–39 (Bankr.D.Ore.1984) ("filing of the bankruptcy petition in bad faith" can permit relief from the automatic stay); *Furness v. Lilienfield*, 35 B.R. 1006, 1010–13 (D.Md.1983) ("Courts have found that if a Chapter 11 petition is not filed in good faith, grounds exist either to vacate the automatic stay or dismiss the petition."); *In re Corp. Deja Vu*, 34 B.R. 845, 846–47, 850 (Bankr.D.Md.1983) (finding "the petition was filed in bad faith. This bad faith constitutes cause to allow the secured creditor relief from the stay."); *In re Lotus Inv., Inc.*, 16 B.R. 592, 595–96 (Bankr.S.D.Fla.1981) ("This Court agrees that lack of 'good faith' in filing a petition under Chapter 11 entitles a secured creditor to relief from the stay.");

DBMP cites no authority for its claim that a creditor seeking leave from stay based on bad faith must prove the "unique facts and circumstances" of his/her own action. And for good reason, as such a condition is impossible. Bad faith, like bad fish in a stew, taints this entire proceeding. Distilled to its essence, DBMP's argument is that if the "cause" that supports lifting stay is equally applicable to all creditors—if ***every*** creditor has cause because of a debtor's bad faith—then ***no creditors*** get relief. Rather, all creditors must eat the same rancid stew day after day, year after year, until they surrender their rights and settle. While an audacious argument, it is legally and logically baseless.

In *Carolin*, the Circuit recognized 11 U.S.C. § 362(d) empowers bankruptcy courts to modify the stay if "with respect to the **interests of a creditor** seeking relief, a debtor has sought the protection of the automatic stay in good faith." *Carolin*, 886 F.2d at 699 (emphasis added). Subjective bad faith, specifically, is shown when the "petitioner's **real motivation** is to 'abuse the reorganization process' and 'to cause hardship or delay to creditors by resort to the Chapter 11 device **merely for the purpose of invoking the automatic stay**, without an intent or ability to reorganize [its] financial activities.'" *Carolin*, 886 F.2d at 702 (emphasis added)(citing *In re Thirtieth Place, Inc.*, 30 B.R. 503, 505 (9th Cir. Bankr. App. 1983)). This is ***precisely*** what DBMP did here.

---

*In re Albany Partners, Ltd.*, 749 F.2d 670, 673–74 (11th Cir.1984) ("[W]e cannot say that the bankruptcy court abused its discretion by granting [retroactive relief from automatic stay, plus dismissal], particularly in light of the finding that the petition was not filed in good faith.").

DBMP's Chicken-Little prophesies about future requests for relief are merely a distraction—they have no valid objections under *Robbins*: (1) all issues pending in the Movants' litigation against DBMP involve state law; (2) liquidating Movants' claims in state court will not interfere with this proceeding and will promote judicial economy; and (3) DBMP's estate is protected because this Court will decide when the Movant's liquidated claims will be paid. *See In re Robbins*, 964 F.2d 342, 345 (4th Cir. 1992).

DBMP argues this Court's expertise is necessary for estimation. Debtor Obj. at 7. So what? No one disputes this Court can render an advisory opinion about a debtor's aggregate asbestos liability. But in the absence of a proven limited fund, and the Debtor specifically disavows any such limited fund, this means nothing to the Bergurds and Herlihys, whose claims against DBMP—causes of action and damages—are governed entirely by Washington and California law, respectively, and cannot be impaired, estimated or liquidated by a bankruptcy court under the Code or the Constitution.

DBMP's attempt to rely on *A.H. Robins* (Debtor Obj. at 8) simply ignores the fact that *Robin's* liabilities caused a "critical depletion" of its operating funds, while this Debtor, on the other hand, has never presented any evidence of financial distress. *See In re A.H. Robins Co., Inc.*, 89 B.R. 555, 558 (E.D. Va. 1988)). DBMP ignores a plain and literal reading of the legislative history of section 524(g) (*Id.* at 8) which says the "asbestos trust/injunction mechanism" is available to asbestos companies "facing a similarly [to Johns-Manville] overwhelming liability" (*see* H. Rep. 103-85, 2d Sess. at 41 (1994)

available at 1994 WL 562232). Old CertainTeed, DBMP, and New CertainTeed are not and never were "overwhelmed" by asbestos liabilities.

Judicial economy supports the Movants. Mrs. Bergrud filed suit against Old CertainTeed and other tortfeasors in 2019. Her claims would have been tried or resolved years ago but for this bad faith bankruptcy. She will ***never*** support a plan of reorganization that impairs her jury access or caps her state law remedies, so Washington state will be burdened with a second lawsuit—now or after this case fails—because of CertainTeed's unchecked greed. *See* 28 U.S.C. 157(b)(5) (Requiring district courts to order personal injury tort claims to be tried before juries in the district court in the district where the claim arose).

The Herlihys seek to avoid such unnecessary duplication by adding DBMP to their pending action in California ***now***. DBMP can't dispute this, so it fawns over estimation instead. But its footnote (Debtor Obj. at Fn.11) provides textbook examples of why no plan that complies with the Constitution will ever be confirmed in ***this*** case. Fibreboard, a company with many more asbestos claims and much less money, already tried what DBMP proposes and the Supreme Court rejected it. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999).

New CertainTeed's ongoing effort to overcome the tort system has saved it over $500 million (ACC Statement at ¶ 4 (Dkt. 2779)), but it makes DBMP say—with a straight face—that the "financial burden" of defending against Movants' claims in the tort system,

as well as the phantom "follow-on lift stay requests" would be "immense," and therefore the Debtor's estate cannot be protected. Debtor Obj. at 13. Even accepting its own expert's projections of $1.2 million to try a single case to verdict, the total expense to defend ***both*** the Herilhy and Bergurd actions amounts to 0.48% of what New CertainTeed has saved by abusing the bankruptcy system ($2.4M/500M).

Even DBMP, for all its indignation about bad faith, ultimately concedes that "bad faith, if relevant, should be considered as part of the Court's balancing under *Robbins*." Debtor Obj. at 15. The Bergruds and Herlihys urge this Court to not put off for tomorrow what must be decided today: did DBMP file in subjective bad faith?

Respectfully submitted, this the 6th day of May, 2024.

**WALDREP WALL BABCOCK**
**& BAILEY PLLC**
*/s/ Thomas W. Waldrep, Jr.*
Thomas W. Waldrep Jr. (NC State Bar No. 11135)
James C. Lanik (NC State Bar No. 30454)
Ciara L. Rogers (NC State Bar No. 42571)
370 Knollwood Street, Suite 600
Winston-Salem, NC 27103
Telephone: 336-717-1280
Facsimile: 336-717-1340
Email: notice@waldrepwall.com

-and-

**THE RUCKDESCHEL LAW FIRM, LLC**
*/s/ Jonathan Ruckdeschel*
Jonathan Ruckdeschel (Maryland, CPF: 9712180133)
8357 Main Street
Ellicott City, Maryland 21043
Telephone: (410) 750-7825

Facsimile: (443) 583-0430
Email: ruck@rucklawfirm.com
*Pro Hac Vice* Admission Pending

**MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC**
*/s/ Clayton L. Thompson*
Clayton L. Thompson (NY Bar No. 5628490)
John Louis Steffan IV (Missouri Bar No. 64180)
150 W. 30th Street, Suite 201
New York, NY 10001
Telephone: (800) 358-5922
Email: CThompson@mrhfmlaw.com
Admitted Pro Hac Vice

*Counsel for Movants*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing THE ESTATE OF PETER L. BERGRUD'S AND MICHAEL N. AND ANN HERLIHY'S OMNIBUS REPLY IN SUPPORT OF MOTIONS FOR RELIEF FROM THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(d) was filed in accordance with the local rules and served upon all parties registered for electronic service and entitled to receive notice thereof through the CM/ECF system.

Respectfully submitted, this the 6th day of May, 2024.

**WALDREP WALL BABCOCK & BAILEY PLLC**

*/s/ Thomas W. Waldrep, Jr.*
Thomas W. Waldrep Jr. (NC State Bar No. 11135)
370 Knollwood Street, Suite 600
Winston-Salem, NC 27103
Telephone: (336) 717-1280
Facsimile: (336) 717-1340
Email: notice@waldrepwall.com

*Counsel for Movants*

FILED & JUDGMENT ENTERED
Steven T. Salata

May 28 2024

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

J. Craig Whitley
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| In re<br>DBMP LLC,[1]<br>Debtor. | Chapter 11<br>Case No. 20-30080 (JCW) |

**ORDER DENYING MOTION OF MICHAEL N. AND ANN HERLIHY FOR RELIEF FROM THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(d)**

This matter coming before the Court on *Michael N. and Ann Herlihy's Motion for Relief From the Automatic Stay Pursuant to 11 U.S.C. § 362(d)* [Dkt. 2755] (the "Motion")[2]; the Court finding that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (b) venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409, and (c) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); the Court having reviewed and considered the Motion, the movants' reply in support of the Motion [Dkt. 2782], the movants' notice of supplemental authority in support of the Motion [Dkt. 2795], the statement in support of the Motion filed by the Official Committee of Asbestos Claimants [Dkt. 2779], the objection to the

[1] The last four digits of the Debtor's taxpayer identification number are 8817. The Debtor's address is 20 Moores Road, Malvern, Pennsylvania 19335.

[2] Capitalized terms used herein but not defined have the meanings given to them in the Motion.

Motion filed by DBMP LLC, the debtor and debtor in possession in the above-captioned chapter 11 case [Dkt. 2777] (the "Objection"), and the joinder to the Objection filed by CertainTeed LLC, CertainTeed Holding Corporation and Saint-Gobain Corporation [Dkt. 2778]; the Court having heard and considered the arguments of counsel at a hearing before the Court on May 9, 2024; and the Court having issued an oral ruling denying the Motion at a hearing before the Court on May 23, 2024 (the "Hearing");

**IT IS HEREBY ORDERED THAT**:

1. The Motion is DENIED for the reasons set forth on the record of the Hearing (which reasons are incorporated herein).

2. This Court shall retain exclusive jurisdiction over any and all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

This Order has been signed electronically.
The Judge's signature and Court's seal appear
at the top of the Order.

United States Bankruptcy Court

FILED & JUDGMENT ENTERED
Steven T. Salata

May 28 2024

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

J. Craig Whitley
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| In re<br><br>DBMP LLC,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 20-30080 (JCW) |

**ORDER DENYING MOTION OF THE ESTATE OF PETER L. BERGRUD FOR RELIEF FROM THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(d)**

This matter coming before the Court on *The Estate of Peter L. Bergrud's Motion for Relief From the Automatic Stay Pursuant to 11 U.S.C. § 362(d)* [Dkts. 2753, 2757] (together, the "Motion")[2]; the Court finding that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (b) venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409, and (c) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); the Court having reviewed and considered the Motion, the movant's reply in support of the Motion [Dkt. 2782], the movant's notice of supplemental authority in support of the Motion [Dkt. 2795], the statement in support of the Motion filed by the Official Committee of Asbestos Claimants [Dkt. 2779], the

[1] The last four digits of the Debtor's taxpayer identification number are 8817. The Debtor's address is 20 Moores Road, Malvern, Pennsylvania 19335.

[2] Capitalized terms used herein but not defined have the meanings given to them in the Motion.

objection to the Motion filed by DBMP LLC, the debtor and debtor in possession in the above-captioned chapter 11 case [Dkt. 2777] (the "Objection"), and the joinder to the Objection filed by CertainTeed LLC, CertainTeed Holding Corporation and Saint-Gobain Corporation [Dkt. 2778]; the Court having heard and considered the arguments of counsel at a hearing before the Court on May 9, 2024; and the Court having issued an oral ruling denying the Motion at a hearing before the Court on May 23, 2024 (the "Hearing");

**IT IS HEREBY ORDERED THAT**:

1. The Motion is DENIED for the reasons set forth on the record of the Hearing (which reasons are incorporated herein).

2. This Court shall retain exclusive jurisdiction over any and all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

This Order has been signed electronically.
The Judge's signature and Court's seal appear
at the top of the Order.

United States Bankruptcy Court

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | | |
|---|---|---|
| In re: | : | |
| | : | Chapter 11 |
| DBMP LLC,[1] | : | |
| | : | Case No. 20-30080 |
| Debtor. | : | |

**NOTICE OF APPEAL OF ORDER DENYING MOTION OF MICHAEL N. AND ANN HERLIHY FOR RELIEF FROM THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(d)**

PLEASE TAKE NOTICE that Michael N. and Ann Herlihy, by and through the undersigned counsel, pursuant to 28 U.S.C. § 158(a), Federal Rule of Bankruptcy Procedure 8001, et seq., and Rule 8001-1 of the Rules of Practice and Procedure of the United States Bankruptcy Court for the Western District of North Carolina, hereby appeal to the United States District Court for the Western District of North Carolina the *Order Denying Motion of Michael N. and Ann Herlihy for Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362(d)* [ECF No. 2808] (the "Order Denying Herlihy Motion to Lift Stay"). A copy of the Order Denying Herlihy Motion to Lift Stay is attached hereto as Exhibit A.

PLEASE TAKE FURTHER NOTICE that the names of all parties to the Order Denying Herlihy Motion to Lift Stay appealed from, and the names, addresses, and telephone numbers of their respective attorneys, are as follows:

**Appellants**:
Michael N. and Ann Herlihy

[1] The last four digits of the Debtor's taxpayer identification number are 8817. The Debtor's address is 20 Moores Road, Malvern, Pennsylvania 19335.

**Counsel for Appellants**:
Thomas W. Waldrep, Jr.
Chris W. Haaf
Waldrep Wall Babcock & Bailey PLLC
370 Knollwood Street, Suite 600
Winston-Salem, NC 27103
Telephone: 336-717-1280
Facsimile: 336-717-1340
Email: notice@waldrepwall.com

Clayton L. Thompson
John Louis Steffan IV
Maune Raichle Hartley French & Mudd, LLC
150 W. 30th Street, Suite 201
New York, NY 10001
Telephone: (800) 358-5922
Email: CThompson@mrhfmlaw.com

Jonathan Ruckdeschel
The Ruckdeschel Law Firm, LLC
8357 Main Street
Ellicott City, Maryland 21043
Telephone: (410) 750-7825
Facsimile: (443) 583-0430
Email: ruck@rucklawfirm.com

**Appellee**:
DBMP LLC

**Counsel for Appellee**:
Garland S. Cassada
Robinson, Bradshaw & Hinson, P.A.
101 North Tryon Street, Suite 1900
Charlotte, North Carolina 28246
Telephone: (704) 377-2536
Facsimile: (704) 378-4000
E-mail: gcassada@robinsonbradshaw.com

Gregory M. Gordon
Jones Day
2727 North Harwood Street, Suite 500
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100

E-mail: gmgordon@jonesday.com
Jeffrey B. Ellman
Jones Day
1221 Peachtree Street, N.E., Suite 400
Atlanta, Georgia 30361
Telephone: (404) 581-3939
Facsimile: (404) 581-8330
E-mail: jbellman@jonesday.com

Respectfully submitted this the 11th day of June 2024.

**WALDREP WALL BABCOCK & BAILEY PLLC**
*/s/ Thomas W. Waldrep, Jr.*
Thomas W. Waldrep Jr. (NC State Bar No. 11135)
370 Knollwood Street, Suite 600
Winston-Salem, NC 27103
Telephone: 336-717-1280
Facsimile: 336-717-1340
Email: notice@waldrepwall.com

-and-

**THE RUCKDESCHEL LAW FIRM, LLC**
*/s/ Jonathan Ruckdeschel*
Jonathan Ruckdeschel (Maryland, CPF: 9712180133)
8357 Main Street
Ellicott City, Maryland 21043
Telephone: (410) 750-7825
Facsimile: (443) 583-0430
Email: ruck@rucklawfirm.com

-and-

**MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC**
*/s/ Clayton L. Thompson*
Clayton L. Thompson (NY Bar No. 5628490)
John Louis Steffan IV (Missouri Bar No. 64180)
150 W. 30th Street, Suite 201
New York, NY 10001

Telephone: (800) 358-5922
Email: CThompson@mrhfmlaw.com

*Counsel for Appellants*

**Exhibit A**

[Order Denying Herlihy Motion to Lift Stay]

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | | |
|---|---|---|
| In re: | : | |
| | : | Chapter 11 |
| DBMP LLC,[1] | : | |
| | : | Case No. 20-30080 |
| Debtor. | : | |

**NOTICE OF APPEAL OF ORDER DENYING MOTION OF THE ESTATE OF PETER L. BERGRUD FOR RELIEF FROM THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(d)**

PLEASE TAKE NOTICE that The Estate of Peter L. Bergrud, by and through the undersigned counsel, pursuant to 28 U.S.C. § 158(a), Federal Rule of Bankruptcy Procedure 8001, et seq., and Rule 8001-1 of the Rules of Practice and Procedure of the United States Bankruptcy Court for the Western District of North Carolina, hereby appeal to the United States District Court for the Western District of North Carolina the *Order Denying Motion of The Estate of Peter L. Bergrud for Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362(d)* [ECF No. 2809] (the "Order Denying Bergrud Motion to Lift Stay"). A copy of the Order Denying Bergrud Motion to Lift Stay is attached hereto as Exhibit A.

PLEASE TAKE FURTHER NOTICE that the names of all parties to the Order Denying Bergrud Motion to Lift Stay appealed from, and the names, addresses, and telephone numbers of their respective attorneys, are as follows:

**Appellants**:
The Estate of Peter L. Bergrud

[1] The last four digits of the Debtor's taxpayer identification number are 8817. The Debtor's address is 20 Moores Road, Malvern, Pennsylvania 19335.

**Counsel for Appellants**:
Thomas W. Waldrep, Jr.
Chris W. Haaf
Waldrep Wall Babcock & Bailey PLLC
370 Knollwood Street, Suite 600
Winston-Salem, NC 27103
Telephone: 336-717-1280
Facsimile: 336-717-1340
Email: notice@waldrepwall.com

Clayton L. Thompson
John Louis Steffan IV
Maune Raichle Hartley French & Mudd, LLC
150 W. 30th Street, Suite 201
New York, NY 10001
Telephone: (800) 358-5922
Email: CThompson@mrhfmlaw.com

Jonathan Ruckdeschel
The Ruckdeschel Law Firm, LLC
8357 Main Street
Ellicott City, Maryland 21043
Telephone: (410) 750-7825
Facsimile: (443) 583-0430
Email: ruck@rucklawfirm.com

**Appellee**:
DBMP LLC

**Counsel for Appellee**:
Garland S. Cassada
Robinson, Bradshaw & Hinson, P.A.
101 North Tryon Street, Suite 1900
Charlotte, North Carolina 28246
Telephone: (704) 377-2536
Facsimile: (704) 378-4000
E-mail: gcassada@robinsonbradshaw.com

Gregory M. Gordon
Jones Day
2727 North Harwood Street, Suite 500
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100

E-mail: gmgordon@jonesday.com
Jeffrey B. Ellman
Jones Day
1221 Peachtree Street, N.E., Suite 400
Atlanta, Georgia 30361
Telephone: (404) 581-3939
Facsimile: (404) 581-8330
E-mail: jbellman@jonesday.com

Respectfully submitted this the 11th day of June 2024.

**WALDREP WALL BABCOCK & BAILEY PLLC**
*/s/ Thomas W. Waldrep, Jr.*
Thomas W. Waldrep Jr. (NC State Bar No. 11135)
370 Knollwood Street, Suite 600
Winston-Salem, NC 27103
Telephone: 336-717-1280
Facsimile: 336-717-1340
Email: notice@waldrepwall.com

-and-

**THE RUCKDESCHEL LAW FIRM, LLC**
*/s/ Jonathan Ruckdeschel*
Jonathan Ruckdeschel (Maryland, CPF: 9712180133)
8357 Main Street
Ellicott City, Maryland 21043
Telephone: (410) 750-7825
Facsimile: (443) 583-0430
Email: ruck@rucklawfirm.com

-and-

**MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC**
*/s/ Clayton L. Thompson*
Clayton L. Thompson (NY Bar No. 5628490)
John Louis Steffan IV (Missouri Bar No. 64180)
150 W. 30th Street, Suite 201
New York, NY 10001

Telephone: (800) 358-5922
Email: CThompson@mrhfmlaw.com

*Counsel for Appellants*

**Exhibit A**

[Order Denying Bergrud Motion to Lift Stay]

FILED & JUDGMENT ENTERED
Steven T. Salata

May 28 2024

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

J. Craig Whitley
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| In re | Chapter 11 |
| DBMP LLC,[1] | Case No. 20-30080 (JCW) |
| Debtor. | |

**ORDER DENYING MOTION OF THE ESTATE OF PETER L. BERGRUD**
**FOR RELIEF FROM THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(d)**

This matter coming before the Court on *The Estate of Peter L. Bergrud's Motion for Relief From the Automatic Stay Pursuant to 11 U.S.C. § 362(d)* [Dkts. 2753, 2757] (together, the "Motion")[2]; the Court finding that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (b) venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409, and (c) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); the Court having reviewed and considered the Motion, the movant's reply in support of the Motion [Dkt. 2782], the movant's notice of supplemental authority in support of the Motion [Dkt. 2795], the statement in support of the Motion filed by the Official Committee of Asbestos Claimants [Dkt. 2779], the

---

[1] The last four digits of the Debtor's taxpayer identification number are 8817. The Debtor's address is 20 Moores Road, Malvern, Pennsylvania 19335.

[2] Capitalized terms used herein but not defined have the meanings given to them in the Motion.

objection to the Motion filed by DBMP LLC, the debtor and debtor in possession in the above-captioned chapter 11 case [Dkt. 2777] (the "Objection"), and the joinder to the Objection filed by CertainTeed LLC, CertainTeed Holding Corporation and Saint-Gobain Corporation [Dkt. 2778]; the Court having heard and considered the arguments of counsel at a hearing before the Court on May 9, 2024; and the Court having issued an oral ruling denying the Motion at a hearing before the Court on May 23, 2024 (the "Hearing");

**IT IS HEREBY ORDERED THAT**:

1. The Motion is DENIED for the reasons set forth on the record of the Hearing (which reasons are incorporated herein).

2. This Court shall retain exclusive jurisdiction over any and all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

This Order has been signed electronically.
The Judge's signature and Court's seal appear
at the top of the Order.

United States Bankruptcy Court

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

IN RE: : Case No. 17-31795-LTB

BESTWALL LLC, : Chapter 11

Debtor. : Charlotte, North Carolina
Thursday, January 18, 2024
: 9:34 a.m.

: : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE LAURA TURNER BEYER,
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor: Robinson, Bradshaw & Hinson, P.A.
BY: RICHARD C. WORF, ESQ.
GARLAND CASSADA, ESQ.
KEVIN CRANDALL, ESQ.
101 N. Tryon Street, Suite 1900
Charlotte, NC 28246

Jones Day
BY: GREGORY M. GORDON, ESQ.
2727 North Harwood St., Suite 500
Dallas, TX 75201-1515

Audio Operator: COURT PERSONNEL

Transcript prepared by: JANICE RUSSELL TRANSCRIPTS
1418 Red Fox Circle
Severance, CO 80550
(757) 422-9089
trussell31@tdsmail.com

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

APPEARANCES (continued):

| | |
|---|---|
| For the Debtor: | Jones Day<br>BY: JEFFREY B. ELLMAN, ESQ.<br>1221 Peachtree Street, N.E., #400<br>Atlanta, GA 30361 |
| For Richard and Joann Dale: | Maune Raichle<br>BY: CLAY THOMPSON, ESQ.<br>150 W. 30th Street, Suite 201<br>New York, NY 10001 |
| For Richard and Joann Dale, Wilson Buckingham and Angelika Weiss: | Waldrep Wall<br>BY: THOMAS W. WALDREP, JR., ESQ.<br>370 Knollwood Street, Suite 600<br>Winston-Salem, NC 27103 |
| For Wilson Buckingham and Angelika Weiss: | Ruckdeschel Law Firm, LLC<br>BY: JONATHAN RUCKDESCHEL, ESQ.<br>8357 Main Street<br>Ellicott City, MD 21043 |
| For Future Claimants' Representative, Sander L. Esserman: | Young Conaway<br>BY: SHARON ZIEG, ESQ.<br>ERIN EDWARDS, ESQ.<br>1000 North King Street<br>Wilmington, DE 19801 |
| | Young Conaway<br>BY: FELTON E. PARRISH, ESQ.<br>Charlotte, NC 28204 |
| For Official Committee of Asbestos Claimants: | Robinson & Cole LLP<br>BY: NATALIE RAMSEY, ESQ.<br>DAVIS LEE WRIGHT, ESQ.<br>1201 N. Market Street, Suite 1406<br>Wilmington, DE 19801 |
| | Robinson & Cole LLP<br>BY: KATHERINE M. FIX, ESQ.<br>1650 Market Street, Suite 3600<br>Philadelphia, PA 19103 |
| | Hamilton Stephens<br>BY: LINDA W. SIMPSON, ESQ.<br>525 N. Tryon St., 14th Floor<br>Charlotte, NC 28202 |

APPEARANCES (continued):

For Georgia-Pacific LLC:

Rayburn Cooper & Durham, P.A.
BY: JOHN R. MILLER, JR., ESQ.
227 West Trade Street, Suite 1200
Charlotte, NC 28202

Debevoise & Plimpton
BY: MARK P. GOODMAN, ESQ.
66 Hudson Boulevard
New York, NY 10001

APPEARANCES (via telephone):

SANDER L. ESSERMAN
Future Claimants' Representative
2323 Bryan Street, Suite 2200
Dallas, TX 75201-2689

P R O C E E D I N G S

(Call to Order of the Court)

THE COURT: All right. Good morning.

(Counsel greet the Court)

THE COURT: We are here in the Bestwall case, Chapter 11 Case No. 17-31795. We've got three matters on the Court's calendar, the eighth continued hearing on the disclosure statement for the amended plan, the eighth continued hearing on motion for entry of order approving the disclosure statement, and the hearing on the motion for relief from stay of Buckingham, Wilson Buckingham and Angelika Weiss and of course, the responses and replies thereto.

As we always do, we'll start by having you all announce your appearances and as I always do, I'll start over here with you, Mr. Cassada. It's the way my brain works, from left to right.

MR. CASSADA: Yes. Good morning, your Honor, and Happy New Year.

THE COURT: Thank you.

MR. CASSADA: Garland Cassada, Robinson Bradshaw. I'm here with my partners, Rich Worf and Kevin Crandall. We represent the debtor.

THE COURT: All right.

MR. MILLER: Morning, your Honor. Jack Miller, Rayburn Cooper & Durham, for Georgia-Pacific.

THE COURT: Okay.

MR. GOODMAN: Morning, your Honor. Mark Goodman, Debevoise & Plimpton, on behalf of Georgia-Pacific.

THE COURT: Okay.

MR. GORDON: Good morning, your Honor. Greg Gordon, Jones Day, on behalf of the debtor. And my partner, Jeff Ellman, is here as well.

THE COURT: All right.

MR. ELLMAN: Good morning.

THE COURT: Very good.

All right. We'll move on over.

MR. RUCKDESCHEL: Morning, your Honor. Jonathan Ruckdeschel on behalf of Mr. Buckingham and Ms. Weiss.

THE COURT: Okay.

MR. THOMPSON: Clay Thompson, Maune Raichle Hartley French & Mudd, on behalf of my clients and the Dales.

THE COURT: Okay.

MR. WALDREP: Your Honor, Tom Waldrep, local counsel for Mr. Ruckdeschel and Mr. Thompson.

THE COURT: All right.

MS. RAMSEY: Good morning, your Honor. Natalie Ramsey from Robinson & Cole on behalf of the Committee, along with my partner, Davis Lee Wright, and my brand new partner, Katherine Fix.

THE COURT: Oh, nice.

MS. RAMSEY: And also, Linda Simpson from Hamilton Stephens.

Thank you.

THE COURT: Congratulations, Ms. Fix.

All right.

MS. ZIEG: Good morning, your Honor. Sharon Zieg from Young Conaway Stargatt & Taylor on behalf of the Future Claimants' Representative. Mr. Esserman is also on the phone, I believe, today.

THE COURT: Okay.

MS. ZIEG: Here with me today is Erin, my partners, Erin Edwards and my new partner, Felton Parrish.

THE COURT: Yes. Congratulations to, to all of you. That's great news.

And Happy New Year to everybody.

All right. And I do understand that some people are on the line listening, but we won't ask them to announce any appearances.

And so with that, we did receive word or Notice of Amended Agenda, which indicated that the disclosure statement hearing and hearing on motion for entry of order approving the disclosure statement are continued by agreement of the parties to February 15th.

Is that right, Ms. Ramsey? Mr. Gordon?

MS. RAMSEY: That's correct, your Honor.

MR. GORDON: Correct.

THE COURT: All right.

That leaves us with the hearing on the motion for relief from stay.

So with that, Mr. Ruckdeschel, we will hear your motion.

MR. RUCKDESCHEL: Good morning, your Honor. Thank you. Jonathan Ruckdeschel on behalf of Wilson Buckingham and his wife, Angelika Weiss.

Our motion for relief from stay raises two grounds. First, we were asking for relief from stay on the basis that this proceeding is a bad faith filing. Both the Fourth Circuit in Carolin and many other courts have recognized bad faith as a rationale for granting relief from stay. We're also moving under the Robbins factors.

I, I'm not -- with respect to bad faith, your Honor, the Court has been extraordinarily receptive to hours of oral argument regarding bad faith in the context of the motion to dismiss and, and I'm not gonna review all of that. I know your Honor is intimately familiar with the issues. But in quick summary, Mr. Buckingham's central contention is that it is not good faith to file for bankruptcy protection simply because a debtor wants to avoid the state law tort system and access 524(g) when the debtor is fully capable of paying all creditors, including its asbestos creditors, in full in

perpetuity, as the debtor admits it is here. Using the bankruptcy system to remove unremovable cases, to consolidate unconsolidatable cases, force mass negotiations is abuse of the bankruptcy system and bad faith, no matter how much the so-called debtor wants the relief of the Code when there's no financial distress.

The facts that Mr. Buckingham relies upon regarding subjective bad faith are not really in dispute. There isn't any legitimate dispute that Georgia-Pacific was never in financial distress. It was never financially threatened. Its profitability or viability as an ongoing enterprise were never threatened by the asbestos litigation, no matter how many tens of thousands of cases they had. It had managed its litigation without a hint of peril for 40 years. It had no need for bankruptcy relief. It was not in any sort of existential crisis.

What it decided is that it didn't want to be in the tort system and there are all kinds of complaints that Bestwall/Georgia-Pacific had about the tort system and its operation, but ultimately, what it did is it manufactured a subsidiary for purposes of pulling one class of creditors, isolating them from all the others, pulling them into bankruptcy circumventing the absolute priority rule, allowing the rest of the enterprise to stay out of bankruptcy to continue to send profits upstream to its corporate parent, and

to remove all of these unremovable state law cases into the federal court system through the bankruptcy courts. There's just no dispute that these things happened and, and that is using the leverage of the automatic stay to force mass negotiations in the bankruptcy court while terminally ill patients like my client, Mr. Buckingham, have their constitutional rights put on hold.

And, and the debtor takes issue with our assertion that they're using the automatic stay for leverage for negotiations, but then simultaneously says, "If the Court lifts the stay, people are not gonna agree to negotiate with us here in the bankruptcy system." That's leverage. That's using this proceeding for negotiating leverage. If you force us to stay here, then we have no option but to negotiate here. If you let us out to exercise our rights in the tort system, we're not gonna take the deal. That's their argument. It's leverage. That's what they're doing, even if they say it's not.

The Fourth Circuit in Carolin expressly stated that a petition must further the purpose of the Code, right? It then describes the purpose of the Code as the resuscitation of a financially troubled debtor, which Georgia-Pacific wasn't and Bestwall isn't. And while the court then adopted the two-prong test that your Honor is obviously familiar with, that relates to dismissing the petition. We're not asking for dismissal. We're asking that the stay be lifted.

And, and just as a side note. As, as we discussed at the end of the dismissal hearing, your Honor, it's Mr. Buckingham's petition [sic] that this petition would be in equally bad faith if Old Georgia-Pacific had filed it because Old Georgia-Pacific had no need of bankruptcy relief. But, but the two-step transaction provides all sorts of other indicia of bad faith because it expressly, and admittedly, was designed to allow one class of creditor to be isolated into a newly formed debtor with, effectively, one meaningful asset, the funding agreement, and, and to avoid the, subjecting the larger business enterprise and all of its assets to the absolute priority rule, right? This end around is a strong indicia of bad faith of this proceeding and a strong reason why the stay should not be granted. The powerful equitable tool of the, of the stay should be lifted.

Your Honor has not ruled on the question of subjective bad faith itself. The original order just denying the Committee's motion to dismiss years ago focused on objective futility, didn't reach the bad faith question. Your Honor's oral ruling on Mr. Buckingham's motion and the Committee's most recent motion to dismiss did not revisit that issue and this motion puts that issue squarely before the Court because Carolin does not apply to lift stay motions, but only, the two-prong test only applies, on its face, to dismissal motions.

And we ask that your Honor rule on the bad faith issue

on the merits so it can go up so that the Fourth Circuit can evaluate this, as your Honor has repeatedly noted, right? This Court has consistently and for years noted that, the need for the, the Fourth Circuit to review this issue and, and Judge Whitley's recent order denying the motion to dismiss that I filed on behalf of the Maune Raichle clients and the Committee's motion also indicates the Court's desire for the Fourth Circuit to review this issue and, and now's the time. Let's do it both at once, right? That'll be the most efficient use of the Fourth Circuit, no matter how your Honor rules, right? And, and if you, if, if you find that the proceeding is not in bad faith, despite the underlying facts and the arguments we've made, we simply ask that you rule, give us your reasons, and certify it. And, and if you find that it is in bad faith, to paraphrase Carolin, because the debtor isn't financially troubled and has no need for resuscitation, then we ask that you make the ruling, lift the stay, and if the debtor wants to appeal to the Fourth Circuit, we will fully support that, right? I'm seeking certification of Judge Whitley's order and we would certainly support having any issue on bad faith with respect to this case go up to the Fourth Circuit as well. I think we all need the guidance.

What struck me last night when I was thinking about this is the debtor appears to argue that even if the Court were to find that the proceeding was filed in bad faith, as defined

by Carolin and Premier, right, it should still be protected by the automatic stay and for that proposition the, the debtor provides no authority. If this is a bad faith filing -- and we believe that it is -- then what the debtor is effectively asking the Court to do is say we're not properly before the Court, but we should subjugate Mr. Buckingham's constitutional rights under the Seventh Amendment for the profit interests of Koch Industries and New Georgia-Pacific by keeping these cases locked here in the bankruptcy court.

So that's the bad faith argument. If you have anything else that you'd like to discuss about our arguments on bad faith, I'm happy to do so, but you know, I think that was a sufficient summary.

With respect to Robbins, the three factors are indisputably met. There's no dispute this is a, a case that involves only state law claims and that the expertise of the bankruptcy court is unnecessary in order to resolve Mr. Buckingham's individual claims against the debtor. Indeed, the Code forbids this Court from liquidating or estimating his individual claim.

Will lifting of the stay promote judicial economy and will not lifting the stay increase the burden on this Court? It promotes judicial economy. It allows this case to be litigated in state court with an asbestos docket and expertise, decades of expertise litigating asbestos claims. The Baltimore

City Circuit Court and the Maryland Federal Courts both have that expertise and can efficiently and effectively resolve this. In fact, in Baltimore there is a, for lack of a better phrase, "rocket docket," an expedited trial docket for living mesothelioma claimants and, and that's an important issue here. Mr. Buckingham's on borrowed time. Not lifting the stay will increase the burden on the federal courts, even if not this Court directly, because 28 U.S.C. 157 mandates that the district court try this case upon request and Mr. Buckingham will make such a request, if necessary.

And the third factor is can the estate be protected by requiring collection through the bankruptcy court. Mr. Buckingham agrees to this.

That's Robbins. Those are the three factors. They all apply. They all apply in our favor. Because of that, the debtor makes collateral arguments against it and, and these arguments have been made and considered by your Honor before and I'll just review them quickly.

We've got the floodgates argument. Well, if you do it here, then everybody's gonna want to do it and then, you know, everybody's gonna be doing it. And, and there are two issues here, your Honor. One, this is the second motion in five years. There are only two. Are there gonna be more? I suspect there will, but is there any rational basis to believe that you're gonna have a thousand of these motions before you?

I don't think so. There's no, there's certainly no history of that. Nobody else seems to be interested.

THE COURT: But if you grant, if I were to grant the motion, Mr. Ruckdeschel, isn't it logical to conclude that that's exactly what would happen?

MR. RUCKDESCHEL: Well, I suspect for people that are recently diagnosed that haven't had a chance to challenge this case before that are stuck and still alive who wanna have a trial during their lifetime, you're gonna see motions for relief from stay. And those are proper, right? And, and once your Honor has made the ruling that in those circumstances, in these circumstances, the Robbins factors are satisfied or the bad faith test is satisfied and there should be relief from stay, then granting those motions is not a problem. That's what should happen. That's justice, right? These are dying people who have rights and their rights should be respected.

And, and the critical part of the floodgates argument, your Honor, is that when it's been made in the past and considered by courts in the past, the debtor hasn't had enough money. So there are all these concerns. Well, we're gonna erode a limited pot of assets that should be distributed ratably between the creditors. Not here. The funding agreement is unlimited. There is no dispute in this case that the debtor has sufficient funds to litigate these cases, to pay these cases in the tort system as it did while it's still here

litigating before your Honor, right? There's $28 billion on the other side of that funding agreement which is vastly in excess of anything they've ever spent and we're talking about one case. But if we were talking about ten cases, it'd be the same. It's not gonna threaten the debtor's financial viability. It's not gonna erode a limited pot of assets.

And, and with due respect to, to my colleague, Mr. Mercer, who I've dealt with prior to this proceeding in, in negotiating settlements, Mr. Mercer is not the only lawyer at Georgia-Pacific that's capable of managing some asbestos cases in the tort system. They did it for 40 years and they did it before that was Mr. Mercer's job and they'll do it after he's retired.

So, so this is not a situation where the debtor has limited resources, limited personnel, limited assets and allowing cases to proceed in the tort system is gonna cause a run on the bank. The bank is flush with cash, right? And it's not gonna distract key personnel because they can hire more personnel to do it, right? The tort system lawyers are different than the bankruptcy lawyers. So you know, they can go down the street to King & Spalding or Nelson Mullins or any of the other firms that Georgia-Pacific historically has used and they can hire lawyers to defend them in the tort system.

So if there are more cases, okay, that's fine, right? This is not an issue where you're gonna have a run on the bank

or where, having to simultaneously litigate in the tort system. And remember, we're not trying to collect. We just wanna liquidate, but, but even if we were trying to collect, there's enough money there. It's not going to deplete the assets of the estate in a meaningful way. There's no showing before the Court that that would happen and, and it's unreasonable to suggest that it could, given the vast assets that lie behind the funding agreement.

So the larger argument that the debtor makes -- and this is sort of woven through their arguments in their pleading -- is that if you allow this, Judge, if you allow people to go and do this, nobody's gonna want to take a deal in the bankruptcy system, right? "It's gonna undermine our ability to negotiate a global resolution. If you let individuals with valuable, viable tort claims in the state law system to liquidate their claims and seek uncapped state law remedies," right, "then people aren't gonna agree to the deal we're proposing." That's not a valid argument, right? This Court is neutral. It does not and cannot favor one outcome over anther and in a case like this where there is not a limited fund, there is no reason why a confirmed plan or a negotiated global resolution should be more attractive to this Court than individuals being allowed to exercise their constitutional rights, right? There's not a limited fund. You are not being asked here, this Court is not being asked here to make sure

that from a limited pot of money people get their fair share. You're being asked to radically remake the tort system and to help negotiations by keeping people locked in here so that they have the leverage to try and get a global resolution. That's wrong.

So ultimately, what we're talking about is a question of fairness. Mr. Buckingham's dying. He has rights. The rights are being prejudiced. At a minimum, they're being delayed. If the debtor has its way and a plan is instituted that caps recovery, then his recovery's being capped. And, and delay here, as we point out in our papers, has the potential of destroying Mr. Buckingham's rights as well. In prior cases that I've had in Maryland with Georgia-Pacific before this proceeding was filed Georgia-Pacific argued that in cases like Mr. Buckingham's where my client lived in Virginia and got sick in Virginia, their claim was controlled by Virginia law. Under Virginia law, a victim's pain and suffering dies with them, right? Under Maryland law, he would have what's called a survival claim and his pain and suffering would be the process, would be the asset of his estate. If Virginia law governs this case, as the debtor will certainly argue, as Georgia-Pacific repeatedly argued in prior cases, then if Mr. Buckingham dies before he can get to trial, his claim dies with him and that's the most valuable part of his claim.

Once the stay is lifted, that doesn't mean this case

is even going to verdict, your Honor. With the parties back on equal footing in the tort system, the debtor and New Georgia-Pacific are free to negotiate a settlement with Mr. Buckingham and Ms. Weiss individually on equal footing with both parties subject to the risk and uncertainty of a jury trial. That's how our legal system is designed. That's how it's worked for 200 years, 200 plus, and, and that's not inequity. That's what's supposed to happen. In 20 years in the asbestos litigation prior to filing this case, your Honor, 100 percent of my cases with Georgia-Pacific resolved through negotiated settlement. I never even picked a jury against them. There's no reason to believe that if this case returns to the tort system for purposes of liquidation, that the parties were gonna have to go to verdict. But if they do, that's how the system works. That's not an objective bad. It's the Constitution.

I ask that your Honor rule on the question of bad faith, rule on the Robbins factors, and lift the stay. But most of all, your Honor, I ask that the Court rule and that we get it up to the Fourth Circuit.

Thank you.

THE COURT: Thank you.

All right. Mr. Thompson.

MR. THOMPSON: Morning, your Honor. Clay Thompson on behalf of the Maune Raichle plaintiffs who join Mr. Buckingham's request.

As you recall, I was here in the fall arguing for the Dales to lift the stay and one of the comments that I made was that this case has an Ortiz v. Fibreboard problem and, you know, we don't have a limited fund here. And we made somewhat similar arguments to Judge Whitley who issued his opinion recently in the Aldrich case where Aldrich is in the same exact situation as, as Georgia-Pacific/Bestwall. At 4, at Page 40 of Judge Whitley's opinion:

> "In sum, a 'no-opt-out' bankruptcy plan" -- and as your Honor would recall, the Committee proposed a plan in this case that had optouts to the tort system, right -- "a 'no-opt-out' bankruptcy plan and trust is entirely appropriate for an insolvent or even distressed debtor," which we contend is not Georgia-Pacific/Bestwall with the funding agreement.
>
> "However, under Ortiz and for solvent and non-distressed debtors," which we would submit is Bestwall/Georgia-Pacific, "a plan/trust which does not permit creditors to 'opt out' and return to the tort system for their jury trials may cause an unconstitutional impairment of the claimants' due process and jury trial rights.
>
> In these cases, Debtors' current plan proposal contemplates a capped plan and a 'no-opt-out' trust. If neither Aldrich nor Murray are insolvent nor

financially distressed, the question lies: is that plan constitutional? That, fortunately, is a question for another day."

Now, I mean, I would argue it's unconstitutional and one of the things the Fourth Circuit said is you challenge those kinds of issues at plan confirmation in, in, in the appeal in this case. We're never gonna get to plan confirmation in this case because the plan that the Committee proposed is unacceptable to the billionaires and the plan that the debtors and Georgia-Pacific will propose is unconstitutional.

So there's no remedy here and this case is never gonna resolve and so there's no reason not to lift the stay for Mr. Buckingham because five years from now or whenever it is that whatever happens in this case fails under Ortiz, which it will, Mr. Buckingham's gonna go to, his estate by then, will go to the tort system and liquidate his claim.

So there's no prejudice to anyone if the stay is lifted. Mr. Ruckdeschel covered that.

The, the copycat argument, the floodgate argument, which I understand logically, but it's not a Robbins factor, your Honor. It's not in Robbins. Those aren't factors. And, and so Mr. Ruckdeschel adequately addressed why those, the floodgates is not a valid reason.

And, and when we hear these things that Bestwall says,

like when the Committee proposed a plan with optouts, they said that's akin to a dismissal. Mr. Buckingham moves to lift the stay. The Dales moved to lift the stay. They say that's akin to a dismissal. What they're saying is they have to pay more in the tort system. They don't wanna be in the tort system. The problem is they're billionaires and they're not in distress. So they can't be in bankruptcy court.

So I would urge you to lift the stay for Mr. Buckingham.

Thank you.

THE COURT: Thank you.

Ms. Ramsey.

MS. RAMSEY: Thank you, your Honor.

The Committee supports the lift stay, largely for the reasons that are set forth in our statement. We do not believe that it will prejudice the debtor because of its resources and because this Court ultimately is the arbiter of how many motions to lift stay that might be permitted by the Court, if the Court were to agree to lift the stay in this case. The Court could decide that there's a limit to how many lift stays it would entertain.

THE COURT: But how can the Court do that in good faith? One thing that Mr. Ruckdeschel didn't address at all are, you know, any unusual sort of fact circumstances that apply to -- well, he did address it, I guess. He didn't phrase

it in those terms. But if the Court were, disagreed with that argument, you know, if I granted the motion for relief from stay, I mean, how can -- how do I get around -- how can I grant this motion for relief from stay, but not grant every other motion for relief from stay? I can't in good faith do that myself as a court.

MS. RAMSEY: So your Honor, I think there are distinctions that -- that could be -- there are criteria the Court could establish that would necessarily, by definition of the reality of mesothelioma diagnosis and the life expectancy, would reduce the number of lift stays that this Court might entertain.

So a mesothelioma person who was, a victim who was diagnosed after the petition was filed, that would give you one criteria. A living mesothelioma with an active trial date who can get to trial within a certain period of time while they are still alive could be another criteria, could be a criteria for someone who's going to come before the Court and seek to lift stay, and not everyone will. I think, in short, the Court could look at the case so far and see that there have only been two lift stay motions. They've both been fairly recent and although I do take the point that if a lift stay were successful, that it might attract other people. I don't think you're going to see everyone who is representing a mesothelioma victim come in and seek to try the case necessarily.

What, what also has been proposed of not seeking to collect but simply to liquidate is another important factor in this because one of the things that the, that the claimants argue in their motion is when we get to plan confirmation we know there are gonna be, if we ever get to a competing plan process and the debtor has a plan, there are gonna be a myriad of confirmation issues that are gonna be argued, including bad faith.

We're also going to be in a position where, if there's not a fully consensual plan, there are going to be claimants who are going to come in and, and challenge, perhaps, the best interest of creditors test and it does prejudice their ability to do that if they don't have some proof of what their claim would be worth outside of a plan. So --

THE COURT: But don't they? If they -- I mean, Mr. Ruckdeschel indicated, as I, as I understand it, that Mr. Buckingham has settled with every other defendant who was named in that lawsuit. Isn't that some indicia of the value of his claim?

MS. RAMSEY: Not against Georgia-Pacific. And this is the unique feature of asbestos litigation that I think is at the root of the issue that I wanted to address, also, which is Footnote 11 of the debtor's response, which is the notion that a trust is efficient and equitable. There's no question that a trust system is much more efficient. Whether it is equitable

is really dependent on the facts and most trusts set a scheduled value for a claim which, if you meet the criteria of the trust, you receive an offer in the scheduled amount. You can settle. There's a maximum amount that is set by a trust. It's never close, in my experience, to the maximum amount that the debtor paid in the tort system. It is typically some multiple of the scheduled value. And the reason you set a maximum is because there's an average value that the trust has to try to meet on an annual basis.

And so the way that the math works for a trust, the average values in between those two, is you have this maximum value and that does allow for a claimant who says "My claim is worth more than the scheduled value" to come in and make an argument, if it's worth it and for them to do so, that they should receive more. That's not the same as having the opportunity to obtain true tort values and every claimant is different.

So the question of equity may seem like if I have a mesothelioma and my neighbor has a mesothelioma, then they should be paid the same amount. That's not the case as against Georgia-Pacific. Maybe one of them only used Georgia-Pacific for 20 years while they were a carpenter and were exposed every day and the other one used a variety of different joint compounds and has claims against ten different joint compound manufacturers. We just saw that Kelly-Moore in the news is

liquidating because it had a joint compound product and, and was, received two substantial verdicts against it and, and elected to go out of business. But as you, as you look at that, those two people are very differently situated in terms of what their damages are against Georgia-Pacific.

So the fact that Mr. Buckingham has received compensation from other defendants, each of the defendants, you'll hear, even the debtor will argue this to you, they all look at what their respective liability is in the context of a case. And so it is important to know what the, the liability would be in the world outside of this one for Mr. Buckingham with respect to Georgia-Pacific as his defendant. That is an important question that is going to be raised as well. There are questions, also, that Mr. Thompson just raised about, about the Ortiz issue, whether you can have a mandatory, non-opt-out proposal in a full, full-pay case.

But, but to get sort of back to the, the motion, the floodgates argument, we do think, also, at some point if it were the case that suddenly there were 3,000 motions to lift stay pending before the Court, we expect that the debtor would come in with proof of the precise cost, the, the diversion, whatever the, the debtor is going to argue, and the Court at that point could take those things into consideration. What you have today before you is just argument that there's a theoretical diversion by the debtor.

We think that -- the other, the other point, I think, is we also know, in addition to, you know -- and, and good faith, of course, is a requirement, generally, in bankruptcy for a debtor on a variety of levels. Obviously, it's a component, as Mr. Ruckdeschel has argued, of dismissal. It's also a component of a lift stay and, and we do think that the Court can take into consideration the factors that have been raised with respect to financial wherewithal in connection with evaluating the lift stay, but that goes two ways. That -- that -- that goes into, as Mr. Ruckdeschel said, if his client goes to trial and he gets a $28 billion judgment, that's a consideration that the Court could take into consideration the next time.

We argued before, your Honor, also for a future claimant -- and this, this is sort of a, an unusual, a person who would have been a future claimant like Mr. Buckingham as of the date the case filed is now a current claimant -- for that group of claimants in the middle there, those individuals are at, at risk. They are very much affected by the Court's estimation. They're very much affected by the plan. They are not claims that were settled ahead of time that the debtor is looking to, to, or that the Committee is looking to in different ways, to argue that the Court should estimate on a particular basis. They are real world, current claims. We have not had settlements, verdicts in the time that this case

has been in bankruptcy. The world has changed quite a lot in asbestos litigation since the, the time of the filing of the, the bankruptcy case. It would give the Court, and we think the parties, an opportunity to assess real-world resort, results at this point in time.

And your Honor, to go back to the point, again, that we've made time and time again, there's -- as -- we believe that the debtor has repeatedly argued to this Court this is a full-pay case. It's a full-pay case. If it's a full-pay case, then it's a full-pay case for the claimants, what their claims would be worth in the context of a litigation where those claims are typically tried and liquidated.

And so for that reason, your Honor, and because we believe that it will not hurt any other claimant, we, we would support, we would support the motion. And again, just to recap, because we don't believe it affects any other claimant because of the financial wherewithal of the debtor, because we have, as the Court knows, raised, also, a question of good faith with respect to both the filing and the conduct of the case, and because we believe it would aid in the objectives that this Court has for the bankruptcy, which is to determine whether there is a resolution that the parties could achieve.

Thank you.

THE COURT: Thank you.

All right.

MR. RUCKDESCHEL: Your Honor?

THE COURT: Yes.

MR. RUCKDESCHEL: Before we go over to Mr. Gordon, may I just have a minute?

THE COURT: Yes, you may.

MR. RUCKDESCHEL: All right. Thank you.

I, I just wanted to, to respond to your Honor's question, right, comment from the bench about, you know, the, the unusual facts or circumstances. I didn't go over it verbally here, but, you know, they're set out in the motion, you know.

Mr., Mr. Buckingham wasn't diagnosed until after this petition was filed. He's a living plaintiff with a pathologically confirmed mesothelioma who has a risk that operation of state law could destroy a right of his if he is delayed. And -- and -- and so, so those are unique circumstances with respect to Mr. Buckingham. And there may be other people that fit into that, but there's not gonna be a thousand of them.

And, and you know, if the Court is looking for a principal basis to evaluate these cases and these requests, you know, mesothelioma is inevitably terminal. If you're alive with it, you have a limited time. So those are two easy ones. Not diagnosed until after the petition is filed is another criteria, you know. If, if the Court believed that having a

risk of an adverse effect of the operation of state law that might control the case, you know, for folks that are in Virginia or in Florida where pain and suffering dies with you, you know, that's another way to dramatically cut the potential pool of people that could ask for a lift stay, if other people come and ask, right? You're not gonna have a line of a hundred people out the door seeking to do that. There just aren't that many that are alive with claims, right?

And you know, Mr. Buckingham notified the debtor per the Court's procedures prior to his deposition. He was deposed for seven days. He's produced all the potential claims. He's given extensive discovery, you know. This case is ready to go in the sense of that and we have a court that has a system available that would let it go, the, the Baltimore City Circuit Court.

So, so those are ways that the Court could handle that floodgate issue, if it's a concern, without being uneven in how the Court treats similarly situated people. There just aren't that many of them, so.

And, and, and my last comment, you know, the, having a few of these cases go through the tort system and resolve or go to verdict, you know, can act like bellwether trials for your Court in the eventual estimation, 5, 10, 20 of them, right? That would give, you know, now that everybody agrees that the debtor and Georgia-Pacific are fully aware of the perceived

shortfalls or manipulation of the tort system by claimants and their unscrupulous lawyers, you know, the Buckingham case is perfect. We've disclosed everything. We've given up the bankruptcy claims that have been made, you know. The case is all in a box and ready to go. And, and so it provides a very good opportunity for the Court to get another datapoint in real time that could be useful in the estimation proceeding.

So with that, I'll, I'll sit down and --

Thank you.

THE COURT: Thank you.

All right. Mr. Gordon.

MR. GORDON: Your Honor, could I have two minutes to confer with our client?

THE COURT: Yes.

(Recess from 10:11 a.m., until 10:23 a.m.)

AFTER RECESS

(Call to Order of the Court)

THE COURT: All right. We are back in the Bestwall case.

And Mr. Gordon, we will hear the debtor's response to the motion for relief from stay.

MR. GORDON: Thank you, your Honor. Greg Gordon on behalf of the, the debtor. And thank you for giving us a few minutes.

I wanted to confer with our client because I wanna

take an issue off the table that received more emphasis today than I was expecting and that's this issue that the movant's rights with respect to pain and suffering damages will be prejudiced as a result of the stay because, on the basis that, I guess as I heard the argument, under Virginia law, which they're saying we're bound to argue -- I don't know whether that's true or not -- that upon the, the passing of the individual those damages are no longer available. The reason I, I wanted the break is I wanted to ask my client whether we'd be prepared to stipulate on the record today that -- well, let me, let me back up first.

The first point with respect to that is if this case successfully confirms and we have a plan that includes a trust and trust distribution procedures, that will be a nonissue because the trust will not penalize a claimant based on status of, of life or death. That's Point 1.

So the -- the only -- Point 2 is I, I think the only other scenario where this could come up is in a situation where the case is dismissed and obviously, the, the other side has said from the beginning they think this case should be dismissed.

We're prepared to stipulate on the record that if there's a dismissal of this case and there's a party whose rights, an individual claimant whose rights will be prejudiced in this way; in other words, was a living plaintiff who passes

away, case is dismissed, that we will not argue that pain and suffering damages are lost. It has never been our intention in this case to use the automatic stay or the Court's injunction to harm claimants in that way.

And so I, I just wanna address that issue first so the record's clear on that and we can just move past that.

THE COURT: Okay. Thank you.

Ms. Ramsey.

MS. RAMSEY: Your Honor, I, I'm sorry to interrupt Mr. Gordon, but I just wanted a clarification.

That applies across all claimants, is that correct? That was my understanding.

MR. GORDON: That's the stipulation. Any, anyone whose rights would be prejudiced in this way based on the imposition of the stay or the injunction, yes, we would make that stipulation.

THE COURT: Okay. Thank you.

MR. GORDON: Hold on, your Honor. I'm getting a question here. Excuse me.

THE COURT: Uh-huh (indicating an affirmative response).

(Pause)

MR. GORDON: Mr. Mercer would like me to be more explicit about that.

When I'm talking about an individual whose rights are

prejudiced with respect to this issue, we're talking about someone who at the time the case was filed and thereafter was alive would then pass away and then this issue would come up with respect to --

THE COURT: Having lost that --

MR. GORDON: -- pain and suffering damage --

THE COURT: -- pain and suffering --

MR. GORDON: -- damages.

THE COURT: -- claim because --

MR. GORDON: So just to be crystal --

THE COURT: -- they're deceased.

MR. GORDON: -- clear about that.

THE COURT: Okay. Thank you.

MR. GORDON: Mr. Mercer's always checking my, my math.

THE COURT: Somebody's gotta do it.

MR. GORDON: It's a thankless job, too.

So to be honest, I wasn't sure exactly how to prepare for the hearing today because it seems like it's just a repeat of a hearing we had back in October and, and frankly, it's a repeat, I think, of, of arguments we've heard in other cases. I mean, if, if you think about it, these movants through Mr. Ruckdeschel and Mr. Waldrep have presented arguments that you've heard two times before, already. They made them in their motion to dismiss the case and frankly, when I was listening to Mr. Ruckdeschel make his summary of his bad faith

position, to me that was just a reargument of the dismissal motion. Then they made them again in a statement they filed in support of the motion to lift stay that Mr. Thompson filed on behalf of the Dales making the same arguments. And so, you know, I obviously wanna address the arguments, but at the same time I'm trying not to try your Honor's patience 'cause I feel like we've gone through this before.

But these came up twice before. Your Honor considered and rejected them before. You did so in your oral ruling on the motion to dismiss filed by these same claimants. You did so in your order denying the Dales' motion to lift stay and we would submit, your Honor, fundamentally, you should reject them again for the same reasons that you rejected them before.

From our perspective, your Honor, nothing has changed since those rulings that would warrant a different result and the movants, in our view, have offered nothing to even suggest that they're situated differently from the Dales. And bottom line, your Honor, is that permitting these movants to litigate their claims in the tort system would irreparably harm us, harm Bestwall, and defeat, frankly, the fundamental purpose of the case, which is to permanently and equitably resolve all current and future claims through a plan of reorganization based on Section 524(g) in this case and it would do that because there is no real basis to distinguish the claim of these movants from either the Dales' claim or the claims of many thousands of

other individuals that are pending against Bestwall and we submit, your Honor, that under the standards applicable to lift stay motions, and particularly Robbins, the motion should be denied.

So let me just spend a little more time on this. But again, I'll try not to test your patience, your Honor.

On the question of unique facts or circumstances, they really at the end of the day have offered nothing, these movants, different from what the Dales did. The one argument you heard is that the diagnosis occurred post bankruptcy. Well, that was true for the Dales as well.

I think I've addressed, hopefully, the argument about the pain and suffering damages.

But otherwise, their arguments are things you've heard before. "Well, it's different now because it's clear the bad faith is before you." Well, the bad faith has been before you since, virtually, the inception of the case. The rhetoric about the debtor being a non-distressed billionaire, you've heard it before. They've simply presented nothing that demonstrates why this case should be treated differently from the claims of other claimants.

In their papers, although we didn't hear it today, they purported to rely on some language in the Fourth Circuit's preliminary injunction opinion. I won't go into that, but your Honor found -- and we agree -- that that opinion confirms the

importance of centralizing the claims in this Court.

We also pointed out, your Honor, that in Aldrich and Murray -- and you heard this before -- Judge Whitley denied a similar motion for relief from stay, I think filed by Mr. Thompson, and he noted the floodgates effect. That was, basically, the basis for that.

On floodgates, I think Ms. Ramsey's attempted today to try to come up with some ways that you could draw distinctions between claims, but that was very, to me anyway, ambiguous, very unclear, and frankly, just speculation as to whether there would be legitimate ways to do that and I don't think, again, anything's been offered on behalf of these particular movants that could get you comfortable that if the floodgates opened, you would have a reasoned basis to say, "Although I granted it here, here are my reasons for denying it in this case or in the other cases." And I think, fundamentally, that's what your Honor said at the last hearing and I agreed with it. You know, it's, it's one thing to say that you can be a gatekeeper, but it's another thing to say and you could in good faith actually distinguish in some way between the types of claims that were presented.

So in fact, as Ms. Ramsey suggested, you could actually limit the number of motions that will be granted. I, I just don't think you have a basis to conclude that you could ever do that. In fact, I looked back at the transcript. I

think what you said was -- and I agreed with this -- "I think I would be hard pressed to deny future motions for relief from stay in this case," and that's because of the lack of the unique circumstances.

The -- you know, in the papers and today arguments have been made about how the case was filed without a legitimate purpose. You heard Mr. Ruckdeschel say today it's indisputable and undisputed that the debtor is not in financial distressed and I hear that, but what they're ignoring, in my view, is findings your Honor's already made in this case. Effectively, they're just asking you to reconsider findings. I mean, we've gone through this and gone through this.

So as examples, you found the case has a valid reorganization purpose, you found a chapter 11 filing, particularly one filed in the context of asbestos mass tort liability need not be due to insolvency, and you found that Bestwall suffered sufficient financial distress to seek resolution of its liability under 524(g). Mr. Ruckdeschel just wants to reargue that, reargue that, have you revisit findings that you've already made.

And I think they're also asking your Honor to disregard your oral ruling on the dismissal motion in which you stated that you would decline to reconsider arguments regarding the debtor's alleged lack of financial distress and bad faith in the case. That's what they're basically asking you to do.

I'm gonna skip forward here, your Honor.

On the Robbins factors, we've laid this all out in our papers, but, you know, the first is the question of the litigation involving only state law so that the expertise of the bankruptcy court is not necessary. But here, your Honor, the, the disagreement is that you just can't focus on the individual claim. This whole case is about the resolution of thousands of claims. You've ordered an estimation in the case. The parties are in the midst of that process and that's a process for this Court to handle. It cannot be handled in state court. The expertise of this Court is clearly necessary.

And as, again, your Honor ruled in connection with the Dales' lift stay motion, you said that:

> "Allowing the ongoing litigation of asbestos claims against the debtor in state court could cause irreparable harm to the debtor which could defeat the purpose of this bankruptcy case and could be akin to the dismissal of the case."

The second factor is whether modifying the stay would promote judicial economy and whether there would be greater interference with the bankruptcy case if the stay were not lifted because matters would have to be litigated in bankruptcy court. And again, the whole purpose of this case is to resolve these claims through the bankruptcy process under the auspices and direction of this Court and permitting individuals to

litigate their claims in state court is completely contrary to that and it wouldn't alter the estimation task that your Honor has to undertake, anyway, because you still have thousands of other claims, or you would still have thousands of other claims that have to be valued.

So all you're really doing is creating diversion, creating additional work just to single out certain claims that, ultimately, is not going to promote judicial economy. It's just going to cause added expense and added work. And your Honor knows this. I mean, our view, of course -- and I think Ms. Ramsey even acknowledged this, to some degree -- is that the most, in our view, the most sufficient, efficient and economic resolution of all the claims against Bestwall, not just these movants' claims, is through this process and the establishment of a Section 524(g) trust. And your Honor's previously recognized the benefit of this process, as has the Fourth Circuit. The Fourth Circuit said recently:

"These bankruptcy procedures promote the equitable, streamlined, and timely resolution of claims at one central place compared to the state tort system which can and has caused delays in getting payment for legitimate claimants."

And then the last factor, your Honor, is whether the estate can be protected properly by a requirement that the creditor seek enforcement of any judgment through the

bankruptcy court. And of course, here, the plaintiffs have said they're willing to forego recovery and put that issue to you, but just allowing the liquidation of the claims themselves is what causes the irreparable harm and potentially defeats the fundamental purpose of the case because you're gonna have, again, liquidation of these claims, valuation of these claims occurring in different forums at the same time. That leads to inequitable treatment.

Now Ms. Ramsey was suggesting somehow that it wouldn't be inequitable because claims are different. And, and it's true that the facts of each case are somewhat different, but that's what the trust distribution procedures are for and I know your Honor knows this. They put, they, they classify the claims in certain ways. They examine the characteristics. They put claims together with common characteristics and they get paid that way. That's the equitable treatment they get. The equitable treatment also, though, occur, includes the opportunity of claimants to decide, "I don't think that grid value for my claim is sufficient and I want to pursue my rights and I want to litigate my claim in the tort system." They can do that, but everyone has that option.

What they're suggesting here today is inequitable, from our view, 'cause they're saying for this, this claimant or maybe for some other claimants you would lift it, give them the opportunity. The others, though, have to stay subject to the

automatic stay and remain in this process. That, to me, is inequitable treatment. It grants certain claimants a preference over other claimants, even though at the end of the day their claims are basically the same or fundamentally the same.

And the one other thing I wanted to note, your Honor -- again, I'm just skipping ahead here -- is that what the evidence in this case has already demonstrated. And that is that approximately 75 percent of the unresolved asbestos claims against the debtor had been pending 10 or more years as of the petition date and approximately 55 percent of unresolved asbestos claims against the debtor were 15 or more years old as of the petition date. That's in the record. That's a fact.

Now just a couple other specific points -- and I wanna look at my notes from the arguments this morning -- but No. 1 -- and we've heard this before and I just wanna make, I wanna address this again on the record -- was a argument in the ACC's statement that the company has basically earned over a $1 billion windfall as a result of the imposition of the automatic stay in this case and that's based on some calculation of the run rate for, I think, liability and defense costs. And of course, what that overlooks completely is the fact that Georgia-Pacific agreed to advance through the funding agreement $1 billion to be deposited into a qualified settlement fund for the exclusive benefit of the claimants. That's always

overlooked. You may remember there was opposition to that. We had a hearing on it. Your Honor authorized that payment, but that money continues to sit in that qualified settlement fund today and as your Honor knows, neither Bestwall nor GP has the ability to get it back.

And then I wanna address an argument made in the Maune Raichle statement and Mr. Thompson made it today. And that is this argument that we have a so-called Ortiz problem and that from the Maune point of view it makes any plan in this case that would include a limited fund with no optouts unconstitutional. And you know, the, the premise for that, fundamentally, is an argument that because the company is not insolvent there is no limited fund and pursuant to or under the Ortiz case no plan can be confirmed unless there is, you know, unless there are optouts and there's no limitation on the fund. And of course, not surprisingly I suppose, Maune's now citing Judge Whitley's opinion as support for that, although I appreciate the fact that Mr. Thompson read the language because he didn't rule on it. He just made some comments about it and said it was an issue "for another day."

But I -- and I'll say one other thing. This seems fairly far afield of the issues that we have today, but I feel like it's important enough it at least deserves a short response. And the response is this, your Honor. Ortiz -- and I imagine your Honor's read it, although it's a very long

opinion -- it's a class action case and the applicable law in that case is Rule 23 of the Federal Rules of Civil Procedure and in particular, it's Rule 23(b)(1)(B) and that Rule permits a mandatory class action to go forward, one that could bind all parties, if its requirements are met. And those include a finding that "adjudication with respect to individual class members would, as a practical matter, be dispositive of the interests of others ... or would substantially impair or impede their ability to protect their interests." The Supreme Court focuses on that, talks about various types of cases that fit within that Rule that, or sub Rule 23(b)(1)(B). And a primary one is a limited fund situation.

And so all Ortiz was about was the Supreme Court interpreting the meaning of Federal Rule of Civil Procedure 23(b) in the context of the facts of Ortiz. Is this a limited fund case that fits within the language of Rule 23(b)(1)(B)? What the Supreme Court fundamentally found was no, it doesn't because it's not a limited fund. The proponent's argument was it's a limited fund because the value of -- the -- you know, because the parties had agreed to a settlement amount which fixed the liability and because the settlement amount fixed the liability, that was the limited fund. And not surprisingly to me, the Supreme Court said, "No, you can't do that. Because if we permit that, this, this section could be satisfied in every single case 'cause all you would do is agree to an amount and

do it." No, the case law is clear and the drafters understood this that you're talking about a situation where the amount of the liability exceeds the amount of the assets available for it. And so at the end of the day -- and then the court does discuss some constitutional issues and one is constitutional avoidance, which you've heard, I think, from the other side. You've heard them argue things like that.

But the point is it's fundamentally a statutory interpretation case that says in the context of a Rule that basically requires there to be a limited fund, there has to be a limited fund. "And what you've done here just arguing that a settlement created the limited fund, that doesn't work and so we can't, we're gonna reverse the approvals below."

That says nothing about bankruptcy. It says nothing about 524(g). In my view, it doesn't support a point that 524(g) is unconstitutional and importantly, if you compare 524(g) to Rule 23, 524(g) says nothing about limited fund. 524(g) says nothing about insolvency. What it does say is if its terms are met, you're entitled to a channeling injunction that would bind everyone. That's what it says. And so this is -- the case really is inapplicable.

Now I know law professors, who Judge Whitley is relying on in part, argue that that should be the same result, but the case does not stand for that proposition. And again, it's a statutory construction case. It's not a case that

stands for a broad principle that it would be unconstitutional in other contexts to have a settlement with no optouts if there's not a limited fund. It just, to me, doesn't support that conclusion.

So I just wanted to respond to that because it's come up. I imagine we're gonna continue to hear about it in, in various contexts and we'll do more work on it. But I mean, I read the case myself. I, I just, I don't see the argument.

So just to conclude -- well, let me, let me check my notes quickly, if I might.

THE COURT: Uh-huh (indicating an affirmative response).

(Pause)

MR. GORDON: I should comment briefly on the argument on the best interest test. You've heard this from time to time. I don't know whether we've really responded to it, but if you think about what they're arguing, I mean, Ms. Ramsey suggested that you're not going to be able to address the best interest test without allowing individuals or claimants an opportunity to litigate their claims in the tort system and all I thought when I heard that was that's another way to argue that the case should be dismissed effectively. Because where that goes, it seems to me, is that every single claimant, then, who wants to challenge the best interest test as it relates to the plan would argue -- and it would be approved -- that they

have to litigate their claim in the tort system first so that they're able, then, to come in and make their case as to whether the best interest test has been satisfied. That would not remotely be necessary. It would be a huge intractable problem. And again, to me, all I hear when I hear that is just another sort of back-door way to argue what would effectively be a dismissal of the case.

So your Honor, just to conclude. From our perspective, the movants are basically asking your Honor to reconsider multiple previous rulings you've made and we submit there's no reason or basis for you to do that and we would request, respectfully, that you decline or deny the motion basically for the same reasons you denied the Dales' motion.

THE COURT: One question --

MR. GORDON: Sure.

THE COURT: -- Mr. Gordon. I guess in his sort of twist on the argument about bad faith Mr. Buckingham in his reply or motion -- I don't recall -- but pointed out that nowhere in Carolin does the Fourth Circuit indicate that its two-pronged approach to dismissal is applicable to motions for relief from stay.

If you would just respond to that argument.

MR. GORDON: Well, I think that's right as, as far as it goes. In other words, the Carolin standards are, are the standards that apply in the case of a motion to dismiss.

So, so I think that's technically correct, but then the question that raises is what standards do apply in the case of a motion for relief from stay and those are the Robbins factors. And we've gone through those. We think they all, clearly, as your Honor's found before, lead to a result that the motion should be denied, but I, I, I guess, your Honor, I, I don't see how that argument helps their position. Because it is a dismissal case. I don't think the Fourth Circuit was suggesting that somehow these factors would apply to stay relief or they wouldn't apply to a stay relief. It was a different context.

THE COURT: Okay. Thank you.

MR. GORDON: Thank you.

THE COURT: All right. Mr. Ruckdeschel.

MR. RUCKDESCHEL: Thank you, your Honor.

I'd like to start where, where we just were. Everybody seems to be in agreement Carolin doesn't apply the two-prong test to lift stay arguments. So, so as I started my argument, the, the bad faith issue is squarely before the Court. And, and contrary to the comments of my colleague that this is just a reargument of motions that have been argued and ruled upon by your Honor in the past, the Court expressly did not rule on bad faith, right? And, and the oral ruling from the motions to dismiss filed by Mr. Buckingham and the Committee also doesn't reach that issue and, and don't reach

that issue because of the pendency at that point of time of the request for an appeal, which was denied.

So, so you know, we still don't have the final ruling from the Court with respect to that motion, but it, you haven't ruled on bad faith, period. And, and so the argument that somehow I'm rearguing something you've already decided is just wrong.

We heard three or four times a fundamental purpose of this case is to permanently resolve all claims in this Court and not in the tort system. I -- I'm -- I'm -- I didn't get that as a quote 'cause I can't write that fast, but we heard it over and over. That's -- it undermines the whole purpose of the case. The whole purpose of this case is to resolve all these claims here. That's their purpose, sure. That is not the purpose of the Code. The purpose of the Code, as Carolin says, is, right, and the purpose of the objective futility analysis that was discussed in Carolin is to ensure that there is embodied in the petition some relation to the statutory objective of resuscitating a financially troubled debtor, the desire to globally resolve asbestos cases if you're not in financial distress from them, if you're not being overwhelmed by them. That's the, that's the Congressional Record language of the purpose of 524(g), to help companies that are facing overwhelming asbestos liabilities resolve them, right? Not here. Never overwhelmed, never overwhelming. Managed

efficiently and effectively for 40 years.

So, so it's their purpose to get a global resolution, but that's not the purpose of the Code. If you qualify as a financially troubled debtor and you are properly before this Court in good faith, right, as defined by the Court [sic], in, in a petition that is seeking to execute, to embody the statutory objective of resuscitating a financially troubled debtor, then 524(g) is available to you. But just wanting 524(g) doesn't make it available any more than any other tool of the Code is available to somebody with enough money to pay their debts as they come due.

Nobody here is arguing, we haven't argued, we hear it over and over from the debtor, nobody here is arguing that there's a solvency requirement. We're arguing financial distress, right? You don't have to be on your last nickel, but you have to be in danger. You have to be threatened. There has to be an overwhelming asbestos liability. This is not a proper purpose and we're not rearguing things that have been ruled on before.

Floodgates. The only, the only thing that's speculative about the floodgates is how many people are gonna come and, and that's not a factor in the analysis under Robbins either, right? Robbins requires that we look individually at each case, right, and, and make determinations based on those cases. There may be implications of that, but it's not a

factor under Robbins. We meet the Robbins test and the attempt to recast the first Robbins factor, which is is this case, is Mr. Buckingham's case a state law case that needs your Honor's expertise. It's not. And you can't just say, well, don't pay attention to Mr. Buckingham's case 'cause the purpose of our proceeding is to give relief to a thousand cases. It's not relevant to the analysis for Mr. Buckingham. The analysis here has to be based on Mr. Buckingham.

It is rank speculation that there's gonna be a flood of additional lift stay motions and as Ms. Ramsey has discussed and as I've discussed, there are rational and reasonable ways for the Court to address them as they come up, right? And, and if it becomes overwhelming, that's a reason to deny it. If it becomes a distraction, that's a reason to deny subsequent ones, but it won't be because there aren't that many living mesothelioma victims who have properly notified Georgia-Pacific and the debtor of the, their illness and their deposition and have done all the things that Mr. Buckingham's done. And, and whether --

THE COURT: What do you estimate there are, Mr. Ruckdeschel? I don't know that anyone --

MR. RUCKDESCHEL: So --

THE COURT: -- has quantified that.

MR. RUCKDESCHEL: So the, the best guess we would have, your Honor, would be to look at how many claims were

being filed per year against Georgia-Pacific, mesothelioma claims the year before they filed for bankruptcy and, and to look at that and then say, okay, now how many of those people were alive, right, and, and you know, then how many of them are gonna come here and do this. Because -- and Ms. Ramsey talked about this a little bit -- but as the practicing asbestos trial lawyer in the room, you know, in Maryland we have joint and several liability. So everybody's responsible. You sue all the defendants and you negotiate, hopefully successfully, with each one of them individually based on the relative strengths of the case and you decide on what's a relative, a, a fair value for that defendant to pay based on my evaluation of risk, my client's toleration of risk, the strength of the case against that particular defendant if we were to go to trial, and you can resolve with all, some, or none of them.

In states like Florida, it's the same thing except there's apportionment of fault. So we're all guessing as to, well, what's the number that they would eventually put on Georgia-Pacific if we went to verdict against Georgia-Pacific 'cause they get to put everybody else on the verdict sheet. Each of those evaluations reflects our evaluation of the value of Mr. Buckingham's claim against that defendant, but not the value of Mr. Buckingham's claim. There is no book that lets us tell, well, a mesothelioma's, victim's claim is worth "X" or "Y," right? You negotiate with each one based on the

individual strengths of the case, right? That's how I do it. There may be firms that have masses of cases that do it differently, but I negotiate each claim individually with somebody like Mr. Mercer and, and we reach an evaluation of the value of that case that can go down and then get reported up the line to Medicare 'cause we have to say exactly how much each person's getting.

So, so there -- there isn't -- there isn't a reasonable basis to predict there's going to be a flood of living mesothelioma plaintiffs coming to your, to your Honor and requesting relief from the stay because they'd have to be claimants that are alive. They'd have to be claimants that believe they have a Georgia, claim against Georgia-Pacific that their lawyers believe is sufficiently likely to be valuable enough to warrant coming before your Honor and asking for relief and adding them in to the, to the claim as opposed to waiting, you know.

And, and so there are all kinds of reasons here 'cause you may, you know, as Ms. Ramsey said, you know, you could have somebody that worked their whole life in the steel mill, but also redid their basement and they used JP Joint Compound. Is that a theoretically viable claim against Georgia-Pacific in the tort system? Sure. Whether you're in Florida or Maryland, is that gonna be a valuable claim in the tort system such that they're gonna come down here and ask to be able to litigate it?

I don't think so. I certainly wouldn't.

So the -- the -- it's pure speculation that this'll be floodgates and if it is, your Honor can address it and, and we've given you criteria that can be applied rationally and evenhandedly across and if something changes and it becomes a problem with respect to the management of the debtor, Georgia-Pacific refused to honor the funding agreement or something, then, you know, we're gonna have a larger crisis about this, but we can deal with that at that time.

There was a discussion that, you know, the most efficient way to resolve these cases is through the bankruptcy system and, and, and a quote from the Fourth Circuit's opinion about the preliminary injunction ruling, which is not surprising that it gets quoted, but the court specifically said, "We're not dealing with a motion to lift stay and we're not dealing with a motion to dismiss," and then they have some discussion about things in general. That statement that, you know, the, the tort system may have problems and can lead to delays is just part of the discussion there. They're not looking at lift stay and they're not looking at dismissal and they, they expressly said, "We're not looking at that. If we were," you know, "then we'd, we'd address those issues."

We're 5-1/2 years into this case. We're gonna be seven years in before estimation's done. Ten, twelve years before there's any plan vote and completion of appeals if a

plan is approved, you know. That's not efficient and speedy resolution of claims, particularly for people who are dying.

The discussion of Robbins Factor 3, you know, the, the debtor's argument is exactly as we said it. "If you let people do this, they're not gonna vote for our plan." Right. 'Cause I have a, a, a claim for Mr. Buckingham that's far more valuable than anything that's reasonably gonna come through a plan.

The optouts that are described, it's true. Trust distribution procedures and, have optouts to the tort system. They're all subject to the cap of the maximum payment, right? A cap to return to the tort system is expressly what was looked at in Amchem and Ortiz and rejected as violative of the Seventh Amendment.

So let's talk about Amchem for just a second and Ortiz. You have to read them together, but fundamentally, the concerns that are being discussed there are Seventh Amendment concerns. Yes, the question is, well, under what circumstance, you know, they're looking at Rule 23, but, but ultimately, what they're saying is the problem is this is gonna implement the, this is going to, to affect the Seventh Amendment. It's going to impair or limit people's rights under the Seventh Amendment in a situation that has not been recognized as permissible, one where there's not a limited fund. And they're talking -- so in, in those cases the, the present claimants had, largely,

agreed, right? So what they're talking about there is just the futures.

THE COURT: Uh-huh (indicating an affirmative response).

MR. RUCKDESCHEL: But it applies if you're doing it over my client's objection and Mr. Buckingham objects. They just -- the, the people pushing for the plan on the plaintiffs' side there have agreed to this and the question then was, well, can we implement this and bind the futures to this deal. And, and it's the Seventh Amendment that's, that's in play there. The fact that it comes up in, in the context of Rule 23 doesn't make it less of a Seventh Amendment case.

Floodgates? Seventy-five percent of the cases are more than ten years old. I'm pretty sure those people aren't coming and asking for relief from stay. Fifty, fifty-five percent more than 15 years old. And, and again, nobody else has come so far.

You know, whether we're gonna talk about Georgia-Pacific, New Georgia-Pacific getting a windfall 'cause it hasn't been in the tort system and funding that or not, well, what's undisputed is that they've upstreamed almost $6 billion in profits to Koch Industries while this case has been pending and not a single penny has gone to a victim.

Your Honor, I, I communicate with Mr. Buckingham. I've spent a lot of time with him. I communicate with him on a

regular basis just to see how he's doing. I spoke with him before Christmas. He reiterated that he's not gonna go gently into this good night. I'm here, you know. I -- I -- I'm gonna keep being here and fighting for him. I couldn't get in touch with him yesterday, but I spoke with Angie and Everett -- he, he goes by his middle name, Everett -- is, he's in the hospital with complications from his chemotherapy and his disease. He's fighting. He's basically wheelchair bound and oxygen dependent now, but he's alive. He's hanging on. This is important to him and I ask that you give him a chance to vindicate his rights, please.

THE COURT: Thank you.

Mr. Thompson.

MR. THOMPSON: Thank you, your Honor.

Okay. So I'm gonna try not to cover stuff that Mr. Ruckdeschel covers. Even though I sit six inches away from him, we don't share notes, so.

Yes. The, the question that you asked about how do you distinguish other requests, there's no prejudice to anybody. They've got enough money to pay everybody in full and defend the cases. There's not a lot of case law that I can find in 524(g) cases where individuals are moving to lift the stay and the reason for that, I think, is because in pre two-step era, 2017, before that, there was real companies subjecting their entire operations to the jurisdiction of the

bankruptcy court. There was a real concern that there wasn't enough money to pay everyone and so you don't have a lot of these requests, right? And so I think that's what's partially at issue here, is that this isn't done historically because before 2017 you couldn't be a multi-billionaire that came into bankruptcy and try to get all the benefits without taking on any of the obligations.

So as I thought about how to make these motions, 'cause I've made several of them now, right, so I was thinking about what's unique about my particular case. And so, for example, last time we were here talking about Mr. Dale another plaintiff's lawyer moved to lift the stay in LTL regarding Valadez, his Valadez case, and Mr. Gordon and I, I think, agree on the posture of that one. So they moved to lift the stay for Valadez in like Spring of 2022 in the LTL case. Mr. Valadez was in his early to mid-20s and he had what would be described as a "rocket-docket" type case. He had a, a firm trial date in California and what Judge Kaplan did was a piecemeal modifying of the stay.

So initially, I think he may have denied the request initially, but he did allow him to file the complaint and then plaintiff's counsel would come back three months later and then there was additional modifications. And then during the second LTL bankruptcy he did allow him to go to trial. Now last time we were here Mr. Gordon did correctly point out that at that

point in time I think the writing was on the wall that LTL was gonna be dismissed, but that was the posture there, okay?

So when I went before Judge Whitley -- and so that was a unique case, right? Young victim, firm trial date that's happening, diagnosed at or shortly after the bankruptcy was filed. When I moved to lift the stay in the Semian matter in Aldrich, I thought that was a unique situation because Mr. Semian had an employer claim against Old Trane. And so in the Aldrich case workers' compensation claims are excluded from the bankruptcy, okay? So Mr. Semian lived in Pennsylvania and in Pennsylvania, unlike most states, his remedy for mesothelioma for, against his employer is not workers' comp. You have to sue your employer.

So I felt that was a unique situation because he's in a situation where he has to sue his employer; therefore, it's not a workers' comp claim; therefore, it's subject to the bankruptcy and I made the arguments that it was a unique case. The debtor opposed it. Judge Whitley said what he said, right? He did -- he -- he was concerned, I think as your Honor clearly is, about this floodgates and how do I distinguish the cases. The truth is is that none of these lift stay motions are gonna be unique enough for the debtor, whether it's in Aldrich or Bestwall. Dale, I moved to lift the stay because Georgia-Pacific was a major defendant in his case for reasons that I thought, you know, they were one of three or four major

defendants. He was a carpenter for a dozen years. He's living. He has a firm trial date.

And so I think that we'll take our guidance from your Honor about -- and there have been several suggestions about how you can do that to distinguish between the types of claims that you would consider allowing to lift the stay and none of the creditors are objecting. The Committee is in favor of Mr. Buckingham liquidating his claim. The FCR and the Committee were in favor of Mr. Dale lifting his, the claim because, again, they can pay everybody in full.

And I didn't move to lift the stay in LTL, for example. I represent 50 people with claims against LTL at that time. I didn't move to lift the stay because I didn't think it was likely that any of my cases would get to trial before the Third Circuit was gonna rule. That was just the calculus that I was doing, right? You have to go and show that you're unique.

And so I think that whatever you decide here, we'll take our guidance from you on that.

There's been talk about the TDPs. Mr. Ruckdeschel discussed those. Yes, the TDPs in prior what I would describe as good faith, limited fund bankruptcies, they do allow optouts to the tort system, but it's for a capped remedy. And so I've had a client who wanted to sue Johns Manville 'cause he grew up across the street from the Manville plant. We actually dug

into this procedure to actually sue Manville and its owners, right? And it's, it's because it's a limited fund case. Manville was overwhelmed by asbestos liabilities and there was a balance struck where current victims of Johns Manville don't get a lot of money, but they get something. Mr. Semian got $17,000 from Johns Manville. He would have gotten zero from Johns Manville but for the cap and the restrictions on the optouts.

We don't have that situation here. What we have here is a company that wants to artificially cap its remedies and they can't do that, right? And so the TDPs are not gonna cure the situation that we have with Mr. Buckingham and Mr. Dale because the TDPs are not gonna allow people to pursue uncapped damages. These are state law claims.

So for better or worse Mr. Dale's claims are under New Jersey law, Mr. Buckingham's are under Maryland law, and those govern. The TDPs can't trump state law. They can't trump the Seventh Amendment. There's not an exception to New Jersey law, to Maryland law, to the Seventh Amendment for companies that would rather not litigate in the tort system, right? There's not an exception for that. Desiring to cap your liabilities is not a valid reason to, to limit my client's state law remedies against your company.

If 524(g) applies to Georgia-Pacific and Bestwall, 524(g) is unconstitutional and that's something we'll

challenge. There's a reason why -- so Ortiz, which we've discussed to my delight more today 'cause I think it's directly relevant to all of these two-step cases, Ortiz and Amchem, '97 and '99. They're both class actions. Nobody disputes that. They're Rule 23 cases. They're not bankruptcy cases. No one disputes that. They postdated 524(g).

So you've got 524(g) in 1994. You've got Fibreboard, who comes in with an agreed class action where they've got a maximum non-opt-out settlement where the plaintiffs and the defendant have agreed that it's a limited fund. They've agreed it's a limited fund and the Supreme Court in its opinion in Ortiz cites 524(g) in a footnote. So they're aware of 524(g), but there's a concurrence that says that you can't impair the Seventh Amendment rights in this way and there's a portion that I'll quote -- there's a footnote in 20, in, in Footnote 23 of that opinion, which I read to Judge Whitley in the argument in Aldrich:

> "It is no answer in this case that the settlement agreement," which everyone agreed to, or 90 plus percent of the people agreed to, "provided for a limited, back-end 'optout' in the form of a right on the part of class members eventually to take their case to court if dissatisfied with the amount provided by the trust."

It, it would require them to "exhaust a variety of

alternative dispute mechanisms, to bring suit, and not against Fibreboard" -- they'd have to sue the trust -- "and it limits damages to $500,000," okay? And Fibreboard was in a lot worse financial position in 1999 than Georgia-Pacific and Bestwall are now.

And so there's a reason why after Ortiz pre-twostep in 2017 -- so it was from 1999 to 2017 -- Combustion Engineering, General Motors, U.S. Gypsum, on and on and on, there's a reason why they subjected their entire company to bankruptcy because they realized that that's how you had to get 524(g). You had to subject all your assets and operations to the bankruptcy court. All of those companies and their lawyers read 524(g) and Ortiz the same way that I do, right? And Ortiz is the reason why this case will never resolve because they're never gonna offer optouts. We already know that. The plan was proposed.

And so we hear a lot about -- and Bestwall wants us to agree to a limited fund and we're not gonna do it. My firm represents a lot of mesothelioma victims. We're not gonna agree that there's a limited fund for current and future victims. We're not gonna help them cap their liability.

And so we've heard about estimation. Your Honor clearly is gonna do estimation and, and the Committee's gonna put on a great case and I'm sure the debtor's gonna put on a good case and you're gonna listen and you're gonna render a, a

good opinion and you're gonna take everything very seriously. The problem is is that none of that is gonna move the case forward because we're not gonna ever vote for a plan that doesn't allow optouts 'cause they can pay everybody in full.

That's the theory of this. That's, that's the theme of this entire case and I would just urge you, as Mr. Ruck, Mr. Ruckdeschel said, to, to rule on bad faith.

Thank you.

THE COURT: Thank you.

Ms. Ramsey.

MS. RAMSEY: Thank you, your Honor. I think I have six points. And again, I'll try not to repeat.

The first is the Court asked Mr. Ruckdeschel to estimate how many claims. The FCR has kindly located the information more quickly than I did. There were 331 mesothelioma claims filed against Georgia-Pacific in 2016 before the filing of the bankruptcy, which was on November the 2nd, that were not dismissed. There were more than that that were originally filed, but that were not dismissed.

Second point -- so that may give the Court some parameters, especially when modified, as discussed by Mr. Ruckdeschel and Mr. Thompson.

The, the second point, relatedly, is this issue of what the claims looked like that were pending at the time of bankruptcy. Part, part of what is happening here a little bit,

your Honor, is everybody is throwing information at the Court that is relevant to this, but it is critically relevant to estimation.

THE COURT: Yep.

MS. RAMSEY: And so, to some extent, I think we have to respond to that a little bit. It is the Committee's position that the reason that 75 percent of the pending cases were ten years or older is because those were the cases that weren't getting addressed.

So clearly, there are gonna be some cases that are -- neither side is particularly -- the plaintiffs are pushing, defendant doesn't really care about. They're gonna hang out there, but there was ongoing activity right up to, very shortly before the filing that cases were being settled. In fact, after DBM -- DBMP -- after Bestwall came into existence as a result of the divisive merger, it was settling cases before the filing and the Court will recall it only existed about 92 days before filing.

So that information, while it may be accurate, we think does not illustrate what the debtor is suggesting to the Court that it should.

The third point is the issue of trusts and the Court is going to hear a lot about this, but this is critically important that the Court have an accurate understanding of how the TDPs operate in most trusts. And those of us who spend a

lot of time working with asbestos trusts, of course, speak in a casual and summary fashion and we use terms that are defined in the trusts that, frankly -- Ms. Zieg and I were talking about this on the, on the plane yesterday -- it took us years to really fully understand this.

So at the right time it is our intention to put a witness on the stand who can walk the Court through the TDPs that are in most of the cases and how they operate, but what the Court was told today with respect to the TDPs was a little bit of a mishmash and understanding precisely the TDPs and how they work I think would help the Court understand why there is such a tremendous disconnect between the debtor and the Claimant Representatives in this case.

In most trusts, the idea was that there was a resolution that was based around, fundamentally, close enough for government work or doing the right thing for the maximum amount of people, but it wasn't perfect and so there were mechanisms put in place so that claims that had same diseases would be treated similarly and those procedures, generally, only took into consideration the unique features of a case when someone decided to go to what's called individual review. And as you've heard, there was a cap, a maximum cap of what that would do and even then in almost every, in every trust you were still subject to the payment percentage. The Court'll hear a lot about payment percentages, but it's, it's a percentage of

what your claim value is that you actually receive from the trust. And so you had that feature and some trusts pay less than 10 percent. Many trusts pay less than 40 percent.

So when you're evaluating all of that as a claimant and what your potential recovery might be, all of those factors go in to whether you seek individual review.

And then with respect to what is contained and constitutionally required, which is you cannot deprive under the Seventh Amendment an individual from pursuing their claim in the, in the tort system, what is required is an optout. It exists, but it is still subject to limitations. So you might be able to go out. The trust, then, is who you sue, right? It's not the defendant. You value your claim. You're still going to be limited to a maximum amount. You're still going to be limited to the payment percentage and in many years your, you fall within the payment queue over a period of years after that.

So, so it exists. There, there are limitations on the right which make it, which make sense in a situation where you want everyone to be treated, to get some of the benefit of a limited fund. The difference here is it doesn't make sense here. And, and again, your Honor, I, I don't wanna overly summarize this because it's critically important that the Court have the benefit of, of having someone walk through, almost on a page-by-page basis, how the TDPs function and what happens in

the real world when a claimant makes a claim against a trust.

Is it efficient? It, it is efficient. I do agree with that. Is it equitable? You'll hear a lot of evidence about this if we, when we get to estimation. The, the answer, we contend, is no. It's, it's really only equitable in a limited fund scenario because not only are you talking about exposure differences that we highlighted today. You're talking about personal differences. Someone who's 40 years old and has five children who are still dependent on them is, their claim is deemed often in the tort system to be a more valuable claim than someone who's 80 years old, is single, and has no dependents. All of those factors go into other health risks. There are a million factors.

And one of the things that was not discussed today with respect to Ortiz and Amchem is another rule that came out of that is you cannot do asbestos litigation in the class action world under Rule 23 because no plaintiff is representative. And, and that, you know, that's just federal law.

So, so 524(g) has adopted a different and a very useful role for the context in which it was, it was created, but that, then, gets me into class actions and what has been called the Ortiz issue.

Again, class actions are, are a very unique feature. They're -- they're not -- they don't apply exactly here. I

think the important point is the one that Mr. Thompson was making, which is the overarching constitutional, jurisdictional issues of the Seventh Amendment of taking without fair compensation, all of those issues that come into play, and the, the notion is if the federal courts under the authority of Rule 23, the federal district courts, cannot have a mandatory non-opt-out class in a fully funded case, does it make sense that 524(g) would allow that. That is an issue that the Court is going to hear a lot about as we get into plan issues.

And so I think I've got two, two points left. One is the best interest test. What I was really trying to argue, your Honor, is there is a prejudice to claimants like Mr. Buckingham if, when he comes before the Court. If he is contesting a plan on the basis of the best interest test, he is obviously in a better position to advise the Court what his claim actually was worth in the tort system versus whatever is proposed under a plan if he has the benefit of, of judgment, of the judgment.

And the last point I wanted to make, your Honor, is really an offer, which is if the Court is prepared to consider lifting the stay, we would ask for a recess to try to propose to the Court specific parameters that the Court might consider as a means to lift the stay here that would define unique, that would assist the Court in its concern about floodgates.

THE COURT: Thank --

MS. RAMSEY: Thank you.

THE COURT: Thank you.

All right. Mr. Gordon, I think we're back with you.

MR. GORDON: Thank you, your Honor. Just a, a few points.

You know, Mr. Ruckdeschel started out by saying that --

MS. RAMSEY: Mr. Gordon, may I interrupt you? I apologize, but I have been given, I've just learned something that I said was inaccurate and I wanna correct it before you speak.

The, the 331 number that I gave the Court was living mesos that were filed.

THE COURT: Okay.

MS. RAMSEY: And I apologize, your Honor. I, I wanted to make sure that information was correct.

THE COURT: Thank you.

MS. RAMSEY: I apologize, Mr. Gordon.

THE COURT: Thank you, Ms. Zieg.

MS. RAMSEY: Uh-huh (indicating an affirmative response).

THE COURT: I appreciate that. Thank you.

Mr. Gordon.

MR. GORDON: So your Honor, with respect to Mr. Ruckdeschel's comments, he, he went right back to where he

started with, which was bad faith, and made the argument that your Honor didn't rule on bad faith in connection with the initial dismissal motion. And obviously, we don't disagree with that. We, we know what your Honor ruled, but as I said before, in that opinion your Honor did find that the case had a proper reorganizational purpose, you did find that the company was in sufficient financial distress to warrant, to justify the filing, and you did find that insolvency was not required. And he is asking you to revisit those points. And from the standpoint of this argument that there's sufficient bad faith to warrant lifting the stay, I would submit that those findings by themselves give you what you need to distinguish this case in all respects from the number of so-called bad faith stay cases they cite. And there was a big string cite and we had a big, long footnote with a response, many of which weren't auto, even automatic stay cases.

So I don't think -- that, that's a very technical argument and I don't even dispute the technical argument, but the underlying findings are, findings that exist in that ruling would have to be revisited and basically, reconsidered.

And if you think about it, again, this is all just another way to argue that the case should be dismissed and you just have to -- it's almost like, at least for me, I kind of lose sort of track of where we are exactly. I mean, think about the way this case has moved. So we had an initial motion

to dismiss that was overruled. You, you heard, or denied. And you heard many of the arguments in that, in connection with that motion that you're hearing today and you addressed them all.

Now they're being dressed up in different ways. Terminology has changed, but they're fundamentally the same argument, but it's just rearguing dismissal because they argued dismissal, lost appeal, then the Buckinghams argued dismissal. Your Honor ruled against that in an oral ruling and then right after that, then we get stay relief basically premised on the same arguments. It's just, they're just gonna keep coming back and raising the exact same issues.

And that goes, really, to the floodgates point, I think. They're, they're telling you it's gonna be limited, but, I mean, their own pleadings and arguments other than what they've said today belie that because if you go back and look at the statement that the Buckinghams filed in support of the Dales, they said that, that every claim --

> "Every claimant who so desires has an absolute right to liquidate their claim before a jury and the balance of the equities requires that any asbestos-related claimant seeking to liquidate their claims against the debtor be allowed to do so."

That's a dismissal of the case, in effect. That's what they're saying. They -- I mean, they're very open and

honest there. They weren't drawing any distinctions. They're saying every claimant should be allowed to do this.

The other thing in terms of floodgates, Mr. Ruckdeschel says that's not a Robbins factor. That's true, but what he ignores is what Robbins did say was that estimation should occur before claim liquidation. And that makes sense because the idea of estimation is to avoid claim liquidation and, of course, they're suggesting that you just ignore what Robbins said and go ahead and allow claim liquidations to occur before the estimation is completed.

On the 331, I was gonna respond to that. We don't have the breakdown today of living versus deceased. So I can't say whether the 331 is correct or not. What I did want your Honor to know is that, on average, in the years leading up to the filing there were approximately 1600 mesothelioma claims filed every year. Some portion of those were living. The rest would be deceased, but that'll give you some order of magnitude. But unfortunately, I don't have the numbers on living versus deceased.

On, on Valadez, I addressed this before and I, I'll say briefly on that, that was a different case. It arose in a different context where there were multiple motions to dismiss that had been, that were pending and, and a trial was imminent. It's very different. In fact, it's like the exact opposite in this case where here, your Honor approved a preliminary

injunction without ruling on the automatic stay but, of course, the stay is in place. That decision was affirmed by the District Court and it's just been affirmed by the Fourth Circuit. It's completely the opposite and notwithstanding all of that -- and not only the Fourth Circuit, but we went through an *en banc* review in the Fourth Circuit, as you know -- and right after that they then come in and basically say, your Honor, "Okay. That's what the Fourth Circuit said, but now let's just take these on a piecemeal basis and you should go ahead and, effectively, reverse your determinations in connection with the preliminary injunction and allow these cases to move forward."

So to me, it's almost, if you think about it, the exact opposite of the situation that existed in LTL.

I'm not gonna say much more about Ortiz 'cause it's, it's so far beyond the scope of this, but I, I will say that the Supreme Court itself recognized that bankruptcy was a different animal. I mean, it has like an, when it talks about constitutional issues, it even carves out bankruptcy.

So that, that's an argument, I suppose, for another day, but I, I just don't accept the fact that Ortiz has any real application here.

The, the other thing I would just say overall, just almost like an atmospheric, there's so much focus now on limited fund and it just shows how the arguments are, have

progressed in this case. Initially, it was solvency versus insolvency, then it was financial distress, now it's limited fund.

But just to take you back to where we were a long time ago -- we've argued this before -- there have been multiple 524(g) cases that have been confirmed where there was a solvent debtor and there was not a limited fund and I didn't want the Court to lose sight of that. Because the way these arguments are cast, it makes it sound as if you're being asked to consider something that's never ever happened before and, you know, Mid-Valley, USG, I can't remember them all now. We've cited them to you before. I know we did in the initial dismissal argument. I'm sure we've done it in arguments since, but it's just that, you know, this is just a continuing issue that keeps coming up. It just gets characterized in a different way, but at the end of the day, your Honor, again from our perspective, this comes down to nothing more: They're asking you to reconsider your decision.

And it's particularly ironic, I think, that they're really asking you to reconsider your preliminary injunction decision, even though that decision has been affirmed at the District Court, been affirmed by the Fourth Circuit, including the, the full Fourth Circuit. It's now, admittedly, under *cert*, it's, will be under *cert* review by the Supreme Court and we'll see. But at this point, your rulings have been affirmed

and from our perspective, there'll be no reason for your Honor to revisit or question the rulings that you've already made.

Thank you, your Honor.

THE COURT: Thank you.

Mr. Ruckdeschel, you can't resist the urge, can you?

MR. RUCKDESCHEL: I'll be less than 90 seconds.

THE COURT: All right.

MR. RUCKDESCHEL: Amchem was decided in 1997. 524(g) was enacted in 1994. Section 5 of the Amchem majority opinion says:

"The argument is sensibly made that a nationwide administrative claims processing regime would provide the most secure, fair, and efficient means of compensating victims of asbestos exposure."

That's exactly what's being argued here. This is a more secure, fair, and efficient mean of compensating victims.

Congress, however -- this is the court again:

"Congress, however, has not adopted such a solution," right? That's post-524(g). 524(g) is not a legislative solution to the asbestos litigation. It is a tool for financially overwhelmed companies facing asbestos liabilities that are properly before the bankruptcy court.

We're not arguing for dismissal. This is another way arguing for dismissal. We're not. I have a dismissal motion. You know, you'll -- your -- you'll -- we'll get your order on

that when, when we get your order on that, but we're arguing for relief from the stay.

And limited fund versus financial distress versus solvency, my clients haven't changed. We've raised financial distress and limited fund in our filings and that's what we're arguing. In USG, there were findings in the lower courts that there was financial distress, just like there was in Kaiser Gypsum. There was a, there was a liquidation analysis where it was determined under the liquidation analysis in Kaiser Gypsum that the, the claimants would do better in the trust system than they would if there was liquidation and payment of the current claimants. And that's happened in each of these cases as they've gone forward, notwithstanding assertions that, well, they had lots of money. There's been that kind of analysis in all these cases and this is no different. It's not proper.

We ask for relief from stay and we ask for a finding on bad faith, please.

THE COURT: Thank you.

All right. Court will take a recess and come back.

(Recess from 11:36 a.m., until 12:54 p.m.)

AFTER RECESS

(Call to Order of the Court)

THE COURT: All right. We are back in the Bestwall matter for a ruling on the, Mr. Buckingham's motion for relief from stay and having considered the brief in support of and in

opposition to the motion for relief from stay and the arguments at today's hearing, I conclude I should deny the motion for relief from stay and in large part, I do so for the same reasons I denied the Dales' motion for relief from stay, the order for which was entered about one month ago, and for the same reasons I granted the preliminary injunction motion early on in this case, but I will add a few things to the remarks that I made when I ruled on the Dales' motion for relief from stay.

Consideration of the Robbins factors, particularly the second factor, that being whether modifying the stay will promote judicial economy and whether there would be greater interference with the bankruptcy case if the stay were not lifted because matters would have to be litigated in bankruptcy court, I believe and find weighs against modifying the automatic stay.

As I said in the Dales' case, I can't look at modifying the stay in Mr. Buckingham's case in isolation, at least particularly not with respect to the second prong. That issue must be considered in the context of this case being a mass tort case and because that is the reality in which we find ourselves, I still conclude that if I granted Mr. Buckingham's motion for relief from stay I would be obliged to grant the motion for relief from stay of most, if not all, claimants who sought similar relief. That is true for Mr. Buckingham as it

was for the Dales because he has not pled unique facts or circumstances that would justify lifting the stay as to him or otherwise sufficiently distinguish his case from the thousands of other cases pending in state court. I suppose that's even more true now, given the debtor's stipulation regarding the pain and suffering claim.

And Mr. Ruckdeschel's right. That number can't be known with certainty. It is speculative, to some extent, but I have to believe and I conclude that it would be in the thousands, or at least enough for me to conclude that it would not promote judicial economy to grant this motion for relief from stay and would ultimately equate to dismissal to do so.

It also flies in the face of having granted the preliminary injunction. I won't address the Curtis factors because they don't apply in this Circuit and frankly, they weren't argued.

Mr. Buckingham accurately points out that Bestwall's bad faith was not explicitly before the Court in the Dales' motion, but it is here. I agree to some extent, but I will specifically address that argument.

In carefully reviewing the Carolin case again for the umpteenth time and the context of this case, the Fourth Circuit includes a brief discussion about 362 in passing and in dicta to support its conclusion that a bankruptcy court can dismiss a chapter 11 petition if it was filed in bad faith. There was no

pending motion for relief from stay in Carolin. That issue was not on the table and they cited to 362 because it includes the word "cause" as does 1112(b). And the Fourth Circuit was defining what that broad language means and of course, ultimately concluded that it supports the construction that a debtor's lack of good faith may constitute cause for dismissal of a petition.

Similarly, the Fourth Circuit points out that 362 "inferentially permits inquiry into the debtor's good faith in commencing this case as a whole," and it cites Collier's for that proposition.

In his reply, Mr. Buckingham accurately points out that, "Nowhere in Carolin does the Fourth Circuit indicate that its two-pronged approach to dismissal is applicable to motions for relief from stay." I guess I would add, though, but nowhere does it say that it doesn't and to me, it defies logic to conclude that the two-prong standard doesn't apply in the context of this case and I underscore that statement if considering whether to grant relief from stay on the basis that the case was filed in bad faith. In other words, it can't be that a less stringent standard applies to a relief from stay motion which, if granted, would result in the dismissal of the case. To conclude otherwise would mean that I could deny the motions to dismiss the case as a bad faith filing for failure to meet the objective futility prong of the two-prong standard,

but grant relief from stay upon the finding of subjective bad faith. If I granted such relief from stay to one claimant, I would be obliged to grant it to all claimants, again resulting in the dismissal of this case and standing in stark contrast to the proposition for which I have held Carolin stands.

And as a practical matter, you know, this issue isn't gonna come up in other cases because in chapter 11 cases the Court wouldn't grant a motion for relief from stay if the case was filed in bad faith. The Court would dismiss the case. And that was true in a couple of the cases that were cited by Mr. Buckingham in his Footnote 6. There were both motions to dismiss and motions for relief from stay that were pending. The Court granted the motion to dismiss, but denied the motion for relief from stay as moot or didn't otherwise consider it.

Otherwise, with respect to the cases Mr. Buckingham cites in support of his argument that a lack of good faith constitutes cause for lifting the stay, I agree with the debtor that those cases are distinguishable. None of them were mass tort cases with tens of thousands of claims pending against the debtor.

I would also note that several of the cases include no reference to 362 or the automatic stay and the Basin Electric Cooperative case was an involuntary petition in which the district court concluded the petition should have been dismissed based on the petitioning creditors' bad faith. My

point is those case citations are somewhat misleading and they don't stand for the proposition for which I believe they were cited.

I will conclude with this and I don't say it lightly. Frankly, I was surprised and a bit frustrated to see another motion for relief from stay be filed so quickly on the heels of having denied the recent motion filed by the Dales. That order was entered on December 13th of last year. I was particularly surprised to see that it was brought on behalf of Mr. Buckingham who filed a statement in support of the Dale motion for relief from stay and whose motion to dismiss I denied in a ruling from the bench on July 28th of last year.

And as an aside, we are working hard on that order and we expect and hope that it will be entered before the February omnibus hearing date.

In my view, this motion for relief from stay is, in many respects, a repeat of the arguments made by Mr. Buckingham in his motion to dismiss and many of the arguments strike me as misplaced in the context of a motion for relief from stay. As I began to review the motion for relief from stay, I was curious but hopeful that it pled some special set of facts and circumstances that could support granting the motion for relief from stay, but it did not. Rather, it raises arguments that have been addressed and ruled on by this Court now several different times and a review of some of the headers in the

motion underscores that. For example, "Bestwall Filed for Bankruptcy Protection in Bad Faith, Which Requires Lifting of the Stay," "There's No Legitimate Reason for Bestwall to be in Bankruptcy." And the sub headers in this section and I'm quoting them, "Mr. Buckingham Must Receive as Much Under a Plan Of Reorganization as He Would in a Liquidation" and "Mr. Buckingham Has An Absolute Right To Liquidate His Individual Personal Injury Claims Before A Jury," also implicitly recognize that some of the issues raised in the motion for relief from stay that are issues more properly raised in the context of plan confirmation, which I recognized when I ruled on the first motion to dismiss and which Judge Whitley just recently acknowledged when he entered the Aldrich order when he said those issues were "for another day."

It's particularly frustrating to the Court, given some of the other recent filings by Mr. Buckingham. For example, a request for a status conference regarding the order on the movants' motion to dismiss on August 31, 2023 while knowing full well that the Court had ruled from the bench and is working on that written order; filing a motion for certification of direct appeal to the Circuit Court of Appeals of order denying Mr. Buckingham's motion to dismiss and setting it on for hearing, again before the written order has been entered and knowing that it's procedurally improper and that that motion can't be heard until the order has been entered;

and now filing a motion for relief from stay that's virtually identical to the one that the Court just ruled on and denied.

All of that is to say to Mr. Ruckdeschel and others, take care in your future pleadings to ensure they are not filed for an improper purpose, that they are not duplicative of the arguments you made in your motion to dismiss, and again in your motion for relief from stay.

So for all of those reasons, the Court denies the motion for relief from stay and I would ask Mr. Gordon to draw an order consistent with those remarks.

Mr. Gordon, we typically have a status hearing at some point during these hearings. I don't know if y'all want to take a recess or how, if you had planned on having a status conference, but I am happy to proceed as you all probably discussed before we started the hearings today.

MR. GORDON: I do have a short status report, your Honor, along the lines of what I've done in prior hearings, if I might.

THE COURT: Yes, you may.

MR. GORDON: So your Honor, the last status report, I guess now, was about three months ago at the October 19 hearing and I just have a list of a few developments since then I thought worthy of calling to the Court's attention.

The first is the pending appeal in the Fourth Circuit on the question of the Illinois claimants sanctions. I let

your Honor know back in October that that appeal had been argued in September. The Court may recall that the issue presented is whether the sanctions order is a final appealable order or not and the status is unchanged. We're still waiting for a decision from the Fourth Circuit.

THE COURT: Right.

MR. GORDON: The second thing I would mention is the Dale lift stay appeal and your Honor may know this, but just to make sure you do. As you indicated, you entered your order on December 13th denying the request. On the 27th of December, the Dales filed a Notice of Appeal. On January the 10th, they filed their Statement of Issues on Appeal and Designation of the Record and our counterdesignations are due next week, on January 24th, and of course, briefing would then occur after that.

Dismissal issues. After our last -- and again, I know your Honor knows this, but just to make sure -- after our last hearing the District Court on November 7th denied the Committee's motion for leave to appeal.

Also on that same date, Mr. Buckingham and Ms. Weiss filed, filed a Notice of Supplemental Authority in this Court providing notice of the District Court opinion and in that Notice they requested that your Honor grant or deny the motion on the merits. On the same day that they did that, they also filed the Motion to Certify, as your Honor knows.

Now with respect to the Motion to Certify, because it was filed prior to the time the order was entered we have had discussions with the other side and we have agreed to push that off. And currently, that's now set for the February hearing and that's just a tentative setting. It all, all depends on, obviously, when the order is entered.

And the last thing I would say on that front is we do understand the Committee is intending to seek to certify and we would work with the other side to ensure that those get briefed together and heard together.

THE COURT: Okay.

MR. GORDON: On the, the preliminary injunction appeal -- I referenced this earlier -- the Committee and the FCR have filed *cert* petitions. Those were filed on December 20th. We've received, the debtor's received an extension to respond to those petitions and our deadlines to respond are March 22 for the Committee petition and March 28th for the FCR petition. And the reason there's a difference in the dates is because they were docketed a few days apart and the time periods run off the date of docketing, not the date of filing.

Estimation discovery. We've continued to work on the document productions called for by the various discovery orders, including the Second Amended Case Management Order. I reported in October on our progress producing custodial attorney e-mails to the Committee and the FCR and those are the

ones that were not saved to firmwide document, to a firmwide document management system and were not organized by claimant. As I projected back then, we did meet the substantial completion estimate for those e-mail productions on October 31. We made the final production by December 15, the date called for in the current CMO, and we also provided at that time a final privilege log.

Now I should point out there's -- there -- it -- we're not completely done because there, there's some limited additional searching we're doing for custodial attorney e-mails really beyond the scope of the current CMO, in our judgment, and these are searches relating to, to claims where neither the debtor, nor the defense firm could identify the actual individuals who worked on the case. And so we're trying to come up with some other ways to locate documentation or e-mails and the like to sort of, to identify who the individuals or attorneys might be that have that information.

That is -- so that is one loose end I wanted to mention to your Honor that we're engaged in and we've tried to keep the Committee and the FCR apprised of where we stand with respect to that remaining piece of work.

And then, your Honor, as called for in the current CMO and as I also reported in October, we did serve on the Committee and the FCR our response to their interrogatory requesting the debtor's contentions with respect to the alleged

non-disclosure claims, claims for which we contend inadequate disclosure was given --

THE COURT: Uh-huh (indicating an affirmative response).

MR. GORDON: -- to the debtor. We finalized our list of, of those claims by the December 1 deadline included in the current CMO. We also served our objections and initial responses to the, the Committee and the FCR's contention interrogatory with respect to those claims on the December 15 deadline.

And you may remember that per the CMO these initial responses were for 30 claimants selected by the debtor out of the list of the overall number of claims and the idea was to illustrate through these kind of exemplar responses how the debtor intended to respond to the full set, to the interrogatory with respect to the full set of claims. We ended up including 31 claimants in the answer.

I'm sure Mr. Worf knows why we added one. I can't say standing here today. I do.

But the remaining responses to the contention interrogatory are due per the CMO by February the 1st.

Since we served these initial responses the parties have been meeting and conferring and this was basically contemplated by the CMO when we decided to basically provide these illustrative responses so the other side could see how we

intended to respond and the Committee and the FCR have raised concerns in those meet and, meet and confers regarding the sufficiency of the responses. As we stand here today, those discussions are ongoing, but the Committee and the FCR have indicated that motion practice may be required to address the issues, or at least some of the issues that have been raised to date by the Committee and the FCR.

So I wanted to put that on your Honor's radar screen that that's something that may come up. It may come up in the next couple of months.

But that said -- and we're hoping to have a conversation yet today -- we plan to discuss the schedule for that if, in fact, we can't reach an agreement. Obviously, we're gonna try hard to resolve all the issues, but that would include an agreement on briefing and a hearing schedule, obviously subject to your Honor's views on that.

Now we have agreed, subject to your Honor's approval, in connection with these ongoing discussions about the responses to the contention interrogatory to suspend the deadline in the CMO for us to serve our final responses. And again, as I indicated earlier, that's the February 1 date.

THE COURT: Uh-huh (indicating an affirmative response).

MR. GORDON: And we've also agreed to suspend the deadline for the Committee and the FCR to provide their

proposed date for the completion of fact discovery. That date was to follow --

THE COURT: Uh-huh (indicating an affirmative response).

MR. GORDON: -- this process of responding to the contention interrogatory. And that date, as specified in the CMO, is 60 days after we complete our document productions.

So because we completed those productions in, on December 15th, February 13 is the applicable date at this point. But again, the idea is to suspend that date as well. And the thinking is that until we either reach agreement on the scope of the debtor's responses to the interrogatory or the Court otherwise adjudicates any remaining dispute that we have, it's difficult -- the parties are really kind of unable to complete the, the tasks that are required by those two deadlines.

So the idea would be just to basically suspend them for now pending either an agreement by the parties or a resolution by the Court at which time we could then come back and talk to the Court about what, what the new dates should be in light of the resolution either by consent or by ruling --

THE COURT: That makes great sense to me.

MR. GORDON: -- from the Court.

And then the last thing I would say, your Honor, is that the debtor's continuing its own discovery efforts. This

process is still ongoing. As I mentioned in October, we did serve subpoenas on four plaintiff firms. We have in the interim been working with those firms to address some of the detail or terms with respect to that discovery and we have reached stipulations with each of them to avoid any motion practice.

So the next step there is actually to work on scheduling depositions for those firms and that's, that's underway.

THE COURT: Okay.

MR. GORDON: And then the, the last topic is just a minor, kind of housekeeping topic.

Back in September your Honor denied our motion challenging confidentiality designations with respect to the deposition of Dr. James Dahlgren. That related both to the deposition, I should say, and certain documents. The Committee and the debtor have been working on a form of order. I believe recently we've reached an agreement with the Committee on the form of order. And so I would expect that order would be uploaded to the Court in the near future.

So I just wanted to give your Honor a heads-up on that.

THE COURT: Okay. Thank you.

MR. GORDON: And that's all I have.

THE COURT: Thank you.

Ms. Ramsey.

MS. RAMSEY: Your Honor, I have nothing else. I think Mr. Gordon accurately provided a, a status of where we are.

THE COURT: Okay.

Ms. Zieg.

MS. ZIEG: I agree, your Honor.

THE COURT: Okay.

MR. GORDON: Well, it apparently wasn't a mishmash. That's good.

MS. ZIEG: You did a very good job this time.

THE COURT: All right.

With that, then, the Court will recess and I expect that we will see you all back in February.

Thank you.

MS. RAMSEY: Thank you.

MR. ELLMAN: Thank you, your Honor.

MR. THOMPSON: Thank you, your Honor.

MR. GORDON: Thank you.

MR. RUCKDESCHEL: Thank you, your Honor.

(Proceedings concluded at 1:16 p.m.)

## CERTIFICATE

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

/s/ *Janice Russell* — January 23, 2024

Janice Russell, Transcriber — Date

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| IN RE: | : | Case No. 17-31795-LTB |
| BESTWALL LLC, | : | Chapter 11 |
| Debtor. | : | Charlotte, North Carolina<br>March 28, 2024 |
| | : | 9:32 a.m. |

: : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE LAURA TURNER BEYER,
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor: Robinson, Bradshaw & Hinson, P.A.
BY: RICHARD C. WORF, ESQ.
GARLAND CASSADA, ESQ.
101 N. Tryon Street, Suite 1900
Charlotte, NC 28246

Jones Day
BY: GREGORY M. GORDON, ESQ.
2727 North Harwood St., Suite 500
Dallas, TX 75201-1515

Audio Operator: COURT PERSONNEL

Transcript prepared by: JANICE RUSSELL TRANSCRIPTS
1418 Red Fox Circle
Severance, CO 80550
(757) 422-9089
trussell31@tdsmail.com

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

APPEARANCES (continued):

| | |
|---|---|
| For the Debtor: | Jones Day<br>BY: JEFFREY B. ELLMAN, ESQ.<br>1221 Peachtree Street, N.E., #400<br>Atlanta, GA 30361 |
| For Richard and Joann Dale, *et al.*: | Maune Raichle<br>BY: CLAY THOMPSON, ESQ.<br>150 W. 30th Street, Suite 201<br>New York, NY 10001 |
| For Richard and Joann Dale, Wilson Buckingham and Angelika Weiss: | Waldrep Wall<br>BY: JENNIFER B. LYDAY, ESQ.<br>DIANA SANTOS JOHNSON, ESQ.<br>370 Knollwood Street, Suite 600<br>Winston-Salem, NC 27103 |
| For Wilson Buckingham and Angelika Weiss: | Ruckdeschel Law Firm, LLC<br>BY: JONATHAN RUCKDESCHEL, ESQ.<br>8357 Main Street<br>Ellicott City, MD 21043 |
| For Future Claimants' Representative, Sander L. Esserman: | Young Conaway<br>BY: FELTON E. PARRISH, ESQ.<br>WILLIAM R. ZWICHAROWSKI, ESQ.<br>227 West Trade Street, Suite 1910<br>Charlotte, NC 28202 |
| For Official Committee of Asbestos Claimants: | Robinson & Cole LLP<br>BY: NATALIE RAMSEY, ESQ.<br>DAVIS LEE WRIGHT, ESQ.<br>1201 N. Market Street, Suite 1406<br>Wilmington, DE 19801 |
| | Robinson & Cole LLP<br>BY: THOMAS DONLON, ESQ.<br>1055 Washington Boulevard<br>Stamford, Connecticut 06901 |
| | Hamilton Stephens<br>BY: ROBERT C. COX, JR., ESQ.<br>525 N. Tryon St., 14th Floor<br>Charlotte, NC 28202 |

APPEARANCES (continued):

For Georgia-Pacific LLC:

Rayburn Cooper & Durham, P.A.
BY: JOHN R. MILLER, JR., ESQ.
227 West Trade Street, Suite 1200
Charlotte, NC 28202

Debevoise & Plimpton
BY: MARK P. GOODMAN, ESQ.
66 Hudson Boulevard
New York, NY 10001

APPEARANCES (via telephone):

For Future Claimants' Representative, Sander L. Esserman:

Young Conaway
BY: SHARON ZIEG, ESQ.
1000 North King Street
Wilmington, DE 19801

SANDER L. ESSERMAN
Future Claimants' Representative
2323 Bryan Street, Suite 2200
Dallas, TX 75201-2689

P R O C E E D I N G S

(Call to Order of the Court)

THE COURT: All right. Good morning.

(Counsel greet the Court)

THE COURT: We are here in the Bestwall case. We have three matters on the calendar today, hearing on motion for certification of direct appeal to the Court of Appeals of Wilson Buckingham and Angelika Weiss and the responses and reply thereto; the motion for certification of direct appeal to the Court of Appeals of the Committee and the debtor's response and the reply thereto; and the hearing on the motion for certification of direct appeal to the Court of Appeals of Mr. Buckingham and Ms. Weiss, and again, the debtor's response and their reply thereto.

As we always do, we'll start over here and have you all announce your appearances, please.

MR. CASSADA: Good morning, your Honor. I'm Garland Cassada of Robinson Bradshaw, here for the debtor, accompanied by my partner, Rich Worf.

THE COURT: Okay, very good.

MR. MILLER: Morning, your Honor. Jack Miller, Rayburn Cooper & Durham, on behalf of Georgia-Pacific.

THE COURT: Okay.

MR. GOODMAN: Morning, your Honor. Mark Goodman, Debevoise & Plimpton, on behalf of Georgia-Pacific.

THE COURT: Okay.

MR. GORDON: Morning, your Honor. Greg Gordon, Jones Day, on behalf of the debtor, and I'm here with Jeff Ellman as well.

THE COURT: Okay.

MR. ELLMAN: Good morning.

THE COURT: Very good. Thank you.

MS. RAMSEY: Good morning, your Honor. Natalie Ramsey of Robinson & Cole, and I'm here with my partners, Davis Lee Wright and Thomas Donlon.

THE COURT: Okay.

MR. THOMPSON: Morning, your Honor. Clay Thompson, Maune Raichle Hartley French & Mudd, for the Dale Family as well all other Maune Raichle Hartley French & Mudd plaintiffs.

THE COURT: Okay.

MR. RUCKDESCHEL: Morning, your Honor. Jonathan Ruckdeschel on behalf of Mr. Buckingham and Ms. Weiss.

THE COURT: Okay.

MR. PARRISH: Good morning, your Honor. Felton Parrish with Young Conaway Stargatt & Taylor on behalf of Sander Esserman, the Future Claimants' Representative. In the courtroom with me is my colleague, Bill Zwicharowski, and on the phone is Mr. Esserman and my partner, Sharon Zieg.

THE COURT: Okay.

MR. COX: Good morning, your Honor. Rob Cox appearing

on behalf of the Committee, also.

THE COURT: I'm used to looking up and seeing Ms. Zieg sitting in that seat over there.

MS. LYDAY: Good morning, your Honor. Jennifer Lyday and I'm here with Diana Santos Johnson as local counsel for Mr. Ruckdeschel and Mr. Thompson.

THE COURT: Okay, very good.

Well, it's a good thing y'all are here today instead of tomorrow since we're in the middle of March Madness and the Tarhills play tonight at 10:00. So this Judge would not be as attentive tomorrow, but I hope y'all have some teams who are still in, in the midst of March Madness.

But with that, what I had in mind is that we would hear the, both of the motions as it, they relate to the dismissal order that was entered in February and let the debtor respond to that motion, those motions, and then move to the motion as it relates to the order denying the motion for relief from stay. But y'all typically talk about these things and have ideas before I get in here.

So if somebody wants, has another suggestion, I'm open to hearing it.

MR. RUCKDESCHEL: Your Honor, it might be more efficient -- my, my remarks are largely going to be related to the lift stay, although I do have some about the dismissal motion -- it may be more efficient for Ms. Ramsey and I just go

first --

THE COURT: Okay.

MR. RUCKDESCHEL: -- and, and deal with them both at once.

THE COURT: Okay. I'm, I'm open to that, too.

Any objection to proceeding that way, Mr. Gordon?

All right.

MR. GORDON: No objection.

THE COURT: Okay, very good.

Ms. Ramsey.

MS. RAMSEY: Thank you, your Honor.

We have some slides, if we could --

THE COURT: Yes.

MS. RAMSEY: -- approach. Thank you.

(Slide presentation handed to the Court)

THE COURT: Thank you.

MR. WRIGHT: Good morning.

MS. RAMSEY: Ready?

THE COURT: Yes, I am.

MS. RAMSEY: Thank you, your Honor. Again, Natalie Ramsey, Robinson & Cole, appearing on behalf of the Committee.

As the Court is aware, the legal standard that applies for today's request by the Committee for direct certification to the Fourth Circuit of the Court's February order denying the Committee's and the Buckingham/Weiss motion for dismissal is

written -- they're -- in four criteria. They are disjunctive and if any of the criteria are met, the statute is mandatory. The Court is required to certify the appeal. The four criteria, as the Court is aware, are that:

The judgment, order, or decree involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court;

No. 2, or No. 2, it involves a matter of public importance; or

No. 3, it involves a question of law requiring resolution of conflicting decisions; or

No. 4, that an immediate appeal may materially advance the progress of the case or proceeding.

The Committee contends that the issue that the Committee has raised regarding whether there is a constitutional requirement that a debtor have a inability, either present or foreseeable, to timely pay its debts as they become due under the Bankruptcy Clause of the Constitution in order to access the subject matter jurisdiction of the bankruptcy court and we contend that that issue meets three of the criteria, Criteria No. 1, 2, and 4.

With respect to the criteria of a question of law as to which there is no binding precedent, this Court found in connection with the dismissal order that the Supreme Court's description of bankruptcy power do not definitively answer or

even address the question of constitutional subject matter jurisdiction. Similarly, Judge Whitley just last month determined that, "So the bottom line is I don't think there are any controlling cases and that's enough right there to send this up with a suggestion."

The debtor argues that the Fourth Circuit's prior refusal to accept direct certification should be a consideration, but it is clear that that is not part of the standard that is required or even appropriate to be considered by this Court. This Court's job is to determine whether the issue satisfies the certification criteria and to certify and the Fourth Circuit, obviously, has discretion with respect to whether it accepts that. In any case, the issues that the Committee raised this time that go to the constitutionality gating issue of subject matter jurisdiction before this Court were never raised or addressed in the prior certification order. They simply were not part of the original arguments.

The Court may recall that in our original request for certification of the 2019 denial of dismissal the issues that we had raised before the Court at that time were whether the Carolin standard should be modified and whether the standard for dismissal, the Carolin standard for dismissal, should be aligned with the standard articulated by other courts. Those are very different types of issues than the issues and the questions that we present here. The questions presented are on

page 4 of our motion filed March the 7th and they are:

No. 1, as bankruptcy courts, like all federal courts, have limited jurisdiction and can only exercise the power authorized by the Constitution, does the Bankruptcy Clause limit the jurisdiction of the bankruptcy court so that it cannot entertain a petition from a well-funded, solvent entity, with no need for bankruptcy, whose economic viability is not threatened?

And, No. 2, is a foreseeable threat to an entity's economic viability a prerequisite for application of the test for bad faith dismissal established in Carolin?

Although the Court certifies the order and not the questions, I go through that to point out and emphasize that the issues that were before this Court before and as to which we now request certification were entirely different focuses. And so there is no prior precedent at the Fourth Circuit of having considered this issue to the extent that the Court finds that that is relevant at all.

The cases the debtor cites in its opposition are, are not to the contrary. None of the cases stand for the proposition that a bankruptcy court's denial of a motion which raised a certain legal issue on the basis of law of the case, also. This is the second argument the debtor makes is, is if, if because the denial of dismissal disposes of some of the issues that were argued by the other motion. On the basis of

law of the case, the debtor says, well, that, then, should be relevant to the Court because those issues are contained with, in that order and, and that's a relevant consideration. The cases that the debtor cites are simply not supportive of that. In the Dillon case, that is a case about interlocutory appeal from a federal arbitration act, not certification by a bankruptcy court. And there, the court ruled law of the case did not apply and it had jurisdiction over the appeal regardless of the fact that the district court had characterized its determination based on law of the case.

Also, Gravel from the Second Circuit, that involved sanction orders. The first order was appealed to the district court, which vacated and remanded. The second sanctions order certified for direct appeal and the Second Circuit considered and decided the underlying legal issue of the bankruptcy court's authority to impose sanctions. So again, standing for the proposition that on appeal the court can go beyond the simple discussion of law of the case.

And finally, Faulkner, same proposition. There, there was a district court decision that, the issue of subject matter jurisdiction against a party. On a subsequent issue to certify the bankruptcy court's contempt order, the court said, "Whether the Court correctly applied law of the case is not the issue. This question is inappropriate for certification because controlling decisions exist."

So with respect to the first criteria, a question of law, we think it is absolutely clear and the order could be certified on that criteria alone, but I will address just the other two briefly.

Public importance. This is clearly an issue of public importance, the question of access to bankruptcy and what entity can access bankruptcy and specifically here with respect to the Texas two-step cases, as they have been called, the question of whether an entity can come in to bankruptcy, announce it has the full ability to pay all of the debts, current and future, no distress, no concerns about its economic viability at all, and access this Court's authority and access the provisions of the Code that would provide for restructuring and adjustment of creditor relations in a circumstance that, where, where all of the claims could be paid in full. As the Court is aware, the criteria here is whether it involves important legal issues or important practical ramifications. Here, we believe it satisfies both of those standards. This Court, again, concluded in connection with its dismissal decision that --

If we can have the next slide.

-- "A threshold question of subject matter jurisdiction transcends this case" -- actually, this is the first hearing, your Honor, on, on the first certification -- "A threshold question of subject matter jurisdiction transcends

this case, its litigants, and asbestos cases in general, and has far-reaching practical implications, and arguably constitutional implications."

And recently, when Judge Whitley certified a similar order denying dismissal concluded that the matter "is publicly important. These are issues, again, that strike at the very core of who's entitled to use bankruptcy." And Judge Whitley phrased it, "Can solvent companies use bankruptcy? ... Who is entitled to be bankrupt? I, I think that is an important issue."

With respect to, again, this most recent order denying the motion to dismiss, the Court said, "I still believe the matter needs to be addressed by the Fourth Circuit. So, one way or the other, I think that will be helpful to all of us." And that the Committee urged the Court to give it an opportunity to appeal it and, "Ultimately, it's for the Fourth Circuit to determine whether it should modify its dismissal standards in mass tort asbestos cases, or, for that matter, all chapter 11 cases."

So again, we think the Court has already recognized the public importance. We believe that its brother court has recognized the public importance and emphasizing it even more in this particular Bestwall case, we have direct attention and we have parties coming in to be heard in connection with the, the petition that is pending before the Supreme Court for

certification of the Fourth Circuit's order approving this Court's grant of the preliminary injunction expressing issues and concerns that also are related to this fundamental issue of access to bankruptcy.

So with respect to members of Congress -- and again, this was a bipartisan senator brief that said:

"Allowing Bestwall's position to prevail here would fuel abuses that are already transforming a system of last resort into a corporate shell game that allows fully solvent corporations to evade accountability for any harm caused by their products and deny tens of thousands of people their day in court. That is not what Congress intended when it created bankruptcy."

And with respect to the *amicus* brief, again bipartisan brief filed in connection with supporting the Committee's petition, the AGs said, "The Fourth Circuit decision allows tortfeasor corporations not facing financial distress to abuse the bankruptcy process." The attention that this case is getting and the attention that the Texas two-step cases are getting nationally every day in various courts and before the, the Senate are important factors to emphasize how much public importance these cases have.

I also mention the number of claimants that are impacted by these bankruptcy cases also lead to public importance. We don't know how many claims have, claimants have

manifested a disease in the last 6-1/2 years since this case has been pending. We do know what the number was that was pending as of the date that the petition is filed, but rough math would have you believe that there are probably 20,000 cases of people or their estates that have been impacted by the Bestwall bankruptcy case and that's without starting to count the impact on the claimants in similar types of cases.

So we believe that, again, this is a issue of extraordinary public importance, probably one that you would have a difficult time finding an issue right now that has greater public importance in the bankruptcy jurisprudence.

I just wanted to cover a couple of other quotes from the senators' brief that I think are specifically relating to the issue of the access to bankruptcy by an entity like Bestwall or Georgia-Pacific:

> "Through its unprincipled, atextual interpretation of the Code's provisions, Bestwall has created a legal stratagem that radically expands the authority of bankruptcy courts and makes a mockery of congressional intent. The bankruptcy system was not designed to provide solvent nondebtors with the option to simply decline to be held liable for alleged wrongdoing."

That's at pages 3-4.

At page 8, the senators' brief said:

> "Congress' careful designation of core proceedings

makes plain that the mere existence of a bankruptcy proceeding is not an all-purpose grant of jurisdiction."

At page 8.

And the, the brief goes on and on. I have a whole page of excerpts that I could bring to the Court's attention, but I'll stop there and just highlight one additional excerpt from the AG brief at page 15, which says, "Congress has only vested limited authority in bankruptcy courts."

So the debtor says in opposition that these are not cases of, of public importance and again, talks about the fact that the courts in other cases required something much more than, than the issues that we have presented, but it, they frankly cite to nothing. The debtor cites to no situation or circumstance that is even remarkably close to the attention that these cases in general or this case in particular has received.

So I'll move now to material advancement of the case, the third criteria that we believe also is satisfied by the denial of dismissal. Again, citing back to your Honor, the Court said in connection with the prior certification that, "It seems inevitable regardless of any ruling by the district court on the dismissal orders that these issues will end up before the Court of Appeals." That is unquestionably the case. We're going to get there eventually. These issues are going to have

to be taken up and the sooner that those issues can be resolved, the sooner we will be able to have some guidance that will direct the future better because, although this case is on a path and moving forward, there are so many unresolved legal issues that have been related to the constitutional issue of access, that the sooner we have guidance, the better.

Next screen, please.

Judge Whitley, again in connection with his recent certification of his denial of dismissal said, "At a minimum, resolution of these issues will help the parties get the answers that are going to ultimately have to be decided."

So with that, your Honor, I will just cap, recap by saying we believe that the order denying dismissal should be certified and that it should be certified on three independent bases. We believe that it satisfies each of these and we would ask the Court to certify.

And the last point that I will make is that we calculate that April the 5th is the deadline for the Court to issue a certification if it is so inclined.

THE COURT: Okay.

MS. RAMSEY: Thank you, your Honor.

THE COURT: Thank you.

All right. Mr. Ruckdeschel.

MR. RUCKDESCHEL: Thank you, your Honor. Jonathan Ruckdeschel on behalf of Wilson Buckingham and Angelika Weiss.

On behalf of my clients, I'd adopt the arguments of the ACC and, and we stand on the pleadings that have been filed for my clients, which we've also adopted the ACC's pleadings regarding the motion to dismiss. Ultimately, in the motion to dismiss, your Honor, the debtor is conflating the role of this Court under Section 158 and the role of the Fourth Circuit with respect to questions of immediate review. This Court's job is to certify if any of the factors are present. The Fourth then gets to make the decision about whether they take it, right? And, and this is not the forum for a merits argument about who's right or who's wrong. We're past that. Your Honor's made the ruling of this Court and now the question is what's the significance of that ruling.

With respect to the law of the case, we pointed out in our reply the only relevant discussion of the law of the case in the context of today, your Honor, is that your Honor has already ruled about the public importance and material advancement prongs of this issue. That's the law of the case and that's the only law of the case that's important here. The Christianson case from the Supreme Court that's cited in the papers makes clear that whatever rulings are made in a lower court that might constitute law of the case do not insulate the merits of the case from review by the appellate court. Interestingly, if you look at Hamilton-Brown v., Hamilton-Brown Shoe v. Wolf Brothers, which is a 1916 case that Christianson

cites as the primary source for its ultimate finding in that regard, there, back, you know, almost a century ago the Supreme Court looked at this and said specifically in the context of, well, we previously declined *cert*, but now we're going to take it and we're going to take it on the merits, right? They go through the exact scenario we're in here and they said the law in the case has no significance to the question of whether the appellate court will now make another discretionary opinion even if it's already looked at the same opinion.

So I would commend Hamilton-Brown Shoe, in, in addition to Christianson, for the Court.

Ms. Ramsey -- the, the, the public importance is only gone up since 2019. Ms. Ramsey talked about the bipartisan *amicus* brief of the senators, the Attorneys General *amicus* brief, the spread of this scheme to transform the Bankruptcy Code into the Tort Reform Code, which has spawned all of the other twosteps in this jurisdiction, LTL which started here, but moved away; Tehum Health that, that we're now reading about with respect to the tragedy in the prison healthcare system; Bayer, talking about doing it publicly with respect to the Roundup liabilities; 3M Aearo, Aldrich/Murray now having been certified and being before the Fourth Circuit. The public importance has vastly increased since 2019. And now we have the constitutional issue framed as well for review.

So, so certification before on dismissal was proper,

it's more proper now. In fact, I would argue that it's mandated by the law of the case and by Section 158.

So, so that brings us to the lift stay. And, and I just wanted to give the Court a little bit of background here as we talk about this. I filed the lift stay motion for Mr. Buckingham to ensure that the question of bad faith as opposed to the question of the Carolin two-prong analysis was squarely framed before the Court in a format that would be immediately appealable, right? Neither this Court, nor Judge Whitley, nor the Fourth Circuit have ever reached the merits of the question of bad faith with respect to these filings. And, and in filing the motion for lift stay we put that issue squarely before this Court. I understand that the Court's application of Carolin to that meant that, once again, the Court didn't reach it, but it's squarely before the Court and now framed for appeal. And, and there had not been such a motion previously. Mr. Dale's motion that Mr. Thompson filed discussed bad faith in passing. It didn't focus on it. It was basically a Robbins motion.

Judge Conrad's ruling regarding the appealability of the ACC's initial motion to dismiss made this especially important to my client in my analysis of this issue because if this Court doesn't certify or if the Fourth Circuit declines the certification review in Aldrich/Murray and here, if you do certify, I need to have that issue framed in a way that the

district court's going to be able to address bad faith and address it in a way that's immediately appealable because the district court has held that the dismissal order is not.

So that's why we filed this. It wasn't in an attempt to be duplicative of what Mr. Dale had done or to have a second bite at the apple. It was to make sure that this issue was framed in a way that could be considered by the appellate court, whether that be the Fourth Circuit or the district court. It could be considered by them now, not at confirmation. Because that's our concern, the continued internecine warfare in this case and all the other twosteps that is going to continue until there is a definitive ruling regarding this is a proper use, right? Whether it's proper for a wealthy and profitable company in need of, no need of chapter 11 and no financial distress to restructure on the eve of bankruptcy for the purpose, the admitted purpose of sidestepping the absolute priority rule, the admitted purpose of sidestepping the equal treatment of creditors, and to force renegotiation of state law liabilities while its creditors' rights are frozen. Mr. Dale didn't press that. He didn't seek certification of the denial and Mr. Dale has now died and his estate has dismissed the appeal to the district court.

So, so it was my belief as Mr. Buckingham's motion that it was important for my client to get that issue framed and before the Court.

Everyone agrees, I believe, that there's no prior decision of the Fourth Circuit applying Carolin's two-pronged analysis to a bad faith lift stay motion, right? And, and prior case law from other jurisdiction suggests that the analysis on lift stay is overlapping, but distinct from the analysis for a bad faith dismissal. And, and the best case to look at that is In re Dixie, Dixie Broadcasting, 871 F.2d 1023, from the Eleventh Circuit, 18, 1989, not 1899, right? And, and there, the, the court says:

"We disagree that bad faith constituting 'cause' for relief from a stay automatically equates to bad faith warranting dismissal of the petition. If that were true, there would not be a need to ever lift a stay for bad faith, because the petition would automatically have to be dismissed. This seems at odds with the intent of the Bankruptcy Code. It is at least inconsistent with the practice in many courts which have lifted a stay on a finding of bad faith but nevertheless, permit the petition to be maintained."

I understand and I appreciate your Honor's approach to this that, "If I grant lift stay to Mr. Buckingham, I'll have to grant it to the others and if I grant it to the others, that's akin of dismissal." I fully understand that. I can disagree with it, but I get it, right? What we can all agree on, though, is that this is a novel issue and, and the

implication of this with respect to public importance has all of the Texas twostep, all of the policy issues because bad faith is framed specifically.

So all the public importance is still there. All the material advancement is still there, but in addition, we now have the importance of a lack of controlling decision, plus the dramatic implication that if, if this approach is correct, then at least in this District if you're super wealthy, you can file a petition in intentional bad faith to achieve ends that are contrary to the purpose of the Code, as defined by the Fourth Circuit, resuscitation of a financially distressed debtor, to achieve ends contrary to that purpose and you're immune from both dismissal and state relief. The more money you have, the less rights the creditors have. And, and I think that issue needs to be reviewed and I think that's a issue of extreme public importance that just adds to the public importance of the dismissal motion.

And, and so I'll end with this question of what are they so afraid of, right? The debtor is clearly desperate to avoid Fourth Circuit review of this issue. If, in fact, this is a straightforward, run-of-the-mill totally proper way to use the Code, what are they so afraid of in getting a ruling? And the best that they've come up with is, "Well, we'll be distracted. We want to focus entirely on estimation and negotiation." And that just doesn't ring true with the vast

assets that the debtor has, the hoards of lawyers that they have available to them, the, the ability to hire more lawyers, the appellate counsel that's generally separate from the folks that are doing this, no real business to manage, right? It's not like this is a, a business that's got complicated international applications. Bestwall is basically just sitting there, right? And, and, and most importantly, your Honor, so, so what are they afraid of? But most importantly, Section 158 doesn't contain an "unless the debtor says it'll be distracted" exception to certification, right?

I ask that the Court certify both motions to the Fourth Circuit.

Thank you.

THE COURT: Thank you.

Mr. Thompson.

MR. THOMPSON: Your Honor, I trimmed these down as I was sitting there listening, so.

I think I need someone to give me --

THE COURT: Ms. Bryant.

MR. RUCKDESCHEL: Are you --

MR. THOMPSON: There we go.

MR. RUCKDESCHEL: There it is.

MR. THOMPSON: Okay. So I've trimmed this from what was in there --

THE COURT: That's impressive, Mr. Thompson. I, I

wouldn't have been able to do that.

MR. THOMPSON: It's easy enough just to delete stuff as it's being covered. So the more things change, the more they stay the same.

This is Clay Thompson on behalf of Maune Raichle. We represent many mesothelioma victims, including Mr. Dale's estate. Mr. Dale, as you know, was before you before. He's since passed away.

In the beginning of this case, Bestwall said, as it says today, that it has the same ability to pay claims as Old GP had and they're saying from the very beginning of the case in their first day pleadings -- this is their informational brief -- they got this idea that they can only, the only way that they can resolve all these asbestos claims is, is here in bankruptcy. It can't achieve what it wants to do in the tort system. So in 2019, your Honor's order correctly recognized -- and, and denied the motion to dismiss -- that they have the full ability to meet all of its obligations.

So what we have in these cases is, are a debtor, is a debtor that can pay everyone in full. They can pay whatever they owe Mr. Dale. They may owe Mr. Dale $10 million. They may owe him $200,000. They may owe him nothing, but whatever it is, they can pay him in full, they can pay Mr. Buckingham in full, they can pay every valid claim in full and your Honor correctly recognized that. And back in 2019 when they were

opposing certification of your 2019 order, which you recognized the uniqueness of this situation, they said, No. 1, "There's no harm to the asbestos claimants 'cause we have the same ability to pay. We can pay everybody in full. So there's no harm as we continue to try to develop this better mousetrap where we can settle asbestos claims without the burdens of bankruptcy out," you know, "we can use bankruptcy, this, this magical section of 524(g) without the chapter 11 part." You can completely remove it, right? And what they said in August of 2019 was, "The ACC," meaning the Committee, "speculates that if the dismissal order continues in effect, other companies with similar situations could replicate this playbook." This is in 2019. Now what we now know is that DBMP and Aldrich at this exact time with the same lawyers are already mapping out their twosteps. So, so yes, it wasn't speculation It's played out with the exact same lawyers.

And so your Honor's order in 2019 when you certified it for all the same reasons that you being, you're being asked to certify it today, you noted that, in your view, Carolin was at odds with other Circuits in terms of bad faith being alone sufficient to dismiss. The Court correctly, as it turns out, right, "The appeal will not benefit from percolating through the normal appellate process," and that's what happened. That's what happened here. The district court finally reached the, the appeal only recently.

Public importance, the, the words the Court used were "an extraordinarily unique set of facts and circumstances." First impression, transcends, all of that is still true today. And then as -- they, they've talked about all these filings happened after 2019, right? And so, the, the prison care case doesn't have anything to do with asbestos. It's literally just a divisive merger, then you file the Badco, and that's why it's got bipartisan attention from, from Congress. This is the Third Circuit ruling. The Third Circuit ruling just said in, in J&J, "If you're not in financial distress, you can't access bankruptcy." And so that's, I bring that up because the Fourth Circuit, 'cause some of the things I saw in the debtor's objections to certification were about the Fourth Circuit in, in this case in affirming your Honor's preliminary injunction has, has already affirmed that Carolin is the, the applicable standard for dismissal and no one's disputing that, right? We all agree Carolin's the applicable standard. And what the Fourth Circuit is saying is that that issue was not before it. The, the order that you entered in 2019, the order that you just entered last month was clearly not before it. The motion to dismiss, financial distress, whether a, a $40 billion company belongs -- 'cause with the funding agreement Bestwall's worth whatever Old, New GP is. So a $40 billion company, whether that company belongs in bankruptcy was not before the Fourth Circuit.

This was the dismissal order from Judge Whitley, "There's been no progress. None has been made in Bestwall, which was filed six years ago. None has been made in DBMP, four years ago." And then he's saying in his dismissal order, page -- he says, "All of which I say simply for the Fourth Circuit's consideration," this concept of "a solvent, non-distressed chapter 11 debtor." This is a novel situation where you have a billionaire that wants to be in bankruptcy. Because with the funding agreement, that's what they are.

And here's the *amicus* brief, "This is just one example of recent abuse within the bankruptcy system," meaning Georgia-Pacific. This was to the Supreme Court seeking *certiorari* in the PI appeal.

The 24 States Attorneys General, "It's removed the incentive to resolve these claims." We've clearly seen that, right? The only burden's on the sick people in these cases, your Honor.

The Aldrich certification hearing before Judge Whitley a month and a half ago, "Hundreds of thousands of people are affected by these cases." 'Cause it's not just Aldrich, it's not just this one. Public importance has, has, has been discussed. Your dismissal order correctly, as always, nothing has changed. They can pay everybody in full, right? They can satisfy all the asbestos claims. New GP has the assets and the obligations. And then you noted in your order at page 55, "The

absence of financial distress, ironically, helps a debtor avoid a bad faith dismissal in this Circuit," and then you're referring to your prior order where you said the same thing, "This case may provide a basis for the Fourth Circuit to re-examine its standard for good faith." And certainly, I, I agree with your Honor and I urge you to certify the dismissal orders for those reasons.

So just a couple of things I wanted to highlight from their objection. "Asking the Fourth Circuit to weigh in again on the same issues would do nothing to advance the law." They're just so, so eager to try to find a way to prevent the Fourth Circuit from deciding. All the Fourth Circuit has to do is decline to take the petition. We should at least allow them. It's not going to be a burden on the Fourth Circuit if they decline not to take it, right?

And then there's this statement about, you know, we're arguing, the movants are arguing about how it could materially advance the case and they're saying, "But again, these arguments disregard that the Fourth Circuit would be limited to reviewing the order on appeal." Let's, again, let the Fourth Circuit decide what the questions are. All we're asking is is for the Fourth Circuit to be given again the opportunity to review the case. If they had taken your Honor's certification from 2019, where would we be now? Probably not here, right? All we're asking you to do is do again correctly what you did

before.

And they note this serial litigation of the same issues will not materially advance, materially delay. As Mr. Ruckdeschel said, they've got armies of appellate lawyers. It's going to be a completely different group of people that are arguing this.

And then I just have to end with this. "The parties instead" -- this is from their objection, page 22 -- " The parties instead should focus on the Court-authorized estimation proceeding to determine the Debtor's asbestos liabilities without distraction." I don't care what Bestwall's total estimated liabilities are and it's not because I don't think the estimation trial won't be well put on or won't be well-reasoned or well thoroughly. Because I know that Bestwall can pay everybody in full, right? They're good for it. New GP gave away $5 billion in dividends. And so total estimation, this Court's advisory opinion, will not do anything because they can pay everybody in full.

So this idea that we're not going to allow the Fourth Circuit to decide whether this novel, bizarre bankruptcy ploy is contrary to Carolin -- and I'm not, we're not asking the Fourth Circuit to reverse Carolin. We're asking the Fourth Circuit, as your Honor was suggesting five years ago, to look at how Carolin applies to this, these facts, these unusual facts that they've created here.

And so one of the things they -- they -- that's not changed is they can pay everybody in full and it's akin to a dismissal if the stay is lifted. So they want to resolve cases, valid state law claims in the tort system, but they'd rather do it in bankruptcy. Well, they're -- the way -- another way to put that is to overcome the tort system and your Honor correctly in your order noted that that's not inconsistent. It's a different way to put it. I've quoted this many times, but that's not inconsistent with what Bestwall has been saying. It's just a new way to phrase it, but that's literally what they're doing, right? They have all the money in the world. They'd just rather pay less. They'd rather not have to deal with their state law liabilities in the tort system. They'd rather abuse the bankruptcy system. And so if the purpose of Carolin is to allow $40 billion companies to abuse the bankruptcy system and, and to use bankruptcy, if that's what Carolin says, is that a $40 billion company can overcome the tort system through bankruptcy, the Fourth Circuit should be the one to say that that's what's allowed.

Thank you, your Honor.

THE COURT: Uh-huh (indicating an affirmative response). Thank you.

All right. Mr. Gordon.

MR. GORDON: I made a big mess here, huh? Trying to find my thing.

THE COURT: Take your time. We can take a brief recess, too.

MR. GORDON: No, I'm ready.

THE COURT: Okay. All right.

MR. GORDON: I -- I'm -- I'm just making excuses.

So your Honor, Greg Gordon, Jones Day, on behalf of the debtor.

I'll start by saying that we're mindful that the Court previously certified its 2019 ruling denying the Committee's first motion to dismiss and we're mindful that in that ruling you found that certification would materially advance the case and that the appeal would raise issues of public importance and you did that over our objection.

We're also mindful that since then your Honor on more than one occasion has reiterated your desire to have the Fourth Circuit address the applicability of Carolin to the facts of this case and we're obviously aware of the fact that Judge Whitley has made similar statements in DBMP and Aldrich/Murray and we're also obviously aware of the fact that he recently certified his opinion denying motions to dismiss filed by the Committee and certain claimants in that case. That all raises the question, of course, of why we are opposing this and why we believe that certification here should not be granted. And I would say to your Honor -- you, you've obviously reviewed the briefs -- that the answer to that is that the situation is

different and certification should be denied for two fundamental reasons.

The first reason, your Honor, is that the order, which is the subject of these two appeals by Mr. Buckingham and by the Committee did not address Carolin. In your order, you expressly declined to reconsider your prior 2019 ruling. Accordingly, you did not rule on the claimants' Carolin arguments, nor did you rule on the Committee's similar arguments. And as you know, the Committee, in addition to its constitutional arguments, did, in fact, seek certification of the Carolin question. In fact, it described that question as, "As a foreseeable threat to an entity's economic viability, a prerequisite for application of the test for bad faith dismissal established in Carolin."

So instead of ruling on those arguments, or on the substance of those arguments, your Honor, you determined that you had already made rulings that now constitute law of the case. You also determined that your ability to reconsider your prior ruling was, quote unquote, questionable, given the appeal to Judge Conrad, which at that time remained pending before him. And specifically in assessing the potential applicability of the divesting rule, you found that, "The issues raised in the Buckingham motion are closely related to the matter on appeal and consideration of the merits of the Buckingham motion could so impact the appeal as to interfere with or effectively

circumvent the appeal process," citing case law. And you ultimately, your Honor, summed up your conclusions by stating that you decline to consider the merits of the issues with respect to Buckingham and with respect to the Committee you decline to reconsider your earlier rulings for the same reason.

That's the order that is the subject of the appeals on which these parties are seeking certification and the fact, your Honor, that your order did not address substance of the Carolin arguments completely, in our view, distinguishes this situation from your prior order and from Judge Whitley's certification ruling. The focus in both cases was Carolin and its applicability to the facts of this case.

Now with respect to your prior certification ruling, your ruling in 2019, you found that certification would materially advance the case "because the Committee is seeking, ultimately, to have the Fourth Circuit reconsider its dismissal standard under 11 U.S.C. 1112(b)." Reconsideration of -- of -- of -- of the Fourth Circuit's -- reconsideration by the Fourth Circuit of its dismissal standard is not at issue here.

You also found the public importance prong for certification to be satisfied on the basis that the case presented "an issue of first impression in the Fourth Circuit regarding subjective bad faith under the Carolin standard." That issue was likewise not the subject of this appeal.

So in short, your Honor, we would submit, contrary to

the arguments of the other parties, that your prior order on certification provides no support for certification of the appeals with respect to this order.

With respect to Judge Whitley, in that situation, unlike the situation with this order here, he, in fact, addressed the merits of the Carolin arguments both made by the, the Committee in that case and by the claimants in that case and his ruling, unlike yours, was not, was not governed by law of the case or by the divesting rule.

And I should also point out, your Honor, the fact that this order does not address Carolin distinguishes this situation from the Aearo case, which the other side has cited, from the LTL case, which the other side cited, because in both those cases the courts did address the issue of bad faith, of a bad faith filing advanced by the movants in those cases.

So the Committee has argued, they did by way of a footnote in their initial motion and by, maybe, a paragraph in their reply, that despite the fact that your order is limited to law of the case, that the Fourth Circuit's free, nonetheless, to address Carolin issues. In its initial motion, it relied on only one case, the Christianson case, which it referred to in a footnote, but that case, we submit, addressed a different situation. There, the Supreme Court accepted a petition for writ of *certiorari*, which, by its nature, exposes the entirety of the case to review and in that connection in

that case the Court of Appeals below, unlike your Honor here, actually ruled on the merits of the underlying claim that it also found was subject to law of the case. So in that case you had a petition for writ of *certiorari* with respect to an order in which the merits were addressed, unlike the situation here.

So we submit, your Honor, that that case provides no support for the Committee's position and recall that the statute at issue here, Section 158(d)(2)(A), limits a direct appeal to the particular judgment, order, or decree in question. That's what we're dealing with here. Your order does not address the Carolin issues. You specifically declined not to do that.

Now in its reply the Committee cites -- I was reading this last night -- they cite a new case, the Blackman case, but as I read that case, your Honor, although law of the case is mentioned there, the court also ruled on the merits; and, therefore, the court on review, on appellate review, was able to, to assess the merits based on the fact that the lower court, in fact, did the same. So from our perspective, that case is distinguishable as well.

Now the Committee said in its reply -- they said -- Ms. Ramsey said today that we've cited no case, as they say, in which law of the case barred an appellate court from considering an issue in a prior order. That's not correct. We cited the Fourth Circuit's case in Dillon. I heard Ms. Ramsey

make an effort to try to distinguish that case, but that involved a renewed motion to compel arbitration where a motion had been initially filed to compel arbitration. It was denied. The party, rather than appealing that order, went ahead and filed a renewed motion thinking, you know, trying to fix the problem. That was denied and appealed. And there, that order was the one that was the focus. That's what the court addressed there. And so that case, in our view, supports our position, as does the Faulkner case, and I think Ms. Ramsey's comments -- that's a Southern District of Texas bankruptcy case -- I think she acknowledged that that case supports our position. There, the bankruptcy court refused to certify a contempt order ruling that that order did not involve jurisdictional issues because the party seeking to certify tried to argue there were jurisdictional questions from a prior ruling that should be viewed as, as being involved in the second order and the court said, no, the ruling was just on law of the case and there's plenty of controlling law on principles of law of the case.

So we would submit that the authorities are clear on this point that if, if the order is limited to law of the case and if an appeal is made, that is the issue that's on appeal because that's the order that's on appeal. You can't go back and say, "Well, I'm just going to ignore that the law-of-the-case principles apply and I'm going to ask the Court to review

the Court's prior substantive rulings on Carolin." That's just not the way it works. And again, ultimately, to me, that all makes sense because of the way Section 158(d)(2) reads. It refers to the particular judgment, order, or decree appealed from.

So that's Point No. 1, the fact that unlike the prior situation, unlike Judge Whitley's situation, no ruling on Carolin, no ruling on the arguments that they want to make. And the reason there was no ruling is because your Honor viewed that those issues had been raised before and addressed before in a very comprehensive opinion by your Honor.

The second reason I would refer to is relitigation and the point here, your Honor, the reason, in our view, that this situation differs from where we were in 2019 and it differs from Judge Whitley's ruling and the reason why certification should be denied is because this is just an ongoing relitigation of the same issues by these parties. The Committee raised all these Carolin issues in its dismissal motion. Your Honor recognized this in your ruling on dismissal. The debtor and the Committee at that time, they agreed to a stipulated set of facts. We engaged in extensive briefing. We had a lengthy oral argument and your Honor entered a very detailed and comprehensive opinion. The Committee appealed that, asked you to certify that. You did certify that ruling and the Fourth Circuit declined to accept

the appeal. In the meantime, the Committee's appeal to the district court and associate, associated motion for leave to pursue an interlocutory appeal were pending before Judge Conrad and despite, then, the, the, the pendency of that appeal -- so we're at the point where the certification has been denied. The matter's back before Judge Conrad. He hasn't ruled yet -- two more motions to dismiss are filed, two motions to dismiss, the two that are before your Honor today raising the same Carolin issues again, the ones that your Honor already ruled on, the ones that your Honor already certified, the ones that the Fourth Circuit already said, "We're not going to accept this," and the ones that were now before Judge Conrad to determine whether an interlocutory appeal should be allowed to move forward. And they did this, of course, because they're not happy with your ruling. They're not happy with the fact that the Fourth Circuit refused to accept the appeal.

So where we are, your Honor, fundamentally, is they're asking you to certify the same issues a second time and they're asking you to do that even though the Fourth Circuit declined to accept the direct review of an order addressing the same issues and they're, they're continuing to do that even though Judge Conrad denied the Committee's request to proceed with an interlocutory appeal and he did so on the basis that your ruling did not involve a controlling question of law because it found that Carolin was binding law in this Circuit and in your

order you applied binding law to the facts of this case. He found there was no substantial ground for difference of opinion about the test to use and he found the Committee had not shown exceptional circumstances to "justify a departure from the basic policy of postponing appellate review until entry of the final judgment."

So the way I think it, your Honor, fundamentally the Committee and Mr. Buckingham are asking you to reconsider your Carolin ruling and if you certify again the Fourth Circuit to reconsider its decision not, not to accept the direct appeal, and, on top of that, they're basically asking you to ignore Judge Conrad's ruling denying the Committee's motion for interlocutory appeal. In short, I would say that they're effectively asking you to facilitate their effort to relitigate Carolin in this court and the district court and in the Fourth Circuit. And I think, really, the fact that they're trying to litigate, relitigate this in the Fourth Circuit, it's just clear when you read the Committee's reply and it's, it's clear from remarks by Mr. Thompson today. As the Committee says in its reply, "In hindsight, the Fourth Circuit could have significantly aided the jurisprudence in this and other Texas two-step cases by addressing the application of its Carolin standard then." According to the ACC, according to Mr. Buckingham, the Fourth Circuit just got it wrong. We submit, your Honor, you should not permit this relitigation.

When Judge Conrad denied the motion for leave to appeal, the Carolin dismissal litigation in this case should have been over. He was basically ruling after the Fourth Circuit declined to accept direct appeal, "I don't see that you've satisfied the requirements for an interlocutory review. This needs to wait for a final order." This should have been over. We should be able to move on in this case, move forward with estimation, but it's not over because the plaintiffs want to keep litigating and relitigating the same issues and if you grant certification to the movants, that will, in our view, simply embolden them to continue to do this.

As your Honor knows, as well as any of us here, we've already dealt with relitigation of issues related to estimation discovery in this case and in fact, in the last week the Committees in Bestwall, DBMP, and Aldrich/Murray filed motions in all three cases to either strike or quash discovery by DBMP propounded to Bestwall and Aldrich that's identical to the claim discovery that Bestwall sought from DBMP and Aldrich/Murray.

With respect to that discovery, the three Committees all filed the same motions making the same arguments and you and Judge Whitley denied those motions and here we go again. They're raising the exact same issues again as if you and Judge Whitley never heard about these issues before. They're making the same claims that it's highly confidential, sensitive

information of the worst possible sort after your Honor made clear you don't see where any of it's confidential. It's just typical information you would see in a complaint. We've had to deal with relitigation with respect to stay motions. Now Mr. Ruckdeschel attempted today to explain why he filed the second motion to stay right on the heels on the first motion to stay when they are, basically, virtually identical. But again, it's just simply relitigation.

And your Honor at one of the last hearings, you've asked the parties to cease this practice. You've asked them not to file duplicative pleadings, not to make duplicative arguments, not to seek duplicative relief, and from our perspective they've just chosen to ignore your Honor's admonitions.

And recall, your Honor, what the Fourth Circuit has already said about this case. The Fourth Circuit has seen this case on two occasions already. In its order affirming your preliminary injunction ruling, it specifically recognized that the Circuit "applies a more comprehensive standard to a request for dismissal of a bankruptcy petition for lack of good faith. That is, the complaining party must show both subjective bad faith and the objective futility of any possible reorganization. The Claimant Representatives have made no showing to this Court of either required element."

The court's taken notice of the plaintiffs' litigation

tactics in this case:

"The Court notes that the Claimant Representatives appear to be using their jurisdictional arguments as a back-door way to challenge the propriety of the reorganization and the merits of the yet-to-be filed chapter 11 plan. This is both premature and improper."

Interestingly, the, the point of view is "premature" with respect to the attacks on the reorganization.

Later, the court said that:

"The main interference with the timely resolution of the claims in Bestwall's bankruptcy proceeding appears to be Claimant Representatives' challenge to the preliminary injunction, thereby prolonging the bankruptcy process and preventing the claimants from obtaining prompt relief. It is not clear why Claimant Representatives' counsel have relentlessly attempted to circumvent the bankruptcy proceeding, but we note that aspirational greater fees that could be awarded to the claimants' counsel in the state-court proceedings is not a valid reason to object to the processing of the claims in the bankruptcy proceeding."

And then lastly, your Honor, recall what Judge Wilkinson said at the argument when the Illinois Claimants

appealed from your contempt order:

"We are not advancing the ball in terms of the ultimate object of the whole bankruptcy proceeding, which is to allow the bankruptcy judge to make a reliable estimate of what exactly Bestwall's asbestos-related liabilities are to fund the trust>"

So you know, the Fourth Circuit has heard about this case. It's seen what's happening in this case and from our perspective, it's here we go again. We've had four dismissal motions filed in this case. Three have raised the same Carolin arguments and if the plaintiffs don't obtain the relief they want, if either you don't certify these appeals or the Fourth Circuit doesn't take them, what's to stop them from filing additional dismissal motions or some other pleadings raising the same issues? And in fact, I heard Mr. Ruckdeschel basically say the reason he filed his lift stay motion was to raise the dismissal issues in connection with lift stay.

So what's, what's next? And are we going to be seeing -- are you going to have to, to enter more orders or are we going to be seeing more appeals of, of orders raising Carolin, more certifications, and going through the same thing over and over and over again? So we submit, your Honor, it's time for this relitigation to be brought to a halt.

So those are the two, two fundamental reasons, your Honor. We think this situation is different from the prior

situations than where Judge Whitley is and why certification should be denied.

So let me then turn to the certification factors quickly just to cover the remaining points I think I need to address today.

With respect to the issue of controlling law, there's no absence of controlling law on the issue of law of the case and neither the Committee, nor Mr. Buckingham argues otherwise. I would submit, your Honor, we would submit that your ruling on those issues does not transcend the parties or otherwise support a finding of public importance and certification of these issues will not materially advance or advance at all this case. These, from our perspective, your Honor, are just straightforward, relatively mundane legal issues that have arisen if you think about it solely because of the plaintiffs' ongoing efforts to relitigate virtually every issue in this case where they don't get a ruling that they like.

With respect to the constitutional arguments, your order obviously addressed those arguments at length and admittedly, you said that those arguments were novel, but are they? The question, from our perspective, is are they the types of arguments that should be certified for direct appeal? And obviously, your Honor wrote a very comprehensive, detailed opinion on the constitutional issues and only you know whether you think that's a close call or not a close call, but we think

there's a number of reasons why you shouldn't certify that issue, or view that as a certifiable issue.

First, we continue to believe that the constitutional arguments are primarily just an effort to recast or repackage the Carolin arguments but in a different format using constitutional jurisdiction as the basis to, to raise the same issue about financial distress and improper restructuring and abuse of the bankruptcy process, etc.

And the, the second thing is it seemed to us -- and again, only your Honor knows 'cause you wrote the opinion -- that you were saying the argument was novel because it doesn't, because there's literally no support for it and your ruling, from our perspective, lays out in great detail the, the complete lack of support for the argument at every level. And as, as you point out, again at great length, Supreme Court cases don't support an argument that the absence of financial distress is a constitutional gating requirement. The Fourth Circuit cases don't, either. Leading treatises don't, either. And you went through a variety of things. You found that the subject of Bankruptcies is not limited to the English and/or early state versions of bankruptcy in 1787. You found that Congress has nearly unlimited power to determine the proper scope of bankruptcies and that power is not just broad. It's also potent. You found that various changes of a fundamental and radically progressive nature are within Congress' power

pursuant to the Bankruptcy Clause. You found that the restructuring of debtor-creditor relations is at its core, is at the core of federal bankruptcy power. You concluded that no court at any level had endorsed the proposition that bankruptcy courts lack subject matter jurisdiction unless a debtor has a sufficient degree of financial distress. You concluded that no court has ever concluded that financial distress is a requirement for constitutional subject matter jurisdiction, including the LTL case. And you also noted that the Committee's need to reach for authorities on insolvency demonstrated the lack of support for their position.

And so based on all of that, to us it's not surprising there's not some controlling case on arguments that no one has ever made before and we submit they're arguments that shouldn't have been made because they're completely devoid of merit and in that respect we did cite that Ladder 3 case in our brief, which is a very similar situation where the court there, the Eastern District of New York, similarly rejected this kind of attempt to try to fashion an issue based on an argument that it viewed as a meritless argument.

So the question for your Honor, I think ultimately -- and again, I, I, I understand that Judge Whitley certified this -- but the question for your Honor is does it make sense to certify an issue that it seems like there's literally no support for it in any level anywhere. Does that make sense?

And if you think about it from -- so from the controlling case perspective, to me it's then completely unsurprising there's no controlling case. And then the question is how would a direct appeal of a, a meritless argument either transcend the parties or materially advance the case? That's not going to do anything, it seems to me. That's not going to support any of the bases that a court would normally rely on to certify an appeal from that kind of argu, you know, the ruling on that kind of argument.

Now with respect to Judge Whitley, 'cause obviously it is --

THE COURT: I like the way you said that, "Now with respect to Judge Whitley." We got to deal with Judge Whitley.

MR. GORDON: Noth -- nothing, nothing negative intended there, your Honor.

THE COURT: No, I know. I know.

MR. GORDON: He's retiring, anyway.

But I mean, again, we readily acknowledge that he made a different determination in the Aldrich/Murray cases and I, I imagine your Honor would be reluctant to rule in a way that's different than he ruled. We understand that, but --

THE COURT: He's, he's retiring. So, you know, who cares.

MR. GORDON: But the one thing I would say -- and I'm sure your Honor has thought about this -- the fact that he has

certified the issue means that issue will go to the Fourth Circuit for its consideration of whether to accept the direct appeal. So it's not as if, if, if your Honor does believe, or, or has a question as to whether or not you should certify 'cause it's, it's novel in some respects, the issues are already going to be, it's already headed to the Fourth Circuit on the petition for acceptance of a, of a direct appeal. And of course, it -- it's -- it's going up in a case where Carolin is squarely presented for consideration by the Fourth Circuit by way of a direct appeal.

And of course, you know, the other thing I would just say about Judge Whitley's situation, to me it, it's very different there when the Carolin issues, or the substance of the Carolin issues was addressed by him. Because again, the certification relates to the entirety of the order. He, he'd already basically found that the Carolin issue should be certified, which has, you know, has been your Honor's view, I think, for quite some time in this case. And so the constitutional issues were going to go up as part of that, in any event.

Let me just see, your Honor, if there's anything else. I think I'm at the end here.

(Pause)

MR. GORDON: Well, I guess I do have to deal with the stay issue. So, so let, let me, if could, just switch to

Mr. Buckingham's stay, certification request with respect to the stay order, if that's okay with your Honor.

THE COURT: Yes.

MR. GORDON: So just, just a few things to say on that because much of what I just said in connection with the dismissal motion, particularly with respect to this problem of relitigation, would be equally applicable to the, the stay certification.

But in, in addition to that, from our perspective, lift stay motions and orders adjudicating those motions are some of the most routine activities that occur in bankruptcy cases, not only chapter 11 cases, but other types of bankruptcy cases and it's a little ironic that the other side has relied on the Fourth Circuit's statement in the Kaiser Gypsum or -- I'm sorry -- in the PI ruling about you can bring a specific motion if you want. Well, in saying that, they also pointed out these are very routine. In fact, I think the quote was, "That is done in bankruptcy proceedings on a routine basis when appropriate."

So there's a, an acknowledgment there by the Fourth Circuit about the routine nature of lift stay orders and, and motions. And as we said in our brief, we were not able to find any case anywhere involving certification exclusively of a lift stay order and to us, that's not surprising because there's so much law in basically every Circuit on stay relief and your

Honor knows that, I'm sure, better than I do.

Now on the question of controlling law, it seems to me that's been a moving target by Mr. Buckingham. You know, initially in the motion the movants allege that there is no controlling decision on whether a bankruptcy court should consider Carolin and not Robbins in deciding whether to lift the stay, but that's premised on their misrepresentation of what your Honor's ruling was. You know, your, your Honor, definitely addressed Carolin in your ruling and applied -- I'm sorry, Robbins -- applied the Robbins factors in your ruling. In fact, you stated:

> "I conclude I should deny the motion for relief from stay and in large part, I do so for the same reasons I denied the Dales' motion for relief from stay. Consideration of the Robbins factors, particularly the second factor, that being whether modifying the stay will promote judicial economy and whether there would be greater interference with the bankruptcy case if the stay were not lifted because matters would have to be litigated in the bankruptcy court, I believe and find weighs against modifying the automatic stay."

You clearly applied Robbins. To suggest that there's a controlling issue of law that you failed to consider Robbins and, instead, substituted Carolin is just a misstatement as to what your ruling even was.

Now in their reply the movants seemed to walk away from that contention a bit and that, and they said, instead, that, in, in a way that, to me, is more benign. the Court, quote unquote, injected Carolin into its analysis for denying the lift stay motion. And of course, as your Honor knows, these issues, Carolin-type issues, were raised by the movants. You were simply responding to issues that they made. But, or that they raised.

But the, the bottom-line point is your Honor did apply controlling law, Robbins, to the facts presented in the lift stay motion by Mr. Buckingham and determined that the motion should be denied. There's no controlling law issue with respect to that motion.

And I should just comment on, you know, there's this continuing argument that your consideration of Carolin in connection with the motion was improper, but when you think about it those issues only arise, or only arose because of the movants' attempts to just continue to relitigate Carolin at every opportunity they, they can. They filed the dismissal motion. It was denied. Now they've more or less conceded today that they filed the stay motion in order to raise the same issue so they could square up an appeal and present that on the same Carolin issues. And you said, "In my view, the motion for relief from stay is in many respects a repeat of the arguments made by Mr. Buckingham in his motion to dismiss and

many of the arguments strike me as misplaced in the context of a motion for relief from stay." And to me, I would say the fact that the plaintiffs are just continuing to attempt to relitigate the same issues in multiple contexts undermines, rather than supports their certification request.

The movants have suggested there's no controlling law in the Fourth Circuit as to whether the potential that other claimants could seek relief from stay, which is not a Robbins factor, is relevant in deciding such a motion, but that factor implicates your discretion in employing the Robbins factors, which do pick up, obviously, the factor of judicial economy and your Honor made that clear in your ruling. That's, that's not a, some controlling law issue. That's, that's a matter of applying the factors of Robbins to the, to the facts presented by the motion.

And relying on Carolin again to argue public importance, to me, can't overcome the fact that this is just a relatively straightforward, garden-variety motion to lift stay to allow a single set of plaintiffs to pursue a single lawsuit and I would say that that can't overcome the conclusion that that just doesn't rise to the level of transcending the parties or being a matter of public importance.

And lastly, I would just say that I don't see how certifying the order with respect to the Buckingham lift stay motion would materially advance the case. You've already

got -- Judge Whitley's done what he's done. We've already had what's happened in this case in this Court, the district court, and the Fourth Circuit with respect to Carolin issues and this relates only to the narrow issue with respect to the Buckinghams. I don't see how expediting that ruling, skipping the, the normal process, skipping the district court, would materially advance the case in any way.

So your Honor, for all those reasons and the reasons set forth in our briefs, we respectfully submit that you should decline to certify this order and, and deny both of the motions.

THE COURT: Okay. Thank you.

MR. RUCKDESCHEL: Your Honor, we're going to --

THE COURT: Mr. Ruckdeschel.

MR. RUCKDESCHEL: -- switch it up and go in reverse order --

THE COURT: All right.

MR. RUCKDESCHEL: -- if that's okay with the Court.

THE COURT: Have at it.

MR. RUCKDESCHEL: Jonathan Ruckdeschel on behalf of Mr. Buckingham and Ms. Weiss.

To, to start, we have never suggested that the Court did anything improper in any of its rulings, in the dismissal ruling or the lift stay ruling. You know, we can disagree about the result that the Court reached without having the

debtor contend that somehow this is being disrespectful to the Court or suggesting that the Court has done anything wrong. We, we've never suggested that and I don't suggest it now. I take great offense at that type of recasting of arguments by advocates who are working for their clients and to somehow being an attempt to smear me or my client before the Court. It, it's not appropriate and has no place here.

There is a difference between asking for a ruling on the question of bad faith and asking for a ruling regarding Carolin. They are related, but they are distinct. This Court, Judge Whitley, and the Fourth Circuit have never addressed the merits of the question of bad faith. This Court has specifically avoided making that ruling based on the discussion and construction of the futility prong of the two-prong analysis and said, "I don't have to reach bad faith." Judge Whitley says, "Thankfully, I can leave that for another day." The Fourth Circuit in the preliminary injunction says, "We are not faced with a motion to dismiss. We are not faced with an individual lift stay. We are not faced with that question."

So the suggestion that anybody is relitigating the question of bad faith just is not true. It does not bear out under the record. No court has ruled on that in this twostep or any other twostep and the fact that it is relevant to the analysis for dismissal as a factor of cause for lift stay, bad faith is a well-recognized, long-recognized, universally

recognized criteria for lifting the stay. That motion cannot result in the dismissal of the case. It's not what we requested. It's not possible under a lift stay motion. We are not relitigating the dismissal motion by asking for a ruling on bad faith in the context of lift stay. It's not relitigating. It hasn't been ruled upon, right?

And, and with respect to Mr. Thompson, while the words "bad faith," I believe, appear in one sentence in the Dale motion, that wasn't the focus of the Dale motion and it certainly wasn't the focus of the oral argument.

There's no relitigating going on here and the constant attempt to say, "Well, your Honor, you've already ruled on, on dismissal and you ruled on this question of bad faith," the Court absolutely has not. The Court has ruled, "You don't meet the Carolin standard for dismissal," but it hasn't ruled on bad faith.

So all of this discussion that they're up here, they're just relitigating, and somehow it's improper for Mr. Buckingham to file his own motion for lift stay raising the bad faith issue is just not borne out by the law. There are individual rights to ask for lift stay. The Fourth Circuit says it. Any individual claimant has a right to move for lift stay and in order to protect Mr. Buckingham's right to appeal, right, I have to file that motion, right? And I did. And, and we're attempting to get the question of bad faith before this

Court, before the district court, before the Fourth Circuit and if that has to come in the context of the lift stay first while Mr. Buckingham is alive, great. He would like to be able to finish his case. That is his right and it is his right and it is my obligation as his lawyer to file that motion And, and so to suggest that somehow filing the lift stay, a motion that asks for different relief that, that comes in a circumstance where the, the cause is universally recognized is somehow relitigating the dismissal motion or relitigating Carolin, it's just false.

With respect to the law of the case, the arguments that have been raised simply ignore the Supreme Court cases on point. The Supreme Court case, we'll go back to Hamilton-Brown Shoe, which is the primary authority, and Christianson, right? "It is, of course, sufficiently evident that the refusal of application for this extraordinary writ is in no case equivalent to the affirmance of the decree that is sought to be reviewed." The denial of *cert* initially in the first appeal had no impact on the ability of the Court to consider the entire case in the context of the second appeal. Denial of review is not a ruling on the merits, no matter how much the debtor wants it to be. The denial of acceptance of immediate review in 2019 when your Honor certified the first motion to dismiss by the Committee is not a determination on the merits. It has no precedential value, whatsoever. And Mr. Buckingham

wasn't even sick and as we've discussed before, there's a fundamental part of that argument that Mr. Buckingham raised which the Committee, the Court found the Committee had conceded that it was, that the desire for, for 524(g) relief was in and of, in and of itself a proper purpose to be before the Court. That's a central part that Mr. Buckingham disputes. That's never been ruled upon, either. It's not relitigation and even if it was, your Honor's role under Section 158 is obligatory. You have to certify. If the Fourth Circuit wants to decide, "Well, we think we've addressed this before," or, "We don't think anything has changed," or whatever the Fourth Circuit wants to do, that's its decision. The statute is written in a mandatory way.

And, and this is an issue that your Honor has noted and Judge Whitley has noted and we have noted and I don't think the debtor seriously disagrees. This question of whether this is a good faith use of the Code is going to be determined by the appellate courts, sooner or later. Even if they got the Committee to agree to some sort of proposed settlement within this Court, there are going to be dozens, hundreds of individual claimant objectors to such a solution and it will get litigated. It will be decided. Let's do it now. Let's get the guidance that we need and let's get it done. Let's get it done in the context of the Aldrich/Murray request right now before the Fourth Circuit. Let them take all three, right?

Let's get it done in the context of the lift stay as well so that the court can make a determination on that so that if these cases continue, if the court says, "Well, we're going to find that these cases won't be dismissed under the Carolin standard," because we're going to go with the application that, that your Honor and Judge Whitley have applied of Carolin so far, there's still a possibility that they would say, "But we do find subjective bad faith."

And so individuals are entitled to relief from stay on an individual basis, right? That possibility exists because it's different relief. It's not the same issue. The lift stay motion is not asking for this Court to re-examine Carolin. It's asking for this Court to make a determination of bad faith so that that can then be considered as cause and applied in the Robbins analysis with respect to the lifting of the stay. And that's something the Court needs to deal with, too. Because then individuals can vindicate their rights while these cases continue, if these cases are going to continue, and ultimately have bad faith determined at confirmation and not now.

I ask that you please grant the certification as the statute requires and let's get this up.

Thank you.

THE COURT: Thank you.

MR. THOMPSON: So briefly, your Honor. Is it okay for me to continue? Do you --

THE COURT: Yes, sir.

MS. THOMPSON: Okay. All right.

THE COURT: Go right ahead.

MR. THOMPSON: It may surprise you to learn that Mr. Ruckdeschel and I were very passionately involved in the LTL bankruptcy as well. We were also involved in that one. So what strikes me is that the two-step debtors don't want appellate review, right? So in the first LTL bankruptcy, we moved to dismiss. The Committee, two separate committees moved to dismiss. The motion was denied. We moved to certify to the Third Circuit. LTL opposed it. Third Circuit dismisses the case. LTL files again. This time Judge Kaplan dismisses it. Now LTL wants to appeal. We consented to their request to appeal. We joined their petition for review. I mean, I don't just mean me. I mean the Committee and the Trustee's Office and everybody else. We welcome Fourth Circuit and Third Circuit and Circuit guidance because what we're seeing in these cases, as you know better than anyone, is these cases are going nowhere and we need the guidance from the Circuit.

And of course, Georgia-Pacific wants to sit in bankruptcy. They're saving a hundred million dollars a year. They were paying about 150 million a year in the tort system. They're paying all of these fine bankruptcy professionals about $50 million a year, but that's a hundred million less than they were paying a year in the tort system. So of course, they want

to stay in bankruptcy court for as long as possible. They're saving money and, and, and it seems like the debtor is taking two diametrically opposed positions when it comes to motions to lift stay, okay?

So what the Fourth Circuit said -- we've all read that opinion many times -- it, it, it said it didn't think that the, it didn't approve of the claimants', I think, back-door challenge to the propriety of the bankruptcy. So what happens? We, we challenged the propriety of the bankruptcy. We moved to dismiss. And then it says you can either, if you're a claimant like, if you represent individuals like I do, Mr. Dale or Mr. Buckingham, Mr. Semian in the Aldrich case, your remedy is to wait for confirmation, which is who knows when, or you can move to lift the stay. So we moved to lift the stay.

And so what I'm hearing from Mr. Gordon is don't certify Mr. Buckingham's motion to lift stay because it's a routine issue. The Third, the Fourth Circuit doesn't need them, but then when -- so that's Position No. 1. It's routine. Don't certify it.

The diametrically opposed position, No. 2, is whenever we do move to lift the stay, we're relitigating the same issues over and over again. What the Circuit actually said was, "Claimants can," at 71 F.4th at 183, "Rather than waiting for confirmation, claimants can bring individual actions for relief based on the specific facts of a particular claim." There have

been two motions to lift stay in this case. That's it. I thought Mr. Dale had some good specific facts. Your Honor found against Mr. Dale. I thought Mr. Semian had some. Tried that one, we lost that one.

So they can't say that this is a garden-variety, routine motion to lift stay. So therefore, the Fourth Circuit doesn't need to review it and then complain when the claimants are doing the remedy that the Fourth Circuit suggested we had. That's what the Fourth Circuit said our remedy was rather than wait for confirmation, which is who knows when.

And I will end with this. Mr. Ruckdeschel alluded to this. My clients will never, never help Georgia-Pacific cap its asbestos liabilities. There will never be an agreement from my clients that Georgia-Pacific can take some amount of money, whatever it is, and put it in a fund and be done with it. Because they're not in distress and they can pay everybody now and forever in full.

So even if we get sent back here, this case has an incurable Ortiz v. Fibreboard problem Judge Whitley correctly recognized. We'll worry about that later, but that's a problem and that's not going to go away and that's all the more reason to certify this case.

Thank you, Judge.

THE COURT: Thank you.

Ms. Ramsey.

MS. RAMSEY: Thank you, your Honor. Natalie Ramsey, Robinson & Cole, for the Committee.

Your Honor, I heard, I think, three points. Mr. Gordon said he was going to make two, but I think I heard three and I'm going to start with the third, which is the issue of the constitutional argument that the Committee has raised. And Mr. Gordon said a couple of things. He said he wanted to ask the Court is this something that should be certified. He asked the Court does it make sense to certify it. That is not the standard. The standard is very clear as to what the certification criteria are.

And here, no binding authority exists. Judge Whitley expressly found that. To ask that the Court find something different, that there is controlling authority, is both inconsistent with what this Court has already said about it, but it also would contradict the decision that Judge Whitley just reached on whether or not there is binding authority with respect to the constitutional argument.

Although it is not, then, directly relevant, Mr. Gordon also said, you know, should you certify a meritless appeal and he referred to the novelty of, of the argument and, and repeated what was, I think, quoted three or four times, language that the debtor obviously loves from a completely different case in every way than this one about repackaging arguments. This is not a repackaging of the Carolin argument

and it is a novel argument in the sense if the case, or issue of first impression, but it arises directly from the novel nature of these cases. This is something that is new to bankruptcy jurisprudence.

So the fact that it has not come up very often would make perfect sense and where it has come up in the past and, and one of the reasons -- and I know the Court observed that on the one hand the authorities that the Committee cited to largely talked in terms of the word "insolvency" and, and, and that, that our argument was different and, and relying on something we were sort of walking back seemed to undercut our argument. From our perspective, it, it does not because these cases are obviously iterative.

And, and so when we look at the Marshall case, which is probably the case that came the closest to ever addressing these issues, it dealt with the question of insolvency, but the court said at -- in, in part:

> "The bankruptcy court reasonably concluded that the Debtors' technical solvency did not bespeak bad faith given that they faced the threat of future litigation, not to mention their very concrete obligation to satisfy the Texas Fraud Judgment, amounting to 12 million."

And a little bit later said, "Here, unlike Marsch and Boynton, the record suggests that Howard and Ilene's liquid

assets were probably insufficient to satisfy the judgment or cover the cost of a supersedeas bond."

So looking at that case in its entirety, the, the court was observing the sort of fourth -- three -- you know, foreseeable difficulty to meet obligations that we would concede would permit access to this Court. What has never been addressed by a court is a circumstance directly like this, at least we haven't found it. I take it the Court couldn't find it and the debtor hasn't found it. No decision has addressed the constitutional limitations of the Bankruptcy Clause in a case that is like this one.

So the fact that, again, as, as Mr. Ruckdeschel sort of said, there's different arguments based on different factors that would lead to the same place is irrelevant. This is a merit -- it, it's a -- the Court did not find it was meritless. The Court disagreed with us, but the Court didn't find it was meritless and we would contend, your Honor, that the, the statute is mandatory and that the issue of whether, whether there is binding authority by itself would lead this up.

With respect to, also, public importance, that criteria alone, again, supports the issue of whether the Court should be certifying. And again, going back to just the attention this Court has gotten, I want to read a couple more of the quotes from the *amicus* briefs supporting the Committee's petition for *cert*. From the senator brief:

"The extraordinary nature of these cases-in which lucrative enterprises face staggering liability only because they harmed thousands in the first place-does not justify dismissing the forum Congress provided to resolve mass claims: multi-district litigation. While 'the Bankruptcy Code presents an inviting safe harbor for such companies,' its 'lure creates the possibility of abuse which must be guarded against to protect the integrity of the bankruptcy system and the rights of all involved.'"

We do believe that this goes directly to the integrity of the bankruptcy court system.

And from the AGs' brief -- and that was at page 14 of the senators' brief.

From the AGs' brief, "Because highly solvent companies are not within that class, this Court should grant the petition to prevent abuse of the bankruptcy process through the Texas Two-Step scheme." AGs' brief at 7.

So again, we, we contend that this, the constitutional issue meets both of those criteria.

The, the first two issues that Mr. Gordon identified, neither of them address the constitutional issue that was first raised in the Committee's third motion to dismiss and the, the issue of whether, of Carolin and its standard for dismissal and the issue of relitigation, neither of those appeal to that

issue. However, again, with respect to --

And I'll put up Slide 9 again.

-- the standard for dismissal from the Christianson case, the court there said, "The invocation of law-of-the-case doctrine does not change this. A district court's adherence to law of the case cannot insulate an issue from appellate review."

The Fourth Circuit ultimately will determine, if, if this Court certifies, this issue is going to be presented before the Fourth Circuit and it will decide whether the Court's reliance on law of the case to deny part of the motion to dismiss, deny reconsideration or consideration of part of the Order to Dismiss brings Carolin before the Court or not, but we think the law is clear that if this order -- and again, it's the order and not the issues that ultimately we believe satisfy -- if the Court's Order of Dismissal is certified, the Fourth Circuit will determine which issues it addresses and we stand by our analysis of the Dillon and Faulkner cases and the Court has heard us speak to those.

With respect to relitigation briefly just because it came up in Mr. Gordon's presentation, the issue of the, the subpoenas issued recently and the Committees in DBMP and Aldrich's decision to, to contest those is not before this Court today.

THE COURT: Thank goodness.

MS. RAMSEY: Yes.

That issue will be before the Court another day and the Court can decide what it will, but it is not appropriate to consider that as part of the issues today. It's just a sideshow.

And with that, your Honor, there was one more point -- and I'm not finding it -- I wanted to make. Oh.

It's going up, anyway. That was the final point I wanted to address. It's going up, anyway. Well, that's kind of a double-edge sword. It's going up. Might as well go up. What, what's the harm either way? But it sounded like the Bestwall debtor would have supported the, the request for certification in Aldrich and Murray, but there, the debtor actually opposed quite vigorously the request for certification.

In, in any event, I think the Court's focus has to be exclusively on this case, the issues in this case for purposes of certification and whether this order meets the mandatory disjunctive requirements for certification.

THE COURT: Thank you.

MS. RAMSEY: Thank you.

THE COURT: Mr. Gordon.

MR. GORDON: Greg Gordon again on behalf of the debtor. Just a few points, your Honor.

The first is I heard some statements from

Mr. Ruckdeschel and Ms. Ramsey that more or less suggest, or at least what I heard, was that your Honor should just punt the issue to the Fourth Circuit, that, I think Mr. Ruckdeschel said it's mandatory, it's obligatory to you, it's discretionary to them, and you should just punt it over to them. Ms. Ramsey sort of said the same thing. Let the Fourth Circuit decide. The issue of law of the case, let them decide. Well, to me, that overlooks the fact that you're essentially a gatekeeper, in our view, with respect to certification and the statute mandates that you actually consider the factors that determine whether or not certification is mandatory and it's not simply a matter of just saying, "Well, I don't really want -- I, I'm going to wash my hands of this," and sort of send it to the Fourth Circuit. That's, that's simply not the way things work.

Ms. Ramsey obviously has a different view of your rulings on the constitutional arguments than, than we do. She believes that they're novel and they're novel for a good reason and that's a reason to certify. Again, as I said before, to me, only you know what you were thinking when, when you wrote that. We didn't interpret it that way. We think it's more like that Ladder 3 case where the court said, "Look, you just made an argument that's basically meritless and not, we're not going to, we're not going to certify based on that argument."

The, the other thing that struck me and I think it was listen, listening to Mr. Thompson, you know, talking about the

stay motions and our position on the stay motions and the certification, is we shouldn't lose sight of the fact -- and I didn't mention this before and maybe I should -- the preliminary injunction's on appeal and what you're basically hearing from them is that this is all publicly important, transcends the parties. "'Cause if I can't, if the case isn't dismissed at the outset, I should be able to file a motion to lift stay and make the same arguments and then everybody else can do the same." Well, basically, the preliminary injunction addressed that. That's gone to the district court, it's gone to the Fourth Circuit, it's gone to the Fourth Circuit *en banc* panel, and now there's a *cert* petition pending. That's really the issue they're trying to relitigate with respect to the stay motions if you think about it.

Mr. Thompson talked about the attorneys' fees that are being spent in this case. His number was way low. Probably, it's more than double of what he indicated that the burn is in this case and again overlooking the billion dollars that we deposited into the QSF a long time ago in this case.

You know, the other thing, Mr. Ruckdeschel primarily made an impassioned plea that, about bad faith. Bad faith needs to be addressed. It needs to be heard, needs to go up. These cases, nothing will ever happen in these cases. And we take issue with the fact that no progress has been made in these cases and we disagree with what Judge, Judge Whitley said

about that. But the, the response to that is as much as he may want that to be the case, it can't happen here and it can't happen here because you didn't rule on bad faith. You didn't rule on Carolin. Again, you, you, you said you'd already decided you weren't reconsidering an applied law of the case.

So as much as they may wish that would be the case, it's not the case here. And again, that's what distinguishes our situation from the prior order.

The last thing I, I should just mention -- and I know your Honor knows this -- is that with the lift stay motion, that is a final order unlike the dismissal ruling. And so there is an ability -- they, they will have their ability to appeal that. The only question is whether they should be permitted to step over the district court and for the reasons I've argued previously, we don't think they should do that, nor be permitted to do that.

So your Honor, again, we would ask that you deny certification.

THE COURT: Okay.

MR. GORDON: Thank you.

THE COURT: All right. Thank you.

Mr. Ruckdeschel, you look like you're about to stand up again.

MR. RUCKDESCHEL: Your Honor, we heard something new. I'd like 30 seconds.

THE COURT: You got 30 seconds.

MR. RUCKDESCHEL: The -- the -- I'm, I'm delighted to hear that the debtor agrees that the lift stay motion is immediately appealable to the district court. The question is will it benefit from going to the district court and having that issue ruled upon, or should it go up so the Fourth Circuit can consider it while it's considering Aldrich/Murray and considering whether it's going to take these cases. The answer is yes, it should.

Thank you.

THE COURT: Uh-huh (indicating an affirmative response).

All right. Why don't we do this, folks. In an effort to get you a ruling today, what I would like to do is just recess until, why don't we say 12:45. That'll give y'all time -- I hate to send you packing and have you come back, but I think it's probably the best thing to do -- come back at 12:45 and I'll give you my ruling, okay?

Thank you.

MR. RUCKDESCHEL: Thank you, your Honor.

MS. RAMSEY: Thank you, your Honor.

(Lunch recess from 11:21 a.m., until 12:45 p.m.)

AFTER RECESS

(Call to Order of the Court)

THE COURT: All right. We are back in the Bestwall

case having recessed for lunch and we're back for the Court to issue its ruling on the motions for certification of direct appeal to the Court of Appeals of Mr. Buckingham and the Committee.

I'll start with the standard, which we all know, as you all know, I know, 'cause we've had to rule on these issues before, but as previously noted in this Court's September 11, 2019 certification for direct appeal to the Fourth Circuit in this case, pursuant to 28 U.S.C. Section 158(d)(2) the standard for certifying a direct appeal is both disjunctive and mandatory and a bankruptcy court is required to certify an order for direct appeal if the court determines that one of the criteria listed in 28 U.S.C. Section 158(d)(2)(A) is satisfied.

Having considered the pleadings and the arguments of counsel at today's hearing, I conclude I should deny Mr. Buckingham's motions for certification of direct appeal and grant the Committee's motion for certification of direct appeal to the Court of Appeals and I'll address them sort of in that order, starting with Mr. Buckingham's motion seeking certification of direct appeal of this Court's dismissal order. And that's how I will refer to the Court's order that was entered on February 21, 2024.

At the hearing on Mr. Buckingham's motion to dismiss, Mr. Ruckdeschel implored the Court to rule on the merits of whether the Court should dismiss this case as a bad faith

filing under Carolin. In short, he sought reconsideration of the Court's earlier ruling and its Opinion and Order denying the Committee's first motion to dismiss. The Court declined to consider the merits of the bad faith filing issue under Carolin in its Dismissal Order and instead, concluded that the Opinion and Order is the law of this case and should not be reconsidered.

The Court further concluded that its jurisdiction to do so was questionable given the pending appeal of the Opinion and Order. Despite its ruling in the Dismissal Order, Mr. Buckingham insists that the appellate issue here is, and I quote, "whether a non-distressed, wealthy debtor filed in bad faith and that direct certification will materially advance this case by providing Mr. Buckingham with the ability to seek review of the Carolin standard in the context of the Dismissal Order."

In an effort to get an issue on appeal to the Fourth Circuit, Mr. Buckingham's motion ignores this Court's ruling and its Dismissal Order. It's as if he has requested certification of what he wished for the order to be, rather than what it is. But in focusing on the Court's ruling and the Dismissal Order and its application of law of the case and the divesting rule, the Court concludes it must deny Mr. Buckingham's motion for certification. The Court followed controlling precedent in its application of the law-of-the-case

doctrine and the divesting rule and because there is controlling precedent on these issues, they don't involve a matter of public importance, or, as the General Motors court stated, "Because the legal issues of law of the case and divestment have already been decided by the Fourth Circuit, there's no matter of public importance for the Fourth Circuit to adjudicate."

Finally, because the Fourth Circuit would be limited to reviewing the Dismissal Order and likely would not reach the Carolin standard and the propriety of this case, the Court can't conclude that granting Mr. Buckingham's motion would materially advance the progress of this case.

With respect to the request of the Committee for certification of direct appeal to the Court of Appeals, let me start by saying that the Court stands by its September 11, 2019 certification for direct appeal to the Court of Appeals. The goal was to get the issue of reconsidering the Carolin standard directly to the Fourth Circuit because, inevitably, that's where we're headed despite what Judge Whitley, the district court, Judge Conrad, or I have to say about the issue. As you all stated in your papers, Judge Whitley and I have been clear about our desire for the Fourth Circuit to consider the good faith question in the context of these cases. Bypassing the district court's consideration of the Opinion and Order made great sense and I regret that the Circuit declined to take the

issue on direct appeal. I have no doubt that a direct appeal of the Opinion and Order would have materially advanced this case and it involved a matter of public importance. Quite frankly, I'm less sure about the Dismissal Order and the subject matter jurisdiction issue addressed therein, particularly in light of my previous experience certifying a matter for direct appeal to the Circuit, which the Circuit denied. I believe the certification request related to the Opinion and Order was far more compelling and I don't consider this issue lightly. As Mr. Gordon put it, I'm not just "punting" this issue to the Fourth Circuit because our certifications will fall on deaf ears if we grant them routinely. But admittedly, this case and the other cases pending in this District are anything but routine.

Technically speaking and pursuant to the plain language of the statute, I find that the order denying motion to dismiss involves a question of law as to which there is no controlling decision of the Fourth Circuit or the Supreme Court. The specific question of law raised by the Committee and addressed in the Dismissal Order is whether the debtor is in sufficient financial distress to be an eligible subject of Bankruptcy pursuant to the Bankruptcy Clause of the Constitution, or, as the Committee asserts, whether this Court lacks constitutional subject matter jurisdiction to hear this case due to the debtor's lack of financial distress. And as

Judge Whitley and I both concluded, there are no cases holding that a sufficient degree of financial distress is a requirement for bankruptcy courts to have subject matter jurisdiction. It was precisely for that reason that the Court had to consider whether the language of the Bankruptcy Clause, the history of American bankruptcy law, or the Supreme Court's descriptions of the bankruptcy power definitively answered or even directly addressed the question of whether constitutional subject matter jurisdiction requires a debtor in financial distress. Therefore, the Court concludes there is no controlling decision of the Fourth Circuit or the Supreme Court on this issue.

Strictly speaking, the Court does not find that a higher court's consideration of the constitutional subject matter jurisdiction issue is a matter of public importance. The public is concerned about whether this case was filed in good faith under Carolin and the Fourth Circuit's dismissal standard. And I say this in jest, but it's doubtful that the public is particularly interested in weighing in on constitutional subject matter jurisdiction. However, to the extent consideration of that issue implicates the propriety of a bankruptcy filing by a company that has never been in financial distress, or, more generally, who can file bankruptcy, the Court concludes that it is a matter of public importance.

And I agree with Judge Whitley's conclusion that the

ramifications of the issues that would be considered by an appellate court are significant in that they affect tens of thousands of claimants in this case and in other pending asbestos cases, thousands of state court lawsuits, and potentially expand beyond asbestos cases into other mass tort cases and the fact that Attorneys General and senators are filing *amicus* briefs with the Fourth Circuit and the Supreme Court weighing in on the Texas twostep is some indication of its public importance.

The Court also agrees that the public importance of these cases has increased significantly since the entry of this Court's initial certification order.

Finally, if the Circuit were to agree with the Committee's assertion that this Court lacks subject matter jurisdiction over the debtor's case, that would materially advance the progress of this case and inevitably result in its dismissal. Therefore, the Court finds that the last prong of the standard under 28 U.S.C. 158(d)(2) is also met.

I understand as a practical matter that given my ruling that the entire order may end up on appeal at the Fourth Circuit, including those issues raised by Mr. Ruckdeschel, perhaps including the Carolin issue. That remains to be seen. Standing alone, I still believe Mr. Ruckdeschel -- excuse me -- Mr. Buckingham's motion should, should be and should have been denied. But if the Circuit ends up addressing the Carolin

issue, that, too, will advance the case and as Ms. Ramsey said, the sooner these issues are resolved on appeal, the sooner we will have guidance that directs the future of all of the asbestos cases pending in this District.

So as to those two motions, Ms. Ramsey, I would ask that you draw up one order granting the Committee's motion and denying Mr. Buckingham's motion for certification for direct appeal.

That leaves us with Mr. Buckingham's motion for certification as it relates to the motion for relief from automatic stay. The Court denies this motion largely for the reasons argued by the debtor at the hearing today and explained in the debtor's objection to Mr. Buckingham's motion. In short, the order applied controlling precedent and presents none of the circumstances justifying immediate appeal under 158(d)(2)(A). It simply doesn't rise to the level of the type of exceptional circumstance for which certification to the Fourth Circuit is necessary. The Court specifically applied the Robbins factors in denying the motion for relief from stay. Robbins is clearly the controlling law in this Circuit when considering a request for relief from stay. Therefore, there's no basis to grant the motion on the basis of lack of controlling law.

A direct appeal of the motion for relief from stay does not involve a matter of public importance and it would not

advance the cause of jurisprudence or transcend the litigants, particularly given the routine nature of motions for relief from stay and the fact that this motion pertains to one claimant. Similarly, it would not materially advance the progress of the case because, as a practical matter, it relates to a narrow issue involving Mr. Buckingham and might remove him from this case, but not otherwise move the ball in the grand scheme of the progression of the case.

So for those reasons, I deny that motion for direct appeal and would ask the debtor to draw an order to that effect.

And that takes care of the matters that were before the Court today.

Mr. Gordon, we often have a status report. I don't know if y'all were anticipating a status report today, but I'm happy to, to hear one if, if there's one to give. I read the press updates and know things are happening that extend beyond this Court. So I'm happy to hear what y'all have to say.

MR. GORDON: Thank you, your Honor. Greg Gordon on behalf of the debtor. So I do have a, a short status report. We were last here on January the 18th. So there's been a little bit of time that's gone by since then.

And a couple of things just to sort of put out there as reminders. You'll remember that we have the pending sanction appeal with respect to what we call the Illinois

Claimants. That was argued back in September. That's still sitting with the Fourth Circuit. So we're still waiting for a decision on that. And it should be about any time, we think, based on normal time frames.

With respect to the Dales' appeal -- I think you heard some of this today -- but your Honor entered an order on December 13th denying that motion for relief from stay filed by the Dales. They filed a notice of appeal to the district court on December 27th, filed a Statement of Issues on Appeal and Designation of the Record on January the 10th, and we filed counterdesignations. But unfortunately, before briefing began Mr. Dale passed away and counsel indicated that they no longer sought to pursue the appeal. And so on March 22nd, just this week, the parties filed a joint stipulation of voluntary dismissal of that appeal.

With respect to the preliminary injunction appeal, your Honor's obviously aware of that. I think I had reported in January that we had received an extension of time to respond to petitions for *certiorari* filed by both the Committee and the Future Claimants' Representative. Our brief in response to the Committee's petition was due on March 22nd and, in fact, was filed on that date. Our response to the FCR's petition is due on March 28th -- I guess tomorrow -- and it will be filed on that date. And then there's an opportunity for the Committee and the FCR to file reply briefs.

And then the estimation discovery, I wanted to provide an update on this because there was a fair amount of activity surrounding estimation discovery in the more recent hearings we've had in the Court.

So the debtor has continued working on the document productions called for by various agreed discovery orders, including the Second Amended Case Management Order that we agreed to, all the parties agreed to and the Court approved after our hearing in August. And as called for in that Case Management Order and as we talked to your Honor about in January, the Committee and the Future Claimants' Representative had served a contention interrogatory on us requesting our contentions with respect to alleged non-disclosure claims. We, in response, finalized a list of alleged non-disclosure claims by the agreed deadline, which was December the 1st. We also served objections and initial responses to the contention interrogatory by the agreed December 15th deadline.

And as your Honor may recall, these initial responses to the contention interrogatory were for the subject of, or for a subset of 30 claimants selected by the debtor only and they were designed to illustrate or show how the debtor intended to respond to the contention interrogatory with respect to the full slate of alleged non-disclosure claims. And in fact, you'll be interested to know we ended up including 31 claimants for some reason instead of 30. Mr. Worf would know the answer

as to why we did that.

I reported in January that after serving the initial responses to the interrogatory the Committee and the FCR raised issues regarding the sufficiency of those responses and basically, they were seeking additional information than what we had been proposing to provide and the parties began meeting and conferring about those concerns to see if we could reach an agreement. And I believe at the time of the January hearing I advised your Honor that those discussions were still ongoing.

Also at the January hearing I reported that the parties had agreed to suspend the upcoming deadlines in the CMO to allow those issues to be discussed and that was to permit time to resolve the issues, or, absent a resolution, have a hearing on any open issues and your Honor did approve the suspension of those deadlines to permit us to continued discussions.

It turned out that that additional time was well used. After several more meet and confers the parties reached an agreement on how to proceed to address the Committee's and the FCR's concerns about the response to the contention interrogatory. Without agreeing that our original response was inadequate, we agreed to provide additional information in the answers, including citations to supporting documents, and we then provided an example of how specifically we intended to proceed using a subset of 17 of the alleged non-disclosure

claims from the December 15 response. After the Committee and the FCR reviewed the examples of those revised answers, they indicated that no motion to compel was necessary at this time and that they expected a motion to compel with respect to our final answer would not be necessary provided that our final answer to the contention interrogatories was consistent with the 17 examples that we provided as part of the meet and confer process.

So the good news is we avoided at this point, anyway, and hopefully, completely the need for any motion practice with respect to the contention interrogatory. So the work on providing the answer, the full answer, as to all the non-disclosure claims is continuing at this point and we expect that to be a rather lengthy response.

In order to kind of move this more quickly, we've agreed to provide answers to the interrogatory in batches. And so the next interim response from us is due on April 5, followed by another interim response on May 3rd, and then the rest of the final response would be due on May 31. And at that point the parties would then discuss setting a date for the conclusion of fact discovery. This is the one --

THE COURT: Uh-huh (indicating an affirmative response).

MR. GORDON: -- open item which was preventing us from reaching agreement on the extent of the fact-discovery period.

In addition, I should note that the debtor is continuing its own discovery efforts. I mentioned in January that we had served subpoenas on four plaintiffs' firms. We've been working with those firms to address the terms of the discovery and as I've indicated in the past, we've reached stipulations with the firms to avoid motion practice and now we're currently working to schedule depositions with respect to those firms in May, June, and July.

And then the only other development I would say with respect to estimation, although I guess not in our case, is we have the, the motions that I referenced earlier today filed by the three different Committees --

THE COURT: Uh-huh (indicating an affirmative response).

MR. GORDON: -- opposing discovery sought by DBMP from Bestwall and Aldrich/Murray and as Ms. Ramsey said, those'll be for another day. But that is a development since we --

THE COURT: Okay.

MR. GORDON: -- last appeared.

And then the very last thing I would mention is that we've had a request from the Committee, subject to your Honor's approval, to move the May 15 hearing date. There's, apparently, a plaintiffs' asbestos bar conference that's scheduled on the date of that hearing, which creates an issue for the Committee. And what's been proposed, which we're

amenable to, is moving the hearing a week up and either having it on May 8th or May 10th, which would either be before or immediately after a scheduled DBMP hearing on May the 9th.

THE COURT: Uh-huh (indicating an affirmative response).

MR. GORDON: And we've indicated to Ms. Ramsey we're okay with that if that works for your Honor.

And at this point I should say no one's aware of anything that's necessarily scheduled for that date, but obviously that's out a ways and no one knows for sure whether something substantive will be up or not.

THE COURT: Okay. Thank you.

Anything to add?

MS. RAMSEY: Thank you, your Honor. Natalie Ramsey again of Robinson & Cole for the Committee.

I'll start just where Mr. Gordon ended. The 8th or the 10th we proposed because there's a DBMP hearing on the 9th --

THE COURT: Uh-huh (indicating an affirmative response).

MS. RAMSEY: -- and we thought that most of the counsel involved would be in Charlotte, anyway, just to provide additional color on those suggested dates. Obviously, if those dates don't work for the Court, there are many other days in May if the Court is amenable to rescheduling that hearing date.

With respect to the estimation discovery and the contention interrogatories, right now we do not anticipate that it will be necessary to file a motion to compel provided that the additional responses that we receive from the debtor are consistent with the information that were provided in the exemplar 15. However, we have told the debtor that we do expect that there will need to be additional discovery with respect to those files. The contention interrogatory is just the first step. And so depending on that additional discovery, there may yet be issues that the Court might have to resolve, although we will do our best to continue to meet and confer.

THE COURT: Uh-huh (indicating an affirmative response).

MS. RAMSEY: And we have, we have had very productive dialogue around discovery.

And then with respect to, just to sort of respond to the debtor is proceeding with its own discovery, the Committee and FCR are largely not at this time because the discovery that we believe that we'll need will be very much informed --

THE COURT: Uh-huh (indicating an affirmative response).

MS. RAMSEY: -- by what we receive from the debtor.

So we really believe that most of our discovery needs will be determined by the information we ultimately receive --

THE COURT: Uh-huh (indicating an affirmative

response).

MS. RAMSEY: -- at the end of May.

THE COURT: Yep.

MS. RAMSEY: Let's see. With respect to the third item on Mr. Gordon's report, the preliminary injunction appeal, the Committee intends to file a reply to the debtor's response, which was filed on March 22nd, and we expect that we will file that reply timely on the, April the 10th.

And then just a, a couple of additional items. The first is the Court has probably noted that on March the 11th there was a declaration filed by the Chief Financial Officer of Georgia-Pacific. This is sort of the annual report that the Court has seen. In the past it has reflected both a representation regarding the current financial results of Georgia-Pacific and the equity value and also disclosed a special dividend which had been made in past years. The, the declaration this year, which is at Docket 3315, reflects no special dividend was made this year. In total, $205 million of regular dividends were made and that Georgia-Pacific had a adjusted EBITDA of $3.547 billion in 2023 and has a current equity value of $28.3 billion, which the declaration reflects is 600 million more than in 2022 and an increase of 7.6 billion since the commencement of the case.

So Georgia-Pacific continues to be in good financial health.

With respect to the last item that we wanted to address, your Honor, the Court may have seen on March 28th that the EPA banned chrysotile asbestos and in doing so, made a statement that, "The science was clear that asbestos is a known carcinogen and has severe impacts on public health." It went on to say that, "Although there are several known types of asbestos, the only form known to be imported, processed, or distributed for use in the United States is chrysotile." And we were gratified by the EPA's decision and by the ban, but because chrysotile is the asbestos that the Court has heard the most about in this case, we did want to make sure that the Court was aware of the ban and we consider, again, this to be a very significant and happy event for all, all citizens.

Thank you.

THE COURT: Uh-huh (indicating an affirmative response). Thank you.

All right.

MR. PARRISH: Nothing from the FCR, your Honor.

THE COURT: All right.

MR. GORDON: Your Honor?

Yes, sir.

MR. GORDON: Can I respond to --

THE COURT: Yes, you can.

MR. GORDON: -- the last point?

So I just want to say with respect to the, this EPA

ban that this was an issue, as your Honor may recall, came up during the Garlock estimation and Judge Hodges actually addressed this very issue and fundamentally found no probative value to findings like this by state regulatory, or by various regulatory agencies and the like and it was primarily because it's done for a different purpose. These are prophylactic measures, precautionary measures. They're based on assumptions, not facts, and you know, they're just trying to assess potential risk based on assumptions and he found that with the absence of evidence there's literally no probative value of that.

So I did, I didn't want to leave that hanging without just pointing out to the Court or reminding the Court that's an issue that was addressed in Garlock. It will certainly be addressed, I'm sure, in this estimation proceeding here. It's just not, not relevant to causation, in our view.

THE COURT: Ms. Ramsey.

MS. RAMSEY: And your Honor, we, we would like to address that at the appropriate time.

THE COURT: I did see the March 28th announcement by the EPA and I do recall the discussion of that issue in the Garlock case and as I read the announcement, I thought to myself that this is exactly how that issue will play out at the, at the relevant time.

But I do appreciate the update from everybody.

And with respect to moving the May 8th hearing, I have a child who's graduating from, or moving the May hearing, I have a child who's graduating from college on May 10th. Apparently, the way Chapel Hill does it is you graduate about five different times. So it starts on Friday and it literally concludes on Sunday. So that day is not going to work. May 8th is, and later in May isn't going to work because we are taking her on a graduation trip.

So our only option is May 8th. And that is a regular chapter 11 hearing day. So if you all are fine being put at the end of a chapter 11 hearing calendar and sifting through whatever Sub V, you know, chapter 11 cases happen to be on the calendar that day, I'm fine just to put you on that regular calendar. But we'll just, you know, probably set you at 10:30 or something and then we'll call the case then and you may have to sit through part of what's going on that day.

But, but happy to move the date to May 8th.

MS. RAMSEY: Thank you, your Honor. That works for the Committee.

And congratulations. I have a son --

THE COURT: Thank you.

MS. RAMSEY: -- also graduating from college, going through the same process a little later in May.

THE COURT: Oh. Congratulations. At least that gets one person off the dole, hopefully, in our houses.

So will somebody send -- Mr. Ellman, you all often will do a notice of rescheduled hearing. Would you mind?

MR. ELLMAN: We'd be happy to do that, your Honor.

THE COURT: Okay.

MR. ELLMAN: We'll do that for sure.

THE COURT: Thank you.

All right.

MR. ELLMAN: If I understand correctly, should we set it for 10:30 a.m. --

THE COURT: Yeah.

MR. ELLMAN: -- on the notice?

THE COURT: Let's go ahead and set it --

MR. ELLMAN: Okay.

THE COURT: -- for 10:30 --

MR. ELLMAN: We will do that.

THE COURT: -- on, on May 8th. And it still may not start at 10:30, but I think, at best, it will start at 10:30.

All right. With that, unless there's anything else the Court needs to address, the Court will recess.

Thank you.

And we'll see you back --

MR. ELLMAN: Thank you, your Honor.

THE COURT: -- on May 8th.

(Proceedings concluded at 1:19 p.m.)

CERTIFICATE

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

/s/ *Janice Russell* April 2, 2024

Janice Russell, Transcriber Date

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| IN RE: | : | Case No. 20-30080-JCW |
| DBMP LLC, | : | Chapter 11 |
| Debtor. | : | Charlotte, North Carolina<br>Thursday, May 9, 2024<br>9:31 a.m. |

: : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE J. CRAIG WHITLEY,
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor:
Robinson, Bradshaw & Hinson, P.A.
BY: GARLAND CASSADA, ESQ.
101 N. Tryon Street, Suite 1900
Charlotte, NC 28246

Jones Day
BY: GREGORY M. GORDON, ESQ.
2727 North Harwood St., Suite 500
Dallas, Texas 75201

Jones Day
BY: ISEL M. PEREZ, ESQ.
600 Brickell Avenue, Suite 3300
Miami, Fl 33131

Audio Operator: COURT PERSONNEL

Transcript prepared by:
JANICE RUSSELL TRANSCRIPTS
1418 Red Fox Circle
Severance, CO 80550
(757) 422-9089
trussell31@tdsmail.com

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

APPEARANCES (continued):

For CertainTeed LLC, *et al.*: Goodwin Procter LLP
BY: HOWARD S. STEEL, ESQ.
620 Eighth Avenue
New York, NY 10018

Rayburn Cooper & Durham, P.A.
BY: JOHN R. MILLER, JR., ESQ.
227 West Trade Street, Suite 1200
Charlotte, NC 28202

For Michael and Ann Herlihy: Maune Raichle
BY: CLAYTON L. THOMPSON, ESQ.
150 West 30th Street, Suite 201
New York, NY 10001

Waldrep Wall
BY: DIANA SANTOS JOHNSON, ESQ.
370 Knollwood Street, Suite 600
Winston-Salem, NC 27103

For Mrs. Peter L. Bergrud: Ruckdeschel Law Firm, LLC
BY: JONATHAN RUCKDESCHEL, ESQ.
8357 Main Street
Ellicott City, MD 21043

For the ACC: Robinson & Cole LLP
BY: DAVIS LEE WRIGHT, ESQ.
1201 N. Market Street, Suite 1406
Wilmington, DE 19801

Robinson & Cole LLP
BY: KATHERINE M. FIX, ESQ.
1650 Market Street, Suite 3600
Philadelphia, PA 19103

Hamilton Stephens
BY: LINDA SIMPSON, ESQ.
525 North Tryon St., Suite 1400
Charlotte, NC 28202

APPEARANCES (continued):

For the FCR:

Young Conaway
BY: SHARON ZIEG, ESQ.
1000 North King Street
Wilmington, DE 19801

Young Conaway
BY: FELTON E. PARRISH, ESQ.
227 West Trade Street, Suite 1910
Charlotte, NC 28202

APPEARANCES (via telephone):

SANDER L. ESSERMAN
Future Claimants' Representative
2323 Bryan Street, Suite 2200
Dallas, TX 75201-2689

P R O C E E D I N G S

(Call to Order of the Court)

THE COURT: Have a seat, all. Good morning.

MR. MILLER: Morning.

MR. RUCKDESCHEL: Morning, your Honor.

THE COURT: Okay. We are back in the DBMP case. We've got an agenda that's on Docket No. 2784.

Let's get appearances first and then we'll see what we have to talk about this morning.

Wherever.

MR. GORDON: Good morning, your Honor. Greg Gordon, Jones Day. I'm here on behalf of the debtor. And this is Isel Perez from Jones Day. She's in our Miami office.

THE COURT: All right, very good.

Others?

MR. CASSADA: Good morning, your Honor. Garland Cassada, Robinson Bradshaw, here for the debtor.

THE COURT: Okay.

MR. MILLER: Morning, your Honor. Jack Miller, Rayburn Cooper & Durham, on behalf of CertainTeed. With me is Howard Steel from Goodwin Procter.

THE COURT: Okay.

All right. This side?

Go ahead, Mr. Thompson.

MR. THOMPSON: Morning, your Honor. Clay Thompson,

Maune Raichle Hartley French & Mudd, on behalf of the Herlihy Plaintiffs.

THE COURT: Okay.

MR. RUCKDESCHEL: Morning, your Honor. Jonathan Ruckdeschel on behalf today of Mrs. Bergrud.

THE COURT: Okay.

MS. FIX: Good morning, your Honor. Katherine Fix from Robinson & Cole on behalf of the Official Committee of Asbestos Personal Injury Claimants. I'm joined today by Linda Simpson of Hamilton Stephens Steele & Martin. Additionally, in advance and with apologies, my partner, Davis Wright, will be joining us. He's rushing in from the airport after a few flight delays.

THE COURT: Okay. Yeah, we've had some storms, as those of you who came in yesterday know.

All right.

MS. ZIEG: Good morning, your Honor.

THE COURT: Good morning.

MS. ZIEG: Sharon Zieg from Young Conaway Stargatt & Taylor on behalf of Sander Esserman, the FCR, who is on the phone today. Also with me today is Felton Parrish of Young Conaway.

THE COURT: Okay.

MS. JOHNSON: Oh. Diana --

THE COURT: There you go.

MS. JOHNSON: Diana Santos Johnson with Waldrep Wall Babcock & Bailey. We are local counsel to the movants today.

THE COURT: Very good.

Anyone else in the courtroom not been reached?

(No response)

THE COURT: Do we have anyone on the telephone that needs to, to announce not previously announced? Star 6 gets you unmuted.

(No response)

THE COURT: Okay, very good.

We have the notice of agenda. There are two motions for relief from stay.

Are there any preliminaries before we get to them?

(No response)

THE COURT: Okay.

All right. Ready to hear from the movants.

I assume you want to use a consolidated record and consolidated arguments. You don't want to argue them sequentially.

MR. THOMPSON: Correct.

MR. RUCKDESCHEL: Correct, your Honor. And, and Mr. Thompson and I have coordinated the arguments so that we're not going to be duplicating things. I know the motions are, largely, similar.

THE COURT: Okay.

MR. RUCKDESCHEL: All right.

THE COURT: Everybody good with that?

(No response)

THE COURT: Okay. Please proceed, Mr. Ruckdeschel.

MR. RUCKDESCHEL: Thank you. Jonathan Ruckdeschel today on behalf of Mrs. Bergrud.

Just as a, a little outline, I'm going to discuss with the Court some foundational matters, why we need a ruling on the issue of subjective bad faith, what our base argument is regarding bad faith filing and cause under 362(d)(1), and the distinctions between what's before the Court with our motions today and what was before the Court when the Committee moved globally to end the stay for all claimants resulting in your Honor's ruling in August of 2021.

THE COURT: Uh-huh (indicating an affirmative response).

MR. RUCKDESCHEL: Mr. Thompson is then going to address the specifics of our arguments and we're hoping that we can avoid duplication.

Before I get into it, I, I just want to make a quick comment, that laced throughout the debtor's opposition are various statements that the movants either concede or don't dispute various matters that I think can best be described, if you actually read our, our papers -- and I know your Honor has -- as wishful thinking. The, the most important one is

that we "effectively concede granting our motions would result in the effective dismissal" of the cases. And, and that statement is just flatly untrue. On pages 17 to 19 of the motion for Ms. Bergrud we specifically address and reject that argument. The debtor provides no coherent argument as to how allowing Mrs. Bergrud or the Herlihys to liquidate but not collect their claims and to get back in line with everyone else would effectively dismiss the case. And because they don't have a coherent argument as to how that would be, they just say it. Well, they effectively concede the point. And, and, and I'll charitably describe that as wishful thinking.

Again, Mr. Thompson will address the specifics of it, but, but I think it's telling when we see a statement like that that's directly contrary to the plain language of the motion it tells us everything we need to know about the validity of that point. And, and those comments are laced throughout the opposition.

So, so I want to start with why we need a ruling. The motion was filed specifically to frame the issue of subjective bad faith before the Court in a manner where it is provided for directly by the case law that controls the Court as cause and in a, in a format that is, unquestionably, immediately appealable, right? Does the Code allow profitable, non-distressed companies to access the bankruptcy system to effectuate tort reform for state law liabilities they admit

they can pay in full, right? Is it bad faith to engage in the eve of bankruptcy restructuring to isolate one class of creditors, avoid the absolute priority rule, and the requirement of equal payment and to strand one class of creditors in bankruptcy indefinitely while seeking judicially compelled negotiations? Is that bad faith, subjective bad faith under the case law? And, and we all agree that Carolin says bad faith is grounds for lifting the stay and we all agree that Carolin then talks about what subjective bad faith is and the purpose of the analysis. Carolin then goes on and adds in the, the discussion of objective futility with respect to whether that bad faith is going to justify dismissal at that phrase, at that phase of the case, right? But neither this Court nor Judge Beyer in Bestwall have ruled on this issue. This hasn't been presented in the context of motions to dismiss and, and both this Court and Judge Beyer have concluded that the objective futility prong of Carolin can't be met at this time; and, therefore, the question of subjective bad faith doesn't have to be reached, right? Judge Beyer, similarly, declined to address the question of subjective bad faith in the motion to lift stay that I filed for Mr. Buckingham and declined to certify that for review.

This Court and Judge Beyer, however, have repeatedly held that we need appellate guidance on precisely this question and that guidance hasn't come, right? The Fourth Circuit

declined direct appeal despite certification in Bestwall regarding the Committee's initial motion to dismiss and in Aldrich regarding motions filed by Mr. Thompson and me on behalf of Maune Raichle's clients and, subsequently, by the Committee. We're seeking *en banc* review of that, but the Fourth has so far declined. And in Bestwall, when the Fourth Circuit declined, it went back to Judge Conrad, who then denied leave to appeal saying it's interlocutory, right?

So that's the elephant in the room. Is this proper or not? And somebody's got to be the first one to rule, your Honor. And, and somebody has to be the first one in the Fourth Circuit to rule on this motion, frames that question, and raises it in a way that the Court can rule in a format that's indisputably immediately appealable. And we urge the Court to rule on this issue and to make the call, right? Continuing to defer on making the call of whether this is bad faith has been the equivalent of finding that it's good faith, right? Not deciding the issue has been the functional equivalent of deciding it in the debtor's favor. The debtor has reaped all of the benefits of the bankruptcy system and the automatic stay as if this was a good faith use of the Code without that determination having been made and if this Court defers again saying the issue is only for confirmation, will be ignoring and voiding the plain language of Carolin and the myriad of other cases that find bad faith is by itself cause under 362(d)(1).

And, and my wife cautioned me -- she's a lawyer -- she says, "Don't sound like a suck-up," right? But, but there's no other way to say this, your Honor. There's no better court to make that determination initially than this Court, right? This Court has lived with these cases, not just this case, but Aldrich/Murray, briefly LTL, right? You know the records backwards and forwards. You've issued numerous lengthy opinions making detailed factual findings regarding a record on all of the issues that are needed to make the call, right? And, and the, this Court has made that call in the past in Patel, for example, right, recognizing that the desire for relief conflates a bankruptcy tool for a bankruptcy purpose if the desire is the only hook for getting us here, if it's not otherwise properly before the Court. This Court's in the best position to make that initial determination and to say that this is a bridge too far. And, and contrary to the situation at the end of your Honor's ruling on the motion to dismiss in Aldrich, here, you're writing with a blank slate, right?

So, so we urge the Court to rule and to reject this perversion of the Code and, and this attempt to transform the Court into a super legislative, tort reform court for the ultra wealthy. But even if the Court's ultimate conclusion is that this is good faith use of the Code, we ask that your Honor rule and rule on the merits so we can get the issue before the appellate court before we wait another five years.

All right. The second issue that I wanted to talk about is our base argument, bad faith is cause under 362(d) independent of Robbins. We also argue that if you consider it in the context of Robbins' analysis, we also have cause. But, but, but as we'll talk about briefly, it's independently cause. The Fourth Circuit has determined that a bad faith filing constitutes cause under 362(d)(1) allowing for lifting of the stay and they say it right in Carolin.

And there are two independent lines of evidence that show bad faith here. Combined, independently either of them could get you to bad faith, but, but combined we believe it's overwhelming. The first is lack of financial distress. The debtor contends it can pay everyone in full just as its predecessor. And the Court has to take it at its word, right? And the Court has found that if the funding agreement is honored or the twostep is set aside at which point the funding agreement unambiguously says we got to fund, then there's ample money, right? And that lack of financial distress alone is sufficient for bad faith under consideration of all the circumstances in this case as analogously discussed in Premier, right? And, and indeed, the ability to pay all creditors alone was found to be sufficient cause to lift the stay post Robbins by the Fourth Circuit in Claughton v Mixson, 33 F.3d 4, from the Fourth Circuit in 1994, right? The single factor that the court analyzed there was there's enough money to pay everybody

and so you got to pay the, the creditor that's getting the relief from stay and you got to do it now. That's cause.

The second line of evidence independently supports the finding of subjective bad faith, the findings that this Court has already made about Project Horizon and the twostep and the purpose of the twostep and the effect of the twostep, right? And, and we contend that that is also subjective bad faith and contrary to the purpose of the Code and contrary to the authority of Congress under the Constitution, as argued by the Committee before your Honor in, in Aldrich, right, for a profitable, non-distressed company to create a new subsidiary on the eve of filing for the purpose of filing bankruptcy designed to addressed one liability and not to actually restructure the ongoing business operations, isolating a single class of creditor, removing from those creditors the direct claims against the assets, avoiding the absolute priority rule and the requirement of equal treatment, and forcing judicially compelled negotiations. All of these findings have been made. They're not really in dispute, right, that, that this was the purpose of Project Horizon and this proceeding, right? And, and when the debtor came with some suggestions in the initial preliminary injunction hearing that, well, maybe this was just an independent decision that hadn't been made before we set the ball rolling down the hill, the Court considered that and rejected it. It was transparent and not consistent with the

evidence.

So we contend that both these lines of evidence, financial distress and the two-step scheme, are independently sufficient and combined, there's not a reasonable dis, reasonable dispute that that can constitute bad faith. And, and I think that's why the debtor fights so hard to not have the Court rule on this issue because once the words are said, right, once the Court says "I've looked at that and that's not what the Code's for," right? Your Honor gave an interview a couple of years ago in a, a magazine, a legal magazine, and said something like, "The Code works well when," you know, "it's helping give breathing room to somebody that's having trouble meeting their obligations. They get a little breathing space." That's not what's happening here. They weren't having any problem needing it, right?

So Carolin specifically discusses bad faith is cause supporting relief from stay under 362(d)(1), period, hard stop. And Robbins doesn't purport to change that. It doesn't address the question of bad faith filing. Robbins neither discusses bad faith, it doesn't talk about bad faith, and it doesn't cite to Carolin. And since Carolin notes bad faith filing is cause for lifting the stay, the assertion that Robbins' analysis is required to determine if bad faith is cause doesn't, can't be squared with the way Carolin's written, right? And the one -- there's one case the debtor cites. They cite a case from the

District of Maryland, Fairville, Fairville Company v. Ramkaran, 315 B.R. 361, from 2004, for the proposition that bad faith is a component of Robbins' analysis. And you got to do it, anyway. But Ramkaran is a case that involves allegation of a bad faith in incurring the debt, not a bad faith allegation about the filing of the bankruptcy itself. Mr. Ramkaran bought a truck. He signed a personal guaranty for the truck and he forged his wife's name on her personal guaranty of the truck, right? And, and eventually when this comes to light during the context of this chapter 13, there's a request to lift stay saying, "Well, this was bad faith. He incurred this debt in bad faith." And the court, citing lots of other chapter 13 cases that deal with incurring an obligation in bad faith, said, "Well, debts incurred in bad faith are dischargeable under 13. And so that's not, by itself, grounds for lifting the stay," right? That has nothing to do with allegations or findings that the proceeding itself was filed in bad faith.

And, and the only discussion in Fairville that comes close to talking about that is when the Fairville court discusses In re Chase from the District of Maryland, 43 B.R. 739, from 1984. And, and they say the only way that incurring the debt in bad faith is going to be by itself grounds for lifting the stay in a 13 is when you incur the debt with the intention of immediately filing a 13 and never pay, right? In other words, if it's part of the scheme, the filing of the

bankruptcy is part of the fraudulent scheme, then the filing is bad faith, not just the debt. That's the only authority that's cited in the debtor's opposition, that Robbina somehow trumps or supersedes the statements or the plain language of Carolin, right?

So the, the other thing in that regard with respect to our base argument is Judge Beyer's construct that if you can't dismiss for bad faith, you can't lift the stay for bad faith. And, and that renders Carolin's statement about bad faith lift stay meaningless because, if that's, in fact, the case, there is no bad faith lift stay. There's only bad faith dismissal. Because any time that you have bad faith you're either going to get dismissal or you're going to have to wait until the end and there won't be any bad faith lift stay. If it's the same standard, then there's only one thing. That's not the way Carolin's structured at all and, and it's not what it says. And it's precisely the paradox recognized by Dixie Broadcasting that we've cited in our papers and the debtor doesn't have a coherent response to Dixie and, and the way that gets analyzed.

So, so the, the last part for me is to just quickly run through what's different than when the Committee moved, right?

So, so first and foremost, throughout your Honor's decision on the Committee's initial motion to terminate the automatic stay for everybody the Court said it's not faced with

a bad faith argument. It's not ruling on bad faith. In Paragraph 248, you express, you expressly say that at the end as well, but it's laced throughout the, the opinion. And, and that was not the argument that was being made, that this was a bad faith filing under 362 warranting relief, that there were arguments that, that skirt around it, that talk about the same types of issues. That wasn't the issue that was addressed and it's not addressed in your Honor's motion, your Honor's order.

The Court was also not faced with and did not address a foundational argument that we make that in enacting 524(g) Congress limited its application to companies facing overwhelming asbestos liabilities, like Johns Manville, something this Court has found does not exist for this debtor, right? And the Court didn't address an argument in -- in that -- that -- the need for financial distress to be properly before the, the bankruptcy court under the Code and Constitution and that lack of financial distress also was evidence supporting a finding of subjective bad faith. That issue was not presented, was not ruled upon.

It was a motion that sought global relief from stay for all claimants to both liquidate and collect their claims. It's not what we're asking. Our clients are asking for the right to liquidate their claims and get back in line, which, which was just what Ms. Robbins did in Robbins, which was Mr. Cassada's case, get back in line. We're not going to

collect.

And the, the last thing, it was only one -- only and I say that in quotes and, and your Honor sort of talked about this, too -- only a year and a half into the case, right? Well, you got three more years of the benefit of protracted litigation in which little to no progress has been made towards confirmation. I'm not saying nothing's been done, but we're no closer to confirmation now than we were three years ago. So now we're 4-1/2 years in, marooned on, and your Honor's words were "on bankruptcy island," right? Here we are, still there.

So, so this is a different motion filed at a different time by different parties raising different arguments that haven't been ruled upon previously. And so any attempt by the debtor to hide behind the Court's denial of the prior motion or the Court's finding that if you get rid of the stay for everybody all at once and allow them to liquidate and collect, it's effectively like there's no bankruptcy at all. That's not what you're faced with. You're faced with the motions of two plaintiffs that are seeking relief with respect to their personal claim to liquidate and get back in line.

And, and there's always the suggestion in these cases, well, this is going to lead to the inevitable drumbeat of hooves, people coming in. There's no evidence that that's happened. It didn't happen in LTL, right? And nobody else has stepped forward to file such a motion here. And we ask that

the Court rule upon this issue and rule upon it based on the facts that you have before you, not on the possibility of what might happen in the future.

And, and we said in the reply, you know, the, the fact that a bad faith filing potentially provides cause for any claimant that comes to ask for relief cannot be a justification for denying all claimants relief if one claimant would be entitled to relief based on a bad faith filing. And Carolin says that they would. You can't say, well, nobody gets it because everyone would be entitled to it. That's the problem with a bad faith proceeding. This case shouldn't be here, right? Eventually, that will get ruled upon, whether it's, whether it's through *en banc*, in, in Aldrich or Bestwall or something else or a dismissal motion here or this case gets dismissed voluntarily if your Honor consolidates the assets or finds the transfer's fraudulent. Ultimately, there will be a resolution of this case either through a plan, potentially a plan nobody thinks about, or through dismissal.

But that's not what's before you today. What's before you today are two groups of plaintiffs, a husband and wife and a widow, asking for relief for themselves. And we ask that you grant it.

THE COURT: All right.

MR. RUCKDESCHEL: Thank you.

THE COURT: Thank you.

Mr. Thompson.

MR. THOMPSON: Can I approach, Judge?

THE COURT: You may.

(Presentation provided to the Court)

THE COURT: Thank you.

THE COURTROOM DEPUTY: No thank you.

MR. THOMPSON: There we go. No matter how many times I rehearse, always need adjustments.

Morning, your Honor. Clay Thompson, Maune Raichle, on behalf of the Herlihy Family. Going to try not to be too duplicative or duplicative of all of Mr. Ruckdeschel's arguments. Obviously, we adopt everything he said -- and he does --

THE COURT: Uh-huh (indicating an affirmative response).

MR. THOMPSON: -- the same -- for the Bergrud motion.

Relief from stay is for cause and I'm going to walk through Carolin a little bit because I, I'd like to talk about how it got to where it got, the Fourth Circuit got to where it got to in a two-prong dismissal standard. And how it got there was it acknowledged that good faith is implicit in several provisions of the Code, right?

THE COURT: Uh-huh (indicating an affirmative response).

MR. THOMPSON: And they saw and explicitly note,

noticed that in 362(d)(1) "for cause" authorized this court "to determine whether respect, with respect to the interests of a creditor," a creditor, "seeking relief, a debtor has sought the protection of the automatic stay in good faith." So we are putting squarely before you on behalf of two creditors whether this debtor has filed in bad faith. That, by itself, is grounds to lift the stay.

Then it goes through Rule 9011, which is the Rule 11 equivalent, of the Bankruptcy Code. That requires good faith. And then it talks about the risks of, as they're weighing about if we're going to have objective futility and subjective bad faith, right, what are the reasons to do that. They talk about, they note that "creditors who become entangled in hopeless Chapter 11 cases have remedies from, of relief from stay," post-petition creditor remedies, right?

So they're discussing about should we dismiss cases earlier on or do we allow them to become objectively futile before we dismiss them. And they note in getting there, right, 362(d) allows creditors relief from stay. All right.

So then they agree with the courts that say that both objective futility and subjective bad faith is required. "It is better risk to proceeding a wrongly motivated invocation of Chapter 11 whose futility is not immediately manifest." And, and your Honor and, and Judge Beyer have both not reached subjective bad faith. We're seven years in to these twosteps

in this District and to date, subjective bad faith has not been ruled upon by the factfinder, the bankruptcy courts in this District. We're urging the Court to do so.

Objective futility, "resuscitating a financially troubled debtor."

Subjective bad faith. What is subjective bad faith? "Whether the petitioner's real motivation is 'to abuse the reorganization process, cause hardship or delay to creditors'" -- and I would argue that Ms. Bergrud's been delayed. She filed her case in 2019 -- "'and whether they're resorting to Chapter 11 merely for purposes of invoking the automatic stay.'"

So then we go to Robbins, which Mr. Ruckdeschel talked about. Robbins doesn't disavow Carolin. Robbins doesn't say what Carolin said about 362(d) for cause doesn't matter or for bad faith. That is not what the law is, no. What Robbins says is for cause, case-by-case basis, balance, before we get to the three factors, potential prejudice to the bankruptcy debtor's estate against the hardships that will be incurred by the individual, by the person seeking relief. We have debtors in these cases that can pay everybody in full, everybody in full. It's not any harm.

Premier Automotive, okay? They find that this debtor did "not file for legitimate purposes of bankruptcy, but it would invoke the automatic stay.... The right to file for

chapter 11 is conditioned upon the debtor's good faith." It's "available only to those debtors and creditors with clean hands," citing Little Creek.

With respect to subjective bad faith, the debtor in Premier Automotive was not even experiencing, experiencing financial difficulties. That's these debtors here. You found that. Courts "have consistently dismissed Chapter 11 petitions filed by financially healthy companies." Now I understand this is not dismissal, but this is what they're talking about when they're saying subjective bad faith. This is what Premier's looking at in terms of what subjection bad faith is and it's when it's filed by financially healthy companies.
Mr. Ruckdeschel alluded to that.

Really, there's two reasons here that there's subjective bad faith. They're not in distress. They can pay everybody in full, No. 1. No. 2, they did the two-step Project Horizon, cloak and dagger, ring fenced the assets, subjected all the victims to bankruptcy. That's Part 2.

"Sole purpose of halting or delaying its ultimate eviction from the Terminal ... to compel the Maryland Port Authority to execute a new lease.... Chapter 11 is not a procedural vehicle which can be commandeered, which may be commandeered solely for 'the purpose of invoking the automatic stay,'" citing Carolin. Bad faith by itself, relief from stay. You don't need to reach Robbins. We can meet Robbins, but you

don't need to even get to Robbins.

So this is what you found. So what I get back in response to the motions are assertions that our motions are "unsupported rhetoric," page 2; "baseless assertions," "unsupported allegations of bad faith," "totally unsupported," totally unsupported, "unsupported objections." Well, they're not based on my findings, right? They're based on your Honor's findings. You wrote a 200-plus paragraph opinion on what DBMP and Old CertainTeed and New CertainTeed and Saint-Gobain did and that's the basis for subjective bad faith. Subjective -- this is from their response at 17, "Movants' arguments regarding the Debtor's alleged subjective bad faith are incorrect, totally unsupported, and more appropriate for dismissal." "Most of the 36 pages advancing a narrative." Well, you know, we, we relied on your findings. We put all the findings in there. We briefed it at length.

This Court's findings, highlight some of them. "Mirror image." This is, this is on page 2, Docket 972, of your Court's, this Court's opinion in 2021. It's "a mirror image of Old CertainTeed: fully operating company which retained all of Old CertainTeed's employees" -- New CertainTeed retained all of Old CertainTeed's employees -- "the bulk of its assets and all of its non-asbestos creditors." DBMP got "no employees, no operations, no assets, few assets."

At page 11, Paragraph 33, "From 20" -- "2002 to 2019,

CertainTeed's annual indemnity costs (payments of settlements and judgments) and defense costs ranged from 80 million to 160 million." It's a lot of money. It's not a lot of money when you're worth billions and billions of dollars, which is what New CertainTeed and Old CertainTeed were worth. They can pay everybody in full.

"Project Horizon" -- this is at Paragraph 38 -- "Project Horizon was an attorney-created and implemented strategy '[t]o facilitate [Old CertainTeed's] ability to pursue a chapter, section 524(g) trust.'"

"Project Horizon was driven not by businesspeople, but by lawyers," Paragraph 43. There was no business purpose here. The lawyers came up with it. They wanted to pay less. They wanted to pay less than they were paying in the tort system.

Paragraph 44, "This was a profitable going concern whose assets significantly outweighed its combined operating and asbestos liabilities," talking about Old CertainTeed, who's now DBMP. It's bad faith. Pay everybody in full.

"Project Horizon" -- Paragraph 46 -- "was to isolate the asbestos liabilities in a single affiliated corporation and file it in chapter 11. That entity could then seek 524(g) injunctive relief shielding," not just the debtor, "but the CertainTeed Enterprise from Old CertainTeed's asbestos liabilities." That's bad faith. The whole purpose of this bankruptcy is to serve a nondebtor. That's bad faith.

56, "This" -- "Thus, in a matter of hours without notice to any of its asbestos creditors," including the Bergruds, who had a pending lawsuit. And your Honor may remember a while ago Ms. Bergrud objected to the stay applying to HD Fowler, who was a supplier of CertainTeed pipe in that case, and that was denied. Debtor objected to that. They wanted HD Fowler protected. So HD Fowler was protected at least for its sale of CertainTeed pipe. That's how long Ms. Bergrud's been involved in this case and her rights have been trampled upon by the debtor.

57, "Old CertainTeed's publicly disclosed financial statements, its assets greatly exceeded its combined operating and asbestos liabilities."

Paragraph 63, "These Agreements are not 'arm's-length' contracts.... Given the insider relationships and conflicts of interest, the legal enforceability of these agreements vis-à-vis third parties is doubtful." This goes to Part 2 of why it's bad faith in terms of the Project Horizon paper shuffling twostep.

Paragraph 67, "The Funding Agreement is not a loan.... Nor is it capped." They can pay everybody in full. They're not in distressed. There's no prejudice to them to defend two cases in the tort system for the first time in five years.

Paragraph 69, "The funding commitment is made by New CertainTeed to DBMP, and not the asbestos claimants. Only DBMP

can enforce the agreement. One wonders how DBMP could ever do so unless New CertainTeed wanted the Funding Agreement enforced." Filing bankruptcy to protect a nondebtor is bad faith, your Honor.

Paragraph 80, "If the Debtor's cash flow is insufficient, New CertainTeed is required to provide DBMP with the funds that DBMP would then use to pay any indemnity it allegedly owes to New CertainTeed." There'd be circular indemnification agreements to manufacture jurisdiction, which Judge King in the dissent in Bestwall discussed.

Paragraph 83. Mr. Ruckdeschel didn't like 83 so he --

MR. RUCKDESCHEL: No. It went blank. Sorry.

MR. THOMPSON: That's all right.

83, "DBMP was created with no employees, no operations, reflects a single purpose: it was a vessel designed to ferry Old CertainTeed's asbestos liabilities into bankruptcy."

Paragraph 100, "By early 2018 Old CertainTeed had learned of the Bestwall case and was investigating whether it could place its asbestos liabilities in a new company." They knew what they were doing. They're watching Bestwall. They didn't want to pay as much as they were paying in the tort system.

Paragraph 102, "While both Old CertainTeed and DBMP have said that bankruptcy was but ... several options, that

strains credibility." That's what your Honor found.

So when, when DBMP says its "baseless," it's "unsupported," "totally baseless," "inaccurate," "totally unsupported," it's your findings they have a problem with, your Honor, not mine. This Court has already found all of these things and all of these things support subjective bad faith and support relief from stay.

106, "The decision that this newly formed corporation would file chapter 11 was made before the Corporate Restructuring and before the Debtor existed." It's all part of the big scheme. Old CertainTeed knew all along that DBMP would exist and file for bankruptcy. New CertainTeed knew it and so did Saint-Gobain. They literally created an entity just to subject people like Ms. Bergrud and Mr. Herlihy to the devastating effects of the automatic stay.

Paragraph 145, which I thought is not exactly on the bad faith part, but I wanted to note it: "524(g) also is not sufficiently comprehensive to occupy the field of resolution or discharge of asbestos liabilities. Even after 524(g) became law, the Supreme Court called on Congress to do more regarding asbestos liabilities, recognizing that Congress had not comprehensively addressed that area." And, and that's right.

Your Honor is, I believe, citing Ortiz v. Fibreboard. There's a concurrence from Justice Rehnquist inviting Congress to take action. And that's my point, right? It's not 28

U.S.C. 524(g). It's within the Bankruptcy Code. You got to be bankrupt to get 524(g). That's why all these companies filed for bankruptcy after Ortiz. They didn't do a twostep. They filed for a real bankruptcy. And so it's not a menu choice. You got to be distressed. You've got to be filing in subjective good faith to access 524(g). It's not just available to any multibillionaire that doesn't want to pay people.

Paragraph 168, "The Debtor claims to have the same funding capacity after the 2019 Restructuring as did Old CertainTeed."

Paragraph 192, "The Debtor may use any funding provided by New CT only for a 'Permitted Funding Use.' New CertainTeed is obligated to provide funding only for 'Permitted ... Uses.' Payment of asbestos-related judgments and settlements is a Permitted Funding Use only when no chapter 11 case is pending." So they've got to pay, New CertainTeed's got to honor inside or outside of bankruptcy. So if there's not a bankruptcy case, they've got to resolve cases in the tort system, right? If, if that wasn't the case, it'd be an obvious fraudulent transfer. So it's, it's available.

And we're not seeking, Judge, to collect, again. We're seeking to liquidate. So they can defend this case without resorting to this condition that the, the payment of funding, of judgments and settlements is a Permitted Funding

Use. They can defend the case for these two without having to resort to what's, what they, again, created themselves is a permitted funding use.

And then 248, "It remains to be seen whether the actions of Old CertainTeed, New CertainTeed and the Debtor were undertaken in good faith.... That will be sorted out in this bankruptcy case." Now I don't know if this is what your Honor meant. I think, I think what you were saying here is that no motion to dismiss is before you. Under Carolin, we got a two-prong approach. Carolin's decided, Fourth Circuit's decided, we don't want to dismiss cases if there's a decent chance to -- we've decided we're going to take the risk that a company can file in subjective bad faith if there's some possibility that they can reorganize. Unless it's objectively futile, we're not going to dismiss the case.

And so I think when you're talking about good faith there, you're talking about good faith encompassing both prongs. And so perhaps, you know, objective futility, you know, we're going to see if CertainTeed or Old CertainTeed can, or, or DBMP can successfully reorganize. And the way that would play out would be if they were able to confirm a plan that meets good faith at confirmation, right?

But that's not what this motion is, right? This motion is simply did they file in subjective bad faith because they wanted to get the automatic stay. And so we can allow the

bankruptcy case to play out and see if plans are proposed, but these two plaintiffs themselves have asserted bad faith. That by itself is grounds.

This is what overcoming the tort system looks like. This is from Saint-Gobain's 2023 annual report. December 31, 2023, they're telling their shareholders, "During the course of" -- at Page 44. It was an exhibit to my motion. Annual Report at 20, at 44. They're talking about this bankruptcy proceeding, "During the course of this bankruptcy process, which is expected to take up to approximately five-to-eight years." Now I don't know if that's five-to-eight years from 2020 or is it five-to-eight years from now? I mean, they saying five-to-eight years from now in December of 2023. That was all part of the plan. They want it to take five-to-eight years. All the company people that testified in the PI were talking about how this is going to take a while. That's why they're doing it. They don't want to be in the tort system. They watched Bestwall. They could see that you could park your liabilities here. Nonetheless, because the funding agreement, estimated debt against DBMP amounting to 407 million.

So I don't know exactly what to take from that unless it's, they're saying that CertainTeed LLC believes it owes DBMP 407 million for their asbestos liabilities. Now if that's what they're saying -- I, I disagree with that number -- but what they're reporting is that they may owe DBMP 407 million. And

then, of course, they gave away over a billion dollars in dividends last year. So everybody's getting paid, but the sick people in these twosteps. That's all by design. It's all part of a scam. That's what they do.

So what we see here is that, according to what the, the Committee filed in support of our motions, was that CertainTeed has saved half-a-billion dollars with this bankruptcy. They've saved, they've saved $500 million, money they would have spent but for this bankruptcy resolving tort claims and they are telling their shareholders, Saint-Gobain is, that their estimated liabilities, at least the foreseeable ones, are 407 million. They've saved more money in this bad faith bankruptcy than they think their total liabilities are. That's bad faith. That's invoking the automatic stay with subjective bad faith.

Here's Bestwall last year. I talked about this before. The arguments that were made in LTL weren't before the, the Fourth Circuit. "If claimants are adversely affected" -- this is at 182 -- "monetarily by the ongoing bankruptcy, then the time and place to raise that concern is at plan confirmation." So that would mean Ms. Bergrud wants to know if she's going to get more in a 7 than an 11 and the time to make that argument, I think what they're saying there monetarily, is at confirmation. And then they say, "Bestwall must propose a plan that addresses the concerns held by a

majority of the claimants." And then it's after that, after that, right? Then they say, "Alternatively, rather than waiting for plan confirmation, claimants can bring individual actions for relief based on the specific facts of a particular claim. That is done on a bankruptcy, in bankruptcy proceedings on a routine basis." Specific facts, routine basis. Every creditor in Bestwall is an asbestos victim.

So the Fourth Circuit knows that the types of people that would be seeking individual relief are all going to be meso, or asbestos cancer, asbestos-disease victims. So every single one of them is going to be someone with mesothelioma who's seeking relief and yet what we get back whenever we file one of these motions for relief is a bunch of stuff that wasn't in Bestwall. So what we hear from the debtors is there's no unique facts or circumstances. Well, that's not in Bestwall. It's not in Robbins. It's not in Carolin. It's not in Premier Automotive.

Less the debtor says it's expensive, too expensive to defend these cases. It would, it would be a distraction. Bestwall doesn't say that. Fourth Circuit didn't say that in Bestwall. Oh, unless it's a distraction, then, you know, you can't get relief for your specific facts, for your specific claim unless there's just speculation that, potentially, thousands of other people would bring claims for relief. Unless the debtor really wants, really, really, really wants a

global deal, then don't give them relief. Don't give individuals relief if the debtor really would like an unconstitutional trust. Unless the debtor wants estimation really bad, then you shouldn't get it. No. What the Fourth Circuit said was specific facts, the particular claim, routine.

So here we are. Their objection. Failed to distinguish the claims from the thousands of others. Mr. Ruckdeschel touched on this. You can't file in bad faith and then say, "Well, it's bad faith for everybody. So if you lift the stay for these two people 'cause we filed in bad faith, that wouldn't be fair to everybody else because we filed in bad faith for them, too," which is essentially what they're saying.

For cause, this 362(d)(1). 362(g)(2), the burden of proof is on the party opposing relief from stay on everything except for the debtor's equity, the issue of the debtor's equity in property. So it's not my burden to somehow -- first of all, unique facts and circumstances isn't a factor. It's not a burden. It's not my burden, anyway. They've got to show that -- it's their burden to convince you not to lift the stay and then we presented specific facts. You, you remember Mr. Semian. Very specific cases, all derived under state law, living victims with mesothelioma, firm trial dates. They opposed every single -- not all of these are in this case, obviously -- they deposed, they opposed every single one of

them.

So specific just to these two cases before you. Mr. Her, Mr. Herlihy has mesothelioma. He has a trial date in early 2025 in California. He's living. California expedites cases. He's got exposure to -- and -- and they don't -- they don't dispute any of this. I'm not saying they've waived anything. I'm just saying that they don't deal with the facts of these cases. They don't address it, right? So he's exposed, working at a shop where they're cleaning blades that were used at the CertainTeed plant in California where they're cutting all this pipe all day. He's exposed to that for a long time. So he's got a case in California. They don't dispute that he's got meso. They don't dispute that he was exposed. They don't dispute that he's got a lawsuit. They don't dispute that he's got a trial date.

Ms. Bergrud, her husband had mesothelioma. He filed a Johns Manville claim years ago. He was exposed to Johns Manville. He's resolved with everybody else other than DBMP. And so now he's got to file a second case, which he will. Whether it's now or later, he's going to file, the estate is going to file a second case.

And so then, largely what the objections are, if we don't get what we want, we are taking our ball and going home. Potentially, thousands. It's "sabotaging the Debtor's prospects" -- this is at 2 -- "for reorganization." This

chapter 11, which they completely fabricated themselves, is the only proceeding in which the debtor can achieve a global and equitable resolution of its current and future asbestos-related claims, critical to achieving the debtor's objective as if -- so, so the debtor has a bad faith objective, but it's critical for them to achieve their bad faith objective of a global resolution that they continue to be protected by the stay.

At 20 [sic], "Lifting the stay ... would be wholly inconsistent with the ultimate goal of estimation." I mean, they have this fixation on estimation 'cause it takes forever and, ultimately, an advisory opinion. It's not binding on any claimant, but they --

THE COURT: Congressionally approved advisory opinion.

MR. THOMPSON: What, what's that?

THE COURT: It's a congressionally approved --

MR. THOMPSON: I understand.

THE COURT: -- advisory opinion.

MR. THOMPSON: Yeah, I understand.

But what I'm saying is is that they are saying that -- they, they think that it's determined, right? Your Honor was involved in Garlock. There was an opinion. The claimants didn't settle off of that opinion, but Garlock wasn't a two-step bad faith bankruptcy. And so they go on and on about "we have this," you know, "We, we're not seeking to avoid state tort, state law tort liabilities" -- that's exactly what

they're doing. Of course, that's what they're doing. That's why they filed this case to begin with -- "through chapter 11 and the estimation proceeding, but, rather, to quantify the aggregate liability in order to negotiate and confirm a consensual plan."

"The Movants' conclusory assertions are simply wrong." They're not simply wrong. They don't want to deal with the state law remedies. So frustrating a bad faith bankruptcy, frustrating bad faith objectives, frustrating bad faith purposes is good. We should be frustrating those. They're acting in bad faith.

"Similar motions are certain to follow ... would not be resolved globally in a single forum." It's not akin to a dismissal. The case can continue. There's been two of these. They can propose a plan while the Bergruds and the Herlihys are liquidating their claims. And if their plan is one that can meet good faith, that's a, you know, this Court found in the PI ruling and the Fourth Circuit said in Bestwall good faith can be decided at, at confirmation. But we're going to make the Bergruds and Mr. Herlihy wait until then to decide bad faith? We urge your Honor to rule now.

Then they say the purpose of estimation is for "negotiating, formulating, and confirming a chapter 11 plan, not for establishing a non-consensual cap on the Debtor's asbestos liabilities as Movants claim." That's exactly what

they're doing, though. When they were looking -- and this is from your findings. The Garlock -- so they say, "Oh, we're not trying to limit people's state law liabilities. We're here to get a global resolution." Well, that's not what this Court found in the PI. This Court found that Old CertainTeed, New CertainTeed, and DBMP looked at the Garlock and Bestwall asbestos bankruptcies, "were among the topics of discussion. They were" -- "There were discussions about how CertainTeed could end up paying less under a 524(g) plan than it would if it continued paying asbestos claims as they arose in the tort system." That's literally what they're doing. They didn't want to pay state law liabilities. That's why they came here. They wanted to subject their victims to this 524(g) plan and bad faith. That's all they're trying to do, is avoid their state law liabilities.

As, as your Honor correctly noted at Paragraph 232, "Almost all claims against a bankruptcy debtor arise under state law. Nevertheless, they are typically liquidated and treated in the bankruptcy courts." And then you note in a footnote at 37 [sic], "Asbestos tort claims, of course, cannot be determined in bankruptcy court. This is the function of the 524(g) asbestos trust." And, and that's right. Because normally, you have a debtor that doesn't have enough money to pay everybody, right?

And then 28:157(b) says that we can get a jury trial

to liquidate. 11, 1129(a) says we can't do worse in an 11 than we would do in a 7. We have to know what we would get in a 7 before a jury.

So then they object and say we, you know, they cite A. H. Robins, "should precede any, any trials of the claims." So you can't let these two cases go because we need to have a, a, a global estimation. And I like that they bring up A. H. Robins and I like that they bring up Manville 'cause those aren't at all like this situation, right? The Dalkon shield claims caused a critical depletion of the company's operating funds. They had no choice but to file for relief. This is from the Fourth Circuit opinion. "The limited fund available under Robins' insurance policy is recognized. It seems incontestable. If the suits are permitted ... any effort at reorganization of the debtor will be frustrated." They had a limited fund. They can't pay everybody in full.

That was the problem in A. H. Robins. "The estimations of the potential and pending claims from the bankruptcy courts should precede any trials of the claims ... to ascertain whether a fair reorganization ... can be achieved." Otherwise, "The resources of the debtor are dissipated," right? And there, it makes perfect sense. Why would you want 25,000 claims to go forward in the tort system if the cost of defending those claims is going to deplete a limited pot of money so that no one gets anything?

Then they were referring, the Fourth Circuit in Robins, referring to Manville where Manville said it "will not deplete the estate and leave the other creditors with empty judgments."

DBMP can pay everyone in full. You found that. They say that. It's no prejudice to them. Because they can pay everyone in full, filed in bad faith. Because they filed in bad faith, we're entitled to relief.

"Even without payment, allowing the" -- this is from their opposition at 17:

> "Even without payment, allowing Movants' claims to proceed to liquidation would still harm the estate. The financial burden of defending ... the Movants' claims in the tort system, in addition to the cost of these ... related to the follow-on lift stay requests, would be immense."

And so if you take their, their expert's opinion on this, which I don't, but what their expert says, is 1.2 million per case. So let's assume that their expert's right. Let's assume it costs 2.4 million to defend both of these two cases to verdict. That is less than one-half of 1 percent of what they've saved by filing this bad faith bankruptcy to begin with.

And the second problem with saying this is if they're saying that the financial burden is a problem, are they saying

they can't pay everyone in full? Because that's a problem, right? If they pay, if they can pay everybody in full, then they can defend every case in full. They can't say that it's going to be burdensome to defend these cases and then stay hidden behind the stay. If they can't pay -- if they can pay everybody in full, that means they can pay everybody in full.

Here's a cite to Manville from the Southern District saying, you know, there's, you don't want to deplete the funds. And then, here again, here's their opposition, Footnote 20, "'Old CertainTeed is no,'" citing your Honor's findings, "'Old CertainTeed is no more, and, at present, the Debtor is exclusively responsible for the DBMP Asbestos Claims.'" And then the debtor saying here in their opposition to this motion a week ago:

> "The Debtor retains the same ability to fund the costs of defending and resolving present and future ... claims as the former CertainTeed LLC did prior to the pre-petition restructuring and through the Second Amended Funding Agreement."

And you know, I think I, I quoted the older funding agreement in error. I think there's been a second amended one, but I don't think it's material for the purposes of this motion.

They can pay everybody in full. "In full" means in full. It's not a burden to defend themselves in the tort

system. They can pay everybody in full. They're not Manville. They not A. H. Robins.

And then they cite the legislative history of 524(g), which I love because the legislative history of 524(g) proves that this case is not a 524(g) case. It talks about Manville, talks about 50,000 to 100,000 more could be expected, total liability of two billion. Lingering uncertainty. The reason why they passed 524(g) was because Manville did their plan. They got their injunction, then there was concern in the stock market. Well, is Manville still protected? So Congress passed to strengthen the injunction, it would avoid depressing the value of, of the stock, and it would undermine the fresh start objectives of bankruptcy and goals of the trust agreement.

So again, Manville, overwhelmed by liabilities, fresh start. None of this applies to DBMP. It was completely fabricated to file for bankruptcy.

The interests of future claimants are ill served if Johns Manville and other asbestos companies are forced into liquidation and lose their ability to generate stock value. So they got to do, they got to do a channeling injunction so future victims get something when they would otherwise get zero. Mr. Bergrud got something from Johns Manville. He was exposed to CertainTeed asbestos cement pipe. He was exposed to Manville asbestos cement pipe. He filed a Manville claim and he didn't get very much. He probably got, like, $17,000 from

Johns Manville, but that's better than zero, which is what he would have gotten but for 524(g) and the channeling injunction. And CertainTeed/DBMP's able to point to that in the tort system and say, "Hey, Manville exposed him, too. You can reduce our liability." That's what 524(g) is for. It's for Manville. It's not for multibillionaires.

The asbestos trust -- and here's where it talks about facing similar, similarly overwhelming liability. No evidence in this case. In fact, the exact opposite. They were never overwhelmed by asbestos liabilities.

Then in Footnote 11, they talk about how the "trust procedures obviate the need to litigate all the tens of thousands of claims.... [A]ccept payments from the trust in lieu of litigating ... alternative dispute resolution mechanisms.... It is extremely rare for litigation to be initiated against an asbestos trust." Yes, it is rare. Because the asbestos trusts don't have any money. It's a limited fund. There's no reason to go and liquidate a claim, a verdict of a million dollars if the trust can't pay a million dollars. That's why it's never done. That has no application here. This is a full pay, you know, allegedly, a full-pay case. They can pay everybody in full.

So saying that there's these, it's rarely instituted against a trust has no bearing here. And they're talking about alternative dispute resolutions. I mean, it's basically a

checkbox of how to violate Ortiz, is what that footnote is, right? Ortiz already dealt with this. You're all familiar with Ortiz. You cited it in your Aldrich opinion. I agree with your Honor. That's a problem in this case. It's a problem in all these cases. You can't bind absent class members, especially in the absence of a limited fund. An again, Footnote 23 in Ortiz. It's not an answer to have a limited back-end optout, which is what DBMP wants. The optout in this case requires alternative dispute mechanisms, limit damages. You can't do that, Judge. And then, of course, they say, "Well, Ortiz is a Rule 23 case. It's not a bankruptcy case." Fibreboard had a lot less money than DBMP. Had a lot more claims and a lot less money and a lot more good faith. 'Cause DBMP has no good faith. And the Supreme Court still tossed Fibreboard's plan and it wasn't like the Supreme Court didn't know that 524(g) was on the books. They noted its existence in a footnote. And Fibreboard, having failed to do it in the tort system, eventually did file for chapter 11, a real chapter 11. They didn't do a twostep. They filed for chapter 11. They subjected their assets to the, in good faith, to the jurisdiction of the bankruptcy court, then they set up a trust.

Nearing the end here, your Honor.

Bad faith, if relevant, should be considered as part of the Court's balancing under Robbins. We don't think you

need to get there, but okay. If you want to consider bad faith as part of Robbins, obviously all these claims are state law claims.

No. 2, judicial economy. What I don't hear a lot of -- and I haven't really raised this until now -- is just how these, these cases have impaired judicial economy. Because we have a lot of clients in all of these cases, Bestwall, Aldrich, DBMP, in which those defendants are the last unresolved entity in their case. And so now the Bergruds are going to have to go and file a second case. So now the Washington state court system is going to be burdened with two cases for the Bergruds, one that they did in 2019 and in that proceeding the Bergruds resolved with people that didn't do twosteps and they resolved with trusts that did good faith bankruptcies. But here, we got DBMP and now they got to file a second case. And we got a lot of clients and a lot of cases and we're going to file all of them. That's judicial economy. They are putting burdens back on the state court system while they try to overcome the tort system in bankruptcy court.

This is very straightforward. Three, we're only seeking enforcement. We're not seeking to get -- we're not -- we're not seeking enforcement and we agree that we can only come back and get enforced here.

Paragraph 30. "Movants will have the opportunity to assess and object to any proposed plan at the appropriate

time." And so that may be at confirmation. I think that's -- I think we're -- if, if that -- if the belief is that good faith is an issue for confirmation for everybody else, that's fine. We're raising it now, as Mr. Ruckdeschel said. You know, I follow these cases very closely. You have been consistent from the very beginning in this case. In 2020, you expressed concerns about this case. You expressed concerns about Aldrich. You wrote detailed opinions, which I am grateful for. These cases are clearly very important to my clients. They're important to us and I'm grateful for this Court's attention to them. These are important issues and there's no court better than this one in this case to make this decision, which is to find that DBMP filed in subjective bad faith and to give relief to these two people.

Thank you, Judge.

THE COURT: Okay. Thank you.

Anyone on the -- we've heard from the movants. Is there anyone else that -- I think there was a joinder by the ACC.

MS. FIX: That's correct, your Honor.

THE COURT: Okay.

MS. FIX: Again, Katherine Fix from Robinson & Cole on behalf of the Committee.

I rise briefly to convey the Committee's support for this lift stay motion, largely based on what we set forth in

our Statement in Support of the Bergrud and Herlihy motions for relief.

We don't see harm in lifting the automatic stay here for several reasons. First, we don't believe it interferes with the debtor's ability to reorganize here. Second, we don't see financial harm to the estate. As noted in our Statement and as set forth before you today in court by Mr. Thompson and Mr. Ruckdeschel, the debtor benefits from cost savings in this bankruptcy. Additionally, there's a funding agreement in place on which your Honor is very well-versed at this point which provides that DBMP has the same ability to satisfy its claims that Old CT had prior to the restructuring. And additionally, the debtor contends that it would be able to fully fund a 524(g) trust via this agreement. If the debtor can pay it in full, it does not prejudice the other claimants in this case.

There's also secondment agreements which can be used to call employees when necessary. And additionally, there's a list of ordinary-course counsel and professionals in this case. They've litigated these types of claims on behalf of Old CT and on the debtor's behalf in the tort system prior to the bankruptcy and they could be called upon to do so now.

Additionally, the Herlihy and the Bergrud claimants, they request a lift stay and state that they merely want to know the state court valuation of their case. We understand that they believe that they will not -- I'm sorry. They

understand that they will not pay, get paid until this Court allows that payment. So again, it's not harming the other claimants in this case at the moment.

And then third, the Committee is, they walk a hard road in this case sometimes. We understand that our claimants have a need for compensation and that there's a delay for it. But on the other hand, we realize that we have to create and present an estimation record because of the Court's estimation order in this case. Nonetheless, we do not believe that this lift stay runs against the objectives of estimation. We're trying to put a value on these torts and it's easier to evaluate and advise on this when you have valuations. We believe that a present-day value, which could be obtained here, could be instructive for the process on both sides.

And based on those reasons, your Honor, we support the request to lift the automatic stay. And unless you have any questions.

THE COURT: All right. Thank you.

Why don't we take a ten-minute recess and then we'll get the debtor's responses and the Affiliates', okay?

(Recess from 10:34 a.m., until 10:49 a.m.)

AFTER RECESS

THE COURT: All right.

(Call to Order of the Court)

THE COURT: Have a seat, all.

Okay. Ready to hear from the debtor.

Okay. Mr. Gordon.

MR. GORDON: Good morning again, your Honor. Greg Gordon on behalf of the debtor.

So I think from our perspective, your Honor, what we have here, fundamentally, are motions to dismiss that are cloaked in the garb of a motion, motions to lift, to lift the stay. And their principal focus, as you heard from both counsel this morning again, is on alleged bad faith of the corporate restructuring and the subsequent filing. And they haven't made, you know, notably, I mean, they've made no effort. The movants have made no effort at all to differentiate their claims from the claims of the many thousands of other individuals with claims pending against this estate. And you know, Mr. Ruckdeschel took great issue with the fact that we're saying they're seeking an effective dismissal of this case, but that's what they are doing and they're doing it because, again, they're not saying there's anything at all unique about their claims and pretty much, their attitude is sort of a so what? I mean, so what if a whole bunch of other claimants file similar motions. "You, DBMP, get what you deserve because you never should have done this in the first place." And that, that, your Honor, is all against the backdrop of a case where no motion to dismiss has ever been filed. It's the one case where that, that hasn't

happened. And you know, I think, fundamentally, what this is is an effort to sidestep the Carolin standard through arguments that the standard with respect to bad faith or cause under motions for relief from stay should be different and it shouldn't be as onerous as Carolin and we should get at dismissal effectively that way, through motions for relief from stay.

And I would say, your Honor, as well, just by way of introduction, that these arguments that you've heard today have been made before and they've been made in this court before and they've made, been made before in the other cases as well and they've all been considered before and they've been rejected before. And they've been rejected by your Honor. They've been rejected by Judge Beyer. There's been a lot of effort, I think, this morning to differentiate these motions from the motion that the Committee and the Future Claimants' Representative filed earlier in this case asking your Honor to lift the stay as to all claimants, but I went back over the last few days and I read again your Honor's opinion on their preliminary injunction, which also disposed of the motion for relief from stay, and I would just say, fundamentally, your Honor, that all the reasons, I think, that your Honor gave for denying that motion apply to these motions as well.

And it was note, noteworthy for me that at that time your Honor noted the fact that no motion to dismiss had been

filed, that it appeared to you that through that motion for relief the Claimant Representatives were seeking to dismiss the case without filing a motion to dismiss. And you went on to say that it was, that dismissal could not be sought through indirect means, such as by a motion for relief from stay.

The counsel that are appearing today on behalf of these claimants you've seen in other cases. We've seen in other cases. They filed motions to dismiss in the other cases. They filed motions for relief from stay in the other cases. As your Honor knows, there have been four motions to dismiss in total filed in Bestwall. Two, I believe, were filed in Aldrich/Murray. I think we've had two motions for relief from stay litigated by the same counsel in Bestwall. We had one in Aldrich/Murray by the same counsel. And all of those motions, many of which were premised on the same or similar arguments being advanced here, have been denied.

These arguments have been made as well in appeal proceedings that have occurred. The Committee and the FCR made similar arguments regarding the impropriety of this bankruptcy filing and the alleged abuse of the Bankruptcy Code in opposing the preliminary injunction in Bestwall. And as your Honor knows, the Fourth Circuit ultimately affirmed that preliminary injunction and it stated, "The time and place to raise concerns about the chapter 11 case is at plan confirmation" and not through "challenges that really go to the merits of the

reorganization."

And the other thing I thought, your Honor, that was interesting this morning is you heard a lot from Mr. Ruckdeschel and Mr. Thompson about the corporate restructuring and the alleged bad faith of the restructuring and the various findings that you made, but they completely ignore the fact that your Honor suggested that the way to address those issues was through adversary proceedings alleging fraudulent transfer causes of action or other causes of action and they ignore the fact that, in fact, that has occurred. I mean, we have three adversary proceedings that are pending attacking the restructuring, attacking the funding agreement, the filing of the bankruptcy, and the way it was done. Those are all in process and it's as if, to hear the arguments today, that none of that's occurred, that none of that's being addressed, and that your Honor never had anything to say about, in your view, the proper way to address issues presented by the pre-petition corporate restructuring and the related transactions.

And I would submit, your Honor, that nothing has changed in this case or in the other cases that would warrant this time ruling differently on the same issues. I submit that nothing has changed with respect to your Honor's rationale for granting the preliminary injunction and denying the Claimant Representatives' motion for relief from stay. And I would

submit that the movants have offered absolutely nothing to suggest that the circumstances that they're in are any different or that these claimants are situated any differently from the approximately 60,000 other claimants whose claims are pending in the, against this estate.

I think I heard Mr. Ruckdeschel say today it's a different time, different claimants, different circumstances, or something like that, but no evidence, no, not even an argument as to why these claims can be differentiated from any of the other claims.

And I think at the end of the day, as your Honor found in connection with your ruling on the preliminary injunction and the motion to lift stay, permitting these movants to litigate their claims in the tort system would irreparably harm the debtor and this estate because it would defeat the fundamental purpose of this case, which is to resolve all these claims in this court through a process that treats all those claims fairly and equitably. And as your Honor concluded -- and I noticed this was on the slide, but it wasn't emphasized -- granting their request "would create bedlam, produce inconsistent results for creditors, and effectively end the bankruptcy case."

So your Honor, let, let me just go through these points quickly, if I can. Again, the movants, in, in terms of fact, unique facts or circumstances, movants have not offered

anything in that respect. They attempt to support their request by relying on the language in the Fourth Circuit's opinion where the court acknowledged that claimants have a right to bring individual motions for relief from stay where, where relief would be appropriate. And as your Honor knows, that issue was addressed by Judge Beyer, finding that there has to be something specific or unique for this Court to find that there's cause to grant their motion for relief from stay. Again, nothing specific or unique has been offered here.

And your Honor reached similar conclusions with respect to the motion for lift stay filed in the Aldrich and Murray case. There, you said if you were "to grant relief from stay to one creditor to liquidate the claim, all of the claimants will, not all, but a substantial number of the claimants, enough to wreck the bankruptcy case, will seek like measure and that effectively precipitates a *de facto* dismissal of the case." Judge Beyer reached a similar conclusion regarding the impact of a ruling in favor of claimants whose claims are no different from the rest. And in our papers we cited other courts who reached similar, similar conclusions in mass tort cases that, in their view, supported denying motions for relief from stay because of the so-called floodgates effect.

Your Honor, we briefed, I think, pretty extensively in our papers the Robbins factors. We would just submit that

those are the factors that apply. The movants spend very little time on these and I think it's because they recognize that they can't prevail on the Robbins factors.

But on the first factor, whether the claims involve only state law issues and the expertise of the court is unnecessary, we're in a Section 524(g) proceeding. Estimation is one of the core proceedings that occurs in a case like this. It addresses the aggregate liability of a company for asbestos claims and your Honor has approved an estimation proceeding and is presiding over it. Your expertise is necessary.

The second is whether the stay would promote judicial economy and whether there'd be a greater interference with the case if the stay were not lifted because matters would have to be litigated in bankruptcy court. They say this will promote -- what they're asking for will promote judicial economy because liquidation of their claims will assist in assessing any proposed plan. But they're just not right about that. Permitting the, the movants to litigate their claims in state court won't change the estimation task before this Court. This Court would still have to estimate on an aggregate basis the liability for the thousands of the claims, thousands of claims pending against the estate. And again, recall that there are approximately 60,000 claims pending and there are about 32,700 pending on active dockets.

And the other thing I would note, your Honor, because

I saw this in your findings yesterday, as you noted half or more of those pending claims have been pending in the state court for over ten years. And you know, the whole purpose of this bankruptcy is to reach a resolution that would pay claimants on an equivalent basis in a manner that's much more efficient and prompt than what they could experience in the tort system.

And I, and I think, again, as you found before, as Judge Beyer has found before, there's just no doubt that if this relief is granted for claimants who are coming in basically telling you "our claims are the same as everyone else, else's, but you should grant the relief, anyway" will lead to a spate of similar requests. They even basically acknowledge this in their pleadings.

So this would not promote judicial economy because we're still going to have the estimation process, but at the same time we'd be required to litigate the same claims outside of the process which, at a minimum, would lead to disparate recoveries on similar claims. So we submit the most judicially efficient way to address the claims is the process that's already in effect and it's been approved by the Court and that is the estimation process.

And then the last factor is whether the estate can be protected properly by a requirement that creditors seek enforcement of any judgment through the bankruptcy court. And

you know, movants obviously have said that "we won't seek payment until later in the case." But nonetheless, there would still be a cost to litigating these claims. And they can say the cost is, you know, small, $1.2 million per claim, but that's a significant cost and we don't know how many claims we'd have to litigate.

And I, I thought what Judge Wilkinson said in the recent argument in the Fourth Circuit was on point where he said:

"We are not advancing the ball in terms of the ultimate object of the whole bankruptcy proceeding, which is to allow the bankruptcy judge to make a reliable estimate of what exactly Bestwall's asbestos-related liabilities are to fund the trust."

The movants' proposal, which would effectively completely contradict what we're trying to do here, would not protect Bestwall.

Now I want to address, your Honor, this, a point that's been made by both the Committee and the claimants about the so-called savings that the company has experienced that either DBMP or New CertainTeed has experienced during this bankruptcy case. There's been no savings. First of all, they ignore the fact that DBMP has been funding the costs of this case and to date, the amount of fees and expenses that have been paid by DBMP approximate $125 million and they're, they're

just ignoring that.

And then they're ignoring, when they talk about our tort history of claims being paid on an annual basis anywhere between 80 and 160 million, they're ignoring that there's two components to that. One is indemnity, one is defense costs. Defenses costs typically ran about 20 to $30 million per year. It's about what the bankruptcy fees have been running. So there's no savings there. And then the indemnity. There's been no indemnity savings that I'm aware of because the claims are still all pending. The purpose of this proceeding is to value those claims and to pay them. There, there has been no savings.

And your Honor in your PI opinion recognized that no claim has been eliminated. No claim has been compromised. The claims are all pending against the estate. They've all been brought into this case and they need to be valued and paid in this case.

So those arguments about a savings are just, they're simply incorrect.

I want to address the subjective bad faith point. So fundamentally, what I'm hearing is that the claimants don't like the way your Honor and Judge Beyer have decided the motions for relief from stay and the motions to dismiss filed to date. They don't like the fact that in the motions to dismiss where there's a two-prong standard that applies, that

only the objective futility standard was applied and not subjective bad faith. That's what this is about. That, that's what they're asking you to do and in order to get there, they're asking you to come up with a new standard for lift stay relief that is not consistent with Carolin or Robbins. They're asking you to decide that in a lift stay context "I don't have to do, I don't have to apply the two prongs of Carolin. I only have to apply the first prong."

And that first prong in and of itself is dispositive. The Robbins factors have no application. They have no authority for that proposition other than cases from other jurisdictions and those cases on their face are all distinguishable either because they're not even lift stay cases or they involve two-party disputes. And you can see in those cases why a court would have decided to lift the stay if it determined the filing was in bad faith. For example, single asset real estate debtor files for bankruptcy to avoid foreclosure. Motion to lift stay and a motion to dismiss are filed. Court decides, "Well, I don't actually have to dismiss the case because the foreclosure, lifting the stay to allow the foreclosure to occur will basically resolve the issue being raised by this movant." And in those cases the court said, "I'm going to lift the stay and allow that to happen."

The other cases they've cited are two-party disputes where one party's trying to frustrate litigation by another

party, for example, by filing for bankruptcy, and the court just says, "I'm going to lift the stay to allow that litigation to proceed."

So I would submit, your Honor, in the face of Carolin and Robbins -- and your Honor's more familiar with those cases than I am -- that what they're asking you to do is not supported by those cases. And it's their -- this is their effort, yet another effort to get around Carolin to have you come up with a different standard in this context even though, effectively -- and I stand by this -- what they're really doing is asking you to, effectively, dismiss this case because these claims are no different from any others.

THE COURT: Okay.

MR. GORDON: I'm trying to move ahead here, your Honor, because --

THE COURT: Take a moment.

MR. GORDON: -- I, I know you've heard a lot, lot of this before.

(Pause)

MR. GORDON: The other thing, your Honor, I think, this, this is also another effort, in my view, to relitigate or attack estimation in this case. I mean, these, these movants are saying that they have an absolute right to liquidate their claims in front of a jury and they say over and over again the estimation's irrelevant. You heard it again today. It's an

advisory opinion. It's meaningless. But as your Honor knows, it is provided by the Code. It is well-established in mass tort cases. And you've entered an estimation order because you found it was appropriate and we're in the midst of that proceeding. We've been moving forward in that proceeding. You've been hearing reports from time to time about where we are in the process and what discovery issues have come up and the like and we're working through all of that. And I would submit that, you know, efforts by the movants to basically reargue that, to reargue that estimation is a waste of time, and that, and to effectively ask you to allow them to opt out of that process are not appropriate.

Then, your Honor, I, I should say a few words about Ortiz since Mr. Thompson spent a fair amount of time on Ortiz. And obviously, I'm well aware of the fact that your Honor commented on Ortiz in your opinion in, in Aldrich. But I, I, I think it's a, going way too far to suggest that, as the, as the movants do here, that Ortiz prohibits on a constitutional basis the ability of DBMP or Aldrich/Murray or Bestwall to confirm a plan that permanently resolves claims for, for a set liability with no optouts. And I say that because Ortiz was a class action case.

THE COURT: Sure.

MR. GORDON: They gloss over it. They make it sound like it's a bankruptcy case. It's a class action case. The

issue was interpreting a provision of Rule 23. The Supreme Court, I thought, was clear that its understanding of Rule 23 was that there had to be a limited fund. And the issue they were addressing was did the company satisfy that requirement by agreeing to a limited settlement fund. And to me, at least, not surprisingly, the court said no. Because then the limited fund wouldn't mean anything. If you can just basically by agreement fix an amount, then those, those words or that interpretation has no meaning.

Now there was mention of constitutional issues, due process, jury trial, but as I read the case -- and your -- again, your Honor's probably spent more time looking at it than I have -- that was under the guise of sort of a constitutional avoidance, you know. "We know that, that there could be concerns raised, but they're avoided by this ruling. We're not having to address those." And the court didn't make any determination about the constitutionality of having a, a bankruptcy case that involved a full and final settlement of claims, whether that was appropriate, whether the entity was solvent or insolvent.

And, and the last thing I'll say on Ortiz is we're here to use 520, Section 524(g) of the Bankruptcy Code. It doesn't say anything about insolvency. It doesn't say anything about financial distress. It says nothing about a limited fund. It says nothing about optouts.

So the argument that would have to be made, I suppose, is that 524(g) itself is unconstitutional because it doesn't reflect constitutional principles that, that movants are asserting were somehow proclaimed in the Ortiz case when I would submit that they wouldn't.

So I don't think, although it's, frankly, pretty irrelevant, I think, to the issues before your Honor here, I don't see Ortiz as being a case that would basically prohibit what 524(g) expressly permits companies to do and what has been done.

Let me just address a couple of things that were said in the remarks, your Honor, by Mr. Ruckdeschel and Mr. Thompson.

One thing, your Honor, Mr. Thompson had some comments that he made about the funding agreement in this case and we address these, I think, in a footnote in our brief, but I did want to remind your Honor that you may recall that we actually amended the funding agreement in this case and we did so to address directly some of the concerns that had been raised. One was enforceability, which Mr. Thompson referred to today. And you may remember we made it clear in the funding agreement that if the debtor failed to enforce, the Committee was authorized to step in and enforce the agreement.

We also have a provision that prohibits New CertainTeed from making dividends. That was another concern

that was raised.

THE COURT: Right.

MR. GORDON: And your Honor recalls that, you know, this funding agreement doesn't have any requirements that New CertainTeed has to approve or agree to a 524(g) plan as a condition to funding, something that they argued in their brief, which is just simply incorrect.

Another thing I wanted to just comment on was Mr. Thompson made a big deal about the fact that Compagnie de Saint-Gobain, the ultimate parent company here, has, has issued dividends to its shareholders during the course of the case. That's completely irrelevant. Compagnie de Saint-Gobain has no liability here. They're the ultimate parent. It could be like General Motors or someone is making dividends to a parent. It's, it's irrelevant. As I've said, there are no dividends that have been made from, by New CertainTeed to anyone and that's not even permitted anymore under the funding agreement.

The other thing that Mr. Thompson said that struck me was he said that Garlock was not a two-step bad faith bankruptcy filing. But what he's forgotten is that, is Coltec. And you'll remember that Coltec engaged in a pre-petition corporate restructuring very similar to what was done in these cases, in DBMP, Aldrich/Murray, and Bestwall. It just didn't use the Texas divisional merger process. And that was, that was signed off on by the plaintiffs' bar and that plan, Garlock

plan, which included the resolution of the Coltec liability, was accepted by a vote and approved by the Court.

And of course, they also overlook the Owens-Illinois case, or Paddock is the actual filing debtor, where, again, a pre-petition restructuring was undertaken that was very, very similar to what was done in these cases, but without the Texas divisional merger. Now they'll argue that that makes them different, but the reality of the transactions was the same.

I think with respect to the Committee, Ms. Fix said that there would be no harm to the debtor because there would be no interference with the bankruptcy case and she said that because she said there'd be no financial harm. But to me, it completely ignores the fact that you're upending the purpose of the case, which is to have these, all these claims resolved here in this court and then handled through a trust approved under a confirmed plan.

She talked about the funding agreement, how there's no harm because claims can be paid in full, but she doesn't address the potential disparate treatment that we have in this case, or the potential for disparate treatment we would have if claims are allowed to go forward. Some claims go forward, some claims don't.

So your Honor, I think I, I would just end by pointing out, again, no motion to dismiss has been filed. No motion to dismiss is pending. We have three adversary proceedings that

have been filed that are addressing the complaints the plaintiffs seem to have about how the corporate restructuring was effected and how this bankruptcy case started.

And we have an estimation process and that process is going forward. And all of those things, or the, well, the adversary and the estimation, to me, belie the argument that no progress is being made in these cases. And obviously, there's been many other things that have been addressed in this case as well during the course of it.

So in the end, your Honor, these movants, in our view, are asking your Honor to reconsider your prior rulings in this case and also your rulings in the motions to dismiss and motions to lift stay in the Aldrich/Murray case and we would submit there's no reason for your Honor to do that and we would respectfully ask that your Honor deny their motions.

THE COURT: Okay.

Anything from the Affiliates? Mr. Steel?

MR. STEEL: Good morning, your Honor. Howard Steel of Goodwin Procter for New CertainTeed.

I think your Honor said at the last hearing it's a, a bit like déjà vu all over again and now all over again. So I, I'll be quick here.

We filed a joinder to the debtor's objection to the motion and we oppose the motion for, on the grounds and reasons and bases and argument on the record by Mr. Gordon.

That's all I got to say, Judge.

THE COURT: Thank you.

MR. STEEL: Thank you.

THE COURT: That got it?

(No response)

THE COURT: Mr. Ruckdeschel.

MR. RUCKDESCHEL: Morning, your Honor. I'm going to try and be very brief.

With respect to Robbins, there was, again, a suggestion that we've sort of given up on Robbins. But we stand on the papers, you know. We, we've argued it. It's there. It's wishful thinking to say we've given up on Robbins.

But Robbins is not necessary when there's bad faith and there's nothing in Robbins that legally or explicitly or implicitly says that it does. And the application of Robbins subsequently in the, the single-factor application of Robbins in Claughton v. Mixson where the ability to pay all creditors was sufficient to meet Robbins pre, precludes the argument that you have to under Robbins do any particular analysis. That's, in fact, the opposite of what Robbins says.

This is not a 524(g) proceeding, your Honor. This is a chapter 11 filing that, that the debtor is seeking 524(g) relief. This is not a 524(g) proceeding. There is no such thing. And fundamentally, the Court has to determine is a financially, non-distressed -- and we just heard about the

amendments to the funding agreement make it clear, right --

THE COURT: Uh-huh (indicating an affirmative response).

MR. RUCKDESCHEL: -- the, the funding agreement is robust. They insist it's robust. They've got the same ability as Old CertainTeed. Is a company that's financially robust not facing overwhelming liabilities as Manville entitled to 524(g) relief or is that simply a tool to which they are not entitled?

And, and I wanted to just remind the Court in Kane v. Johns Manville, the Second Circuit summarized Manville's situation: "The Bankruptcy Court found that 'Johns-Manville was and remains a financially besieged enterprise in desperate need of reorganization of its crushing real debt, both present and future.'" That's not Old CertainTeed and it's not the debtor. And, and they're just not entitled to it and the legislative history of 524(g) specifically says that Congress is enacting it for companies that are facing a similarly overwhelming liability as Manville, not the debtor, right?

This is not a 524(g) proceeding. 524(g) is a tool, not a purpose. No matter how much they want it, it is not a justification to be in front of this Court if they are not otherwise entitled to bankruptcy relief and they are not.

Disparate recoveries for disparate people. That's mandated by the Seventh Amendment, by AmChem, and Ortiz, which have to be read together, by 28 U.S.C. 157, absent a limited

fund, right? Our -- nothing in 524(g) overturns 157 which prohibits the bankruptcy court from liquidating or estimating an individual's personal injury claim. Whether that happens now, whether it happens preconfirmation, post estimation, whether it happens post approval of a plan, Mrs. Bergrud will have that right. Every plan that's been enacted in order to not violate the Seventh Amendment has the right for her to go and liquidate it.

With respect to judicial economy, there's going to be a trial. It's just a question of when. Are we going to make her continue to wait?

Still no explanation as to how liquidating a claim and getting a number and then getting back in line is the equivalent of dismissal. It's not. The case is going to continue. If Mr. Thompson and I can succeed in some other format and some other motion getting your, your Honor to dismiss this case, which, and not approve a plan, great, but that's all going to happen. It's going to happen independently of whether Mrs. Bergrud gets to liquidate her claim or the Herlihys do while Mr. Herlihy is still alive. And that certainly is a distinguishing factor of Mr. Herlihy.

And the fact that Mrs. Bergrud only has CertainTeed remaining in order to finish the claims of the joint tortfeasors that killed her family member is a distinguishing factor, but that's not part of the analysis, right?

This takes you back to our tainted fish stew, right? It -- there -- the argument of the debtor is everybody has to eat the rancid fish stew because that's all the stew that there is. And so nobody gets to sit out. Nobody gets relief because everybody would be entitled to it. Well, if this is a bad faith proceeding -- and that's all we're asking the Judge, your Honor to rule upon -- if this is bad faith, then they should get that relief.

Oh. There was a long discussion of how this is just rehashing prior rulings. No court has ruled on bad faith, not your Honor, not the Fourth Circuit. The Fourth Circuit -- and the Fourth -- the discussion of the Fourth Circuit's decision on the preliminary injunction motion in Bestwall, the Fourth Circuit expressly in the majority opinion says, "We're not faced with a motion to dismiss and we're not addressing that issue. And therefore, assuming that we're properly here, which is the starting point, then the PI is proper." You can't then take that and say, "And therefore, they've approved something that wasn't disputed." That was the whole basis of the opinion. It's simply wrong to say so.

We're not asking for a new standard for lifting the stay. It's right in Carolin.

With respect to the number of claims pending, we hear conflicting, inherently irreconcilable things from the defendant. One, they acknowledge at least half of these cases

are on what are called inactive dockets. They haven't been moving and they're not moving. They're not even eligible to move. But then we hear, well, you know, there's still 30,000 cases that have been pending for, you know, ten years or more and most of them are, that have been pending and, and the vast majority of them have been pending more than ten years. It's their burden to show that those cases are ever going to move. They're not. Not every court has adopted an official inactive docket in the tort system.

So there are lots of places around the country where there are just cases sitting out there and just not moving and not being prosecuted. CertainTeed's tort law, tort, tort-system experience certainly reflects that. They weren't defending 10,000 active cases, right? Otherwise, their cost of defense would have been a heck of a load, heck of a lot more than 20 million a year, right? It's their burden to come forward and say, "Well, there's some realistic possibility that there's going to be a huge number of people doing this," if you're even considering that, which you shouldn't be. Because you're not faced with that. You're faced with two people asking for relief in their individual cases and agreeing to get back in line.

We've talked about 524(g). It's not available to companies that are financially robust and nor is the bankruptcy system itself, right? The Code was not designed to allow

financially robust, non-distressed companies to come in and access its powerful, equitable tools. That's just not what it's there for. It's there to help people that are teetering on the brink of financial, of, of financial collapse, like they said in Furness, right? And, and companies that just want bankruptcy relief are the Patels.

So, so it's bad faith when you've got all the money to come to the bankruptcy court and try and access it. It doesn't mean that that's something that Mr. Gordon has done wrong. We're not arguing that this is a sanctionable exercise or not a good faith argument for an extension of the law. We've never raised that argument, right? What we're saying is it doesn't go there. You can't get there under the, under the Code and, and we're asking the Court to make a ruling on that.

And I understand. You may rule against us, but then at least I can go and I can say, "Here's the analysis of the Court on the legal issue and it's wrong. District Court, it's wrong." Fourth Circuit, if you don't, you know, if you certify it and they take it, but I've got it and I've got it in a motion that I can appeal today, right?

And, and I think that when you objectively look at the facts, as your Honor has and you make the determinations that you have, it's clear this is a bridge too far and here you are ruling on a blank slate.

One offhand thought I, I just wanted to, to talk

about. If you return this to the tort system, it's going to cost a million two. That assumes a whole lot of things, that, that it's going to go to verdict, that they don't win on some sort of motion, that they don't decide to negotiate a settlement, right? They could end up going to verdict and, and winning, then the claimant's gone, right? They could go to verdict and, and end up getting a really low verdict that helps them in estimation and actually tells Mrs. Bergrud she's going to get less than some plan that eventually gets approved.

But, but the, the Chicken Little, you have to assume the worst case scenario is not a basis for denying relief from lift stay in the context of a bad faith filing and this is a bad faith filing as defined by the law. And again, that doesn't mean it's nefarious. It just means it's not consistent with the purpose and intent of the Code and the purpose and intent of the Bankruptcy Clause of the United States Constitution.

Your Honor, can I have --

THE COURT: Just a moment.

MR. RUCKDESCHEL: -- 15 seconds?

(Pause)

MR. RUCKDESCHEL: That's it.

THE COURT: All right.

MR. RUCKDESCHEL: Thank you, Judge.

THE COURT: Thank you.

Since the argument was made the debtor has the burden of proof, Mr. Gordon, did you have anything else? We're fairly informal as to who argues last, but --

MR. GORDON: No, your Honor. I don't, I don't think so. Thank you.

THE COURT: Okay, very good.

Anything else from the Affiliates' side? Okay.

All right. Well, thank you for those thoughts. A whole lot rings similar to what we have heard previously and been arguing about for four years now. There are a couple of nuances there. I think I'd like to organize my thoughts in view of the oral arguments and give you a decision. I think we're going to be back on the 23rd and I'll just start that hearing with the announcement.

For those -- since I'm just going to make a ruling, if any of you wouldn't be here otherwise, feel free to -- we'll try to patch you in by telephone or something.

MR. RUCKDESCHEL: Thank you, your Honor.

THE COURT: So we'll save you some travel.

But that's basically that for now.

As many of you have probably heard by now, the Circuit has announced my successor. June 26th, which is my expiration date, is coming fairly quickly. Having gotten that announcement, we're now starting to try to sort out who's going to take what cases and how this is all going to be done.

There's also the matter of FBI background checks, which may well not be completed before June 26th. I don't have any information to share with you right now as to who's going to handle what going forward, but I'm sure you're interested and I'll let you know as soon as I possibly can.

But we will, we are meeting on those matters and talking to the Circuit as well and trying to figure out how this gets handled. There's entirely a possibility that I may be here a month or two later than my technical retirement date simply because it generally takes about four months to get a background check through. And so we wouldn't be able to get that finished before the 26th of June.

So alternative, we may get a visiting judge. You may get Judge Hodges out of retirement, even though he, he maintains that asbestos work is inconsistent with retirement, but -- y'all work way too hard.

But we'll try to let you know something and if I can, I'll try to tell you what I know two weeks from now, okay?

Anything else?

(No response)

THE COURT: Well, I hope your travels in weren't too bad given the weather yesterday and hope they go out more smoothly than they, they came in.

So we'll recess.

MR. GORDON: Your Honor? I did have a status report

if you want it. It's very short.

THE COURT: Well, sit down. We'll -- let's hear it.

MR. GORDON: So just -- it's only a couple of topics, I think.

So the first is estimation. Wanted your Honor to know the discovery process is continuing to move forward. You know, we've been in the process of collecting materials from our jurisdictional counsel around the country, as I reported before. That's coming very close to completion and we're up around three million documents there. We've got a group of lawyers still reviewing those materials for responsiveness privilege and, even if privileged, whether they should be produced under the agreed 502(d) order your Honor's aware of. And we're working to complete that as soon as we can. We continue to make productions of documents on a rolling basis. We're expecting another significant production in the coming weeks.

As your Honor knows, the estimation CMO deadlines have been suspended by agreement and, you know, the idea was since we have a better idea of what the volume of materials is, that we could sit down with the other side and start to hash out new dates. That process has now begun. There's been a meet, there's been a couple of meet and confers, I think, to date and hopefully, within, and even before you leave the bench, we'll be able to come back with a proposed schedule for the

estimation going forward.

And then of course, we had the recent motions to strike or motions to quash that were decided.

THE COURT: Uh-huh (indicating an affirmative response).

MR. GORDON: We had agreement yesterday on the forms of order. I, I think those have probably been uploaded already today. If not, they will be.

THE COURT: They hadn't hit my desk yet, so.

MR. GORDON: Okay. They will be uploaded shortly.

Okay. On the discovery referee, we had the hearing on the motion to suspend.

THE COURT: He hasn't quit, has he?

MR. GORDON: As far as we know, he's still working.

THE COURT: After I told him he needed to go back and do more reports, I wasn't sure whether that would play out.

MR. GORDON: We haven't heard anything, your Honor.

And again, we have a form of order that was agreed to yesterday with respect to that. And that's either been uploaded already or it will be today.

And then on the adversary proceedings -- and these are the substantive consolidation and fraudulent transfer -- your Honor knows that we had the dispute about --

THE COURT: Uh-huh (indicating an affirmative response).

MR. GORDON: -- possession, custody, or control of documents with respect to the parent company. You authorized Rule 30(b)(6) depositions. Those were taken on April 25. There is a motion to compel that's been filed by the Committee and the FCR. And just to remind the Court, the rest of the schedule is that objections are due by May 17, replies are due by noon on May 21, then the hearing is set for May 23, as your Honor noted.

And then lastly, your Honor, we're continuing to collect documents from the agreed 26 custodians. A plan remains that we'll, once we've collected those, we'll then apply the search terms and see, on a test basis, really, to see whether we get false hits or not. And if, depending on the, the outcome of that, we'll then sit down with the Committee and the FCR to work on search terms.

I, I just wanted your Honor to know that on all those fronts, things are continuing to move as, as they should.

THE COURT: Thank you.

Any comments? Additions? Others?

MS. FIX: No, your Honor.

THE COURT: Okay, very good.

All right. If there's nothing else, we'll recess.

Travel safely.

MR. RUCKDESCHEL: Thank you, your Honor.

(Proceedings concluded at 11:37 a.m.)

<u>CERTIFICATE</u>

I, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

/s/ *Janice Russell* May 14, 2024

Janice Russell, Transcriber Date

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| IN RE: | : | Case No. 20-30080-JCW |
| DBMP LLC, | : | Chapter 11 |
| Debtor, | : | Charlotte, North Carolina<br>Thursday, May 23, 2024<br>9:33 a.m. |

: : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

| | | |
|---|---|---|
| OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS and SANDER L. ESSERMAN, etc., | : | AP 21-03023 (JCW) |
| Plaintiffs, | : | |
| v. | : | |
| DBMP LLC and CERTAINTEED LLC, | : | |
| Defendants, | : | |

: : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

| | | |
|---|---|---|
| OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS and SANDER L. ESSERMAN, etc., | : | AP 22-03000 (JCW) |
| Plaintiffs, | : | |
| v. | : | |
| CERTAINTEED LLC, CERTAINTEED HOLDING CORPORATION, and SAINT-GOBAIN CORPORATION, | : | |
| Defendants, | : | |

: : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS, on behalf of the estate of DBMP LLC, : AP 22-03001 (JCW)

Plaintiff,

v.

COMPAGNIE DE SAINT-GOBAIN S.A., *et al.*,

Defendants.

: : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE J. CRAIG WHITLEY,
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

| | |
|---|---|
| For Debtor/Defendant, DBMP LLC: | Robinson, Bradshaw & Hinson, P.A.<br>BY: DAVID SCHILLI, ESQ.<br>101 N. Tryon Street, Suite 1900<br>Charlotte, NC 28246 |
| Audio Operator: | COURT PERSONNEL |
| Transcript prepared by: | JANICE RUSSELL TRANSCRIPTS<br>1418 Red Fox Circle<br>Severance, CO 80550<br>(757) 422-9089<br>trussell31@tdsmail.com |

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

APPEARANCES (continued):

For Debtor/Defendant, DBMP LLC:

Jones Day
BY: JEFFREY B. ELLMAN, ESQ.
1221 Peachtree Street, N.E., #400
Atlanta, GA 30361

Jones Day
BY: JAMES M. JONES, ESQ.
250 Vesey Street
New York, NY 10281

For Plaintiff, ACC:

Robinson & Cole LLP
BY: RYAN M. MESSINA, ESQ.
1201 N. Market Street, Suite 1406
Wilmington, DE 19801

Robinson & Cole LLP
BY: ANDREW A. DePEAU, ESQ.
280 Trumbull Street
Hartford, CT 06103

Winston & Strawn LLP
BY: CARRIE HARDMAN, ESQ.
200 Park Avenue
New York, NY 10166-4193

Winston & Strawn LLP
BY: KATHERINE PRESTON, ESQ.
800 Capitol Street, Suite 2400
Houston, TX 77002-2925

Caplin & Drysdale
BY: NATHANIEL MILLER, ESQ.
One Thomas Circle, N.W.,
Washington, DC 20005

Hamilton Stephens
BY: ROBERT A. COX, JR., ESQ.
525 North Tryon St., Suite 1400
Charlotte, NC 28202

APPEARANCES (continued):

| | |
|---|---|
| For Plaintiff, FCR : | Young Conaway<br>BY: FELTON E. PARRISH, ESQ.<br>227 West Trade Street, Suite 1910<br>Charlotte, NC 28202 |
| | Young Conaway<br>BY: SEAN GREECHER, ESQ.<br>1000 North King Street<br>Wilmington, DE 19801 |
| For Defendants, CertainTeed LLC, *et al.*: | Rayburn Cooper & Durham, P.A.<br>BY: JOHN R. MILLER, JR., ESQ.<br>MATTHEW TOMSIC, ESQ.<br>227 West Trade Street, Suite 1200<br>Charlotte, NC 28202 |
| | Goodwin Procter LLP<br>BY: GABRIELLE L. GOULD, ESQ.<br>DOUGLAS H. FLAUM, ESQ.<br>STACY DASARO, ESQ.<br>620 Eighth Avenue<br>New York, NY 10018 |
| For Michael and Ann Herlihy: and Mrs. Peter L. Bergrud: | Waldrep Wall<br>BY: DIANA SANTOS JOHNSON, ESQ.<br>370 Knollwood Street, Suite 600<br>Winston-Salem, NC 27103 |
| For Defendants, Compagnie de Saint-Gobain S.A., *et al.*: | Hughes Hubbard & Reed, LLP<br>BY: WILLIAM J. BEAUSOLEIL, ESQ.<br>One Battery Park Plaza, 16th Flr.<br>New York, NY 10004-1482 |

APPEARANCES (via telephone):

| | |
|---|---|
| For Plaintiff, ACC: | Winston & Strawn LLP<br>BY: DAVID NEIER, ESQ.<br>200 Park Avenue<br>New York, NY 10166-4193 |
| For Michael and Ann Herlihy: | Maune Raichle<br>BY: CLAYTON L. THOMPSON, ESQ.<br>150 West 30th Street, Suite 201<br>New York, NY 10001 |

APPEARANCES (via telephone):

For Mrs. Peter L. Bergrud: Ruckdeschel Law Firm, LLC
BY: JONATHAN RUCKDESCHEL, ESQ.
8357 Main Street
Ellicott City, MD 21043

SANDER L. ESSERMAN
Future Claimants' Representative
2323 Bryan Street, Suite 2200
Dallas, TX 75201-2689

P R O C E E D I N G S

(Call to Order of the Court)

THE COURT: Have a seat, all. Good morning.

(Counsel greet the Court)

THE COURT: Let's just stay off record for a moment. As many of you know --

(Off record from 9:33 a.m., until 9:36 a.m.)

THE COURT: If the clerk wants to call the case.

THE COURTROOM DEPUTY: Okay. No. 1, DBMP LLC, Case 20-30080, continued hearing on motion on the Estate of Peter L. Bergrud for relief from the automatic stay; continued hearing on Michael N. and Ann Herlihy for relief from the automatic stay. And in the Adversary Proceedings 21-3023, 22-3000, 22-3001, we have motions to compel that are also being heard today.

THE COURT: All right, very good.

Let's get appearances, starting with the Debtors. Who do we have?

MR. ELLMAN: Good morning, your Honor. Jeffrey Ellman from Jones Day on behalf of the Debtor. Also here with me, Jim Jones from Jones Day and David Schilli from Robinson Bradshaw.

THE COURT: All right.

MR. MILLER: Good morning, your Honor. Jack Miller, Rayburn Cooper & Durham, on behalf of CertainTeed and certain other Non-Debtor Affiliates. With me from RCD, is Matt Tomsic.

And I'd like to introduce the Court to Jack Reynolds. He's going to spend the summer with us. He's a rising --

THE COURT: All right. Welcome.

MR. MILLER: -- 3L at Wake Forest.

And then from Goodwin Procter we've got Gabrielle Gould, Stacy Dasaro, Mr. Flaum, and I don't see Mr. Steel here yet, but Howard Flaum as well.

Thank you.

THE COURT: Okay, very good.

All right. How about on the ACC's side?

MS. HARDMAN: Good morning, your Honor. Carrie Hardman from Winston & Strawn on behalf of the Committee and with me is Katie Preston as well from Winston & Strawn. I believe Mr. Neier is on the phone as well.

And I will try to do this justice and if somebody needs to correct me, by all means.

We have Rob Cox from Hamilton Stephens Steele & Martin. We have Nate Miller from -- Nathaniel Miller. Excuse me -- from Caplin & Drysdale. We also have Ryan Messina and Andrew DePeau from Robinson & Cole.

THE COURT: All right, very good.

FCR?

MR. GREECHER: Thank you. Good morning, your Honor. Sean Greecher from Young Conaway, here with my partner, Felton Parrish. And Mr. Esserman, the FCR, is on the phone.

THE COURT: Okay, very good.

Anyone else in the courtroom needing to announce?

MS. JOHNSON: Yes. Good morning. Diana Santos Johnson with Waldrep Wall Babcock & Bailey. We're local counsel for the movants for the motions to lift stay and they are on the phone. And I think they would like to announce for themselves.

THE COURT: All right. We'll get telephone appearances in a second.

Yes, sir.

MR. BEAUSOLEIL: Good morning, your Honor. Bill Beausoleil from Hughes Hubbard & Reed for Compagnie de Saint-Gobain.

THE COURT: All right, very good.

Anyone else in the courtroom?

(No response)

THE COURT: All right. Let's see if we can get this done. Telephonic appearances? I'm just going to call it Debtor instead of Plaintiffs or Defendants and the like.

Anyone on the phone that needs to announce on behalf of the Debtors?

(No response)

THE COURT: Okay.

Do we have anyone else for the ACC?

Star 6 unmutes, by the way.

MR. THOMPSON: Good morning, your Honor. Clay Thompson with Maune Raichle Hartley French & Mudd on behalf of the Herlihy and, Herlihy Plaintiffs and the Bergrud Estate. And Jonathan Ruckdeschel is also on the line with me.

Thank you for allowing us to appear telephonically today.

THE COURT: Yes, sir.

Anyone else? F, FCR reps?

(No response)

THE COURT: Affiliates? Anyone else on the telephone?

(No response)

THE COURT: Okay, very good.

Are there any preliminaries? We've got the agenda, of course, that I'm looking at, Docket 2799, but I think it's filed in the adversaries as well as the base case.

Any preliminaries before we get to what we've got on the calendar today? Good-of-the-order announcements and the like or --

MS. HARDMAN: Your Honor, I think we just have a few updates relative to discovery, generally, but I think we can take those in connection with the motion to compel.

THE COURT: All right.

Anyone else? We're good?

(No response)

THE COURT: Okay. I guess the first order of business

is what to do with the Bergrud and Herlihys' motions for relief from stay. So I guess I get to start out by boring you with long talk, but here's where we are.

Both have relief from stay motions. It probably won't surprise anyone that I think that the motions have to be denied for the reason that we've had substantially identical requests for relief that I think have been entertained at least four times between the three so-called "two-step" cases in this District and on each occasion the motions were denied.

Back at the outset of this case we had a motion by the ACC for relief from stay and in conjunction with the preliminary injunction and on August the 12th I entered Findings and Conclusions at that time that did a number of things, but effectively, with regard to the relief from stay, denied the request. The ACC then was seeking relief to permit all 60,000 plus claimants, or however many there are, to individually liquidate their tort claims, both against the Debtor and as against the new company, New CertainTeed, in the tort system.

My ruling then was premised on three or four different points. First, that there wasn't cause to, to grant relief from stay because it would greatly prejudice the estate and the harm to the Debtor and its estate would outweigh any hardship occasioned to the asbestos claimants, which was almost entirely delay harm; that causing the tort system to be flooded with

asbestos cases, even as the chapter 11 case remained pending wouldn't serve judicial economy and in fact, that the asbestos claims arose under state law didn't support relief from stay because it involved individual claimants getting their claims determined in state court as opposed to in the bankruptcy case; that it also would imperil the ability for the Court to treat consistently and fairly all similarly situated claimants in a 524(g) plan, particularly those that are future claimants; and that to grant relief from stay would, would effectively destroy the bankruptcy case. There would be no chance of a successful reorganization. It would be, effectively, tantamount to dismissal of the chapter 11 case and without meeting the standards for a bad faith dismissal under the Carolin case.

I noted then that delay itself is not generally considered to be a reason to grant relief from stay because it takes time to work through the bankruptcy process and get a, a confirmed plan and that if there was delay, that bankruptcy was not the only forum that presented a prospect, that effectively the state court system with so many cases that were filed more than ten years ago also involves delay, given the number of these claims, but that, on the other hand, if there was good faith and cooperation, that the parties might actually be faster in bankruptcy by, by agreeing on a number and treatment under a trust and plan.

Back then, the ACC, and now the movants, decried the

Texas twostep and the follow-on bankruptcy as being, *per se*, a fraud perpetrated by the Debtor's predecessors against the asbestos claimants. Of course, the Debtor and those allied with the Debtor deny this. They say they're in bankruptcy just to access the trust mechanisms offered under 524(g) and those are only available in chapter 11 and they also say they plan to pay every meritorious claim, that effectively, they believe this would be fairer and more efficient because they wouldn't be paying bogus claims because it's too expensive to try the cases to verdict.

Back then when we were talking about this, the ACC wanted to allow the claimants to attack New CT as well. That was problematic for a variety of reasons, not just the interference with the reorganization, but also legally because the individual claimants were then talking about pursuing for their individual benefit claims that we would consider in the Fourth Circuit first crack avoidance claims and that would interfere with the bankruptcy resolution of those claims. Now I don't see that in the present motion, but I wasn't entirely clear whether that was in the back of someone's mind.

But for whatever reason, I have since recognized there is, in fact, an estate claim there. There's a right for creditors to challenge the divisional merger and with the Debtor in bankruptcy, under Circuit precedent those estate claims had to be prosecuted by the estate and I've since

allowed the ACC to assert and they have asserted those claims. So granting relief from stay on a wholesale basis would undermine the effort.

So that was the reason the ACC motion was denied.

As you know, we got the same type of motion again in Aldrich and Murray filed by the Maune Raichle firm and on behalf of Mr. Semian. And I, again, denied a similar motion for relief from stay for basically the same reasons as I did early on in this case, that if the Court were to grant relief from stay to one creditor to liquidate the claim, then all of the creditors would seek that, or most of them, at least enough to wreck the bankruptcy case and that would, effectively, precipitate a *de facto* dismissal.

Then in the fall of last year in Bestwall, Judge Beyer's case, same firm filed on behalf of a similarly cited asbestos claimant, Dale, for the same relief from Judge Beyer. And again, it was denied on simple, similar reasons. Judge Beyer in October said that she was sympathetic to the claimant, but couldn't find cause, that if you only had one claim and you viewed it in isolation under the Robbins factors, which are the factors that we have controlling in our Circuit for relief from stay, a court might find cause to grant the motion. However, Bestwall was a mass tort case involving thousands and thousands of claimants all with legally similar claims and to grant the one motion would result in a wave of like motions. If granting

this one, she would have to grant all future motions for relief from stay and again, we end up with a *de facto* dismissal of the case. So she denied that motion.

She denied it, also, in -- she granted the PI, the preliminary injunction request, early in the case and that was affirmed by the Fourth Circuit. The Fourth Circuit did say in dicta that "rather than waiting for confirmation, that claimants can bring individual claims for relief based on the specific facts of a particular claim." The problem she found there with Dale was that the Dales didn't have any, any unique facts. And again, allowing them to litigate in state court would cause irreparable harm, defeat the purpose of the bankruptcy case, and effectively, be akin to dismissal.

Then again, another motion filed in, in Bestwall in January, almost identical to Dale was on behalf of Buckingham. And in her January 23rd bench ruling Judge Beyer denied that as well. She basically went through the Robbins factors at this point in time and noted that the second, that modifying the stay will promote judicial economy, was not met and frankly, that there would be greater interference by granting the motion than if the stay were not lifted and said that those weighed against filing.

She reiterated that you couldn't look at granting Buckingham relief from stay to liquidate without considering what, that the same relief would have to be granted to almost

all. And while she says that Carolin, notes that Carolin had a brief possibly dicta statement about 362 being an alternate relief for the creditor, that it was not appropriate to grant that. It made no sense to say a case, relief from stay should be granted for subjective bad faith if it was going to lead to dismissal when the Fourth Circuit has already said that the standard, and as reiterated in these cases, that the standard is two prong and you cannot dismiss the case for bad faith unless there is subjective futility, which, of course, doesn't exist.

So she denied that and then warned counsel against repeatedly filing motions which present the same grounds and theories as those previously rejected.

But here we are again, Rounds 2 and 3 in the DBMP case with the same firm pressing the same rejected relief and theories and it will not surprise you that I'm denying the motions again. I'd say nothing really has changed since my first ruling in this case with, on the ACC motion. It looks like maybe trying out the new relief from stay arguments on a different judge, but the fact is I agree with Judge Beyer's analysis. I believe under Carolin if we're going to start granting relief from stay en masse, then you're back under Carolin and we can't on the basis of subjective bad faith, if that exists, warrant, effectively, tubing the whole case. That's to do, effectively, indirectly what I am not permitted

to do directly.

Now the movants have suggested that thinking that there's an avalanche of motions coming is speculative, but I would disagree with all that. I disagreed before. I've presided over now, I think, a half dozen or maybe eight asbestos cases and been doing this for a decade and while I don't know as much as all of you about those cases, I would say that from what I've experienced it is an absolute certainty that to grant these two motions would lead to hundreds, if not thousands, of more.

As we all know, there are thousands and thousands of claimants, but most of them are represented by a dozen or so asbestos firms across the country, firms that are knowledgeable about bankruptcy law, well informed about what's going on in each of these cases, many serving on the ACC indirectly, and are creditor firms that are aggressive in representing their clients and protecting their rights. The firms have heavy influence over voting. Just witness the Garlock and Kaiser case. The claimants were all opposed to the Debtors' proposal, but when a deal was struck with the ACC in, in those cases the result became a, almost a hundred-percent vote in favor. And all of that experience tells me that if I were to grant these two motions for relief from stay, even just to liquidate the claims, by month's end I'd have dozens of claimants making the motions and by the end of the summer there'd be tens of

thousands.

So my prior ruling and reasoning in the ACC relief from stay matter and the dismissal matters, especially the denial of dismissal, I'm readopting here today.

I also agree, generally, with the Debtor's arguments, except for those few occasions where the Debtor starts talking about things that I may have decided otherwise in the preliminary injunction and a couple of things that, like saying that Ortiz doesn't apply in these cases. If you read the Aldrich decision, well, it might. So that's not for today.

But otherwise, I generally agree with where the Debtors and Affiliates are coming from on this.

I do want to say a couple words about specific arguments that were raised just for the benefit of a reviewing court, if there is one. The movants are saying that the twostep in bankruptcy were take, undertaken in subjective bad faith. I don't feel comfortable making that conclusion today, not on this record or at this stage in the case. That same basic argument was made in the manufacturing jurisdiction and PI arguments in Bestwall, and, as you know, the District Court and then the Fourth Circuit effectively rejected those. The Panel even scolded the claimants for delaying the bankruptcy case and the Fourth Circuit didn't overturn their ruling. And since then, Judge Beyer and I both have encouraged direct appeals of our dismissal rulings to the Circuit, but twice

those have been denied.

It is obvious that the ACC thinks that if a profitable conglomerate breaks off part of itself to use chapter 11, that's, *per se*, bad faith and that the filing, a filing to overcome the tort system is a fraud, but the Debtors think just the opposite, that this is an efficient way of dealing with an intractable problem. And by the way, they owe less than what the claimants think and they think they've been abused by bogus claims in the tort system. The Debtors also maintain they intend to pay all allowed claims. They just don't think they owe as many of them.

So they, from their vantage point, say they're not just stranding the asbestos claims. And it's, of course, true that they'd like a capped plan. Every asbestos debtor to date practically has and they'd like to avoid punitive damage awards, etc., etc., and they'd like to protect their affiliates. But there's nothing new about any of that. Are those aspirations, *per se*, bad faith? It seems to me that right now the Fourth Circuit doesn't seem to, nor does our District Court.

I've mentioned the differences of opinion about whether a non-distressed solvent company can use bankruptcy tools. In the Aldrich order denying dismissal, I gave you my take about where I see the landscape and the potential issues lying ahead. No change there today because a higher court than

this one will ultimately make the call. But can I find today that this filing is subjective bad faith because it's sought by a solvent non-distressed entity and does that dismiss, justify dismissal? I'd say the answer in this Circuit at the moment appears to be no.

And moreover, we are currently litigating the propriety of the, of the divisional merger and the bankruptcy filing in the adversary proceedings and whether those events were detrimental to creditors. And that also cautions against trying to determine the same matters, like subjective bad faith in this current motion. But even if subjective bad faith lies, I don't think it's the standard. At most, it's a factor. The standard for relief from stay is cause and the controlling case in our Circuit is Robbins. Robbins involves a balancing test and as I, both I and Judge Beyer have held, here relief from stay would lead to case dismissal, which under Carolin is not attainable for simply subjective bad faith.

So I'm not going to try to do indirectly something that I'm not permitted to do or not inclined to do under existing law. I am bound by the Carolin decision.

Now movants seem to think the Court invited this motion. I didn't. I try to listen to the issues that y'all present and consider the evidence and make the findings from, that support the decisions and answer the questions fairly. On occasion, I have been known to talk a little longer than

shorter because I think in some ways it helps you on trying to understand how your jury is seeing the case as it goes along and maybe helps you on settlement grounds.

But bottom line is the Court's not on anybody's side. I'm not an activist and I'm not trying to engineer any particular result. On the facts found in the PI ruling, I held that the bankruptcy stay applied, that dismissal wasn't permitted, and the third-party injunction was required. That's a preliminary ruling, but that's what I thought and that hasn't changed today.

There were some more arguments that were just rehashes of arguments previously made and rejected in the PI and the ACC relief from stay motions as well as in the two cases, like arguing that Premier is the standard, not Carolin. I'm not going to go back through all of that, again. But I would say this. We've been through this at least four times. Repeating this exercise for different claimants with the same identical legal posture is a waste of everyone's time. It's not very likely to work and your vexation of not being able to get to the Circuit or getting a ruling that you like doesn't justify increasing your opponent's costs and everyone's workload.

So like Judge Beyer before me, I would suggest not continuing to try to beat your head against a rock. That's not going to change the outcome, but it could end up with you being sanctioned for pressing the same rejected theories time and

again. So we've got enough problems to deal with and I'm just going to leave that as a word to the wise, recognizing that my time here is short.

So bottom line is the motions are denied. I would call upon the opponents, the Debtors primarily, to draw a short order that just makes reference to the verbal findings and conclusions and run it by everyone else for comments and send it on down.

Got that, Mr. Ellman?

All right. Everyone ready to move on? Do you need a moment or we, we ready to launch into the next matter?

(No response)

THE COURT: Okay. Then we will move on, if I can find the page, to the motion of the Committee to compel and the responses filed thereto. It's not just the Committee, Committee and the FCR to compel. Excuse me.

All right. Who's going to be arguing for the movants?

MS. HARDMAN: Morning, your Honor. Carrie Hardman from Winston & Strawn on behalf of the Committee and the Plaintiffs, unless Mr., Mr. Greecher says otherwise.

So thank you for hearing from us today. I did say I think we had a few status updates relative to discovery, generally. I will start with one that I'm going to start with intentionally in case there's any clarification that's needed from the other side of the table here.

We have motions to seal before your Honor for both our motion to compel as well as our reply. We did that in an abundance of caution. We recognize good swaths of what we protected was likely not needed for redaction purposes, but we did that in, in the interest of time to make sure that the parties had an opportunity to --

THE COURT: Sure.

MS. HARDMAN: -- review and dedesignate.

We spoke with the Debtor and the Defendants as well this morning and I believe we reached agreement on how to treat those two motions, both the motion and the reply, as well as all of the attachments or exhibits there.

THE COURT: Okay.

MS. HARDMAN: I believe we are down to one issue that would remain redacted and we are fine with this.

THE COURT: Okay.

MS. HARDMAN: Mr. Greecher is nodding for the sake of the record. So both Plaintiffs are in agreement on this. And that is to redact, there is a Footnote 29 in our opening motion. It references certain amounts relative to loans that are, I would say, upstreamed is just --

THE COURT: Right.

MS. HARDMAN: -- the way I would characterize it. Folks can disagree with that, but the idea is that there are specific amounts there that need to remain redacted. I believe

that would effectively be redacting of the first parentheses in that footnote, but if the parties felt differently about the breadth of that redaction, we can certainly talk about it. But that was my interpretation of what we discussed.

I pause to say if we need to revisit this at the end of the oral argument this morning, your Honor, give parties an opportunity. I just thought I'd start with that so that we could give them a long chance to decide if that's exactly where we are. But either way, we can work that out.

THE COURT: Anyone want to respond there?

Ms. Gould.

MS. GOULD: Your Honor, Gabrielle Gould from Goodwin Procter on behalf of the Non-Debtor Affiliates. Good morning.

THE COURT: Good morning.

MS. GOULD: We agree with Ms. Hardman that the numbers which require redacting seem to be located in the initial parentheses in Footnote 29 of Plaintiffs' moving brief. And so if that is the, if that remains under seal, then we are fine with the rest of the brief being placed on the public docket as well as the exhibits.

THE COURT: Okay.

Are we going to refile it with that redaction made?

MR. COX: Your Honor, Rob Cox appearing on behalf of the ACC.

In the past, we've usually filed it under a notice

that, of a filing of kind of unredacted or un, unsealed documents.

THE COURT: Right.

MR. COX: We'll just follow that same procedure if that works for the Court and parties.

THE COURT: Well, it beats me having the clerks trying to figure out how to blank out something in an existing filing, so. All right.

MR. COX: We'll take care of it, your Honor.

THE COURT: Okay, very good.

Any other --

MS. HARDMAN: Thank you, Mr. Cox.

Because I did not have the answer to that question, your Honor.

So that, that covers the first ground and the first motion. I think that probably, or there is one of the motions on your agenda, your Honor.

THE COURT: Right.

MS. HARDMAN: With respect to the status update, I just had a few other aspects of --

THE COURT: Hang on one moment so I can --

MS. HARDMAN: Of course.

THE COURT: -- instruct the clerk.

So that would be Contested No. 3E, Motion of the Committee to Under Seal. These were noticed for a different

day, I think, so.

And then there was another one, was there not, or is that the only one?

MS. HARDMAN: There should be one for the reply as well, I believe, your Honor.

THE COURT: Right. Okay.

MS. HARDMAN: And I do not have it in front of me, but --

THE COURT: I thought there were two motions to seal, but I may be wrong.

In any event, that's what it relates to, Madam Clerk.

THE COURTROOM DEPUTY: Got it.

THE COURT: All right. Go ahead.

MS. HARDMAN: There should be one for the motion, one for the reply --

THE COURT: Right.

MS. HARDMAN: -- I, I believe. We will, can confirm if we, if need be.

Thank you. So thank you for indulging me. We have just a few updates relative to discovery. We've talked about a number of these items with respect to various status conferences over the last couple of months with your Honor and I think the few items I just wanted to tick through are a status update on search terms, mobile device certification, steps in furtherance since your last ruling on the status

conference motion that we filed, and a subpoena that we've issued to the French parent, is how I would say that just easily here today.

Of course, it's never a good start when I'm starting with search terms, your Honor, as an update, but alas, here we are.

Plaintiffs produced an initial set of search terms to the Defendants on March 6th. Back on March 7th, the day after that, we had a hearing before your Honor in the *seriatim* hearings on the motion for a status conference where the Debtor indicated that they've been waiting for our search terms, but were ready to promptly run them since they had gotten them the day before.

It's been 11 weeks, I believe by my count, since we've sent those search terms and today, we still don't have what we call the hit reports. We were told on March 25th we'd see that report in the coming weeks before all of the documents would be collected and that they'd send us some feedback that they deemed un, unnecessary search terms, or the like. We did ask for those search terms to be run on the business custodians to start.

This is not a perfect process, this hit report process. It doesn't need to be perfect. It's a matter of pushing a handful of buttons once you have the discovery --

THE COURT: Uh-huh (indicating an affirmative

response).

MS. HARDMAN: -- to spit out an Excel file that tells you how many hits are on a particular term. Sometimes you see there's no hits. Sometimes you see there's millions of hits and you want to craft your --

THE COURT: Uh-huh (indicating an affirmative response).

MS. HARDMAN: -- search terms, accordingly. It helps various parties to try to get to something that makes some sense in terms of search terms.

All that said, the Defendants have told us they want to wait to run the search terms until they have all of the collection of the subject custodians. I, I will raise this to say, relatedly, the parties are at an impasse on some time limitation issues. I think you've heard some of those temporal limitation issues that have come up once or twice so far, your Honor, this year. There is one related to the document production, which is still in discussion among the parties. It is an issue that, hopefully, we can resolve. But if not, need to address before the Court at some point.

In the interest of time, we recommended to the Defendants that they pull all of the documents for those custodians going back to our broader search time frame just because if we end up in a dispute, you'd rather have all of it collected in the first instance and then narrow from there,

rather than have to then go back and pull a broader swath later. It makes it a bit of an inefficient process.

So we made that suggestion. Defendants have said that they will not do that. They'll run based on the time limitations that they believe apply.

So your Honor, we're trying to avoid these issues, but eventually, we may have to get some of those time issues in front of your Honor before we even get to search terms. But I'll come back to that in a moment.

When it comes to mobile device certification, while we're working out that search term list, the parties have been working to finalize a certification that the custodians will each review and sign to address whether they've used their mobile devices for business purposes during the relevant time period. The certification will help us figure out which mobile phones need to be located, searched as part of the discovery process.

As part of the Defendants' duty under the Federal Rules to produce responsive documents, they must search all of available locations for those responsive documents. That includes these cellphones, texts, chats, notes that otherwise might not be available on a computer, but might be available on these phones.

We've learned in the Rule 30(b)(6) depositions, which we'll discuss in a bit, that the company issues employee-issued

phones or -- excuse me -- company-issued phones to employees. So it wouldn't be surprising to us that the custodians would have on these company-issued phones texts or chats or other communications that they use for business purposes on a regular basis. And it's no reason to think that if they do that in their ordinary course, that they stopped during the corporate restructuring.

So we have to think that we might have --

THE COURT: Uh-huh (indicating an affirmative response).

MS. HARDMAN: -- some responses relative to the mobile device certification.

I believe I mentioned at one of our prior conferences that we are at an impasse on mobile device certification on a particular issue. Of course, that issue involves the time frame applicable to the mobile device certification. We understand Defendants want a more narrowed time frame than the Plaintiffs do and of course, for the reasons we will discuss in a bit, we do believe the longer time frame is appropriate, particularly when it comes to discovery of the facts and circumstances of the corporate restructuring and the resulting DBMP bankruptcy. We know when these things occurred. So it shouldn't be a dispute as to that relevant time period, but we'll try our best to reach a resolution.

Therefore, to the extent we don't reach a resolution,

we plan to bring some of these issues before your Honor. And I actually had a note that we are cognizant of your time frame and are certainly glad to hear that you will be with us a little bit longer. But we don't want to add to your already full plate. I know that you have a --

THE COURT: Uh-huh (indicating an affirmative response).

MS. HARDMAN: -- lot going on to try and work through some of your case, cases as it is. But we will do our best to try and narrow our issues and get a finite set of, of these issues before your Honor.

As a status update since our last meeting with your Honor related to the motion for a status conference, as you know, we filed that motion on February 15th. Your Honor permitted Rule 30(b)(6) depositions to take place so we could get to the heart of the issues that we believed remain unanswered. As to the dispute regarding the time frame occurred applicable to those depositions, your Honor ruled that the narrower time frame should apply. On April 25th, we took the depositions of Mr. Thomas Pier, who was the Chief Technology, is the Chief Technology Officer, and an Associate General Counsel, Ms. Sheri Brutsch.

From a discovery dispute perspective, we faced an additional set of speaking objections and instructions not to answer that were disguised as answers in your personal capacity

and even a mid-break counsel discussion while the witness remained under oath. Some of those objections were lodged at aiming to keep Plaintiffs within the time frame limitations, yet Defendants asked questions in redirect that were well outside of that time frame that your Honor set at their request. So even -- so we're not entirely sure what limitations apply when it comes to time frames except for when the Defendants instructed us not to answer, instructed not to answer on that basis.

Plaintiffs, again, are considering the various issues that rely, relate to these time frame issues, including those as to what is the relevant time frame and we are likely to revert with motion practice, to the extent that these seem to be a common theme.

THE COURT: Okay.

MS. HARDMAN: Finally, as an update, we served subpoena on the French parent. You will no doubt hear about the existence of this subpoena in short order when it comes to the motion to compel, but just wanted to raise it as a status update.

In responding to an inquiry to delay the deadline to set, serve responses and objections from the French parent, Plaintiffs made a direct request of the French parent to confirm that they actually intend to produce documents to us. Otherwise, we're just extending that deadline to respond to

receive, effectively, nonanswers, from our perspective. Counsel for the French parent responded to our direct inquiry about the intention for production of documents indicating they will respond regarding potential document productions. You can call me a cynical New Yorker if you'd like, your Honor, but we interpret "potential productions" to mean there's a distinct possibility that there'll be no productions. But happy to be corrected on that score if CSG, the parent, is willing to confirm responsive documents will be produced.

Despite what we interpret as a nonanswer to our question or a noncommitment, we agreed as a gesture of good faith to extend their deadline to respond to our subpoenas by about two weeks. It's coming due the first week of June or so. We're happy to further extend that deadline if there's confirmation that documents responsive to our request will be produced. Our interpretation of this non-commitment response, unfortunately, further validates our need to file and proceed with our motion here today, your Honor.

With that, we do have a set of slides. So I'm going to pause a moment.

THE COURT: Let's see if anyone else wants to make an update --

MS. HARDMAN: Sure.

THE COURT: -- statement or --

MS. HARDMAN: That sounds good.

THE COURT: -- a rebuttal statement under the circumstances.

Before you start, Ms. Gould, let me say this.

I should have mentioned as well that anticipating that you're likely stuck with me for a few more months, we're not changing at the moment any of our dates. We've got those dates reserved for you and I know you plan on them. We'll try to keep those as much as we can.

But for the next few months if you're noticing something, just do it on the normal date, okay?

All right. Ms. Gould.

MS. HARDMAN: Thank you, your Honor.

MS. GOULD: Thank you, your Honor. Just some brief response to some of the purported updates that Ms. Hardman provided.

THE COURT: Sure.

MS. GOULD: With respect to search terms, as, as the Non-Debtor Affiliates and the Debtors had made clear, given the number of custodians that we've agreed to it makes sense to gather not a hundred percent of the data, but a large majority of the data before you run the search terms. Otherwise, when you're going to run the search terms and see what the hit reports are, it's not very effective if you don't know that it's run through the entire amount of data. I suspect, in the end, there will be some overbroad search terms when we run it.

I think one of Plaintiffs' search terms was North Carolina.

So I expect that we will have some back and forth, but we've been working diligently to gather, again, the majority of the data and I think we're very close to being able to run search terms.

In terms of the time limitation issues, we're happy to work with counsel for Plaintiffs to see if we can come to any agreements before an impasse is declared and we need to spend more of the Court's time on motion practice. So we certainly are happy to meet and confer with Plaintiffs in good faith on those issues as well as the mobile device certification.

The one part where we have to make sure the record is clear is with respect to the depositions that took place on April 25th of Mr. Pier and Ms. Brutsch. Ms. Hardman referred to instructions not to answer. That is false. That is flatly false. There was one instance where we cautioned the witness if there was a privilege object, you know, if there was privilege involved, not to answer, but the witness, I believe, answered the question. There -- that was one in all of the two depositions that lasted the entire day of April 25th.

The objections that took place were because, as Ms. Hardman noted, the Court had specifically ruled on the time frame, that the depositions were only to, to cover the time frame from August 23, 2021 to the present. Very frequently Plaintiffs' counsel went well beyond that time frame in the

questioning, which was inappropriate of the 30(b)(6) witnesses. So when that took place, we noted that we objected to the time frame. It was outside the scope of the Court's order and the witness would be answering in his or her personal capacity, not as a designated corporate representative on behalf of the company. Those were the objections made.

As far as the subpoena concerning Compagnie de Saint-Gobain, we do understand that finally, a year after we told Plaintiffs that we could, "we," the Defendants, could not produce documents of Compagnie de Saint-Gobain, that that subpoena was finally served. I personally have not seen the subpoena. So I can't comment any further on that or the conversations between Plaintiffs' counsel and counsel for Compagnie de Saint-Gobain. But we do understand that subpoena has finally been served.

Thank you.

THE COURT: Thank you.

Anyone else?

Mr. Ellman.

MR. JONES: Your Honor, Jim Jones for the Debtor.

We were not anticipating the argument that you just heard. We were anticipating an argument on an actually filed motion to compel.

We concur with Ms. Gould that we are working diligently on both search terms trying to iron out the

appropriate dates and the time intervals that were discussed.

And we also understand that a subpoena has, was served the day the motion to compel that we are here to argue was filed and Mr. Beausoleil can confirm that and his arrangements, if any, with the ACC because he's with us today.

THE COURT: Yes, sir.

MR. BEAUSOLEIL: Good morning. I can come up.

THE COURT: You better come around --

MR. BEAUSOLEIL: Yes.

THE COURT: -- if we want to get you recorded, Mr. Beausoleil.

MR. BEAUSOLEIL: I get farther and farther back. Hate people yell.

Good morning, your Honor. Bill Beausoleil, counsel for Compagnie de Saint-Gobain.

Again, you know, we, no motion has been filed against us. We finally got the subpoenas two weeks ago. The condition -- and I've never seen this in over 25 years of practice -- to get an extension you have to commit to produce documents. We're looking at it and everything else. It's particularly egregious here. They are asking me to confirm something that if I did it, I would be committing a crime or abetting a crime under federal French law.

There are ways to -- the, the French blocking statute has been amended in 2022. There are ways to do it. We re

doing it quickly. Specifically, you send, send the subpoenas in with a letter to the Sisse, S-I-S-S-E. That's been done. It's confirmed. Until you get through that process, you can't say you're going to or not going to -- well, you could say you're not going to -- you can't say you're going to do something that would be in violation of the French blocking statute.

That's, that's where we're at. I, you know, we're months away from responding, meeting and conferring, doing all these, the other things. We intend to do that in good faith, but on that narrow issue that I won't even confirm I'll produce documents, I don't want to go to jail in France.

THE COURT: Okay. Thank you, Mr. Beausoleil.

I think we can all do without any of us going to jail. So we've got enough things to talk about now. All right.

MS. HARDMAN: Yes, your Honor. And for the record, no one on the Plaintiffs' side wants to see Mr. Beausoleil go to jail or any party, for that matter, including his clients.

The idea was simply to move along with respect to responses. To the extent that their response is, in fact, the French blocking statute does not permit us to produce documents, that's a rather clear answer to us and at least that's what I'm interpreting right now, your Honor. That's what we expected. It's what we've been told all along would be a response that we'd receive.

So we're just trying to move forward. And with respect to that subpoena, that's what we anticipated might be the response.

THE COURT: Okay.

Folks, I don't want y'all to give Judge Edwards the wrong impression here. It has become traditional -- and I think the Debtor started in these cases -- to have general case updates. We don't need to be arguing about things that aren't before us today. I understand you've got some frustrations and you're working with one another and each of you has a different perspective. We'll deal with those if, if --

MR. JONES: Thank you, your Honor.

THE COURT: -- you need to, okay? All right.

MS. HARDMAN: Thank you, your Honor.

THE COURT: Why don't we hear the motions that we do have before us.

Is there anything else that needs to be known, good-of-the-order type announcements about the cases? Any other -- I view these as watching the future attractions before the main movie starts. But thank you for letting me know what's going on.

How about we turn to the current motion.

MS. HARDMAN: Sounds good, your Honor.

We do have slides. So I believe that they're being e-mailed to the parties and we have hard copies if your Honor

wouldn't mind if we approach?

THE COURT: Please.

MS. HARDMAN: Thank you.

(Slide presentation provided to the Court)

THE COURT: Thank you.

MS. HARDMAN: All right, your Honor. We are here today on some certain discovery disputes and, and we're here today on, as Plaintiffs in three adversary proceedings, what we call, colloquially, the subcon proceeding and, as well as our role as estate representatives in the fraudulent transfer and fiduciary duty proceedings.

We are here on the Plaintiffs' motion to compel what is discovery that should have been produced to the Plaintiffs back in the PI proceeding years ago at this point, let alone now in the adversary proceedings. Before we get into all this, I do want to point out that we did just walk through only some of what have been the disputes at this point. From our perspective, it has been a time-consuming and expensive process to, to just pull teeth to get this discovery from the Defendants here. This slide shows some of what we've been up against in discovery in these adversary proceedings. I'm not going to walk through this for the sake of everyone involved. It is a demonstrative just to get to my one overarching point, your Honor.

My one overarching point is there's a bigger-picture

question here, from our perspective. We hear time and again from the Defendants, including the Debtor, the Non-Debtor Affiliates, that there's no there there with respect to Plaintiffs' claims, how the corporate restructuring and DBMP's bankruptcy were always on the up and up, then why not let us pressure test it? If the transactions and decisions making up the corporate restructuring and the resulting DBMP bankruptcy were all completely defensible, nothing to see here, as Defendants have stated in their opposition papers today and generally throughout the case, why hide behind these discovery tactics? It can't just be about costs because going through all these disputes involves an expense as well.

We are the estate representatives here conducting an investigation into the events that the Defendants, again, claim are entirely defensible. Why in that case would discovery be subject to so much hinderance and delay? We aren't asking for irrelevant information here. This is solely about the corporate restructuring that created DBMP and the filing of DBMP for bankruptcy. By extension for today's purposes, if the French parent were involved on such a limited basis, as the Defendants claim, then why hide behind all these rules or policies to avoid production of responsive information? Wouldn't that information, if available, just prove their point? Again, the bigger question comes back to me. Why are all these tactics used if there's nothing to hide?

For today's round of disputes, what our request boils down to is rather simple. We ask the Court to require the Defendants to comply with the Federal Rules, to produce documents within their possession, custody, or control. We believe that those documents include documents from the French parent. We may call them CSG today or the French parent. As we noted in our second footnote in the motion, we do not seek a specific court order requiring particular documents to be produced today. Rather, what we envision in your ruling, if you were to agree with us, is it would inform the Defendants of what their obligations are in terms of the retrieval of documents and other discovery that is respontive, responsive to Plaintiffs' already pending requests. This will, of course, be subject to reasonable search parameters, search terms where appropriate, aspects that the parties will search out after your ruling on these issues.

So first, we are talking about possession, custody, and control, something you've seen probably referred to as PCC all over the place here. I'm just largely going to rely on our papers to spell out the --

THE COURT: Uh-huh (indicating an affirmative response).

MS. HARDMAN: -- applicable law here. Just wanted to demonstrate what the law says, generally. Rule 34 of the Federal Rules that's applicable here requires parties to the

litigation to produce documents within their possession, custody, or control. That usually means you go first to the party in litigation because that's, because what they have in their possession, custody, or control should be the first stop for relevant or responsive documents. The primary focus and purpose of Rule 34 is to ensure that proper disclosure of facts are made and the truth is obtained in an effort to resolve disputes.

PCC is possession, custody, or control. We only need to demonstrate one. The Defendants have focused on possession or custody to demonstrate that we somehow failed to establish what we seek, yet we are focused largely on control. We believe that under the applicable authority Defendants certainly have control over documents responsive to our requests whether they happened to originate in the U. S. or France. Control does not require physical possession and includes more than just the legal right to demand documents. It is also found when there is a practical ability to obtain those documents from a nonparty.

Now I say "nonparty," which is a somewhat triggering word among this group. I want the record to reflect, your Honor, that the Plaintiffs do not agree that CSG is a nonparty. We understand the position from the Defendants on that score and, of course, of CSG, but Plaintiffs simply don't support treating CSG, who's a beneficiary of a PI, who actively

participated in the discovery protocols and the Case Management Order in these, these adversaries, who fought alongside the Defendants to stay the fiduciary duty action, and who are here today to truly be a nonparty. The fiduciary duty action may be stayed, but, from our perspective, Compagnie de Saint-Gobain hardly fits the definition of a nonparty.

And I'm sure you'll recognize on this slide that there's one case we cited in our source information down below -- it's again in our motion practice as well -- because it's your own work, your Honor.

THE COURT: Uh-huh (indicating an affirmative response).

MS. HARDMAN: I'll do my best not to put words in your mouth. Just want to note that the BK Racing case introduced, included the same standard for determining control, that it "need not be limited to a legal right to obtain documents, but, rather, can be found when there's a practical ability to obtain them from a nonparty."

The Uniden case, which is cited throughout our briefs, is a Middle District of North Carolina case. We cite it in our papers. It spoke on this issue in the context of a parent-sub relationship as well and indicated that while a subsidiary may not have the right to demand turnover of documents, a subsidiary is required to respond to Rule 35 [sic] requests, which can include the production of parent company's documents.

So I'll go to the next slide here. Back to the determination about whether control exists when one has the practical ability to obtain. There are factors considered by courts in the Fourth Circuit. The six of them are shown here. There's been some discussion in the papers about whose burden it is today, your Honor. Whether it's Plaintiffs on control or Defendants in refusing to comply with their discovery obligations, it doesn't really matter for today's purposes, from our perspective. Plaintiffs have amply demonstrated that the Defendants have the requisite control over the responsive discovery documents that are held by CSG.

I will try to power walk through these factors in a, in a short while, but the long and the short of it is while we're not required to show all six of these factors, we do believe all six support the determination that the Defendants have possession, custody, or control over French documents and e-mails that would be responsive to our discovery demands.

A minor point, your Honor. I will say "documents" a lot today. "Documents" includes e-mails and all sorts of other discovery material. I just want to be clear about that so that there's no confusion.

The facts that we've laid out in our pleadings we'll describe at a high level today and we'll describe at a high level today will demonstrate one central point. Access to the French parent's documents is absolutely available to the

Defendants when there is a justified business purpose and apparently not when there might be a, a, a lack of desire to produce. And that may include a legal process. It's clear the Defendants are using their ability to access documents on a selective basis using access as both a sword and a shield when it comes to this litigation.

I can't help but see a pattern here, your Honor. First, we're talking about selective assertions of privilege in the PI discovery that is incorporated here and then more recently, we've been talking about the selective assertions of time frame limitations, which are waived when the testimony is desired on a particular issue. And now, we're talking about selective assertions of access to discovery. It's discretionary discovery here, your Honor, at the Defendants' discretion, cherry picking when to produce and when to claim foreign laws prevent production or their access has been blocked.

While there are a number of factual points laid out in our pleadings, the few key facts are shown here, which demonstrate that the Defendants have control warranting ex, warranting the exercise to obtain discoverable documents under Rule 34. French parent's employees are sent to work in the U. S. whether on secondment or as an expatriated employee and during that period they maintain access to their e-mails no matter what. Certain of them retain access to their files as

well, but they certainly retain access to their e-mails no matter what.

That's no surprise from a practical perspective. Compagnie de Saint-Gobain is a $40 billion global enterprise with thousands of employees, including a good chunk in the U. S. It is no surprise they'd spend substantial time here in the U. S. and figure out a whole program to make that happen. Ms. Brutsch let us know that Mr. Phelizon, who was also involved in the corporate restructuring, was one of those secondees. I'll discuss that in a short while as well. He was a sort of hybrid who had maintained access to some files as well as his e-mail.

Mr. Pier, the Chief Technology Officer, let us know that visiting employees of Compagnie de Saint-Gobain would maintain their access to their French documents and e-mails while conducting business here in the U. S. One such instance would have likely come into play when a number of those high-level executives came to Goodwin Procter's New York City offices for a significant Project Horizon meeting back in October of 2019. That is the referenced Bates stamps here that you see.

At a high level, the Saint-Gobain enterprise shares the same wide-area network where all of their files and programs reside. Everything, as I understand it, is on this W -A-N or WAN, WAN, separated by firewalls, including one that

separates North America from France. However, Mr. Pier testified that any separation between North America and France can be broken if there's a business need. He explained that the firewall can be overridden to allow connectivity where there's a business requirement or a business need to share information and that there's a process through which the override can be requested, reviewed and, if approved, it can be implemented.

So as I mentioned before, it appears there are policies and rules in place which can be overridden when needed, whether by request of the U. S. employees, or otherwise.

Well, what about specific documents? When it comes to actual document storage, you got to talk about e-mails as well as electronic documents. First, e-mails of all Defendants and French employees are exclusively held in the French Technology Department. If a Defendant in the U. S. wanted their old e-mail files that they didn't have access to, they'd actually have to ask the French IT system for permission. If a Defendant wanted the French files, they'd have to do the exact same thing. And while I initially was surprised to hear this, I gave it a bit more thought and it makes complete sense. Of course, this massive enterprise, which is ultimately run by a French parent, centralizes their e-mail and all of their data in one entity in France.

So all of the e-mails that have already been produced in these cases reside in some way, shape, or form at the French parent's IT servers, or IT system. I'm sorry. I'm probably going to use the wrong technology term today, your Honor, but it is not intentional. In addition, I'm sure there's some cost saving there to the enterprise to have everything centralized. It would make complete sense. You also then have some, you know, centralized oversight and control by centralizing their e-mails.

But more than that, it's clear that the Saint-Gobain enterprise holds itself out as one enterprise. Mr. Pier, the company's Chief Technology Officer in North America, said it best, saying, "There's no notion of French e-mails versus U. S. e-mails. They're one and the same. It's one company. E-mails are maintained by one company." So how does one enterprise share its files across all of it's affiliates? As I said before, it's by simply lodging a request and filling out a form. At least that's the on-paper procedure here, your Honor. It's a formal process, a request of documents if needed. Such request is reviewed by the French IT Department and if needed, by higherups in the company.

But of course, with tens of billions of dollars in corporate transactions that are occurring every year, it is no surprise that there's extensive back and forth between the North American affiliates and the French entities. No one is

suggesting that the Defendants ignore their protocols that may be in place for the company to obtain documents. In fact, we submit that it's the Defendants' duty under Rule 34 to at least lodge the request to the French parent, but they have not done so. In fact, we would hope that the French parent would be more receptive and responsive to its own affiliates than it would, perhaps, a subpoenaing party.

It appears to us that the Defendants and, and CSG would rather Plaintiffs, instead, go through endless hoops of relying on third-party discovery to fulfill the Defendants' obligations to produce responsive documents, a process that while it exists, in reality does not exist on an ordinary-course basis for the Defendants and Compagnie de Saint-Gobain when it comes to their everyday operations.

We've talked about e-mails. Discovery also includes documents. We've learned in the 30(b)(6) depositions that the enterprise operates just as many companies do. Their employees share information and work collaborative, collaboratively on documents and other projects. Given their enormous size and extensive operations, of course they share information and collaborate every single day. This seems obvious, but when a group works on a particular project we learned that the project can involve individuals both domestically here in the U. S. as well as in France or elsewhere.

So how do they do that? Well, the wonders of the

internet, of course, but, more specifically here, the company utilizes a few different programs to share documents and other information. Of course, there's the exchange of e-mails which can include the exchange of documents that are attached, then there's also something called OneDrive or SharePoint, which are programs, as I understand it, to share files in a, or have a shared folder. It's a document exchanging type program.

And then the final one that I'll discuss here, your Honor, which we use a lot in this courthouse, actually, and in my office as lately, as well is Microsoft Teams. It turns out that Teams has far more capabilities than even I know how to use or have at least, maybe I missed the, the instructional day on how to use Teams, but there's probably a lot more to it even on my program than I notice.

That is what this company has actually figured out. The things I don't know yet, they have figured out. I received a lesson from Mr. Pier in his deposition about the program's capabilities in the context of what the Saint-Gobain enterprise uses Teams for. He explained that folks from any office in the company can open up a shared project, which he called a Teams Group. I'm sure it's probably called a Teams. I'm not sure. It's a sort of virtual conference room, your Honor, where folks can save documents. They can exchange documents. They can even work and edit in tandem on there. They can have a chat conversation, all of which is saved so that they can refer to

it if they need to go back and revisit a discussion that they've been having on a particular issue. It all makes complete sense. It's a way for folks virtually to work together as if they are sitting right next to one another. Mr. Pier even explained that these Teams Groups that he belongs to, some of which are project based, include French employees.

So this is how the company is able to claim that there are all these walls to access, but the practical reality is that they routinely circumvent those walls through OneDrive, SharePoint, or what sounds to be the most common, these Teams Groups. There may be other ways, but these were the ones that were discussed the most with the company's representatives.

Now back to the factors and I will do my best to make this as speedy as possible, your Honor. We're talking about the practical ability to obtain. There are six factors here, your Honor. And while, again, we don't have to demonstrate every factor, we do believe each one does speak to the practical ability for the Defendants to obtain documents from the French parent.

So as to the first factor, it's called The Corporate Structure, Common Relationships, Financial Relationships, your Honor. Defendants have pointed to each finding here to make a suggestion that each one alone, each one of our enumerated factors alone, isn't sufficient. Even if that were true, we aren't arguing them separately. We are arguing them together,

your Honor. And when we talk about these factual points we think they all support finding of this factor together.

The wholly owned subsidiary relationship between the French parent and the Defendants here, your Honor, Defendants appear to rely, again, on the corporate formality to suggest that the parent-sub relationship alone does not establish control. Sure, we agree with the fact that if that were the case, the parent-sub relationship alone doesn't rule the day. However, Plaintiffs submit there is more present on this factor that warrants a finding of control. Courts within this Circuit have found control where there is a sub-parent relationship. The Steele case that we've cited in our briefs -- it's a District of Maryland case --

THE COURT: Uh-huh (indicating an affirmative response).

MS. HARDMAN: -- from 2006 -- says:

"The specific form of corporate relative involved doesn't matter, whether it's a parent, sister, or subsidiary corporation. Courts are able to disregard the corporate form to prevent, among other things, 'misleading actions whereby corporations try to hide documents and make discovery of them difficult.'"

Courts within the Fourth Circuit order subsidiary defendants to produce documents from a foreign parent. We cited another couple of cases as well to support that, the

Ultra-Mek case, the Estate of Colombia, I believe, and the Mt. Hawley case.

Additionally, your Honor, control over documents of a foreign parent has also been found where the foreign parent was, quote unquote, responsible for the preparation of consolidated financial statements that included a U. S. subsidiary.

Your Honor, we had a slide at one point that I could demonstrate that they filed consolidated financial statements, but I thought I'd spare you the graphic and --

THE COURT: Okay.

MS. HARDMAN: -- I imagine that is not a disputed fact here, your Honor.

Defendants do claim in response that consolidated financials alone are insufficient to show control. Again, we're citing more than that to support a finding of control here. And again, this is only about discovery obligations. We are not currently at this moment talking about substantive consolidation. This is not a bigger-picture issue. We're just talking about discovery.

THE COURT: Uh-huh (indicating an affirmative response).

MS. HARDMAN: In fact, as noted in our motion, a significant amount -- and I am not saying the number because it would otherwise be redacted -- a significant amount of funds is

upstreamed in unpaid loans from the Defendant New CT to Saint-Gobain Finance Corporation, which we understand ultimately filters up at the end of the day to the French parent.

So there's clearly a relationship between these entities. And there is, again, as you see here on this chart, overlapping management at the French parent and the Defendants. Defendants suggest the roles of these overlapping senior management is either meaningless or irrelevant or that there's some temporal limitation to this analysis. Clearly, we disagree with that characterization and have not seen a case to support the idea that the current positions of these management folks are all that matter here.

As to the second factor, the connection of the French parent to the transactions at issue, your Honor, on this factor courts have found that the exchange of documents, collaboration, or a close working relationship are enough to establish this factor. And we think this factor is established easily. Documents were exchanged. Compagnie de Saint-Gobain collaborated with their U. S. subsidiaries, the Defendants here, your Honor, on Project Horizon and a former member of the Legal Department even indicated that the French parent was responsible for authorizing the restructuring and the DBMP bankruptcy.

These next few slides are just demonstratives, your Honor -- I'm not going to sit on them too long -- to support

our findings. Here, you see this is an e-mail about Project Horizon and it says, "The Current Thinking." And what I will say is it's got a slide deck that went to Pierre André. Mr. Chalendar is the Chairman and CEO of the French parent. I would consider this both an exchange of documents and collaboration.

Next, we have an image of what we call the "working list" or the "working group list" for Project Horizon and it's quite a long list. The document that goes behind the front-facing e-mail here is the original top of this e-mail and then you see the continuation. There's an, there's a set of ellipses there where the U. S. list was and at the bottom of it was the list of the Paris folks on the working group list. You see French employees, eight of them here, I believe. As I understand it, in my own daily work life when we call something a "working group," it usually consists of the people who actually work on a project, collaborate, exchange documents, and the like.

Finally, as I referenced today, on the screen is the e-mail referencing the big meeting in New York City in October that included a full team for Project Horizon. Again, more exchange of information, collaboration, and clearly a close working relationship. This is one of multiple examples. The French flew to New York to discuss Project Horizon. Therefore, we believe the facts establish this second factor.

On to the third factor, halfway through, your Honor. Whether Compagnie de Saint-Gobain will benefit if the Defendants prevail in the adversary proceedings. We've cited case law in our motion that supports a finding of this factor in the parent-subsidiary context. And now, as to whether the French parent will benefit if the Defendants prevail in the adversary proceedings here, your Honor, well, Compagnie de Saint-Gobain is relying heavily on the Defendants' success in conducting, completing, and defending the corporate restructuring and the resulting DBMP bankruptcy. Let's start with the obvious.

Compagnie de Saint-Gobain will benefit from Defendants' prevailing in these adversary proceedings because the fiduciary duty action is clearly tied to what we do in the fraudulent transfer action. Compagnie de Saint-Gobain also claims a common legal interest that if the Defendants remain successful in the challenges of these adversary proceedings, then such claims will protect Compagnie de Saint-Gobain's involvement here.

And when it comes to the benefits of the French parent as to the positions espoused by the Defendants here, there's something very important to note, the injunctive relief. It is all tied to the propriety of the corporate restructuring and the DBMP bankruptcy, which is challenged in these adversary proceedings. This injunctive relief, this issue distinguishes

the case from the very typical interest that a parent might just have in a subsidiary's litigation. Compagnie de Saint-Gobain benefits from the preliminary injunction granted at the outset of this case that was intended to carry to the permanent injunction afforded by 524(g) contemplated and considered by filing this bankruptcy case in the first place. Should Defendants find success, the continued preliminary injunction turned permanent injunction will protect Compagnie de Saint-Gobain from very significant asbestos liability. The Defendants have admitted their liability here is at least $500 million. We, of course, think it's billions. But in any case, these are significant sums that if the Defendants and the Debtor are successful, they'll insulate Compagnie de Saint-Gobain from such liability.

Shown here on the next slide, you'll see how the protections of the corporate restructuring and the injunction of asbestos liability is a foremost benefit for the French parent, given how involved they are and the updates on the meso, mesothelioma liabilities and Project Horizon here. Clearly, the French parent recognizes the importance of what they perceive as shedding their asbestos liabilities and how beneficial it would be to them if they were successful in this bankruptcy process through their subsidiaries.

I'm going to try and short circuit at least one set of factors here, your Honor, and combine them. They are somewhat

related and intertwined. Listed out here, your Honor, are a number of factual supports supporting both Factor 4, which is the exchange of documents in the ordinary course and agreements that permit the exchange of documents.

We want to note that the sixth factor refers to agreements, but it's broader than that. That factor, the point of that factor is whether the parties actually exchange and share documents to meet business needs, which they do here on a routine basis.

There's a few factors, there's a few points of factual support I've mentioned already a few times, but the factors, of course, overlap a bit in their considerations. E-mails are exchanged in the ordinary course of business. Documents and communications are exchanged in the ordinary course of business by Teams, OneDrive, or SharePoint. Mr. Pier testified in order to gain access to those documents in these ways you simply have to ask a Teams Group leader for access. It's not the same process as going to French IT for permission. You simply ask one to the other. For instance, your Honor, if I had a Teams Group, all I'd have to do is send you an e-mail or you would say, "I want to join," and I would send you that invite. This is not subject to the same policies or procedures of having to go to French IT to get access.

The company has also established a secondee program and an expat program that they employ in their ordinary course

of business. These folks are imported from France or another office to North America to work alongside their North American colleagues. While the Defendants' witness to testify on the secondees and, and expatriates issues was not able to provide detail regarding the particular secondees or expats that are working at the moment, including any of their names or what their projects that they came here for are, generally speaking, the secondees appear to join the team for a very specific project with more limited interaction with the U. S. They're here for about a year. In fact, Ms. Brutsch testified that the secondees come to the States, still connected to their French system, and supposedly don't cross over at all with the North American systems.

So they come to work side-by-side with other U. S. employees, but each don't have access to one another's systems. It seems very strange on, on its face, but the reality is the various workarounds that are afforded by Teams or OneDrive or SharePoint as well as e-mail sharing in the ordinary course of business is how these folks operate in the ordinary course.

As far as the expats go, for which there are many as you see here -- and they stay quite a while -- Ms. Brutsch testified that these folks are cut off from their French systems when they reach the Americas, except, of course, their e-mail remains the same.

So there is some continuity here. They are given

American computers and American phones. Again, to avoid what I imagine is likely continuity concerns, there are the workarounds we've discussed to ensure that they can continue their operations when they come to the U. S., Teams sharing, e-mail exchange of documents, sharing of files on One Drive or SharePoint, again.

All that said, we were told that despite these general rules, Mr. Phelizon, who was a secondee to the U. S. who was involved in the corporate restructuring, is some sort of hybrid between these two concepts. He came over, maintains access to his e-mails, but also brought a flash drive of files with him from France. So he's sort of in between here. The Defendants volunteered this information in deposition despite going back beyond the requested limited time frame. So I guess it was selectively helpful for us to understand that.

Next slide.

Ms. Brutsch testified that employees exchange e-mails with the French parent in the ordinary course of business.

Next slide.

Ms. Brutsch also testified that the exchange of documents occurred in the ordinary course by a Teams Group for collaboration and editing. This also speaks to the second factor about connection between the French parent and the Defendants.

And Mr. Pier backed up Ms. Brutsch's testimony about

sharing documents with the French and North American companies via Teams.

Mr. Pier explained that the same rings true for the firewall. As mentioned before, if there's a business requirement or need to share information across two sites, the firewall rule can be established to allow connectivity between the French and the North American sites. All you need is a business requirement or a business need. I posit that a litigation discovery request qualifies as a requirement of doing business.

On Factors 4 and 6, I leave you with some precedent case law cited in our motion practice that supports the finding of control in circumstances analogous to this one.

And on to the final, though fifth of the six factors, is whether Compagnie de Saint-Gobain has participated in these adversary proceedings. I've lifted, listed some factual support here, all of which I know your Honor is well aware of except, perhaps, the last two. And of course, one added bullet today, your Honor. We welcome Mr. Beausoleil, as you've heard from him already this morning, your Honor.

Compagnie de Saint-Gobain has participated in numerous meet and confers to establish a Case Management Order in these adversary proceedings. They litigated whether or not the fiduciary duty action would remain stayed. They participated in five court hearings on that front. They participated in the

oral argument before Judge Bridges and they have participated in the Rule 30(b)(6) depositions. For that reason, we do believe the fifth factor is established here, your Honor.

Finally, just to address some points made by the Defendants that I would call the miscellaneous at this point, there are a number of other points that are addressed which we've addressed, in turn, here. I think there's probably two, I think. One is that the foreign laws restrict production of documents. You've heard it from Mr. Beausoleil this morning and we have heard that all along for the last nine months to a year at this point.

On this score, Defendants' position raised toward the end of their responses is that, raised without a reference to a single case because this, this is simply not the supported law. The Supreme Court has recognized that it is well-settled that such statutes do not deprive an American court of the power to order a party, to subject it to the jurisdiction to produce evidence even though the act of production may violate that statute. And that is the Societe Internationale case from 1987.

As the Supreme Court has held in that case, the French blocking statute is not dispositive of a question whether the party should produce discovery through the Hague Procedures or the Federal Rules. That is the Delaware case of In re Global Power Equipment Group, also cited in our pleadings.

Finally, courts within the First Circuit, Fourth Circuit agree even in the face of a blocking statute, the Supreme Court does not require folks to first resort to the Hague Convention Procedures or other foreign procedures when discovery is sought from a foreign litigant. And that is the Eastern District of Virginia case, MeadWestvaco Corp.

Finally, Compagnie de -- the Defendants take an interesting position that because we served the Defendant -- excuse me -- because we served a subpoena on the French parent, they no longer need to be in the middle of all this. I say it's interesting because -- but I guess I should say it's consistent. Defendants all point to one another, utilize their purported corporate separateness when advantageous and not when convenient. In the PI, it was easier to respond together as one unit. Now in litigation that the Plaintiffs commenced, they are separate and we need to ensure all formalities are followed. If we're talking about formalities here, your Honor, forgive me for standing on ceremony, but a party has a duty under the Federal Rules to produce documents within their possession, custody, and control under Rule 34. Serving a nonparty has no bearing on whether that duty has been fulfilled. And normally, of course, when documents are in the possession, custody, and control of a party that's where you'd obtain them in the first instance. Third-party subpoenas would not be necessary. Defendants have turned this Rule upside down

in their pleadings. Even if that were somehow true, even if Defendants' interpretation were somehow true, our interpretation of the French's failure to commit to even production at this point further validates our need to proceed with the relief we seek here today, your Honor.

For these and other reasons in our motion and our reply, we submit that the motion should be granted.

THE COURT: Okay. Thank you.

MS. HARDMAN: Thank you, your Honor.

THE COURT: Is that all for this side? I was going to suggest we take our mid-morning break, but how long do you think you'll be, Mr. --

MR. GREECHER: I was thinking maybe 15, 20 minutes.

THE COURT: Why don't we take a break for comfort and we'll come back in about 15 minutes and hear you.

MS. HARDMAN: Thank you, your Honor.

MR. GREECHER: Thank you, your Honor.

THE COURT: Thank you.

(Recess from 10:54 a.m., until 11:11 a.m.)

AFTER RECESS

(Call to Order of the Court)

THE COURT: Have a seat, all.

Mr. Greecher, ready to go?

MR. GREECHER: I am, your Honor. Thank you. Sean Greecher from Young Conaway on behalf of the FCR.

The FCR joins in the arguments made by Ms. Hardman and the ACC. I'll do my best to not be repetitive in my comments.

Your Honor's faced with what we see as a pretty straightforward legal question here. Does the Defendants' ability to obtain documents from its French parent demonstrate control over such documents for purposes of obligating the Defendants to respond to appropriate, relevant discovery in the adversary proceedings? Now sadly, it took us months of avoidable obstruction and delay to uncover the underlying facts and circumstances to bring this question to the Court. In our prior meet and confers and colloquies with the Court, the Defendants simply provided a conclusory statement that the Defendants can't produce because they do not have formal agreements obligating CSG to turn over documents housed in France. Back in March, counsel advised your Honor, "We're not aware of any agreements that permit or otherwise allow Defendants to obtain documents from Compagnie de Saint-Gobain."

Further, when the Plaintiffs pushed on more granular questions about the nature of the Saint-Gobain enterprise's IT operations and communications that went to this issue of control, the questions were rebuffed as "irrelevant." For example, they refused to answer specific questions about the nature of how e-mail was maintained across the enterprise stating that "further questions concerning e-mail are unnecessary and can only be viewed as an attempt to create a

discovery dispute where none exists." Now thankfully, the Court offered us an opportunity to take formal discovery of the company witnesses to test the Defendants' conclusions of law here and we now see the picture more clearly and frankly, quite differently than how the Defendants portrayed the facts.

So back to the legal principle. Party must produce documents in their possession, custody, or control. We'll take Defendants at their word -- and Mr. Pier's testimony supports this -- that, for example, the North American Defendants don't have possession or custody of the e-mail inboxes or other documents of other French parent custodians. All of the e-mail inboxes in the Saint-Gobain domain, whether there inboxes of French employees or U. S. employees, Canadian, Mexican, Croatian, Thai, Vietnamese, they're all maintained through Microsoft systems administered centrally through the French parent.

And further, at present, there are firewalls in place that the French parent erected so that if, for example, a U. S.-based employee in Malvern, Pennsylvania tries to access a file generated in France, he or she quite well might not be able to click a button and have that document appear on their screen.

So we focus today on control and "control" means right, authority, or practical ability to produce, or obtain documents. We cited any number of cases and in each case this

is a disjunctive test.

So when counsel told your Honor they're unaware of agreements, their answer really didn't fully answer that control test. At best, it relates to two of those three indicia of control. It certainly didn't speak to practical ability. And the deposition testimony was clear. Even if there are no formal agreements, there is a regular practice by which the parent and subsidiary communicate and share information. And there's an established formalized protocol that the parent and subsidiary have put in place to obtain across, documents across the entity divide.

So again, that employee in Malvern, Pennsylvania can get access of a file generated in France, as Mr. Pier testified, if there's a business need. At that point, that Malvern employee can click a button and have that file on their screen through any number of types of software that the entity has at its disposable, disposal. This protocol, for whatever reason, the Defendants have not chosen to employ so that the Plaintiffs can conduct a full investigation and pursue challenges to the corporate restructuring in which French custodians played a significant part based upon the discovery that the, the Plaintiffs have received in connection with the preliminary injunction.

Now both objections passionately advocate for what, I think, the Defendants would like the law to be with respect to

this issue. They would like the question of control to be answered by whether or not the Defendants have a legal right to demand the documents, but that is not the law in the Circuit and your Honor stated exactly that in the BK Racing case. Control is not even limited to a legal right to obtain documents. Right, authority, or practical ability is sufficient.

And the cases that Defendants cite suggest some sort of ground swale in the other direction would suggest quite the opposite is true. The vast majority of the cases of the most recent vintage in the Fourth Circuit are in line with your Honor's BK Racing opinion. Control is not limited to a legal right to obtain documents. And if your Honor is so inclined to dig into the purported authority that our friends on the other side have cite, cited, you'll see how far they've had to stretch to find any whispers of support for their argument here, that the wholly owned subsidiary Defendants don't have control over relevant documents of the French parent. They cited cases of an insured being asked to obtain documents from their entirely unrelated insurer. They cited a case about an international trade union being asked to produce documents from a local operating under the union's organizational charter, but having absolutely no organizational or management connection between the two entities. They've cited a case about an organization that establishes international engineering

standards being asked to obtain records from a company that was a member of the standard-setting organization. They cited a case of a party litigant in an environmental matter who was asked to obtain technical reports from an entirely independent environmental contractor that did work on the property. Those aren't this case, your Honor.

As noted in the motion, the Defendants have the burden to show that the, that the documents requested are inaccessible. They provide no such evidence and, and, and they can't because they testified at the 30(b)(6) depositions they've never even tried to obtain the documents.

Your Honor, the motion goes through the factors established by the DuPont case for estab, for determining a subsidiary's practical ability to obtain documents of a parent, such that it could be found as having control over the documents. We put those up again. I'll briefly step through them again.

The first one is what I call the structural factor. Courts don't require a finding that the entities are corporate alter egos. We're not asking for that today. Rather, the Court merely needs to find (1) a close working relationship and (2) a means by which the subsidiary could obtain the documents when it's in its interest to do so. Both of these are clearly the case here based upon the testimony. The French parent and the subsidiary regularly share employees as secondees or

expatriated employees. Financially, the parties are tied together by consolidated financial reporting and the transfer of funds that are passing from the subsidiaries to the parent, amounts listed in Footnote 29 of the motion.

Second factor, I call it the at-issue factor. Was the parent involved in the transactions at issue in the litigation? Absolutely, it was. The French parent's executive leadership was part of the Project Horizon team. The preliminary injunction document production shows numerous e-mails between North American and French parent employees and evidence of various meetings among the groups and their consultants, discussions of various documents that were shared among those parties. The French were the ones who gave the ultimate approval of that transaction. It's, frankly, surprising to us that the Defendants even argued this factor on behalf of their parent here.

The third factor, the, what I call the pecuniary factor. Will the parent benefit from a certain outcome of this case? Again, absolutely. That's not the case with respect to the environmental consultant. They had no pecuniary interest in the case. But the French parent is and has been admittedly portrayed as having a common legal interest with the Debtor in resolving asbestos liability. So much so that it is a beneficiary of the preliminary injunction granted by the Court, this Court, at the outset of the case. Its interest in seeing

the structure established through the corporate restructuring, one of the Defendants argue, has isolated the asbestos liabilities squarely on the shoulders of the newly formed DBMP is an enormous one. Once again, Defendants' arguments on this point are just not credible.

The next factor, what I call the ordinary-course factor. Did the parent exchange documents with the subsidiary in the ordinary course? Deposition testimony, your Honor, is clear that they did. Though the Defendants' 30(b)(6) witness was a bit inconsistent on this point, the testimony showed that in condition, in addition to communicating regularly by e-mail, the Defendants and the French parent collaborate regularly on a project-by-project basis and they certainly collaborated on the Project Horizon corporate restructuring and bankruptcy filing preparations. Ms. Brutsch testified that there's an established protocol in place so that the U. S. affiliates can obtain materials from the French parent. The Defendants and the French parent communicate freely through Microsoft Teams sites through which the North American and French participants in the project have free access to the group documents.

Next, the relationship to the litigation factor. And this is different from the question of whether the parent's involved in the transaction. This factor determ, examines whether the parent has a relationship to the litigation. And again, it certainly does. The, the Plaintiffs allege that the

parent's and its directors' and officers' role in authorizing and orchestrating the corporate restructuring gives rise to independent claims and causes of action, that counsels participated and appeared in the adversary proceedings and various discovery matters in these proceedings and the fiduciary duty action against the French parent and the various officers and directors is plainly connected to the litigation into the propriety of that corporate restructuring. If the restructuring was an appropriate corporate action, then the fiduciary counsel related to those parties' orchestration of the restructuring fall away. There's a clear relationship and connection here.

And finally, this legal rights and authority factor. Again, the Defendants have denied that they're aware of any agreements, but the course of conduct, as evidenced by the Defendants' testimony, shows a formal process.

In the objection, the Debtor makes much of an alleged concession that because the U. S. Defendants have to request access to documents that are maintained by the French parent's IT operation, this means the U. S. Defendants don't have control. That's simply not the law and it neglects to engage in the analysis undertaken by the court, the court in the DuPont case and the numerous cases similarly analyzing the factors of control. This argument essentially is the same as the argument that the only way the U. S. affiliates have

control is if the French parent is legally compelled to turn over the documents. The testimony is the affiliates can and do regularly request documents under an established protocol and that's enough, we think, your Honor, to satisfy the factors.

So your Honor, I believe you can dispense with the arguments our friends make that you can simply look at whether the French parent has a legal obligation to provide access. All of the other factors point clearly to the practical ability to obtain the withheld documents.

The Defendants say that they have possession or custody of the e-mail inboxes of the North American custodians because those custodians access their e-mail on devices that the Defendants maintain and so they can direct these custodians to provide access to their sent and received e-mails. But in an absolute sense, all of the e-mails of all Saint-Gobain international employees are maintained globally through systems managed by the French. There's no notion of French e-mails or U. S. e-mails, as Defendants testified through Mr. Pier.

Finally, I'd like to go back to this issue of efforts to obtain documents from France. We first, as Ms. Hardman said, reject the principle that a party litigant can or should be permitted to defer their obligations to produce documents in favor of a third party or, as they also argue in their objection, an alleged nonparty. Party litigants don't get a free pass from production obligations under the Federal Rules

just because there is another potential avenue of access and particularly here where that other avenue would be far more onerous. If your Honor is going to credit the notion that CSG is a nonparty, then that first principle, that party litigants are obligated to produce everything in their possession, custody, or control, is critically important.

And second, with respect to the pursuit of a subpoena, yes, we have pursued a subpoena. Unsurprisingly, we continue to meet further headwinds. We expect that the North American -- we expected that the North American Defendants would have appropriately pursued access to these documents in accordance with the protocol they have in place for obtaining documents from the French parent. As noted in the motion, we were taken aback that the Defendants simply didn't bother trying. So now that we've done what we believe the Defendants should have done and still should have, should have done and still should do in order to obtain those documents, we've been given no assurance that the French parent will consent to produce a single document related to their involvement in the restructuring.

Your Honor, this is vexing for at least two reasons. First, the document requests were issued in June of 2023. The Defendants took no action for nearly a year, simply made no effort to obtain the documents that are purportedly behind this French iron curtain. And after we served a subpoena, the

French parent is only now pressing forward with these efforts to engage with the French bureaucracy to obtain clearance that they believe is required to ensure the disclosure is not prohibited by a French block, blocking statute. And again, we're not here to argue whether or not the French blocking statute applied, but the point is, your Honor, that we clearly needed to do something to get things moving, which is why we filed both the motion and also the subpoena to avoid this continued inaction.

A second reason that this is somewhat vexing, your Honor, is the Defendants' refusal to comply with their obligations to pursue communications necessary to the prosecution of the French parent's subsidiary's pursuit of a chapter 11 proceeding. Let me say it again.

The fact --

THE COURT: Try that one again. I didn't get it.

MR. GREECHER: Yeah, no. I, I lost it myself, your Honor.

This, this chapter 11 proceeding is undertaken by the French parent's wholly owned subsidiary and the refusal of the Defendants to comply with their obligations to pursue communications related to a key pillar of that restructuring, this, you know, this fraudulent transfer action, really does have an impact on, on how this proceeding moves forward. And we would suggest that, you know, whether the action, whether,

whether the requests are coming by virtue of a subpoena or by virtue of an obligation of the non, of the nondebtor and the Debtor to produce documents within their possession or custody or control may have a very significant difference in how that request is perceived by the French Government agency that Mr. Beausoleil was talking about. It really suggests two different postures. One would be the French parent's provision of documents in furtherance of a restructuring strategy they initiated or the French parent's productions of documents under compulsion of a U. S. subpoena as a nonparty.

Now I don't know if this will make a difference in the mind of a bureaucrat sitting in Paris, but it certainly seems plausible that this Court not directing the Defendants to produce these documents and the extent such documents are being produced under applicable law increases the risk that the French parent will attempt to weaponize that French blocking statute against the Plaintiffs.

So what I'm trying to suggest, your Honor, is to the extent you view the question here as a tossup, we'd humbly request that your Honor not adopt a position that would tend to erect or maintain a further impediment to the Plaintiffs' right to obtain these documents, which we believe will allow for a thorough investigation of the intentions of all the decisionmakers, French or domestic, as they engaged in this Texas restructuring and U. S. bankruptcy filing.

Now there very well may still be issues that we all need to deal with in connection with claims of applicability of the French blocking statute. Your Honor ruling that the U. S. Defendants need to cooperate with producing the documents because they're within the U. S. Defendants' control certainly doesn't mean that you're taking away parties' ability to press that potential dispute as to the applicability of the statute down the road. Again, we're not looking for anyone to risk going to jail over a document production. It simply, your Honor, in our view, streamlines and maybe simplifies the path to that particular implement of torture, which is the discussion of the French blocking statute before your Honor. We'd suggest that an order compelling the production of documents within the Defendants' control would assist us in that effort to move things forward.

Your Honor, unless you have any questions, we would request that your Honor approve the motion.

THE COURT: Not at the moment. Thank you, Mr. Greecher.

MR. GREECHER: Thank you, your Honor.

THE COURT: Do you need a few moments?

MS. GOULD: Thank you, your Honor. We do have a slide deck as well we'd like to hand out at this time. And --

THE COURT: All right, please.

MS. GOULD: -- if it's okay, we'd like to approach the

bench with one as well.

THE COURT: You may.

(Slide presentation provided to the Court)

THE COURT: Thank you, Mr. Miller.

For housekeeping reasons, we will be able to run up as late as about 1:00 before we need to take a lunch recess. I don't know what you've got in mind, Ms. Gould, but --

MS. GOULD: Very good. Thank you, your Honor.

THE COURT: Very good.

MS. GOULD: Okay. Thank you, your Honor.

Your Honor, again, we represent the Non-Debtor Affiliates, which are Saint-Gobain Company Corporation, CT Holding, and CT LLC. For ease of convenience, I will just refer to Defendants.

THE COURT: Okay.

MS. GOULD: Of course, counsel for the Debtor is here and can let --

THE COURT: Right.

MS. GOULD: -- the Court know whether they agree with all of what I'm about to say.

For almost one year the Defendants have told Plaintiffs they do not have possession, custody, or control over documents of its ultimate parent in France, Compagnie de Saint-Gobain, which I will refer to as CSG. Dating back to the preliminary injunction proceeding in 2020, Defendants have

produced any responsive, non-privileged documents from CSG that are in Defendants' files. For example, if someone sent an e-mail to Defendants and it's in their files and is not privileged, it has been produced. To the extent Plaintiffs are trying to show through this litigation that CSG was involved in the corporate restructuring and subsequent bankruptcy filing by DBMP, these communications with CSG and the U. S. Defendants in the files of the U. S. Defendants would be the best evidence and they either got that doc, those documents in the preliminary injunction or will be getting them through the implemented search terms to be run.

As Ms. Hardman's argument and the parties' briefs make clear, this is a complicated issue with various views of the law, which is not always consistent and lacks certain Fourth Circuit precedent. While we are prepared to go through all the issues and evidence or the lack thereof in detail, none of this is really necessary where, as here, Plaintiffs finally served a subpoena upon the nonparty, the non-U. S. parent. The issues concerning the production of documents by CSG should be resolved in connection with that subpoena and not by motion practice with any other party. And what only can be litigation gamesmanship, Plaintiffs waited until literally minutes before serving the motion before the Court to serve a subpoena on CSG through their counsel at Hughes Hubbard despite Defendants telling Plaintiffs for one full year that Defendants cannot

either access or demand the documents from CSG that Plaintiffs seek. And we further told the Plaintiffs, as we laid out in our brief, that they should reach out to Hughes Hubbard on this issue. We told them that last fall. Given that Plaintiffs have now finally served the subpoena, the issue of what, if any, CSG documents can or should be produced should be argued by CSG. They should have taken this simple step a year ago.

Defendants have continually made clear that e-mails of French custodians are subject to foreign privacy and data protection laws. As stated in our brief last fall, we told Plaintiffs to reach out to Hughes Hubbard. Plaintiffs' assertion in their briefs that Defendants somehow didn't ask counsel for CSG whether they would provide Defendants with the documents is baseless. It's pure speculation, as are the majority of their arguments you've heard today. Defendants confirmed with CSG's counsel months ago that they would, indeed, not give the documents to counsel for Defendants. Plaintiffs' speculation that Defendants can somehow get documents from CSG because recovery, discovery is a business need is both, again, just that, speculation, but also not true. Instead, Plaintiffs have forced the parties and the Court to spend time on letters, motions, deposition notices, and briefing. Plaintiffs took two depositions in the aid of their motion and at the end of the day, Plaintiffs have proffered zero evidence to refute what Defendants have maintained all

along, that Defendants do not control documents of their ultimate parent, CSG, whether they be e-mail boxes of CSG custodians or documents created by employees of CSG which reside on share drives at CSG.

As was demonstrated in our brief -- and we'll walk the Court through today -- Plaintiffs have failed to meet their burden -- and we will show the Court it is indisputably their burden of showing through evidence. Again, they lack evidence, not rank speculation or inferences -- that U. S. Defendants have control. No matter in the end the lens that this Court chooses to view control, it is a fact-specific determination and Plaintiffs have offered no facts. Plaintiffs' request should be flatly denied.

So let's start with the legal standard. It's Rule 34, possession, custody, or control. That's not in dispute, but what we don't agree is whether control exists and the standards that the Court should look at for control. There are two standards that have been set forth for the Court in the briefing: The legal right to obtain documents upon demand and the practical ability to obtain documents. But before I get into the legal standards, I want to focus on the facts and that's because, again, it's a fact-specific inquiry. So let's look at some of the dispositive evidence.

As you heard, your Honor, Defendants deposed Tom Pier, who is the Chief Technology Officer of Saint-Gobain North

America, as well as Shari Brutsch, an Associate General Counsel for Defendant Saint-Gobain Corporation who's been employed as an in-house counsel for 12 years. And Mr. Pier testified as follows with respect to Defendants' lack of control. Defendants don't have access to e-mails of employees of CSG. I think you heard Mr. Greecher say they do. It's speculation. It's contrary to evidence. Defendants don't have access to share drives of CSG. Defendants don't have access to hard drives or backups of hard drives of employees at CSG. The testimony by Mr. Pier, again the Chief Technology Officer, makes clear Defendants are not able to obtain CSG's documents.

Again, Plaintiffs today stated when CSG, that CSG documents are available when there is a business purpose. That is flatly contradicted by the evidence, including the testimony of Mr. Pier and Ms. Brutsch.

The deponents provided further testimony, again evidence, concerning lack of control. Mr. Pier testified he's not aware of any instance where Defendant has requested access to e-mail of CSG employees or whether any such request for e-mails of a CSG employee have been granted.

Ms. Brutsch similarly said she's never been involved in a request for CSG e-mails or documents.

And then again, Mr. Pier said Defendants cannot access documents or ESI -- that's electronically stored information -- of CSG unless specifically granted access, specifically granted

access.

Ms. Brutsch, with respect to obtaining CSG e-mails, explained this. She testified there are rules, EU rules that need to be complied with with respect to getting CSG e-mails and documents. That is why employes from the U. S. cannot get French documents. They're all aware. They work at a company, at a conglomerate where the ultimate parent is based in France. They're all aware of the EU and French rules which apply here to documents.

Further and notably, Ms. Brutsch testified that CSG has not produced documents in any U. S. litigation. This is an important fact, your Honor. There are cases which look at, well, gee, did, did the foreign parent ever produce documents to help themselves in an earlier proceeding? The answer, the only evidence here is no. This is unrebutted evidence.

But even if the Court chooses to under -- these facts are enough for the Court to decide, just as the Court did in the Smith v. O'Haro case where the Court looked at the facts and said, "Without undertaking some analysis, the facts on their face lead to an outcome that there was no control over the documents," that could easily be decided by your Honor the same way here. However, even if the Court chooses to undertake a legal analysis, the outcome is the same.

So let's turn to the standard to be applied for control. We didn't hear much about the standard. Again,

Fourth Circuit hasn't interpreted control and within the Fourth Circuit there are certain courts, North Carolina District Courts, that have adopted the legal right test and rejected the practical ability test where, as here, in the same exact circumstances before this Court information is readily available through a subpoena *duces tecum*. No compelling reason exists to expand the definition of "control" under Rule 34 to accommodate the more broad practical ability test. That is North Carolina District Court law in the same circumstances we have in this case, your Honor.

And Plaintiffs glossed over that today. You didn't hear anything about that, not surprisingly. Their only response was to cite to a case, Ultra-Mek, where the court decided it was not going to apply the legal right test because there was no subpoena. It said, "Neither party has informed the court that a subpoena *duces tecum* has been served." We started today with talking about the subpoena, your Honor.

So Ultra-Mek's inapplicable and that is the standard this Court should follow.

Now let's talk about burden. Under either standard, any standard the Court chooses to apply, Plaintiffs have not met their burden to demonstrate through evidence that Defendants have control over CSG's documents and Plaintiffs have tried mightily to escape this burden, your Honor. They did it in their briefs and they did it again today. I think I

actually heard one of the lawyers say the burden doesn't matter. Burdens do matter, your Honor. They do. There's no question. The law in this Circuit is clear that the party seeking production of documents that it contends are in the other party's control has the burden of proof on this issue. This is actually a quote from a case heavily relied upon by Plaintiffs, the Ultra-Mek case. Rather, the cases cited by -- oh, sorry.

As we explained in our moving brief, the cases upon which Plaintiffs rely to either say the burden somehow shifted or there is no burden here, if your Honor looks at those cases -- and we provided distinguishing parentheticals -- they are completely inapplicable. They concern motions to compel discovery under Federal Rules 26 and 33. They are not concerning the question of establishing control under Rule 34, which is the only issue before this Court today.

So there's no question that the burden is Plaintiffs and they haven't met it.

Now, again we submit that the legal right test is the appropriate test for this Court to follow, given that there's a subpoena served in this case. To prove that a party has the legal right to obtain documents on demand, Plaintiffs must show that Defendants can command the release of the documents by the entity that actually possesses them and the evidence before this Court is that Defendants cannot command CSG to produce the

documents before them. Effectively, Plaintiffs have conceded this argument. There's nothing in their briefs. They didn't argue it today and that's why they incorrectly ask this Court to ignore this test, to just bypass it. But given that there was a subpoena served, this is the correct standard and there's no question that they can't show control through legal right.

Lacking proof to meet the legal right test, Plaintiffs point out that some courts within this Circuit where there is no outstanding subpoena -- again not this case -- have looked at whether the party has the practical ability to obtain documents from the nonparty using a number of factors. The Court has the factors. I won't look through them. The only difference between the case we cited, Suh, which was an Eastern District of North Carolina case, and the case that Plaintiffs cite, DuPont, is that DuPont has an extra sixth factor, agreements. We believe the Suh case with the five factors is the right one, should the Court decide to look at it. There's no such DuPont test that's followed in this Circuit, as Plaintiffs would indicate. But either way, the factors are, are not vastly different. But when you look at those factors, it's the same result. Plaintiffs still have not met their burden of showing control.

Now part of the reason they haven't met their burden to prove practical ability is because they haven't provided actual facts as evidence, that the factors of control are

present. Speculation and inferences, as Plaintiffs offer, are not enough. And we quote here the Princeton Digital case, which I'll try, in general, not to read a lot of cases to your Honor, but this one bears pausing on for a moment:

> "The Court notes upfront its decision here is not and cannot be based on what might possibly be or what one might assume to be the relationship between the U. S. defendant and its foreign-affiliated entity with regard to the instant litigation. It has to be based on the current record before the Court, and what that record actually demonstrates."

And so Plaintiffs have to show evidence. They have to, they cannot show inference and speculation.

Your Honor, at this point I'm going to pause to say that Defendants maintain that the legal right standard is appropriate and given the subpoena Plaintiffs have finally served upon CSG and for the reasons already discussed, we believe your Honor can decide Plaintiffs' motion under that standard without any further argument. However, if your -- so if your Honor agrees with us on that point, we can stop here. Otherwise, we are prepared to argue the practical ability standard for control and why Plaintiffs haven't met that burden, their burden under that standard.

THE COURT: I can't give you a ruling at the moment. Keep going.

MS. GOULD: Very good, your Honor. I thought you might say that.

Plaintiffs have based a number of their arguments with respect to the practical ability factors based on impermissible speculation, which should be rejected. We'll look at the factors.

The first factor to determine control is whether the party and nonparty share a sufficiently close connection that it evidences control. That's an important part.

So Plaintiffs first talk about that we're part of the same corporate structure in their motion. But clearly, just being part of the same corporate structure can't suffice. And we site the Provost v. Kia case for that point.

So then Plaintiffs try to make an argument on this factor claiming that there were not just common relationships, but significant ones between Defendants and CSG via their overlap of directors, officers, and employees. They go so far as to claim there's an interlocking governance structure in their motion, big, big words. But when you strip away Plaintiffs' rhetoric, they have no evidence to back up these claims. The roles held by three individuals to which Plaintiffs refer -- and you saw them on Ms. Hardman's slide moments ago -- do not support a finding that Defendants control CSG's documents. Courts evaluating common relationships for purposes of determining whether control exists look at whether

the party seeking discovery has shown that the party and the nonparty have interlocking management, whether they're intertwined. They're not just trying to decide does one person work for one company and that same person has a title at another company. That's not what the standard is set by the cases.

So first, Plaintiffs point out that Mark Rayfield, the CEO of Saint-Gobain North America, is a member of a committee, that he's a member of CSG's global Executive Committee. So they're trying to make something of the fact that a gentleman who is a head of a region sits on a global Executive Committee with other heads of regions. That is not the overlap that the courts require. There's also no case law cited that committee membership is remotely relevant to the issue of control.

Second, they point to Mr. Kinisky. He held, essentially, the same roles as Mr. Rayfield, but he ended those roles in 2020. So not only is that not even any evidence of current overlap, there, both the fact of his roles don't matter and it's not current.

And finally, Plaintiffs bring up Mr. Jean-Francois Phelizon, which also provides no support. He was employed by Compagnie de Saint-Gobain in France until 2017 when he came to work in the U. S. and he still works here today. Plaintiffs point, again, to his role on a committee in 2017, which is not relevant. And as Ms. Brutsch testified, he had no access --

when he came here to the United States he had no access to Compagnie de Saint-Gobain information other than his own prior e-mails when he was working for Saint-Gobain in the U. S.

And also, your Honor, the Court should know Mr. Phelizon happens to be an agreed-upon custodian. And so we will be collecting his documents and running the aforementioned search terms through them.

And just pausing on e-mails for a moment. It makes sense for people to be able to access their own prior e-mails. It doesn't mean you can access anyone else's e-mails or you have access to an e-mail server or an e-mail box. If you're moving from one part of a company to another and you're going to be there for a long time, it'd be very hard to do a job if you couldn't look at your e-mails from the day before you moved, right? Makes common sense. Plaintiffs tried to make much ado of it, but there's nothing to make. It's common business practice.

Plaintiffs complain that the U. S. Defendants don't provide any detail as the role held by these individuals. But again, that's because Plaintiffs mistake their burden. It's their burden to provide evidence that these common relationships demonstrate an interlocking management or, in the Colomb case they cited, a complete unity of control. Again, these few instances of a title here, a title there is far from what the standard requires. Again, even though Saint-Gobain

North America has 15,000 employees, Plaintiffs desperately refer to the handful of employees -- and it is a handful -- who are seconded or expatriated from Compagnie de, Compagnie de Saint-Gobain to Saint-Gobain North America. They don't even just, they're not even seconded or expatriated to the Defendants. It's anywhere within Saint-Gobain North America. They try to point to these relationships as common relationships showing evidence of control, but not so.

And I want to put up a slide to just look at the difference because it's been, it was miscited. It's misconstrued throughout their presentation. It's also evidence of nothing because it's a -- a -- it's the top of the head of the pin. It's a very small number of people in connection with 15,000 U. S. employees.

So just, so just quickly. Expatriated employees, there are about 16-to-30 per year. Those are people who are there for a longer term. So if they're there for a longer term, they get a new U. S. laptop. They cut off access to their French documents, again other than they need to use their e-mails to continue to work. And they're removed from all access to CSG systems.

Secondees, there's one-to-two per year. They're on short-term assignments of less than a year because they're here on a short-term assignment. They bring their French laptop. They only use their French laptop and they do not get any

access to U. S. systems. That -- we cited all the testimony. That is the testimony. It's not, it's not anything that you heard from Plaintiffs today. That is the testimony about secondees and expatriated employees. This is far -- the, the, you know, 15 or so people per year that come over to the 15,000-employee company, it's far from the overlap of management and decisionmakers in the Ultra-Mek case that Plaintiffs rely upon.

Quickly, the cases Plaintiffs cite are distinguishable. We cite them in our brief. We won't belabor the Court here about them. And then Plaintiffs cite an additional case in their reply, the AFL Telecomms. case, which also provides no further support for their position. And there, notably, the court actually adopted the legal control test that we're asking your Honor to adopt, so.

Plaintiffs fail in their attempt to show, they try to then -- switching gears on this same factor -- they try to demonstrate financial relationships, again, that evidence control. You can't look at anything in a vacuum. It's not just financial relationships that matter. They actually have to evidence control. Plaintiffs point to the fact that CSG has consolidated financial statements, which include U. S. subsidiaries, which includes Defendants, CT LLC and SGC. But again, a global company's mere use of a consolidated financial statement in accordance with governing securities and

accounting rules does not evidence control. If that were the standard, every global company that has a consolidated financial statement would have a problem. Plaintiffs cite to Ultra-Mek for their support, but in that case the consolidated financials were in addition to an overlap of corporate officers that demonstrated the sub was essentially a pass-thru. I don't think there's been any allegation here that the U. S. entities are essentially pass-thrus for Compagnie de Saint-Gobain, nor could there be.

So then Plaintiffs, grasping at straws, reference loan documents between CT LLC and a separate entity, Saint-Gobain Finance Corp. Shows nothing more than that There are intercompany loans at a large conglomerate. They are well documented and recorded. They claim that this is a mechanism through which the U. S. entity provides financial support to, to Compagnie de Saint-Gobain. Again, this is all rank speculation and argument. There is no evidence before the Court on any of this. And again, as I cited in the Princeton Digital case that we looked at, that is far from insufficient.

In any event, the Plaintiffs don't explain how an ordinary course intercompany transaction at a large conglomerate evidences that a sub has the practical ability to obtain documents from a parent. They're still missing that link, which is critical.

So again, they have shown nothing with respect to the

first factor. Let's move to the second factor.

So Plaintiffs have, have to show and have failed to show that CSG has a sufficient connection to the corporate restructuring. So they seek to lower the bar here, as set forth in the briefing. Case law confirms that the connection to the litigation must be extensive and supported by substantial or overwhelming evidence. That's what it is. You can't, you can't just argue it. It actually has to have evidence. And this is made clear by the case cited by Plaintiffs, Baby Jogger.

Baby Jogger was a patent infringement case where plaintiff sought to compel the defendant to produce documents in possession of non-party affiliates related to the design and manufacture of the stroller at issue in the case. The court found there was overwhelming evidence. There was intimate involvement. Employees of the defendant and the non-party affiliates were heavily involved in the product development. And the types of documents that were looked at here, there were spreadsheets identifying the tasks to be carried out by each employee. There were all kinds of documents showing involvement in the design and development of the product.

Here, there is no evidence that CSG designed or implemented the corporate restructuring, nor could there be. It didn't happen. But in any event, Plaintiffs have always argued to the contrary. As this Court's well aware,

Plaintiffs' position has been that the corporate restructuring is a lawyer-driven strategy, that it was driven by lawyers, internal and external, for Old CT. Not our position, but that's Plaintiffs' position, which is wholly inconsistent the position they're taking today. There is no evidence in the record that CSG was involved in the planning and execution of the corporate restructuring, let alone evidence to meet the heavy or intimate involvement necessary.

Again, the other cases cited by Plaintiffs where courts granted motion to compel have significant involvement of the nonparty. Those are listed in our brief. There's a high bar here that Plaintiffs must meet.

So what have Plaintiffs shown? They, they basically show a bunch of e-mails which are not evidence before the Court. They're e-mails where Plaintiffs are arguing snippets from documents and what Plaintiffs believe they show and what they're trying to show is that it's some kind of high-level coordination or high level -- high level -- they had a meeting. The documents show there was a meeting that took place, but high-level coordination, even if that was shown, even if that was evidence, among a party and a non-party affiliate is not sufficient involvement in the underlying transaction. And that's made clear from the Shell case that we cited in our brief.

So they, they rely on these e-mails and they argue and

then they seek to create impermissible inferences, rather than presenting facts. They show nothing more than CSG personnel scheduling meetings and receiving status updates regarding the potential restructuring of the U. S. companies that CSG owned. Plaintiffs cite to no evidence demonstrating that CSG conceived, designed, or implemented the corporate, corporate restructuring because it didn't happen. What the evidence is is that Eric Placidet, the CFO, testified that "status meetings on Project Horizon informed people in Paris of what the status of the project was, knowing that, obviously, the project was managed locally under the local responsibility." That's evidence. Plaintiffs attempt to provide speculation about what documents meant or showed is insufficient to meet their heavy burden on this factor.

Okay. Factor 3. Plaintiffs fail to demonstrate any of the Defendants and non-party CSG exchanged documents in the ordinary course of business. So a lot of what you heard today where Ms. Hardman talked about Teams and a wide-area network, I'll talk about each of those in particular, but it all misses the mark. Plaintiffs' position is that Defendants have control of CSG's documents based on a claimed ordinary exchange of documents, that, that people in different areas of the company can have a Teams meeting. That certainly can't be the standard. It fails based on the law and the facts. Defendants have cited clear legal authority requiring that any exchange of

documents that is demonstrated for this factor must be with respect to the subject matter of the litigation. It can't be they're allowed to have a Teams meeting or they're allowed to send an e-mail to one another and in fact, they do send, you know. Oh, in a giant company people send e-mails to one another. That's can't be the standard. It is not the standard set by the cases we have in our brief. It has to be exchange of documents with respect to the subject matter of the communication.

We've cited the In re Takata Airbag case that your Honor can review and again, the Shell case. For example, in the Shell case the court denied the motion to compel where it says there's no evidence that the entity's coordinator, St. Jacquemin's (phonetic) "regarding the preparation and prosecution of patent applications, filings, and renewals." That's the kind of exchange of documents that courts look at in evaluating this factor.

The -- even the cases cited by Plaintiffs follow this standard. For example, the Baby Jogger case. In Baby Jogger, when they looked at the communications they said did the communications relate to the issues in the litigation, not just can you, can you Zoom with somebody from another office.

So in their reply Plaintiffs success, unsuccessfully -- excuse me -- unsuccessfully try to remedy this error by pointing to the same e-mails that they cited as evidence of

Compagnie de Saint-Gobain's substantial involvement. There's just some group of e-mails they put together and they're trying to say this shows that they were e-mailing each other. However, again, two problems. One, the e-mails are not before the Court and not evidence. They're just arguing based upon e-mails from snippets of them. But in any event, all the e-mails do are talk about setting up meetings. They, they said one, oh, here's a Teams list. That is not the kind of documents related to the litigation that courts look at. Courts look at are there documents relating to the preparation of the patents that are not at, now at issue in the litigation, things like that. This falls far short of the standard necessary.

Despite these clear legal standards, Plaintiffs continue to rely on this general use by employees of e-mails and file-sharing platforms, such as Teams, SharePoint, which I didn't even know what SharePoint was until, until this case, which is actually a, a place within Teams where documents can be stored, and OneDrive, which OneDrive is, essentially, a way to send an e-mail with attachments when the attachments are too large. Sometimes you try to send an e-mail, then the attachment gets bounced back or it says it, it can't even get sent. All OneDrive is is a way to send a larger file in a way that will somehow get through.

However, these standard, modern technologies are (1) wholly irrelevant to the standards courts use for this factor,

including the cases Plaintiffs cite, and (2) commonplace in today's world. It can't be the law that one entity could control the documents of another simply based on communications about matters unrelated to the litigation because the entities use modern technology methods, such as Microsoft Teams. If that were the standard, corporate affiliates would always be deemed to be in control of documents of one another and no analysis would be necessary.

So let's talk about the testimony of Mr. Pier, in any event, just to clear up what he talked about about technology, even though this entire subject is untethered to the subject matter of the litigation. So although it's irrelevant, we want to make sure the record is clear.

The undisputed evidence is that Defendants do not have the practical ability to obtain or access CSG documents through technological means unless someone from CSG chooses to send or share a document with an employee of Defendants. It's the points that we looked at before. Mr. Pier testified Defendants, nor IT Services North America have access to e-mails, share drives, hard drives, backups of hard drives, or employee mobile phones or tablets of employees of CSG.

So again, even though it's not relevant, I want to also just look at what was Mr. Pier's testimony about Teams. As Ms. Hardman admitted today, she said her office uses it, the Court uses it, we all use it. It's commonplace, not relevant.

So there's zero evidence that anyone at the U. S. Defendants or Compagnie de Saint-Gobain used Teams to collaborate with respect to the corporate restructuring or the subsequent bankruptcy filing, nor can there be since Teams wasn't even rolled out at Saint-Gobain North America until mid-2020, just as it was for so many people during the pandemic. There's no evidence in the record that Teams was even in use. It's just irrelevant.

Second, both Mr. Pier and Ms. Brutsch testified that access to a particular workspace in Teams is limited to those individuals who are sent an invitation to join or they can request and have their request either approved or denied. So again, it's not some free-for-all. It's, there may be a small team on a small workspace to get some work done and then you can give a small number of people to get access.

And let's talk about Mr. Pier's testimony. After all their cutting and pasting of sound bites from Mr. Pier's testimony in their reply, all Plaintiffs have shown is that Mr. Pier testified that if someone from CSG wanted to share a document by Teams with an employee of a U. S. Defendant, it is technologically possible to do that. That's like saying somebody could send you an e-mail with a document attached, if they wanted to. It is evidence of nothing.

In any event, Mr. Pier never testified there's any broad sharing of documents, generally, between Defendants and

CSG either in general or through, he talked about how IT professionals -- he's a part of a group of working IT professionals implementing IT. So he said sometimes he collaborates with his colleagues on topics to share information, such as migration from Windows 10 to Windows 11.

So being in a -- Mr. Pier having a Teams Group where he talks to French IT colleagues about how they're going to implement Windows 10 is hardly evidence that the Defendants here have control over the documents of Compagnie de Saint-Gobain.

And let's look at some of Mrs. Brutsch's testimony. Although none of the communications she referenced concerned the subject of the underlying litigation and are not instructive, we should be clear on what she said. Plaintiffs point to the fact that Defendants report financial information to CSG as evidence of a regular exchange of documents in the ordinary course of business. Again, reporting financial information to a parent company can't be evidence of practical ability to obtain documents on demand from that company, right? You're providing information up to the parent. It doesn't mean that we can then get their documents. Ms. Brutsch testified this is not an exchange of information. She explained, right, there's some monthly reporting that gets done. Accounting gets done here in the U. S. and then there's a system by when the, the closed month-end accounting gets sent to CSG. She said

there's no exchange of data from CSG back to Eric, referring to Placidet, the CFO, and his controllers in that monthly close process. She testified it's a one-way street. Defendants can't access documents or data of CSG through the financial reporting tools that are used to report information. It's a one-way flow.

So in short, Defendants and CSG did not have any exchange of documents concerning the issues in the underlying case, let alone an exchange sufficient to show that control is evidence here.

Factor 4. Plaintiffs have failed to demonstrate that CSG benefits to the necessary degree from the outcome of the adversary proceeding. So Plaintiffs refer to a benefit. They've said there's a benefit and they even called it an "enormous" benefit, but the hyperbole doesn't make it so. And again, they failed to offer any evidence. While Plaintiffs try to walk away from the Afros case they cited -- if you look in their reply, they had cited it initially and then they walked away by claiming it's an out-of-Circuit case -- that case makes clear that Plaintiffs have to show a direct benefit. That's the standard, a direct benefit. You can't just say, oh, a benefit. That'd be too easy to prove.

The point is also made clear by the DuPont case, relied upon by Plaintiffs on their so-called DuPont factors, refers to this factor as the degree to which the nonparty will

benefit from the outcome of this case. So even DuPont assumes there's some baseline benefit to prevailing in a litigation if you're a related company. There's got to be something more. What is the degree of that benefit? If Plaintiffs' arguments concerning a purported benefit to CSG, which arguments boil down to nothing more than arguing financial consequences present in every single litigation, are accepted by this Court, which they should not be, it would eviscerate the need for courts to evaluate this factor at all.

So let's look at what are the standards set by the courts? Well, different courts have said -- the Afros case said there needs to be the direct benefit. We covered that. Two other courts, the Humana v. Teva court and In re Zantac, said if the movant fails to establish that a nonparty is potentially liable for a verdict against the party from whom discovery is sought or otherwise has a financial interest in the case, courts have found there's no significant benefit for determining control. So those courts have said there has to be a significant benefit and it's basically got to be the level of being liable for a verdict.

Hampton Hall, the case relied upon by Plaintiffs, is distinguished. The court there found that the -- sorry -- oh. They were closely related entities which were created to be involved in the development and management of the plaintiff and given the close corporate structure, they found that there

could be an affect. There's no claim that CSG was created to be involved with Defendants, nor could there be.

So again, if we go back to the Princeton case that we looked at before in connection with the requirements of facts and not inferences, the court at one point considered whether the non-party Japanese-affiliated corporation which developed the video games benefited financially from the U. S. affiliate which distributed the video games and, if so, to what degree. And in considering these questions the court said:

> "Again, the Court might assume that the answer to this question is 'yes' in light of the fact that Konami Japan developed the games, but it would prefer not to assume or guess when making such significant decisions-it needs a record to support a conclusion in Plaintiff's favor here."

So Plaintiffs have only put forth speculation argument. That cannot be the basis for such a conclusion. The benefit must be direct, it must be significant, and it must be more than just a mere financial benefit that can be claimed with respect to any nonparty affiliated entity. Courts should not assume or guess when making such decisions.

So what evidence have Plaintiffs offered? So here are two statements, one from Plaintiffs' moving brief and one from their reply. From the moving brief, Plaintiffs say:

> "CSG will benefit enormously if it prevails in these

adversary proceedings since the purpose of it, purpose of the corporate restructuring and ensuing bankruptcy filing was to isolate and deal with asbestos-related lawsuits and liabilities with minimal impact on its affiliates and other ordinary-course creditors, all of which impact CSG's bottom line, in addition to the bottom line of the U. S. Defendants."

That is 100 percent argument and speculation, zero evidence.

Now let's look at their reply. Plaintiffs assert:

"It's hard to imagine how the parent entities of an enterprise with enormous asbestos liabilities would receive no benefit from the attempted relief from that liability contemplated by the corporate restructuring and resulting DBMP bankruptcy."

Again, no evidence there, either. It's pure argument on the part of Plaintiffs.

So Plaintiffs somehow, then, try to switch gears and assert that a common legal interest shared by Defendants and CSG is somehow an acknowledgment of a direct benefit from the outcome of the adversary proceedings. So this argument is both illogical and contrary to evidence. The letter cited from counsel for DBMP to which Plaintiffs rely plainly states on its case there are financial consequences, as there are in most legal matters, but the interests are decidedly legal. Again,

the financial consequences present in every litigation do not suffice.

So again, not only are Plaintiffs' arguments just that, arguments and speculation, but they're also contrary to facts. Here, CSG will not be liable for a verdict as in the cases that I just pointed out if Plaintiffs prevail in the adversary proceedings. In the adversary proceedings, Plaintiffs seek to avoid the corporate restructuring and consolidate the bankrupt, bankrupt estate of DBMP with New CT. In this case, the adversary proceedings are part of a larger bankruptcy proceeding in connection with which the size of a liability is to be determined, the size of liability of DBMP is to be determined. Sizing a liability is not the same as deriving a benefit from a litigation by defeating a claim.

Here, estimating DBMP's liability will enable the funding of a Section 524(g) trust to pay claims. It is not a win-loss proposition, like the litigations referenced in the relevant case law where a direct benefit from prevailing in a case means paying a verdict or losing a significant amount of sales. That's what, that's what the cases cover.

In any event, none of the arguments advanced by Plaintiffs form a basis for this Court to conclude -- again, all of these factors have to be tethered to does it show control. It does not show that Defendants have practical control over CSG's documents or that they could compel their

production when, as here, a nonparty -- sorry -- when as -- in -- as it could be in the cases where a nonparty is liable for the party's verdict.

Factor 5. CSG has not participated in the adversary proceedings. In their reply brief, Plaintiffs again try to evade standards set by the courts, again saying that they are outside of the Fourth Circuit. However, Plaintiffs, who bear the burden, have failed to cite a single case in or out of the Fourth Circuit that either (1) explains the standards necessary to show a nonparty's participation in the litigation or (2) rebuts the two cases that Defendants cited, Alimenta and Afros, which make clear that it's, again for this standard, it's actual involvement in the litigation.

Their entire rebuttal is saying that these cases are 40 years old, which is irrelevant and a point with which Plaintiffs must agree since they affirmatively cited Afros in their moving brief. And so we cited the Alimenta and Afros cases, right, where, for example, in Afros the court found a nonparty's involvement in the key decisions regarding the litigation, including the decision to counterclaim, were made by the non-party employee with no direct connection with the defendant. Those are the kind of things, that's the kind of participation in the litigation that we're talking about here, right? In the Alimenta case, the court found that the nonparty had been intimately involved in the discovery process,

including participating in plaintiff's answers to interrogatories. That's not present here.

Plaintiffs rely on the fact that CSG is a party to the fiduciary duty proceeding, however, they can't provide any support for their proposition that being named simply as a defendant rises to the level of participation. They claim that CSG's counsel, Mr. Beausoleil, attended the 30(b)(6) depositions, which concerned the exchange of documents with CSG. He made appearances at court hearings -- they allege he made appearances at court hearings, but at none of these did he argue or take any positions or ask any questions. There's no evidence of participation under the standards set forth in Alimenta and Afros which have not been rebutted.

Plaintiffs again assert the common legal interest. They try that one again here with CSG. It's also insufficient to demonstrate CSG's participation. And finally, in their reply brief Plaintiffs pull out a statement made by counsel for CSG from approximately a year-and-a-half ago at a court conference where parties were discussing the stay in the fiduciary duty proceeding and counsel, counsel says they're relying on that "CSG would participate if it was appropriate," some statement made by CSG in that, in that transcript. However, the statement by counsel for CSG that CSG might participate in discovery cannot be evidence that CSG has participated in discovery.

In any event, again, once again, Plaintiffs' arguments, not evidence, but arguments miss the mark because they're untethered to the idea that Defendants control CSG documents.

Factor 6. So as I mentioned upfront, the Suh case to which we cite for the practical ability standards does not have this factor. We don't believe it's appropriate or necessary to look at it, but for the sake of completeness we'll discuss it today.

Not all courts look at this factor about agreement, whether agreements among the entities reflect the party's legal rights or authority to obtain certain documents as part of the analysis of control. Plaintiffs rely upon DuPont and Baby Jogger, neither or which actually analyze this factor. Suh doesn't consider it, either, and there's no reason this Court should.

So first, I think it's indisputable there are no actual agreements between the entities with respect to the production of documents, as this factor would seem to require on its face. If there was, I think we would have heard about that front and center.

So Plaintiffs make three arguments, none of which are relevant or demonstrate control. First, Plaintiffs point to the process through which e-mails are sought by a request to the Paris-based IT team. This is most definitely, first of

all, not an agreement and it does not evidence control. There's also zero evidence and, that any Defendant has ever requested or received approval for accessing e-mails or documents from CSG. Rather, the evidence is clear that Defendants could not secure materials from CSG to meet their own business needs, the standard Plaintiffs cite. Ms. Brutsch explained this. She explained that the reason documents are not requested from CSG is because CSG will not turn them over because there are rules that need to be complied with with respect to getting Compagnie de Saint-Gobain e-mails. She said rules, EU rules, that need to be complied with. In addition, Ms. Brutsch again testified CSG documents have not been produced in any U. S. litigation proceeding.

Plaintiffs' second throwaway point in this section again goes back to the seconded and expatriated employees. I won't belabor it. I explained already that expatriated employees are cut off from their CSG documents when they come here. And there are only few of them. This, this idea of secondees and expatriates showing control goes nowhere.

And third, Plaintiffs twist the idea that there is a, it's called a wide-area network -- again a topic I knew nothing about until this case -- which is actually technology that connects offices, data centers, and Cloud applications together to make a false, sweeping statement that U. S. Defendants and CSG are connected to the same global wide-area network. That

part's true, but here's the rub. It says "through which U. S. Defendants can obtain access to materials uploaded by foreign affiliates based on a business need." That's not true and there's no evidence of it. A wide-area network is simply a commonly used telecommunications network. Saying a company is connected through one is meaningless.

I have been wracking my brain for weeks to try to think of an analogy for the Court on a wide-area network and it actually came to me on the break before because I was staying in a hotel last night, that I'm staying in a hotel and I have Wi-Fi, which I accessed this morning. Everybody in the hotel has access to Wi-Fi. There's some Wi-Fi network in this hotel. That does not mean that I can access documents or information of another hotel guest staying in another hotel room. Because in general, we're all on the same Wi-Fi network of the hotel. It's the same idea.

So again, it's false and it's meaningless. When -- and it's false because when asked if it was his understanding that Saint-Gobain North America cannot access anything loaded by a non-North American affiliate to the wide-area network, Mr. Pier answered, "The default implementation of firewall rules prevents access among sites." There's a network. I don't know. It's given power, whatever the right word is, but then they put up firewalls to prevent everyone from going outside of where they're supposed to. He testified he was not

aware of any request to modify firewalls to access documents outside of North America to anywhere, not just France. There are firewalls. You can't get them by being on a wide-area network. You cannot get documents outside of the U. S.

Your Honor, Defendants thank you for your time spent listening to the presentation today. However, none of this really had to be. Plaintiffs served CSG with a subpoena only when they filed this motion. Now that it has been served, the issue of getting documents from CSG should be between Plaintiffs and CSG and that process should play out. All the effort and time and money was unnecessary. However, if the Court still intends to decide Plaintiffs' motion, the proper standard for the Court to follow is the similar in-Circuit cases where a subpoena was also served. In those cases, given the fact of the subpoena being served upon the nonparty, the North Carolina District Courts declined to expand the test for determining control past the legal right test.

Here, Defendants do not have the legal right to documents of CSG and Plaintiffs have not demonstrated any evidence to the contrary. The Court should deny Plaintiffs' motion to compel.

Thank you.

THE COURT: Thank you.

All right. We're now at about 12:20. Do we want to hear the Debtor's arguments? Can we get that done before 1:00,

or should we break now?

Mr. Jones?

MR. JONES: We can certainly get my argument done before 1:00, your Honor.

THE COURT: Okay. All right. Let's see what we can do.

MR. JONES: May I approach, your Honor?

THE COURT: You may.

(Slide presentation provided to the Court)

THE COURT: Thank you.

MR. JONES: Thank you. Thank you, your Honor. Jim Jones again for the Debtors. And we thank you for your time today. I will be relatively brief. I will try to be other than repetitious as the lunch hour approaches and as my colleagues will tell you, lunch is my favorite time of the day.

Let's stick with control very briefly. We know what Rule 34 requires, possession, custody, or control. Control has been the term, if we search the record today, that would turn back the most hits. We've talked about hit reports. Control would win the prize.

Possession, custody, or control. Control, we've heard is either the legal right or in some Circuits' and in some courts' views the practicable, practical ability to obtain, one or the other. Some courts use both. But control still means control and I think the courts got it right when those

definitions before you were read into those opinions. Possession, custody, or control requires, at a minimum, the practical ability to obtain the materials sought on demand, on demand.

I also think the American Heritage got it right when in the dictionary it says "legal right and practical control both require the ability to exercise authoritative or dominating influence over; to direct." And here, it would be the sought-after material.

So whether or not we're talking about legal right or whether or not we're talking about practical ability to obtain, we're talking about control and I think the DuPont factors may be interesting and some courts may have thought them help, thought them helpful. But neither really matter here and neither, they're just not met. Neither do they matter or, nor are they met. Because control means control.

CSG did not -- rather, the subsidiaries here do not have control over CSG's documents. I think that has been made quite clear by Ms. Gould, whose argument I join. CSG did not decide whether the corporate restructuring would have been entered into. That's clear in the record, evidence before you. CSG was informed about a restructuring. That's a part of the record and in fact, the slide that was presented to you by our friends on the other side of the room to suggest CSG was more involved than CSG was included -- I think it was Slide 12 of

the ACC's deck -- included the word "update" in the sentence. CSG was receiving an "update."

So yes, they were informed. Yes, they were updated. They were not the decisionmakers here and Mr. Rayfield's testimony, Mr. Bondi's testimony, and the testimony we set forth at Page 8 and 9 of our brief, your Honor, makes that clear.

Sure, there are shared networks. I think Ms. Gould's analogy just presented is as compelling as any about why that is not evidence of control. In our brief, I'll let Mr. Wilson, who was, who came up with, at our firm, with the analogy take the credit here, but I think it's, it's a good analogy as well, which is folks who share a parking garage, share spaces in that parking garage, don't, don't have the right to take each other's cars when they leave at the end of the business day. That's what a share, that's what sharing a network is. It is not evidence of control.

Sure, there were personnel that communicated back and forth with those in France. That's a part of the record here. To the extent those documents were in the files of U. S. custodians, they were produced in the preliminary injunction proceeding. They've all been produced three or four years ago.

Sure, there may be some financial interest on the part of the ultimate parent in the outcome of the proceeding. That's what equity ownership means, your Honor. It doesn't

mean that subsidiaries have control of that parent, that parent's documents.

And the common-interest doctrine was cited in the brief of our adversaries on their side of the room as somehow implicating that the subsidiaries control the documents of the parent. Without doubt, the parent and the intermediate parents of DBMP share a common legal interest in connection with these proceedings and that no more shows that the subsidiaries control the documents in the position, possession of the ultimate French parent than would it show that two codefendants who are not commonly owned but merely are both on the same side of the "V" in a typical lawsuit who assert common interest control one another's documents.

So com, the common-interest doctrine as protective of privileged communications does not inform this argument today, your Honor, about whether subsidiaries control the documents within the possession of their ultimate parent.

So we need not today and you need not over the course of days to come wrestle really more about this, in my judgment, and that's because CSG has agreed to accept service of a subpoena that was served on it the morning that the ACC and the FCR filed the motion to compel in this case. Mr. Beausoleil has risen this morning -- I guess it's the afternoon now -- but has risen earlier today to tell us that, yes, indeed, they have the subpoena. Yes, indeed, they have taken the first steps

with the French authorities to assist in processing a response to that subpoena and that is now underway.

Now it cannot be laid, if that's the right past tense and I always screw it up, at the feet of DBMP or the Non-Debtor Affiliates who are not CSG that our friends at the ACC and the FCR took so long to serve that subpoena. They have known for quite some time that CSG would receive and accept service because it was stipulated, I think, as a part of the negotiations over the scheduling orders in these adversary proceedings.

So when, as the court -- and I think it's Bleecker -- "when information," said, "When information is readily available," or, rather, "attainable through a subpoena *duces tecum*, no compelling reason exists to expand the definition of control." I agree with the authors of the court there and I commend that to your Honor. We don't need to arm wrestle over things, exert any more perspiration than we already have. We know now who controls the documents and we know that because CSG, they're CSG's documents and CSG can now respond to that subpoena, as it must, pursuant to Rule 45 and whatever French or other international conven, French regulatory regime or international convention indicates that it should.

So just a moment, your Honor, on --

THE COURT: Uh-huh (indicating an affirmative response).

MR. JONES: -- a, a few things quickly with respect to timing. We've been charged here today, that is, those on this side of the courtroom, with hinderance, delay tactics, being vexing, among other things. I will try to bear up, nonetheless, but I think it's important to look at the schedule and the timeline here when we talk about delay.

Four years after the folks with us today applied, for the ACC applied to be special litigation international counsel and informed the Court about the Paris office there and its abilities to assist in international discovery; 2-1/2 years after suing a French company, CSG, and other French citizens in one of the adversary proceedings pending before your Honor; 2 years after CSG stipulated, as I mentioned, it would accept service of, of a subpoena for the documents sought now; about a year after serving document requests on the U. S. Defendants for those documents, we assume, but we haven't seen the subpoena; 9 months after the U. S. Defendants responded and said they would produce their own documents, but would not produce CSG's documents; and then after serial meet and confers, a few conferences with your Honor, and the corporate rep deps about which you've heard, only then was the subpoena served on CSG.

So the timeline is as we've set forth here, and when your Honor has a moment, you may review the deadlines and the dates and the activities set forth beneath those dates, if you

choose.

Your Honor, I put up this because we've been charged both in the papers and I think further today with a few things, three or four of which I've already mentioned. But in the papers we were charged with "posturing and manipulating and needlessly creating discovery disputes through the claim that we are distinct entities for purposes of discovery when such discovery was completed collectively in the PI proceeding."

Well, your Honor, I, I put the e-mail before you to me from counsel for the ACC because we did our best there to be appropriate and efficient in discovery, as we have done in all of these adversary proceedings, and that is with the domestic affiliates mentioned in my e-mail we agreed to gather and produce documents to facilitate efficient discovery in that hurry-up preliminary injunction proceeding without the necessity of, of forcing the ACC to serve subpoenas on the domestic U. S. affiliates of the Debtor. And we did that after we asked them to agree that they would not charge us with lack of corporate separateness because we were trying to be facilitative, if that's an adjective. And here we are today being, at least roughly, so charged.

Your Honor, the motion itself sort of, in my judgment, reveals the goal of, of its filing and that is to avoid the burden of compliance with Rule 45 and foreign law if and to the extent it should apply. And that's at reply brief, the reply

brief at Paragraph 10. And it suggests that in that, in that paragraph that it would be burdensome and time consuming to do what a party must to secure documents from a French corporation. If the subpoena that was served earlier this month had been served at the outset of these adversary proceedings, your Honor, much of what we're talking about today may not have been necessary and that, again, is not through the fault of any of the Debtor or its Non-Debtor Affiliates.

Your Honor, the one other thing I wanted to mention is because it's not in the papers and I think it was counsel for the FCR that suggested that the PI was entered or was sought and entered for the benefit of CSG. The PI was sought and entered for the benefit of the Debtor however many years ago, your Honor. It applies to the, the Debtor's affiliates for the reasons you know and were set forth in the ruling you wrote, I think, in August of '21. And there would have been no basis to sue the French parent for that which the PI was imposed.

So I wanted to mention that just because it was not a part of the papers and had not been anticipated until I heard it.

Your Honor, that's all I have and if, if I help us get to lunch a little sooner than we otherwise would have, I'm glad that I did.

THE COURT: Do we have arguments --

Thank you, Mr. Jones.

Do we have arguments completed at least on the respondents' side?

(No response)

THE COURT: Are we ready to move to rebuttal?

MS. GOULD: Oh. Yes, thank you, your Honor.

THE COURT: Okay.

Any time prognostications at this point? We're about 20 minutes to 1:00 when I'll feel obliged to stop, but if we're going to be very short, then maybe we launch into that and maybe we take a break instead.

MS. HARDMAN: Your Honor, I, I will, unfortunately, admit I have a stack of Post-Its over here. So I, I would love to say that I think I'll be done in less than 20 minutes, but I worry my, my Post-Its will end up causing me to wax a little more poetic than I wish.

So I actually might be able to make it even shorter when we get back, if I have --

THE COURT: Sure.

MS. HARDMAN: -- the benefit of a few minutes to collect my thoughts.

THE COURT: Anyone opposed to taking a break now?

(No response)

THE COURT: All right. We'll take our lunch recess and try to pick up about a quarter till. Give you five minutes more under the circumstances.

If any of you are not making arguments, apparently the ACC baseball tournament is going on next door. So you can spend the lunch hour over there, I suppose.

We'll take a break. Court's in recess.

MS. HARDMAN: Thank you, your Honor.

(Lunch recess from 12:39 p.m., until 1:48 p.m.)

AFTER RECESS

(Call to Order of the Court)

THE COURT: Have a seat.

Okay. I don't know if it's even colder here than it was before in the morning, so.

Ms. Hardman, we're back to you, I believe.

MS. HARDMAN: Your Honor, yes. Carrie Hardman from Winston & Strawn on behalf of the Committee and Plaintiffs, again unless Mr. Greecher says otherwise.

I was going to actually comment and say thank you. I felt a little bit warmer since we've gotten back, but maybe that's in my head. I guess give me five more minutes and if I'm shivering, I apologize.

I did want to raise a few points in response. We have heard a lot from both sides today. I will try to be as brief as I can. And I tried my best to distill my Post-Its, but I still have a few left because tacos took a little bit of precedent over my, my handwriting.

So I apologize for that, your Honor, but I will do my

best to make it as seamless as possible.

I will start at the beginning here, your Honor. I think we have agreement among the parties that Rule 34 does apply here. We're talking about parties in discovery and active litigation. It's the party to this litigation that has the obligation to produce documents within its possession, custody, and control. Much ado has been made about the subpoena that we have sent to the French parent. I, I don't know what that has to do with an obligation of a party to respond to their discovery demands. It certainly doesn't absolve their liabilities and their obligations under Rule 34.

Much has been made about the timeline in which we served that subpoena as well as sort of a, "Hey, look over here at this." There's a very long timeline. Your Honor, Plaintiffs have never hidden the ball on this issue. We have told your Honor. We've been very forthright about what we thought might happen if we served that subpoena and we've gotten the beginnings of exactly what we thought might happen. We're not required to serve third-party subpoenas, especially if we believe the parties have the discovery we're seeking. We did think it was going to be futile if we served this subpoena because of the positions that the Defendants have taken all along.

Nonetheless, your Honor suggested at one of our recent conferences that maybe we should lob that subpoena over and

that's exactly what we did and the response we received thus far, while it might be the cynic in me, is aligned with what I thought might happen and that is Mr. Beausoleil does not want to get arrested. Your Honor, we understand the position that Compagnie de Saint-Gobain believes that they're in. We take a differing position with respect to documents that are within the possession, custody, and control of U. S. parties.

We also are setting aside for another day the position that Compagnie de Saint-Gobain takes about being a nonparty here, but that is, again, a discussion for another day.

I will say that there's been mention today that Mr. Beausoleil made of some steps that he's taken in response to the subpoena, including going, beginning with steps related to the French process, is what I guess I'll call it. Interestingly, not once has it been raised by the Defendants in this action that they either asked their French counterparts to start that process in response to their subpoenas, if that's what they believe is required. We don't think it is, but if that's what they believe, then why did that process not start when we actually served them document demands?

All that said, we still don't think that process is even required here because the law in the U. S. is clear. If there is possession, custody, and control of documents by U. S. entities, even if they're foreign documents, that those rules, the French blocking statutes and other applicable rules, don't

apply in this circumstance. We don't have to go through that process.

We've talked about the burden and Ms. Gould said one of the lawyers said that the burden doesn't matter. I was one of those lawyers, if we're going to be clear about that for the record. What I really meant to say was not that the burden doesn't matter, but the burden issue and the dispute we were having about burden doesn't matter here, your Honor, 'cause we believe we've met our burden, if we have that burden. We have provided you ample evidence, I believe, both in our motion practice as well as in our presentation today of facts that support each of the various factors to find possession, custody, and control.

Ms. Gould referenced that there's a high burden of proof when we talk about that burden. Your Honor, I respectfully disagree. We're talking about discovery here. We're not talking about a burden of proof to determine the underlying substance of a particular matter. The test here is simple. If you have possession, custody, and control of the document, then you must produce it.

The Debtor seems to agree with us that there is these, there's two tests and maybe the practical ability to obtain test that could apply here, your Honor. I know your Honor has mentioned it in your rulings. I understand that other Defendants take the position that it certainly doesn't apply

and can't apply and has been rejected. I don't think the law in this Circuit is that clear. We do certainly think it applies here. It could be either/or and we rely on that test.

A few grandiose statements were also made today, your Honor. There was no evidence on our side whatsoever, nothing to see here. In fact, we've proved nothing and that we can't, they cannot access documents.

With respect to demonstrating that there was no evidence on our side, I, as a demonstrative I would put up both sets of slides to show you that we almost cited some of the same facts to support each of our positions. Now we take differing positions on those issues, but we cite the same facts when we talk about secondees or expatriates, when we talk about the documents, or discussion about relative access issues, whether it's Teams or SharePoint or OneDrive. We're both citing the same facts. We talk about two, two testimonial -- excuse me -- two depositions taken that provided ample evidence that supported both of our sides here, your Honor, and I think, from our perspective --

THE COURT: Uh-huh (indicating an affirmative response).

MS HARDMAN: -- and our, and position and what we interpreted with respect to the information provided in there was certainly ample evidence to support our position.

Ms. Gould went through a list of the kinds of

documents that the Defendants simply cannot access, whether that's e-mails or hard drive or share drives. Your Honor, I'll talk about it, again. The general gist here is simple. Yes, we understand that there is a default rule with respect to the company about access. However, what we've discovered in the discovery that's been taken thus far is that the default rule, yes, it exists and no one disputes that. But that, in reality and in practice, that rule is circumvented, overridden. There's ways around it that have been met for business needs for the company here. Said simply, if that's the case, why is this also not a business need? A, a subpoena or a document demand of a party should in, in all circumstances be part of that business need.

Ms. Gould mentioned that we've been going at this for about a year with respect to their position and that their position hasn't changed. And she's right. What Plaintiffs have heard for about a year is the conclusory statement, "Take our word for it. There isn't anything to see here. We can't access it." Yet, when we take the documents and we do the discovery here we do learn that there, in fact, is some evidence to demonstrate that there is access and what I've learned, if anything, from my limited time with my own clerkship is I was told, without divulging anything from behind the bench, is "look at the footnotes." That's where some of the most important things exist. And in Footnote 11 -- we talk

about there's nothing to see here, there's nothing to see here -- but in Footnote 11 of the Non-Debtor Affiliates' response, it indicates no documents are exchanged, nothing's exchanged except they maintain their e-mails in the ordinary course of business.

So they do, in fact, maintain their e-mails in the ordinary course of business. I will admit I'm guilty of hiding things in footnotes, too, but it's there. These are facts for us to demonstrate that there is, in fact, possession, custody, and control.

There's been an indication by, I believe, counsel to the Debtor that the French parent, we believe, is more involved in the process of corporate, the corporate restructuring and the DBMP bankruptcy than they were, in fact. "Take our word for it again. They weren't as involved as you think they were." Okay. Well, the evidence doesn't just show that there's a meeting here or there. The testimony that we've received thus far has indicated that they were involved. It indicates that they provide not just updates, but they provided feedback. Why fly all the way to New York if all you're doing is getting an update? Seems expensive, maybe, you know. I can't speak for the eight French folks that came over here, but I imagine it wasn't just for a quick jaunt to the, to the United States.

There was a discussion about the Bleecker case that

with, when it comes to some of the factors that we're dealing with here, your Honor, that if a subpoena *duces tecum* would provide readily available documents, that there's no need to pursue the practical ability to obtain test. What I will say about that is the Ultra-Mek case that we did cite says the subpoena here would not be factored in if it's clear that the documents are not "readily attainable." And what I haven't heard today, your Honor, is that if we serve Compagnie de Saint-Gobain, those documents are going to magically appear in my inbox tomorrow. I don't think that's going to happen. I think Mr. Beausoleil's made that clear that he can't do that under threat of, perhaps, being wanted in France.

So I think, from our perspective, they aren't readily attainable. Therefore, that rule from Bleecker doesn't necessarily apply here or kick in.

Again, our position from the Committee's side here is that the French blocking statute or other applicable U. S., foreign statutes would not apply when possession, custody, and control is found in the U. S. Again, we've mentioned that these documents are not readily attainable.

Finally -- no, not finally. I got more, I got more Post-Its. I apologize.

The Non-Debtor Affiliates have mentioned that to establish the level of control needed here the Defendants must be able to command the release of documents, putting up,

effectively, a much higher threshold. As we said in our reply, the case Uniden says otherwise. Even if a subsidiary can't order a parent to produce documents, they may still have to produce what's available to them in their possession, custody, and control under Rule 34.

There was a discussion about the benefit standard where, perhaps, Compagnie de Saint-Gobain would benefit from the Defendants' position here if they are successful. The discussion about that benefit point here has been lodged by the Defendants to suggest that it must be a direct benefit. DuPont said it could be a degree of benefit -- and I know Ms. Gould referenced that as well -- or a likely benefit as the Hampton case we cite indicates.

This is not pure speculation at all. Compagnie de Saint-Gobain, while not the one who sought the relief, does receive relief from the preliminary injunction in these cases, that if we are successful in challenging the underlying merits through these actions, that such benefit is no longer available. And I would imagine that Compagnie de Saint-Gobain would agree that billions of dollars of asbestos liability would certainly be a significant impact to them in terms of a benefit to avoid, if that's what they're going for.

Again, there's been an indication that we provided no evidence and only inferences here or there, yet we spent much time going over factual slides on both sides citing many of the

same matters. And as I mentioned before, the secondees, the expat, the expats, we talked, we both talked about the loans that are funneled up to Compagnie de Saint-Gobain. There has not been an indication that those funds that end up at another entity don't ultimately filter up to Compagnie de Saint-Gobain and there has been no indication that the consolidated financial statements that I mentioned somehow don't exist. Again, when it comes to the loans that we've talked about that filter up from New CT ultimately up to Compagnie de Saint-Gobain, there's been no dispute that those funds flow that direction.

On Page 17 of Ms. Gould's slides, Ms. Gould mentioned that Mr. Phelizon pro, came over to the U. S. with nothing but his e-mails. Again, when we talk about footnotes or the small print, that's not entirely true. In fact, Ms. Gould set up a line of inquiry in the deposition of Ms. Brutsch where she ended up indicating that he came over with a flash drive in his hand. So we know he at least had some documents. I don't know what they're about. I don't know if they're related to the corporate restructuring or not, but they're here. So wouldn't we examine that to find out if those documents are, in fact, responsive?

There was much made about our reference to Teams and, in fact, indicated, you know, it's just a Teams meeting. That's -- as I mentioned before, your Honor, Teams has much

more capability than even I utilize or realize and it certainly has abilities that my law firm as a practice is not going to maintain, but companies do because they want to maintain their files. You can save lots of things in there for a very long time, unless you're a law firm, and those things are able to be saved, shared, exchanged, in the ordinary course. So it's not "just a Teams meeting."

Ms. Gould referenced that this Teams practice at the company is very commonplace. Ordinary course of business, your Honor. One thing she did mention, though, was a fact that was brand new to us today, your Honor, and that is that the Teams program was not utilized during the time of the corporate restructuring. Your Honor, the time of the corporate restructuring was back in October of 2019, is when it was consummated, right? We've talked about how it goes back even years prior to that in terms of the planning.

The discussion about Teams was also deemed irrelevant today, your Honor. What I will say about this is we argued before your Honor a few months, few weeks ago, few months ago at this point, with respect to the possession, custody, and control topics that would be going forward in the Rule 30(b)(6) depositions. Defendants indicated at that point that the relevance to the corporate restructuring is not a factor when you talk about possession, custody, and control. In fact, your Honor, ruled that the time frame should be much shorter in

terms of what we can even ask about when it comes to those 30(b)(6) depositions and yet today we have learned something brand new that we couldn't ask about in those depositions, that Teams was not used back then. Why? Because I can't ask that question in the deposition, your Honor, because it's outside of the scope that the Defendants so hard fought to keep.

So your Honor, I, I have to say that it's in line with what happened during the deposition as well when inquiries were made about Mr. Phelizon that go back in time as well. They're using the time frames to their advantage and not when none available. So you know, at some point I would certainly like to ask questions related to the Teams process.

What I will say about that is if we had been permitted to ask questions, I think some of the questions I would have asked, your Honor, is, "Okay. First, was Teams used during the corporate restructuring process?" If the answer is "No," as the Defendants have now told us today, "Okay. Did the company use some other process, some other program?" If the answer was "No," so are we suggesting that this company all of a sudden for the first time began collaborating in a way that they use on an ordinary course basis for the first time back in 2020 when Teams is introduced? I bet the answer to that question is, no, they probably used something else. I don't know what it is because I wasn't allowed to ask questions about this issue, your Honor, because it goes back before August 23 of

2021.

Ms. Gould mentioned that employees that come from France maintain access to their French e-mails. It's just practical, she said. That's what we want to focus here on, your Honor, practical. Practical ability to obtain documents. There's lots of rules. There's lots of default rules here. Of course there are. Every company should have them, but practically, that is not how it has been working for a company, a multi-billion dollar conglomerate that needs to coordinate among its various offices and its various facilities to ensure that they have a successful business.

So while it's not the way things should be, the way things are is what we think your Honor needs to examine and rule on with respect to possession, custody, and control.

And with that, I think I've covered my ground and Mr. Greecher will probably save the day, your Honor.

Thank you.

THE COURT: Mr. Greecher.

MR. GREECHER: Let's not, let's hope it's not up to that, up to me, your Honor.

Sean Greecher again, your Honor. Just a couple things I'd like to touch on.

First, with respect to the statements from Ms. Gould indicating that the communications between or among the U. S. and the French parties, that there's a lack of evidence that,

that, that demonstrates anything other than much more than scheduling meetings and, and, and the like.

Your Honor, I do have a copy of a document I think maybe we could walk through. If I can approach, I have --

THE COURT: Please.

(Document provided to the Court)

THE COURT: Thank you.

MR. GREECHER: Your Honor, if I could briefly just step through this. What -- what I -- what this indicates is that it's, it is, indeed, at the end, if you go to the last page, it is a, an invite to a Webex meeting. It's a Webex meeting that was scheduled for January 21, 2020.

You go to the next page toward the front and there's an, it's an e-mail from a Saint -- Dina Pokedoff at Saint-Gobain to a various number of parties, including a number of parties who are French affiliates. This e-mail says, "For our call at 11:00 a.m., please log in to the Webex so that we can all review/discuss documents together."

You then flip forward a number of pages, you see a number of redacted entries. And if you go to the second page and you look at the Subject line at the top of that, the Subject line is Paris' Minor Edits to Final Release - Privileged and Confidential. And again, we've, you've been prohibited from seeing the, you know, the, the nature of that.

But your Honor, my point here is simply that there are

more than simply invitations to meetings, one. Two, there was a process by which documents were shared and collaborated upon, even before Teams. Apparently, it was through Webex. And three, there were comments to documents, comments to -- as -- as -- if you note on the very last page, it would appear to be a press release from CSG, a press release from DBMP, and DBMP Investor Relations Q&A on January 22, 2020, a pretty important day with respect to the chapter 11 process.

So we reject the suggestion that there's no evidence.

Second, I, I wanted to talk a little bit about what, what sort of the default implementation is. I think that's an important term here, your Honor, and to the extent that you're interested in it, I think it's on Page 142 of Mr. Pier's deposition where he talks about the note, this notion of a default implementation of the rules of -- of -- of the rules of the game here and Mr. Pier indicated that access could be granted if there was a business need. And your Honor, we'll suggest that you take a look at that. We believe that it demonstrates that there is, in fact, an opportunity for the rules of the game, the default implementation, to be changed as and when the need arises.

I, you know, I, I was wrestling with the, the analogy that was in the Debtor's paper and, you know, full marks to Mr. Jones' associate. I, I thought it was creative and the same, and the same sort of analogy from Ms. Gould today. I

don't think they quite hit the mark, you know. The, the suggestion that, you know, that if, if, if Ms. Gould is in a hotel and her, you know, she's using the Wi-Fi, that other parties can't get access to that. Well, that might be the default implementation, but to the extent that there is a crime that was committed in the hotel, let's just say that it was on, I don't know, October 23, 2019, just picking a date. For sure, there would be an opportunity for parties to investigate what was going on at the hotel, whether there was a crime committed in the hotel, that folks would have access. Yes, the default implementation is that parties don't, don't have access, generally, to the, you know, the, the document or the communications of others, but that's not necessarily a hard-and-fast rule.

And with respect to the car analogy, I think it's a bit hyperbolic. I think the more apt version of that one might be that to the extent a company regularly lets employees drive the company cars and one of the employees potentially committed a crime on, I don't know, let's use October 23, 2019 again, investigators should have the opportunity to examine all the company cars and understand who did what, when, and where.

That's what we're asking for here, to understand who did what, where. That's what we've been asking for since the outset of this, this proceeding and we believe that this is an important step, your Honor, to allow us to undertake that

investigation.

Thank you.

THE COURT: All right.

Has that got it? Ms. Gould.

MS. GOULD: Your Honor, may I respond very briefly? Just a few points.

So first, just to close the door on e-mails. Accessing your own -- so there's a @saintgobain.com e-mail address and just because you can access your own e-mails if you move from France to the U. S. does not mean you can access anybody else's. I think that's pretty clear. So I don't think we need to belabor that.

Second, Ms. Hardman mentioned that Mr. Phelizon not only had access to his e-mails, he actually brought a stick of --

THE COURT: Uh-huh (indicating an affirmative response).

MS. GOULD: -- jump drive or a flash drive. That's true and we have collected the documents from that drive to be searched with the search terms and produce. There's no issue with respect to that stick or drive.

And third, I think -- just want to point out one statement Ms. Hardman made because it encapsulates my entre presentation when I said that their entire presentation is based on speculation and inferences, not facts.

And the document that Mr. Greecher just handed you is actually, it was not attached to their papers as in, you know, with a declaration or otherwise. It's not evidence. It's not in the record.

But Ms. Hardman made the statement when she was looking at saying, "I imagine their meeting wasn't just for a quick jump to the U. S." That is pure speculation about the meeting and it is not anything that this Court can base an order of control on.

So again, we ask that the Court denies the Plaintiffs' motion.

Thank you.

THE COURT: Mr. Jones.

MR. JONES: Thank you, your Honor. Two quick points.

The first one is there was nothing prohibiting the ACC from serving document requests on the Debtor and the Non-Debtor Affiliates that are a party to the adversary proceeding in which we gather today and serving a subpoena on CSG contemporaneously. They chose not to. And the timeline that I have suggested might be worthy of your review in Chambers will show the delay that occurred because they chose not to.

Second, I don't think there's anything in this record, nor is there anything that occurs to me that suggests that the Debtor and the Non-Debtor Affiliates who are not CSG had any obligation to seek from anyone what is not theirs, nor am I

aware of any procedure by which the Debtor and/or the Non-Debtor Affiliates who are not CSG could have started any process in France to gather documents were they so inclined.

And then last, on the press release, invitation of discussion of what appears to be a press release, the documentation of which you were handed up moments ago by Mr. Greecher, if you look at the very last page of the document, which has a Bates number ending in 639, it does show that, apparently, either attached or otherwise and perhaps the topic of discussion -- again, this is a little bit of speculation on my part because the document's been redacted for privilege, it appears -- you see at the bottom of the page these words, "CSG Press Release, DBMP Press Release," and then something "DBMP_Investor Relations QA Draft."

So what we have here is of the, roughly, 4,000, I think it was, documents produced in the case, a single meeting invitation that appears to have involved at least the attachment of, if not the discussion of, separate press releases, one for CSG as something that may have required notice to the public apparently was impending and one from DBMP. I don't know that that has any other pertinence, if it -- if it had -- I don't know that that has any pertinence to the inquiry before your Honor.

That's all I have,

THE COURT: You don't suppose that might have been

'cause they were in different languages?

MR. JONES: Perhaps.

THE COURT: Okay.

Anyone else? We done?

MS. HARDMAN: Your Honor, I only have one last point on those issues raised by the Defendants, your Honor. And I think Mr. Greecher hit the nail on the head with this.

Your Honor, I could probably produce to you every single invitation of meetings that happened that involved the French to demonstrate how frequently this happened. It seems an exercise that may not be worth its salt to show you a whole bunch of invitations.

But one thing I will say that we lawyers all probably can agree with. At some point in our careers we've recommended to our clients that, "Maybe it's best that you just meet in person on certain issues. Maybe all the real work gets done when you meet in person." And maybe that's what happened here. We're talking about a lawyer-driven strategy, your Honor. The entire corporate restructuring was driven by lawyers. I'm a lawyer. I would instruct my clients it'd do better by having a conversation in person about something, especially something this sensitive.

So from, from our perspective, yes, our evidence is that there's a number of meetings. We would like to ask questions about those meetings and we'd like to get a full

understanding of what happened. Again, we're just testing our theory here. We're testing our position on these issues. We believe that what we've seen so far in the evidence supports our position.

Your Honor, we think that that means that there's probably more there and given the fight that we're, we're putting up every step of the way here, your Honor, we think that maybe there is some there there after all.

Thank you, your Honor.

THE COURT: Now done?

(No response)

THE COURT: Okay.

I'm going to have to work my way through this and as there are quite a few things competing for attention at the moment, I'm not exactly sure when I will be through. I'm not talking about a period of months, but it may be a couple weeks before you hear back from me on this regard. And at that point I'll either announce this at one of our hearings or, if we decide to write it, we'll, we'll try to put it up.

But I'll send out an e-mail to the group when I know which way we're going with it.

If there's nothing else, I think I should recess this as quickly as possible. 'Cause I imagine it's a mob scene out at the airport and quite a few of you are going to have to fight your way to, on the plane.

So why don't we go ahead and recess at this juncture. And I'll let you know as soon as I can, all right?

MS. HARDMAN: Thank you, your Honor.

MR. GREECHER: Thank you, your Honor.

MS. GOULD: Thank you.

THE COURT: All right.

(Proceedings concluded at 2:19 p.m.)

CERTIFICATE

I, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

*/s/ Janice Russell* May 28, 2024

Janice Russell, Transcriber Date

**Case Nos. 3:24-cv-558-KDB; 3:24-cv-559-KDB**

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

---

PETER L. BERGRUD AND MICHAEL N. AND ANN HERLIHY,

Appellants,

v.

DBMP LLC,

Appellee.

---

On Appeal from the United States Bankruptcy Court for
the Western District of North Carolina, Charlotte Division
Case No. 20-30080 (AAE)

---

**BRIEF FOR APPELLEE DBMP LLC**

---

NAI-1540993688

Gregory M. Gordon
(TX Bar No. 08435300)
**JONES DAY**
2727 North Harwood Street, Suite 500
Dallas, Texas 75201
Telephone: (214) 220-3939
E-mail: gmgordon@jonesday.com
(Admitted *pro hac vice*)

Jeffrey B. Ellman
(GA Bar No. 141828)
**JONES DAY**
1221 Peachtree Street, N.E., Suite 400
Atlanta, Georgia 30361
Telephone: (404) 521-3939
Facsimile: (404) 581-8330
E-mail: jbellman@jonesday.com
(Admitted *pro hac vice*)

C. Kevin Marshall
(DC Bar No. 476266)
**JONES DAY**
51 Louisiana Ave., N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
E-mail: ckmarshall@jonesday.com
(Admitted *pro hac vice*)

Garland S. Cassada
(NC Bar No. 12352)
Richard C. Worf, Jr.
(NC Bar No. 37143)
**ROBINSON, BRADSHAW & HINSON, P.A.**
101 North Tryon Street, Suite 1900
Charlotte, North Carolina 28246
Telephone: (704) 377-2536
Facsimile: (704) 378-4000
E-mail:
gcassada@robinsonbradshaw.com
rworf@robinsonbradshaw.com

*Counsel for Appellee/Debtor DBMP LLC*

## CORPORATE DISCLOSURE STATEMENT

Appellee DBMP LLC makes the following disclosure:

1. Is the party a publicly-held corporation or other publicly-held entity?
☐Yes ☒ No

2. Does the party have any parent corporations?
☒Yes ☐ No

   If yes, identify all parent corporations, including grandparent and great-grandparent corporations:
   See Exhibit A attached hereto.

3. Is 10% or more of the stock of a party owned by a publicly-held corporation or other publicly-held entity:
☒ Yes ☐ No

   If yes, identify all such owners:
   Compagnie de Saint-Gobain (France) (indirect owner)

4. Is there any other publicly-held corporation or other publicly-held entity that has a direct financial interest in the outcome of the litigation?
☐ Yes ☒ No

   If yes, identify the entity and the nature of its interest:

5. Is the party a trade association?
☐ Yes ☒ No

   If yes, identify all members of the association, their parent corporations, and any publicly held companies that own 10% or more of a member's stock:

6. If the case arises out of a bankruptcy proceeding, identify any trustee and the members of any creditors' committee:
See Exhibit B attached hereto. The future claimants' representative is Sander L. Esserman.

*/s/ Garland S. Cassada*
Garland S. Cassada

September 18, 2024
Date

**EXHIBIT A**

DBMP LLC Parent Corporations

CertainTeed Holding Corporation
Compagnie de Saint-Gobain (France)
Saint-Gobain Corporation
Saint-Gobain Delaware Corporation
Societe de Participations Financieres et Industrielles

## EXHIBIT B

Asbestos Claimants' Committee

1. Theresa V. Germont
   c/o Cohen, Placitella & Roth, P.C.
   Attn: Christopher M. Placitella
   127 Maple Avenue
   Red Bank, NJ 07701

2. Earl F. Powell
   c/o Goldberg Persky White, P.C.
   Attn: Bruce E. Mattock
   11 Stanwix Street, Suite 1800
   Pittsburgh, PA 15222

3. Cindy Burch
   c/o Kazan, McClain, Satterly & Greenwood PLC
   Attn: Steven Kazan
   55 Harrison Street, Suite 400
   Oakland, CA 94607

4. Jimmy Reich
   c/o Maune Raichle Hartley French & Mudd, LLC
   Attn: Marcus E. Raichle, Jr./Chris McKean
   1015 Locust St., Ste. 1200
   St. Louis, MO 63101

5. Robin S. Wierenga
   c/o Cooney & Conway
   Attn: John D. Cooney
   120 N. LaSalle Street, Suite 3000
   Chicago, IL 60602

6. Patsy Diehl, Special Administrator of Carl Diehl
   c/o The Gori Law Firm
   Attn: Sara Salger
   156 North Main Street
   Edwardsville, IL 62025

7. Kurt Henningsen
c/o Law Offices of Peter G. Angelos, P.C.
Attn: Armand J. Volta, Jr.
100 N. Charles Street, 22nd Floor
Baltimore, MD 21201

8. James Hunt
c/o The Shepard Law Firm
Attn: Michael Shepard
160 Federal Street
Boston, MA 02110

9. Francisco Galaviz
c/o Shrader & Associates, L.L.P.
Attn: Robert E. Shuttlesworth
9 Greenway Plaza, Suite 390
Houston, TX 77046

10. Wendy Roberts, spouse of Colin Roberts, Deceased
c/o SWMW Law, LLC
Attn: Lauren E. Williams
701 Market Street, Suite 1000
St. Louis, MO 63101

11. Alice B. Nuzzolese
c/o Weitz & Luxenberg, P.C.
Attn: Perry Weitz
700 Broadway
New York, NY 10003

## TABLE OF CONTENTS

Page

STATEMENT OF THE ISSUE AND STANDARD OF REVIEW ........................1

INTRODUCTION ..........................................................................................2

STATEMENT OF THE CASE.......................................................................4

A. Bankruptcy Code § 362 ..........................................................................4

B. Bankruptcy Code § 524(g) ......................................................................4

C. The History of Asbestos Claims Against Old CT and the Corporate Restructuring ..........................................................................6

D. DBMP's Chapter 11 Case: Its Preliminary Injunction Motion, the Committee Lift-Stay Motion, and Other Proceedings ...................9

E. Dismissal Efforts in the Similar *Bestwall* and *Aldrich* Cases ............14

F. The Four Lift-Stay Efforts in *Bestwall* and *Aldrich*..........................17

G. Appellants' Stay Relief Motions .........................................................20

SUMMARY OF ARGUMENT ....................................................................23

ARGUMENT ...............................................................................................24

I. The Bankruptcy Court Did Not Abuse Its Broad Discretion Under the Fourth Circuit's Controlling Precedent in *Robbins*.....................................24

A. *Robbins* Controls the Lift-Stay Analysis............................................25

B. The Bankruptcy Court Properly Applied *Robbins* in Its Lift-Stay Analysis...........................................................................29

C. The Bankruptcy Court Properly Considered the Tens of Thousands of Other Claimants as Part of Applying *Robbins'* "Judicial Economy" Factor ..............................................................34

II. The Bankruptcy Court Properly Considered *Carolin* in Response to Appellants' "Bad Faith" Arguments ..........................................................39

A. The Bankruptcy Court Properly Recognized It Could Not Accept an Argument That the Case Was Filed in "Bad Faith" Apart From Applying *Carolin's* Rule Governing That Question......40

B. Appellants' Subjective Bad-Faith Arguments, Detached From *Carolin*, Are Misplaced In This Lift-Stay Context ............................42

CONCLUSION ............................................................................................48

## TABLE OF AUTHORITIES

**Page**

CASES

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)....................5

*Carolin Corp. v. Miller*,
886 F.2d 693 (4th Cir. 1989)....................passim

*Claughton v. Mixson*,
33 F.3d 4 (4th Cir. 1994)....................1, 28

*Evans v. Eaton Corp. Long Term Disability Plan*,
514 F.3d 315 (4th Cir. 2008)....................1

*Fairville Co. v. Ramkaran (In re Ramkaran)*,
315 B.R. 361 (D. Md. 2004)....................27, 40

*Furness v. Lilienfield*,
35 B.R. 1006 (D. Md. 1983)....................28

*Harrington v. Purdue Pharma L.P.*,
144 S.Ct. 2071 (2024)....................39

*In re A.H. Robins Co.*,
880 F.2d 709 (4th Cir. 1989)....................5

*In re Albany Partners, Ltd.*,
749 F.2d 670 (11th Cir. 1984)....................28

*In re Aldrich Pump LLC*,
2023 WL 9016506 (Bankr. W.D.N.C. Dec. 28, 2023)....................16, 30

*In re Aldrich Pump LLC*,
No. 20-30608 (Bankr. W.D.N.C.)....................passim

*In re Bestwall LLC*,
605 B.R. 43 (Bankr. W.D.N.C. 2019) ............................................................14

*In re Bestwall LLC*,
658 B.R. 348 (Bankr. W.D.N.C. 2024) ..........................................................15

*In re Bestwall LLC*,
71 F.4th 168 (4th Cir. 2023), *cert. denied* (U.S. May 13, 2024)................passim

*In re Bestwall LLC*,
No. 17-31795 (Bankr. W.D.N.C.) ...........................................................passim

*In re Corp. Deja Vu*,
34 B.R. 845 (Bankr. D. Md. 1983) ...................................................................28

*In re Dunes Hotel Assocs.*,
188 B.R. 162 (Bankr. D.S.C. 1995)...........................................................41, 43

*In re Eatman*,
182 B.R. 386 (Bankr. S.D.N.Y. 1995)...............................................................31

*In re Garlock Sealing Techs. LLC*,
No. 10-31607 (Bankr. W.D.N.C.) .....................................................................46

*In re Honx, Inc.*,
2022 WL 17984313 (Bankr. S.D. Tex. Dec. 28, 2022)......................................46

*In re Ionosphere Clubs, Inc.*,
922 F.2d 984 (2d Cir. 1990) ...............................................................................4

*In re Johns-Manville Corp.*,
36 B.R. 727 (Bankr. S.D.N.Y. 1984)................................................................47

*In re Johnson*,
655 B.R. 83 (Bankr. D.S.C. 2023).....................................................................26

*In re Kinney*,
51 B.R. 840 (Bankr. C.D. Cal. 1985) ...............................................................28

*In re Little Creek Dev. Co.*,
779 F.2d 1068 (5th Cir. 1986) ....................................................................28

*In re Lotus Invs., Inc.*,
16 B.R. 592 (Bankr. S.D. Fla. 1981) ...........................................................28

*In re LTL Mgmt., LLC*,
64 F.4th 84 (3d Cir. 2023) ...................................................................15, 46

*In re Madden*,
1999 WL 33486095 (Bankr. D.S.C. Dec. 21, 1999) ........................................41

*In re Mid-Valley, Inc.*,
305 B.R. 425 (Bankr. W.D. Pa. 2004)...........................................................46

*In re N. Am. Refractories Co.*,
No. 02-20198 (Bankr. W.D. Pa.) ....................................................................46

*In re Nw. Child Dev. Ctrs., Inc.*,
2020 WL 8813970 (Bankr. M.D.N.C. 2020)....................................................26

*In re Premier Auto. Servs., Inc.*,
492 F.3d 274 (4th Cir. 2007) .......................................................22, 44, 45

*In re Scott*,
42 B.R. 35 (Bankr. D. Ore. 1984)....................................................................28

*In re Secrest*,
453 B.R. 623 (Bankr. E.D. Va. 2011)........................................................26, 35

*In re Setzer*,
47 B.R. 340 (Bankr. E.D.N.Y. 1985) ..............................................................28

*In re SunEdison, Inc.*,
557 B.R. 303 (Bankr. S.D.N.Y. 2016)..............................................................35

*In re Talladega Steaks, Inc.*,
50 B.R. 42 (Bankr. N.D. Ala. 1985) .................................................................28

*In re Thirtieth Place, Inc.*,
30 B.R. 503 (Bankr. App. 9th Cir. 1983) ....................................................28

*In re United Gilsonite Labs.*,
No. 11-02032 (Bankr. M.D. Pa.) ..........................................................................46

*In re USG Corp.*,
No. 01-2094 (Bankr. D. Del.) ..............................................................................46

*In re Victory Const. Co., Inc.*,
9 B.R. 549 (Bankr. C.D. Cal. 1981), *vacated on other grounds as moot*, 37 B.R. 222 (B.A.P. 9th 1984) ..............................................................28

*In re W.R. Grace & Co.*,
Nos. 01-1139, 1140 (Bankr. D. Del.) ..................................................................46

*In re Wiencko*,
2004 WL 1146490 (4th Cir. 2004) .......................................................................25

*In re Yukon Enters., Inc.*,
39 B.R. 919 (Bankr. C.D. Cal. 1984) ..................................................................28

*Ivester v. Miller*,
398 B.R. 408 (M.D.N.C. 2008) ...........................................................................25

*Lawrence v. Motors Liquidation Co. (In re Motors Liquidation Co.)*,
2010 WL 4630327 (S.D.N.Y. Nov. 8, 2010).........................................................35

*Lee v. Anasti (In re Lee)*,
461 F. App'x 227 (4th Cir. 2012) .........................................................................25

*Malbon v. Pa. Millers Mut. Ins. Co.*,
636 F.2d 936 (4th Cir. 1980) ...............................................................................27

*Matter of Rexene Prods. Co.*,
141 B.R. 574 (Bankr. D. Del. 1992)........................................................................4

*Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*,
474 U.S. 494 (1986)................................................................................................4

*N.A.A.C.P. v. City of Mansfield, Ohio*,
866 F.2d 162 (6th Cir. 1989) ....................................................................1

*Official Comm. of Asbestos Claimants of Bestwall LLC v. Bestwall LLC*,
No. 24-170 (4th Cir. May 31, 2024), Dkt. 15 ....................................................15

*Official Comm. of Asbestos Claimants v. Bestwall LLC*,
No. 19-396 (W.D.N.C. Nov. 7, 2023), Dkt. 19 ..................................................14

*Official Comm. of Asbestos Claimants v. Bestwall LLC*,
No. 19-408 (4th Cir. Nov. 14, 2019), Dkt. 13 ....................................................14

*Official Comm. of Asbestos Personal Injury Claimants v. Aldrich Pump LLC*,
No. 24-00042-RJC (W.D.N.C.) ..........................................................................16

*Official Comm. of Asbestos Personal Injury Claimants v. Aldrich Pump LLC*,
No. 24-128(L) (4th Cir. Apr. 17, 2024), Dkt. 50 ................................................16

*Ortiz v. Fibreboard*,
527 U.S. 815 (1999)...........................................................................................42

*Robbins v. Robbins (In re Robbins)*,
964 F.2d 342 (4th Cir. 1992) ......................................................................passim

*Robert Semian and Other Claimants of Maune Raichle Hartley French & Mudd, LLC*, No. 24-00044-RJC (W.D.N.C.) ....................................17

*Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.)*,
907 F.2d 1280 (2d Cir. 1990) ......................................................................31, 32

*Toibb v. Radloff*,
501 U.S. 157 (1991).............................................................................................6

*Truck Ins. Exch. v. Kaiser Gypsum Co.*,
144 S. Ct. 1414 (2024)...................................................................................5, 44

*Westberry v. Gislaved Gummi AB*,
178 F.3d 257 (4th Cir. 1999) ....................................................................1

*Wilson Buckingham and Angelika Weiss v. Bestwall LLC*,
No. 24-00297-RJC (W.D.N.C.) ...........................................................19

**STATUTES**

11 U.S.C. § 109 ........................................................................................6

11 U.S.C § 362 .....................................................................................passim

11 U.S.C. § 503 ........................................................................................6

11 U.S.C § 524(g) ..................................................................................passim

11 U.S.C. § 1103 ......................................................................................6

11 U.S.C. § 1112(b) ............................................................................14, 16

**OTHER AUTHORITIES**

3 Collier on Bankruptcy ¶ 362.10 (16th ed. 2024) ..............................................32

H.R. Rep. No. 103-835 (1994)........................................................................47

Rep. of the Judicial Conf. Rep. of the Judicial Conf. Ad Hoc Comm.
on Asbestos Litig. 2 (1991).........................................................................4

Sandrea Friedman, *Manville: Good Faith Reorganization or "Insulated'" Bankruptcy*, 12 Hofstra L. Rev. 121, 122 (1983) ........................47

U.S. Constitution Bankruptcy Clause ..............................................................15, 16

## STATEMENT OF THE ISSUE AND STANDARD OF REVIEW

***Did the Bankruptcy Court abuse its discretion in denying Appellants' motions for relief from the automatic stay?***

Appellants' Brief (at 5) misstates the standard of review. "A decision to lift the automatic stay under section 362 of the [Bankruptcy] Code is within the discretion of the bankruptcy judge and this decision may be overturned on appeal only for abuse of discretion." *Robbins v. Robbins (In re Robbins)*, 964 F.2d 342, 345 (4th Cir. 1992); *see Claughton v. Mixson*, 33 F.3d 4, 5 (4th Cir. 1994) (Congress has "granted broad discretion to bankruptcy courts" in this area).

An abuse of discretion occurs when the court's "conclusion is guided by erroneous legal principles or rests upon a clearly erroneous factual finding." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999) (internal citations omitted). "[T]he abuse of discretion standard requires a reviewing court to show enough deference to a primary decision-maker's judgment that the court does not reverse merely because it would have come to a different result in the first instance." *Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 322 (4th Cir. 2008). Only in the "rarest of cases" should a lower court's evaluation of the equities be disrupted on appeal. *N.A.A.C.P. v. City of Mansfield, Ohio*, 866 F.2d 162, 166 (6th Cir. 1989) (quoting *Baja Contractors, Inc. v. City of Chi.*, 830 F.2d 667, 674 (7th Cir. 1987)).

## INTRODUCTION

In this mass-tort bankruptcy, Appellants filed on the same day virtually identical motions for relief from the automatic stay through the same counsel. The Bankruptcy Court[1] correctly applied the Fourth Circuit's longstanding precedent for considering such motions and set out a reasoned basis for its decision. The Court thus faithfully and appropriately exercised its discretion; it certainly did not abuse it.

Appellants, however, seek to utilize this otherwise straightforward appeal to indirectly litigate issues involving their desire to *dismiss* DBMP's bankruptcy. They do this even though no motion to dismiss has been filed and even though the same arguments have repeatedly failed in similar cases in this District—both in the dismissal and lift-stay context.

Appellants ostensibly seek relief from the automatic stay to pursue their state court claims against DBMP. But they do not assert *any* unique circumstances—any "specific facts of a particular claim," as the Fourth Circuit recently put it—to distinguish themselves from the tens of thousands of other tort claimants against DBMP. As a result, if they prevailed in obtaining stay relief on their motions, virtually any claimant could do the same, resulting in a rush of claimants returning

---

[1] Judge J. Craig Whitley was the presiding judge at the time these motions were heard and decided, and he was the judge who entered the orders denying the motions on appeal here. Upon Judge Whitley's retirement, DBMP's case was reassigned to Judge Ashley A. Edwards on September 16, 2024.

to the tort system and the effective dismissal of DBMP's case. In fact, Appellants admit they filed their motions to try to obtain a ruling on "bad faith" in an apparent effort to circumvent the Fourth Circuit's longstanding precedent for a bad faith dismissal of a Chapter 11 case, *Carolin Corp. v. Miller*, 886 F.2d 693 (4th Cir. 1989).

The Bankruptcy Court recognized that the motions involved "the same firm pressing the same rejected relief" before a different judge, and found it obvious that granting such relief would amount to a back-door way to dismiss the case. The court correctly acknowledged and applied the Fourth Circuit's governing factors from *Robbins*, 964 F.2d 342, to find that if it granted relief to Appellants, who are similarly situated to all other asbestos claimants with claims against DBMP, it would effectively lead to case dismissal and be contrary to prior rulings in the case preserving the stay. The fundamental purpose of DBMP's case—the establishment of a trust to fairly and equitably resolve all tort claims under 11 U.S.C § 524(g)—would be defeated. The court further recognized that such result would indirectly achieve what would otherwise be foreclosed under *Carolin*. It correctly was unwilling to do indirectly what it could not do directly.

This Court should affirm.

## STATEMENT OF THE CASE

### A. Bankruptcy Code § 362.

Under Section 362 of the Bankruptcy Code, the commencement of a bankruptcy case automatically imposes a stay. 11 U.S.C. § 362. Among other things, the automatic stay prevents the litigation of claims that are pending or that may be filed against the debtor in the tort system.

The purpose is "three-fold: [1] to prevent certain creditors from gaining a preference for their claims against the debtor; [2] to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it; and, [3] in general, to avoid interference with the orderly liquidation or rehabilitation of the debtor." *Matter of Rexene Prods. Co.*, 141 B.R. 574, 576 (Bankr. D. Del. 1992) (citations omitted). "[T]he automatic stay allows the bankruptcy court to centralize all disputes concerning property of the debtor's estate in the bankruptcy court so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas." *In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 989 (2d Cir. 1990). It is one of the most "fundamental debtor protections provided by the bankruptcy laws." *Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 503 (1986).

### B. Bankruptcy Code § 524(g).

Over 30 years ago, a Judicial Conference committee called asbestos litigation "a disaster of major proportions to both the victims and the producers," which courts were "ill-equipped" to handle. Rep. of the Judicial Conf. *Ad Hoc* Comm. on Asbestos

Litig. 2 (1991). Facing a glut of asbestos cases, courts became bogged down, and "long delays [became] routine." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 598 (1997). An asbestos tort case can last a decade or more, *see In re Bestwall LLC*, 71 F.4th 168, 183 (4th Cir. 2023), *cert. denied* (U.S. May 13, 2024) (Nos. 23-675, 23-702); and "[a]lmost two-thirds" of expenditures may go to "attorneys' fees and other litigation expenses" rather than "injured persons," *In re A.H. Robins Co.*, 880 F.2d 709, 726 (4th Cir. 1989) (citation omitted). For example, upon its bankruptcy filing, "nearly half of DBMP's pending asbestos-related claims on active dockets had been filed more than 10 years ago." App.223.[2]

In 1994, Congress added Section 524(g) to the Bankruptcy Code. It enables a Chapter 11 debtor facing "substantial" and indeterminate asbestos claims to globally resolve all current and future claims by funding a trust under a confirmed plan of reorganization and secure a permanent "channeling" injunction to protect itself and qualifying affiliates. 11 U.S.C. § 524(g)(2)(B); *see also Truck Ins. Exch. v. Kaiser Gypsum Co.*, 144 S. Ct. 1414, 1421-22 (2024). The statute protects claimants by, among other things, requiring (1) the appointment of a future claimants' representative and a current claimants' committee, both of which the debtor funds; (2) supermajority support by 75% of current claimants for a plan of reorganization seeking relief under Section 524(g); and (3) district-court approval of such plan as

[2] References to "App." refer to the *App. to Appellants' Br.* filed in these appeals at Dkt. 5.

fair and equitable. *See id.*; 11 U.S.C. §§ 524(g)(2)-(4), 503(b)(2), 1103(a). A trust established by a Section 524(g) plan administratively processes and pays claims fairly, promptly, and with lower transaction costs, for the benefit of claimants. *See* 11 U.S.C. § 524(g)(2). As the Bankruptcy Court here put it, in an earlier ruling not at issue in this appeal: "A section 524(g) trust 'will provide all claimants—including future claimants who have yet to institute litigation—with an efficient means through which to equitably resolve their claims." App.237.

Section 524(g), like Chapter 11 more generally, does not require insolvency or any level of financial distress. Rather, "Congress took care in [11 U.S.C.] § 109 to specify who qualifies—and who does not qualify—as a debtor under the various chapters of the Code." *Toibb v. Radloff*, 501 U.S. 157, 161 (1991). Although Congress provided that a Chapter 9 municipal debtor must be insolvent, it omitted that requirement for voluntary Chapter 11 debtors. 11 U.S.C. §§ 109(c)&(d). Over the years, courts have authorized over 60 trusts under Section 524(g)—including for many solvent companies. *See* App.544-545.

### C. The History of Asbestos Claims Against Old CT and the Corporate Restructuring.

For nearly 50 years, the predecessor of DBMP, CertainTeed Corporation (with all of its historical forms, collectively, "Old CT"), faced hundreds of thousands of asbestos-related claims as a result of asbestos-containing products manufactured and/or sold until the 1970s or early 1980s, and asbestos cement-pipe products that

were produced and sold until 1993. App.62-63; App.170-71. Old CT's asbestos-containing products were not friable and, as long as recommended work practices were followed, were not likely to release hazardous concentrations of asbestos into the air. *See* App.63.

For more than 20 of those years, Old CT was named in a relatively small number of asbestos lawsuits, and its defense and indemnity costs likewise were relatively low. App.64-65; App.171. But as certain primary asbestos manufacturers began to file for bankruptcy protection, particularly in the early 2000s, the number of claims against Old CT escalated sharply. App.171. By January 2020, almost 60,000 asbestos-related claims, filed in courts across the country, were pending against DBMP, with approximately 32,200 claims on active dockets. App.172.

All told, since 2002 alone, DBMP and Old CT incurred approximately $2 billion in costs defending and resolving over 300,000 lawsuits alleging asbestos exposure. App.63-64; App.171. Absent the Chapter 11 case, DBMP expects thousands of additional claims would have been filed against it for decades to come. App.64; App.172.

That magnitude and projected continuation of this litigation led Old CT to undertake a corporate restructuring in Fall 2019, completing a "divisional merger" under a decades-old provision in Texas's Business Organizations Code. App.57. Old CT ceased to exist, and two new companies, DBMP and CertainTeed LLC

("New CT"), were formed. DBMP received Old CT's asbestos-related liabilities and certain substantial assets and an operating business that produces cash flow. App.59-60; App.177. New CT received all other assets and liabilities of Old CT. App.60.

The new companies also executed a Funding Agreement, a contract obligating New CT to fund DBMP's expenses for a Chapter 11 reorganization and Section 524(g) trust to the extent that DBMP's assets are insufficient, without any corresponding repayment obligation. App.60-61. It is not necessary to the funding obligation that New CT obtain relief under Section 524(g) or agree to the terms of a plan in DBMP's case.[3]

The restructuring enabled Old CT to pursue Section 524(g) relief without the entire company having to file for bankruptcy. The Funding Agreement preserves the paying power of Old CT because it makes available New CT's and DBMP's combined resources from Old CT—giving DBMP the ability to meet its obligations, including paying asbestos claims. A filing by Old CT thus would not have increased assets available to pay claimants. However, it would have magnified the complexity, time, and cost of the case—not only delaying resolution for asbestos claimants but

---

[3] In DBMP's and New CT's view, these terms of the funding arrangement were clear from the start. Nevertheless, during the bankruptcy case, they entered into a stipulation to confirm them and also to address other concerns that representatives of the claimants had raised about the Funding Agreement. This included agreeing to prohibit New CT from making dividends or forgiving intercompany loans, as well as removing the limitation that New CT is only required to fund costs that are necessary or appropriate. Dkt. 1279, Ex. B. Unless noted, docket citations refer to the Bankruptcy Court docket (No. 20-30080).

also affecting vendors, customers, and employees, and risking diminution of assets available to fund a trust. App.174-75.

### D. DBMP's Chapter 11 Case: Its Preliminary Injunction Motion, the Committee Lift-Stay Motion, and Other Proceedings.

In January 2020, DBMP filed its Chapter 11 case to permanently, globally, and fairly resolve its asbestos liability through a Section 524(g) trust. App.67; App.219. It also moved to temporarily enjoin (or in the alternative declare that the automatic stay barred) prosecution of "DBMP Asbestos Claims" against certain non-debtor affiliates and distributors. App.162-63. This would prevent claimants from circumventing the bankruptcy by seeking to liquidate and collect from non-debtor parties the same claims brought against DBMP, which claims were to be resolved globally in the Chapter 11 case. The Official Committee of Asbestos Personal Injury Claimants (the "Committee") and the legal representative for future asbestos claimants (the "Future Claimants' Representative" and, together with the Committee, the "Claimant Representatives") objected. App.163. The Committee also moved for relief from the automatic stay as to all asbestos claimants. App.164. After a multi-day hearing on both motions, the Bankruptcy Court granted DBMP's motion and denied the Committee's.

**1.** On DBMP's motion, the Bankruptcy Court found that DBMP is "exclusively responsible for the DBMP Asbestos Claims" and that continued prosecution of those claims against the non-debtor parties in the tort system "would

necessarily result in the liquidation and recovery of claims against" DBMP outside of the Chapter 11 case. It thus held that the automatic stay barred prosecution of such claims during the bankruptcy case. App.210.

In the alternative, it also granted the preliminary injunction request. It found that DBMP's reorganization would "be impossible without the benefit of the automatic stay and the preliminary injunction." App.168. In support, it made several additional findings, particularly that:

(a) DBMP "has the financial ability to appropriately fund a section 524(g) trust and to pay the administrative costs" of the case, App.232;

(b) prosecution of the DBMP Asbestos Claims outside of the case "would gravely harm, and almost certainly end," DBMP's reorganization efforts, App.234;

(c) the harm to DBMP outweighed any prejudice to asbestos claimants, because the "harm to asbestos claimants appears to be delay in recovering what for most asbestos claimants will be but a small portion of their overall damages" given that claimants typically sue and collect from multiple defendants, App.236; and

(d) DBMP's successful reorganization "would promote Congress's particular goal in section 524(g) by establishing an asbestos trust that would

efficiently and equitably resolve tens of thousands of asbestos claims." App.237.

**2.** In denying the Committee's lift-stay motion, the Bankruptcy Court recognized that the relief sought—effective dismissal of the Chapter 11 case—"appears not directly obtainable" under the Fourth's Circuit's rule for dismissing a case as filed in "bad faith," *Carolin*, 886 F.2d 698[4], and could not "be had through indirect means" (that is, a motion to lift stay rather than a motion to dismiss). App.168. The Bankruptcy Court noted that "the way to challenge" the corporate restructuring and the filing of DBMP's case "is not through piecemeal individual claimant actions in the tort system. It is through plan negotiation and/or an adversary proceeding filed in this case for the benefit of all asbestos claimants." App.229.

Applying the factors from *Robbins*, 964 F.2d 342, the standard in this Circuit for lift-stay motions, the court found a lack of cause to grant the Committee's motion for relief from stay. In support, it made several findings, including that:

(a) DBMP would suffer substantial prejudice if relief were granted, which would outweigh any hardship occasioned to the asbestos claimants due to delay, App.218, 221-23;

---

4 For a bad faith dismissal, *Carolin* requires the movant to establish *both* that (a) pursuing a reorganization would be objectively futile *and* that (b) the debtor filed the bankruptcy case in subjective bad faith. *Carolin*, 886 F.2d at 700-02.

(b) a Section 524(g) trust could "provide all asbestos claimants," including future claimants, "a more efficient means to resolve their claims," App.223;

(c) the piecemeal litigation of asbestos cases in multiple state and federal courts across the country following relief from stay would not promote judicial economy (regardless of the fact that the claims involved state law), App.225;

(d) if relief from stay were granted, the "ability to treat equitably and consistently all similarly situated claimants through a section 524(g) consensual plan of reorganization would be foreclosed"; and "bedlam" and "inconsistent results for creditors" would result, App. 219, 229; and

(e) thus, granting relief "would amount to an effective dismissal of the Chapter 11 Case without satisfying the Fourth Circuit's stringent *Carolin* dismissal standard, or even such a motion being filed," App.219.

No party appealed the Bankruptcy Court's rulings.

**3.** The Claimant Representatives, picking up on the Bankruptcy Court's suggestion about the proper way to challenge the corporate restructuring and bankruptcy filing, commenced three adversary proceedings in the bankruptcy case: (a) a proceeding seeking substantive consolidation of DBMP with New CT or, in the alternative, reallocating the asbestos liabilities of DBMP to New CT [Adv. Pro.

No. 21-03023, Adv. Dkt. 1]; (b) a proceeding asserting intentional and constructive fraudulent conveyance claims related to the corporate restructuring, which, among other things, alleged that the restructuring had rendered DBMP insolvent [Adv. Pro. No. 22-03000, Adv. Dkt. 14]; and (c) a proceeding asserting breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, and civil conspiracy in connection with the corporate restructuring [Adv. Pro. No. 22-03001, Adv. Dkt. 12].[5] Discovery in the first two proceedings is ongoing, while the third is stayed pending resolution of the fraudulent transfer allegations.

**4.** DBMP has continued to advance the bankruptcy case and its efforts to reach a resolution with the Claimant Representatives. At the request of DBMP, the Bankruptcy Court approved, as is common in asbestos bankruptcies, a process for estimating DBMP's aggregate liability for purposes of negotiating, formulating, and confirming a Chapter 11 plan. App.533-34. The parties are preparing for the court-authorized estimation proceeding. The Bankruptcy Court also, at the request of DBMP, ordered the parties to mediation to negotiate the possible resolution of the Chapter 11 case.

[5] The Claimant Representatives, authorized by the Bankruptcy Court, filed the latter two proceedings on behalf of the bankruptcy estate. Dkt. 1197.

### E. Dismissal Efforts in the Similar *Bestwall* and *Aldrich* Cases.

Although no motion to dismiss has been filed in DBMP's case, four have been filed in *In re Bestwall LLC*, No. 17-31795 (LTB) (Bankr. W.D.N.C.), and two in *In re Aldrich Pump LLC*, No. 20-30608 (JCW) (Bankr. W.D.N.C.)—asbestos cases also pending in this District. The debtors in *Aldrich* and *Bestwall* were formed through corporate restructurings similar to that which formed DBMP. The claimants who filed dismissal motions in those cases were all represented by some or all of Appellants' counsel.

**1.** In *Bestwall*, the official committee of asbestos claimants first moved to dismiss the case in 2018 as a "bad faith" filing under 11 U.S.C. § 1112(b). Applying *Carolin*, the bankruptcy court declined to dismiss because the committee had not satisfied the requirement to show objective futility. *In re Bestwall LLC*, 605 B.R. 43, 49-51 (Bankr. W.D.N.C. 2019); *see supra* n.4. The Fourth Circuit declined a direct appeal, and the District Court denied leave to appeal. *Official Comm. of Asbestos Claimants v. Bestwall LLC*, No. 19-408 (4th Cir. Nov. 14, 2019), Dkt. 13; *Official Comm. of Asbestos Claimants v. Bestwall LLC*, No. 19-396 (W.D.N.C. Nov. 7, 2023), Dkt. 19.

Five years later, in early 2023, certain claimants ("Buckingham") moved to dismiss Bestwall's case as—again—a "bad faith" filing under Section 1112(b). The

committee joined in, filing its third motion to dismiss[6] and asking the court to revisit its *Carolin* analysis. It also repackaged the argument that the debtor had insufficient "financial distress" (*see generally In re LTL Mgmt., LLC*, 64 F.4th 84 (3d Cir. 2023)) as a "jurisdictional" challenge under the Constitution's Bankruptcy Clause. The bankruptcy court again denied the motions to dismiss. *In re Bestwall LLC*, 658 B.R. 348 (Bankr. W.D.N.C. 2024). The court first found that Buckingham sought dismissal "largely for the same reasons previously argued by the Committee" years earlier—that is, dismissal for bad faith under *Carolin*—and the law-of-the-case doctrine barred reconsideration of its prior decision. *Id.* ¶¶ 9-10, 13-21, 25. Regarding the constitutional challenge, which the committee said provided "additional context for" applying *Carolin*, the court rejected it after extensively analyzing Supreme Court and Fourth Circuit precedent. *Id.* ¶¶ 9, 25-60.

The bankruptcy court granted the committee's request to certify a direct appeal to the Fourth Circuit because of the constitutional issue, but it denied Buckingham's request because he simply raised previously adjudicated *Carolin* issues governed by law of the case. *Bestwall*, Dkt. 3354 at 73-76. The Fourth Circuit accepted the committee's direct appeal, and briefing is underway. *Official Comm.*

6 The committee had moved to dismiss a second time alleging Bestwall had failed to prosecute the case, and the bankruptcy court denied the motion. The committee did not seek to appeal. *Bestwall*, Dkt. 1546.

*of Asbestos Claimants of Bestwall LLC v. Bestwall LLC*, No. 24-170 (4th Cir. May 31, 2024), Dkt. 15.

**2.** In *Aldrich*, the official committee of asbestos claimants and certain individual claimants similarly moved to dismiss in early 2023 arguing that the debtors there also lacked "financial distress." From this factual premise, they urged Judge Whitley (also the bankruptcy judge in *DBMP* at that time) to dismiss the cases as filed in "bad faith" under 11 U.S.C. §1112(b) and *Carolin*. As with *Bestwall*, they also repackaged their lack-of-distress argument as a "jurisdictional" challenge under the U.S. Constitution's Bankruptcy Clause. The court denied the motions. *In re Aldrich Pump LLC*, 2023 WL 9016506, at *28 (Bankr. W.D.N.C. Dec. 28, 2023). It recognized *Carolin* as the "controlling precedent" for a bad-faith dismissal standard, and held that the debtors' cases were not objectively futile. *Id.* at 52. The court "agree[d] with" the decision denying dismissal in the "factually similar" *Bestwall* case in 2019. *Id.* at 54. And it rejected the constitutional arguments on grounds similar to the reasoning in *Bestwall*. *Id.* at 22-27, 33-35. The Fourth Circuit declined a direct appeal, and motions for leave to appeal are pending before the District Court (Judge Conrad). *Official Comm. of Asbestos Personal Injury Claimants v. Aldrich Pump LLC*, No. 24-128(L) (4th Cir. Apr. 17, 2024), Dkt. 50; *Official Comm. of Asbestos Personal Injury Claimants v. Aldrich Pump LLC*, No. 24-00042-RJC

(W.D.N.C.); *Robert Semian and Other Claimants of Maune Raichle Hartley French & Mudd, LLC*, No. 24-00044-RJC (W.D.N.C.).

**F. The Four Lift-Stay Efforts in *Bestwall* and *Aldrich*.**

Certain claimants, again represented by counsel to Appellants, previously filed four separate stay-relief motions in *Bestwall* and *Aldrich*.

**1.** In *Bestwall*, certain claimants (the "Dales") moved for stay-relief to pursue their asbestos claims against Bestwall in state court. *Bestwall*, Dkt. 3127. The bankruptcy court denied the motion. It applied the *Robbins* factors and considered the context of the debtor's case, "which is a mass tort asbestos case with an excess of 60,000 claimants." *Bestwall*, Dkt. 3154 at 69:24-25. Yet the Dales failed to plead "any unique facts or circumstances that would justify lifting the stay as to them or otherwise distinguish[] their case from the thousands of cases that are pending in state court." *Id.* at 70:9-11. It followed that, if the court granted their motion, it "would be hard pressed to deny future motions for relief from stay in this case." *Id.* at 70:6-8. Finally, for reasons similar to those it had found in granting a preliminary injunction to prevent Bestwall asbestos claims from being pursued against the debtor's affiliates (which the Fourth Circuit by then had affirmed, *Bestwall*, 71 F.4th 168), the court concluded that allowing the "ongoing litigation of asbestos claims against the debtor in state court could cause irreparable harm to the debtor," defeat

the purpose of the debtor's case and thus be "akin to dismissal of the case." *Id.* at 71:1-4. The Dales appealed, but later withdrew their appeal.

Approximately two weeks later, Buckingham filed his own stay-relief motion, which repeated the arguments he had raised in his denied motion to dismiss. *Bestwall*, Dkt. 3242. The bankruptcy court denied the stay-relief motion "for the same reasons" it had denied the Dales' motion and had granted the debtor's request for a preliminary injunction. *Bestwall*, Dkt. 3268 at 77:3-4. The court found that consideration of the factors under *Robbins* "weigh[ed] against modifying the automatic stay." *Id.* at 77:10-16. The court again recognized it had to consider the issues "in the context of this case being a mass tort case," and found Buckingham did not plead any "unique facts or circumstances that would justify lifting the stay" or "otherwise sufficiently distinguish his case from the thousands of other cases pending in state court." *Id.* at 77:20-21; 78:1-4. Again it found that to grant the motion would obligate the court to grant such a motion for "most, if not all, claimants who sought similar relief." *Id.* at 77:23-25. And that "would ultimately equate to dismissal." *Id.* at 78:12.

In response to Buckingham's recycled dismissal arguments, the bankruptcy court found that it would defy "logic to conclude that [*Carolin*'s] two-prong standard doesn't apply" to the motion to the extent premised on a purported bad-faith filing. *Id.* at 79:16-17. That was particularly so where: (a) lifting the stay essentially would constitute a dismissal of the case; (b) the arguments raised in support of lifting the

stay were the same arguments as those raised in support of dismissing the case; and (c) the court already had denied multiple motions to dismiss. *Id.* at 79:20-80:5, 81:16-25. Buckingham's appeal of this ruling is pending. *Wilson Buckingham and Angelika Weiss v. Bestwall LLC*, No. 24-00297-RJC (W.D.N.C.).

**2.** In *Aldrich*, in early 2023, a certain claimant ("Semian") filed a motion for stay-relief. *Aldrich*, Dkt. 1588. Judge Whitley denied that motion for the reasons he had stated in granting the debtors' request for a preliminary injunction in *Aldrich* (which was not appealed). *Aldrich*, Dkt. 1702 at 67:3-6; 68:1-7. He found that if the court granted "relief from stay to one creditor to liquidate the claim, all of the claimants"—or at least a "substantial number of the claimants, enough to wreck the bankruptcy case"—would "seek like measure and that effectively precipitates a *de facto* dismissal of the case." *Id.* at 67:6-67:12. He also found that, as the committee in those cases was also pursuing adversary proceedings (similar to those in *DBMP*) challenging key aspects of the cases, "we would be undermining" those lawsuits if relief was granted. *Id.* at 67:14-20.

In Spring 2024, certain additional claimants filed another lift-stay motion in *Aldrich*, largely identical to Buckingham's in *Bestwall* and the stay-relief motions in these appeals. *Aldrich*, Dkt. 2243. After the bankruptcy court entered its order denying the stay-relief motions at issue in these appeals, the claimants in *Aldrich* withdrew their motion. *Aldrich*, Dkt. 2268.

## G. Appellants' Stay Relief Motions.

Following denial of motions for dismissal and stay-relief in *Bestwall* and *Aldrich*, the same counsel filed Appellants' stay-relief motions in DBMP's case. App.240-77, 382-419 (together, the "Stay Relief Motions"). The Stay Relief Motions only briefly discussed the *Robbins* precedent in this Circuit governing stay-relief. Instead, they focused on the bad-faith-filing arguments claimants had raised in *Bestwall* and *Aldrich*.[7] At the hearing, counsel for one appellant, the Bergruds, conceded that they, through the vehicle of a lift-stay motion, sought a ruling "on the merits" of the bad-faith issues that they could appeal as-of-right (unlike a ruling denying a motion to dismiss, which is interlocutory). App.776-77, 779.

The Bankruptcy Court denied the Stay Relief Motions. It recognized that the motions were from "the same firm pressing the same rejected relief and theories" raised in *Bestwall* and *Aldrich*, recounted the litigation of those motions, and agreed with Judge Beyer's reasoning in *Bestwall*, and also recounted its own findings earlier in *DBMP* in denying the Committee's lift-stay motion. App. 857-62; *see supra* 11-12 (summarizing findings on Committee lift-stay motion). As the court recognized, "we've had substantially identical requests for relief that I think have been

---

[7] DBMP did dispute (App.530) and continues to dispute the facts at the root of Appellants' claims for harm based on alleged exposure to Old CT's asbestos products.

entertained at least four times between the three so-called 'two-step' cases in this District." App.857.

The Bankruptcy Court saw no reason for a different conclusion this time. *Id.* If anything, each successive motion confirmed the reasons for denying stay relief. Although Appellants claimed it was "speculative" to think that granting the motions would lead to an "avalanche of motions" seeking the same relief for other claimants, the Bankruptcy Court concluded the truth was anything but. App.863-64. Based on its experience in asbestos cases, the court found that, if it granted the motions, "even just to liquidate the claims," it was actually "an absolute certainty" that there would be "dozens of claimants making the motions and by the end of summer there'd be tens of thousands." *Id.* This is, in part, because most of the tens of thousands of claimants against DBMP "are represented by a dozen or so asbestos firms across the country, firms that are knowledgeable" about the cases, with "many serving on the [Committee] indirectly," and "are aggressive in representing their clients." *Id.* Appellants' arguments for lifting the stay attacked the whole case, as filed in bad faith, rather than involving facts specific to Appellants; they thus would apply equally to any other movant. App.862.

The Bankruptcy Court recognized that "the standard for relief from stay is cause and the controlling case in our Circuit is *Robbins*," which "involve[d] a balancing test," and, as a result, bad faith is not the "standard" but is "[a]t most, [] a

factor." App.866. And to the extent that stay-relief was grounded on an argument that the bankruptcy case was filed in bad faith, then, as Judge Beyer had recognized, *Carolin*'s two-prong standard for identifying such "bad faith" must be applied. App.862. Otherwise—if the court in the lift-stay context were to find a case improperly filed when it did not satisfy the *Carolin* standard—it would be "indirectly" doing something that it is "not permitted to do or not inclined to do under existing law." App.866; *see also* App.862-63. The Bankruptcy Court thus did not feel comfortable making conclusions on subjective bad faith (just one of the two elements for finding bad faith under *Carolin*) "on this record or at this stage in the case." App.864. Plus, tellingly, some of Appellants' arguments "were just rehashes of arguments previously made and rejected . . . like arguing that *Premier*[8] is the standard [for dismissal], not *Carolin*." App.867. The court also pointed out that the Claimant Representatives were pursing adversary proceedings challenging the corporate restructuring in DBMP's case. App.866.

Appellants appealed from the Bankruptcy Court's orders denying their Stay Relief Motions. App.568, 570 (together, the "Denial Orders"). The motions—argued together below—have been consolidated on appeal.

8 *In re Premier Auto. Servs., Inc.*, 492 F.3d 274 (4th Cir. 2007).

## SUMMARY OF ARGUMENT

The Bankruptcy Court did not abuse its discretion in denying the Stay Relief Motions under *Robbins*—the precedent that controls motions for relief from the automatic stay in this Circuit, as the Fourth Circuit and lower courts have long recognized. This is true in both mass tort and non-mass-tort cases. As stated by the Bankruptcy Court, allegations of "bad faith," if relevant, should be considered as part of the bankruptcy court's balancing under *Robbins*.

Under this standard, the Bankruptcy Court appropriately exercised its discretion to deny the Stay Relief Motions, particularly under *Robbins*'s "judicial economy" factor. The Bankruptcy Court reasonably took into account that: (a) neither Appellant pled unique facts or circumstances that would justify lifting the automatic stay as to them, which made it likely that, if the court granted stay relief to them, other similarly situated claimants would seek and likely have an equally strong claim to such relief, sabotaging DBMP's prospects for reorganization that would address asbestos claims globally; (b) lifting the stay "*en masse*" would essentially constitute a dismissal of the case (where no dismissal had been sought nor could be granted under the Fourth Circuits' *Carolin* standard); (c) the arguments presented in support of granting relief were the same arguments previously rejected in denying other, similar stay-relief motions filed by the same counsel in other similar cases in this District; and (d) the Claimant Representatives are actively

prosecuting adversary proceedings regarding the propriety of the corporate restructuring and DBMP's case on behalf of all claimants.

The Bankruptcy Court also did not abuse its discretion by considering *Carolin* in assessing Appellants' unsupported allegations that the stay should be lifted because DBMP supposedly filed its case in "bad faith." *Carolin* is the standard in this Circuit for determining whether a Chapter 11 case was filed in "bad faith," and other courts likewise have applied *Carolin*'s two-prong standard in deciding motions for relief from stay premised on the debtor's alleged bad faith filing of Chapter 11. And the arguments for "bad faith" here just mirror those raised in motions to dismiss that were denied in *Bestwall* and *Aldrich*. The Bankruptcy Court's consideration and application of *Carolin* in connection with the Stay Relief Motions was neither novel nor unprecedented, but correct and well within its discretion under *Robbins*.

## ARGUMENT

### I. The Bankruptcy Court Did Not Abuse Its Broad Discretion Under the Fourth Circuit's Controlling Precedent in *Robbins*.

The Bankruptcy Court properly exercised its discretion in evaluating the Stay Relief Motions under *Robbins*—the precedent in this Circuit that controls such motions. Appellants' emphasis on purported bad faith does nothing to change the legal standard or the deferential standard of review.

### A. *Robbins* Controls the Lift-Stay Analysis.

**1.** The Fourth Circuit has instructed bankruptcy courts, in evaluating requests to lift the automatic stay for cause, to balance the "potential prejudice to the [] debtor's estate against the hardships that will be incurred by the person seeking relief" if such relief is denied. *Robbins*, 964 F.2d at 345. To aid in this balancing, courts should particularly consider "(1) whether the issues in the pending litigation involve only state law, so the expertise of the bankruptcy court is unnecessary; (2) whether modifying the stay will promote judicial economy and whether there would be greater interference with the bankruptcy case if the stay were not lifted because matters would have to be litigated in bankruptcy court; and (3) whether the estate can be protected properly by a requirement that creditors seek enforcement of any judgment through the bankruptcy court." *Id.*

Across 30 years, multiple courts (including the Fourth Circuit itself) have affirmed the factors enumerated in *Robbins* as the standard for determining whether cause exists to lift the stay in the Fourth Circuit. *See Lee v. Anasti (In re Lee)*, 461 F. App'x 227, 234 (4th Cir. 2012) (concluding that "the bankruptcy court and the district court properly considered and applied the relevant factors under *Robbins*" in deciding motion for relief from stay); *In re Wiencko*, 2004 WL 1146490, at *2 (4th Cir. 2004) (*Robbins* factors are controlling for relief from automatic stay analysis); *Ivester v. Miller*, 398 B.R. 408, 425-29 (M.D.N.C. 2008) (recognizing *Robbins*

factors as controlling, and affirming denial of stay relief in which bankruptcy court treated second factor as dispositive); *In re Nw. Child Dev. Ctrs., Inc.*, 2020 WL 8813970, at *1-2 (Bankr. M.D.N.C. 2020) (recognizing *Robbins* factors as controlling); *In re Johnson*, 655 B.R. 83, 91-92 (Bankr. D.S.C. 2023) (same).

Additionally, the *Robbins* factors have been uniformly applied in deciding motions for relief from stay in mass-tort cases within this District. *See* App.217-229 (applying the *Robbins* factors to deny Committee's motion for relief from stay);[9] *Bestwall*, Dkt. 3268 at 77:10-16 (same); *Bestwall*, Dkt. 3154 at 70:12-71:8 (same); *Aldrich*, Dkt. 1702 at 70:3-14 (same).

As the factors suggest and the Fourth Circuit has confirmed, "[a] decision to lift the automatic stay under section 362 of the Code is within the discretion of the bankruptcy judge." *Robbins*, 964 F.2d at 345. It follows that relief from the automatic stay "is not a matter of right." *In re Secrest*, 453 B.R. 623, 627 (Bankr. E.D. Va. 2011).

**2.** Despite all this, Appellants assert that the Bankruptcy Court could grant relief from the automatic stay "without engaging in the balancing factors set forth in *Robbins*" simply because they argued DBMP's case was filed in bad faith. Br. 27.

---

9 The Bankruptcy Court's earlier ruling denying the Committee's motion to lift stay was not "on a different issue," as Appellants assert. Br. 12. The standard was the same—*Robbins*. *See* App.217-18; *supra* 11-12. And, as the court recognized below, its reasons for denying that earlier motion largely decide the present motions. *See* App.860, 862, 864.

But, in denying the Stay Relief Motions, the Bankruptcy Court was not "required" to determine DBMP's good-faith apart from the governing *Robbins* framework. Br. 24-25. As found by the Bankruptcy Court, allegations of bad faith, if relevant, should be considered as part of the bankruptcy court's balancing under *Robbins*. *See* App.866 (finding that "the standard for relief from stay is cause and the controlling case in our Circuit is *Robbins*," which "involve[d] a balancing test," and, as a result, bad faith is not the "standard" but is "[a]t most, [] a factor"); *Fairville Co. v. Ramkaran (In re Ramkaran)*, 315 B.R. 361, 366 (D. Md. 2004) (finding that "bad faith is one component of, but not necessarily dispositive of, the balance test" under *Robbins*).[10]

Appellants offer much rhetoric, but they cite no contrary case. Instead, the cases they cite about bad faith as cause to lift the stay are all distinguishable—none involved a "mass tort case[] with tens of thousands of claims pending against the debtor," *Bestwall*, Dkt. 3268 at 80:18-20, and only a few actually addressed bad faith in the context of the automatic stay. In fact, most focused on dismissal issues and

10 In fact, the Bankruptcy Court did not have to address the bad-faith allegations at all in denying the Stay Relief Motions. *See Malbon v. Pa. Millers Mut. Ins. Co.*, 636 F.2d 936, n.8 (4th Cir. 1980) ("It is, of course, not absolutely necessary, that a judge, in disposing of a motion, specifically recite or otherwise discuss each contention advanced by the parties.").

involved single-asset debtors seeking to avoid foreclosures or other two-party disputes.[11]

Nor do Appellants' assertions of alleged bad faith alter the task before the Bankruptcy Court or the standard of review before this Court. *See* Br. 5, 30 (asserting that this Court should exercise *de novo* review). Granting relief from the automatic stay is a discretionary decision of the bankruptcy court and is reviewed for abuse of discretion. *See Robbins*, 964 F.2d at 345 ("decision may be overturned on appeal only for abuse of discretion"); *Claughton*, 33 F.3d at 5 ("We will reverse a decision to lift the automatic stay 'for cause' only when an abuse of discretion has occurred.").

---

[11] *See, e.g.*, *In re Little Creek Dev. Co.*, 779 F.2d 1068 (5th Cir. 1986) (reversing and remanding bankruptcy court order lifting the automatic stay to allow secured creditor to foreclose on real-estate property that was debtor's single asset); *In re Albany Partners, Ltd.*, 749 F.2d 670 (11th Cir. 1984) (dismissing bankruptcy case and annulling automatic stay in case filed on the eve of foreclosure); *Furness v. Lilienfield*, 35 B.R. 1006 (D. Md. 1983) (dismissing bankruptcy case filed to delay a single trial in the district court); *In re Talladega Steaks, Inc.*, 50 B.R. 42 (Bankr. N.D. Ala. 1985) (dismissing bankruptcy case involving dispute between shareholders and management of the debtor); *In re Kinney*, 51 B.R. 840 (Bankr. C.D. Cal. 1985) (imposing sanctions on attorney due to multiple repeat filings in cases that were dismissed for bad faith); *In re Setzer*, 47 B.R. 340 (Bankr. E.D.N.Y. 1985) (dismissing bankruptcy case filed as a litigation tactic to circumvent a district court order and where debtor faced only a handful of lawsuits); *In re Yukon Enters., Inc.*, 39 B.R. 919 (Bankr. C.D. Cal. 1984) (granting motion to lift stay to allow foreclosure of real-estate property); *In re Scott*, 42 B.R. 35 (Bankr. D. Ore. 1984) (granting motion to lift stay to allow foreclosure of real-estate property); *In re Corp. Deja Vu*, 34 B.R. 845 (Bankr. D. Md. 1983) (granting motion to lift stay to allow foreclosure of real-estate project); *In re Thirtieth Place, Inc.*, 30 B.R. 503 (Bankr. App. 9th Cir. 1983) (dismissing bankruptcy case filed by debtor to delay foreclosure); *In re Victory Const. Co., Inc.*, 9 B.R. 549, 560 (Bankr. C.D. Cal. 1981) (granting motion to lift stay in case filed to avoid foreclosure of real-estate property), *vacated on other grounds as moot*, 37 B.R. 222 (B.A.P. 9th 1984); *In re Lotus Invs., Inc.*, 16 B.R. 592 (Bankr. S.D. Fla. 1981) (granting motion to lift stay to allow foreclosure of real-estate project); *cf.* Br. 19 n.19.

Under the precedent of this Circuit, the Bankruptcy Court was right to look to the *Robbins* factors in determining whether cause existed to grant relief from the automatic stay. It does not matter that Appellants incorporated bad-faith arguments into the Stay Relief Motions. There was no error, and thus no abuse of discretion, as to the governing law.

### B. The Bankruptcy Court Properly Applied *Robbins* in Its Lift-Stay Analysis.

**1.** Once the question that Fourth Circuit precedent requires is properly framed, it is evident that the Bankruptcy Court appropriately exercised its discretion in applying the *Robbins* factors to deny the Stay Relief Motions.

The Bankruptcy Court properly considered the specific facts at issue, including that: (a) DBMP is a mass-tort debtor that is a defendant in tens of thousands of asbestos cases and, absent the bankruptcy case, "it is likely that thousands of additional claims would be filed against DBMP . . . for decades to come," App.172; (b) of the Appellants, the Bergruds already have achieved recoveries on their claims against other defendants and asbestos trusts, App.270, and the Herlihys will be proceeding against other non-bankrupt defendants in short order, App.413; (c) Appellants' claims are indistinguishable from other asbestos claims against DBMP, all of which are also stayed, App.530-32; (d) Appellants' counsel had similarly sought stay-relief for different claimants in *Bestwall* and *Aldrich*, raising similar arguments that were rejected, App.857, 862; (e) DBMP's bankruptcy case is

the only proceeding in which DBMP can fairly and equitably treat all similarly situated claimants, current and future, and the parties in the case have been working towards an estimation of DBMP's liability in aid of plan negotiations and the establishment of an asbestos trust, App.533-35; (f) the establishment of an asbestos trust in DBMP's case would result in a "more efficient means to resolve" asbestos claims for "all asbestos claimants," App.223; and (g) delay on its own is insufficient to justify relief from the automatic stay, App.222-24.[12]

Based on these facts, the Bankruptcy Court appropriately exercised its discretion in denying the Stay Relief Motions—which motions were in "the same identical legal posture," App.867, as those in *Bestwall* and *Aldrich*. App.862; *see also supra* 17-19. Contrary to Appellants' contention, the Bankruptcy Court *did* explain why the *Robbins* factors favored denying the motions, particularly in recounting and adopting its own and the *Bestwall* court's earlier reasoning. *Compare* Br. 28, *with* App.857-60, 864 (after summarizing prior ruling and reasoning under

---

[12] Neither DBMP nor the debtors in the similar asbestos cases in this District are the source of any delay in these cases. *See* App.233 (finding "DBMP cannot be faulted for a lack of diligence" because it has "attempted to move forward into other case matters . . . only to have the [Claimant] Representatives argue—and [the bankruptcy court] to direct—that the preliminary injunction hearing should come first"); *see also Bestwall*, 71 F.4th at 183-84 ("the main interference with the timely resolution of the claims in Bestwall's bankruptcy proceeding appears to be Claimant Representatives' challenge to the preliminary injunction, thereby prolonging the bankruptcy process and preventing the claimants from obtaining prompt relief."); *Aldrich*, 2023 WL 9016506, at *32 (finding no unreasonable delay in the debtors' prosecution of their cases, including because "at every opportunity [the official committee of asbestos claimants and claimant law firms] have sought to force dismissal of these cases").

*Robbins* on the Committee's lift-stay motion, readopting it), and App.860-62 (summarizing and agreeing with Judge Beyer's *Robbins*-based analysis in denying lift-stay motions in *Bestwall*); *see supra* 11-12 (summarizing ruling on Committee motion); *see also* App.866 (further discussing *Robbins*). The court then went on to provide detailed responses to Appellants' arguments involving "bad faith" and *Carolin*, including (as further discussed below) elaborating on how granting their motions would (as *Robbins* requires it to consider) be contrary to judicial economy. App.862-68. This is exactly what a careful exercise of discretion under *Robbins* should look like.

**2.** With no response to the Bankruptcy Court's reasoned and detailed analysis, Appellants instead attack the Bankruptcy Court for purportedly shifting the burden of proof to them. Br. 4, 28-29. But this attack is a red herring.

First, Appellants ignore that, as the parties seeking relief, they had the burden of providing sufficient evidence to establish a *prima facie* case. *See Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.)*, 907 F.2d 1280, 1285 (2d Cir. 1990) ("Section 362(d)(1) requires an initial showing of cause by the movant . . . . If the movant fails to make an initial showing of cause, however, the court should deny [stay] relief without requiring any showing from the debtor that it is entitled to continued protection."); *In re Eatman*, 182 B.R. 386, 390 (Bankr. S.D.N.Y. 1995) ("While section 362(g) allocates the burden of ultimate persuasion,

under either ground, the movant must still make a *prima facie* showing that it is entitled to the relief that it seeks."); *see also* 3 Collier on Bankruptcy ¶ 362.10 (16th ed. 2024) (same).

Contrary to Appellants' assertions, the Bankruptcy Court's statements in the earlier preliminary injunction order do not "by themselves, substantiate DBMP's bad faith." Br. 8. In issuing that opinion, the Bankruptcy Court acknowledged that issues of bad-faith were not properly before it as no motion to dismiss had been filed. *See* App.219, 228. Further, the Bankruptcy Court itself later clarified that it went "on at length in the preliminary injunction order" so that the parties "might start the negotiating process, or at least [reach] a consensus on how to go forward," *see* Dkt. 1155 at 84:4-9, and that the court's statements "could be considered *dicta*." *See* Dkt. 1285 at 22:6-13. In any event, the Bankruptcy Court below found that Appellants failed to establish cause for relief, App.857, 864, and the court could not reach the conclusion requested by the claimants (*i.e.*, that DBMP's case was filed in bad faith) "on this record or at this stage in the case." App.864.

Moreover, even had Appellants succeeded in making a *prima facie* case for relief, DBMP met its burden of demonstrating that it "is entitled to continued protection." *See Sonnax*, 907 F.2d at 1285. In its objection to the Stay Relief Motions, DBMP explained how granting relief from stay, among other things, would result in Appellants' receiving preferential treatment compared to other claimants,

lead to disparate recoveries on similar claims, and frustrate DBMP's ability to make progress toward establishing a trust for the benefit of all claimants. *See* App.527-554. And the Bankruptcy Court acknowledged that, based on rulings "in this Circuit," the answer to the question of whether a "filing is subjective bad faith because it's sought by a solvent [allegedly] non-distressed entity . . . appears to be no." App.866.

Appellants try to make much of the fact that the Fourth Circuit recently stated that claimants can bring actions for stay "relief based on the specific facts of a particular claim," and such relief may be granted "where appropriate." *Bestwall*, 71 F.4th at 183. But Appellants' fundamental problem is that they identified *no* "specific" facts, "particular" to their claims, to distinguish their lift-stay motions from one that could be brought by any of the *tens of thousands* of other claimants against DBMP and thereby justify an exception for them as "appropriate." This is highlighted by the fact that the Stay Relief Motions (a) are nearly identical and were filed on the same day and (b) mirror arguments previously (and unsuccessfully) raised by other claimants in *Bestwall* and *Aldrich*.

Unhappy with the result, Appellants assert that the Bankruptcy Court's rationale means "no individual request for relief can ***ever*** be granted." Br. 28 (emphasis in original). This is incorrect. Rather, it just means an individual request by a tort claimant in a mass-tort Chapter 11 case cannot be granted when it is based on a ground that would apply *equally* to an individual request by *any other* tort

claimant in the case. Confirming this, DBMP previously agreed, and the Bankruptcy Court entered an order, to modify the automatic stay to allow an appeal to proceed because unique circumstances *did* justify such relief. *See* Dkt. 542 (modifying automatic stay to allow state supreme court to dispose of appeal and court on remand to dispose of the matter, given the unique fact that the judgment was supported by an appellate bond and would not adversely impact the bankruptcy estate).

By carefully considering the *Robbins* factors and applying them to the facts of DBMP's case and the Stay Relief Motions, the Bankruptcy Court was well within its discretion in concluding relief was *not* appropriate here. The Bankruptcy Court did not commit any error, much less reversible error.

### C. The Bankruptcy Court Properly Considered the Tens of Thousands of Other Claimants as Part of Applying *Robbins'* "Judicial Economy" Factor.

Appellants contend that the Bankruptcy Court erred by basing its ruling on "speculative actions of other civil plaintiffs" if the Stay Relief Motions were granted, and concluding that granting the motions would be akin to dismissal. Br. 28-30; *see also id.* at 4. But all of this was part of the Bankruptcy Court's discretionary evaluation of *Robbins*' judicial-economy factor and informed by the court's experience presiding over "a half dozen or maybe eight asbestos cases." App.863. Reframed in this (correct) context, Appellants are questioning whether the Bankruptcy Court abused its discretion in analyzing *Robbins*' "judicial economy"

factor—including by considering the context of DBMP's mass-tort asbestos case and the likelihood that other similarly situated claimants would seek the same relief in a piecemeal fashion, thus sabotaging DBMP's prospects for reorganization. But this was entirely appropriate because judicial economy is an *inherently* predictive question.

This factor has been described as "*seek[ing] to avoid* duplication of effort in different forums *and to conserve* the resources of the litigants and the courts while providing for the efficient and effective administration of the bankruptcy estate and the resolution . . . of the state court . . . action." *Secrest*, 453 B.R. at 629 (emphases added). It is always forward-looking. And it is always appropriate to consider the presence and likely effect of others who might seek the same relief, even in non-mass-tort cases. *Lawrence v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, 2010 WL 4630327, at *5 (S.D.N.Y. Nov. 8, 2010) (noting that potential for opening floodgates to claimants with similar allegations is "the very state of affairs the automatic stay was enacted to prevent"); *In re SunEdison, Inc.*, 557 B.R. 303, 308 (Bankr. S.D.N.Y. 2016) ("Granting stay relief to Vivint may encourage other claimants to file their own stay relief motions.").

All the more is it appropriate in a mass-tort bankruptcy, such as DBMP's. Whether granting the Stay Relief Motions would open the floodgates to hundreds or thousands of similar motions undoubtedly is relevant to any analysis of judicial

economy—especially when the arguments raised in support of lifting the stay are not specific to the individual claimant but rather apply to any claimant in the case.

In considering this factor below, the Bankruptcy Court expressly, and with reasons, disagreed with Appellants that it was "speculative" to think that granting a stay-relief motion in a mass-tort asbestos case would lead to an "avalanche of motions." App.863-64. The court's own experience and knowledge of the experience of other courts, as well as the logic of the motions, counseled otherwise—that, in fact, an avalanche was "an absolute certainty." App.863. The Bankruptcy Court saw, and found, that if it granted the motions, "even just to liquidate the claims," there would be "dozens of claimants making the motions and by the end of summer there'd be tens of thousands." App.863-64.

Among other things, this is because most of the tens of thousands of claimants against DBMP "are represented by a dozen or so asbestos firms across the country, firms that are knowledgeable" about the cases, with "many serving on the [Committee] indirectly," and "are aggressive in representing their clients." *Id.*; *see also Aldrich*, Dkt. 1702 at 67:8-12 (in denying lift-stay motion, stating that if court were to "grant relief from stay to one creditor to liquidate the claim, … a substantial number of the claimants, enough to wreck the bankruptcy case, will seek like measure and that effectively precipitates a *de facto* dismissal of the case"). Indeed, Appellants are represented by the same counsel that has appeared in *Bestwall* and

*Aldrich* on behalf of other claimants on similar requests for stay-relief[13] and Maune Raichle Hartley French & Mudd, LLC represents claimants sitting on the committees in DBMP's case, *Bestwall*, and *Aldrich*.[14]

There would be no reason for any of them to hold back on copy-cat motions that do not at all depend on any specific facts of a particular claim but rather would require being granted "en masse." App.862. And it would make no difference if these copy-cat motions were to request only permission to liquidate claims, App.863-64, as the Bankruptcy Court's obligation to grant all similar motions would remain unchanged—effectively resulting in a flood of litigation in the tort system and ending the Debtor's ability to address all similarly situated claimants in a fair and equitable manner. *See also* App. 860 (Bankruptcy Court finding in *Aldrich* that if it "were to grant relief from stay to one creditor to liquidate the claim, then all the creditors would seek that, or . . . at least enough to wreck the bankruptcy case and . . . "effectively, precipitate a *de facto* dismissal"). Again, this is what a reasoned exercise of discretion within the guidelines of precedent looks like.

Nor was the Bankruptcy Court's straightforward reasoning "unmoored from the Code, from logic, and from controlling case law." Br. 25. In *Bestwall*, the

---

13 *Aldrich*, Dkt. 2243 at 35; *Bestwall*, Dkt. 3242 at 18; *Bestwall*, Dkt. 3127 at 24-25; *Aldrich*, Dkt. 1588 at 28.

14 Dkt. 155 (order appointing the official committee of asbestos personal injury claimants); *Aldrich*, Dkt. 147 (same); *Bestwall*, Dkt. 348 (same).

bankruptcy court has twice reasoned that, if it granted an individual claimant's motion to lift the stay and liquidate their claims without any specific facts of a particular claim being at issue, it "would be obliged" to grant such motions by any other claimant. *See Bestwall*, Dkt. 3268 at 77:17-78:12; *Bestwall*, Dkt. 3154 at 70:6-11 (stating that court would be "hard pressed to deny future motions for relief" if it granted the individual claimant's lift-stay motion that lacked any unique facts). This was the inevitable conclusion when an individual claimant pled no "unique facts or circumstances" to "sufficiently distinguish his case from the thousands of other cases pending in state court." *See Bestwall*, Dkt. 3268 at 77:25-78:4; *Bestwall*, Dkt. 3154 at 69:23-70:11 (same).

The Stay Relief Motions repeat the same rejected arguments previously raised by other claimants. *See supra* 17-19. Indeed, Appellants made no effort to explain how the Bankruptcy Court, if it granted *their* motions, might deny the next lift-stay request *without* abusing its discretion. The Bankruptcy Court's reasoning, therefore, was not "contrary to the Code, logic, and equity," Br. 4, and does not lead to "absurd results," Br. 26. The absurdity lies on the other side. The Bankruptcy Court's conclusions were reasonable and its ruling was the result of a careful analysis of DBMP's case and the specific facts (or lack thereof) in the Stay Relief Motions.

## II. The Bankruptcy Court Properly Considered *Carolin* in Response to Appellants' "Bad Faith" Arguments.

The Bankruptcy Court did not abuse its discretion in considering *Carolin* in response to Appellants' unsupported, generalized allegations that DBMP's case was filed in bad faith.[15] Instead, the court properly recognized Appellants' efforts to raise dismissal issues indirectly so they could try to appeal those issues[16] in a case where (a) no motion to dismiss has been filed and (b) the parties "are currently litigating the propriety" of the corporate restructuring "and the bankruptcy filing in adversary proceedings." App.866. Addressing bad-faith filings is what the *Carolin* case is

[15] Although DBMP disagrees with Appellants' characterization of the corporate restructuring in the DBMP case and with Appellants' interpretation of Supreme Court precedent, DBMP has limited its briefing to the relevant issues raised in this appeal. But DBMP wishes to address a couple of points raised in this context. First, DBMP and New CT (by virtue of the Funding Agreement) *have* placed their "assets on the table" for "distribution" to the claimants, and New CT has agreed to Bankruptcy Court jurisdiction over enforcement of the Funding Agreement (and the related stipulation amending the Funding Agreement). *Harrington v. Purdue Pharma L.P.*, 144 S.Ct. 2071, 2077-78, 2081 (2024); *see also* Dkt. 1279 ¶ 8 ("[DBMP] and New CT agree that [the Bankruptcy] Court shall have jurisdiction over any and all matters arising from or related to the implementation, enforcement or interpretation of this Stipulation and, during the pendency of [DBMP's] case, the enforcement of the [] Funding Agreement."). Further, DBMP and its affiliates have not received any "windfall," and DBMP's affiliates are not "gorg[ing] on [their] profits." *See* Br. 2, 7. Any profits earned by DBMP's subsidiary are maintained by DBMP for the benefit of the asbestos claimants in the bankruptcy case or properly utilized to pay expenses related to the case, and any profits earned by New CT are similarly maintained for the benefit of claimants (through the Funding Agreement) or utilized to pay on-going business expenses. No amounts have been distributed to DBMP's or New CT's owners.

[16] Counsel for the Bergruds openly admitted that the goal of the Stay Relief Motions was to raise the subjective bad-faith arguments to permit them to be tested on appeal. *See* App.776-777 ("[t]he motion was filed specifically to frame the issue of subjective bad faith before the Court in a manner where it is provided for directly by the case law that controls the Court as cause and . . . in a format that is, unquestionably, immediately appealable"); *id.* at 779 ("we ask that your Honor . . . rule on the merits so we can get the issue before the appellate court").

about, and its standard for dismissal cannot be avoided by framing the "bad faith" issue as a request for stay relief.

### A. The Bankruptcy Court Properly Recognized It Could Not Accept an Argument That the Case Was Filed in "Bad Faith" Apart From Applying *Carolin*'s Rule Governing That Question.

The Bankruptcy Court's consideration of *Carolin* in connection with the Stay Relief Motions was not in contravention of "precedent and logic." Br. 13. Consideration of *Carolin* was proper considering that the Stay Relief Motions were based on an alleged bad-faith bankruptcy filing, as reinforced by the Bankruptcy Court's findings that, given the context of this mass-tort case, granting the Stay Relief Motions would operate as a *de facto* dismissal of DBMP's case.

Although *Carolin* does not explicitly state that its two-prong approach applies to lift-stay motions, other courts have applied *Carolin* in connection with *Robbins* to decide such motions where there is an allegation, as here, that the case itself was filed in bad faith. In *Bestwall*, for example, the court denied a similar lift-stay motion, recognizing that it would defy "logic to conclude that [*Carolin*'s] two-prong standard doesn't apply" given that (a) the arguments for lifting the stay were the same as those for dismissal, (b) the court already had denied motions to dismiss the case under *Carolin*, and (c) lifting the stay would essentially constitute dismissing the case. *Bestwall*, Dkt. 3268 at 79:15-80:9; *see, e.g., Ramkaran*, 315 B.R. at 365 (in affirming ruling denying motion to lift the automatic stay, finding that *Carolin*'s

"strict standard for the use of bad faith as a basis for dismissal applies equally" to Section 362); *In re Madden*, 1999 WL 33486095, at *2 (Bankr. D.S.C. Dec. 21, 1999) (applying *Carolin*'s two-prong standard in denying motion for relief from the automatic stay premised on the debtor's alleged bad faith in filing the case); *In re Dunes Hotel Assocs.*, 188 B.R. 162, 169 n.12 (Bankr. D.S.C. 1995) (analyzing whether the case should be dismissed under *Carolin* and explaining that "[t]his same stringent two-prong test applies to [movant's] alternative request for stay relief on the basis of bad faith.").

The Bankruptcy Court, in agreement with this authority (and with none to the contrary),[17] correctly found that, if it granted the Stay Relief Motions, it would also have to be willing to start "granting relief from stay *en masse*," amounting to *de facto* dismissal. So it would make no sense to consider some standard other than *Carolin*'s two-element requirement. App.862; *supra* n.4. Otherwise, the court would be "indirectly" doing something that it is "not permitted to do or not inclined to do under existing law." App.866; *see also* App.862-63 ("That's to do, effectively, indirectly what I am not permitted to do directly."). As there was no abuse of discretion by the Bankruptcy Court in following relevant precedent, this Court similarly should not countenance Appellants' efforts to achieve an effective

---

[17] Appellants' cases in support of bad-faith as a basis for relief from the automatic stay, Br.19 n.19, are all distinguishable. *See supra* n.11.

dismissal of DBMP's case indirectly, without satisfying *Carolin*'s two-prong standard for dismissal.

### B. Appellants' Subjective Bad-Faith Arguments, Detached From *Carolin*, Are Misplaced In This Lift-Stay Context.

Appellants cannot avoid the requirement to satisfy both prongs of the *Carolin* test for a bad-faith bankruptcy case simply by raising bad faith in a lift-stay context. To date, no party has directly sought dismissal of DBMP's case, but dismissal under similar facts has been denied in both *Bestwall* and *Aldrich*,[18] and the Bankruptcy Court below recognized it did not now see a basis for dismissal of DBMP's case under the *Carolin* standard. App.866-67. Further, as highlighted by the Bankruptcy Court, the Claimant Representatives already are challenging the corporate restructuring and the filing of DBMP's case in pending adversary proceedings.[19] A properly filed motion to dismiss and those adversary proceedings are proper mechanisms for challenging the propriety of the entire Chapter 11 case—not piecemeal lift-stay requests by individual claimants.

---

[18] *See supra* 14-17.

[19] Appellants' contentions that claimants must "waive their Constitutional rights to jury trials and state law damages" and that a trust by DBMP is "unconstitutional" are misguided. Br. 26. Section 524(g) plans do not deprive asbestos claimants of access to the tort system nor do they eliminate claimants' rights to a jury trial. And *Ortiz*—cited by Appellants to support this argument—at its core involved whether Rule 23(b)(1)(B) of the Federal Rules of Civil Procedure (a class action rule that the Supreme Court interpreted to require a limited fund) was satisfied where "the only limited fund . . . was a creature of the settlement itself." *Ortiz v. Fibreboard*, 527 U.S. 815, 830 (1999). *Ortiz* did not address any limited fund issues in the context of bankruptcy generally or Section 524(g) specifically.

**1.** *Carolin* clearly requires *both* objective futility and subjective bad faith to establish a bad-faith filing. Appellants cannot simply disregard half of the two-prong *Carolin* test because that prong cannot be met.

Although they contend that Judges Beyer and Whitley erred by not ruling on subjective bad faith in denying motions to dismiss in *Bestwall* and *Aldrich*, that just misreads applicable law. Br. 5 n.4. Under *Carolin*, if objective futility cannot be demonstrated, the dismissal test fails and subjective bad faith does not matter. *E.g., Dunes Hotel*, 188 B.R. at 170 ("The failure of the Movants to establish objective futility alone requires denial of the Movants' request to dismiss the Dunes case for bad faith."). Although Appellants cite a footnote in *Carolin* for their contention that subjective bad faith must be assessed, it actually undermines their point: The footnote concerns how to assess subjective bad faith when there *is* "objective futility" (specifically, "overwhelming" evidence of it), which of course makes it necessary to proceed to the subjective-bad-faith element of dismissal. *Cf. Carolin*, 886 F.2d at 701 n.3, *with* Br. 5 n.4. Here, although the Bankruptcy Court has not had occasion to rule on a motion to dismiss in DBMP's case, it did, in granting DBMP's preliminary-injunction motion, effectively recognize that DBMP's case is not objectively futile because DBMP "has the financial ability to appropriately fund a § 524(g) trust and to pay the administrative costs of" its case. *See* App.232. That remains true.

Appellants' singular focus on subjective bad faith also ignores that, apart from rhetoric, they have presented no evidence to demonstrate it. The Bankruptcy Court itself (a) stated it was not comfortable concluding that subjective bad faith existed "on this record or at this stage in the case," (b) recognized that the "same basic argument" regarding the corporate restructuring had been "effectively rejected" by the Fourth Circuit in the *Bestwall* preliminary-injunction opinion, and (c) reiterated and readopted its earlier conclusions, "[o]n the facts found in the P[reliminary] I[njunction] ruling," "that the bankruptcy stay applied, that dismissal wasn't permitted, and the third-party injunction was required." *See* App.864, 866-67. As a result, the Bankruptcy Court did not abuse its discretion in declining to rule on subjective bad faith to deny the Stay Relief Motions.

**2.** Appellants also offer, as they and others have done before, a cursory argument that the Fourth Circuit's decision in *Premier*, favorably citing and *applying* the *Carolin* test, somehow rejected or revised it. Br. 2, 14. They use this as their primary ground to argue that "financial distress" should be required for a good-faith filing, even though that is not the *Carolin* standard.[20]

---

[20] Appellants cite the Supreme Court's observation in *Truck* that bankruptcy "offers individuals and businesses in financial distress a fresh start" as conclusive proof of their arguments. Br. 2 (citing *Truck*, 144 S. Ct. at 1420-21). But the Supreme Court in *Truck* simply decided that the debtors' insurer was a "party in interest" permitted to object to a Section 524(g) plan of reorganization. *Truck*, 144 S. Ct. at 1420. And, in so doing, it recognized that Section 524(g) "allows a Chapter 11 debtor with substantial asbestos-related liability," like DBMP, "to establish and fund a trust" to pay asbestos claims. *Id.* at 1421. Appellants' cited language is not an announcement of a requirement for bankruptcy eligibility nor is it a standard for good faith

Appellants' argument that *Premier* creates a dismissal standard other than the one in *Carolin* is simply inaccurate, as the Bankruptcy Court below recognized. *See* App.867 ("[T]here were some more arguments that were just rehashes of arguments previously made and rejected . . . like arguing that *Premier* is the standard, not *Carolin*."). In *Premier*, the Fourth Circuit dismissed a bankruptcy case finding that, *under Carolin*, there was both objective futility and subjective bad faith. 492 F.3d at 280-82. There, the Fourth Circuit found that the case was objectively futile because the purpose of the bankruptcy filing was to resurrect a lease that was core to the debtor's business, but had already expired and could not be revived in bankruptcy. *Id.* at 277, 280. As to subjective bad faith, after a review of the totality of the circumstances, the Fourth Circuit found that the debtor was a "solvent business entity with no unsecured creditors and few, if any, secured creditors," and it filed the case solely to invoke the stay to try to preserve a lease it failed to extend by agreement (even though the stay ultimately could not assist it in preserving its leasehold) and with no plan to successfully prosecute a Chapter 11 case. *Id.* at 280-81.

Here, by contrast, DBMP has tens of thousands of disputed asbestos claims against it, and anticipates it will be subject to significant future claims. *See* App.172. And, unlike in *Premier*, DBMP filed its case to resolve an issue that bankruptcy, and in particular Section 524(g), is specifically designed to address. *See* App.225

("Congress enacted section 524(g) to address precisely the type of state law-based asbestos claims faced by [DBMP]").[21]

Appellants also ignore multiple cases involving solvent debtors, each of which had been defending and paying claims in the tort system, that resulted in claimant-supported and court-approved asbestos trusts established under a Section 524(g) plan of reorganization. *See In re Mid-Valley, Inc.*, 305 B.R. 425, 429-31 (Bankr. W.D. Pa. 2004) (bankruptcy court stating that the "fact of solvency does not require a finding that the bankruptcy filing was in bad faith"); *In re N. Am. Refractories Co.*, No. 02-20198 (Bankr. W.D. Pa.); *In re Garlock Sealing Techs. LLC*, No. 10-31607 (Bankr. W.D.N.C.); *In re W.R. Grace & Co.*, Nos. 01-1139, 1140 (Bankr. D. Del.); *In re USG Corp.*, No. 01-2094 (Bankr. D. Del.); *In re United Gilsonite Labs.*, No. 11-02032 (Bankr. M.D. Pa.)); *In re Honx, Inc.*, 2022 WL 17984313, at *2 (Bankr. S.D. Tex. Dec. 28, 2022) ("Congress recognized that while an asbestos bankruptcy differs from a 'classic' bankruptcy with an insolvent or near-insolvent debtor, it is still a forward-looking solution meant to treat fairly all parties in interest. That is the hallmark purpose of chapter 11. That is not a 'bad faith' motive.").

---

[21] Even less could the decision of *another* circuit overrule the precedent of the Fourth Circuit. That is sufficient to show the irrelevance of Appellants' argument from the "good faith" standard of the Third Circuit in *LTL*. Br. 7, 18. Plus, since *LTL*, the Fourth Circuit has reiterated that *Carolin* remains its rule, and is a different, more stringent test than what has been adopted in the Third Circuit. *Bestwall*, 71 F.4th at 182.

Indeed, the *Johns-Manville* case they invoke, Br. 18 n.17, 22, was not viewed so differently in its day from the way in which Appellants bemoan this case. *See In re Johns-Manville Corp.*, 36 B.R. 727, 729 (Bankr. S.D.N.Y. 1984) (filing was "greeted with great surprise and consternation"). As one commentator put it then: The "Manville reorganization raises the novel question of whether the bankruptcy laws should shield a *presently sound corporation* from possible future economic distress." Sandrea Friedman, *Manville: Good Faith Reorganization or "Insulated'" Bankruptcy*, 12 Hofstra L. Rev. 121, 122 (1983) (emphases added). Not only did that case answer that question in the affirmative, but Congress thereafter enacted Section 524(g) to ratify the *Johns-Manville* approach. *See* H.R. Rep. No. 103-835 at 40 (1994) ("The procedure is modeled on the trust/injunction in the Johns-Manville case, which pioneered the approach a decade ago in response to the flood of asbestos lawsuits it was facing.").

**3.** Finally, as the Bankruptcy Court previously recognized, "the way to challenge" the corporate restructuring and DBMP's case "is not through piecemeal individual claimant actions in the tort system. It is through plan negotiation and/or an adversary proceeding filed in this case for the benefit of all asbestos claimants." App.229; App.866; *see also Bestwall*, 71 F.4th at 183 ("If the claimants are adversely affected monetarily by the ongoing bankruptcy, then the time and place to

raise that concern is at plan confirmation, not by a purported jurisdictional challenge that really goes to the merits of the reorganization.").

To that end, the Claimant Representatives are prosecuting adversary proceedings in DBMP's case regarding the appropriateness of the corporate restructuring and DBMP's bankruptcy filing, including two in which they are acting as estate representatives. *See supra* 12-13. The Bankruptcy Court below correctly found that these proceedings raise some of the same issues Appellants tried to raise in the Stay Relief Motions and thus cautioned against deciding the issues prematurely in connection with those motions. *See* App.866. It also is striking that Appellants make (legally irrelevant) arguments here about DBMP's lack of financial distress while the Claimant Representatives in their adversary proceedings assert that DBMP was rendered ***insolvent*** as a result of the corporate restructuring.[22] That issue will be resolved in time in the adversary proceedings and appropriately was not addressed below.

## CONCLUSION

For all these reasons, this Court should affirm the Denial Orders.

---

[22] *See*, *e.g.*, Amended Complaint, Adv. Pro. No. 22-03000 (JCW), Adv. Dkt. 14 ¶¶ 6, 54, 73, 107, 114, 125, 144, 151; Amended Complaint, Adv. Pro. No. 22-03001 (JCW), Adv. Dkt. 12, ¶¶ 2, 7, 78, 101, 105, 125, 126, 139, 141, 145, 146, 148, 153, 155, 162, 180, 182.

## STATEMENT REGARDING ORAL ARGUMENT

Because these appeals simply concern whether the Bankruptcy Court abused its discretion in applying the controlling Fourth Circuit standard to the facts here, DBMP does not believe oral argument would significantly aid the Court in its decisional process. DBMP nevertheless would be happy to participate if the Court concludes oral argument would be useful.

Dated: September 18, 2024

Respectfully submitted,

*<u>/s/ Garland S. Cassada</u>*
Garland S. Cassada (NC Bar No. 12352)
Richard C. Worf, Jr. (NC Bar No. 37143)
ROBINSON, BRADSHAW & HINSON, P.A.
101 North Tryon Street, Suite 1900
Charlotte, North Carolina 28246
Telephone: (704) 377-2536
Facsimile: (704) 378-4000
E-mail: gcassada@robinsonbradshaw.com
rworf@robinsonbradshaw.com

Gregory M. Gordon (TX Bar No. 08435300)
JONES DAY
2727 North Harwood Street, Suite 500
Dallas, Texas 75201
Telephone: (214) 220-3939
E-mail: gmgordon@jonesday.com
(Admitted *pro hac vice*)

Jeffrey B. Ellman (GA Bar No. 141828)
JONES DAY
1221 Peachtree Street, N.E., Suite 400
Atlanta, Georgia 30361
Telephone: (404) 521-3939
Facsimile: (404) 581-8330
E-mail: jbellman@jonesday.com
(Admitted *pro hac vice*)

C. Kevin Marshall (DC Bar No. 476266)
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
E-mail: ckmarshall@jonesday.com
(Admitted *pro hac vice*)

*Counsel for Appellee/Debtor DBMP LLC*

## CERTIFICATE OF COMPLIANCE

I hereby certify that: (1) this brief complies with the type-volume limitation of FED. R. BANKR. P. 8015(a)(7)(B) because this brief contains 12,092 words, excluding the parts of the brief exempted by FED. R. BANKR. P. 8015(g); and (2) this brief complies with the typeface requirements of FED. R. BANKR. P. 8015(a)(5)(A) and the type style requirements of FED. R. BANKR. P. 8015(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in a 14-point Times New Roman font in the text, and in a 12-point Times New Roman font in the footnotes.

Dated: September 18, 2024

*<u>/s/ Garland S. Cassada</u>*
Garland S. Cassada

## CERTIFICATE OF COMPLIANCE
## REGARDING USE OF ARTIFICIAL INTELLIGENCE

Pursuant to the Court's June 18, 2024 Order, 3:24-mc-104, the undersigned hereby certifies that no artificial intelligence was employed in performing legal research for the preparation of the foregoing brief with the exception of such artificial intelligence embedded in standard online legal research sources such as Westlaw, Lexis, FastCase, and Bloomberg. The undersigned further certifies that every statement and every citation to an authority contained in the foregoing brief has been checked by me or another attorney in these appeals, and/or a paralegal working at my direction or at the direction of another attorney in these appeals, as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Dated: September 18, 2024    *<u>/s/ Garland S. Cassada</u>*
Garland S. Cassada

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on September 18, 2024, a copy of the foregoing was served upon the parties in these appeals by ECF electronic service.

Dated: September 18, 2024

*/s/ Garland S. Cassada*
Garland S. Cassada

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:24-CV-558-KDB; 3:24-CV-559-KDB

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | APPEAL FROM |
| DBMP LLC,[1] | ) | USBC WDNC |
| | ) | Case No. 20-30080 |
| Debtor. | ) | |
| | ) | |
| PETER L. BERGRUD and MICHAEL N. AND ANN HERLIHY | ) | |
| Plaintiffs-Appellants, | ) | |
| v. | ) | |
| DBMP LLC, | ) | |
| Defendant-Appellee. | ) | |

# REPLY BRIEF OF APPELLANTS

WALDREP WALL BABCOCK & BAILEY PLLC
370 Knollwood Street, Suite 600
Winston-Salem, NC 27103
Telephone: 336-717-1280

THE RUCKDESCHEL LAW FIRM, LLC
8357 Main Street
Ellicott City, Maryland 21043
Telephone: 410-750-7825

[1] The last four digits of the Debtor's taxpayer identification number are 8817. The Debtor's address is 20 Moores Road, Malvern, Pennsylvania 19355.

**MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC**
**150 W. 30th Street Suite 201**
**New York, NY 10001**
**Telephone: 314-241-2003**

## I. INTRODUCTION

The Bankruptcy Court refused to apply the Bankruptcy Code and controlling precedent to the undisputed facts before it. Accordingly, this Court reviews the Bankruptcy Court's Order *de novo*. Appellants Michael Herlihy and the Bergrud Estate are "entangled in a hopeless Chapter 11 case[]" involving a debtor that filed its petition in bad faith. The Fourth Circuit has expressly stated that their remedy in just such a case is to seek relief from stay. *See Carolin Corp. v. Miller*, 886 F.2d 698, 700 (4th Cir. 1989) (citing 11 U.S.C. § 362(d)(1)).

But the Bankruptcy Court refused to even consider bad faith—the fundamental issue put squarely before it—and whether a non-distressed multibillionaire that files a petition for purposes contrary to the Code can nevertheless be shielded indefinitely and without exception by a nationwide litigation stay. Having no legal or coherent way to defend this absurd result, DBMP's response ("Resp." (Dkt. No. 9)) ignores the issue.

## II. ARGUMENT

Bad faith is—by itself—cause for lifting the automatic stay pursuant to 11 U.S.C. § 362(d)(1). *Carolin*, 886 F.2d at 699. Indeed, the existence of stay relief in bad faith cases was a significant reason for the Fourth Circuit adopting *Carolin*'s two-pronged standard for bad faith dismissal—because it was confident creditors in such cases would not be held hostage by bad faith debtors seeking to leverage the stay for ulterior motives.

DBMP has repeatedly admitted—and affirmatively argued—that it is fully capable of paying all its debts in full, inside ***or*** outside of bankruptcy. *See* App. 117, 180. The undisputed facts, found by the Bankruptcy Court, show that DBMP's "real motivation" is ***not*** "resuscitating a financially troubled" company, but to "abuse the reorganization process," "cause hardship [and] delay [its] creditors." Specifically, DBMP seeks to leverage the automatic stay to achieve results to which it is not entitled under state law or the Code. *See Carolin*, 886 F.2d at 701-02 (defining what constitutes subjective bad faith in filing for bankruptcy); *see also In re Premier Auto Services*, 492 F.3d 274, 280-81 (4th Cir. 2007) (bankruptcy is not for "financially healthy companies with no need to reorganize" under Chapter 11).

**A. <u>The Undisputed and Established Facts Show DBMP Filed in Bad Faith.</u>**

DBMP does not engage with whether its petition was filed in bad faith—the only issue before this Court on appeal—until thirty-eight pages into its Response. *See* Resp. at 39-48, Section II. Legally, DBMP half-heartedly argues that the Bankruptcy Court acted within its discretion by ignoring the bad faith issue. DBMP, and the Bankruptcy Court, both ignore the Code's express allocation of the burden of proof upon the debtor when opposing relief from stay. Factually, DBMP characterizes Appellants' argument as merely "unsupported, generalized allegations…" Resp. at 39, 44.

DBMP is wrong. Refusal to apply Fourth Circuit precedent and the plain language of the Code regarding the burden of proof is plain legal error. And this Court reviews

plain legal error *de novo*. *See Copley v. United States*, 959 F.3d 118, 121 (4th Cir. 2020); *see also In re Jones*, 591 F.3d 308, 310 (4th Cir. 2010). Even under a more generous standard of review, a court that misapprehends or misapplies the applicable law abuses its discretion. *United States v. Richardson*, 96 F.4th 659, 665 (4th Cir. 2024).

Appellants set forth in detail the undisputed facts, already found by the Bankruptcy Court, that demonstrate DBMP filed its Chapter 11 petition in bad faith. (Opening "Brief" at 8-11 (Dkt. No 4); App. 169–239 (Bankruptcy Court's detailed factual findings conclusions of law on preliminary injunction in 2021)). That factual record was squarely before the Bankruptcy Court when considering the motions below. *See generally* App. 240-526.

DBMP disputes ***none*** of these facts in its Response, nor does it refute the specific facts set forth by the Appellants about their individual claims: Appellants have mesothelioma, caused by exposure to asbestos from Old CertainTeed's products, and they have state law claims against DBMP they able to pursue in state court. *See In re Bestwall LLC*, 71 F.4th 168, 183 (4th Cir. 2023) ("[C]laimants can bring individual actions for relief based on the specific facts of a particular claim.").

Instead, DBMP reaffirms that both it and "New CT have placed their 'assets on the table' for 'distribution' to the claimants…." Resp. at 39 n.15 (citing *Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 2071, 2077-78, 2081 (2024)). That's precisely Appellant's point. DBMP is worth the full value of New CertainTeed, a non-distressed multibillionaire that

can pay all claims in full inside ***or*** outside of Chapter 11. *See* App. 174, 192, 215. Because DBMP admits it can easily pay all creditors in full, its petition, by definition, fails to further the purpose of the Code as defined by *Carolin*, *Premier Auto*, and legions of caselaw from other Circuits. *See* Opening Brief at 15-26.

DBMP's "real motivation" in filing its petition is not to resuscitate a "financially troubled debtor" — which is how the Fourth Circuit defines the Bankruptcy Code's purpose (*Carolin*, 886 F.2d at 701). Rather, there is no real dispute that DBMP seeks to invoke and enforce the automatic stay to force judicially compelled renegotiation of debts it has no right to renegotiate. In turn, this is how the Fourth Circuit defines a bad faith abuse of the Code. *Carolin*, 886 F.2d at 700-02; *Premier Auto*, 492 F.3d at 281. Appellants here seek the ***exact*** remedy for bad faith that is set forth in the Code and *Carolin*, and DBMP does not dispute the facts that entitle them to that remedy.

Appellants seek only limited relief: Mr. Herlihy, suffering from a terminal asbestos-caused cancer, simply asks to liquidate his claim before a jury—something he is statutorily entitled to do and which the Bankruptcy Court is statutorily prohibited from doing—before he dies. *See* 28 U.S.C. § 157(b)(2)(B) (bankruptcy courts do not have power to liquidate, i.e. quantify the value of, individual personal injury tort claims). After Mr. Herlihy's claim is quantified by a jury in California state court, he expressly agreed to

return to the bankruptcy court to await the conclusion of this case—waiting in line with the rest of DBMP's creditors.[2]

Given DBMP's continued insistence on its financial ability to pay its creditors and all administrative costs of its [bad faith] bankruptcy (Resp. at 43), DBMP's desperate attempts to block Mr. Herlihy and the Bergrud Estate from exercising their rights are pretextual.

### B. *Carolin* Requires Relief from Stay When a Debtor Files in Bad Faith.

DBMP admits that *Carolin* "does not explicitly state that its two-prong approach" for dismissal "applies to lift stay motions." Resp. at 40. That's because *Carolin* sets a standard for dismissal, not lifting a stay. But DBMP's grudging admission is deliberately myopic. In *Carolin*, the Fourth Circuit expressly recognized that creditors like the Herlihys and Bergruds can and should obtain relief from stay in circumstances like those here, when a well-heeled debtor files a petition in bad faith, to weaponize the automatic stay and force renegotiation of state law liabilities, which it has no right to do outside of bankruptcy. *See* Opening Brief at 24–26.

DBMP claims that, while the Fourth Circuit has not held that its two-prong dismissal standard applies to lift stay motions, "other courts" have. Resp. at 40. Which "other courts"? The only "other court" in America that has so held is not really another

---

[2] Of course, once the stay is lifted, nothing prevents DBMP and New CT from liquidating his claim through a settlement negotiated with Mr. Herlihy individually.

court, simply another judge in another bad-faith Texas Two-Step pending in the Bankruptcy Court for the Western District of North Carolina where a massively profitable fabricated "debtor" seeks to use the bankruptcy process to enact non-legislative tort reform: *Bestwall*. The *Bestwall* decision denying relief from the automatic stay without addressing the question of bad faith is also under appeal. *See* Resp. 17-19) (W.D.N.C., Case No. 3:24-cv-00297-RJC)

The other cases invoked by DBMP are readily distinguishable (*see* Resp. at 40-42). First, *In re Dunes Hotel Assocs.*, 188 B.R. 162, 169 (Bankr. D.S.C. 1995) involved a creditor's motion for dismissal, not for lifting stay. And *Dunes* measured objective futility in the context of a financially distressed entity owning a single real estate asset and attempting to thwart foreclosure, not a multi-billion-dollar corporation seeking to avoid tort system liabilities it managed without distress for decades and which it admits it can pay in full.

DBMP's citation to *In re Ramkaran*, 315 B.R. 361, 365 (D. Md. 2004) as a "bad faith" case borders on disingenuous. *Ramakaran* involved the debtor's bad faith in obtaining a loan, *not* credible allegations (and proof) that the entire bankruptcy was filed (and proceeding) in bad faith.

*In re Madden* likewise bears no relation to the undisputed facts of this case. *Madden* involved two individuals who filed for Chapter 13 mere months after obtaining an automobile loan. *In re Madden*, No. CIV.A. 99-08282-W, 1999 WL 33486095, at *2 (Bankr. D.S.C. Dec. 21, 1999). The lender argued the petition's timing was "cause" under Section

362(d)(1). But the bankruptcy court found the debtors filed the petitions to protect against foreclosure after defaulting on their home mortgage payments and that the debtors had ***not*** purchased the vehicles knowing they would be filing for bankruptcy. *Id*.

Here, the Bankruptcy Court's factual findings establish that New CT and DBMP deliberately structured this bankruptcy to force all its state law asbestos creditors—creditors it admits it can pay in full—into forced renegotiation of its liabilities while it and its profitable businesses (now housed in New CT) enjoy the indefinite benefit from the automatic stay. *See* App. 171-174 (Bankruptcy Court's Findings). This is bad faith. And because DBMP can defend itself and pay all its asbestos creditors through its access to the vast wealth of New CT, no claimants will be harmed if Appellants quantify their claims against DBMP. Any amount spent defending against Appellants' claims will not reduce what is available to all other creditors.

Stripped of pretense, DBMP's claim of harm is that if individual claimants are permitted to exercise their right to liquidate their claims before juries—a right expressly guaranteed them by the Code—those claimants could not then be forced to renegotiate the value of their claims with the "gun" of indefinite delay pointed at their head. *See* 11 U.S.C. §1129(a)(7)(A)(ii) (mandating that creditors receive as much in a Chapter 11 reorganization of the debtor as that creditor would receive in a Chapter 7 liquidation which, under the facts of this case, means their full, jury-determined, state law damages). And under these circumstances, when a claimant like Mr. Herlihy liquidates his claim,

Section 1129 precludes forcing him into a reduced payment settlement—which is exactly what DBMP seeks to do.

**C. Seeking to leverage the stay into delaying and impeding the rights of creditors a debtor can pay in full and without distress by forcing them into judicially compelled negotiations seeking a result to which the "debtor" is not entitled under state law or the Code, is the definition of bad faith and was forcefully rejected in *Premier Auto.* The Debtor's Reliance on *Robbins* Is Misplaced. *Carolin* Controls.**

Lacking any coherent response to *Carolin* and *Premier Auto*, DBMP seeks refuge in *In re Robbins*, 964 F.2d 342 (4th Cir. 1992). But *Robbins* was not a bad faith case and DBMP provides no rational explanation as to why its analysis should or does apply when, as here, the bankruptcy proceeding itself was filed in bad faith for purposes contrary to the Code.

Nothing in *Robbins* purports to change the relief available to creditors in bad faith bankruptcy cases as expressly set forth in *Carolin* three years earlier. *Robbins* neither discusses "bad faith" nor does it cite to *Carolin*. And, because *Carolin* recognizes that bad faith is cause for stay relief under Section 362(d)(1), the assertion that the *Robbins* analysis is required here, on these facts, is unsupported.

DBMP contends bad faith is only a component of the larger *Robbins* analysis, again claiming to rely upon *Ramkaran* from the District of Maryland. Resp. at 27 (citing 315 B.R.

at 366). But *Ramkaran* involved "bad faith" in obtaining a loan, ***not*** an allegation that the entire Chapter 11 proceeding was in bad faith.[3]

DBMP's bizarre argument regarding judicial economy encapsulates the through-the-looking-glass dissembling that is required to defend its position. DBMP ignores the fact that this entire proceeding was filed in bad faith and for purposes contrary to the Code's statutory goal of resuscitating a financially troubled debtor (*See generally Carolin*). DBMP further ignores the Fourth Circuit's express pronouncement in 2007 (*Premier Auto*) that lack of financial distress is a hallmark of bad faith bankruptcies. Having avoided the controlling precedent, DBMP argues that ***maintaining*** this bad faith proceeding and indefinitely delaying Appellants' statutory and Constitutional rights somehow ***furthers*** judicial economy. *See* Resp. at 34-35.

Delaying the rights of thousands of claimants DBMP admits it can pay in full outside of bankruptcy is the epitome of judicial waste and abuse, and maintaining the status quo is the anthesis of judicial economy as reflected by the five years this case has been pending with no end in sight.

---

[3] *Ramkaran* and the cases it references were Chapter 13 cases where the courts noted fraudulent inducement did not bar discharge. *Citing and quoting In re Chase*, 43 BR 739 (D. Md. 1984). *Ramkaran* distinguished claims of bad faith regarding the incurring of a specific debt and bad faith that taints the entire proceeding. The nature of the debt itself cannot preclude a Chapter 13 filing unless the debt was fraudulently incurred without any intention of repayment because of an anticipated abuse of the Chapter 13 process. *Margraf v. Oliver*, 28 B.R. 420 (S.D. Ohio 1983).

In the end, DBMP contends that *Carolin's* standard for dismissal cannot be different than that for stay relief. Resp. at 38-40. But *Carolin's* plain language rejects this contention, as does simple logic. In *Carolin*, the Fourth Circuit adopted a two-pronged standard for dismissal ***because*** individual stay relief under Section 362(d)(1) remained available against bad faith debtors. *Carolin*, 886 F.2d at 698-99 ("Just as Section 1112(b) . . . permits inquiry into a debtor's good faith in the context of [a] . . . motion to dismiss, Section 362(d)(1) . . . authorizes the court to determine whether . . . a debtor has sought the protection of the automatic stay in good faith."). The express possibility that a victim of a bad faith bankruptcy could win a lift stay motion yet lose a motion to dismiss (at the portals of the case) is part of the balance struck by the Fourth Circuit in *Carolin*. 886 F.2d at 699–700.

DBMP's argument would eliminate bad faith as grounds for relief from stay, because every case that qualified for such relief would—by DBMP's construction—also require dismissal for bad faith and objective futility. Under this rationale, *Carolin's* separate discussion of bad faith as an independent basis for stay relief would be superfluous and nonsensical. *Compare, In re Dixie Broadcasting*, 871 F.2d 1123, 1129 (11th Cir. 1989) ("We disagree that bad faith constituting "cause" for relief from a stay automatically equates to bad faith warranting dismissal of the petition. If that were true, there would not be a need to ever lift a stay for bad faith, because the petition would necessarily have to be dismissed"). Like so many other of its counter-logical and counter-

factual arguments, DBMP does not attempt to explain this conundrum. Instead, it simply ignores it and hopes this Court will too. The same is true for the failure of the Bankruptcy Court to apply the Code's express allocation of the burden of proof on the Debtor in resisting lift stay motions. *See* Resp. at 31.

### D. DBMP's Irrelevant Attempts to Distract from the Bad Faith Issue Before This Court Must Be Ignored.

Lacking legitimate responses for the actual issue before the Court, DBMP unloads a panoply of irrelevant assertions about Appellants' lawyers (Resp. at 17, 20), prior motions to dismiss (Resp. at 14-16), prior motions for relief from stay (Resp. 17-19), and its apparent dissatisfaction with litigating in the tort system (Resp. at 4-8), in a transparent attempt to distract the Court with a fabricated tale of woe that is irrelevant to the issue here: DBMP's bad faith entitles Appellants to relief.

Section 524(g) of the Code is only available to financially troubled debtors (*Carolin*) who face "overwhelming" asbestos liabilities[4] and who are properly in bankruptcy. *See* Opening Brief at 18 nn .17, 21, and 23. n.21. Section 524(g) is a not menu choice for non-distressed billionaires that prefer to avoid the tort system. Nor does Section 524(g) alter 11 U.S.C. § 1129's requirement that creditors receive at least as much as they would in a liquidation and 28 U.S.C. § 157's prohibition on the bankruptcy court liquidating personal

[4] Section 524(g) injunctive relief is available to "any asbestos company facing…overwhelming liability," who can prove that they are "likely to be subject to substantial future asbestos claims, the number of which cannot be easily predicted." H.R. REP. 103-835, 41; 1994 U.S.C.C.A.N. 3340, 3350.

injury claims. DBMP has no coherent response for these issues, seeking to avoid them with misdirection, and omits material events in its misleading tale about Section 524(g) and the history of asbestos litigation. Resp. at 4-6.

After Section 524(g) was passed in 1994, the Supreme Court rejected class action attempts in 1997 (*Amchem*) and 1999 (*Ortiz*) to impair state law remedies and jury access against companies that did ***not*** have a limited fund to pay such claims.[5] And after the Supreme Court's express instruction that any change would have to come from Congress, Congress repeatedly considered and rejected legislation aimed at asbestos litigation.[6]

DBMP, like the defendants *Amchem* and *Ortiz*, does not have a limited fund to pay claims. To the contrary, it admits, and the Bankruptcy Court found, it has ample funds to pay all its asbestos liabilities without strain—just as it had for decades before it instituted the Texas Two-Step to seek tort reform Congress decided against. Under the Code and under the controlling Supreme Court and Fourth Circuit precedent, DBMP cannot impair Appellants' Seventh Amendment rights to all state law remedies and jury trials whether

---

[5] *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), and *Ortiz v. Fibreboard Corp*., 527 U.S. 815 (1999). In *Amchem* and *Ortiz*, the Court rejected attempts to use the judicial system to enact asbestos tort-reform or to limit the Seventh Amendment rights of asbestos victims in the absence of a proven limited fund. Rather, the Supreme Court held that tort-reform regarding asbestos litigation must come from Congress, and that Congress had failed to enact such reform. *See Amchem*, 521 U.S. at 598–99, 628–29; *Ortiz*, 527 U.S. at 865. Since *Amchem* and *Ortiz*, Congress has repeatedly considered and rejected asbestos litigation tort-reform.

[6] *See e.g.* Fairness in Asbestos Injury Resolution Act of 2005, S. 852, 109th Cong. (2005); Fairness in Asbestos Compensation Act of 1999, S. 758, 106th Cong. (1999); Asbestos Compensation Act of 2000, H.R. 1283, 106th Cong. (1999); and Asbestos Claims Criteria and Compensation Act of 2003, S. 413, 108th Cong. (2003).

DBMP attempts to do this in bankruptcy or in in a class action. Despite this, CertainTeed and DBMP purport to use bankruptcy courts as a bespoke super-legislature, trying to avoid the civil jury system by making the same policy arguments Congress rejected 20 years ago. This is wrong.

This proceeding was filed in bad faith and bad faith is "cause" for lifting the stay. The burden of proof in resisting Appellants' motion was on DBMP and it failed entirely to meet that burden.

## III. CONCLUSION

The Code specifically places the burden of proof in resisting Appellants' lift stay motions upon the Debtor. 11 U.S.C. § 362(g). *Carolin* and *Premier Auto* define what constitutes bad faith in filing bankruptcy petitions. *Carolin* expressly held that bad faith was grounds for lifting the stay under 11 U.S.C. § 362(d). In the face of this incontestable precedent and statutory authority, the Bankruptcy Court reversed the burden of proof, refused to apply *Carolin* as written, and ignored the undisputed facts which the Bankruptcy Court itself had already found to be true. These plain errors require reversal.

Compounding these plain errors, the Bankruptcy Court adopted a rule that eliminates bad faith as a basis for lift stay relief, and effectively held that so long as a debtor's bad faith and misconduct affects ***all*** creditors, then ***no*** creditor can ever be granted lift stay relief. This unprecedented and illogical rule is contrary to the Code and to *Carolin* and mandates reversal.

Finally, because the relevant facts are not in dispute, this Court can and should reverse the Bankruptcy Court's Order, enter a finding of bad faith, and grant Appellants relief from stay on that basis.

**Respectfully submitted this the 2nd day of October, 2024.**


**WALDREP WALL BABCOCK & BAILEY PLLC**

*/s/ Thomas W. Waldrep, Jr.*
Thomas W. Waldrep Jr. (NC State Bar No. 11135)
Jennifer B. Lyday (NC State Bar No. 39871)
Chris W. Haaf (NC State Bar No. 46077)
Ciara L. Rogers (NC State Bar No. 42571)
370 Knollwood Street, Suite 600
Winston-Salem, NC 27103
Telephone: 336-717-1280
Facsimile: 336-717-1340
Email: notice@waldrepwall.com

– and –

THE RUCKDESCHEL LAW FIRM, LLC
Jonathan Ruckdeschel
(Maryland, CPF: 9712180133)
8357 Main Street
Ellicott City, Maryland 21043
Telephone: 410-750-7825
Facsimile: 443-583-0430
Email: ruck@rucklawfirm.com
Admitted Pro Hac Vice

*Counsel for the Appellants*

## CERTIFICATE OF COMPLIANCE

I hereby certify that (1) this reply brief complies with the type-volume limitation of Fed. R. Bankr. P. 8015(a)(7)(B)(ii) because this reply brief contains 3,481 words; and (2) this reply brief complies with the typeface requirements of Fed. R. Bankr. P. 8015(a)(5)(A) as well as the type style requirements of Fed. R. Bankr. P. 8015(a)(6) because this reply brief has been prepared in a proportionally spaced typeface in a 12-point Palatino Linotype font in the text and quotations, and 10-point Palatino Linotype font in the footnotes.

Dated: October 2, 2024

*/s/ Thomas W. Waldrep, Jr.*

Thomas W. Waldrep Jr. (NC Bar No. 11135)

**CERTIFICATE OF COMPLIANCE REGARDING USE OF ARTIFICIAL INTELLIGENCE**

Pursuant to the Court's June 18, 2024 Order, 3:24-mc-104, the undersigned hereby certifies that no artificial intelligence was employed in performing legal research for the preparation of the foregoing reply brief with the exception of such artificial intelligence embedded in standard online legal research sources such as Westlaw, Lexis, FastCase, and Bloomberg. The undersigned further certifies that every statement and every citation to an authority contained in the foregoing reply brief has been checked by me or another attorney in this case, and/or a paralegal working at my direction or at the direction of another attorney in this case, as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Dated: October 2, 2024 *_/s/ Thomas W. Waldrep, Jr._*

Thomas W. Waldrep Jr. (NC Bar No. 11135)

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing Reply Brief was filed in accordance with the local rules and served upon all parties registered for electronic service and entitled to receive notice thereof through the CM/ECF system.

Respectfully submitted this the 2nd day of October 2024.

**WALDREP WALL BABCOCK & BAILEY PLLC**


*/s/ Thomas W. Waldrep, Jr.*
Thomas W. Waldrep Jr. (NC Bar No. 11135)
370 Knollwood Street, Suite 600
Winston-Salem, NC 27103
Telephone: (336) 717-1280
Facsimile: (336) 717-1340
Email: notice@waldrepwall.com

*Counsel for the Appellants*

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| MICHAEL N. HERLIHY AND ANN HERLIHY,<br><br>Appellants,<br><br>vs.<br><br>DBMP, LLC,<br><br>Appellee. | No. 3:24-cv-558 |
| ESTATE OF PETER L. BERGRUD,<br><br>Appellant,<br><br>vs.<br><br>DBMP, LLC,<br><br>Appellee. | No. 3:24-cv-559 |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE KENNETH D. BELL
UNITED STATES DISTRICT COURT JUDGE
OCTOBER 24, 2024

APPEARANCES:

On Behalf of the Appellants:

JONATHAN RUCKDESCHEL, ESQ.
The Ruckdeschel Law Firm, LLC
8357 Main Street
Ellicott City, Maryland 21043

CLAYTON L. THOMPSON, ESQ.
Maune Raichle Hartley French & Mudd, LLC
1015 Locust Street, Suite 1200
St. Louis, Missouri 63101

Cheryl A. Nuccio, RMR-CRR
Official Court Reporter
United States District Court
Charlotte, North Carolina

APPEARANCES:

On Behalf of the Appellants (Cont'd.):

CHRIS W. HAAF, ESQ.
Waldrep Wall Babcock & Bailey, PLLC
370 Knollwood Street, Suite 600
Winston-Salem, North Carolina 27103

THOMAS WILLIAM WALDREP, JR., ESQ.
Waldrep Wall Babcock & Bailey, PLLC
1076 West Fourth Street
Winston-Salem, North Carolina 27101

On Behalf of the Appellee:

C. KEVIN MARSHALL, ESQ.
Jones Day - Washington
51 Louisiana Avenue, NW
Washington, DC 20001

JEFFREY B. ELLMAN ESQ.
Jones Day
1420 Peachtree Street NE, Suite 800
Atlanta, Georgia 30309

GARLAND STUART CASSADA, ESQ.
Robinson Bradshaw & Hinson, PA
101 North Tryon Street, Suite 1900
Charlotte, North Carolina 28246

P R O C E E D I N G S

THURSDAY AFTERNOON, OCTOBER 24, 2024

(Court called to order at 1:30 PM.)

THE COURT: Good afternoon.

ALL COUNSEL: Good afternoon.

THE COURT: All right. We're here on two consolidated appeals from the bankruptcy court. Be glad to hear from whichever of the appellants' counsel would like to go first.

MR. RUCKDESCHEL: Good afternoon, Your Honor. Jonathan Ruckedschel on behalf of both the Bergruds and the Herlihys.

I appreciate the Court allowing me to appear today and argue on behalf of my clients. I know you've reviewed the materials and so I'm going to focus on a couple discrete issues, and obviously I'm here if Your Honor has any questions about anything.

This Court is the first Article III court in the Fourth Circuit to consider the simple question before it and that question is: Is the bankruptcy system for financially distressed companies in need of resuscitation or is the bankruptcy system available for ultra wealthy, super solvent corporations to fundamentally restructure state law, federal statutory constitutional rights of creditors, creditors the company freely admits it can pay in full? That's the crux of

this issue. Is this case, is this petition consistent with the goals of the bankruptcy code?

THE COURT: See, I don't understand the issue before the Court that way. You want this Court to find that this was a bad faith petition, correct?

MR. RUCKDESCHEL: Correct.

THE COURT: But what's actually before the Court is whether the bankruptcy court was required to make a finding on the issue of bad faith.

MR. RUCKDESCHEL: I think that's a subset of what we're arguing and I think that the *Carolin* case makes clear that bad faith and -- subjective bad faith in filing of a bankruptcy petition is cause under 11 U.S.C. 362 for lifting the stay.

THE COURT: Yeah, I've seen that several times in your pleadings. For instance in your brief, document 4 at page 8, it says, "Bad faith is cause for relief from the automatic stay even if dismissal cannot be granted," and you cite *Carolin* for the proposition, but *Carolin* doesn't say that.

MR. RUCKDESCHEL: Well, Your Honor, the language in *Carolin* that we're discussing is on page 699 where the court is discussing the question of whether there's a good faith requirement for filing at all and examines the code's provision governing relief from the automatic stay in 362, and

then uses that proposition, that 362 -- bad faith is cause under 362 to say -- and the words from the Fourth Circuit are that inferentially -- just as 1112(b) inferentially permits inquiry into a debtor's good faith in the context of an interested party's motion to dismiss, Section 362(d)'s for cause language authorizes the court to determine whether, with respect to the interest of the creditor seeking relief, a debtor has sought the protection of the automatic stay in good faith.

THE COURT: So two things with respect to that.

One, the court was undertaking there to determine the effective good faith on dismissal of a petition and was searching all sorts of case law and code provisions to discern whether there was such an opportunity to dismiss for good faith. And in support of its conclusion, it pointed to the lift-stay, but it didn't say in there that the lift-stay alone is cause. In fact, what you just read accurately has been turned in your brief to -- again, at your reply brief -- excuse me, your original brief at page 30, "The error below is clear. The bankruptcy court was required to determine whether with respect to the interest of a creditor seeking relief, a debtor sought the protection of the automatic stay in good faith," and cite *Carolin* for that proposition.

But again, *Carolin* doesn't say that. You turned the word authorizes the court into requires the court.

MR. RUCKDESCHEL: I understand the distinction, Your Honor. And I believe that the court below acknowledged that bad faith was at least a factor that it needed to consider. The debtor has acknowledged that bad faith is at least a factor that it needs to consider, and it was framed before the court. And bad faith certainly has been found to be grounds or cause under 362 for lifting the stay, and that is the issue that was presented to the court and that's why we phrase it as that was the issue the court was required to rule upon. And I --

THE COURT: What court has decided that bad faith standing alone is cause period, full stop to lift a stay?

MR. RUCKDESCHEL: We have cited additional cases in the brief with respect to -- with respect to that, that the debtor's distinction for -- is not that those cases don't stand for the proposition that bad faith filing is cause. They say those weren't mass tort cases. So they're arguing that there's a factual distinction, not that the legal issue isn't established.

And I think that makes common sense because the question of bad faith is, is this case properly invoking the automatic stay? Is it properly before the Court? Are we furthering the purposes of the bankruptcy code by having this petition filed? If not, then the bankruptcy court has no interest in continuing the automatic stay in a proceeding

that's not properly before it even if the two-pronged analysis of *Carolin* says but it can't dismiss it right away.

And I think that was the distinction that -- the case that best talks about the distinction and plays it out is the *Dixie Broadcasting* case where the argument from -- the argument that was presented to the court was that if there's bad faith for lifting the stay, then the case has to be able to be dismissed. And the court says no, bad faith under 362 and bad faith under 1112 are the same type of analysis but they result in different things, and bad faith that justifies lifting the stay does not necessarily mean that it's bad faith sufficient to dismiss the entire case. So you could have a bad faith filing that was specific to a particular type of claim that wouldn't get the whole case thrown out or not.

And we're asking that the Court make that ruling, that the Court make a determination as to whether this case is in fact filed for proper purposes. And if not, to determine that it's cause under 362 and to grant the relief from stay for us -- the limited relief from stay for us to go to a jury and liquidate our claim, simply determine the amount, and then come back and wait for distribution depending on how the bankruptcy case turns out. If the bankruptcy case is dismissed, obviously then we'll collect -- if we prevail in our jury trial, we'll collect in the state court system. And if a trust is approved and survives appeal, then we'll collect

whatever our rights are under the trust.

THE COURT: In what way were these lifts from stay motions different from what the asbestos claimants moved for in 2021?

MR. RUCKDESCHEL: So I think that's a great question.

The claimants committee opposed the imposition of the preliminary injunction that was not only enforcing the automatic stay but extending it to the new -- new CertainTeed so that claimants like my clients could not file -- my clients weren't sick at that point, but they could not file a claim and -- against new CertainTeed and then argue the successor liability issues or other things that might be able to attack the Texas two-step transaction. They were opposing that for all claimants not only so that -- and opposing the imposition of a stay so that all claimants, everybody in the world, would have the right to liquidate their claims and collect. In other words, it would be like the bankruptcy proceeding was going along here, but everything else was status quo with respect to both liquidation and collection.

We're not asking for that. We're simply asking to exercise the right guaranteed to us by 28 U.S.C. 157 to liquidate our claim before a jury, and then we'll come back and we'll wait and we'll see what our rights are. We could lose, we could end up with a judgment that is less than we

might get under a plan, or we could end up with a judgment that would be more; but that's all important information for my client to have when they decide whether to vote for or against a particular plan. We want to know how are we going to do.

And in fact, Section 1129 of the code, the Best Interest of the Creditors Test in Section 1129(a)(7), says that a plan cannot be confirmed over the objection of even a single creditor if that creditor is not going to receive as much under the plan as they would in a Chapter 7 liquidation. My clients can't make that analysis for them specifically until they know what the jury says the value of their claim is.

So that's different. We're not looking to have it olly olly oxen free, for everybody to go and litigate as if this bankruptcy was never filed. All we want to do is exercise our statutorily guaranteed right to a jury trial to liquidate our claim, to quantify it.

THE COURT: How many asbestos claimants are involved in this bankruptcy?

MR. RUCKDESCHEL: So the number that generally has been used by the debtor is approximately 60,000 pending claims, I believe. However, more than half of those claims at the time of filing were on what are called inactive dockets in the state courts, meaning that these are cases that are

judicially segregated away and they are inactive. They're not doing anything. And in fact, in most jurisdictions where there's an inactive docket, certain things have to happen in order for you to get off the inactive docket.

Most of those cases were filed historically, Judge, by people who had radiologic evidence of damage to their lungs from asbestos but were not symptomatically ill. Once they had an x-ray saying, well, you might have scarring in your lungs from asbestos, limitations started to run so cases were filed to protect limitations even though people weren't physically sick and inactive dockets were created as a way to warehouse these claims. So more than half of the claims are on inactive dockets.

And Judge Whitley found in the preliminary --

THE COURT: I'm not finished there.

MR. RUCKDESCHEL: Yes.

THE COURT: So how many non-asbestos claimants are involved in this bankruptcy?

MR. RUCKDESCHEL: Zero.

THE COURT: Right. How many of these asbestos claimants do you represent?

MR. RUCKDESCHEL: Just the Herlihys and the Bergruds.

THE COURT: Of all the 60,000 those are your only clients?

MR. RUCKDESCHEL: That's my only clients. Maune Raichle who is also representing the Herlihys and the Bergruds has additional claimants that they represent. But The Ruckdeschel Law Firm, I am representing the Herlihys and the Bergruds and only for purposes of this motion and this appeal.

THE COURT: Because I was under the impression there were a very few number of firms representing the vast majority of asbestos claimants. Is that mistaken?

MR. RUCKDESCHEL: So that's been stated and I don't know what the factual basis is for that. Certainly one could look at the proofs of claim that were filed and make a determination as to that. That wasn't explained in any detail in His Honor's ruling and it's not information that, you know, I can verify thumbs up or thumbs down. But it certainly seems reasonable that if you collected all the claims, including those on inactive dockets, and you lumped them together, that a smaller number of firms would represent a larger number of the claimants.

In the asbestos litigation as it has existed for the past 15 years, it is extraordinarily rare for any claims other than mesothelioma claims to be litigated in the tort system. There are some lung cancer cases that get litigated but not many. And there are very, very few nonmalignant asbestos disease claims that get litigated in the court system, and those are the claims that make up the vast bulk of these cases

that are on inactive dockets. And there are another huge chunk of cases here, more than half of the cases on active dockets, Judge Whitley found in the preliminary injunction ruling, had been pending for more than ten years and weren't moving.

So in Baltimore we don't have an actual -- I'm sorry, in Florida we don't have an inactive docket. I practice in Maryland and Florida. We do have an inactive docket in Baltimore. We don't have one in Florida. So in Florida if you had a case that you had to file to preserve limitations for somebody that had pleural plaques, which is scarring of the lining of the lungs from asbestos that doesn't cause in most people any symptomatic disease, you would file that claim and it would just sit there. It sits there open on the docket. Nothing happens. There's now a criteria bill in Florida that limits the filing of those claims but it's not retroactive. So there's a huge mass of cases in Florida that were filed, for lack of a better phrase, to preserve the statute of limitations that are not being litigated and have never been litigated actively. They're just sitting there.

THE COURT: Well, one of your criticisms of the bankruptcy court's findings was that if he lifted the stay in these two cases, the hordes would follow.

MR. RUCKDESCHEL: Right.

THE COURT: And you say, oh, no, that's so

speculative. That couldn't possibly happen.
MR. RUCKDESCHEL: Right.
THE COURT: It seems to me that it would almost certainly happen.
MR. RUCKDESCHEL: So here's why I believe that that's not the case, Your Honor.
First, the inactive docket people are clearly not going to come.
Second, there's no reason to believe that any of these cases that had been pending for ten years prior to the 2021 preliminary injunction ruling, which is more than half of the rest, there's no indication or reason to believe that any of those people that have been content to let their cases languish in state court for the last ten years or longer are going to run to the court for a chance to liquidate their claims.
THE COURT: So how many does that leave?
MR. RUCKDESCHEL: It's not clear, right, because the precise numbers aren't there, but let's say it's ten thousand.
THE COURT: Let's say it's ten thousand.
MR. RUCKDESCHEL: So now we have ten thousand people that theoretically can come and do it. Nobody has asked for that other than us.
THE COURT: Well, that may well be because these motions keep getting slapped down in the bankruptcy court and

maybe they listened to Judge Whitley's admonition to please stop bothering him with motions that he's ruled on many times before. Could be.

MR. RUCKDESCHEL: So it may be that or it may be that, you know, you've got to be careful if you're the dog chasing the car. What do you do when you catch it?

So if you grant lift-stay to my clients, we're going to have to go try our case. We're going to have to spend the time and the money to do that. We're going to have to undertake the risk that we might get washed out by the jury. They might rule against us. We might get a crummy ruling, a small apportionment of fault in California where they apportion fault by the tort feasor, so we could end up with a big verdict but a very small judgment. We're going to have to spend all the time and money to do that for a very uncertain result and we're going to have to come back and wait, right. We're going to have to come back and wait and then we'll be subject to the vagaries of what happens in the rest of this bankruptcy case. And that's an undertaking that our clients have authorized us to do, that they want to do, and that we're asking for the right to do as we have under 28 U.S.C. 157.

THE COURT: How many lift-stays would it take to undermine the bankruptcy proceeding as Judge Whitley feared?

MR. RUCKDESCHEL: None.

THE COURT: Ten thousand? I mean, if there are ten

thousand lift-stays, would that be a problem for a pending bankruptcy?

MR. RUCKDESCHEL: So these cases -- any claimant that wants to try their case in front of a jury has an absolute unconditioned statutory right under 28 U.S.C. 157 to ask for permission to liquidate their claim, and it's worded mandatorily. The bankruptcy court shall refer the case to the district court either where the bankruptcy is pending, you, or the district court where the case arose. So in Herlihy's case that would be California.

So whether it happens right now or whether it happens down the road, the Herlihys have an absolute right granted to them by Congress to liquidate their claim in front of a jury and Congress has forbidden the bankruptcy court from liquidating personal injury claims. Not just asbestos claims, any personal injury claim.

So these trials are going to happen --

THE COURT: No, my question was how many lift-stay grants would effectively result in the -- whether dismissal -- the effective dismissal or just a complete interruption of the bankruptcy proceeding?

MR. RUCKDESCHEL: There is no number of cases -- if you granted a hundred, it would have no dismissal effect on this case because all you're doing is quantifying the claim. Quantifying how much is your claim worth. And then you're

coming back and waiting for distribution or dismissal, whichever might happen. It's not dismissal. Quantifying claims is not dismissal. The reason that the debtor doesn't like anyone having the right to quantify their claim now relates back to how the code treats -- treats the Best Interest of Creditors Test.

So once the Herlihys -- let's just assume that the Herlihys get a judgment of a million dollars, right. When they come back, because the debtor acknowledges that it has enough money to pay everybody a hundred cents on the dollar and it has access to the vast wealth of new CertainTeed through the funding agreement, which the debtor has made very clear is enforceable not just by them, but, since the amendment, also by others if they refuse to enforce it. The Herlihys will not be able to be crammed down into a mass negotiated settlement that would provide less than their tort damages as determined by the jury. That's why the debtor doesn't want this to happen because their plan is to cram everybody down into a one-size-fits-all settlement that has caps on how much people can recover. And so it will frustrate that purpose, but that's not a proper purpose under the bankruptcy code.

THE COURT: Well, under the *Robbins* case, when a bankruptcy court is considering whether to lift the stay for cause, the Court is to consider that on a case-by-case basis.

MR. RUCKDESCHEL: Absolutely.

THE COURT: So what's different about these two claimants from all the other claimants? What is case-by-case different about them?

MR. RUCKDESCHEL: So the *Robbins* analysis, if the Court were to apply *Robbins*, which we believe should not because it's not a bad faith case. In *Robbins* it wasn't a question that the petition was properly before the court. But in *Robbins*, right, Your Honor is absolutely correct that it says it should be a case-by-case analysis with respect to judicial economy and questions in the second prong.

So the first prong -- there is no doubt this is a state law case, so under *Robbins* the first prong is -- there's no dispute that is settled.

The third prong is settled because that's the one where it says can the estate be protected by having you come back to collect? And we've agreed to that.

So the second prong on judicial economy says, you know, which court is going to be able to resolve this more efficiently? And it looks at, in the *Robbins* case, this marital property dispute, and the bankruptcy court says, well, I could resolve this, but it's going to be more efficient for the Florida state court which has expertise in it to do it and that will free us up for other things. So that's the judicial economy analysis.

If you apply that analysis to our case, it has to warrant to lift-stay because if you're comparing whether the bankruptcy court is going to liquidate my clients' claims or the state court, the bankruptcy court is forbidden to do it. Congress says you can't do it so it's going to have to go to another court. It's just a question of which one.

And so what makes Mr. Herlihy different? That's not part of the standard. He doesn't have to have a unique fact. And that's where things get conflated. The language of the cases that we cited say on the specific facts of a particular case. It doesn't say on -- when the Fourth Circuit said that, it doesn't say on the unique facts or that the facts have to be different than any other claimant, because if that was the case, then if your case is improper with respect to all claimants, no claimant can get relief, right? And that's certainly an inequitable result in a situation that's supposed to be looking at equity.

But if you wanted to look at distinctions, one, my clients want to liquidate their claims. They're here. They're asking for permission to do it. They're asking for the right to exercise what Congress has told them they have an absolute right to do.

Mr. Herlihy is still alive. He has a chance to get the answer to this question during his lifetime. There's a trial date set in March currently in California in state

court. We have a hearing November 12 about whether we're going to keep what's called that preference date. California has a policy in place for managing asbestos cases with living folks that gives them preference for trial time. So Mr. Herlihy is alive and wants to quantify his claim during his lifetime and has a trial date.

All of those things are vastly different than the overwhelming majority of other claimants. Nobody else has come forward asking for that right. Most people with mesothelioma don't live very long and most of the claimants are dead, and very few of them have existing trial dates that are now, what, five months out.

So certainly for Mr. Herlihy, those factors are unique to him or unique to a very small subset of claimants. I don't think the debtor is going to get up and say there could be tens of thousands or a thousand or even several hundred living plaintiffs with pending trial dates five months out that are asking for relief.

But again, I think that when we look at the language of the Fourth Circuit, in the *Bestwall* preliminary injunction appeal, they say the specific facts of the plaintiff's case, not the unique facts of the plaintiff's case. All of the claimants in *Bestwall* are asbestos claimants like this. So if they wanted to say only people that have unique facts can get relief from a stay, then they would have said that. What they

said is you just have to come forward with your particular facts and ask for relief. All the claimants are entitled to a jury trial, absolutely, under 28 U.S.C. 157. 28 U.S.C. 1411 says nothing in the bankruptcy code impairs jury trial rights. And 157, which is the procedures section, says the bankruptcy court shall refer the case out to either the district court where the case is pending -- I apologize for pointing at the bench there, Your Honor -- or to the court where the case originated.

So they're going to have that right. They're going to have the right to do this before they can be forced to accept the settlement that's trying to be crammed down upon them. And they're asking for it, so that's unique to them too.

We do have one case. Of all the two-step cases that have been filed, we have one case where we have some example, some history about this because there hasn't been any relief from stay granted for a living claimant to liquidate their claim. In *Bestwall* we know Judge Beyer denied my motion there for my client Wilson Buckingham. We withdrew our motion in the Aldrich case after Judge Whitley's ruling in this case. And here we are, this is the only -- these are the only two motions here.

But in *LTL*, right, the Johnson & Johnson bankruptcy, there was a hotly contested lift-stay motion that was argued

repeatedly and which Judge Kaplan eventually lifted the stay for. One claimant came and asked just like we're the one claimant here or the two claimants here asking. After that lift-stay was granted, nobody else asked for that relief. And I can't tell you why people didn't do things, but I can tell you as a plaintiff lawyer who tries these cases before juries around the country, it makes a lot of sense because it's risky and it's going to cost a lot of money.

Well, our clients want to do that. They want to exercise their right and they're asking the Court to do that. They have an absolute right to do it. And it's not a question of -- like it was in *Robbins*, of is the bankruptcy court going to do it or is the Florida court going to do it? The bankruptcy court isn't allowed to do it by statute, so it's going to happen. It's just a question of whether it happens in the federal court system or whether it happens in the state court system.

I can tell Your Honor that the first motion we'd file if the bankruptcy court orders that the case be tried here would be to ask that this Court abstain and send it to California for the state court to handle because we have a pending trial date. We have judges there and a state court system that handles asbestos cases capably every day.

THE COURT: Just so I'm clear on your positions, are there any findings of fact by Judge Whitley that you think are

clearly erroneous?

MR. RUCKDESCHEL: So --

THE COURT: Or is this all an application of the law appeal?

MR. RUCKDESCHEL: We believe that the facts that are relevant to the determination have been determined by Judge Whitley and we're not challenging those determinations. I think that the -- to the extent that the Court were to consider the comment from Judge Whitley that we've referred to as speculative, that this would undoubtedly lead to ten thousand claimants coming by the end of the summer, I don't think that's a finding of fact. There wasn't any evidence to support it. This is the musing of Judge Whitley based on no information. None of these Texas two-step cases have had relief from stay granted other than LTL for a single claimant where no one else came.

So there's no factual basis to support what Judge Whitley says, you know, I believe this is going to happen inevitably if I do this. There just isn't a factual basis for that. So I don't consider that a finding of fact. But if that's a finding of fact, then it's clearly erroneous because there was no evidence to support it.

THE COURT: All right. And then with respect to his *Robbins* analysis, if we go with *Robbins* and the facts that he found, what are your criticisms of the -- his *Robbins*

analysis?

MR. RUCKDESCHEL: So with respect to *Robbins*, putting -- I'll skip past we believe *Carolin* and not *Robbins* is the right standard. So when we get to *Robbins*, what we end up --

THE COURT: Yeah, that's a good direction to go.

MR. RUCKDESCHEL: What we end up in, as I mentioned before, is we end up in this analysis of prong two and the judicial economy and is this going to be something that just opens the flood gates and then ends up being the effective dismissal of the case.

To the extent that that musing, that that will be the effective dismissal of the case is considered a finding of fact as well, then we certainly contend that that's clearly erroneous, to go back to Your Honor's last question, because, again, there's no evidence that that's the case. We're not asking for dismissal. And quantifying and coming back for distribution per the terms of the resolution of the bankruptcy case is not dismissal. It's not the equivalent of dismissal. It's not dismissal. It may be something that the debtor doesn't like the implications of, but that's not dismissal. So that's a finding of fact, if to the extent it is, that we find to be clearly erroneous because it's not supported by the evidence.

But with respect to the analysis of prong two, I

think there are three things that I'd like to focus on.

First, as I stated before, I believe that the proper analysis under *Robbins* is to look at the claim before the Court and the judicial economy issues related to that claim and that claim only. The *Robbins* case doesn't say unless you think that the whole civil justice system should be reformed and that this is a better result, to have everything resolved in one case and there be no trials. That's effectively what the judge says. He says, well, if we have this case result in a resolution that solves every case and settles every asbestos claim filed against CertainTeed, then there will be no trials and that will be more efficient for the judicial system.

That's not the analysis that *Robbins* says. *Robbins* says look at the claim that is sought to be determined -- liquidation of, in that case, the property interest; here, the value of my client's claim -- and evaluate which court is going to do it better if it's got to be done. And here we know the bankruptcy court can't do it.

So that's really the crux of why *Robbins* isn't applicable and the analysis in *Robbins* isn't applicable because the claims at issue here are the Herlihys' claim and the Bergruds' claim, and they have -- they have the absolute right to liquidate them in front of a jury.

So the only question with respect to the Court would be is it more efficient to do it here in the bankruptcy court

or is it more efficient to do it in the state court? But it can't even answer that question because Congress has forbidden it. Congress has forbidden the bankruptcy court to liquidate it. So I don't think that the *Rollins* analysis can be applied to this case.

The second part about *Rollins* that I think the bankruptcy court was clearly erroneous on, as the Court mentioned and referenced that bad faith was at least a factor to consider, right, and the debtor has said, well, it's only a factor but it's a factor, right. They've acknowledged that. But then it never did. So the bankruptcy court never ruled on whether it was bad faith. So it can't apply a balancing test where it's evaluating whether there's cause to lift the stay if one of the bases for cause is bad faith and it acknowledges that's a factor and then it doesn't do it.

So in terms of the equitable analysis that's going on there, the court didn't do that analysis even though it said bad faith was a factor.

THE COURT: Speaking of which --

MR. RUCKDESCHEL: And the third part --

THE COURT: Speaking of which, now that the *Bestwall* case has been accepted by the court of appeals for hearing on exactly the issue you tried to raise before, which is these kinds of bankruptcy petitions are bad faith almost per se, and if you want this Court to remand and direct the bankruptcy

court to make a finding on bad faith, wouldn't we all be better off waiting to see what the Fourth Circuit says about whether these sort of arrangements are bad faith?

MR. RUCKDESCHEL: If Judge Beyer had certified the motion to dismiss I filed on behalf of Wilson Buckingham for review by the Fourth Circuit in *Bestwall* and the Fourth Circuit had accepted that, then I would agree with you, Your Honor; but the Fourth Circuit didn't do that and Judge Beyer didn't do that. Judge Beyer refused to consider Mr. Buckingham's arguments about bad faith as we've articulated it here under *Carolin*. Plus we also argued about the satisfaction of the objective futility standard as well. That's beyond the scope of what we're here for.

But Judge Beyer didn't certify her denial of our motion and so what's been certified and accepted is her denial of the committee's motion and the committee's motion was confined to the Seventh Amendment issue -- to a constitutional issue regarding the bankruptcy clause, I'm sorry, not a Seventh Amendment issue. So that's what's before the Fourth Circuit, and it's entirely possible that the Fourth Circuit rules on that thumbs up or thumbs down and that the bad faith issue still needs to be litigated.

So if the Court finds that it's not -- that these proceedings are not barred by the bankruptcy code, right, that Congress -- to the extent the code allows what's being done

here, that doesn't exceed the scope of the delegation of authority to Congress under the bankruptcy code.

If the Court finds that that's okay, it's still going to have to come back and go through the bad faith analysis which Judge Beyer never ruled upon. She didn't rule upon subjective bad faith in denying the asbestos claimants committee's initial motion to dismiss. She said the committee had conceded that a desire for a 524(g) resolution was a proper purpose before the bankruptcy. And then she said, "And because I've determined objective futility is not satisfied, I don't have to go and reach -- and I do not go and reach the question of subjective bad faith."

Judge Whitley made the same determination in *Aldrich/Murray* with the motion to dismiss that I had filed in *Aldrich/Murray* on behalf of Mr. Semian and found that because in his interpretation of *Carolin* objective futility was not satisfied, he wasn't going to reach subjective bad faith.

The same thing happened with respect to the lift-stay motions, Your Honor. In the lift-stay motion and in the preliminary injunction motion in this case, Judge Whitley said, "I'm not reaching bad faith. It's not before me." It's in, I think it's paragraph 243 of the preliminary injunction ruling. So he wasn't ruling on bad faith. He says that waits for another day.

Same for the lift-stay rulings in both *Bestwall* and

in this case, both Judge Beyer and Judge Whitley did not rule on subjective bad faith. So the bankruptcy court has never determined one way or the other. They've said repeatedly in certifying things to the Fourth Circuit, "We think we need guidance from the Fourth Circuit about these issues," but they've never ruled on it to say whether it is or is not good faith or bad faith. That's never been ruled upon.

And the Fourth Circuit in the *Bestwall* appeal on the preliminary injunction matter expressly stated, "We're not considering a bad faith motion here. We're not considering an argument like financial distress and so we're not ruling on it." So it's never been ruled upon.

And I don't think the pendency of the limited appeal -- the appeal of the limited motion filed by the committee in *Bestwall* -- in *Bestwall* raising the bankruptcy clause constitutional issue is a reason to delay making that determination here. We need to get this issue resolved by an Article III court. And, you know, eventually it's going to have to be resolved. Whether it's now or whether it's at confirmation, this is going to have to be resolved: Is this a good faith use of the bankruptcy system?

And judicial economy tells us, Your Honor, we should rule on that. Let's rule on it. Because if it's not, if this is an abuse of the bankruptcy process, as we believe it is, then let's get that ruling made. We can get rid of all of

these cases.

That's not what's being -- the relief sought here. All we're asking for is to liquidate, right? We want to liquidate. We believe we have cause under 362, that cause being bad faith.

And we believe that the indicia of bad faith are not only the wholesale and admitted lack of financial distress of CertainTeed, but also the two-step maneuver that was conducted so that we could -- so that CertainTeed could isolate this one class of creditor, asbestos claimants, in an empty shell that Judge Whitley found in the preliminary injunction was created for the purpose of filing for bankruptcy and created for the purpose of isolating these claims from the profitable business so that it wouldn't be subjected to that. We believe that's another indicia of bad faith in addition to the lack of financial distress, and we've argued that.

So this is something that needs to be ruled upon and I don't think waiting for the Fourth Circuit to rule on the constitutional issue helps us with judicially economically handling these things. Let's get the ruling made and let's let my client while he's alive get his day in court. He's got a reservation in California for a trial date in March, but we're going to have to get the relief in order to be able to do that.

THE COURT: All right. Thank you.

Does counsel -- I'm sorry, were you not through?

MR. RUCKDESCHEL: No, I was going to say --

THE COURT: You don't have to be through. I just thought you were.

MR. RUCKDESCHEL: No, I think, Your Honor, that we've covered in our discussion pretty much everything I had here. You know, some court has to be the first court to rule on this issue. The bankruptcy court has steadfastly and studiously in both -- in all of these cases pending in this district avoided making this ruling in both the context of dismissal and in the context of lift-stay.

It is unquestionably something that the Court can consider. If we want to look at *Carolin* as saying that the Court can consider bad faith as cause but isn't required to, it's unquestionably something that can be considered. And justice and equity tells us that it should be considered.

If these cases are not furthering the purpose of the bankruptcy code as the Fourth Circuit has defined it in *Carolin* and *Premiere*, then there is no justice and no utility served by maintaining the automatic stay because the automatic stay exists to protect the legitimate interests of the bankruptcy system in legitimate cases. If this is not properly before the bankruptcy court, then the stay should not bar my clients from exercising their right, and it shouldn't delay them either. Mr. Herlihy should be allowed to see this

claim litigated to conclusion during his lifetime. He wants to do that, he's asking to do it, and Congress has said that he has the right to do it. We'd ask that the Court grant it.

THE COURT: Thank you.

Does counsel for Mr. Bergrud want to be heard?

MR. THOMPSON: No, Your Honor. I join Mr. Ruckdeschel's arguments. Thank you.

THE COURT: What say the appellees?

MR. MARSHALL: Good afternoon, Your Honor. I'm Kevin Marshall for the debtor DBMP, LLC.

I'd like to structure my comments around two points where your conversation with my colleague focused. The one is the need to determine subjective bad faith and the second is the implications if this motion were granted.

On the first, Your Honor asked whether there's any case saying that in the lift-stay context, a court has to consider bad faith. And the short answer there is no, there is no such case. Mr. Ruckdeschel didn't identify one. He did mention the *Dixie Broadcasting* case in passing that's only in their reply. It's not on that issue. And there is a case saying you don't have to, which is the *Ramkaran* case out of the District of Maryland, which is in our brief. And the *Ramkaran* court there, Judge Chasanow, did so based on her reading of the *Robbins* and *Claughton* balancing test.

There's also a case in the second circuit which we

cite, *Sonnax*. It doesn't directly say you don't have to consider bad faith, but it recognizes that a lift-stay motion is a multi-factor analysis and implicitly recognizes you don't have to touch on every imaginable factor.

But in any event, the bankruptcy court here did consider the question of subjective bad faith in several respects.

So first, the primary argument, perhaps only argument, for subjective bad faith in this context is that it's bad faith to file for bankruptcy when you lack what Mr. Ruckdeschel calls financial distress, set aside what exactly that means.

And what Judge Whitley did, it's at the top of page 866 in the appendix, was say, "So if I'm asked to decide is it subjective bad faith to file a bankruptcy in this situation where you don't have financial distress, the answer in this circuit is no." That's the first level at which he considered this.

The second is he said, "Even if there is subjective bad faith, you're making this argument because you want me to effectively dismiss the case. But I can only do that under the *Carolin* test. And even if there were subjective bad faith, *Carolin* says I can't dismiss unless there's subjective futility, which there isn't."

And beyond that, there are no other facts at issue.

So if one were to say Judge Whitley needs to have gone further into subjective bad faith, what would that have been? Actually, let me back up. He also said further analysis into subjective bad faith is premature. What was he talking about there? Well, the claimants here have multiple avenues for attacking this bankruptcy and one that Judge Whitley -- two, or three depending on how you count, that Judge Whitley has allowed, are two adversary proceedings, cases within the case.

So they're arguing that the debtor and New CT should be substantially consolidated, treated the same, and they're arguing that the corporate reorganization was a fraudulent conveyance. And what Judge Whitley is saying is if I need to get more into subjective bad faith, which I don't think I do, but the place to do that is in these adversary proceedings where we're challenging and considering the case as a whole, not in the context of a motion to lift the stay as to some particular claimants.

And there's a particular irony in these adversary proceedings because in the fraudulent conveyance claim, the argument is that the debtor is insolvent; whereas before Your Honor, the argument is the debtor has too much money. So the approach seems to be any stick to beat that dog.

So the only -- there are no other facts at issue if there were to be a remand. We actually agree on that. There's nothing more to be considered as to whether there is

subjective bad faith. It's really just the financial distress argument and perhaps supplemented by the argument that if you do a corporate restructuring before you file for bankruptcy and don't have financial distress, that's subjective bad faith. That, again, is a question of law; and as Judge Whitley said, in the Fourth Circuit that's just not the law.

And I'll add one other --

THE COURT: Is it not the law in the Fourth Circuit because they've said it's not or because they haven't said yet?

MR. MARSHALL: If you apply the *Carolin* test, there is no requirement to have financial distress to file for bankruptcy. The Fourth Circuit hasn't directly --

THE COURT: Those weren't the facts in *Carolin*, though, were they?

MR. MARSHALL: No, but --

THE COURT: There wasn't any opportunity for the Court to weigh in on that.

MR. MARSHALL: The Court in *Carolin* articulated a general rule for when a case can be dismissed for being filed in bad faith. One aspect of that is whether the case is objectively futile and one aspect of that is the funding of the debtor. So it can't be the case that having lots of funding to be able to carry out the case is itself a way of creating objective futility; and without objective futility,

there's no basis for dismissing the case as filed in bad faith.

Finally, on this piece of the two points I wanted to cover, I'll just add that in the case of DBMP, there's one additional fact not in dispute which is DBMP filed for bankruptcy after the *Bestwall* court had denied the motion to dismiss. So even if there were a question under *Carolin* or what the Fourth Circuit might think, if what we're talking about is subjective bad faith, the mindset of DBMP, they waited until the *Bestwall* case had been cleared, at least by the bankruptcy court, as properly filed. Only then did they file. It's very hard to imagine how that would be consistent with subjective bad faith.

So that's the end of the first point I wanted to cover. Unless the Court has more questions, then I'll move on to the second.

So Mr. Ruckdeschel's basic point was all we want to do is get our one little claim or maybe two liquidated and that is really not a source of concern. Well, as Your Honor pointed out, there's actually a lot of claims out there. Set aside the inactive ones, it's undisputed that at the time DBMP filed for bankruptcy, we had over 32,000 active claims. In addition, and this is the whole reason for filing for bankruptcy, we know there will be thousands more in the future. That's the nature of asbestos illness and asbestos

litigation. There's a long latency period. We've had 300,000 claims so far in the history of this litigation and we're coming into bankruptcy because we know there will be more and we want to set up a trust with an injunction protecting us and that trust will pay claims not only now but going into the future. So all of that has to be considered, the 30,000 plus the enumerable others that will come.

And Mr. Ruckdeschel has given you no distinction between his claim or the two claims here and those 30,000. We pressed them on that in our brief. And in their reply all they say, this is page 3, is, "Well, we have mesothelioma and we think DBMP is responsible." 30,000 other people now, and many thousand more in the future, will say the exact same thing.

THE COURT: Yeah, but his argument is you don't have to show that you're different from any other claimant, just that on a case-by-case basis the stay should be lifted as to this claim.

MR. MARSHALL: Well, the Fourth Circuit said specific facts of a particular claim. And in the context of a mass tort case, by definition you're going to have a lot of claimants who are the same. And so if you can't give a reason for lifting the stay as to yourself that's different from all those other claimants, you're necessarily putting the bankruptcy court in a bind where it can't grant your motion

without granting all the others that will follow on.

In our case, there have been some situations -- there's been one situation in our case where a lift-stay was granted, we agreed to it, because of specific facts regarding the particular claim. There's an appeal pending in California from a judgment. The judgment was bonded and so the result of the appeal is not going to affect the bankruptcy estate. We agreed to lift the stay in that context and the court did, and that's in our brief.

It's also good to keep in mind that normally in the lift-stay context -- and this is what the Fourth Circuit had in mind. It's also I think what *Carolin* had in mind. The arguments for lifting the stay do involve the specific situations of the creditor. So the statute itself gives us an example of a good reason to lift the stay. That a secured creditor says it lacks adequate protection, which means its collateral is declining in value and needs to be compensated or it needs to be able to foreclose, to liquidate the collateral before it declines in value more. That's to a large degree what was going on in the *Carolin* case, what's going on in a lot of these other cases.

Or you could have a debtor who is getting divorced and there's a question about allocating property rights between the spouses. That's a very common situation for lifting the stay, but also specific to the spouse who's not

the debtor. That was the *Robbins* case. It was the *Claughton* case.

So to use a lift-stay motion to attack the case as a whole does not represent the universe of lift-stay motions, which is why in *Carolin* the Court said that happens only in an extreme situation.

As to the question of whether what Judge Whitley did is speculative, first of all, the *Robbins* test itself calls for a predictive judgment, so he can hardly be criticized for doing that. The language is the Court has to balance potential prejudice to the debtor's estate against the hardships that will be incurred by the claimant. So Judge Whitley did exactly what he is supposed to do.

It also is entirely reasonable to look at the prior lift-stay motions in these other asbestos bankruptcies, in *Aldrich* and in *Bestwall*, and recognize, as Your Honor pointed out, they've all been denied. It's entirely reasonable for a judge to say, well, what happens if I grant one? And we have yet to hear from Mr. Ruckdeschel any reason why thousands of follow-on motions wouldn't be granted or wouldn't have to be granted if Judge Whitley or his successor wanted to avoid being reversed on appeal.

Finally, kind of related, I'd like to talk about the question about liquidating the claims. It's good to keep in mind that if the bankruptcy proceeds, what will happen is that

a trust will be set up. All claims will be channeled to that trust. So in a sense, it will be the trust that will liquidate the claims. No one is saying -- we're not saying the bankruptcy court itself has authority to liquidate these claims. Nor are we saying there should be trials later. Claims will be submitted to the trust. They have to be submitted to the trust. The trust will make an offer of settlement. And if past experience is any guide, 99 and more percent of the claimants will accept that offer and be done.

If they're unhappy with it, there is always an opt-out consistent with the statutory provisions Mr. Ruckdeschel mentioned and they can then go to court and get a jury trial. But most people don't because the 524(g) trust system is a better mousetrap for dealing with the intractable pathologies of asbestos litigation.

So it's a false choice he's suggesting here between saying we can go actually have a trial in California or the bankruptcy court couldn't actually liquidate this. We're trying to get a global resolution of our claims through bankruptcy with a trust to pay claimants and an injunction. The only way to do that is if the claims are liquidated through that system and not in thousands of separate jury trials in state courts all over the country.

Let me just touch on a few other points and if there are no questions, I will be done.

There is no cram-down going on here. The trust will be set up. The trust will have procedures and matrices for paying claims. Those are usually written by the plaintiffs' lawyers. The trust will only be set up if 75 percent of current claimants vote in favor of it, a super majority requirement compared to the norm in bankruptcy which is 50 percent. So the trial is only going to be channeled to the trust if that has happened, if we've had a 75 percent vote plus lots of other findings that have to happen. And even then, at the end a jury trial is permitted.

I think that's really all I have. We discussed remand briefly. We all agree there are no factual disputes or facts open so I don't see why there would be any reason for a remand. I actually --

THE COURT: Well, the only reason it occurred to me was one of the criticisms is the bankruptcy court didn't make a finding and should have.

MR. MARSHALL: And so my --

THE COURT: I'm not saying I accept that criticism; but if that's the case, if the Court did find that that's correct, shouldn't it remand to the bankruptcy court and say make a finding rather than this Court do it in the first instance?

MR. MARSHALL: And so I tried to answer that at the beginning, which is I think he did make two different findings

on that. And then the third was to the extent you want me to think about this more, it's premature. That's why we have these adversary proceedings. And I don't think he actually had to make a finding. That's my answer there.

As to the current *Bestwall* appeal in the Fourth Circuit, I actually agree with Mr. Ruckdeschel. The issue there is constitutional. *Carolin* is not directly presented. It, of course, comes up in the briefing, but I don't think the court there is going to be directly considering the *Carolin* questions that Judge Whitley was wrestling with.

I don't think I have any notes. If the Court doesn't have any further questions, I will be done.

THE COURT: All right. Thank you.

MR. MARSHALL: Thank you, Your Honor.

THE COURT: Would you like to respond?

MR. RUCKDESCHEL: I would, Your Honor. Thank you.

THE COURT: I'm shocked.

MR. RUCKDESCHEL: I'll be brief, I promise.

The *Ramkaran* case was not a bad faith filing case. The bad faith that was alleged in *Ramkaran* related to bad faith in obtaining the loan that then led to the bankruptcy filing. So it wasn't a challenge in *Ramkaran* about bad faith with respect to whether the petition was filed in good faith or not. The bad faith there was about getting a loan, so it's not -- it's not relevant to the Court's consideration here.

With respect to the implications, the language from Judge Whitley in the oral ruling regarding the motion that the answer in this circuit appears to be no is not a ruling and the judge didn't rule on whether it was good faith or bad faith. He didn't do that. And later on says, you know, "I'm not comfortable making that ruling now about the two-step." He's not comfortable. He hasn't ruled on it and didn't rule on it. He scrupulously avoided ruling on it both in the dismissal rulings that he's entered and in ruling here.

THE COURT: Part of his reasoning for that was he didn't feel like the record was sufficient. Didn't he say, "I'm not comfortable ruling on it on this record at this time"?

MR. RUCKDESCHEL: He did. He did. And the challenge that we have with that, Your Honor, is that if you look at the discussion in *Premier Auto* and *Carolin* regarding what constitutes bad faith, right, all of the facts that are necessary have already been determined by Judge Whitley. There isn't a need for additional factual development for that issue to be determined as a matter of law by the Court.

And I think *Premiere* is a great example of that. As Your Honor pointed out, the Court didn't have the opportunity in *Carolin* to rule on the question of financial distress because the debtor there was destitute. It was penniless. It was a bad faith filing because it couldn't be rehabilitated

and they were just trying to stall off the inevitable foreclosure.

In *Premier*, on the other hand, we have exactly what's happening here. The subjective bad faith discussion which begins in *Premiere* in section B, right, with respect to *Carolin's* second prong of subjective bad faith. The Court then goes on, right, and what it focuses on first and foremost is the bankruptcy court, that it wasn't even experiencing financial difficulties. *Premiere's* bankruptcy filings reveal a solvent business entity, that's DBMP, with no unsecured creditors and few, if any, secured creditors. The equivalent of that in this case is DBMP's affirmative claim and the findings by Judge Whitley that they have enough money to pay everybody a hundred cents on the dollar.

So this fact alone may justify dismissal of *Premiere's* Chapter 11 petition under bad faith, right. Then they say other circuits haven't hesitated to dismiss for bad faith filings that aren't the -- petitions by financially healthy companies with no need to reorganize under the protection of Chapter 11. And I think it's important to look at that language there, need for Chapter 11. Chapter 11 isn't just, hey, you know, it would be great if I could reject this contract and Chapter 11 lets me do it. I've got all the money in the world to pay my obligations under it, but I'm going to file a petition because I want the remedy that Chapter 11

allows. You have to qualify, you have to have a need for Chapter 11.

What we see in the briefing, what we hear in argument today from my colleague is we want to do this, right. And I agree, there's no doubt that CertainTeed really wants to have asbestos liability behind it. That's great. That's a lovely desire and it's a lovely want. But it's not authorized under the code as the code has been interpreted by the Fourth Circuit and as the code has been interpreted uniformly by the other circuits, including most analogously in the *LTL* case.

And so it's bad faith to file a bankruptcy petition when you don't need bankruptcy relief. When you're just trying to access the tools of bankruptcy like the automatic stay. And that's why the automatic stay needs to be lifted in this case.

With respect to this suggestion, well, you can exercise your right under 28 U.S.C. 157 after the plan has been confirmed, absolutely not.

Number one, that's not how the statute's written. Congress says the bankruptcy court shall send the case to the district court either in the district where the bankruptcy is proceeding or where the claim arose. Shall. It's mandatory. We have an absolute right to a jury trial.

And what we know from *Amchem* and *Ortiz* -- and Judge Whitley has commented on this in the past. What we know from

the *Amchem* and *Ortiz* cases is that having a limited right to a jury trial, which is what they tried to do in *Amchem* and *Ortiz* to get around the Seventh Amendment problem in the class action settlement that was going to globally resolve, for example, fiber boards liability, the Court said a jury trial right that leads to limited recovery -- which is what will happen in this trust and what will happen in all trusts. What happens is you do have a right if you don't like the trust's valuation of your claim because there is a range that the trust can do, but there's a cap. There's a maximum recovery. And if you go and exercise your jury trial right in any of the trusts that have been established in the past and in the trust that's being proposed here, the maximum you can recover is whatever the maximum is provided for as the max payment under the trust. So it's not the same and it's not equivalent -- it wouldn't be legal under the Seventh Amendment and it's not what's happening here.

28 U.S.C. 157 allows us to liquidate our claim and we need to know what the value of our claim is. It's routinely done. We need to know what the value of our claim is so we can determine whether Section 1129(a)(7) is satisfied at confirmation. Because if you don't, if the trust potentially limits my client's recovery and my client is not allowed to liquidate their claim before a jury, as they have the absolute right to do before confirmation, then my client's

claim will have to be treated as impaired and all -- it will have to be treated as a claim where he's going to get less than he would under a liquidation. And then a single objection scuttles the whole plan.

So the code doesn't allow you to get where they want to go unless everybody agrees to it. And that's why they keep saying in their papers we want a consensual -- we want to negotiate a consensual resolution. That's great that that's what they want. My client wants his day in court. Congress and the Constitution say he's allowed to do so. And maintaining the automatic stay to prevent him from exercising that right in a case that's filed in the bankruptcy court for purposes that are not the recognized purpose of the bankruptcy code, which *Carolin* defines as the resuscitation of a financially troubled debtor, which *Premiere Auto* says, you know, courts haven't hesitated to throw out claims by financially -- debtors that are not financially distressed, and then looks at how *Premiere* was trying to use the bankruptcy process to manage litigation with its landlord just like DBMP is trying to use this bankruptcy process to manage the litigation with tens of thousands of people. That's not something that a financially robust company is allowed to do. It's not consistent with the code. And if it's not consistent with the code, then none of the policies that suggest the automatic stay should remain in place are furthered by

maintaining the case or the automatic stay. My client should have the right to his day in court as Congress has provided him.

Thank you, Your Honor.

THE COURT: Thank you.

Mr. Marshall, do you want to respond to any of that?

MR. MARSHALL: I would be happy to with two short points, Your Honor.

THE COURT: All right.

MR. MARSHALL: Thank you.

First I just want to put all this in context, which is under *Robbins* and *Claughton*, the bankruptcy court had discretion, broad discretion, to resolve the lift-stay motion. I think the argument is established. Judge Whitley did not make an error of law. He did not make any clear error of fact. And it's obvious from the transcript he engaged in reasoned decision-making.

So at most, although I don't think even this is true, there are some quibbles with some points he did or didn't make. If the abuse of discretion standard means anything, he should be affirmed.

Secondly, this mass tort bankruptcy seeks to establish a trust and injunction under Section 524(g) of the bankruptcy code. That provision says you can get an injunction and trust if you face asbestos liability that is

substantial and is going to be going on for a long time and no one really knows how much or for how long. That is DBMP's situation. Neither Chapter 11 nor 524(g) requires solvency. And as we explain in our brief, many debtors facing asbestos liability have sought and obtained relief through Section 524(g) even though they were solvent.

Thank you.

THE COURT: Do you want to respond to his argument that the Seventh Amendment right will be impaired by --

MR. MARSHALL: I had that as my third. I wasn't going to get into it.

So it's not true. It's not true I'll say for two reasons.

So what the statute -- the Seventh Amendment right is that when you get your -- that you have a right to have a jury decide the facts and liquidate -- you have a right to have the jury decide your claim. That is explicitly preserved by 28 U.S.C. 1411. But it is always the case in these bankruptcies that that is done at the back end. It's actually even been true before 524(g). The Fourth Circuit has a case from the '80s, *Robins*, the Dalkon Shield case. They say, oh, yeah, do the bankruptcy first, do the estimation, and if we're going to have jury trials to satisfy 1411, we'll do them at the end. That's the first part.

The second relates to the *Ortiz* case. It wasn't

actually a Seventh Amendment case, and Ortiz actually supports us, Your Honor. *Ortiz* was simply interpreting the Federal Rules of Civil Procedure, Rule 23, regarding a particular type of class action. And the main thing to know there is the Court narrowly defined the ability to employ that part of a class action limited fund, and one of the reasons they did so was so the class action wouldn't interfere with bankruptcy. And they specifically recognized bankruptcy is a special remedial scheme that operates differently.

We are trying to take advantage of that special remedial scheme. It doesn't violate the Seventh Amendment. It doesn't violate any other part of the Constitution.

Thank you.

THE COURT: Thank you.

And just to clarify, you don't agree that the standard of review here is abuse of discretion, correct?

MR. RUCKDESCHEL: So we believe that because, as DBMP agrees, the facts are not in dispute, that we have a question of law and that that's a de novo question for the Court to look at. We believe we also survive under abuse of discretion.

Your Honor, may I have another 30 seconds?

THE COURT: Yeah, we're getting close to playing ping-pong here, but sure.

MR. RUCKDESCHEL: I had one thing that I pulled up

while my colleague was talking the last time that I didn't get to.

The *Claughton* case which they have repeatedly cited as saying, well, this is a discretionary decision by the bankruptcy court as to whether to lift the stay or not, it's true that that's what *Claughton* says. *Claughton* wasn't a bad faith case -- or it doesn't decide it on bad faith. But what they did decide in upholding the decision to lift the stay in *Claughton* is that the solvency of the debtor's estate, the ability to pay, as they discussed, the ability to pay all creditors in full was the reason that the stay was necessary to be lifted.

They say, "Given the solvency of the debtor's estate, we think the bankruptcy court correctly exercised its equitable power to prevent the debtor from manipulating the bankruptcy court's protection to prolong Mixon's sixteen-year wait for her share of the marital property." We believe that's exactly what's happening here.

And with respect to -- with respect to *Ortiz*, the Court is clear in *Ortiz* -- well, I'm sorry. Let me start with 524(g).

524(g), nothing in the enactment of 524(g) expanded the jurisdiction of the bankruptcy system to non-financially distressed creditors. It doesn't say that it's doing that. And in fact, if you look at the legislative history which

we've citied in the briefing, the legislative history says it's enacting it to -- enacting the provision of the code to codify the solution from *Johns-Manville* and to make it available to companies that are facing overwhelming asbestos liability.

And we know from the *Kane* case, Second Circuit, that Johns-Mansville was a financially besieged company in desperate need of reorganization under bankruptcy notwithstanding the Hofstra Law Review article cited in the appellee's brief that suggests maybe Johns-Manville wasn't distressed. Well, the Second Circuit says they were.

So nothing in 524(g) says "and it's available to anyone with asbestos liabilities." The Congress enacted it to codify the solution from *Manville* to deal with companies that are overwhelmed. That's not DBMP. They've never claimed that they were.

Thank you.

THE COURT: All right. Thank you.

Appreciate everyone's efforts on this both written and oral. I always feel like I benefit from oral argument. I always learn something. And I'll get an order out as soon as I can.

And rest assured that you will not drive me into retirement the way you did Judge Whitley. Even though he's a year younger than I am and chose to leave early in my view,

I'm going to hang on a little while.

All right. Thank you all. We'll be in recess until I'm not sure when.

(End of proceeding at 2:35 PM.)

*****

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CERTIFICATE OF REPORTER

I, Cheryl A. Nuccio, Federal Official Realtime Court Reporter, in and for the United States District Court for the Western District of North Carolina, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 28th day of October 2024.

s/Cheryl A. Nuccio

Cheryl A. Nuccio, RMR-CRR
Official Court Reporter

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO. 3:24-CV-00558-KDB

| | |
|---|---|
| **MICHAEL N. HERLIHY, ANN HERLIHY AND THE ESTATE OF PETER L. BERGRUD,**<br><br>**Appellants,**<br><br>**v.**<br><br>**DBMP LLC,**<br><br>**Appellee.** | **ORDER** |

**THIS MATTER** is before the Court on a consolidated appeal of rulings of the Bankruptcy Court denying the Appellants' Motions for Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362(d) in Debtor DBMP LLC's bankruptcy. (*See In re DBMP LLC*, No. 20-30080 (Bankr. W.D.N.C.) ("DBMP Bankr.") Doc. Nos. 2808, 2809, 2753, 2755, 2757).

Appellants are two of tens of thousands of plaintiffs who filed asbestos-related tort claims against building products manufacturer CertainTeed Corporation ("CTC") and/or its various subsidiaries, predecessors, successors or related companies. In 2019, CTC underwent a "divisional merger" under Texas law in which two new companies, DBMP and CertainTeed LLC, were created with the intent of segregating all of CTC's asbestos-related liabilities in DBMP, where the claims could be collectively resolved in a bankruptcy. All of CTC's employees and nearly all of CTC's other assets and liabilities (i.e., its entire ongoing business) were retained in CertainTeed LLC ("CertainTeed"). DBMP and CertainTeed then executed a "Funding Agreement," in which CertainTeed purportedly agreed to fund DBMP's bankruptcy expenses and reorganization, including the cost of resolving the asbestos-related claims. In the ensuing DBMP Chapter 11

bankruptcy filed three months later, Appellants and all the other asbestos-related claimants' state law tort claims were automatically stayed under Section 362 of the bankruptcy code and, over vigorous objection, the Bankruptcy Court entered a preliminary injunction prohibiting the claimants from bringing the same asbestos-related claims against CertainTeed and its distributors.

At the outset, it is important to clarify what issues are and are not before the Court in this appeal. Appellants have appealed the denial of their request to be relieved of the automatic stay that prevents them from pursuing their asbestos claims in state court. The Bankruptcy Court denied the Appellants' motions based on its weighing of the factors described in *In re Robbins*, 964 F.2d 342 (4th Cir. 1992), the governing authority in this Circuit on bankruptcy "lift-stay" motions. Whether the Bankruptcy Court abused its discretion in applying *Robbins* is the narrow issue this Court must decide. Numerous other issues are pending in the Bankruptcy Court, including the question of whether the division of CertainTeed Corporation's assets in the "divisional merger" was a fraudulent transfer, and other broad claims of wrongdoing. Those issues are not now before this Court and their merits will not be resolved in this appeal.

As to the merits of the appeal, for the reasons discussed below, the Court finds that the Bankruptcy Court did not abuse its discretion in denying Appellants' motion to lift the automatic stay. Therefore, this appeal will be **DENIED** and the decision of the Bankruptcy Court **AFFIRMED**.

## I. LEGAL STANDARD

When a bankruptcy petition is filed, most judicial actions against the debtor commenced before the filing of the petition are automatically stayed. *See* 11 U.S.C. § 362(a)(1). The automatic stay gives the bankruptcy court an opportunity to harmonize the interests of both debtor and creditors while preserving the debtor's assets for repayment and reorganization of his or her

obligations. According to section 362(d), the bankruptcy court may lift the stay "for cause." Because the Code provides no definition of what constitutes "cause," courts must determine when relief is appropriate on a case-by-case basis. *In re Robbins*, 964 F.2d at 345. Bankruptcy judges have broad discretion in determining what constitutes sufficient cause to grant relief from stay under section 362(d)(1). *In re Morgan*, 659 B.R. 461, 470 (Bankr. D.S.C. 2024); *see also Robbins*, 964 F.2d at 345; 3 *Collier on Bankruptcy* § 362.07 [1] (16th ed. 2024).

When a district court reviews a bankruptcy court's decision to decline to lift an automatic stay, the district court acts as an appellate court, reviewing the bankruptcy court's findings of fact for clear error and conclusions of law *de novo*. *See Canal Corp. v. Finnman (In re Johnson),* 960 F.2d 396, 399 (4th Cir. 1992). Further, a bankruptcy court's discretionary determination on whether to lift an automatic stay will be overturned only upon a showing of abuse of that discretion. *In re Ramkaran*, 315 B.R. 361, 363–64 (D. Md. 2004); *see Claughton v. Mixson,* 33 F.3d 4, 5 (4th Cir.1994) ("We will reverse a decision to lift the automatic stay 'for cause' only when an abuse of discretion has occurred.") (citing *In re Robbins,* 964 F.2d at 345).

An abuse of discretion occurs when the bankruptcy court relies upon clearly erroneous findings of fact or uses an erroneous legal standard. *Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 261 (4th Cir. 1999). However, even if a bankruptcy court applies the correct legal principles to adequately supported facts, the discretion of the bankruptcy judge "is not boundless and subject to automatic affirmance." *Id.* (citing *Wilson v. Volkswagen of Am., Inc.,* 561 F.2d 494, 506 (4th Cir. 1977)). "This court is obligated to review the record and reasons offered by the [bankruptcy] court and to reverse if the 'court has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors.'" *Id.* (quoting *Wilson,* 561 F.2d at 506).

## II. FACTS AND PROCEDURAL HISTORY

The relevant facts and initial procedural history of this complex bankruptcy are described in detail in the Bankruptcy Court's August 8, 2021, FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING ORDER: (I) DECLARING THAT THE AUTOMATIC STAY APPLIES TO CERTAIN ACTIONS AGAINST NON-DEBTORS, (II) DENYING MOTION OF THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS TO LIFT THE STAY, AND ALTERNATIVELY (III) PRELIMINARILY ENJOINING SUCH ACTIONS. DBMP Bankr. Doc. No. 972, 2021 WL 3552350 (Bankr. W.D.N.C. Aug. 11, 2021). While the parties certainly characterize the facts differently, they acknowledge that the Bankruptcy Court's recitation of the fundamental facts of CTC's corporate restructuring and CertainTeed's subsequent bankruptcy are not clearly erroneous.[1] Therefore, the Court affirms and adopts the Bankruptcy Court's statement of the facts (which are very briefly summarized above). *Id.* at pp. 9-33, 2021 WL 3552350 at **4-18.

Following the Bankruptcy Court's ruling on the initial "lift-stay" motions and Preliminary Injunction, the legal representatives for the current and future asbestos claimants filed additional adversary proceedings in the bankruptcy case: (a) a proceeding seeking substantive consolidation of DBMP with CertainTeed or, in the alternative, reallocating the asbestos liabilities of DBMP to CertainTeed; (b) a proceeding asserting intentional and constructive fraudulent conveyance claims related to the corporate restructuring, which, among other things, alleged that the

[1] Appellants contend that to the extent the Bankruptcy Court's prediction that numerous other asbestos claimants would seek to take advantage of a ruling lifting the automatic stay for the Appellants is a "finding of fact," then it is clearly erroneous. The Court, however, views that predictive judgment of the Bankruptcy Court not as a factual finding, but rather as the court's consideration of the *Robbins* factor of "judicial economy," which is subject to the "abuse of discretion" standard of review.

restructuring had rendered DBMP insolvent; and (c) a proceeding asserting breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, and civil conspiracy in connection with the corporate restructuring. Discovery in the first two proceedings is ongoing, while the third is stayed pending resolution of the fraudulent transfer allegations. Also, the Bankruptcy Court has approved a process for estimating DBMP's aggregate liability for purposes of negotiating, formulating, and confirming a Chapter 11 plan, and has ordered the parties to mediation to negotiate the possible resolution of the Chapter 11 case.

On April 18, 2024, the Estate of Peter Bergrud and Michael and Ann Herlihy filed Motions for Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362(d). DBMP Bankr. Doc. Nos. 2753, 2755. The Bankruptcy Court denied the motions on May 28, 2024, for reasons stated during a hearing on May 23, 2024. *Id.* at Doc. Nos. 2808, 2809; Doc. No. 5 (Appendix) at 854, 862-874 (applying the balancing test of *Robbins* and finding, in part, that relief from stay would as a practical matter improperly lead to dismissal of the bankruptcy when thousands of other similarly situated asbestos claimants also sought relief from the stay). Appellants timely appealed and the motions – argued together below – have been consolidated on appeal. Following full briefing, the Court held oral argument on October 24, 2024, and the appeal is now ripe for decision.

## III. DISCUSSION

The factors which must be considered in deciding whether to lift the automatic stay as to any creditor or claim are well established in the Fourth Circuit.[2] *See In re Robbins*, 964 F.2d at

[2] At oral argument, Appellants argued that *Robbins* is inapplicable to their motions to lift the automatic stay because "bad faith" was not at issue in *Robbins*. However, nothing in Robbins suggests that it cannot or should not be applied to motions where "bad faith" might be considered. On the contrary, *Robbins* states that the factors it describes are to be applied broadly, to wit, "courts must determine when discretionary relief [for 'cause'] is appropriate on a case-by-case basis. . . The factors that courts consider in deciding whether to lift the automatic stay include:…" *In re*

345. Courts should consider: (1) whether the issues in the pending litigation involve only state law, so the expertise of the bankruptcy court is unnecessary; (2) whether modifying the stay will promote judicial economy and whether there would be greater interference with the bankruptcy case if the stay were not lifted because matters would have to be litigated in bankruptcy court; and (3) whether the estate can be protected properly by a requirement that creditors seek enforcement of any judgment through the bankruptcy court. *Id*. Overall, the court must "balance potential prejudice to the bankruptcy debtor's estate against the hardships that will be incurred by the person seeking relief from the automatic stay if relief is denied." *Id*.

In the Bankruptcy Court's 2021 ruling on the asbestos claimants' request to lift the automatic stay (which the court referenced and incorporated into its ruling on Appellants' lift-stay motions), the court weighed the *Robbins* factors. *See* Doc. No. 5 at 223-35. "Applying those factors and striking that balance," it concluded the stay motion:

> should be denied because: (a) prejudice to the estate would result if the stay is lifted and this prejudice significantly outweighs any hardship to the Debtor's asbestos claimants; (b) allowing the tort system to be re-flooded with asbestos cases at the same time the Chapter 11 Case remains pending would not serve judicial economy; and (c) the fact that asbestos claims arise under state law does not support a modification of the stay because it necessarily involves individual creditors liquidating their claims against the Debtor outside of the bankruptcy proceeding, asserting estate causes of action for their individual benefit, and thwarting any attempt to globally and permanently resolve asbestos claims in a single forum."

*Id*. at 224.

More specifically, as to the prejudice to the Debtor's estate, the Bankruptcy Court found that lifting the stay would deplete estate resources through increased costs and irreparably harm the prospects for reorganization:

---

*Robbins*, 964 F.2d at 345. Therefore, *Robbins* provides the governing framework in this Circuit for resolving motions to lift the automatic stay, including those which arguably involve "bad faith."

> [A]sbestos claims would not be resolved globally in a single forum; they would be litigated piecemeal in hundreds of state and federal courts across the country. The ability to treat equitably and consistently all similarly situated claimants through a section 524(g) consensual plan of reorganization would be foreclosed; and the Debtor's ability to achieve any type of a successful reorganization would be substantially impaired, if not eliminated."

*Id.* at 225. Indeed, the court found that allowing the litigation (and ultimate liquidation) of thousands of asbestos claims in the tort system "would amount to an effective dismissal of the Chapter 11 Case without satisfying the Fourth Circuit's stringent *Carolin* dismissal standard" (which is discussed further below). *Id.*

In comparison, the bankruptcy court found that the hardship to the asbestos claimants was relatively modest because claimants could continue to pursue other defendants in the tort system, who collectively paid claimants far more than they would likely receive from CertainTeed (historically, "Old CertainTeed paid less than 4% of the total recoveries received by the typical asbestos claimants whose claims they resolved."). *Id.* at 228. Also, the court found that it was likely given the "funding agreement" that claimants would receive payment in the bankruptcy and that "delay in payment due to bankruptcy is not a reason to grant relief from stay."

Moreover, with respect to judicial economy, the court held that lifting the stay would mean "dumping more than 60,000 asbestos cases back into the tort system. It would result in piecemeal litigation of asbestos cases in multiple state and federal courts across the country even as the Debtor is attempting to resolve those same claims in this Court." *Id.* at 231. Thus, it concluded that "[a] case dump of this magnitude would not promote judicial economy. It would be the furthest thing from judicial economy."[3]

---

[3] Appellants argue that their motion to lift the stay implicates only themselves, not the tens of thousands of other asbestos claimants in the bankruptcy. Like the Bankruptcy Court, this Court disagrees and declines to ignore the "real world" consequences of lifting the stay as to Appellants.

Finally, the bankruptcy court concluded that the fact that the asbestos claims arise under state law cannot, standing alone, justify lifting the stay. First, the court noted, "[a]lmost all claims against a bankruptcy debtor arise under state law." *Id.* Also, more specific to the context of asbestos claims, the court noted that:

> Section 524(g) of the Bankruptcy Code provides a debtor with a unique mechanism to resolve its asbestos liabilities in a single forum through a consensual plan of reorganization process. Indeed, Congress enacted section 524(g) to address precisely the type of state law-based asbestos claims faced by the Debtor. To lift the stay as to all asbestos personal injury claims as requested would contravene the clear purpose of section 524(g) of the Bankruptcy Code.

*Id.* at 231-32. Accordingly, the state law nature of the asbestos claimants' claims was found insufficient to lift the automatic stay.

This Court has carefully reviewed the Bankruptcy Court's *Robbins* analysis and concludes that the court did not abuse its discretion in balancing the relevant factors. It is not unreasonable to conclude that DBMP's bankruptcy estate would be harmed by allowing thousands of asbestos claimants to proceed in state court while the bankruptcy "continues" (to the extent that would even be possible). Nor is the Bankruptcy Court's finding that claimants' delay in receiving comparatively modest payments does not outweigh DBMP's likely harm clearly incorrect. Moreover, the court's conclusions that lifting the stay would not promote judicial economy and that the state law nature of asbestos claims does not justify a stay are not outside the bounds of the court's discretion. Again, this Court's role is not to decide what it might have done in the first instance (although that is not to suggest it would have ruled differently), but rather only to ensure that the Bankruptcy Court has not abused its discretion, which it has plainly not done here.

---

If the stay were lifted, it would only be a matter of time (and likely not much time) until numerous other similarly situated claimants inundated the Bankruptcy Court with lift-stay motions, which the court would be obligated to grant to be consistent.

Appellants' arguments in both the Bankruptcy Court and this Court do not focus on balancing the *Robbins* factors. Rather, they contend that DBMP's lack of good faith in filing the bankruptcy is, standing alone, sufficient "cause" to lift the stay and it was plain legal error not to rule directly on the Debtor's bad faith.[4] In support of their position, they rely almost exclusively on *Carolin v. Miller*, 886 F.2d 693 (4th Cir. 1989).[5] Yet, *Carolin* does not reach the holding Appellants suggest, much less require that the Bankruptcy Court abandon the appropriate *Robbins* analysis.

In *Carolin*, the court decided the question of whether a debtor's lack of good faith "may" constitute cause for dismissal of a bankruptcy petition, and the court ultimately held that "we agree with those courts that require that *both* objective futility and subjective bad faith be shown in order to warrant dismissals for want of good faith in filing." *Id.* at 700-01. In reaching that conclusion, the court discussed the code's provision governing relief from the "automatic stay," 11 U.S.C. §

[4] Appellants also contend that enforcing the automatic stay provision will deny them their constitutional and statutory rights to a jury trial. However, while the application of the automatic stay may well *delay* a jury trial on their claims, it does not preclude a jury trial in accordance with the applicable law. Indeed, Appellee stated at oral argument (without contradiction by Appellants) that jury trials – although rare – most often occurred later in bankruptcy proceedings.

[5] In their Reply brief and at oral argument, Appellants cited *In re Dixie Broadcasting*, 871 F.2d 1023, 1029 (11th Cir. 1989) as holding that the bankruptcy court is required to consider whether the bankruptcy petition was filed in "bad faith" and that a finding of "bad faith" requires the granting of a motion to lift the automatic stay. Putting aside the fact that *Dixie* is not binding on this Court (as are *Robbins* and *Carolin*), the Court in *Dixie* does not hold that a bankruptcy court is *required* to consider "bad faith"; rather, in that case the court found that the District Court did not abuse its discretion in considering and finding "bad faith" sufficient to justify lifting the automatic stay (where the petition was filed only when an adverse ruling in a long running state court contract litigation was imminent and "[i]t seems clear that Dixie entered bankruptcy to get out of its bad deal"). *Id.* at 1027. Here, in contrast, to the extent the Bankruptcy Court considered "bad faith," it concluded after a review of all relevant factors to exercise its discretion not to lift the stay. Thus, *Dixie* is not inconsistent with the ruling here, but instead simply reflects the application of a different court's judgment and discretion to different facts to reach a different result.

362(a), which it noted "also suggests a bankruptcy court's authority to dismiss a Chapter 11 petition for want of good faith." *Id.* at 699.

However, in discussing that automatic stay provision, the *Carolin* court specifically referenced the situation (present in *Carolin*) "where a debtor has but one significant asset and a single creditor has a secured claim against that asset, [so] 'for cause' relief from the stay in favor of such a creditor would normally entail dismissal in short order of the entire case." *Id.* In "such circumstances," the court said, the statute "inferentially permits inquiry into the debtor's good faith in commencing the case as a whole." *Id.* Therefore, not only is the *Carolin* discussion of "good faith" related to relief from an automatic stay clearly "dicta" (in a case involving dismissal of a petition), the court's comment specifically describes situations – like that found by the bankruptcy court here – in which the lifting of the stay would be tantamount to a dismissal of the petition, and thus require a showing of both objective futility and subjective bad faith under the *Carolin* analysis.

Also, as further evidence that *Carolin* does not mandate the result urged by Appellants, the two cases cited in the *Collier on Bankruptcy* section cited in *Carolin*'s automatic stay discussion – *In re Albany Partners, Ltd.,* 749 F.2d 670, 674 (11th Cir. 1984) and *In re Little Creek Development Co.,* 779 F.2d 1068, 1072 (5th Cir. 1986) – each require both subjective bad faith and objective futility before granting relief from the stay. *See Carolin*, 886 F.2d at 699-700. So, it is incorrect to read *Carolin* as holding that in ruling on a motion to lift a stay, a bankruptcy court must decide if a petition was filed in bad faith and if it so finds then it must lift the stay. On the contrary, while "bad faith in filing for bankruptcy is sometimes grounds for lifting an automatic stay under Section 362, [] a finding of bad faith alone does not constitute *per se* cause for relief from a stay." *In re Ramkaran*, 315 B.R. 361, 363–64 (D. Md. 2004). So, to be clear, the Bankruptcy Court *could* have considered DBMP's alleged "bad faith" among its balancing of all the *Robbins*

factors, but was not required to do so under *Carolin*. However, if, as the Bankruptcy Court concluded here, granting the automatic stay would in practical effect amount to a dismissal of the bankruptcy petition, it was required under *Carolin* to find both objective futility and subjective bad faith to grant relief from the stay related to "bad faith." The Bankruptcy Court thus correctly applied *Carolin*.

In summary, the Court concludes that the Bankruptcy Court did not abuse its discretion under *Robbins* in its balancing of the harm to the Debtor of granting relief from the automatic stay with the harm to the Appellants in light of all the circumstances and further committed no error of law in its alternate analysis[6] under *Carolin*. Therefore, the Court will deny the Appellants' appeal and affirm the ruling of the Bankruptcy Court.

## IV. ORDER

**NOW THEREFORE IT IS ORDERED THAT:**

Appellants' appeal of the denial of their Motions for Relief from the Automatic Stay (DBMP Bankr. Doc. Nos. 2753, 2755) are **DENIED** and the Bankruptcy Court's rulings (DBMP Bankr. Doc. Nos. 2808, 2809) are **AFFIRMED**. The Clerk is directed to close this matter in accordance with this Order.

**SO ORDERED ADJUDGED AND DECREED**.

Signed: October 28, 2024

Kenneth D. Bell
United States District Judge

[6] As discussed in detail above, the Bankruptcy Court's application of *Robbins* – apart from any discussion of *Carolin* and the effective dismissal of the bankruptcy if the asbestos claimants are allowed to liquidate their claims in state court – is wholly sufficient to support the denial of the motion for relief from stay.

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**3:24-CV-558-KDB**
**3:24-CV-559-KDB**

| | | |
|---|---|---|
| IN RE:<br><br>DBMP LLC,[1]<br><br>Debtor. | ) | APPEAL FROM<br>USBC WDNC<br>Case No. 3:20-30080 |
| THE ESTATE OF PETER L. BERGRUD; AND MICHAEL N. AND ANN HERLIHY<br><br>Plaintiffs-Appellants,<br><br>v.<br><br>DBMP LLC,<br><br>Defendant-Appellee. | ) | |

**NOTICE OF APPEAL TO UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

PLEASE TAKE NOTICE that The Estate of Peter L. Bergrud and Michael N. and Ann Herlihy (collectively, the "Appellants"), by and through the undersigned counsel, pursuant to 28 U.S.C. §158(d)(1), hereby appeal to the United States Court of Appeals for the Fourth Circuit the District Court's *Order*[2] [Doc. No. 14] entered on October 28, 2024 (the "Order"). A copy of the Order is attached hereto as **Exhibit A**.

[1] The last four digits of the Debtor's taxpayer identification number are 8817. The Debtor's address is 20 Moores Road, Malvern, Pennsylvania 19355.
[2] The Order is simply called "Order", and the docket entry is as follows: ORDER: Appellants' appeal of the denial of their Motions for Relief from the Automatic Stay (DBMP Bankr. Doc. Nos. 2753, 2755) are DENIED and the Bankruptcy Court's rulings (DBMP Bankr. Doc. Nos. 2808, 2809) are AFFIRMED.

PLEASE TAKE FURTHER NOTICE that the names of all parties to the Order appealed from, and the names, addresses, and telephone numbers of their respective attorneys, are as follows:

**Appellants**:

Michael N. Herlihy
Ann Herlihy
The Estate of Peter L. Bergrud

**Counsel for Appellants:**

Thomas W. Waldrep, Jr.
Chris W Haaf
Waldrep Wall Babcock & Bailey PLLC
370 Knollwood Street, Suite 600
Winston-Salem, NC 27103
Telephone: (336) 717-1280
Email: notice@waldrepwall.com

Jonathan Ruckdeschel
The Ruckdeschel Law Firm, LLC
8357 Main Street
Ellicott City, Maryland 21043
Telephone: (410) 750-7825
Email: ruck@rucklawfirm.com

Clayton L. Thompson
John Louis Steffan IV
Maune Raichle Hartley French & Mudd, LLC
150 W. 30th Street, Suite 201
New York, NY 10001
Telephone: (800) 358-5922
Email: CThompson@mrhfmlaw.com

**Appellee**:

DBMP LLC

**Counsel for Appellee**:

C. Kevin Marshall

Jones Day - Washington
51 Louisiana Ave., NW
Washington, DC 20001
Telephone: (202) 879-3939
Email: ckmarshall@jonesday.com

Garland Stuart Cassada
Robinson, Bradshaw & Hinson, P. A.
101 North Tryon Street
Suite 1900
Charlotte, No 28246
Telephone: (704) 377-8317
Email: gcassada@robinsonbradshaw.com

Gregory M. Gordon
Jones Day
2727 N. Harwood
Dallas, TX 75201
Telephone: (214) 220-3939
Email: gmgordon@jonesday.com

Jeffrey B. Ellman
Jones Day
1420 Peachtree Street NE
Suite 800
Atlanta, GA 30309
Telephone: (404) 822-0918
Email: jbellman@jonesday.com

Respectfully submitted this the 29th day of October, 2024.

**WALDREP WALL BABCOCK & BAILEY PLLC**

/s/ *Thomas W. Waldrep Jr.*
Thomas W. Waldrep Jr. (NC State Bar No. 11135)
Chris Haaf (NC State Bar No. 46077)
Diana Santos Johnson (NC State Bar No. 40050)
370 Knollwood Street, Suite 600
Winston-Salem, NC 27103
Telephone: 336-717-1280
E-mail: notice@waldrepwall.com

-and-

**THE RUCKDESCHEL LAW FIRM, LLC**

*/s/ Jonathan Ruckdeschel*
Jonathan Ruckdeschel (Maryland, CPF: 9712180133)
8357 Main Street
Ellicott City, Maryland 21043
Telephone: (410) 750-7825
Facsimile: (443) 583-0430
Email: ruck@rucklawfirm.com

-and-

**MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC**

*/s/ Clayton L. Thompson*
Clayton L. Thompson (NY Bar No. 5628490)
John Louis Steffan IV (Missouri Bar No. 64180)
150 W. 30th Street, Suite 201
New York, NY 10001
Telephone: (800) 358-5922
Email: CThompson@mrhfmlaw.com

*Counsel for Appellants*

# EXHIBIT A

Order

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**CIVIL ACTION NO. 3:24-CV-00558-KDB**

| | |
|---|---|
| **MICHAEL N. HERLIHY, ANN HERLIHY AND THE ESTATE OF PETER L. BERGRUD,**<br><br>**Appellants,**<br><br>**v.**<br><br>**DBMP LLC,**<br><br>**Appellee.** | **<u>ORDER</u>** |

**THIS MATTER** is before the Court on a consolidated appeal of rulings of the Bankruptcy Court denying the Appellants' Motions for Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362(d) in Debtor DBMP LLC's bankruptcy. (*See In re DBMP LLC*, No. 20-30080 (Bankr. W.D.N.C.) ("DBMP Bankr.") Doc. Nos. 2808, 2809, 2753, 2755, 2757).

Appellants are two of tens of thousands of plaintiffs who filed asbestos-related tort claims against building products manufacturer CertainTeed Corporation ("CTC") and/or its various subsidiaries, predecessors, successors or related companies. In 2019, CTC underwent a "divisional merger" under Texas law in which two new companies, DBMP and CertainTeed LLC, were created with the intent of segregating all of CTC's asbestos-related liabilities in DBMP, where the claims could be collectively resolved in a bankruptcy. All of CTC's employees and nearly all of CTC's other assets and liabilities (i.e., its entire ongoing business) were retained in CertainTeed LLC ("CertainTeed"). DBMP and CertainTeed then executed a "Funding Agreement," in which CertainTeed purportedly agreed to fund DBMP's bankruptcy expenses and reorganization, including the cost of resolving the asbestos-related claims. In the ensuing DBMP Chapter 11

bankruptcy filed three months later, Appellants and all the other asbestos-related claimants' state law tort claims were automatically stayed under Section 362 of the bankruptcy code and, over vigorous objection, the Bankruptcy Court entered a preliminary injunction prohibiting the claimants from bringing the same asbestos-related claims against CertainTeed and its distributors.

At the outset, it is important to clarify what issues are and are not before the Court in this appeal. Appellants have appealed the denial of their request to be relieved of the automatic stay that prevents them from pursuing their asbestos claims in state court. The Bankruptcy Court denied the Appellants' motions based on its weighing of the factors described in *In re Robbins*, 964 F.2d 342 (4th Cir. 1992), the governing authority in this Circuit on bankruptcy "lift-stay" motions. Whether the Bankruptcy Court abused its discretion in applying *Robbins* is the narrow issue this Court must decide. Numerous other issues are pending in the Bankruptcy Court, including the question of whether the division of CertainTeed Corporation's assets in the "divisional merger" was a fraudulent transfer, and other broad claims of wrongdoing. Those issues are not now before this Court and their merits will not be resolved in this appeal.

As to the merits of the appeal, for the reasons discussed below, the Court finds that the Bankruptcy Court did not abuse its discretion in denying Appellants' motion to lift the automatic stay. Therefore, this appeal will be **DENIED** and the decision of the Bankruptcy Court **AFFIRMED**.

## I. LEGAL STANDARD

When a bankruptcy petition is filed, most judicial actions against the debtor commenced before the filing of the petition are automatically stayed. *See* 11 U.S.C. § 362(a)(1). The automatic stay gives the bankruptcy court an opportunity to harmonize the interests of both debtor and creditors while preserving the debtor's assets for repayment and reorganization of his or her

obligations. According to section 362(d), the bankruptcy court may lift the stay "for cause." Because the Code provides no definition of what constitutes "cause," courts must determine when relief is appropriate on a case-by-case basis. *In re Robbins*, 964 F.2d at 345. Bankruptcy judges have broad discretion in determining what constitutes sufficient cause to grant relief from stay under section 362(d)(1). *In re Morgan*, 659 B.R. 461, 470 (Bankr. D.S.C. 2024); *see also Robbins*, 964 F.2d at 345; 3 *Collier on Bankruptcy* § 362.07 [1] (16th ed. 2024).

When a district court reviews a bankruptcy court's decision to decline to lift an automatic stay, the district court acts as an appellate court, reviewing the bankruptcy court's findings of fact for clear error and conclusions of law *de novo*. *See Canal Corp. v. Finnman (In re Johnson),* 960 F.2d 396, 399 (4th Cir. 1992). Further, a bankruptcy court's discretionary determination on whether to lift an automatic stay will be overturned only upon a showing of abuse of that discretion. *In re Ramkaran*, 315 B.R. 361, 363–64 (D. Md. 2004); *see Claughton v. Mixson,* 33 F.3d 4, 5 (4th Cir.1994) ("We will reverse a decision to lift the automatic stay 'for cause' only when an abuse of discretion has occurred.") (citing *In re Robbins,* 964 F.2d at 345).

An abuse of discretion occurs when the bankruptcy court relies upon clearly erroneous findings of fact or uses an erroneous legal standard. *Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 261 (4th Cir. 1999). However, even if a bankruptcy court applies the correct legal principles to adequately supported facts, the discretion of the bankruptcy judge "is not boundless and subject to automatic affirmance." *Id.* (citing *Wilson v. Volkswagen of Am., Inc.,* 561 F.2d 494, 506 (4th Cir. 1977)). "This court is obligated to review the record and reasons offered by the [bankruptcy] court and to reverse if the 'court has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors.'" *Id.* (quoting *Wilson,* 561 F.2d at 506).

## II. FACTS AND PROCEDURAL HISTORY

The relevant facts and initial procedural history of this complex bankruptcy are described in detail in the Bankruptcy Court's August 8, 2021, FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING ORDER: (I) DECLARING THAT THE AUTOMATIC STAY APPLIES TO CERTAIN ACTIONS AGAINST NON-DEBTORS, (II) DENYING MOTION OF THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS TO LIFT THE STAY, AND ALTERNATIVELY (III) PRELIMINARILY ENJOINING SUCH ACTIONS. DBMP Bankr. Doc. No. 972, 2021 WL 3552350 (Bankr. W.D.N.C. Aug. 11, 2021). While the parties certainly characterize the facts differently, they acknowledge that the Bankruptcy Court's recitation of the fundamental facts of CTC's corporate restructuring and CertainTeed's subsequent bankruptcy are not clearly erroneous.[1] Therefore, the Court affirms and adopts the Bankruptcy Court's statement of the facts (which are very briefly summarized above). *Id.* at pp. 9-33, 2021 WL 3552350 at **4-18.

Following the Bankruptcy Court's ruling on the initial "lift-stay" motions and Preliminary Injunction, the legal representatives for the current and future asbestos claimants filed additional adversary proceedings in the bankruptcy case: (a) a proceeding seeking substantive consolidation of DBMP with CertainTeed or, in the alternative, reallocating the asbestos liabilities of DBMP to CertainTeed; (b) a proceeding asserting intentional and constructive fraudulent conveyance claims related to the corporate restructuring, which, among other things, alleged that the

[1] Appellants contend that to the extent the Bankruptcy Court's prediction that numerous other asbestos claimants would seek to take advantage of a ruling lifting the automatic stay for the Appellants is a "finding of fact," then it is clearly erroneous. The Court, however, views that predictive judgment of the Bankruptcy Court not as a factual finding, but rather as the court's consideration of the *Robbins* factor of "judicial economy," which is subject to the "abuse of discretion" standard of review.

restructuring had rendered DBMP insolvent; and (c) a proceeding asserting breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, and civil conspiracy in connection with the corporate restructuring. Discovery in the first two proceedings is ongoing, while the third is stayed pending resolution of the fraudulent transfer allegations. Also, the Bankruptcy Court has approved a process for estimating DBMP's aggregate liability for purposes of negotiating, formulating, and confirming a Chapter 11 plan, and has ordered the parties to mediation to negotiate the possible resolution of the Chapter 11 case.

On April 18, 2024, the Estate of Peter Bergrud and Michael and Ann Herlihy filed Motions for Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362(d). DBMP Bankr. Doc. Nos. 2753, 2755. The Bankruptcy Court denied the motions on May 28, 2024, for reasons stated during a hearing on May 23, 2024. *Id.* at Doc. Nos. 2808, 2809; Doc. No. 5 (Appendix) at 854, 862-874 (applying the balancing test of *Robbins* and finding, in part, that relief from stay would as a practical matter improperly lead to dismissal of the bankruptcy when thousands of other similarly situated asbestos claimants also sought relief from the stay). Appellants timely appealed and the motions – argued together below – have been consolidated on appeal. Following full briefing, the Court held oral argument on October 24, 2024, and the appeal is now ripe for decision.

## III. DISCUSSION

The factors which must be considered in deciding whether to lift the automatic stay as to any creditor or claim are well established in the Fourth Circuit.[2] *See In re Robbins*, 964 F.2d at

---

[2] At oral argument, Appellants argued that *Robbins* is inapplicable to their motions to lift the automatic stay because "bad faith" was not at issue in *Robbins*. However, nothing in Robbins suggests that it cannot or should not be applied to motions where "bad faith" might be considered. On the contrary, *Robbins* states that the factors it describes are to be applied broadly, to wit, "courts must determine when discretionary relief [for 'cause'] is appropriate on a case-by-case basis. . . The factors that courts consider in deciding whether to lift the automatic stay include:…" *In re*

345. Courts should consider: (1) whether the issues in the pending litigation involve only state law, so the expertise of the bankruptcy court is unnecessary; (2) whether modifying the stay will promote judicial economy and whether there would be greater interference with the bankruptcy case if the stay were not lifted because matters would have to be litigated in bankruptcy court; and (3) whether the estate can be protected properly by a requirement that creditors seek enforcement of any judgment through the bankruptcy court. *Id*. Overall, the court must "balance potential prejudice to the bankruptcy debtor's estate against the hardships that will be incurred by the person seeking relief from the automatic stay if relief is denied." *Id*.

In the Bankruptcy Court's 2021 ruling on the asbestos claimants' request to lift the automatic stay (which the court referenced and incorporated into its ruling on Appellants' lift-stay motions), the court weighed the *Robbins* factors. *See* Doc. No. 5 at 223-35. "Applying those factors and striking that balance," it concluded the stay motion:

> should be denied because: (a) prejudice to the estate would result if the stay is lifted and this prejudice significantly outweighs any hardship to the Debtor's asbestos claimants; (b) allowing the tort system to be re-flooded with asbestos cases at the same time the Chapter 11 Case remains pending would not serve judicial economy; and (c) the fact that asbestos claims arise under state law does not support a modification of the stay because it necessarily involves individual creditors liquidating their claims against the Debtor outside of the bankruptcy proceeding, asserting estate causes of action for their individual benefit, and thwarting any attempt to globally and permanently resolve asbestos claims in a single forum."

*Id*. at 224.

More specifically, as to the prejudice to the Debtor's estate, the Bankruptcy Court found that lifting the stay would deplete estate resources through increased costs and irreparably harm the prospects for reorganization:

---

*Robbins*, 964 F.2d at 345. Therefore, *Robbins* provides the governing framework in this Circuit for resolving motions to lift the automatic stay, including those which arguably involve "bad faith."

> [A]sbestos claims would not be resolved globally in a single forum; they would be litigated piecemeal in hundreds of state and federal courts across the country. The ability to treat equitably and consistently all similarly situated claimants through a section 524(g) consensual plan of reorganization would be foreclosed; and the Debtor's ability to achieve any type of a successful reorganization would be substantially impaired, if not eliminated."

*Id.* at 225. Indeed, the court found that allowing the litigation (and ultimate liquidation) of thousands of asbestos claims in the tort system "would amount to an effective dismissal of the Chapter 11 Case without satisfying the Fourth Circuit's stringent *Carolin* dismissal standard" (which is discussed further below). *Id.*

In comparison, the bankruptcy court found that the hardship to the asbestos claimants was relatively modest because claimants could continue to pursue other defendants in the tort system, who collectively paid claimants far more than they would likely receive from CertainTeed (historically, "Old CertainTeed paid less than 4% of the total recoveries received by the typical asbestos claimants whose claims they resolved."). *Id.* at 228. Also, the court found that it was likely given the "funding agreement" that claimants would receive payment in the bankruptcy and that "delay in payment due to bankruptcy is not a reason to grant relief from stay."

Moreover, with respect to judicial economy, the court held that lifting the stay would mean "dumping more than 60,000 asbestos cases back into the tort system. It would result in piecemeal litigation of asbestos cases in multiple state and federal courts across the country even as the Debtor is attempting to resolve those same claims in this Court." *Id.* at 231. Thus, it concluded that "[a] case dump of this magnitude would not promote judicial economy. It would be the furthest thing from judicial economy."[3]

---

[3] Appellants argue that their motion to lift the stay implicates only themselves, not the tens of thousands of other asbestos claimants in the bankruptcy. Like the Bankruptcy Court, this Court disagrees and declines to ignore the "real world" consequences of lifting the stay as to Appellants.

Finally, the bankruptcy court concluded that the fact that the asbestos claims arise under state law cannot, standing alone, justify lifting the stay. First, the court noted, "[a]lmost all claims against a bankruptcy debtor arise under state law." *Id.* Also, more specific to the context of asbestos claims, the court noted that:

> Section 524(g) of the Bankruptcy Code provides a debtor with a unique mechanism to resolve its asbestos liabilities in a single forum through a consensual plan of reorganization process. Indeed, Congress enacted section 524(g) to address precisely the type of state law-based asbestos claims faced by the Debtor. To lift the stay as to all asbestos personal injury claims as requested would contravene the clear purpose of section 524(g) of the Bankruptcy Code.

*Id.* at 231-32. Accordingly, the state law nature of the asbestos claimants' claims was found insufficient to lift the automatic stay.

This Court has carefully reviewed the Bankruptcy Court's *Robbins* analysis and concludes that the court did not abuse its discretion in balancing the relevant factors. It is not unreasonable to conclude that DBMP's bankruptcy estate would be harmed by allowing thousands of asbestos claimants to proceed in state court while the bankruptcy "continues" (to the extent that would even be possible). Nor is the Bankruptcy Court's finding that claimants' delay in receiving comparatively modest payments does not outweigh DBMP's likely harm clearly incorrect. Moreover, the court's conclusions that lifting the stay would not promote judicial economy and that the state law nature of asbestos claims does not justify a stay are not outside the bounds of the court's discretion. Again, this Court's role is not to decide what it might have done in the first instance (although that is not to suggest it would have ruled differently), but rather only to ensure that the Bankruptcy Court has not abused its discretion, which it has plainly not done here.

---

If the stay were lifted, it would only be a matter of time (and likely not much time) until numerous other similarly situated claimants inundated the Bankruptcy Court with lift-stay motions, which the court would be obligated to grant to be consistent.

Appellants' arguments in both the Bankruptcy Court and this Court do not focus on balancing the *Robbins* factors. Rather, they contend that DBMP's lack of good faith in filing the bankruptcy is, standing alone, sufficient "cause" to lift the stay and it was plain legal error not to rule directly on the Debtor's bad faith.[4] In support of their position, they rely almost exclusively on *Carolin v. Miller*, 886 F.2d 693 (4th Cir. 1989).[5] Yet, *Carolin* does not reach the holding Appellants suggest, much less require that the Bankruptcy Court abandon the appropriate *Robbins* analysis.

In *Carolin*, the court decided the question of whether a debtor's lack of good faith "may" constitute cause for dismissal of a bankruptcy petition, and the court ultimately held that "we agree with those courts that require that *both* objective futility and subjective bad faith be shown in order to warrant dismissals for want of good faith in filing." *Id.* at 700-01. In reaching that conclusion, the court discussed the code's provision governing relief from the "automatic stay," 11 U.S.C. §

---

[4] Appellants also contend that enforcing the automatic stay provision will deny them their constitutional and statutory rights to a jury trial. However, while the application of the automatic stay may well *delay* a jury trial on their claims, it does not preclude a jury trial in accordance with the applicable law. Indeed, Appellee stated at oral argument (without contradiction by Appellants) that jury trials – although rare – most often occurred later in bankruptcy proceedings.

[5] In their Reply brief and at oral argument, Appellants cited *In re Dixie Broadcasting*, 871 F.2d 1023, 1029 (11th Cir. 1989) as holding that the bankruptcy court is required to consider whether the bankruptcy petition was filed in "bad faith" and that a finding of "bad faith" requires the granting of a motion to lift the automatic stay. Putting aside the fact that *Dixie* is not binding on this Court (as are *Robbins* and *Carolin*), the Court in *Dixie* does not hold that a bankruptcy court is *required* to consider "bad faith"; rather, in that case the court found that the District Court did not abuse its discretion in considering and finding "bad faith" sufficient to justify lifting the automatic stay (where the petition was filed only when an adverse ruling in a long running state court contract litigation was imminent and "[i]t seems clear that Dixie entered bankruptcy to get out of its bad deal"). *Id.* at 1027. Here, in contrast, to the extent the Bankruptcy Court considered "bad faith," it concluded after a review of all relevant factors to exercise its discretion not to lift the stay. Thus, *Dixie* is not inconsistent with the ruling here, but instead simply reflects the application of a different court's judgment and discretion to different facts to reach a different result.

362(a), which it noted "also suggests a bankruptcy court's authority to dismiss a Chapter 11 petition for want of good faith." *Id.* at 699.

However, in discussing that automatic stay provision, the *Carolin* court specifically referenced the situation (present in *Carolin*) "where a debtor has but one significant asset and a single creditor has a secured claim against that asset, [so] 'for cause' relief from the stay in favor of such a creditor would normally entail dismissal in short order of the entire case." *Id.* In "such circumstances," the court said, the statute "inferentially permits inquiry into the debtor's good faith in commencing the case as a whole." *Id.* Therefore, not only is the *Carolin* discussion of "good faith" related to relief from an automatic stay clearly "dicta" (in a case involving dismissal of a petition), the court's comment specifically describes situations – like that found by the bankruptcy court here – in which the lifting of the stay would be tantamount to a dismissal of the petition, and thus require a showing of both objective futility and subjective bad faith under the *Carolin* analysis.

Also, as further evidence that *Carolin* does not mandate the result urged by Appellants, the two cases cited in the *Collier on Bankruptcy* section cited in *Carolin*'s automatic stay discussion – *In re Albany Partners, Ltd.,* 749 F.2d 670, 674 (11th Cir. 1984) and *In re Little Creek Development Co.,* 779 F.2d 1068, 1072 (5th Cir. 1986) – each require both subjective bad faith and objective futility before granting relief from the stay. *See Carolin*, 886 F.2d at 699-700. So, it is incorrect to read *Carolin* as holding that in ruling on a motion to lift a stay, a bankruptcy court must decide if a petition was filed in bad faith and if it so finds then it must lift the stay. On the contrary, while "bad faith in filing for bankruptcy is sometimes grounds for lifting an automatic stay under Section 362, [] a finding of bad faith alone does not constitute *per se* cause for relief from a stay." *In re Ramkaran*, 315 B.R. 361, 363–64 (D. Md. 2004). So, to be clear, the Bankruptcy Court *could* have considered DBMP's alleged "bad faith" among its balancing of all the *Robbins*

factors, but was not required to do so under *Carolin*. However, if, as the Bankruptcy Court concluded here, granting the automatic stay would in practical effect amount to a dismissal of the bankruptcy petition, it was required under *Carolin* to find both objective futility and subjective bad faith to grant relief from the stay related to "bad faith." The Bankruptcy Court thus correctly applied *Carolin*.

In summary, the Court concludes that the Bankruptcy Court did not abuse its discretion under *Robbins* in its balancing of the harm to the Debtor of granting relief from the automatic stay with the harm to the Appellants in light of all the circumstances and further committed no error of law in its alternate analysis[6] under *Carolin*. Therefore, the Court will deny the Appellants' appeal and affirm the ruling of the Bankruptcy Court.

## IV. ORDER

**NOW THEREFORE IT IS ORDERED THAT:**

Appellants' appeal of the denial of their Motions for Relief from the Automatic Stay (DBMP Bankr. Doc. Nos. 2753, 2755) are **DENIED** and the Bankruptcy Court's rulings (DBMP Bankr. Doc. Nos. 2808, 2809) are **AFFIRMED**. The Clerk is directed to close this matter in accordance with this Order.

**SO ORDERED ADJUDGED AND DECREED**.

Signed: October 28, 2024

Kenneth D. Bell
United States District Judge

[6] As discussed in detail above, the Bankruptcy Court's application of *Robbins* – apart from any discussion of *Carolin* and the effective dismissal of the bankruptcy if the asbestos claimants are allowed to liquidate their claims in state court – is wholly sufficient to support the denial of the motion for relief from stay.