No. 24-2109

# United States Court of Appeals
*for the*
# Fourth Circuit

MICHAEL N. HERLIHY; ANN HERLIHY;
THE ESTATE OF PETER L. BERGRUD,

*Claimants-Appellants,*

– v. –

DBMP, LLC,

*Debtor-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NORTH CAROLINA, CHARLOTTE DIVISION

## JOINT APPENDIX
## Volume 3 of 3 (Pages JA1213 to JA1397)

JONATHAN RUCKDESCHEL
THE RUCKDESCHEL LAW FIRM, LLC
8357 Main Street
Ellicott City, Maryland 21043
(410) 750-7825
rucklawfirm@rucklawfirm.com

THOMAS W. WALDREP, JR.
CHRIS W. HAAF
DIANA S. JOHNSON
WALDREP WALL BABCOCK & BAILEY PLLC
370 Knollwood Street, Suite 600
Winston-Salem, North Carolina 27103
(336) 722-6300
twaldrep@waldrepwall.com
chaaf@waldrepwall.com
dsantosjohnson@waldrepwall.com

*Counsel for Claimants-Appellants*

*(For Continuation of Appearances See Inside Cover)*

COUNSEL PRESS (800) 4-APPEAL • (JOB 811477)

JOHN L. STEFFAN
MAUNE RAICHLE HARTLEY FRENCH
& MUDD, LLC
1015 Locust Street, Suite 1200
St. Louis, Missouri 63101
(314) 320-9643
jsteffan@mrhfmlaw.com

CLAYTON L. THOMPSON
MAUNE RAICHLE HARTLEY FRENCH
& MUDD, LLC
150 West 30th Street, Suite 201
New York, New York 10001
(314) 241-2003
cthompson@mrhfmlaw.com

*Counsel for Claimants-Appellants*

GARLAND S. CASSADA
RICHARD C. WORF
ROBINSON BRADSHAW
& HINSON, P.A.
101 North Tryon Street, Suite 1900
Charlotte, North Carolina 28246
(704) 377-2536
gcassada@robinsonbradshaw.com
rworf@robinsonbradshaw.com

JEFFREY B. ELLMAN
JONES DAY
1221 Peachtree Street, N.E.,
Suite 400
Atlanta, Georgia 30361
(404) 521-3939
jbellman@jonesday.com

GREGORY M. GORDON
JONES DAY
2727 North Harwood Street,
Suite 500
Dallas, Texas 75201
(214) 220-3939
gmgordon@jonesday.com

C. KEVIN MARSHALL
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
(202) 879-3939
ckmarshall@jonesday.com

SARAH E. WELCH
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
(216) 586-3939
swelch@jonesday.com

*Counsel for Debtor-Appellee*

## TABLE OF CONTENTS

### District Court Case No. 3:24-cv-00558

**VOLUME ONE**


District Court Docket Sheet ........ JA1

Motion to Consolidate Related Appeals
Filed July 16, 2024 ........ JA6

Brief of Appellants
Filed August 19, 2024 ........ JA12

Appendix to Appellants' Brief
Filed August 19, 2024 ........ JA52

Document 1 - Voluntary Petition Under Chapter 11
Filed January 23, 2020 ........ JA58

Document 22 - Informational Brief of DBMP LLC
Filed January 23, 2020 ........ JA76

Document 24 - Declaration of Robert J. Panaro
Filed January 23, 2020 ........ JA110

Document 614 - Motion of the Official Committee to Asbestos Personal Injury Claimants to Lift Stay
Filed January 31, 2021 ........ JA161

Document 656 - Debtor's Objection to Motion of the Official Committee of Asbestos Personal Injury Claimant's to Lift Stay
Filed January 13, 2021 ........ JA192

Document 972 - Findings of Fact and Conclusions of Law
Filed August 11, 2021 ........ JA218

Document 2753 - The Estate of Peter L. Bergrud's Motion for Relief from the Automatic Stay
Filed April 18, 2024 ........ JA297

Document 2757 - Exhibits to the Estate of Peter L. Bergrud's Motion for Relief from the Automatic Stay
Filed April 18, 2024

Exhibit 1 - Transcript of Proceedings Before Hon. J. Craig Whitley
Heard March 30, 2024 .................................................... JA335

Exhibit 2 - Transcript of Proceedings Before Hon. Laura Turner Beyer
Heard October 19, 2023 .................................................... JA344

Exhibit 3 - Transcript pf Proceedings Before Hon. Laura Turner Beyer
Heard January 18, 2024 .................................................... JA350

Exhibit 4 - Bergrud Medical Records
Filed August 19, 2024 .................................................... JA357

Exhibit 5 - Deposition of Leon David Horowitz
Filed April 18, 2024 .................................................... JA361

Exhibit 6 - Video Deposition of Lloyd C. Ambler
Filed August 19, 2024 .................................................... JA373

Exhibit 7 - Videotaped Discovery Deposition of Lloyd Ambler
Taken August 20, 2014.................................................... JA378

Exhibit 8 - Videotaped Deposition of Lloyd Ambler, Vol. 2
Filed April 18, 2024 .................................................... JA382

Exhibit 9 - Video Deposition of Juan Bergrud
Taken October 15, 2019 .................................................... JA387

Exhibit 10 - Discovery Deposition of Juan Bergrud, Vol. 2
Taken October 16, 2019 .................................................... JA398

Exhibit 11 - Discovery Deposition of Richard Trumbull
Taken November 18, 2019 .................................................... JA407

Exhibit 12 - Dr. Brodkin Medical Evaluation Report of Peter Bergrud
Filed April 18, 2024 .................................................... JA416

Exhibit 13 - Report of Dr. Christopher DePasquale, Re. Peter Bergrud Dated February 19, 2020
Filed April 18, 2024 .......................................................... JA424

Exhibit 14 - Complaint For Personal Injury
Filed April 9, 2019 .......................................................... JA428

Exhibit 15 - Consolidated Financial Statements, Dec. 31, 2023
Filed April 18, 2024 .......................................................... JA435

Document 2755 - Michael and Ann Herlihy's Motion for Relief From the Automatic Stay
File April 18, 2024.......................................................... JA439

Document 2755-1 - Exhibits to Michael and Ann Herlihy's Motion for Relief From the Automatic Stay

Exhibit 1 - Transcript of Proceedings Before Hon. J. Craig Whitley
Heard March 30, 2023 .......................................................... JA477

Exhibit 2 - Transcript of Proceedings Before Hon. Laura Turner Beyer
Heard October 19, 2023 .......................................................... JA486

Exhibit 3 - Transcript of Proceedings Before Hon. Laura Turner Beyer
Heard January 18, 2024 .......................................................... JA492

**VOLUME TWO**

Exhibit 4 - Surgical Pathology Report of Michael Herlihy
Filed April 18, 2024 .......................................................... JA499

Exhibit 5 - Complaint for Personal Injury and Loss of Consortium
Filed August 4, 2023 .......................................................... JA501

Exhibit 6 - Order to Show Cause
Executed January 26, 2024 .......................................................... JA531

Exhibit 7 - Videotaped Discovery Deposition of Lloyd Ambler
Taken August 20, 2014.......................................................... JA536

Exhibit 8 - Deposition of Leon David Horowitz
Taken June 30, 1980 .......... JA540

Exhibit 9 - Videotaped Deposition of Lloyd C. Ambler, Vol. 1
Filed April 18, 2024 .......... JA552

Exhibit 10 - Videotaped Deposition of Lloyd C. Ambler, Vol. 2
Filed April 18, 2024 .......... JA557

Exhibit 11 - Videotaped Deposition of Michael Herlihy
Taken October 20, 2023 .......... JA562

Exhibit 12 - Deposition of Michael Herlihy, Vol. 3
Taken November 3, 2023 .......... JA573

Exhibit 13 - Consolidated Financial Statements, December 31, 2023
Filed April 18, 2024 .......... JA580

Document 2777 - Debtor's Omnibus Objection to the Estate of Bergrud and Herlihy Motions from Relief of Automatic Stay
Filed May 2, 2024 .......... JA584

Exhibit 1 - Excerpt of Bestwall LLC, Chapter 11 Transcript
Heard September 22, 2023 .......... JA606

Document 2779 - Statement of the Official Committee of Asbestos Personal Injury Claimants in Support of Claimants' Motions for Relief from Automatic Stay
Filed May 2, 2024 .......... JA612

Document 2782 - The Estate of Peter Bergrud's and Michael and Ann Herlihy's Omnibus Reply in Support of Motions for Relief from the Automatic Stay
Filed May 6, 2024 .......... JA616

Document 2808 - Order Denying Motion of the Estate of Michael and Ann Herlihy for Relief of the Automatic Stay
Filed May 28, 2024 .......... JA625

Document 2809 - Order Denying Motion of the Estate Peter Bergrud for Relief of the Automatic Stay
Filed May 28, 2024 .......... JA627

Document 2820 - Notice of Appeal of Order Denying Michael and Ann Herlihy Motion for Relief of the Automatic Stay
Filed June 11, 2024 .......... JA629

Exhibit A - Order Denying Herlihy Motion to Lift Stay
Filed May 28, 2024 .......... JA633

Document 2821 - Notice of Appeal of Order Denying Motion of the Estate of Peter Bergrud for the Relief from the Automatic Stay
Filed June 11, 2024 .......... JA634

Exhibit A - Order Denying Motion of the Estate of Peter Berdrud for Relief from the Automatic Stay
Filed May 28, 2024 .......... JA638

Transcript of Proceedings Before Hon. Laura Turner Beyer
Heard January 18, 2024 .......... JA641

Transcript of Proceedings Before Hon. Laura Turner Beyer
Heard March 28, 2024 .......... JA733

Transcript of Proceedings Before Hon. J. Craig Whitley
Heard May 9, 2024 .......... JA825

Transcript of Proceedings Before Hon. J. Craig Whitley
Heard May 23, 2024 .......... JA904

**VOLUME THREE**

Brief for Appellee
Filed September 18, 2024 .......... JA1048

Reply Brief of Appellants
Filed October 2, 2024 .......... JA1114

Transcript of Proceedings Before the Hon. Kenneth D. Bell
Heard October 24, 2024 .......... JA1133

Order on Appellant's Motion for Relief
Filed October 28, 2024 .......... JA1186

Notice of Appeal
Filed October 29, 2024 .......... JA1197

Exhibit A - Order Denying Appellants Motion for Relief from the Automatic Stay
Filed October 28, 2024 .......... JA1201

**United States Bankruptcy Court**
**Western District of North Carolina**
**Charlotte Division, Case No. 20-30080**

Stipulation and Agreed Order Modifying the Automatic Stay
Filed October 26, 2020 .......... JA1213

Transcript of Proceedings Before the Hon. J. Craig Whitley
Filed October 18, 2021
Heard October 14, 2021 .......... JA1218

Order Authorizing Estimation of Current and Future Mesothelioma Claims
Filed October 21, 2021 .......... JA1312

Stipulation Between Debtor and Certainteed LLC Regarding Second Amended Funding Agreement
Filed January 5, 2022 .......... JA1315

Transcript of Proceedings Before the Hon. J. Craig Whitley
Filed January 10, 2022
Heard January 6, 2022 .......... JA1359

FILED & JUDGMENT ENTERED
Steven T. Salata

October 26 2020

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

J. Craig Whitley
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| In re | Chapter 11 |
| DBMP LLC,[1] | Case No. 20-30080 (JCW) |
| Debtor. | |

**STIPULATION AND AGREED ORDER**
**MODIFYING THE AUTOMATIC STAY**

A. WHEREAS, on May 24, 2019, the former CertainTeed Corporation ("Old CT") filed a petition for review in the Supreme Court of California with respect to a judgment (the "Burch Judgment") in an asbestos personal injury case captioned *Burch v. CertainTeed Corp.*, which appeal was assigned Case No. S255969 (the "Burch Appeal");

B. WHEREAS, Old CT obtained a bond, bond number 106769281, with respect to the Burch Appeal from Travelers Casualty and Surety Company of America (the "Burch Appeal Bond");

[1] The last four digits of the Debtor's taxpayer identification number are 8817. The Debtor's address is 20 Moores Road, Malvern, Pennsylvania 19355.

C. WHEREAS, as a result of a corporate restructuring completed on October 23, 2019, among other things, (1) Old CT ceased to exist, (2) DBMP LLC (the "Debtor") was formed; and (3) DBMP became responsible for the Burch Judgment and obtained Old CT's rights with respect to the Burch Appeal Bond;

D. WHEREAS, on July 10, 2019, the Supreme Court of California entered an order in the Burch Appeal granting the petition for review as to certain issues regarding damages and deferred further action in the matter pending consideration and disposition of the case captioned *B.B. v. County of Los Angeles*, Case No. S250734 (the "B.B. Appeal"), also pending before the Supreme Court of California;

E. WHEREAS, on January 23, 2020 (the "Petition Date"), the Debtor commenced the above-captioned chapter 11 bankruptcy case;

F. WHEREAS, as of the Petition Date, the Burch Appeal and any proceedings on remand therefrom became subject to the automatic stay imposed by section 362 of title 11 of the United States Code (the "Bankruptcy Code");

G. WHEREAS, on February 5, 2020, a *Notice of Bankruptcy Filing and Stay of Proceeding and Entry of Temporary Restraining Order* was filed in the Burch Appeal (the "Stay Notice");

H. WHEREAS, on August 10, 2020, the Supreme Court of California issued an opinion in the B.B. Appeal (the "B.B. Opinion");

I. WHEREAS, the plaintiff in the underlying litigation and respondent in the Burch Appeal (the "Plaintiff"), on the one hand, and the Debtor (together with the Plaintiff, the "Parties"), on the other, have agreed to modify the automatic stay imposed by section 362 of Bankruptcy Code in connection with the Burch Appeal on the terms set forth herein;

Based on the agreement of the Parties, as reflected by the respective signatures of their counsel set forth below, **IT IS HEREBY ORDERED AS FOLLOWS:**

1. Pursuant to section 362(d) of the Bankruptcy Code, the automatic stay is modified:

(a) to the extent required to allow the Supreme Court of California to take such further actions as may be necessary in connection with the disposition of the Burch Appeal, including the entry of an order remanding the matter for further proceedings with respect to the calculation of damages consistent with the B.B. Opinion; and

(b) following any remand, to the extent required to allow the court of remand to take such further actions as may be necessary in connection with the disposition of the matter on remand, including (i) conducting proceedings with respect to the calculation of damages consistent with the B.B. Opinion and (ii) entering an amended judgment (an "Amended Judgment").

2. Pursuant to section 362(d) of the Bankruptcy Code, the automatic stay shall be further modified to permit the Plaintiff to pursue collection of any Amended Judgment, in accordance with applicable law, solely from Burch Appeal Bond.

3. For the avoidance of doubt, nothing herein shall modify the automatic stay applicable to the wrongful death matter captioned Burch v. CertainTeed Corp., Case No. 4:19-cv-08236-SBA, pending before the United States District Court for the Northern District of California, which matter is not the subject of the Burch Judgment or the Burch Appeal.

4. Notwithstanding Rule 4001(a)(3) of the Federal Rules of Bankruptcy Procedure, this Agreed Order shall be effective immediately upon entry.

5. This Court shall retain jurisdiction with respect to all matters relating to the interpretation, implementation or enforcement of this Agreed Order.

AGREED AND CONSENTED TO BY:

*/s/ Steven Kazan*
Steven Kazan
KAZAN, MCCLAIN, SATTERLEY & GREENWOOD
55 Harrison St. Suite 400
Oakland, California 94607
Phone: (877) 995-6372
E-mail: skazan@kazanlaw.com

*Counsel for Plaintiff*

*/s/ Garland S. Cassada*
Garland S. Cassada (NC Bar No. 12352)
David M. Schilli (NC Bar No. 17989)
Andrew W.J. Tarr (NC Bar No. 31827)
ROBINSON, BRADSHAW & HINSON, P.A.
101 North Tryon Street, Suite 1900
Charlotte, North Carolina 28246
Telephone: (704) 377-2536
Facsimile: (704) 378-4000
E-mail: gcassada@robinsonbradshaw.com
dschilli@robinsonbradshaw.com
atarr@robinsonbradshaw.com

Gregory M. Gordon (TX Bar No. 08435300)
Amanda Rush (TX Bar No. 24079422)
JONES DAY
2727 North Harwood St., Ste. 500
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
E-mail: gmgordon@jonesday.com
asrush@jonesday.com

Jeffrey B. Ellman (GA Bar No. 141828)
Danielle Barav-Johnson (GA Bar No. 751721)
JONES DAY
1420 Peachtree St., N.E., Ste. 800
Atlanta, Georgia 30309
Telephone: (404) 581-3939
Facsimile: (404) 581-8330
E-mail: jbellman@jonesday.com
dbarav@jonesday.com

*Counsel for the Debtor and Debtor and Debtor in Possession*

This Order has been signed electronically. The Judge's signature and Court's seal appear at the top of the Order.

United States Bankruptcy Court

FILED & JUDGMENT ENTERED
Steven T. Salata

November 29 2021

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

J. Craig Whitley
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| In re<br><br>DBMP LLC,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 20-30080 (JCW) |

**ORDER AUTHORIZING ESTIMATION OF**
**CURRENT AND FUTURE MESOTHELIOMA CLAIMS**

This matter coming before the Court on the *Motion of the Debtor for Estimation of Current and Future Mesothelioma Claims* [Dkt. 948] (the "Motion"),[2] filed by DBMP LLC, the debtor and debtor in possession in the above-captioned chapter 11 case (the "Debtor"); the Claimant Representatives having filed objections to the Motion [Dkts. 1040, 1042] (together, the "Objections"); the Debtor having filed a reply in further support of the Motion [Dkt. 1081]

[1] The last four digits of the Debtor's taxpayer identification number are 8817. The Debtor's address is 20 Moores Road, Malvern, Pennsylvania 19355.

[2] Capitalized terms not otherwise defined herein have the meaning given to them in the Motion.

(the "Reply"); the Court having reviewed the Motion, the Objections and the Reply and having heard the statements of counsel and the evidence adduced with respect to the Motion at a hearing before the Court on October 4, 2021 (the "Hearing"); the Court finding that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (b) venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409, (c) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), (d) notice of the Motion and the Hearing was sufficient under the circumstances, (e) the mesothelioma claims asserted or that may be asserted against the Debtor are contingent or unliquidated claims, the fixing or liquidation of which would unduly delay the administration of the Chapter 11 Case and (f) estimation of the claims under section 502(c) of the Bankruptcy Code is necessary and appropriate; the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and the Court having announced its ruling on the Motion at a hearing on October 14, 2021 (the "Oral Ruling");

IT IS HEREBY ORDERED THAT:

1. For the reasons set forth in the Oral Ruling (which is incorporated herein), the Motion is GRANTED on the terms of this Order.

2. Pursuant to section 502(c) of the Bankruptcy Code, the Court shall estimate the Debtor's aggregate liability for all current and future mesothelioma claims arising from any product or other source.

3. Estimation is not being conducted for purposes of distribution, but rather for plan negotiation and confirmation purposes. Estimation shall not be used to establish a non-consensual cap on the Debtor's asbestos liabilities.

4. The estimated amount of all current and future claims, including non-mesothelioma claims, shall be determined by dividing the Court's estimated amount for

mesothelioma claims by 0.92, representing a 92%-8% split between mesothelioma and non-mesothelioma claims.

5. The timeline for the estimation shall be set forth in a separate case management order. The Debtor and the Claimant Representatives may submit an agreed case management order for the Court's consideration or, in the absence of agreement, may seek entry of such an order by motion.

6. This Order shall be immediately effective upon its entry.

7. This Court shall retain exclusive jurisdiction over any and all matters arising from or related to the implementation, interpretation or enforcement of this Order.

This Order has been signed electronically.
The Judge's signature and Court's seal appear
at the top of the Order.

United States Bankruptcy Court

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| IN RE: | : | Case No. 20-30080-JCW |
| DBMP LLC, | : | Chapter 11 |
| Debtor. | : | Charlotte, North Carolina<br>Thursday, October 14, 2021 |
| | : | 9:30 a.m. |

: : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE J. CRAIG WHITLEY,
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor:

Robinson, Bradshaw & Hinson, P.A.
BY: RICHARD C. WORF, ESQ.
101 N. Tryon Street, Suite 1900
Charlotte, NC 28246

Jones Day
BY: GREGORY M. GORDON, ESQ.
2727 North Harwood Street
Dallas, TX 75201-1515

Jones Day
BY: JEFFREY B. ELLMAN, ESQ.
1221 Peachtree St., N.E., #400
Atlanta, Georgia 30309

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

---

**JANICE RUSSELL TRANSCRIPTS**
**1418 Red Fox Circle**
**Severance, CO 80550**
**(757) 422-9089**
**trussell31@tdsmail.com**

APPEARANCES (continued):

| | |
|---|---|
| For the ACC: | Caplin & Drysdale<br>BY: KEVIN MACLAY, ESQ.<br>TODD PHILLIPS, ESQ.<br>One Thomas Circle, NW, Suite 1100<br>Washington, DC 20005 |
| | Robinson & Cole LLP<br>BY: NATALIE D. RAMSEY, ESQ.<br>1201 N. Market Street, Suite 1406<br>Wilmington, DE 19801 |
| | Winston & Strawn, LLP<br>BY: DAVID NEIER, ESQ.<br>CARRIE V. HARDMAN, ESQ.<br>200 Park Avenue<br>New York, NY 10166-4193 |
| | Hamilton Stephens<br>BY: ROBERT A. COX, JR., ESQ.<br>525 North Tryon St., Suite 1400<br>Charlotte, NC 28202 |
| For Future Claimants' Representative, Sander L. Esserman: | Young Conaway<br>BY: SEAN T. GREECHER, ESQ.<br>ERIN EDWARDS, ESQ.<br>1000 North King Street<br>Wilmington, DE 19801 |
| | Alexander Ricks PLLC<br>BY: FELTON E. PARRISH, ESQ.<br>JACK SPENCER, ESQ.<br>1420 E. 7th Street, Suite 100<br>Charlotte, NC 28204 |
| For CertainTeed Corporation and Saint-Gobain Corporation: | Goodwin Procter LLP<br>BY: HOWARD S. STEEL, ESQ.<br>620 Eighth Avenue<br>New York, NY 10018 |
| | Rayburn Cooper & Durham, P.A.<br>BY: JOHN R. MILLER, JR., ESQ.<br>227 West Trade Street, Suite 1200<br>Charlotte, NC 28202 |
| ALSO PRESENT (via telephone): | SANDER L. ESSERMAN<br>Future Claimants' Representative |

P R O C E E D I N G S

(Call to Order of the Court)

THE COURT: Have a seat, everyone. Good morning.

(Counsel greet the Court)

THE COURT: Okay. We are back in the DBMP matters. Since we're in the courtroom and as my judicial assistant's out, I'm going to go back and instead of announcing your appearances for you, do it the traditional way and ask you to announce, starting with those in the courtroom.

I think for, most of you have been with us before. When you're speaking, though, I would ask you to take the masks off so that we can hear you clearly. And you can throw them back on just as soon afterwards as possible, so.

All right. Appearances?

MR. GORDON: Good morning, your Honor. Greg Gordon, Jones Day, on behalf of the debtor. Jeff Ellman is also here from Jones Day and Rich Worf from the Robinson Bradshaw firm is here as well.

THE COURT: All right.

MR. MILLER: Morning, your Honor. Jack Miller, Rayburn Cooper & Durham, on behalf of Saint-Gobain Corporation and CertainTeed. I've also got Howard Steel with me again with Goodwin Procter.

THE COURT: Okay, very good.

Anyone else on this side?

(No response)

THE COURT: All right. Let's start over here. Mr. Maclay?

MR. MACLAY: Good morning, your Honor. Nice to see you again.

THE COURT: As well.

MR. MACLAY: Kevin Maclay here for the Committee from Caplin & Drysdale. From Caplin & Drysdale also is my colleague, Todd Phillips.

THE COURT: Uh-huh (indicating an affirmative response).

MR. MACLAY: Joining me from, from Robinson is Natalie Ramsey and then Rob Cox is here as well from the Hamilton firm.

THE COURT: Very good.

Others on this side?

MR. NEIER: And good morning, your Honor. David Neier and Carrie Hardman, Winston & Strawn, for the Committee as well.

THE COURT: Okay.

MR. PARRISH: Good morning, your Honor. Felton Parrish with Alexander Ricks on behalf of the Future Claimants' Representative. Also I wanted to introduce you to a couple of new members of our team, Sean Greecher --

THE COURT: Uh-huh (indicating an affirmative response).

MR. PARRISH: -- and Erin Edwards from Young Conaway Stargatt & Taylor.

THE COURT: Okay.

MR. PARRISH: Also in the courtroom --

THE COURT: Welcome.

MR. PARRISH: -- is Jack Spencer and on the phone, Mr. Esserman is on the phone. His line is muted so he won't be making an appearance, but I did want to let you know that he is here and participating.

THE COURT: And I believe that gets everyone that's physically present.

Are there any parties on the telephone announcing appearances?

(No response)

THE COURT: Okay, very good.

All right. We had two motions on for today. Are there any preliminaries, or are we ready to get right to them?

MR. NEIER: David Neier on behalf of the Committee, your Honor. Just one preliminary matter.

THE COURT: Uh-huh (indicating an affirmative response).

MR. NEIER: As you know, we had the hearing on the standing motion on --

THE COURT: Uh-huh (indicating an affirmative response).

MR. NEIER: -- October 5th and then on October 7th there was a decision out of the Eastern District of North Carolina by Judge Calloway --

THE COURT: Uh-huh (indicating an affirmative response).

MR. NEIER: -- which talks about derivative standing.

THE COURT: Uh-huh (indicating an affirmative response).

MR. NEIER: I'm not going to talk about the case or anything like that because, you know, Mr. Gordon should have a, a chance to review it and, and it's not a clear-cut case one way or the other, but it's -- it's -- it touches on the matters that are before this Court.

So I'm just going to hand up a copy --

THE COURT: You're just wanting to hold, hand the opinion up?

MR. NEIER: -- and give it to Mr. Gordon.

THE COURT: All right, very good.

(Opinion handed to the Court and Mr. Gordon)

THE COURT: Okay. Thank you.

Okay. Mr. Gordon.

MR. GORDON: Your Honor, I guess one other preliminary matter. It's just administrative. We've got two days of hearings set next week, 21st and 22nd, on the various discovery motions. I did want your Honor to know that we've reached out

to the other side to reach agreement on the order of presentation and allotment of time and the like and as soon as we reach agreement on those matters, we'll let your Honor know about that.

THE COURT: Okay. I've got the two days blocked out for all of you.

Did anyone need to say anything about that?

(No response)

THE COURT: All right. So bottom line is I'm at your disposals. Just need to give staff enough time to eat lunch between the hearings, so. All right?

MR. GORDON: We appreciate it, your Honor.

THE COURT: Any other preliminaries?

(No response)

THE COURT: Okay, very good.

All right. Let's go into the, the two motions. I, I don't know if there was an agreement as to how these were going to be presented or how much time was going to be allotted, if, if that's necessary. They're more limited in scope than what we've been talking about last week. Any --

MR. GORDON: They are, your Honor. Our, our intention was just to take them in the order they appear on the agenda, which is the funding agreement motion --

THE COURT: Uh-huh (indicating an affirmative response).

MR. GORDON: -- followed by the tolling agreement motion. And I think, at least speaking for the debtor, we don't plan to spend a ton of time on these.

THE COURT: Okay.

Everyone of the same mind?

(No response)

THE COURT: All right.

MR. GORDON: That was a fairly --

THE COURT: It's the debtor's motion. Lead off.

MR. GORDON: That was a fairly vague comment, I'm sure. Your Honor appreciated that.

All right. Let's go ahead to Slide 2.

So, your Honor, the -- I'm going to start with a few slides that just, you know, basically provide the context for the relief we're, we're seeking. Obviously, the request that the debtor has made is to have the Court approve amendments to the funding agreement that was established in connection with the corporate restructuring that occurred prebankruptcy and the changes that we're proposing appear, as your Honor knows, both in the funding agreement and also in a proposed order that we attached to the initial motion. There was criticism leveled by the Committee and the FCR with respect to certain findings that were proposed --

THE COURT: Uh-huh (indicating an affirmative response).

MR. GORDON: -- in that order and, and in the reply we indicated that we are prepared to make changes to address some of those issues and, and I'll go through those in detail.

THE COURT: Okay.

MR. GORDON: So these first two slides, your Honor, are two that you saw last week in connection with the, the standing argument and, and the, the purpose of these was to provide the context in the sense that what we are trying to do through these changes and with, obviously, the support of CertainTeed is to respond directly to some of the concerns that your Honor noted in the preliminary injunction hearing and, obviously, concerns that were raised or have been raised by the Committee and the FCR.

As your Honor knows as well, we also made some additional changes. As the debtor was reviewing the funding agreement, we realized that there were some other aspects of the agreement that could be improved upon, in our view, from the perspective of the debtor and its estate. And so there are changes that were made beyond those that were raised --

THE COURT: Uh-huh (indicating an affirmative response).

MR. GORDON: -- either by the parties or the Court.

So looking at Slide 2, your Honor raised a concern about the, the fact that only DBMP could enforce the funding agreement. It's obviously an agreement between DBMP and New

CertainTeed and what we tried to do here was, in the order, provide a clear provision that says, "If for any reason the debtor fails to take action to enforce" -- you know what? I haven't handed up --

MS. HARDMAN: Yeah.

MR. NEIER: Yeah.

MR. GORDON: Is that what you're looking for?

I'm sorry, your Honor.

THE COURT: That's okay.

MR. GORDON: I'm ahead of myself.

Can I approach?

THE COURT: Yes, sir.

MR. GORDON: Sorry about that.

MR. NEIER: No, no problem. Thank you.

(Slide deck handed to the Court and counsel)

MR. GORDON: I'd forgotten that we have paper plus (inaudible.)

Okay. Where are we and what were we doing here? Okay.

So the idea in the order was to make clear, you know, by stipulation because it, the proposal was that this is an order that would be stipulated and agreed to by both the debtor and New CertainTeed and approved by the Court, but if the debtor fails for any reason to take action to enforce, then both the debtor and New CertainTeed are agreeing that the

claimant representatives could take actions on behalf of the estate to enforce the contract.

And I'll say on this point, obviously your Honor had raised concerns about the fact that, I think you raised a concern about the, about the claimants being one step removed from where they were before.

THE COURT: Uh-huh (indicating an affirmative response).

MR. GORDON: And my take on this always was that there shouldn't be an issue in that respect, given that we're in this Court and we have fiduciary obligations, we have rights under the funding agreement, and there's never been any thought on the part of the debtor that the debtor wouldn't force, enforce its rights, but because of the concerns that were raised by both the Court and the claimant representatives, we thought we should just be clear --

THE COURT: Uh-huh (indicating an affirmative response).

MR. GORDON: -- and we asked New CertainTeed to agree to this and they, they agreed they would to basically make clear the claimant representatives could step in if, in fact, we breached our obligations or failed to pursue our rights.

THE COURT: Uh-huh (indicating an affirmative response).

MR. GORDON: And also, we added just for clarity that

if there was any dispute that arose with respect to the funding agreement, the parties were agreeing that dispute would be heard here. So there --

THE COURT: Uh-huh (indicating an affirmative response).

MR. GORDON: -- wouldn't be, shouldn't be any concern about CertainTeed doing something in another court or this action occurring somewhere else. No, this would all be focused here and addressed, addressed here.

And then there was a concern raised about the words "necessary" or "appropriate" in various places in the funding agreement where we talked about the funding commitment from New CertainTeed. We viewed those words as very broad, you know. It didn't say "necessary" and "appropriate." It said either "necessary" or "appropriate," but I think your Honor and the, and the parties made a fair point, "Well, what does that mean, exactly? Does that place some kind of limitation on the obligation of New CertainTeed?" And so again, we talked to New CertainTeed about it and there was a willingness just to take those words out to eliminate any potential uncertainty about that.

And then your Honor also in the opinion raised the concern about the legal enforceability of the funding agreement vis-à-vis third parties. And, you know, again from our perspective, we've always believed, whether it's, you know,

whether it's viewed as an insider contract or not, that it is enforceable. But again, to put that, you know, certainly as between the parties, anyway, but to put that issue to bed we were willing in the order -- and again, New CertainTeed agreed to this -- to make clear through a finding that it is a valid and enforceable contract.

And I, and I was reminded this morning, looking back at Judge Beyer's ruling on the motion to dismiss in Bestwall, that she, she did find that it was an enforceable agreement. There were arguments advanced by the Committee in connection with that motion in Bestwall that it was an illusory contract, it wasn't enforceable, it wasn't real, and she rejected those arguments in her, in her dismissal opinion and found specifically that it was enforceable.

But again, because there's been concerns raised, we wanted to put those to bed by, in a stipulated order, making clear that the parties agree that it is enforceable and then we'd have the *imprimatur* of the Court on that agreement as well.

Next slide, please.

And then, your Honor, going to Slide 3, you raised a concern in the preliminary injunction opinion about whether or not New CertainTeed's obligation to fund a section 524(g) trust was conditioned on New CertainTeed either receiving 524(g) relief or New CertainTeed approving any plan in the case. And

that language doesn't appear -- there's no language to that effect in the existing funding agreement --

THE COURT: Uh-huh (indicating an affirmative response).

MR. GORDON: -- but obviously, it was a concern raised and that suggested to us that maybe there's some ambiguity or maybe it wasn't as clear as it could have been. And so we added --

THE COURT: Or maybe some of the Aldrich language got in that opinion.

MR. GORDON: Yeah, yeah. And the language in Aldrich is, obviously, different.

THE COURT: Uh-huh (indicating an affirmative response).

MR. GORDON: But in any event, just to be very clear about that -- and again, New CertainTeed was fine with this -- we just are now expressed to put in, basically, an avoidance of, you know, for avoidance of doubt, New CertainTeed will fund the plan, regardless of whether the plan provides that New CertainTeed will receive the protection of section 524(g) and regardless of whether the, whether New CertainTeed supports a plan of reorganization.

So again, that was never the intent and we thought we ought to just, we can be more express about it, we will be more express about it.

Your Honor raised a concern and the other side has as well about an ability of New CertainTeed to forgive material obligations owed to it by affiliates.

THE COURT: Uh-huh (indicating an affirmative response).

MR. GORDON: And we talked to New CertainTeed about that and they are willing to agree to make clear that, that they have no right to do that. And so that's, that's been added to the, the amended agreement, or would be if it's approved.

A similar concern was raised about New CertainTeed's ability to send dividends, to make dividends to its parent companies, parent company, or up the chain. And, and we talked to CertainTeed about that and they're willing, again, to put in a prohibition against the payment of any dividends during the course of the case.

So again, if this amended funding agreement were approved, we'd have that clear language as well.

Next slide, please.

We added a provision because, again, we noted -- I don't think this was raised by anybody, but, you know, we noted that there wasn't crystal clear language that indicated that if the debtor incurred costs and expenses with respect to enforcing the agreement, that those would be covered under the funding agreement and now we've included a new provision that

makes clear that they would.

We added a provision that memorializes a practice that already exists, which is that the financial information from New CertainTeed that's provided to the debtor under the terms of the funding agreement can be made available by the debtor to the claimant representatives. Again, we've been doing that since the inception of the case, but we thought we should go ahead and memorialize that in the amended agreement.

We also added language to indicate that New CertainTeed cannot enter into any contract that prohibits it from making the payments it's required to make under the funding agreement, again just to provide further assurances in terms of the, in terms of the commitment by New CertainTeed under the agreement.

We substantially shortened cure periods that exist in the agreement. It's, by, I think, two-thirds in all cases.

And we also, we noted another thing is there's obviously an indemnification obligation that runs from the debtor to New CertainTeed which couldn't be honored during the course of the chapter 11 case and we saw that as a potential issue under the funding agreement. So we added language to make clear that that's not an issue. If -- there is no issue if indemnification can't be paid during the course of the case in view of the automatic stay.

THE COURT: Okay.

MR. GORDON: All right. Next slide, please.

We added a provision in the order, again related to the distribution of financial information, that we would provide it within five business days after receipt from New CertainTeed. We also added some other provisions. We, we're proposing that the debtor would provide any notices received from New CertainTeed within five business days. We provide those to the claimant representatives and also, we provide any notices that the debtor gives under the, under the funding agreement to the claimant representatives within three business days. And then we also thought, well, we, we ought to go ahead and be fully transparent about instances where we make funding requests and then receive proof that the funding occurred. And so we have a provision in the order that provides that copies of all funding requests will be provided within three business days and copies of proof of funding would be provided within five business days.

All right. Next slide, please.

So as we read the objection that was filed by the Committee and the FCR, there seemed to be five issues or five objections that they've raised. The first is that they, they take the position that the proposed findings could serve to extinguish the estate claims that they wished to pursue in connection with their standing request. They complain that the prohibition on dividends would not stop New CertainTeed from

engaging in a practice of making intercompany loans under a centralized cash management systems with its affiliates. They complain about the, the continued ability of New CertainTeed to incur senior debt or engage in material M&A activity. They complain that the funding commitment's still not secured or guaranteed and they claim that the anti-assignment provision permits New CertainTeed to basically have veto power over a creditor plan. So there, you know, notwithstanding the clarifications we're proposing to make with respect to the lack of conditionality on plan funding, they're, they're claiming that, I, I think, New CertainTeed gets to the same place in a back-door way through the anti-assignment provision, which is not, not the case, and I'll explain why.

Next slide.

Okay. So on, on the findings we obviously went back and, and took a look at those. There was no intention on our part to extinguish any estate claims. I mean, all we're trying to do here is respond to concerns that were raised, perceive risks that have been identified. There's no intent to do that. And so in taking another look at the findings we proposed a couple of changes. The first is that we would add a finding that makes clear that nothing in the order would constitute a finding regarding the viability of any estate claims. And then secondly, we would remove the Finding (f) that the Committee so vehemently complained about, which was that, "The terms of the

Second Amended Agreement are fair and reasonable and contain adequate protections for the debtor's estate and creditors." We would just take those out. Again, there was no effort to, on our part, to try to affect or diminish or extinguish estate claims that may exist.

Next slide, please.

On the, the point about the intercompany loans, from my perspective this is really a nonissue. These were explored in great detail in the depositions, in the many depositions that were taken. This company, you know, CertainTeed, like many companies we've represented has internal cash management practices that it follows. The corporate restructuring didn't affect those practices at all. The funding agreement didn't affect those practices at all and it basically has kind of a intercompany banking arrangement with another entity that, you know, that holds and manages the cash. These are overnight loans and these are loans. These aren't dividends. These are loans. They're payable on demand to New CertainTeed. That cash is always available to New CertainTeed. That's operations, that's an operation that's in the ordinary course of the company's business. It makes sense from a management perspective that the company would centrally manage its cash and from our perspective, that's a nonissue and, in fact, I think we've provided additional comfort on this issue, anyway, because we made it clear through the prohibition that I talked

about earlier that intercompany loans cannot be forgiven. And so these are intercompany loans through a cash management system and now there's a clear commitment by New CertainTeed that it cannot forgive those loans.

So the, the continuing parade of horribles that we hear and the theorizing or hypothesizing about things that may happen, there's just no basis for that and I think, again, there should be reassurance from the changes that have been agreed, agreed to with New CertainTeed.

Okay. So on the issues of debt incurrence and M&A transactions, you know, the point here, again, is that nothing was changed by either the corporate restructuring or the funding agreement. Old, Old CertainTeed was always in a position to incur debt senior to asbestos claims, which are just unsecured, contingent, unliquidated claims. It was always free to enter into corporate transactions pre-corporate restructuring. Nothing was changed in that regard. And I, again, I would just say that no evidence has ever been presented by the Committee or the FCR that transactions like this are even in the contemplation of the parties and this is all just pure speculation and hypothesizing by the Committee and the FCR.

The, the other thing I would point out, which I think is important to keep in mind, is if there were a sale and the sale generates proceeds, the proceeds would come back into New

CertainTeed and because there's now this prohibition against dividends, they can't be dividended out. And so that should provide -- I, I believe that prohibition should provide comfort with respect to a sale transaction. And, and the same thing for a senior financing. If there, if there's financing for some reason, there's an equivalent amount of money that comes in equal to the debt. That can't be dividended, either.

So there's been a, you know, there's been a fair exchange and equivalent exchange of value.

And then there's been a lot of focus on the "all or substantially all" provision which, from my perspective, is very customary in agree, you know, in, in commercial agreements. And here, this has sort of been turned upside down, this provision. This is intended to provide protection in the sense that if there is a sale of all or substantially all of the assets -- and, of course, that means the consideration would come in and it doesn't go anywhere -- but in addition, there's an obligation on New CertainTeed's part to have the buyer assume the funding agreement obligations.

So that, that's actually a benefit. It's not a negative.

Next slide, please.

On the collateral issue or the guarantee issue, again the claimants have always only had contingent, unliquidated, unsecured claims. They've never had a right to collateral.

They've never had a right to insist on a corporate guarantee and nothing's changed in that respect. And the fact that these amendments don't include such provisions, in our view, is not a reason to conclude that these amendments should be approved.

Now on the anti-assignment provision, a great deal's been made about this and, and all I would, all I would say about this is an assignment of the funding agreement isn't necessary to fund a plan. You can try to do a plan based on an assignment, but it's not required. And I, to me, what's important is that the funding agreement makes clear that New CertainTeed is obligated to fund any section 524(g) plan that's confirmed by the Court and the district court by final order. It's, it's that simple. It doesn't say that New CertainTeed has to approve it. It doesn't say that New CertainTeed has to obtain any rights with respect to it. It doesn't say it has to be a debtor plan. It doesn't say that the debtor has to support it. It's that simple. And this suggestion by the other side that this provision means there can't be a creditor plan without the support of New CertainTeed, I -- I -- I would just suggest to your Honor is simply incorrect. It's not correct. There's no, no limitations.

And I would also say that the anti-assignment provision is not a surprising one at all. I mentioned this last week. With this type of, we characterize it as a financing or a financial accommodation, or however you want to

talk about it, I don't think I've ever seen one that doesn't have an anti-assignment provision in it. It's between the parties, you know, it's, it's between the funder and the fundee, basically, or the payor and the payee, however you want to characterize the parties, and to suggest that, instead, it should be like a blank check that could be assigned to anybody at any time, that, to me, just is contrary to sort of commercial reality and, and more importantly, isn't necessary in light of the clear provision on New CertainTeed's obligation to fund a section 524(g) plan.

There was a fair amount of argument in the objection about the proper legal standard. I'm not going to spend a lot of time on this because I think at the end of the day, from our perspective, whether you look at this under a business judgment standard or under the entire fairness standard that the other side proposes, the standard is satisfied. And the reason it is is because, basically, this funding agreement is a series of improvements. These amendments are a series of improvements to the funding agreement. There are a series of concessions by New CertainTeed. It really doesn't require anything of the debtor. These amendments don't require anything of the debtor. There's no requirement of any expenditure of estate funds. There's no reduction in any of the assets. All we're doing, in our view, is bolstering the strength of a key asset of the debtor and we're doing that by just, you know, further

clarifying our rights under that agreement and the commitments by New CertainTeed under that agreement.

And there were a number of arguments that this funding agreement's being put together solely for the benefit of New CertainTeed, but from our perspective the exact opposite is true, that the, really, the only beneficiary here is the debtor and its estate. They seem to, the other side seems to want to tie this to the standing issues and their desire to litigate, but from our perspective that issue can be put aside. It's been separately briefed. It's been heard by the Court. The question for this Court is whether these amendments should be approved because they do nothing but benefit the estate. They clarify commitments that have already been made and they address concerns and risks that have been identified by the Court and the parties during the course of this case.

So, your Honor, just to, to kind of wrap things up, we think the, these amendments show clear benefits to the estate. We think the claimant representatives are basically ignoring the benefits or disregarding the benefits because they want to pursue their litigation strategy, but irrespective of that, your Honor, and separate and apart from that, we believe these are clear benefits to the estate and we would respectfully request that your Honor grant the motion.

THE COURT: All right.

Does Saint-Gobain have any remarks? Do you want to

comment there?

MR. STEEL: Good morning, your Honor. Howard Steel, Goodwin Procter, for Saint-Gobain Corp. and New CT.

For the record, we filed a joinder to the reply. That's at Docket No. 1133. I just stand briefly to reiterate that we support approval of the motion for the reasons articulated by Mr. Gordon, including his recitation of the changes to the funding agreement which we agree with. For the reasons set forth in the motion, the reply, Mr. Gordon's presentation, the objections should be overruled in their entirety.

New CT has honored all funding requests under the funding agreement to date and underscores its clear commitment to provide the promised funding for this case in a section 524(g) trust. We re respectfully request that the Court approve the motion.

And unless your Honor has any questions, I'll cede the podium to the Committee.

THE COURT: Thank you.

MR. STEEL: Thank you, your Honor.

THE COURT: Ready to go on this side, or do you need a moment?

MR. MACLAY: I am ready, your Honor.

THE COURT: Okay. Lead off, Mr. Maclay.

MR. MACLAY: And, your Honor, with your permission,

I'd like to make my way over to the podium.

THE COURT: You're welcome.

In the new courtrooms we tried to preserve North Carolina practice while giving us some flexibility for these mass hearings where we have more lawyers than we have spaces, but --

MR. MACLAY: Thank you, your Honor.

Before I get into the granular details, your Honor, I'd just like to make a couple of overarching comments, which is if what this motion were about was improving the funding agreement for the benefit of the claimants, you would have assumed that before making such changes there would have been a phone call, a meeting, a discussion, with the people supposedly benefited by these changes to discuss what would be appropriate improvements. How should this work to actually make the claimants better off? But none of that happened and the reason that didn't happen, your Honor, is this isn't really about the details of the changes and we can't lose the forest for the trees here.

What this is about is an attempt by the debtors to get this Court, by the debtor, to get this Court to approve the amended funding agreement. They're not just asking your Court to sign off on the changes. They're asking this Court to sign off on the agreement as amended to give this Court's *imprimatur* to the funding agreement as a whole and that is the fundamental

problem here. This is about getting the approval order, not just about the changes themselves. They want this Court to say that this funding agreement is now appropriate and it is pretty clear, your Honor, that one of the reasons to do that is to bolster defenses against the upcoming fraudulent transfer and substantive consolidation proceedings.

And so when the debtor says there's no intent to foreclose remedies here, well, there might not be an intent, your Honor, but in their arguments last week you heard the debtor argue that the revisions to the funding agreement made the fraudulent transfer action unnecessary and it strains credulity that that's just, you know, an unintended side effect, your Honor. That is, in fact, what this is all about. It's all about getting the Court's approval to place obstacles in front of those pending fraudulent transfer and substantive consolidation actions. And this Court shouldn't grant its *imprimatur* to those things. And so to put it in sort of big-picture terms, potential malfeasance under the funding agreement are the symptoms, but the Texas twostep and divisive merger is the disease and the fraudulent transfer and substantive consolidation motions are the cure and we shouldn't prevent curing the disease to purporting to address the symptoms.

Now there are a couple of specific things that Mr. Gordon said that I'd like to address. One is that they

have now provided that in response to the, the holding that only DBMP can enforce the funding agreement that now the claimant reps may take such action, but that's limited to if the debtor failed to take action to enforce its remedies, its remedies. What if the debtor just fails to do affirmative things that would be necessary to make the funding agreement a real document that actually provides protections? The language that they have proposed does nothing about that scenario. It does nothing about what if the debtor doesn't make a demand for funding. It, it doesn't go into a whole series of, of potential future events. It's quite limited when you look at the language, even though it's proposed to be quite broad, but it just isn't. It's only limited to remedies.

Another example of, of a similar problem, your Honor. They have added language that says, "For the avoidance of doubt, nothing herein shall constitute a finding regarding the viability of any claims that may be asserted on behalf of the estate under Chapter 5 of the Bankruptcy Code or other estate-held claims." Well, this is quite narrow. This doesn't say "nothing herein shall affect the ability to pursue those claims." It doesn't say, "Any of the findings herein shall be irrelevant and not taken as precedential in those other proceedings." It, it's extremely narrow. It's proposed to be broad but when you parse out its language, it just isn't.

We also heard the debtor make a lot about the fact

that, hey, although it's true -- and they haven't argued that, that New CertainTeed could upstream, essentially, all of its cash. It can't make dividends, but it can send out all of its money through loans. But hey, that's what they used to do before the corporate restructuring. But, your Honor, the whole point here is now there is a bankruptcy and in bankruptcy you don't get to do that. You don't get to send all of your money away to unknown other, other, other recipients. And that's the point. They have separated their assets from there liabilities and they've only stuck their liabilities in the bankruptcy and that is very problematic. And so they are now essentially telling you, "We could have done that before, but now we're not before. Now we're in bankruptcy." And our point throughout this case has been they're trying to get the benefits of bankruptcy without the burdens of bankruptcy and that is illegitimate. It is inappropriate and this Court should not put its *imprimatur* on such attempts.

I will also note that although they talked about how the overnight loans are payable on demand to New CertainTeed, the record is clear that no such payment demand has ever been made and, and there is an express provision in the restructuring -- excuse me -- in the funding agreement, your Honor, that there are no third-party beneficiaries, clearly an attempt to preclude the Committee or anyone else from trying to force the debtor to exercise its rights in a variety of ways,

including to demand, for example, the loans be repaid. And as we pointed out in our papers, we're talking about hundreds and hundreds and hundreds of millions of dollars that have been sent away. And who knows what happens once they get to New CertainTeed because New CertainTeed isn't in front of your Honor. Your Honor doesn't have transparency into what they're doing with the money. And so you can't take as a given that the money is able to be recalled. There's just no evidentiary support for that. And this isn't an evidentiary proceeding and they've made no attempt to show the contrary.

They say before the corporate restructuring Old CT could have incurred senior debt to the debt owed to their asbestos victims and the corporate restructuring didn't change that, but now there's a bankruptcy and in bankruptcy, your Honor, a debtor doesn't get to incur senior debt to its existing obligations without court approval and that, again, is the point. Now we're in bankruptcy. The Bankruptcy Rules should be respected, the bankruptcy protections for creditors should be enforced, and clever maneuvers to try to avoid those protections should not be sanctioned by the Court.

They say there's no evidence that hypothetical transactions are contemplated that would harm asbestos claimants. Well, your Honor, again, we're talking about hypothetical transactions largely by New CertainTeed who is not in front of this Court. So neither this Court nor the

Committee nor the FCR has any transparency into what the heck New CertainTeed is contemplating. If they were in this bankruptcy, then we would get such transparency and that, of course, is what the substantive consolidation is designed to accomplish as well as the fraudulent transfer request.

They say asbestos claimants have always had unsecured, contingent, unliquidated claims, but, your Honor, the assets have now been removed from their grasp and put in a different entity. And so in the absence of a guarantee there's now one more obstacle to their recovery. It's not just that they're, they're unsecured as they always have been. It's also the case that the party to whom, that owes them, supposedly, payment is, is one step removed and absent the guarantee, even if they retain, they have no, they now have weaker rights, your Honor. Because it's not just they have to enforce their unsecured payment. They then have to try to get that secondary party to pay in the party that they supposedly are owed the obligation from.

So they are clearly made structurally subordinated. They're clearly made worse off and absent a guarantee, it's, it's just that much more obvious. It sort of illustrates and highlights the prejudice to the claimants of this restructuring, of this Texas twostep divisive merger of keeping the assets out of bankruptcy when the liabilities are stuck into bankruptcy.

And, and they're -- I, I will talk about the details a little bit, although I think the big picture, your Honor, is they want you to bless, effectively, the divisive merger, they want you to effectively bless their separation of assets from liability, they want you to effectively bless the structural subordination of the only real creditors that this company has, the, the asbestos creditors, but they, they keep telling you that New CertainTeed and debtor approval of a plan aren't needed. We heard that again today, but if you look at the actual Page 11 of the packet, you know, what the actual Page 11 says is that "New CT approval of a plan not needed." It doesn't say New CT or debtor approval of a plan isn't needed, although Mr. Gordon said that.

And then if you go to the actual underlying documents, your Honor, the revised definition of "permitted funding use" under the revisions that, that we were provided as part of the reply says that, "For the avoidance of doubt, regardless of whether such plan of reorganization provides that the payor will receive the protection of section 524(b) of the Bankruptcy Code and regardless of whether the payor supports this plan of reorganization," etc. Your Honor, the payor is New CertainTeed, the payee is the debtor, and there is nothing in this language that says that the payee doesn't have to support the plan. It's only talking about the payor.

So there is a disjunction between the language that's

actually attached to their reply brief and what you've been told today in court, although the slide is more in line with the actual document. And this is just another illustration, your Honor. If you get too lost in the weeds here, it's easy to lose the big picture. This is all about advantaging the debtor's affiliate vis-à-vis the asbestos creditors. That is the entire obvious purpose of it, as revealed by their arguments last week, and that is not an appropriate exercise for the debtor, which is supposed to be a fiduciary for the claimants, to be taking here. Everything they're doing doesn't benefit the claimants on whose behalf they're purporting to do it. It benefits their funding affiliate and that's the essential ultimate impropriety here.

Among the findings they seek, the Second Amended Funding Agreement is a valid contract enforceable in accordance with its terms. Well, again, your Honor, they want your Court's *imprimatur* to the entire Second Amended Funding Agreement.

If you'd give me one second, your Honor.

THE COURT: Uh-huh (indicating an affirmative response).

(Pause)

MR. MACLAY: Excuse me, your Honor.

THE COURT: No problem.

MR. MACLAY: And that is not an appropriate finding

and that finding remains in the document as amended.

They also continue to request that this Court find that the Second Amended Funding Agreement is a reasonable exercise of the debtor's business judgment and it is in the best interest of the debtor's estate and creditors. Again, that's not for the benefit of the constituents. That's for the benefit of the funding affiliate and, and there are not appropriate underlying facts to support either of those conclusions because as I have already noted, your Honor, the sole beneficiary in the big picture of these changes is CertainTeed, New CertainTeed, because it's the principal target of the fraudulent transfer action and it's the, and the pending request for substantive consolidation, of course, would affect it and bring it in. And so by seeking to benefit an insider because, of course, New CertainTeed is an insider of the debtor, the debtor's laboring under a profound conflict of interest with respect to this very motion.

And, of course, we've already talked about how the second, the amended funding agreement wouldn't alter the ringfencing and structural subordination of asbestos creditors. And so if asbestos creditors remained disadvantaged, your Honor, by the Second Amended Funding Agreement, we would argue and we would request that you not approve it, that you not put the Court's stamp of approval on something which structurally subordinates and is part of a scheme, frankly, to structurally

subordinate the asbestos claimants.

Whether you call it a loan or whether you call it a dividend, if all the money leaves, your Honor, it's gone and that's just a clear and obvious problem for the asbestos claimants who would rely on money to pay them for their harms and that really is a response to almost all of their proposed minutiae changes because if all the money can leave, all the money can leave whether the loans in question are, are payable on demand or not because, of course, there's no reason to think that that right to request payment would ever be exercised. It hasn't ever been exercised to date. And this is not an independent debtor. This is a controlled debtor with overlapping officers, as this Court has recognized.

And the assignment issue, your Honor, remains very troubling because in addition to the fact that they don't talk about the payee's consent or, or request, it's also the case that without the assignment of the funding agreement you couldn't, for example, have a pass-thru plan. Without the ability to rely on the funding agreement's provisions, how could a trust, you know, send these cases back to the tort system if that's what ended up being the best result for the constituency. And this is just another example, your Honor, of the subtle attempts to change the playing field to make it less level to put more leverage in the hands of the funding affiliate to give the asbestos constituency fewer options as we

move forward and this Court shouldn't bless that kind of an exercise, especially when undertaken by the fiduciary of those same asbestos claimants.

And, your Honor, I won't go through further 'cause it's already, I think, exhaustively discussed in our brief the cosmetic changes and their unhelpfulness with respect to the timing of, of when, you know, we would get notice of certain things, how long it would take the Committee and the FCR to actually get results. Too long. The money could easily be gone in the intervening time period. And by the way, why do you need a two-week cure period, for example, to cure a payment default when the funds are supposedly payable upon demand? It's just another example, as we pointed out in our brief, of kind of the illusory nature of a lot of these changes and their real intent, which is to place additional obstacles between the constituents and their ability to get paid.

And as we noted, your Honor, even after the amendments New CertainTeed would still be expressly permitted to engage in consolidations and mergers and to transfer substantially all of their assets. And as we, we noted to your Honor in the Bondi deposition, Mr. Bondi couldn't even qualify what "substantially all of the assets" would mean, whether it'd be 50, 80, 90. The ambiguity remains and has not been fixed by any measure.

With respect to the finding, your Honor, that it's, the, the entry into the Second Amended Funding Agreement is in

the best interest of the debtor's estate and creditors, well, the estate is conflicted because it's controlled by the benefited funding parent and the creditors don't agree.

With respect to the second finding, the business judgment one, your Honor, we have already made quite clear you don't get the business judgment presumption if, in an insider transaction and there is no argument that this isn't an insider transaction. It's a non-arm's-length transaction where the signatory for the debtor is an officer of New CertainTeed and on the other side of that transaction it's New CertainTeed signing. That is not arm's length. There is no business judgment presumption, whatsoever, and it just doesn't even make any sense, frankly, that argument. But it's clear that the business judgment rule doesn't apply and we've already cited cases to you that transactions like that are inherently suspect because they're rife with the possibility for abuse, courts use heightened scrutiny of them, and we've also cited several cases that rejected such insider transactions. Vessels with no business operations are not entitled to business judgment. And, and a good example of that, your Honor, is the Bidermann case, 203 B.R. 547, 551-52, in which the Southern District of New York Bankruptcy Court found that there's no effective exercise of business judgment and disapproved a proposed sale that lacked both disinterestedness and due care as key individuals held executive positions with both sellers and

buyers.

The next finding that the debtors seek, your Honor, is that the Second Amended Funding Agreement is a valid contract enforceable in accordance with its terms. Well, it's true, your Honor, that your Honor had raised questions in your ruling -- and, and I think appropriately so -- about whether it's enforceable against third parties and they basically are telling you, "Yeah, we want to fix that. We want to make it more enforceable," presumably against third parties, presumably against the parties to whom they owe fiduciary duties, the asbestos creditors. That's not a valid reason to make this change and the fact is the restructuring agreement both as amended and initially is a critical component of the Texas twostep/divisive merger which has separated assets from liabilities as an abuse of the Bankruptcy Code, has prevented this Court from being able to oversee the actual assets, and has disadvantaged structurally the asbestos creditors. There is no reason for this Court to find that such an agreement is valid or enforceable according to its terms as against the asbestos constituency.

And so, your Honor, to make a long story short, I'll, I'll conclude my remarks by saying don't lose the forest for the trees. This isn't about helping the asbestos creditors. If it were, you wouldn't be hearing this argument here today. This is about helping the debtor's parent have additional

defenses and obstacles to the fraudulent transfer and substantive consolidation motions and this Court shouldn't put its stamp of approval on such an effort.

Thank you.

THE COURT: Thank you.

How about from the FCR's perspective? Any argument there?

All right. Ready to go?

MS. GREECHER: Thank you. Yes, your Honor. Sean Greecher from Young Conaway on behalf of the FCR. And we, we certainly join in the arguments of Mr. Maclay. If I could just note a couple things.

At the outset, the motion purports to seek approval only of the debtor's entry into this amendment to the funding agreement and it seeks this relief under section 363(b) which, of course, addresses the use, sale, and lease of the debtor's property, but the reply states -- and, and we heard again today -- clearly, that the amendment does not impose any additional obligations on the debtor and counsel says that the amendment simply clarifies commitments the parents has, has made.

So if the parent is simply providing concessions or clarifications to the debtor and the asbestos claimants in this amendment and the debtor is not providing any consideration, seems an order isn't necessary. So we have to ask why are we

here and why, why, why are they asking for an order. And I think Mr. Maclay touched on it. They're looking for something else. They're looking for an *imprimatur* as to the entirety of the agreement, which, which we don't think is appropriate.

I'd like to note Paragraph 2 of the order indicates the debtor is authorized to perform all of its obligations under the Second Amended Funding Agreement. And again, we've been told there are no obligations of the debtor under the Second Amended Funding Agreement. So this relief really isn't necessary and the Court doesn't need to grant that, that relief.

If the Court's entertaining any approval of an order, it should be clear that it's absolutely not approving the funding agreement in any way or the structure in any way and it needs to be crystal clear, in our view, that the, the order is of absolutely no preclusive or precedential impact on the estate's claims or any other parties' claims.

But again, we simply don't think that an order needs to be entered, you know, based on the debtor's own representations here.

I'd like to just briefly talk about the motives that are imputed on the creditor representatives indicating this is a stratagem to subject the debtor to time-consuming litigation when, instead, the parties should be negotiating a plan to address the liabilities. And your Honor heard a lot about this

last week and, and I won't reargue what was well argued last week, but I do want to indicate that our response on this point is the same here. The debtor and parent want to negotiate on their playing field which, in our view, they intentionally tilted in the months leading up to the bankruptcy case and any successful negotiation of the type that the debtor and parent would suggest really requires that the, the, the playing field be leveled here.

In the reply, your Honor, the debtor noted the FCR's statement that the joint, that the, the FCR did not oppose any of the revisions here and I hope the Court understands that as the faint praise that it was intended to be. The funding agreement obviously does not level the playing field, in our view. It does not put the parties into the same bargaining or litigation positions that they were in prior to the corporate restructuring which, as you've heard, what we, is what we think is, is an appropriate step here.

Today, your Honor, we, we heard from counsel that the funding agreement is modeled on Bestwall. If you review the pleadings in that case, your Honor, regarding the proposed approval of the creditor plan, the debtor puts front and center in that case the argument that the funding agreement cannot be assigned and the parent in Bestwall similarly says the agreement is a non-assignable financial accommodation. Counsel here says that that doesn't foreclose New CT having obligations

to fund a, a, a 524(g) plan, but certainly not any 524(g) plan. At a minimum, the funding agreement seeks to limit the options of, of the sort of plan that could be approved, if you, if you accept the argument that the, that the funding agreement is a financial accommodation, which we will reserve on. Mr. Maclay noted at a minimum we'd expect that a parent would oppose any sort of pass-thru plan or plan to provide for evergreen funding that the trust would be able to draw upon. So, so if nothing else, the funding agreement seeks to head off certain potential plan concepts that could be, could be considered, again tilting the playing field in, in the favor, in the direction that the debtors and the parent would like this, this case to go.

Also wanted to focus on Paragraph 6 of the order, which the debtor argues should satisfy the claimant representatives' concern regarding the ability to ensure enforcement. The, the order does not give the claimants the right to enforce compliance with the agreement. Rather, it, it establishes an indirect process where the claimants have to request that the debtor take an action, give the debtor ten business days to respond, and then ask the, ask this Court to hear any potential dispute, but not a dispute between the parent and the claimants, which is what I thought that I heard was, was the intention. The dispute referred to in Paragraph 6 is a dispute between the debtor and the claimants.

So essentially, it's a mini standing motion that,

that, that the claimant representatives would have to file. Again, it seems to be more, more roadblock, more roadblocks and more potential manufactured leverage.

At the October 5th hearing counsel for New CertainTeed said -- this is on Page 192 of the transcript -- "We're saying to the Court, both parties, both the debtor and New CertainTeed are saying to the Court, "Look, if we don't do what we're supposed to do, then the Committee and the FCR can enforce their rights." The agreement doesn't say that and Paragraph 6, in our view, does not say that, Paragraph 6 of the proposed order. It simply invites further negotiations, litigation, and disputes. I think our view is that, to the extent that the Court enters an order, as I said, it should be a very simple order approving the, the modifications to this agreement with nothing more other than a very clear message that, that it is subject to the, the revision and further dispute as to the propriety of, of the agreement in its entirety.

Unless you have any further questions, your Honor, I'll --

THE COURT: All right. Thank you.

MR. GREECHER: -- turn things over.

THE COURT: Okay. Back to you, Mr. Gordon.

MR. GORDON: Thank you, your Honor.

So first of all, I want to be very clear about one thing and it's really the very first thing that Mr. Maclay

said. And what you've heard is what we hear at virtually every hearing that we have improper motives, that our, we have an evil intent in this case, that our strategy is to squeeze the claimants until they accept less. It's all the same sort of thing.

But what he said at the outset was that it's our position that these amendments are required in order to make the case that standing shouldn't be authorized and I want to be very clear and I thought we were clear in the plea, in the pleadings. We think standing should not be authorized whether or not these amendments are made. I mean, these amendments don't change the, the *status quo* to the point that they have a, a material impact, if any impact at all, on that question. The question there is whether you have a sufficient basis to determine that standing should be given. The other side hasn't even really been able to articulate what the benefit of the litigation would be, given that we have the funding agreement, and the amendments don't change that fundamental problem that they, they have.

The other thing I would say, your Honor, that was striking to me notwithstanding all the comments you heard, and at least as I heard them I, I didn't hear anything that suggested that any of these changes was harmful to their constituency, not a single thing. The, the only harm that they can point to is this ledge, alleged evil motive or conspiracy

to undermine their standing, their standing arguments, their desire to litigate substantive consolidation, fraudulent transfer claims, and the like. And, and the reason for that, your Honor, is there's no basis to argue that any of these changes is a problem and that, that's why the FCR had to say what he said. I don't know how he does it, but he says he opposes the motion while at the same time he doesn't have an objection to the changes being made. I mean, the changes are obviously beneficial.

Now a lot was said about the findings. And again, those comments were all attributed to this improper intent. Mr. Maclay indicated that the, the kind of preservation language we put, put into the findings isn't broad enough. It refers to viability, but it doesn't say any effect, or whatever. If they want to expand the preservation finding, we're, we're okay with that. We're fine with that. Again, the intention here is not to undermine in any way their position with respect to standing or their desire to litigate substantive consolidation, or whatever it is that they want to do.

You heard a lot of argument, again, about the corporate restructuring, lot of argument about the divisive merger, and the separation of assets and ringfencing. I'm not going to get into that. Obviously, with the funding agreement there's no ringfencing. But the point is, your Honor, that

there's no finding, contrary to what Mr. Maclay stated, there's no finding in here that asks your Honor to approve the restructuring or the divisive merger. There's nothing like that. We just had, we, we thought, fairly straightforward findings that the Court would want to make in connection with approving an agreement of this, this time, of this kind.

Now Mr. Reecher [sic] suggests that we don't need an order at all and what's puzzling to me about that is there's several provisions in the order -- and again, it's a stipulated order -- that are for the benefit of the constituents represented by these parties. So I really don't understand that. And also, I would say an argument like that puts us between a rock and a hard place. Because if we were just to make these amendments without bringing this to the Court, I can imagine the negative reaction we would get from the other side. How could these insiders have agreed to make amendments to the funding agreement without presenting them to the Court? And even they are suggesting there's a standard to be applied. We don't think the standard they're suggesting is required, but I would have thought that under that standard, you know, there would be findings that would be made in connection with the order.

But again, the findings, we thought your Honor would want some findings to support a ruling. We figured that because this is a transaction between affiliates it should be

brought to the Court for consideration by party, the parties and approval of the Court. And I think an order is appropriate and again, it's beneficial to the other parties because of the provisions that we've included.

Now the Committee for some reason is opposed to a finding that says the contract's enforceable and I, I don't understand why it would oppose a finding that's obviously to the benefit of the constituents, particularly in an environment where there have been concerns raised by both the representatives and the Court as to whether or not this is an enforceable agreement. So how does that possibly harm the claimants by having the Court find based on a stipulation of the parties to the contract that the contract is enforceable?

There were a number of arguments by Mr. Maclay to the effect that this is simply about advantaging the debtor's affiliate, that the debtor has a conflict of interest, how can it possibly enter into a transaction like that. And again, I would submit that this advantages the debtor, these amendments advantage the debtor and the estate, not the affiliate. I think the only basis for that concern is a concern that somehow your Honor is sanctioning an, an, an agreement, a restructuring, a divisional merger. That's not the case at all. We could add findings to that effect if we need to do that, that the Court's making no finding as to whether or not the restruct -- I, I think you, you said this already in the

preliminary injunction opinion -- that you're not making any findings as to the propriety of those transactions. We would be fine with that.

There was a comment by Mr. Maclay that a transaction like this, an arrangement between affiliates is subject to heightened scrutiny. Well, it's subject to full scrutiny. I mean, we've presented it to the Court. We've given it to the parties. We're being fully open and transparent. Here's what we have. He, he said that no evidence has been presented. Well, the evidence you have is the terms themselves. I mean, the terms themselves will tell you whether or not this is an appropriate contract, whether under their standard it's entirely fair to the parties, entirely fair to the estate, and I would submit that it is.

And then Mr. Reecher, he, he complained about the, the provision that, that gives the claimants the right to step in and enforce the contract, that that was essentially a mini standing process. I don't think it is. I assume what he's referring to is the provision that says if there's a disagreement between the debtor and the claimant representatives as to whether a default has occurred, then that matter would be taken to the Court. I would assume since this is a relatively straightforward contract and it's a matter of funding requests and then funding requests being satisfied it would be clear whether or not there's been a default or not.

But if for some reason it's, there's not clarity, all we're doing is saying that, well, if there's a disagreement among the estate representatives, then we should come to your Honor and work that out.

And then -- so I really won't say any more, your Honor. I think, you know, what's before your Honor today is the narrow question of whether or not this funding agreement as amended should be approved as, as a, an amended agreement that's beneficial to the estate. We don't think the other side has come up with a single reason as to why it's not beneficial to the estate, why these changes aren't helpful for providing clarity, for providing assurances about the commitment that exists and will be honored by New CertainTeed under this agreement. We would request, again, that your Honor approve the motion.

THE COURT: Anything else? That got it?

MR. MACLAY: Just 30 seconds, your Honor.

THE COURT: Go ahead.

MR. MACLAY: Your Honor, two quick points. One, I think the theme has been made pretty clear from the Committee's side that we view all this as, largely, window dressing and not really getting to the essential problems with the funding agreement. And secondly, even here today we've heard the debtor acknowledge that various provisions that they were seeking to have your Court enter should probably be changed,

which is an indication, your Honor, that you should deny the motion and if there's actually changes to the funding agreement that actually benefit the constituents, the debtor should engage with those constituents and come back to the Court in the future if an understanding can be reached as to actual changes that are actually helpful as opposed to what we view as a stratagem.

But what they presented to you, even by their own acknowledgment, your Honor, has a lot of flaws and that's just at the tree level, at the forest level. You've already heard our position.

THE COURT: Uh-huh (indicating an affirmative response).

MR. MACLAY: So, your Honor, we would ask that you deny the motion.

THE COURT: May I assume from that -- the, the contention has been throughout the case that the debtor has reached out and wanted to negotiate and the claimants weren't willing. So are you telling me that if they did reach out to you about this funding agreement, that you'd be willing to discuss those, those changes?

MR. MACLAY: Absolutely, your Honor. And that's always been the case. You've never heard the Committee say that we weren't willing to talk with them. That may be a talking point, but it's not one the Committee has ever signed

off on.

THE COURT: Right, but the question I raised last week was is this just an existential threat what transpired before bankruptcy so that it's got to be litigated and nothing else can happen in the case unless that happens first. That's really where I'm trying to figure out is. Are we talking about a case where the question is what is the number, which we have to get to, or is it a question where we have to decide whether this case is appropriate at all? And --

MR. MACLAY: Your Honor --

THE COURT: -- it seems to me we've got a couple different avenues that we could pursue here. If, if you can shed any light on that, Mr. Maclay, it'd be helpful to me.

MR. MACLAY: Happy to do so, your Honor.

Going back to my symptoms, disease, and cure points --

THE COURT: Uh-huh (indicating an affirmative response).

MR. MACLAY: -- the, this transaction that happened here, the separation of assets from liabilities and then sticking only the liabilities into the bankruptcy is a problem. It's not just about a number.

THE COURT: Uh-huh (indicating an affirmative response).

MR. MACLAY: it is about a fundamental problem that disadvantages the asbestos constituency in this case.

THE COURT: Uh-huh (indicating an affirmative response).

MR. MACLAY: So I do think that those issues are almost certainly going to have to be resolved.

THE COURT: Uh-huh (indicating an affirmative response).

MR. MACLAY: And so when, when I'm making the point that we're willing to talk with the debtors, of course we're willing to talk with the debtors about anything. We're not even putting any preconditions on talks, but I don't want to mislead the Court.

THE COURT: Uh-huh (indicating an affirmative response).

MR. MACLAY: It is true that what the debtor has done here is inappropriate, in our view, contrary to the law, and that will almost certainly have to be addressed.

THE COURT: Uh-huh (indicating an affirmative response).

MR. MACLAY: It's not just about the number.

THE COURT: Okay. Thank you.

I don't know if anyone else wanted to weigh in on that. It, it was more of a question of do we just have a legal issue here that, that precludes any attempts to resolve the case and I was curious as to what y'all might be willing to tell me at this point.

All right. Let's take a ten-minute recess. We'll go to the next motion.

(Recess from 10:40 a.m., until 10:56 a.m.)

AFTER RECESS

(Call to Order of the Court)

THE COURT: Have a seat everyone.

All right. Ready to move on to the tolling agreement motion?

MR. MACLAY: Can I make one preliminary comment?

MR. GORDON: Sure.

MR. MACLAY: Just to follow up on my response to your Honor's question before.

THE COURT: Right.

MR. MACLAY: Just one -- one -- I'll actually take off my mask.

THE COURT: Okay.

MR. MACLAY: Just one follow-up comment, your Honor, which is, of course, this isn't just about the Committee's perspective. It's also about the debtor's and its parent's perspective.

THE COURT: Sure.

MR. MACLAY: And from the Committee's perspective, the debtor and its parent created this problem and they can solve it. And it's not just about money.

But I just wanted to make clear that there were some

things that, obviously, that the debtor and the, and the parent could do to try to undo some of the harms that they've caused that, that are not just about money. That's all.

THE COURT: Okay, very good.

MR. GORDON: Your Honor, I, I would actually, I've been ruminating about what your Honor asked. I'd like to respond for a couple of minutes, if I could.

THE COURT: Go ahead.

MR. GORDON: Let me think about how I'm going to say this. So, your Honor, I think you're asking the right question and I think what you're hearing, fundamentally, from the Committee is what I would characterize -- and I don't mean this to sound derogatory -- but I would characterize it as litigation posturing.

THE COURT: Uh-huh (indicating an affirmative response).

MR. GORDON: And at least in the cases I've been in I've seen it in these cases. I saw it in Bondex when the Committee repeatedly said it would, wouldn't get to a deal, there wasn't a number because there was a corporate restructuring that was done eight years earlier. The Robinson Bradshaw firm saw it in Garlock and you may know this. The argument there was if the company's insolvent, it belongs to the claimants. If the company's solvent, the case needs to be dismissed. We're never going to get to a number.

THE COURT: Uh-huh (indicating an affirmative response).

MR. GORDON: And you're basically hearing similar arguments here, but the basis, you know, that we, we'll never get to a number based on a complaint about a corporate restructuring.

THE COURT: Uh-huh (indicating an affirmative response).

MR. GORDON: We've heard the same thing in Bestwall as well.

THE COURT: Sure.

MR. GORDON: And I would just say, your Honor, that, just to be, hopefully, somewhat practical about it, there has to be a number that all parties would agree would be beneficial to the claimants. I think it's widely acknowledged -- and I think counsel on the other side would acknowledge this -- that the tort system isn't the best system for resolving these types of claims. There's been a lot written about that.

THE COURT: Uh-huh (indicating an affirmative response).

MR. GORDON: Trusts, on the other hand, as your Honor, I think, noted in your PI opinion, provide a very efficient process to pay these claims, process them quickly and pay them and there has to be a number that, ultimately, the sides will agree to. There, there has to be. I don't think an estate

fiduciary could stand before you and credibly argue there's no number and some ancillary litigation has to take place.

So all I would say is I know your Honor's grappling with this issue. You're asking the question, but I think you're getting the answer, at least I would expect, the litigation position of the parties. And all I would say to your Honor is it seems to me it's ultimately up to the Court --

THE COURT: Uh-huh (indicating an affirmative response).

MR. GORDON: -- obviously, which way this case goes.

THE COURT: Uh-huh (indicating an affirmative response).

MR. GORDON: And you have a structure to do that because all you can really do, I think, is look at the matters that are brought before you for, for, for ruling and you -- you -- and you've always done this, I know -- you just consider them based on the facts and the law and you rule and it breaks, you know, they'll break the way they do.

THE COURT: Uh-huh (indicating an affirmative response).

MR. GORDON: And so the question is they're telling you that they prefer to, I think what they're telling you is they would prefer to put estimation aside, not focus on a number, and litigate for, I think Mr. Neier acknowledged, two-to-four years and if we're talking appeal, more than that. So

we'd have a case sitting in limbo for two-to-four years. And to me, you shouldn't make a decision of that magnitude based on answers by the Committee that are, are just litigation answers, in my view, but it's a question of standing, do they meet the standing --

THE COURT: Uh-huh (indicating an affirmative response).

MR. GORDON: -- requirements or not?

THE COURT: Sure.

MR. GORDON: Substantive consolidation, do they have a substantive consolidation case or not? Estimation, is that an appropriate motion or not in, in a case like this? And from my perspective, that will guide the path forward in this case. But --

THE COURT: Okay.

MR. GORDON: -- I, I, you know, we, we on this side of the table know from experience that what we're hearing is what we typically hear in a litigation and it's, it's the way it is. Nothing wrong with it.

THE COURT: Uh-huh (indicating an affirmative response).

MR. GORDON: But ultimately, I think it's up to your Honor and your Honor knows this, I know, but you'll have to decide, I think --

THE COURT: Uh-huh (indicating an affirmative

response).

MR. GORDON: -- what path makes the most sense --

THE COURT: Right.

MR. GORDON: -- for this case.

THE COURT: Well, that, that, as I mentioned last week, Mr. Gordon, is the, what I keep going back and forth. Obviously, doing this job for as many years as I have, I've heard a lot of litigation posturing and then you get to a, a settlement. This is a bit new because of that pre-petition restructuring/divisional merger. That hasn't been tested, as far as I know, and that adds a wrinkle.

What I was essentially asking is is that such a game changer from this side of the room that no matter what, we're not going to agree to anything. No number could ever suffice. We've got to test this because it could happen again in another case. If that's the thing, the way they're approaching it, we'll save ourselves a lot of argument time in, in these future motions when you tell me that you tried to reach out and they wouldn't talk to you. If that's going to be the, the way the case goes, I'd like to know about it on the frontend.

And I realize from this side that it takes two to make an agreement and what happened happened before bankruptcy and I understand how you feel about it.

That was all I was asking, was if we know beyond any reasonable dispute today that this has to be litigated, then

there's a way to try to get it up as quickly as possible. If we've got our typical asbestos case -- and I'm new enough to this I'm not sure I know what a typical asbestos case is. I'm either on my fourth or sixth now, but, but at least I have some feelings about what y'all do --

MR. GORDON: Yeah.

THE COURT: -- then, you know, we have a number of options. But if we've got to get that one issue decided before anything else happens and the representatives can tell me definitively now that nothing is ever going to work, then I need to know that, okay?

MR. GORDON: Okay.

THE COURT: All right. I understand the posturing aspect.

MR. GORDON: Well, all, all I would say from the debtor's perspective -- well, you, you know the debtor's position. The debtor believes there is a number. We'll get to a number. We think what the parties need is a structure that's focused on --

THE COURT: Right.

MR. GORDON: -- the number, not litigation that's on the side that has nothing to do with that.

THE COURT: Right.

MR. GORDON: So I think your Honor knows where we are.

THE COURT: Mr., Mr. Maclay, you want to say

something?

MR. MACLAY: I would, your Honor. There are a couple of specific things that Mr. Gordon said that I'd like to correct and then just make a more general comment.

Just to be clear, it was, it was the Caplin firm that was in the Garlock case and having been in that case, I don't recall anything at all like what's happened here in terms of a Texas twostep, in terms of the Committee saying they would never resolve the case. That is -- I was in the case. That's all news to me, if it happened. I don't believe that it did.

But what I do know about the Garlock case from having been in it is that over a hundred and, approximately $150 million were spent in professionals' fees largely in connection with the contested estimation, the result of which had nothing to do with the final outcome. And I know they have a different --

THE COURT: Uh-huh (indicating an affirmative response).

MR. MACLAY: -- litigation theory on that and I think it's pretty clear that for the debtor to say, "What I heard from Mr. Maclay is litigation posturing," but what you're hearing from me, your Honor, well, that's just, you know, God's own truth, it's a little bit -- look, we, we all have our perspectives on this case and I will take as a given that we're both presenting those perspectives in good faith

THE COURT: Uh-huh (indicating an affirmative response). Understood.

MR. MACLAY: But the reality is, your Honor, it's interesting for Mr. Gordon to point to Bestwall at the same time as he says, "Well, there has to be, it has to just be about the number." Because his only example of something like this doesn't support his premise.

THE COURT: Uh-huh (indicating an affirmative response).

MR. MACLAY: And so I will consult with the Committee as will my co-counsel, your Honor, between now and, and next week and, and I will see with appropriate client authority what else would be appropriate for me to share with your Honor at that time. But, you know, I've already given you sort of my perspective --

THE COURT: Right.

MR. MACLAY: -- on what would be, what would make the most sense and I don't think Mr. Gordon has disagreed with my proposition that the debtor and its affiliate created this problem and they could solve it. It's just whether or not they're willing to --

THE COURT: Right.

MR. MACLAY: -- from my perspective.

THE COURT: Well, all I will say at this point is that if y'all would rather I hold off, I will, but I'm prepared to

give you rulings on the motion to estimate, the two-step protocol aspect, and the standing matter today. I can hold them until next week's hearing if everybody wants those. But I was going to give them to you after we get through arguing this motion.

So I've already got an idea what I think should happen next, even though if the parties were to reach a, a, an accord on what, how to progress in this case. I do have the same concerns everyone else has, that Bestwall seems to be -- well, I don't want to offend Judge Beyer or anything -- but it, it is getting a little more out, heated and out of control than, than it was when you started and potentially, we're going to do this twice more.

So I would love to see an accord on how we approach these cases, but I've got a ruling already ready for you and I'll be happy to deliver it at the end of this motion unless everybody thinks they could use another week to, to talk about issues.

But one of the things that's interesting to me is if this is just a no way no how, never, if we've got a Winston Churchill-type position on this, then, then it would be helpful to know that that's the case. I'm used to people saying what they will and won't do and then ending up sometime entirely differently from where they started and that's the natural process of all this. But it would have been useful to know if,

if there is just a, this is never going to be approved and we're never going to do anything to make it happen.

So let's move on to the next motion and --

MR. MACLAY: Thank you, your Honor. Just --

THE COURT: -- something we can address.

MR. MACLAY: Just to, to respond to one --

THE COURT: Uh-huh (indicating an affirmative response).

MR. MACLAY: -- maybe implicit question what you said.

THE COURT: Uh-huh (indicating an affirmative response).

MR. MACLAY: I think from the Committee perspective -- and I don't speak for any other party than the Committee --

THE COURT: Uh-huh (indicating an affirmative response).

MR. MACLAY: -- we do think it would be useful to hear your Honor's rulings as we move forward.

THE COURT: Okay.

All right. And I said three of the four motions we heard last week. The crime-fraud and at-issue waiver's a little more complex from my vantage point. I need a little more time with that one. So I'm holding it for now, all right?

MR. NEIER: Greg, can we have a copy?

THE COURT: Okay. On to the --

MR. NEIER: Greg?

THE COURT: -- motion for a tolling agreement.

MR. GORDON: I just stood up.

MR. NEIER: No, the copy, the copy. I didn't want to interrupt.

MR. GORDON: Your Honor, I, I do have hard copy and Mr. Neier is reminding me before I forget.

MR. NEIER: It's all I was doing.

MR. GORDON: I was trying to assure him I hadn't forgotten. I just stood up.

MR. NEIER: I'm sorry.

MR. GORDON: That's fine. Just kidding.

(Slide deck handed to counsel)

MS. HARDMAN: Thank you.

MR. GORDON: May I approach, your Honor?

THE COURT: Yes, sir.

(Slide deck handed to the Court)

THE COURT: Thank you.

Whenever you're ready.

MR. GORDON: Greg Gordon again on behalf of the debtor, your Honor.

So, your Honor, just a bit of an overview to start out. As I think someone referred to earlier -- I can't remember now who it was -- we, we did pattern the tolling agreement after the, the one that was approved in the Kaiser Gypsum case. These have sort of developed somewhat over time.

We've negotiated them in other cases and we thought that was a good form to use. And I, we want to make clear right at the outset there's nothing in the tolling agreement that prevents the Committee and the FCR from completing their investigation into estate claims. There's nothing in the tolling agreement that would prevent them from litigating estate claims if the Court were to confer standing on them. That, those issues simply are not addressed.

These tolling agreements, as your Honor knows from other cases, have been used in a number of others, including Garlock and the Kaiser Gypsum case, also in Specialty Products, which is the Bondex case. And we had this quote, I think I showed this maybe last week from Judge Hodges in Garlock, but it seems to me that entering into tolling agreements, it's the proper way to preserve where we are and where we might go while keeping the focus on estimation and going from there. And as your Honor recalls from the last hearing, Judge Hodges did not grant standing, but instead --

THE COURT: Uh-huh (indicating an affirmative response).

MR. GORDON: -- went the way of the tolling agreements in that case.

And then just pointing out what your Honor, I thought, fairly acknowledged in, in the PI opinion about, you know, if this is a situation where the debtor and New CertainTeed do

what they're, they say they will do -- and I would submit all the evidence that your Honor has would show that that's, that we do mean what we say -- then, perhaps, this litigation isn't necessary. And again, we think a tolling agreement would make sense to preserve the estate claims.

Okay. So with respect to this argument about tolling impacting the standing, you know, that's a, that's a matter that's been separately briefed. I guess your Honor's prepared to rule on it. This only preserves claims. That's all the tolling does and it simply provides more time for the Committee and the FCR to complete their investigation. The reason we brought it up in connection with standing is because of a argument advanced by the Committee that the standing needed to be approved right away because the deadlines, the deadline is looming and we're just trying to say to your Honor, well, there's no reason to worry about timing because the parties are willing to toll.

Next slide, please.

So there, there's been criticism in the objection to the parties that the debtor proposed to include as counterparties in the tolling agreement and a suggestion that, you know, the debtor shouldn't be in control of that issue, that's not appropriate, that's a problem with the tolling agreement, but we actually agree with the claimant representatives on that. We've never taken the position that

determining who the potential defendants would be is solely a matter for the debtor and we've invited the Committee and the Future Claimants' Representative to tell us who they'd like to add to the agreement and I think we were clear in both the motion and in the form agreement itself about our willingness to do that.

Now they, they said something in their, their brief about, well, we haven't committed to provide tolling on behalf of every potential defendant. Well, we can't do that when the potential defendants haven't been identified yet. We feel confident, I think we do and I think New CertainTeed and Saint-Gobain, that we can get tolling agreements from all the potential defendants, but until we see a list we can't definitively, obviously, commit because we don't know who the targets are.

Next slide, please.

This is sort of back to the same point, you know. There's this argument that the order contains a disguised injunction basically against standing, but all the finding says -- and it's Finding (f) -- is because entry into the tolling agreement will preserve claims, there's no need for any further action to preserve claims. And I went back and looked this morning. The same finding was in the Bondex order. It's not an injunction. It was just an acknowledgment that, that when we say the claims are preserved they're, in fact, preserved and

there isn't a need to do anything else to ensure that they're preserved. To me, that just provides clarity that, you know, preservation of the claims is effected.

So again, the order, nothing in the order and nothing in the agreement enjoins anything. There's no standstill contained in the agreement.

Next slide, please.

There are complaints raised by the other side that the agreement has unilateral termination rights and what's been lost here is the fact that the only concessions that are being made in the tolling agreement are, are from the parties who are agreeing to toll. And it's been typical on these agreements to provide -- I don't think it's ever been exercised, at least in the cases I've been in -- that if the potential defendants at some point say, "You know what? I'm tired of tolling. I'd rather you just sue me," that they can terminate the agreement on their own. They have to give 60 days' notice so that the claimant representatives or whoever the estate party is with the rights has time to take action so that the, you know, there's not a lapse, there's not a time bar.

But there's no need, as, as the Committee and the FCR suggest, for the debtor or anyone else to terminate the agreement because there's, there's no commitment on the side. There's, there's no, again, no standstill, no injunction. Lawsuit can be filed at any time if, in fact --

THE COURT: Uh-huh (indicating an affirmative response).

MR. GORDON: -- standing has been conferred for that purpose.

Next slide, please.

There was a complaint in the objection about the definition of "preserved estate claims." There seemed to just be a misunderstanding about that. It seemed to be a quibble with the language that we use to define the claims, but the language that we use was exactly the same as the language that they were saying was missing.

So perhaps, the other side can clarify today what it is that's not broad enough about the proposed definition and as we tried to indicate in our reply, I mean, we're willing to work on the definition if for some reason it isn't broad enough, but they said they wanted it clear that the claims, it picks up any claims that relate to or arise from the corporate restructuring. That's what it says, says now, so. But again, you know, we're open on that issue.

Next slide, please.

Again, I won't spend any material time on this. We think the legal standard is, is satisfied whether you want to use a business judgment standard or an entire fairness standard and for the same reasons, really, is we believe it was satisfied with respect to the funding agreement. There's no

obligation on the estate. There's no cost. We're not allowing any claims. We're not granting any rights to non-debtor affiliates. We're simply securing their agreement to toll deadlines so that estate claims against them can be preserved.

So, your Honor, just to, just to sum up very quickly. From our perspective, like the funding agreement, the tolling agreement only provides benefits to the estate. It provides benefits with, in our view, no corresponding cost and we would submit that instead of opposing the motion, that the Committee and the FCR should be working with us to finalize a tolling agreement that's acceptable to them, one that has a definition of claims that they're satisfied with, one that has target defendants that we're satisfied with, and we would respectfully request that your Honor grant the motion.

THE COURT: All right. Thank you.

All right. How about from Saint-Gobain?

MR. STEEL: Sure. For the record, your Honor, Howard Steel, Goodwin Procter --

THE COURT: Uh-huh (indicating an affirmative response).

MR. STEEL: -- for Saint-Gobain Corporation and New CertainTeed.

We filed a joinder to the reply at Docket No. 1132. For reasons set forth in the motion, the reply, Mr. Gordon's presentation, we support approval of the motion and

respectfully request that the Court overrule the objections, approve the motion.

Unless the Court has any questions for me, that's all.

THE COURT: Thank you, Mr. Steel.

MR. STEEL: Thank you.

THE COURT: All right.

This side? Mr. Neier.

MR. NEIER: Good morning, your Honor. David Neier on behalf of the Committee.

Your Honor, I think this can be resolved and I think if your Honor's prepared to rule on the standing motion, I think this motion should be deferred and we should talk with the debtor and try and resolve things in this. And I, you know, I think that hearing what's going to happen with respect to standing will resolve a lot of the matters that we have.

There's a little bit of revisionism that's gone on here.

THE COURT: Uh-huh (indicating an affirmative response).

MR. NEIER: First of all, I apologize. I have no slides. In fact, my colleagues, my colleagues have banned me from PowerPoint based on my last presentation.

THE COURT: Don't worry about it. I'm from the paper era, so.

MR. NEIER: And so, you know, you have to remember how

we got here. We filed --

THE COURT: Uh-huh (indicating an affirmative response).

MR. NEIER: -- the standing motion on August 23, Docket No. 1008. The debtor very quickly filed an emergency motion to continue on September 2, Docket 26 [sic] --

THE COURT: Uh-huh (indicating an affirmative response).

MR. NEIER: -- and said, "There's no reason. We should continue indefinitely the standing motion 'cause we're going to have tolling agreements and a revised funding agreement."

THE COURT: Uh-huh (indicating an affirmative response).

MR. NEIER: And then on September 23, they filed at the same time their motion to approve the tolling agreement and their opposition to standing. In their motion to approve the tolling agreement, they talk about standing 25 times. In their motion to, in their opposition to standing, they talk about the tolling agreement 34 times.

So to us, this was really just about bolstering the standing motion and your Honor's going to rule on that. So really, it's sort of by the wayside at this point. Even at the October 4th hearing, Mr. Gordon gave a presentation and he said, you know, "We're proposing a tolling agreement so that

the parties actually don't have to focus on unnecessary litigation, but instead, should be focused on the central issue." And, of course, the central issue is estimation, in their view. We view that as another path to litigation, also taking two-to-four years, or, based on Bestwall, maybe more.

So both paths, in our view, whether it's estimation, substantive consolidation/fraudulent transfer, are litigation paths. They're just different litigation paths. Each side would like their litigation path to go first and defer the other.

But it's pretty clear to us that a tolling agreement does have certain advantages. You know, I've said that I think the action plan should be something along the lines of, you know, having a very simple complaint against the main actors in the corporate restructuring with respect to fraudulent transfer under the Bankruptcy Code and state law. And there are a lot of other actions which are, you know, the, the 108 statute or the 108 pause, almost like a statutory tolling agreement, is going to expire on January 23rd. It may make sense to have a tolling agreement in, in those circumstances, you know. Do we really need to have, for instance, breach of fiduciary duty litigation going on at the same time that we're really talking about what we think is the central issue, which is putting Humpty Dumpty back together again.

So from our perspective, there, there can be an

agreement on tolling. We do have some concerns with respect to the tolling agreement, but we have no existential objection to a tolling agreement. You know, with respect to our concerns, you know, Mr. Gordon says there is no standstill. He put that in his --

THE COURT: Uh-huh (indicating an affirmative response).

MR. NEIER: -- in his reply. It may also be in his motion, but we'd like to see it in both the order and the tolling agreement. What they're asking your Honor to approve is a tolling agreement substantially in the form of the tolling agreement that's, that's attached. We obviously would like to make sure that the tolling agreement is effective and, in fact, we don't think the debtor should be the party to the tolling agreement. If the Committee is granted standing -- whoever the, whoever the party is that has standing should be the party on the other side of the tolling agreement and can make sure the form is effective and there should be some mechanism where whatever tolling agreements are entered into, you know, are shared and everybody has the ability to look at them, make sure the language is effective.

We have no objection to the debtor facilitating the entry into tolling agreements, but we don't think they should be a party to them at this point. And we think the debtor does have a profound, I think the words were "a profound conflict of

interest" that Mr. Maclay used and I think that is correct, that it -- it is -- it is not appropriate for the debtor to be signing tolling agreement with its parent, just like it's not -- it's not -- it's not the way to go. If you're going to have a tolling agreement, it should be with a party that has standing and it should be a party that is not conflicted.

And, you know, Mr., Mr. Gordon did reach out to us and asked us to comment on the form of the tolling agreement, but at the time they were using the tolling agreement as part of their opposition to standing and we said, "Well, unless you're going to consent to standing, we're not really going to talk about the tolling agreement," but now, it's going to be resolved. So if it's going to be resolved, we can talk about the tolling agreement and talk about some of these issues.

You know, for the, with respect to the Committee identifying the people who are potential defendants, we certainly will provide a list of who we think the potential defendants are but if standing is denied, the debtor still has the fiduciary obligation to make its own determination. It's their obligation. Just the way Mr. Gordon says they have fiduciary obligations with respect to the negotiation of the funding agreement, they have fiduciary obligations to identify who the potential defendants are if they're the party with standing. If we're the party with standing, we would ask the debtor to share a list, we would also share a list with them,

and we'll see if we can get appropriate tolling agreements.

You know, as I said, there are things that we would do to improve the tolling agreement, but we don't have a problem with the tolling agreement itself. We objected to it at the time because it was being used to bolster the standing motion. That's going to be resolved. I think this should be deferred and we can see if under certification we could submit an appropriate order and maybe a form of tolling agreement, but it would have some protocols where tolling agreements are shared and we look at it. It would make clear that there's no standstill. It would use a definition that not only includes the corporate restructuring, but also the filing of the bankruptcy --

THE COURT: Uh-huh (indicating an affirmative response).

MR. NEIER: -- and, and other actions like that that took place after October 23, 2019, the date of the corporate restructuring.

So, you know, that -- that's -- that's our feeling on the tolling agreement. This is a motion that can be deferred and we can get back to you. If we can't reach an agreement, you know, I would request that we get on the phone with your Honor to maybe work out whatever remaining issues there are. But there really shouldn't be any issues. We like tolling agreements. They like tolling agreements. We should be able

to get to a, a quick resolution of the issue.

THE COURT: All right.

How about from the FCR's perspective.

MR. NEIER: Thank you, your Honor.

MS. EDWARDS: Morning, your Honor. Erin Edwards from Young Conaway Stargatt & Taylor on behalf of the FCR.

Your Honor, we join in Mr. Neier's arguments and we also join in his suggestion to defer ruling on this while we hear on the standing motion because they are interrelated. It might impact the negotiation of, if any tolling agreement must be entered into, if the debtor's the party negotiating it, some of the points we might have with it.

I did just want to make one point based off of today's argument and the debtor's papers. It's been all over their papers that there's no standstill. So there, there would be no issue if we were granted standing and stepped in the debtor's shoes to prosecute these claims while they were tolled. But the actual proposed language now in the tolling agreement that they supplied says that:

"This agreement is the entire agreement between the parties with respect to the subject matter and no representations, acknowledgments, warrants, promises, or conditions were made by any party except as expressly set forth herein."

And if you look at the proposed tolling agreement,

there's no express provision saying that any of these preserved claims can actually be prosecuted during the tolling period. So there is a provision to terminate and there is a provision saying that the Committee and FCR can investigate discovery, but nothing about prosecution of claims.

So that's a fundamental issue that would have to be addressed if we do need to get to that point.

But otherwise, your Honor, like, like Mr. Neier suggested, we, we think deferring ruling makes sense at this point.

THE COURT: Okay.

Back to this side. Mr. Gordon.

MR. GORDON: Just a couple of things, your Honor.

I mean, it sounds like it's not really, not any more asserting the objections that it sounded like they were in the pleadings. But on this point by Mr. Neier that the Committee should be the party to the tolling agreement, that, to me, is just sort of a back-door standing request, "Give us standing and we'll be the party. We'll deal with it." And in every case I've been in, anyway, the debtor's always been the party to the tolling agreements. On this issue of fiduciary duties and who identifies the parties and who negotiates, we've always -- and the other side knows this -- we've always negotiated these agreements with the other side. We've always talked to the other side about lists of defendants. We would do exactly

the same here. We are fiduciaries and we will clearly talk to and have every intention to talk to the representatives of the claimants who are the ones who are arguing that there are these estate claims that need to be preserved.

So whether standing is granted or it's not granted, I think, as Mr. Neier suggested, I think that back and forth between the parties would occur either way.

Then the last thing, just to say Mr. Ellman wanted me to correct the record because I made a misstatement in my opening and that is when I was talking about the disguised injunction provision I said that a very similar provision, I apparently said was in the Bondex order. I meant to say the Kaiser Gypsum order.

THE COURT: Uh-huh (indicating an affirmative response).

MR. GORDON: That's the order I looked at this morning where the same finding was there.

But again, we would request that your Honor approve this.

Having said that, I should say we tried to negotiate this with the other side. For reasons that don't matter at this point, those negotiations didn't occur. That would still be our intent, to negotiate this agreement, both with respect to any language changes, although we dispute the point that was made by the FCR about the agreement, and again, the list of

target defendants.

THE COURT: Okay.

MR. GORDON: Thank you.

THE COURT: Let me ask one question about -- you said the, the defendants could opt out, effectively, if they decide they wanted to just go ahead and get it over with. If they were going to be sued, be sued.

What happens if one defendant opts out and the others don't? Would you have separate pieces of litigation as to each defendant or is it a, if one opts out, it, it goes as to everyone?

MR. GORDON: I -- I think --- I -- I -- as I remember the agreement, it could be just one that could opt out. It's never happened --

THE COURT: Uh-huh (indicating an affirmative response).

MR. GORDON: -- and, and from my perspective, if someone is convinced to enter into the tolling agreement to begin with --

THE COURT: Right.

MR. GORDON: -- there's no reason -- I mean, nothing -- I don't, I don't see anything that would change that would cause somebody to revisit that, but in negotiating these agreements we found that parties have asked for that right. It's just never been exercised.

THE COURT: Okay, very good.

Y'all need a break before I make these rulings?

(No response)

THE COURT: All right. Well, let's get to it.

I want to thank you all. I find that after 27 years of being a bankruptcy judge I've done most everything and I really enjoy these cases because y'all give me looks that I have never seen before and never thought about before and they're intriguing just from a puzzle-working perspective from my end.

So always interesting and I congratulate you on the quality of your representation and how flexible y'all are. Even within three cases that seem to be sort of alike, the cases take on their own life and you don't see the same arguments case to case. So it's, it's very interesting from a professional perspective.

I don't want to read to you for an hour. So let me just talk my way through this, if I can. Among the many things we don't agree about in the case, one is what is the central issue. The debtor says the central issue is determining the extent of the debtor's liability for these claims and as such, estimation is the next logical step forward and that will eventually promote a consensus on a plan.

Meanwhile, and we heard it again this morning, from the representatives' perspective the central issue, if not the

central issue, at least a co-central issue, is who exactly is liable for these asbestos liabilities and whether or not nondebtors are liable because the restructuring and the divisional merger were improper or fraudulent conveyances, or whatever, such that New CertainTeed and others might bear the, the claimants' liabilities as well as the debtor and for that reason the representatives, of course, see standing to be the logical way, and asserting these claims, as being the logical way to move forward with that litigation and that that might lead to a resolution.

I got to tell you from the Court's perspective watching these asbestos cases and this, these hearings, in particular, it's a bit like watching an amateur wrestling match as each side, if you'll forgive me, kind of pushes and pulls and grapples and tries to get some kind of leverage on its opponent by which it could get to the point of forcing a resolution of the case and, of course, in this last round of arguments about standing and about estimation what we're hearing, essentially, is each side say, "Well, we've got the preferred maneuver and the one that's most likely to lead us to a case resolution and while we're doing that, I'd like for the other side's tactic to be delayed."

So basically, self-interest being what it is, everyone wants to do the things that might afford it leverage while its opponent doesn't get to do whatever. I don't know in the short

run that either way would make settlement more likely in the short run. The litigation, as we know, is going to take a long period of time, some potential appeals, great deal of expense. I'm proud to say that I remember Garlock 'cause I took over right after the estimation hearing and the professional fees were at 125 million there.

So I wasn't responsible for much of that 150. I, I tell Judge Hodges that, too, on occasion, that, but I do remember by the end of it the parties were pretty hot at one another and it looked to me, while there was an agreement that was reached between the debtor and the FCR in a year's time, the parties overall were, were farther away instead of closer, at least that was my view of it at the point. I wasn't there at the first part of the case. But the bottom line is in the long run they did produce a settlement and we can argue about whether estimation caused that or something else. But the bottom line is if it, if it worked, it didn't work in a short period of time.

And as I've alluded to before, I have a question in my own mind whether this pre-petition activity was such that, that no matter what it needed to be examined and ruled upon by a court and that nothing else might happen other than that. I've, I've listened to you talk about -- I also wondered about whether we were talking about a fight over capped plans, evergreen plans, full-pay plans or something else and I still

don't know what's envisioned by the parties and what you hope for there, but that -- I at least have a feeling like that there is a number that might make it work in this case.

So anyway -- and I will tell you also that I had some small hope that by going on at length in the preliminary injunction order the parties might be able to use the observations of the Court being a neutral party and, that they might start the negotiating process, or at least a consensus on how to go forward and that hadn't worked as yet. Instead, we've got the current flurry of motions. So the question's what to do.

I might have been inclined at this point in time to send all of you to, to mediation had Garlock, had Bestwall not already attempted that under similar circumstances and it doesn't look like that really got you anywhere. So while I, I am a big believer in negotiation -- and as you know, at the end of the day negotiation has to be had if a plan's going to be confirmed in order to secure the votes -- we've got to do some things. I -- we could just sit back, frankly, at this point in this case and in Aldrich and just wait for Bestwall to produce some resolution and save you some money, but that's not my nature and I doubt it's yours. I'm not sure how long it's going to take to get to a resolution in Garlock, in Bestwall.

But the second thought would be that I view us as having two paths that are likely to produce the same kinds of

issues and, and fights that you're dealing with in Bestwall if we're not careful and I believe that negotiation and consensus, at least as to the procedural matters, is really important and maybe we can avoid that. It sounds to me like that if we go down the estimation path, well, we may be going into a blackberry patch and we're all going to get stuck with some thorns along the way. But then again, litigating over the fraudulent conveyance may be -- are all of y'all familiar with kudzu? Everybody here? Some folks, it doesn't grow everywhere in the country, but I'm afraid that litigating over the fraudulent conveyance could be wading through the kudzu patch and if we do both, then you might be going through both patches.

But it's not my job to make you settle and you're more adept at that than, than, probably, I am. So it is my job to move the case along. So while I don't know that either path is going to be likely to produce settlement in the short run, either might end up with, with resolution in the long run. It just may take us a lot of money and effort and I wish there were some way that we could avoid that. But at the moment, I'm not sure what it is. I would just simply say since we are willing to talk about procedural matters, I would encourage you all to, to work on these things.

Short answer, debtor's motion for estimation is granted. The motion of the, the representatives for standing

is also granted and that might just drag us through both fields at the same time and we get cut up and have to wade through all of it.

But bottom line is as to estimation, my ruling's about the same as Judge Beyer's in Bestwall. Without regard to which is likely to produce more results, estimation proceedings are probably the norm in the asbestos cases. They've certainly been done in a lot of the leading ones, including those, including cases from here. I, I agree with Judge Beyer that while I may have some control over how we estimate and how, what the timing is, that at the end of the day 502(c) and the Robins case make it mandatory for me and liquidating these claims. All the things that were argued in the briefs, I agree with, generally, except whether it's likely to lead to the, the quickest resolution and whether it is the central question in the case.

Bottom line is our Circuit believes that, that this is appropriate in a mass tort case. I don't think it's being used for an improper purpose, at least not directly. We have proper reasons for needing to estimate, including confirmation, negotiation, maybe best interest. That one, while I understand the argument that the, the funding agreement provides full pay, the, the representatives have argued successfully to this point to me that that is a conditional agreement and could not be assumed at this point in time.

So bottom line is I think that there are reasons to estimate and that we should do so.

I'm not inclined to do a two-step. I think that's a recipe for delay and additional costs and then, conceptually, it also, effectively, adopts one side's way of, of valuing asbestos claims for the purposes of the first hearing and then doesn't allow the, the other party to advance its claim. So even if we got through that first round, I think what you would end up with is the debtor saying, "Well," you know, "that was your settlement approach method and we don't agree that that's our liability," for all the usual reasons. So from my vantage point, all we would get at the end of the first round would be an argument that we need to have a second.

So if we're going to do it, let's do it once. And so to that end, I'm not inclined to, to go with that.

Let's see if there's anything else I need to say about estimation.

I did agree, Mr. Neier, with your observation that both of these are litigation paths, but the bottom line is that the one nit I would say about it is that order had something in it about the estimation should assess the debtor's legal liability and that, I think, is a loaded term in the current circumstances. Maybe we ought to go back with something more like what the statute and the Piccinin decision said, that we're estimating for purposes of allowance the debtor's

aggregate liability for current and future mesothelioma claims.

The other thing I overlooked was to say about the constitutional and due process grounds, we can't estimate here for distribution purposes. That's a matter that, if it's going to be done, would have to be done in district court, but that's not what I think we're doing. I think what we're doing is for plan negotiation and confirmation purposes, instead, and a bankruptcy judge can do that. So in any event.

I think there was also a suggestion as to the estimation amount, that we divide the estimated amount for mesothelioma claims by .92 percent and split out 8 percent between the mesothelioma and non-mesothelioma claims. I didn't hear any argument about that. Maybe I'm wrong, but, if not, that was fine.

So in any event, as for the timeline for estimation, y'all need to talk about that before I get involved in it and try to figure out what works best under the circumstances and I'm sure that will be influenced by the, the two motions that we have on, or two of the motions that we have on next week.

As to standing, I would love for you to be able to prosecute this case without having to get into all this litigation. And you're right. It has been done in Garlock and Kaiser and the like without actually having to start that litigation, but I do believe it's important that the, the claimant representatives be able to have standing to do all

that. Now you're taking a chance, of course, that, that if our Circuit believes that only a trustee can do that, you, you may rue that you ever asked, but we've done it before in our court. It's pretty accepted practice within Fourth Circuit bankruptcy courts under appropriate circumstances and obviously, almost every Circuit has, has recognized it. Our Circuit used to recognize it under the Act and while in the Baltimore Emergency Services case they questioned it, I, I don't see what else you can do. The colorable claims exist for the reasons I said in the, in the preliminary injunction. I think there's a conflict in regard to the corporate restructuring not only as to the affiliate parent relationships, but also that the, the debtor doesn't have its own employees, but borrows from the potential defendants and effectively, some of those parties, if we get into D&O-type litigation, could be potential defendants as well, so. And I believe the, the reasoning of the Cybergenics Corporation decision, the Third Circuit's ruling, I, I generally agree with, with what they have asserted. The colorable claims exist. The debtor doesn't believe there are claims or that they would be beneficial and I don't think they could bring those claims.

The Texas divisional merger statute envisioned that if creditors believe that a divisional merger or a divisive merger, whatever you want to call it, is unfair, then they have the right to challenge them and in the injunction order I came

down on the side that those claims are claims that under our Circuit's authority belong to the estate so that they can't bring them themselves. If that's the case, then if those transactions are ever to be examined or contested, as the Texas statute envisioned, then I only have two ways to go. I either have to dismiss the case and let the individual claimants bring them or we have to afford either a, a representative that's not the debtor in possession to bring them, be it a trustee or, or these committees. No one here wants a trustee and that would add substantial costs in terms of commission, delays, and interfere with the, the flow of the case between the core parties, anyway. So I don't think that's a good idea, either.

And so -- and I would also point out that when we were arguing about the preliminary injunction the debtor suggested the representatives should seek standing and I agree with that. They -- I think it is.

As to whether this is premature and unnecessary and all those other things, again, I would like to see you either enter into tolling agreements and hold those until we can get some efforts to see if we can come to a number that works, but I'm not ordering it. I'd like to leave that to you folks to talk about standing is what it is. I'm not ruling on the tolling agreement motion itself, but at this point recognizing standing, I recognize the representatives and the debtor need to have a conversation as to what might be possible.

The request for a draft complaint, normally I would want one. They're not required, but they are helpful to know what we're talking about and in this case I think it's because y'all spent $20 million litigating the preliminary injunction case and doing discovery. We all know exactly what transpired. Maybe not what everybody said or thought about it, but what happened and in that injunction order I explained as best I could what I thought had happened at this point. So I just don't think we need a draft complaint.

As to completing your investigation, I think that would be wise, too, before anything gets filed, but if you can't get a tolling agreement and if I don't approve that tolling agreement that has been propounded, then you may have to do something different. But the bottom line is that I think it would be great if y'all can work something out to hold this and get to that other central issue as to how much is owed.

Cost benefit. Well, since most of the assets of the Old CertainTeed got separated from these liabilities and as, as I indicated, I think you've got some conditions in the funding agreement, more on that later. I think that, that you have to say the cost benefit would have to be in favor of what we're doing. I don't relish this. I would, I realize how expensive it's going to be to get to the end of that process, but the bottom line is that I think that would weigh in favor of it.

The second part of that request about unrestrained

2004 discovery, I'm not inclined towards that. I think we have done a world of discovery on these matters and now that we have got a, a consolidation adversary teed up, these matters are in litigation. I think we're in discovery at this point about those. So I think you're going to need to do that in the context of the litigation if more is to be had.

I think that's about it.

As to what the, what you're getting standing to do, essentially I agreed with the representatives. We're, we're looking into the corporate restructuring writ large, meaning including the, the restructuring itself, the divisional mergers, and the decision to file bankruptcy and whatever claims arise out of that. You may be able to put that more artfully in an order than me. But that's generally what I'm, I'm inclined to do.

And as to the crime-fraud exception or at-issue waiver, I'm going to hold that one for now and we'll see where we go with that.

But that's the, that's the ruling on the three motions that, that I was prepared to deal with. I'll try to be -- I don't know if I'll have crime-fraud by next week or not, but that's, that one's going to have to sort out somewhat in view of what I've already said and what y'all do next.

But that help? Everybody good?

(No response)

THE COURT: I'd ask for the debtor to do the draft order on the, or proposed order on the estimation matter and, and the representatives to take it for the standing motion and, and then circulate those and send them on down when you're ready, okay?

What else do we need to do today, anything?

(No response)

THE COURT: All right. Well, travel safely. Look forward to seeing you again next week.

MR. NEIER: Your Honor?

MR. MACLAY: Thank you, your Honor.

MR. NEIER: Thank you, your Honor.

Are, are you intending that we basically say in these orders "For the reasons set forth on the record," is that the idea?

THE COURT: That would be sufficient for me. "For the reasons stated in the prevailing parties' written submissions, as clarified or changed on the ruling." Obviously, the two-step protocol and the unlimited discovery are, are in a different category, so. Okay?

MR. NEIER: Thank you, your Honor.

THE COURT: All right. Thank you.

MR. GORDON: Thank you.

(Proceedings concluded at 11:51 a.m.)

CERTIFICATE

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

/s/ *Janice Russell* October 18, 2021

Janice Russell, Transcriber Date

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| DBMP LLC[1] | : | Case No. 20-30080 (JCW) |
| Debtor. | : | |

# STIPULATION BETWEEN THE DEBTOR AND CERTAINTEED LLC REGARDING SECOND AMENDED FUNDING AGREEMENT

## RECITALS

A. On January 23, 2020 (the "Petition Date"), DBMP LLC ("DBMP" or the "Debtor") commenced the above-captioned bankruptcy case (the "Chapter 11 Case") by filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code in this Court.

B. Prior to the Petition Date, in October 2019, the former CertainTeed Corporation ("Old CT") underwent a corporate restructuring by completing a divisional merger under the Texas Business Organizations Code (the "Corporate Restructuring"). As a result of the Corporate Restructuring, (1) Old CT ceased to exist and (2) two new companies were formed: DBMP and CertainTeed LLC ("New CT").

C. As part of the Corporate Restructuring, DBMP and New CT became parties to a Funding Agreement, a copy of which (as amended before the Petition Date and without its Schedule 2) was attached as Annex 2 to the first day declaration at Dkt. 24 (the "Funding Agreement").

1 The last four digits of the Debtor's taxpayer identification number are 8817. The Debtor's address is 20 Moores Road, Malvern, Pennsylvania 19335.

D. The Official Committee of Asbestos Personal Injury Claimants and Sander L. Esserman, as the legal representative for future asbestos claimants (together, the "Claimant Representatives"), from time to time have raised concerns about the terms of the Funding Agreement. The Court also expressed certain concerns about the Funding Agreement.

E. In an effort to address these concerns, DBMP and New CT agreed to the terms of the *Second Amended and Restated Funding Agreement* dated as of September 15, 2021 (the "Second Amended Funding Agreement"). A true and correct copy of the Second Amended Funding Agreement (without Schedule 2 thereto) is attached hereto as Exhibit A. A blackline showing the changes to the prior Funding Agreement is attached hereto as Exhibit B.[2]

F. The Debtor sought Court approval of the Second Amended Funding Agreement pursuant to *Motion of the Debtor for an Order Authorizing It to Enter Into Second Amended and Restated Funding Agreement* [Dkt. 1051] (the "Funding Agreement Motion"). At a hearing on December 16, 2021 (the "December Hearing"), the Court announced its decision to deny the Funding Agreement Motion, but further indicated that the Debtor and New CT could agree to the terms of the Second Amended Funding Agreement in a stipulation filed with the Court. *See* Hearing Tr. Dec. 16, 2021 125:4-8 ("So the bottom line is that I don't even know that, that the debtor and New CertainTeed need my endorsement. If you want to make these changes, just basically stipulate that this is, this is how you will construe it and you don't need anyone's agreement.")

G. The Debtor and New CT now enter into this Stipulation consistent with the Court's ruling on the record at the December Hearing.

---

2 Schedule 2 to the Second Amended Funding Agreement is bank account information for the Funding Account (as defined therein). Schedule 2 remains unchanged from the Funding Agreement in place on the Petition Date.

**STIPULATION**

IT IS HEREBY STIPULATED AND AGREED BY THE PARTIES THAT:

1. The Debtor and New CT agree to the terms of the Second Amended Funding Agreement, effective as of the date of this Stipulation, and to the other terms set forth below.

2. The Debtor and New CT agree that the Second Amended Funding Agreement is intended to be a valid contract, enforceable in accordance with its terms. New CT agrees to provide funding to the Debtor consistent with the terms of the Second Amended Funding Agreement.

3. The Debtor agrees to provide to counsel for the Claimant Representatives copies of the financial information received from New CT under Section 4(a) of the Second Amended Funding Agreement, on a confidential basis under the protective order entered in this case [Dkt. 251], within five business days after receiving such information.

4. The Debtor agrees to provide to counsel for the Claimant Representatives copies of (a) any notices received from New CT under the Second Amended Funding Agreement within five business days after receiving such notice and (b) any notices given by the Debtor to New CT (including any Notices of Default) under the Second Amended Funding Agreement within three business days after giving such notice.

5. The Debtor agrees to provide to counsel for the Claimant Representatives (a) copies of all funding requests under Section 2(b) of the Second Amended Funding Agreement within three business days of the Debtor making such request and (b) copies of proof of funding of each such funding request within five business days of such proof becoming available to the Debtor.

6. If, upon an Event of Default under Section 6 of the Second Amended Funding Agreement, the Debtor fails to take action to enforce its remedies as Payee against New CT as Payor, then the Debtor and New CT agree that they will not oppose a request of the Claimant

Representatives to take such actions as are necessary or appropriate on behalf the Payee to pursue remedies in this Court to address such Event of Default after first giving the Debtor and its counsel 10 business days' advance written notice.

7. The Debtor and New CT agree that any disagreement about whether there is an Event of Default under the Second Amended Funding Agreement shall be resolved by this Court upon motion and notice to counsel for the Debtor, New CT and the Claimant Representatives.

8. The Debtor and New CT agree that this Court shall have jurisdiction over any and all matters arising from or related to the implementation, enforcement or interpretation of this Stipulation and, during the pendency of this case, the enforcement of the Second Amended Funding Agreement.

Dated: January 5, 2022
Charlotte, North Carolina

Respectfully submitted,

RAYBURN COOPER & DURHAM, P.A.

*/s/ John R. Miller, Jr.*
John R. Miller, Jr. (N.C. Bar No. 28689)
227 West Trade Street, Suite 1200
Charlotte, North Carolina 28202
Telephone: (704) 334-0891
Facsimile: (704) 377-1897
E-mail: jmiller@rcdlaw.net

-and-

Howard S. Steel (admitted *pro hac vice*)
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Telephone: (212) 813-8840
Fax: (212) 409-8404
E-mail: hsteel@goodwinlaw.com

*Counsel to CertainTeed LLC*

ROBINSON, BRADSHAW & HINSON, P.A.

*/s/ Garland S. Cassada*
Garland S. Cassada (N.C. Bar No. 12352)
David M. Schilli (N.C. Bar No. 17989)
Andrew W.J. Tarr (NC Bar No. 31827)
101 North Tryon Street, Suite 1900
Charlotte, North Carolina 28246
Telephone: (704) 377-2536
Facsimile: (704) 378-4000
E-mail: gcassada@robinsonbradshaw.com
dschilli@robinsonbradshaw.com
atarr@robinsonbradshaw.com

-and-

Gregory M. Gordon (admitted *pro hac vice*)
JONES DAY
2727 North Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
E-mail: gmgordon@jonesday.com

-and-

Jeffrey B. Ellman (admitted *pro hac vice*)
JONES DAY
1221 Peachtree Street, N.E., Suite 400
Atlanta, Georgia 30361
Telephone: (404) 521-3939
Facsimile: (404) 581-8330
E-mail: jbellman@jonesday.com

*Counsel for the Debtor and Debtor-In-Possession*

**Exhibit A**

# `SECOND AMENDED AND RESTATED FUNDING AGREEMENT

This SECOND AMENDED AND RESTATED FUNDING AGREEMENT, dated as of September 15, 2021 (as it may be amended, restated, modified or supplemented from time to time, this "Agreement") is between CERTAINTEED LLC, a Delaware limited liability company ("Payor"), and DBMP LLC, a North Carolina limited liability company ("Payee").

## RECITALS

A. Prior to and in contemplation of the conversion of CertainTeed LLC, a Delaware limited liability company ("Old CT (DE)"), to a Texas limited liability company (as such, "Old CT (TX)") and the subsequent divisional merger of Old CT (TX) pursuant to Chapter 10 of the TBOC (the "Divisional Merger"), CertainTeed Holding Corporation, a Delaware corporation ("CT Holding"), as payor, and Old CT (DE), as payee, executed and delivered a Funding Agreement, dated as of October 22, 2019 (the "Original Funding Agreement").

B. Immediately after the execution of the Original Funding Agreement and prior to the Divisional Merger, Old CT (DE) converted from a Delaware limited liability company into a Texas limited liability company, Old CT (TX), pursuant to Section 18.216 of the Delaware Limited Liability Company Act and Section 10.102 of the TBOC (the "TX Conversion").

C. Immediately following the effectiveness of the TX Conversion, CT Holding, in its capacity as the sole member of CT (TX), approved a Plan of Divisional Merger contemplating the Divisional Merger (the "Plan of Divisional Merger").

D. At the effective time of the Divisional Merger, (1) certain property of CT (TX), as set forth on Schedule 5(b)(i) to the Plan of Divisional Merger and certain liabilities and obligations of CT (TX), as set forth on Schedule 5(c)(i) to the Plan of Divisional Merger (collectively, the "Allocated Assets and Liabilities") were allocated to a new Texas limited liability company created upon the effectiveness of the Divisional Merger ("DBMP (TX)"), (2) the remaining property, liabilities and obligations of CT (TX) were allocated to another new Texas limited liability company created upon effectiveness of the Divisional Merger ("New CT (TX)"), and (3) CT (TX) ceased to exist.

E. Immediately following the effectiveness of the Divisional Merger, CT Holding assigned to New CT (TX), and New CT (TX) assumed from CT Holding, all rights and obligations of CT Holding under the Original Funding Agreement (such assignment and assumption, the "Post-Merger Assignment"), whereupon CT Holding was released from its obligations, and ceased to have any further obligations, under the Original Funding Agreement.

F. Following the Divisional Merger and the Post-Merger Assignment, (1) New CT (TX) effected a conversion (the "DE Conversion") into Payor, a Delaware limited liability company, and (2) DBMP (TX) effected a conversion (the "NC Conversion") into Payee, a North Carolina limited liability company.

G. In connection with the allocation to DBMP (TX) of the Allocated Assets and Liabilities, CT Holding and its successors and assigns agreed, pursuant to the Original Funding Agreement, to provide funding to Old CT (DE) and, after the TX Conversion, CT (TX), and,

after the Divisional Merger, DBMP (TX) and, after the NC Conversion, DBMP, sufficient to pay the costs of operations of DBMP's business and other liabilities and obligations included in the Allocated Assets and Liabilities as and when they become due.

H. The Allocated Assets and Liabilities included the rights and obligations of CT (TX) (as successor to Old CT (DE) in the TX Conversion) under the Original Funding Agreement, and, at the effective time of the Divisional Merger, pursuant to the terms and conditions of the Plan of Divisional Merger, the rights and obligations of CT (TX) under the Original Funding Agreement were allocated to DBMP (TX) such that, following the effectiveness of the Divisional Merger, DBMP (TX), and, following the NC Conversion, DBMP, had assets having a value at least equal to its liabilities and had financial capacity sufficient to satisfy its obligations as they become due in the ordinary course of business, including any Asbestos Related Liabilities.

I. Payor and Payee then amended and restated the Original Funding Agreement to reflect that the Merger, the Post-Merger Assignment, the DE Conversion and the NC Conversion had occurred and Payor, a Delaware limited liability company having the name "CertainTeed LLC," and Payee, a North Carolina limited liability company having the name "DBMP LLC," were the parties to such agreement (as so amended and restated, the "Amended and Restated Funding Agreement").

J. Payor and Payee now desire to amend and restate the Amended and Restated Funding Agreement to incorporate certain changes intended to clarify the terms hereof and further enhance the rights of Payee consistent with the purposes of this Agreement.

**AGREEMENT**

NOW, THEREFORE, in consideration of the foregoing, the parties hereto agree as follows:

1. Definitions. As used in this Agreement, the following terms have the meanings herein specified unless the context otherwise requires:

"Affiliate" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control," as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise. For purposes of this definition, the terms "controlling," "controlled by" and "under common control with" have correlative meanings.

"Allocated Assets and Liabilities" has the meaning specified in the recitals to this Agreement.

"Amended and Restated Funding Agreement" has the meaning specified in the recitals to this Agreement.

"Asbestos Related Liabilities" has the meaning specified in Schedule 1 to this Agreement.

"Bankruptcy Case" means any voluntary case under chapter 11 of the Bankruptcy Code commenced by the Payee in the Bankruptcy Court.

"Bankruptcy Code" means title 11 of the United States Code, as amended from time to time and any successor statute and all rules and regulations promulgated thereunder.

"Bankruptcy Court" means the United States Bankruptcy Court where the Bankruptcy Case is commenced.

"Base Rate" means, for any day, a fluctuating interest rate per annum as shall be in effect from time to time, which rate per annum shall at all times be equal to the greater of (a) the rate of interest established by Bank of America, N.A from time to time, as its "prime rate," whether or not publicly announced, which interest rate may or may not be the lowest rate charged by it for commercial loans or other extensions of credit, and (b) the Federal Funds Effective Rate in effect from time to time, determined one Business Day in arrears, plus 1/2 of 1% per annum.

"Board" means: (a) with respect to a corporation, the board of directors of the corporation or any committee thereof; (b) with respect to a partnership, the board of directors, the managing member or members or the board of managers, as applicable, of the general partner of the partnership; (c) with respect to a limited liability company, the managing member or members or the board of managers, as applicable, of the limited liability company; and (d) with respect to any other Person, the board or committee of such Person serving a similar function.

"Business Day" means each day other than a Saturday, a Sunday or a day on which banking institutions in Charlotte, North Carolina or at a place of payment are authorized by law, regulation or executive order to remain closed.

"Capital Stock" means: (a) in the case of a corporation, corporate stock; (b) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock; (c) in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and (d) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person; but excluding (in each case of (a) through (d) above) any debt securities convertible into such equity securities.

"Contractual Obligation" means, as to any Person, any obligation or similar provision of any security issued by such Person or any agreement, instrument or other undertaking (excluding this Agreement) to which such Person is a party or by which it or any of its property is bound.

"CT (DE)" has the meaning specified in the recitals to this Agreement.

"CT Holding" has the meaning specified in the recitals to this Agreement.

"CT (TX)" has the meaning specified in the recitals to this Agreement.

"DBMP" has the meaning specified in the recitals to this Agreement.

"DBMP (TX)" has the meaning specified in the recitals to this Agreement.

"Default" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"DE Conversion" has the meaning specified in the recitals to this Agreement.

"District Court" means the United States District Court in the district of the Bankruptcy Court.

"Dividend" means, with respect to any entity, a distribution of cash or any other assets or properties made by such entity to such entity's member or parent company.

"Divisional Merger" has the meaning specified in the recitals to this Agreement.

"Event of Default" has the meaning specified in Section 6.

"Federal Funds Effective Rate" means, for any period, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight Federal Funds transactions with members of the Federal Reserve System arranged by Federal Funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York.

"Funding Account" means the account of the Payee listed on Schedule 2 to this Agreement, into which the proceeds of all Payments made under this Agreement shall be deposited, or such other account designated in writing by the Payee to the Payor from time to time.

"Funding Date" has the meaning specified in Section 2(b).

"Funding Request" has the meaning specified in Section 2(b).

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, in effect from time to time, consistently applied. If at any time any change in GAAP (including any adoption of International Financial Reporting Standards) would materially affect the computation of any amount required to be computed under this Agreement, the Payor may give written notice to the Payee of its intent to preserve the original intent of this Agreement and upon delivery of such notice, such amounts shall be calculated in accordance with GAAP as in effect at the end of the fiscal period ended immediately prior to such change in GAAP.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority,

instrumentality regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"NC Conversion" has the meaning specified in the recitals to this Agreement.

"New CT" has the meaning specified in the recitals to this Agreement.

"New CT (TX)" has the meaning specified in the recitals to this Agreement.

"Organizational Documents" means: (a) with respect to any corporation, its certificate or articles of incorporation and bylaws; (b) with respect to any limited liability company, its certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation of such entity.

"Original Funding Agreement" has the meaning specified in the recitals to this Agreement.

"Payee" has the meaning specified in the first paragraph of this Agreement.

"Payee Affiliate" means any wholly owned Affiliate of the Payee (and in no case includes the Payor or any Payor Affiliate).

"Payee Material Adverse Effect" means: (a) a material impairment of the rights and remedies of the Payor under this Agreement, or of the ability of the Payee to perform its material obligations under this Agreement; or (b) a material adverse effect upon the legality, validity or enforceability of this Agreement against the Payee.

"Payment" has the meaning specified in Section 2(a).

"Payor" has the meaning specified in the first paragraph of this Agreement.

"Payor Affiliate" means any wholly owned Affiliate of the Payor (and in no case includes the Payee or any Payee Affiliate).

"Payor Material Adverse Effect" means: (a) a material adverse change in, or a material adverse effect upon, the business, assets, liabilities (actual or contingent) or financial condition of the Payor and its Subsidiaries, taken as a whole; (b) a material impairment of the rights and remedies of the Payee under this Agreement, or of the ability of the Payor to perform its material obligations under this Agreement; or (c) a material adverse effect upon the legality, validity or enforceability of this Agreement against the Payor.

"Payor Tax Liabilities" means the portion of any tax liabilities of the consolidated tax group of which the Payor is a member that arises from the income of the Payor, any Subsidiaries

of the Payor that are disregarded entities for tax purposes, and any entities whose tax items are included in the Payor's tax items pursuant to the Amended and Restated Tax Item Allocation Agreement, effective as of October 23, 2019, to which the Payor and the Payee are parties.

"Permitted Funding Use" means each of the following:

(a) the payment of any and all costs and expenses of the Payee incurred in the normal course of its business (including the payment of any indemnification or other obligations of the Payee owing to any managers or officers of the Payee) at any time when there is no proceeding under the Bankruptcy Code pending with respect to the Payee;

(b) the payment of any and all costs and expenses of the Payee incurred during the pendency of any Bankruptcy Case, including the costs of administering the Bankruptcy Case and any and all other costs and expenses of the Payee incurred in the normal course of its business (including the payment of any indemnification or other obligations of the Payee owing to any managers or officers of the Payee);

(c) the funding of any amounts to satisfy (i) the Payee's Asbestos Related Liabilities established by a judgment of a court of competent jurisdiction or final settlement thereof at any time when there is no proceeding under the Bankruptcy Code pending with respect to the Payee; (ii) following the commencement of any Bankruptcy Case, the Payee's Asbestos Related Liabilities in connection with the funding of a trust under section 524(g) of the Bankruptcy Code for the benefit of existing and future claimants that is included in a plan of reorganization for the Payee confirmed by a final, nonappealable order of the Bankruptcy Court and the District Court (for the avoidance of doubt, regardless of whether such plan of reorganization provides that the Payor will receive the protection of section 524(g) of the Bankruptcy Code and regardless of whether the Payor supports such plan of reorganization); and (iii) in the case of either (i) or (ii), any ancillary costs and expenses of the Payee associated with such Asbestos Related Liabilities and any litigation thereof, including the costs of any appeals;

(d) the funding of any amounts necessary to cause the Funding Account to contain at least $5,000,000 at such time;

(e) the funding of any obligations of the Payee owed to the Payor or any Payor Affiliate, including any indemnification or other obligations of the Payee under any agreement provided for in the Plan of Divisional Merger; and

(f) the payment of any and all costs and expenses of the Payee incurred in connection with the pursuit of available remedies to collect any unfunded Payments due and owing to the Payee or otherwise to enforce the performance by the Payor of any provision of this Agreement;

in the case of clauses (a) through (f) above, solely to the extent that any cash distributions theretofore received by the Payee from its Subsidiaries are insufficient to pay such costs and expenses and fund such amounts and obligations in full and further, in the case of

clause (c)(ii) above, solely to the extent the Payee's other assets are insufficient to satisfy the Payee's Asbestos Related Liabilities in connection with the funding of such trust.

"Person" means any individual, corporation, partnership, limited liability company, joint venture, trust, unincorporated organization, or government or any agency or political subdivision thereof.

"Plan of Divisional Merger" has the meaning specified in the recitals to this Agreement.

"SEC" means the Securities and Exchange Commission.

"Subsidiary" means any Person a majority of the outstanding Voting Stock of which is owned or controlled by the Payor or by one or more other Subsidiaries and that is consolidated in the Payor's accounts.

"TX Conversion" has the meaning specified in the recitals to this Agreement.

"Voting Stock" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of such Person.

2. Funding Obligations and Procedures.

(a) Funding Obligations. The Payor hereby agrees, on the terms and conditions set forth in this Agreement, upon the request of the Payee from time to time in accordance with the requirements of Section 2(b), to make payments to the Payee (each, a "Payment"), the proceeds of which shall be used by the Payee for any Permitted Funding Use. Nothing in this Agreement shall obligate the Payor to make Payments under this Agreement that in the aggregate exceed the aggregate amount of all Permitted Funding Uses, and nothing in this Agreement shall obligate the Payor to make any individual payment under this Agreement that exceeds the amount requested by the Payee in the applicable Funding Request.

(b) Funding Requests. To request a Payment, the Payee shall deliver to the Payor a written request (which written request may be a .pdf delivered via email) for such Payment in a form reasonably acceptable to the Payor and signed by the Payee (each, a "Funding Request"). Each Funding Request shall specify (i) the amount of the requested Payment, which shall be no less than $500,000, and (ii) the date of the requested Payment, which shall be the date that is five Business Days following the delivery of such Funding Request (each such date, a "Funding Date"). Each Funding Request by the Payee shall constitute a representation and warranty by the Payee that the conditions set forth in Section 2(d) have been satisfied. Except as required to comply with the minimum requirements in Section 2(b)(i), Payee shall not deliver a Funding Request for an amount in excess of the aggregate amount necessary for the Payee to fund all current Permitted Funding Uses and all projected Permitted Funding Uses over the 30 days following the date of such Funding Request.

(c) Payments. Subject only to the satisfaction of the conditions set forth in Section 2(d), on any Funding Date, the Payor shall pay or cause to be paid to the Payee

an amount equal to the amount of the requested Payment specified in the applicable Funding Request. All Payments shall be made by wire or other transfer of immediately available funds, in United States dollars, to the Funding Account. In the event that the Payor does not make any Payment within the time period required by this Section 2(c), the amount of the requested Payment shall bear interest at a rate per annum equal to the Base Rate *plus* 2% until such Payment is made and the Payor shall include any interest accruing pursuant to this Section 2(c) in the next Payment made to the Payee.

(d) Conditions to Payments. The Payor's obligation to make any Payment is subject to the satisfaction of the following conditions as of the date of the Funding Request relating to such Payment (i) the representations and warranties of the Payee set forth in Section 3(b) shall be true and correct without regard to the impact of any Bankruptcy Case, including any notices or other actions that may be required therein, and (ii) there shall have been no violation by the Payee of the covenant set forth in Section 5.

3. Representations and Warranties.

(a) Representations and Warranties of the Payor. The Payor represents and warrants to the Payee that:

(i) Existence, Qualification and Power. The Payor (A) is duly organized or formed, validly existing and, as applicable, in good standing under the laws of its jurisdiction of incorporation or organization, (B) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (I) own or lease its material assets and carry on its business and (II) execute, deliver and perform its obligations under this Agreement, and (C) is duly qualified and is licensed and, as applicable, in good standing under the laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (B)(I) or (C), to the extent that failure to do so could not reasonably be expected to have a Payor Material Adverse Effect.

(ii) Authorization; No Contravention. The execution, delivery and performance by the Payor of this Agreement has been duly authorized by all necessary corporate or other organizational action, and does not and will not (A) contravene the terms of its Organizational Documents, (B) conflict with or result in any breach or contravention of, or the creation of any lien under, or require any payment to be made under (I) any Contractual Obligation to which it is a party or affecting it or its properties or (II) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which it or its property is subject, or (C) violate any applicable law; except in each case referred to in clause (B) or (C), to the extent the failure to do so could not reasonably be expected to have a Payor Material Adverse Effect.

(iii) Governmental Authorization; Other Consents. No approval, consent, exemption, authorization or other action by, or notice to, or filing with,

any Governmental Authority or any other Person is necessary or required in connection with the execution delivery or performance of this Agreement by, or enforcement against, the Payor.

(iv) Binding Effect. This Agreement has been duly executed and delivered by the Payor. This Agreement constitutes a legal, valid and binding obligation of the Payor, enforceable against the Payor in accordance with its terms, except to the extent such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally and by equitable principles.

(b) Representations and Warranties of the Payee. The Payee represents and warrants to the Payor that:

(i) Existence, Qualification and Power. The Payee (A) is duly organized or formed, validly existing and, as applicable, in good standing under the laws of its jurisdiction of incorporation or organization, (B) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (I) own or lease its material assets and carry on its business and (II) execute, deliver and perform its obligations under this Agreement and (C) is duly qualified and is licensed and, as applicable, in good standing under the laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (B)(I) or (C), to the extent that failure to do so could not reasonably be expected to have a Payee Material Adverse Effect.

(ii) Authorization; No Contravention. The execution, delivery and performance by the Payee of this Agreement has been duly authorized by all necessary corporate or other organizational action, and does not and will not (A) contravene the terms of its Organizational Documents, (B) conflict with or result in any breach or contravention of, or the creation of any lien under, or require any payment to be made under (I) any Contractual Obligation to which it is a party or affecting it or its properties or (II) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which it or its property is subject, or (C) violate any applicable law; except in each case referred to in clause (B) or (C), to the extent the failure to do so could not reasonably be expected to have a Payee Material Adverse Effect.

(iii) Governmental Authorization; Other Consents. No approval, consent, exemption, authorization or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution delivery or performance of this Agreement by, or enforcement against, the Payee.

(iv) Binding Effect. This Agreement has been duly executed and delivered by the Payee. This Agreement constitutes a legal, valid and binding

obligation of the Payee, enforceable against the Payee in accordance with its terms, except to the extent such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally and by equitable principles.

4. Covenants of the Payor.

(a) Provision of Financial Information.

(i) The Payor will furnish to the Payee, no later than 90 days after the end of each fiscal year (in the case of annual financial statements) and 60 days after the end of each fiscal quarter other than the last fiscal quarter (in the case of quarterly financial statements), unaudited annual and quarterly consolidated financial statements prepared in accordance with GAAP (subject to the absence of notes to the financial statements and related disclosures, and, with respect to quarterly financial statements, normal year-end audit adjustments).

(ii) By accepting such financial information, the Payee will be deemed to have represented to and agreed with the Payor that: (A) it will not use the information in violation of applicable securities laws or regulations; and (B) it will not communicate the information to any Person, including in any aggregated or converted form, and will keep the information confidential, other than where disclosure of such information is required by law, regulation or legal process (in which case the Payee shall, to the extent permitted by law, notify the Payor promptly thereof); *provided however*, that the Payee may deliver a copy thereof to counsel for any official committee of asbestos claimants and any future claimants' representative appointed in any Bankruptcy Case on a confidential basis under a protective order entered in such Bankruptcy Case.

(iii) Notwithstanding the foregoing, the financial statements, information and other documents required to be provided as described in Section 4(a)(i), may be, rather than those of the Payor, those of any direct or indirect parent of the Payor. Notwithstanding the foregoing, the Payor may fulfill the requirement to distribute such financial information by filing the information with the SEC within the applicable time periods required by the SEC. The Payor will be deemed to have satisfied the reporting requirements of Section 4(a)(i) if any direct or indirect parent of the Payor has filed such reports containing such information with the SEC within the applicable time periods required by the SEC and such reports are publicly available. To the extent a direct or indirect parent of the Payor provides financial statements, information and other documents pursuant to the first sentence of this Section 4(a)(iii) or such parent files such report with the SEC pursuant to the third sentence of this Section 4(a)(iii), and if the financial information so furnished relates to such direct or indirect parent of the Payor, the same shall be accompanied by consolidating information that explains in reasonable detail the difference between the information relating to such parent on the one hand, and the information relating to the Payor and its Subsidiaries on a standalone basis, on the other hand.

(b) Successor to the Payor upon Consolidation or Merger.

(i) Subject to the provisions of Sections 4(b)(ii) and 4(b)(iii), nothing contained in this Agreement shall prevent any consolidation or merger of the Payor with or into any Person, or successive consolidations or mergers in which the Payor or its successor or successors shall be a party or parties, or shall prevent any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all the property of the Payor (for the avoidance of doubt, calculated by including any equity interests held by the Payor), to any Person; *provided, however*, and the Payor hereby covenants and agrees, that, if the surviving Person, acquiring Person or lessee is a Person other than the Payor, upon any such consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition, all of the Payor's funding obligations under this Agreement and the observance of all other covenants and conditions of this Agreement to be performed by the Payor, shall be expressly assumed by an amendment to this Agreement or such other documentation in form reasonably satisfactory to the Payee, executed and delivered to the Payee by the Person formed by such consolidation, or into which the Payor shall have been merged, or by the Person which shall have acquired or leased such property. This covenant will not apply to (A) a merger of the Payor with an Affiliate solely for the purpose of reincorporating the Payor in another jurisdiction within the United States, (B) any conversion of the Payor from an entity formed under the laws of one state to the same type of entity formed under the laws of another state, or (C) any conversion of the Payor from a limited liability company to a corporation, from a corporation to a limited liability company, from a limited liability company to a limited partnership or a similar conversion, whether the converting entity and the converted entity are formed under the laws of the same state or the converting entity is formed under the laws of one state and the converted entity is formed of the laws of a different state. Notwithstanding the foregoing, this Section 4(b)(i) will not apply to any consolidation or merger, or any sale, assignment, transfer, conveyance, lease or other disposition of assets, between or among Payor and its Subsidiaries.

(ii) Upon any consolidation or merger, or any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all of the assets, of the Payor (for the avoidance of doubt, calculated by including any equity interests held by the Payor) in a transaction that is subject to, and that complies with, the provisions of the preceding clause (i), the successor Person formed by such consolidation with the Payor or into which the Payor is merged, or to which such sale, assignment, transfer, lease, conveyance or other disposition is made, shall succeed to, and be substituted for (so that from and after the date of such consolidation, merger, sale, lease, conveyance or other disposition, the provisions of this Agreement referring to the "Payor" shall refer instead to the successor Person and not to the Payor), and may exercise every right and power of, the Payor under this Agreement with the same effect as if such successor Person had been named as the Payor herein. In the event of a succession in compliance with this Section 4(b)(ii), the predecessor Person shall be relieved

from every obligation and covenant under this Agreement upon the consummation of such succession.

(iii) Any consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition referred to in the preceding clause (i) shall not be permitted under this Agreement unless immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing.

(c) Financial Limitations.

(i) The Payor shall not make any Dividend; *provided*, *however*, that nothing in this Section 4(c)(i) shall prohibit the Payor from making any Dividend solely to fund Payor Tax Liabilities.

(ii) The Payor shall not forgive any obligation owed to it by an Affiliate of the Payor and shall cause each of its Subsidiaries not to forgive any obligation owed to such Subsidiary by an Affiliate of such Subsidiary.

(d) Limitation on Payment Prohibitions. The Payor will not consensually enter into any contract that prohibits the Payor from making Payments under this Agreement.

5. Covenants of the Payee. The Payee shall not use the proceeds of any Payment made under this Agreement for any purpose other than a Permitted Funding Use. The Payee will perform its indemnification obligations owing to the Payor under the agreements provided for in the Plan of Divisional Merger in all material respects, subject, in the event that a proceeding under the Bankruptcy Code is pending with respect to the Payee, to the resulting automatic stay under section 362 of the Bankruptcy Code.

6. Events of Default. Each of the following events constitutes an "Event of Default":

(a) the Payor defaults in its funding obligations pursuant to Section 2 and such default continues for a period of 10 Business Days;

(b) the Payor defaults in the performance of, or breaches, any covenant or representation or warranty of the Payor in this Agreement (other than a covenant or representation or warranty which is specifically dealt with elsewhere in this Section 6) and such default or breach continues for a period of 30 days, or, in the case of any failure to comply with Section 4(a) of this Agreement, 60 days, in each case after there has been given, by registered or certified mail, to the Payor by the Payee a written notice specifying such default or breach and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder;

(c) the Payor, pursuant to or within the meaning of the Bankruptcy Code or any similar federal or state law for the relief of debtors, (i) commences a voluntary case, (ii) consents to the entry of an order for relief against it in an involuntary case, (iii) consents to the appointment of a custodian of it or for all or substantially all of its

property, (iv) makes a general assignment for the benefit of its creditors, or (v) generally is not paying its debts as they become due; and

(d) a court of competent jurisdiction enters an order or decree under the Bankruptcy Code or any similar federal or state law for the relief of debtors that (i) is for relief against the Payor, (ii) appoints a custodian of the Payor for all or substantially all of the property of the Payor, or (iii) orders the liquidation of the Payor, and, in each case of (i) through (iii) above, such order or decree remains unstayed and in effect for 60 consecutive days.

Upon becoming aware of any Default or Event of Default, the Payor shall promptly deliver to the Payee a statement specifying such Default or Event of Default.

7. Remedies. Upon the occurrence of any Event of Default, and at any time thereafter during the continuance of any such Event of Default, the Payee may pursue any available remedy to collect any unfunded Payments due and owing to the Payee or to enforce the performance of any provision of this Agreement.

8. Notices. All notices required under this Agreement, including each Funding Request and any approval of or objection to a Funding Request, shall be delivered to the applicable party to this Agreement at the address set forth below. Unless otherwise specified herein, delivery of any such notice by email, facsimile or other electronic transmission (including .pdf) shall be effective as delivery of a manually executed counterpart thereof.

Payor:

CERTAINTEED LLC
20 Moores Road
Malvern, Pennsylvania 19355
Attention: Mark A. Rayfield, President and Chief Executive Officer
Email: Mark.A.Rayfield@saint-gobain.com

with a copy to:

CERTAINTEED LLC
20 Moores Road
Malvern, Pennsylvania 19355
Attention: R. Craig Smith, Divisional Counsel
E-mail: Craig.Smith@saint-gobain.com

Payee:

DBMP LLC
20 Moores Road
Malvern, Pennsylvania 19355
Attention: Joseph N. Bondi, President
Email: Joseph.N.Bondi@saint-gobain.com

with a copy to:

DBMP LLC
20 Moores Road
Malvern, Pennsylvania 19355
Attn: Michael T. Starczewski, Chief Legal Officer
E-mail: Michael.T.Starczewski@saint-gobain.com

9. Governing Law; Submission to Jurisdiction. This Agreement shall be governed and construed in accordance with the laws of the State of North Carolina. Any legal proceeding seeking to enforce any provision of, or based on any matter arising under, this Agreement may be brought: (a) at any time there is not a proceeding under the Bankruptcy Code pending with respect to the Payee, in state or federal court in Charlotte, North Carolina; or (b) at any time there is a proceeding under the Bankruptcy Code pending with respect to the Payee, in the Bankruptcy Court. Each of the Payor and the Payee hereby irrevocably and unconditionally submits to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such legal proceeding.

10. No Implied Waiver; Amendments. No failure or delay on the part of the Payee to exercise any right, power or privilege under this Agreement, and no course of dealing between the Payor, on the one hand, and the Payee, on the other hand, shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under this Agreement preclude any other or further exercise thereof or the exercise of any other right, power or privilege. No notice to or demand on the Payor in any case shall entitle the Payor to any other or further notice or demand in similar or other circumstances, or constitute a waiver of the right of the holder of this Agreement to any other or further action in any circumstances without notice or demand. The remedies provided in this Agreement are cumulative and not exclusive of any remedies provided by law. No amendment or waiver of any provision of this Agreement, nor consent to any departure by the Payee therefrom, shall in any event be effective unless the same shall be in writing, specifically refer to this Agreement, and be signed by the Payor and the Payee, and then such amendment or waiver shall be effective only in the specific instance and for the specific purpose for which given. A waiver on any such occasion shall not be construed as a bar to, or waiver of, any such right or remedy on any future occasion.

11. Counterparts; Entire Agreement; Electronic Execution. This Agreement may be executed in separate counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement constitutes the entire contract among the parties relating to the subject matter hereof and supersedes, in its entirety, the Amended and Restated Funding Agreement. This Agreement shall become effective when it shall have been executed by each party hereto and each party hereto shall have received counterparts hereof which, when taken together, bear the signatures of each of party hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Delivery of an executed counterpart of a signature page of this Agreement by telecopy, .pdf or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement.

12. Severability. If any one or more of the provisions contained in this Agreement are invalid, illegal or unenforceable in any respect, the validity, legality or enforceability of all the remaining provisions will not in any way be affected or impaired. If any one or more provisions contained in this Agreement are deemed invalid, illegal or unenforceable because of their scope or breadth, such provisions shall be reformed and replaced with provisions whose scope and breadth are valid under applicable law.

13. Transfer; Assignment. This Agreement shall be binding upon the Payor and its successors and assigns, and the terms and provisions of this Agreement shall inure to the benefit of the Payee and its successors and assigns. The Payor's rights and obligations under this Agreement may not be assigned without the prior written consent of the Payee; *provided*, *however*, that no such consent of the Payee shall be required in connection with any transfer effected in compliance with Section 4(b). The Payee's rights and obligations under this Agreement may not be assigned without the prior written consent of the Payor.

14. Construction. The descriptive headings herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement. The word "including" means without limitation by reason of enumeration. The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless specifically stated otherwise, all references to Sections and Schedules are to the Sections and Schedules of or to this Agreement.

15. Rights of Parties. This Agreement shall not confer any rights or remedies upon any Person other than the parties hereto and their respective successors and permitted assigns.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**CERTAINTEED LLC**, a Delaware limited liability company, as the Payor

By: *mark rayfield*
mark rayfield (Jan 4, 2022 17:06 EST)
Mark A. Rayfield
President and Chief Executive Officer

**DBMP LLC**, a North Carolina limited liability company, as the Payee

By: ______________________________
Joseph N. Bondi
President

*[Signature Page to Second Amended and Restated Funding Agreement]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**CERTAINTEED LLC**, a Delaware limited liability company, as the Payor

By: ______________________________
Mark A. Rayfield
President and Chief Executive Officer

**DBMP LLC**, a North Carolina limited liability company, as the Payee

By: ______________________________
Joseph N. Bondi
President

## SCHEDULE 1

### Definition of Asbestos Related Liabilities

For purposes of this Agreement, "Asbestos Related Liabilities" means all Liabilities (as defined below) of the Payee related in any way to asbestos or asbestos containing materials.

Capitalized terms that are used in this Schedule 1 have the following meanings:

(a) "Cause of Action" means any claim, judgment, cause of action, counterclaim, crossclaim, third party claim, defense, indemnity claim, reimbursement claim, contribution claim, subrogation claim, right of set off, right of recovery, recoupment, right under any settlement Contract and similar right, whether choate or inchoate, known or unknown, contingent or noncontingent.

(b) "Contract" means any contract, agreement, arrangement, lease, indenture, mortgage, deed of trust, evidence of indebtedness, License, Plan, guarantee, understanding, course of dealing or performance, instrument, bid, order, proposal, demand, offer or acceptance, whether written or oral.

(c) "Governmental Authority" means any national, central, federal, state, provincial, municipal, local or other domestic, foreign or supranational governmental, legislative, administrative or regulatory authority, agency, court, arbitration tribunal, board, department or commission, or other governmental or regulatory entity, including any competent governmental authority responsible for the determination, assessment or collection of taxes.

(d) "Law" means any national, central, federal, state, provincial, municipal, local or other domestic, foreign or supranational statute, law, ordinance, decree, order, injunction, rule, regulation, directive, constitution, code, edict, writ, judgment, opinion, decree, injunction, stipulation, award or other document or pronouncement having the effect of law (including common law) of any Governmental Authority, including rules and regulations of any regulatory or self-regulatory authority with which compliance is required by any of the foregoing.

(e) "Liability" shall mean any claim, demand, offer, acceptance, action, suit, liability or obligation of any kind, whether accrued or fixed, absolute or contingent, matured or unmatured, determined or determinable, choate or inchoate, asserted or unasserted, known or unknown, including (i) those arising or that may arise under any past, present or future Law or Contract or pursuant to any Cause of Action or Proceeding and (ii) all claims for economic or noneconomic damages or injuries of any type or nature whatsoever (including claims for physical, mental and emotional pain and suffering, loss of enjoyment of life, loss of society or consortium and wrongful death, as well as claims for damage to property and punitive damages).

(f) "License" means any license, sublicense, agreement, covenant not to sue or permission.

(g) "Person" means any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, benefit plan, unincorporated organization, business, syndicate, sole proprietorship, association, organization, labor union or other entity or Governmental Authority.

(h) "Plan" means, with respect to any Person, (i) any "employee benefit plan" (as defined in Section 3(3) of ERISA), (ii) all specified fringe benefit plans as defined in Section 6039(D) of the Internal Revenue Code, and (iii) any other plan, program, policy, agreement or arrangement, whether or not in writing, relating to compensation, employee benefits, severance, change in control, retention, deferred compensation, equity, employment, consulting, vacation, sick leave, paid time off, salary continuation, disability, hospitalization, medical insurance, life insurance, scholarship programs, incentive compensation or bonus compensation, in each case that is sponsored, maintained or contributed to or required to be sponsored, maintained or contributed to by, or otherwise covering, such Person.

(i) "Proceeding" means any action, appeal, arbitration, assessment, cancellation, charge, citation, claim, complaint, concurrent use, controversy, contested matter, demand, grievance, hearing, inquiry, interference, investigation, litigation (including class actions and multidistrict litigation), mediation, opposition, re-examination, summons, subpoena or suit, or other case or proceeding, whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private, commenced, brought, conducted or heard by or before, under the supervision or direction of, or otherwise involving, any Governmental Authority or arbitrator or other agreed-upon tribunal or dispute resolution mechanism.

**Exhibit B**

**SECOND AMENDED AND RESTATED FUNDING AGREEMENT**

This SECOND AMENDED AND RESTATED FUNDING AGREEMENT, dated as of ~~October 23, 2019~~September 15, 2021 (as it may be amended, restated, modified or supplemented from time to time, this "Agreement") is between CERTAINTEED LLC, a Delaware limited liability company ("Payor"), and DBMP LLC, a North Carolina limited liability company ("Payee").

**RECITALS**

A. Prior to and in contemplation of the conversion of CertainTeed LLC, a Delaware limited liability company ("Old CT (DE)"), to a Texas limited liability company (as such, "Old CT (TX)") and the subsequent divisional merger of Old CT (TX) pursuant to Chapter 10 of the TBOC (the "Divisional Merger"), CertainTeed Holding Corporation, a Delaware corporation ("CT Holding"), as payor, and Old CT (DE), as payee, executed and delivered a Funding Agreement, dated as of October 22, 2019 (the "Original Funding Agreement").

B. Immediately after the execution of the Original Funding Agreement and prior to the Divisional Merger, Old CT (DE) converted from a Delaware limited liability company into a Texas limited liability company, Old CT (TX), pursuant to Section 18.216 of the Delaware Limited Liability Company Act and Section 10.102 of the TBOC (the "TX Conversion").

C. Immediately following the effectiveness of the TX Conversion, CT Holding, in its capacity as the sole member of CT (TX), approved a Plan of Divisional Merger contemplating the Divisional Merger (the "Plan of Divisional Merger").

D. At the effective time of the Divisional Merger, (1) certain property of CT (TX), as set forth on Schedule 5(b)(i) to the Plan of Divisional Merger and certain liabilities and obligations of CT (TX), as set forth on Schedule 5(c)(i) to the Plan of Divisional Merger (collectively, the "Allocated Assets and Liabilities") were allocated to a new Texas limited liability company created upon the effectiveness of the Divisional Merger ("DBMP (TX)"), (2) the remaining property, liabilities and obligations of CT (TX) were allocated to another new Texas limited liability company created upon effectiveness of the Divisional Merger ("New CT (TX)"), and (3) CT (TX) ceased to exist.

E. Immediately following the effectiveness of the Divisional Merger, CT Holding assigned to New CT (TX), and New CT (TX) assumed from CT Holding, all rights and obligations of CT Holding under the Original Funding Agreement (such assignment and assumption, the "Post-Merger Assignment"), whereupon CT Holding was released from its obligations, and ceased to have any further obligations, under the Original Funding Agreement.

F. Following the Divisional Merger and the Post-Merger Assignment, (1) New CT (TX) effected a conversion (the "DE Conversion") into Payor, a Delaware limited liability company, and (2) DBMP (TX) effected a conversion (the "NC Conversion") into Payee, a North Carolina limited liability company.

G. In connection with the allocation to DBMP (TX) of the Allocated Assets and Liabilities, CT Holding and its successors and assigns agreed, pursuant to the Original Funding

Agreement, to provide funding to Old CT (DE) and, after the TX Conversion, CT (TX), and, after the Divisional Merger, DBMP (TX) and, after the NC Conversion, DBMP, sufficient to pay the costs of operations of DBMP's business and other liabilities and obligations included in the Allocated Assets and Liabilities as and when they become due.

H. The Allocated Assets and Liabilities included the rights and obligations of CT (TX) (as successor to Old CT (DE) in the TX Conversion) under the Original Funding Agreement, and, at the effective time of the Divisional Merger, pursuant to the terms and conditions of the Plan of Divisional Merger, the rights and obligations of CT (TX) under the Original Funding Agreement were allocated to DBMP (TX) such that, following the effectiveness of the Divisional Merger, DBMP (TX), and, following the NC Conversion, DBMP, had assets having a value at least equal to its liabilities and had financial capacity sufficient to satisfy its obligations as they become due in the ordinary course of business, including any Asbestos Related Liabilities.

I. Payor and Payee ~~desire to amend and restate~~then amended and restated the Original Funding Agreement to reflect that the Merger, the Post-Merger Assignment, the DE Conversion and the NC Conversion ~~have~~had occurred and Payor, ~~now~~ a Delaware limited liability company having the name "CertainTeed LLC," and Payee, ~~now~~ a North Carolina limited liability company having the name "DBMP LLC," ~~are~~were the parties to such agreement (as so amended and restated, the "Amended and Restated Funding Agreement").

J. Payor and Payee now desire to amend and restate the Amended and Restated Funding Agreement to incorporate certain changes intended to clarify the terms hereof and further enhance the rights of Payee consistent with the purposes of this Agreement.

**AGREEMENT**

NOW, THEREFORE, in consideration of the foregoing, the parties hereto agree as follows:

1. Definitions. As used in this Agreement, the following terms have the meanings herein specified unless the context otherwise requires:

"Affiliate" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control," as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise. For purposes of this definition, the terms "controlling," "controlled by" and "under common control with" have correlative meanings.

"Allocated Assets and Liabilities" has the meaning specified in the recitals to this Agreement.

"Amended and Restated Funding Agreement" has the meaning specified in the recitals to this Agreement.

"Asbestos Related Liabilities" has the meaning specified in Schedule 1 to this Agreement.

"Bankruptcy Case" means any voluntary case under chapter 11 of the Bankruptcy Code commenced by the Payee in the Bankruptcy Court.

"Bankruptcy Code" means title 11 of the United States Code, as amended from time to time and any successor statute and all rules and regulations promulgated thereunder.

"Bankruptcy Court" means the United States Bankruptcy Court where the Bankruptcy Case is commenced.

"Base Rate" means, for any day, a fluctuating interest rate per annum as shall be in effect from time to time, which rate per annum shall at all times be equal to the greater of (a) the rate of interest established by Bank of America, N.A from time to time, as its "prime rate," whether or not publicly announced, which interest rate may or may not be the lowest rate charged by it for commercial loans or other extensions of credit, and (b) the Federal Funds Effective Rate in effect from time to time, determined one Business Day in arrears, plus 1/2 of 1% per annum.

"Board" means: (a) with respect to a corporation, the board of directors of the corporation or any committee thereof~~,~~; (b) with respect to a partnership, the board of directors, the managing member or members or the board of managers, as applicable, of the general partner of the partnership~~,~~; (c) with respect to a limited liability company, the managing member or members or the board of managers, as applicable, of the limited liability company~~,~~; and (d) with respect to any other Person, the board or committee of such Person serving a similar function.

"Business Day" means each day other than a Saturday, a Sunday or a day on which banking institutions in Charlotte, North Carolina or at a place of payment are authorized by law, regulation or executive order to remain closed.

"Capital Stock" means: (a) in the case of a corporation, corporate stock~~,~~; (b) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock~~,~~; (c) in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited)~~,~~; and (d) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person~~,~~; but excluding (in each case of (a) through (d) above) any debt securities convertible into such equity securities.

"Contractual Obligation" means, as to any Person, any obligation or similar provision of any security issued by such Person or any agreement, instrument or other undertaking (excluding this Agreement) to which such Person is a party or by which it or any of its property is bound.

"CT (DE)" has the meaning specified in the recitals to this Agreement.

"CT Holding" has the meaning specified in the recitals to this Agreement.

"CT (TX)" has the meaning specified in the recitals to this Agreement.

"DBMP" has the meaning specified in the recitals to this Agreement.

"DBMP (TX)" has the meaning specified in the recitals to this Agreement.

"Default" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"DE Conversion" has the meaning specified in the recitals to this Agreement.

"District Court" means the United States District Court in the district of the Bankruptcy Court.

"Dividend" means, with respect to any entity, a distribution of cash or any other assets or properties made by such entity to such entity's member or parent company.

"Divisional Merger" has the meaning specified in the recitals to this Agreement.

"Event of Default" has the meaning specified in Section 6.

"Federal Funds Effective Rate" means, for any period, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight Federal Funds transactions with members of the Federal Reserve System arranged by Federal Funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York.

"Funding Account" means the account of the Payee listed on Schedule 2 to this Agreement, into which the proceeds of all Payments made under this Agreement shall be deposited, or such other account designated in writing by the Payee to the Payor from time to time.

"Funding Date" has the meaning specified in Section 2(b).

"Funding Request" has the meaning specified in Section 2(b).

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, in effect from time to time, consistently applied. If at any time any change in GAAP (including any adoption of International Financial Reporting Standards) would materially affect the computation of any amount required to be computed under this Agreement, the Payor may give written notice to the Payee of its intent to preserve the original intent of this Agreement and upon delivery of such notice, such amounts shall be calculated in accordance with GAAP as in effect at the end of the fiscal period ended immediately prior to such change in GAAP.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"NC Conversion" has the meaning specified in the recitals to this Agreement.

"New CT" has the meaning specified in the recitals to this Agreement.

"New CT (TX)" has the meaning specified in the recitals to this Agreement.

"Organizational Documents" means: (a) with respect to any corporation, its certificate or articles of incorporation and bylaws,; (b) with respect to any limited liability company, its certificate or articles of formation or organization and operating agreement,; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation of such entity.

"Original Funding Agreement" has the meaning specified in the recitals to this Agreement.

"Payee" has the meaning specified in the first paragraph of this Agreement.

"Payee Affiliate" means any wholly owned Affiliate of the Payee (and in no case includes the Payor or any Payor Affiliate).

"Payee Material Adverse Effect" means: (a) a material impairment of the rights and remedies of the Payor under this Agreement, or of the ability of the Payee to perform its material obligations under this Agreement,; or (b) a material adverse effect upon the legality, validity or enforceability of this Agreement against the Payee.

"Payment" has the meaning specified in Section 2(a).

"Payor" has the meaning specified in the first paragraph of this Agreement.

"Payor Affiliate" means any wholly owned Affiliate of the Payor (and in no case includes the Payee or any Payee Affiliate).

"Payor Material Adverse Effect" means: (a) a material adverse change in, or a material adverse effect upon, the business, assets, liabilities (actual or contingent) or financial condition of the Payor and its Subsidiaries, taken as a whole,; (b) a material impairment of the rights and remedies of the Payee under this Agreement, or of the ability of the Payor to perform its material obligations under this Agreement,; or (c) a material adverse effect upon the legality, validity or enforceability of this Agreement against the Payor.

"Payor Tax Liabilities" means the portion of any tax liabilities of the consolidated tax group of which the Payor is a member that arises from the income of the Payor, any Subsidiaries of the Payor that are disregarded entities for tax purposes, and any entities whose tax items are included in the Payor's tax items pursuant to the Amended and Restated Tax Item Allocation Agreement, effective as of October 23, 2019, to which the Payor and the Payee are parties.

"Permitted Funding Use" means each of the following:

(a) the payment of any and all costs and expenses of the Payee incurred in the normal course of its business (including the payment of any indemnification or other obligations of the Payee owing to any managers or officers of the Payee) at any time when there is no proceeding under the Bankruptcy Code pending with respect to the Payee;

(b) the payment of any and all costs and expenses of the Payee incurred during the pendency of any Bankruptcy Case~~ that are necessary or appropriate in connection therewith~~, including the costs of administering the Bankruptcy Case and any and all other costs and expenses of the Payee incurred in the normal course of its business (including the payment of any indemnification or other obligations of the Payee owing to any managers or officers of the Payee);

(c) the funding of any amounts ~~necessary or appropriate ~~to satisfy (i) the Payee's Asbestos Related Liabilities established by a judgment of a court of competent jurisdiction or final settlement thereof at any time when there is no proceeding under the Bankruptcy Code pending with respect to the Payee~~,~~; (ii) following the commencement of any Bankruptcy Case, the Payee's Asbestos Related Liabilities in connection with the funding of a trust under section 524(g) of the Bankruptcy Code for the benefit of existing and future claimants that is included in a plan of reorganization for the Payee confirmed by a final, nonappealable order of the Bankruptcy Court and the District Court~~,~~ (for the avoidance of doubt, regardless of whether such plan of reorganization provides that the Payor will receive the protection of section 524(g) of the Bankruptcy Code and regardless of whether the Payor supports such plan of reorganization); and (iii) in the case of either (i) or (ii), any ancillary costs and expenses of the Payee associated with such Asbestos Related Liabilities and any litigation thereof, including the costs of any appeals;

(d) the funding of any amounts necessary to cause the Funding Account to contain at least $5,000,000 at such time;~~ and~~

(e) the funding of any obligations of the Payee owed to the Payor or any Payor Affiliate, including any indemnification or other obligations of the Payee under any agreement provided for in the Plan of Divisional Merger; and

(f) the payment of any and all costs and expenses of the Payee incurred in connection with the pursuit of available remedies to collect any unfunded Payments due and owing to the Payee or otherwise to enforce the performance by the Payor of any provision of this Agreement;

in the case of clauses (a) through (~~e~~f) above, solely to the extent that any cash distributions theretofore received by the Payee from its Subsidiaries are insufficient to pay such costs and expenses and fund such amounts and obligations in full and further, in the case of clause (c)(ii) above, solely to the extent the Payee's other assets are insufficient to ~~fund amounts necessary or appropriate to ~~satisfy the Payee's Asbestos Related Liabilities in connection with the funding of such trust.

"Person" means any individual, corporation, partnership, limited liability company, joint venture, trust, unincorporated organization, or government or any agency or political subdivision thereof.

"Plan of Divisional Merger" has the meaning specified in the recitals to this Agreement.

"SEC" means the Securities and Exchange Commission.

"Subsidiary" means any Person a majority of the outstanding Voting Stock of which is owned or controlled by the Payor or by one or more other Subsidiaries and that is consolidated in the Payor's accounts.

"TX Conversion" has the meaning specified in the recitals to this Agreement.

"Voting Stock" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of such Person.

2. Funding Obligations and Procedures.

(a) Funding Obligations. The Payor hereby agrees, on the terms and conditions set forth in this Agreement, upon the request of the Payee from time to time in accordance with the requirements of Section 2(b), to make payments to the Payee (each, a "Payment"), the proceeds of which shall be used by the Payee for any Permitted Funding Use. Nothing in this Agreement shall obligate the Payor to make Payments under this Agreement that in the aggregate exceed the aggregate amount ~~necessary for the Payee to fund~~of all Permitted Funding Uses, and nothing in this Agreement shall obligate the Payor to make any individual payment under this Agreement that exceeds the amount requested by the Payee in the applicable Funding Request.

(b) Funding Requests. To request a Payment, the Payee shall deliver to the Payor a written request (which written request may be a .pdf delivered via email) for such Payment in a form reasonably acceptable to the Payor and signed by the Payee (each, a "Funding Request"). Each Funding Request shall specify (i) the amount of the requested Payment, which shall be no less than $500,000, and (ii) the date of the requested Payment, which shall be the date that is five Business Days following the delivery of such Funding Request (each such date, a "Funding Date"). Each Funding Request by the Payee shall constitute a representation and warranty by the Payee that the conditions set forth in Section 2(d) have been satisfied. Except as required to comply with the minimum requirements in Section 2(b)(i), Payee shall not deliver a Funding Request for an amount in excess of the aggregate amount necessary for the Payee to fund all current Permitted Funding Uses and all projected Permitted Funding Uses over the 30 days following the date of such Funding Request.

(c) Payments. Subject only to the satisfaction of the conditions set forth in Section 2(d), on any Funding Date, the Payor shall pay or cause to be paid to the Payee an amount equal to the amount of the requested Payment specified in the applicable Funding Request. All Payments shall be made by wire or other transfer of immediately available funds, in United States dollars, to the Funding Account. In the event that the Payor does

not make any Payment within the time period required by this Section 2(c), the amount of the requested Payment shall bear interest at a rate per annum equal to the Base Rate *plus* 2% until such Payment is made and the Payor shall include any interest accruing pursuant to this Section 2(c) in the next Payment made to the Payee.

(d) Conditions to Payments. The Payor's obligation to make any Payment is subject to the satisfaction of the following conditions as of the date of the Funding Request relating to such Payment (i) the representations and warranties of the Payee set forth in Section 3(b) shall be true and correct without regard to the impact of any Bankruptcy Case, including any notices or other actions that may be required therein, and (ii) there shall have been no violation by the Payee of the covenant set forth in Section 5.

3. Representations and Warranties.

(a) Representations and Warranties of the Payor. The Payor represents and warrants to the Payee that:

(i) Existence, Qualification and Power. The Payor (A) is duly organized or formed, validly existing and, as applicable, in good standing under the laws of its jurisdiction of incorporation or organization, (B) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (I) own or lease its material assets and carry on its business and (II) execute, deliver and perform its obligations under this Agreement, and (C) is duly qualified and is licensed and, as applicable, in good standing under the laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (B)(I) or (C), to the extent that failure to do so could not reasonably be expected to have a Payor Material Adverse Effect.

(ii) Authorization; No Contravention. The execution, delivery and performance by the Payor of this Agreement has been duly authorized by all necessary corporate or other organizational action, and does not and will not (A) contravene the terms of its Organizational Documents, (B) conflict with or result in any breach or contravention of, or the creation of any lien under, or require any payment to be made under (I) any Contractual Obligation to which it is a party or affecting it or its properties or (II) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which it or its property is subject, or (C) violate any applicable law; except in each case referred to in clause (B) or (C), to the extent the failure to do so could not reasonably be expected to have a Payor Material Adverse Effect.

(iii) Governmental Authorization; Other Consents. No approval, consent, exemption, authorization or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution delivery or performance of this Agreement by, or enforcement against, the Payor.

(iv) Binding Effect. This Agreement has been duly executed and delivered by the Payor. This Agreement constitutes a legal, valid and binding obligation of the Payor, enforceable against the Payor in accordance with its terms, except to the extent such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally and by equitable principles.

(b) Representations and Warranties of the Payee. The Payee represents and warrants to the Payor that:

(i) Existence, Qualification and Power. The Payee (A) is duly organized or formed, validly existing and, as applicable, in good standing under the laws of its jurisdiction of incorporation or organization, (B) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (I) own or lease its material assets and carry on its business and (II) execute, deliver and perform its obligations under this Agreement and (C) is duly qualified and is licensed and, as applicable, in good standing under the laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (B)(I) or (C), to the extent that failure to do so could not reasonably be expected to have a Payee Material Adverse Effect.

(ii) Authorization; No Contravention. The execution, delivery and performance by the Payee of this Agreement has been duly authorized by all necessary corporate or other organizational action, and does not and will not (A) contravene the terms of its Organizational Documents, (B) conflict with or result in any breach or contravention of, or the creation of any lien under, or require any payment to be made under (I) any Contractual Obligation to which it is a party or affecting it or its properties or (II) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which it or its property is subject, or (C) violate any applicable law; except in each case referred to in clause (B) or (C), to the extent the failure to do so could not reasonably be expected to have a Payee Material Adverse Effect.

(iii) Governmental Authorization; Other Consents. No approval, consent, exemption, authorization or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution delivery or performance of this Agreement by, or enforcement against, the Payee.

(iv) Binding Effect. This Agreement has been duly executed and delivered by the Payee. This Agreement constitutes a legal, valid and binding obligation of the Payee, enforceable against the Payee in accordance with its terms, except to the extent such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally and by equitable principles.

4. Covenants of the Payor.

(a) Provision of Financial Information.

(i) The Payor will furnish to the Payee, no later than 90 days after the end of each fiscal year (in the case of annual financial statements) and 60 days after the end of each fiscal quarter other than the last fiscal quarter (in the case of quarterly financial statements), unaudited annual and quarterly consolidated financial statements prepared in accordance with GAAP (subject to the absence of notes to the financial statements and related disclosures, and, with respect to quarterly financial statements, normal year-end audit adjustments).

(ii) By accepting such financial information, the Payee will be deemed to have represented to and agreed with the Payor that: (A) it will not use the information in violation of applicable securities laws or regulations; and (B) it will not communicate the information to any Person, including in any aggregated or converted form, and will keep the information confidential, other than where disclosure of such information is required by law, regulation or legal process (in which case the Payee shall, to the extent permitted by law, notify the Payor promptly thereof).; *provided however*, that the Payee may deliver a copy thereof to counsel for any official committee of asbestos claimants and any future claimants' representative appointed in any Bankruptcy Case on a confidential basis under a protective order entered in such Bankruptcy Case.

(iii) Notwithstanding the foregoing, the financial statements, information and other documents required to be provided as described in Section 4(a)(i), may be, rather than those of the Payor, those of any direct or indirect parent of the Payor. Notwithstanding the foregoing, the Payor may fulfill the requirement to distribute such financial information by filing the information with the SEC within the applicable time periods required by the SEC. The Payor will be deemed to have satisfied the reporting requirements of Section 4(a)(i) if any direct or indirect parent of the Payor has filed such reports containing such information with the SEC within the applicable time periods required by the SEC and such reports are publicly available. To the extent a direct or indirect parent of the Payor provides financial statements, information and other documents pursuant to the first sentence of this Section 4(a)(iii) or such parent files such report with the SEC pursuant to the third sentence of this Section 4(a)(iii), and if the financial information so furnished relates to such direct or indirect parent of the Payor, the same shall be accompanied by consolidating information that explains in reasonable detail the difference between the information relating to such parent on the one hand, and the information relating to the Payor and its Subsidiaries on a standalone basis, on the other hand.

(b) Successor to the Payor upon Consolidation or Merger.

(i) Subject to the provisions of Sections 4(b)(ii) and 4(b)(iii), nothing contained in this Agreement shall prevent any consolidation or merger of the Payor

with or into any Person, or successive consolidations or mergers in which the Payor or its successor or successors shall be a party or parties, or shall prevent any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all the property of the Payor (for the avoidance of doubt, calculated by including any equity interests held by the Payor), to any Person; *provided*, *however*, and the Payor hereby covenants and agrees, that, if the surviving Person, acquiring Person or lessee is a Person other than the Payor, upon any such consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition, all of the Payor's funding obligations under this Agreement and the observance of all other covenants and conditions of this Agreement to be performed by the Payor, shall be expressly assumed by an amendment to this Agreement or such other documentation in form reasonably satisfactory to the Payee, executed and delivered to the Payee by the Person formed by such consolidation, or into which the Payor shall have been merged, or by the Person which shall have acquired or leased such property. This covenant will not apply to (A) a merger of the Payor with an Affiliate solely for the purpose of reincorporating the Payor in another jurisdiction within the United States, (B) any conversion of the Payor from an entity formed under the laws of one state to the same type of entity formed under the laws of another state, or (C) any conversion of the Payor from a limited liability company to a corporation, from a corporation to a limited liability company, from a limited liability company to a limited partnership or a similar conversion, whether the converting entity and the converted entity are formed under the laws of the same state or the converting entity is formed under the laws of one state and the converted entity is formed of the laws of a different state. Notwithstanding the foregoing, this Section 4(b)(i) will not apply to any consolidation or merger, or any sale, assignment, transfer, conveyance, lease or other disposition of assets, between or among Payor and its Subsidiaries.

(ii) Upon any consolidation or merger, or any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all of the assets, of the Payor (for the avoidance of doubt, calculated by including any equity interests held by the Payor) in a transaction that is subject to, and that complies with, the provisions of the preceding clause (i), the successor Person formed by such consolidation with the Payor or into which the Payor is merged, or to which such sale, assignment, transfer, lease, conveyance or other disposition is made, shall succeed to, and be substituted for (so that from and after the date of such consolidation, merger, sale, lease, conveyance or other disposition, the provisions of this Agreement referring to the "Payor" shall refer instead to the successor Person and not to the Payor), and may exercise every right and power of, the Payor under this Agreement with the same effect as if such successor Person had been named as the Payor herein. In the event of a succession in compliance with this Section 4(b)(ii), the predecessor Person shall be relieved from every obligation and covenant under this Agreement upon the consummation of such succession.

(iii) Any consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition referred to in the preceding clause (i) shall not be

permitted under this Agreement unless immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing.

(c) Financial Limitations.

(i) The Payor shall not make any Dividend; *provided, however*, that nothing in this Section 4(c)(i) shall prohibit the Payor from making any Dividend solely to fund Payor Tax Liabilities.

(ii) The Payor shall not forgive any obligation owed to it by an Affiliate of the Payor and shall cause each of its Subsidiaries not to forgive any obligation owed to such Subsidiary by an Affiliate of such Subsidiary.

(d) Limitation on Payment Prohibitions. The Payor will not consensually enter into any contract that prohibits the Payor from making Payments under this Agreement.

5. Covenants of the Payee. The Payee shall not use the proceeds of any Payment made under this Agreement for any purpose other than a Permitted Funding Use. The Payee will perform its indemnification obligations owing to the Payor under the agreements provided for in the Plan of Divisional Merger in all material respects, subject, in the event that a proceeding under the Bankruptcy Code is pending with respect to the Payee, to the resulting automatic stay under section 362 of the Bankruptcy Code.

6. Events of Default. Each of the following events constitutes an "Event of Default":

(a) the Payor defaults in its funding obligations pursuant to Section 2 and such default continues for a period of 10 Business Days;

(b) the Payor defaults in the performance of, or breaches, any covenant or representation or warranty of the Payor in this Agreement (other than a covenant or representation or warranty which is specifically dealt with elsewhere in this Section 6) and such default or breach continues for a period of ~~90~~30 days, or, in the case of any failure to comply with Section 4(a) of this Agreement, ~~180~~60 days, in each case after there has been given, by registered or certified mail, to the Payor by the Payee a written notice specifying such default or breach and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder;

(c) the Payor, pursuant to or within the meaning of the Bankruptcy Code or any similar federal or state law for the relief of debtors, (i) commences a voluntary case, (ii) consents to the entry of an order for relief against it in an involuntary case, (iii) consents to the appointment of a custodian of it or for all or substantially all of its property, (iv) makes a general assignment for the benefit of its creditors, or (v) generally is not paying its debts as they become due; and

(d) a court of competent jurisdiction enters an order or decree under the Bankruptcy Code or any similar federal or state law for the relief of debtors that (i) is for relief against the Payor, (ii) appoints a custodian of the Payor for all or substantially all of the property of the Payor, or (iii) orders the liquidation of the Payor, and, in each case of

(i) through (iii) above, such order or decree remains unstayed and in effect for 60 consecutive days.

Upon becoming aware of any Default or Event of Default, the Payor shall promptly deliver to the Payee a statement specifying such Default or Event of Default.

7. Remedies. Upon the occurrence of any Event of Default, and at any time thereafter during the continuance of any such Event of Default, the Payee may pursue any available remedy to collect any unfunded Payments due and owing to the Payee or to enforce the performance of any provision of this Agreement.

8. Notices. All notices required under this Agreement, including each Funding Request and any approval of or objection to a Funding Request, shall be delivered to the applicable party to this Agreement at the address set forth below. Unless otherwise specified herein, delivery of any such notice by email, facsimile or other electronic transmission (including .pdf) shall be effective as delivery of a manually executed counterpart thereof.

Payor:

CERTAINTEED LLC
20 Moores Road
Malvern, Pennsylvania 19355
Attention: Mark A. Rayfield, President and Chief Executive Officer
Email: Mark.A.Rayfield@saint-gobain.com

with a copy to:

CERTAINTEED LLC
20 Moores Road
Malvern, Pennsylvania 19355
Attention: R. Craig Smith, Divisional Counsel
E-mail: Craig.Smith@saint-gobain.com

Payee:

DBMP LLC
20 Moores Road
Malvern, Pennsylvania 19355
Attention: Joseph N. Bondi, President
Email: Joseph.N.Bondi@saint-gobain.com

with a copy to:

DBMP LLC
20 Moores Road
Malvern, Pennsylvania 19355
Attn: Michael T. Starczewski, Chief Legal Officer

E-mail: Michael.T.Starczewski@saint-gobain.com

9. Governing Law; Submission to Jurisdiction. This Agreement shall be governed and construed in accordance with the laws of the State of North Carolina. Any legal proceeding seeking to enforce any provision of, or based on any matter arising under, this Agreement may be brought: (a) at any time there is not a proceeding under the Bankruptcy Code pending with respect to the Payee, in state or federal court in Charlotte, North Carolina; or (b) at any time there is a proceeding under the Bankruptcy Code pending with respect to the Payee, in the Bankruptcy Court. Each of the Payor and the Payee hereby irrevocably and unconditionally submits to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such legal proceeding.

10. No Implied Waiver; Amendments. No failure or delay on the part of the Payee to exercise any right, power or privilege under this Agreement, and no course of dealing between the Payor, on the one hand, and the Payee, on the other hand, shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under this Agreement preclude any other or further exercise thereof or the exercise of any other right, power or privilege. No notice to or demand on the Payor in any case shall entitle the Payor to any other or further notice or demand in similar or other circumstances, or constitute a waiver of the right of the holder of this Agreement to any other or further action in any circumstances without notice or demand. The remedies provided in this Agreement are cumulative and not exclusive of any remedies provided by law. No amendment or waiver of any provision of this Agreement, nor consent to any departure by the Payee therefrom, shall in any event be effective unless the same shall be in writing, specifically refer to this Agreement, and be signed by the Payor and the Payee, and then such amendment or waiver shall be effective only in the specific instance and for the specific purpose for which given. A waiver on any such occasion shall not be construed as a bar to, or waiver of, any such right or remedy on any future occasion.

11. Counterparts; Entire Agreement; Electronic Execution. This Agreement may be executed in separate counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement constitutes the entire contract among the parties relating to the subject matter hereof and supersedes, in its entirety, the ~~Original~~Amended and Restated Funding Agreement. This Agreement shall become effective when it shall have been executed by each party hereto and each party hereto shall have received counterparts hereof which, when taken together, bear the signatures of each of party hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Delivery of an executed counterpart of a signature page of this Agreement by telecopy, .pdf or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement.

12. Severability. If any one or more of the provisions contained in this Agreement are invalid, illegal or unenforceable in any respect, the validity, legality or enforceability of all the remaining provisions will not in any way be affected or impaired. If any one or more provisions contained in this Agreement are deemed invalid, illegal or unenforceable because of their scope or breadth, such provisions shall be reformed and replaced with provisions whose scope and breadth are valid under applicable law.

13. Transfer; Assignment. This Agreement shall be binding upon the Payor and its successors and assigns, and the terms and provisions of this Agreement shall inure to the benefit of the Payee and its successors and assigns. The Payor's rights and obligations under this Agreement may not be assigned without the prior written consent of the Payee; *provided*, *however*, that no such consent of the Payee shall be required in connection with ~~the Post-Merger Assignment or~~ any transfer effected in compliance with Section 4(b). ~~Upon giving effect to the Post-Merger Assignment, CT Holding will be released from its obligations as the Payor and will have no further obligations under this Agreement. The DE Conversion shall not constitute an assignment of the Payor's rights and obligations under this Agreement.~~ The Payee's rights and obligations under this Agreement may not be assigned without the prior written consent of the Payor. ~~None of the TX Conversion, the Divisional Merger or the NC Conversion shall constitute an assignment of the Payee's rights and obligations hereunder.~~

14. Construction. The descriptive headings herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement. The word "including" means without limitation by reason of enumeration. The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless specifically stated otherwise, all references to Sections and Schedules are to the Sections and Schedules of or to this Agreement.

15. Rights of Parties. This Agreement shall not confer any rights or remedies upon any Person other than the parties hereto and their respective successors and permitted assigns.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**CERTAINTEED LLC**, a Delaware limited liability company, as the Payor

By: ______________________________
Mark A. Rayfield
President and Chief Executive Officer

**DBMP LLC**, a North Carolina limited liability company, as the Payee

By: ______________________________
Joseph N. Bondi
President

## SCHEDULE 1

### Definition of Asbestos Related Liabilities

For purposes of this Agreement, "Asbestos Related Liabilities" means all Liabilities (as defined below) of the Payee related in any way to asbestos or asbestos containing materials.

Capitalized terms that are used in this Schedule 1 have the following meanings:

(a) "Cause of Action" means any claim, judgment, cause of action, counterclaim, crossclaim, third party claim, defense, indemnity claim, reimbursement claim, contribution claim, subrogation claim, right of set off, right of recovery, recoupment, right under any settlement Contract and similar right, whether choate or inchoate, known or unknown, contingent or noncontingent.

(b) "Contract" means any contract, agreement, arrangement, lease, indenture, mortgage, deed of trust, evidence of indebtedness, License, Plan, guarantee, understanding, course of dealing or performance, instrument, bid, order, proposal, demand, offer or acceptance, whether written or oral.

(c) "Governmental Authority" means any national, central, federal, state, provincial, municipal, local or other domestic, foreign or supranational governmental, legislative, administrative or regulatory authority, agency, court, arbitration tribunal, board, department or commission, or other governmental or regulatory entity, including any competent governmental authority responsible for the determination, assessment or collection of taxes.

(d) "Law" means any national, central, federal, state, provincial, municipal, local or other domestic, foreign or supranational statute, law, ordinance, decree, order, injunction, rule, regulation, directive, constitution, code, edict, writ, judgment, opinion, decree, injunction, stipulation, award or other document or pronouncement having the effect of law (including common law) of any Governmental Authority, including rules and regulations of any regulatory or self-regulatory authority with which compliance is required by any of the foregoing.

(e) "Liability" shall mean any claim, demand, offer, acceptance, action, suit, liability or obligation of any kind, whether accrued or fixed, absolute or contingent, matured or unmatured, determined or determinable, choate or inchoate, asserted or unasserted, known or unknown, including (i) those arising or that may arise under any past, present or future Law or Contract or pursuant to any Cause of Action or Proceeding and (ii) all claims for economic or noneconomic damages or injuries of any type or nature whatsoever (including claims for physical, mental and emotional pain and suffering, loss of enjoyment of life, loss of society or consortium and wrongful death, as well as claims for damage to property and punitive damages).

(f) "License" means any license, sublicense, agreement, covenant not to sue or permission.

(g) "Person" means any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, benefit plan, unincorporated organization, business, syndicate, sole proprietorship, association, organization, labor union or other entity or Governmental Authority.

(h) "Plan" means, with respect to any Person, (i) any "employee benefit plan" (as defined in Section 3(3) of ERISA), (ii) all specified fringe benefit plans as defined in Section 6039(D) of the Internal Revenue Code, and (iii) any other plan, program, policy, agreement or arrangement, whether or not in writing, relating to compensation, employee benefits, severance, change in control, retention, deferred compensation, equity, employment, consulting, vacation, sick leave, paid time off, salary continuation, disability, hospitalization, medical insurance, life insurance, scholarship programs, incentive compensation or bonus compensation, in each case that is sponsored, maintained or contributed to or required to be sponsored, maintained or contributed to by, or otherwise covering, such Person.

(i) "Proceeding" means any action, appeal, arbitration, assessment, cancellation, charge, citation, claim, complaint, concurrent use, controversy, contested matter, demand, grievance, hearing, inquiry, interference, investigation, litigation (including class actions and multidistrict litigation), mediation, opposition, re-examination, summons, subpoena or suit, or other case or proceeding, whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private, commenced, brought, conducted or heard by or before, under the supervision or direction of, or otherwise involving, any Governmental Authority or arbitrator or other agreed-upon tribunal or dispute resolution mechanism.

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| IN RE: | : | Case No. 20-30080-JCW |
| DBMP LLC, | : | Chapter 11 |
| Debtor, | : | Charlotte, North Carolina<br>Thursday, January 6, 2022 |
| | : | 9:31 a.m. |

: : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

| | | |
|---|---|---|
| OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS and SANDER L. ESSERMAN, etc., | : | AP 21-03023 (JCW) |
| Plaintiffs, | : | |
| v. | : | |
| DBMP LLC and CERTAINTEED LLC, | : | |
| Defendants. | : | |

: : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE J. CRAIG WHITLEY,
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES (via Teams):

| | |
|---|---|
| For Debtor/Defendant, DBMP: | Robinson, Bradshaw & Hinson, P.A.<br>*BY: GARLAND CASSADA, ESQ.<br>* RICHARD C. WORF, ESQ.<br>101 N. Tryon Street, Suite 1900<br>Charlotte, NC 28246 |

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

---

**JANICE RUSSELL TRANSCRIPTS**
**1418 Red Fox Circle**
**Severance, CO 80550**
**(757) 422-9089**
**trussell31@tdsmail.com**

APPEARANCES (via Teams continued):

| | |
|---|---|
| For Debtor/Defendant, DBMP: | Jones Day<br>*BY: GREGORY M. GORDON, ESQ.<br>2727 North Harwood Street<br>Dallas, TX 75201-1515 |
| | Jones Day<br>*BY: JEFFREY B. ELLMAN, ESQ.<br>1221 Peachtree St., N.E., #400<br>Atlanta, Georgia 30309 |
| | Jones Day<br>*BY: JAMES M. JONES, ESQ.<br>250 Vesey Street<br>New York, NY 10281 |
| For Plaintiff, ACC: | Caplin & Drysdale<br>*BY: KEVIN MACLAY, ESQ.<br>* TODD PHILLIPS, ESQ.<br>One Thomas Circle, NW, Suite 1100<br>Washington, DC 20005 |
| | Robinson & Cole LLP<br>*BY: NATALIE D. RAMSEY, ESQ.<br>1201 N. Market Street, Suite 1406<br>Wilmington, DE 19801 |
| | Winston & Strawn LLP<br>*BY: CARRIE V. HARDMAN, ESQ.<br>200 Park Avenue<br>New York, NY 10166-4193 |
| For Plaintiff, Future Claimants' Representative, Sander L. Esserman: | Young Conaway<br>*BY: SHARON ZIEG, ESQ.<br>* EDWIN HARRON, ESQ.<br>* SEAN T. GREECHER, ESQ.<br>1000 North King Street<br>Wilmington, DE 19801 |
| | Alexander Ricks PLLC<br>*BY: FELTON E. PARRISH, ESQ.<br>1420 E. 7th Street, Suite 100<br>Charlotte, NC 28204 |

APPEARANCES (via Teams continued):

For Defendant, CertainTeed Corporation:

Rayburn Cooper & Durham, P.A.
*BY: JOHN R. MILLER, JR., ESQ.
227 West Trade Street, Suite 1200
Charlotte, NC 28202

Goodwin Procter LLP
*BY: HOWARD S. STEEL, ESQ.
620 Eighth Avenue
New York, NY 10018

ALSO PRESENT (via Teams):

*SANDER L. ESSERMAN
Future Claimants' Representative
2323 Bryan Street, Suite 2200
Dallas, TX 75201-2689

*SHELLEY K. ABEL
Bankruptcy Administrator
402 West Trade Street, Suite 200
Charlotte, NC 28202

P R O C E E D I N G S

(Call to Order of the Court)

THE COURT: Okay. Have a seat, everyone. Good morning.

We're back in the DBMP base bankruptcy case and we'll be over in the adversary proceeding as well of Committee versus DBMP, Adversary 21-03023, here in a moment.

We have a -- we're doing this by Teams videoconferencing and I know there are quite a few of you on the line. So let's see if we can take stock of who is participating today. And let me just tell you who I have on our list of participants and then you can backfill from there.

As I understand it, on behalf of the debtor Richard Worf, Greg Gordon, James Jones, Jeffrey Ellman, potentially as speakers.

Todd Phillips, Natalie Ramsey, Carrie Hardman, Ed Harron -- oh, excuse me. Carrie Hardman on behalf of the ACC.

FCR, Ed Harron, Sean Greecher, Felton Parrish.

And on behalf of New CT, Howard Steel.

Other attendees, but potentially not speakers, Sharon Zieg and Sander Esserman, FCR and FCR counsel.

Do we have any others wishing to announce appearances or to make corrections?

MR. MACLAY: Yes, your Honor. Kevin Maclay is also here for the ACC --

THE COURT: Okay.

MR. MACLAY: -- although Todd Phillips will be taking the lead for Caplin. Thank you.

THE COURT: Very good.

Anyone else?

MR. MILLER: Good morning, your Honor. Jack Miller, Rayburn Cooper & Durham, on behalf of New CT. I'm here.

THE COURT: Okay.

Anyone else?

MS. ABEL: Good morning, your Honor. Shelley Abel, Bankruptcy Administrator.

THE COURT: Thank you.

MR. CASSADA: Your Honor, this is Garland Cassada. I'm also appearing for the debtor --

THE COURT: Okay. Thank you.

MR. CASSADA: -- but not, not speaking.

THE COURT: Very good.

Anyone else?

(No response)

THE COURT: Okay.

We have a Notice of Agenda that has been filed at Docket 1278 and I suppose we ought to, before we light into the matters that are showing on the docket, just ask for a general status update as has become traditional in these matters.

Anyone got anything you need to let the group know?

MR. GORDON: Morning, your Honor. Greg Gordon on behalf of the debtor.

THE COURT: Okay.

MR. GORDON: I, I don't think there's a lot to report this morning. I did want to let your Honor know, if you hadn't seen it on the docket yesterday, that we did file a stipulation with respect to --

THE COURT: Uh-huh (indicating an affirmative response).

MR. GORDON: -- the second amended funding agreement pursuant to the comments your Honor made at the, at the prior hearing.

THE COURT: Uh-huh (indicating an affirmative response).

MR. GORDON: We're also currently working with the other side on a form of order with respect to trust discovery. That order is out for review to the Committee and the FCR and we hope to get that finalized and uploaded shortly.

I guess another thing I would comment on is with respect to estimation we recognize that the ball's in our court to put together a case management order with respect to that and we haven't progressed very far with that so far because that depends, in part, on resolution of some of the open PIQ and trust discovery issues.

THE COURT: Uh-huh (indicating an affirmative

response).

MR. GORDON: And as soon as those get settled I think we'll be in a position to put together a CMO, share it with the other side, and then present it to the Court.

THE COURT: Okay.

MR. GORDON: And then otherwise, your Honor, we've had discussions with the other side about the tolling --

THE COURT: Uh-huh (indicating an affirmative response).

MR. GORDON: -- agreement and I'm pleased to report based on the most recent conversation I, I think we are very close to an agreement on the form of the tolling agreement, if not there completely. And with your Honor's permission, we would just go ahead and upload the order once that's finalized.

And then at the, the same time we received, I think within the last week or so, a list of the parties from whom the Committee and the FCR would like the debtor and New CT to seek tolling agreements.

THE COURT: Uh-huh (indicating an affirmative response).

MR. GORDON: And we've got some issues with respect to that list. We had a preliminary discussion with the other side about it a couple of days ago and the ball's in our court at this point to come back with some refinements --

THE COURT: Uh-huh (indicating an affirmative

response).

MR. GORDON: -- to the list and we expect to have some discussions about that thereafter and it may be that, you know, I know that your Honor had set aside some time for status conferences with respect to the tolling agreement.

THE COURT: Uh-huh (indicating an affirmative response).

MR. GORDON: It may be that we won't need it as to the form of the agreement. We may need it as to the scope of the list of parties from whom the agreement would be sought.

THE COURT: Uh-huh (indicating an affirmative response).

MR. GORDON: But obviously, we would intend to keep the Court apprised of, of the status of that and, and obviously, we'll work with the other side to try to work through all the issues that may exist with respect to the list.

THE COURT: All right.

MR. GORDON: The only other thing I would note, your Honor, with respect to the tolling agreement is that because we have the list of parties that's still somewhat in a state of flux, it's possible that the form of the agreement may need to change somewhat at least with respect to certain of the parties.

THE COURT: Uh-huh (indicating an affirmative response).

MR. GORDON: Because, you know, certain of the parties that are on the list have not yet seen the form of the agreement and they may have their own comments. But, you know, the Committee and the FCR, as an example, is aware that some of the law firms that are on the list have comments from malpractice carriers and the like that require some comments and I think there's been a general understanding so far that maybe the agreement will have to be customized in certain respects for some of the parties, if necessary. And obviously, that's all going to have to get worked through with the Committee and the FCR to make sure that whatever changes may be required for that purpose or otherwise required by some of these parties, that those changes are acceptable to the Committee and the FCR.

THE COURT: Okay. Did we ever agree on which date you were going to use if, if you needed the date?

MR. GORDON: You know, your Honor, I don't think we had a discussion about that and I actually don't have those dates right --

THE COURT: Right.

MR. GORDON: -- in front of me at the moment.

THE COURT: Well, I think I had the 10th after 3:00, I think the 12th was available, and then the 21st. We were all trying to get this done before the 23rd.

MR. GORDON: Right.

THE COURT: The 21st in the morning. It would be helpful to me rather than have to hold all three days if y'all could figure out which day you were going to use, if you did. I don't need to know this moment, but if you could let us know that within a day or two so that we don't have to stretch out there.

MR. GORDON: It seems like --

THE COURT: Ms. Hardman?

MR. GORDON: -- from my perspective, anyway, the 12th might be the ideal date.

THE COURT: Ms. Hardman?

MS. HARDMAN: Your Honor, if I may?

THE COURT: Uh-huh (indicating an affirmative response).

MS. HARDMAN: Carrie Hardman on behalf of the ACC.

We had discussed preliminarily on our call earlier this week with the debtor and New CT that maybe the 12th at 9:30 might work for the group, but I think it was subject to Mr. Gordon confirming that that worked for him as well. So --

THE COURT: All right.

MS. HARDMAN: -- if that works for him, that works for us.

THE COURT: Okay.

MR. GORDON: That works fine.

THE COURT: Okay. Let's pencil that in, if you need

it. Let me know --

MS. HARDMAN: Great. Thank you.

THE COURT: -- if you don't. It would be also helpful there.

So in any event, we'll, we'll go forward with that.

Anything else by the debtor by way of good-of-the order announcements?

MR. GORDON: Not from me, your Honor, no.

THE COURT: For the clerk's --

MR. GORDON: Thank you.

THE COURT: For the clerk's benefit, the tolling agreement, No. 3 -- that's what we've been discussing -- and tentatively settled, but if need be, to discuss terms or disagreements we will tentatively put that over until the, the 12th at 9:30, subject to being removed if, if there are no disagreements, all right?

So from the ACC's perspective, any preliminary remarks before we get into the rest of this?

MR. PHILLIPS: No, your Honor. We'll, we'll reserve for --

THE COURT: Okay.

MR. PHILLIPS: -- for -- to respond if anything comes up. Thank you.

THE COURT: How about the FCR?

MR. HARRON: Thank you, your Honor. Nothing to add.

THE COURT: Anyone else?

(No response)

THE COURT: Okay.

Well, then, my question is what remains of the calendar, where would you like to go next?

(No response)

THE COURT: Any -- you want to take them in order or did we want to talk about some of the other issues? We had had some discussions earlier and y'all were going to caucus about No. 1, the personal injury questionnaires in, in view of my comments about the differences in the cases and whether or not this should be pursued by a claims bar date as in, as the debtors' seeking in Aldrich. Any --

MR. GORDON: So, your Honor, Greg Gordon again on behalf of the debtor.

So from the debtor's perspective where we've come out after considering it internally is we think it does make sense to go forward with a bar date --

THE COURT: Uh-huh (indicating an affirmative response).

MR. GORDON: -- in conjunction with the PIQ and we're still thinking about the details of how that would work exactly. But our thought was that we would endeavor to get a motion on file --

THE COURT: Uh-huh (indicating an affirmative

response).

MR. GORDON: -- seeking a bar date in time for the next omnibus hearing and, of course, that motion would contain the, the details of what we'd be seeking with respect to the bar date.

THE COURT: Okay.

Anyone else want to talk about how you want to proceed as to that?

Mr. Phillips.

MR. PHILLIPS: Your Honor, Todd Phillips on behalf of the Committee.

We think a, a bar date is deeply inappropriate in this matter, an asbestos claims bar date, and we will be opposing it for the record.

THE COURT: Okay.

MR. PHILLIPS: Thank you.

THE COURT: All right.

I would assume the FCR feels the same. Mr. Harron?

MR. HARRON: That's right, your Honor. We'll, we'll generally reserve until we see the motion, but in our experience, you know, bar dates are a bad idea in these cases.

THE COURT: Okay.

And that also gives us --

MR. HARRON: Thank you.

THE COURT: -- the opportunity for, for the Aldrich

case to -- I'm working on that one as well, so.

Then may I assume that you're, that by consensus, instead of me having the PIQ under advisement, we're going to talk about that at the same time as the bar date, just continue it over?

MR. GORDON: Greg Gordon on behalf of the debtor.

I think that's right, your Honor. Because, obviously, the bar date can impact the PIQ, to some extent, and in our view it would make sense that those be heard together.

THE COURT: Okay. So February 10, that work?

MR. GORDON: Yes, your Honor.

THE COURT: Okay.

I, I know that there will be responses necessarily filed, but at least on the ACC side because of Aldrich I think I've read most of what you're likely to say. So don't feel like you have to give me every, every line and verse that, that might have been said in the other case. Just give me the, the new stuff, all right?

February --

MR. PHILLIPS: Understood.

THE COURT: Okay, very good.

February 10, 9:30.

And, Madam Clerk, that one previously had shown as under advisement, but it is, effectively, continued, No. 1.

THE COURTROOM DEPUTY: Gotcha.

THE COURT: All right.

Okay. All right. Where from there?

We were also, had a question that had been raised by e-mail, but it wasn't raised in this case, I now see, but it was raised in Aldrich about the motion to dismiss in the adversary, motions, 4 and 5. I don't know whether all of y'all were involved in that. When I saw the e-mail, I was reading it off my cellphone, and I thought we were talking about this case, not Aldrich.

But as I understand Mr. Miller's e-mail from that case, there was a question about scheduling a motion to dismiss that looks very similar to the one we have here, the ones we have here, in Aldrich and they were talking about scheduling that on March the 3rd.

That presents a little bit of a, a conundrum of whether we want to rule in one case now and realize that the next group's not going to get a fresh shot at this or whether we want to hold this decision long enough for them to at least argue and, or the parties in that, recognizing that the FCRs are, are different and the debtors are different, although represented by the same firm.

So my question is what are your 'druthers on the motions to dismiss?

MR. GORDON: This is Greg Gordon again, your Honor.

As I understand it in Aldrich -- you know, my

involvement's fairly minimal -- that the e-mail was sent in because I think the, the motion to dismiss in that case had originally been scheduled for late this month --

THE COURT: Right.

MR. GORDON: -- if I recall, and the Committee had requested that the, that that hearing be moved to March and I think the question put to your Honor was is your Honor okay with that.

THE COURT: Right.

MR. GORDON: Because we're aware of the fact that the motion's pending in the DBMP case.

THE COURT: Right.

MR. GORDON: I, I think from the DBMP perspective, your Honor, we, we, we just have to defer to what, what you want to do. We obviously appreciate the fact that they're two cases, that they're similar issues, and we, we understand that in the past you've had a desire to not have one get out in front of the other and to try to, to, you know, allow each company to have the opportunity to make their arguments with sort of no prejudgment, I guess, or, or decision --

THE COURT: Uh-huh (indicating an affirmative response).

MR. GORDON: -- that would suggest some prejudgment on the issues.

So I, I think from our perspective we view that as --

we're fine either way, I guess, in other words --
THE COURT: How --
MR. GORDON: -- or we would --
THE COURT: How about --
MR. GORDON: -- defer to the Court.
THE COURT: How about the other groups?
Mr. Phillips, we're not hearing you. I'm sorry. Unmute, if you would.
MR. PHILLIPS: Sorry.
THE COURT: There you go.
MR. PHILLIPS: Todd Phillips on behalf of the Committee, your Honor.
The DBMP motions have been fully briefed, argued, they're ready to go. The Aldrich motions are, frankly, somewhat different than these and, and we haven't, we have about a month to brief those and the hearing's not until March. I, I think that this case is ready to go and we're happy to get a ruling from you today, if you have it. I, we don't see any reason to hold that back.
THE COURT: Any others?
(No response)
THE COURT: Okay.
I'm going to hold that one back till next month just simply because of my error. I was assuming that we had that, that we were holding it for Aldrich, and I'm going to take it

one more month. And I apologize for delaying you in that way. That's not my nature. I want to get these things decided and, frankly, I think I have that one decided. But bottom line is I haven't had the occasion to read any of the Aldrich, either the motion to dismiss or the complaint.

So I would sort of like to know what I'm getting into there before I start announcing things broadly here.

And with that in mind and asking your indulgence, I'm going to continue that one over on my own motion to February 10, okay? I'll give you the announcement then. It's sitting here looking at me, but it could change. All right?

So that takes care of No. 4 and 5. And again, they're not advisement at -- they're continued for ruling, not, not to be heard, okay?

Okay. And then that leaves us, I think, with the crime-fraud/at-issue waiver motion of the Committee, No. 2, correct? Anything else that we need to talk about before that? Good?

(No response)

THE COURT: Okay. Let's see if I can find my materials here.

I would say at the outset that this is one that is difficult in a variety of respects, both the way it came up and the size and scope of the inquiry. We're not talking about one document. We're not talking about one deposition. We're

talking about the entirety of what's been done here and that being the case, it's hard to come up with one simple answer and I'll just tell you the way I look at it and, and we can talk about it some further. I'm not going to recite to you all the law. You've -- more or less, the general principles are well known and, and have been cited in the briefs.

But the way this appears to me is what we're doing today is trying to litigate a motion that was first raised in the personal injury, the preliminary injunction adversary and was not reached and now that we've decided the preliminary injunction and that has issued, that adversary is, effectively, over, but we're trying to do it again. You recall, of course, the Representatives filed the motion to appoint the mediator and before we got to the preliminary injunction -- I guess it was November, December of, of last year, being 2020 -- and we went through all of that.

Essentially, the contention was that as to the corporate restructuring, the funding agreement, and the reasons underlying the bankruptcy filing, that the debtor's statements about why it filed the case and, and why it underwent the corporate restructuring, both in that adversary and in the first day brief, the contention was that we had an at-issue waiver and, potentially, a crime-fraud exception and at that time the ACC was looking for details about all. Of course, there were broad assertions of privilege, same thing happened

in the depositions, and we ended up with about 4,000 documents on a log and 200 or so instructions not to answer at depositions, a very narrow time frame, and with an injunction hearing that had been continued multiple times, and the inability to get all of that sorted out before we got to the hearing without continuing it. And I'm not going to recite to you what y'all all did trying to work through that, but I think the answer is that you weren't able to get the categories nailed down and you weren't able to satisfy yourselves with, with privilege.

So the ACC filed this motion for a discovery mediator -- I believe it was the ACC -- to address all of that and effectively, had to withdraw the motion before we got there to avoid continuing the injunction hearing again. And we had that injunction hearing and in the same time period Mr. Gross' testimony came to light and we dealt with that. Understanding that the ACC has seen what -- and then I made some comments about what I thought the evidence showed as to the motivation of the filings and the timing of, of both the CR and the, the decision to file bankruptcy.

So we've got it back again after the, the injunction's over and, if anything, I think the requests now are broader than they were before. Now there's a desire for all of the documents and testimony that was asked for before, plus a ruling that it, that the debtor and New CT can't perspectively

assert privileges about any aspects of the corporate restructuring and the decision to file. That's a pretty broad thing to be asking and, in fact, the latter part's almost an affirmative injunction.

So what we've got, essentially, is the debtor saying you can't have any of this and the Committee wanting everything that has anything to do with the, those two or three topics and from the Court's perspective, my first question is, well, is this necessary at this point in time in the case? The first motion, of course, won't be heard because it was withdrawn. There were certainly findings made in the, findings of fact and conclusions of law that it appeared to me there were some selective testimony being given while the effort to block the Committee's and FCR's questions about these matters was being maintained.

That left the Court in a little bit of an awkward spot in that hearing because I hadn't decided the, the privilege issues, but there was some need to say something about it, at least. I, I felt like as much as y'all had argued it and had put it in your proposed findings and conclusions, that it might be useful to tell y'all what I was, what a third party was reacting to the evidence that had been seen. And so I basically told you some of what I was thinking.

I really couldn't make a full-fledged decision as to whether all this was privileged then or not. Didn't finish the

motion, I didn't have an in-camera review of the documents, and effectively, could hardly conclude, as the ACC seems to want to use the Gross testimony and what I said earlier, to be a ruling that all discussions and all documents related to these matters are now fair game and unprivileged.

In point of fact, I think, if you're really strictly construing it, it may well be what I said about the timing and the decision making about these events could be considered *dicta* from that decision. But again, both sides addressed it in detail and I thought I'd let you know what I was thinking, but when it came down to the preliminary injunction ruling itself, effectively I decided it not based on the motivation or who filed when and who made the decision. So I made it based on concepts of estate property and foundational rulings by our Circuit court that effectively decide who has first crack at fraudulent conveyances and causes of action that might be shared between a trustee and, or a debtor/trustee and individual creditors.

So the preliminary injunction is entered. It wasn't appealed. I didn't rely on those privileged communications or anybody's expressions of good faith or bad faith or any of that. So that's over and that begs the question is at this particular moment in time what purpose would be served by the current motion of granting it and is it really teed up to be decided at the moment. The PI matter's over. A final

injunction's not going to be had in that adversary. That would only come from a plan, if one's ever confirmed.

So what this looks to me like is, effectively, a motion to obtain discovery for use in future proceedings in the case, either adversaries or contested matters, which normally you would say Rule 26 would be the better vehicle. The discovery is not really relevant to the one pending matter that is about to go into discovery, which is estimation. It certainly is relevant to the substantive consolidation motion, but we all know we've got a motion to dismiss pending there, we hadn't filed answers, and we're not in discovery in, in that action, and we don't have any adversary at the moment attacking the corporate restructuring and the, the filing. There -- the 548 and alter ego lawsuits have yet to be filed. So there's no discovery there.

It also could be relevant, this type of information, to a contested confirmation as to matters of good faith and not forbidden by law and all that sort of thing, but we're not there, either. So we are kind of at a point that we're betwixt and between, if you will. So that makes me inclined for now to deny the motion without prejudice to raise it again.

But having said that, I want to say that it looks almost certain to me that this is going to come up again and it could come up in piecemeal fashion, given all the various proceedings where some of these issues apply. I'm not real

keen on the idea of trying to take discovery three times on, effectively, the same topics, particularly since you've already done it once to a certain extent, to the extent privilege wasn't claimed.

So it may be worthwhile to discuss whether trying to work through this under a 2004 examination like what's been proposed, effectively, is the better way of doing it. That might save you some briefing. It might save you multiple rounds of deposition. I think it is very likely either before now or going to be in the future that there's going to be some, to some extent, some waiver here, if the debtor's going to want to testify in these other matters, about why it did things and what its intentions are and it's going to be relevant to things like an intentional fraudulent conveyance. The debtor, of course, is not raising that, so.

But the bottom line is it's going to be hard to, to finish this case without sorting out some of these matters and it is entirely likely, particularly given the breadth of the number of documents and the number of depositions and then just the plain subject matter of this, that there's going to be some of that. As I said in the Findings of Fact and Conclusions of Law, it's just not going to work to have the witnesses tell half the story. It's not going to be able to be done that they can come in and say, "This is why we decided what we decided at the board meeting," or the Project Horizon, or who made the

calls and that sort of thing and then claim privilege as to what's going to be asked about other things as to those decisions. That's the sword-and-shield part.

The other part of that is that, that because what we're dealing with here are effectively business strategies that emanated from legal advice, the decision to do the divisional merger, the corporate restructuring, and all that, those things are blended together. So it's going to be very hard to sort out. You can't do it on a generalized basis, in my opinion. You have to look at the documents and talk about each of the individual issues. Because it's very much blended. Is it business? Is it legal? Is it legal advice, or is it just corporate intentions? So it's going to be really tough to sort all that out.

The other thing I would say is what came across to me -- and I'll just make this observation -- from the injunction testimony was that the way this was presented and the number of privilege claims that another way of looking at it would not be a waiver, but the fact that witnesses who were testifying probably lack personal information as to some of the matters they were testifying to. If you couldn't answer the follow-up questions as, without referencing something a lawyer told you, it's very likely that, that what you were testifying to was also told to you by a lawyer, especially in this context.

So I think there's some reasons that everyone wants to

get this sorted out. The debtor's going to want to be able to use their witness testimony as to the asserted good faith and the, the lack of desire to harm creditors. And I understand that. I'm not gainsaying that they weren't, but the bottom line is that we're going to have to either do this document by document or we're just going to have to have a waiver at, at large by consent.

So the point being, I'm just thinking you're, if not today, you're going to have some issues down the road about how this works out.

The other thought I would point out is the privilege logs I've looked at aren't particularly illuminating. I doubt they're sufficient. Maybe that last round where we had the 70 examples or so are better than the earlier ones, but the ones that, overall, didn't say enough about what a document contains or why it would be privileged and I think the, the privilege logs are going to have to be worked over, again.

So I think there's enough here that would warrant some future inquiry as well. We've been talking about *prima facie* cases either at crime-fraud or, or otherwise. Someone, I think, is going to have to look at the documents and compare them in context.

Now earlier in the first motion there was a suggestion that be done in the first cut by, basically, an examiner or a privilege mediator, if you would, and maybe that's the way to

do it. The reality is, as long as you've got 4,000 documents and 200 deposition instructions, then the Court cannot go look at all of those and make individualized calls. Now there may be some other ways to do that that you can work out amongst yourselves. I know you've got that sort of thing going on in Bestwall as well and have probably already started talking about it.

But the bottom line is we're either going to have to characterize documents and then provide samples for review with the ruling controlling all the samples, or we're going to have to have somebody wade through every last one of them and understand it in context. Maybe we have to do both before it's over with.

But the bottom line is I'm denying the motion without prejudice for the moment, but if y'all would rather that I hold it and let you talk about this some, if you think there's any need to discuss it further as to how it's going to come up. What I'm denying today, I might be allowing in, in six months' time once we get into the discovery phase of an adversary and if I allow it, I'm not going to allow it en masse. As I mentioned at the last hearing, the way the current motion is framed, it has me not only providing, finding no privilege as to all the documents, the ones I haven't seen, but also asserting that there is no right to claim a privilege going forward. I can't do it in those broad strokes.

So I think we're, if we're really serious about this, we're going to have to wade through the documents. We're going to have to figure out a mechanism so that the disputes can be pared down and we can, can deal with them.

But for now, for the clerk's benefit, I'm denying without prejudice, but with a I hear where you're coming from and at some juncture, if we can't work this out, there may be a good chance that some of this is going to either turn out to be waived or will be waived before we're done, okay?

All right. Questions?

MS. HARDMAN: Thank you, your Honor. I, I think -- this is Carrie Hardman on behalf of the ACC.

I just wanted to react to one of the last statements you made with respect to whether or not we would hold this or treat it as --

THE COURT: Uh-huh (indicating an affirmative response).

MS. HARDMAN: -- a denial at the moment. The ACC, of course, would prefer to hold it. I, I wanted to also note to your Honor that we, too, understand the unique position you were in because I think for the last two weeks since the hearing on the 16th we have been trying to narrow and hear the terms that you, that you mentioned to us on the 16th and in doing so, got right up to the last minute last night and actually filed a letter on the docket attempting to do just

that and narrow our request.

I would suggest that if your Honor was amenable to it, that if, if we were to hold your ruling subject to the debtor and New CT's opportunity to review the letter we filed last night and a proposal we made in there, which includes, as your Honor had mentioned, a discovery mediator or discovery referee, that we might have a, a solution to this to get through that process. It's, of course, up to your Honor, but that was sort of where we --

THE COURT: Uh-huh (indicating an affirmative response).

MS. HARDMAN: -- approached it last night and we came up with a number of categories that we think are more narrow, would lend to us analyzing the list of 4,000 and getting it down to a more manageable number for a discovery mediator and their team to review and call balls and strikes on those things.

So I think that's sort of where we were coming out, if your Honor was amenable to that. And I don't know if Ms. Ramsey has more to add to that. But that was, that was --

THE COURT: All right. Ms. --

MS. HARDMAN: -- sort of where we are coming out, your Honor.

THE COURT: Ms. Ramsey, what do you say?

MS. RAMSEY: Thank you, your Honor.

I don't have much more to add to that other than the, the fact that one of the other things that we did not address in our letter but have considered and think it's appropriate would be for there to be additional revisions to the privilege log. That would enable us to evaluate more, with more information exactly what we're looking at and that also might assist us in narrowing the categories.

So I do believe that a further dialogue with the debtor before the Court rules would be of assistance.

THE COURT: How about you, Mr. Gordon?

MR. GORDON: So, your Honor -- this is Greg Gordon.

Not surprisingly from our perspective, we think you should go ahead and deny this without prejudice for the reasons you indicated. That's not to say that the debtor's not willing to have discussions about how to proceed, but your Honor referenced Bestwall and, and you, you're probably aware of the fact that there, what we've been trying to do or what Bestwall's been trying to do is work out an agreed 502(d) order --

THE COURT: Uh-huh (indicating an affirmative response).

MR. GORDON: -- that would basically provide that, look, we're willing to, or Bestwall's willing to provide documents relevant to the issues the Committee wishes to explore, but only if it has the protections of a 502(d) order.

And that's something that, you know, Judge Beyer has encouraged for reasons that, at least to the debtor there, are obvious and, you know, so far we haven't been able to get any traction there because the response we keep getting is, "Well, that's great, but we'll take every document" --

THE COURT: Uh-huh (indicating an affirmative response).

MR. GORDON: -- "under the 502(d) order." It's sort of the same problem that we have here.

And so -- but I wanted your Honor to know in this case we're prepared to have discussions to try to work this through to come up with a reasonable compromise that allows the Committee to see the types of documents that they're saying that they need to see.

THE COURT: Uh-huh (indicating an affirmative response).

MR. GORDON: But from our perspective, as your Honor was pointing out, that needs to happen in an appropriate context so that we know what the issue is that the Committee actually is seeking to explore. I think doing it the other way, which is let's leave it open, let's bring in some sort of referee or somebody to start going through these documents document by document or privilege log entry by privilege log entry is just kind of putting the cart before the horse and makes it, going to make it very difficult for that person to

make any of the calls. I mean, think about, your Honor, for example, privilege waiver. How can you make any calls on privilege waiver not even knowing what the context is in which that assertion is being made? It can't just be made in a vacuum. Because that's a matter of has there been some privileged document that's been put at issue? Is, is there something that's, that's out there right now? And I think right now the answer is no for the reasons that your Honor indicated.

I think what we're saying is that -- and what we've told the other side -- is we recognize that down the road that could very well happen and we're prepared to have discussions about, you know, basically using a 502(d) order to start making some headway on those issues. But to reverse it, have somebody without context, without a proceeding --

THE COURT: Uh-huh (indicating an affirmative response).

MR. GORDON: -- just start to make calls on either individual documents or categories of documents is just not doable and not reasonable and it just would be, to my way of thinking at least, very, very inefficient.

THE COURT: Well, let me make sure you understood what I said. Maybe I wasn't clear.

MR. GORDON: Sure.

THE COURT: My belief is that if the -- we may have

and we certainly have enough here to warrant someone looking at documents based on what was going on in the adversary proceeding if the adversary were still alive. It's effectively over, in my mind. Most of the cases, particularly the Circuit cases from our court, our Circuit, is if you don't do the, the review, the privilege review, you're likely to get reversed on whatever you do.

So from my vantage point, there was enough there to make a *prima facie* showing and to warrant the exercise and to include in that the, the idea that I think we need to modify the privilege logs to be more disclosive. But at the same time the oddity of that is a bankruptcy case is not like a piece of civil litigation. We have a case and then we have multiple contested matters and adversaries and the question is does it waive for all purposes and all circumstances. And what I don't want to do is balkanize this where we end up having discovery in one adversary that some people are a part of and maybe not others and where the issues are more limited in one context than the other and then we have to go do it all over again in the runup to a confirmation hearing, or whatever else. I want to do it once.

So notwithstanding pending proceeding rules, my suggestion was that we might talk about using the 2004 vehicle once for all purposes in the case. That's about as far as I can take you right now. From my vantage point because we don't

have anything that is pending that, that raises these questions and because I didn't decide the injunction based upon what New CertainTeed or Old CertainTeed was thinking and who made the calls and all that sort of thing, that there was no need to get into it. But it is almost certain we're going to, if we haven't already.

So my vantage point is perhaps y'all want to talk about a procedure -- and I don't know about 502 Rules or otherwise. I haven't studied that the way Judge Beyer has -- but, or whether you want to try to do it by updating a privilege log, trying to sort into some categories, have some discussions about how to approach this, and cut it down.

I don't know whether we need a mediator or not. I'd rather -- frankly, I probably know a lot more about it than, than a mediator. If you give me, you know, 25 issues to look at in context, I might be able to help you. If I'm going to have to look at 4,000 documents and try to use my imagination as to how, what circumstance, that's going to take an awful long time and it, and you're probably not going to get a very focused opinion out of it.

So I'm thinking practicalities here, guys. For now, I think the motion is denied, but I'll keep it open and not enter the order to let y'all talk about how to approach it, if you'd like to. That make sense?

MR. GORDON: Well, your Honor -- this is Greg Gordon

again.

Certainly, I hear you loud and clear on that and we're, we're happy to do that and, and what I'm hearing, of course, is that you want us to try to work together to come up with a practical solution to these issues and we'll definitely work on that.

You know, I did want to respond. I wasn't intending to suggest in my remarks -- and maybe I wasn't clear -- any balkanization --

THE COURT: Right.

MR. GORDON: -- or anything. All I was saying was it, it, it feels to me like we don't necessarily have the context.

And, of course, the other point I was going to make is that no matter what matter these issues come up in, I, I think the good news is that we have the same parties, pretty much, involved in all the matters and I don't think --

THE COURT: Yeah.

MR. GORDON: -- there would be any interest on our part -- and I assume the same would, would be the case for New CT -- in saying, "Okay. Well, there's been this ruling on privilege for purposes of this particular matter, but you can't use the documents for another matter."

THE COURT: Yeah.

MR. GORDON: That seems unlikely to me, given, again, that the parties are the same. I mean, obviously I hear you

loud and clear that matters are discrete, but here, the parties are the same. But I understand exactly what you're saying.

I guess I did have one question --

THE COURT: Uh-huh (indicating an affirmative response).

MR. GORDON: -- for you based on your comments. You talked about using 2004, Rule 2004, and I guess, at least speaking for me, it wasn't clear to me what you meant by that.

THE COURT: Wasn't that the way this was presented? Effectively, the original discovery had been propounded under 2004 by the, by the --

MR. GORDON: Right.

THE COURT: -- proponents. So technically speaking, we could use the vehicle that was raised in the injunction, that process. We can make the deposition rules apply, if need be, but what I don't want to get into is limited relevance based on what's in the particular lawsuit. If -- I'd like to do this once.

MR. GORDON: I see.

THE COURT: Okay?

MR. GORDON: I see. Okay.

THE COURT: And, and that's all I was saying about it in terms of this.

Mr. Steel, do you want to say something?

MR. STEEL: Yeah. Good morning, your Honor. Howard

Steel, Goodwin Procter, for New CT.

Given Mr. Gordon's reference, I just wanted to confirm for the Court we appreciate your Honor's guidance here. And yeah, we're, we're prepared to have discussions with the parties, as Mr. Gordon suggested.

THE COURT: Well, we're going to have to talk next month, anyway. Why don't I just leave matters right there. You've got the ruling, if I'm going to have to enter the order. Let's just hold the order until you, you have a chance to talk to see if you can come up with something here.

From -- I guess what I'm saying, again, at the end of the day is if this were the ruling before the preliminary injunction and time permitted, I would have some, some rulings about tightening up the, the privilege logs and making some in-camera reviews before we went to that injunction. What I'm ruling now is that, that matter's over, so. And we're not in the next one.

So we can use this as a procedural vehicle if you can work out some practical solutions, but otherwise, the, the ruling is motion denied without prejudice to asserting it at the appropriate time. I just want to save you some briefing and me some reading, if need be. I've gone back and compared the motion for the mediator to the current motion and the responses and the like and I'd like to save us all that, if we can, one, one time more if we can use the present procedural

posture to get something workable, okay?

Anything else?

MS. RAMSEY: Thank you.

THE COURT: Okay.

MS. HARDMAN: Thank you, your Honor.

MR. GORDON: Not from the debtor, your Honor. Thank you.

THE COURT: All right. Well --

MS. RAMSEY: Thank you.

THE COURT: Well, I don't know whether our next hearing will be in person or not. That's certainly the intention, but the way things are going right now, who knows. I just saw our Circuit had cancelled in-person hearings this month, so. And I'm seeing some of that around the country in other courts. We'll let you know if that happens, but we'll assume for now that we will be in person next month, all right?

MR. GORDON: Thank you, your Honor.

THE COURT: Very good. We'll recess.

MR. PHILLIPS: Thank you.

(Proceedings concluded at 10:20 a.m.)

CERTIFICATE

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

/s/ *Janice Russell* January 10, 2022

Janice Russell, Transcriber Date