No. 24-2109

# United States Court of Appeals
*for the*
# Fourth Circuit

MICHAEL N. HERLIHY; ANN HERLIHY;
THE ESTATE OF PETER L. BERGRUD,

*Claimants-Appellants,*

– v. –

DBMP, LLC,

*Debtor-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NORTH CAROLINA, CHARLOTTE DIVISION

## CORRECTED OPENING BRIEF OF APPELLANTS

JONATHAN RUCKDESCHEL
THE RUCKDESCHEL LAW FIRM, LLC
8357 Main Street
Ellicott City, Maryland 21043
(410) 750-7825
rucklawfirm@rucklawfirm.com

THOMAS W. WALDREP, JR.
CHRIS W. HAAF
DIANA S. JOHNSON
WALDREP WALL BABCOCK & BAILEY PLLC
370 Knollwood Street, Suite 600
Winston-Salem, North Carolina 27103
(336) 722-6300
twaldrep@waldrepwall.com
chaaf@waldrepwall.com
dsantosjohnson@waldrepwall.com

*Counsel for Claimants-Appellants*

*(For Continuation of Appearances See Inside Cover)*

JOHN L. STEFFAN
MAUNE RAICHLE HARTLEY FRENCH
& MUDD, LLC
1015 Locust Street, Suite 1200
St. Louis, Missouri 63101
(314) 320-9643
jsteffan@mrhfmlaw.com

CLAYTON L. THOMPSON
MAUNE RAICHLE HARTLEY FRENCH
& MUDD, LLC
150 West 30th Street, Suite 201
New York, New York 10001
(314) 241-2003
cthompson@mrhfmlaw.com

*Counsel for Claimants-Appellants*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 24-2109 Caption: Michael Herlihy v. DBMP, LLC

Pursuant to FRAP 26.1 and Local Rule 26.1,

The Estate of Peter L. Bergrud; And Michael N. And Ann Herlihy
(name of party/amicus)

who is Appellants, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☑YES ☐NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Thomas W. Waldrep, Jr. Date: 11/19/2024

Counsel for: Appellants



Print to PDF for Filing

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....... iii

I. INTRODUCTION ....... 1

II. JURISDICTIONAL STATEMENT ....... 5

III. STATEMENT OF THE ISSUES ....... 7

IV. STATEMENT OF THE CASE ....... 8

A. Old CertainTeed and Appellants' Underlying State Tort Cases ....... 9

B. Old CertainTeed Creates DBMP, Which Two-Steps into North Carolina ....... 10

C. Appellants' § 362(d) Motions and the Bankruptcy Court's Ruling ....... 15

D. Appeal to the District Court ....... 20

E. The Present Appeal ....... 20

V. SUMMARY OF ARGUMENT ....... 22

VII. STANDARD OF REVIEW ....... 27

VIII. ARGUMENT ....... 28

A. Bankruptcy: Powerful Relief for the Financially Distressed. But DBMP is Not Financially Distressed ....... 29

B. Lack of Financial Distress = Lack of Good Faith. DBMP's Invocation of Bankruptcy's Powerful Equitable Weapons Was Bad Faith ....... 34

C. Other Indicia of Bad Faith Bankruptcies: DBMP's Chapter 11 Filing Is Tainted by New Debtor Syndrome, Forum Shopping, and a Desire (Not Need) for Judicially Compelled Negotiations ....... 40

D. The Automatic Stay: Congressionally and Judicially Limited Because It Is So Disruptive. The Stay's Protections (1) Do Not Inure to the Bad Faith Debtor and (2) Serve No Pro-Creditor Purpose ................................ 47

E. The Bankruptcy Court Erred by Failing to Require that DBMP Prove Continuation of the Stay Was Warranted and Compounded Its Error by Putting Hypothetical Case Management Concerns Over Foundational Issues of Judicial Power ................................. 53

IX. CONCLUSION ......................................................................... 59

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Bartenwerfer v. Buckley*,
598 U.S. 69 (2023) .......... 3, 29

*Bond v. U.S.*,
564 U.S. 211 (2011) .......... 58

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985) .......... 60

*Canal Corp. v. Finnman (In re Johnson)*,
960 F.2d 396 (4th Cir. 1992) .......... 30, 58

*Carolin Corp. v. Miller*,
886 F.2d 698 (4th Cir. 1989) .......... *passim*

*Czyzewski v. Jevic Holding Corp.*,
580 U.S. 451 (2017) .......... 51

*Ford Motor Co. v. Montana Eighth Judicial Dist. Ct.*,
592 U.S. 351 (2021) .......... 58

*Fox Valley Const. Workers Fringe Ben. Funds v. Pride of Fox Masonry & Expert Restorations*,
140 F.3d 661 (7th Cir. 1998) .......... 47

*Furness v. Lilienfield*,
35 B.R. 1006 (D. Md. 1983) .......... *passim*

*Grady v. A.H. Robins Co., Inc.*,
839 F.2d 198 (4th Cir. 1988) .......... 26, 48

*Grogan v. Garner*,
498 U.S. 279 (1991) .......... 29, 30, 58

*Harrington v. Purdue Pharma L.P.*,
603 U.S. ----, 144 S. Ct. 2071 (2024) .......... 30

*In re A.H. Robins Co.*,
788 F.2d 994 (4th Cir. 1986) .......... 48

*In re Bestwall LLC*,
71 F.4th 168 (4th Cir. 2023) .......... 2, 5, 16

*In re Capitol Food Corp. of Fields Corner*,
490 F.3d 21 (1st Cir. 2007) .......... 31, 35

*In re Cedar Shore Resort, Inc.*,
235 F.3d 375 (8th Cir. 2000) .......... *passim*

*In re Coastal Cable TV, Inc.*,
709 F.2d 762 (1st Cir. 1983) .......... 31

*In re Cohoes Indus. Terminal, Inc.*,
931 F.2d 222 (2d Cir. 1991) .......... 31

*In re Cook*,
104 F.2d 981 (7th Cir. 1939) .......... 31, 41, 42

*In re Corp. Deja Vu*,
34 B.R. 845 (Bankr. D. Md. 1983) .......... 53

*In re Dixie Broadcasting, Inc.*,
871 F.2d 1023 (11th Cir. 1989) .......... 22, 25, 52

*In re Dunes Hotel Assocs.*,
188 B.R. 162 (D.S.C. 1995) .......... 41

*In re Dutch Flat Inv. Co.*,
6 B.R. 470 (Bankr. N.D. Cal. 1980) .......... 45

*In re Heritage Wood'n Lakes*,
73 B.R. 511 (Bankr. M.D. Fla. 1987) .......... 43

*In re Jones*,
591 F.3d 308 (4th Cir. 2010) .......... 27

*In re Kestell*,
99 F.3d 146 (4th Cir. 1996) .......... 45

*In re Kirkland*,
600 F.3d 310 (4th Cir. 2010) .......... 27

*In re Little Creek Dev. Co.*,
779 F.2d 1068 n.2 (5th Cir. 1986) .......... *passim*

*In re LTL Management* LLC, No. 23-2971,
2024 WL 3540467 (3d Cir. July 25, 2024) .......... 60

*In re LTL Mgmt., LLC*,
64 F.4th 84 (3d Cir. 2023) .......... *passim*

*In re Marsch*,
36 F.3d 825 (9th Cir. 1994) .......... 22, 32, 41

*In re Patel*,
Case No. 20-30455, 2022 WL 1420045 (Bankr. W.D.N.C. May 4, 2022) .......... 4, 23, 40

*In re Pappas*,
7 B.R. 488 (Bankr. D. Mass. 1980) .......... 43

*In re Phoenix Piccadilly, Ltd.*,
849 F.2d 1393 (11th Cir. 1988) .......... 41, 43

*In re Premier Automotive Servs.*,
492 F.3d 274 (4th Cir. 2007) .......... *passim*

*In re RAD Properties, Inc.*,
84 B.R. 827 (Bankr. M.D. Fla. 1988) .......... 53

*In re Robbins*,
964 F.2d 342 (4th Cir. 1992) .......... *passim*

*In re Russo*,
94 B.R. 127 (Bankr. N.D. Ill. 1988) .......... 47

*In re Selinsky*,
365 B.R. 260 (Bankr. S.D. Fla. 2007) .......... 47

*In re SGL Carbon Corp.*,
200 F.3d 154 (3d Cir. 1999) .......... *passim*

*In re South Beach Securities, Inc.*,
606 F.3d 366 (7th Cir. 2010) .......... 22

*In re Stewart*,
175 F.3d 796 (10th Cir. 1999) .......... 32

*In re Talladega Steaks, Inc.*,
50 B.R. 42 (Bankr. N.D. Ala. 1985) .......... 53

*In re Victory Const. Co., Inc.*,
9 B.R. 549 (Bankr. C.D. Cal. 1981) .......................................... 53

*In re Waldron*,
785 F.2d 936 (11th Cir. 1986)..................................... 32, 34, 61

*In re Winshall Settlor's Trust*,
758 F.2d 1136 (6th Cir. 1985), *rev'd on other grounds*,
*Toibb v. Radloff*, 501 U.S. 157 (1991) ...................................... 31

*In re Yukon Enterprises, Inc.*,
39 B.R. 919 (Bankr. C.D. Cal. 1984) ......................................... 52

*Janvey v. Romero*,
883 F.3d 406 (4th Cir. 2018)............................................... 3, 29

*Kane v. Johns-Manville Corp.*,
843 F.2d 636 (2d Cir. 1988) .................................................. 39

*Local Loan Co. v. Hunt*,
292 U.S. 234 (1934)............................................................ 30, 31

*McCorkle v. First Penn. Banking & Trust Co.*,
459 F.2d 243 (4th Cir. 1972)................................................... 30

*Milwaukee Postal Bldg. Corp. v. McCann*,
95 F.2d 948 (8th Cir. 1938).................................................... 46

*Mongiello Bros. Coal Corp. v. Houghtailing Properties Inc.*,
309 F.2d 925 (5th Cir. 1962)................................................... 46

*Ortiz v. Fibreboard Corp.*,
527 U.S. 815 (1999)............................................................... 45

*Ritzen Group, Inc. v. Jackson Masonry, LLC*,
589 U.S. 35 (2020)................................................................... 6

*Ry. Labor Execs. Ass'n v. Gibbons*,
455 U.S. 457 (1982)............................................................... 29

*Truck Ins. Exchange v. Kaiser Gypsum Company, Inc.*,
602 U.S. 268 (2024)........................................................... 23, 29

*United States v. Rumely*,
345 U.S. 41 (1953)................................................................. 60

*Wetmore v. Markoe*,
196 U.S. 68 (1904) .......... 31

**Statutes & Other Authorities:**

U.S. Const. amend. VII .......... 58

U.S. Const. art. I, § 8, cl. 4 .......... 29

11 U.S.C. § 362 .......... 7, 24

11 U.S.C. § 362(a) .......... *passim*

11 U.S.C. § 362(d) .......... *passim*

11 U.S.C. § 362(d)(1) .......... *passim*

11 U.S.C. § 362(g)(1) .......... 3

11 U.S.C. § 362(g)(2) .......... *passim*

11 U.S.C. § 524(g) .......... 39

11 U.S.C. § 726(a)(6) .......... 51

11 U.S.C. § 1112 .......... 24, 25

11 U.S.C. § 1112(b) .......... 24, 37, 38, 49

11 U.S.C. § 1129(a) .......... 17

28 U.S.C. § 157(b) .......... 17

28 U.S.C. § 157(b)(2) .......... 54, 57

28 U.S.C. § 157(b)(2)(B) .......... 52

28 U.S.C. § 157(b)(5) .......... 3, 52, 54, 57

28 U.S.C. § 158 .......... 6

28 U.S.C. § 1332 .......... 56

28 U.S.C. § 1334(c)(2) .......... 52, 54, 57

Cal. Const. art. 1, § 16 .......... 58

Wash. Const. art. I, § 21 .......... 58

AMERICAN BANKRUPTCY INSTITUTE, 2022 Annual Spring Meeting Session Replay, Comments of Gregory M. Gordon, Esq., April 22, 2022 .......... 14

Ames Alexander, *Profitable companies are dodging asbestos lawsuits. A Charlotte court has helped them*, THE CHARLOTTE OBSERVER*,* July 24, 2024 .......... 51

Ending Corporate Bankruptcy Abuse Act of 2024, S.4746, 118th Congress Second Session (2023-2024).......... 60

H.R. Rep. No. 95-595 (1977).......... 50

H.R. Rep. No. 103-835 (1994).......... 39

Jeff Tiberri, *Legal maneuvers used in Charlotte bankruptcy court hold up lawsuits by victims of asbestos exposure*, NORTH CAROLINA PUBLIC RADIO (July 30, 2024) .......... 51

S. Rep. No. 95-989 (1978) .......... *passim*

# I. INTRODUCTION

Forty years ago, a federal judge sounded the alarm regarding perversion of the Bankruptcy Code by wealthy corporations:

> This Court has watched with alarm as major corporations have filed for Chapter 11 reorganization or threatened to file Chapter 11 petitions to evade existing labor contracts, or to invoke the automatic stay provision to evade pending litigation. As discussed hereafter, the Court considers such practices to be a gross abuse of the bankruptcy proceedings. Chapter 11 was designed to give those teetering on the verge of a fatal financial plummet an opportunity to reorganize on solid ground and try again, not to give profitable enterprises an opportunity to evade contractual or other liability.

*Furness v. Lilienfield,* 35 B.R. 1006, 1009 (D. Md. 1983).

This appeal arises from one of four "Texas Two-Step" Chapter 11 cases languishing in the Western District of North Carolina. In a Texas Two-Step, a profitable business divides itself into two new companies. One new company is assigned the profitable business' asbestos liabilities and immediately files for bankruptcy, stranding the asbestos victims in bankruptcy. The other is assigned virtually all the profitable business, and all non-asbestos liabilities and continues business-as-usual, free from the obligations and limitations of the Bankruptcy Code.[1]

[1] The Texas Two-Step gets its name because the splitting of the profitable company to isolate the asbestos creditors is accomplished via a "divisive

For seven years, the Bankruptcy Courts in the Charlotte have refused to rule on the fundamental issue presented here: is it bad faith for (1) a profitable, non-distressed corporation (2) to isolate one class of creditor from its profitable business and all other creditors in a newly-created corporation for the purpose of (3) invoking bankruptcy's automatic stay to force re-negotiation of state-law tort liabilities that (4) the corporation admits it can pay in full and without distress, outside of bankruptcy?

Here, and in the other Texas Two-Step cases, these four facts are not disputed. They were the express basis for the two motions on appeal, which argued that the Debtor's petition was filed in bad faith. But the Bankruptcy Court refused to rule on the bad faith issue. Instead, it denied Appellants' Motions for Relief from Stay without determining whether the non-distressed Debtor's attempt to "overcome the tort system" in Article I courts was consistent with the Bankruptcy Code's purposes.

merger" under Texas law. *See generally In re LTL Mgmt., LLC*, 64 F.4th 84, 96 (3d Cir. 2023); *see also In re Bestwall LLC*, 71 F.4th 168, 173–74 (4th Cir. 2023).

The automatic stay freezes all creditor rights at the beginning of a Chapter 11 case. *See* 11 U.S.C. § 362(a). Given its disruptive impact on creditors, the automatic stay has Congressionally mandated limits. Bankruptcy courts "shall" grant relief from the stay "for cause." 11 U.S.C. § 362(d)(1). When a creditor seeks relief from the stay, Congress places the burden of proof[2] squarely upon the debtor. *See* 11 U.S.C. § 362(g)(2).

Bad faith is "cause" for relief from the automatic stay. *Carolin Corp. v. Miller*, 886 F.2d 699–700 (4th Cir. 1989). A bankruptcy petition is filed in bad faith when it does not further "the purposes of the Code." *Id.* at 701. Those purposes? "[R]esuscitating a financially troubled debtor," *id.*, while protecting creditors' interests, *see Bartenwerfer v. Buckley*, 598 U.S. 69, 72 (2023); *Janvey v. Romero*, 883 F.3d 406, 410 (4th Cir. 2018).

Below, Appellants sought limited relief from the stay to quantify the value of their personal injury claims against the Debtor before a jury. This right is expressly guaranteed by Congress. *See* 28 U.S.C. § 157(b)(5). Appellants' motions asserted that the undisputed facts set forth above demonstrated bad faith. Relief from the stay was required because bad

[2] There is one exception, proof of lack of equity in property. *See* 11 U.S.C. § 362(g)(1). There is no dispute this exception is not relevant to this case.

faith is cause for stay relief, because the burden of resisting stay relief is on the Debtor, and because Congress mandates that relief "shall" issue for cause. But the Bankruptcy Court refused to examine DBMP's bad faith.

The Debtor here presented no evidence to controvert the undisputed facts above and prove good faith (or lack of cause). The Bankruptcy Court, ignoring the Debtor's statutory burden of proof, filled this evidentiary void with speculation about hypothetical effects that stay relief might have on *the Debtor's* goal. That goal? Judicially compelled negotiations to force mass resolution of state-law debts the Debtor was, and is, fully able to pay without distress.

Then, the Bankruptcy Court applied an inapposite case (*In re Robbins*, 964 F.2d 342 (4th Cir. 1992)) involving a debtor whose good faith was not challenged. The Bankruptcy Court never ruled on the central issue: the petition was filed in bad faith because the Debtor's purpose was "not in line with any of the purposes of the Bankruptcy Code." *See In re Patel*, Case No. 20-30455, 2022 WL 1420045, at *5-7 (Bankr. W.D.N.C. May 4, 2022). Instead, the Bankruptcy Court ignored binding precedent that it is bad faith for a non-distressed company to use

bankruptcy jurisdiction to force "judicially compelled" negotiations. *In re Premier Automotive Servs.*, 492 F.3d 274, 280–81 (4th Cir. 2007) ("*Premier Auto*"). This was error.

Since 2017, when the first Texas Two-Step bankruptcy was filed in the Western District of North Carolina, no court in this Circuit has ruled on the central issue posed here: whether non-distressed Texas Two-Step bankruptcies are consistent with the purposes of the Bankruptcy Code—*i.e.*, whether they are good faith filings.[3] This appeal crystallizes this legal question, on undisputed facts. It is imperative that this Court decide this issue now and reverse the Bankruptcy Court's ruling.

## II. JURISDICTIONAL STATEMENT

This is an appeal from the final order of the U.S. District Court for the Western District of North Carolina (Hon. Kenneth D. Bell) (the "District Court"), entered October 28, 2024, JA1186-1196, affirming the Bankruptcy Court for the Western District of North Carolina's (Hon. J.

[3] In *In re Bestwall LLC*, 71 F.4th 168, 182 (4th Cir. 2023), this Court expressly noted that the question of good faith was not before it. Later, this court declined interlocutory review of an order denying a motion to dismiss based upon bad faith, notwithstanding the Bankruptcy Court's certification of the bad faith question and plea for guidance. *See Official Committee of Asbestos Personal Injury Claimants v. Aldrich Pump LLC*, No. 24-128, D/E 50, April 17, 2024.

Craig Whitley) (the "Bankruptcy Court's") denial of (1) the *Motion of The Estate of Peter L. Bergrud For Relief From The Automatic Stay*, and (2) the *Motion of Michael N. and Ann Herlihy for Relief from The Automatic Stay*, both entered May 28, 2024, JA625-628, (together the "Denial Orders"). The underlying Chapter 11 bankruptcy case was filed by DBMP LLC ("DBMP" or "Debtor"), Case No. 20-30080 (Bankr. W.D.N.C.) (the "Bankruptcy Case").[4]

Appellants are: (1) Peter L. Bergrud, a mesothelioma victim who died from asbestos-caused cancer in 2019, whose estate is represented by his widow, Cheryl (collectively, "the Bergruds"); and (2) living mesothelioma victim Michael N. Herlihy and his wife, Ann ("the Herlihys"). JA297, JA439. Appellants filed timely notices of appeal. JA297, JA629-640.

This Court has jurisdiction pursuant to 28 U.S.C. § 158. *See Ritzen Group, Inc. v. Jackson Masonry, LLC*, 589 U.S. 35, 38 (2020).

[4] The District Court consolidated the appeals of the Denial Orders. *See Herlihy v. DBMP LLC*, 24-CV-00558 (W.D.N.C.), unnumbered text only docket entry, July 18, 2024. JA3, JA6-11.

## III. STATEMENT OF THE ISSUES

1. **Bad faith.** A bankruptcy case filed to invoke 11 U.S.C. § 362's automatic stay and force renegotiation of state-law tort liability that the Debtor admits it can pay in full, without financial distress, is not filed in good faith. The Debtor's isolation of a single class of creditor via its Texas Two-Step restructuring provides additional indicia of bad faith.

2. **"[S]hall grant relief…for cause."** The Bankruptcy Court abused its discretion when it declined to rule on whether the Debtor's Chapter 11 petition was filed in bad faith, given that bad faith was the basis for Appellants' respective motions and that bad faith is "cause" for relief from stay under 11 U.S.C. § 362(d)(1).

3. "**[T]he Party Opposing Such Relief has the Burden of Proof.**" The Bankruptcy Court erred when it failed to require that the Debtor prove its petition was filed for purposes consistent with the purposes of the Code. *See* 11 U.S.C. § 362(g)(2). Instead, the Bankruptcy Court denied Appellants' motions based on speculation about how stay relief would affect the Debtor's desired outcome, without addressing whether that outcome furthered the purposes of the Code.

4. **Good faith is a prerequisite to bankruptcy power; case management is not.** The Bankruptcy Court abused its discretion when it concluded that granting relief from stay would frustrate efficient case management of the Debtor's bankruptcy (a) without determining whether the Debtor's petition furthered the purposes of the Code and (b) where Appellants sought only to liquidate, but not collect upon, their claims, thereby posing no risk of "dismemberment" to the estate.

## IV. STATEMENT OF THE CASE

Under *Carolin* and *Premier Auto*, a bankruptcy petition filed by a profitable company in no need of resuscitation for the purpose of altering state-law liabilities it can pay in full and without distress is filed in bad faith. "Chapter 11 was designed to give those teetering on the verge of a fatal financial plummet an opportunity to reorganize on solid ground and try again, not to give profitable enterprises an opportunity to evade contractual or other liability." *In re SGL Carbon Corp.*, 200 F.3d 154, 166 (3d Cir. 1999) (quoting *Furness*, 35 B.R. at 1009).

Nevertheless, the Bankruptcy Courts in the Western District of North Carolina repeatedly have refused to rule on whether the Texas Two-Step scheme constitutes a bad faith use of the bankruptcy system.

This critical issue must be addressed. The material facts are undisputed. This Court should rule on the discrete issue of bad faith now.

### A. <u>Old CertainTeed and Appellants' Underlying State Tort Cases.</u>

By the mid-1960s, CertainTeed Corporation knew that asbestos caused mesothelioma and that it used a particularly carcinogenic form of the fiber in its asbestos-cement pipe. JA380-381. Heedlessly, CertainTeed kept selling its asbestos-laden pipe into the 1990s.

In the mid-1960s, Air Force veteran Peter Bergrud began a decades-long construction career in Washington state. JA432. He regularly cut, beveled, and drilled Old CertainTeed's asbestos-cement pipe. JA405-406; JA415. In 2019, Mr. Bergrud was diagnosed with—and died from—mesothelioma. Asbestos was found in his lung tissue. JA360.

Michael Herlihy worked at a California saw sharpening company from the mid-1980s to the mid-1990s. JA569. One of his employer's biggest clients was the CertainTeed plant in Riverside, California, where CertainTeed manufactured asbestos-cement pipe from 1965 through the early 1990s. JA569-570. Mr. Herlihy regularly breathed dust caked on the saw blades used to cut the asbestos-cement pipe at CertainTeed's

plant. JA570. Mr. Herlihy was diagnosed with mesothelioma on March 23, 2023. JA500. He is still alive.

The Bergruds sued Old CertainTeed in Washington state court in April 2019. JA429-434. The Herlihys filed suit in August 2023 in California state court. JA502-530. Both Appellants are unable to proceed with their claims against DBMP because of the automatic stay. *See* JA532-535.[5]

### B. Old CertainTeed Creates DBMP, Which Two-Steps into North Carolina.

The Bankruptcy Court made detailed factual findings as part of its decision to grant a preliminary injunction extending the protections of the automatic stay to New CertainTeed and other entities affiliated with DBMP. JA218-296 ("Findings"). The Debtor did not dispute those findings, which were the basis for Appellants' motions below and are the factual basis for this appeal.

[5] As in most asbestos-related personal injury cases, Appellants asserted claims against other joint tortfeasors they alleged contributed to their harm. How the existence of multiple joint tortfeasors relates to the ultimate liability of any individual tortfeasor (*e.g.*, joint-and-several liability, several liability, or a combination of both) is a matter of state law.

In 2018, Old CertainTeed "was a profitable going concern whose assets significantly outweighed its combined operating and asbestos liabilities." JA231, Findings ¶ 44. Indeed, "on Old CertainTeed's publicly disclosed financial statements, [it] had almost $3 billion in assets and less than half of that in all liabilities." JA237, Findings ¶ 57. Old CertainTeed "never entertained a bankruptcy filing for itself." JA231, Findings ¶ 44. Such a filing would have had "serious negative consequences." JA231-232, *id.* ¶¶ 44-45.

Nevertheless, inspired by Bestwall, the first Texas Two-Step bankruptcy, Old CertainTeed executed its own Texas Two-Step to "overcome the tort system." By so doing, Old CertainTeed sought to minimize its entirely manageable liability for poisoning Americans with asbestos, all while leaving its profitable business free from the obligations of Chapter 11. JA230-231; JA247, Findings ¶¶ 42, 100.

By 2018, Old CertainTeed began discussing "a plan to isolate [its] asbestos liabilities in a new company, with minimal assets, that would file for bankruptcy." JA230, Findings ¶¶ 40-42. The shell entity would shield "the CertainTeed Enterprise from Old CertainTeed's asbestos liabilities." JA232, Findings ¶ 46. The plan, codenamed "Project

Horizon[,]" was a "closely guarded corporate secret" that was "driven not by businesspeople, but by lawyers." JA230231, Findings ¶¶ 41, 43.

After the Two-Step, "New CertainTeed" was "essentially a mirror image of Old CertainTeed: a fully operating company with all of Old CertainTeed's employees, the bulk of its assets and operations, and all of its non-asbestos creditors." JA219, Findings ¶ 1. DBMP was "quite different," being "allocated 100% of Old CertainTeed's considerable asbestos liabilities."[6] JA219, JA234, JA238, Findings ¶¶ 1, 53, 65. The Bankruptcy Court diagrammed Old CertainTeed's Texas Two-Step as follows:

[6] New CertainTeed received approximately 97% of Old CertainTeed's assets, most of its operations, and all its employees. Only 3% of Old CertainTeed's assets were given to DBMP. Among these assets was approximately $25 million in cash, Old CertainTeed's asbestos liabilities, and the ability to draw from the "Funding Agreement." JA234-238, Findings ¶¶ 53, 65.




JA236, Findings ¶ 58.

DBMP and New CertainTeed executed a series of "Funding Agreements" that require New CertainTeed to provide DBMP with all funds necessary to satisfy DBMP's asbestos liabilities, whether DBMP is in or out of bankruptcy. *See* JA1315-1318; JA1326 ("Permitted Funding"). The Funding Agreement "is not a loan," does not impose "repayment obligations" on DBMP, and is not capped. JA238, Findings ¶¶ 66-67.[7]

Through the Funding Agreement, DBMP (and New CertainTeed) "steadfastly" maintain that DBMP "has the same ability to fund the costs

[7] Since the Bankruptcy Court's Findings, DBMP and New CertainTeed entered into a Second Amended Funding Agreement. JA1315–1318. The Second Amended Funding Agreement does not alter New CertainTeed's obligation to fund DBMP's asbestos liabilities. JA1341-1358 (redline of amendments); JA1068 (DBMP explaining amendment).

of defending and resolving present and future asbestos claims, both in the state and federal courts and in connection with any chapter 11 filing as [former CertainTeed]." JA237-238, Findings ¶¶ 61, 65. DBMP admits "the Funding Agreement…makes available New CT's and DBMP's combined resources from Old CT—giving DBMP the ability to meet its obligations, including paying asbestos claims." JA1068.

In sum, DBMP's bankruptcy was filed not out of financial need, but out of a desire to invoke the automatic stay to freeze state-law jury trials and force renegotiation of Old CertainTeed's asbestos liabilities while leaving CertainTeed's profitable business—and all its other creditors—free of bankruptcy's "serious negative consequences." JA856. More concisely, in the words of the architect of the Texas Two-Step, the scheme is the latest in a long line of attempts to "overcome the tort system."[8]

---

[8] JA308, JA451. *See also* AMERICAN BANKRUPTCY INSTITUTE, 2022 Annual Spring Meeting Session Replay, 43:00–48:39, at 44:17, Comments of Gregory M. Gordon, Esq., April 22, 2022, available at: https://www.abi.org/texas-two-step-of-tort-liability-jj-annual-spring-meeting-2022-video-replay. Mr. Gordon's comments about the Two-Step have been referenced frequently before the United States Bankruptcy Court for the Western District of North Carolina (i.e., *In re Aldrich Pump LLC, et al.*, Case No. 20-30608, D/E 1712, Ex. 2).

In January 2020, DBMP filed a voluntary petition for relief under Chapter 11 (the "Petition"). DBMP's petition triggered the automatic stay under 11 U.S.C. § 362(a). DBMP's parent subsequently announced that it expected DBMP's bankruptcy "to take up to approximately five to eight years," during which "all asbestos litigations [sic] have been stayed and all related costs suspended." JA437.

In 2021, the Bankruptcy Court granted the Debtor's motion to preliminarily enjoin litigation against New CertainTeed, effectively extending the protections of the automatic stay to New CertainTeed. The Bankruptcy Court reasoned that allowing continued unfettered litigation and collection against New CertainTeed would be "tantamount to dismissal" of the Debtor's bankruptcy. JA915. In so ruling, the Bankruptcy Court expressly recognized that it was not ruling on "bad faith" or on a motion to dismiss. JA260, Findings ¶¶ 149-50; JA914-915.

Appellants' § 362(d) lift stay motions, in contrast, placed DBMP's bad faith squarely before the Bankruptcy Court.

### C. <u>Appellants' § 362(d) Motions and the Bankruptcy Court's Ruling.</u>

In April 2024, pursuant to § 362(d) and following this Court's invitation to individual Two-Step victims to seek relief from the stay in

Two-Step bankruptcies, Appellants moved the Bankruptcy Court for relief from the stay. JA297-476; *In re Bestwall, LLC*, 71 F.4th 168, 183 (4th Cir. 2023) ("[C]laimants can bring individual actions for relief based on the specific facts of a particular claim.").[9]

Appellants premised their motions on bad faith. DBMP is not and never has been in financial distress; it admits it can pay all asbestos creditors in full outside of bankruptcy. Additionally, the Texas Two-Step—which strands a single class of creditors in bankruptcy but shields all other creditors and 97% of CertainTeed's profitable business from the obligations of bankruptcy—confirms DMBP was using Chapter 11 as a litigation tactic regarding state-law asbestos liabilities it was fully able to pay. *See* JA234-238, Findings ¶¶ 53, 65. Accordingly, DBMP's Chapter 11 petition does not serve the Bankruptcy Code's purpose of resuscitating a financially distressed debtor and is in bad faith. In turn, bad faith is "cause" for relief from the stay, and relief is mandatory under § 362(d).

[9] The Debtor's lack of financial distress was not before the Fourth Circuit in *Bestwall*: "In this appeal, by contrast, [appellants] do not make the arguments raised by the claimants in *LTL Management*." *Bestwall*, 71 F.4th at 182.

Appellants sought extremely limited relief: lifting the automatic stay so they could quantify their personal injury claims against DBMP before a jury—a right guaranteed to them by Congress and the Seventh Amendment.[10] Appellants expressly forswore collection, asking only to quantify their claims and return to the bankruptcy proceeding. *See generally* JA227-476 (Motions for Relief). Appellants are the only claimants who have sought relief from the stay in the four-year existence of the DBMP case. The Debtor vigorously objected. JA584-611

The Bankruptcy Court denied both motions on May 23, 2024. JA905-1047 (hearing), JA913-925 (announcing ruling); JA625-628 (Orders Denying Appellants' Motions for Relief).

The Bankruptcy Court refused to assess whether the Debtor invoked bankruptcy jurisdiction in bad faith. Instead, the Bankruptcy Court parroted the conclusion from its 2021 decision, which did not address bad faith and which reasoned that allowing unfettered litigation *and collection* against New CertainTeed would be the functional equivalent of dismissal.

[10] Under 11 U.S.C. § 1129(a) and 28 U.S.C. § 157(b), the Bankruptcy Court is prohibited from liquidating or estimating (*i.e.*, quantifying) personal injury claims.

The Bankruptcy Court provided no coherent explanation how quantifying Appellants' two individual claims and returning to the bankruptcy proceeding to await its conclusion would equate to dismissal. Rather, the Bankruptcy Court speculated—based on no record evidence—that lifting the stay for Appellants would result in the filing of hundreds or thousands of additional motions for relief from the stay, that the Court somehow would be required to grant all of these hundreds or thousands of motions, and that this would "defeat the purpose of the bankruptcy case, and effectively, be akin to dismissal." JA918.

The Court cited no record evidence to support its "finding" that hundreds or thousands of additional motions would be filed, and no authority that it would be "required" to grant those motions.[11] Nor did the Court explain how merely quantifying the value of claims and foregoing collection pending conclusion of the bankruptcy proceeding would "be akin to dismissal."

[11] At no point did the Debtor offer any evidence of how or why granting the limited relief from stay sought by Appellants "would lead to case dismissal" despite the Congressional allocation of the burden of proof in resisting lift stay motions to the debtor. *See* 11 U.S.C. § 362(g)(2).

As for the dispositive issue—DBMP's bad faith—the Bankruptcy Court "[didn't] feel comfortable making that conclusion today…" JA921. Although the evidence of bad faith stemmed primarily from the Bankruptcy Court's own detailed factual findings—findings which were not disputed by DBMP—the Bankruptcy Court stated:

> I've mentioned the differences of opinion about whether a non-distressed solvent company can use bankruptcy tools. … Can I find today that this filing is subjective bad faith because it's sought by a solvent non-distressed entity and does that dismiss, justify dismissal? I'd say the answer in this Circuit at the moment appears to be no. … [E]ven if subjective bad faith lies, I don't think it's the standard.
>
> *At most,* it's a factor. The standard for relief from stay is cause and the controlling case in our Circuit is *Robbins*. *Robbins* involves a balancing test and as I, both I and [the Bankruptcy Court in *Bestwall*] have held, here relief from stay would lead to case dismissal, which under *Carolin* is not attainable for simply subjective bad faith. So I'm not going to try to do indirectly something that I'm not permitted to do or not inclined to do under existing law. I am bound by the *Carolin* decision. JA922-923.

The Bankruptcy Court did not find the Debtor filed for bankruptcy in good faith—which the Congressional allocation of the burden of proof on

the debtor *required*. JA918. This is so whether bad faith alone constitutes cause, or whether bad faith is merely "a factor" in a balancing analysis.[12]

**D. <u>Appeal to the District Court.</u>**

Appellants appealed to the United States District Court for the Western District of North Carolina. JA12-51. After a hearing, the District Court issued its ruling on October 28, 2024. JA1186. The District Court held "that the Bankruptcy Court did not abuse its discretion under *Robbins* …." JA1196. Despite recognizing that bad faith can be grounds for lifting an automatic stay, the District Court likewise failed to examine whether DBMP filed in bad faith. *See* JA1195-1196. The District Court similarly failed to provide any explanation of how granting Appellants' limited motions for relief solely to quantify (but not collect) their claims would amount to effective dismissal of the bankruptcy, nor did it address the lack of record evidence to support such a conclusion.

**E. <u>The Present Appeal.</u>**

[12] Neither the Bankruptcy Court nor the Debtor have ever seriously contended that a putative debtor can deliberately file a bankruptcy petition for purposes contrary to the Congressional purposes of the Code and nevertheless be shielded indefinitely by the automatic stay. Yet that is the result of the Bankruptcy Court's ruling if bad faith is only "a factor" in lift stay analysis and the Bankruptcy Court can deny lift stay relief without ruling on that factor.

Appellants are victims of Old CertainTeed's asbestos-containing products. Mr. Bergrud has already died from mesothelioma. Mr. Herlihy is living on borrowed time.

Appellants' motions isolated one issue: whether this Texas Two-Step bankruptcy was filed in bad faith as defined by this Circuit's longstanding precedent. There is no dispute that DBMP (1) is not financially troubled, (2) can pay all creditors in full outside of bankruptcy, and (3) engaged in a pre-filing Texas Two-Step to isolate a single class of creditors and force renegotiation of Old CertainTeed's state-law tort liabilities. All the while, 97% of Old CertainTeed's profitable non-distressed business (and all its other creditors) remain free from the obligations of bankruptcy.

The Bankruptcy Court refused to rule on the foundational question, rejecting it as "a waste of everyone's time." JA924. Instead, it treated the case as it would a good faith bankruptcy and purported to apply a balancing test regarding whether stay relief should issue. This was error.

Treating a bankruptcy like a good faith filing when bad faith has been raised puts the cart before the horse. Before a court balances the automatic stay's harm to creditors against the potential disruption of the

bankruptcy case, it must determine if the bankruptcy case itself furthers the purposes of the Bankruptcy Code—*i.e.*, whether the petition is in good faith. If not, then no disruption of the case can tilt the balance against the creditors' rights—particularly when only limited creditor relief is sought.

The Code's allocation of the burden of proof to the Debtor confirms Congress' unequivocal intention that relief from the automatic stay be granted absent *proof* that no cause exists. Proof requires evidence; a failure of proof cannot be overcome with speculation. The Bankruptcy Court's refusal to decide whether the Debtor has invoked Chapter 11 in bad faith is the subject of this appeal.

## V. SUMMARY OF ARGUMENT

This Circuit has long abided *Furness*' warning that Chapter 11 should not "give profitable enterprises an opportunity to evade contractual or other liability." *Furness*, 35 B.R. at 1009.[13]

[13] *Furness* is foundational. Half a dozen federal appellate courts (and numerous lower courts) have relied on its on it when analyzing a debtor's bad faith. *See In re SGL Carbon Corp.*, 200 F.3d 154, 165 (3d Cir. 1999); *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1071 n.1, 1072 n.2 (5th Cir. 1986); *In re South Beach Securities, Inc.*, 606 F.3d 366, 376 (7th Cir. 2010); *In re Cedar Shore Resort, Inc.*, 235 F.3d 375, 381 (8th Cir. 2000); *In re Marsch*, 36 F.3d 825, 828 (9th Cir. 1994); *In re Dixie Broadcasting,*

The purpose of Chapter 11 is "to allow the resuscitation of a financially troubled debtor." *Carolin Corp. v. Miller,* 886 F.2d 698, 701 (4th Cir. 1989). This Court expressly confirmed that bankruptcy is not for "financially healthy companies with no need to reorganize under the protection of Chapter 11." *Premier Auto*, 492 F.3d at 280 (4th Cir. 2007) (*citing SGL Carbon,* citing *Furness* and other authority).

The Supreme Court reaffirmed this principle earlier this year: "Bankruptcy offers individuals and businesses *in financial distress* a fresh start to reorganize, discharge their debts, and maximize the property available to creditors." *Truck Ins. Exchange v. Kaiser Gypsum Company, Inc.,* 602 U.S. 268, 272 (2024) (emphasis added).

The uncontested facts demonstrate that DBMP is not in financial distress. It accordingly filed in bad faith. In addition to its admitted ability to pay its creditors in full—sufficient in itself for a bad faith finding—DBMP's Texas Two-Step demonstrates its purposes are, in the

---

*Inc.*, 871 F.2d 1023, 1027 (11th Cir. 1989). This Circuit, in turn, relies upon *SGL Carbon* and *Little Creek* in *Carolin* and *Premier Auto.*

words of Judge Whitley in another case, "not in line with any of the purposes of the Bankruptcy Code."[14]

Section 362(a)'s automatic stay is one of bankruptcy's most powerful and disruptive tools. Accordingly, Congress and the courts designed limits to ensure the stay is not improperly invoked. Congress engineered two dramatic limits in § 362(d): the mandate that relief "shall" be granted if "cause" exists, and the allocation of the burden of proof—of *disproving* cause—upon the debtor. 11 U.S.C. § 362. The Bankruptcy Court's ruling violated both Congressional limits.

Despite (1) copious and undisputed indicia of DBMP's bad faith put squarely before it, (2) the mandatory nature of relief from stay, and (3) the Congressionally mandated burden of proof, the Bankruptcy Court refused to rule on whether DBMP filed in bad faith and refused to grant relief from the stay.

In *Carolin*, this Circuit recognized the availability of stay relief where bad faith is "cause" under § 362(d). This recognition was a building block of *Carolin*'s two-pronged standard for dismissal of bad faith petitions under 11 U.S.C. § 1112(b). *Carolin* recognized that creditors

[14] *In re Patel*, 2002 WL 1420045, at *6 (Bankr. W.D.N.C. 2022).

whose rights were mired in bad faith petitions had access to relief from the automatic stay, even if the petition might not qualify for dismissal pursuant to § 1112 at the "very portals" of a case. 886 F.2d at 700. The availability of stay relief mitigated the potential harm to creditors of delay caused by not dismissing a petition upon a finding of subjective bad faith. *Id.* at 699–700.

By conflating the § 362(d) relief-from-stay standard with the § 1112 dismissal standard, the Bankruptcy Court ignored *Carolin*'s reasoning and effectively eliminated bad faith as "cause" for stay relief. *Accord In re Dixie Broadcasting,* 871 F.2d 1023, 1029 (11th Cir. 1989) ("We disagree that bad faith constituting 'cause' for relief from a stay automatically equates to bad faith warranting dismissal of the petition. If that were true, there would not be a need to ever lift a stay for bad faith, because the petition would necessarily have to be dismissed.").

Moreover, by refusing to address bad faith, the Bankruptcy Court created a bizarre and unjust rule. Under the Bankruptcy Court's reasoning, a profitable, non-distressed company can *deliberately* file a bankruptcy petition in bad faith and, nevertheless, enjoy the automatic stay's benefits indefinitely. Under this through-the-looking-glass rule, a

massively profitable company that freely admits it has no financial *need* for bankruptcy—and that it has filed for bankruptcy to force restructuring of state-law debts it can pay in full, without distress—is immune from both dismissal for bad faith *and* from stay relief.

But the ability to pay creditors in full does not entitle a debtor to benefit from the automatic stay under 11 U.S.C. § 362(a) while it leverages the bankruptcy system for its non-bankruptcy goal. The ability to pay all creditors in full, without distress, outside of bankruptcy, means the debtor should not benefit from Chapter 11 at all.

Instead of addressing the Debtor's bad faith, the Bankruptcy Court applied *In re Robbins*, 964 F.2d 342 (4th Cir. 1992), a case that presumes good faith and, therefore, is superfluous to the bad faith analysis. But even assuming that *Robbins'* equitable factors apply, the Bankruptcy Court still erred: it ruled on conjecture rather than evidence, *see* § 362(d)(1); ignored the nil potential for "dismemberment" of the estate, *see Grady v. A.H. Robins Co., Inc.*, 839 F.2d 198, 202 (4th Cir. 1988); and gave weight to the purported purpose of the Debtor's Texas Two-Step bankruptcy scheme without determining if that purpose was consistent with Congress' purposes for the Code, *see Carolin*, 886 F.2d at 700.

The Bankruptcy Code is not a tool for ultra-wealthy corporations to wield against Americans sickened and killed by their dangerous and defective products. Congress never so intended, nor has this Circuit—or any other—ever so held. The Bankruptcy Court's ruling mutates Article I courts into tribunals of unlimited jurisdiction, available for any purpose so long as a debtor—counterintuitively—can pay all its creditors.

DBMP's lack of financial distress (and pre-filing Texas Two-Step) demonstrate its Chapter 11 case was filed in bad faith. Bad faith is cause for relief from the automatic stay. And where cause exists, relief to a creditor is mandatory. Ignoring assertions of bad faith *incentivizes* parties to act in bad faith.

This Court must intercede now, and rule on the foundational issue plaguing the Texas Two-Step bankruptcies filed in the Western District of North Carolina. This Court must reverse.

## VII. STANDARD OF REVIEW

This Court examines factual findings of the bankruptcy court for clear error and reviews legal conclusions de novo. *In re Kirkland*, 600 F.3d 310, 314 (4th Cir. 2010). Where, as here, the relevant facts are

undisputed, this Court reviews the bankruptcy court's decision de novo. *In re Jones*, 591 F.3d 308, 310 (4th Cir. 2010).

## VIII. ARGUMENT

Courts uniformly acknowledge that a bankruptcy case does not serve the purposes of the Code unless a debtor is in financial distress. And a Chapter 11 case that fails to serve the Code's purposes is not brought in good faith. Lack of good faith is well-recognized cause for relief from § 362(a)'s automatic stay. Because relief from stay is mandatory "for cause" under § 362(d), because a debtor's bad faith is "cause," and because the Bankruptcy Court refused to entertain whether bad faith even exists here, the Bankruptcy Court erred.

This appeal touches on some of the Bankruptcy Code's granular provisions, but the controlling principles here are broad ones: limits on bankruptcy's disruptive power, limits on federal jurisdiction, and the foundational purposes of the Bankruptcy Code. Put simply, bankruptcy is for debtors struggling to pay their creditors. It is not a tool for the ultra-wealthy to restructure state-law liabilities they admit they can pay in full.

Because the material facts demonstrating bad faith are undisputed, the existence of "cause" is a question of law for this Court. And because Congress mandates relief from the automatic stay when cause exists, this Court should reverse the Bankruptcy Court and grant Appellants relief from the automatic stay.

### A. Bankruptcy: Powerful Relief for the Financially Distressed. But DBMP is Not Financially Distressed.

A "debtor has no constitutional or 'fundamental' right to a discharge in bankruptcy." *Grogan v. Garner*, 498 U.S. 279, 286 (1991). "Congress' power under the Bankruptcy Clause[15] contemplate[s] an adjustment of a *failing debtor's* obligations." *Ry. Labor Execs. Ass'n v. Gibbons*, 455 U.S. 457, 466 (1982) (emphasis added). Bankruptcy offers a "fresh start" to "businesses in financial distress." *Truck Ins. Exch. v. Kaiser Gypsum Co., Inc.*, 602 U.S. 268, 272 (2024).

Chapter 11 vests courts with "considerable powers" that "can impose significant hardship" on creditors. *In re LTL Mgmt., LLC*, 64 F.4th 84, 103 (3d Cir. 2023) (cleaned up). Recognizing this, bankruptcy

[15] "[The Congress shall have power … ] To establish an uniform Rule of Naturalization, and uniform Laws on the subject of Bankruptcies throughout the United States." U.S. Const. art. I, § 8, cl. 4.

law balances the opposing interests of debtors and creditors. *See Bartenwerfer v. Buckley*, 598 U.S. 69, 72 (2023); *Janvey v. Romero*, 883 F.3d 406, 410 (4th Cir. 2018); *In re Little Creek Development Co.*, 779 F.2d 1068, 1071–72 (5th Cir. 1986). But "the good and useful ends of the bankruptcy process can be badly abused." *Premier Auto,* 492 F.3d at 277.

A "simple bargain" lies beneath bankruptcy's complexities. *Harrington v. Purdue Pharma L.P.*, 603 U.S. ----, 144 S. Ct. 2071, 2077–78 (2024). A company which "places virtually all its assets on the table for its creditors" may win a discharge of its debts. *Id*. But only if that company seeks bankruptcy's safe harbor in "good faith." *Carolin,* 886 F.2d at 698. The "fresh start" offered by Chapter 11 is limited to "honest but unfortunate debtor[s]." *Grogan*, 498 U.S. at 286–87 (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)).

Like all federal courts, bankruptcy courts have limited jurisdiction; they must be "alert to avoid overstepping" their limited power. *Canal Corp. v. Finnman (In re Johnson)*, 960 F.2d 396, 399 (4th Cir. 1992); *McCorkle v. First Penn. Banking & Trust Co.*, 459 F.2d 243, 244 n.1 (4th Cir. 1972). Courts cannot wield bankruptcy's "powerful equitable weapons," like the automatic stay, on behalf of "financially healthy

companies with no need to reorganize." *See Premier Auto,* 492 F.3d at 279-82 (quoting *SGL Carbon*, 200 F.3d at 166 (collecting cases)).

To the contrary, the purpose of the Bankruptcy Code is universally recognized as allowing for "resuscitating a financially troubled debtor." *Carolin*, 886 F.2d at 701 (quoting *In re Coastal Cable TV, Inc.*, 709 F.2d 762, 765 (1st Cir. 1983)).[16]

---

[16] *See also Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934) ("One of the primary purposes of the Bankruptcy Act is to relieve the honest debtor from *the weight of oppressive indebtedness*, and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes."); *Wetmore v. Markoe*, 196 U.S. 68, 77 (1904) ("Systems of bankruptcy are designed to relieve the honest debtor from the weight of indebtedness which *has become oppressive* …"); *In re Capitol Food Corp. of Fields Corner*, 490 F.3d 21, 25 (1st Cir. 2007) (acknowledging that a debtor need not be "insolvent" before filing, but that it must face "some type of *financial distress*"); *In re Cohoes Indus. Terminal, Inc.*, 931 F.2d 222, 228 (2d Cir. 1991) (debtor must "at least … face such *financial difficulty* that, if it did not file at that time, it could anticipate the need to file in the future"); *In re SGL Carbon Corp.*, 200 F.3d at 164–66 ("Courts have allowed companies to seek the protections of bankruptcy when faced with pending litigation that posed a *serious threat to the companies' long term viability*."); *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1073 (5th Cir. 1986) ("[T]he purpose of Chapter 11 reorganization is to assist *financially distressed* business enterprises … "); *In re Winshall Settlor's Trust*, 758 F.2d 1136, 1137 (6th Cir. 1985) (*rev'd on other grounds*, *Toibb v. Radloff*, 501 U.S. 157, 160 n. 3 (1991)) ("The purpose of Chapter 11 reorganization is to *assist financially distressed*" debtors); *In re Cook*, 104 F.2d 981, 985 (7th Cir. 1939) (holding the debtor had no valid bankruptcy purpose where "proceeding was instituted not for the purpose

Federal courts (except Article I courts in the Western District of North Carolina) are unified on the issue of financial distress. Chapter 11's legislative history is similarly unequivocal:

> Chapter 11 deals with the reorganization of a *financially distressed* business enterprise, providing for its rehabilitation by adjustment of its debt obligations and equity interests. …
>
> Reorganization, in its fundamental aspects, involves the thankless task of determining who should share the losses incurred by an *unsuccessful business* and how the values of

---

of obtaining benefits afforded by the Act to a corporation *in financial distress*, but to enable appellees to escape the jurisdiction of another court"; "A Federal Court should not extend its jurisdiction under such circumstances."); *In re Cedar Shore Resort, Inc.*, 235 F.3d 375, 380 (8th Cir. 2000) (affirming a finding of debtor bad faith because, *inter alia*, the Debtor "was not in dire financial straits," had no "problems with any other creditors," and filed bankruptcy to "thwart" state court litigation by one creditor); *In re Marsch*, 36 F.3d 825, 829 (9th Cir. 1994) (affirming bad faith finding where debtor "had the financial means to pay" obligations, which posed no "danger of disrupting business interests"); *In re Stewart*, 175 F.3d 796, 811 (10th Cir. 1999) (recognizing that relieving "oppressive indebtedness" is "[o]ne of the main purposes of bankruptcy law"); *In re Waldron*, 785 F.2d 936, 940 (11th Cir. 1986) (recognizing Chapter 11's purpose giving a fresh start to a "financially troubled debtor" rather than the "financially secure"; "Permitting the financially secure [debtor] to avoid an option by filing bankruptcy would prompt a flood of litigation: any business that proves it miscalculated could avoid unprofitable deals through the bankruptcy process. This result makes a travesty of the bankruptcy process.") (emphasis added throughout footnote).

> the estate should be apportioned among creditors and stockholders.

S.Rep. No. 95-989, pp. 9-10 (1978). Congress has never extended the protections of the Bankruptcy Code to successful, profitable businesses seeking a better deal on liabilities they can pay in full, nor could such attempt survive Constitutional review.

Here, the Bankruptcy Court's factual findings are unchallenged. DBMP "steadfastly" maintains it has the "same ability to fund the costs of defending and resolving present and future asbestos claims, both in the state and federal courts and in connection with any chapter 11 filing" as Old CertainTeed. JA237-238. DBMP subsequently assured the District Court the "Funding Agreement … makes available New [CertainTeed's] and DBMP's combined resources from Old [CertainTeed]—giving DBMP the ability to meet its obligations, including paying asbestos claims." JA1068.

The linchpin material fact in this appeal—DBMP's lack of financial distress—is uncontroverted. And a lack of financial distress means the lack of a valid bankruptcy purpose—a lack of good faith.

**B. Lack of Financial Distress = Lack of Good Faith. DBMP's Invocation of Bankruptcy's Powerful Equitable Weapons Was Bad Faith.**

"Bad faith" in the context of Chapter 11 filings does not mean "actual fraud" or "proof of malice." *In re Waldron*, 785 F.2d 936, 941 (11th Cir. 1986). Rather, the good faith requirement simply "prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way or to achieve reprehensible purposes." *Premier Auto*, 492 F.3d at 279; *accord Waldron*, 785 F.2d at 941 (bankruptcy courts must "preserve the integrity of the bankruptcy process by refusing to condone its abuse"). Subjective bad faith may be shown where a debtor files "to abuse the reorganization process," or "to cause hardship," or "to delay creditors by resort to the Chapter 11 device merely for the purpose of invoking the automatic stay." *Premier Auto*, 492 F.3d at 280 (citing *Carolin*, 886 F.2d at 702).

"The purpose of Chapter 11 reorganization is to assist financially distressed business enterprises by providing them with breathing space in which to return to a viable state." *Premier Auto*, 492 F.3d at 284. In *Premier Auto*, the debtor, like DBMP, "had no demonstrable need to

reorganize when it filed the petition; it was not, the bankruptcy court found, even 'experiencing financial difficulties.'" *Id.* at 280. The bankruptcy filings revealed a "solvent[17] business entity with no unsecured creditors and few, if any, secured creditors." *Id.* Those facts supported a finding of "impermissible purpose"—*i.e.*, of bad faith. *Id.*

In *Premier Auto*, this Court cited the Third Circuit's decision in *SGL Carbon* for the proposition that "financially healthy companies with no need to reorganize under the protection of Chapter 11" do not belong in Chapter 11. 492 F.3d at 280. In *SGL Carbon*, a Delaware manufacturer facing significant antitrust liability was, nevertheless, "financially healthy." *SGL Carbon*, 200 F.3d at 156. Such a debtor "has no need to rehabilitate or reorganize," so its petition "cannot serve the rehabilitative purpose for which Chapter 11 was designed." *Id.* at 166. Chapter 11, after all, requires the use of "considerable powers" (like the

---

[17] Appellants have never asserted that *insolvency* is required for bankruptcy. A good faith debtor who legitimately believes he will run out of money should not have to wait to seek relief. *See In re Capitol Food Corp. of Fields Corner*, 490 F.3d 21, 25 (1st Cir. 2007). But DBMP can pay all its creditors via the uncapped funding agreement backstopped by New CertainTeed. At no time has DBMP presented any evidence that it was out of money, about to run out of money, or in any financial distress.

automatic stay) that "can impose significant hardship on particular creditors." *Id.* at 165.

"When financially troubled petitioners seek a chance to remain in business, the exercise of those powers is justified. But this is not so when a petitioner's aims lie outside those of the Bankruptcy Code." *Id.* at 165–66. The absence of a valid, reorganizational, Chapter 11 purpose doomed SGL Carbon's bankruptcy for "lack of good faith." *Id.*

*SGL Carbon* was the doctrinal start (and end) for a recent high profile Texas Two-Step case. In *LTL Management*, the Third Circuit twice rejected—for lack of good faith—a non-distressed bankruptcy materially identical to this one. There, a Johnson & Johnson ("J&J") affiliate executed a Texas Two-Step whereby J&J dumped its asbestos liabilities into LTL Management ("LTL"). *See In re LTL Mgmt., LLC*, 64 F.4th 84, 95–96 (3d Cir. 2023). LTL was backstopped by a "Funding Agreement" it could use "like an ATM disguised as a contract" to draw necessary money from J&J. *See id.* LTL had "massive liabilities," but its "call on assets to fund them exceeded any reasonable projections" available on the record. *Id.* at 109. Because LTL lacked financial distress,

it lacked a valid bankruptcy purpose and, therefore, lacked the good faith required for a debtor to invoke Chapter 11's considerable powers. *See id.*

Here, the *Premier Auto*, *Carolin*, *SGL Carbon*, and *LTL Management* principles control: DBMP's Chapter 11 lacks good faith as a matter of law. As in *Premier Auto*, DBMP has "no demonstrable need to reorganize" and is not "experiencing financial difficulties." It does not need "breathing space" or "resuscitation." Accordingly, its bankruptcy does not serve Chapter 11's rehabilitative purpose and is, therefore, in bad faith.

Like SGL Carbon, DBMP does not need bankruptcy to "remain in business." Accordingly, the courts' deployment of Chapter 11's "powerful equitable tools" on DBMP's behalf is unjustified. DBMP's attempt to limit its mass-tort liabilities is no different than SGL Carbon's attempt to use bankruptcy to limit its antitrust liability. Like SGL Carbon, DBMP's bad faith is manifest. "[I]f a Chapter 11 plan does not have a rehabilitative purpose, the statutory provisions designed to accomplish the reorganizational objectives become destructive of the legitimate rights and interests of creditors." *SGL Carbon*, 200 F.3d at 166.

*SGL Carbon* points to *Carolin*, this Circuit's touchstone for bad faith dismissal under 11 U.S.C. § 1112(b), as recognizing a "good faith requirement" that is "indispensable" to Chapter 11's purposes. *SGL Carbon*, 200 F.3d at 162. *Carolin*, unlike this case, concerned a debtor with "no realistic chance to rehabilitate," 886 F.2d at 702, and prompted this Court to articulate its two-part test for § 1112(b) "bad faith" dismissal, *id.* at 700–02.

In announcing that test, this Court acknowledged the possibility that some Chapter 11 cases filed in subjective bad faith may nevertheless survive dismissal motions "at the very portals of bankruptcy." *Id.* at 700. But creditors who could not win dismissal under § 1112(b) had other remedies, including—expressly—"relief from stay." *Id.*

*LTL Management* was a materially identical Two-Step Scheme: the same debtor-side lawyers and the same fundamental deficiency as here: bad faith.[18] The Third Circuit "start[ed], and stay[ed], with good faith.

[18] Like this case, LTL's first Chapter 11 petition was filed in the Western District of North Carolina, presumably to take advantage of what Two-Step debtors argue is the more stringent standard for dismissal in this Circuit. Appellants strongly disagree with the debtors' illogical position; the Fourth Circuit has never ruled that a company can effectively be rich enough to buy the equitable relief provided by the Code. But dismissal is not at issue here.

Good intentions—such as to protect the [corporate] brand or comprehensively resolve litigation—do not suffice alone. What counts to access the Bankruptcy Code's safe harbor is to meet its intended purposes." 64 F.4th at 93. "[G]iven Chapter 11's ability to redefine fundamental rights of third parties, only those facing financial distress can call on bankruptcy's tools to do so. Applied here, while [J&J's made-for-bankruptcy shell company] faces substantial future talc liability, its funding backstop plainly mitigates any financial distress foreseen on its petition date." *Id.* at 110.

Like LTL Management, DBMP is fully backstopped by a corporate affiliate that can pay DBMP's asbestos liabilities in full, inside or outside of bankruptcy. [19] DBMP *wants* access to the powerful equitable weapons

[19] The existence of 11 U.S.C. § 524(g) does nothing to help the Debtor. Section 524(g) is a tool of bankruptcy, not a bankruptcy purpose. Congress did not fling open Chapter 11's doors to profitable non-distressed debtors who manipulate their corporate structure to isolate asbestos disease victims when it enacted § 524(g). Rather, § 524(g) was enacted in the wake of the Johns-Manville bankruptcy "for use by any asbestos company facing a similarly overwhelming [to Johns-Manville] liability." H.R. Rep. No. 103-835, at 40–41 (1994)*; see also Kane v. Johns-Manville Corp.*, 843 F.2d 636, 640 (2d Cir. 1988) (confirming Manville was faced with "crippling" lawsuits); *id.* at 649 (recognizing Manville was a "financially besieged enterprise in desperate need of reorganization of its crushing debt, both present and future."); S. Rep. No. 95-989, at 9

of bankruptcy, but it does not *need* them to prevent a "fatal financial plummet." *SGL Carbon*, 200 F.3d at 166 (quoting *Furness*, 35 B.R. at 1009). Rather, DBMP conflates its desire for access to a proper tool of bankruptcy with a proper bankruptcy purpose. *See In re Patel*, 2022 WL 1420045, at *7.

As in *LTL Management*, *SGL Carbon*, and *Premier Auto*, the Debtor's lack of financial distress means bad faith taints DBMP's Chapter 11 case. But other indicia of bad faith exist here, too, and make DBMP's bad faith indisputable.

### C. Other Indicia of Bad Faith Bankruptcies: DBMP's Chapter 11 Filing Is Tainted by New Debtor Syndrome, Forum Shopping, and a Desire (Not Need) for Judicially Compelled Negotiations.

Bad faith can be demonstrated in myriad ways, and courts consider the totality of the circumstances. *Carolin*, 886 F.2d at 701; *In re Cedar Shore Resort, Inc.*, 235 F.3d 375, 379 (8th Cir. 2000) (citing *Little Creek*, 779 F.2d at 1072); *Furness*, 35 B.R. at 1012 (D. Md. 1983). It is, of course,

---

(1978) (legislative history suggesting Chapter 11 was meant to deal "with the reorganization of a financially distressed enterprise"). Unlike Johns-Manville, Old CertainTeed / DBMP have never faced lawsuits that would "cripple" or "overwhelm" them.

"unlikely that a debtor will ever acknowledge its own bad faith." *In re Cedar Shore*, 235 F.3d at 380 (internal citation omitted).

"New debtor syndrome" describes a bad faith Chapter 11 case filed soon after a one-asset entity is created or revitalized, to isolate creditors. *In re Little Creek*, 779 F.2d at 1073; *In re Dunes Hotel Assocs.*, 188 B.R. 162, 171 (D.S.C. 1995).

A debtor that enters Chapter 11 to "orchestrate pending litigation" rather than to ease "genuine financial distress" abuses the Code's provisions in bad faith. *Furness*, 35 B.R. at 1013*; see also In re Cook*, 104 F.2d 981, 985 (7th Cir. 1939) (debtor lacked good faith when it entered bankruptcy "not for the purpose of obtaining benefits afforded by the Act to a corporation in financial distress, but to enable [it] to escape the jurisdiction of another [state] court…").

Entering bankruptcy to leverage the automatic stay and force creditors into "judicially compelled negotiations" indicates bad faith. *Premier Auto*, 492 F.3d at 280. So does shopping for a debtor-friendly forum. *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1395 (11th Cir. 1988). Likewise, using the bankruptcy system to thwart creditors' state

court rights signals bad faith. *In re Cedar Shore*, 235 F.3d at 381; *In re Marsch*, 36 F.3d 825, 828–29 (9th Cir. 1994).

Here, in addition to DBMP's admitted lack of financial distress, multiple indicia of bad faith taint its Chapter 11 filing. Like Premier Auto, which entered bankruptcy to force its landlord into "judicially compelled negotiations," DBMP invoked the automatic stay to "overcome the tort system"—to resolve all its state-law asbestos tort liability in one federal forum. As in *Premier Auto*, DBMP's "unilateral expectation that judicially compelled … negotiations might culminate in agreement" did not make its invocation of Chapter 11 proper. 492 F.3d at 282–83.

The undisputed facts here fall squarely into the words of the Seventh Circuit nearly a century ago:

> the instant proceeding was instituted not for the purpose of obtaining benefits afforded by the Act to a corporation in financial distress, but to enable appellees to escape the jurisdiction of another court where the day of reckoning for their alleged acts of misconduct was at hand. It is our conclusion that a Federal Court should not extend its jurisdiction under such circumstances. To do so is to furnish a haven of repose for one accused and called to account by a court of competent jurisdiction.

*In re Cook*, 104 F.2d at 985.

In *Little Creek*, the Fifth Circuit recognized that "new debtor" syndrome—the transfer of one's assets to a new debtor on the eve of a Chapter 11 finding—is indicia of bad faith. *In re Little Creek*, 779 F.2d at 1073 n.3 (collecting cases). So too here. DBMP exists as a newly-created stooge receptacle for the asbestos liabilities of its wealthy corporate affiliates; it was created (in October 2019) for the purpose of immediately filing (three months later) for bankruptcy.[20]

Further, "new debtor" DBMP was engineered for one specific federal jurisdiction: the Western District of North Carolina. Even more egregiously than in *Phoenix Piccadilly*, where a venue over 700 miles from the debtor's property and creditors was chosen for filing, here the ultimate decision to create DBMP and plunge it into bankruptcy happened in France. *See* 849 F.2d at 1395 (citing *In re Pappas*, 7 B.R. 488, 490 (Bankr. D. Mass. 1980)); *In re Heritage Wood'n Lakes*, 73 B.R. 511, 514 (Bankr. M.D. Fla. 1987).

As a matter of judicial restraint, the specter of "judicially compelled negotiations," combined with forum shopping cannot be overlooked.

---

[20] The Bankruptcy Court flatly rejected DBMP's attempt to claim that it was not formed for the purpose of filing for bankruptcy, as not credible and contrary to the evidence. JA248, Findings ¶102.

DBMP, through its restructuring and Funding Agreements, has access to the vast resources of its corporate affiliates. It does not stand in the same position as a typical Chapter 11 debtor, which is incentivized to escape from bankruptcy as soon as practicable.

Instead, DBMP has entered the one bankruptcy district in America which permits wealthy, non-distressed corporations to deploy bankruptcy's "powerful equitable weapons" to effectuate extra-legislative tort reform due to their dissatisfaction with the civil justice system. And it permits them to do so after performing a Texas Two-Step, leaving the profitable business free from the obligations of bankruptcy.

For seven years, this bankruptcy district has steadfastly refused to rule on whether such an attempt by a debtor constitutes a good faith invocation of the Code. Appellants (and the other claimants in this case), by contrast, are individual American citizens and "creditors" of DBMP through no fault of their own, but simply by virtue of breathing dust from DBMP's products. Whether the Debtor's grievances about the states' tort systems are pretextual or not is beside the point—Congress has never granted the bankruptcy court the authority to enact civil justice reform. Appellants (and the Debtor) already have Constitutionally appropriate

forums to negotiate with DBMP: the state civil courts of California and Washington.

In these circumstances, the automatic stay does not act in its Congressionally-assigned role as a tool for rehabilitation; the Two-Step debtors have no need of rehabilitation. Rather, in these cases, the automatic stay mutates into a weapon for the ultra-wealthy to bludgeon their creditors into submission, bypassing Congress and the state legislatures and using the bankruptcy courts to effectuate tort reform.

Congress never empowered Article I courts to "overcome the tort system" via the Bankruptcy Code. Changing the civil justice system is the exclusive province of Congress and the state legislatures. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 842 (1999) (recognizing the "serious constitutional concerns" raised by aggregating individual tort claims, "especially where a case seeks to resolve future liability in a settlement-only action"). This Court should not countenance such tactics.

In short, while the Debtor's petition is terminally flawed by its lack of financial distress, its Texas Two-Step scheme provides ample additional indicia of bad faith. Has DBMP forum shopped? Yes. Isolated one class of creditor? Yes. *See In re Kestell*, 99 F.3d 146, 149–50 (4th Cir.

1996). Attempted to keep assets out of the reach of bankruptcy jurisdiction? Yes. *See In re Dutch Flat Inv. Co.*, 6 B.R. 470, 471 (Bankr. N.D. Cal. 1980) (finding bad faith, and reasoning that guarding against misuse of Chapter 11 is particularly needed "where debtors have elected not to submit the actual entities in interest to the jurisdiction of the court thereby isolating the entities in interest from scrutiny and control of the court during the proceedings."); *Milwaukee Postal Bldg. Corp. v. McCann*, 95 F.2d 948, 952 (8th Cir. 1938) (where "the debtor … was organized and the property conveyed to it for the sole purpose of attempting to work out a reorganization…[a] corporation organized for such a purpose is not within the remedy afforded by" bankruptcy law); *Mongiello Bros. Coal Corp. v. Houghtailing Properties Inc.*, 309 F.2d 925, 930 (5th Cir. 1962) ("[T]he Act is not to be abused by the extension of its privileges to those not within the contemplation of it, such as where individual debtors convey their property to a corporation for the purpose of utilizing" bankruptcy proceedings.)

Appellants do not expect DBMP to "acknowledge its own bad faith." *In re Cedar Shore*, 235 F.3d at 380. But when the issue was raised directly to the Bankruptcy Court, it was obligated to assess whether the

statutory power entrusted to it had been properly invoked. Its failure to do so, especially when relief from the stay is mandated by statute, *see* § 362(d), was error.

### D. *The Automatic Stay: Congressionally and Judicially Limited Because It Is So Disruptive. The Stay's Protections (1) Do Not Inure to the Bad Faith Debtor and (2) Serve No Pro-Creditor Purpose.*

Section 362(a)'s automatic stay, which stops any other proceedings against a debtor, is one of Chapter 11's most "powerful" tools. *See, e.g. SGL Carbon*, 200 F.3d at 165; *Fox Valley Const. Workers Fringe Ben. Funds v. Pride of Fox Masonry & Expert Restorations*, 140 F.3d 661, 666 (7th Cir. 1998); *In re Selinsky*, 365 B.R. 260, 267 (Bankr. S.D. Fla. 2007). *Accord In re Russo*, 94 B.R. 127, 129 (Bankr. N.D. Ill. 1988) ("The automatic stay is one of the most powerful weapons known to the law.")

Congress expressly recognized the automatic stay's potential to infringe on a creditor's rights:

> The automatic stay by its nature, seriously affects the rights of all the debtor's creditors. As a result, certain limitations are placed upon the continuance of the stay…Any creditor may request the court for relief from such stay, which request shall be given calendar priority by the court."

S. Rep. 95-989, 4–5.

> "[A]t hearings on relief from the stay, the only issue will be the lack of adequate protection, the debtor's equity in the property, and *the necessity of the property of an effective reorganization of the debtor*, or *the existence of other cause* for relief from the stay."

*Id.* at *55 (emphasis added).

Like most bankruptcy provisions, the automatic stay is intended to protect both creditors and (good faith) debtors. Debtors avoid "an uncontrollable scramble for [their] assets in a number of uncoordinated proceedings in different courts." *In re A.H. Robins Co.*, 788 F.2d 994, 998 (4th Cir. 1986). Creditors are protected from one another: the stay "preclude[s] one creditor from pursuing a remedy to the disadvantage of other creditors." *Id.* Absent the stay, "dismemberment rather than reorganization" would be "the inevitable result." *Grady v. A.H. Robins Co., Inc.*, 839 F.2d 198, 202 (4th Cir. 1988).

The statutory provision controlling relief from stay is found in 11 U.S.C. § 362(d). "On request of a party in interest and after notice and a hearing, the court *shall* grant relief from the stay provided under [§ 362(a)], such as by terminating, annulling, modifying, or conditioning such stay … for cause." 11 U.S.C. § 362(d)(1).

Congress allocated the burden of resisting stay relief (or, as the legislative history puts it, the party arguing for "continuance of the stay")

onto the party opposing stay relief—here, the Debtor. 11 U.S.C. § 362(g)(2).

Bad faith is widely recognized as "cause" for stay relief under § 362(d). "[C]reditors who become entangled in hopeless Chapter 11 cases … have [the] remed[y] of relief from stay." *Carolin*, 886 F.2d at 700.[21] Section 362(d)(1)'s "for cause" language "authorizes the court to determine whether, with respect to the interests of a creditor seeking relief, a debtor has sought the protection of the automatic stay in good faith." *Id.* at 699.

---

[21] The Bankruptcy Court's ruling presupposes that *Carolin* somehow prevents dismissal. While that issue is not before this Court, such an interpretation of *Carolin* goes against its plain language. Further, the "objective futility," part of *Carolin*'s § 1112(b) test, has never been a requirement for § 362(d) lift stay. Grafting *Carolin*'s dismissal analysis into this § 362(d) lift stay request was error. Nevertheless, to the extent that this Court were to hold that *Carolin*'s two-pronged test for bad faith dismissal applies, the undisputed facts and DBMP's lack of financial distress, demonstrate objective futility in addition to subjective bad faith—as a matter of law. *See Carolin*, 886 F.2d at 701 (proof "inevitably will overlap" re: the inquiry into a petition's objective futility and subjective bad faith). *Carolin* defines the purpose of the objective futility analysis as ensuring the petition serves the Code's purpose of "resuscitating a financially troubled debtor." *Id.* Because DBMP is not a "financially troubled debtor" and has never needed "resuscitating" its petition is objectively futile as a matter of law.

As discussed in Sections VIII.B–C, *supra*, there is no colorable argument that DBMP filed its Chapter 11 petition in good faith. It does not qualify for the continued protection of the automatic stay, and it does not (under any reasonable understanding of fundamental fairness) deserve it.

Moreover, because DBMP admits it can pay its creditors in full, the automatic stay's "anti-dismemberment" purposes are not served by the stay's continuance (even if Appellants sought to both quantify *and collect*). Nor can DBMP pretend there is any threat to the size of the estate: it admits it can fully pay all asbestos creditors, now and in the future, inside or outside of bankruptcy.[22] But these concerns are purely hypothetical given the express limitation of the relief sought by Appellants to merely quantifying the value of their claims.

Unlike most bankruptcies, where good faith debtors seek to return quickly back into the commercial world, here DBMP benefits by sitting

---

[22] *See* H.R.Rep. No. 95-595, at 341 (1977); S.Rep. No. 95-989, at 50 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5836 (emphasis added) ("[I]t will often be more appropriate to permit proceedings to continue in their place of origin, *when no great prejudice to the bankruptcy estate would result*, in order to leave the parties to their chosen forum and to relieve the bankruptcy court from many duties that may be handled elsewhere.").

behind § 362(a)'s high wall indefinitely.[23] DBMP has not paid a single verdict or settlement in five years. Its cost to defend asbestos-related claims in state court since this case was filed is $0.00. This collateral (and improper) benefit of Old CertainTeed's Texas Two-Step was expressly recognized by DBMP's corporate parent when it announced it expected DBMP's bankruptcy "to take up to approximately five to eight years," during which "all asbestos litigations [sic] have been stayed and all related costs suspended." JA437.

On the other side of the debtor-creditor balance stand Peter Bergrud's family and the Herlihys. The Bergruds filed suit against

---

[23] The Texas Two-Step has resulted in billions of dollars in windfall to equity holders, who are supposed eat last at Chapter 11's table. *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 457 (2017); 11 U.S.C. § 726(a)(6). Additionally, well over $500,000,000.00 in fees has been doled out to bankruptcy professionals in the four cases parked in the Western District of North Carolina. *See* Ames Alexander, *Profitable companies are dodging asbestos lawsuits. A Charlotte court has helped them*, THE CHARLOTTE OBSERVER, July 24, 2024, https://www.charlotteobserver.com/news/local/crime/article289390884.html; Jeff Tiberri, *Legal maneuvers used in Charlotte bankruptcy court hold up lawsuits by victims of asbestos exposure*, NORTH CAROLINA PUBLIC RADIO (July 30, 2024), https://www.wunc.org/show/due-south/2024-07-30/legal-maneuvers-used-in-charlotte-bankruptcy-court-hold-up-lawsuits-by-victims-of-asbestos-exposure.

DBMP's predecessor six months before Old CertainTeed executed its Two-Step. They have waited almost six years to present their case to a Washington jury.[24] Mr. Herlihy was diagnosed with mesothelioma over three years after DBMP filed its petition. Unless the stay is lifted, there is a real risk he will not see his day in court.[25]

In this case, the costs of delay inure only to the detriment to the creditors. Thus, the automatic stay here does nothing to serve Congress' balance between a debtor's need for a "breathing spell" and all creditors' right to payment. The Bankruptcy Court had no discretion to skip over the question of whether the automatic stay was protecting a bad-faith debtor. Bad faith is "cause," and cause mandates stay relief. *See* 11 U.S.C. § 362(d)(1).

---

[24] *See* 28 U.S.C. §§ 157(b)(2)(B), (b)(5), § 1334(c)(2).

[25] Sometimes lift stay preferred to dismissal. *See In re Yukon Enterprises, Inc.*, 39 B.R. 919, 920-21 (Bankr. C.D. Cal. 1984) ("[T]he lifting of the stay is often a more prudent course for creditors rather than seeking dismissal of the case."). *See also In re Dixie Broadcasting*, 871 F.2d 1023, 1029 (11th Cir. 1989) (collecting cases) ("We disagree that bad faith constituting 'cause' for relief from a stay automatically equates to bad faith warranting dismissal of the petition. If that were true, there would not be a need to ever lift a stay for bad faith, because the petition would necessarily have to be dismissed. That seems at odds with the intent of the Bankruptcy Code [and] is at least in consistent with the practice in many courts.").

### E. The Bankruptcy Court Erred by Failing to Require that DBMP Prove Continuation of the Stay Was Warranted and Compounded Its Error by Putting Hypothetical Case Management Concerns Over Foundational Issues of Judicial Power.

When cause for stay relief is shown—and bad faith is cause[26]—relief is not optional. *See* 11 U.S.C. § 362(d) ("shall grant relief").

Here, instead of analyzing bad faith, the Bankruptcy Court blindly looked to *In re Robbins*, 964 F.2d 342 (4th Cir. 1992). In that post-divorce

[26] *Carolin*, 886 F.2d at 699; *Furness*, 35 B.R. at 1011 ("Courts have found that if a Chapter 11 petition is not filed in good faith, grounds exist to either vacate the automatic stay or dismiss the petition."); *In re Talladega Steaks, Inc.*, 50 B.R. 42, 43 (Bankr. N.D. Ala. 1985) (same); *In re Victory Const. Co., Inc.*, 9 B.R. 549, 560 (Bankr. C.D. Cal. 1981) (vacated on other grounds as moot, 37 B.R. 222 (B.A.P. 9th 1984) ("[T]he debtor's lack of 'good faith' in filing a case under Chapter 11 is 'cause,' independent of the existence of lack of adequate protection, to vacate the automatic stay under § 362(d)(1)); *In re Corp. Deja Vu*, 34 B.R. 845, 850 (Bankr. D. Md. 1983) ("Reorganization was neither contemplated nor possible. The petition was filed in bad faith. This bad faith constitutes cause to allow the secured creditor relief from the stay."); *In re RAD Properties, Inc.*, 84 B.R. 827, 831 (Bankr. M.D. Fla. 1988) ("[T]he court concludes that the debtor's pending Chapter 11 case was filed in bad faith, which constitutes cause within the meaning of Section 362(d)(1) of the bankruptcy code for lifting the automatic stay.").

equitable distribution dispute, the issue of bad faith was not discussed. This Court reasoned that the consideration of "cause" under § 362(d) balances "potential prejudice to the bankruptcy debtor's estate against the hardships that will be incurred by the person seeking relief from the automatic stay if relief is denied." *Robbins*, 964 F.2d at 345.

As discussed in Section VIII.D., *supra*, DBMP's lack of financial distress (and the resulting existence of bad faith) disprove the need for continuing the automatic stay. The harm to the Bergruds and Herlihys is manifest. The risk of prejudice to the Debtor's estate is non-existent—it admits the uncapped ability to pay all creditors fully. Indeed, taking DBMP at its word, *every* claimant in this case could quantify his claim against the Debtor in a civil court then return to bankruptcy to await distribution, all without affecting the amount paid to any other creditor. Under the law, every claimant has the right to do just that. *See* 28 U.S.C. § 157(b)(2); 28 U.S.C. § 157(b)(5); 28 U.S.C. § 1334(c)(2).

But the Bankruptcy Court ignored the rationale for the automatic stay in its discussion in *Robbins*'. Instead, the Court bypassed the question of bad faith and limited itself to certain non-inclusive factors—announced in a case where bad faith was not discussed. Those factors

include (1) whether the issues in outside-bankruptcy litigation involve only state law (so the expertise of the bankruptcy court is unnecessary); (2) whether modifying the stay will promote judicial economy and whether there would be greater interference with the bankruptcy case if the stay were not lifted because matters would have to be litigated in bankruptcy court; and (3) whether the estate can be protected properly by a requirement that creditors seek enforcement of any judgement through the bankruptcy court. *Id.*

Even assuming *Robbins* applies in a bad faith case, the Bankruptcy Court erred. There was no dispute *Robbins'* first and third factors supported lifting the stay. As to the first factor, the Bergruds' claims arise under Washington's law, and the Herlihys' under California's. Not only is the Bankruptcy Court's expertise unnecessary in quantifying Appellants' claims, Congress forbids it from so doing. As to the third factor, even setting aside the unlimited funding available to DBMP's "estate" and the Debtor's professed ability to pay each creditor 100-cents on the dollar, Appellants have foresworn payment pending resolution of the bankruptcy proceeding.

The Bankruptcy Court's ruling, which purports to rely upon *Robbins* second factor, illogically ignored the undisputed facts of this case and the purposes of the Code. In the context of a bad faith filing, *Robbins*' discussion of judicial economy automatically weighs in favor of lifting the stay.

If the petition does not further the purposes of the Bankruptcy Code, then, by definition, it does not further judicial economy for the bankruptcy court to continue to exercise jurisdiction. Judicial economy is undoubtedly an important concern, but only if a case belongs in court in the first place.[27] What purpose can "judicial economy" possibly serve in a case where one party has no business wielding Bankruptcy Code's "powerful equitable weapons?" The purposes of the bad faith debtor, perhaps, but not the "clear purposes of the bankruptcy code." *See Carolin*, 886 F.3d at 700.

[27] Imagine: a Virginia plaintiff sues a Virginia defendant in Article III court in Virginia, under a state law tort theory for $74,999. *But see* 28 U.S.C. § 1332. The parties approach the hypothetical court with a joint report, a discovery plan, and a well-reasoned proposed scheduling order. Under the Bankruptcy Court's reasoning here, that Article III judge should ignore the facially problematic existence of the case itself, and focus instead on the effects of the parties' scheduling proposals on her docket.

And even assuming *arguendo* that *Robbins*' second factor can be assessed without considering the Debtor's bad faith—and it logically cannot—it was the Debtor's burden to *prove* the lack of cause for stay relief. 11 U.S.C. § 362(g)(2). There is no record evidence thereof. The findings by the Bankruptcy Court on the matter are slippery-slope conjecture, inferential, and reasoned entirely in favor of the party with the burden of proof. Making inferences in the Debtor's favor was twice error: once in ignoring the statutory command that stay relief "shall" issue for cause, and once in replacing the statutory burden of proof with hypothetical conjecture not based upon any record evidence.

Every claimant in this non-distressed tort-reform bankruptcy has the right to liquidate/estimate his claim before a jury—Congress has expressly forbidden the Bankruptcy Court from so doing. *See* 28 U.S.C. § 157(b)(2); 28 U.S.C. § 157(b)(5); 28 U.S.C. § 1334(c)(2). The "rights of all the debtor's creditors" cannot be overlooked, and any claimant who wants to vindicate those rights will require judicial resources to do so. S. Rep. 95-989, 4-5.

What is at stake here goes far beyond the two-party post-divorce equitable distribution dispute in *Robbins*. Although DBMP's ongoing

asbestos liability—caused by decades of poisoning Americans with deadly products—may be an accounting headache for its shareholders and executives, DBMP has "no constitutional" or "fundamental" right to a discharge in bankruptcy. *Grogan*, 498 U.S. at 286. Here, the automatic stay freezes the rights of dying citizens and their families nationwide, in every state and federal court.

Apart from citizens' constitutional jury trial rights found in almost all states (and the U.S. Constitution's Seventh Amendment)[28], each state itself has an interest in enforcing its own safety regulations and in providing its citizens a forum for redressing injuries. *See Ford Motor Co. v. Montana Eighth Judicial Dist. Ct.*, 592 U.S. 351, 368 (2021). The Bankruptcy Court's reasoning permits a single Article I court to allow the "continuance of the stay," S. Rep. 95-989, 4-5, to disruptive nationwide effect, without even assessing the propriety of its own jurisdiction. Such a rule belies the nature of a court "of limited jurisdiction," *In re Johnson*, 960 F.2d at 399, and tramples on core federalism principles, *see Bond v.*

---

[28] *See* Cal. Const. art. 1, § 16 ("Trial by jury is an inviolate right and shall be secured to all…"); Wash. Const. art. I, § 21 ("The right of trial by jury shall remain inviolate…"); U.S. Const. amend. VII ("In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved…").

*U.S.*, 564 U.S. 211, 221-22 (2011).[29] Leaving the Bankruptcy Court's reasoning untouched puts this Court's imprimatur on vast federal overreach in the form of an effectively unreviewable automatic stay.[30]

The automatic stay's effect on creditors' and states' rights is staggeringly heavy. It cannot not be weighed against the concerns of judicial economy in a case where the federal judiciary has no authority to deploy its "powerful equitable weapons." *Carolin*, 886 F.2d at 698.

## IX. CONCLUSION

[29] "[F]ederalism secures to citizens the liberties that derive from the diffusion of sovereign power. … [It] protects the liberty of all persons within a State by ensuring that laws enacted in excess of delegated governmental power cannot direct or control their actions. … By denying any one government complete jurisdiction over all the concerns of public life, federalism protects the liberty of the individual from arbitrary power. When a government acts in excess of its lawful powers, that liberty is at stake."

[30] Indeed, the attorneys general of dozens of states have voiced unequivocal opposition to the Texas Two-Step. *See* Brief of North Carolina, Arizona, California, Colorado, Connecticut, Delaware, Illinois, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nevada, New Jersey, New Mexico, New York, North Dakota, Oregon, Pennsylvania, Rhode Island, South Dakota, Vermont, Washington, Wisconsin, and the District of Columbia as Amicus Curiae, *Official Committee of Asbestos Claimants v. Bestwall LLC*, Case No. 23-675 (January 22, 2024), *available at* https://www.supremecourt.gov/DocketPDF/23/23-675/298347/20240122164305807_Bestwall%20-%20NC%20et%20al.%20amicus.pdf

The Texas Two-Step has drawn rare bipartisan Congressional scorn. *See* Brief of Members of Congress as Amici Curiae in Support of Petitioner, *Off. Comm. of Asbestos Claimants v. Bestwall LLC*, 2024 WL 2116276 (U.S. May 13, 2024) (No. 23-675).[31] It has earned rebuke from two dozen state attorneys general, including North Carolina's. *See* FN30, *supra*. The only federal appellate court to address it has carefully and thoroughly, rejected it twice. *In re LTL Management, LLC*, 64 F.4th 84 (3d Cir. 2023); *In re LTL Management* LLC, No. 23-2971, 2024 WL 3540467 (3d Cir. July 25, 2024). And bipartisan legislation has been introduced to specifically eliminate the Two-Step.[32]

"Courts must not be 'blind' to what '[a]ll others can see and understand.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 486 (1985) (quoting *United States v. Rumely*, 345 U.S. 41, 44 (1953)). Bankruptcy is for those in financial distress. According to the Bankruptcy Court's reasoning, this Circuit offers unique judicial protection—in the form of a

---

[31] *Available at* https://www.judiciary.senate.gov/imo/media/doc/23-675%20Bestwall%20amicus%20FINAL.pdf.

[32] Ending Corporate Bankruptcy Abuse Act of 2024, S.4746, 118th Congress Second Session, (2023-2024) *available at* https://sykes.house.gov/media/press-releases/sykes-gooden-whitehouse-hawley-introduce-bipartisan-legislation-to-deter-texas-two-step-bankruptcy-trick.

blind eye—to bad faith debtors who have invoked the automatic stay, so long as those debtors are flush with cash. That reasoning is illogical, inequitable, and erroneous.

Bankruptcy's cornerstone "has always been the doing of equity." *In re Waldron*, 785 F.2d at 941. "Attempting to circumvent a legal obligation through a technicality of the law" is the "antithesis" of "[g]ood faith or basic honesty." *Id.* Because the material fact—DBMP's admitted ability to pay its creditors in full—is undisputed, this Court need simply apply the law. DBMP's lack of financial distress means its Chapter 11 case was filed in bad faith. Its pre-filing Texas Two-Step compounds that bad faith. Bad faith is cause for relief from the automatic stay. And where cause exists, relief to a creditor is mandatory. This Court must reverse.

Respectfully Submitted,

*<u>/s/ Thomas W. Waldrep, Jr.</u>*

THOMAS W. WALDREP, JR.
CHRIS W. HAAF
DIANA S. JOHNSON
WALDREP WALL BABCOCK
& BAILEY PLLC
370 Knollwood Street, Suite 600
Winston-Salem, North Carolina 27103
(336) 722-6300
twaldrep@waldrepwall.com
chaaf@waldrepwall.com

dsantosjohnson@waldrepwall.com

JONATHAN RUCKDESCHEL
THE RUCKDESCHEL LAW FIRM, LLC
8357 Main Street
Ellicott City, Maryland 21043
(410) 750-7825
rucklawfirm@rucklawfirm.com

CLAYTON L. THOMPSON
MAUNE RAICHLE HARTLEY FRENCH
& MUDD, LLC
150 West 30th Street, Suite 201
New York, New York 10001
(314) 241-2003
cthompson@mrhfmlaw.com

JOHN L. STEFFAN
MAUNE RAICHLE HARTLEY FRENCH
& MUDD, LLC
1015 Locust Street, Suite 1200
St. Louis, Missouri 63101
(314) 320-9643
jsteffan@mrhfmlaw.com

*Counsel for Claimants-Appellants*

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**No.** 24-2109 **Caption:** Michael Herlihy v. DBMP, LLC

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2) & 40(d)(3).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

- [x] this brief or other document contains 12,732 [*state number of*] words
- [ ] this brief uses monospaced type and contains ____________ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

- [x] this brief or other document has been prepared in a proportionally spaced typeface using MS Word [*identify word processing program*] in Century Schoolbook, 14 pt. [*identify font size and type style*]; **or**
- [ ] this brief or other document has been prepared in a monospaced typeface using ____________ [*identify word processing program*] in ____________ [*identify font size and type style*].

(s) Thomas W. Waldrep, Jr.

Party Name Appellants

Dated: February 28, 2025