**No. 25-1013**

# In the Supreme Court of the United States

OFFICIAL COMMITTEE OF ASBESTOS CLAIMANTS OF
BESTWALL LLC,

*Petitioner*,

v.

BESTWALL LLC,

*Respondent.*

On Petition for a Writ of Certiorari to the
United States Court of Appeals for the Fourth Circuit

**BRIEF OF SENATOR RICHARD DURBIN,
SENATOR SHELDON WHITEHOUSE, AND
SENATOR JOSH HAWLEY AS AMICI CURIAE
IN SUPPORT OF PETITIONER**

VARSHINI PARTHASARATHY
GUPTA WESSLER LLP
235 Montgomery Street
Suite 629
San Francisco, CA 94104
(415) 573-0336

DEEPAK GUPTA
  *Counsel of Record*
JONATHAN E. TAYLOR
GREGORY A. BECK
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
*deepak@guptawessler.com*

*Counsel for Amici Curiae*

March 25, 2026

# TABLE OF CONTENTS

Table of authorities .......................................................... ii

Interest of amici curiae ................................................. 1

Introduction and summary of argument ...................... 2

Statement ........................................................................ 5

Argument ........................................................................ 8

    I.   Congress has never given wealthy corporations access to bankruptcy's protections without a showing of financial distress ............................................................. 8

    II.  The good-faith requirement preserves Congress's intent to limit bankruptcy to those who are actually "bankrupt" ................ 11

    III. The increasing prevalence of bankruptcy abuse by wealthy, non-distressed tortfeasors underscores the need for review ................... 15

Conclusion .................................................................... 18

# TABLE OF AUTHORITIES

**Cases**

*Carolin Corp. v. Miller*,
886 F.2d 693 (4th Cir. 1989).................................... 4, 15

*Central Virginia Community College v. Katz*,
546 U.S. 356 (2006)........................................................ 8

*Cohen v. de la Cruz*,
523 U.S. 213 (1998)........................................................ 8

*Continental Illinois National Bank & Trust Co. of Chicago v. Chicago, Rock Island & Pacific Railway Co.*,
294 U.S. 648 (1935)........................................................ 9

*Czyzewski v. Jevic Holding Corp.*,
580 U.S. 451 (2017)...................................................... 17

*Georgine v. Amchem Products, Inc.*,
83 F.3d 610 (3d Cir. 1996) ........................................... 17

*Harrington v. Purdue Pharma L.P.*,
603 U.S. 204 (2024)...................................................... 15

*In re 15375 Memorial Co. v. Bepco, L.P.*,
589 F.3d 605 (3d Cir. 2009) ......................................... 13

*In re Bestwall LLC*,
71 F.4th 168 (4th Cir. 2023) ........................................... 2

*In re Cedar Shore Resort, Inc.*,
235 F.3d 375 (8th Cir. 2000)........................................ 10

*In re Combustion Engineering, Inc.*,
391 F.3d 190 (3d Cir. 2004) ......................................... 12

*In re Integrated Telecom Express, Inc.*,
384 F.3d 108 (3d Cir. 2004) ............................. 11–13, 16

*In re Little Creek Development Co.*,
779 F.2d 1068 (5th Cir. 1986)................................ 11, 14

*In re LTL Management, LLC*,
64 F.4th 84 (3d Cir. 2023)................................. 4, 10, 17

*In re SGL Carbon Corp.*,
200 F.3d 154 (3d Cir. 1999) ................................. 11, 17

*In re Victory Construction Co., Inc.*,
9 B.R. 549 (Bankr. C.D. Cal. 1981) ........................... 11

*Marrama v. Citizens Bank of Massachusetts*,
549 U.S. 365 (2007).......................................... 3

*Ortiz v. Fireboard Corp.*,
527 U.S. 815 (1999)......................................... 16

*Shapiro v. Wilgus*,
287 U.S. 348 (1932)...................................... 13, 14, 16

*Williams v. U.S. Fidelity & Guaranty Co.*,
236 U.S. 549 (1915)......................................... 10

*Wright v. Union Central Life Insurance Co.*,
304 U.S. 502 (1938)......................................... 10

**Statutes**

11 U.S.C. § 1112............................................ 4, 11

11 U.S.C. § 524............................................. 13

28 U.S.C. § 1407........................................... 16

Act of March 2, 1867, 14 Stat. 517........................... 9

Bankruptcy Act of 1841, 5 Stat. 440 ......................... 9

Bankruptcy Act of 1898, 30 Stat. 544 ....................... 10

## Law review articles

Michael A. Francus,
*Designing Designer Bankruptcy*,
102 Tex. L. Rev. 1205 (2024) ............................ 7, 12, 17

Michael A. Francus,
*Texas Two-Stepping Out of Bankruptcy*,
120 Mich. L. Rev. Online 38 (2022) ....................... 5, 10

Diane B. McColl,
*Good Faith in Chapter Eleven Reorganizations*,
35 S.C. L. Rev. 333 (1984). ......................................... 14

Samir D. Parikh,
*Mass Exploitation*,
170 U. Pa. L. Rev. Online 53 (2022) ........................... 7

Thomas E. Plank,
*The Constitutional Limits of Bankruptcy*,
63 Tenn. L. Rev. 487 (1996) ......................................... 9

Joseph E. Simmons,
*Reconstructing the Bankruptcy Power: An
Originalist Approach*,
131 Yale L.J. 306 (2021) ............................................... 9

Lindsey D. Simon,
*Bankruptcy Grifters*,
131 Yale L.J. 1154 (2022) ........................................... 16

Charles Jordan Tabb,
*The History of the Bankruptcy Laws in the
United States*,
3 Am. Bankr. Inst. L. Rev. 5 (1995) ....................... 9, 10

## Other authorities

7 Collier on Bankruptcy ¶ 1112.07 (16th ed. 2022)......... 11

168 Cong. Rec. S683 (daily ed. Feb. 15, 2022) ............ 8, 16

Evading Accountability: Hearing on Corporate
Manipulation of Chapter 11 Bankruptcy Before
the Senate Committee on the Judiciary, 118th
Congress (2023) ........................................................... 18

H.R. Rep. No. 103-835 (1994),
*as reprinted in* 1994 U.S.C.C.A.N. 3340 .................... 12

H.R. Rep. No. 109-31 (2005),
*as reprinted in* 2005 U.S.C.C.A.N. 88 ......................... 3

H.R. Rep. No. 95-595 (1977),
*as reprinted in* 1978 U.S.C.C.A.N. 5963 .................... 12

Letter from Senators Richard J. Durbin,
Elizabeth Warren, and Richard Blumenthal
and Representatives Carolyn B. Maloney and
Raja Krishnamoorthi, to Alex Gorsky,
Chairman and CEO, Johnson & Johnson
(Nov. 10, 2021) ........................................................ 15, 18

Letter from Senators Richard J. Durbin,
Elizabeth Warren, and Richard Blumenthal
and Representatives Carolyn B. Maloney and
Raja Krishnamoorthi, to Joaquin Duato,
Vice-Chairman of the Executive Committee,
Johnson & Johnson (Dec. 17, 2021) ............................ 7

Press Release,
*Whitehouse, Hawley, Sykes, Gooden
Introduce Bipartisan Legislation to Deter
'Texas Two-Step' Bankruptcy Trick*
(July 23, 2024) .............................................................. 6

S. Rep. No. 95-989 (1978),
*as reprinted in* 1978 U.S.C.C.A.N. 5787 .................... 12

## INTEREST OF AMICI CURIAE

Amici curiae are the following members of the U.S. Senate[1]:

**Senator Richard Joseph Durbin**, the Ranking Member of the Senate Judiciary Committee and the senior United States senator from Illinois, a seat he has held since 1997.

**Senator Sheldon Whitehouse**, the Ranking Member of the Senate Judiciary Committee Subcommittee on Federal Courts, Oversight, Agency Action, and Federal Rights and the junior United States senator from Rhode Island, a seat he has held since 2007.

**Senator Josh Hawley**, the Chairman of the Senate Judiciary Subcommittee on Crime and Counterterrorism and the senior United States senator from Missouri, a seat he has held since 2019.

Amici possess deep experience with the nation's bankruptcy laws. They hold leadership positions on, and are members of, the Senate committee and subcommittee with legislative jurisdiction over the Bankruptcy Code. And while they represent different states and are members of different political parties, amici share a grave concern regarding the manipulation and misuse of the bankruptcy system. They have previously filed briefs to raise similar concerns, including one in support of a prior petition in this case, and one cited by Judge King in an earlier dissent. *See* Brief of Members of Congress as Amici Curiae Supporting Petitioner, *Official Comm. of*

---

[1] No counsel for a party authored this brief in whole or in part, and no person or entity, other than amici or their counsel, made any monetary contribution to its preparation or submission. Both parties received timely notice of intent to file this brief.

*Asbestos Claimants v. Bestwall LLC*, No. 23-675 (U.S. Jan. 22, 2024); *In re Bestwall LLC*, 71 F.4th 168, 195 (King, J., dissenting) (4th Cir. 2023) (citing Brief of Senator Richard Durbin, et al. as Amici Curiae Supporting Appellees, *In re Aearo Techs., LLC*, No. 22-2606 (7th Cir. Feb. 1, 2023)).[2]

Amici are troubled by the increasing prevalence of bankruptcy abuse by wealthy corporations with no financial distress. In recent years, multiple profitable corporations have leveraged Chapter 11's protections to immunize themselves from liability while denying thousands of injured claimants—including amici's constituents—their day in court. If maintained, the decision below would validate this manipulation of the bankruptcy system and encourage other corporations to follow suit. Fully solvent corporations that lack any semblance of financial distress should not be given the green light to use bankruptcy to sidestep litigation. Congress certainly did not intend to authorize such maneuvers when it created the Bankruptcy Code.

**INTRODUCTION AND
SUMMARY OF ARGUMENT**

The question presented by this case is whether an entity with a conceded ability to pay all of its debts can invoke the Bankruptcy Code to circumvent state tort law. In answering "yes" to that question, the Fourth Circuit reached a decision that gives profitable companies a virtually failproof roadmap to isolate their asbestos liabilities in the bankruptcy system and delay justice for thousands of plaintiffs.

---

[2] Unless otherwise specified, all internal quotation marks, citations, and alterations are omitted from quotations throughout.

Amici are members of Congress who write to urge the Court to reject this long-running attempt at bankruptcy abuse. Congress established our bankruptcy system to give the "honest but unfortunate debtor" a "fresh start," *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 367 (2007), as the "last resort" for those with no other option. H.R. Rep. No. 109-31, pt. 1, at 4 (2005), *as reprinted in* 2005 U.S.C.C.A.N. 88, 90. Yet in recent years, corporations have sought to extend bankruptcy's reach to contexts progressively further afield from the Bankruptcy Code's text and purpose—not to obtain badly needed financial relief, but to exploit the bankruptcy system to evade litigation from tort victims.

Through dubious readings of the Code, financially healthy corporations have invented elaborate loopholes in an attempt to secure the debt-discharging benefits of bankruptcy without subjecting themselves to its creditor-protecting burdens. These maneuvers were expressly designed to consolidate, delay, or prevent lawsuits brought against the companies by individuals who allege that they suffered serious harm. Even when unsuccessful, these misuses of the Code allow corporations to continue business as usual, while victims are denied the chance to seek relief.

The poster child for this tactic is the so-called "Texas Two-Step." Through this maneuver, a corporation transfers its tort liability to a shell company created for the sole purpose of discharging that liability in bankruptcy. The shell company—which often receives a funding commitment from its asset-rich "parent"—then moves to a favorable jurisdiction and files for bankruptcy. In the process, it obtains an automatic stay that halts all litigation against not only the bankrupt shell company, but also its non-bankrupt parent and affiliates.

In most circuits, that transparent attempt to manipulate Chapter 11 would be dismissed for lack of good faith under 11 U.S.C. § 1112(b). Because the shell company is not in financial distress, those circuits recognize, its petition "cannot serve the rehabilitative purpose for which Chapter 11 was designed." *In re LTL Mgmt., LLC*, 64 F.4th 84, 101 (3d Cir. 2023). But the Fourth Circuit applies a different test: It dismisses a bankruptcy petition for lack of good faith only if it is both objectively futile *and* filed in subjective bad faith. *See Carolin Corp. v. Miller*, 886 F.2d 693, 700–01 (4th Cir. 1989). Because the shell company has a funding agreement—and can pay its current and future debts— its reorganization effort will not be objectively futile. So, in the Fourth Circuit, its subjective bad faith is ignored.

Congress provided no mechanism in the Code for entities with a conceded ability to timely and fully pay all debts to leverage bankruptcy's extraordinary powers against their creditors. But the existence of even one jurisdiction with a test like the Fourth Circuit's means that every perpetrator of bankruptcy abuse will seek refuge there. Indeed, it is "not by coincidence" that "debtors formed by divisional mergers and bearing substantial asbestos liability seem to prefer filing in the Fourth Circuit." *LTL*, 64 F.4th at 98 n.8.

In this case, Bestwall's successful attempt to enjoin hundreds of thousands of legal claims against Georgia-Pacific exemplifies both the benefit of the Texas Two-Step to tortfeasors and the cost of the maneuver to the American people—and to the integrity of the bankruptcy system itself. Through its unprincipled, atextual interpretation of the Code, Bestwall has created a legal stratagem that radically expands bankruptcy's protections and makes a mockery of congressional intent.

The bankruptcy system was not designed to provide wealthy non-debtors with the option to simply decline to be held liable for alleged wrongdoing, but that is precisely what the Fourth Circuit's decision allows. That was not what Congress intended, and it is not a result that this Court should permit.

## STATEMENT

In recent years, a growing number of wealthy corporations have exploited the Bankruptcy Code to exempt themselves from mass-tort litigation. The maneuver at issue here is the "Texas Two-Step." In pursuing this maneuver, a corporation facing liability attempts to limit its exposure (and evade adverse jury verdicts) by reincorporating in Texas, Delaware, or another state with a similar divisive merger statute, dividing itself in two, and offloading its liability onto a newly formed shell company. *See* Michael A. Francus, *Texas Two-Stepping Out of Bankruptcy*, 120 Mich. L. Rev. Online 38, 40 (2022). That shell company—which often receives a funding commitment from its asset-rich "parent"—then moves to a favorable jurisdiction and files for bankruptcy, receiving an automatic stay for both itself and its non-bankrupt parent that promptly stops all pending litigation. *Id.* at 41. Once the automatic stay issues, the entire corporate enterprise stands to benefit from the bankruptcy court's protections, shielding valuable assets from victims' reach while allowing the parent company to continue business as usual. *See id.*

Under the auspices of the Code, highly profitable corporations have used the Texas Two-Step to obtain sweeping preliminary injunctions without ever filing for bankruptcy themselves. These injunctions have barred personal-injury claimants like amici's constituents—including critically ill and terminal cancer patients—from

pursuing state-law remedies against the entities that caused their injuries. In other words, through systematic abuse of bankruptcy laws, these companies have successfully "shield[ed] themselves from liability for corporate misconduct." Press Release, *Whitehouse, Hawley, Sykes, Gooden Introduce Bipartisan Legislation to Deter 'Texas Two-Step' Bankruptcy Trick* (July 23, 2024), https://perma.cc/NUK8-C7JS (statement of Sen. Hawley). And they have denied hundreds of thousands of Americans an opportunity to seek restitution in a court of law.

Georgia-Pacific pioneered the scheme after it faced thousands of personal-injury lawsuits stemming from asbestos poisoning. In 2017, the company "moved" to Texas for less than five hours and promptly divided itself into two new entities: New GP was entrusted with the old Georgia-Pacific's profitable assets and business operations, while Bestwall was shouldered with virtually all its asbestos liabilities. *See* App. 5a, 128a. Three months later, Bestwall filed for bankruptcy, receiving a preliminary injunction that protected the entire Georgia-Pacific enterprise from asbestos litigation—and barred all current and future asbestos plaintiffs from litigating against New GP and its affiliates. *See* App. 5a–6a.

Despite its bankruptcy petition, Bestwall is far from a debtor in distress. Bestwall exists solely to carry forward the asbestos-related liabilities of Georgia-Pacific, which it concedes it is fully able to pay as a result of its so-called "funding agreement" with New GP. *See* App. 92a. That agreement is backed by New GP's billions of dollars in assets, and it guarantees that Bestwall is able to fully satisfy its asbestos-related financial obligations. *See* App. 128a–129a. Since its bankruptcy filing, however, Bestwall has paid zero dollars to its approximately 56,000 current

asbestos claimants, a number that rises with every passing day as more and more victims are diagnosed with cancer. *See* App. 29a. Except for Bestwall's creditors—that is, the ordinary Americans who are Georgia-Pacific's tort victims—all of Georgia-Pacific's other creditors have continued to be paid in the ordinary course.[3]

Georgia-Pacific is far from alone in pursuing the Texas Two-Step: CertainTeed replicated the move in 2019, Trane Technologies followed suit in 2020, and Johnson & Johnson attempted it (twice) in 2021 and 2023. *See* Francus, *Texas Two-Stepping Out of Bankruptcy*, 120 Mich. L. Rev. Online at 41–42; Michael A. Francus, *Designing Designer Bankruptcy*, 102 Tex. L. Rev. 1205, 1230 n.150 (2024). In each case, the new, liability-laden shell declared bankruptcy, enjoining all pending tort claims despite its expressly guaranteed access to the coffers of its non-bankrupt, asset-rich corporate affiliates.

The Texas Two-Step has thus severely undermined and distorted a system designed to help "struggling businesses as a last resort." Letter from Senators Richard J. Durbin, Elizabeth Warren, and Richard Blumenthal and Representatives Carolyn B. Maloney and Raja Krishnamoorthi, to Joaquin Duato, Vice-Chairman of the Executive Committee, Johnson & Johnson at 1 (Dec. 17, 2021), https://perma.cc/XYF2-4QUC. It allows corporations "to avoid legal accountability for their own wrongdoing," and "to dodge

---

[3] *See, e.g.*, Samir D. Parikh, *Mass Exploitation*, 170 U. Pa. L. Rev. Online 53, 69 (2022) (arguing that "divisive mergers that involve funding agreements that push insolvency risk onto victims should be viewed as fraudulent transfers because the financial backstop—[the non-bankrupt parent's] assets—could very well prove to be a mirage").

their legal obligations to victims." 168 Cong. Rec. S683 (daily ed. Feb. 15, 2022) (statement of Sen. Durbin).

## ARGUMENT

The Fourth Circuit insisted that its decision did not "address the merits of whether solvent debtors may seek bankruptcy protection." App. 16a. Yet by refusing to revisit the bankruptcy court's statutory good-faith ruling, it effectively held that any bankruptcy petition is filed in good faith so long as the debtor is able to pay all current and future liabilities. *See id.* In other words, the Fourth Circuit all but gave any wealthy tort defendant an unassailable, step-by-step plan to leverage bankruptcy to isolate its asbestos liabilities in its jurisdiction—and thereby gain a strategic advantage over its creditors and victims. Congress didn't authorize such a result when it enacted the Code, and this Court shouldn't permit it.

## I. Congress has never given wealthy corporations access to bankruptcy's protections without a showing of financial distress.

In enacting the modern Bankruptcy Code and the early bankruptcy laws that preceded it, Congress intended to "afford[] relief *only* to an honest but unfortunate debtor." *Cohen v. de la Cruz*, 523 U.S. 213, 217 (1998) (emphasis added). The Bankruptcy Act of 1800, the first bankruptcy law passed after the Constitution's ratification, was designed primarily to benefit creditors, and it provided no protection to debtors able to meet their obligations. *See Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 373–74 (2006).

A few decades later, in the Bankruptcy Act of 1841, Congress "conferr[ed] upon the debtor the right by voluntary petition to surrender his property, with some exceptions, and relieve himself of all future liability in

respect of past debts." *Cont'l Ill. Nat. Bank & Tr. Co. of Chicago v. Chicago, R.I. & P. Ry. Co.*, 294 U.S. 648, 670 (1935).

With basic exemptions for essential items—up to a maximum of $300—the debtor had to "surrender all his property" (except that made exempt) to receive a discharge of his debts. Charles Jordan Tabb, *The History of the Bankruptcy Laws in the United States*, 3 Am. Bankr. Inst. L. Rev. 5, 17 & n.98 (1995) (citing Bankruptcy Act of 1841, ch. 9, §§ 3–4, 5 Stat. 440, 443, *repealed by*, Act of Mar. 3, 1843, ch. 82, 5 Stat. 614).

After the financial crisis caused by the Civil War, "overwhelming pressure for another federal bankruptcy law" led Congress to enact the Bankruptcy Act of 1867. *Id.* at 19. That statute made bankruptcy available to all debtors, regardless of creditor approval, and introduced bankruptcy proceedings for corporations. *See* Joseph E. Simmons, *Reconstructing the Bankruptcy Power: An Originalist Approach*, 131 Yale L.J. 306, 337 (2021). Despite its considerable expansion of the bankruptcy system, the 1867 Act retained an explicit insolvency requirement for all proceedings. *See* Thomas E. Plank, *The Constitutional Limits of Bankruptcy*, 63 Tenn. L. Rev. 487, 546 (1996) (citing Act of Mar. 2, 1867, ch. 176, § 11 (voluntary), § 39 (involuntary), 14 Stat. 517, 521, 536 (repealed 1878)).

In the Bankruptcy Act of 1898, which ushered in the modern system of bankruptcy legislation, Congress extended the availability of voluntary proceedings and limited the grounds for denying discharge. *See* Tabb, *The History of the Bankruptcy Laws in the United States*, 3 Am. Bankr. Inst. L. Rev. at 23–24. It also "gave the trustee important powers to avoid … fraudulent transfers"—or transfers made with "actual intent to

hinder, delay, or defraud any creditor of the debtor." *Id.* at 26 (citing Bankruptcy Act of 1898, ch. 541, § 67e, 30 Stat. 544, 564, *amended by*, Act of June 22, 1938 (Chandler Act), ch. 575, 52 Stat. 840, *repealed by*, Bankruptcy Reform Act of 1978, Pub. L. No. 95-598, 92 Stat. 2549); Francus, *Texas Two-Stepping Out of Bankruptcy*, 120 Mich. L. Rev. Online at 43. But bankruptcy's purpose remained consistent with its historical origins. It was designed, as this Court explained, "to relieve the honest debtor from the weight of oppressive indebtedness," and to "permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes." *Williams v. U.S. Fid. & Guar. Co.*, 236 U.S. 549, 554–55 (1915).

So even as Congress expanded the categories of persons and entities to whom relief was made available over time, it didn't change the longstanding requirement that debtors be actually "bankrupt." *See, e.g.*, *Wright v. Union Cent. Life Ins. Co.*, 304 U.S. 502, 513–14 (1938) ("The subject of bankruptcies is nothing less than the subject of the relations between an insolvent or nonpaying or fraudulent debtor, and his creditors, extending to his and their relief."). Across its iterations of the early bankruptcy laws, "Congress designed Chapter 11 to give those businesses teetering on the verge of a fatal financial plummet an opportunity to reorganize on solid ground and try again, not to give profitable enterprises an opportunity to evade contractual or other liability." *LTL*, 64 F.4th at 103 (quoting *In re Cedar Shore Resort, Inc.*, 235 F.3d 375, 381 (8th Cir. 2000)).

## II. The good-faith requirement preserves Congress's intent to limit bankruptcy to those who are actually "bankrupt."

**A.** In the modern Bankruptcy Code, Congress has continued to allow courts presented with extreme examples of bankruptcy abuse by asset-rich debtors to dismiss petitions on the grounds that the bankruptcy filing was not filed in "good faith." *See In re Little Creek Dev. Co.*, 779 F.2d 1068, 1071 (5th Cir. 1986); *accord In re Victory Const. Co., Inc.*, 9 B.R. 549, 551–60 (Bankr. C.D. Cal. 1981) (tracing the historical origins of the good-faith requirement), *vacated on other grounds*, 37 B.R. 222 (B.A.P. 9th Cir. 1984). "Every bankruptcy statute since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith for the commencement, prosecution, and confirmation of bankruptcy proceedings." *Id.*; *see also* 7 Collier on Bankruptcy ¶ 1112.07 (16th ed. 2022) ("[T]he requirement of good faith has been held to be an implicit condition to the filing and maintenance of a bankruptcy case for over a century.").

The modern statutory basis that allows bankruptcy courts to dismiss petitions for lack of good faith is 11 U.S.C. § 1112(b). Because "good faith necessarily requires some degree of financial distress on the part of a debtor," *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 121 (3d Cir. 2004), requiring it "prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way." *In re SGL Carbon Corp.*, 200 F.3d 154, 161–62 (3d Cir. 1999). In this way, the good-faith standard ensures that courts can "use [their] equitable powers to reach an appropriate result in individual cases." H.R. Rep. No. 95-595, at 405–06 (1977), *as reprinted in* 1978 U.S.C.C.A.N.

5963, 6362; *see* S. Rep. No. 95-989, at 117 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5903 (same).

**B.** Congress did not displace the good-faith requirement when it enacted Section 524(g). That provision—which was codified in response to the Johns-Manville bankruptcy—authorizes the discharge of asbestos claims against third parties only in tightly prescribed circumstances. *See* Francus, *Designing Designer Bankruptcy*, 102 Tex. L. Rev. at 1208.

In the 1980s, the Manville corporation, once the "the world's largest asbestos manufacturer," filed for bankruptcy to manage a "deluge of lawsuits," "with estimated liabilities running into the billions." *Id.* As part of this filing, it split into two, creating a Trust and a successor corporation. "The Trust operated for the benefit of tort victims and housed all tort liability (via an injunction channeling all tort claims to the Trust) along with assets to compensate those tort victims." *Id.* "And the successor corporation continued carrying on Manville's business operations, free of tort litigation and tort liability." *Id.* Congress viewed the Manville bankruptcy as a "good model for managing asbestos mass torts, which, at the time, clogged the federal courts." *Id.* So it codified the model in Section 524(g), establishing an "asbestos trust/injunction mechanism … for use by any asbestos company facing a similarly overwhelming liability." H.R. Rep. No. 103-835, at 41 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 3340, 3350.

Section 524(g), as that legislative history makes clear, is "a consequential benefit of an otherwise good faith filing," not a "valid justification for a Chapter 11 filing." *Integrated Telecom*, 384 F.3d at 128; *see In re Combustion Eng'g, Inc.*, 391 F.3d 190, 234 & n.46 (3d Cir. 2004). Its protections "assume the existence of a valid

bankruptcy, which, in turn, assumes a debtor in financial distress." *Integrated Telecom*, 384 F.3d at 128.

The plain text of the provision confirms this understanding. For example, a debtor may invoke Section 524(g) only if "future demands" faced by the debtor outside of bankruptcy are "likely to threaten the plan's purpose." 11 U.S.C. § 524(g)(2)(B)(ii)(III). That condition can't be satisfied if the volume of claims doesn't actually endanger the debtor's viability. As another example, it would make no sense for Section 524(g) to require that the debtor fund the trust with "a majority of the voting shares" of itself, its parent, and/or its subsidiaries unless those entities were genuinely distressed. *Id.* § 524(g)(2)(B)(i)(III).

In enacting Section 524(g), Congress thus did not alter or otherwise "eviscerate any limitation that the good faith requirement places on Chapter 11 filings." *Integrated Telecom*, 384 F.3d at 128. Without sufficient financial distress, a debtor's "desire to take advantage of the protections of the Code," including Section 524(g), "cannot establish good faith." *In re 15375 Mem'l Corp. v. Bepco, L.P.*, 589 F.3d 605, 620 (3d Cir. 2009). Otherwise, anyone who wanted to discharge a debt would have a valid reason to file.

**C.** As this Court held in *Shapiro v. Wilgus*, 287 U.S. 348 (1932)—the earliest case discussing the standard in the bankruptcy context—the good-faith requirement ensures that wealthy debtors do not abuse the Code as "part and parcel of a scheme whereby the form of a judicial remedy was to supply a protective cover for a fraudulent design." *Id.* at 355. In that case, a Pennsylvanian was "unable to pay his debts as they matured" but "believed that he would be able to pay them in full" if given more time. *Id.* at 352. Because

Pennsylvania law didn't permit the appointment of a receiver, he formed a Delaware corporation and, on the same day, conveyed all his property to the new company for a promise to pay his debts. *See id.* Three days later, a federal court put the company in receivership and enjoined claims by its creditors. *See id.* at 352–53.

This Court found the debtor's scheme plainly incompatible with equitable principles of good faith. *See id.* at 357. The "aim of this receivership," Justice Cardozo explained for the Court, was "not to administer the assets of a corporation legitimately conceived for a normal business purpose," but to put the debt "in such a form and place that levies would be averted"—"a purpose which has been condemned in Anglo-American law since the Statute of Elizabeth." *Id.* at 354–55. It didn't matter that the debtor intended only to delay creditors long enough to pay them in full, or that he "acted in the genuine belief" that the plan was "fair and lawful." *Id.* at 357. The receivership was "part and parcel of a scheme" in which the "judicial remedy was to supply a protective cover for a fraudulent design." *Id.* at 355. It therefore lacked the "scrupulous good faith" that equity requires, and the creditors' claims could proceed notwithstanding the injunction. *Id.* at 357.

The good-faith requirement, in this way, safeguards the core purpose of the bankruptcy system. It "prevents abuse of the bankruptcy process," and it "protects the jurisdictional integrity of the bankruptcy courts by rendering their powerful equitable weapons … available only to those debtors and creditors with 'clean hands.'" *Little Creek*, 779 F.2d at 1072; *see* Diane B. McColl, *Good Faith in Chapter Eleven Reorganizations*, 35 S.C. L. Rev. 333, 336 (1984).

But in the Fourth Circuit—and the Fourth Circuit alone—debtors like Bestwall can establish their good faith by pointing to a funding commitment from their wealthy, non-bankrupt "parent," thus establishing that reorganization will *not* be objectively futile, and thereby avoiding any further scrutiny. *Carolin*, 886 F.2d at 700-01. The more assets a debtor can access, then, the more easily it can demonstrate its "good faith" to secure bankruptcy's protections. That absurd outcome doesn't just defy common sense. It also undermines Congress's "simple bargain" in enacting the Code—that a "debtor can win a discharge of its debts" only if it "proceeds with honesty and places virtually *all* its assets on the table for its creditors." *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 209 (2024) (emphasis added).

## III. The increasing prevalence of bankruptcy abuse by wealthy, non-distressed tortfeasors underscores the need for review.

This case is just one example of recent abuse within the bankruptcy system. Georgia-Pacific's pursuit of the Texas Two-Step maneuver inspired a wave of companies to attempt the same or similar strategies, using bankruptcy to sidestep litigation without ever declaring bankruptcy themselves. *See, e.g.*, Letter from Senators Richard J. Durbin, Elizabeth Warren, and Richard Blumenthal and Representatives Carolyn B. Maloney and Raja Krishnamoorthi, to Alex Gorsky, Chairman and CEO, Johnson & Johnson at 2 (Nov. 10, 2021), https://perma.cc/N7TC-SPKX ("Exploitation of the bankruptcy system by large companies to avoid accountability is unsurprising, but it is also unacceptable."). The practice, still new but increasingly common, even has a name: "bankruptcy grifting." Lindsey D. Simon, *Bankruptcy Grifters*, 131 Yale L.J.

1154, 1207 (2022). The label describes cases where a joint tortfeasor "latch[es] onto a bankruptcy case," receiving benefits such as "channeling injunctions and releases" without incurring any of the associated costs. *Id.*

This Court has rejected similar schemes for nearly a century. Like the Pennsylvania debtor in *Shapiro*, Georgia-Pacific created Bestwall not for a "normal business purpose," but "for the very purpose of being sued." 287 U.S. at 355. There is no dispute that New GP is "highly solvent and cash rich" and, therefore, could not have attained the injunction by filing its own petition. *Integrated Telecom*, 384 F.3d at 124. Nor is there any dispute that Bestwall could pay all current and anticipated talc claims in full under its funding agreement with New GP.

As in *Shapiro*, in other words, Bestwall's creation and bankruptcy are "parts of a single scheme to hinder and delay creditors in their lawful suits," a purpose long "condemned in Anglo-American law." 287 U.S. at 353–54. For eight years and counting, the sweeping injunction has shielded Georgia-Pacific's profitable operations and assets from asbestos claimants. And for critically ill and dying cancer patients, this delay is devastating. As amici have stated, it deprives them of "their day in court," 168 Cong. Rec. S683, and provides inspiration for other deep-pocketed tortfeasors to escape liability by doing the same.

To be sure, certain tortfeasors have "faced enormous potential liabilities and defense costs." *Ortiz v. Fireboard Corp.*, 527 U.S. 815, 829 (1999). But the extraordinary nature of these cases—in which lucrative enterprises face staggering liability only because they harmed thousands in the first place—does not justify dismissing the forum Congress provided to resolve mass claims: multi-district litigation. 28 U.S.C. § 1407. If there is to be "innovation in

the management of mass tort litigation," that "reform must come from the policy-makers, not the courts." *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 634 (3d Cir. 1996). While "the Bankruptcy Code presents an inviting safe harbor for such companies," its "lure creates the possibility of abuse which must be guarded against to protect the integrity of the bankruptcy system and the rights of all involved." *SGL Carbon*, 200 F.3d at 169.

In insisting that good faith can be decided *after* plan confirmation—and downplaying the grave practical implications of its rule—the Fourth Circuit effectively endorsed bankruptcy abuse in its jurisdiction as an end-run around mass-tort liability. *See* App. 16a. Other courts have already observed that debtors "seem to prefer filing in the Fourth Circuit." *LTL*, 64 F.4th at 98 n.8. Commentators have noted this forum-shopping problem as well. *See* Francus, *Designing Designer Bankruptcy*, 102 Tex. L. Rev. at 1233 (predicting that debtors like Bestwall will "continu[e] to forum shop to jurisdictions that do not impose a financial distress requirement").

If Bestwall's position becomes law—if concededly non-bankrupt corporate entities can forestall their creditors and victims through bankruptcy filings in the Fourth Circuit for years on end—those abuses are likely to become routine, making "every case that rare case." *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 470 (2017). That, then, is the logical consequence of denying certiorari in this case: Corporations facing mass-tort liability will have a well-defined playbook and a friendly forum for sidestepping lawsuits, undermining both the ability of individuals to hold companies accountable and the integrity of the bankruptcy system.

Allowing Bestwall's position to prevail here would fuel abuses that are already transforming a system of last

resort into a "corporate shell game" that allows well-heeled corporations "to evade accountability for any harm caused by [their] products" and deny "tens of thousands of people their day in court." Letter from Senators Richard J. Durbin, et al. to Alex Gorsky, at 1."That's not what Congress intended when it created bankruptcy." Evading Accountability: Hearing on Corporate Manipulation of Chapter 11 Bankruptcy Before the S. Comm. on the Judiciary, 118th Cong., at 00:24:57 (2023) (statement of Sen. Durbin), https://perma.cc/GS3B-TJ6M; *see id.* at 01:50:06 (statement of Sen. Hawley) ("We need to give more Americans the ability to get that recourse [against wealthy, corporate tortfeasors] in court."). And that is not a result that this Court should allow to continue.

## CONCLUSION

The petition for certiorari should be granted, and the decision below should be reversed.

Respectfully submitted,

DEEPAK GUPTA
   *Counsel of Record*
JONATHAN E. TAYLOR
GREGORY A. BECK
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
*deepak@guptawessler.com*

-19-

VARSHINI PARTHASARATHY
GUPTA WESSLER LLP
235 Montgomery Street
Suite 629
San Francisco, CA 94104
(415) 573-0336

March 25, 2026          *Counsel for Amici Curiae*